UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                    )
UNITED STATES OF AMERICA,           )
            PLAINTIFF,              )   CASE NO. 13CR4228-DMS
                                    )
                                    )   SAN DIEGO, CALIFORNIA
                                    )MONDAY, APRIL 13, 2015
                                    )   9:00 A.M. CALENDAR
ARASH GHAHREMAN,                    )
            DEFENDANT.              )
_____)        VOLUME I


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL/DAY ONE





INTERPRETERS:                   BADI BADIOZAMANI
                                ASLAN ASLANIAN


                                LEE ANN PENCE,
REPORTED BY:                    OFFICIAL COURT REPORTER
                                UNITED STATES COURTHOUSE
                                333 WEST BROADWAY ROOM 1393
                                SAN DIEGO, CALIFORNIA 92101

```
COUNSEL APPEARING:

FOR PLAINTIFF:          LAURA E. DUFFY,
                        UNITED STATES ATTORNEY
                        BY:  SHANE P. HARRIGAN
                             TIMOTHY D. COUGHLIN
                        ASSISTANT U.S. ATTORNEYS
                        880 FRONT STREET
                        SAN DIEGO, CALIFORNIA 92101

FOR DEFENDANT           FEDERAL DEFENDERS OF SAN DIEGO, INC.
GHAHREMAN:                   BY:  ELLIS M. JOHNSTON
                                  JOSEPH S. CAMDEN
                        TRIAL ATTORNEYS
                        225 BROADWAY, SUITE 900
                        SAN DIEGO, CALIFORNIA 92101
```

1      SAN DIEGO, CALIFORNIA – MONDAY, APRIL 13, 2015 – 9:00 A.M.

2                              *   *   *

3           **THE CLERK:**  NO. 1 ON CALENDAR, CASE NO. 13CR4228,

4   UNITED STATES OF AMERICA VERSUS ARASH GHAHREMAN; ON FOR JURY

5   TRIAL.

6           **MR. HARRIGAN:**  GOOD MORNING.  SHANE HARRIGAN AND

7   TIMOTHY COUGHLIN ON BEHALF OF THE UNITED STATES.

8           **THE COURT:**  GOOD MORNING.

9           **MR. JOHNSTON:**  TRIP JOHNSTON, FEDERAL DEFENDERS,

10  ALONG WITH JOE CAMDEN, LEE ANN HUDSON WILL ASSIST US WITH JURY

11  SELECTION, ON BEHALF OF MR. GHAHREMAN.  HE IS PRESENT.

12          **THE COURT:**  GOOD MORNING.

13          ARE THERE ANY ISSUES WE NEED TO DISCUSS AT THIS

14  TIME?

15          **MR. CAMDEN:**  YOUR HONOR, WE RECEIVED THE COPY OF THE

16  AMENDMENT -- NOT THE AMENDMENT BUT THE SHORT VERSION OF THE

17  INDICTMENT THAT THE COURT INTENDED TO READ TO THE JURY.

18          **THE COURT:**  YES.

19          **MR. CAMDEN:**  IT IS FINE EXCEPT THERE WAS ONE OF THE

20  OVERT ACTS THAT WE WONDERED IF THE COURT WOULD ALSO TAKE OUT.

21  IT WAS PAGE 22 GGG, AND ON THE NEXT PAGE HHH.

22          SO BOTH OF THOSE, JUST BECAUSE MR. GHAHREMAN IS THE

23  ONLY ONE BEING CHARGED ON THIS INDICTMENT -- SORRY -- MR.

24  GHAHREMAN IS THE ONLY ONE IN TRIAL TODAY AND BOTH OF THOSE ARE

25  OVERT ACTS ONLY NAMING YILDIZ AND TAHERKHANI.

                        APRIL 13, 2015

```
 1            THE COURT:  WHAT WOULD BE THE OBJECTION?
 2            MR. CAMDEN:  I MEAN, THE COURT HAS TAKEN OUT SEVERAL
 3     OF THE OVERT ACTS JUST TO SHORTEN THINGS UP.
 4            THE COURT:  YES.
 5            MR. CAMDEN:  OBVIOUSLY THE GOVERNMENT IS GOING TO
 6     INTRODUCE MOST OF THE OVERT ACTS THAT RELATE TO WHAT HE DID.
 7     THERE ARE PLENTY OF THOSE LISTED IN THE INDICTMENT.  THESE ARE
 8     JUST RELATED TO THE TWO -- ONE WHO HAS ALREADY PLED GUILTY AND
 9     ONE WHO IS NOT GOING TO BE BEFORE THE COURT, TAHERKHANI.
10     JUST TO SHORTEN THINGS.  JUST A SUGGESTION.
11            MR. HARRIGAN:  YOUR HONOR, I WOULD NOTE THAT
12     ACTUALLY THERE IS TYPOGRAPHICAL ERRORS IN THOSE TWO.  IT
13     SHOULD READ YILDIZ AND GHAHREMAN.  MR. TAHERKHANI WAS ALWAYS
14     IN IRAN.  I THINK THEY SHOULD STAY IN.  I WOULD ASK AN
15     AMENDMENT, AND ABSENT THAT IF DEFENDANT IS UNWILLING TO AGREE
16     TO AN AMENDMENT OF THE INDICTMENT THAT WE JUST REMOVE THEM.
17     THAT IS FINE.
18            THE COURT:  SO BOTH OF THOSE PARAGRAPHS SHOULD
19     REFERENCE MR. GHAHREMAN NOT --
20            MR. HARRIGAN:  IT SHOULD BE MR. YILDIZ AND MR.
21     GHAHREMAN.  IT IS AN OBVIOUS MISTAKE.
22            THE COURT:  ON THAT REQUEST, AS TO TRIPLE G AND
23     TRIPLE H, PAGES 22 AND 23, I WOULD DECLINE TO REDACT THEM.
24     THEY ARE JUST NEUTRAL STATEMENTS OF THE OVERT ACTS THAT ARE
25     ALLEGED, AND IT COMPLETES THE BACKGROUND FOR PURPOSES OF
```

APRIL 13, 2015

1   NOTIFYING THE JURY WHAT THE CHARGES ARE.

2       **MR. JOHNSTON:**  JUST TO BE CLEAR, YOUR HONOR.  THE

3   GOVERNMENT HAS INDICATED THAT THEY BELIEVE THAT IS A

4   TYPOGRAPHICAL ERROR, THEY DIDN'T MEAN TO SAY KOORUSH

5   TAHERKHANI RECEIVED DELIVERY OF THOSE PRODUCTS ON JUNE 17TH.

6   WE ARE NOT AGREEING TO ANY AMENDMENT OF THE INDICTMENT.  THAT

7   WOULD HAVE TO BE TAKEN BACK TO THE GRAND JURY.  SO WHAT THE

8   COURT WOULD BE TELLING THEM IS SOMETHING THE GOVERNMENT

9   DOESN'T EVEN INTEND TO PROVE, WHICH IS THAT KOORUSH TAHERKHANI

10   WAS PRESENT IN SAN DIEGO WHEN THESE ITEMS WERE ULTIMATELY

11   SHIPPED OUT AND DELIVERED.  SO I THINK IT IS A SLIGHTLY

12   DIFFERENT PROBLEM FOR THE GOVERNMENT.

13       AND WE ARE NOT AGREEING TO ANY AMENDMENTS AT THIS

14   POINT TO AN INDICTMENT.  IF THE GRAND JURY WANTS TO PASS ON A

15   NEW INDICTMENT, THAT IS THE GOVERNMENT'S CALL.  WE ARE

16   CERTAINLY NOT AGREEING TO THEM.

17       JUST ONE FINAL THING, JUST TO BE CLEAR.  MR. CAMDEN

18   SAID THAT THE REDACTIONS ARE FINE.  WE APPRECIATE THE COURT'S

19   EFFORTS BUT WE DO MAINTAIN THE COURT SHOULD NOT READ THE

20   INDICTMENT TO THE JURY IN THIS CASE WITHOUT THE PREVIOUS

21   REDACTIONS.

22       **THE COURT:**  ALL RIGHT.

23       **MR. HARRIGAN:**  I WOULD SUGGEST A COMPROMISE, WHICH

24   IS JUST LET'S REMOVE MR. TAHERKHANI'S NAME FROM THAT.  I AGREE

25   THAT IS NOT GOING TO BE PROVEN THAT MR. TAHERKHANI ACCEPTED

APRIL 13, 2015

1    DELIVERY IN SAN DIEGO.  THAT WOULD HAVE BEEN A PHYSICAL

2    IMPOSSIBILITY BECAUSE THE EVIDENCE WILL SHOW HE WAS IN IRAN AT

3    THE TIME.

4         **THE COURT:**  SO THE PROPOSAL IS SIMPLY TO REFERENCE

5    MR. YILDIZ?

6         **MR. HARRIGAN:**  THAT IS FINE, YOUR HONOR.

7         **THE COURT:**  MR. JOHNSTON.

8         **MR. JOHNSTON:**  YOUR HONOR, WE WILL ACCEPT THAT.  WE

9    CERTAINLY ARE STILL ASKING THE COURT TO STRIKE THOSE TWO

10   PARAGRAPHS FOR THE OTHER REASONS STATED BY MR. CAMDEN.

11        **THE COURT:**  ALL RIGHT.  OKAY.

12        SO AS TO THOSE TWO PARAGRAPHS, I WOULD REDACT THE

13   REFERENCE TO TAHERKHANI AND NOT REFERENCE MR. GHAHREMAN; IT

14   WOULD SIMPLY REFERENCE YILDIZ.

15        I WOULD OVERRULE THE OBJECTION AS TO READING THE

16   INDICTMENT.  THIS INDICTMENT IS JUST THAT, IT IS A REFERENCE

17   TO THE ALLEGATIONS OF THE GOVERNMENT'S CHARGES.  ALL OF THE

18   POTENTIALLY INFLAMMATORY STATEMENTS HAVE BEEN REDACTED THAT

19   WOULD CAUSE UNDUE OR UNFAIR PREJUDICE, POTENTIALLY.  AND IT

20   HAS BEEN SIGNIFICANTLY SHORTENED, THOUGH IT WILL STILL TAKE

21   SOME TIME TO READ.

22        ARE THERE ANY OTHER HOUSEKEEPING MATTERS?

23        **MR. HARRIGAN:**  NOT AT THIS POINT, YOUR HONOR.  I

24   JUST HAVE A QUESTION.

25        AS TO THE JURY LIST, IS THIS THE ORDER THEY WILL BE

APRIL 13, 2015

```
 1   SEATED IN THE BOX?
 2            THE COURT:  YES.  SO THEY WILL BE SEATED -- YES.  WE
 3   DO SEAT NO. 1 ON THE TOP FAR LEFT.
 4            THE CLERK:  CORRECT.
 5            THE COURT:  SO 1 THROUGH 8 AT THE TOP, 9 THROUGH 16
 6   ON THE BOTTOM ROW, 17 THROUGH 24 BEHIND MR. JOHNSTON, AND THEN
 7   25 TO 32 BEHIND GOVERNMENT COUNSEL.
 8            I JUST NOTICED, THE FIRST PROSPECTIVE JUROR, IS THAT
 9   MR. BESTE FROM YOUR OFFICE?
10            MR. HARRIGAN:  IT APPEARS TO BE, YOUR HONOR.
11            THE COURT:  ERIC JOHN BESTE, IS THAT ONE AND THE
12   SAME?
13            MR. HARRIGAN:  I BELIEVE -- I DON'T KNOW ERIC'S
14   MIDDLE NAME, BUT I BELIEVE IT IS.
15            MR. JOHNSTON:  IF I WAS A BETTING MAN, YOUR HONOR, I
16   WOULD SAY IT IS.
17            THE COURT:  IF SO, CAN WE SIMPLY STIPULATE AT THIS
18   TIME THAT HE WOULD --
19            MR. HARRIGAN:  ABSOLUTELY.
20            THE COURT:  HE WOULD APPEAR BUT WE WON'T CALL HIM,
21   SO WE WILL START WITH NO. 2.
22            THE CLERK:  DO YOU WANT TO REPLACE 33 IN HIS SPOT?
23            THE COURT:  33 IN HIS SPOT.
24            MR. HARRIGAN:  WE WON'T SEAT HIM IN THE NO. 1 SEAT.
25            THE COURT:  YES.  WE WILL PUT NO. 33 --
```

APRIL 13, 2015

1          **MR. HARRIGAN:**  33.

2          **THE COURT:**  (NAME REDACTED) IN HIS SPOT.

3          **MR. JOHNSTON:**  YOUR HONOR, I DON'T HAVE A PROBLEM

4   WITH NOT SEATING MR. BESTE.  I KNOW I WAS CALLED IN THIS COURT

5   ONCE BEFORE AND BARELY GOT TO SIT DOWN BEFORE I WAS ASKED TO

6   LEAVE, BUT I THINK IT IS APPROPRIATE TO HAVE HIM COME IN.

7          **THE COURT:**  YES.  BUT THERE IS NO OBJECTION, IF IT

8   IS MR. BESTE -- HE IS AN AUSA -- TO NOT CALLING HIM, WE WILL

9   SIMPLY START WITH (NAME REDACTED) AS PROSPECTIVE JUROR NO. 1?

10         **MR. JOHNSTON:**  I THINK THAT IS FINE, YOUR HONOR.

11         **THE COURT:**  ARE THERE ANY OTHER -- THERE WAS THE

12  ISSUE WITH RESPECT TO THE ADMONITION TO GIVE TO THE JURORS

13  REGARDING AGENT COLE'S STATEMENTS THAT Y-690 TRIODE TUBES ARE

14  CLASSIFIED AS MUNITIONS AND REQUIRE AN EXPORT LICENSE NO

15  MATTER WHERE SENT.  DID THE PARTIES REACH AN AGREEMENT ON THAT

16  ISSUE?

17         **MR. CAMDEN:**  WE WERE FOCUSING ON OTHER THINGS.  I

18  HAVEN'T SPOKEN WITH OPPOSING COUNSEL ABOUT THAT.  MY

19  UNDERSTANDING IS THAT THERE IS NOT GOING TO BE AN AGREEMENT ON

20  THAT.  I WILL LET THE GOVERNMENT GIVE ITS POSITION.

21         **THE COURT:**  SOME INSTRUCTION, THEN, WOULD HAVE TO BE

22  GIVEN BEFORE AGENT COLE TESTIFIES.  IS THAT WHEN THE DEFENSE

23  REQUEST IT BE GIVEN?

24         **MR. CAMDEN:**  I THINK IT NEEDS TO BE GIVEN BEFORE ANY

25  WITNESS WOULD TESTIFY ABOUT THE CLASSIFICATION OF THE Y-690 AS

APRIL 13, 2015

```
 1   A MUNITION.

 2           THE COURT:  IS THAT GOING TO HAPPEN TODAY, THERE

 3   WILL BE A WITNESS ON THAT ISSUE?

 4           MR. COUGHLIN:  THERE WON'T BE A WITNESS WITH REGARD

 5   TO CLASSIFICATION.  I WON'T MAKE ANY MENTION IN THE OPENING.

 6   I DON'T BELIEVE -- TOMORROW IS ACTUALLY THE FIRST TIME SOMEONE

 7   MIGHT BE HERE.  I THINK WE HAVE THREE WITNESSES ARRANGED FOR

 8   TODAY, AND WE HAVE ONE FOR TOMORROW, TOM COX, WHO COULD

 9   POTENTIALLY HAVE A COMMENT.

10           THE COURT:  OKAY.  I DO HAVE A PROPOSAL, BUT WE CAN

11   ADDRESS THAT AT 4:30 OR SOME TIME LATER TODAY.

12           THE DEFENSE, AT DEFENSE TABLE, WILL HAVE MS. HUDSON

13   PRESENT SO I WILL INTRODUCE HER TO THE JURY.

14           HOW ABOUT FOR THE GOVERNMENT, WILL THERE BE ANY CASE

15   AGENTS?

16           MR. HARRIGAN:  YES, YOUR HONOR.  OUR CASE AGENT IS

17   KEVIN HAMAKO, H-A-M-A-K-O.  HE IS WITH HOMELAND SECURITY

18   INVESTIGATIONS.

19           THE COURT:  YES.

20           GOOD MORNING.

21           MR. HARRIGAN:  WE HAVE TWO PARALEGALS WHO WILL

22   PROBABLY BE ALTERNATING ASSISTING US RUNNING THE SANCTION

23   PROGRAM.  THOSE ARE JACOB GONZALEZ AND GIAN MILAN.

24           THE COURT:  THANK YOU.  OKAY.

25           ARE THERE ANY OTHER MATTERS?
```

APRIL 13, 2015

```
 1          WE DO HAVE THE JURY ON ITS WAY, SO ABSENT ANY OTHER

 2   HOUSEKEEPING ISSUES WE WILL TAKE A BRIEF RECESS, AND WHEN THE

 3   JURY ARRIVES WE WILL GET STARTED RIGHT AWAY WITH JURY

 4   SELECTION.

 5          MR. GHAHREMAN WILL BE ASSISTED WITH A FARSI

 6   INTERPRETER THROUGHOUT THE TRIAL; IS THAT CORRECT?

 7          MR. JOHNSTON:  YES, YOUR HONOR.  HONESTLY, I DON'T

 8   KNOW HOW IT WILL GO.  HE HAS BEEN USING AN INTERPRETER IN

 9   COURT.  HE CERTAINLY UNDERSTANDS AND SPEAKS SOME ENGLISH; THIS

10   IS HIS PREFERRED LANGUAGE.  I DON'T KNOW IF THERE WILL COME A

11   TIME IN COURT WHERE IT IS TOO CONFUSING FOR HIM TO BE

12   LISTENING TO THE ENGLISH AND LISTENING TO THE INTERPRETER.  WE

13   WILL SEE HOW IT GOES, BUT WE ARE GOING TO START OUT THIS WAY.

14          THE COURT:  ALL RIGHT.

15          MR. CAMDEN:  YOUR HONOR, I JUST SPOKE WITH HIM AND

16   THE INTERPRETERS.  HE HAD REQUESTED CONSECUTIVE INTERPRETATION

17   BUT I UNDERSTAND THAT IS GOING TO BE IMPOSSIBLE FOR EVERYBODY

18   TO PAUSE AFTER THEY SPEAK TO WAIT FOR THE INTERPRETER.  WE

19   EXPLAINED THAT TO HIM.

20          THE COURT:  YES.

21          MR. CAMDEN:  BUT HE DOES UNDERSTAND ENGLISH.

22          THE COURT:  ALL RIGHT.  THANK YOU.

23          MR. JOHNSTON:  YOUR HONOR, I WAS JUST REMINDED OF

24   ONE SMALL THING.  I SPOKE WITH MR. HARRIGAN BEFORE COURT ABOUT

25   HIS OTHER WITNESSES AND THEM BEING SEQUESTERED.  AGENT HAMAKO
```

APRIL 13, 2015

```
1   WILL BE PRESENT DURING THE TRIAL AS A CASE AGENT.  I DON'T
2   HAVE A PROBLEM WITH THAT AS LONG AS ALL OTHER WITNESSES ARE
3   SEQUESTERED UNTIL THEY TESTIFY.
4            THE COURT:  DO YOU AGREE?
5            MR. HARRIGAN:  I AGREE, YOUR HONOR.  AND I WOULD
6   MAKE THE SAME REQUEST.
7            THE COURT:  YES.  SO ANY MOTION TO EXCLUDE WITNESSES
8   WOULD BE GRANTED AS TO EACH SIDE, WITH THE EXCEPTION OF AGENT
9   HAMAKO WHO IS THE CASE AGENT AS WELL.
10           MR. JOHNSTON.
11           MR. JOHNSTON:  I DO HAVE MY INVESTIGATOR, LUCIANO
12  SILVA, WHO WILL BE IN AND OUT ASSISTING ME IN THIS CASE, AND
13  MAY WELL BE A WITNESS TESTIFYING.  I WOULD JUST ASK FOR THE
14  SAME ACCOMMODATION FOR HIM TO BE WITH US.
15           MR. HARRIGAN:  NO OBJECTION, YOUR HONOR.
16           MR. JOHNSTON:  THANK YOU.
17           THE COURT:  OKAY.  WE WILL WAIT FOR THE JURY.  THEY
18  SHOULD BE COMING UP ANY MINUTE.
19           (RECESS)
20           (WHEREUPON THE JURY PANEL WAS CALLED, SEATED AND
21            SWORN.  THE PROCEEDINGS CONTINUED AS FOLLOWS)
22           THE CLERK:  NO. 1 ON CALENDAR, CASE NO. 13CR4228,
23  UNITED STATES OF AMERICA VERSUS ARASH GHAHREMAN; ON FOR JURY
24  TRIAL.
25           MR. HARRIGAN:  GOOD MORNING, YOUR HONOR.  ASSISTANT
```

APRIL 13, 2015

```
1    U.S. ATTORNEY SHANE HARRIGAN AND TIMOTHY COUGHLIN ON BEHALF OF
2    THE UNITED STATES.
3            THE COURT:  THANK YOU.  GOOD MORNING.
4            MR. JOHNSTON:  GOOD MORNING, YOUR HONOR.  TRIP
5    JOHNSTON OF FEDERAL DEFENDERS, ALONG WITH JOSEPH CAMDEN OF MY
6    OFFICE, ON BEHALF OF MR. GHAHREMAN.  WE ARE ASSISTED BY LEEANN
7    HUDSON.
8            THE COURT:  THANK YOU.  GOOD MORNING.
9            GOOD MORNING, LADIES AND GENTLEMEN.  WELCOME TO ALL.
10   YOU ARE IN COURTROOM 13-A.  I AM JUDGE DANA SABRAW.  IT IS MY
11   PLEASURE TO GREET ALL OF YOU THIS MORNING.  AND I WOULD LIKE
12   TO START BY THANKING EACH AND EVERY ONE OF YOU FOR TAKING TIME
13   OUT OF YOUR BUSY SCHEDULES TO PARTICIPATE IN THIS JURY
14   SELECTION PROCESS.  WE KNOW THAT YOU ARE ALL VERY BUSY.  THIS
15   IS OBVIOUSLY A VERY IMPORTANT PART OF OUR GOVERNMENTAL
16   PROCESS, AND WE THANK YOU ALL FOR TAKING THE TIME TO
17   PARTICIPATE IN IT.
18           WE ARE GOING TO SPEND MOST OF THIS MORNING SELECTING
19   A JURY, AND THEN WE WILL SPEND THE NEXT COUPLE OF WEEKS IN
20   TRIAL HEARING THIS MATTER.
21           THIS IS A CRIMINAL CASE.  IT IS ENTITLED UNITED
22   STATES OF AMERICA VERSUS ARASH GHAHREMAN.
23           THIS MORNING WE ARE GOING TO SPEND TIME GIVING YOU
24   SOME INFORMATION ABOUT THE CASE.  I WILL DO THE INTRODUCTIONS
25   INITIALLY, AND THEN COUNSEL WILL HAVE AN OPPORTUNITY TO
```

APRIL 13, 2015

1   QUESTION SOME OF THE PROSPECTIVE JURORS.

2          WE WILL BE IN SESSION WITH ALL OF US TOGETHER.  I

3   WOULD ASK THAT FOR THOSE OF YOU BEHIND THE RAILING THAT YOU

4   NOT EXIT ON YOUR OWN, WE WILL TAKE RECESSES TOGETHER.  IT IS

5   IMPORTANT THAT WE HEAR ALL OF THE DISCUSSION WHEN WE ARE ALL

6   IN SESSION TOGETHER, SO PLEASE DON'T EXIT ON YOUR OWN.

7          DURING THE VOIR DIRE PROCESS ALL WE ARE ATTEMPTING

8   TO DO IS TO GIVE EACH OF YOU SOME INFORMATION ABOUT THE CASE.

9   AND AS I MENTIONED, COUNSEL AND I WILL BE DOING THAT.  AND WE

10  WILL BE ASKING EACH OF YOU WHETHER, BASED ON YOUR OWN PERSONAL

11  LIFE EXPERIENCES AND BACKGROUND, WHETHER THERE IS ANYTHING

12  ABOUT THE CASE THAT GIVES YOU ANY HESITATION IN BEING

13  ABSOLUTELY FAIR AND IMPARTIAL.

14         THE OVERARCHING GOAL OF THE JURY PROCESS IS THAT WE

15  IMPANEL JURORS WHO CAN BE FAIR, NEUTRAL, IMPARTIAL.  HEAR AND

16  DECIDE THE CASE ON A CLINICAL AND DISPASSIONATE BASIS.  SO IN

17  ORDER TO DO THAT WE WILL GIVE YOU SOME INFORMATION ABOUT THE

18  CASE, AND THEN AT THE END OF THE INQUIRY ASK WHETHER EACH OF

19  YOU FEEL THAT YOU CAN BE FULLY FAIR AND IMPARTIAL.

20         INITIALLY WE WILL BE QUESTIONING THE 32 PROSPECTIVE

21  JURORS, SO THAT WOULD BE ALL OF THE LADIES AND GENTLEMEN

22  SEATED IN FRONT OF THE RAILING.

23         FOR THOSE OF YOU BEHIND THE RAILING, WHAT INVARIABLY

24  HAPPENS IS ONE OR MORE OF THE 32 PROSPECTIVE JURORS IS

25  EXCUSED, ONE OR MORE OF YOU IN THE AUDIENCE MAY BE CALLED

APRIL 13, 2015

1   FORWARD.  SO I DO ASK THAT YOU PAY CAREFUL ATTENTION TO ALL OF

2   THE PROCEEDINGS.

3            AT THIS TIME I WOULD LIKE TO REINTRODUCE TO YOU THE

4   PARTICIPANTS IN THE TRIAL.  ONCE AGAIN, THIS IS ENTITLED

5   UNITED STATES OF AMERICA VERSUS ARASH GHAHREMAN.

6            MR. GHAHREMAN, WOULD YOU PLEASE STAND AND FACE ALL

7   PROSPECTIVE JURORS, INCLUDING THOSE BEHIND YOU.

8            THANK YOU.

9            AND HE IS BEING REPRESENTED BY HIS COUNSEL,

10  MR. ELLIS JOHNSTON AND MR. JOE CAMDEN.

11           AND THEY ARE BEING ASSISTED BY MS. LEEANN HUDSON,

12  WHO WILL BE WITH US THIS MORNING.

13           REPRESENTING THE UNITED STATES OF AMERICA ARE

14  ASSISTANT UNITED STATES ATTORNEYS SHANE HARRIGAN AND TIMOTHY

15  COUGHLIN.

16           THANK YOU.

17           I WOULD BEGIN AT THIS TIME BY FOCUSING ON THE

18  SCHEDULING OF THE CASE.  WE WILL BE IN SESSION TODAY FROM NOW

19  UNTIL 4:30.  WE WILL TAKE AN HOUR AND A HALF LUNCH RECESS FROM

20  12:30 TO 2:00.  AND THEN STARTING TOMORROW WE ARE GOING TO GO

21  TO AN 8:30 TO 2:00 P.M. SCHEDULE, WITH TWO 15-MINUTE BREAKS.

22           I FIND THAT JURORS REALLY ENJOY THAT SCHEDULE.  IT

23  GIVES THEM FIVE HOURS OF TESTIMONY HERE IN COURT, AND THEN

24  THEY ARE ON THEIR WAY BY 2:00 O'CLOCK TO TEND TO OTHER

25  MATTERS.

APRIL 13, 2015

```
 1              WE ARE IN SESSION MONDAY THROUGH THURSDAY.  WE WILL
 2   NOT BE IN SESSION THIS WEEK THIS FRIDAY, SO THAT WOULD BE A
 3   DARK DAY.  SO MONDAY THROUGH THURSDAY THIS WEEK.  NEXT WEEK I
 4   ANTICIPATE WE WILL BE IN SESSION MONDAY THROUGH MOST OF THE
 5   WEEK, 8:30 TO 2:00.  I DO ANTICIPATE THAT THE CASE WILL
 6   CONCLUDE PERHAPS WEDNESDAY, BUT I WOULD ASK YOU, FOR PURPOSES
 7   OF SCHEDULING, TO ASSUME THAT THE TRIAL WILL GO A FULL TWO
 8   WEEKS, THAT IS THROUGH FRIDAY OF NEXT WEEK.  NOT THIS FRIDAY
 9   BUT NEXT FRIDAY.
10              SO THE FIRST QUESTION I HAVE IS, HAVING HEARD THAT
11   SCHEDULE, WHETHER THERE IS ANY ONE OF YOU WHO WOULD FIND IT
12   DIFFICULT OR IMPOSSIBLE TO STAY WITH US THROUGH THAT PERIOD OF
13   TIME.
14              OKAY.  I SEE A NUMBER OF HANDS.
15              WE ARE GOING TO START OVER HERE.
16              FOR THOSE OF YOU BEHIND THE RAILING, WE ARE NOT
17   GOING TO CALL ON YOU AT THIS TIME, WE ARE GOING TO FOCUS ON
18   THE 32 JURORS IN FRONT OF THE RAILING.
19              LET'S START WITH JUROR NO. 1, (NAME REDACTED).
20         **PROSPECTIVE JUROR:**  YES.
21         **THE COURT:**  WHAT IS YOUR CONCERN?
22         **PROSPECTIVE JUROR:**  WE HAVE A -- I WORK IN A
23   PHARMACEUTICAL COMPANY, AND WE HAVE AN IMPORTANT STUDY THAT
24   NEEDS TO BE OUT NEXT WEEK.
25         **THE COURT:**  AND THE STUDY IS DUE OUT NEXT WEEK?
```

APRIL 13, 2015

```
 1            PROSPECTIVE JUROR:  YES.

 2         THE COURT:  AND YOU NEED TO BE THERE?

 3            PROSPECTIVE JUROR:  YES.

 4         THE COURT:  IS THIS A MATTER THAT YOU CAN TEND TO

 5   PERHAPS IN THE AFTERNOON, UNDERSTANDING THAT WE WILL BE IN

 6   RECESS FROM 2:00 P.M. ON STARTING TOMORROW?

 7            PROSPECTIVE JUROR:  I WOULD HAVE TO BE PRESENT

 8   THURSDAY AT 5:00 O'CLOCK.

 9            THE COURT:  THURSDAY AT 5:00 P.M.?

10            PROSPECTIVE JUROR:  YES.  AND FRIDAY.

11         THE COURT:  OF THIS WEEK?

12            PROSPECTIVE JUROR:  OF NEXT WEEK.

13            THE COURT:  ALL RIGHT.  THAT LIKELY CAN BE

14   ACCOMMODATED.  IF WE CAN ACCOMMODATE THAT, WOULD YOU BE ABLE

15   TO SERVE AS A JUROR IN THIS CASE?

16            PROSPECTIVE JUROR:  YES.

17         THE COURT:  LET ME MAKE A NOTE OF THAT.

18            SO THURSDAY, 5:00 P.M., THAT IS NOT A CONCERN

19   SCHEDULING WISE.  BUT FRIDAY OF NEXT WEEK YOU WOULD NEED TO BE

20   OUT.  OKAY.  THANK YOU.  WE CAN WORK WITH THAT.

21            THERE WAS ANOTHER HAND ON THE TOP ROW.  LET'S GO TO

22   JUROR NO. 5, (NAME REDACTED).

23            PROSPECTIVE JUROR:  YES.  MY COMPANY ONLY PAYS FOR

24   THREE DAYS, SO IT WOULD BE A HARDSHIP FOR ME.

25            THE COURT:  WE DO GET THAT FROM TIME TO TIME.  WHAT
```

APRIL 13, 2015

```
1   I HAVE DONE IN THE PAST IS CONTACTED EMPLOYERS AND ASKED THEM

2   TO PAY MORE THAN THE THREE DAYS, PAY THE DURATION OF THE

3   TRIAL, IF ONE OF THEIR EMPLOYEES IS SEATED AS A JUROR.

4          IF I WERE TO DO THAT AND YOUR EMPLOYER WERE TO

5   AGREE, WOULD YOU BE ABLE TO SERVE?

6          PROSPECTIVE JUROR:  IF THEY AGREE, YES.

7          THE COURT:  ALL RIGHT.  OKAY.  SO LET ME MAKE A NOTE

8   OF THAT, AND ASK THAT YOU STAY WITH US AT THIS TIME.

9          PROSPECTIVE JUROR:  SURE.

10         THE COURT:  OKAY.

11         NEXT TO YOU IS JUROR NO. 7, (NAME REDACTED).

12         PROSPECTIVE JUROR:  UM-HUM.  MY SON IS ON SPRING

13  BREAK THIS WEEK AND WE WERE HOPING TO TAKE A FAMILY VACATION,

14  LEAVING EITHER WEDNESDAY NIGHT OR THURSDAY MORNING.

15         THE COURT:  YES.  OKAY.  LET ME MAKE A NOTE OF THAT.

16  I WILL COME BACK TO YOU IN A MOMENT.

17         AND JUROR NO. 8, (NAME REDACTED).

18         PROSPECTIVE JUROR:  YES.  WHERE I WORK WE ARE GOING

19  THROUGH A TRANSITIONAL STAGE.  I TEXTED MY BOSS THIS MORNING I

20  GOT SELECTED.  HE SAID PLEASE ASK IF YOU COULD POSTPONE

21  BECAUSE HE SAID IT IS A BUSINESS CRITICAL THING BECAUSE I AM

22  THE ONLY ONE THAT WORKS IN MY POSITION.  AND WE HAVE A 30-DAY

23  TIME LINE IN WHICH SOMETHING NEEDS TO BE COMPLETED, AND IT

24  TRAILS IN THROUGH THIS MONTH.

25         THE COURT:  OKAY.  SIMILAR QUESTION.  IF YOU ARE
```

```
 1   ABLE TO TEND TO THOSE -- I KNOW THIS IS AN IMPOSITION, BUT IF
 2   YOU ARE ABLE TO WORK FROM 2:00 P.M. ON, AS WELL AS THIS FRIDAY
 3   WE WOULD NOT BE IN SESSION, CAN YOU ACCOMMODATE OUR SCHEDULE?
 4             PROSPECTIVE JUROR:  WE CLOSE -- WE CLOSE SO EARLY,
 5   WE CLOSE LIKE 5:30, SO IT WOULD BE LIKE THE KIND OF A THING
 6   WHERE I WOULD NEED TO -- I WOULD ONLY HAVE SUCH A SMALL MARGIN
 7   OF TIME TO COMPLETE MY WORK.  I WOULDN'T HAVE ENOUGH TO
 8   COMPLETE IT.
 9             THE COURT:  AND YOU ARE THE ONLY ONE IN THIS
10   POSITION?
11             PROSPECTIVE JUROR:  IN MY POSITION, CORRECT.
12             THE COURT:  ALL RIGHT.  LET ME MAKE A NOTE OF THAT,
13   AND WE WILL COME BACK TO YOU.
14             ON THE BOTTOM ROW CAN I HAVE A SHOW OF HANDS AS TO
15   WHO MIGHT HAVE DIFFICULTY WITH THE SCHEDULE?
16             I DON'T SEE ANY HANDS.
17             LET'S MOVE OVER HERE, THEN, TO JURORS 17 THROUGH 24.
18   I SEE JUROR NO. 17 HAS RAISED HER HAND.
19             PROSPECTIVE JUROR:  I CAN SPEAK LOUD.
20             THE COURT:  (NAME REDACTED)
21             PROSPECTIVE JUROR:  YES.  MY DAUGHTER, RIGHT NOW SHE
22   IS GOING TO HAVE SURGERY ON HER BACK, SO SHE WILL PROBABLY BE
23   OUT FOR ANOTHER TWO OR THREE WEEKS.  AND IT IS IN BRAWLEY.  SO
24   I WAS JUST HOPING TO BE THERE FOR HER.
25             THE COURT:  DID SHE HAVE THE SURGERY?
```

APRIL 13, 2015

```
 1            PROSPECTIVE JUROR:  SHE IS GOING TO HAVE IT SHORTLY.
 2   ANOTHER HALF HOUR.
 3            THE COURT:  OKAY.  LET ME MAKE A NOTE OF THAT, AND I
 4   WILL COME BACK TO YOU AS WELL.
 5            ANYONE ELSE IN THIS ROW?  LET'S GO TO JUROR NO. 19,
 6   (NAME REDACTED).
 7            PROSPECTIVE JUROR:  I AM A PHYSICIAN ASSISTANT IN
 8   CARDIAC SURGERY, AND I AM THE PRIME ASSISTANT FOR A CARDIAC
 9   SURGEON THAT OPERATES OUT OF FOUR DIFFERENT HOSPITALS HERE IN
10   SAN DIEGO.  I DON'T GET REIMBURSED PAST FIVE DAYS, AND I AM
11   THE SOLE PROVIDER FOR MY FAMILY.
12            THE COURT:  SO TWO QUESTIONS.  ONE, IF YOU ARE
13   SELECTED CAN YOU WORK WITH THIS SCHEDULE, UNDERSTANDING THAT
14   YOU WOULD BE AVAILABLE AFTER 2:00 P.M. STARTING TOMORROW?
15            PROSPECTIVE JUROR:  NO.  ALL OF OUR CASES START AT
16   7:00 IN THE MORNING.  AND A CARDIAC SURGERY CASE OFTENTIMES
17   TAKES UNTIL 2:00 P.M., AND THEN WE WILL DO A SECOND CASE THAT
18   DAY.
19            THE COURT:  IS THERE ANYONE WHO CAN -- ARE YOU THE
20   ONLY ONE, OR ARE THERE OTHERS THAT CAN COVER?
21            PROSPECTIVE JUROR:  WELL, TODAY I HAVE THREE
22   DIFFERENT PEOPLE THAT ARE DOING WHAT I USUALLY DO THAT I HAD
23   TO GET TO FILL IN FOR ME.  WE DON'T HAVE THAT MANY PEOPLE THAT
24   CAN DO WHAT I DO AND IT MAKES -- IT WOULD MEAN THAT THE
25   SURGEON WOULD HAVE TO CANCEL CERTAIN CASES.
```

APRIL 13, 2015

1      **THE COURT:**  DO YOU BELIEVE THAT SURGERIES WOULD

2   ACTUALLY HAVE TO BE CANCELED, OR COULD THE HOSPITALS WORK

3   AROUND?

4      **PROSPECTIVE JUROR:**  I THINK IT WOULD BE VERY

5   DIFFICULT.  IT IS POSSIBLE, BUT I THINK IT WOULD BE VERY

6   DIFFICULT.  AND IF IT WENT TWO WEEKS IT WOULD PUT QUITE A

7   BURDEN ON THE PRACTICE.

8      **THE COURT:**  ALL RIGHT.  AND THERE IS FIVE DAYS' PAY?

9      **PROSPECTIVE JUROR:**  YES.

10     **THE COURT:**  OKAY.  LET ME MAKE A NOTE OF THIS.  AS I

11   MENTIONED WITH ANOTHER PROSPECTIVE JUROR, I DO ROUTINELY CALL

12   EMPLOYERS AND HAVE HAD GOOD SUCCESS WITH EMPLOYERS AGREEING TO

13   PAY THE EXTRA TIME ONCE THEY HAVE A DATE CERTAIN AS TO WHEN

14   THE JURY DUTY IS COMING TO AN END.  SO LET ME MAKE A NOTE OF

15   THAT, AND I WILL COME BACK TO YOU IN A MOMENT.

16     **PROSPECTIVE JUROR:**  OKAY.  THANK YOU.

17     **THE COURT:**  ANYONE ELSE?  WE ARE GOING TO GO OVER TO

18   JUROR NO. 24, (NAME REDACTED).

19     **PROSPECTIVE JUROR:**  I DON'T GET REIMBURSED FOR ANY

20   TIME OFF OR PAID FOR ANY LEAVE.

21     **THE COURT:**  NO PAY?

22     **PROSPECTIVE JUROR:**  NOPE.

23     **THE COURT:**  WOULD YOU BE WILLING TO SERVE WITH THE

24   CONDITION THAT I WOULD BE ABLE TO CONTACT YOUR EMPLOYER AND IF

25   THEY AGREE TO PAY?

APRIL 13, 2015

21

```
 1              PROSPECTIVE JUROR:  IF THEY WERE IN AGREEMENT, YES.

 2              THE COURT:  ALL RIGHT.  IF THEY ARE NOT IN AGREEMENT

 3     THEN WE CAN WORK AROUND THAT.

 4              PROSPECTIVE JUROR:  GREAT.

 5              THE COURT:  OKAY.  LET'S GO TO THIS SECTION.  WE

 6     WILL START WITH JUROR NO. 25, NAME REDACTED).

 7              PROSPECTIVE JUROR:  I AM AN ESCROW OFFICER, AND I AM

 8     THE ONLY -- AT A NEW COMPANY AND I AM THE ONLY ONE THAT IS

 9     THERE.  THE OTHER THING IS THAT I AM LEAVING ON THE 18TH FOR

10     MY 30TH ANNIVERSARY.

11              THE COURT:  OKAY.  SO YOU HAVE A TRIP PLANNED.

12              PROSPECTIVE JUROR:  YES, I DO.

13              THE COURT:  ALL RIGHT.  LET ME MAKE A NOTE OF THAT

14     AS WELL.  THANK YOU.

15              AND JUROR NO. 26, (NAME REDACTED).

16              PROSPECTIVE JUROR:  I AM IN THE PROCESS OF MOVING

17     THIS WEEK, AND I ACTUALLY HAVE MOVERS COMING ON WEDNESDAY AND

18     MOVING MY STUFF OVER TO THE NEW APARTMENT.  I HAVE TO BE OUT

19     OF THE OTHER APARTMENT BY SATURDAY.

20              THE COURT:  OKAY.  AND THAT IS SET, YOU HAVE GOT A

21     TRUCK AND MOVERS?

22              PROSPECTIVE JUROR:  YEAH.

23              THE COURT:  OKAY.  THANK YOU.

24              LET'S GO TO JUROR NO. 28.

25              PROSPECTIVE JUROR:  GOOD MORNING, JUDGE.  I HAVE THE
```

APRIL 13, 2015

1    FINANCIAL BURDEN.  MY EMPLOYER WILL NOT PAY ME IF I GO OVER

2    THAN THREE DAYS.

3              THE COURT:  OKAY.  SO SIMILAR QUESTION, IF I CALL

4    AND THEY AGREE TO PAY, CAN YOU SERVE?

5              PROSPECTIVE JUROR:  YES, JUDGE.  THANK YOU.

6              THE COURT:  ALL RIGHT.  VERY GOOD.

7              ANYONE ELSE?

8              JUROR NO. 30, (NAME REDACTED).

9              PROSPECTIVE JUROR:  YES.  I AM IN SOFTWARE SALES AND

10   NEXT WEEK, SUNDAY THROUGH WEDNESDAY, I HAVE A CONFIRMED TRIP

11   TO A CLIENT OUT OF STATE THAT I HAVE BEEN WORKING ON FOR THREE

12   MONTHS.  AND ALSO STARTING ON THURSDAY OF NEXT WEEK I HAVE A

13   FAMILY VACATION THAT HAS BEEN BOOKED SINCE DECEMBER.

14             THE COURT:  AND SO FOR THE BUSINESS TRAVEL, WHEN IS

15   THAT SET?

16             PROSPECTIVE JUROR:  I LEAVE ON SUNDAY AND COME BACK

17   WEDNESDAY NIGHT.

18             THE COURT:  THAT'S A MATTER THAT YOU -- I TAKE IT

19   YOU COULD RESCHEDULE BUT IT WOULD BE VERY DISRUPTIVE.

20             PROSPECTIVE JUROR:  IT IS THE FINAL MEETING WITH THE

21   CLIENT AND WE ARE GOING TO CLOSE ABOUT 2 MILLION IN SOFTWARE

22   SALES, AND I GET PAID OFF OF COMMISSION.  I HAVE BEEN INVOLVED

23   FOR 90 DAYS, I CAN'T MISS THAT MEETING.

24             THE COURT:  THANK YOU.  I WILL MAKE A NOTE OF THAT.

25             ANYONE ELSE?

APRIL 13, 2015

23

```
 1              SO, COUNSEL, I WOULD BE INCLINED TO EXCUSE --
 2              WHAT THIS MEANS, HOWEVER, IS THAT IF YOU ARE EXCUSED
 3   YOU ACTUALLY DON'T GET TO LEAVE, YOU HAVE TO REPORT BACK
 4   DOWNSTAIRS.  THERE ARE OTHER TRIALS AND OTHER JUDGES, SOME
 5   JUDGES AREN'T AS NICE AS I AM AND THEY MAY KEEP YOU.  SO THERE
 6   IS NO CERTAINTY IN BEING EXCUSED.  BUT GIVEN WHAT I HAVE
 7   HEARD, COUNSEL, I WOULD BE INCLINED TO EXCUSE JUROR NO. 7,
 8   (NAME REDACTED); JUROR NO. 8, (NAME REDACTED); JUROR NO. 17,
 9   (NAME REDACTED); JUROR NO. 19, (NAME REDACTED); JUROR NO. 25
10   (NAME REDACTED); JUROR NO. 26, (NAME REDACTED); AND JUROR
11   NO. 30, (NAME REDACTED).
12              ANY OBJECTION?
13         MR. HARRIGAN:  NO OBJECTION ON BEHALF OF THE
14   GOVERNMENT.
15         MR. JOHNSTON:  NO.
16         THE COURT:  FOR ALL OF YOU I JUST IDENTIFIED, YOU
17   WOULD BE EXCUSED FROM THIS PROCEEDING.  AND I WOULD ASK THAT
18   YOU REPORT BACK DOWNSTAIRS TO THE JURY LOUNGE.  THANK YOU VERY
19   MUCH.  AND PLEASE DO LEAVE THE QUESTIONNAIRES.
20              WE ARE GOING TO FILL THE SEATS STARTING IN THE
21   NUMERICAL ORDER.
22              MADAM CLERK.
23         THE CLERK:  NO. 34, (NAME REDACTED).
24         THE COURT:  SO I WILL ASK THAT YOU TAKE SEAT NO. 7
25   UP ON THE TOP RIGHT.
```

APRIL 13, 2015

```
 1            THE CLERK:  NO. 35, (NAME REDACTED).

 2            THE COURT:  AND, (NAME REDACTED), I ASK THAT YOU

 3    TAKE SEAT NUMBER -- IF YOU GO OVER JUST ONE MORE, TAKE SEAT

 4    NO. 8 TOP FAR RIGHT.  THANK YOU.

 5            THAT WAS (NAME REDACTED), AM I CORRECT?

 6            THE CLERK:  CORRECT.

 7            NO. 36, (NAME REDACTED).

 8            THE COURT:   (NAME REDACTED), YOU WILL BE GOING OVER

 9    TO SEAT NO. 17.  LET ME TAKE A MOMENT TO WRITE IN THE NAME.

10            THE CLERK:  NO. 37, NAME REDACTED).

11            THE COURT:   (NAME REDACTED), IF YOU WILL TAKE SEAT

12    NO. 19.  ALL RIGHT.

13            THE CLERK:  NO. 38, (NAME REDACTED).

14            THE COURT:  AND, (NAME REDACTED), YOU WILL BE TAKING

15    SEAT NO. 25.  GIVE ME JUST A MOMENT.  OKAY.

16            THE CLERK:  NO. 39, (NAME REDACTED).

17            THE COURT:  AND, (NAME REDACTED), IF YOU WILL TAKE

18    SEAT NO. 26.

19            THE CLERK:  26?

20            THE COURT:  YES.  THAT WOULD BE SEAT 26.

21            THE CLERK:  ONE MORE, RIGHT?  NO. 40.

22            THE COURT:  SEAT 28.

23            THE CLERK:  40, (NAME REDACTED).

24            THE COURT:  SO (NAME REDACTED) WILL TAKE SEAT 28.

25    AND I THINK OUR LAST SEAT IS NO. 30.
```

APRIL 13, 2015

25

```
 1              THE CLERK:  NO. 41, (NAME REDACTED).
 2              THE COURT:  OKAY.  WE HAVE ALL SEATS REFILLED.
 3         THERE HAVE BEEN A NUMBER OF INDIVIDUALS THAT HAVE
 4    BEEN CALLED.  I HAVE THE SAME QUESTION, AND THAT IS, GIVEN THE
 5    JURY SCHEDULE, ANY ONE OF YOU FIND IT DIFFICULT OR IMPOSSIBLE
 6    TO STAY WITH US THROUGH THIS TRIAL?
 7         I DON'T SEE ANYONE IN THE JURY BOX.  NO ONE OVER
 8    HERE.
 9         I SEE A COUPLE OF HANDS OVER HERE.
10         JUROR NO. 17, (NAME REDACTED).
11              PROSPECTIVE JUROR:  YES.
12              THE COURT:  DID I GET THE NAME RIGHT?
13              PROSPECTIVE JUROR:  OH, YEAH.
14              THE COURT:  DO YOU HAVE CONCERNS WITH THE SCHEDULE?
15              PROSPECTIVE JUROR:  MY WORK ACTUALLY PAYS ME FOR
16    ONLY FIVE DAYS.  IF YOU COULD CALL.
17              THE COURT:  OKAY.  I WILL.  THANK YOU.  ALL RIGHT.
18         THERE WAS ONE OTHER HAND, JUROR 19, (NAME REDACTED).
19              PROSPECTIVE JUROR:  IT IS EXACTLY THE SAME
20    SITUATION.  I GET PAID FOR FIVE DAYS.  IF YOU COULD CALL AND
21    THEY WILL DO THAT, I WOULD BE HAPPY TO SERVE.
22              THE COURT:  VERY GOOD.  THANK YOU.  OKAY.  I DON'T
23    SEE ANY OTHER HANDS.  ALL RIGHT.  SO WE WILL CONTINUE ON.
24         THERE WILL BE AN INDICTMENT THAT I AM GOING TO READ
25    TO YOU AT THIS TIME.
```

APRIL 13, 2015

26

```
 1              PRIOR TO DO THAT DOING THAT I AM GOING TO
 2   IDENTIFY -- OR ASK MR. HARRIGAN OR MR. COUGHLIN TO IDENTIFY
 3   THOSE WITNESSES THAT THE GOVERNMENT MAY BE CALLING.  AND IF
 4   YOU COULD IDENTIFY BY NAME AS WELL AS AGENCY AND POSITION THAT
 5   WOULD BE HELPFUL.
 6              MR. HARRIGAN:  YES.  THANK YOU, YOUR HONOR.
 7              THE UNITED STATES WILL BE CALLING MOLLY MILLER, WHO
 8   IS FROM THE DEPARTMENT OF TREASURY, OFFICE OF FOREIGN ASSETS
 9   CONTROL.
10              WE WILL ALSO BE CALLING AN INDIVIDUAL BY THE NAME OF
11   GREG TOPCZEWSKI.  THAT IS SPELLED T-O-P-C-Z-E-W-S-K-I.  HE IS
12   EMPLOYED -- OR WAS FORMERLY EMPLOYED BY NORTHROP GRUMMAN
13   SPERRY MARINE.
14              WE ALSO PLAN TO RALF MAGNER, WHO IS EMPLOYED BY
15   NORTHROP GRUMMAN IN HAMBURG, GERMANY.
16              WE ALSO PLAN TO CALL TOM COX, WHO IS EMPLOYED BY
17   COMMUNICATIONS & POWER INDUSTRIES IN PALO ALTO.
18              OUR LAW ENFORCEMENT WITNESSES WILL INCLUDE WITNESSES
19   FROM DEPARTMENT OF HOMELAND SECURITY, HOMELAND SECURITY
20   INVESTIGATIONS.  THEY ARE KEVIN HAMAKO, JOHN HELSING AND DAVID
21   COLE.
22              AND FINALLY YOU WILL BE HEARING FROM A WITNESS BY
23   THE NAME OF ERGUN YILDIZ.
24              THE COURT:  THANK YOU VERY MUCH.
25              ANYONE KNOW OF, ACQUAINTED WITH ANY ONE OF THOSE
```

APRIL 13, 2015

```
 1   INDIVIDUALS?

 2           I DON'T SEE ANY HANDS.

 3           I ALSO NEGLECTED TO INTRODUCE TO YOU, WHEN I WAS

 4   INTRODUCING COUNSEL FOR THE UNITED STATES.  THERE ARE TWO

 5   PARALEGALS ASSISTING THEM, MR. JACOB GONZALEZ AND MR. GIAN

 6   MILAN.

 7           WOULD YOU PLEASE STAND?

 8           AND THE CASE AGENT WHO HAS BEEN IDENTIFIED IS AGENT

 9   KEVIN HAMAKO.

10           THANK YOU.

11           ANYONE KNOW OF ANY OF THE -- OTHER THAN MR. BESTE,

12   DOES ANYONE KNOW OF ANY OF THE ATTORNEYS, PARTIES IN THIS

13   CASE?

14           I DON'T SEE ANY HANDS.

15           **MR. HARRIGAN:**  YOUR HONOR, THERE WAS ONE OTHER

16   WITNESS, JOE HONG, ALSO A SPECIAL AGENT WITH HOMELAND SECURITY

17   INVESTIGATIONS.

18           **THE COURT:**  JOHN HONG, H-O-N-G.

19           **MR. HARRIGAN:**  YES.  HE IS FROM SAN FRANCISCO.

20           **THE COURT:**  ALL RIGHT.  ANYONE KNOW OF THAT

21   INDIVIDUAL?

22           I SEE NO HANDS.

23           THANK YOU.  YOU MAY BE SEATED.

24           THERE IS ALLEGATIONS IN THIS CASE.  THE GOVERNMENT

25   HAS FILED A SUPERSEDING INDICTMENT.  IT IS RELATIVELY LENGTHY.
```

APRIL 13, 2015

1    I AM GOING TO READ IT TO YOU, IN SUMMARY FASHION.  AND I AM

2    GOING TO START BY INDICATING THAT THE SUPERSEDING INDICTMENT

3    CONTAINS NINE COUNTS AGAINST DEFENDANTS KOORUSH TAHERKHANI,

4    TIG MARINE SERVICES, ERGUN YILDIZ AND MR. ARASH GHAHREMAN.

5         THE CASE WHICH YOU HAVE BEEN CALLED TO HEAR INVOLVES

6    ONLY THE DEFENDANT, MR. ARASH GHAHREMAN.  WHILE WE WILL BE

7    REFERRING TO THE OTHER DEFENDANTS THROUGHOUT THE PROCEEDINGS,

8    YOU WILL BE ASKED TO DETERMINE ONLY WHETHER OR NOT DEFENDANT

9    ARASH GHAHREMAN IS GUILTY OR NOT GUILTY OF THE CHARGES ALLEGED

10   IN THE SUPERSEDING INDICTMENT.  YOU ARE NOT TO SPECULATE AS TO

11   THE STATUS AS TO THE OTHER DEFENDANTS.

12        GENERALLY, THE GOVERNMENT HAS CHARGED NINE COUNTS IN

13   ITS INDICTMENT AGAINST MR. GHAHREMAN:  ATTEMPTED EXPORT TO AN

14   EMBARGOED COUNTRY, SPECIFICALLY IRAN, AND CONSPIRACY TO DO THE

15   SAME, IN VIOLATION OF 50, UNITED STATES CODE, SECTIONS 1702

16   AND 1705, AND 31 CODE OF FEDERAL REGULATIONS, OR CFR, SECTIONS

17   560.204 AND 560.203 IN COUNTS 1, 3 AND 4.  THEY HAVE ALSO

18   CHARGED GENERALLY SMUGGLING GOODS FROM THE UNITED STATES AND

19   CONSPIRACY TO DO THE SAME IN VIOLATION OF 18, UNITED STATES

20   CODE, SECTIONS 371 AND 554 IN COUNTS 2, 5 AND 6.  AND THEY

21   HAVE CHARGED LAUNDERING OF MONEY INSTRUMENTS AND CONSPIRACY TO

22   DO THE SAME IN VIOLATION OF 18, UNITED STATES CODE, SECTION

23   1956(H) AND 1956(A)(2)(A) IN COUNT 7, 8 AND 9.

24        IT IS IMPORTANT TO KEEP IN MIND THAT THE SUPERSEDING

25   INDICTMENT IS NOT EVIDENCE.  IT IS SIMPLY A STATEMENT OF WHAT

APRIL 13, 2015

1   THE GOVERNMENT HAS CHARGED AND WILL SEEK TO PROVE, BUT IT IS
2   NOT EVIDENCE.
3           IF YOU ARE SELECTED AS A JUROR IN THIS CASE IT WILL
4   BE YOUR DUTY AND RESPONSIBILITY TO DETERMINE WHETHER MR.
5   GHAHREMAN IS GUILTY OR NOT GUILTY BASED SOLELY ON THE EVIDENCE
6   ADMITTED AT TRIAL AND THE LAW GIVEN TO YOU BY THE COURT.
7           MR. GHAHREMAN HAS ENTERED A NOT GUILTY PLEA, THUS
8   PUTTING INTO ISSUE EACH AND EVERY ELEMENT OF THESE CHARGES
9   AGAINST HIM.
10          THE SUPERSEDING INDICTMENT -- AND HERE A SUMMARY
11  VERSION OF IT -- READS AS FOLLOWS.
12          THIS WILL TAKE SOME TIME BUT IT WILL GIVE YOU A VERY
13  GENERAL, HELPFUL OVERVIEW OF WHAT THE GOVERNMENT IS ALLEGING
14  IN THIS CASE AND IT WILL GIVE YOU SOME UNDERSTANDING OF WHAT
15  THE GOVERNMENT'S CASE IS, AS IT ALLEGES IT, AGAINST MR.
16  GHAHREMAN.
17          THE INTRODUCTORY ALLEGATIONS ARE THESE.  THAT
18  DEFENDANT, TIG MARINE ENGINEERING SERVICES, TIG MARINE, WAS A
19  COMPANY ESTABLISHED IN DUBAI, UNITED ARAB EMIRATES, THAT
20  BROKERED GOODS, SERVICES AND TECHNOLOGY FOR FOREIGN CUSTOMERS
21  TO INCLUDE ACQUISITION AND EXPORTATION OF U.S. GOODS AND
22  TECHNOLOGY FOR EXPORT TO AND IN USE IN IRAN.
23          DEFENDANT KOORUSH TAHERKHANI WAS A CITIZEN AND
24  RESIDENT OF IRAN AND THE FOUNDER AND DIRECTOR OF TIG MARINE
25  WHO USED TIG MARINE AS A FRONT COMPANY FOR THE ILLEGAL

APRIL 13, 2015

30

1   ACQUISITION AND EXPORTATION OF U.S. GOODS AND TECHNOLOGY FOR

2   EXPORT TO, AND END USE IN, IRAN.

3            DEFENDANT ERGUN YILDIZ WAS A CITIZEN OF GERMANY

4   RESIDING IN DUBAI, UNITED ARAB EMIRATES, AND THE PRESIDENT OF

5   TIG MARINE.

6            DEFENDANT ARASH GHAHREMAN WAS A CITIZEN OF THE

7   UNITED STATES RESIDING IN NEW YORK, WHO ACTED AS AN AGENT OF

8   TIG MARINE, TAHERKHANI AND YILDIZ IN THEIR EFFORTS TO ACQUIRE

9   U.S. GOODS AND TECHNOLOGY FOR ILLEGAL EXPORT FROM THE UNITED

10  STATES.

11            DEFENDANTS TAHERKHANI, TIG MARINE, YILDIZ AND

12  GHAHREMAN, WITH THE ASSISTANCE OF OTHER INDIVIDUALS, WERE

13  ATTEMPTING TO ACQUIRE U.S. GOODS AND TECHNOLOGIES, INCLUDING

14  THE FOLLOWING MARINE NAVIGATION EQUIPMENT AND MILITARY

15  ELECTRONIC EQUIPMENT, FOR EXPORTATION TO AND END USE IN IRAN:

16  THE NAVIGAT-2100 FIBER OPTIC GYROCOMPASS AND ATTITUDE

17  REFERENCE SYSTEM WHICH WE REFER TO AS NAVIGAT-2100 WAS

18  MANUFACTURED BY NORTHROP GRUMMAN SPERRY MARINE WHICH WAS

19  LOCATED IN CHARLOTTESVILLE, VIRGINIA.  THE NAVIGAT-2100 WAS

20  USED IN MARITIME NAVIGATION APPLICATIONS IN STRAPDOWN

21  TECHNOLOGY FOR INTEGRATED BRIDGES AND ADVANCED HIGH SPEED

22  VESSELS.

23            AND THE PLANAR TRIODE Y-690, WHICH WE REFER TO AS

24  THE Y-690, WAS MANUFACTURED BY COMMUNICATIONS & POWER

25  INDUSTRIES, OR CPI, WHICH WAS LOCATED IN PALO ALTO,

1    CALIFORNIA.  THE Y-690 WAS AN ELECTRON TUBE USED IN MILITARY

2    AIRBORNE RADAR AND TRANSPONDER APPLICATIONS.

3            THE FOLLOWING ALLEGATIONS RELATE TO THE IRAN TRADE

4    EMBARGO.  THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT,

5    WHICH IS REFERRED TO AS IEEPA, AN ACRONYM FOR THAT STATUTE,

6    TITLE 50, UNITED STATES CODE, SECTIONS 1701 THROUGH 1706,

7    AUTHORIZED THE PRESIDENT OF THE UNITED STATES TO IMPOSE

8    ECONOMIC SANCTIONS ON A FOREIGN COUNTRY.  ON MARCH 15, 1995

9    THE PRESIDENT ISSUED EXECUTIVE ORDER NO. 12957.  EXECUTIVE

10   ORDER NO. 12957, AS EXPANDED AND CONTINUED BY EXECUTIVE ORDERS

11   12959 AND 13059, WAS IN EFFECT AT ALL TIMES RELEVANT TO THIS

12   INDICTMENT.  THE EXECUTIVE ORDERS IMPOSED ECONOMIC SANCTIONS,

13   INCLUDING A TRADE EMBARGO, ON IRAN.  THE EXECUTIVE ORDERS

14   PROHIBITED, AMONG OTHER THINGS, THE EXPORTATION,

15   RE-EXPORTATION, SALE OR SUPPLY, DIRECTLY OR INDIRECTLY, TO

16   IRAN OR THE GOVERNMENT OF IRAN, OF GOODS, TECHNOLOGIES OR

17   SERVICES FROM THE UNITED STATES.

18           PURSUANT TO THE EXECUTIVE ORDERS, THE UNITED STATES

19   SECRETARY OF THE TREASURY PROMULGATED THE IRANIAN TRANSACTIONS

20   AND SANCTIONS REGULATIONS CONTAINED AT 31 CFR, OR CODE OF

21   FEDERAL REGULATIONS PART 560, IMPLEMENTING THE SANCTIONS

22   IMPOSED BY THE EXECUTIVE ORDERS.  SECTION 560.203 PROHIBITED

23   ANY TRANSACTION THAT EVADED OR AVOIDED, OR HAD THE PURPOSE OF

24   EVADING OR AVOIDING, ANY OF THE OTHER IRANIAN TRANSACTIONS AND

25   SANCTIONS REGULATIONS.  SECTION 560.204 PROHIBITED THE

APRIL 13, 2015

1    UNAUTHORIZED EXPORTATION, RE-EXPORTATION, SALE OR SUPPLY,

2    DIRECTLY OR INDIRECTLY, FROM THE UNITED STATES OF GOODS,

3    TECHNOLOGY OR SERVICES TO IRAN OR THE GOVERNMENT OF IRAN.

4           THE DEPARTMENT OF TREASURY'S OFFICE OF FOREIGN

5    ASSETS CONTROL ADMINISTERED THE AUTHORIZATION AND ISSUANCE OF

6    LICENSES FOR ANY EXPORTS SUBJECT TO THE IRANIAN TRANSACTIONS

7    AND SANCTIONS REGULATIONS.  WITH VERY LIMITED EXCEPTIONS IT

8    WAS ILLEGAL, UNDER THE IEEPA AND THE IRANIAN TRANSACTIONS AND

9    SANCTIONS REGULATIONS TO EXPORT PRODUCTS OR SERVICES TO IRAN

10   OR THE GOVERNMENT OF IRAN, OR TO EXPORT THE PRODUCTS OR

11   SERVICES TO A THIRD COUNTRY IF THE EXPORT WAS INTENDED OR

12   DESTINED FOR IRAN OR THE GOVERNMENT OF IRAN.

13          AT ALL TIMES RELEVANT TO THIS INDICTMENT DEFENDANTS

14   TAHERKHANI, TIG MARINE, YILDIZ AND GHAHREMAN DID NOT APPLY

15   FOR, RECEIVE OR POSSESS A LICENSE OR AUTHORIZATION FROM THE

16   OFFICE OF FOREIGN ASSETS CONTROL TO EXPORT ANY MARINE

17   NAVIGATION EQUIPMENT OR MILITARY ELECTRONIC EQUIPMENT, OR

18   RELATED PARTS, COMPONENTS OR TECHNOLOGY TO IRAN.

19          THE FOLLOWING ALLEGATIONS RELATE TO COUNT 1,

20   CONSPIRACY TO EXPORT TO A EMBARGOED COUNTRY.

21          DEFENDANTS TAHERKHANI, TIG MARINE, YILDIZ AND ARASH

22   GHAHREMAN DID KNOWINGLY AND WILLFULLY AGREE AND CONSPIRE WITH

23   EACH OTHER AND WITH OTHER PERSONS, KNOWN AND UNKNOWN, TO

24   EXPORT, SELL AND SUPPLY MARINE NAVIGATION EQUIPMENT AND

25   MILITARY ELECTRONIC EQUIPMENT, DIRECTLY AND INDIRECTLY, AND

APRIL 13, 2015

1    ENGAGE IN TRANSACTIONS WITHIN THE UNITED STATES THAT EVADE AND

2    AVOID, AND HAVE THE PURPOSE OF EVADING AND AVOIDING, THE

3    PROHIBITION AGAINST EXPORTING, SELLING AND SUPPLYING MARINE

4    NAVIGATION EQUIPMENT AND MILITARY ELECTRONIC EQUIPMENT,

5    DIRECTLY AND INDIRECTLY, FROM THE UNITED STATES TO IRAN AND

6    THE GOVERNMENT OF IRAN IN VIOLATION OF THE EMBARGO IMPOSED

7    UPON THAT COUNTRY BY THE UNITED STATES WITHOUT HAVING FIRST

8    OBTAINED THE REQUIRED LICENSES AND AUTHORIZATIONS FROM THE

9    OFFICE OF FOREIGN ASSETS CONTROL, UNITED STATES DEPARTMENT OF

10   TREASURY.

11            THE FOLLOWING ALLEGATIONS RELATE TO THE METHOD AND

12   MEANS OF THE CONSPIRACY AS ALLEGED BY THE GOVERNMENT.

13            THE METHOD AND MEANS BY WHICH THE DEFENDANTS SOUGHT

14   TO ACCOMPLISH THE OBJECTS OF THE CONSPIRACY INCLUDED, AMONG

15   OTHERS, THE FOLLOWING.  DEFENDANTS TAHERKHANI, TIG MARINE AND

16   YILDIZ WOULD RECEIVE PURCHASE ORDERS AND REQUESTS FROM

17   CO-CONSPIRATORS AND CUSTOMERS IN IRAN FOR U.S. ORIGIN GOODS

18   AND TECHNOLOGY.  DEFENDANTS TAHERKHANI, TIG MARINE AND YILDIZ,

19   WITH THE ASSISTANCE OF DEFENDANT ARASH GHAHREMAN, WOULD

20   PURCHASE FROM SUPPLIERS LOCATED IN THE UNITED STATES, KNOWN AS

21   THE U.S. SUPPLIERS, THE GOODS AND TECHNOLOGY SOUGHT BY THE

22   CO-CONSPIRATORS AND CUSTOMERS IN IRAN.

23            IN ORDER TO OBTAIN THE GOODS AND TECHNOLOGY FROM THE

24   UNITED STATES SUPPLIERS AND EVADE THE PROHIBITION AGAINST

25   EXPORTING OR TRANSSHIPPING GOODS AND TECHNOLOGY TO IRAN,

1  DEFENDANTS TAHERKHANI AND YILDIZ USED DEFENDANT TIG MARINE, A

2  COMPANY LOCATED IN DUBAI, UNITED ARAB EMIRATES, AS A FRONT

3  COMPANY FOR THE PURCHASE OF GOODS AND TECHNOLOGY SOUGHT BY

4  THEIR CO-CONSPIRATORS AND CUSTOMERS IN IRAN.

5        IN ORDER TO OBTAIN THE GOODS AND TECHNOLOGY FROM

6  U.S. SUPPLIERS AND EVADE THE PROHIBITION AGAINST EXPORTING OR

7  TRANSSHIPPING GOODS AND TECHNOLOGY TO IRAN, DEFENDANT

8  TAHERKHANI, AN IRANIAN NATIONAL, DIRECTED DEFENDANT YILDIZ, A

9  GERMAN NATIONAL, TO ACT AS THE PRESIDENT OF DEFENDANT TIG

10  MARINE.

11        IN ORDER TO OBTAIN GOODS AND TECHNOLOGY FROM U.S.

12  SUPPLIERS AND EVADE THE PROHIBITION AGAINST EXPORTING OR

13  TRANSSHIPPING GOODS AND TECHNOLOGY TO IRAN, DEFENDANT

14  GHAHREMAN, A U.S. CITIZEN AND RESIDENT, ACTED AS THE AGENT AND

15  PRIMARY NEGOTIATOR FOR DEFENDANTS TAHERKHANI, TIG MARINE AND

16  YILDIZ IN THE PURCHASE OF SAID GOODS AND TECHNOLOGY SOUGHT BY

17  THEIR CO-CONSPIRATORS AND CUSTOMERS IN IRAN.

18        DEFENDANTS TAHERKHANI, YILDIZ AND GHAHREMAN WOULD

19  USE VARIOUS EMAIL ACCOUNTS TO COMMUNICATE WITH SUPPLIERS OF

20  U.S. GOODS AND TECHNOLOGY.

21        IN ORDER TO OBTAIN U.S. GOODS AND TECHNOLOGY FROM

22  U.S. SUPPLIERS AND EVADE U.S. EXPORT CONTROLS, DEFENDANTS

23  WOULD KNOWINGLY AND INTENTIONALLY CONCEAL FROM SUPPLIERS THAT

24  THE GOODS AND TECHNOLOGY WERE INTENDED FOR, AND WERE TO BE

25  DELIVERED TO, IRAN OR THE GOVERNMENT OF IRAN.

APRIL 13, 2015

35

```
 1            DEFENDANTS ALSO WOULD INDUCE AND INSTRUCT

 2   INDIVIDUALS AND COMPANIES WITHIN THE U.S. TO KNOWINGLY OR

 3   UNWITTINGLY PROVIDE FALSE END USER INFORMATION TO U.S.

 4   SUPPLIERS AND MANUFACTURERS.  AND WOULD INDUCE AND INSTRUCT

 5   INDIVIDUALS AND COMPANIES WITHIN THE UNITED STATES TO CONCEAL

 6   THE EXPORTATION OF U.S. GOODS AND TECHNOLOGY TO IRAN BY

 7   VARIOUS MEANS, INCLUDING SHIPPING OR SMUGGLING THE GOODS TO A

 8   THIRD COUNTRY FOR TRANSSHIPMENT TO IRAN.

 9            DEFENDANTS WOULD CAUSE FUNDS TO BE TRANSPORTED FROM

10   A PLACE OUTSIDE THE UNITED STATES TO A PLACE IN THE UNITED

11   STATES TO PROMOTE THE ACQUISITION OF AND ILLICIT EXPORTATION

12   OF U.S. GOODS AND TECHNOLOGY TO IRAN BY VARIOUS MEANS,

13   INCLUDING THE WIRE TRANSFER OF FUNDS FROM A THIRD COUNTRY TO

14   U.S. BANK ACCOUNTS.

15            THE FOLLOWING RELATE TO OVERT ACTS THAT ARE ALLEGED

16   WITH RESPECT TO THE CONSPIRACY THAT IS ALLEGED IN COUNT 1.

17            IN FURTHERANCE OF THE CONSPIRACY AND TO EFFECT THE

18   OBJECTS THEREOF, DEFENDANTS COMMITTED THE FOLLOWING OVERT

19   ACTS, AMONG OTHERS, FROM DECEMBER 16, 2012 THROUGH JUNE 1,

20   2013, WITHIN THE SOUTHERN DISTRICT OF CALIFORNIA AND

21   ELSEWHERE.

22            AS TO THE NAVIGAT-2100'S, DEFENDANT TAHERKHANI SENT

23   AN EMAIL TO DEFENDANT GHAHREMAN IN THE UNITED STATES IN WHICH

24   HE REQUESTED THAT MR. GHAHREMAN OBTAIN PRICE QUOTES FROM U.S.

25   SUPPLIERS FOR FOUR TO SIX SETS OF THE NAVIGAT-2100.
```

APRIL 13, 2015

1              AT THE DIRECTION OF DEFENDANTS TAHERKHANI AND

2   YILDIZ, DEFENDANT GHAHREMAN PROVIDED A U.S. SUPPLIER WITH END

3   USE INFORMATION RELATING TO THE PURCHASE OF SIX

4   NAVIGAT-2100'S, IN WHICH HE IDENTIFIED THE CUSTOMER AS

5   DEFENDANT TIG MARINE OF DUBAI, UNITED ARAB EMIRATES, FOR END

6   USE IN A MARINE VESSEL OWNED BY A SHIPPING COMPANY IN DUBAI.

7              THEREAFTER, DEFENDANT GHAHREMAN SENT DEFENDANT

8   TAHERKHANI AN EMAIL IN WHICH HE INFORMED TAHERKHANI THAT THAT

9   U.S. SUPPLIER HAD REJECTED THE SALE OF THE NAVIGAT-2100

10  BECAUSE THE U.S. MANUFACTURER DEEMED THE TRANSACTION

11  SUSPICIOUS.  THEREAFTER, DEFENDANT GHAHREMAN SENT AN EMAIL TO

12  A HOMELAND SECURITY INVESTIGATIONS UNDERCOVER AGENT, WHO WAS

13  POSING AS A BROKER OF U.S. GOODS AND TECHNOLOGY, WHICH IS

14  REFERRED TO AS THE SAN DIEGO SUPPLIER, AND INFORMED THE SAN

15  DIEGO SUPPLIER THAT HE HAD A FRIEND IN DUBAI, UNITED ARAB

16  EMIRATES, WHO NEEDED SIX NAVIGAT-2100'S.

17             LATER, DEFENDANT GHAHREMAN SPOKE BY TELEPHONE WITH

18  THE SAN DIEGO SUPPLIER, AND INFORMED THE SAN DIEGO SUPPLIER OF

19  HIS PREVIOUS UNSUCCESSFUL ATTEMPT TO OBTAIN THE NAVIGAT-2100

20  FROM ANOTHER U.S. SUPPLIER.

21             THEREAFTER, DEFENDANT GHAHREMAN SPOKE BY TELEPHONE

22  WITH THE SAN DIEGO SUPPLIER AND INFORMED THE SAN DIEGO

23  SUPPLIER THAT THE CUSTOMER FOR THE NAVIGAT-2100 ULTIMATELY

24  WANTED TO PURCHASE 100 UNITS OF THE NAVIGAT-2100.  BUT

25  GHAHREMAN ACKNOWLEDGED THAT SUCH A LARGE TRANSACTION WAS RISKY

APRIL 13, 2015

1   BECAUSE THE U.S. MANUFACTURER OF THE NAVIGAT-2100 WOULD ASSUME

2   THAT THE END USER OF SUCH A LARGE PURCHASE ORDER WAS A FOREIGN

3   GOVERNMENT.

4           THEREAFTER, DEFENDANT GHAHREMAN FORWARDED TO

5   DEFENDANT TAHERKHANI A PRICE QUOTATION OF $284,000 FOR FOUR

6   NAVIGAT-2100'S WHICH HE HAD RECEIVED FROM THE SAN DIEGO

7   SUPPLIER, AND INFORMED TAHERKHANI THAT HE SHOULD ADD A

8   COMMISSION OF $20,000 TO BE PAID TO MR. GHAHREMAN.

9           THEREAFTER, DEFENDANT GHAHREMAN SPOKE BY TELEPHONE

10  WITH THE SAN DIEGO SUPPLIER, AND DURING THAT TELEPHONE

11  CONVERSATION GHAHREMAN ACKNOWLEDGED THAT DUE TO GHAHREMAN'S

12  PREVIOUS FAILED ATTEMPTS TO OBTAIN THE NAVIGAT-2100'S, THE SAN

13  DIEGO SUPPLIER WOULD HAVE TO ORDER THE NAVIGAT-2100'S BY

14  PROVIDING FALSE END USER INFORMATION TO THE U.S. MANUFACTURER.

15          LATER, DEFENDANT TAHERKHANI SENT AN EMAIL TO THE SAN

16  DIEGO SUPPLIER IN WHICH HE ATTACHED A FUNDS TRANSFER RECEIPT

17  FROM A BANK IN DUBAI SHOWING A WIRE TRANSFER TO THE SAN DIEGO

18  SUPPLIER'S BANK ACCOUNT IN THE AMOUNT OF $10,000, WHICH SUM

19  REPRESENTED A PARTIAL PAYMENT OF THE 10 PERCENT DOWN PAYMENT

20  DUE UNDER THE SALES CONTRACT FOR THE FOUR NAVIGAT-2100'S.

21          THEREAFTER, DEFENDANT TAHERKHANI CAUSED

22  APPROXIMATELY $10,000 TO BE WIRED FROM A BANK IN DUBAI TO THE

23  SAN DIEGO SUPPLIER'S BANK ACCOUNT IN SAN DIEGO, CALIFORNIA.

24          THEREAFTER, DEFENDANT GHAHREMAN SENT AN EMAIL TO THE

25  SAN DIEGO SUPPLIER IN WHICH HE ATTACHED A FUNDS TRANSFER

APRIL 13, 2015

1  RECEIPT FROM A BANK IN DUBAI, UNITED ARAB EMIRATES, SHOWING A

2  WIRE TRANSFER TO THE SAN DIEGO SUPPLIER'S BANK ACCOUNT IN THE

3  AMOUNT OF $18,000, REPRESENTING THE REMAINDER OF THE

4  10 PERCENT DOWN PAYMENT FOR THE FOUR NAVIGAT-2100'S.

5         LATER DEFENDANT GHAHREMAN SPOKE WITH THE SAN DIEGO

6  SUPPLIER BY TELEPHONE, AND DURING THAT CONVERSATION DEFENDANT

7  GHAHREMAN REJECTED THE SUPPLIER'S PROPOSAL THAT DEFENDANT

8  TAHERKHANI USE DEFENDANT GHAHREMAN'S U.S. BANK ACCOUNT TO WIRE

9  TRANSFER THE INSTALLMENT PAYMENTS TO THE SUPPLIER BECAUSE HE

10 DID NOT WANT TO BE ASSOCIATED WITH EXPORTING THE

11 NAVIGAT-2100'S.

12        LATER DEFENDANT GHAHREMAN HAD A TELEPHONE

13 CONVERSATION WITH THE SAN DIEGO SUPPLIER, IN WHICH

14 MR. GHAHREMAN ACKNOWLEDGED THAT THE SAN DIEGO SUPPLIER AND

15 GHAHREMAN WERE TAKING ALL THE RISK WITH THE EXPORT LAWS BY

16 PROVIDING FALSE END USER INFORMATION TO THE U.S. MANUFACTURER

17 OF THE NAVIGAT-2100.

18        THEREAFTER, DEFENDANTS TAHERKHANI AND GHAHREMAN

19 SPOKE WITH THE SAN DIEGO SUPPLIER BY TELEPHONE AND AGREED THAT

20 AFTER GHAHREMAN AND YILDIZ VIEWED THE NAVIGAT-2100 AND

21 WITNESSED THE SHIPPING OF THE ITEM TO DEFENDANT TIG MARINE IN

22 DUBAI, TAHERKHANI WOULD MAKE AN ADDITIONAL INSTALLMENT PAYMENT

23 OF APPROXIMATELY $28,500.

24        LATER, DEFENDANT YILDIZ SENT THE SAN DIEGO SUPPLIER

25 AN EMAIL IN WHICH HE AGREED THAT AFTER HE INSPECTED THE ONE

APRIL 13, 2015

1   UNIT OF THE NAVIGAT-2100 AN ADDITIONAL INSTALLMENT PAYMENT

2   WOULD BE MADE TO THE SAN DIEGO SUPPLIER'S BANK ACCOUNT VIA

3   WIRE TRANSFER.

4        THE FOLLOWING ARE ALLEGATIONS WITH RESPECT TO OVERT

5   ACTS AS TO THE Y-690 TRANSACTION BETWEEN JANUARY 2, 2013 AND

6   JUNE 17, 2013.

7        ON OR ABOUT JANUARY 2, 2013, DEFENDANT TAHERKHANI

8   SENT AN EMAIL TO DEFENDANT GHAHREMAN IN WHICH HE ASKED

9   GHAHREMAN IF HE COULD OBTAIN SEVERAL U.S. MANUFACTURED

10  MILITARY ELECTRONIC PARTS INCLUDING THE Y-690.

11       THEREAFTER, DEFENDANT GHAHREMAN SENT THE SAN DIEGO

12  SUPPLIER AN EMAIL IN WHICH GHAHREMAN REQUESTED A PRICE

13  QUOTATION FOR THE MILITARY ELECTRONIC PARTS REQUESTED BY

14  DEFENDANT TAHERKHANI.

15       AFTER DEFENDANT GHAHREMAN RECEIVED A PROFORMA

16  INVOICE FOR 50 UNITS OF THE Y-690 FROM THE SAN DIEGO SUPPLIER,

17  MR. GHAHREMAN SENT AN EMAIL TO THE SAN DIEGO SUPPLIER IN WHICH

18  HE REQUESTED A DATA SHEET AND PRODUCT SPECIFICATIONS FOR THE

19  Y-690 TO FINALIZE THE DEAL AND CONTRACT WITH THE CUSTOMERS.

20       THEREAFTER, AN IRANIAN CUSTOMER OF DEFENDANT

21  TAHERKHANI SENT AN EMAIL TO TAHERKHANI IN WHICH HE THANKED

22  TAHERKHANI FOR THE EMAIL DATA SHEET WITH RESPECT TO THE Y-690

23  TUBE, AND REQUESTED A PROFORMA INVOICE AND DELIVERY TIME FOR

24  100 UNITS OF THE Y-690.

25       LATER, THE IRANIAN CUSTOMER SENT DEFENDANT

APRIL 13, 2015

1  TAHERKHANI A REQUEST FOR A QUOTE FROM THE IRANIAN CUSTOMER'S

2  COMPANY, LOCATED IN TEHRAN, IRAN, FOR VARIOUS MILITARY

3  ELECTRONIC PARTS, INCLUDING 100 UNITS OF THE Y-690.

4        DEFENDANT GHAHREMAN SPOKE WITH THE SAN DIEGO

5  SUPPLIER BY TELEPHONE, AND DURING THAT CONVERSATION

6  ACKNOWLEDGED THAT A U.S. EXPORT LICENSE WAS REQUIRED TO EXPORT

7  THE Y-690 TO ANY LOCATION OUTSIDE THE UNITED STATES, AND

8  REQUESTED THAT THE SAN DIEGO SUPPLIER PROVIDE FALSE END USER

9  INFORMATION TO THE MANUFACTURER AND U.S. EXPORT LICENSING

10  AGENCY REGARDING THE SALE OF THE Y-690.

11        AFTER RECEIVING A REVISED SALES CONTRACT FROM THE

12  SAN DIEGO SUPPLIER FOR THE PURCHASE OF 50 UNITS OF THE Y-690,

13  DEFENDANT GHAHREMAN SENT THE SAN DIEGO SUPPLIER AN EMAIL IN

14  WHICH HE ACCEPTED THE CONTRACT ON BEHALF OF DEFENDANTS TIG

15  MARINE AND TAHERKHANI.

16        THEREAFTER, DEFENDANT GHAHREMAN SPOKE BY TELEPHONE

17  WITH THE SAN DIEGO SUPPLIER, AND DURING THAT CONVERSATION

18  MR. GHAHREMAN ACKNOWLEDGED THAT THE SUPPLIER WAS SELLING THE

19  Y-690 TO DEFENDANTS TAHERKHANI AND TIG MARINE WITHOUT THE

20  PROPER U.S. EXPORT LICENSE.

21        LATER, DEFENDANT GHAHREMAN SPOKE BY TELEPHONE WITH

22  THE SAN DIEGO SUPPLIER, AND ACKNOWLEDGED THAT BECAUSE THE

23  Y-690 WAS SUBJECT TO EXPORT RESTRICTIONS NEITHER HE NOR

24  DEFENDANT TAHERKHANI SHOULD HAVE DIRECT CONTACT WITH THE U.S.

25  MANUFACTURER OF THE Y-690.

APRIL 13, 2015

```
 1          LATER, DEFENDANT GHAHREMAN SPOKE BY TELEPHONE WITH
 2   THE SAN DIEGO SUPPLIER AND ACKNOWLEDGED THAT THE Y-690
 3   REQUIRED A U.S. EXPORT LICENSE, AND THAT THEY RISKED GOING TO
 4   JAIL BECAUSE THEY DID NOT HAVE THE PROPER EXPORT LICENSE TO
 5   SELL THE Y-690 TO DEFENDANTS TIG MARINE AND TAHERKHANI.
 6          DURING A LATER MEETING WITH THE SAN DIEGO SUPPLIER
 7   AND HIS SUPERVISOR IN LAS VEGAS, NEVADA, DEFENDANTS YILDIZ AND
 8   GHAHREMAN DISCUSSED THE NAVIGAT-2100 AND THE Y-690
 9   TRANSACTIONS, AS WELL AS FUTURE TRANSACTIONS INVOLVING U.S.
10   GOODS DESTINED FOR IRAN, INCLUDING THE USE OF FALSE END USER
11   STATEMENTS TO ACQUIRE THE U.S. GOODS, MEANS AND METHODS TO
12   AVOID THE IRANIAN TRADE SANCTIONS AND DETECTION BY U.S.
13   CUSTOMS OFFICIALS, THE RISKS OF GOING TO JAIL FOR THEIR
14   ILLEGAL BUSINESS TRANSACTIONS, AND THE END USERS IN IRAN FOR
15   THE NAVIGAT-2100'S AND Y-690'S.
16          THESE ALLEGATIONS RELATE TO THE OVERT ACTS REGARDING
17   THE VIEWING, PAYMENT AND SHIPMENT OF THE NAVIGAT-2100'S AND
18   Y-690'S.
19          LATER, DEFENDANT TAHERKHANI CAUSED APPROXIMATELY
20   $32,590 TO BE WIRED FROM A BANK IN DUBAI, UNITED ARAB
21   EMIRATES, TO THE SAN DIEGO SUPPLIER'S BANK ACCOUNT IN SAN
22   DIEGO, CALIFORNIA, WHICH MONIES REPRESENTED A PARTIAL PAYMENT
23   FOR THE NAVIGAT-2100 AND FULL PAYMENT FOR THE TWO Y-690'S.
24          ON JUNE 17, 2013, IN SAN DIEGO, CALIFORNIA,
25   DEFENDANT YILDIZ ACCEPTED DELIVERY OF THE NAVIGAT-2100 AND THE
```

APRIL 13, 2015

1   TWO Y-690'S.

2           LATER, ON JUNE 17, 2013, AT A COMMERCIAL CARRIER

3   FACILITY IN SAN DIEGO, CALIFORNIA, IN ORDER TO TRANSSHIP THE

4   NAVIGAT-2100 AND THE TWO Y-690'S TO IRAN, DEFENDANT YILDIZ

5   PROVIDED THE NAVIGAT-2100 AND THE TWO Y-690'S TO A COMMERCIAL

6   CARRIER FOR SHIPMENT FROM THE U.S. TO THIRD COUNTRIES.

7           THE NEXT SUMMARY RELATES TO COUNT 2.  WE ARE ON THE

8   HOME STRETCH.  THE FOLLOWING COUNTS SIMPLY INCORPORATE WHAT

9   YOU HAVE HEARD, AND THEN RELATE TO DIFFERENT COUNTS.

10          COUNT 2 IS CONSPIRACY TO SMUGGLE GOODS FROM THE

11  UNITED STATES.  ALL DEFENDANTS, INCLUDING TAHERKHANI, TIG

12  MARINE, YILDIZ AND GHAHREMAN, DID KNOWINGLY AND INTENTIONALLY

13  AGREE AND CONSPIRE WITH EACH OTHER AND WITH OTHER PERSONS,

14  KNOWN AND UNKNOWN, TO COMMIT OFFENSES AGAINST THE UNITED

15  STATES; THAT IS, KNOWINGLY RECEIVE, BUY AND FACILITATE THE

16  TRANSPORTATION AND SALE OF MERCHANDISE, ARTICLES AND OBJECTS

17  TO WIT, MARINE NAVIGATION EQUIPMENT AND MILITARY ELECTRONIC

18  EQUIPMENT, PRIOR TO EXPORTATION, KNOWING THE SAME TO BE

19  INTENDED FOR EXPORTATION FROM THE UNITED STATES CONTRARY TO

20  LAW AND REGULATION OF THE UNITED STATES.

21          COUNT 3 IS ATTEMPTED EXPORT TO AN EMBARGOED COUNTRY.

22  ON OR ABOUT JUNE 17, 2013, ALL DEFENDANTS DID KNOWINGLY AND

23  WILLFULLY ATTEMPT TO EXPORT, SELL AND SUPPLY MARINE NAVIGATION

24  EQUIPMENT, SPECIFICALLY A NAVIGAT-2100, INDIRECTLY FROM THE

25  UNITED STATES TO IRAN AND THE GOVERNMENT OF IRAN, VIA THE

APRIL 13, 2015

1    UNITED ARAB EMIRATES, WITHOUT HAVING FIRST OBTAINED THE

2    REQUIRED AUTHORIZATIONS FROM THE OFFICE OF FOREIGN ASSETS

3    CONTROL, UNITED STATES DEPARTMENT OF TREASURY.

4            COUNT 4.  ATTEMPTED EXPORT TO EMBARGOED COUNTRY.  ON

5    OR ABOUT JUNE 17, 2013 ALL DEFENDANTS DID KNOWINGLY AND

6    WILLFULLY ATTEMPT TO EXPORT, SELL AND SUPPLY MILITARY

7    ELECTRONIC EQUIPMENT, SPECIFICALLY TWO UNITS OF THE Y-690,

8    INDIRECTLY FROM THE UNITED STATES TO IRAN AND THE GOVERNMENT

9    OF IRAN, VIA THE CZECH REPUBLIC AND THE UNITED ARAB EMIRATES,

10   WITHOUT HAVING FIRST OBTAINED THE REQUIRED AUTHORIZATIONS FROM

11   THE OFFICE OF FOREIGN ASSETS CONTROL, UNITED STATES DEPARTMENT

12   OF TREASURY.

13           COUNT 5.  SMUGGLING OF GOODS FROM THE UNITED STATES.

14   BEGINNING ON OR ABOUT FEBRUARY 19, 2013 AND CONTINUING TO ON

15   OR ABOUT JUNE 17, 2013, ALL DEFENDANTS DID KNOWINGLY RECEIVE,

16   BUY AND FACILITATE THE TRANSPORTATION AND SALE OF MERCHANDISE,

17   ARTICLES AND OBJECTS, SPECIFICALLY A NAVIGAT-2100, PRIOR TO

18   EXPORTATION, KNOWING THE SAME TO BE INTENDED FOR EXPORTATION

19   FROM THE UNITED STATES CONTRARY TO LAW AND REGULATION OF THE

20   UNITED STATES, TO WIT, THAT IS, WITHOUT HAVING FIRST OBTAINED

21   THE REQUIRED AUTHORIZATIONS FROM THE OFFICE OF FOREIGN ASSETS

22   CONTROL, UNITED STATES DEPARTMENT OF TREASURY.

23           COUNT 6.  SMUGGLING OF GOODS FROM THE UNITED STATES.

24   BEGINNING ON OR ABOUT MARCH 10, 2013 AND CONTINUING TO ON OR

25   ABOUT JUNE 17, 2013 ALL DEFENDANTS DID KNOWINGLY RECEIVE, BUY

1    AND FACILITATE THE TRANSPORTATION AND SALE OF MERCHANDISE,

2    ARTICLES AND OBJECTS, THAT IS TWO UNITS OF THE Y-690, PRIOR TO

3    EXPORTATION, KNOWING THE SAME TO BE INTENDED FOR EXPORTATION

4    FROM THE UNITED STATES, CONTRARY TO THE LAW AND REGULATION OF

5    THE UNITED STATES, THAT IS, WITHOUT HAVING FIRST OBTAINED THE

6    REQUIRED AUTHORIZATIONS FROM THE OFFICE OF FOREIGN ASSETS

7    CONTROL, UNITED STATES DEPARTMENT OF TREASURY.

8           COUNT 7.  CONSPIRACY TO LAUNDER MONEY OR MONETARY

9    INSTRUMENTS.  BEGINNING AT A DATE UNKNOWN AND CONTINUING TO ON

10   OR ABOUT JUNE 17, 2013, ALL DEFENDANTS DID KNOWINGLY COMBINE,

11   CONSPIRE AND AGREE WITH EACH OTHER AND WITH OTHER PERSONS,

12   KNOWN AND UNKNOWN, TO TRANSFER AND TRANSMIT FUNDS TO A PLACE

13   IN THE UNITED STATES FROM AND THROUGH A PLACE OUTSIDE OF THE

14   UNITED STATES WITH THE INTENT TO PROMOTE THE CARRYING ON OF

15   SPECIFIED UNLAWFUL ACTIVITY, THAT IS, CRIMINAL VIOLATIONS OF

16   TITLE 50, UNITED STATES CODE, SECTIONS 1702 AND 1705, AND

17   TITLE 31, CODE OF FEDERAL REGULATIONS, PARTS 560.203 AND

18   560.204 UNDER THE IEEPA AND THE IRANIAN TRANSACTIONS AND

19   SANCTIONS REGULATIONS, AND TITLE 18, UNITED STATES CODE,

20   SECTION 554, SMUGGLING GOODS FROM THE UNITED STATES.

21          COUNT 8.  LAUNDERING OF MONETARY INSTRUMENTS.  ON OR

22   ABOUT MARCH 6, 2013 ALL DEFENDANTS TRANSMITTED AND TRANSFERRED

23   MONETARY INSTRUMENTS AND FUNDS, THAT IS, $18,000 IN UNITED

24   STATES CURRENCY, TO A PLACE IN THE UNITED STATES FROM AND

25   THROUGH A PLACE OUTSIDE THE UNITED STATES WITH THE INTENT TO

APRIL 13, 2015

1  PROMOTE THE CARRYING ON OF SPECIFIED UNLAWFUL ACTIVITY, THAT

2  IS, UNDER CRIMINAL VIOLATIONS OF TITLE 50, UNITED STATES CODE,

3  SECTIONS 1702 AND 1705, AND TITLE 31, CODE OF FEDERAL

4  REGULATIONS, PARTS 560.203 AND 560.204, AND TITLE 18 OF UNITED

5  STATES CODE SECTION 554.

6        THE FINAL COUNT, 9, LAUNDERING OF MONETARY

7  INSTRUMENTS.  ON OR ABOUT JUNE 17, 2013 ALL DEFENDANTS

8  TRANSMITTED AND TRANSFERRED MONETARY INSTRUMENTS AND FUNDS,

9  THAT IS $32,590 IN UNITED STATES CURRENCY, TO A PLACE IN THE

10 UNITED STATES FROM AND THROUGH A PLACE OUTSIDE THE UNITED

11 STATES, WITH THE INTENT TO PROMOTE THE CARRYING ON OF

12 SPECIFIED UNLAWFUL ACTIVITY, THAT IS, CRIMINAL VIOLATIONS OF

13 TITLE 50, U.S. CODE, SECTIONS 1702 AND 1705, AND TITLE 31,

14 CFR, PARTS 560.203 AND 560.204, AND TITLE 18 OF THE UNITED

15 STATES CODE, SECTION 554.

16       THAT COMPLETES THE SUMMARY OF THE GOVERNMENT'S

17 SUPERSEDING INDICTMENT.

18       AND AGAIN I WOULD REMIND YOU THAT TO THOSE

19 ALLEGATIONS MR. GHAHREMAN HAS ENTERED A NOT GUILTY PLEA, THUS

20 PUTTING INTO ISSUE EACH AND EVERY ELEMENT OF THE NINE COUNTS

21 THAT ARE ALLEGED AGAINST HIM.

22       IF YOU ARE SELECTED AS A JUROR IN THIS CASE IT WOULD

23 BE YOUR DUTY AND RESPONSIBILITY TO DETERMINE THIS CASE BASED

24 SOLELY ON ADMISSIBLE EVIDENCE AND THE LAW GIVEN TO YOU BY THE

25 COURT.  THE FACT THAT THESE ALLEGATIONS HAVE BEEN READ OR THAT

APRIL 13, 2015

1    MR. GHAHREMAN IS PRESENT HERE TODAY IS NOT IN ANY SENSE

2    EVIDENCE AGAINST HIM.  SO YOUR OBLIGATIONS WOULD BE TO BE

3    CLINICAL, FAIR AND NEUTRAL IN ASSESSING ALL ADMISSIBLE

4    EVIDENCE, EVALUATING THE LAW, AND ATTEMPTING TO ARRIVE AT A

5    VERDICT IF ABLE TO DO SO.

6              HERE AGAIN, THE GENERIC CLASSIFICATION OF THE

7    CHARGES ARE:  ATTEMPTED EXPORT TO AN EMBARGOED COUNTRY, IRAN,

8    AND CONSPIRACY TO DO THE SAME; SMUGGLING GOODS FROM THE UNITED

9    STATES AND CONSPIRACY TO DO THE SAME; LAUNDERING OF MONETARY

10   INSTRUMENTS AND CONSPIRACY TO DO THE SAME.  THOSE ARE THE NINE

11   COUNTS IN SUMMARY FORM.

12             AND SO HERE THE FIRST QUESTION I HAVE WITH RESPECT

13   TO THIS CHARGING DOCUMENT OF OUR 32 PROSPECTIVE JURORS IS

14   WHETHER THERE IS ANYTHING ABOUT THE NATURE OF THESE CHARGES,

15   THIS SUBJECT MATTER, GIVEN YOUR OWN LIFE EXPERIENCES, THINGS

16   THAT MAY HAVE HAPPENED TO YOU OR SOMEONE NEAR OR DEAR TO YOU,

17   THAT CAUSES YOU TO FEEL THAT YOU CANNOT FULFILL YOUR

18   OBLIGATIONS AS A JUROR; AND THAT IS TO BE FAIR AND NEUTRAL TO

19   BOTH SIDES, TO HEAR AND DECIDE THE CASE IN A CLINICAL,

20   NEUTRAL, DELIBERATE, JUDICIOUS FASHION.  IS THERE ANY ONE OF

21   YOU THAT FEELS THAT YOU HAVE CONCERNS ABOUT YOUR ABILITY TO DO

22   THAT, SIMPLY IN LIGHT OF THE CHARGES THAT I READ?

23             I DON'T SEE ANY HANDS.

24             LET ME COVER A COUPLE OF CONCEPTS.

25             IN A CRIMINAL CASE A DEFENDANT IS PRESUMED TO BE

APRIL 13, 2015

1    INNOCENT UNLESS AND UNTIL THE CONTRARY IS PROVEN.  AND IN A

2    CASE OF REASONABLE DOUBT HE IS ENTITLED TO A NOT GUILTY

3    VERDICT.  THE EFFECT OF THE PRESUMPTION IS TO PLACE UPON THE

4    GOVERNMENT, OR THE UNITED STATES, THE BURDEN OF PROVING THE

5    DEFENDANT GUILTY BEYOND A REASONABLE DOUBT.  UNLESS THAT IS

6    DONE, THE PRESUMPTION OF INNOCENCE PREVAILS.

7            SO THERE IS TWO BASIC CONCEPTS HERE THAT ARE THE

8    ESSENCE OF OUR CRIMINAL JUSTICE SYSTEM IN THE UNITED STATES.

9    ONE IS THE PRESUMPTION OF INNOCENCE.  IN EVERY TRIAL

10   THROUGHOUT THE UNITED STATES, STATE OR FEDERAL COURT, ANYONE

11   WHO IS ACCUSED OF A CRIME IS ENVELOPED OR SURROUNDED BY A

12   PRESUMPTION OF INNOCENCE.  SO HE OR SHE IS PRESUMED INNOCENT,

13   AND THAT PRESUMPTION CARRIES UNLESS THE GOVERNMENT CAN PROVE

14   THE CHARGE AGAINST HIM OR HER BEYOND A REASONABLE DOUBT.

15           IS THERE ANYONE WHO IS OPPOSED TO THAT BASIC

16   FRAMEWORK, THAT FOUNDATION OF OUR CRIMINAL JUSTICE SYSTEM,

17   SUCH THAT YOU CANNOT BE FAIR AND IMPARTIAL IN THIS CASE?

18              I DON'T SEE ANY HANDS.

19           THE SECOND ASPECT IS THE BURDEN OF PROOF, BEYOND A

20   REASONABLE DOUBT.  AND I WILL READ THE STANDARD TO YOU.  A

21   REASONABLE DOUBT IS A DOUBT BASED UPON REASON AND COMMON

22   SENSE, AND MAY ARISE FROM A CAREFUL AND IMPARTIAL

23   CONSIDERATION OF ALL OF THE EVIDENCE OR FROM A LACK OF

24   EVIDENCE.  PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT

25   LEAVES YOU FIRMLY CONVINCED THAT THE DEFENDANT IS GUILTY.

APRIL 13, 2015

```
 1              THAT STANDARD, PROOF BEYOND A REASONABLE DOUBT, IS
 2   THE HIGHEST STANDARD IN OUR LEGAL SYSTEM.  AND THE QUESTION
 3   HERE IS WHETHER ANY OF YOU HAVE A QUARREL WITH THAT BURDEN
 4   THAT IS PLACED ON THE GOVERNMENT.  IN ORDER TO SUCCESSFULLY
 5   PROSECUTE ANY CHARGE OR COUNT AGAINST ANY DEFENDANT ANYWHERE
 6   IN THE UNITED STATES THE GOVERNMENT MUST PROVE THEIR CASE
 7   BEYOND A REASONABLE DOUBT.  ANYONE HAVE A QUARREL WITH THAT
 8   STANDARD OF PROOF, THAT PRESUMPTION THAT IS PLACED UPON THE
 9   GOVERNMENT?
10              I DON'T SEE ANY HANDS.
11              IT IS ALSO IMPORTANT TO RECOGNIZE THAT THE STANDARD
12   IS PROOF BEYOND A REASONABLE DOUBT, OR DOUBT THAT IS BASED IN
13   REASON OR COMMON SENSE.  THE STANDARD DOES NOT REQUIRE PROOF
14   BEYOND ANY DOUBT OR BEYOND THE SHADOW OF A DOUBT.  ANYONE HAVE
15   ANY CONCERNS, HESITATION ABOUT THAT QUALIFICATION?
16              ALL RIGHT.
17              DO ANY OF YOU HAVE ANY PRIOR KNOWLEDGE ABOUT THIS
18   CASE, AS YOU NOW HAVE SOME GENERAL BASIC UNDERSTANDING OF THE
19   ALLEGATIONS, ANY INTEREST IN THE OUTCOME OF THE CASE FOR ANY
20   REASON, OR ANY STRONG FEELING IN FAVOR OF ONE SIDE OR ANOTHER,
21   FOR ANY REASON, AS YOU SIT HERE THIS MORNING?
22              I DON'T SEE ANY HANDS.
23              ANOTHER BASIC CONCEPT IN OUR SYSTEM OF JUSTICE
24   THROUGHOUT THE UNITED STATES IS THE ROLE OF JURORS.  JURORS
25   ARE ASKED, AS I HAVE REPEATED NOW, TO SIT IN A DISPASSIONATE,
```

1    NEUTRAL, CLINICAL, OBJECTIVE MANNER.  TO KEEP AN OPEN MIND, TO

2    BE FAIR AND NEUTRAL.  NOT TO TAKE SIDES.  AND EQUALLY

3    IMPORTANT TO, THROUGHOUT THE PROCEEDINGS, BE OPEN AND

4    OBJECTIVE, HEAR ALL OF THE EVIDENCE, NO MATTER WHICH SIDE

5    PRESENTS IT.  AND THEN TO, IN GOOD FAITH, TO THE BEST OF YOUR

6    ABILITY, DETERMINE WHAT THE FACTS ARE.

7            SO JURORS STAND IN JUDGMENT OF THE ACTIONS OF

8    OTHERS.  WE DON'T ASK YOU TO STAND IN JUDGMENT OF ANYONE, BUT

9    WE DO ASK YOU TO JUDGE THE ACTIONS OR THE CONDUCT OF OTHERS.

10           IN ORDER TO DO THAT, AND IN ORDER TO MAKE A

11   DETERMINATION AS TO WHAT THE EVIDENCE HAS SHOWN, YOU HAVE TO

12   FEEL COMFORTABLE MAKING DECISIONS.  AND WHAT THAT REQUIRES IS

13   THAT YOU HAVE SOME COMFORT LEVEL EXERCISING COMMON SENSE,

14   EVALUATING WITNESS DEMEANOR, HEARING ARGUMENT FROM COUNSEL,

15   LISTENING ATTENTIVELY AND DISPASSIONATELY TO ALL OF THE

16   EVIDENCE THAT YOU WILL HEAR IN THE CASE; AND THEN DETERMINING

17   FOR YOURSELF WHAT YOU THINK HAPPENED, WHAT IS THE EVIDENCE.

18   IT REQUIRES YOU TO BE COMFORTABLE STANDING IN JUDGMENT OF THE

19   ACTIONS OF OTHERS.

20           IS THERE ANY ONE OF YOU WHO IS UNCOMFORTABLE SERVING

21   IN THAT MANNER OR CAPACITY?

22           I DON'T SEE ANY HANDS.

23           WHAT IS ALSO REQUIRED IS THAT JURORS FOLLOW THE LAW.

24   SO THE COURT HAS THE OBLIGATION OF PROVIDING THE LAW AS TO

25   THESE NINE COUNTS TO THE MEMBERS OF THE JURY.  WHETHER OR NOT

APRIL 13, 2015

```
1    YOU PERSONALLY AGREE WITH THE LAW, THE OBLIGATION OF THE
2    JURORS IS TO FOLLOW THE LAW.  SO IF YOU HEAR LAW, FOR EXAMPLE,
3    ON THE COUNTS WITH RESPECT TO TRADE EMBARGOES TO IRAN OR
4    CONSPIRACY OR MONEY LAUNDERING, AND YOU PERSONALLY DISAGREE
5    WITH THE LAW OR HAVE QUESTIONS ABOUT IT, THIS WOULD NOT BE THE
6    FORUM TO RAISE THE DISAGREEMENT.  YOU WOULD HAVE TO ACCEPT THE
7    LAW, AS GIVEN TO YOU BY THE COURT, AND THEN TO MECHANICALLY
8    APPLY THAT LAW TO THE FACTS AS EACH OF YOU DETERMINES THE
9    FACTS.  AND THEN TO ATTEMPT TO ARRIVE AT A VERDICT IF YOU ARE
10   ABLE TO DO SO.
11           SO HERE AGAIN WHAT IT REQUIRES IS EACH JUROR DECIDES
12   FOR HIMSELF OR HERSELF WHAT THE EVIDENCE IS.  THEY HEAR THE
13   LAW FROM THE COURT, THEY APPLY THE LAW TO THE FACTS AS EACH OF
14   YOU DETERMINES THEM, AND THEN YOU SEE IF YOU CAN ARRIVE AT A
15   VERDICT AS TO ANY ONE OR MORE OF THE COUNTS.
16           ANY OF YOU HAVE ANY DISCOMFORT SERVING IN THAT
17   MANNER OR CAPACITY?
18           I DON'T SEE ANY HANDS.
19           DO ANY OF YOU HAVE ANY DISCOMFORT SERVING AS A
20   JUROR, UNDERSTANDING YOUR ROLE NOW, BECAUSE OF ANY MORAL,
21   PHILOSOPHICAL, RELIGIOUS CONCERNS, OR JUST A PERSONAL
22   DISCOMFORT IN MAKING DECISIONS?  ANYONE FEEL IMPAIRED IN THAT
23   WAY?
24           **PROSPECTIVE JUROR:**  (NAME REDACTED, JUROR NO. 2).  I
25   AM GOING TO SPEAK NOW, BECAUSE IF THIS IS A POTENTIAL
```

APRIL 13, 2015

1    TERRORIST THING, I DON'T KNOW IF I WOULD FEEL COMFORTABLE.  I

2    AM NOT JUDGING BECAUSE I DON'T KNOW ANY FACTS, BUT IF MY LIFE

3    WOULD BE IN JEOPARDY OR MY FAMILY'S LIFE, YOU KNOW, 9/11 AND

4    ALL THAT.

5              **THE COURT:**  OKAY.  WE ARE SPEAKING WITH JUROR 2,

6    (NAME REDACTED).  THERE IS NONE OF THAT.

7              **PROSPECTIVE JUROR:**  OKAY.

8              **THE COURT:**  SO LET ME MAKE THIS COMMENT.

9              FIRST I WILL START ON A DIFFERENT TOPIC COMPLETELY,

10   AND THAT IS LET'S ASSUME THIS CASE INVOLVED THE SUBJECT MATTER

11   OF ABORTION.  NOW, EVERYONE HERE HAS A STRONG VIEW, ONE WAY OR

12   ANOTHER, AND WE ARE EACH ENTITLED TO OUR OWN OPINIONS AND

13   BELIEFS.  THAT SUBJECT MATTER CAN CAUSE CONCERN FOR PEOPLE.

14   BUT IF THEY ARE ASKED TO DECIDE, FOR EXAMPLE, A CASE INVOLVING

15   PICKETING AT PLANNED PARENTHOOD, AND IT IS A FIRST AMENDMENT

16   OR A TRESPASS CHARGE OR ALLEGATION INVOLVED, WHAT WE FIND IS

17   THAT JURORS ARE COMFORTABLE HEARING AND DECIDING THAT TYPE OF

18   CASE.  THEY CAN SET ASIDE THEIR GENERALLY HELD BELIEFS ABOUT

19   ABORTION, FOR EXAMPLE, AND INSTEAD FULFILL THEIR OBLIGATION IN

20   THE COURTROOM BY FOCUSING ON WHAT'S THE CHARGE, WHAT'S THE

21   EVIDENCE, WHAT'S THE LAW, IS THIS DEFENDANT GUILTY OR NOT

22   GUILTY AS CHARGED; WITHOUT LETTING THEIR GENERALLY HELD

23   BELIEFS ON A GENERAL SUBJECT MATTER INVADE THAT DELIBERATIVE

24   PROCESS.

25              SO THE FIRST QUESTION IS, DO YOU FEEL YOU CAN DO

APRIL 13, 2015

```
 1   THAT?

 2            PROSPECTIVE JUROR:  IF IT IS A MORAL ISSUE,

 3   RELIGIOUS OR SOMETHING LIKE THAT, I FEEL THAT I WOULD HAVE THE

 4   ABILITY TO BE FAIR.

 5            THE COURT:  ALL RIGHT.  IN THIS CASE, TO BE CLEAR,

 6   IT HAS NOTHING TO DO WITH TERRORISM OR 9/11 OR ANY OF THAT.

 7   THE ALLEGATIONS --

 8            PROSPECTIVE JUROR:  TEHRAN AND DUBAI AND, YOU KNOW,

 9   EXPORTATION, AND NOT HAVING, YOU KNOW, THE PROPER CREDENTIALS.

10   AND THEN ALSO IF THERE IS -- YOU KNOW, THERE IS MARINE

11   NAVIGATION, MILITARY ISSUES, 9/11, ALL OF THIS SENDS RED FLAGS

12   IN MY HEAD.  AND, YOU KNOW, MY FAMILY, MYSELF, I DON'T WANT TO

13   BE INVOLVED IN ANY, YOU KNOW, IN FEAR OF MY LIFE IF I WAS TO

14   SIT UP HERE AS A JUROR AND THEN RULE ON SOMETHING.

15            THE COURT:  TO BE CLEAR, THIS CASE DOES NOT INVOLVE

16   ANYTHING ABOUT 9/11 OR ANY TYPE OF ACTIVITY LIKE THAT.  IT HAS

17   NOTHING TO DO WITH THAT.  IT HAS SIMPLY TO DO, IF WE LOOK AT

18   IT IN A CLINICAL FASHION, WITH AN ALLEGATION OF ILLEGAL

19   EXPORTATION TO A COUNTRY THAT WE ARE NOT SUPPOSED TO SHIP TO.

20   SO THAT IS KIND OF THE ESSENCE OF THE CASE.

21            NOW, CLEARLY, THE EVIDENCE IS GOING TO BE BRINGING

22   INTO ISSUE DIFFERENT COUNTRIES LIKE IRAN.  THERE IS MUCH IN

23   THE MEDIA TODAY ABOUT IRAN AND OTHER COUNTRIES WHERE THE

24   UNITED STATES HAS TENSION, COULD BE RUSSIA, COULD BE CHINA,

25   COULD BE OTHER COUNTRIES IN THE MIDDLE EAST, THERE IS A
```

APRIL 13, 2015

```
 1    VARIETY OF COUNTRIES.  AND THERE ARE MANY COUNTRIES THAT ARE
 2    EMBARGOED, WE CANNOT EXPORT WITHOUT MEETING CERTAIN
 3    REQUIREMENTS.
 4            SO THE TASK HERE, AND THIS IS -- I GO BACK TO THE
 5    ABORTION ANALOGY, IS SIMPLY THE INFORMATION IN THIS CASE
 6    INVOLVING IRAN AND THE ALLEGATION OF EXPORT TO AN EMBARGOED
 7    COUNTRY CAN RAISE PASSION IN CERTAIN MEMBERS OF THE JURY, JUST
 8    LIKE ABORTION COULD.  BUT THE QUESTION IS WHETHER YOU CAN SET
 9    ASIDE ANY POTENTIAL PASSION OR PREJUDICE OR COMPASSION,
10    WHATEVER IT MIGHT BE, AND TO JUST MECHANICALLY EVALUATE THE
11    EVIDENCE, APPLY IT TO THE LAW, AND RENDER A DECISION IN A
12    CLINICAL MANNER.
13            DO YOU FEEL THAT YOU CAN DO THAT?
14            PROSPECTIVE JUROR:  YES, I CAN.  AND I DO THAT ON A
15    DAILY BASIS.  I REVIEW FACTS AND INVESTIGATE INFORMATION AND
16    BRING IT BEFORE THE COURT, BECAUSE I WORK FOR A COURT, SAN
17    DIEGO SUPERIOR COURT.  BUT I JUST DON'T HAVE TIME TO BE IN
18    FEAR OF MY LIFE, YOU KNOW.  I JUST WANT TO MAKE SURE THAT, YOU
19    KNOW, I AM PROTECTED.
20            THE COURT:  THAT IS NOT A CONCERN HERE.
21            PROSPECTIVE JUROR:  IF WE LATER FIND OUT ANYTHING.
22            THE COURT:  NO, THERE IS ABSOLUTELY NO EVIDENCE OR
23    SUGGESTION OF THAT.
24            PROSPECTIVE JUROR:  OKAY.  THANKS.
25            THE COURT:  SO LET ME FOLLOW UP WITH (NAME REDACTED;
```

APRIL 13, 2015

```
 1   JUROR NO. 2) AND THE CONCEPT OF THE ALLEGATIONS INVOLVING
 2   IRAN, AN EMBARGOED COUNTRY.  THERE IS OBVIOUSLY MUCH
 3   DISCUSSION IN THE NEWS TODAY ABOUT IRAN, AND WE HEAR DAILY
 4   DIFFERENT ACCOUNTS.  THERE IS MUCH DISCUSSION ABOUT OTHER
 5   COUNTRIES, AS WELL, WHERE TENSIONS ARISE PERIODICALLY.
 6            IS THERE ANYTHING ABOUT THAT FACT, AGAIN
 7   UNDERSTANDING YOUR OBLIGATIONS AS JURORS IN THIS CASE, THAT
 8   CAUSES ANY ONE OF YOU ANY CONCERN ABOUT BEING COMPLETELY FAIR
 9   TO BOTH SIDES?
10            I SEE ONE HAND.
11            LET ME TURN TO JUROR NO. 17 -- I AM SORRY -- IT
12   WOULD BE JUROR NO. 25, (NAME REDACTED).
13            PROSPECTIVE JUROR:  I HAVE A QUESTION.
14            THE COURT:  YES.
15            PROSPECTIVE JUROR:  I AM A NEWS JUNKIE, SO IN THE
16   NEWS THERE IS ARTICLES THAT THE PRESIDENT IS GOING TO LIFT
17   IRAN'S EMBARGO.  IF THIS TRIAL GOES INTO A COUPLE OF MONTHS
18   WILL THIS CHARGE STILL HOLD AGAINST THIS PERSON?
19            THE COURT:  THAT IS A FAIR QUESTION.  AND ALL I CAN
20   SAY IS, WHAT MAY OR MY NOT HAPPEN IN THE FUTURE WE DON'T HAVE
21   ANY CONTROL OVER.  ALL WE CAN DO IS DECIDE THIS CASE, WITH
22   THIS LAW.  AND SO HYPOTHETICALLY IF CIRCUMSTANCES WERE TO
23   CHANGE DOWN THE ROAD, IF LAWS WERE TO CHANGE AT A LATER TIME
24   AND THEY MIGHT IMPACT THIS CASE, THEN THAT WOULD BE A MATTER
25   FOR THE COURT TO ADDRESS AT A LATER TIME, ASSUMING AN ADVERSE
```

APRIL 13, 2015

1   RESULT TO MR. GHAHREMAN.  IF THE JURY HEARS AND DECIDES THE

2   CASE AND CONCLUDES THE GOVERNMENT HAS NOT MET ITS BURDEN, THEN

3   IT IS ACADEMIC.

4           BUT THE BOTTOM LINE IS, WHAT MAY OR MAY NOT HAPPEN

5   IN THE FUTURE WE CANNOT SPECULATE ABOUT.  WE HAVE TO DEAL WITH

6   THESE ALLEGATIONS, THE LAW PRESENTLY, AND THEN THE OBLIGATIONS

7   OF THE JURORS TO FULFILL THAT OBLIGATION; THAT IS, TO

8   DETERMINE THE FACTS AND APPLY THE LAW.

9           CAN YOU DO THAT?

10          **PROSPECTIVE JUROR:**  YES.

11          **THE COURT:**  AND YOU MENTIONED YOU ARE A NEWS JUNKIE.

12  I AM ASSUMING THAT MANY PROSPECTIVE JURORS ARE NEWS JUNKIES.

13  THERE IS A LOT OF INFORMATION GOING ON PRESENTLY.  THERE IS

14  DISCUSSIONS PRESENTLY ABOUT IRAN AND REACHING AN AGREEMENT

15  WITH RESPECT TO THE NUCLEAR FACILITIES AND OTHERWISE.  ALL OF

16  THESE THINGS ARE ONGOING.  DAILY DISCUSSIONS ABOUT CUBA AND

17  RUSSIA AND NORTH KOREA AND MANY, MANY OTHER COUNTRIES, SOME

18  POSITIVE, SOME NOT POSITIVE.  BUT NONE OF THAT MATTERS WHEN IT

19  COMES TO THE OBLIGATIONS OF JURORS IN THIS CASE.

20          AND SO ARE YOU COMFORTABLE SERVING IN THAT CAPACITY?

21          **PROSPECTIVE JUROR:**  YES.

22          **THE COURT:**  OKAY.

23          ANYONE ELSE HAVE ANY CONCERNS OR HESITATION AS WE

24  DISCUSS THIS TOPIC?

25          I DON'T SEE ANY OTHER HANDS.  OKAY.

APRIL 13, 2015

```
 1              THERE WILL BE TESTIMONY FROM LAW ENFORCEMENT
 2    OFFICERS, HOMELAND SECURITY, THREE OR FOUR SUCH WITNESSES.
 3    AND THE QUESTION HERE IS WHETHER ANY OF YOU WOULD, GIVEN YOUR
 4    OWN LIFE EXPERIENCES, OCCUPATION, THINGS THAT MAY HAVE
 5    HAPPENED TO ANYONE NEAR OR DEAR TO YOU, WOULD HAVE CONCERNS
 6    ABOUT YOUR ABILITY TO BE COMPLETELY FAIR IN YOUR ASSESSMENT OF
 7    TESTIMONY FROM LAW ENFORCEMENT.  WOULD YOU BE BIASED IN FAVOR
 8    OF OR PREJUDICED AGAINST LAW ENFORCEMENT SIMPLY BY VIRTUE OF
 9    THEIR POSITION OR STATUS.  ANYONE HAVE THAT CONCERN?  OKAY.
10              SO WHAT IS IMPORTANT HERE IS LAW ENFORCEMENT, JUST
11    LIKE ANY OTHER WITNESS, ARE TREATED THE SAME.  YOU MEASURE
12    WHAT THEY SAY BY OBJECTIVE FACTORS:  HOW THEY APPEAR ON THE
13    WITNESS STAND, THE CONSISTENCY OF THEIR PRESENTATION, THEIR
14    ABILITY TO SEE OR HEAR OR KNOW THE MATTERS THAT THEY TESTIFY
15    ABOUT.  THOSE TYPES OF SUBJECTIVE CRITERIA.
16              ANYONE HAVE ANY CONCERNS ABOUT YOUR ABILITY TO
17    EVALUATE LAW ENFORCEMENT TESTIMONY IN THAT CLINICAL FASHION?
18              OKAY.  I DON'T SEE ANY HANDS.
19              I HAVE A FEW GENERAL QUESTIONS, A FEW MORE, AND THEN
20    WE WILL MOVE TO THE QUESTIONNAIRE.
21              THERE IS REFERENCE TO THE UNITED STATES DEPARTMENT
22    OF TREASURY, OFFICE OF FOREIGN ASSETS CONTROL.  ANYONE HAVE
23    ANY CONNECTION -- BUSINESS, PROFESSIONAL, COMMERCIAL OR
24    OTHERWISE -- WITH THAT AGENCY?
25              I SEE NO HANDS.
```

APRIL 13, 2015

```
 1              NORTHROP GRUMMAN, THAT IS A WELL-KNOWN COMPANY.

 2   ANYONE HAVE ANY CONNECTION WITH NORTHROP GRUMMAN?

 3              I SEE ONE HAND.  LET ME MOVE TO JUROR NO. --

 4         PROSPECTIVE JUROR:  I HAVE A CUSTOMER.

 5         THE COURT:  JUROR NO. 13.  LET ME IDENTIFY YOU. FOR

 6   THE RECORD.

 7              PROSPECTIVE JUROR:  (NAME REDACTED).

 8         THE COURT:  THANK YOU.  WHAT IS YOUR CONNECTION WITH

 9   NORTHROP.

10         PROSPECTIVE JUROR:  I AM A CONTRACTS NEGOTIATOR

11   SENIOR WITH ANOTHER LARGE DEFENSE CONTRACTOR, AND THEY ARE A

12   CUSTOMER OF MINE.

13         THE COURT:  SO WHO DO YOU WORK WITH OR FOR?

14         PROSPECTIVE JUROR:  LOCKHEED MARTIN.

15         THE COURT:  LOCKHEED.  AND IN YOUR EMPLOYMENT STATUS

16   WITH LOCKHEED YOU DEAL WITH NORTHROP FROM TIME TO TIME?

17         PROSPECTIVE JUROR:  YES.

18         THE COURT:  DO YOU HAVE -- SO THAT IS A

19   PROFESSIONAL --

20         PROSPECTIVE JUROR:  CORRECT.

21         THE COURT:  -- RELATIONSHIP.

22              DO YOU OWN ANY STOCK OR HAVE ANY INTEREST IN

23   NORTHROP?

24         PROSPECTIVE JUROR:  NO.

25         THE COURT:  YOUR RELATIONSHIP WITH NORTHROP IS
```

APRIL 13, 2015

1    PURELY PROFESSIONAL, ATTENDANT TO YOUR WORK OBLIGATIONS?

2            **PROSPECTIVE JUROR:**  YES.

3            **THE COURT:**  DO YOU HAVE ANY SPECIAL FEELINGS ABOUT

4    NORTHROP, POSITIVE OR NEGATIVE, THAT WOULD AFFECT YOUR ABILITY

5    TO BE COMPLETELY FAIR?

6            **PROSPECTIVE JUROR:**  NO.

7            **THE COURT:**  YOU WILL BE HEARING TESTIMONY FROM ONE

8    OR TWO WITNESSES FROM NORTHROP.  ARE YOU COMFORTABLE

9    EVALUATING THEIR TESTIMONY NEUTRALLY?

10           **PROSPECTIVE JUROR:**  SURE.

11           **THE COURT:**  OKAY.  THANK YOU.

12           ANYONE ELSE?  ANY CONNECTION WITH NORTHROP OF ANY

13   KIND?

14           I DON'T SEE ANY HANDS.

15           HOW ABOUT POWER GRID PRODUCTS OR COMMUNICATIONS &

16   POWER INDUSTRIES, CPI.  ANY CONNECTION, KNOWLEDGE, AFFILIATION

17   WITH?

18           I SEE NO HANDS.

19           DO ANY OF YOU KNOW ANYTHING ABOUT THE NAVIGAT-2100

20   FIBER OPTIC GYROCOMPASS?  ANYONE MARINE TECHIES, OR HAVE ANY

21   ENGINEERING BACKGROUND, KNOW ANYTHING ABOUT THAT DEVICE?

22           I DON'T SEE ANY HANDS.

23           HOW ABOUT THE Y-690 ELECTRON TUBE, ANYONE KNOW

24   ANYTHING ABOUT THAT?

25           I DON'T SEE ANY HANDS.

APRIL 13, 2015

1          DO ANY OF YOU HAVE RELATIVES OR FAMILY MEMBERS OR

2    CLOSE PERSONAL FRIENDS IN IRAN OR THE UNITED ARAB EMIRATES?

3          I DON'T SEE ANY HANDS.

4          THE DEPARTMENT OF HOMELAND SECURITY WILL BE INVOLVED

5    IN THIS TRIAL.  THE ALLEGATIONS, AS YOU HAVE HEARD, INVOLVE

6    UNDERCOVER AGENTS FROM HOMELAND SECURITY AND A COUPLE OF

7    SPECIAL AGENTS.

8          DO ANY OF YOU HAVE ANY CONNECTION WITH HOMELAND

9    SECURITY OR ANY OF ITS DEPARTMENTS OR AGENCIES OR

10   AFFILIATIONS?

11         I DON'T SEE ANY HANDS.

12         I WILL BROADEN THE QUESTION.  HAVE ANY OF YOU HAD

13   SUCH A NEGATIVE OR POSITIVE EXPERIENCE WITH LAW ENFORCEMENT OF

14   ANY KIND -- LOCAL, STATE, FEDERAL, COUNTY -- SUCH THAT YOU

15   WOULD HAVE CONCERNS ABOUT BEING COMPLETELY OBJECTIVE AND FAIR

16   WITH RESPECT TO THE GOVERNMENT'S CASE OR LAW ENFORCEMENT

17   SPECIFICALLY?

18         I DON'T SEE ANY HANDS.

19         HOW ABOUT ANY DISPUTE OF SUCH A NATURE, UNFAVORABLE

20   OR POSITIVE, COULD BE TAXES WHICH ARE DUE IN TWO DAYS, THAT

21   YOU HAVE A GENERAL DISLIKE FOR THE GOVERNMENT -- STATE,

22   FEDERAL, LOCAL, COUNTY -- SUCH THAT YOU JUST DON'T FEEL YOU

23   CAN FAIRLY EVALUATE A CASE BROUGHT BY THE UNITED STATES OF

24   AMERICA?

25         OKAY.  I DON'T SEE ANY HANDS.

APRIL 13, 2015

```
 1              THIS CASE INVOLVES UNDERCOVER AGENTS, AND YOU WILL
 2     BE INSTRUCTED ON THAT AS WELL.  THE LAW PROVIDES AND ALLOWS
 3     FOR THAT TYPE OF LAW ENFORCEMENT ACTIVITY.  IS THERE ANY ONE
 4     OF YOU, SIMPLY BECAUSE OF THAT FACT ALONE, THE USE OF
 5     UNDERCOVER AGENTS IN THIS CASE, FEEL THAT YOU CANNOT FAIRLY
 6     EVALUATE THE TESTIMONY AND BE NEUTRAL AS TO BOTH SIDES?
 7              I DON'T SEE ANY HANDS.
 8              DO ANY OF YOU BELONG TO ANY -- ANY OF YOU A MEMBER
 9     OF AN ORGANIZATION, EITHER BY WAY -- BY MEMBER I MEAN YOU
10     CONTRIBUTE MONEY OR TIME OR ARE AN ACTUAL MEMBER OF ANY
11     ORGANIZATION THAT TAKES A POSITION IN FAVOR OF OR AGAINST,
12     COULD BE LAW ENFORCEMENT, OR INTERNATIONAL TREATY AND TRADE,
13     U.S./MEXICO RELATIONS, NAFTA, ANY OF THOSE THINGS.  ANYONE
14     BELONG TO ANY TYPE OF ORGANIZATION OR CONTRIBUTE MONEY TO ANY
15     ORGANIZATION THAT TAKES A POSITION ONE WAY OR ANOTHER?
16              I DON'T SEE ANY HANDS.
17              LET'S GO TO -- WE WILL RUN THROUGH THE
18     QUESTIONNAIRE, AND THEN WE WILL MOST LIKELY TAKE A BRIEF BREAK
19     AT THAT TIME BEFORE COUNSEL QUESTION THE PROSPECTIVE JURORS.
20              SO WHAT I WOULD LIKE TO DO AT THIS TIME -- THIS GOES
21     RELATIVELY QUICKLY.  WE ARE GOING TO START WITH JUROR NO. 1,
22     WORK TO YOUR LEFT, MY RIGHT.  AND WE ARE GOING TO GO THROUGH
23     ALL 32 JURORS.
24              THE QUESTIONNAIRE CONTAINS 10 QUESTIONS.  YOU DON'T
25     HAVE TO READ THE QUESTION, YOU CAN SIMPLY AND VERY BRIEFLY
```

APRIL 13, 2015

1    RESPOND TO EACH OF THE 10 QUESTIONS.

2            LET'S START WITH JUROR NO. 1, (NAME REDACTED).

3        **PROSPECTIVE JUROR:**  (NAME REDACTED).

4            I AM VICE PRESIDENT OF CLINICAL OPERATIONS FOR A

5    PHARMACEUTICAL COMPANY.

6            MY WIFE IS -- WORKS IN HUMAN RESOURCES.

7        **THE COURT:**  WHAT TYPE OF COMPANY?  SAME COMPANY?

8        **PROSPECTIVE JUROR:**  A PHARMACY BENEFITS MANAGEMENT

9    COMPANY.

10       **THE COURT:**  OKAY.  THANK YOU.

11       **PROSPECTIVE JUROR:**  I HAVE THREE DAUGHTERS.  THEY

12   ARE ALL -- TWO ARE IN COLLEGE, ONE IS IN HIGH SCHOOL.

13           I LIVE IN SCRIPPS RANCH.

14           I HAVE NEVER SERVED AS A JUROR NOR BEEN ON A GRAND

15   JURY.

16           I HAVE NOT HAD A FAMILY MEMBER OR CLOSE FRIEND

17   VICTIMIZED.

18           AND HAVE I HAVE A COUSIN THAT WORKS IN LAW

19   ENFORCEMENT.

20       **THE COURT:**  WHAT AGENCY?

21       **PROSPECTIVE JUROR:**  IT IS A COUNTY IN OHIO.

22       **THE COURT:**  OKAY.  ANYTHING ABOUT THAT RELATIONSHIP

23   GIVE YOU ANY CONCERNS HERE?

24       **PROSPECTIVE JUROR:**  NO.

25           AND YES, I CAN BE FAIR AND IMPARTIAL.

APRIL 13, 2015

```
 1              THE COURT:  ALL RIGHT.  THANK YOU.
 2              (NAME REDACTED; JUROR NO. 2)
 3              PROSPECTIVE JUROR:  GOOD MORNING.  MY NAME IS (NAME
 4    REDACTED).
 5              I AM A CLERK AT THE SAN DIEGO SUPERIOR COURT.
 6              MY SPOUSE WORKS FOR QUALCOMM, AN ACCOUNTANT THERE.
 7              DO NOT HAVE ANY CHILDREN, JUST A FOUR-LEGGED FURRY
 8    CHILD.
 9              I HAVE SERVED -- OH, I LIVE IN CENTRAL SAN DIEGO.
10              I HAVE SERVED ON A CRIMINAL CASE.  WE DID REACH A
11    VERDICT.
12              THE COURT:  WITHOUT DISCLOSING THE VERDICT, WHAT WAS
13    THE CHARGE IN THAT CASE?
14              PROSPECTIVE JUROR:  IT WAS UNDER THE INFLUENCE.
15              THE COURT:  OKAY.  THANK YOU.
16              PROSPECTIVE JUROR:  AND I HAVE NOT SERVED ON A GRAND
17    JURY OR FEDERAL OR STATE COURT.
18              I HAVE BEEN A VICTIM OF A CRIME, HAD AN OBJECT
19    STOLEN FROM THE TRUNK OF MY VEHICLE.  AND DID NOT HAVE THEIR
20    NAME OR LICENSE PLATE SO I COULD NOT REPORT IT.
21              I DO HAVE -- I AM CLOSELY ASSOCIATED WITH LAW
22    ENFORCEMENT, SHERIFF'S DEPARTMENT.  I DO WORK FOR THE
23    COURTHOUSE.  BUT NO CLOSE FRIENDS.
24              AND I CAN BE COMPLETELY FAIR AND IMPARTIAL.
25              THE COURT:  YOUR CONTACT WITH LAW ENFORCEMENT IS
```

APRIL 13, 2015

```
 1   THROUGH WORK?

 2              PROSPECTIVE JUROR:  YES.

 3              THE COURT:  OKAY.  VERY GOOD.  THANK YOU.

 4              JUROR NO. 3.

 5              PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).

 6              I AM RETIRED FROM NON-PROFIT FUNDRAISING.

 7              MY EX-HUSBAND WAS AN EDUCATOR -- OR IS.  I DON'T

 8   KNOW.

 9              THE COURT:  AT WHAT LEVEL?

10              PROSPECTIVE JUROR:  AT UCSD.

11              THE COURT:  OKAY.  AND WHAT SUBJECTS DID HE TEACH?

12              PROSPECTIVE JUROR:  HISTORY.

13              THE COURT:  OKAY.  THE NON-PROFIT YOU WORKED FOR,

14   WHAT AREA IS IT INVOLVED IN?

15              PROSPECTIVE JUROR:  MY MOST RECENT, WHERE I RETIRED

16   FROM, THE GIRL SCOUTS.  I WORKED FOR OTHER NON-PROFITS IN THE

17   CITY.

18              THE COURT:  OKAY.  THANK YOU.

19              PROSPECTIVE JUROR:  I LIVE IN CENTRAL SAN DIEGO.

20              I HAVE TWO CHILDREN.  THEY ARE MORE OR LESS

21   EMPLOYED.  MY DAUGHTER IS IN THE NON-PROFIT WORLD.  MY SON IS

22   COMPLETING A MASTER'S IN MARINE TRANSPORTATION, AND WORKS PART

23   TIME FOR A MARINE TRANSPORTATION COMPANY OUT OF HOUSTON.

24              THE COURT:  DO YOU KNOW WHAT COMPANY?

25              PROSPECTIVE JUROR:  MATTHEWS DANIEL.
```

APRIL 13, 2015

```
 1              THE COURT:  DO YOU KNOW WHAT HE DOES?  DO YOU

 2   UNDERSTAND ANYTHING HE IS DOING?

 3              PROSPECTIVE JUROR:  NO.

 4              THE COURT:  ALL RIGHT.

 5              PROSPECTIVE JUROR:  HE EVENTUALLY WILL PERHAPS BE A

 6   CAPTAIN OF A SHIP.

 7              THE COURT:  YES.  THE NON-PROFITS YOUR DAUGHTER

 8   WORKS FOR, WHAT TYPES, GENERALLY?  WHAT FIELDS?

 9              PROSPECTIVE JUROR:  IT IS THE REVSON FOUNDATION IN

10   NEW YORK CITY.  THEY FUND PROJECTS FOR -- THEY HAVE SEVERAL

11   DIFFERENT AREAS OF EMPHASIS AROUND NEW YORK.

12              THE COURT:  WHAT IS THEIR EMPHASIS?  CAN YOU

13   ELABORATE?

14              PROSPECTIVE JUROR:  WOMEN'S ISSUES AND THE CITIZENS

15   OF NEW YORK, AND I DON'T KNOW WHAT ELSE.  SHE JUST STARTED

16   THERE.

17              THE COURT:  DOMESTIC VIOLENCE, THOSE TYPES OF

18   ISSUES?

19              PROSPECTIVE JUROR:  I DON'T KNOW.

20              THE COURT:  ALL RIGHT.  OKAY.  THANK YOU.

21              PROSPECTIVE JUROR:  I HAVE NOT SERVED ON A JURY.

22              I HAVE BEEN THE VICTIM OF A CRIME.  MY HOUSE WAS

23   ROBBED.

24              I DO HAVE A FAMILY MEMBER THAT HAS BEEN CHARGED WITH

25   A CRIME.
```

APRIL 13, 2015

```
 1              AND NO LAW ENFORCEMENT CONNECTIONS.

 2              AND I THINK I CAN BE FAIR.

 3         THE COURT:  WHEN YOUR HOME WAS BURGLED, DID YOU

 4   REPORT THAT?

 5         PROSPECTIVE JUROR:  YES.

 6         THE COURT:  ANYONE APPREHENDED?

 7         PROSPECTIVE JUROR:  NOPE.

 8         THE COURT:  ANY COMPLAINTS ABOUT THE INVESTIGATION

 9   OR LACK THEREOF?

10         PROSPECTIVE JUROR:  NO.

11         THE COURT:  THE FAMILY MEMBER WHO WAS CHARGED, IS

12   THERE ANYTHING ABOUT THAT INCIDENT THAT GIVES YOU ANY CONCERNS

13   ABOUT SERVING FAIRLY IN THIS CASE?

14         PROSPECTIVE JUROR:  NO.

15         THE COURT:  DO YOU FEEL THAT HE OR SHE WAS FAIRLY

16   TREATED?

17         PROSPECTIVE JUROR:  YES.

18         THE COURT:  DO YOU HAVE SOME HESITATION IN THAT

19   REGARD?

20         PROSPECTIVE JUROR:  A LITTLE.

21         THE COURT:  ALL RIGHT.  AND THE UNFAIR TREATMENT,

22   DID IT COME AT THE HANDS OF LAW ENFORCEMENT, THE COURT SYSTEM,

23   THE PROSECUTOR, OR OTHERS?

24         PROSPECTIVE JUROR:  WELL, I THINK IT WAS NOT SUCH A

25   HORRIBLE THING BUT THAT THIS PERSON HAS HAD TO DEAL WITH FOR A
```

APRIL 13, 2015

```
 1   NUMBER OF YEARS.  IT IS LIKE, WHEN IS THIS EVER GOING TO GO
 2   AWAY.
 3           THE COURT:  PROBATION, THAT TYPE OF THING,
 4   OVERSIGHT?
 5           PROSPECTIVE JUROR:  YEAH.  I MEAN, EVERYTHING FROM
 6   NOT BEING ALLOWED INTO CANADA FOR A FAMILY VACATION TO, YOU
 7   KNOW, WHEN YOU GET LICENSES, TRANSPORTATION.
 8           THE COURT:  WOULD IT BE FAIR TO SAY THAT SOME OF THE
 9   OBJECTION YOU HAVE, IF ANY, WAS NOT THE COURT PROCESS,
10   PERHAPS --
11           PROSPECTIVE JUROR:  NO.
12           THE COURT:  -- THE PUNISHMENT THERE, BUT MORE OF THE
13   ANCILLARY EFFECT?
14           PROSPECTIVE JUROR:  UM-HUM.  UM-HUM.
15           THE COURT:  YES?
16           PROSPECTIVE JUROR:  UM-HUM, YES.
17           THE COURT:  THANK YOU.
18           JUROR NO. 4.
19           PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).
20           I AM RETIRED, BUT I WAS A PROFESSOR OF MATHEMATICS
21   AND COMPUTER SCIENCE AT USD.
22           MY HUSBAND IS AN ELECTRICAL ENGINEER WHO USED TO
23   WORK FOR THE NAVY.
24           WE HAVE NO CHILDREN.
25           WE LIVE IN TIERRASANTA.
```

APRIL 13, 2015

```
 1              I HAVE NEVER BEEN ON A JURY OR A GRAND JURY.

 2              I HAVE BEEN A VICTIM OF A CRIME.  A YOUNG MAN DROVE

 3   HIS CAR INTO THE FRONT WALL OF OUR CONDO AFTER BEING CHASED BY

 4   THE POLICE.

 5              AND I HAVE BEEN A PARTY TO A CLASS ACTION LAWSUIT

 6   AGAINST OUR -- THE BUILDER OF OUR HOUSE FOR BUILDING DEFECTS.

 7              THAT'S ABOUT IT.

 8         THE COURT:  HOW ABOUT QUESTION 9 AND 10?

 9         PROSPECTIVE JUROR:  NOBODY HAS BEEN IN LAW

10   ENFORCEMENT.

11              AND, YES, I CAN BE FAIR AND IMPARTIAL.

12         THE COURT:  ALL RIGHT.

13              AND, (NAME REDACTED; JUROR NO. 3), I AM SORRY IF I

14   MISSED IT.  DID YOU ANSWER QUESTION NO. 10?  I THINK YOU DID.

15         PROSPECTIVE JUROR:  UH-HUH.

16         THE COURT:  YOU DON'T HAVE ANY HESITATION ABOUT

17   SERVING FAIRLY?

18         PROSPECTIVE JUROR:  NOPE.

19         THE COURT:  THANK YOU.

20              JUROR NO. 5.

21         PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).

22              I AM A PROJECT MANAGER AT A SPORTS AND ENTERTAINMENT

23   COMPANY IN NORTH COUNTY.

24              MY PARTNER OF 21 YEARS WORKS OVER AT NORTH ISLAND IN

25   TRANSPORTATION.
```

APRIL 13, 2015

```
1              I HAVE NO KIDS.

2              I LIVE IN EAST COUNTY.

3              I HAVE NEVER BEEN ON A JURY BEFORE.

4              I DO NOT HAVE ANY IMMEDIATE FRIENDS -- OH, I AM

5   SORRY.

6              I HAVE HAD A CAR STOLEN.

7              AND I DO NOT HAVE ANY IMMEDIATE FAMILY MEMBERS OR

8   CLOSE FRIENDS IN LAW ENFORCEMENT.

9              AND I CAN BE FAIR AND IMPARTIAL.

10             THE COURT:  DID THE VEHICLE THAT WAS STOLEN, DID YOU

11  REPORT THAT?

12             PROSPECTIVE JUROR:  I DID.

13             THE COURT:  ANYONE APPREHENDED?

14             PROSPECTIVE JUROR:  NO.

15             THE COURT:  ANY COMPLAINTS ABOUT THE INVESTIGATION?

16             PROSPECTIVE JUROR:  NO.

17             THE COURT:  ALL RIGHT.  THANK YOU.

18             JUROR NO. 6.

19             PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).

20             I AM A FINANCIAL ADVISOR, SERIES 7 LICENSED.

21             MY SPOUSE, SHE IS A SOCIAL WORKER AT A LOCAL

22  HOSPITAL.

23             TWO CHILDREN, SCHOOL AGE.  MIDDLE SCHOOL.

24             LIVE IN NORTH COUNTY SAN DIEGO.

25             I HAVE NOT SERVED AS A JUROR BEFORE.  NOT AS A GRAND
```

APRIL 13, 2015

1    JUROR.

2            SO I HAVE BEEN A VICTIM OF A CRIME, WAS HELD UP AT

3    GUNPOINT IN 1988.  SO I WAS A WITNESS OF THAT.  TOO CLOSE FOR

4    COMFORT.

5            **THE COURT:**  DID YOU REPORT THAT?

6            **PROSPECTIVE JUROR:**  THE POLICE WERE ON SCENE AFTER

7    THE CRIME.

8            **THE COURT:**  ANYONE APPREHENDED?

9            **PROSPECTIVE JUROR:**  NO.

10           **THE COURT:**  ANY COMPLAINTS ABOUT THE INVESTIGATION?

11           **PROSPECTIVE JUROR:**  UH-UH.

12           WHAT DOES ACCUSED OR CHARGED MEAN?

13           **THE COURT:**  WELL, ACCUSED WOULD BE ARRESTED, AS

14   BROADLY AS THAT.  AND THEN SOMETIMES THE ARREST WILL THEN LEAD

15   TO AN ACTUAL CHARGE AND A DISPOSITION.

16           **PROSPECTIVE JUROR:**  OKAY.  I HAVE A COMPLAINT LETTER

17   FROM A CLIENT IN REGARDS TO AN IRS LEVY AGAINST THEM, AND I AM

18   BEING ACCUSED, NOT IN A COURT CASE, OF COOPERATING WITH THE

19   GOVERNMENT WHEN HIS ASSETS WERE SEIZED.  WHICH IS NOT A

20   COMPLAINT AGAINST ME, IT IS A COMPLAINT AGAINST FIRM POLICY.

21   IT CAN'T BE SPECIFICALLY AGAINST ME BECAUSE OUR FIDUCIARY

22   RESPONSIBILITY IS TO ACT WITH A COURT ORDER IN TERMS OF

23   FEDERALLY REGULATED ADVISORY COMPANIES.

24           **THE COURT:**  YES.  HAS A LAWSUIT BEEN FILED?

25           **PROSPECTIVE JUROR:**  NO.

APRIL 13, 2015

```
 1              THE COURT:  ALL RIGHT.  SO YOU ARE WAITING TO HEAR
 2    WHAT, IF ANYTHING, COMES OF THAT ACCUSATION.
 3              PROSPECTIVE JUROR:  CORRECT.
 4              THE COURT:  ANYTHING ABOUT THAT GIVE YOU ANY CONCERN
 5    SERVING IN THIS CASE?
 6              PROSPECTIVE JUROR:  NONE WHATSOEVER.
 7              AND THEN WHAT'S THE LAST ONE.  NO FAMILY IN LAW
 8    ENFORCEMENT.
 9              AND I CAN BE FAIR AND IMPARTIAL.
10              THE COURT:  THANK YOU.
11              JUROR NO. 7.
12              PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).
13              I AM A CLAIMS MANAGER FOR A COMMERCIAL INSURANCE
14    COMPANY.
15              MY HUSBAND IS RETIRED.
16              NO CHILDREN.
17              LIVE IN THE COLLEGE AREA.
18              SERVED AS A JUROR ON A CRIMINAL CASE, AND WE DID
19    REACH A VERDICT.
20              NEVER BEEN ON A GRAND JURY.
21              NO. 8 IS NO.
22              NO. 9 IS NO.
23              AND 10 IS YES.
24              THE COURT:  YOUR HUSBAND IS RETIRED FROM WHAT FIELD?
25              PROSPECTIVE JUROR:  HE WAS IN CONSTRUCTION.  DOES
```

```
 1   HANDYMAN WORK.  WAS A SCULPTOR.
 2           THE COURT:  OKAY.  AND THE JURY EXPERIENCE, WITHOUT
 3   DISCLOSING THE VERDICT, YOU INDICATED THAT THE JURY DID ARRIVE
 4   AT A VERDICT.  AM I CORRECT?
 5           PROSPECTIVE JUROR:  YES.
 6           THE COURT:  WHAT WAS THE CHARGE IN THAT CASE?
 7           PROSPECTIVE JUROR:  THAT WAS DOMESTIC VIOLENCE.
 8           THE COURT:  VERY GOOD.  THANK YOU.
 9           JUROR NO. 8.
10           PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).
11           I AM LOGISTICS ENGINEER WORKING FOR THE DEPARTMENT
12   OF THE NAVY, SUPPORTING F-18 AIRCRAFT.
13           MY WIFE IS A CAREGIVER.
14           I HAVE ONE DAUGHTER WHO IS A FLIGHT ATTENDANT.
15   WORKS FOR DELTA AIRLINES.
16           I LIVE IN SAN DIEGO.
17           THE COURT:  WHAT PART?
18           PROSPECTIVE JUROR:  I LIVE IN SAN YSIDRO.
19           THE COURT:  OKAY.
20           PROSPECTIVE JUROR:  I HAVE NOT SERVED ON A JURY, OR
21   SERVED AS A MEMBER OF THE GRAND JURY.
22           I HAVE A FAMILY MEMBER WHO HAS BEEN CHARGED WITH A
23   CRIME.
24           THE COURT:  HOW LONG AGO?
25           PROSPECTIVE JUROR:  HE IS RIGHT NOW IN JAIL.
```

APRIL 13, 2015

```
 1              THE COURT:  ALL RIGHT.  DO YOU FEEL THAT HE WAS
 2    TREATED FAIRLY?
 3              PROSPECTIVE JUROR:  I WAS NOT THERE, SO I AM NOT
 4    SURE.
 5              THE COURT:  DO YOU HAVE STRONG FEELINGS ONE WAY OR
 6    ANOTHER ON THE SUBJECT, OR IS IT MORE OF JUST INFORMATIONAL
 7    BACKGROUND TO YOU?
 8              PROSPECTIVE JUROR:  MORE INFORMATIONAL BACKGROUND.
 9              THE COURT:  OKAY.  ALL RIGHT.
10              PROSPECTIVE JUROR:  I DON'T HAVE ANY FAMILY MEMBERS
11    WORKING FOR LAW ENFORCEMENT.
12              AND I CAN BE COMPLETELY FAIR AND IMPARTIAL.
13              THE COURT:  YOU INDICATED THAT YOU -- DID YOU SAY
14    THE DEPARTMENT OF NAVY?
15              PROSPECTIVE JUROR:  YES.
16              THE COURT:  WORKING ON AIRCRAFT?
17              PROSPECTIVE JUROR:  YES.
18              THE COURT:  AS A --
19              PROSPECTIVE JUROR:  LOGISTICS ENGINEER.
20              THE COURT:  LOGISTICS ENGINEER.  OKAY.  YOU DON'T
21    HAVE ANY INFORMATION ABOUT THE DEVICES THAT ARE AT ISSUE IN
22    THIS CASE?
23              PROSPECTIVE JUROR:  I WORK IN COMMUNICATIONS SYSTEMS
24    AND ALL OF THAT, BUT NOT WITH THIS TYPE OF EQUIPMENT.
25              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU VERY MUCH.
```

APRIL 13, 2015

```
 1              WE ARE GOING TO PASS THE MICROPHONE DOWN TO JUROR
 2   NO. 9, BOTTOM FAR LEFT OF THE JURY BOX.
 3              VERY KIND OF YOU TO HAND DELIVER IT TO (NAME
 4   REDACTED)
 5              PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).
 6              I AM A SUPERVISING MANAGEMENT ANALYST.
 7              MY HUSBAND IS RETIRED MILITARY.
 8              I HAVE ONE SON, HE HAS AUTISM SO HE DOESN'T HAVE --
 9   IS NOT EMPLOYED.
10              I LIVE IN NORTHERN SAN DIEGO COUNTY.
11              I SERVED AS AN ALTERNATE ON A CASE AND THERE WAS A
12   VERDICT.
13              THE COURT:  WAS THAT A CRIMINAL OR A CIVIL CASE?
14              PROSPECTIVE JUROR:  IT WAS DOMESTIC VIOLENCE.
15              THE COURT:  OKAY.
16              PROSPECTIVE JUROR:  AND I HAVE NEVER BEEN ON THE
17   GRAND JURY.
18              MY OLDEST BROTHER WAS A VICTIM OF A CRIME.  HE WAS
19   WORKING AS AN ARMED SECURITY GUARD, AND HE WAS KILLED IN A
20   ROBBERY ATTEMPT.
21              THE COURT:  HOW LONG AGO DID THAT OCCUR?
22              PROSPECTIVE JUROR:  28 YEARS AGO.
23              THE COURT:  IS THERE ANYTHING ABOUT THAT INCIDENT
24   THAT GIVES YOU ANY CONCERNS ABOUT SERVING IN THIS PARTICULAR
25   CASE?
```

APRIL 13, 2015

```
 1              PROSPECTIVE JUROR:  NO, NO.  THEY CAUGHT THE PERSON
 2   AND HE WAS CONVICTED, AND THAT'S ALL BEEN RESOLVED.
 3              THE COURT:  ALL RIGHT.  THANK YOU.
 4              PROSPECTIVE JUROR:  LET'S SEE.  NEVER BEEN ACCUSED
 5   OF A CRIME.
 6              NO PARTY -- NO WITNESS TO A LAWSUIT OR PARTY TO IT.
 7              MY OLDEST STEPBROTHER WAS IN THE FBI BUT HE RETIRED
 8   30 YEARS AGO.  SO HE KNOWS NOTHING.
 9              AND, YES, I CAN BE IMPARTIAL.
10              THE COURT:  ALL RIGHT.  YOU ARE A MANAGEMENT ANALYST
11   FOR WHAT TYPE OF COMPANY?
12              PROSPECTIVE JUROR:  THE CITY OF SAN DIEGO IN THE
13   PUBLIC UTILITIES DEPARTMENT.
14              THE COURT:  OKAY.  VERY GOOD.  ALL RIGHT.  THANK
15   YOU.
16              JUROR NO. 10.
17              PROSPECTIVE JUROR:  (NAME REDACTED).
18              MY OCCUPATION IS RECEIVING ASSOCIATE AT HOME DEPOT.
19              MY GIRLFRIEND WORKS FOR THE POST OFFICE.
20              I HAVE ONE DAUGHTER.
21              I LIVE IN CHULA VISTA.
22              THE COURT:  IS YOUR DAUGHTER A YOUNGSTER?
23              PROSPECTIVE JUROR:  NO.  I AM SORRY.  SHE IS 25.
24              THE COURT:  OKAY.  IS SHE FULL TIME EMPLOYED?
25              PROSPECTIVE JUROR:  YES, SHE IS.
```

APRIL 13, 2015

```
 1              THE COURT:  WHAT FIELD?
 2              PROSPECTIVE JUROR:  I AM NOT SURE BECAUSE SHE LIVES
 3  IN ANOTHER STATE.
 4              THE COURT:  OKAY.  THANK YOU.
 5              PROSPECTIVE JUROR:  I NEVER SERVED.  I NEVER WAS ON
 6  A GRAND JURY.
 7              I HAD A FRIEND WHO WAS CHARGED WITH A CRIME IN 1983.
 8              THE COURT:  THAT CASE HAS BEEN RESOLVED?
 9              PROSPECTIVE JUROR:  OH, YES, 1983.
10              THE COURT:  WAS HE TREATED FAIRLY IN YOUR VIEW?
11              PROSPECTIVE JUROR:  YES.
12              THE COURT:  ALL RIGHT.  ANYTHING ABOUT THAT INCIDENT
13  GIVE YOU ANY CONCERNS SERVING IN THIS CASE?
14              PROSPECTIVE JUROR:  NO.
15              AND I DON'T KNOW ANYONE WHO WORKS FOR LAW
16  ENFORCEMENT.
17              AND, YES, I CAN BE FAIR AND IMPARTIAL.
18              THE COURT:  OKAY.  VERY GOOD.  THANK YOU.
19              JUROR NO. 11.
20              PROSPECTIVE JUROR:  (NAME REDACTED).
21              I AM AN MRI TECHNOLOGIST.
22              MY SPOUSE WORKS AT NORDSTROMS.
23              AND NO CHILDREN.
24              AND I LIVE IN CENTRAL SAN DIEGO.
25              NEVER SERVED ON A JURY FOR A CIVIL CASE OR A GRAND
```

APRIL 13, 2015

```
 1   JURY.

 2              BEEN ACCUSED AND CHARGED WITH A DUI.

 3              NO IMMEDIATE FAMILY MEMBERS OR CLOSE FRIEND EVER

 4   WORKED FOR A LAW ENFORCEMENT AGENCY.

 5              AND I CAN BE FAIR AND IMPARTIAL.

 6         THE COURT:  DID YOU SERVE ON A CRIMINAL JURY?

 7         PROSPECTIVE JUROR:  NO.

 8         THE COURT:  OKAY.  SO NO JURY SERVICE OF ANY KIND.

 9         PROSPECTIVE JUROR:  NO.

10         THE COURT:  THE INCIDENT INVOLVING YOU, HOW LONG AGO

11   DID THAT OCCUR?

12         PROSPECTIVE JUROR:  2011.

13         THE COURT:  WHEN YOU LOOK BACK ON THAT INCIDENT, YOU

14   FEEL YOU WERE TREATED FAIRLY?

15         PROSPECTIVE JUROR:  YES.

16         THE COURT:  ANYTHING ABOUT THE PROCESS GIVE YOU ANY

17   CONCERNS SERVING HERE?

18         PROSPECTIVE JUROR:  NO.

19         THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

20         JUROR NO. 12.

21         PROSPECTIVE JUROR:  (NAME REDACTED).

22         I AM RETIRED FROM THE COUNTY OF SAN DIEGO.

23         THE COURT:  WHAT AGENCY?

24         PROSPECTIVE JUROR:  PROBATION DEPARTMENT.

25         THE COURT:  OKAY.  AND WERE YOU A PROBATION OFFICER?
```

APRIL 13, 2015

1      **PROSPECTIVE JUROR:**  YES, PROBATION OFFICER.

2      **THE COURT:**  WHAT DIVISION?

3      **PROSPECTIVE JUROR:**  WORKING WITH JUVENILES IN THE

4  DETENTION FACILITY.

5      **THE COURT:**  ALL RIGHT.  OKAY.

6      AND JUST SO I AM CLEAR, IN THAT CAPACITY YOU WERE

7  OFTENTIMES INTERVIEWING CHILDREN ACCUSED OF A CRIME, AND THEN

8  YOU WERE PREPARING PROBATION REPORTS FOR THE ASSISTANCE OF THE

9  COURT?

10      **PROSPECTIVE JUROR:**  NO, I DIDN'T.  I WORKED IN THE

11  DETENTION FACILITY.  I WAS A CORRECTIONAL PROBATION OFFICER.

12      **THE COURT:**  I SEE.  OKAY.  YOU WERE ACTUALLY WITHIN

13  THE --

14      **PROSPECTIVE JUROR:**  INSTITUTION.

15      **THE COURT:**  SERVING AS A CORRECTIONAL OFFICER.

16      **PROSPECTIVE JUROR:**  CORRECT.

17      **THE COURT:**  ALL RIGHT.  THANK YOU.

18      **PROSPECTIVE JUROR:**  MY WIFE WORKS FOR THE

19  GOVERNMENT, SHE WORKS OVER IN BALBOA HOSPITAL.

20      **THE COURT:**  WHAT AGENCY DOES SHE WORK WITH?

21      **PROSPECTIVE JUROR:**  SHE IS IN CLERICAL.

22      **THE COURT:**  AND IS IT A COUNTY OR --

23      **PROSPECTIVE JUROR:**  FEDERAL.

24      **THE COURT:**  FEDERAL AGENCY.  DO YOU KNOW WHAT AGENCY

25  IT IS?

APRIL 13, 2015

```
 1              PROSPECTIVE JUROR:  NO, I AM NOT FOR SURE.

 2              BETWEEN US WE HAVE FIVE KIDS.  ONE MINOR CHILD AT

 3   HOME.  TWO DAUGHTERS THAT ARE -- THEY WORK CLERICAL AS WELL.

 4   AND I HAVE ONE SON WHO IS UNEMPLOYED.

 5              I LIVE IN SPRING VALLEY.

 6              I WAS ON A CRIMINAL CASE BEFORE, AND A VERDICT WAS

 7   REACHED.  IT WAS DOMESTIC VIOLENCE.

 8              AND NO. 8 IS NO.

 9              NO. 9 WOULD BE NO.

10              AND, YES, I CAN BE FAIR AND IMPARTIAL.

11              THE COURT:  DID YOU HAVE PEACE OFFICER STATUS?

12              PROSPECTIVE JUROR:  YES.

13              THE COURT:  PRESENTLY DO YOU HAVE PEACE OFFICER

14   STATUS?

15              PROSPECTIVE JUROR:  I AM RETIRED, SO I DON'T KNOW

16   HOW THAT WOULD WORK.

17              THE COURT:  I AM NOT SURE EITHER.  IS THERE ANYTHING

18   ABOUT THAT POSITION, THAT STATUS, THAT GIVES YOU ANY CONCERN

19   ABOUT SERVING FAIRLY TO BOTH SIDES HERE?

20              PROSPECTIVE JUROR:  NO, NOT AT ALL.

21              THE COURT:  ALL RIGHT.  THANK YOU.

22              JUROR NO. 13.

23              PROSPECTIVE JUROR:  HI.  MY NAME IS (NAME REDACTED).

24              I AM A CONTRACTS NEGOTIATOR SENIOR WITH LOCKHEED

25   MARTIN.
```

APRIL 13, 2015

```
 1              MY HUSBAND IS AN ELECTRICAL ENGINEER WITH ANOTHER
 2    DEFENSE CONTRACTOR.
 3              WE LIVE IN THE NORTH COUNTY.
 4              WE HAVE TWO CHILDREN, THEY ARE BOTH GROWN AND
 5    MARRIED AND MOVED OUT.
 6              THE COURT:  WHAT ARE THEIR OCCUPATIONS?
 7              PROSPECTIVE JUROR:  ONE WORKS AT A BIOMEDICAL FIRM,
 8    SHE DOES DOC CONTROL WORK.  AND THE OTHER IS STILL A
 9    STUDENT --
10              THE COURT:  OKAY.
11              PROSPECTIVE JUROR:  -- OF MUSIC.
12              THE COURT:  WHAT AGENCY OR COMPANY DID YOUR HUSBAND
13    OR DOES HE WORK FOR?
14              PROSPECTIVE JUROR:  HE WORKS FOR GENERAL ATOMICS.
15              THE COURT:  OKAY.  VERY GOOD.  THANK YOU.
16              DOES HE HAVE DEALINGS WITH NORTHROP, DO YOU KNOW?
17              PROSPECTIVE JUROR:  I DON'T THINK SO.  HE WORKS IN
18    THE DEPOT, THEY REPAIR THINGS.  I DON'T THINK HE DOES, BUT I
19    DON'T KNOW.
20              THE COURT:  OKAY.  THANK YOU.
21              PROSPECTIVE JUROR:  WE LIVE IN NORTH COUNTY.
22              I HAVE SERVED ON THREE CRIMINAL CASES, TWO OF WHICH
23    REACHED A VERDICT.  ONE WAS DRUGS, ONE WAS ALCOHOL AND ONE WAS
24    A SHOOTING.
25              THE COURT:  AND WAS THE HUNG JURY ON THE SHOOTING
```

APRIL 13, 2015

```
 1   CASE?
 2              PROSPECTIVE JUROR:  IT WAS.
 3              THE COURT:  OKAY.  HAVING SERVED ON A JURY THAT WAS
 4   UNABLE TO ARRIVE AT A VERDICT, DO YOU HAVE ANY HESITATION
 5   SERVING AGAIN AS A JUROR?
 6              PROSPECTIVE JUROR:  NO.
 7              THE COURT:  ALL RIGHT.
 8              PROSPECTIVE JUROR:  I HAVE NOT SERVED ON A GRAND
 9   JURY.
10              VICTIM OF A CRIME, WE HAD OUR TRUCK STOLEN.  WE DID
11   REPORT IT.  IT WAS FOUND, I THINK A DAY OR TWO LATER.  WE DID
12   GET IT BACK.  THEY NEVER FOUND WHO DID IT, BUT WE GOT THE
13   VEHICLE BACK.
14              LAW ENFORCEMENT, I HAVE AN UNCLE WHO IS RETIRED LAW
15   ENFORCEMENT, UP IN THE BAY AREA.  MY BROTHER AND SISTER-IN-LAW
16   RETIRED FROM THE PROBATION DEPARTMENT UP IN THE BAY AREA.  AND
17   I UNDERSTAND MY NEPHEW JUST GOT ACCEPTED TO BE A POLICE
18   OFFICER.  AND MY SON-IN-LAW IS STILL LOOKING FOR THAT JOB IN
19   LAW ENFORCEMENT, BUT HE HAS NOT RECEIVED IT YET.
20              THE COURT:  ANYONE IN FEDERAL LAW ENFORCEMENT THAT
21   YOU HAVE MENTIONED?
22              PROSPECTIVE JUROR:  NO.
23              THE COURT:  ANY CONCERNS ABOUT BEING ABSOLUTELY FAIR
24   IN EVALUATING LAW ENFORCEMENT TESTIMONY?
25              PROSPECTIVE JUROR:  NO.
```

APRIL 13, 2015

```
 1              THE COURT:  NO?

 2              PROSPECTIVE JUROR:  NO.

 3              THE COURT:  OKAY.

 4              PROSPECTIVE JUROR:  AND I BELIEVE I CAN BE FAIR AND

 5   IMPARTIAL.

 6              THE COURT:  ALL RIGHT.  THANK YOU.

 7              JUROR NO. 14.

 8              PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).

 9              I AM A PARALEGAL FOR AN ENVIRONMENTAL CONSULTING

10   FIRM.

11              MY HUSBAND IS SELF-EMPLOYED, HE OWNS VARIOUS

12   INTERNET RETAIL SITES.

13              I HAVE FOUR CHILDREN, ONE IN COLLEGE AND THREE IN

14   SCHOOL AGE.

15              WE LIVE IN NORTH COUNTY.

16              I NEVER SERVED ON ANY SORT OF JURY.

17              8 NO, NOBODY, VICTIM OF CRIME OR CHARGED.

18              MY HUSBAND, FROM 1994 TO 1998, WAS MILITARY POLICE

19   DOWN AT 32ND STREET, AND THEN WORKED FOR A SHORT TIME AS A

20   FIELD EVIDENCE TECH FOR OCEANSIDE P.D.

21              AND, YES, I DO BELIEVE I CAN BE FAIR AND IMPARTIAL.

22              THE COURT:  ALL RIGHT.  THANK YOU.

23              JUROR NO. 15.

24              PROSPECTIVE JUROR:  (NAME REDACTED).

25              I AM CURRENTLY NOT WORKING, WAS A PROPERTY MANAGER,
```

APRIL 13, 2015

```
 1   REAL ESTATE.
 2              THE COURT:  OKAY.
 3              PROSPECTIVE JUROR:  MY EX-HUSBAND IS IN REAL ESTATE.
 4              WE HAVE ONE CHILD WHO IS 18 AND LOOKING FOR COLLEGE
 5   RIGHT NOW.  WE HAVE 20 DAYS TO DECIDE.
 6              I LIVE IN THE EAST COUNTY.
 7              AND, NO, I HAVE NOT SERVED ON A CASE BEFORE.
 8              NO ONE IS IN -- I HAVEN'T BEEN A VICTIM OR -- NO. 8.
 9              ON NO. 9, I DON'T KNOW OF ANYBODY.
10              AND, YES, I CAN BE FAIR.
11              THE COURT:  ALL RIGHT.  THANK YOU.
12              JUROR NO. 16.
13              PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).
14              I AM A PRINCIPAL ENGINEER OF THE IMPERIAL IRRIGATION
15   DISTRICT IN IMPERIAL.
16              MY WIFE WORKS AS A MERCHANDISER AT THE AMERICAN
17   GREETINGS.
18              I HAVE THREE CHILDRENS, MY DAUGHTER AND TWO SONS.
19   MY DAUGHTER IS HOUSEWIFE.  AND MY SON, THE MIDDLE SON, WORK
20   FOR -- AS REGISTERED NURSE IN LOMA LINDA.  AND HE HAS GOT HIS
21   ANESTHESIOLOGY FROM UCLA, I BELIEVE.  MY OTHER SON IS A
22   SCORER, COMPOSER FOR MOVIES, AND TODAY IS THE FIRST DAY THAT
23   HE WORKS IN PARAMOUNT.  DOING WELL.  I HAVE FOUR
24   GRANDCHILDREN.  TWO DAUGHTERS AND TWO GRANDDAUGHTERS AND
25   GRANDSONS.  THEY LIVE IN CHULA VISTA, AND WE LIVE IN CALEXICO,
```

APRIL 13, 2015

```
 1   CALIFORNIA.

 2            I NEVER SAT ON A JURY IN A CRIMINAL OR CIVIL CASE

 3   BEFORE.  I NEVER SERVE ON A MEMBER OF A GRAND JURY.

 4            I DON'T HAVE ANY VICTIM OF A CRIME, OR WITNESS OF A

 5   CRIME BEFORE.

 6            MY SON-IN-LAW, HE WORK FOR HOMELAND SECURITY, AND HE

 7   IS IN THE I.N.S., AND HE WORKS HERE IN THE -- I THINK IT IS

 8   OTAY ON THE BORDER.

 9            THE COURT:  IS HE A BORDER PATROL?

10            PROSPECTIVE JUROR:  NO, HE IS WORKING FOR CHECKING

11   THE TRUCKS COMING FROM MEXICO INTO THE UNITED STATES.

12            THE COURT:  SO HE WORKS AT A PORT OF ENTRY?

13            PROSPECTIVE JUROR:  PORT OF ENTRY, AGRICULTURAL.

14            THE COURT:  IT IS AGRICULTURAL?

15            PROSPECTIVE JUROR:  AGRICULTURAL INSPECTION.

16            THE COURT:  IS HE CUSTOMS AND BORDER PROTECTION OR

17   IS IT MORE AN AGRICULTURAL PORT OF ENTRY ASSIGNMENT?

18            PROSPECTIVE JUROR:  I BELIEVE IT IS -- IT IS I.N.S.,

19   IMMIGRATION NATURALIZATION OFFICE, BUT HE WORKS AT THE

20   AGRICULTURAL --

21            THE COURT:  ALL RIGHT.

22            PROSPECTIVE JUROR:  -- RIGHT NOW, INSPECTION OF THE

23   TRUCKS COMING.

24            THE COURT:  DO YOU KNOW, IS HE INVOLVED IN LAW

25   ENFORCEMENT WITH RESPECT TO IF ILLEGAL DRUGS OR UNDOCUMENTED
```

APRIL 13, 2015

```
 1    INDIVIDUALS ARE APPREHENDED, IS HE INVOLVED IN THOSE MATTERS
 2    AS FAR AS FILING REPORTS AND TESTIFYING?
 3              PROSPECTIVE JUROR:  I THINK HE IS RIGHT THERE AT THE
 4    BORDER, AND NORMALLY THEY DON'T WANT TO TALK TO US ABOUT THAT.
 5    AND THEY, YOU KNOW, THEY NORMALLY PUT ON THE NEWS THEY GOT
 6    SOMETHING COMING INTO THIS COUNTRY THAT THEY NORMALLY
 7    INSPECTED.
 8              THE COURT:  YES.
 9              PROSPECTIVE JUROR:  AND I WILL BE COMPLETELY FAIR
10    AND IMPARTIAL.
11              THE COURT:  IF ASKED TO SERVE AS A JUROR, WOULD YOU
12    BE STAYING HERE IN SAN DIEGO OR WOULD YOU BE MAKING A COMMUTE?
13              PROSPECTIVE JUROR:  MY DAUGHTER LIVES HERE, SO I
14    MIGHT STAY WITH MY DAUGHTER HERE IN CHULA VISTA FOR THE TIME.
15              THE COURT:  VERY GOOD.  ALL RIGHT.  THANK YOU.
16              WE ARE GOING TO GO OVER TO JUROR NO. 17 NOW, TO
17    (NAME REDACTED).
18              PROSPECTIVE JUROR:  HELLO, MY NAME IS (NAME
19    REDACTED).
20              MY OCCUPATION IS I AM AN ENGINEER AT GENERAL ATOMICS
21    AERONAUTICAL SYSTEMS.
22              I AM SINGLE.
23              I DON'T HAVE ANY CHILDREN.
24              I LIVE IN ESCONDIDO.
25              I HAVE NEVER SERVED AS A JUROR IN A CRIMINAL OR A
```

APRIL 13, 2015

```
 1   CIVIL CASE.  AND I HAVE NEVER SERVED AS A MEMBER OF THE GRAND

 2   JURY.

 3              NONE OF FOUR TO NO. 8 APPLY TO ME, BUT I DO HAVE A

 4   MEMBER.  MY UNCLE, HE WAS ACCUSED OR CHARGED WITH A CRIME.

 5              THE COURT:  HOW LONG AGO?

 6              PROSPECTIVE JUROR:  FOR NO. 9 NO.

 7              AND 10, YES, I CAN BE COMPLETELY FAIR AND IMPARTIAL.

 8              THE COURT:  WITH RESPECT TO YOUR UNCLE, HOW LONG AGO

 9   WAS HE CHARGED?

10              PROSPECTIVE JUROR:  I THINK IT WAS ROBBERY.

11              THE COURT:  HOW MANY YEARS AGO?

12              PROSPECTIVE JUROR:  20-SOMETHING YEARS AGO.

13              THE COURT:  DO YOU HAVE STRONG FEELINGS ONE WAY OR

14   ANOTHER ABOUT THAT INCIDENT?

15              PROSPECTIVE JUROR:  NO.

16              THE COURT:  ALL RIGHT.  THANK YOU.

17              JUROR NO. 18.

18              PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).

19              I AM RETIRED.

20              MY EX-HUSBAND WAS IN THE AIRLINE BUSINESS.

21              I HAVE ONE SON.  YES, HE IS EMPLOYED.

22              THE COURT:  WHAT FIELD?

23              PROSPECTIVE JUROR:  REAL ESTATE.

24              THE COURT:  OKAY.  AND WHAT FIELD ARE YOU RETIRED

25   FROM?
```

APRIL 13, 2015

```
 1              PROSPECTIVE JUROR:  WHAT'S THAT?
 2          THE COURT:  WHAT FIELD ARE YOU RETIRED FROM?
 3          PROSPECTIVE JUROR:  I WAS A MANAGER OF A RETAIL
 4   STORE.
 5          THE COURT:  ALL RIGHT.
 6          PROSPECTIVE JUROR:  NORTH COUNTY.
 7          I WAS ON A JURY IN THE 70'S.  YES, WE REACHED A
 8   VERDICT.
 9          THE COURT:  WAS THAT A CRIMINAL OR A CIVIL CASE?
10          PROSPECTIVE JUROR:  TRESPASSING.
11          THE COURT:  OKAY.
12          PROSPECTIVE JUROR:  NEVER BEEN ON A GRAND JURY.
13          AND I WAS A VICTIM OF A CRIME, SOMEONE BROKE INTO MY
14   HOME.  YES, I HAVE A RELATIVE WHO WAS CHARGED WITH A CRIME.
15          THE COURT:  HOW LONG AGO?
16          PROSPECTIVE JUROR:  TWO YEARS.
17          THE COURT:  AND HAS THAT MATTER RESOLVED?
18          PROSPECTIVE JUROR:  YES.
19          THE COURT:  IS THERE ANYTHING ABOUT THAT INCIDENT
20   THAT GIVES YOU ANY CONCERN ABOUT SERVING IN THIS PROCEEDING?
21          PROSPECTIVE JUROR:  NO.
22          THE COURT:  DO YOU FEEL THAT HE WAS TREATED FAIRLY?
23          PROSPECTIVE JUROR:  YES.
24          THE COURT:  ANY HESITATION?
25          PROSPECTIVE JUROR:  NO.
```

APRIL 13, 2015

```
 1            THE COURT:  ALL RIGHT.
 2            PROSPECTIVE JUROR:  NOBODY IN LAW ENFORCEMENT.
 3            AND I THINK I CAN BE FAIR.
 4            THE COURT:  THE HOME BURGLARY, YOU REPORTED THAT
 5   INCIDENT?
 6            PROSPECTIVE JUROR:  YES.
 7            THE COURT:  WAS ANYONE APPREHENDED?
 8            PROSPECTIVE JUROR:  YES.
 9            THE COURT:  YOU WERE SATISFIED WITH THE
10   INVESTIGATION?
11            PROSPECTIVE JUROR:  VERY.
12            THE COURT:  ALL RIGHT.  THANK YOU.
13            JUROR NO. 19.
14            PROSPECTIVE JUROR:  HELLO.  MY NAME IS (NAME
15   REDACTED).
16            I AM A MANAGER OF CONTRACTS FOR GENERAL ATOMICS
17   AERONAUTICAL SYSTEMS, WHICH IS A DEFENSE CORPORATION SELLING
18   PRIMARILY TO THE MILITARY.
19            THE COURT:  DO YOU KNOW (NAME REDACTED; JUROR NO.
20   17)?
21            PROSPECTIVE JUROR:  NO, I DON'T.
22            THE COURT:  ALL RIGHT.
23            PROSPECTIVE JUROR:  NOR DO I KNOW THE OTHER JUROR'S
24   HUSBAND.
25            THE COURT:  OKAY.
```

APRIL 13, 2015

```
 1              PROSPECTIVE JUROR:  WHO ALSO WORKS AT GENERAL

 2    ATOMICS.

 3              MY SPOUSE, HE IS AN ELECTRICAL ENGINEER, A PATENT

 4    ATTORNEY.  AND HE IS CURRENTLY WORKING AT THE U.S. PATENT AND

 5    TRADE OFFICE AS A PATENT EXAMINER.

 6              WE HAVE TWO CHILDREN, TWINS, A BOY AND A GIRL.  THEY

 7    ARE 21.  ONE IS ABOUT TO GRADUATE FROM UCSD WITH A

 8    MICROBIOLOGY DEGREE.  AND THE OTHER ONE IS AT GROSSMONT

 9    COMMUNITY COLLEGE STUDYING INFORMATION SYSTEMS.

10              YES, I HAVE SERVED AS A JUROR IN A CIVIL CASE ACROSS

11    THE STREET.  AND, YES, WE DID COME TO A VERDICT.

12              THE COURT:  WHAT WAS THE COMPLAINT IN THAT CASE?

13              PROSPECTIVE JUROR:  IT WAS A CONSTRUCTION DISPUTE, A

14    BUILDING DISPUTE IN THE CHULA VISTA AREA.

15              THE COURT:  YES.  THANK YOU.

16              PROSPECTIVE JUROR:  AND, YES, I HAVE BEEN A VICTIM

17    OF A CRIME.  I HAVE HAD MY PURSE STOLEN A COUPLE TIMES AND I

18    HAVE HAD MY CAR STOLEN.  NO, I HAVE NOT BEEN A WITNESS TO A

19    CRIME.  I HAVE NEVER BEEN ACCUSED OF OR CHARGED WITH A CRIME,

20    HOWEVER I DO HAVE TWO SIBLINGS THAT LIVE IN DIFFERENT STATES,

21    IDAHO AND WASHINGTON STATE.  BOTH HAVE BEEN IN AND OUT OF JAIL

22    AND PRISON DUE TO DRUG RELATED CHARGES.

23              THE COURT:  ANY CONCERNS ABOUT THE WAY EITHER ONE OF

24    THOSE TWO WERE TREATED?

25              PROSPECTIVE JUROR:  NO, NONE.
```

APRIL 13, 2015

```
 1              THE COURT:  ALL RIGHT.  THE MATTERS IN WHICH YOU
 2    WERE A VICTIM, DID YOU REPORT THOSE INCIDENTS?
 3              PROSPECTIVE JUROR:  YES, I DID.
 4              THE COURT:  ANY COMPLAINTS ABOUT ANY ONE OF THEM?
 5              PROSPECTIVE JUROR:  NO.
 6              AND A PARTY OR WITNESS IN ANY LAWSUIT, MY HUSBAND
 7    AND I -- THIS WAS QUITE A LONG TIME AGO, MAYBE 18 YEARS OR SO
 8    AGO -- WERE IN A LAWSUIT.  JUST A NEIGHBORHOOD SMALL-TIME
 9    DISPUTE OVER -- WHAT DO YOU CALL IT -- BORDER -- NOT A RIGHT
10    OF WAY --
11              THE COURT:  EASEMENT OR BOUNDARY?
12              PROSPECTIVE JUROR:  YEAH, BOUNDARIES, BASICALLY.
13    PROPERTY LINES.  BUT IT ALL GOT SETTLED.  OUT OF COURT,
14    ACTUALLY.  SO IT ALL TURNED OUT FINE AND IT WAS QUITE A LONG
15    TIME AGO.
16              AND, NO, I HAVE NO IMMEDIATE FAMILY MEMBER OR CLOSE
17    FRIEND IN LAW ENFORCEMENT.
18              AND, YES, I CAN BE COMPLETELY FAIR AND IMPARTIAL.
19              THE COURT:  ALL RIGHT.
20              CAN YOU GIVE ME THE DIVISION AGAIN AT GENERAL
21    ATOMICS WHERE YOU WORK?
22              PROSPECTIVE JUROR:  I WORK AT GENERAL ATOMICS IN THE
23    POWAY AREA.  I WORK IN -- I AM A MANAGER OF CONTRACTS THERE.
24    AERONAUTICAL SYSTEMS, THEY ARE ALL DIFFERENT CORPORATIONS
25    ACTUALLY, NOT DIVISIONS.  AND I WORK AT AERONAUTICAL SYSTEMS.
```

APRIL 13, 2015

```
 1    THE MAIN GENERAL ATOMICS IS IN LA JOLLA.  WE SELL AN UNMANNED
 2    AIR VEHICLE, THE PREDATOR, TO THE AIR FORCE, THE GRAY EAGLE TO
 3    THE ARMY.  MY CUSTOMER FOR THE LAST 10 YEARS HAS BEEN
 4    100 PERCENT THE ARMY.  WE SELL THE GRAY EAGLE UAV TO THE
 5    MILITARY THAT WAY.
 6            THE COURT:  DO YOU HAVE ANY SPECIAL UNDERSTANDING
 7    ABOUT THE ALLEGATIONS IN THIS CASE WITH RESPECT TO DEVICES
 8    THAT MAY BE SUBJECT TO EMBARGO?
 9            PROSPECTIVE JUROR:  WELL, CERTAINLY WE WATCH OUT FOR
10    THAT.  WE HAVE TO BE VERY CAUTIOUS IN, YOU KNOW, BEING
11    COMPLIANT WITH THOSE TYPES OF LAWS.  BUT I DON'T HAVE A -- AND
12    WHEN IT WOULD BE NECESSARY WE HAVE A DEPARTMENT WITHIN OUR OWN
13    DEPARTMENT THAT WORKS SPECIFICALLY WITH IMPORT/EXPORT
14    COMPLIANCE WITH THE STATE.  BUT I HAVEN'T BEEN CLOSELY
15    INVOLVED IN THAT FOR A WHILE.
16            WHEN WE SELL TO THE ARMY WE SELL AND THEY TAKE
17    POSSESSION OF IT HERE IN THE STATES AND THEY TAKE CARE OF IT
18    FROM THERE.
19            THE COURT:  VERY GOOD.  THANK YOU.
20            JUROR NO. 20.
21            PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).
22            I AM RETIRED.
23            I DON'T HAVE A SPOUSE SO THIS NEXT QUESTION IS NON
24    APPLICABLE.
25            I HAVE ONE CHILD THAT I STILL GET IN TOUCH WITH, HE
```

APRIL 13, 2015

1   IS ABOUT 22.  HE IS PART TIME EMPLOYED AND IS MAINLY A

2   STUDENT.  HE JUST WAS ACCEPTED BY UCSD TO GO INTO THEIR

3   MICROCHEMISTRY PROGRAM, BUT HE WANTS TO GO TO BERKELEY SO HE

4   IS PUSHING FOR THAT, AND I AM BEHIND HIM ON IT.

5           I LIVE IN DOWNTOWN SAN DIEGO IN AN AREA CALLED THE

6   EAST VILLAGE.

7           I HAVE SERVED AS A JUROR IN A CRIMINAL CASE SOME

8   YEARS AGO, NOT IN CALIFORNIA.  AND I HAVE SERVED AS A

9   ALTERNATE IN A CIVIL CASE, ALSO IN A COURT NOT IN CALIFORNIA.

10  I HAVE NEVER SERVED AS A MEMBER OF A GRAND JURY IN EITHER

11  FEDERAL OR STATE COURT.

12          OH, I FORGOT TO GO BACK UP THERE.

13          YES, IN THE CRIMINAL CASE, A VERDICT WAS REACHED IN

14  ABOUT A DAY AND A HALF.  AND IN THE OTHER CASE -- SORRY -- I

15  LEFT THE PANEL BEFORE A JURY -- BEFORE THE JURY RENDERED THE

16  VERDICT SO I DON'T KNOW WHAT HAPPENED WITH THAT ONE.

17          **THE COURT:**  WAS THAT A CRIMINAL OR A CIVIL CASE?

18          **PROSPECTIVE JUROR:**  IT WAS A CIVIL.  THAT IS WHAT I

19  WAS TRYING TO SAY.  ONE WAS CRIMINAL, THEY REACHED A VERDICT.

20  ONE WAS CIVIL, AND WHAT HAPPENED WITH THEM I DON'T KNOW.

21          **THE COURT:**  WHAT WAS THE CHARGE IN THE CRIMINAL

22  CASE?

23          **PROSPECTIVE JUROR:**  ASSAULT AND BATTERY WITH THE

24  INTENT TO DO BASICALLY MORTAL HARM.

25          **THE COURT:**  OKAY.

APRIL 13, 2015

1        **PROSPECTIVE JUROR:**  I HAVE BEEN A VICTIM OF A CRIME,

2  A WITNESS TO A CRIME.  DON'T REMEMBER BEING ACCUSED OF A

3  CRIME, AND NEVER CHARGED WITH ONE.  AND A PARTY OR A WITNESS

4  IN A LAWSUIT TO A CRIME, NOT SO.  VICTIM OF THE CRIME IS I HAD

5  ANY NUMBER OF ITEMS OF PERSONAL PROPERTY -- RIFLES, PISTOLS,

6  STEREOS, A GIRLFRIEND'S SEWING MACHINE -- ALL OF THOSE WERE

7  STOLEN FROM ME AT ONE TIME OR ANOTHER.  WITNESS TO A CRIME, I

8  SAW A HIT AND RUN MANY YEARS AGO.  AND AS I SAID, NEVER

9  ACCUSED OR CHARGED WITH A CRIME, OR A PARTY OR A WITNESS.

10        I PERSONALLY HAVE NEVER WORKED IN LAW ENFORCEMENT.

11  MY STEPDAD, HOWEVER, WAS COUNTY MARSHAL IN WESTERN KENTUCKY

12  RIGHT ABOUT THE TIME THAT KOREA STARTED, THE WAR IN KOREA

13  STARTED.

14        I BELIEVE I CAN RENDER A FAIR AND IMPARTIAL

15  DECISION, BASED SOLELY ON THE EVIDENCE AND THE INSTRUCTIONS OF

16  THE COURT.

17        AND THAT IS THAT FOR ME.

18        **THE COURT:**  WHAT FIELD ARE YOU RETIRED FROM?

19        **PROSPECTIVE JUROR:**  I DID A NUMBER OF THINGS, BUT

20  MOST RECENTLY I WAS WORKING AS A -- I GUESS YOU WOULD CALL IT

21  AN ADMINISTRATOR, PERSONNEL, HUMAN RESOURCES, SOMETHING IN

22  THAT AREA.

23        **THE COURT:**  AND WHAT TYPE OF COMPANY WAS THAT FOR?

24        **PROSPECTIVE JUROR:**  WE TRIED TO FIND HOMES AND JOBS

25  FOR HOMELESS VETS.

APRIL 13, 2015

1          **THE COURT:**  OKAY.

2          YOU WITNESSED A HIT AND RUN.  DID YOU PROVIDE A

3   STATEMENT TO LAW ENFORCEMENT?

4          **PROSPECTIVE JUROR:**  YES.  THIS WAS 30-SOME YEARS

5   AGO.

6          **THE COURT:**  ALL RIGHT.  ANYTHING COME OF THAT, OR

7   YOU JUST PROVIDED THE STATEMENT?

8          **PROSPECTIVE JUROR:**  THE PARTIES INVOLVED NEVER

9   REACHED ANY KIND OF SATISFACTORY RESOLUTION.

10          **THE COURT:**  WERE YOU CALLED TO TESTIFY?

11          **PROSPECTIVE JUROR:**  NEVER GOT THAT FAR.

12          **THE COURT:**  ALL RIGHT.

13          THE CRIMES WHERE YOU HAVE BEEN A VICTIM, YOU HAVE

14   REPORTED THOSE?

15          **PROSPECTIVE JUROR:**  I HAVE.

16          **THE COURT:**  ANY COMPLAINTS ABOUT ANY OF THOSE

17   SITUATIONS AS FAR AS LACK OF INVESTIGATION OR PROSECUTION?

18          **PROSPECTIVE JUROR:**  YEAH.  I DON'T THINK THEY WORKED

19   HARD ENOUGH TO FIND THE GUYS, AND NONE OF THEM WERE EVER

20   CAUGHT.  EVEN THOUGH AT ONE POINT ONE OF THE OFFICERS TOLD ME

21   THEY THOUGHT THEY KNEW WHO DID IT, HE WASN'T A RESIDENT OF THE

22   COUNTY AND ALL THEY COULD DO IS TO CONTACT THE POLICE IN THE

23   COUNTY IN WHICH HE LIVED IN.  AND THAT IS THE LAST I HEARD OF

24   IT.

25          **THE COURT:**  ANY CONCERNS, GIVEN THAT FACT, ABOUT

APRIL 13, 2015

```
 1    BEING FAIR TO THE GOVERNMENT IN HEARING THIS CASE?

 2              PROSPECTIVE JUROR:  I DON'T HOLD A GRUDGE.

 3              THE COURT:  ALL RIGHT.  VERY GOOD.  THANK YOU.

 4              JUROR NO. 21.

 5              PROSPECTIVE JUROR:  HI.  MY NAME IS (NAME REDACTED).

 6              I AM A -- WHAT AM I?  -- DIRECTOR OF CULINARY

 7    SERVICES FOR A SENIOR FACILITY.

 8              MY WIFE WORKS WITH ANTHEM BLUE CROSS DEALING WITH

 9    MENTAL HEALTH.

10              I HAVE ONE SON WHO IS MIDDLE SCHOOL AGED, SO HE IS

11    NOT WORKING.

12              I LIVE IN CLAIRMONT.

13              I HAVE SERVED ON A CRIMINAL CASE, KIND OF MULTIPLE

14    CHARGES.  WE CAME TO A CONCLUSION ON ONE CHARGE AND THE OTHERS

15    WERE DEADLOCKED.  IT WAS ATTEMPTED MURDER, ASSAULT WITH A

16    DEADLY WEAPON, VARIOUS OTHER THINGS OF THAT NATURE.

17              THE COURT:  YES.

18              PROSPECTIVE JUROR:  I HAVE NEVER SERVED ON A GRAND

19    JURY.

20              LET'S SEE.  VICTIM OF A CRIME.  GOODNESS.  1984, MY

21    FIRST JOB, WE WERE ROBBED AT GUNPOINT.  WE CALLED THE POLICE

22    AND FILLED OUT A REPORT, NEVER FOUND THE GUY.  HAD MY HOUSE

23    BROKEN INTO ONCE.  FILED A REPORT, NEVER FOUND THE -- CAN'T

24    SAY GUY, PERSON THAT ROBBED US.

25              DON'T HAVE ANY FAMILY MEMBERS IN LAW ENFORCEMENT.
```

APRIL 13, 2015

```
 1                AND I THINK I CAN RENDER A COMPLETELY FAIR AND
 2   IMPARTIAL DECISION.
 3                THE COURT:  THANK YOU.
 4                JUROR NO. 22.
 5                PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).
 6                I AM RETIRED.
 7                THE COURT:  WHAT FIELD?
 8                PROSPECTIVE JUROR:  I WAS A SALES REP FOR PETER PAUL
 9   CADBURY CANDY.
10                THE COURT:  I LOVE THAT CANDY.
11                PROSPECTIVE JUROR:  MY HUSBAND WAS A C.F.O. WITH THE
12   TUNA FISHING INDUSTRY, AND HE IS RETIRED.  HE DOES TAX WORK
13   NOW.
14                I HAVE TWO DAUGHTERS.  ONE IS A KINDERGARTEN
15   TEACHER.  AND THE OTHER ONE, SHE DOESN'T WORK AT ALL, SHE
16   PLAYS A LOT.  THEY ARE BOTH MARRIED, THOUGH.
17                I HAVE SERVED ON TWO JURIES, A FEDERAL AND A STATE
18   COURT.  THERE WAS A VERDICT RENDERED IN EACH CASE.
19                I HAVE A FRIEND THAT IS ON THE -- OH, I GOT AHEAD OF
20   MYSELF.
21                MY HUSBAND AND I WAS THE VICTIM OF A CRIME.  WE WERE
22   STOPPED ON THE FREEWAY, OR THE ROAD, AND VICIOUSLY KARATE
23   CHOPPED.  AND WE WENT TO COURT, AND WE LOST.
24                THE COURT:  YOU BROUGHT A CIVIL LAWSUIT?
25                PROSPECTIVE JUROR:  YEAH.
```

APRIL 13, 2015

```
 1              THE COURT:  ALL RIGHT.  WAS THERE ANY CRIMINAL

 2   PROSECUTION, DO YOU KNOW?

 3              PROSPECTIVE JUROR:  THERE WAS NO PROSECUTION THAT I

 4   KNOW OF FOR WHAT HE DID.

 5              THE COURT:  ALL RIGHT.  IS THERE ANYTHING ABOUT THE

 6   OUTCOME OF THE CASE, THE ADVERSE RESULT, THAT WILL AFFECT YOUR

 7   ABILITY TO SERVE AS A JUROR HERE?

 8              PROSPECTIVE JUROR:  NO, I AM SMARTER NOW.

 9              I DO HAVE A FRIEND THAT WORKS AS A VOLUNTEER SHERIFF

10   FOR THE COUNTY.

11              AND I DO THINK I CAN RENDER A VERDICT.

12              THE COURT:  ALL RIGHT.  AND DO SO FAIRLY, AND BE

13   FAIR?

14              PROSPECTIVE JUROR:  YES.

15              THE COURT:  THE FEDERAL JURY, WHAT WAS THE CHARGE IN

16   THAT CASE?

17              PROSPECTIVE JUROR:  ONE OF THEM WAS THERE, WAS BEING

18   SUED FOR A MALPRACTICE.

19              THE COURT:  YES.

20              PROSPECTIVE JUROR:  AND THE OTHER ONE WAS SUING FOR

21   MONEY THAT THEY HAD INCURRED AND WANTED REIMBURSEMENT FOR.

22              THE COURT:  OKAY.  SO BOTH CASES WERE CIVIL, NOT

23   CRIMINAL.

24              PROSPECTIVE JUROR:  I THOUGHT ONE WAS -- OKAY.  ONE

25   WAS IN STATE COURT AND THE OTHER ONE WAS IN FEDERAL.
```

APRIL 13, 2015

```
 1            THE COURT:  OKAY.  ALL RIGHT.  FAIR ENOUGH.  THANK
 2   YOU.
 3            JUROR NO. 23.
 4            PROSPECTIVE JUROR:  GOOD MORNING, YOUR HONOR.  MY
 5   NAME IS (NAME REDACTED).
 6            I AM CURRENTLY A DEPUTY DIVISION MANAGER AT A
 7   COMPANY CALLED LEIDOS, USED TO BE SAIC.  I MANAGE A GROUP OF
 8   ABOUT 120 PEOPLE.  WE ARE A FAIRLY BIG DEFENSE CONTRACTOR.  I
 9   ALSO HAD 30 YEARS IN THE U.S. NAVY, RETIRED FROM THAT AND FROM
10   THE RESERVES.
11            MY SPOUSE IS A STAY-AT-HOME MOM.  SHE ALSO TEACHES
12   PART TIME AT NATIONAL UNIVERSITY ON-LINE.
13            WE HAVE FOUR BOYS.  THE OLDEST IS ACTUALLY ENLISTING
14   IN THE NAVY NEXT WEEK.  THE NEXT ONE DOWN IS IN LOCAL SCHOOLS,
15   AND THE OTHER TWO ARE IN HIGH SCHOOL AND MIDDLE SCHOOL.
16            WE LIVE IN RANCHO PENASQUITOS.
17            I HAVE NEVER SERVED AS A JUROR ON A -- IN A CRIMINAL
18   OR CIVIL CASE, NOR AS A MEMBER OF A GRAND JURY.
19            NONE OF OUR IMMEDIATE FAMILIES OR CLOSE FRIENDS HAVE
20   REALLY BEEN VICTIMS OF CRIMES OR ANY OF THAT LISTED IN NO. 8.
21            NOR HAVE THEY HAVE WORKED FOR A LAW ENFORCEMENT
22   AGENCY.
23            AND ON NO. 10, YES, I CAN RENDER A COMPLETELY FAIR
24   AND IMPARTIAL DECISION.
25            THE COURT:  THE DIVISION YOU WORK IN WITH SAIC, DO
```

APRIL 13, 2015

```
 1    YOU DEAL AT ALL WITH THE SALE OF EQUIPMENT COULD BE SUBJECT TO
 2    THESE EMBARGO LAWS?
 3              PROSPECTIVE JUROR:  NO.  WE MOSTLY SELL SERVICES, SO
 4    LIKE SOME OF THE OTHERS WE ARE FAMILIAR WITH THE ITAR RULES
 5    AND THINGS LIKE THAT, ABOUT THAT.  A LOT OF ATTENTION GETS
 6    PAID TO THAT.  BUT WE DON'T ACTUALLY SHIP EQUIPMENT.  OUR
 7    CUSTOMER IS PRIMARILY THE U.S. GOVERNMENT.
 8              THE COURT:  VERY GOOD.
 9              JUROR NO. 24.
10              PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).
11              I WORK AS A SENIOR CLIENT RELATIONS MANAGER FOR A
12    COMMERCIAL REAL ESTATE COMPANY.
13              MY BOYFRIEND IS A FLOORING INSTALLER IN
14    CONSTRUCTION.
15              I DON'T HAVE ANY CHILDREN.
16              I LIVE IN CHULA VISTA.
17              I HAVE NEVER SERVED ON ANY TRIAL OR BEEN A JUROR.
18              I HAVE BEEN A VICTIM OF A CRIME, MY CAR WAS BROKEN
19    INTO.  THERE WAS NO RESOLUTION TO THAT.  I HAVE NEVER
20    WITNESSED A CRIME.  I HAVE NEVER BEEN ACCUSED OF A CRIME.  MY
21    UNCLE WAS CONVICTED OF A CRIME.
22              THE COURT:  HOW LONG AGO?
23              PROSPECTIVE JUROR:  OVER 10 YEARS AGO.
24              THE COURT:  WERE YOU INVOLVED IN ANY WAY, AS A
25    SUPPORT PERSON OR OTHERWISE?
```

APRIL 13, 2015

```
 1              PROSPECTIVE JUROR:  NO.

 2              THE COURT:  ANY STRONG FEELINGS, ONE WAY OR ANOTHER,

 3    ON THAT ISSUE?

 4              PROSPECTIVE JUROR:  NO.

 5              MY NEIGHBOR IS A RETIREE FROM THE BORDER PATROL.

 6              AND I CAN BE FAIR AND IMPARTIAL.

 7              THE COURT:  WHAT ARE YOUR DAILY DUTIES AT WORK?

 8              PROSPECTIVE JUROR:  I ASSIST FIVE VERY BUSY AND

 9    SUCCESSFUL BROKERS.

10              THE COURT:  SO AS AN ASSISTANT TO THEM?

11              PROSPECTIVE JUROR:  RIGHT.  IN THEIR DAILY

12    OPERATION.

13              THE COURT:  WHEN YOUR CAR WAS STOLEN, YOU REPORTED

14    THAT?

15              PROSPECTIVE JUROR:  MY CAR WAS BROKEN INTO.

16              THE COURT:  BROKEN INTO.

17              PROSPECTIVE JUROR:  I DID REPORT IT.

18              THE COURT:  ANY COMPLAINTS ABOUT -- YOU DID REPORT

19    IT?

20              THE DEFENDANT:  I DID REPORT IT.

21              THE COURT:  NO ONE APPREHENDED?

22              PROSPECTIVE JUROR:  NO, UNFORTUNATELY NOT.

23              THE COURT:  ANY COMPLAINTS ABOUT THE INVESTIGATION

24    OR LACK THEREOF?

25              PROSPECTIVE JUROR:  NO.  THEY DID WHAT THEY COULD.
```

APRIL 13, 2015

| | |
|---|---|
| 1 | **THE COURT:**  VERY GOOD. |
| 2 | I THINK WE SHOULD TAKE A BRIEF RECESS HERE, AND WE |
| 3 | WILL FINISH UP WITH JURORS 25 THROUGH 32 ON THE QUESTIONNAIRE. |
| 4 | THEN COUNSEL WILL HAVE A BRIEF OPPORTUNITY TO ASK QUESTIONS OF |
| 5 | THE 32 PROSPECTIVE JURORS.  AND THEN WE WILL SELECT A JURY, |
| 6 | HOPEFULLY BEFORE LUNCH, WHICH WE WILL TAKE AT 12:30. |
| 7 | WHEN WE ARE ON RECESS I WILL ASK THAT THE 32 |
| 8 | PROSPECTIVE JURORS RECLAIM THE SAME SEAT, BECAUSE WE HAVE EACH |
| 9 | OF YOU IDENTIFIED BY NUMBER, SO PLEASE TAKE THE SAME SEAT. |
| 10 | AND FOR ALL OF YOU, INCLUDING THOSE BEHIND THE |
| 11 | RAILING, KEEP IN MIND THE ADMONITION NOT TO DISCUSS THE CASE, |
| 12 | FORM OR EXPRESS ANY OPINIONS OR CONCLUSIONS. |
| 13 | WE WILL TAKE JUST A 10-MINUTE RECESS FROM THIS |
| 14 | POINT, SO ABOUT 11:32, I THINK -- ABOUT 11:32.  10 MINUTES |
| 15 | FROM HERE. |
| 16 | THERE ARE RESTROOMS RIGHT DOWN THE HALLWAY.  WE WILL |
| 17 | BE BACK IN SESSION IN 10 MINUTES.  THANK YOU. |
| 18 | (RECESS) |
| 19 | **THE COURT:**  WELCOME BACK. |
| 20 | WE HAVE ALL PROSPECTIVE JURORS, COUNSEL AND MR. |
| 21 | GHAHREMAN. |
| 22 | WE LEFT OFF WITH JUROR 25, (NAME REDACTED) |
| 23 | **PROSPECTIVE JUROR:**  MY NAME IS (NAME REDACTED). |
| 24 | I WORK AS A RADIO MANAGER FOR AT&T. |
| 25 | MY SPOUSE WORKS AS A -- IN HEALTH CARE.  SHE IS IN |

APRIL 13, 2015

1    HEALTH CARE WITH KAISER.

2           I HAVE TWO CHILDRENS.  THEY ARE IN KINDERGARTEN.

3           I LIVE IN SABRE SPRINGS AREA.

4           NO, I HAVE NOT SERVED BEFORE, AND NEITHER IN GRAND

5    JURY OR FEDERAL OR STATE COURT.

6           NO, NONE OF MY FAMILY MEMBER OR MYSELF ARE VICTIM OF

7    CRIME OR IN ANY LAWSUIT.

8           ONE OF MY FRIEND IS IN DHS.  HE WORKS ON THE BORDER.

9           **THE COURT:**  BORDER PATROL AGENT?

10          **PROSPECTIVE JUROR:**  YES.

11          **THE COURT:**  ALL RIGHT.

12          **PROSPECTIVE JUROR:**  YES, I CAN BE FAIR AND IMPARTIAL

13   IN MY DECISION QUESTION.

14          **THE COURT:**  THANK YOU VERY MUCH.

15          JUROR NO. 26.

16          **PROSPECTIVE JUROR:**  MY NAME IS (NAME REDACTED).

17          I AM A CLAIM DATA SPECIALIST FOR AETNA, WHICH IS THE

18   HEALTH INSURANCE COMPANY.

19          I AM NOT MARRIED.

20          I DO NOT HAVE ANY CHILDREN.

21          I RESIDE IN THE LA MESA AREA.

22          I HAVE SERVED AS A JUROR ON A FEW CASES.  I HAVE NOT

23   SERVED AS A GRAND JURY MEMBER.

24          I HAVE BEEN A VICTIM OF CRIME, HAD MY CAR BROKEN

25   INTO AND MY PURSE, AND HAD ALL OF THAT STOLEN.  THEY CAME OUT,

APRIL 13, 2015

1    FILED A REPORT.  THAT'S ALL THEY COULD DO.

2              **THE COURT:**  ALL RIGHT.

3              **PROSPECTIVE JUROR:**  THAT IS ALL WE DID.

4              FAMILY MEMBER, I HAVE A BROTHER-IN-LAW WHO -- I

5    DON'T KNOW IF THIS WOULD BE CONSIDERED -- WELL, HE IS A

6    CAPTAIN FOR SOUTHWEST AIRLINES BUT HE IS ALSO AN AIR MARSHAL.

7    I DON'T KNOW IF HE DOES THAT NOW THAT HE IS A CAPTAIN, BUT,

8    ANYWAY.  HE WAS, OR IS, AN AIR MARSHAL.

9              AND I BELIEVE I CAN BE FAIR AND IMPARTIAL.

10             **THE COURT:**  HOW MANY TIMES HAVE YOU SERVED AS A

11   JUROR?

12             **PROSPECTIVE JUROR:**  I HAVE SERVED AS AN ALTERNATE

13   AND AS A REGULAR JUROR.  TWO SUPERIOR COURT, ONE FEDERAL.  THE

14   ONE THAT I WAS AN ALTERNATE, I DON'T KNOW IF IT WAS CRIMINAL

15   OR CIVIL, BUT IT WAS A CHECK FRAUD CASE.  I WAS AN ALTERNATE

16   SO I WASN'T IN ON THE DECISION.  THEN THE OTHER TWO -- THE

17   SUPERIOR COURT ONE, IT WAS A FIRST-DEGREE MURDER TRIAL, AND WE

18   CAME TO A DECISION.  AND THE OTHER ONE, THE FEDERAL, THERE WAS

19   KIND OF A LONG LIST.  IT WAS, LIKE, DRUG TRAFFICKING,

20   CONSPIRACY, RACKETEERING, LAUNDERING.  I AM NOT SURE WHAT

21   ELSE, BUT IT WAS A FEDERAL CASE.  AND WE ALSO CAME TO A

22   DECISION.

23             **THE COURT:**  OKAY.  VERY GOOD.  THANK YOU.

24             JUROR NO. 27.

25             **PROSPECTIVE JUROR:**  MY NAME IS (NAME REDACTED).

APRIL 13, 2015

```
 1              I AM THE TICKETING MANAGER AND SALES MANAGER AT
 2    BALBOA PARK.
 3              MY SIGNIFICANT OTHER IS A COMPUTER PROGRAMMER WHO
 4    WORKS MOSTLY WITH NON-PROFIT ORGANIZATIONS LIKE ARTS, OPERA
 5    AND THEATER.
 6              NO CHILDREN.
 7              LIVE IN THE OAK PARK AREA.
 8              I WAS AN ALTERNATE ONCE ON A DUI CASE.
 9              THE COURT:  DID THE JURY ARRIVE AT A VERDICT?  DO
10    YOU KNOW?
11              PROSPECTIVE JUROR:  I WASN'T THERE FOR THAT PART.
12              I WAS A VICTIM OF A CRIME, I WAS ASSAULTED.
13              AND I DON'T HAVE ANY FAMILY OR FRIENDS IN LAW
14    ENFORCEMENT.
15              AND I CAN BE FAIR AND IMPARTIAL.
16              THE COURT:  THE MATTER IN WHICH YOU WERE A VICTIM,
17    WAS THAT REPORTED?
18              PROSPECTIVE JUROR:  YES.
19              THE COURT:  ANYONE APPREHENDED?
20              PROSPECTIVE JUROR:  THAT MOMENT, YEAH.
21              THE COURT:  DO YOU HAVE ANY COMPLAINTS ABOUT THE
22    INVESTIGATION OR HOW THE CASE WAS HANDLED?
23              PROSPECTIVE JUROR:  NO.
24              THE COURT:  OKAY.  THANK YOU.
25              JUROR NO. 28.
```

APRIL 13, 2015

1          **PROSPECTIVE JUROR:**  MY NAME IS (NAME REDACTED).

2               I AM AN INTERNAL RECRUITER FOR A RECRUITING AGENCY.

3               MY HUSBAND IS A CLINICAL PSYCHOLOGIST AT THE V.A.

4     HOSPITAL.

5               WE DON'T HAVE ANY CHILDREN.

6               LIVE IN THE HILLCREST NEIGHBORHOOD OF SAN DIEGO.

7               I HAVE NEVER SERVED AS A JUROR IN ANY WAY.

8               I HAVE HAD A BIKE STOLEN AND A SIBLING ARRESTED 10

9     YEARS AGO FOR UNDERAGE DRINKING, SO NOTHING THAT WAS

10    IMPACTFUL.

11              I HAVE A TENANT THAT IS ON THE SAME LOT WHO IS A

12    MILITARY POLICE OFFICER.

13              I DO FEEL THAT I CAN RENDER A COMPLETELY FAIR AND

14    IMPARTIAL DECISION.

15         **THE COURT:**  THANK YOU VERY MUCH.

16              JUROR NO. 29.

17         **PROSPECTIVE JUROR:**  MY NAME IS (NAME REDACTED).

18              RIGHT NOW I AM A STAY-AT-HOME MOM.

19              MY HUSBAND IS A FORKLIFT DRIVER.

20              I HAVE TWO CHILDREN, THEY ARE BOTH TODDLERS.

21              I LIVE IN CHULA VISTA.

22              I HAVE SERVED ON ONE JURY, IT WAS CRIMINAL.  AND

23    THERE WAS NO VERDICT REACHED.

24         **THE COURT:**  WHAT WAS THE CHARGE IN THAT CASE?

25         **PROSPECTIVE JUROR:**  SEXUAL ASSAULT.

APRIL 13, 2015

105

```
 1              THE COURT:  OKAY.
 2              PROSPECTIVE JUROR:  I HAVE NEVER BEEN ON A GRAND
 3    JURY.
 4              8 IS NO.
 5              9, NO.
 6              AND 10 IS YES.
 7              THE COURT:  OKAY.  THANK YOU VERY MUCH.
 8              JUROR NO. 30.
 9              PROSPECTIVE JUROR:  HELLO.  MY NAME IS (NAME
10    REDACTED).
11              I AM A RETIRED PRESCHOOL TEACHER.
12              MY HUSBAND IS RETIRED FROM THE SHERIFF'S DEPARTMENT,
13    SAN DIEGO COUNTY.
14              THE COURT:  WAS HE A SHERIFF DEPUTY?
15              PROSPECTIVE JUROR:  HE WAS.  HE RETIRED AS AN
16    ASSISTANT SHERIFF.
17              THE COURT:  OKAY.
18              PROSPECTIVE JUROR:  FOUR CHILDREN.  ONE IS A GRAPHIC
19    ARTIST.  ONE WORKS WITH AUTISTIC KIDS.  ONE IS AN ATTORNEY IN
20    SAN JOSE.  AND ONE JUST IS GETTING HIS REAL ESTATE LICENSE.
21              THE COURT:  THE ONE WHO IS AN ATTORNEY, WHAT TYPE OF
22    LAW DOES HE OR SHE PRACTICE?
23              PROSPECTIVE JUROR:  HE IS A DEFENSE ATTORNEY.
24              THE COURT:  DOES HE WORK FOR A PUBLIC AGENCY?
25              PROSPECTIVE JUROR:  NO, HE HAS HIS OWN.
```

APRIL 13, 2015

106

```
 1            THE COURT:  IS HE DOING CRIMINAL DEFENSE OR CIVIL
 2   DEFENSE OR BOTH?
 3            PROSPECTIVE JUROR:  BOTH.
 4            THE COURT:  ALL RIGHT.  DO YOU KNOW WHICH ONE
 5   PREDOMINANTLY, OR IS IT A PRACTICE THAT IS KIND OF --
 6            PROSPECTIVE JUROR:  I THINK PROBABLY CRIMINAL.
 7            THE COURT:  ALL RIGHT.  ANYTHING ABOUT THAT FACT
 8   GIVE YOU ANY CONCERN ABOUT SERVING FAIRLY TO BOTH SIDES IN
 9   THIS CASE?
10            PROSPECTIVE JUROR:  NO.
11            THE COURT:  OKAY.
12            PROSPECTIVE JUROR:  I LIVE IN ESCONDIDO.
13            I HAVE NEVER SERVED ON ANY JURY.
14            AND I HAVE BEEN A VICTIM OF -- I HAD A CAR STOLEN,
15   LIKE, 30 YEARS AGO.  AND I WAS A PARTY IN A LAWSUIT.  IT WAS A
16   BUSINESS THING, A PARTNER, A BUSINESS PARTNER.  I HAD TO SUE
17   HER FOR MONEY, AND WON.
18            ONCE AGAIN, MY HUSBAND WAS IN LAW ENFORCEMENT.
19            AND I THINK I CAN BE FAIR AND IMPARTIAL.
20            THE COURT:  YOUR HUSBAND RETIRED AS THE ASSISTANT
21   SHERIFF.  WAS HE THE UNDER SHERIFF?
22            PROSPECTIVE JUROR:  NO.  THE UNDER SHERIFF IS
23   ABOVE -- THERE IS, LIKE, FOUR ASSISTANT SHERIFFS AND THEN THE
24   UNDER SHERIFF AND THEN THE SHERIFF.
25            THE COURT:  SO HE WAS PART OF THE EXECUTIVE
```

APRIL 13, 2015

107

```
 1   COMMITTEE.
 2              PROSPECTIVE JUROR:  YES.
 3              THE COURT:  IS THERE ANYTHING ABOUT THAT
 4   RELATIONSHIP THAT GIVES YOU ANY CONCERN ABOUT SERVING FAIRLY
 5   TO BOTH SIDES?
 6              PROSPECTIVE JUROR:  NO.
 7              THE COURT:  THANK YOU VERY MUCH.
 8              JUROR NO. 31.
 9              PROSPECTIVE JUROR:  YES.  MY NAME IS (NAME
10   REDACTED).
11              I AM AN ANALYTICAL CHEMIST FOR THE UNITED STATES
12   GOVERNMENT, DEPARTMENT OF DEFENSE.  MY BACKGROUND IS IN
13   TOXICOLOGY, BLOOD AND URINE DRUG TESTING, TOXICAL GENETICS.
14   AND I CURRENTLY HOLD A CALIFORNIA LICENSE AS A TOXICOLOGIST
15   AND MEDICAL LAB TECHNOLOGIST.
16              QUESTIONS 3 AND 4, NO. 3, I AM SINGLE, NEVER
17   MARRIED.  NO DEPENDENTS.
18              QUESTION 5, I LIVE IN CHULA VISTA, SOUTHBAY.
19              QUESTION NO. 6, I SERVED AS A JUROR IN 1993,
20   NORTHERN CALIFORNIA, SOLANO COUNTY, CALIFORNIA, ON A CIVIL
21   CASE, WHICH A VERDICT WAS RENDERED.  I WAS THE JURY FOREMAN.
22              AND NO. 7 IS NO.
23              NO. 8, MYSELF, HAD A BRAND NEW CAR BROKEN INTO ON
24   TWO OCCASIONS UP IN THE BAY AREA.  POLICE DID INVESTIGATE, BUT
25   NOTHING -- THEY DIDN'T FIND WHO DID IT.  MY INSURANCE COVERED
```

APRIL 13, 2015

```
1    THE DAMAGES.  QUESTIONS 2, 3, 4 UNDER THAT ANSWER IS NO.

2            NO. 9 IS NO.

3            AND NO. 10, YES, I FEEL I CAN BE FAIR AND IMPARTIAL.

4        THE COURT:  THE CIVIL CASE WHERE YOU WERE A JUROR,

5    WHAT WAS THE COMPLAINT ABOUT THERE?

6        PROSPECTIVE JUROR:  IT INVOLVED A HIGHWAY

7    MAINTENANCE AND CONSTRUCTION.  I THINK IT HAD TO DO WITH

8    CALTRANS.  AND WORK WAS BEING DONE ON A ROADWAY THERE IN

9    SOLANO COUNTY, AND IT INVOLVED HOW THE CONES WERE SET UP.

10       THE COURT:  YES.

11       PROSPECTIVE JUROR:  SOMEONE DROVE THROUGH THE

12   DEMARCATION.

13       THE COURT:  THANK YOU.

14           JUROR NO. 32.

15       PROSPECTIVE JUROR:  MY NAME IS (NAME REDACTED).

16           I AM A DRIVER, AND I WORK FOR MYSELF.

17           I DON'T HAVE A SPOUSE OR CHILDREN.

18           I LIVE IN SHELLTOWN.

19           I HAVE NEVER BEEN ON A JURY, AND NEVER BEEN ON A

20   GRAND JURY.

21           I HAVE BEEN THE VICTIM OF MANY CRIMES.  I HAVE BEEN

22   CHARGED WITH A CRIME.

23           AND I DON'T HAVE ANY FAMILY MEMBERS THAT ARE IN LAW

24   ENFORCEMENT.

25           AND I BELIEVE THAT I COULD BE A FAIR JUDGE.
```

APRIL 13, 2015

```
 1            THE COURT:  WHAT TYPE OF DRIVING ARE YOU DOING?  DO
 2   YOU WORK FOR A COMPANY OR ON YOUR OWN?
 3            PROSPECTIVE JUROR:  I AM AN INDEPENDENT CONTRACTOR
 4   AND I WORK FOR GRUBHUB, EAT 24 AND POST MATES, WHICH ARE ALL
 5   DELIVERY SERVICES THAT I CAN BE AN INDEPENDENT CONTRACTOR FOR.
 6            THE COURT:  WHAT TYPE OF ITEMS ARE YOU DELIVERING?
 7            PROSPECTIVE JUROR:  MOSTLY I DELIVER FOOD, BUT THERE
 8   ARE NO LIMITATIONS TO SOME OF THE THINGS THAT I CAN DELIVER.
 9   I CAN DELIVER DIAPERS, DEODORANT, TRASH BAGS, ALCOHOL.
10            THE COURT:  YOU HAVE BEEN A VICTIM OF MANY CRIMES.
11   DID YOU REPORT THOSE INCIDENTS?
12            PROSPECTIVE JUROR:  SOME I HAVE, YES.
13            THE COURT:  ANY COMPLAINTS ABOUT THE INVESTIGATION
14   OR LACK THEREOF?
15            PROSPECTIVE JUROR:  WHEN I WAS MUGGED THE GUY JUST
16   TOOK OFF SO THERE WAS NO WAY TO CATCH HIM AND THERE WERE NO
17   WITNESSES.  THE OTHER CRIMES I DIDN'T REPORT.
18            THE COURT:  WHY DID YOU ELECT NOT TO REPORT?
19            PROSPECTIVE JUROR:  I WAS YOUNG AND I JUST DIDN'T --
20   IT JUST WASN'T GOOD FOR ME.
21            THE COURT:  ALL RIGHT.
22            YOU WERE CHARGED WITH A CRIME.  HOW LONG AGO WAS
23   THAT?
24            PROSPECTIVE JUROR:  IN '08.  IT IS A MISDEMEANOR.
25   MY REGISTRATION -- I HAD IMPROPER REGISTRATION ON MY CAR.
```

APRIL 13, 2015

```
1              THE COURT:  OKAY.  DO YOU FEEL YOU WERE TREATED
2    FAIRLY?
3              PROSPECTIVE JUROR:  YEAH.
4              THE COURT:  ALL RIGHT.  VERY GOOD.  THANK YOU.
5              AT THIS TIME COUNSEL WILL HAVE AN OPPORTUNITY TO ASK
6    QUESTIONS OF THE PROSPECTIVE JURORS, THE 32 PROSPECTIVE
7    JURORS.
8              WE WILL START WITH MR. JOHNSTON ON BEHALF OF MR.
9    GHAHREMAN.
10             MR. JOHNSTON.
11             MR. JOHNSTON:  GOOD MORNING EVERYONE.
12             I APPRECIATE EVERYONE COMING HERE TODAY TO SHARE
13   WITH US THINGS ABOUT THEIR BACKGROUND, THEIR HISTORY, THEIR
14   BELIEFS.  AND WE ASK YOU TO DO THAT, WE CALL THIS VOIR DIRE,
15   BECAUSE IT IS AN OPPORTUNITY FOR US TO SEE; BUT MORE
16   IMPORTANTLY FOR YOU TO TALK TO US AS THE ATTORNEYS, TO THE
17   JUDGE, ABOUT WHETHER YOU ARE THE RIGHT JUROR FOR THIS CASE,
18   AND WHETHER YOU WOULD WANT YOURSELF AS A JUROR IF YOU WERE
19   SITTING AT DEFENSE TABLE.
20             SO I JUST WANT TO TAKE THE OPPORTUNITY TO PURSUE
21   SOME OF THE THINGS THAT YOU HAVE ALREADY TALKED ABOUT, AND ASK
22   YOU SOME QUESTIONS, KNOWING THAT ONE THING IS CLEAR:  THERE IS
23   NO RIGHT OR WRONG ANSWER.  IT JUST MAY BE THAT A CASE ISN'T
24   THE RIGHT CASE FOR YOU.  AS JUDGE SABRAW SAID, THERE ARE
25   PLENTY OF OTHER CASES THE JURY COMMISSIONER CAN FIND FOR YOU
```

APRIL 13, 2015

```
1    IF THIS ISN'T THE RIGHT CASE.  SO FOR THE NEXT 15 OR 20
2    MINUTES I AM JUST GOING TO ASK YOU TO SIT BACK, RELAX, AND
3    TREAT THIS LIKE A LITTLE FIRESIDE CHAT WITH ME, A FEDERAL
4    JUDGE, A COUPLE OF FEDERAL PROSECUTORS AND 40 PEOPLE YOU JUST
5    MET HERE TODAY.
6         I WANT TO START WITH ONE THING -- AND I DON'T WANT
7    TO PICK ON ANYONE OR PICK ANYBODY OUT.  BUT AT THE BREAK I DID
8    OVERHEAR A JUROR ASKING A QUESTION ABOUT THESE GENTLEMEN HERE
9    SEATED AT THIS TABLE.  WHAT ARE THEY TALKING ABOUT?  WHAT IS
10   GOING ON?  AND I JUST WANT TO GO AHEAD AND ADDRESS THIS EARLY
11   ON.
12        MR. GHAHREMAN IS SEATED HERE AT THE DEFENSE TABLE,
13   AND SOME OF YOU MAY HAVE NOTICED HE IS WEARING A HEADSET.
14   MR. GHAHREMAN CAME TO THE UNITED STATES IN 2007.  HE IS A
15   UNITED STATES CITIZEN, BUT HE WAS BORN IN IRAN.  HIS FIRST
16   LANGUAGE IS NOT ENGLISH, IT IS FARSI.  BUT I WANT TO ASK IF
17   ANYONE HAS ANY CONCERNS THAT MR. GHAHREMAN -- LET ME BACK UP.
18        YOU WILL HEAR THAT HE SPEAKS ENGLISH.  YOU WILL BE
19   THE JUDGE OF HOW GOOD THAT ENGLISH IS.  BUT YOU WILL HEAR
20   THROUGHOUT THE COURSE OF THIS TRIAL THAT HE SPEAKS ENGLISH.
21        DOES ANYONE HAVE A CONCERN THAT HERE, NOW, IN COURT,
22   WHEN HE IS FACING CHARGES, THAT HE IS USING AN INTERPRETER, A
23   FARSI INTERPRETER?  DOES ANYONE HAVE ANY TROUBLE OR CONCERN
24   ABOUT THAT?  CAN ANYONE THINK OF WHY MR. GHAHREMAN MIGHT
25   CHOOSE TO USE AN INTERPRETER HERE AS OPPOSED TO SIMPLY
```

APRIL 13, 2015

```
 1   LISTENING IN ENGLISH?

 2            PROSPECTIVE JUROR NO. 4:  MAYBE HE UNDERSTANDS IT

 3   BETTER.

 4            MR. JOHNSTON:  I AM SORRY, YOUR NAME?

 5            PROSPECTIVE JUROR:  (NAME REDACTED; JUROR NO. 4)

 6            MR. JOHNSTON:  (NAME REDACTED) SAYS MAYBE HE

 7   UNDERSTANDS IT BETTER.  MAYBE THIS IS AN IMPORTANT PART IN HIS

 8   LIFE WHERE HE WANTS TO MAKE SURE HE UNDERSTANDS WHAT IS GOING

 9   ON.

10            DOES ANYONE HAVE A PROBLEM WITH THAT?  WOULD ANYONE

11   PREFER THAT HE NOT USE THE INTERPRETER?  OKAY.  THANK YOU.

12            NOW I WANT TO TURN BACK TO THE FIRST -- I BELIEVE IT

13   IS (NAME REDACTED; JUROR NO. 2).  I WOULD LIKE TO THANK YOU

14   FOR BEING THE FIRST ONE TO SPEAK UP AND RAISE A CONCERN IN

15   THIS CASE -- OR AT LEAST WHAT MIGHT BE A CONCERN IN THIS CASE.

16   I THINK IF PEOPLE CAN TALK ABOUT THEIR ISSUES OR CONCERNS WE

17   WILL HAVE A MUCH BETTER SENSE OF WHO THE RIGHT JURY IS IN THIS

18   CASE.

19            BUT YOU GUYS HEARD A VERY LENGTHY RECITATION OF THE

20   CHARGES IN THIS CASE, THE INDICTMENT.  I BELIEVE, (NAME

21   REDACTED; JUROR NO. 2), YOU SAID WHEN YOU HEARD THINGS LIKE

22   TEHRAN OR DUBAI THAT RAISED SOME RED FLAGS IN YOUR HEAD.

23            I THINK WHAT YOU SAID IS:  MY CONCERN IS IS THIS A

24   CASE ABOUT TERRORISM.

25            PROSPECTIVE JUROR:  NO, I JUST THINK IT IS JUST ALL
```

APRIL 13, 2015

```
1   THE ELEMENTS HERE.  THE MARINE NAVIGATION, THE TESLA,
2   TESLAN-2.  I DON'T KNOW WHAT THEY ARE IMPORTING IT FOR, NOT
3   HAVING THE PROPER CREDENTIALS.  MONEY LAUNDERING.  YOU KNOW,
4   BEING ACCUSED OF IT, NOT SAYING THEY ARE GUILTY OF IT.
5            BUT THEN ALSO, AS A JUROR, I, YOU KNOW, NEED TO
6   RENDER A FAIR AND IMPARTIAL DECISION ON SOMETHING LIKE THAT.
7   I JUST DON'T HAVE TIME TO SIT ON A CASE --
8            THE INTERPRETER:  EXCUSE ME, YOUR HONOR.  YOUR
9   HONOR, COULD SHE USE THE MICROPHONE.
10           PROSPECTIVE JUROR:  I JUST DON'T HAVE TIME TO SIT ON
11  A CASE WHERE MY LIFE MIGHT BE IN JEOPARDY.  YOU HEAR OF JURORS
12  RECEIVING DEATH THREATS AND, YOU KNOW, HAVING TO, YOU KNOW, BE
13  IN FEAR OF THEIR LIVES OR THEIR FAMILY BEING -- YOU KNOW,
14  THEIR LIVES ARE AT JEOPARDY BECAUSE AS A JUROR YOU ARE TRYING
15  TO MAKE A DECISION, AND THIS IS HIS LIFE.
16           SO ALL THOSE THINGS JUST RAISE RED FLAGS IN MY MIND,
17  YOU KNOW, MISSILES, TEHRAN, ALL OF THOSE THINGS.  I AM NOT
18  SAYING THAT THAT IS WHAT IS GOING ON, BUT IN THE NEWS THIS IS
19  WHAT IS HAPPENING IN REAL LIFE.  SO I PERSONALLY DON'T HAVE
20  TIME TO BE IN FEAR.
21           NOW, I CAN RENDER A FAIR AND IMPARTIAL DECISION, I
22  DO IT DAILY.  BUT I JUST PERSONALLY, IN MY LIFE, I DON'T HAVE
23  WANT TO TAKE THE TIME AND I DON'T HAVE TIME TO BE IN FEAR OF
24  MY LIFE AS A JUROR.
25           MR. JOHNSTON:  I THINK WE WILL ALL AGREE THAT IS A
```

APRIL 13, 2015

 1   FAIR CONCERN TO HAVE.  MY QUESTION IS, DO YOU THINK THAT

 2   THE -- LET ME BACK UP.

 3           I AM NOT SURE WE EVER HEARD ANY TALK ABOUT MISSILES

 4   FROM THE JUDGE.

 5           **PROSPECTIVE JUROR:**  TESLA-2 MILITARY ELECTRONICS,

 6   MARINE NAVIGATION.  YOU MENTIONED Y-690 AND NAVIGATION 2100.

 7   WHAT ARE THOSE THINGS USED FOR?  I DON'T KNOW.  IN MY MIND,

 8   YOU KNOW, THAT COULD BE ANYTHING.  MILITARY ELECTRONICS, THAT

 9   COULD BE, YOU KNOW, NAVIGATING FOR WHAT?  THE OCEANS,

10   MISSILES, YOU KNOW.

11           **MR. JOHNSTON:**  FAIR ENOUGH.  AND LET ME OPEN THIS UP

12   TO OTHERS.  I DON'T MEAN TO PICK ON YOU, (NAME REDACTED; JUROR

13   NO. 2), AND I APPRECIATE YOUR COMMENTS.

14           IS THERE SOMETHING ABOUT WHAT YOU HEARD FROM THE

15   JUDGE THAT -- YOU HEARD THAT THE ITEMS WERE ALLEGED BY THE

16   GOVERNMENT TO BE GOING TO IRAN.  IS THERE SOMETHING ABOUT IRAN

17   OR MILITARY ITEMS THAT MAKES ANYONE ELSE MAKE A CONNECTION TO

18   TERRORISM OR CONCERNS ABOUT TERRORISM?

19            YEAH.

20           **PROSPECTIVE JUROR NO. 2:**  ATOMIC MISSILES.  NUCLEAR

21   WEAPONS.  YOU KNOW, TO BE QUITE HONEST.

22           **MR. JOHNSTON:**  ANYONE ELSE?

23           HOW ABOUT (NAME REDACTED; JUROR NO. 4).  FOR YOU,

24   WERE THE SAME RED FLAGS RAISED, OR CONCERNS?

25           I AM SORRY.  I HAD IT BACKWARDS.

APRIL 13, 2015

```
1              (NAME REDACTED; JUROR NO. 3).
2         PROSPECTIVE JUROR:  WELL, YOU KNOW, I DON'T KNOW.
3    IT IS A LITTLE HARD TO SAY BECAUSE I DO HAVE THIS SON WHO GOES
4    TO SEA ON MARINE VESSELS AND TALKS ABOUT JOBS THAT AREN'T
5    PARTICULARLY SAFE SOUNDING TO MOMMY.  AND LIKE (NAME REDACTED;
6    JUROR NO. 2), I DON'T KNOW WHAT THESE PARTICULAR NAVIGATIONAL
7    SYSTEMS ARE USED FOR.  SO I DON'T KNOW.  BUT, I MEAN, IT IS
8    NOT A COMFORTABLE THOUGHT, I WOULD SAY.
9         MR. JOHNSTON:  YES, MA'AM.  LET ME GET YOU THE
10   MICROPHONE.  FOR THE RECORD --
11        MR. HARRIGAN:  (NAME REDACTED; JUROR NO. 32)
12        MR. JOHNSTON:  YES.
13        PROSPECTIVE JUROR:  YES.
14        THE FACT THAT THERE IS AN EMBARGO AGAINST TRADE WITH
15   THIS COUNTRY IS CONCERNING FOR ME.  WHETHER OR NOT IT IS IRAN,
16   NORTH KOREA OR WHOEVER, THERE ARE REASONS WHY WE ARE NOT
17   TRADING WITH THEM.  BEYOND THAT, FOR ME IT IS NOT SPECIFICALLY
18   THAT IT IS IRAN.  I DON'T KNOW HOW I CAN EXPRESS IT.
19        PROSPECTIVE JUROR NO. 2:  AND I AGREE WITH THAT.  IT
20   IS NOT NECESSARILY -- I AM NOT, YOU KNOW, SINGLING OUT TEHRAN,
21   IT IS JUST WITH, YOU KNOW, THE UNITED STATES AND TERRORISM, I
22   JUST DON'T FEEL COMFORTABLE TO BE A JUROR ON -- YOU KNOW, THAT
23   COULD POTENTIALLY -- I AM NOT SAYING THAT THIS IS WHAT THIS IS
24   ALL ABOUT.  IT COULD BE FOR A BOAT, YOU KNOW, THEY ARE
25   BUILDING.  BUT, YOU KNOW, THOSE ARE JUST QUESTIONS IN MY MIND.
```

APRIL 13, 2015

1    AND I AM A BUSY PERSON AND I DON'T HAVE TIME TO BE IN FEAR OF

2    MY LIFE.

3         **MR. JOHNSTON:**  AND THEY ARE VERY LEGITIMATE

4    CONCERNS.  I GUESS MY ULTIMATE QUESTION TO YOU IS, DO YOU FEEL

5    LIKE THIS IS THE RIGHT CASE FOR YOU WITH THOSE CONCERNS?  DO

6    YOU FEEL LIKE YOU WOULD WANT YOURSELF AS A JUROR IN THIS CASE

7    WERE YOU SITTING AT THE TABLE?

8         **PROSPECTIVE JUROR NO. 2:**  I PERSONALLY WOULDN'T BE

9    INVOLVED IN ANYTHING LIKE THIS.

10        **MR. JOHNSTON:**  CERTAINLY NOT.

11        **PROSPECTIVE JUROR:**  AND I CAN BE ON ANY OTHER CASE.

12   I JUST DON'T FEEL, BEING SELECTED AS A JUROR ON SOMETHING LIKE

13   THIS, THAT I WANT TO, YOU KNOW, LIVE THE NEXT TWO WEEKS

14   WONDERING IF -- WHAT AM I INVOLVED IN.  AND YOU HEAR STORIES

15   OF JURORS GETTING DEATH THREATS AND, YOU KNOW, BECAUSE THEY

16   ARE ABOUT READY TO DECIDE ON A MAN'S LIFE.  I DON'T KNOW WHAT

17   HE IS CONNECTED TO SO, QUITE HONESTLY, TAKE ME OFF THE CASE.

18   GIVE ME DUI OR SOMETHING ELSE, YOU KNOW.  TAX EVASION, YOU

19   KNOW, IN THE FEDERAL COURT.

20        **MR. JOHNSTON:**  I APPRECIATE THAT.  AND I THINK THAT

21   IT IS VERY GOOD OF YOU TO SAY THAT.

22        DO OTHER PEOPLE FEEL LIKE MAYBE THIS JUST ISN'T THE

23   RIGHT CASE BECAUSE OF THE NATURE OF THESE CHARGES?  DOES

24   ANYONE FEEL LIKE GIVE ME A DUI, A TAX EVASION BECAUSE OF

25   LEGITIMATE CONCERNS YOU HOLD?  DOES ANYONE SHARE (NAME

APRIL 13, 2015

1    REDACTED; JUROR NO. 2) OPINION ON THIS?

2              NO ONE.  LET ME MOVE ON.

3              (NAME REDACTED; JUROR NO. 13), RIGHT?  I THINK YOU

4    TOLD THE JUDGE YOU FELT LIKE YOU COULD BE FAIR AND IMPARTIAL

5    IN THIS CASE, RIGHT?

6              **PROSPECTIVE JUROR:**  YES.

7              **MR. JOHNSTON:**  AND YOU HAVE SEVERAL FAMILY MEMBERS

8    IN LAW ENFORCEMENT OR ASPIRING TO LAW ENFORCEMENT.

9              **PROSPECTIVE JUROR:**  I HAVE ASPIRING, RETIRED AND

10   CURRENT, YES.

11             **MR. JOHNSTON:**  IN THIS CASE WE WILL HEAR FROM A LOT

12   OF LAW ENFORCEMENT PERSONNEL, BOTH UNDERCOVER AGENTS AND

13   INVESTIGATIVE AGENTS.  DO YOU THINK THAT YOU COULD HOLD THEIR

14   TESTIMONY -- OR DOES THEIR TESTIMONY HAVE A CERTAIN WEIGHT TO

15   IT BECAUSE THEY ARE LAW ENFORCEMENT, AS OPPOSED TO, SAY, A LAY

16   PERSON THAT COMES IN.

17             **PROSPECTIVE JUROR:**  EVERYBODY IS THE SAME.

18             **MR. JOHNSTON:**  EVERYBODY IS THE SAME.  CAN YOU

19   EXPLAIN THAT, DESCRIBE THAT, WHAT YOU MEAN BY THAT?

20             **PROSPECTIVE JUROR:**  WE ALL HAVE TO LISTEN TO EACH --

21   EACH PERSON HAS TO PRESENT WHAT INFORMATION THEY HAVE FOR US

22   TO TAKE UNDER CONSIDERATION.

23             **MR. JOHNSTON:**  IS LAW ENFORCEMENT CAPABLE OF HAVING

24   BIASES IN THE WAY THEY SEE THINGS?

25             **PROSPECTIVE JUROR:**  EVERY PERSON IS CAPABLE OF

APRIL 13, 2015

```
 1   HAVING BIASES IN THE WAY THEY SEE THINGS.

 2           MR. JOHNSTON:  DOES ANYONE AGREE WITH THAT OPINION?

 3           I SEE A FEW HANDS.  I APPRECIATE THAT.

 4           DOES ANYONE DISAGREE WITH THAT?  DOES ANYONE THINK

 5   JUST BECAUSE THEY ARE LAW ENFORCEMENT, THEY HAVE PARTICULAR

 6   TRAINING, THEY HAVE TAKEN AN OATH, THAT THEY HAVE MORE

 7   CREDIBILITY WHEN THEY COME TO THE STAND AND TESTIFY IN A CASE?

 8           I AM SORRY.  SOMEONE BACK THERE.

 9           (NAME REDACTED; JUROR NO. 23).

10           PROSPECTIVE JUROR:  YES.

11           MR. JOHNSTON:  YOU WERE WITH THE NAVY FOR 30 YEARS,

12   RIGHT?

13           PROSPECTIVE JUROR:  YES.

14           MR. JOHNSTON:  AND YOU WORK NOW FOR A DEFENSE

15   CONTRACTOR?

16           PROSPECTIVE JUROR:  YES, I DO.

17           MR. JOHNSTON:  DOES YOUR COMPANY DO ANY WORK WITH

18   CIVILIAN END USERS?

19           PROSPECTIVE JUROR:  PRIMARILY OUR CUSTOMER IS D.O.D.

20   MY DIVISION IN PARTICULAR WORKS WITH THE NAVY WITH OFFICE OF

21   NAVAL RESEARCH AND OTHER CUSTOMERS.  BUT THE COMPANY AS A

22   WHOLE, YES, THEY DO HAVE CIVILIAN CUSTOMERS IN SOME CASES.

23           MR. JOHNSTON:  OKAY.  AND ARE THOSE FREQUENTLY LARGE

24   CUSTOMERS, SMALL CUSTOMERS?

25           PROSPECTIVE JUROR:  GOOD QUESTION.  THEY HAVE SOME
```

APRIL 13, 2015

```
 1    THINGS WHERE IT IS STRICTLY LOGISTICS, I THINK.  HONESTLY, THE

 2    CIVILIAN SIDE OF IT, I AM NOT THAT FAMILIAR WITH.  BUT I KNOW

 3    IT IS ABOUT A $4 BILLION COMPANY.  A GOOD PORTION OF THAT

 4    COMES FROM DEFENSE.  THERE ARE SOME IN THE HEALTH CARE AREA,

 5    FOR INSTANCE, I THINK THEY DO SOME STUFF.  IN OUR AREA WE KIND

 6    OF HAVE BLINDERS ON, WE DON'T REALLY LOOK AT MUCH ELSE.

 7              MR. JOHNSTON:  (NAME REDACTED), I BELIEVE --

 8              PROSPECTIVE JUROR:  (NAME REDACTED; JUROR NO. 17).

 9    HOW ARE YOU?

10              MR. JOHNSTON:  I BELIEVE YOU WORK AT GENERAL

11    ATOMICS, RIGHT?

12              PROSPECTIVE JUROR:  YES.

13              MR. JOHNSTON:  DO YOU WORK ON THE UNMANNED DRONE

14    PROGRAM?

15              PROSPECTIVE JUROR:  YEAH, I WORKED ON THE

16    INTEGRATION FLOOR OF PREDB AND GRAY EAGLE AIRCRAFTS.

17              MR. JOHNSTON:  SO YOU ARE ON SORT OF THE ENGINEERING

18    SIDE OF WHAT --

19              SORRY, MA'AM.

20              PROSPECTIVE JUROR:  (NAME REDACTED; JUROR NO. 19)

21              MR. JOHNSTON:  (NAME REDACTED; JUROR NO. 19) IS ON

22    THE CONTRACT SIDE.

23              PROSPECTIVE JUROR:  (NAME REDACTED; JUROR NO. 17)

24    YES.

25              MR. JOHNSTON:  DO YOU THINK ANYTHING ABOUT HAVING
```

APRIL 13, 2015

120

```
 1    THAT CLOSE RELATIONSHIP WITH THE GOVERNMENT AND BEING A
 2    CONTRACTOR FOR IT WOULD MAKE IT DIFFICULT FOR YOU TO JUDGE
 3    ANOTHER PERSON WHO HAS BEEN ACCUSED WITH THESE CHARGES?
 4              PROSPECTIVE JUROR:  TO AN EXTENT, I THINK, YES.
 5    WHEN I HEAR A COMPANY LIKE NORTHROP GRUMMAN, THEY BUILD
 6    DEFENSE -- WHAT DO THEY BUILD.  THEY BUILD UAV'S BUT THEY
 7    BUILD IT FOR THE UNITED STATES.  WHEN I HEAR THAT THEY ARE
 8    SELLING IT TO SOMEONE LIKE IRAN IT JUST KIND OF BRINGS UP SOME
 9    FLAGS IN ANY MIND, YOU KNOW.
10              MR. JOHNSTON:  SO YOU THINK, SITTING HERE TODAY
11    HAVING HEARD THE CHARGES, THAT IT MIGHT BE DIFFICULT TO START
12    OUT WITH THE PRESUMPTION OF INNOCENCE WITH MR. GHAHREMAN
13    BEFORE HEARING THE EVIDENCE?
14              PROSPECTIVE JUROR:  TO SOME EXTENT, YES.
15              MR. JOHNSTON:  TO AN EXTENT.  THANK YOU.
16              DOES ANYONE ELSE SHARE THAT CONCERN, HAVING HEARD
17    THIS INDICTMENT, THESE CHARGES -- LET ME ASK THIS.  WHO HAS
18    HEARD THE EXPRESSION WHERE THERE IS SMOKE THERE IS FIRE?
19    OKAY.
20              AND, LET'S SEE, SEATED NEXT TO (NAME REDACTED; JUROR
21    NO. 25), IS THAT (NAME REDACTED; JUROR NO. 26)?  YES.
22              CAN YOU TELL US WHAT THAT MEANS TO YOU?
23              PROSPECTIVE JUROR:  WHERE THERE IS FIRE THERE IS
24    SOMETHING GOING ON.  IT USUALLY -- NOT USUALLY BUT IT COULD
25    POSSIBLY BE WHAT IT IS, A FIRE.  BUT IT CAN BE OTHER THINGS,
```

APRIL 13, 2015

1    TOO.

2              **MR. JOHNSTON:**  FAIR ENOUGH.

3              I DON'T KNOW IF YOU GUYS COULD HEAR (NAME REDACTED),

4    SHE SAID, YOU KNOW, WHERE SOMETHING APPEARS TO BE GOING ON IT

5    COULD BE FIRE BUT IT COULD BE OTHER THINGS, TOO.

6              LET ME ASK YOU THIS QUESTION, THOUGH.  MR. GHAHREMAN

7    IS SITTING HERE BEFORE WE HAVE HAD ANY EVIDENCE IN THIS CASE.

8    DO YOU LOOK AT HIM TO PRESUME HIM TO BE INNOCENT; OR IF HE IS

9    SITTING HERE HE MUST BE GUILTY OF SOMETHING?

10             **PROSPECTIVE JUROR:**  NO, IT IS INNOCENT FIRST.  I

11   HAVEN'T HEARD ANYTHING SO I DON'T KNOW.

12             **MR. JOHNSTON:**  FAIR ENOUGH.

13             ANYONE HAVE A DIFFERENT VIEW, HAVING SAT THROUGH

14   THIS MORNING, THE RECITATION OF THE INDICTMENT?

15             YES, SIR.  YOUR NAME?

16             **PROSPECTIVE JUROR:**  (NAME REDACTED; JUROR NO. 31).

17             **MR. JOHNSTON:**  (NAME REDACTED), LET ME GET THE MIKE

18   DOWN HERE.

19             **PROSPECTIVE JUROR:**  I JUST WANTED TO BACK UP WHAT A

20   COUPLE OF THE JURORS THAT SPOKE UP EARLIER HAVE SAID, I MEAN,

21   WHAT YOU SAID WHERE THERE IS SMOKE THERE IS FIRE.

22             I GUESS, WELL, THIS MORNING WHEN THE JUDGE HIMSELF

23   READ OFF, OKAY, EMAILS THAT WENT BACK AND FORTH TO VARIOUS

24   PEOPLE, MONEY THAT WAS SENT BY WIRE TO THIS, THAT AND THE

25   OTHER ACCOUNT, INVOICES THAT WERE DRAFTED RE-DRAFTED; THAT

APRIL 13, 2015

```
1   PRETTY MUCH PLAYS INTO THE WHERE-THERE-IS-SMOKE-THERE-IS-FIRE

2   ANALOGY FOR ME.

3          AND SOMEONE ASKED EARLIER COULD I LOOK AT THE

4   DEFENDANT AND, YOU KNOW, GIVE A PRESUMPTION OF INNOCENCE, THAT

5   JUST BECAUSE HE WAS HERE MADE HIM GUILTY.  I COULD LOOK AT HIM

6   AND SAY, YOU KNOW, YES, HE IS INNOCENT FIRST, BUT HE IS HERE

7   FOR A REASON.

8          MR. JOHNSTON:  YES, HE IS, BECAUSE HE IS CHARGED

9   WITH THESE CRIMES.  BUT IN YOUR HEART OF HEARTS DO YOU FEEL

10  LIKE HE IS HERE BECAUSE HE IS PROBABLY GUILTY BEFORE HEARING

11  THE EVIDENCE IN THE CASE?

12         PROSPECTIVE JUROR:  I DON'T KNOW.

13         MR. JOHNSTON:  WELL, DO YOU THINK THAT NOT KNOWING

14  THAT YOU COULD PUT THAT ASIDE AND PRESUME HIM INNOCENT UNTIL

15  YOU HEAR ALL OF THE EVIDENCE IN THE CASE; OR WOULD THAT BE

16  HARD TO DO?

17         PROSPECTIVE JUROR:  THAT WOULD BE HARD, BUT I COULD

18  PROBABLY DO THAT.

19         MR. JOHNSTON:  DOES ANYONE ELSE THINK THAT WOULD BE

20  HARD TO DO, EVEN WHERE WE STAND HERE NOW TODAY?

21         SIR, (NAME REDACTED; JUROR NO. 12), WHAT DO YOU

22  THINK, WOULD IT BE HARD TO DO?

23         PROSPECTIVE JUROR:  NO, I DON'T THINK IT WOULD BE

24  HARD TO DO FOR ME.  NOT AT ALL.

25         MR. JOHNSTON:  LET ME ASK YOU.  I BELIEVE YOU SAID
```

APRIL 13, 2015

1    THAT YOU ARE RETIRED PROBATION OFFICER.

2              **PROSPECTIVE JUROR:**  YES.

3              **MR. JOHNSTON:**  YOU ACTUALLY WORKED IN THE DETENTION

4    SIDE OF JUVENILE HALL.

5              **PROSPECTIVE JUROR:**  CORRECT.

6              **MR. JOHNSTON:**  NOW, MANY PEOPLE ARE THERE WITHOUT

7    HAVING BEEN ADJUDICATED, RIGHT?

8              **PROSPECTIVE JUROR:**  YES.

9              **MR. JOHNSTON:**  THEY HAVE BEEN ACCUSED OF DOING

10   THINGS BUT THEY HAVEN'T BEEN ADJUDICATED.

11             **PROSPECTIVE JUROR:**  CORRECT.

12             **MR. JOHNSTON:**  AND EVEN HAVING THAT EXPERIENCE, YOU

13   DON'T THINK IF HE HAS GOTTEN THIS FAR AND HE IS SITTING HERE

14   AT TRIAL THAT MAYBE HE IS GUILTY?

15             **PROSPECTIVE JUROR:**  NO, NOT AT ALL.  I STILL FEEL I

16   COULD BE FAIR AND IMPARTIAL.

17             **MR. JOHNSTON:**  WHAT IN YOUR EXPERIENCE MAKES YOU

18   THINK THAT DESPITE SEEING THESE PEOPLE WHO, YOU KNOW, HAVE

19   BEEN ACCUSED OF A CRIME, THEY ARE NOT NECESSARILY GUILTY ONCE

20   THEY GET HERE TO TRIAL?

21             **PROSPECTIVE JUROR:**  THERE IS TWO SIDES TO EVERY

22   STORY.  I JUST, YOU KNOW, DON'T WANT TO PASS JUDGMENT.

23             **MR. JOHNSTON:**  (NAME REDACTED; JUROR NO. 13)

24             DO YOU AGREE WITH THAT?

25             **PROSPECTIVE JUROR:**  YEAH.  YOU HAVE TO GO THROUGH

APRIL 13, 2015

```
 1    THE PROCESS TO BE ABLE TO RENDER A DECISION.

 2             MR. JOHNSTON:   THANK YOU.

 3             (NAME REDACTED; JUROR NO. 6), WHAT ARE YOUR THOUGHTS

 4    HAVING HEARD THIS?  DO YOU HAVE CONCERNS THAT YOU CAN LISTEN

 5    TO THIS TESTIMONY AND PRESUME HIM INNOCENT UNTIL YOU HAVE

 6    HEARD ALL OF THE EVIDENCE IN THE CASE?

 7             PROSPECTIVE JUROR:   THAT'S THE GUIDANCE OF THE

 8    COURT.  WE ARE BROUGHT HERE TO GIVE THE DEFENDANT PRESUMED

 9    INNOCENCE UNTIL WE HAVE HEARD ALL OF THE FACTS, AND WE ARE

10    REMINDED OF THAT BY THE COURT.

11             MR. JOHNSTON:   DO YOU FEEL LIKE IN THIS CASE YOU

12    WOULD HAVE TO HEAR FROM MR. GHAHREMAN?  NOW THAT YOU HAVE

13    HEARD EVIDENCE OF EMAILS AND PHONE CALLS AND OTHER THINGS, DO

14    YOU FEEL LIKE, HAVING HEARD ALL OF THAT, HE WOULD HAVE TO TAKE

15    THE STAND TO DEFEND HIMSELF IN THIS CASE?

16             PROSPECTIVE JUROR:   I AM NOT A LAWYER.  WE ARE GOING

17    TO FIND OUT IF HE HAS TO TAKE THE STAND.

18             MR. JOHNSTON:   I GUESS WHAT I AM ASKING IS NOT YOUR

19    OPINION AS A LAWYER.  AS A PERSON WHO IS A JUROR, AS JUDGE

20    SABRAW SAID, WHO HAS TO STAND IN JUDGMENT OF HIS ACTIONS, DOES

21    ANYONE FEEL LIKE A DEFENDANT REALLY HAS TO TESTIFY?

22             PROSPECTIVE JUROR:   I WILL SPEAK FOR MYSELF.

23             MR. JOHNSTON:   FOR YOURSELF, CERTAINLY.  I AM NOT

24    ASKING FOR ANYONE ELSE.

25             PROSPECTIVE JUROR:   IF IT WERE ME ON TRIAL I
```

APRIL 13, 2015

125

1    CERTAINLY WOULD WANT TO SPEAK IF I WAS NOT GUILTY.

2            **MR. JOHNSTON:**  CAN ANYONE ANY THINK OF ANY REASON

3    WHY SOMEONE MIGHT NOT WANT TO TESTIFY IN THEIR TRIAL, EVEN IF

4    THEY ARE NOT GUILTY?

5            **THE COURT:**  MR. JOHNSTON, WE WILL HAVE TO WRAP UP.

6            **MR. JOHNSTON:**  SURE.  SORRY, YOUR HONOR.

7            LET ME JUST -- DOES ANYONE -- CAN ANYONE THINK OF

8    WHY SOMEONE WHO IS NOT GUILTY WOULD NOT TESTIFY?

9            **PROSPECTIVE JUROR NO. 9:**  THE CONCERN TO NOT

10   INCRIMINATE YOURSELF -- TO INCRIMINATE YOURSELF.

11           **MR. JOHNSTON:**  (NAME REDACTED; JUROR NO. 9).

12           **PROSPECTIVE JUROR:**  HE HAS GOT AN INTERPRETER.  HE

13   IS, YOU KNOW -- OBVIOUSLY ENGLISH WAS NOT HIS FIRST LANGUAGE.

14   AND MAYBE HE FEELS THAT BY TESTIFYING HIMSELF THAT HE MIGHT

15   SAY SOMETHING THAT IS NOT -- IT IS NOT WHAT HE MEANT TO SAY.

16   THE MEANING MIGHT BE VIEWED DIFFERENTLY FROM WHAT HE INTENDED.

17           **MR. JOHNSTON:**  THANK YOU.

18           THANK YOU ALL FOR SHARING YOUR THOUGHTS AND OPINIONS

19   WITH ME.

20           THANK YOU, YOUR HONOR.

21           **THE COURT:**  THANK YOU.

22           MR. HARRIGAN, GOVERNMENT'S VOIR DIRE.

23           **MR. HARRIGAN:**  THANK YOU, YOUR HONOR.

24           GOOD MORNING, EVERYONE.  MY NAME IS SHANE HARRIGAN,

25   AND MY COLLEAGUE HERE IS TIM COUGHLIN.

APRIL 13, 2015

126

```
 1            LET ME SAY AT THE OUTSET, I AM GOING TO ASK A FEW
 2    QUESTIONS.  I WILL TRY TO KEEP IT BRIEF, BUT REALLY THE OBJECT
 3    HERE, AS DEFENSE HAS TOLD YOU, IS TO GET A FAIR AND IMPARTIAL
 4    JURY, AS HIS HONOR TOLD YOU, 12 MEN AND WOMEN WHO CAN JUST
 5    JUDGE THE EVIDENCE OPEN AND FAIRLY.  AND, MOST IMPORTANTLY,
 6    FOLLOW THE LAW AS THE JUDGE INSTRUCTS YOU, BECAUSE THE END
 7    GOAL HERE IS A FAIR TRIAL, RIGHT?  WE HAVE ALL HEARD THE
 8    PRINCIPLE, DEFENDANT IS ENTITLED TO A FAIR TRIAL.  IT IS A
 9    FOUNDATION, A ROCK OF OUR SYSTEM.
10            PARTICULARLY TRUE IS THE UNITED STATES IS ENTITLED
11    TO A FAIR TRIAL, HAVING YOU LISTEN TO IT WITH AN OPEN MIND AND
12    FOLLOW THE LAW.  AND THAT MAY NOT BE SUCH A FAMILIAR SAYING TO
13    YOU ALL OR SOMETHING YOU HAVE HEARD, BUT THAT IS THE CASE.
14            SO MY FIRST QUESTION TO YOU IS, DOES ANYONE DISAGREE
15    WITH THE PROPOSITION THAT NOT ONLY THE DEFENDANT, AS WE KNOW,
16    IS ENTITLED TO A FAIR TRIAL, BUT THE UNITED STATES IS ENTITLED
17    TO A FAIR TRIAL.  ANYONE?
18            I DON'T SEE ANY HANDS.
19            LET ME TALK TO YOU BRIEFLY AGAIN ABOUT THE CHARGES.
20    NOW, YOU HEARD THE CHARGES, AND THERE HAS BEEN TALK, PEOPLE
21    COMMENTED ON THEM.  THEY ARE SERIOUS CHARGES.  ALL RIGHT.
22    DEFENDANT IS CHARGED WITH ATTEMPTING TO ACQUIRE TECHNOLOGY
23    HERE IN THE UNITED STATES AND GET IT ILLEGALLY TO IRAN IN
24    VIOLATION OF U.S. EXPORT LAWS, RIGHT?  AND THE JUDGE WILL
25    INSTRUCT YOU, AS HE HAS, THAT THE BURDEN ON THE GOVERNMENT IS
```

APRIL 13, 2015

127

```
 1    PROOF BEYOND A REASONABLE DOUBT.
 2            NOW, THAT IS OUR BURDEN, WE WELCOME THAT BURDEN.
 3    BUT HERE IS MY QUESTION.  BECAUSE OF THE NATURE OF THE CHARGES
 4    AND SOME -- (NAME REDACTED; JUROR NO. 2), YOU EXPRESSED SOME
 5    CONCERNS -- THIS IS A LITTLE BIT DIFFERENT.  BECAUSE THEY ARE
 6    SO SERIOUS, IS THERE ANYONE AMONG YOU WHO IS GOING TO SAY, YOU
 7    KNOW WHAT?  I AM GOING TO HOLD THE GOVERNMENT TO A HIGHER
 8    BURDEN BECAUSE I HAVE TO HAVE -- HOLD THIS GUY IN JUDGMENT AND
 9    THE CONSEQUENCES FOR WHAT IS GOING TO HAPPEN.  I AM GOING TO
10    HOLD THE JUDGE TO A HIGHER BURDEN.  EVEN IF YOU, THE
11    GOVERNMENT, MR. HARRIGAN, MR. COUGHLIN, HAVE MET IT, I AM
12    SORRY, I AM GOING TO HOLD YOU TO A HIGHER BURDEN.  ANYBODY?
13            DOES EVERYONE UNDERSTAND THAT WHETHER YOU ARE
14    CHARGED WITH SHOPLIFTING OR THE CHARGES HERE, THE GOVERNMENT
15    ALWAYS HAS THE SAME BURDEN OF PROOF, PROOF BEYOND A REASONABLE
16    DOUBT?
17            NOW, (NAME REDACTED; JUROR NO. 30), YOU WOULDN'T
18    HOLD THE GOVERNMENT TO PROVE BEYOND ALL POSSIBLE DOUBT, WOULD
19    YOU?
20            PROSPECTIVE JUROR:  OF THE SHOPLIFTING?
21            MR. HARRIGAN:  FOR THIS CASE.  YOU WOULDN'T HOLD US
22    TO A HIGHER BURDEN.
23            PROSPECTIVE JUROR:  REPEAT THE QUESTION AGAIN.
24            MR. HARRIGAN:  YOU WOULDN'T REQUIRE IN THIS CASE,
25    BECAUSE OF THE NATURE OF THE CHARGES, FOR US TO PROVE THE
```

APRIL 13, 2015

1    DEFENDANT'S GUILT BEYOND ALL POSSIBLE DOUBT, ANY DOUBT, WOULD

2    YOU?

3              **PROSPECTIVE JUROR:**  I WOULD HOLD THE GOVERNMENT TO

4    TRY TO PROVE TO THE BEST OF THEIR ABILITY.

5              **MR. HARRIGAN:**  BEYOND A REASONABLE DOUBT.

6              **PROSPECTIVE JUROR:**  BEYOND A REASONABLE DOUBT.

7              **MR. HARRIGAN:**  YOU WOULD AGREE, WOULDN'T YOU, THAT

8    IT IS PRACTICALLY IMPOSSIBLE TO PROVE ANYTHING BEYOND ALL

9    POSSIBLE DOUBT?

10             **PROSPECTIVE JUROR:**  I AGREE.

11             **MR. HARRIGAN:**  DOES ANYONE DISAGREE WITH THAT

12   PROPOSITION, THAT IT IS PRACTICALLY IMPOSSIBLE TO PROVE

13   ANYTHING BEYOND ALL POSSIBLE DOUBT?

14             I DON'T SEE ANY HANDS.  THE RECORD SHOWS NO ONE IS

15   RAISING THEIR HANDS.

16             LET ME TALK TO YOU A LITTLE BIT ABOUT SOME OF THE

17   WITNESSES YOU ARE GOING TO HEAR, OR WE ANTICIPATE YOU WILL

18   HEAR.  AND HIS HONOR MENTIONED SOME OF THEM.

19             YOU ARE GOING TO HEAR FROM AGENTS FROM HOMELAND

20   SECURITY INVESTIGATIONS, AND ONE OF THOSE IS DAVID COLE.  AND

21   YOU WILL HEAR THAT HE WAS ACTING IN AN UNDERCOVER CAPACITY.

22   HE WAS PLAYING A ROLE.  ALL RIGHT?  HE WAS PRETENDING TO BE A

23   BROKER OF U.S. GOODS WHO COULD ASSIST THE DEFENDANT AND OTHERS

24   IN GETTING GOODS AND TECHNOLOGY FROM THE UNITED STATES TO IRAN

25   WITHOUT GETTING CAUGHT AND ARRESTED.  HE WAS POSING AS A

APRIL 13, 2015

CRIMINAL.

AND HE WILL TELL YOU THAT HE MET WITH THE DEFENDANT IN PERSON, HE TALKED TO HIM ON THE PHONE, HE E-MAILED HIM; AND ALL THAT TIME HE WAS PLAYING A ROLE.  HE LIED ABOUT HIS NAME, HE WAS LYING ABOUT WHAT HE WANTED TO DO, ALL TO LEARN MORE ABOUT WHAT THE DEFENDANT WAS UP TO AND HIS ASSOCIATES.

NOW, HEARING THAT ALONE, AND HEARING NOTHING ELSE, DOES THAT OFFEND ANYONE'S SENSE OF FAIR PLAY AND DECENCY?  THE FACT THAT THE GOVERNMENT USED THOSE METHODS, THAT THE AGENTS PRETENDED TO BE SOMEONE ELSE?

SEEING NO HANDS.

(NAME REDACTED; JUROR NO. 6), YOU WOULD AGREE WITH THE PROPOSITION THAT IT WOULDN'T BE A VERY EFFECTIVE TOOL FOR AN AGENT TO WALK UP TO A CRIMINAL ORGANIZATION, OR SOMEBODY WHO WAS INVOLVED IN A CRIMINAL ORGANIZATION, AND IDENTIFY THEMSELVES AS A POLICE OFFICER IN ORDER TO FURTHER THAT INVESTIGATION.

**PROSPECTIVE JUROR:**  I AM THINKING THAT WON'T WORK.

**MR. HARRIGAN:**  I THINK SO TOO.  THAT IS WHY THE JUDGE WILL INSTRUCT YOU THAT STEALTH AND DECEPTION ARE PROPER TECHNIQUES.  YOU WILL HEAR THAT.

DOES ANYONE DISAGREE WITH THAT PROPOSITION, THAT LAW ENFORCEMENT OFTEN HAVE TO USE, OR IT IS A NECESSARY FACT OF THEIR WORK, USE UNDERCOVER AGENTS TO INFILTRATE CRIMINAL ORGANIZATIONS?

APRIL 13, 2015

```
 1          I DON'T SEE ANY HANDS.  THANK YOU.
 2          LET ME BRIEFLY TALK ABOUT ANOTHER WITNESS YOU ARE
 3   GOING TO HEAR FROM, AND HE WAS MENTIONED BY HIS HONOR WHEN WE
 4   READ THE WITNESS LIST, AND MENTIONED IN THE INDICTMENT.  HIS
 5   NAME IS ERGUN YILDIZ.  HE IS AN INDIVIDUAL, YOU WILL HEAR, WHO
 6   PLED GUILTY TO CHARGES INVOLVING THE SAME CHARGES THAT
 7   DEFENDANT WAS CHARGED WITH.
 8          AND WE ANTICIPATE HE WILL TESTIFY, AND HE WILL TELL
 9   YOU THAT HE ACTED AS THE PRESIDENT OF A FRONT COMPANY FOR
10   MR. TAHERKHANI, THE OTHER ASSOCIATE, IN ORDER TO DIVERT THOSE
11   GOODS TO IRAN.  OKAY.
12          NOW, HEARING THAT FACT ALONE, DOES -- AND THE FACT
13   IS YOU WILL HEAR HE PLED GUILTY, TOO, AND HE ADMITTED TO
14   COMMITTING THE CRIMES CHARGED.  AND THAT HE WILL BE TESTIFYING
15   WITH THE HOPE THAT HE RECEIVES SOME BENEFITS FOR THOSE -- FOR
16   HIS TESTIMONY.
17          NOW, HEARING THAT FACT ALONE, THAT MR. YILDIZ IS
18   HOPING TO RECEIVE SOME BENEFIT, THAT HE PLED GUILTY TO
19   COMMITTING A CRIME, IS THERE ANYBODY WHO WILL SAY, I DON'T
20   CARE WHAT HE HAS TO SAY, I AM NOT GOING TO LISTEN TO HIM AT
21   ALL.
22          (NAME REDACTED; JUROR NO. 26), IS THAT RIGHT?  WHEN
23   YOU HEAR THE FACT THAT WE ARE GOING TO HAVE A WITNESS WHO HAS
24   PLED GUILTY TO A CRIME TESTIFY, OR THE FACT THAT A PERSON HAS
25   PLED GUILTY TO A CRIME, I ASSUME THAT THAT DOESN'T EVOKE WARM
```

APRIL 13, 2015

1  FUZZY FEELINGS ABOUT THAT PERSON, DOES IT?

2           **PROSPECTIVE JUROR:**  NOT WARM FUZZY FEELINGS.

3           **MR. HARRIGAN:**  THAT MAKES SENSE.  BUT YOU UNDERSTAND

4  THAT YOUR DUTY HERE, AS A JUROR, IS NOT WHETHER YOU LIKE OR

5  DISLIKE SOMEBODY OR ADMIRE THEM, RIGHT?

6           **PROSPECTIVE JUROR:**  RIGHT.

7           **MR. HARRIGAN:**  YOUR DUTY IS TO JUDGE THEIR

8  CREDIBILITY.

9           **PROSPECTIVE JUROR:**  CORRECT.

10           **MR. HARRIGAN:**  AND WILL YOU BE ABLE TO LISTEN TO

11  MR. YILDIZ' TESTIMONY DISPASSIONATELY, AND KEEP AN OPEN MIND?

12           **PROSPECTIVE JUROR:**  YES.

13           **MR. HARRIGAN:**  AND JUDGE IT FAIR AND IMPARTIALLY?

14           **PROSPECTIVE JUROR:**  YES.

15           **MR. HARRIGAN:**  AND JUDGE IT BASED ON -- SO YOU

16  UNDERSTAND IT IS NOT WHETHER YOU LIKE OR DISLIKE SOMEBODY.

17           **PROSPECTIVE JUROR:**  CORRECT.

18           **MR. HARRIGAN:**  BUT WHETHER YOU BELIEVE THEM.

19           **PROSPECTIVE JUROR:**  CORRECT.

20           **MR. HARRIGAN:**  AND YOU CAN KEEP THOSE DISTINCTIONS

21  IN MIND?

22           **PROSPECTIVE JUROR:**  YES.

23           **MR. HARRIGAN:**  IS THERE ANYBODY WHO CAN'T?  IS THERE

24  ANYBODY SAYING, I DON'T CARE.  I HAVE HEARD THAT MR. YILDIZ IS

25  AN ACCOMPLICE IN A CRIME, HE IS GOING TO GET SOME BENEFITS.

APRIL 13, 2015

1   THAT I DON'T CARE WHAT HE HAS TO SAY, I AM JUST NOT GOING TO

2   LISTEN TO HIM.

3           WILL YOU ALL BE ABLE TO JUDGE HIM, AS THE JUDGE TOLD

4   YOU, ON FACTORS BASED ON LIKE WHAT HE HAS TO SAY, WHETHER IT

5   IS CORROBORATED BY OTHER WITNESSES, HIS DEMEANOR AND ANY

6   BIASES HE MIGHT HAVE.  ANYBODY NOT WILLING TO DO THAT?

7           I DON'T SEE ANY HANDS.

8           NOW, THE EVIDENCE YOU ARE GOING TO HEAR IN THIS CASE

9   IS BOTH DIRECT AND CIRCUMSTANTIAL.

10          (NAME REDACTED; JUROR NO. 12), I AM GOING TO PICK ON

11  YOU.  DO YOU KNOW WHAT CIRCUMSTANTIAL EVIDENCE IS, OR CAN YOU

12  DESCRIBE WHAT IT IS?

13          **PROSPECTIVE JUROR:**  NO, NOT CLEARLY.

14          **MR. HARRIGAN:**  LET ME TRY TO GIVE YOU AN EXAMPLE.

15  JUST A BENIGN EXAMPLE.

16          I CAME HOME THE OTHER NIGHT, AND MY WIFE AND KIDS

17  WERE GONE AND I HAD TO FEED A CAT.  MY CAT IS SITTING AT THE

18  BOWL, MEOWING AND SQUAWKING.  AND RATHER THAN FEED HIM, I FEED

19  MYSELF FIRST.  I THROW MY FOOD, SOME CHICKEN, IN THE

20  MICROWAVE.  ZAP THAT.  TAKE IT OUT, PUT IT ON THE COUNTER.  I

21  GO UPSTAIRS TO CHANGE.  AND WHEN I COME DOWN, MY CHICKEN IS

22  GONE, AND THERE IS A PAW PRINT ON THE PLATE.  AND MY CAT IS NO

23  LONGER BY HIS BOWL, THE CAT IS OVER SITTING ON THE COUCH

24  LICKING ITS PAWS, AND THERE IS A PIECE OF CHICKEN ON THE

25  COUCH.  RIGHT?

APRIL 13, 2015

1          **PROSPECTIVE JUROR:**  SO YOU JUST ASSUME THAT THE CAT

2    ATE THE CHICKEN.

3               **MR. HARRIGAN:**  JUST ASSUMED.

4          **PROSPECTIVE JUROR:**  CIRCUMSTANTIAL.

5               **MR. HARRIGAN:**  CIRCUMSTANTIAL.  AS THE JUDGE WILL

6    INSTRUCT YOU, IT IS NOT AN ASSUMPTION, IT IS --

7          **PROSPECTIVE JUROR:**  CIRCUMSTANTIAL.

8               **MR. HARRIGAN:**  IT IS FACTS YOU CAN DRAW OR

9    INFERENCES YOU CAN MAKE FROM OTHER FACTS AND EVIDENCE, RIGHT?

10         **PROSPECTIVE JUROR:**  YES.

11              **MR. HARRIGAN:**  NO ONE ELSE WAS HOME, YOU KNOW.  THE

12   CHICKEN IS BY THE CAT, THERE IS PAW PRINTS.  I DIDN'T SEE IT

13   HAPPEN BUT I KNOW WHAT HAPPENED.

14         **PROSPECTIVE JUROR:**  RIGHT.

15              **MR. HARRIGAN:**  SO YOU ARE GOING TO HEAR BOTH DIRECT

16   AND CIRCUMSTANTIAL EVIDENCE IN THIS CASE.

17              HAVE YOU EVER WATCHED ANY CRIME SHOWS ON T.V. OR

18   DRAMA SERIES?

19         **PROSPECTIVE JUROR:**  YES.

20              **MR. HARRIGAN:**  HAVE YOU EVER HEARD A LAWYER TELL --

21   OR ANYBODY -- A LAWYER TELL THEIR CLIENT OR SOMEBODY ELSE,

22   THEY DON'T HAVE A CASE, IT IS JUST CIRCUMSTANTIAL EVIDENCE.

23         **PROSPECTIVE JUROR:**  YES.

24              **MR. HARRIGAN:**  DO YOU UNDERSTAND THAT YOU ARE NOT

25   GOING TO GET AN INSTRUCTION IN THIS COURT THAT YOU CAN'T

APRIL 13, 2015

1   CONSIDER CIRCUMSTANTIAL EVIDENCE.  IN FACT, THE JUDGE WILL

2   INSTRUCT YOU THAT YOU CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

3   EVIDENCE AND GIVE BOTH EQUAL WEIGHT.  IN FACT, YOU CAN BASE

4   YOUR ENTIRE DECISION ON CIRCUMSTANTIAL EVIDENCE.

5          DOES ANYBODY HAVE AN ISSUE WITH THAT AT ALL?  THE

6   IDEA THAT YOU CAN MAKE DETERMINATIONS AND BASE YOUR DECISIONS

7   ON FACTS AND EVIDENCE THAT TELL YOU OTHER THINGS?  ANYONE HAVE

8   A PROBLEM WITH THAT?

9          I TAKE IT IN YOUR JOB AS A CORRECTIONAL OFFICER AT

10  THE JUVENILE CENTER YOU OFTEN HAD DEALT FACE-TO-FACE WITH SOME

11  OF YOUR YOUNG OFFENDERS; IS THAT RIGHT?

12          **PROSPECTIVE JUROR:**  (NAME REDACTED; JUROR NO. 12)

13  YES.

14          **MR. HARRIGAN:**  DID YOU HAVE TO MAKE A DETERMINATION

15  WHEN YOU HAD THOSE MEETINGS WHAT THEY WERE THINKING?

16          **PROSPECTIVE JUROR:**  YES.

17          **MR. HARRIGAN:**  I TAKE IT YOU ARE NOT A MIND READER.

18          **PROSPECTIVE JUROR:**  NOT AT ALL.

19          **MR. HARRIGAN:**  WHEN YOU ARE TRYING TO MAKE A

20  DETERMINATION WHAT HAPPENED OR WHETHER THIS PERSON -- WHAT

21  THIS PERSON IS THINKING, THE JUVENILE OFFENDER, WHAT DID YOU

22  DO?  HOW DID YOU MAKE THAT DETERMINATION?

23          **PROSPECTIVE JUROR:**  IT IS HARD TO TELL WHAT SOMEBODY

24  IS THINKING, SO YOU HAVE TO BASE IT ON THE TYPE OF EVIDENCE

25  YOU HAVE PRESENTED BEFORE YOU.

APRIL 13, 2015

1          **MR. HARRIGAN:**  WHAT THEY SAY, RIGHT?

2          **PROSPECTIVE JUROR:**  RIGHT, OF COURSE WHAT WAS SAID.

3          **MR. HARRIGAN:**  HOW THEY SAY IT, RIGHT?

4          **PROSPECTIVE JUROR:**  YES, DEMEANOR.

5          **MR. HARRIGAN:**  THEIR BEHAVIOR?

6          **PROSPECTIVE JUROR:**  YES.

7          **MR. HARRIGAN:**  OKAY.  AND WHAT OTHER PEOPLE SAY.

8          **PROSPECTIVE JUROR:**  RIGHT.

9          **MR. HARRIGAN:**  CORRECT.  OKAY.  CIRCUMSTANCES,

10   RIGHT?

11          **PROSPECTIVE JUROR:**  RIGHT.

12          **MR. HARRIGAN:**  DID YOU DO THAT ON A DAILY BASIS?

13          **PROSPECTIVE JUROR:**  YES.

14          **MR. HARRIGAN:**  ALL RIGHT.

15          (NAME REDACTED; JUROR NO. 25), LAST THING, YOU ARE

16   THE LAST PERSON I AM GOING TO PICK ON BECAUSE YOU ARE THE NEWS

17   JUNKIE.

18          IS THERE ANYBODY ELSE WHO IS A NEWS JUNKIE WHO

19   FOLLOWS THE NEWS, PARTICULARLY CURRENT NEWS?  OKAY.

20          YOU MADE THE COMMENT THAT, YOU KNOW, HOW THIS WOULD

21   BE AFFECTED, WHAT HAPPENED HERE TODAY, IN THE FUTURE.  AND YOU

22   UNDERSTAND THAT AS WE STAND HERE TODAY THE DEFENDANT IS

23   CHARGED WITH VIOLATING U.S. EXPORT LAWS, CORRECT?  AND AT THE

24   TIME HE COMMITTED THOSE OFFENSES IT WAS A VIOLATION OF LAW.

25          **PROSPECTIVE JUROR:**  YES.

APRIL 13, 2015

1          **MR. HARRIGAN:**  IN FACT, IT IS A VIOLATION OF LAW

2     TODAY.

3          **PROSPECTIVE JUROR:**  YES.

4          **MR. HARRIGAN:**  ARE YOU ABLE TO -- AND THE JUDGE WILL

5     INSTRUCT YOU, THAT IS ALL YOUR DECISION IS.  IT IS NOT WHAT IS

6     TO HAPPEN IN THE FUTURE.  ALL RIGHT?

7          **PROSPECTIVE JUROR:**  YES.

8          **MR. HARRIGAN:**  KNOWING THAT, AND DESPITE THE FACT

9     YOU ARE A NEWS JUNKIE, IS A GREAT THING, AND YOU MAY STILL

10    CONTINUE TO FOLLOW IT AT OTHER POINTS IN TIME, BUT KNOWING

11    THAT, WILL YOU BE ABLE TO FOLLOW THE LAW AS THE JUDGE

12    INSTRUCTS YOU AND APPLY THE FACTS AT LAW WITH AN OPEN AND FAIR

13    MIND?

14          **PROSPECTIVE JUROR:**  (NODS HEAD)

15          **MR. HARRIGAN:**  CAN YOU MAKE THAT COMMITMENT TO THE

16    COURT, TO THE PROSECUTION, TO THE DEFENSE?

17          **PROSPECTIVE JUROR:**  YES.

18          **MR. HARRIGAN:**  IS THERE ANYBODY HERE WHO HAS READ

19    ABOUT IRAN SANCTIONS, FEELS ONE WAY OR THE OTHER, WHO IS

20    UNWILLING TO MAKE THAT COMMITMENT TO FOLLOW THE LAW AS THE

21    JUDGE INSTRUCTS YOU?

22          I SEE NO HANDS.

23          THAT'S GOOD, BECAUSE AT THE END OF THE DAY, IF YOU

24    ARE SELECTED AS A JUROR, I AM GOING TO COME BACK AND TALK TO

25    YOU, AND I AM GOING TO HOLD YOU TO THAT COMMITMENT.

APRIL 13, 2015

137

```
 1              THANK YOU.

 2              THE COURT:  THANK YOU.

 3              I HAVE JUST A COUPLE OF FOLLOW-UP QUESTIONS, AND

 4    THEN WE WILL RECESS FOR LUNCH.

 5              THERE HAS BEEN SOME DISCUSSION ABOUT THE PRESUMPTION

 6    OF INNOCENCE, THE GOVERNMENT'S BURDEN OF PROOF.  AND AS I

 7    BEGAN THE INTRODUCTION THIS MORNING, I EXPLAINED THE CONCEPT

 8    OF THE PRESUMPTION OF INNOCENCE.

 9              AND SO HERE, UNDER THE LAW, THROUGHOUT THE UNITED

10    STATES IN EVERY CRIMINAL PROCEEDING, WHEN ONE IS ACCUSED OF A

11    CRIME HE OR SHE, IN FACT, HAS, AND CARRIES WITH HIM OR HER, A

12    PRESUMPTION; AND THAT IS A PRESUMPTION OF INNOCENCE.  THAT IS

13    OUR SYSTEM.  THAT'S THE FOUNDATION, THE BEDROCK OF THE SYSTEM

14    THAT MR. HARRIGAN WAS REFERRING TO.

15              THE GOVERNMENT CAN OVERCOME THAT PRESUMPTION ONLY BY

16    ADMISSIBLE EVIDENCE.  PROOF, PROOF BEYOND A REASONABLE DOUBT,

17    THE STANDARD WE TALKED ABOUT.

18              SO THE QUESTION IS WHETHER, GIVEN THE ALLEGATIONS IN

19    THIS CASE, NO MATTER WHAT YOUR PERSONAL BELIEFS AND OPINIONS

20    ARE ABOUT EMBARGOED COUNTRIES AND THINGS THAT ARE GOING ON

21    INTERNATIONALLY, WHETHER YOU CAN SIT IN A FAIR, CLINICAL,

22    NEUTRAL MANNER AND DECIDE, WHAT ARE THE FACTS.  THESE ARE THE

23    FACTS AS I FIND THEM TO BE, IN A CLINICAL, OBJECTIVE MANNER.

24    HERE IS THE LAW GIVEN TO ME BY THE COURT.  HAS THE GOVERNMENT

25    MET ITS BURDEN OF PROOF BEYOND A REASONABLE DOUBT?
```

APRIL 13, 2015

1          IS THERE ANYONE WHO HAS ANY DOUBT ABOUT THEIR

2     CAPACITY TO PERFORM AS A JUROR IN THAT MANNER?  OKAY.

3          I DON'T SEE ANY HANDS.

4          JUROR NO. 31, (NAME REDACTED), YOU INDICATED THAT

5     YOU CAN PROBABLY DO IT.  CAN YOU DO IT?  BECAUSE THAT IS WHAT

6     IS REQUIRED.  IT IS ESSENTIALLY A CLINICAL EXERCISE WHERE YOU

7     ARE IN THE CONFINES OF A COURTROOM.  IT IS AN ADVERSARIAL

8     SYSTEM, THERE IS DIRECT AND CROSS-EXAMINATION, THERE IS

9     ARGUMENT, THERE IS LAW; AND YOU ARE ASKED TO EVALUATE,

10    OBJECTIVELY AND CLINICALLY, THE EVIDENCE, APPLY THE LAW AND DO

11    SO MECHANICALLY, WHILE HOLDING THE GOVERNMENT TO ITS BURDEN OF

12    PROOF.

13         SO AS THE JUROR BEGINS -- JURY BEGINS ITS

14    DELIBERATION, MR. GHAHREMAN WILL BE ENVELOPED WITH A

15    PRESUMPTION OF INNOCENCE.  AND THEN THE MEMBERS OF THE JURY

16    DISCUSS WHETHER OR NOT THE GOVERNMENT HAS MET ITS BURDEN,

17    AGAIN IN A CLINICAL, FAIR WAY.  CAN YOU DO THAT?

18         **PROSPECTIVE JUROR:**  I AM GOING TO SAY NO.

19         **THE COURT:**  NO.  ALL RIGHT.

20         SO GIVEN THE ALLEGATIONS IN THIS CASE, YOU HAVE SOME

21    HESITATION ABOUT YOUR ABILITY TO DO THAT?

22         **PROSPECTIVE JUROR:**  YES.

23         **THE COURT:**  ALL RIGHT.  DO YOU FEEL THAT YOU WOULD

24    BE INHIBITED FROM KEEPING AN OPEN MIND, GIVEN THE ALLEGATIONS

25    THAT HAVE BEEN PRESENTED?

APRIL 13, 2015

139

1     **PROSPECTIVE JUROR:**  I THINK THAT WOULD BE DIFFICULT,

2     YES.  I GO BACK AGAIN, YOU READ THE -- YOU READ THE -- I GO

3     BACK TO THE WHERE-THERE-IS-SMOKE-THERE-IS-FIRE ANALOGY, AND

4     THIS MORNING WHEN YOU READ OFF ALL OF THE CHARGES, I GUESS IN

5     MY MIND YOU ESSENTIALLY READ THE SMOKE.

6            **THE COURT:**  YES.  NOW --

7            **PROSPECTIVE JUROR:**  SO IT JUST -- I GUESS THE ONLY

8     WAY I CAN EXPLAIN IS, YES, WE ARE HERE TO DECIDE IF THOSE

9     THINGS ARE TRUE, BUT IT SEEMS TO ME SOMEONE WENT TO AN AWFUL

10    LOT OF TROUBLE TO GO THROUGH SUCH AN ELABORATE PROCESS.

11           **THE COURT:**  THE QUESTION IS -- WHAT I READ ARE

12    ALLEGATIONS, SO THEY ARE NOT PROVEN.  THESE ARE THE

13    GOVERNMENT'S STATEMENTS OF WHAT THEY HOPE TO PROVE.  SO THE

14    QUESTION IS WHETHER YOU CAN KEEP AN OPEN MIND, HEAR ALL OF THE

15    EVIDENCE AND DETERMINE, OBJECTIVELY AND CLINICALLY, WHETHER OR

16    NOT THE GOVERNMENT HAS PROVEN ITS CASE BEYOND A REASONABLE

17    DOUBT; UNDERSTANDING THAT THERE ARE MANY ELEMENTS AND DEFENSES

18    TO THE COUNTS THAT HAVE BEEN ALLEGED.

19           SO THE QUESTION IS WHETHER YOU CAN KEEP AN OPEN

20    MIND, NUMBER ONE, TO WHETHER THE GOVERNMENT HAS PROVEN ITS

21    CASE BEYOND A REASONABLE DOUBT, NUMBER TWO, KEEP AN OPEN MIND

22    TO ANY DEFENSE THAT MAY BE PRESENTED; AND TO DETERMINE

23    WHETHER, AFTER ALL OF THE EVIDENCE IS IN, THE GOVERNMENT HAS

24    OR HAS NOT PROVEN ITS CASE.

25           DO YOU FEEL THAT YOU CAN DO THAT, OR DO YOU FEEL

APRIL 13, 2015

```
 1    THAT YOU HAVE SOME RESERVATION?

 2              PROSPECTIVE JUROR:  I HAVE RESERVATIONS.

 3              THE COURT:  ALL RIGHT.  OKAY.

 4              AND (NAME REDACTED), JUROR NO. 17, GIVEN YOUR

 5    POSITION AT -- IS IT GENERAL ATOMICS?

 6              PROSPECTIVE JUROR:  YES.

 7              THE COURT:  ALL RIGHT.  VERY GOOD.

 8              SIMILAR QUESTION ON THIS PRESUMPTION OF INNOCENCE.

 9    THE WAY OUR SYSTEM WORKS, AS I HAVE EXPLAINED IT, IS WITH THIS

10    PRESUMPTION OF INNOCENCE, AND THE GOVERNMENT ATTEMPTING TO

11    MEET ITS BURDEN OF PROOF BEYOND A REASONABLE DOUBT.

12              CAN YOU SET SIT FAIRLY AND OBJECTIVELY AND FULFILL

13    THOSE DUTIES AS A JUROR?

14              PROSPECTIVE JUROR:  WELL, LIKE THE OTHER PERSON

15    SAID, I MEAN, IT IS HARD TO MAINTAIN A NEUTRAL MIND AND, YOU

16    KNOW, NOT BE BIASED TOWARDS ONE SIDE OR THE OTHER.  BUT I

17    THINK I CAN REMAIN NEUTRAL.

18              THE COURT:  ALL RIGHT.

19              I THINK (NAME REDACTED), JUROR NO. 26, SAID IT BEST,

20    AND THAT IS THAT INNOCENCE IS FIRST, THAT'S THE PRESUMPTION.

21    AND THEN THE GOVERNMENT, IN ORDER TO SUCCEED IN ANY

22    PROSECUTION, HAS TO OVERCOME THAT PRESUMPTION WITH ADMISSIBLE

23    EVIDENCE BEYOND A REASONABLE DOUBT.

24              PROSPECTIVE JUROR:  (NAME REDACTED; JUROR NO. 17)

25    CORRECT.
```

APRIL 13, 2015

1          **THE COURT:**  CAN YOU SIT FAIRLY AND MAKE THAT

2   DETERMINATION?

3          **PROSPECTIVE JUROR:**  YEAH, I THINK I CAN DO THAT.

4          **THE COURT:**  ALL RIGHT.

5          THERE WAS ALSO A REFERENCE BY (NAME REDACTED), JUROR

6   NO. 6, THAT IF YOU WERE A DEFENDANT YOU MIGHT WANT TO TESTIFY.

7   AND YOU FAIRLY POINTED OUT THAT YOU ARE NOT A LAWYER AND YOU

8   DON'T KNOW WHAT THE STANDARD IS.

9          WELL, TO BE CLEAR, THE DEFENSE, IN ANY CASE, DOESN'T

10  HAVE TO DO ANYTHING.  THEY CAN SIT ON THEIR HANDS AND WATCH

11  THE PROCEEDINGS.  THEY DON'T HAVE TO BE INVOLVED IN ANY WAY.

12  THEY DON'T HAVE TO PRESENT ANY DEFENSE.  THEY DON'T HAVE TO DO

13  ANYTHING.  AND THEY CAN COME UP AT THE END OF THE DAY AND SAY

14  THE GOVERNMENT HASN'T MET IT BURDEN.  YOU HAVE HEARD ALL OF

15  THE EVIDENCE, THEY HAVEN'T MET THEIR BURDEN, THE PRESUMPTION

16  OF INNOCENCE STANDS.

17         HERE THE QUESTION IS WHETHER YOU CAN EVALUATE THE

18  CASE IN THAT PRISM -- LET'S ASSUME THERE IS NO DEFENSE.  MR.

19  GHAHREMAN ELECTS NOT TO TESTIFY, WHICH IS HIS CONSTITUTIONAL

20  RIGHT.  AND THE DEFENSE COUNSEL STANDS UP AND SAYS, THE

21  GOVERNMENT HASN'T MET ITS BURDEN.

22         DO YOU FEEL THAT YOU CAN BE FAIR IN YOUR EVALUATION,

23  GIVEN NO DEFENSE, AND ASSESS WHETHER OR NOT THE GOVERNMENT HAS

24  MET ITS BURDEN?

25         **PROSPECTIVE JUROR:**  YES, I CAN.

APRIL 13, 2015

1          **THE COURT:**  OKAY.  VERY GOOD.  OKAY.

2          WHAT I WOULD LIKE TO DO IS -- IT IS 12:30, AND I

3   WOULD LIKE TO RECESS FOR LUNCH.

4          WHEN YOU COME BACK, WE WILL BE BACK IN SESSION AT

5   2:00 O'CLOCK.  WE ARE GOING TO BE VERY CLOSE TO HAVING A JURY

6   SELECTED.  I AM GOING TO BE MEETING WITH COUNSEL BEFORE, AND

7   THEY WILL START THEIR INITIAL EXERCISE OF PREEMPTORY

8   CHALLENGES.

9          I WILL NEED EVERYONE TO RETURN IN ORDER TO COMPLETE

10  THE JURY SELECTION PROCESS, BUT I THINK IT WON'T TAKE US LONG

11  ONCE YOU RETURN AT 2:00 O'CLOCK.

12         WHEN YOU RETURN AT 2:00, PLEASE WAIT OUTSIDE BECAUSE

13  MS. KLOSTERMAN, OUR COURTROOM DEPUTY, WILL GREET YOU, AND THEN

14  SHE WILL LET YOU BACK IN THE COURTROOM AT 2:00.

15         WE WILL BE CALLING FORWARD, AT THAT TIME, THE 12

16  DELIBERATING JURORS AMONG THE 32 OF YOU.  IF YOU ARE NOT

17  SELECTED AS A JUROR, SO IN OTHER WORDS ONE OR MORE OF YOU ARE

18  EXCUSED, I URGE YOU NOT TO TAKE THAT PERSONALLY.  IT IS NOT A

19  REFLECTION ON YOU IN ANY WAY.  RATHER, WHAT IT SHOWS IS

20  COUNSELS' ENDEAVOR TO SELECT THOSE JURORS WHO THEY WANT TO

21  HEAR THE CASE FROM THEIR VANTAGE POINT.  DOESN'T REFLECT

22  ANYTHING ELSE.

23         I ASK YOU TO KEEP THAT IN MIND.  AND AT 2:00 O'CLOCK

24  WHAT I ENVISION IS WE WILL CALL FORWARD THE 12 DELIBERATING

25  JURORS, AND PERHAPS AN ALTERNATE JUROR OR TWO.  IT MAY BE THAT

APRIL 13, 2015

```
 1   WE ARE GOING TO HAVE TO TAKE SOME ADDITIONAL TIME TO QUESTION
 2   ONE OR TWO OTHER JURORS, BUT WE WILL BE CLOSE TO HAVING A JURY
 3   SELECTED SHORTLY AFTER 2:00.
 4           PLEASE KEEP IN MIND THE ADMONITION NOT TO DISCUSS
 5   THE CASE, FORM OR EXPRESS ANY OPINIONS OR CONCLUSIONS.
 6           YOU MAY ALSO BE ENCOUNTERING COUNSEL, MR. GHAHREMAN
 7   AND OTHERS WHILE YOU ARE OUTSIDE, AND THEY HAVE BEEN
 8   ADMONISHED NOT TO HAVE ANY COMMUNICATION WITH ANY ONE OF YOU,
 9   AND I ASK YOU NOT HAVE ANY COMMUNICATION OF ANY KIND WITH ANY
10   ONE OF THEM.  I WILL INSTRUCT FURTHER ON THAT ONCE WE SELECT A
11   JURY, BUT AT THIS TIME PLEASE KEEP THESE ADMONITIONS IN MIND.
12           I WANT TO THANK YOU ALL VERY MUCH FOR YOUR TIME AND
13   ATTENTION THIS MORNING.  AND WE WILL SEE YOU ALL AT 2:00
14   O'CLOCK.
15           AGAIN, WAIT OUTSIDE, WE WILL CALL YOU IN AT 2:00.
16   THANK YOU.
17           MR. JOHNSTON, WOULD YOU CLOSE THE DOOR?
18           **MR. JOHNSTON:**  SURE.
19           **THE COURT:**  THANK YOU.
20           WE ARE OUTSIDE THE PRESENCE OF THE JURY VENIRE.
21           ANY CHALLENGES FOR CAUSE?  DON'T HAVE TO GIVE ME THE
22   REASONS, JUST IDENTIFY FOR NUMBER.
23           **MR. JOHNSTON:**  NO. 2, YOUR HONOR, (NAME REDACTED).
24           **THE COURT:**  ANY OTHERS?
25           **MR. JOHNSTON:**  AND, YES, YOUR HONOR.  NO. 31, (NAME
```

APRIL 13, 2015

```
 1   REDACTED).

 2             THE COURT:  ANY OBJECTION?

 3             MR. HARRIGAN:  JUST A MOMENT, YOUR HONOR.

 4             NOT AS TO (NAME REDACTED; JUROR NO. 31).  BUT I

 5   THOUGHT (NAME REDACTED; JUROR NO. 2) SAID SHE COULD BE FAIR

 6   WHEN I ASKED QUESTIONS.

 7             THE COURT:  ALL RIGHT.  AS TO THOSE TWO CHALLENGES

 8   FOR CAUSE, I WOULD GRANT THEM.

 9             (NAME REDACTED; JUROR NO. 2) CLEARLY WANTS OUT OF

10   THE CASE AND SEEMS TO ME WAS PREPARED TO SAY ANYTHING TO DO

11   SO.

12             (NAME REDACTED; JUROR NO. 31) IS A CLOSER CALL, BUT

13   ULTIMATELY INDICATED HE HAS RESERVATIONS ABOUT HIS ABILITY TO

14   FULFILL HIS OBLIGATIONS AS A JUROR.  SO I WOULD GRANT BOTH

15   CHALLENGES.

16             ANY OTHER DEFENSE CHALLENGES FOR CAUSE?

17             MR. JOHNSTON:  YOUR HONOR, I WOULD SAY (NAME

18   REDACTED; JUROR NO. 17) IS A CLOSE CALL.  HE SAID, I THINK I

19   CAN; I WOULD LIKE TO HAVE HEARD HIM SAY, I CAN.  BUT I AM NOT

20   MAKING THAT MOTION.

21             THE COURT:  YOU ARE NOT.

22             MR. JOHNSTON:  NO.

23             THE COURT:  OKAY.

24             ANY CHALLENGES BY THE GOVERNMENT?

25             MR. HARRIGAN:  NO, YOUR HONOR.
```

APRIL 13, 2015

1    **THE COURT:**  SO THAT LEAVES US -- I WILL ASK, THEN,

2    ON PEREMPTORIES THAT COUNSEL FOCUS ON JURORS 1 THROUGH 30 IN

3    ORDER TO GET 12 JURORS.  IF ALL PEREMPTORIES ARE USED WE WILL

4    HAVE TWO POTENTIAL ALTERNATES.  IF NOT ALL PEREMPTORIES ARE

5    USED WE MIGHT HAVE A LARGER ALTERNATE POOL, AND THAT DEPENDS

6    ON WHAT COUNSEL DO.  SO WE MAY OR MAY NOT HAVE TO QUESTION

7    JURORS AT 2:00 O'CLOCK.

8         WHAT I AM GOING TO ASK IS THAT WE MEET AT 10 MINUTES

9    TO 2:00, SO COUNSEL WILL HAVE THE LUNCH HOUR TO GO THROUGH,

10   AND MS. HUDSON CAN DO HER THING, AND GOVERNMENT COUNSEL CAN

11   MEET AND CONFER AS WELL, SELECT THE JURORS YOU WANT TO

12   EXERCISE YOUR PEREMPTORIES ON.  AND WE WILL SIMPLY RUN THROUGH

13   THE PEREMPTORIES JUST BEFORE 2:00, SEE WHERE WE ARE AT THAT

14   TIME, WHETHER OR NOT WE HAVE A JURY.  I WOULD LIKE TO HAVE TWO

15   ALTERNATES, IF POSSIBLE.

16        ANY OTHER MATTERS?

17   **MR. HARRIGAN:**  NO, YOUR HONOR.

18   **MR. JOHNSTON:**  NO, YOUR HONOR.

19   **THE COURT:**  LET'S MEET AT 10 TO 2:00.  THANK YOU.

20                    *   *   *

21

22

23

24

25

APRIL 13, 2015

```
 1   SAN DIEGO, CALIFORNIA - MONDAY, APRIL 13, 2015 - 2:00 P.M.
 2                          *   *   *
 3            THE COURT:  WE ARE BACK ON THE RECORD WITH COUNSEL
 4   AND MR. GHAHREMAN, OUTSIDE OF THE PRESENCE OF THE JURY VENIRE.
 5            WE ARE IN A POSITION AT THIS TIME TO EXERCISE
 6   PEREMPTORY CHALLENGES?  WE WILL START, AGAIN, FOCUSING ON
 7   JURORS 1 THROUGH 29.  30 AND 32 WOULD BE THE ALTERNATES AT
 8   THIS POINT.
 9            IN THE FIRST FOUR ROUNDS THE GOVERNMENT WILL
10   EXERCISE ONE PEREMPTORY AND THE DEFENSE TWO PEREMPTORIES.
11   THEN ROUNDS FIVE AND SIX WOULD BE ONE AND ONE.
12            THE GOVERNMENT'S FIRST PEREMPTORY.
13            MR. HARRIGAN:  JUROR NO. 3, YOUR HONOR, (NAME
14   REDACTED).
15            THE COURT:  MR. GHAHREMAN'S FIRST TWO PEREMPTORIES.
16            MR. JOHNSTON:  6 AND 8, YOUR HONOR.
17            THE COURT:  6 WOULD BE (NAME REDACTED).  8, (NAME
18   REDACTED).
19            GOVERNMENT'S NEXT.
20            MR. HARRIGAN:  NO. 9, YOUR HONOR.
21            THE COURT:  (NAME REDACTED).
22            DEFENDANT'S NEXT TWO.
23            MR. JOHNSTON:  12, (NAME REDACTED).  AND 13, (NAME
24   REDACTED).
25            THE COURT:  GOVERNMENT'S THIRD.
```

APRIL 13, 2015

```
 1              MR. HARRIGAN:  NO. 11, (NAME REDACTED).

 2              THE COURT:  DEFENDANT'S NEXT TWO.

 3              MR. JOHNSTON:  17, YOUR HONOR, (NAME REDACTED).  AND

 4    19, (NAME REDACTED).

 5              THE COURT:  GOVERNMENT'S FOURTH.

 6              MR. HARRIGAN:  NO. 15, YOUR HONOR.

 7              THE COURT:  (NAME REDACTED).

 8              DEFENDANT'S NEXT TWO.

 9              MR. JOHNSTON:  I AM SORRY, YOUR HONOR.  THAT WAS THE

10    GOVERNMENT'S FOURTH?

11              THE COURT:  YES.

12              MR. JOHNSTON:  23, (NAME REDACTED).  AND 24, YOUR

13    HONOR, (NAME REDACTED).

14              THE COURT:  GOVERNMENT'S FIFTH.

15              MR. HARRIGAN:  NO. 20, (NAME REDACTED).

16              THE COURT:  THIS WOULD BE A SINGLE PEREMPTORY HERE.

17              MR. GHAHREMAN'S NINTH?

18              MR. JOHNSTON:  18, YOUR HONOR, (NAME REDACTED).

19              THE COURT:  GOVERNMENT'S SIXTH AND FINAL.

20              MR. HARRIGAN:  NO. 25, (NAME REDACTED).

21              THE COURT:  AND MR. GHAHREMAN'S FINAL PEREMPTORY.

22              MR. JOHNSTON:  COULD I HAVE ONE BRIEF MOMENT, YOUR

23    HONOR?

24              THE COURT:  YES.

25              MR. JOHNSTON:  YOUR HONOR, IF I COULD INQUIRE.  IF
```

APRIL 13, 2015

1   WE DO NOT USE OUR FINAL PEREMPTORY FOR THE JURY WILL WE STILL

2   BE ALLOWED TO HAVE ONE FOR THE ALTERNATE?

3          **THE COURT:**  YES.  SO EACH SIDE WOULD HAVE ONE

4   PEREMPTORY, BUT IN A PERFECT WORLD THERE WOULD BE AN AGREEMENT

5   WHERE WE WOULD END UP WITH TWO ALTERNATES AND NOT HAVE THE

6   NEED TO CONTINUE WITH VOIR DIRE.  BUT, OF COURSE, THE PARTIES

7   ARE FREE TO EXERCISE, AS TO ALTERNATES, ONE PEREMPTORY EACH.

8          **MR. JOHNSTON:**  YOUR HONOR, WE WILL JUST MOVE ON TO

9   OUR ALTERNATE.

10         **THE COURT:**  SO YOU WILL PASS?

11         **MR. JOHNSTON:**  YES, YOUR HONOR.  RESERVING THE

12  ALTERNATE STRIKE.

13         **THE COURT:**  IT WOULD JUST BE THE ONE PEREMPTORY EACH

14  SIDE.

15         **MR. JOHNSTON:**  CORRECT, YOUR HONOR.

16         **THE COURT:**  OKAY.  SO THAT WOULD MEAN FOR THE

17  ALTERNATES WE WOULD BE SELECTING FROM JUROR NO. 29, 30 AND 32.

18         SO THE RECORD IS CLEAR, MADAM CLERK, WOULD YOU

19  IDENTIFY THE 12 DELIBERATING JURORS.

20         **THE CLERK:**  NO. 1 WOULD BE (NAME REDACTED; JUROR NO.

21  1); NO. 2 WILL BE (NAME REDACTED; JUROR NO. 4); NO. 3 WILL BE

22  (NAME REDACTED; JUROR NO. 5); NO. 4 WILL BE (NAME REDACTED;

23  JUROR NO. 7); NO. 5 WILL BE (NAME REDACTED; JUROR NO. 10),

24  NO. 6 WILL BE (NAME REDACTED; JUROR NO. 14); 7 WILL BE (NAME

25  REDACTED; JUROR NO. 16); 8 WILL BE (NAME REDACTED; JUROR NO.

APRIL 13, 2015

```
 1   21); 9 WILL BE (NAME REDACTED; JUROR NO. 22); 10 WILL BE (NAME
 2   REDACTED; JUROR NO. 26); 11 WILL BE (NAME REDACTED; JUROR NO.
 3   27), AND 12 WILL BE (NAME REDACTED; JUROR NO. 28).
 4            THE COURT:  ALL RIGHT.  THAT WOULD BE OUR 12
 5   DELIBERATING JURORS.  THE ALTERNATES WE WOULD SELECT FROM 29,
 6   (NAME REDACTED), 30 (NAME REDACTED), AND 32 (NAME REDACTED).
 7            WOULD THERE BE AGREEMENT AS TO ANY TWO, OR DO
 8   COUNSEL PREFER TO SIMPLY EXERCISE ONE PEREMPTORY EACH?
 9            MR. HARRIGAN:  WELL, THE GOVERNMENT WOULD BE FINE
10   WITH THE NEXT TWO IN ORDER, 29 AND 30.
11            MR. JOHNSTON:  WE ARE FINE WITH THAT, YOUR HONOR.
12            THE COURT:  ALL RIGHT.  SO WE WOULD EXCUSE 32 (NAME
13   REDACTED).
14            MR. HARRIGAN:  YES.
15            THE COURT:  THE ALTERNATES WOULD BE (NAME REDACTED;
16   JUROR NO. 29) AND (NAME REDACTED; JUROR NO. 30).
17            DO YOU AGREE?
18            MR. JOHNSTON:  YES, YOUR HONOR.
19            THE COURT:  MR. HARRIGAN, DO YOU AGREE?
20            MR. HARRIGAN:  YES, YOUR HONOR.
21            THE COURT:  ALL RIGHT.  AND IF ALTERNATES ARE NEEDED
22   WE WILL SIMPLY DRAW FROM THE TWO RANDOMLY, AND SUBSTITUTE
23   WHOEVER HAS THE SHORT STRAW, IF NECESSARY.  OKAY.
24            WE WILL BRING IN THE JURY.  WE WILL HAVE THEM
25   SEATED, SWORN.  I WILL GIVE THE PRETRIAL ADMONITION.  THEN WE
```

APRIL 13, 2015

```
 1    WILL START WITH OPENING STATEMENT.
 2              (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN
 3              OPEN COURT, IN THE HEARING OF THE JURY)
 4         THE COURT:  GOOD AFTERNOON, LADIES AND GENTLEMEN.
 5    WELCOME BACK.
 6              WE HAVE ALL PROSPECTIVE JURORS.
 7              WE ARE GOING TO CALL FORWARD AT THIS TIME 12
 8    DELIBERATING JURORS AND TWO ALTERNATE JURORS.  IF YOUR NAME IS
 9    CALLED, PLEASE STEP FORWARD.
10         THE CLERK:  NO. 1, (NAME REDACTED; JUROR NO. 1).
11         THE COURT:  BE THE THIRD SEAT.  (NAME REDACTED), IF
12    YOU WILL GO TO THE TOP ROW, AND YOU CAN ACCESS EITHER SIDE.
13         THE CLERK:  ACTUALLY, THE BACK --
14         THE COURT:  I SEE.  YOU ARE GOING TO HAVE TO COME
15    AROUND THIS WAY, GO TO THE TOP ROW.  IF YOU WILL GO TOWARD THE
16    END TO THE THIRD SEAT FROM THE LEFT.  YES.  PERFECT.
17              SO YOU WILL BE JUROR NO. 1.  THANK YOU.
18         THE CLERK:  NO. 2, (NAME REDACTED; JUROR NO. 4.).
19         THE COURT:  (NAME REDACTED), YOU WILL BE SEATED, OF
20    COURSE, RIGHT NEXT TO (NAME REDACTED; JUROR NO. 1).
21         THE CLERK:  NO. 3, (NAME REDACTED; JUROR NO. 5);
22    NO. 4 (NAME REDACTED; JUROR NO. 7); NO. 5 (NAME REDACTED;
23    JUROR NO. 10); NO. 6 (NAME REDACTED; JUROR NO. 14); NO. 7
24    (NAME REDACTED; JUROR NO. 16).
25         THE COURT:  (NAME REDACTED; JUROR NO. 16), I WILL
```

APRIL 13, 2015

ASK THAT YOU GO TO THE SECOND BOTTOM ROW, DOWN TOWARD THE END,
RIGHT UNDERNEATH (NAME REDACTED; JUROR NO. 1).

      **THE CLERK:**  NO. 8, (NAME REDACTED; JUROR NO. 21);
NO. 9 (NAME REDACTED; JUROR NO. 22); NO. 10 (NAME REDACTED;
JUROR NO. 26); NO. 11 (NAME REDACTED; JUROR NO. 27); NO. 12,
(NAME REDACTED; JUROR NO. 28).  ALTERNATE 1, (NAME REDACTED;
JUROR NO. 29)

      **THE COURT:**  (NAME REDACTED; JUROR NO. 29), YOU ARE
WELCOME TO TAKE ON THE TOP ROW ANY ONE OF THE TWO SEATS.  I AM
NOT SURE YOU CAN GET UP THERE -- YOU HAVE TO GO AROUND.  FOR
THE BOTTOM ROW THERE IS AN ACCESS POINT ON THE LEFT SIDE.

      **THE CLERK:**  ALTERNATE 2 IS (NAME REDACTED; JUROR NO.
30).

      **THE COURT:**  OKAY.  (NAME REDACTED; JUROR NO. 30),
THERE IS AN ACCESS POINT ON THE BOTTOM LEFT, OR RIGHT,
WHICHEVER WAY YOU PREFER.  YOU CAN TAKE ANY ONE OF THOSE TWO
SEATS.  OKAY.

      LADIES AND GENTLEMEN, WE HAVE SELECTED OUR JURY.  I
WAS NOT CERTAIN WHETHER WE WOULD NEED TO CONTINUE THE VOIR
DIRE PROCESS WITH ANY OF THE OTHER PROSPECTIVE JURORS, BUT AS
YOU CAN SEE WE HAVE FILLED OUT OUR JURY GIVEN THE 32 PEOPLE WE
INITIALLY QUESTIONED.

      SO I WANT TO THANK ALL OF YOU WHO ARE SEATED BEHIND
THE RAILING AT THIS POINT FOR YOUR TIME THIS MORNING AND THIS
AFTERNOON.  YOUR SERVICES ARE MUCH APPRECIATED.

APRIL 13, 2015

1          YOU WOULD BE EXCUSED AT THIS TIME.  I WOULD ASK THAT

2     YOU REPORT BACK TO THE JURY LOUNGE.

3          THANK YOU VERY MUCH.

4          MADAM CLERK, WOULD YOU SWEAR THE JURY, PLEASE.

5          **THE CLERK:**  PANEL, PLEASE RISE AND RAISE YOUR RIGHT

6     HANDS.

7          LADIES AND GENTLEMEN OF THE JURY, DO YOU, AND EACH

8     OF YOU, SOLEMNLY SWEAR OR AFFIRM THAT YOU WILL WELL AND TRULY

9     TRY THE CAUSE NOW BEFORE THE COURT AND A TRUE VERDICT THEREIN

10    RENDER ACCORDING TO THE EVIDENCE?

11         **THE JURY PANEL:**  YES.

12         **THE CLERK:**  PLEASE BE SEATED.

13         **THE COURT:**  WELCOME, LADIES AND GENTLEMEN.

14         I AM GOING TO COVER A PRETRIAL ADMONITION.  THESE

15    INSTRUCTIONS TAKE 10 MINUTES OR SO TO COVER.  THEY SET OUT

16    GENERALLY YOUR DUTIES AND OBLIGATIONS AS JURORS.

17         FOLLOWING THESE PRETRIAL ADMONITIONS WE WILL MOVE

18    INTO OPENING STATEMENT OF COUNSEL, AND THEN THE PRESENTATION

19    OF THE CASE.

20         IT WILL BE YOUR DUTY TO FIND FROM THE EVIDENCE WHAT

21    THE FACTS ARE.  YOU AND YOU ALONE WILL BE THE JUDGES OF THE

22    FACTS.  YOU WILL THEN APPLY TO THE FACTS, AS YOU DETERMINE

23    THEM, THE LAW THAT IS GIVEN TO YOU BY THE COURT.  YOU MUST

24    FOLLOW THAT LAW WHETHER YOU AGREE WITH IT OR NOT.

25         NOTHING THE COURT MAY SAY OR DO DURING THE COURSE OF

APRIL 13, 2015

153

1    TRIAL IS INTENDED TO INDICATE OR SHOULD BE TAKEN BY YOU AS

2    INDICATING WHAT YOUR VERDICT SHOULD BE.

3         THE EVIDENCE FROM WHICH YOU WILL FIND THE FACTS WILL

4    CONSIST OF SWORN TESTIMONY OF WITNESSES, EXHIBITS WHICH ARE

5    RECEIVED INTO EVIDENCE, AND ANY FACTS TO WHICH THE ATTORNEYS

6    STIPULATE OR AGREE.

7         CERTAIN THINGS ARE NOT EVIDENCE AND MUST NOT BE

8    CONSIDERED BY YOU.  THE FOLLOWING ARE NOT EVIDENCE:  NUMBER

9    ONE, STATEMENTS AND ARGUMENTS BY THE ATTORNEYS ARE NOT

10   EVIDENCE; NUMBER TWO, QUESTIONS AND OBJECTIONS OF THE

11   ATTORNEYS ARE NOT EVIDENCE; THREE, TESTIMONY THAT THE COURT

12   HAS EXCLUDED OR ASKED YOU TO DISREGARD IS NOT EVIDENCE; AND,

13   FOUR, ANYTHING YOU MAY SEE OR HEAR OUTSIDE OF THE COURTROOM IS

14   NOT EVIDENCE AND MUST BE DISREGARDED.  YOU ARE TO DECIDE THE

15   CASE SOLELY ON THE EVIDENCE RECEIVED HERE WITHIN THE CONFINES

16   OF THE COURTROOM, AND NOT ON ANY OTHER SOURCE OF INFORMATION.

17        THERE ARE TWO KINDS OF EVIDENCE, DIRECT AND

18   CIRCUMSTANTIAL.  YOU HAVE HEARD A LITTLE BIT ABOUT THAT

19   EARLIER THIS MORNING.

20        DIRECT EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS

21   TESTIMONY BY A WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW

22   OR HEARD OR DID.  THAT WOULD BE PERCIPIENT TESTIMONY.

23   CIRCUMSTANTIAL EVIDENCE, ON THE OTHER HAND, IS INDIRECT

24   EVIDENCE; THAT IS, IT IS PROOF OF ONE OR MORE FACTS FROM WHICH

25   YOU MAY INFER OR CONCLUDE THAT OTHER FACTS EXIST.

APRIL 13, 2015

1          YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

2     EVIDENCE.  THE LAW PERMITS YOU TO GIVE EQUAL WEIGHT TO BOTH,

3     BUT IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY

4     EVIDENCE.

5          THE FEDERAL RULES OF EVIDENCE CONTROL WHAT MAY BE

6     RECEIVED IN EVIDENCE, SO WHEN COUNSEL ASK A QUESTION OR OFFER

7     AN EXHIBIT, OPPOSING COUNSEL MAY OBJECT.  IF AN OBJECTION IS

8     MADE I HAVE AN OBLIGATION TO RULE ON THAT OBJECTION.  IF I

9     OVERRULE AN OBJECTION THAT MEANS YOU WILL NOT HEAR THE ANSWER

10    OR THE EXHIBIT WILL NOT BE RECEIVED, AND I WOULD ASK YOU AT

11    THAT TIME NOT TO --

12          LET ME RESTATE IT.

13          IF I OVERRULE AN OBJECTION THAT MEANS THAT THE

14    ANSWER WILL COME IN OR THE EXHIBIT WILL BE RECEIVED; BUT I AM

15    NOT COMMENTING ON THE WEIGHT OR THE VALUE OF THE EVIDENCE,

16    THAT WOULD BE YOUR ROLE.  IF I SUSTAIN AN OBJECTION THAT MEANS

17    THERE WOULD NOT BE AN ANSWER TO THE QUESTION OR THE EXHIBIT

18    WILL NOT COME INTO EVIDENCE, IN WHICH CASE I WOULD ASK YOU NOT

19    TO SPECULATE AS TO WHAT THE ANSWER MIGHT HAVE BEEN OR WHAT THE

20    EXHIBIT MAY HAVE SHOWN.

21          IT WILL BE UP TO YOU TO DECIDE WHICH WITNESSES TO

22    BELIEVE, WHICH WITNESSES NOT TO BELIEVE, AND HOW MUCH OF ANY

23    WITNESS'S TESTIMONY TO ACCEPT OR TO REJECT.  HOW DO YOU DECIDE

24    WHAT TO BELIEVE AND WHAT NOT TO BELIEVE?  LISTEN TO THE

25    WITNESSES, WATCH THEM AND OBSERVE THEM, THEN DECIDE WHETHER

APRIL 13, 2015

1    YOU BELIEVE OR DISBELIEVE THEM, THE SAME WAY YOU DECIDE SUCH

2    QUESTIONS IN YOUR ORDINARY LIFE:  DID THEY KNOW WHAT THEY WERE

3    TALKING ABOUT?  WERE THEY CANDID, HONEST, OPEN AND TRUTHFUL?

4    DO THEY HAVE A REASON TO FALSIFY, EXAGGERATE OR DISTORT THEIR

5    TESTIMONY?  USE YOUR COMMON SENSE AND GOOD JUDGMENT TO

6    EVALUATE THEIR TESTIMONY BASED ON ALL OF THE CIRCUMSTANCES.

7            AS YOU KNOW, THIS IS A CRIMINAL CASE.  THERE ARE

8    THREE BASIC RULES ABOUT A CRIMINAL CASE THAT I ASK THAT YOU

9    KEEP IN MIND AT ALL TIMES.  WE COVERED THESE EARLIER THIS

10   MORNING.

11           FIRST, A DEFENDANT IS PRESUMED INNOCENT UNLESS

12   PROVEN GUILTY.  THE INDICTMENT AGAINST MR. GHAHREMAN BROUGHT

13   BY THE GOVERNMENT IS ONLY AN ACCUSATION, NOTHING MORE.  IT IS

14   NOT PROOF OF GUILT OR ANYTHING ELSE.  MR. GHAHREMAN,

15   THEREFORE, STARTS OUT WITH A CLEAN SLATE.  YOU MUST NOT BE

16   INFLUENCED BY ANY PERSONAL LIKES OR DISLIKES, OPINIONS,

17   PREJUDICES OR SYMPATHY.

18           SECOND, THE BURDEN OF PROOF IS ON THE GOVERNMENT AT

19   ALL TIMES.  THE DEFENDANT, MR. GHAHREMAN, HAS NO BURDEN TO

20   PROVE THAT HE IS NOT GUILTY OR TO PRESENT ANY EVIDENCE OR TO

21   TESTIFY.  SINCE HE HAS THE RIGHT TO REMAIN SILENT, THE LAW

22   PROHIBITS YOU FROM REACHING YOUR VERDICT BY CONSIDERING THAT

23   HE MAY NOT HAVE TESTIFIED.

24           THIRD, THE GOVERNMENT MUST PROVE MR. GHAHREMAN'S

25   GUILT BEYOND A REASONABLE DOUBT, AS YOU HAVE ALREADY BEEN

APRIL 13, 2015

156

```
 1   INSTRUCTED.

 2           THE FOLLOWING ADMONITIONS RELATE GENERALLY TO YOUR

 3   CONDUCT AS JURORS.

 4           FIRST, DURING THE TRIAL YOU ARE NOT TO DISCUSS THE

 5   CASE WITH ANYONE OR PERMIT ANYONE ELSE TO DISCUSS IT WITH YOU.

 6   THE LAW PROVIDES AS FOLLOWS:  IT IS THE DUTY OF JURORS DURING

 7   THE RECESS OR ADJOURNMENT NOT TO CONVERSE AMONG THEMSELVES OR

 8   WITH ANYONE ELSE ON ANY SUBJECT CONNECTED WITH THIS TRIAL, OR

 9   TO ALLOW ANYONE TO CONVERSE WITH THEM CONCERNING THE TRIAL OR

10   ANY MATTER CONNECTED WITH THE TRIAL.  AND IT IS FURTHER THE

11   DUTY OF JURORS NOT TO FORM OR EXPRESS ANY OPINION THEREON

12   UNTIL THE CASE IS FINALLY SUBMITTED TO THEM FOR THEIR

13   DECISION.

14           SO UNTIL YOU RETIRE TO THE JURY ROOM TO DELIBERATE

15   ON YOUR VERDICT YOU ARE NOT PERMITTED TO TALK ABOUT THIS CASE

16   TO ANYONE.  AND THAT ADMONITION INCLUDES EVERYDAY COURTESIES

17   AND EXCHANGES SUCH AS SAYING HELLO OR GOOD-BYE TO THE

18   PARTICIPANTS IN THIS TRIAL.

19           I HAD GIVEN THAT ADMONITION EARLIER.  IT IS

20   IMPORTANT IN THAT REGARD NOT TO HAVE ANY COMMUNICATION OF ANY

21   KIND WITH ANY OF THE LAWYERS, MR. GHAHREMAN OR WITNESSES OR

22   ANY OTHER PARTICIPANT IN THE TRIAL.

23           AT THE CONCLUSION OF THE CASE, ONCE WE HAVE HEARD

24   FROM THE JURY ON THIS MATTER, THAT ADMONITION WOULD BE LIFTED

25   AND YOU WOULD BE FREE TO DISCUSS THIS CASE WITH ANYONE.
```

APRIL 13, 2015

1          IN ADDITION, THE ADMONITION APPLIES TO NOT DISCUSS

2     THE CASE WITH ANYONE.  AND THAT INCLUDES ANYONE:  YOUR SPOUSE,

3     SIGNIFICANT OTHER, CHILDREN, FRIENDS.  WE ASK THAT YOU NOT

4     TEXT OR EMAIL OR DO ANY OF THAT.

5          AND THE REASON FOR THAT IS, AS YOU HAVE BEEN HEARING

6     THROUGHOUT THE PROCEEDINGS, THE TRIAL IS SELF-CONTAINED.  THE

7     DECISIONS YOU MAKE IN THIS PROCEEDING MUST BE BASED ONLY ON

8     THE ADMISSIBLE EVIDENCE AND THE LAW THAT IS GIVEN TO YOU BY

9     THE COURT, AND WITH THE BENEFIT OF THE DELIBERATING JURORS AT

10    THE END OF THE CASE.  IT WOULD BE ERROR AND RESULT IN A

11    MISTRIAL IF ANY ONE OF THE JURORS COMMUNICATED WITH OTHER

12    INDIVIDUALS OUTSIDE OF THIS TRIAL.

13         THE REASON THAT ADMONITION IS SO IMPORTANT IS

14    BECAUSE WE ALL HAVE OPINIONS ON ALL DIFFERENT MANNER OF

15    SUBJECTS, AND MANY PEOPLE MAY HAVE OPINIONS ON THIS VERY

16    SUBJECT, THE ALLEGATIONS THAT ARE PRESENTED IN THIS CASE.  BUT

17    THOSE OPINIONS WOULD NOT BE INFORMED DECISIONS.  ONLY THE

18    PEOPLE HERE THAT HEAR THE EVIDENCE, HEAR THE LAW, HAVE AN

19    OPPORTUNITY TO DELIBERATE, WILL BE MAKING INFORMED DECISIONS.

20    SO IT IS IMPORTANT TO KEEP THAT ADMONITION IN MIND NOT TO HAVE

21    ANY COMMUNICATION WITH ANYONE ABOUT THE CASE UNTIL THE CASE IS

22    CONCLUDED.  ONCE THE TRIAL IS CONCLUDED THAT ADMONITION WOULD

23    BE LIFTED AND YOU ARE FREE, OF COURSE, TO TALK TO ANYONE YOU

24    DESIRE.

25         SECOND, DO NOT READ ANY NEWS STORIES OR ARTICLES OR

APRIL 13, 2015

LISTEN TO ANY RADIO OR TELEVISION REPORTS ABOUT THE CASE OR
ABOUT ANYONE THAT HAS ANYTHING TO DO WITH THE CASE.

THIRD, DO NOT CONDUCT ANY RESEARCH, SUCH AS
CONSULTING DICTIONARIES, SEARCHING THE INTERNET OR USING OTHER
REFERENCE MATERIALS.  AND DO NOT MAKE ANY INVESTIGATION ON
YOUR OWN.  THE TRIAL, AS I HAVE INDICATED, IS SELF-CONTAINED.
THE DECISIONS YOU MAKE HAVE TO BE BASED ON THE EVIDENCE AND
LAW HERE IN THIS PROCEEDING.

IN THIS DAY AND AGE IT IS VERY TEMPTING TO GOOGLE OR
GET ON THE INTERNET.  YOU CAN FIND AN ABUNDANCE OF INFORMATION
IN SECONDS, LITERALLY.  HERE AGAIN, THAT WOULD BE ERROR
BECAUSE SO MUCH OF THE INFORMATION THAT YOU COULD RETRIEVE MAY
NOT BE RELEVANT TO THIS CASE, MAY BE UNINFORMED OPINIONS, MAY
BE INACCURATE.  SO IT IS VERY IMPORTANT TO CONFINE YOURSELVES
TO THESE PROCEEDINGS.

AFTER THE ADMONITION IS LIFTED YOU ARE, OF COURSE,
FREE TO DISCUSS THE CASE, RESEARCH THE CASE, GOOGLE VARIOUS
ISSUES; BUT I ASK THAT YOU KEEP THIS ADMONITION FIRMLY IN MIND
PENDING THE TRIAL.

FOURTH, DO NOT FORM ANY OPINION UNTIL ALL OF THE
EVIDENCE IS IN.  KEEP AN OPEN MIND ON THE CASE AND UPON ALL OF
THE ISSUES THAT YOU WILL BE ASKED TO DECIDE.  DO NOT MAKE UP
YOUR MIND ABOUT WHAT THE VERDICT SHOULD BE UNTIL AFTER YOU
HAVE GONE TO THE JURY ROOM AND YOU HAVE HAD AN OPPORTUNITY TO
DISCUSS THE CASE WITH YOUR FELLOW JURORS.

APRIL 13, 2015

1          FINALLY, IF YOU DESIRE TO TAKE NOTES YOU ARE FREE TO

2     DO SO.

3          HAVE WE PROVIDED THE NOTEBOOKS?

4          THEY ARE PROBABLY AT YOUR FEET OR THEY ARE IN VIEW.

5          MANY JURORS ELECT TO TAKE NOTES; MANY JURORS DON'T

6     TAKE NOTES OR FEW NOTES.  IT IS PURELY A PERSONAL CALL.  IT IS

7     UP TO YOU.  IF YOU WANT TO TAKE NOTES THE CAUTION I WOULD GIVE

8     IS THAT THINGS HAPPEN RELATIVELY QUICKLY IN THESE PROCEEDINGS.

9     GENERALLY IT IS BY WITNESS TESTIMONY, QUESTION-AND-ANSWER

10    FORMAT.  THE ANSWER IS THE EVIDENCE.  SO IF YOU ARE WRITING

11    DOWN THE ANSWER TO A QUESTION YOU MAY -- IF YOU ARE NOT

12    MULTITASKING AND PAYING CAREFUL ATTENTION YOU MAY MISS THE

13    NEXT QUESTION AND ANSWER.  SO IF YOU TAKE NOTES YOU HAVE TO

14    MULTITASK.  SOME PEOPLE ARE VERY COMFORTABLE WITH THAT; OTHERS

15    ARE NOT.

16         ALSO, YOUR NOTES ARE ONLY AN AID TO ASSIST YOUR

17    MEMORY.  I URGE YOU TO PAY CAREFUL ATTENTION TO THE TESTIMONY

18    WHEN YOU HEAR IT.  THIS PROCEEDING IS GOVERNED BY YOUR MEMORY

19    OF THE WITNESS' TESTIMONY, AND YOUR NOTES ARE AN AID TO ASSIST

20    YOU IN THAT MEMORY, IF YOU TAKE NOTES, BUT THEY ARE NOT

21    CONTROLLING IN ANY WAY.

22         WE WILL NOT PROVIDE TO YOU A TRANSCRIPT OF THE

23    TESTIMONY, SO ONCE YOU BEGIN YOUR DELIBERATIONS YOU WILL NOT

24    HAVE THE BENEFIT OF A WRITTEN TRANSCRIPT TO READ WHAT THE

25    WITNESS ACTUALLY TESTIFIED TO.  RATHER, YOU HAVE TO PAY

APRIL 13, 2015

CAREFUL ATTENTION, TAKE NOTES IF YOU DESIRE, AND THEN WHEN YOU

BEGIN YOUR DELIBERATIONS YOU WILL BE DELIBERATING BASED ON

YOUR MEMORY OF THE TESTIMONY, AS WELL AS THE EXHIBITS THAT ARE

RECEIVED INTO EVIDENCE.

THE NEXT PHASE OF THE TRIAL WILL BEGIN SHORTLY.

FIRST EACH SIDE MAY MAKE AN OPENING STATEMENT.  OPENING

STATEMENT IS NOT EVIDENCE, IT IS SIMPLY THE OPPORTUNITY FOR

THE ATTORNEYS TO OUTLINE FOR YOU WHAT THEY BELIEVE THE

EVIDENCE WILL SHOW.

FOLLOWING OPENING STATEMENTS THE GOVERNMENT WILL

PRESENT ITS CASE IN CHIEF, AND COUNSEL FOR MR. GHAHREMAN WILL

HAVE AN OPPORTUNITY TO CROSS-EXAMINE ANY SUCH WITNESSES.

THEN, AFTER THE GOVERNMENT RESTS, MR. GHAHREMAN IS FREE TO,

BUT NOT OBLIGATED TO, PRESENT A DEFENSE.  IF HE ELECTS TO

PRESENT A DEFENSE THEN HE WILL CALL HIS OWN WITNESSES, AND THE

GOVERNMENT WILL HAVE AN OPPORTUNITY TO CROSS-EXAMINE THOSE

WITNESSES.

AFTER ALL OF THE EVIDENCE IS PRESENTED YOU WILL HEAR

THE INSTRUCTIONS FROM THE COURT, I WILL PROVIDE YOU THE LAW AS

IT GOVERNS THESE COUNTS.  AND THEN COUNSEL WILL MAKE THEIR

CLOSING ARGUMENTS FOLLOWING THE JURY INSTRUCTIONS.

I WILL ALSO PROVIDE TO EACH OF YOU A WRITTEN PACKAGE

OF INSTRUCTIONS, SO YOU WILL HAVE THE INSTRUCTIONS TO READ

ALONG WITH ME.  AND YOU WILL HAVE THE OPPORTUNITY TO TAKE

THOSE INSTRUCTIONS WITH YOU, EACH OF YOU, ONCE YOU BEGIN YOUR

APRIL 13, 2015

1    DELIBERATIONS.  SO ONCE YOU DELIBERATE YOU WILL HAVE YOUR

2    NOTES, THE WRITTEN JURY INSTRUCTIONS, THE VERDICT FORM AND THE

3    EXHIBITS.

4           THE SCHEDULE, AS I OUTLINED EARLIER, WILL BE UNTIL

5    4:30 TODAY.  TOMORROW WE WILL REVERT TO AN 8:30 TO

6    2:00 SCHEDULE, SO PLEASE KEEP THAT IN MIND.  WE ARE GOING TO

7    START EARLIER, 8:30.  WE RUN ON TIME, WE RECESS ON TIME.  WE

8    GENERALLY WILL GO FROM 8:30 TO 10:15, TAKE A 15-MINUTE BREAK;

9    10:30 TO 12:15, TAKE A 15-MINUTE BREAK, EACH BREAK IS 15

10   MINUTES; PICK UP AT 12:30 AND GO TO 2:00.  YOU ARE WELCOME TO

11   BRING SOMETHING TO EAT AND/OR DRINK.

12          THE JURY LOUNGE IS THE DOOR IMMEDIATELY BEHIND YOU,

13   TO YOUR LEFT, AND YOU ARE WELCOME TO IT.  SO DURING THE RECESS

14   ONLY THE MEMBERS OF THE JURY CAN GO BACK THERE.  THERE ARE TWO

15   RESTROOMS IN THERE.  THERE IS A MICROWAVE.  THERE IS COFFEE,

16   THERE IS TEA.  THERE IS A SINK.  THERE ARE LOTS OF CHAIRS AND

17   A TABLE.  THERE ARE CLOSETS BACK THERE IF YOU WANT TO HANG

18   THINGS AND STORE THINGS.  THERE IS A REFRIGERATOR TOO.

19          IT IS VERY COMFORTABLE, IT IS VERY NICE

20   ACCOMMODATION, SO MANY JURORS LIKE TO GO BACK THERE DURING THE

21   RECESS AND GET A QUICK BITE TO EAT, GO TO THE RESTROOM,

22   WHATEVER IT MIGHT BE.  OR YOU ARE FREE TO GO OUT INTO THE

23   HALLWAY AND USE THE FACILITIES IN THE HALLWAY, AND SEE THE

24   VIEW.  SO WHATEVER YOU WOULD LIKE TO DO, WHETHER IT IS THE

25   JURY ROOM OR THE HALLWAY, WOULD BE UP TO YOU.

APRIL 13, 2015

1          THEN, FINALLY, I WOULD COMMENT THAT THE 8:30 TO

2   2:00 SCHEDULE, WHILE JURORS REALLY ENJOY IT, IT IS A FAIRLY

3   INTENSE SCHEDULE.  IT IS FIVE HOURS.  IT IS A LOT OF

4   TESTIMONY, IT IS A LOT OF WORK.  YOU WILL BE TIRED AT 2:00.

5   IT IS A LOT TO LISTEN TO AND HEAR AND PAY ATTENTION TO.  SO I

6   ASK THAT YOU REST WELL, BE FULLY ATTENTIVE.  AND AT

7   2:00 O'CLOCK YOU CAN BE ASSURED THAT YOU WILL BE ON YOUR WAY

8   AHEAD OF TRAFFIC.  AND SO TO THE EXTENT YOU WOULD LIKE TO

9   BRING SOMETHING TO EAT, PLEASE DO THAT.  AND THEN CONSUME THAT

10  DURING THE BREAK.

11         FINALLY, ON THE BACK OF THE NOTEBOOK -- YOU DON'T

12  HAVE TO DO IT NOW, BUT ON THE BACK OF THE NOTEBOOK IS

13  MS. JAMIE KLOSTERMAN'S NAME AND TELEPHONE NUMBER.  MAYBE HER

14  NAME IS NOT THERE, BUT THERE IS A TELEPHONE NUMBER.  IF YOU

15  CALL IT MS. KLOSTERMAN WILL ANSWER THE PHONE.

16         IF YOU ARE CAUGHT IN TRAFFIC OR THERE IS ANY PROBLEM

17  THAT'S THE NUMBER YOU WOULD CALL, AND SHE CAN SEE TO IT THAT I

18  RECEIVE ANY QUESTION OR COMMENTS YOU MIGHT HAVE, AND I CAN

19  DISCUSS IT WITH COUNSEL.

20         AT THIS TIME WE ARE GOING TO MOVE TO OPENING

21  STATEMENT OF COUNSEL.  HERE AGAIN THE GOVERNMENT AND THE

22  DEFENSE WILL HAVE AN OPPORTUNITY SIMPLY TO OUTLINE WHAT THEY

23  BELIEVE THE EVIDENCE WILL SHOW, BUT WHAT COUNSEL SAY IS NOT

24  EVIDENCE.

25         MR. COUGHLIN.

APRIL 13, 2015

OPENING STATEMENT BY MR. COUGHLIN

```
 1            MR. COUGHLIN:  THANK YOU, YOUR HONOR.

 2            THE EVIDENCE WILL SHOW THAT THIS WAS NO ORDINARY

 3  BUSINESS DEAL.  YOU WILL HEAR THAT AN INDIVIDUAL BY THE NAME

 4  OF KOORUSH TAHERKHANI WAS AN IRANIAN BUSINESSMAN.  AT THE

 5  TIME, HE WAS A RESIDENT OF IRAN, HE WORKED IN IRAN, BUT HE

 6  ALSO TRAVELED IN THE MIDDLE EAST.  HE WAS EDUCATED IN IRAN.

 7  HE HAD AN ADVANCED DEGREE IN MARINE ENGINEERING.

 8            NOW, MR. TAHERKHANI WAS LOOKING TO ACQUIRE CERTAIN

 9  U.S. TECHNOLOGIES.  AND AT THAT SAME TIME, HE HAD BEEN THE

10  FOUNDER OF A COMPANY THAT WAS LOCATED IN DUBAI CALLED TIG

11  MARINE.  HE WAS THE OWNER/FOUNDER.  AND YOU WILL HEAR

12  TESTIMONY THAT ORIGINALLY WHEN THAT COMPANY WAS FOUNDED IT WAS

13  FOUNDED BY SEVERAL OTHER IRANIANS, BUT THAT COMPANY WENT UNDER

14  BECAUSE IT COULDN'T DO ANY BUSINESS.  SO WHAT HE DID -- WHAT

15  HE DID WAS -- AND YOU WILL SEE THE MAP THERE, IRAN IS ABOVE

16  AND THE UNITED ARAB EMIRATES, WHERE DUBAI IS, IS BELOW.  THEY

17  ARE VERY CLOSE TO ONE ANOTHER.

18            SO WHAT HE DID WAS HE OPENED THIS COMPANY A SECOND

19  TIME, BUT THIS TIME HE PUT A GERMAN NATIONAL IN CHARGE OF THE

20  COMPANY.  NO IRANIAN CONNECTION AT THIS POINT IN TIME.  THE

21  GERMAN NATIONAL WAS IN CHARGE OF THE COMPANY.  AND THAT

22  PERSON'S NAME IS ERGUN YILDIZ.

23            YOU WILL HEAR TESTIMONY FROM ERGUN.  HE WILL TELL

24  YOU THAT THE SOLE PURPOSE OF PUTTING HIM IN CHARGE OF THAT

25  COMPANY WAS SO THAT WHEN PEOPLE LOOKED AT THAT COMPANY IN
```

1    DUBAI WHAT THEY SAW WAS, HEY, HERE IS A GERMAN NATIONAL, NO

2    CONNECTION TO IRAN.

3              ESSENTIALLY, HE IS GOING TO TELL YOU THAT WAS A

4    FRONT COMPANY.  THAT WAS A FRONT COMPANY SO MR. TAHERKHANI

5    COULD SERVICE HIS CUSTOMERS IN IRAN WITHOUT WORRYING ABOUT

6    SANCTIONS.  WITHOUT WORRYING ABOUT SANCTIONS.

7              YOU WILL HEAR TESTIMONY THAT ONCE THIS WAS IN PLACE

8    AND MR. TAHERKHANI WAS LOOKING TO SECURE THESE U.S. GOODS HE

9    DECIDED, I AM GOING TO REACH OUT TO MY OLD FRIEND, MY OLD

10   CLASSMATE, ARASH GHAHREMAN.  THE DEFENDANT.

11             YOU WILL HEAR THAT ARASH, AN IRANIAN, WAS BORN IN

12   IRAN, WAS EDUCATED, LIKE MR. TAHERKHANI, IN MARINE

13   ENGINEERING.  HE ALSO WORKED IN IRAN AS WELL BEFORE HE BECAME

14   A UNITED STATES CITIZEN.  BUT THE BEAUTY OF REACHING OUT TO

15   MR. GHAHREMAN IS HE IS ALREADY HERE.  HE ALREADY HAS THE

16   CONTACT FOR THE BUSINESS THAT HE WANTS TO ENGAGE IN.

17             SO IN LATE DECEMBER HE REACHED OUT TO HIS OLD

18   CLASSMATE, MR. GHAHREMAN, AND SAID, HEY, I AM LOOKING TO TRY

19   TO PURCHASE A NAVIGAT-2100, CAN YOU HELP ME?

20             WELL, MR. GHAHREMAN HAD BEEN IN THE UNITED STATES

21   FOR A NUMBER OF YEARS BY THEN, AND HE HAD BEEN DOING THIS IN

22   TERMS OF HELPING PEOPLE FIND PRODUCTS, AND HE HAD SOMEBODY IN

23   MIND.  HE REACHED OUT TO TIMCO ENGINEERING, WHICH WAS A SMALL

24   COMPANY IN INDIANA, IN ORDER TO SECURE THE NAVIGAT.  YOU WILL

25   HEAR LATER TESTIMONY THAT NAVIGAT IS ACTUALLY MANUFACTURED BY

OPENING STATEMENT BY MR. COUGHLIN

 1   NORTHROP GRUMMAN.

 2          WELL, MR. TAHERKHANI DIDN'T WANT TO HAVE ANYTHING TO

 3   DO WITH NORTHROP GRUMMAN.  WHAT HE WAS INTERESTED IN -- WHAT

 4   HE WAS INTERESTED IN WAS HAVING THE NAVIGAT ON THE SHELF SO

 5   THAT THE DISTRIBUTOR COULD JUST TAKE IT OFF THE SHELF AND SEND

 6   IT OUT THE DOOR.  AND THAT IS HOW HE DIRECTED MR. GHAHREMAN TO

 7   HANDLE IT:  GO TO A DISTRIBUTOR.  DON'T GO TO THE

 8   MANUFACTURER.

 9          WELL, YOU WILL HEAR TESTIMONY THAT TIMCO DIDN'T HAVE

10   IT ON THE SHELF.  TIMCO DID NOT HAVE THE NAVIGAT-2100 ON THE

11   SHELF.  SO WHAT THEY DID, WHAT ANY DISTRIBUTOR WOULD DO, THEY

12   WENT TO NORTHROP GRUMMAN.  NORTHROP GRUMMAN IMMEDIATELY LOOKED

13   AT THIS AND THEY NIXED THE DEAL.  NO DEAL.  WE ARE SANCTION

14   CONSCIOUS.  AND THEY GAVE THE REASONS.  THEY TOLD TIMCO WHAT

15   THE PROBLEM WAS.  THE PROBLEM WAS TWOFOLD.

16          THIS WAS A MISSMATCH.  WHAT YOU TOLD ME THIS WAS

17   GOING TO BE USED FOR DOESN'T MAKE SENSE.  IT IS WAY TOO

18   SOPHISTICATED FOR THE SHIP YOU ARE SUGGESTING IT SHOULD BE PUT

19   INTO.  AND THE SECOND REASON IS THE COMPANY THAT IT WAS GOING

20   TO WAS IN THE UNITED ARAB EMIRATES.  DUBAI.  TIG MARINE.

21          AND SO BASED ON THOSE FACTORS THEY JUST NO BID IT.

22   THEY SAID, WE ARE JUST NOT GOING TO FILL THIS ORDER.

23          YOU WILL HEAR FROM THEIR NATIONAL -- YOU WILL HEAR

24   FROM THEIR SECURITY OFFICER AT NORTHROP AS TO HOW HE LOOKED AT

25   THAT PROCESS, WHO HE CONSULTED, AND HOW HE CAME TO THAT

APRIL 13, 2015

OPENING STATEMENT BY MR. COUGHLIN

1    DECISION.

2          SO NOW MR. GHAHREMAN, NOW HE NEEDS TO GET A NAVIGAT.

3    WHAT DOES HE DO?  WELL, HE IS KIND OF STUCK.  BUT THE OFFICER,

4    THE SECURITY OFFICER AT NORTHROP, HE REACHED OUT TO HIS

5    HOMELAND SECURITY FOLKS AND SAID, THIS SEEMS SUSPICIOUS TO ME,

6    I AM GOING TO GIVE THIS INFORMATION TO YOU.

7          AND THEY CAME BACK AND THEY SAID, WOULD YOU PLEASE

8    GIVE THIS PHONE NUMBER AND TELL TIMCO THAT MAYBE THIS BROKER

9    CAN HELP THE PERSON THAT IS LOOKING FOR THE NAVIGAT.

10          WELL, THAT BROKER WAS A GROUP OF FEDERAL AGENTS FOR

11   HOMELAND SECURITY.  THAT GROUP WAS A GROUP OF AGENTS FOR

12   HOMELAND SECURITY.

13          YOU ARE GOING TO HEAR TESTIMONY FROM THE LEAD AGENT

14   THAT DEALT WITH MR. GHAHREMAN, DEALT WITH MR. TAHERKHANI, AND

15   HE IS GOING TO EXPLAIN TO YOU THE WHOLE PROCESS.  SO THE SAME

16   DAY, THE SAME DAY THAT TIMCO TURNED OVER THE BROKER NUMBER TO

17   MR. GHAHREMAN, HE STARTS EMAILING THIS BROKER THAT IS GOING TO

18   HELP HIM OUT.

19          LITTLE DOES HE KNOW THE UNDERCOVER AGENT IS THE

20   BROKER.  HE EMAILS HIM TWICE THE SAME DAY.  THE AGENT DIDN'T

21   CALL HIM, HE EMAILED -- YOU WILL SEE THE TESTIMONY THAT HE WAS

22   EMAILED TWICE ON THAT SAME DAY FROM MR. GHAHREMAN.

23          THEN WHAT HAPPENED WAS, HE CALLED HIM.  HE FINALLY

24   GOT AHOLD OF HIM.  TOLD HIM THE WHOLE STORY OF THE FAILURE AT

25   TIMCO, TOOK IT FROM THERE.  THEN HE SAID, I AM INTERESTED IN

1    PURCHASING THE NAVIGAT-2100.

2              WHEN HE FOUND OUT THAT HE HAD GO TO NORTHROP HE

3    SAID, WELL, NORTHROP, THEY ARE A DEFENSE FIRM, WHY WERE YOU

4    GOING THERE?

5              HE SAID, I DIDN'T GO THERE, TIMCO WENT THERE.  THEY

6    WERE TRYING TO GET IT FROM THE MANUFACTURER, I WASN'T.

7              SO THE AGENT GINNED UP AN INVOICE, A PRICE QUOTE IF

8    YOU WILL, FOR FOUR NAVIGAT-2100'S.  THEY ARE ABOUT 60,000,

9    OR $70,000 EACH.  AND HE SENT THAT PRICE QUOTE OFF TO MR.

10   GHAHREMAN.

11             AND WHAT HAPPENED?  THEY STARTED TO HAVE A

12   CONVERSATION.  THEY STARTED THE NEGOTIATIONS.  GHAHREMAN

13   IMMEDIATELY SAID, WE NEED 100 NAVIGATS.  HE TOLD THE

14   UNDERCOVER AGENT, AGENT COLE, WE NEED 100 NAVIGATS.

15             AGENT COLE SAID, 100?  IF I GO TO ORDER 100 NAVIGATS

16   THEY ARE GOING TO THINK A FOREIGN GOVERNMENT IS REACHING OUT

17   FOR THIS.  WHAT DO YOU THINK?  IS THAT THE ROAD YOU WANT TO GO

18   DOWN?

19             AND OF COURSE MR. GHAHREMAN UNDERSTOOD WELL, MAYBE

20   THAT IS NOT A GOOD IDEA.  MAYBE THAT IS NOT A GOOD IDEA THAT

21   SOMEBODY STARTS SCRUTINIZING THIS PARTICULAR DEAL.  SO, OKAY,

22   WELL, YOU KNOW WHAT, I STILL WOULD LIKE TO GO FORWARD WITH THE

23   FOUR.

24             SO THAT IS WHAT HAPPENS.  THEY BEGIN THE PROCESS,

25   THE NEGOTIATION, IF YOU WILL, FOR FOUR NAVIGATS, AND REACH A

OPENING STATEMENT BY MR. COUGHLIN

1    CONTRACT WITH FOUR EVENTUALLY.

2         BUT ONE OF THE THINGS THAT THE UNDERCOVER AGENT SAYS

3    TO HIM, SAYS TO MR. GHAHREMAN, IS, YOU KNOW THAT END USER

4    INFORMATION OR THE INFORMATION THAT YOU GAVE TO TIMCO HOW IT

5    WAS GOING TO BE USED IN A SHIP AND THAT YOUR COMPANY WAS

6    LOCATED IN DUBAI, TIG MARINE.  I AM NOT GOING TO USE ANY OF

7    THAT.  I AM GOING TO PUT IN SOME FALSE INFORMATION, FALSE

8    PAPERWORK, WHEN I ORDER YOUR FOUR.

9         MR. GHAHREMAN SAID, THAT IS FINE.  I UNDERSTAND.  I

10   UNDERSTAND.

11        SO THE PROCESS BEGAN IN CONNECTION WITH THAT.

12        AND THE TIG MARINE WEBSITE IS UP THERE NOW, AND YOU

13   ARE GOING TO HEAR ERGUN TALK ABOUT THAT WEBSITE.  THAT WAS THE

14   FRONT COMPANY THAT WENT DOWN -- THAT DIDN'T GO FORWARD WITH

15   THE ORIGINAL PURCHASE WHEN NORTHROP GRUMMAN WAS INVOLVED

16   BECAUSE THEY COULD TELL SOMETHING WAS WRONG WITH THIS COMPANY.

17   AND THE MISMATCH ON THE PRODUCT WAS A PROBLEM.

18        DURING THE SAME TIME DURING THE SAME TIME, IN

19   ADDITION TO THE NAVIGAT WHAT HAPPENED IS MR. GHAHREMAN SAID,

20   WELL, I HAVE ANOTHER ORDER.

21        HE HAD RECEIVED ANOTHER REQUEST FROM MR. TAHERKHANI.

22   IF HE COULD GET A PRICE QUOTE ON THE Y-690.

23        NOW, YOU ARE GOING TO HEAR FROM THE MANUFACTURER, A

24   REPRESENTATIVE FROM THE MANUFACTURER OF BOTH NORTHROP GRUMMAN

25   AND FOR THE Y-690 MANUFACTURED BY CPI, AND THEY ARE GOING TO

APRIL 13, 2015

1    TELL YOU WHAT THEY DO AND ALL OF THE DIFFERENT USES.  THEY

2    BOTH HAVE MILITARY AND CIVILIAN USE, BOTH ITEMS DO.  BUT THEY

3    ARE THE KIND OF ITEMS THAT BOTH OF THOSE COMPANIES PAY CLOSE

4    ATTENTION TO THAT SHOULD NOT GET IN THE WRONG HANDS, IN HANDS

5    WHERE THERE IS AN EMBARGOED COUNTRY.  AND SO THEY PAY

6    ATTENTION TO THAT.

7            YOU ARE GOING TO HEAR A SECURITY OFFICER TELL YOU

8    EXACTLY WHAT HE DOES AS IT RELATES TO THE NAVIGAT.  THE SAME

9    IS TRUE OF CPI WHEN THEY ARE LOOKING AT THEIR PRODUCT, THE

10   Y-690.

11           SO I AM GOING TO SHOW YOU THE TWO.  THIS IS THE

12   NAVIGAT-2100.  THIS WAS THE PRODUCT HE WAS INTERESTED IN.  YOU

13   WILL HEAR -- YOU WILL HEAR TESTIMONY.

14           **THE COURT:**  THOSE MONITORS ARE FLEXIBLE, SO YOU CAN

15   PULL THOSE CLOSER TO YOU.

16           **JUROR:**  THEY WEREN'T TURNED ON.

17           **THE COURT:**  I SEE.

18           **MR. COUGHLIN:**  YOU ARE GOING TO HEAR TESTIMONY THAT

19   THE NAVIGAT-2100 IS USED IN MARINE NAVIGATION, AND YOU WILL

20   HEAR TESTIMONY THAT THE Y-690 IS USED IN AIRBORNE RADAR.

21           WELL, WHEN MR. GHAHREMAN GOT THE ORDER FROM

22   TAHERKHANI TO GO AFTER THE Y-690, HE AGAIN REACHED OUT TO

23   AGENT COLE AND SAID, I WOULD LIKE TO ORDER 100 Y-690'S.

24           NOW, THEY WERE NOT IN THE SAME PRICE RANGE AS

25   NORTHROP GRUMMAN'S NAVIGAT-2100.  YOU WILL HEAR THAT THEY WERE

OPENING STATEMENT BY MR. COUGHLIN

 1   A LITTLE OVER $2,000 APIECE.  SO THEY ORIGINALLY SAID, WE

 2   WOULD LIKE TO PURCHASE 100.

 3           AND DURING THE PROCESS OF NEGOTIATIONS AGENT COLE,

 4   YOU WILL HEAR, WAS PLAYING A ROLE.  AND THAT ROLE WAS THE ROLE

 5   OF THE UNDERCOVER FACILITATOR, THE PERSON, THE BROKER TRYING

 6   TO MAKE THIS DEAL HAPPEN.  BUT HE WAS ALWAYS TALKING TO

 7   MR. GHAHREMAN, AND EVEN LATER ON, WHEN MR. YILDIZ SHOWED UP IN

 8   LAS VEGAS, TO HIM AS WELL:  THERE IS A GREAT RISK INVOLVED,

 9   THERE IS A GREAT RISK INVOLVED IN PURCHASING THESE PRODUCTS.

10   AND IF WE ARE NOT CAREFUL, IF WE DON'T DO IT JUST RIGHT, WE

11   ARE GOING TO GO TO JAIL.  WE ARE GOING TO GO TO JAIL.  SO WE

12   HAVE TO BE VERY CAREFUL.

13           AND WHEN THEY STARTED GETTING INTO THE Y-690'S, IN

14   ADDITION TO THE NORMAL PAPERWORK REQUIRED TO TELL THE COMPANY

15   WHERE IT IS GOING, IT IS CALLED END USER PAPERWORK, THERE WAS

16   AN ADDITIONAL LAYER THAT HAD TO BE TAKEN CARE OF FOR THE

17   Y-690, AND THAT WAS THEY HAD TO ACQUIRE AN EXPORT LICENSE.

18           SO MR. GHAHREMAN AND AGENT COLE BEGAN TO DISCUSS

19   THIS.  AND AGENT COLE WAS VERY CONCERNED ABOUT THAT, IN HIS

20   ROLE AS A BROKER, THAT WANTED TO BE CAREFUL TO MANAGE THE RISK

21   OF EXPORTING THIS TO A SANCTIONED COUNTRY.  SO HE JUST KEPT

22   SAYING, OVER AND OVER AGAIN, I AM KIND OF CONCERNED THIS IS

23   GOING TO IRAN.

24           AND THE RESPONSE THAT MR. GHAHREMAN SAYS, YOU KNOW,

25   SOMETIMES I JUST DON'T WANT TO KNOW.  SOMETIMES IT IS BETTER

APRIL 13, 2015

OPENING STATEMENT BY MR. COUGHLIN

```
 1   NOT TO KNOW.  SOMETIMES IT IS BETTER NOT TO KNOW.

 2            BUT HE KNEW WHERE HIS FRIEND WAS.  AND YOU WILL HEAR

 3   PLENTY OF EVIDENCE AS THIS CASE IS PRESENTED TO YOU WITH

 4   EMAILS, VIDEO CONVERSATIONS -- OR VIDEOTAPED MEETINGS,

 5   TELEPHONE CONVERSATIONS, TRANSCRIPTS OF THOSE, THOSE WILL ALL

 6   BE PLAYED FOR YOU, YOU WILL SEE HIS RESPONSE TO EACH JAG AND

 7   JOG AND TURN TO MAKE THIS DEAL HAPPEN.

 8            AND AS YOU LOOK AT MR. GHAHREMAN YOU WILL SEE THAT

 9   EACH TIME HE HAD A CHANCE TO SAY, OH, MY GOSH, I DON'T WANT TO

10   GO TO JAIL, OR OH, MY GOSH, I AM CONCERNED; HE DIDN'T TAKE

11   THAT OPPORTUNITY.  HE DIDN'T, IN ANY WAY, PUSH BACK AWAY FROM

12   THIS PARTICULAR DEAL.  AND THAT WAS FOR ONE REASON:  MONEY.

13   HE WAS GOING TO MAKE MONEY.

14            THE FIRST DEAL, THE NAVIGAT-2100, HE TOLD TAHERKHANI

15   HIS COMMISSION WAS GOING TO BE $5,000 FOR EACH NAVIGAT THAT HE

16   WAS ABLE TO SECURE, FOR A TOTAL OF $20,000 ON THAT PARTICULAR

17   SALE.  YOU WILL REMEMBER HE WAS ASKING FOR 100 THE FIRST TIME.

18            WHAT IS ALSO AN INTERESTING THING ABOUT THE Y-690

19   WHEN THEY WENT TO ORDER IT, IS MR. GHAHREMAN ASKED AGENT COLE,

20   I NEED SOME DATA INFORMATION, SOME SPEC SHEETS ON THE Y-690 SO

21   I CAN GIVE THEM TO THE CUSTOMER SO THE CUSTOMER CAN MAKE SOME

22   DECISIONS ABOUT THIS.

23            AND AGENT COLE WILL TELL YOU WHAT HE DID WAS HE

24   GAVE -- HE GAVE MR. GHAHREMAN A WEB LINK FOR THE INFORMATION,

25   FOR THE DATA THAT HE WAS ASKING FOR.
```

APRIL 13, 2015

OPENING STATEMENT BY MR. COUGHLIN

```
1              AND THE INVESTIGATION LATER ON SHOWED THAT MR.
2    TAHERKHANI GOT AN EMAIL FROM AN IRANIAN CUSTOMER WHO SAID,
3    THANK YOU FOR THE DATA SHEET.  WHEN CAN I ORDER UP THE 100
4    Y-690'S AND HOW LONG WILL IT TAKE FOR THEM TO BE DELIVERED?
5              THAT WAS TAHERKHANI IN IRAN.  ERGUN YILDIZ IS STILL
6    IN THE TIG MARINE IN DUBAI.  AND IN THE UNITED STATES IS
7    MR. ARASH GHAHREMAN, THE DEFENDANT.
8              NOW, EVENTUALLY WHAT HAPPENED WAS THE AGENT WAS ABLE
9    TO SECURE THE FIRST PAYMENT, IF YOU WILL, 10 PERCENT DOWN FOR
10   THE ORDER OF THE FOUR NAVIGATS.  AND THEY WIRED $28,000 IN TWO
11   PAYMENTS TO THE BANK ACCOUNT, THE UNDERCOVER BANK ACCOUNT THAT
12   AGENT COLE WILL TELL YOU ABOUT.  AND THE PROCESS BEGAN.
13             YOU WILL HEAR THERE WAS SOME DRAGGING OF FEET, AND
14   THE REASON WAS BECAUSE IT WAS NOT A NORMAL BUSINESS DEAL.
15   WHEN YOU HAVE A NORMAL BUSINESS DEAL YOU ORDER SOMETHING THEN
16   YOU PAY FOR IT, OR YOU PAY THEN YOU GET IT.  EITHER ONE OF
17   THOSE IS A NORMAL TRANSACTION.
18             YOU WILL HEAR EVIDENCE THAT THERE WAS A LOT OF BACK
19   AND FORTH, AND THE AGENT WILL TELL YOU THE ONLY REASON FOR
20   THAT IS BECAUSE THEY WERE AFRAID OF LOSING THEIR MONEY.  AND
21   IT HAD HAPPENED TO THEM BEFORE WHEN THEY GOT RIPPED OFF,
22   BECAUSE WHO ARE THEY GOING TO GO TO?  THE UNITED STATES
23   GOVERNMENT?  I WAS TRYING TO GET SOME TECHNOLOGY AND WHAT
24   HAPPENED WAS I GOT RIPPED OFF.  THEY KEPT MY MONEY.
25             IT IS AGAINST THE LAW.  IT IS AGAINST THE LAW FOR A
```

OPENING STATEMENT BY MR. COUGHLIN

1    UNITED STATES CITIZEN, LIKE MR. GHAHREMAN, TO EXPORT AN ITEM,

2    A GOOD, IF YOU WILL, A U.S. MADE GOOD, TO AN EMBARGOED COMPANY

3    LIKE IRAN.

4          EVENTUALLY WHAT HAPPENED, IN ORDER TO BRING THIS

5    DEAL TO A CONCLUSION, THE UNDERCOVER AGENT, AGENT COLE, SAID,

6    MY COMPANY IS HAVING A RETREAT IN LAS VEGAS, AND WE WOULD LIKE

7    TO INVITE YOU, MR. GHAHREMAN AND MR. TAHERKHANI, TO OUR

8    COMPANY'S RETREAT.

9          AND INITIALLY MR. TAHERKHANI SAID, GREAT, I WILL BE

10   THERE.  BUT THEN, AS TIME UNFOLDED —— AND IT WAS A VERY SHORT

11   PERIOD OF TIME —— HE TOLD THE AGENT, YOU KNOW, WHEN IRANIANS

12   COME TO THE UNITED STATES THEY GET ARRESTED.  SO YOU KNOW

13   WHAT?  I THINK I AM NOT GOING TO COME.  I AM NOT GOING TO

14   COME.

15         AND SO HE SAID, YOU KNOW WHAT I AM GOING TO DO?  I

16   AM GOING TO REACH OUT TO THE PERSON I PUT AS THE PRESIDENT OF

17   TIG MARINE, ERGUN YILDIZ, AND I AM GOING TO HAVE HIM COME.

18         AND YOU WILL HEAR THAT ERGUN WAS GETTING COPIED ON

19   SOME OF THESE ITEMS, BUT ESSENTIALLY HE WAS HAPPY IN HIS ROLE

20   AS THE PRESIDENT OR THE MANAGING DIRECTOR OF TIG MARINE

21   BECAUSE MR. TAHERKHANI HAD SAID TO HIM, I WILL PAY YOU $80,000

22   A YEAR TO DO NOTHING BUT JUST PUT YOUR NAME ON THIS COMPANY.

23         IT WAS A GOOD DEAL FOR MR. ERGUN YILDIZ AND HE WAS

24   HAPPY WITH IT.  BUT HE IS GOING TO TESTIFY HERE TODAY OF

25   EXACTLY WHAT HE KNEW WAS GOING ON WITH MR. TAHERKHANI AND

APRIL 13, 2015

1    WHERE THOSE GOODS WERE GOING FROM THE VERY MOMENT HE BECAME

2    INVOLVED.

3           YOU WILL HEAR TESTIMONY THAT THEY DID -- MR. YILDIZ

4    AND MR. GHAHREMAN DID FLY TO LAS VEGAS.  GHAHREMAN CAME FROM

5    NEW YORK AND MR. YILDIZ CAME FROM DUBAI.

6           AND WHEN THEY ARRIVED IN LAS VEGAS, MR. GHAHREMAN

7    MET INITIALLY WITH THE AGENT AND THEY WENT OUT TO DINNER

8    TOGETHER.  THAT IS AN AUDIO CONVERSATION THAT YOU ARE GOING TO

9    HEAR.  AND IN THAT CONVERSATION AGAIN THE AGENT PRESSES HIM

10   THAT THESE ARE GOING TO IRAN, THESE GOODS ARE GOING TO IRAN,

11   OF COURSE.  THAT IS WHERE THE COMMENT COMES IN, WELL, YOU

12   KNOW, DAVE, SOMETIMES IT IS BETTER NOT TO KNOW.  SOMETIMES IT

13   IS BETTER NOT TO KNOW.

14          BUT THE AGENT WAS VERY CONCERNED THAT POTENTIALLY

15   THIS Y-690 WAS GOING TO HAVE A MILITARY USE, AND HE WAS VERY

16   CONCERNED ABOUT THAT.  AND SO WHAT HAPPENED WAS MR. GHAHREMAN

17   SAID NOT TO WORRY, NOT TO WORRY, IT IS GOING TO AN AIRPORT.

18   IT IS GOING TO AIRPORT USE, DON'T WORRY ABOUT IT.

19          HE DIDN'T SAY IRAN THAT TIME, BUT HE DID SAY IT THE

20   NEXT DAY WHEN THEY ALL MET TOGETHER.  WHEN MR. YILDIZ AND MR.

21   GHAHREMAN AND THE UNDERCOVER AGENTS MET TO LOOK AT THE GOODS

22   ON JUNE 13TH, THEY DID THAT IN ORDER TO ASSURE THESE

23   INDIVIDUALS THAT WERE GOING TO HAVE THESE SHIPPED TO IRAN,

24   THROUGH A THIRD PARTY IN DUBAI, THAT THESE WERE THE GOODS AND

25   EVERYTHING WAS GOOD.  SO THEY HAD AN OPPORTUNITY TO LOOK.

APRIL 13, 2015

OPENING STATEMENT BY MR. COUGHLIN

```
 1              AND THERE WAS LOTS OF DISCUSSION ON THAT DAY:  WHAT
 2   DO WE DO?  HOW DO WE AVOID SCRUTINY OF CUSTOMS OR LAW
 3   ENFORCEMENT?
 4              WELL, LET'S TAKE OFF ALL THE PACKAGING, THE NORMAL
 5   PACKAGING SO IT DOESN'T SAY NORTHROP GRUMMAN, IT DOESN'T SAY
 6   CPI ON IT.  WELL, THAT IS ONE WAY WE COULD DO IT.
 7              WHAT IF WE KEEP THE MANUALS THAT WOULD COME WITH IT,
 8   WHY DON'T WE SHIP THOSE SEPARATELY?  THERE WAS DISCUSSION
 9   ABOUT THAT.
10              THEN AGENT COLE AGAIN RAISED HIS CONCERN ABOUT THE
11   POSSIBILITY THAT WHAT HAPPENS IF THERE IS A TECHNICAL PROBLEM
12   WITH ONE OF THESE, AND THEY ARE IN A FOREIGN COUNTRY NOW,
13   IRAN, AND THEY WANT TO GO BACK TO THE MANUFACTURER.  IF THEY
14   DO THAT THEN THEY ARE GOING TO KNOW THAT I FALSIFIED THE
15   PAPERWORK.
16              MR. GHAHREMAN CAME UP WITH A SOLUTION.  HE SAID, WE
17   WILL REMOVE THE SERIAL NUMBERS ON THESE PRODUCTS.  WE WILL
18   REMOVE THE SERIAL NUMBERS.
19              THAT WAS HIS ANSWER TO MAKING SURE THAT THE SCRUTINY
20   DID NOT LEAD BACK TO HIS FRIEND THE BROKER WHO HE DIDN'T
21   REALIZE WAS AN UNDERCOVER AGENT ACTING IN THAT CAPACITY.
22              THEY TALKED ABOUT A NUMBER OF OTHER THINGS BUT
23   MAINLY THEY ENDED UP TALKING ABOUT, WHERE ARE THESE GOING?
24   AND IN THE END YOU WILL HEAR THAT BOTH INDIVIDUALS
25   ACKNOWLEDGED THAT THESE WERE GOING TO IRAN.  THEY WERE GOING
```

APRIL 13, 2015

OPENING STATEMENT BY MR. COUGHLIN

 1  FIRST TO A DIFFERENT COUNTRY -- DUBAI FOR THE NAVIGATS, THE
 2  CZECH REPUBLIC FOR THE Y-690S -- BUT THEY WERE EVENTUALLY
 3  GOING TO GO TO THOSE CUSTOMERS THAT MR. TAHERKHANI HAD SECURED
 4  IN IRAN.  AND THEY ALL KNEW IT.  AND THEY WERE TAKING WHATEVER
 5  STEPS WERE APPROPRIATE SO THAT THEY COULD GET TO THE END USER
 6  THAT WAS PAYING THE BIG MONEY FOR THESE KINDS OF THINGS.
 7          LADIES AND GENTLEMEN, WHEN YOU CONSIDER THE EVIDENCE
 8  IN THIS CASE -- EMAILS, AUDIO, VIDEO, TESTIMONY -- YOU ARE
 9  GOING TO COME UP WITH ONLY ONE ANSWER:  THE DEFENDANT,
10  MR. ARASH GHAHREMAN, IS GUILTY OF THE CONSPIRACY TO EXPORT
11  GOODS, U.S. GOODS, TO AN EMBARGOED COUNTRY, TO SMUGGLE U.S.
12  GOODS OUT OF THE UNITED STATES AND TO LAUNDER MONEY, AND THE
13  SUBSTANTIVE COUNTS THAT ARE CHARGED WITH THEM.
14          THANK YOU.
15          **THE COURT:**  MR. JOHNSTON, DO YOU WISH TO MAKE AN
16  OPENING STATEMENT AT THIS TIME?
17          **MR. JOHNSTON:**  YES, THANK YOU.
18          THIS IS A CASE ABOUT AN IRANIAN BORN CITIZEN WHO WAS
19  GIVEN EVERY OPPORTUNITY BY HIS HOME COUNTRY TO BECOME A
20  SUCCESSFUL BUSINESSMAN.  IT IS ALSO A CASE ABOUT HIS
21  COMPATRIOT, A SMOOTH TALKING INTERNATIONAL MAN OF BUSINESS
22  WHO, LIKE THE OTHER, HAD CONSISTENT, DIRECT, BEHIND THE SCENES
23  ACCESS TO ALL OF THEIR COMPANY'S CLIENTS AND CUSTOMERS,
24  INCLUDING THOSE IN IRAN.
25          THIS IS ALSO A CASE ABOUT HOW THOSE TWO MEN WENT TO

APRIL 13, 2015

OPENING STATEMENT BY MR. JOHNSTON

1   GREAT LENGTHS TO CONCEAL THEIR TRUE INTENTIONS FROM ANYONE WHO

2   WOULD INCREASE THE RISK OF THEM NOT GETTING TO GET THOSE

3   PRODUCTS THAT THEY WANTED TO PROCURE, AND CERTAINLY FROM

4   ANYONE WHO MIGHT INCREASE THE RISK OF THOSE TWO MEN BEING

5   PROSECUTED FOR THEIR ACTIONS.

6          BUT THOSE TWO MEN, THEY ARE NOT SITTING AT THIS

7   TABLE TODAY.  ONE OF THEM, KOORUSH TAHERKHANI, HAS RECEDED

8   INTO THE SHADOWS, PROBABLY TO THE PROTECTION OF HIS OWN HOME

9   COUNTRY, IRAN.

10          AND THE OTHER, ERGUN YILDIZ, A NEWLYWED WHO IS

11   DESPERATE TO GET HOME, STRUCK A DEAL WITH THE GOVERNMENT TO

12   MAKE SURE THAT HE DIDN'T HAVE TO SIT AT THAT TABLE.  A DEAL

13   WHOSE SWEETNESS DEPENDS ON JUST HOW MUCH HE WILL PLEASE THE

14   GOVERNMENT IN THEIR PROSECUTION OF THE ONLY PERSON WHO SITS

15   HERE IN FRONT OF YOU TODAY, ARASH GHAHREMAN.

16          AND TO UNDERSTAND HOW MR. GHAHREMAN FINDS HIMSELF

17   SITTING HERE TODAY IN JUDGMENT BEFORE YOU, YOU WILL FIND OUT A

18   LITTLE BIT MORE ABOUT WHO HE IS:  A MAN WHO GREW UP IN THE

19   REVOLUTIONARY, CHANGING AND OFTEN UNFAIR LANDSCAPE THAT WAS

20   IRAN AFTER THE SHAH, WHO HIS FAMILY SUPPORTED, WAS THROWN OUT

21   OF POWER.  A MAN WHO EXPERIENCED FIRST-HAND THE LIMITED

22   OPPORTUNITIES AND LIMITATIONS THAT A PERSON FACES IN THAT

23   COUNTRY WHEN THEY DON'T HAVE THE RIGHT CONNECTIONS.

24          YOU WILL ALSO LEARN THAT HE IS A MAN WHO TOOK

25   ADVANTAGE OF THE LIMITED OPPORTUNITIES HE HAD, STUDIED ABROAD

APRIL 13, 2015

OPENING STATEMENT BY MR. JOHNSTON

```
 1   AND CAME HERE TO THE UNITED STATES TO BECOME A HARD WORKING

 2   AND PROUD UNITED STATES CITIZEN.

 3          AND YOU WILL ALSO COME TO UNDERSTAND, AS YOU LISTEN

 4   TO THE EVIDENCE, THE LIMITED ROLE THAT MR. GHAHREMAN PLAYED

 5   WHEN, AS A FULL-TIME GRADUATE STUDENT HERE IN THE UNITED

 6   STATES, HE WAS CONTACTED BY AN OLD DISTANT COLLEGE FRIEND TO

 7   HELP HIM WITH A BUSINESS TRANSACTION HERE IN THE UNITED

 8   STATES.

 9          AND TO APPRECIATE THE DIFFICULTY OF THE POSITION

10   MR. GHAHREMAN FOUND HIMSELF IN, YOU WILL HAVE TO PAY ATTENTION

11   TO TWO THINGS.  FIRST, THE TERMS OF THE AGREEMENT THAT HE HAD

12   WITH TIG MARINE AS AN INTERMEDIARY, BUT EQUALLY IMPORTANT THE

13   CONTEXT OF THE ROLE THAT HE HAD TO PLAY.  AND THAT IS GOING TO

14   REQUIRE YOU TO PAY CLOSE ATTENTION TO YET ANOTHER PERSON WHO

15   WILL NOT BE SITTING HERE AT THE DEFENSE TABLE; AND THAT IS

16   DAVID MILLS, THE SALES REPRESENTATIVE FOR SOUTH STAR TRADING,

17   ALSO KNOWN AS DAVID COLE, UNDERCOVER SPECIAL AGENT FOR

18   DEPARTMENT OF HOMELAND SECURITY INVESTIGATIVE SERVICES.  DAVID

19   MILLS, THE GREGARIOUS, FAST TALKING UNDERCOVER AGENT WHO, I

20   THINK EVERYONE WILL AGREE AT THE CONCLUSION OF THIS TRIAL,

21   PLAYS A VERY CONVINCING ROLE AS THE SLICK BUSINESSMAN WHO

22   DOESN'T LET ANYONE GET A WORD IN EDGEWISE.

23          DAVID MILLS, WHO TRIES TO PUSH THIS DEAL THROUGH,

24   EVEN WHEN TIG MARINE HAS RESERVATIONS BECAUSE DAVID MILLS

25   CAN'T OR WON'T COMPLY WITH THE CREDIT TERMS OF THE CONTRACT
```

APRIL 13, 2015

OPENING STATEMENT BY MR. JOHNSTON

 1  THAT THEY HAD BOTH SIGNED.

 2          AND, YES, DAVID COLE, THE UNDERCOVER SPECIAL AGENT,

 3  WHO CONTINUOUSLY TRIES TO FOIST HIS NARRATIVE THAT THESE ITEMS

 4  WERE GOING TO IRAN ONTO MR. GHAHREMAN; ALL THE WHILE MR.

 5  GHAHREMAN IS SIMPLY TRYING TO KEEP A DEAL ON TRACK BETWEEN TWO

 6  PARTIES.  A DEAL FOR SHIPMENT OF GOODS, NOT TO IRAN BUT TO

 7  DUBAI.

 8          YOU ARE GOING TO HEAR DAVID MILLS SAY A LOT OF

 9  THINGS THAT SIMPLY AREN'T TRUE.  YOU ARE GOING TO HEAR THAT

10  DAVID MILLS LIES TO MR. GHAHREMAN ABOUT THE EXPORT

11  RESTRICTIONS FOR THE Y-690'S, CLAIMING THAT THEY ARE MUNITIONS

12  THAT REQUIRE A SPECIAL EXPORT LICENSE TO BE SENT TO ANY

13  COUNTRY IN THE WORLD.

14          YOU ARE GOING TO HEAR HIM TRY TO WRAP MR. GHAHREMAN

15  INTO BAD STATEMENTS ABOUT GOING TO JAIL, DESPITE REPEATEDLY

16  TELLING MR. GHAHREMAN THAT IT IS HE, DAVID MILLS, WHO IS

17  RESPONSIBLE FOR PROCURING THESE LICENSES, NOT MR. GHAHREMAN.

18          AND YOU WILL HEAR HIM CONTINUOUSLY TRY TO TELL MR.

19  GHAHREMAN THAT THESE ITEMS ARE DESTINED FOR IRAN, WITHOUT

20  GIVING HIM AN OPPORTUNITY TO EXPLAIN.

21          YOU WILL HEAR HIM TELL MR. GHAHREMAN THAT EVEN IF HE

22  DID HAVE AN OPPORTUNITY TO EXPLAIN, IT WOULD BE DISRESPECTFUL

23  TO TELL ME THESE ARE GOING ANYWHERE ELSE.  I DON'T LIKE BEING

24  LIED TO WHEN IT IS OBVIOUS TO ME WHERE THESE ITEMS ARE GOING

25  TO.

APRIL 13, 2015

OPENING STATEMENT BY MR. JOHNSTON

1           BUT ONE THING THAT DAVID MILLS WILL SAY THAT YOU

2    WILL HEAR WILL RING TRUE AND WILL HELP YOU UNDERSTAND AT LEAST

3    THE KEY TO THIS CASE, AND THAT IS WHEN HE TELLS MR. GHAHREMAN,

4    LOOK, YOU ARE STUCK IN THE MIDDLE.  THAT IS A VERY TOUGH SPOT.

5    I UNDERSTAND THAT.  KOORUSH TAHERKHANI DOESN'T TRUST ME, I

6    DON'T TRUST HIM.  YOU ARE TRYING TO HELP ME, YOU ARE TRYING TO

7    HELP HIM.  I RESPECT THAT ABOUT YOU.  I LIKE THAT ABOUT YOU.

8           AND YES INDEED, MR. GHAHREMAN WAS IN THE MIDDLE

9    BETWEEN TWO PARTIES THAT HAVE A MULTITUDE OF INTENTIONS, BOTH

10   APPARENT AND HIDDEN.  BUT THE ONLY THING THAT YOU WILL SEE IS

11   APPARENT TO MR. GHAHREMAN, AND THE THING THAT HE FOCUSES

12   ATTENTION ON, IS HIS CONTRACTUAL OBLIGATION TO FIND A SELLER

13   OF PRODUCTS FOR ULTIMATE SHIPMENT TO DUBAI.

14           AND AS YOU LISTEN TO THE EVIDENCE AND THE TESTIMONY

15   YOU WILL HAVE TO ASK YOURSELF:  WHAT COULD HE DO?  DOES HE

16   DISRESPECT DAVID MILLS --

17           **MR. HARRIGAN:**  OBJECTION.  ARGUMENTATIVE.

18           **THE COURT:**  OVERRULED.

19           YOU MAY PROCEED.

20           **MR. JOHNSTON:**  DOES HE DISRESPECT DAVID MILLS AND

21   RISK LOSING HIS TRUST IN BUSINESS BY TELLING HIM THESE ITEMS

22   AREN'T GOING TO IRAN?  DOES HE -- DOES HE TELL HIM, YOU ARE

23   NOT RIGHT ABOUT THE LAW, THE Y-690'S DON'T REQUIRE ANY SPECIAL

24   EXPORT LICENSE TO GO TO DUBAI?

25           NO.

APRIL 13, 2015

1      AND YOU WILL ALSO HAVE TO ASK YOURSELF WHAT CAN MR.

2   GHAHREMAN -- OR WHAT POSITION IS HE IN, AS AN OCCASIONAL

3   INTERMEDIARY, NON-EXCLUSIVE PARTICIPANT WITH TIG MARINE, WHAT

4   SORT OF AUTHORITY DOES HE REALLY HAVE TO QUESTION THE

5   INFORMATION THAT KOORUSH TAHERKHANI GIVES HIM OR TIG MARINE

6   GIVES HIM.

7      IF TIG MARINE GIVES HIM END USER INFORMATION HE HAS

8   AN OBLIGATION TO PROVIDE THAT INFORMATION TO THE MANUFACTURER

9   OR TO THE SELLER.  IF THE MANUFACTURER OR SELLER GIVES HIM

10  BACK A RESPONSE, A REJECTION, A COMMENT, HE HAS AN OBLIGATION

11  TO CONVEY THAT INFORMATION BACK TO TIG MARINE.  BUT WHAT HE

12  DOESN'T HAVE AUTHORITY TO DO IS TO CHALLENGE THOSE

13  REPRESENTATIONS OR TO NOT CONVEY THOSE REPRESENTATIONS.  IN

14  THE END HE IS AN INTERMEDIARY, HE IS A MAN IN THE MIDDLE, A

15  GO-BETWEEN BETWEEN TWO PARTIES THAT ARE TRYING TO MAKE A DEAL.

16      AND ONE OTHER THING IS CLEAR, AND THESE ARE HIS

17  CONTRACTS, WHICH YOU WILL SEE.  EVERYTHING, TO HAVE ANY EFFECT

18  WHATSOEVER, MUST BE IN WRITING.  AND THE ONE THING THAT WAS

19  CLEAR TO MR. GHAHREMAN WERE THE TERMS OF THOSE CONTRACTS THAT

20  HE WORKED ON AND THAT HE SIGNED, AND THAT WAS FOR SHIPMENT AND

21  DELIVERY OF THESE PRODUCTS TO DUBAI.

22      AND MORE IMPORTANTLY, YOU WILL SEE THAT MR.

23  GHAHREMAN IS ONLY PRIVY TO THE INFORMATION THAT KOORUSH

24  TAHERKHANI AND TIG MARINE CHOOSE TO PROVIDE TO HIM.  YOU WILL

25  SEE AMPLE EVIDENCE OF THE FREE EXCHANGE OF INFORMATION BETWEEN

OPENING STATEMENT BY MR. JOHNSTON

1    THE PRINCIPALS OF TIG MARINE, THE KOORUSH TAHERKHANI AND THE

2    ERGUN YILDIZ, ALONG WITH THEIR IRANIAN CUSTOMERS.  BUT YOU

3    WILL ALSO SEE THAT THEY CAREFULLY CONCEALED THE IDENTITIES OF

4    THESE INDIVIDUALS FROM MR. GHAHREMAN WHEN THEY COMMUNICATED

5    WITH HIM.  DID THEY DO IT TO PROTECT MR. GHAHREMAN?  NO.  THEY

6    DID IT TO PROTECT THEMSELVES.

7             AND THE GOVERNMENT WON'T PRODUCE ONE IOTA OF

8    EVIDENCE SUGGESTING WHY THEY WOULD LET MR. GHAHREMAN IN ON

9    THEIR SECRET.  MR. GHAHREMAN IS STUCK HERE IN THE UNITED

10   STATES WITH THE LIMITED INFORMATION THAT THEY GIVE HIM, FAR

11   AWAY FROM THEM.  AND THAT'S THE WAY THEY LIKE IT.

12            AIRPORTS?  YES.  FERRIES?  YES.  A COMPANY IN AJMAN,

13   UNITED ARAB EMIRATES OWNED BY AN IRANIAN CITIZEN?  YES.

14            MR. GHAHREMAN GIVES DAVID MILLS ALL OF THE

15   INFORMATION THAT HE HAS.  BUT HE EVEN GOES SO FAR AS TO SAY

16   THIS -- AND YOU NEED TO LISTEN CAREFULLY WHEN YOU HEAR ALL OF

17   THIS TESTIMONY AND THIS TESTIMONY AND THESE RECORDINGS.  HE

18   EVEN GOES SO FAR TO TELL DAVID MILLS, IF THESE ITEMS WERE

19   GOING TO GO TO IRAN I WOULD FIND OUT ABOUT IT BECAUSE OF THE

20   PEOPLE I KNOW IN IRAN.

21            NOW OF COURSE DAVID MILLS, DYING TO HEAR WHAT DAVID

22   MILLS WANTS TO HEAR, HE MISINTERPRETS ARASH AS SAYING, I

23   ALREADY KNOW WHERE THESE ITEMS ARE GOING SO I DON'T HAVE TO

24   ASK KOORUSH TAHERKHANI.

25            BUT YOU, THE JURY, WILL BE THE JUDGE OF WHAT IS SAID

APRIL 13, 2015

1    AND WHAT IS HEARD; NOTWITHSTANDING MR. GHAHREMAN'S THICK

2    ACCENT, NOT WITHSTANDING HIS IMPERFECT COMMAND OF ENGLISH.

3          AND I WANT YOU TO CONTINUE TO LISTEN CAREFULLY, AT

4    THAT SAME MEETING, THAT SAME DINNER MEETING, WHEN DAVID MILLS

5    TRIES TO CAST THE NET FURTHER AND ASKS MR. GHAHREMAN ABOUT HIS

6    CONNECTIONS THAT HE HAS IN IRAN, HEY, COULD THOSE PEOPLE USE

7    THE SERVICES OF SOUTH STAR TRADING, HOPING TO DRUM UP MORE

8    BUSINESS FOR YOU AND ME?

9          MR. GHAHREMAN TELLS HIM THERE IS NO AMERICAN MARKET

10   THERE IN IRAN.  MAYBE SOME DAY IT WILL BE INTRODUCED, BUT

11   THERE ARE SANCTIONS THERE TODAY.  IT CANNOT BE DONE TODAY.

12         LISTEN AND YOU WILL HEAR.  BUT WHAT YOU WILL HEAR A

13   LOT OF IN THE END, I AM AFRAID TO SAY, IS A LOT OF DAVID

14   MILLS.  A LOT OF A PERSON WHO DOESN'T WANT TO BE DISRESPECTED,

15   WHO DOESN'T WANT TO BE LIED TO.  WHO WON'T TAKE ANY OTHER

16   ANSWERS THAN THE ONES THAT HE WANTS TO HEAR.

17         AND ALSO, THANKFULLY TO THE VAST POWERS OF THE

18   FEDERAL GOVERNMENT, ITS AGENCIES, ITS INVESTIGATIVE TOOLS, YOU

19   ARE GOING TO HAVE AN OPPORTUNITY TO SEE BEHIND THE CURTAIN,

20   SEE BEHIND THE CURTAIN OF TIG MARINE WHAT THE PRINCIPALS, LIKE

21   ERGUN YILDIZ AND KOORUSH TAHERKHANI, ARE REALLY UP TO.

22         BUT IN THE END THOSE MEN WILL NOT BE SITTING HERE IN

23   JUDGMENT BEFORE YOU, INSTEAD IT WILL ONLY BE ARASH GHAHREMAN,

24   THE MAN STUCK IN THE MIDDLE.  A HARD WORKER, A STUDENT, A

25   UNITED STATES CITIZEN, WHO CAME HERE TO THIS COUNTRY NOT

APRIL 13, 2015

1    HIDING ANYTHING ABOUT HIMSELF, NOT HIDING HIS BACKGROUND.

2         FOR ALL OF THE CHARGES THAT THE GOVERNMENT HAS

3    BROUGHT AGAINST MR. GHAHREMAN THEY MUST PROVE THAT HE

4    WILLFULLY AND KNOWINGLY VIOLATED THE LAW.  NOT SOME MADE-UP

5    REGULATION ABOUT Y-690'S BEING MUNITIONS AND REQUIRING A

6    SPECIAL EXPORT LICENSE TO DUBAI.  NOT SOME MADE-UP REGULATIONS

7    THAT MR. GHAHREMAN UNDERSTOOD APPLIED NOT TO HIM BUT TO DAVID

8    MILLS, THE EXPORTER.

9         THEY ARE GOING TO HAVE TO PROVE THAT HE WILLFULLY

10   AND KNOWINGLY VIOLATED THE LAWS THAT THEY CHARGED.  AND

11   BECAUSE MR. GHAHREMAN DID NOT WILLFULLY ENGAGE IN THESE

12   TRANSACTIONS KNOWING THAT THESE ITEMS' INTENDED USE WAS NOT

13   FOR SOME COMPANY IN AJMAN OR DUBAI OWNED BY AN IRANIAN

14   CITIZEN, BECAUSE HE DID NOT KNOW THAT THESE ITEMS WERE

15   INTENDED FOR USE IN THE TERRITORY OF IRAN OR BY THE GOVERNMENT

16   OF IRAN, HE IS NOT GUILTY.

17        NOW, DAVID MILLS TOLD MR. GHAHREMAN THAT HE

18   RESPECTED HIM FOR THE DIFFICULT POSITION THAT HE WAS IN.  BUT

19   AT THE CONCLUSION OF THIS CASE I WILL ASK YOU, THE JURY, TO

20   RESPECT WHAT THE LAW REQUIRES AND FIND MR. GHAHREMAN NOT

21   GUILTY OF ALL COUNTS.

22        THANK YOU.

23        **THE COURT:**  THANK YOU.

24        LET'S GO AHEAD AND GET STARTED WITH THE GOVERNMENT'S

25   CASE IN CHIEF.  SO AT THIS POINT, GOVERNMENT'S FIRST WITNESS.

APRIL 13, 2015

MILLER – DIRECT–EXAMINATION

```
 1          MR. COUGHLIN:  THANK YOU, YOUR HONOR.

 2          AT THIS TIME THE GOVERNMENT CALLS TO THE STAND MOLLY

 3   MILLER.

 4          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

 5          YOU DO SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE

 6   YOU SHALL GIVE IN THE CAUSE NOW BEFORE THIS COURT SHALL BE THE

 7   TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH.

 8          THE WITNESS:  I DO.

 9          THE CLERK:  PLEASE TAKE THE STAND.

10          PLEASE STATE YOUR FULL NAME, AND SPELL YOUR FIRST

11   AND LAST NAMES FOR THE RECORD.

12          THE WITNESS:  MY FULL NAME IS MOLLY J. MILLER.

13   FIRST NAME IS SPELLED M-O-L-L-Y.  LAST NAME, M-I-L-L-E-R.

14          THE COURT:  THANK YOU.  GOOD AFTERNOON.

15          THE WITNESS:  GOOD AFTERNOON.

16                    DIRECT EXAMINATION

17   Q.    (MR. COUGHLIN) MS. MILLER, WHO DO YOU WORK FOR?

18   A.    I WORK FOR THE OFFICE OF FOREIGN ASSETS CONTROL AT THE

19   DEPARTMENT OF THE TREASURY.

20   Q.    AND WHAT IS YOUR TITLE THERE?

21   A.    I AM A CHIEF IN THE ENFORCEMENT DIVISION.

22   Q.    AND CAN YOU TELL US A LITTLE BIT ABOUT YOUR EDUCATIONAL

23   BACKGROUND.

24   A.    I HAVE A BACHELOR'S IN POLITICAL SCIENCE FROM WHEATON

25   COLLEGE IN ILLINOIS, AND A MASTER'S IN INTERNATIONAL AFFAIRS
```

APRIL 13, 2015

MILLER – DIRECT–EXAMINATION

1  FROM JOHNS HOPKINS UNIVERSITY.

2  **Q.**    AND CAN YOU TELL US A LITTLE BIT ABOUT YOUR EMPLOYMENT

3  HISTORY, INCLUDING -- UP TO AND INCLUDING YOUR CURRENT

4  POSITION AT OFAC?

5  **A.**    I HAVE BEEN IN WASHINGTON FOR ABOUT 14 YEARS.  I STARTED

6  OUT WORKING FOR CONGRESS AT THE U.S. HOUSE OF REPRESENTATIVES.

7  AFTER THAT I WENT TO U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT

8  FOR A BRIEF TIME.  I WENT TO THE TREASURY DEPARTMENT IN 2008

9  AT OFAC, AND I HAVE BEEN THERE SINCE THEN WITH THE EXCEPTION

10 OF A YEAR AND A HALF AT WHICH I WAS AT THE WHITE HOUSE AT THE

11 NATIONAL SECURITY COUNCIL.

12 **Q.**    I WOULD LIKE TO DIRECT YOUR ATTENTION, THEN, TO WHEN YOU

13 FIRST STARTED AT OFAC AND ASK YOU TO GIVE US A LITTLE BIT OF

14 YOUR EXPERIENCES THERE DURING THAT TIME, BEGINNING IN 2008.

15 **A.**    BEGINNING IN 2008, FOR THREE AND A HALF YEARS I WAS A

16 POLICY ANALYST AT OFAC, AND IN THAT CAPACITY I WAS PRIMARILY

17 RESPONSIBLE FOR PREPARING MEMOS AND PRESENTATIONS RELATING TO

18 U.S. SANCTIONS PROGRAMS.  I ALSO SPENT A SIGNIFICANT AMOUNT OF

19 TIME IN THAT CAPACITY DRAFTING REGULATIONS THAT IMPLEMENT U.S.

20 SANCTIONS PROGRAMS.

21 **Q.**    AND IN CONNECTION WITH THAT TIME PERIOD WERE YOU ALSO

22 INVOLVED IN PROVIDING TRAINING?

23 **A.**    I RECEIVED A LOT OF TRAINING, ON-THE-JOB TRAINING AS

24 PART OF THAT POSITION.

25 **Q.**    OKAY.

APRIL 13, 2015

MILLER - DIRECT-EXAMINATION

1    **A.**    I ALSO DID A LOT OF COORDINATION WITH OTHER U.S.

2    GOVERNMENT AGENCIES, AND SPEAKING ABROAD TO FOREIGN

3    GOVERNMENTS.

4    **Q.**    OKAY.  IN CONNECTION WITH THAT TIME PERIOD WHAT WAS YOUR

5    NEXT ASSIGNMENT, IF YOU WILL.

6    **A.**    IN DECEMBER OF 2011 I LEFT OFAC BRIEFLY TO WORK AT THE

7    WHITE HOUSE AT THE NATIONAL SECURITY COUNCIL.

8    **Q.**    WHAT WERE YOUR DUTIES AND RESPONSIBILITIES THERE?

9    **A.**    I WAS THE DIRECTOR FOR AFRICAN AFFAIRS.  MY PRIMARY

10   RESPONSIBILITY WAS TO BE A LIAISON BETWEEN THE PRESIDENT AND

11   THE REST OF THE U.S. GOVERNMENT AGENCIES THAT WORKED ON THE

12   COUNTRIES THAT I COVERED FOR THE PRESIDENT.

13   **Q.**    AND IN CONNECTION WITH THOSE DUTIES AND

14   RESPONSIBILITIES, DID YOU HAVE OCCASION TO INTERFACE WITH OFAC

15   AS WELL?

16   **A.**    YES, SOMETIMES.

17   **Q.**    IN WHAT CAPACITY?

18   **A.**    PRIMARILY --

19   **Q.**    WHAT KIND OF DUTIES DID YOU HAVE WITH THEM AS IT RELATES

20   TO YOUR CURRENT JOB AT THAT TIME WITH THE WHITE HOUSE?

21   **A.**    PRIMARILY COORDINATING WITH THEM ANY TIME THAT THERE WAS

22   A SANCTIONS-RELATED MATTER THAT CAME INTO PLAY WITH REGARD TO

23   THE BROADER REMIT OF FOREIGN POLICY ISSUES I WAS COVERING FOR

24   THE PRESIDENT.

25   **Q.**    GOING TO DIRECT YOUR ATTENTION, THEN, WHEN YOU CAME BACK

APRIL 13, 2015

1   TO OFAC.  WHAT YEAR WAS THAT?

2   **A.**    MAY OF 2013.

3   **Q.**    CAN YOU TELL US WHAT YOUR DUTIES AND RESPONSIBILITIES

4   WERE THEN?

5   **A.**    I CAME BACK IN A SENIOR ADVISORY CAPACITY.  I WAS

6   ATTACHED TO THE PART OF OFAC THAT DEALS WITH LICENSING

7   COMPLIANCE AND POLICY MATTERS.  I HELPED OVERSEE A NUMBER OF

8   DIFFERENT LICENSING CATEGORIES, AS WELL AS A SERIES OF POLICY

9   ISSUES.  I DID REGULATORY DRAFTING AGAIN.  DID A LOT OF

10  SPEAKING AND TRAVELING, IN PARTICULAR IN EUROPE.

11  **Q.**    IN CONNECTION WITH YOUR SPEAKING ENGAGEMENTS, WHAT WAS

12  THE PURPOSE OF THOSE ENGAGEMENTS, VIS-A-VIS YOUR POSITION

13  THERE AT OFAC?

14  **A.**    IT WAS LARGELY COORDINATING WITH OTHER JURISDICTIONS,

15  LIKE THE EUROPEAN UNION, ON SANCTIONS ISSUES.

16  **Q.**    DID YOU ALSO PROVIDE TRAINING TO DIFFERENT GROUPS --

17  **A.**    YES.

18  **Q.**    -- IN THAT CAPACITY?  YES?

19  **A.**    YES.

20  **Q.**    HOW OFTEN DID YOU DO THAT?

21  **A.**    I WOULD SAY EVERY COUPLE OF MONTHS I WOULD BE SPEAKING

22  OR TRAVELING INVOLVING SOME KIND OF EDUCATIONAL OR TRAINING

23  COMPONENT.

24  **Q.**    YOU SAID A GOOD PART OF THE JOB WHEN YOU RETURNED TO

25  OFAC HAD TO DO WITH LICENSING.  CAN YOU TELL US A LITTLE BIT

1   MORE ABOUT THAT.

2   **A.**    WELL, THE LICENSING DIVISION AT OFAC RECEIVES

3   APPLICATIONS FROM INDIVIDUALS OR COMPANIES THAT WANT TO ENGAGE

4   IN SOME KIND OF ACTIVITY THAT WOULD OTHERWISE BE AGAINST THE

5   RULES.  SO IN MY CAPACITY I WAS HELPING TO SUPERVISE, FOR A

6   PERIOD OF TIME, THE TEAM THAT LOOKED AT CUBA APPLICATIONS, SO

7   I REVIEWED THE APPLICATIONS AND SIGNED LICENSES, OR SIGNED

8   DENIAL LETTERS WHEN WE DID NOT ISSUE A LICENSE.

9   **Q.**    NOW, WITH REGARD TO THAT TIME PERIOD WHEN YOU WERE A

10  SENIOR ANALYST, DID YOU ALSO DEAL WITH OTHER COUNTRIES AS

11  WELL, THEIR LICENSING ISSUES?

12  **A.**    I AM NOT SURE I UNDERSTAND THE QUESTION.

13  **Q.**    DURING THE TIME YOU WERE A SENIOR ANALYST THERE, DID YOU

14  ALSO INTERFACE OR DEAL WITH ISSUES RELATING TO SANCTIONS IN

15  OTHER COUNTRIES BESIDES CUBA?

16  **A.**    OH, I SEE.  YES.

17  **Q.**    WHAT WERE SOME OF THE COUNTRIES YOU DEALT WITH IN THAT

18  CAPACITY?

19  **A.**    PRETTY MUCH THE FULL RANGE OF OUR PROGRAMS.  WE HAVE A

20  NUMBER OF REGIONAL PROGRAMS THAT FOCUS ON COUNTRIES SUCH AS

21  CUBA, IRAN, SUDAN, BURMA; BUT ALSO SOME FUNCTIONAL PROGRAMS

22  LIKE TERRORISM, WEAPONS PROLIFERATION.  SO I HAD SOME

23  INTERACTION WITH PRETTY MUCH ALL OF THEM ACROSS THE BOARD.

24  **Q.**    I WOULD LIKE YOU TO STEP BACK AND TELL US A LITTLE BIT

25  ABOUT WHERE THE AUTHORITY FOR OFAC, TO DO WHAT IT DOES IN

1    TERMS OF SANCTIONS AND REGULATIONS, COMES FROM.  IF YOU COULD

2    WALK US THROUGH THAT.

3    **A.**    SURE.  OUR PRINCIPAL GOVERNING STATUTE IS CALLED THE

4    INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT, SOMETIMES

5    REFERRED TO AS IEEPA, IN ITS ACRONYM.  AND IT IS A FEDERAL

6    STATUTE THAT GIVES THE PRESIDENT THE AUTHORITY TO DECLARE A

7    NATIONAL EMERGENCY WITH REGARD TO SOME KIND OF THREAT TO THE

8    NATIONAL SECURITY, FOREIGN POLICY OR ECONOMY OF THE UNITED

9    STATES.

10       ONCE HE HAS DECLARED THAT NATIONAL EMERGENCY HE CAN

11   REGULATE OR RESTRICT COMMERCE, INCLUDING THROUGH WHAT WE REFER

12   TO AS THE BLOCKING OF ASSETS, SOME PEOPLE SAY FREEZING, OF

13   INDIVIDUALS AND COMPANIES THAT ARE ENGAGED IN CERTAIN CONDUCT

14   THAT HE FINDS TO BE CONTRIBUTING TO THAT CONFLICT.  THERE ARE

15   ALSO COMPREHENSIVE TRADE PROHIBITIONS INVOLVED IN HIS

16   REGULATION OF CONGRESS UNDER THAT STATUTE.

17   **Q.**    SO IN CONNECTION WITH THAT PARTICULAR FINDING OR

18   DETERMINATION, HOW DOES THAT THEN FLOW DOWN FROM THE PRESIDENT

19   TO YOUR AGENCY?

20   **A.**    WELL, THE PRESIDENT EXERCISES THIS AUTHORITY BY ISSUING

21   EXECUTIVE ORDERS, AND IN THOSE ORDERS CUSTOMARILY HE DELEGATES

22   THE AUTHORITY TO THE SECRETARY OF THE TREASURY IN CONSULTATION

23   WITH OTHER KEY CABINET OFFICIALS TO IMPLEMENT THE PROGRAM.

24   AND OFAC IS THE AGENCY WITHIN TREASURY THAT CARRIES OUT THAT

25   ADMINISTRATION OF THE PROGRAMS.

APRIL 13, 2015

MILLER – DIRECT-EXAMINATION

1   **Q.**    SO IS IT OFAC, IN FACT, IF YOU WILL, FILLS OUT THE

2   SANCTIONS AND REGULATIONS OF THE EXECUTIVE ORDER OF THE

3   PRESIDENT?

4   **A.**    YES.

5   **Q.**    AND IF I WAS TO USE THE TERM EMBARGO, WHAT DO YOU

6   UNDERSTAND THAT TO BE IN RELATION TO EXECUTIVE ORDERS OR

7   SANCTIONS OR REGULATIONS?

8   **A.**    IT IS A TERM OF ART WE WOULD UNDERSTAND TO MEAN A

9   RESTRICTION ON EXPORT AND IMPORT WITH REGARD TO A PARTICULAR

10  TERRITORY.  A TRADE BAN, SO TO SPEAK.

11  **Q.**    ARE THE SANCTIONS AND REGULATIONS THAT YOU PUT IN PLACE,

12  ARE THEY ECONOMIC IN NATURE?

13  **A.**    YES.

14  **Q.**    THEY ARE NOT CRIMINAL IN NATURE.

15  **A.**    I AM NOT SURE I UNDERSTAND THE DISTINCTION.  THEY ARE

16  ECONOMIC IN NATURE IN THE SENSE THAT THEY REGULATE COMMERCE.

17  THERE IS A BROADER RANGE OF SANCTIONS THAT COULD INCLUDE

18  RESTRICTIONS ON FOREIGN ASSISTANCE OR MILITARY ASSISTANCE, AND

19  WE HAVE CIVIL AND CRIMINAL POTENTIAL LIABILITY UNDER ECONOMIC

20  SANCTIONS.

21  **Q.**    EXACTLY.  IF SOMEONE CHOOSES TO VIOLATE THOSE SANCTIONS

22  AND REGULATIONS, CORRECT?

23  **A.**    CORRECT.

24  **Q.**    BUT YOU DON'T ENFORCE THE CRIMINAL ASPECT OF THAT,

25  CORRECT?

APRIL 13, 2015

MILLER - DIRECT-EXAMINATION

1  **A.**    NO.  OFAC ONLY HAS CIVIL PENALTIES AUTHORITY.

2  **Q.**    NOW, IS IRAN A COUNTRY THAT IS UNDER CERTAIN SANCTIONS?

3  **A.**    YES.

4  **Q.**    CAN YOU TELL US A LITTLE BIT ABOUT THOSE?

5  **A.**    U.S. SANCTIONS WITH RESPECT TO IRAN FIND THEIR ORIGINS

6  IN 1995 WITH THE BEGINNING OF QUITE A FEW EXECUTIVE ORDERS

7  THAT THE PRESIDENT ISSUED WITH REGARD TO IRAN, MOSTLY

8  REVOLVING AROUND SOME OF THE NATIONAL SECURITY THREATS THAT

9  THE PRESIDENT IDENTIFIED IRAN AS POSING.  AND THE PROGRAM IS

10  PRETTY COMPREHENSIVE IN NATURE.  IT, BY AND LARGE, PROHIBITS

11  ALL TRADE AND INVESTMENT BY U.S. PERSONS WITH IRAN.

12  **Q.**    AND WHEN YOU SAY A U.S. PERSON, CAN YOU BE -- CAN YOU

13  EXPAND ON THAT A LITTLE BIT AND TELL US WHAT THAT DEFINITION

14  INCLUDES?

15  **A.**    WE DEFINE U.S. PERSON PRETTY --

16        **MR. CAMDEN:**  OBJECTION ON THIS POINT.  RELEVANCE.

17  THE INDICTMENT SAYS FROM THE UNITED STATES, NOT BY A UNITED

18  STATES PERSON.

19        **THE COURT:**  OVERRULED.

20        YOU MAY ANSWER.

21        **THE WITNESS:**  WE DEFINE U.S. PERSON PRETTY BROADLY

22  IN OUR REGULATIONS TO INCLUDE U.S. CITIZENS, BUT ALSO ANY

23  FOREIGN PERSON WHO IS RESIDING IN THE UNITED STATES, WHATEVER

24  THEIR STATUS.  WE ALSO ASSERT THAT A U.S. PERSON INCLUDES U.S.

25  CITIZENS THAT ARE LIVING ABROAD, OR U.S. COMPANIES THAT HAVE

APRIL 13, 2015

MILLER – DIRECT–EXAMINATION

1  SUBSIDIARIES ABROAD, FOR EXAMPLE.

2  **Q.    (MR. COUGHLIN)** IN CONNECTION WITH IRAN, IS THERE

3  CERTAIN REGULATIONS THAT HAVE BEEN PUT IN PLACE THAT ARE

4  WELL–KNOWN, THE NAMES OF THEM?

5  **A.**    YES.

6  **Q.**    COULD YOU TELL US ABOUT THEM, IF YOU WOULD.

7  **A.**    THE IRANIAN TRANSACTIONS AND SANCTIONS REGULATIONS WERE

8  PROMULGATED TO IMPLEMENT THE VARIOUS EXECUTIVE ORDERS THAT THE

9  PRESIDENT ISSUED WITH RESPECT TO IRAN.

10      ALL OF OUR REGULATIONS PROVIDE ADDITIONAL CONTOURS TO

11  WHAT IS ALREADY –– WHAT ALREADY CARRIES THE FORCE OF LAW IN

12  THE EXECUTIVE ORDER, WHICH IS TO SAY THAT THEY INCLUDE

13  ADDITIONAL INTERPRETIVE PROVISIONS, SOME BROAD AUTHORIZATIONS

14  THAT WE CALL GENERAL LICENSES, SOME DEFINITIONS.  INFORMATION

15  ABOUT PENALTIES FOR VIOLATING THE REGULATIONS.

16  **Q.**    NOW, DOES OFAC HAVE A MECHANISM BY WHICH THEY TRY TO

17  MAKE THESE DETERMINATIONS OPEN TO THE PUBLIC OR MAKE SURE THAT

18  EVERYBODY UNDERSTANDS WHAT THESE SANCTIONS AND REGULATIONS

19  ARE?

20  **A.**    YES.  WE HAVE A PRETTY ROBUST WEBSITE THAT CONTAINS

21  INFORMATION ON EACH OF THE PROGRAMS THAT WE ADMINISTER.  WE

22  ALSO DO HUNDREDS OF OUTREACH EVENTS EVERY YEAR TO VARIOUS

23  SECTORS –– VARIOUS INDUSTRIES IN THE PRIVATE SECTOR, AS WELL

24  AS TO FOREIGN AUDIENCES.  WE HAVE A COUPLE OF HOTLINES THAT

25  RECEIVE THOUSANDS OF CALLS EVERY YEAR FROM INDIVIDUALS THAT

APRIL 13, 2015

1  WANT TO KNOW WHETHER WHAT THEY PROPOSE DOING IS ALLOWABLE

2  UNDER THE REGULATIONS THAT WE ADMINISTER.

3  **Q.**    IN CONNECTION WITH THOSE KIND OF PHONE CALLS, ARE THEY

4  SEEKING TO KNOW WHETHER OR NOT THEY MIGHT NEED A LICENSE?

5  **A.**    YES, FREQUENTLY.

6  **Q.**    CAN YOU TELL US A LITTLE BIT ABOUT HOW LICENSING WORKS

7  IN RELATION TO IRAN, FOR EXAMPLE?

8          **THE COURT:**  MR. COUGHLIN, BEFORE WE GO INTO THAT

9  SUBJECT, LET'S TAKE A BREAK HERE.

10         WE WILL TAKE A 15-MINUTE RECESS, UNTIL 3:30.

11         YOU ARE WELCOME TO USE THE JURY ROOM OVER HERE.  IF

12 YOU GO INTO THE JURY LOUNGE YOU WILL HAVE TO STAY THERE, AND

13 SO WE WILL CLOSE THAT DOOR AND KEEP IT CLOSED UNTIL 3:30.  OR

14 YOU CAN GO OUT INTO THE GENERAL HALLWAY.

15         AGAIN, PLEASE KEEP IN MIND ALL OF THE ADMONITIONS.

16         WE WILL PICK UP AT 3:30.  THANK YOU.

17         (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

18         OPEN COURT, OUT OF THE HEARING OF THE JURY)

19         **THE COURT:**  WE HAVE COUNSEL, NO JURY.  MR. GHAHREMAN

20 IS NOT PRESENT EITHER.

21         **MR. CAMDEN:**  HE IS IN THE RESTROOM, YOUR HONOR, BUT

22 I CAN ADDRESS THIS.

23         **MR. JOHNSTON:**  WE WILL WAIVE HIS PRESENCE.

24         **THE COURT:**  ALL RIGHT.

25         MR. CAMDEN.

APRIL 13, 2015

MILLER – DIRECT-EXAMINATION

1      **MR. CAMDEN:**  YES, YOUR HONOR.

2           SO, I BELIEVE THE GOVERNMENT IS LEADING UP TO AND

3      GOING TO, AFTER THE BREAK, INTRODUCE WHAT THEY MARKED AS

4      EXHIBITS 401 AND 402 IN THE BINDER.

5           THEY ARE TWO LETTERS DATED –– THE FIRST ONE IS DATED

6      OCTOBER 6TH, 2014 ADDRESSED TO MR. SHANE HARRIGAN, AND THE

7      SECOND IS DATED AUGUST 5TH, 2014.  THEY ARE BOTH FROM THE

8      OFFICE OF FOREIGN ASSETS CONTROL.  THEY ARE BOTH LICENSE

9      DETERMINATIONS INDICATING THAT CERTAIN NAMED INDIVIDUALS DID

10     NOT HAVE LICENSES TO EXPORT GOODS TO IRAN.

11          BUT THEY ARE SIGNED THOMAS FEDDO, THE ASSISTANT

12     DIRECTOR FOR ENFORCEMENT OFFICE OF ASSETS CONTROL; NOT BY

13     MOLLY MILLER WHO IS THE TESTIFYING WITNESS IN THIS CASE.  SO I

14     THINK THERE IS A CONFRONTATION PROBLEM.

15          THE CONFRONTATION CLAUSE OBVIOUSLY PREVENTS THE

16     GOVERNMENT –– OR PROHIBITS THE GOVERNMENT FROM INTRODUCING

17     STATEMENTS, OUT-OF-COURT STATEMENTS, THAT WERE MADE IN

18     ANTICIPATION OF LITIGATION THAT ARE TESTIMONIAL.

19          SO THERE IS A PASSAGE IN MELENDEZ-DIAZ, WHICH IS THE

20     MOST RECENT SUPREME COURT CONFRONTATION CLAUSE CASE.  IT IS

21     557 U.S. 305, PAGE 323.

22          IN THE COPY I PROVIDED THE COURT AND OPPOSING

23     COUNSEL THERE IS A HIGHLIGHTED PARAGRAPH ON PAGE 13 OF THE

24     PRINTOUT THAT DISCUSSES CERTIFICATES OF NON-EXISTENCE OF

25     RECORDS SPECIFICALLY AND SAYS THAT THEY ARE CONFRONTATIONAL

APRIL 13, 2015

MILLER - DIRECT-EXAMINATION

1   AND REQUIRE CONFRONTATION.

2          SO I AM GOING TO HAVE A CONFRONTATION CLAUSE

3   OBJECTION.  I WOULD RATHER RAISE IT NOW OUTSIDE OF THE

4   PRESENCE OF THE JURY SO THAT THEY DON'T GET ANY HINT OF WHAT

5   IS GOING ON BEHIND THIS.

6          **THE COURT:**  MR. COUGHLIN.

7          **MR. HARRIGAN:**  YOUR HONOR, LET ME SAY AT THE OUTSET,

8   DEFENSE COUNSEL HAS KNOWN ABOUT THIS THROUGH OUR INTERVIEWS.

9   AND AGAIN ON THE EVE OF -- OR DURING THE TESTIMONY, TO RAISE

10  IT NOW I AM A LITTLE CONCERNED.  BUT THIS IS NO DIFFERENT THAN

11  THE CERTIFICATE OF NON-EXISTENCE THAT WE DO UNDER THE 1326

12  CASES, IF THIS PERSON HAS KNOWLEDGE OF HOW THOSE RECORDS

13  CHECKS ARE RUN.  THAT IS EXACTLY IT.  SHE IS THE CHIEF

14  ENFORCEMENT OFFICER.  I BELIEVE SHE WILL BE ABLE TO TESTIFY

15  NOT ONLY TO THESE CERTIFICATE OF RECORDS, BUT SHE PERSONALLY

16  WENT BACK AND DID A DOUBLE CHECK, CONDUCTED HERSELF.

17         IS THAT CORRECT?

18         **MR. COUGHLIN:**  THAT IS CORRECT.  SHE DID THIS ON HER

19  OWN TO BE SURE THAT THESE PARTICULAR CERTIFICATES WERE

20  ACCURATE, AND SHE WILL IDENTIFY THE SIGNATOR OF THOSE AS THE

21  PERSON WHO IS HER BOSS, HER IMMEDIATE BOSS.

22         **MR. HARRIGAN:**  RIGHT.  SO SHE DOES HAVE PERSONAL

23  KNOWLEDGE, UNLIKE THE MELENDEZ CASE WHERE I BELIEVE THERE WAS

24  AN ANALYST TESTIFYING WHO HAD NO PERSONAL KNOWLEDGE OF WHAT

25  WAS CONTAINED IN THE CERTIFICATE.

APRIL 13, 2015

MILLER – DIRECT–EXAMINATION

1          **MR. CAMDEN:**  I THINK WHAT THEY ARE TALKING ABOUT IS

2     THE BUSINESS RECORDS EXCEPTION, YOUR HONOR, WHERE THE PERSON

3     HAS TO HAVE KNOWLEDGE FOR THE FOUNDATION.

4          IF THESE LETTERS COME IN, THESE LETTERS ARE

5     ASSERTING THAT A SEARCH OCCURRED ON A CERTAIN DATE AS TO

6     CERTAIN -- SO, YOU KNOW, IF SHE WERE TO TESTIFY THAT, I RAN

7     RECORDS CHECKS ON THESE PEOPLE AND DIDN'T FIND ANYTHING, THERE

8     WOULDN'T BE A CONFRONTATION CLAUSE PROBLEM.  THE PROBLEM IS

9     THE EVIDENCE, THESE LETTERS ACTUALLY COMING IN WHEN THE PERSON

10    WHO SIGNED IT -- AS AN ASSERTION OF FACT WHEN THE PERSON WHO

11    SIGNED IT IS NOT ON THE WITNESS STAND.

12          **MR. HARRIGAN:**  WELL, I DON'T BELIEVE THERE IS A

13    CONFRONTATION CLAUSE PROBLEM.  SHE HAS PERSONAL KNOWLEDGE OF

14    HOW THESE ARE RUN, RIGHT, YOUR HONOR?  AND HOW THE SEARCH IS

15    DONE.  AND THE FACT THAT THE PERSON THAT THOSE PERSONALLY --

16    THE PERSON WHO RAN IT AND DOUBLE CHECKED WHAT WAS DONE ON

17    THAT, THESE ARE PART OF HER JOB AND PART OF WHAT SHE KNOWS,

18    AND ACTUALLY HAS PERSONAL KNOWLEDGE OF WHAT IS CONTAINED IN

19    THE CERTIFICATES THAT WE ARE ATTEMPTING TO INTRODUCE.  I DON'T

20    SEE THE CONFRONTATION CLAUSE PROBLEM.

21          **THE COURT:**  HER TESTIMONY, ASSUMING FOUNDATION FOR

22    PERSONAL KNOWLEDGE, WOULD CERTAINLY COME IN.  THE ISSUE IS

23    WHETHER THE EXHIBIT, WHICH IS SIGNED BY A DIFFERENT PERSON,

24    COMES IN, WHICH SAYS THE SAME THING BUT ALBEIT THROUGH A

25    DIFFERENT PERSON WHO IS SIGNING THE LETTER.  RIGHT?

APRIL 13, 2015

1      **MR. CAMDEN:**  YES, YOUR HONOR.  THAT IS THE PROBLEM

2  IS THAT MR. FEDDO, THOUGH, IF HE WERE ON THE STAND THERE

3  WOULDN'T BE A CONFRONTATION CLAUSE PROBLEM.

4      **THE COURT:**  I WOULD LIKE TO RESERVE ON THAT ISSUE.

5  THE SUBSTANCE OF THE TESTIMONY WILL COME IN, ASSUMING THE

6  FOUNDATION.

7      ON THE EXHIBIT, YOU CAN GO THROUGH, SHOW THE WITNESS

8  THE EXHIBITS, BUT I AM NOT CERTAIN WHETHER THE EXHIBITS

9  THEMSELVES COME INTO EVIDENCE BECAUSE THEY ARE SIGNED BY A

10  DIFFERENT PERSON.  I NEED TO READ THAT MOST RECENT CASE BEFORE

11  MAKING THAT DETERMINATION.

12      BUT YOU CAN SET THE FOUNDATION THROUGH THIS WITNESS

13  AT THIS TIME.  I ASK THAT YOU NOT SHOW THE EXHIBIT TO THE

14  JURY, DON'T PUBLISH IT.

15      **MR. COUGHLIN:**  OKAY.

16      **THE COURT:**  THEN I CAN RULE ON IT TOMORROW MORNING.

17      **MR. COUGHLIN:**  ALL RIGHT.

18      **THE COURT:**  OKAY.  I THINK WE HAVE A COUPLE EXTRA

19  MINUTES HERE, SO WE WILL RECESS FOR A COUPLE MINUTES.

20      (RECESS)

21      (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

22      OPEN COURT, IN THE HEARING OF THE JURY)

23      **MR. HARRIGAN:**  YOUR HONOR, I WILL GO GET OUR

24  WITNESS.

25      **THE COURT:**  YES.

APRIL 13, 2015

MILLER - DIRECT-EXAMINATION

1      WE ARE BACK ON THE RECORD WITH ALL PRESENT.  WE WILL

2  RESUME WITH THE TESTIMONY OF MS. MILLER.

3      MR. COUGHLIN.

4  **Q.**   **(MR. COUGHLIN)** MS. MILLER, WE WERE JUST BEGINNING TO

5  TALK ABOUT LICENSES.  COULD YOU TELL US A LITTLE BIT ABOUT HOW

6  LICENSES ARE ISSUED AND HOW LICENSE CHECKS ARE DONE?

7  **A.**   WELL, OFAC WILL ISSUE SPECIFIC LICENSES, WE CALL THEM,

8  SOMETIMES.  WHEN AN INDIVIDUAL WANTS TO ENGAGE IN A SPECIFIC

9  ACTIVITY THAT WOULD OTHERWISE BE PROHIBITED BY THE RULES WE

10 HAVE SOMETHING CALLED GENERAL LICENSES THAT ARE BROADER

11 AUTHORIZATIONS.  THOSE GET PROMULGATED IN THE REGULATIONS

12 THEMSELVES.  AND INDIVIDUALS WHO REACH THE CRITERIA ON THE

13 GENERAL LICENSE DON'T HAVE TO COME IN CASE BY CASE, THEY DO

14 WHAT THE GENERAL LICENSE AUTHORIZES.

15 **Q.**   WITH REGARD TO THE SPECIFIC LICENSE, THEY ALLOW

16 PARTICULAR TYPES OF BEHAVIOR OR ALLOW CERTAIN CONDUCT TO

17 OCCUR?

18 **A.**   YES.

19 **Q.**   NOW, TELL ME A LITTLE BIT ABOUT HOW CERTIFIED LICENSE

20 DETERMINATIONS ARE MADE.

21 **A.**   WE SOMETIMES GET REQUESTS FROM A LAW ENFORCEMENT AGENCY

22 OR FROM THE U.S. ATTORNEY'S OFFICES ABOUT WHETHER A PARTICULAR

23 TYPE OF CONDUCT WOULD REQUIRE A LICENSE FROM OFAC, THAT IS

24 WHAT LICENSING DETERMINATIONS -- WE EVALUATE THAT REQUEST.

25 AND THEN WE SEND A LETTER THAT IS NOTARIZED THAT EXPLAINS WHAT

APRIL 13, 2015

MILLER - DIRECT-EXAMINATION

1    WOULD BE REQUIRED IF THAT CONDUCT WERE TO TAKE PLACE.

2    **Q.**    AND BESIDES U.S. ATTORNEY'S OFFICES OR LAW ENFORCEMENT,

3    WHO ELSE DO YOU SEND THESE LICENSING DETERMINATIONS TO?

4    **A.**    THAT IS PRETTY MUCH IT, LAW ENFORCEMENT.

5    **Q.**    OKAY.  IN CONNECTION WITH CONDUCTING A LICENSE

6    DETERMINATION, CAN YOU WALK US THROUGH THE PROCESS.  IN OTHER

7    WORDS, SOMEBODY MAKES A REQUEST, AND THEN WHAT HAPPENS?

8    **A.**    WE EVALUATE THE CONDUCT THAT THEY HAVE DESCRIBED IN

9    THEIR REQUEST, AND SEND A FORMAL LETTER THAT EXPLAINS WHETHER

10   WE BELIEVE THAT THAT CONDUCT WOULD REQUIRE AUTHORIZATION FROM

11   OFAC PURSUANT TO OUR REGULATIONS.

12   **Q.**    AND IN CONNECTION WITH A CERTIFIED LICENSE HISTORY

13   CHECK, WHAT IS THAT AND HOW IS THAT DIFFERENT?

14   **A.**    A HISTORY CHECK IS JUST SIMPLY A REQUEST, AGAIN,

15   TYPICALLY FROM A LAW ENFORCEMENT AGENCY OR THE U.S. ATTORNEY'S

16   OFFICES, ABOUT WHETHER OFAC HAS EVER ISSUED A LICENSE TO A

17   PARTICULAR PARTY.

18   **Q.**    AND AGAIN, WHO ARE SOME OF THE ENTITIES THAT MAKE THAT

19   REQUEST?

20   **A.**    LAW ENFORCEMENT AGENCIES AND THE U.S. ATTORNEY'S

21   OFFICES, TYPICALLY.

22   **Q.**    NOW, WITH REGARD TO REGULATIONS, WE WERE TALKING BRIEFLY

23   ABOUT THAT IN CONNECTION WITH IRAN.  IS THERE CERTAIN

24   REGULATIONS, WHETHER IT IS A DIRECT EXPORT OR RE-EXPORT OR

25   INDIRECT, ARE THOSE PART OF THE REGULATIONS RELATED TO IRAN?

APRIL 13, 2015

MILLER – DIRECT-EXAMINATION

1   **A.**    THE PROHIBITION IN OUR REGULATIONS ON THE EXPORTATION OR

2   RE-EXPORTATION OF GOODS, TECHNOLOGY OR SERVICES APPLIES

3   WHETHER THAT EXPORT OR RE-EXPORT IS DIRECT OR INDIRECT.

4   **Q.**    WHAT IS THE MEANT BY DIRECT OR INDIRECT?

5   **A.**    MEANING IT COULD EITHER –- IT IS PROHIBITED WHETHER IT

6   IS MEANT TO BE EXPORTED DIRECTLY FROM THE UNITED STATES TO

7   IRAN, OR WHETHER IT IS ULTIMATELY INTENDED FOR IRAN BUT GOES

8   THROUGH A THIRD COUNTRY.

9   **Q.**    AND IS THE INDIRECT SOMETHING THAT YOU SEE PRETTY

10  REGULARLY?

11  **A.**    YES.

12  **Q.**    I WOULD LIKE TO DIRECT YOUR ATTENTION TO THIS PARTICULAR

13  CASE.  WAS YOUR OFFICE MADE A REQUEST IN CONNECTION WITH

14  MAKING SOME DETERMINATIONS?

15  **A.**    YES.

16  **Q.**    AND DID YOU BECOME AWARE OF THOSE REQUESTS?

17  **A.**    YES.

18  **Q.**    HOW DID YOU BECOME AWARE OF THOSE REQUESTS?

19  **A.**    WE DISCUSSED THEM, AND I REVIEWED THEM WITHIN OUR

20  RECORDKEEPING SYSTEM AS WELL.

21  **Q.**    WAS THAT SOMETHING YOU DID YOURSELF?

22  **A.**    YES.

23  **Q.**    AND MADE THE DETERMINATION?

24  **A.**    OH, I REVIEWED THAT IN OUR SYSTEM.  I DID NOT PERSONALLY

25  MAKE THE DETERMINATION.

APRIL 13, 2015

MILLER – DIRECT-EXAMINATION

1   **Q.**   BUT YOU REVIEWED THE RECORD CHECK; IS THAT CORRECT?

2   **A.**   YES.

3   **Q.**   SO ARE YOU ABLE TO TESTIFY FROM YOUR OWN KNOWLEDGE OF

4   MAKING THAT REVIEW AS TO WHAT WAS IN THE RECORDS?

5   **A.**   YES.

6         **MR. COUGHLIN:**  MAY I APPROACH, YOUR HONOR?

7         **THE COURT:**  YES.

8   **Q.**   **(MR. COUGHLIN)** I WOULD LIKE TO SHOW YOU WHAT HAS BEEN

9   MARKED AS GOVERNMENT'S 401, AND ASK IF YOU RECOGNIZE WHAT THAT

10  IS.

11        (EXHIBIT 401 MARKED FOR IDENTIFICATION)

12  **A.**   YES, I DO.

13  **Q.**   DO YOU RECOGNIZE -- CAN YOU TELL US WHAT THAT IS?

14        **MR. CAMDEN:**  YOUR HONOR, BEFORE THEY START ON THIS,

15  I AM GOING TO RE-RAISE THE OBJECTION, AND ALSO LACK OF

16  FOUNDATION.  I DON'T THINK THE FOUNDATION HAS BEEN THERE TO

17  DEAL WITH THE CONFRONTATION CLAUSE OBJECTION.

18        **THE COURT:**  I WOULD SUSTAIN THE OBJECTION.

19  **Q.**   **(MR. COUGHLIN)** LET'S GO BACK AND TALK A LITTLE BIT MORE

20  ABOUT LICENSING.

21        IN CONNECTION WITH YOUR EXPERIENCE -- AND AT ONE POINT

22  IN TIME, AS A SENIOR ANALYST, YOU WERE IN CHARGE OF LICENSING;

23  IS THAT CORRECT?

24  **A.**   NOT IN CHARGE OF IT, BUT I DID FOR A TEMPORARY PERIOD

25  SUPERVISE THE CUBA LICENSING.  AND EVEN OUTSIDE OF THAT PERIOD

APRIL 13, 2015

MILLER - DIRECT-EXAMINATION

```
 1   I WAS FREQUENTLY ENGAGED WITH THE HEAD OF OUR LICENSING
 2   DIVISION ON A NUMBER OF DIFFERENT LICENSING ISSUES.
 3   Q.    AND IN CONNECTION WITH YOUR CURRENT JOB AS CHIEF OF
 4   ENFORCEMENT, DOES THAT INVOLVE BEING WELL-VERSED IN THE
 5   LICENSING PROCESS AND PROCEDURE?
 6   A.    YES.
 7   Q.    AND IT ALSO INVOLVED BEING KNOWLEDGEABLE OF HOW
 8   CERTIFIED LICENSE CHECKS ARE DONE?
 9   A.    YES.  THE ENFORCEMENT DIVISION DOES THESE LICENSE
10   DETERMINATIONS AND HISTORY CHECKS.
11   Q.    AND HAVE YOU DONE HUNDREDS OF THESE?
12   A.    NOT HUNDREDS, NO.  I HAVE ONLY BEEN IN THIS POSITION
13   SINCE JANUARY.
14   Q.    HOW MANY HAVE YOU DONE PERSONALLY?
15   A.    I ACTUALLY SUPERVISE THE TEAM THAT DOES THEM, SO I DON'T
16   PERSONALLY RUN THE CHECKS.
17   Q.    BUT IN THIS --
18   A.    BUT I REVIEW THEM.
19   Q.    IN THIS PARTICULAR CASE, DID YOU PERSONALLY REVIEW THIS?
20   A.    NO, BECAUSE THIS PRECEDES MY TENURE IN THE ENFORCEMENT
21   DIVISION.
22   Q.    BUT, I MEAN, IN CONNECTION WITH GOING TO CHECK TO MAKE
23   SURE IT HAD BEEN DONE.
24   A.    YES.
25   Q.    YOU PERSONALLY DID THAT.
```

APRIL 13, 2015

MILLER – DIRECT-EXAMINATION

1    **A.**    YES.

2    **Q.**    SO YOU ARE HERE TO TESTIFY FROM THAT PERSONAL KNOWLEDGE;

3    IS THAT CORRECT?

4    **A.**    YES.

5    **Q.**    NOW, CAN YOU TELL US A LITTLE BIT ABOUT THAT PROCESS

6    WHEN THE CERTIFIED LICENSE DETERMINATION IS CONDUCTED, WHAT

7    ARE THEY LOOKING FOR -- WHAT ARE YOU LOOKING FOR?  I SHOULD

8    SAY.

9    **A.**    IN THE DETERMINATION?

10   **Q.**    YES.

11   **A.**    WE ARE LOOKING TO SEE WHETHER THE CONDUCT THAT HAS BEEN

12   DESCRIBED TO US BY THE REQUESTER WOULD REQUIRE AUTHORIZATION

13   FROM OFAC.

14   **Q.**    AND IN CONNECTION WITH THE LETTER THAT IS DATED -- THAT

15   IS RIGHT BEFORE YOU RIGHT NOW, IS THERE A DATE ON THAT LETTER?

16   **A.**    OCTOBER 6, 2014.

17          **MR. CAMDEN:**  I AM STILL GOING TO OBJECT TO ANY MORE

18   MENTION, YOUR HONOR, OF THESE EXHIBITS.

19          **THE COURT:**  I WOULD SUSTAIN THE OBJECTION WITH

20   RESPECT TO THE CONTENT WITHIN THE EXHIBITS.

21   **Q.**    **(MR. COUGHLIN)** IN CONNECTION WITH THIS, DO YOU RECALL

22   WHAT THE PARTICULAR GOODS THAT WERE BEING LOOKED FOR IN TERMS

23   OF TRYING TO FIND A DETERMINATION, A LICENSE DETERMINATION,

24   NOT -- YOU CAN LOOK AT THAT DOWN THERE IN FRONT OF YOU.  CAN

25   YOU LOOK AT THAT AND FIND OUT WHAT THEY WERE?

APRIL 13, 2015

1           **MR. CAMDEN:**  OBJECTION, YOUR HONOR.  HE IS TALKING

2     ABOUT THE CONTENTS.

3           **THE COURT:**  WOULD YOU REPHRASE THE QUESTION, PLEASE.

4     **Q.    (MR. COUGHLIN)** I WOULD LIKE YOU TO LOOK AT THE

5     PARTICULAR EXHIBIT BEFORE YOU.  DOES THAT REFRESH YOUR

6     RECOLLECTION WHAT YOU REVIEWED?

7     **A.**    YES.

8           **MR. CAMDEN:**  YOUR HONOR, I BELIEVE SHE IS TESTIFYING

9     ABOUT THE CONTENTS OF THE LETTER.  SHE ALREADY TESTIFIED SHE

10    DIDN'T RUN THE CHECK HERSELF.

11          **THE COURT:**  SHE CAN TESTIFY AS TO HER PERCIPIENT

12    RECOLLECTION, BUT WITHOUT REVEALING THE CONTENTS OF THE

13    EXHIBIT.

14          **MR. COUGHLIN:**  YOUR HONOR, CAN WE HAVE A SIDEBAR?

15          **THE COURT:**  YES.

16          (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD AT

17          THE BENCH, OUT OF THE HEARING OF THE JURY)

18          **MR. COUGHLIN:**  WITH THIS PARTICULAR EXHIBIT, I THINK

19    THE POINT THAT I AM TRYING TO MAKE IS THAT SHE PERSONALLY TOOK

20    THE STEPS AND FOLLOWED UP ON THE REQUEST THAT WAS MADE IN THE

21    LETTER.  SHE USED THE LETTER AS A GUIDE TO DO THE REVIEW

22    HERSELF AND CONFIRM THAT WHAT THE LETTER SAID IS CORRECT.  SO

23    EVEN IF YOU HAD THE PERSON WHO ACTUALLY IS THE SIGNATOR TO THE

24    LETTER, THEY WOULD STILL HAVE TO REFER TO THE LETTER TO SEE

25    WHAT THE REQUEST WAS.  THAT'S ALL SHE WAS DOING HERE.

APRIL 13, 2015

MILLER – DIRECT–EXAMINATION

1    I UNDERSTAND THE COURT'S DETERMINATION, YOU DO NOT

2    WANT TO PUT THE EXHIBIT INTO EVIDENCE.  BUT IN TERMS OF WHAT

3    THE REQUEST WAS, SHE CAN USE THIS TO REFRESH HER RECOLLECTION

4    AND THEN TESTIFY TO THAT.

5         **THE COURT:**  I WOULD ASK –– WILL SHE WILL BE

6    AVAILABLE TOMORROW, IF NECESSARY?

7         **MR. COUGHLIN:**  SHE WAS PLANNING ON GOING BACK TO

8    WASHINGTON TONIGHT, BUT I UNDERSTAND WHAT YOU ARE ASKING.

9         **THE COURT:**  I THINK I WOULD LIKE TO CONFINE THE

10   EXAMINATION TO WHAT SHE KNOWS, WHAT SHE DID, AS OPPOSED TO

11   WHAT IS STATED IN THAT LETTER.

12        **MR. COUGHLIN:**  OKAY.

13        **MR. HARRIGAN:**  I THINK THE ISSUE IS RUNNING A

14   CERTIFIED DETERMINATION SHE HAS PERSONAL KNOWLEDGE OF WHAT A

15   PERSON DOES, AND SHE WAS JUST SAYING YES, WHAT THEY DID TO DO

16   THIS WAS CORRECT.  AND WHAT THE LETTER SIMPLY SAYS IS FOR THIS

17   ITEM IT REQUIRES A LICENSE.  THE SAME THING WOULD BE FOR THE

18   LICENSE HISTORY CHECK, WE HAVE A DATABASE WE RUN THAT THROUGH.

19        **THE COURT:**  I THINK YOU CAN ASK HER GENERALLY WHAT

20   HER UNDERSTANDING IS, BUT NOT THE CONCLUSIONS FROM THIS

21   LETTER.  THAT'S THE DISTINCTION.

22        **MR. COUGHLIN:**  CAN I ASK HER, DID YOU PERSONALLY RUN

23   A CHECK OR MAKE A DETERMINATION AS TO THE EXPORTATION OF A

24   GYROCOMPASS OR PLANAR TRIODE?

25        **THE COURT:**  YOU CAN ASK HER THAT, BUT YOU WOULD HAVE

APRIL 13, 2015

MILLER - DIRECT-EXAMINATION

```
 1   TO, AT THIS POINT, REST ON WHATEVER THE ANSWER IS.
 2          MR. COUGHLIN:  UNLESS I BRING HER BACK WITH A
 3   CERTIFIED COPY?
 4          MR. HARRIGAN:  HERE IS OUR SUGGESTION.  PASS ON
 5   THAT, WHETHER THERE WAS ANY LICENSE, WHICH I THINK SHE CAN
 6   TESTIFY TO.  THE LICENSE CHECK WAS DONE, SHE WAS FAMILIAR WITH
 7   THE PROCESS AND THE PROCEDURES.
 8          MR. CAMDEN:  SHE MAY BE FAMILIAR WITH THE PROCESS
 9   AND PROCEDURES, WHAT I HEARD ON DIRECT WAS SHE DIDN'T RUN A
10   LICENSE CHECK HERSELF, SHE RELIED ON OTHER PEOPLE.  SHE
11   SUPERVISES THE DEPARTMENT, THE LETTERS PREDATE HER.
12          THE COURT:  WOULD YOU LIKE TO TAKE THIS WITNESS ON
13   VOIR DIRE, SEE IF THE FOUNDATION CAN BE MADE.
14          MR. CAMDEN:  IF THE GOVERNMENT CAN LAY IT THEY CAN
15   LAY IT.  I AM OBJECTING AT THIS POINT.  I DON'T THINK IT IS MY
16   JOB TO LAY THE FOUNDATION.
17          MR. COUGHLIN:  WE CAN BRING HER BACK TOMORROW, THEN.
18          THE COURT:  THANK YOU.
19          (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN
20          OPEN COURT, IN THE HEARING OF THE JURY)
21   Q.    (MR. COUGHLIN) I WOULD LIKE TO JUST BRIEFLY TALK A
22   LITTLE BIT ABOUT WHAT YOU DID IN CONNECTION WITH MAKING A
23   DETERMINATION ABOUT YOUR TESTIMONY HERE TODAY WITH REGARD TO
24   THE DOCUMENTS THAT -- ONE OF THEM WHICH IS BEFORE YOU.
25          WHAT ACTIONS OR STEPS DID YOU TAKE?
```

APRIL 13, 2015

1   **A.**    I WENT INTO OUR RECORDKEEPING SYSTEM AND I REVIEWED THE

2   FACT THAT WE HAD, AS AN AGENCY, ISSUED A DETERMINATION TO YOUR

3   OFFICE THAT THE ACTIVITY THAT IS --

4           **MR. CAMDEN:**  YOUR HONOR, I AM GOING TO OBJECT

5   ANYTHING FURTHER SUBSTANTIVE.

6           **THE COURT:**  I WOULD SUSTAIN THE OBJECTION.

7           **MR. COUGHLIN:**  NOTHING FURTHER OF THIS WITNESS AT

8   THIS TIME, YOUR HONOR, SUBJECT TO RE-CALL.

9           **THE COURT:**  YES.

10          CROSS-EXAMINATION.

11          THERE MAY BE A FEW QUESTIONS FROM DEFENSE COUNSEL.

12  THANK YOU.

13                      CROSS-EXAMINATION

14  **Q.**    **(MR. CAMDEN)** MS. MILLER, I WANT TO -- I AM NOT GOING TO

15  ASK ANY GENERAL QUESTIONS, I WILL JUST HOME STRAIGHT IN ON THE

16  ISSUE.

17          THE PART WE ARE TALKING ABOUT, THE BANS, EXPORTATION

18  RE-EXPORTATION, SALE OR SUPPLY OF GOODS OR SERVICES TO IRAN,

19  THAT IS 31 CFR 560.204, CORRECT?

20  **A.**    UM-HUM, THAT'S CORRECT.

21  **Q.**    AND I WANT TO TALK ABOUT WHERE EXACTLY -- SO IT COVERS

22  GOODS AND SERVICES, RIGHT?

23  **A.**    GOODS, TECHNOLOGY AND SERVICES.

24  **Q.**    RIGHT.  BY A U.S. CITIZEN OR BY A U.S. PERSON, HOWEVER

25  THAT IS DEFINED, OR FROM THE UNITED STATES, RIGHT?

                        APRIL 13, 2015

MILLER – CROSS-EXAMINATION

1   **A.**    CORRECT.

2   **Q.**    AND IT IS TO IRAN OR THE GOVERNMENT OF IRAN, CORRECT?

3   **A.**    THAT'S CORRECT.

4   **Q.**    AND IRAN IS FURTHER DEFINED IN THE REGULATIONS, RIGHT?

5   **A.**    I AM ACTUALLY NOT SURE IF WE DEFINE THE COUNTRY OF IRAN.

6   WE DEFINE THE GOVERNMENT OF IRAN IN THE REGS.

7   **Q.**    RIGHT.  AND THE GOVERNMENT OF IRAN IS THE STATE OF

8   IRAN -- NOT EXCLUSIVELY BUT INCLUDES THE STATE OF IRAN, RIGHT?

9   **A.**    STATE MEANING GOVERNMENT?

10  **Q.**    I AM QUOTING HERE 31 CFR 560.304.  IF I TOLD YOU THAT IT

11  SAYS GOVERNMENT OF IRAN MEANS THE STATE INCLUDING ITS

12  SUBDIVISIONS.

13  **A.**    THAT SOUNDS RIGHT.  I DON'T HAVE IT IN FRONT OF ME.

14  **Q.**    OR ANYONE IN CONTROL OR ANY CORPORATION OR ENTITY

15  CONTROLLED BY THE GOVERNMENT OF IRAN, RIGHT?

16  **A.**    CORRECT.

17  **Q.**    AND ANY -- THEN 560.313 ALSO COVERS ORGANIZATIONS IN

18  WHICH THE GOVERNMENT OF IRAN OWNS A 50 PERCENT OR GREATER

19  INTEREST OR CONTROLLING INTEREST, CORRECT?

20  **A.**    AGAIN, I DON'T KNOW THE REFERENCE BECAUSE I DON'T HAVE

21  IT IN FRONT OF ME, BUT THAT SOUNDS RIGHT.

22  **Q.**    IF I WERE TO SHOW YOU A COPY OF THAT CFR WOULD THAT HELP

23  REFRESH YOUR MEMORY?

24  **A.**    I MEAN, THAT SOUNDS RIGHT.  IF YOU WANT ME TO ACTUALLY

25  SAY THAT THAT IS WHAT THAT SAYS THEN --

APRIL 13, 2015

MILLER - CROSS-EXAMINATION

1  **Q.**    YOU WOULD AGREE THAT THAT IS WHAT THAT SAYS, 560 CFR

2  304.

3  **A.**    I DON'T HAVE THAT SECTION MEMORIZED.  IT SOUNDS RIGHT.

4  IF YOU WANT TO PRESENT IT TO ME I CAN LOOK AT IT TO MAKE SURE.

5  **Q.**    BUT IT SOUNDS RIGHT.  SO THE EFFECT OF A LICENSE, WHEN A

6  LICENSE IS GRANTED, IS TO REMOVE THE PROHIBITION, CORRECT?

7  **A.**    IT DOESN'T REMOVE IT, BUT PERHAPS OBVIATES IT.  IT IS

8  AUTHORIZING SOMETHING THAT WOULD OTHERWISE BE PROHIBITED.

9  **Q.**    SO -- ONE SECOND.  IF I WERE TO TELL YOU AGAIN THAT THE

10  REGULATIONS 560.502 SAY ANY REGULATION, RULING, INSTRUCTION OR

11  LICENSE AUTHORIZING ANY TRANSACTION OTHERWISE PROHIBITED UNDER

12  THIS PART HAS THE EFFECT OF REMOVING A PROHIBITION CONTAINED

13  IN THIS PART FROM A TRANSACTION.

14      YOU WOULD AGREE THAT THAT IS A CORRECT STATEMENT OF THE

15  LAW.

16  **A.**    IF THAT IS HOW IT IS WORDED, SURE.

17      **MR. HARRIGAN:**  OBJECTION, YOUR HONOR.  MAY HE PUT

18  THE DOCUMENT IN FRONT OF HER SO SHE CAN READ IT?

19      **THE COURT:**  YES.

20      **MR. HARRIGAN:**  I MEAN, OTHERWISE HE IS TESTIFYING.

21      **THE COURT:**  WOULD YOU SHOW THE --

22      **MR. CAMDEN:**  THIS IS CROSS-EXAMINATION, NUMBER ONE.

23  IT IS THE CFR, CODE OF FEDERAL REGULATIONS.  IT IS THE LAW.  I

24  THINK THE COURT CAN TAKE JUDICIAL NOTICE.  NUMBER TWO, I DON'T

25  NEED A WITNESS TO TESTIFY ON THE LAW.  AND NUMBER THREE, SHE

APRIL 13, 2015

MILLER – CROSS-EXAMINATION

1    HAS TESTIFIED SHE DRAFTED THE --

2              **THE COURT:**  MR. CAMDEN, I UNDERSTAND.  IF YOU WANT

3    TO PURSUE THIS LINE OF QUESTIONS, I WOULD ASK THAT YOU SHOW

4    THE WITNESS THE REGULATION.

5              **MR. CAMDEN:**  UNDERSTOOD.

6    **Q.**    **(MR. CAMDEN)** SO I AM SHOWING YOU A COPY OF WHAT -- WHAT

7    HAS BEEN MARKED AS DEFENSE EXHIBIT A.

8         DO YOU RECOGNIZE THAT?

9              (EXHIBIT A MARKED FOR IDENTIFICATION)

10   **A.**    THIS IS 31 CFR 560.502, YES.

11   **Q.**    SO THAT IS FROM THE CODE OF FEDERAL REGULATIONS,

12   CORRECT?

13   **A.**    YES.

14   **Q.**    WHICH OFAC ADMINISTERS AND PUBLISHES, ACTUALLY.

15   **A.**    CORRECT.

16   **Q.**    AND THAT SAYS THAT THE EFFECT OF A LICENSE IS TO REMOVE

17   THE PROHIBITION, CORRECT?  SUBSECTION C.

18   **A.**    YES.

19   **Q.**    OKAY.

20        YOU TALKED IN YOUR TESTIMONY ON DIRECT EXAMINATION ABOUT

21   THE DIFFERENCE BETWEEN GENERAL LICENSES AND SPECIFIC LICENSES.

22   SO GENERAL LICENSES ALLOW ANYBODY, WITHOUT APPLYING TO OFAC

23   SPECIFICALLY, TO SEND CERTAIN TYPES OF GOODS OR PROVIDE

24   SERVICES TO IRAN AS AN EXCEPTION TO THE PROHIBITION, CORRECT?

25   **A.**    PROVIDED THAT THEY MEET WHATEVER CRITERIA IS SPECIFIED

APRIL 13, 2015

MILLER — CROSS-EXAMINATION

1   WITHIN THE GENERAL LICENSE.

2   **Q.**   RIGHT.  EXACTLY.  SO MY NEXT POINT IS OFAC CAN MAKE THE

3   LICENSES AS GENERAL OR AS SPECIFIC AS THEY WANT, CORRECT?

4   **A.**   THAT IS CORRECT.

5   **Q.**   SO THERE ARE GENERAL LICENSES FOR A VARIETY OF THINGS,

6   CORRECT?

7   **A.**   THAT'S CORRECT.

8   **Q.**   FOR EXAMPLE, MEDICAL SUPPLIES.  WHICH ARE NOT AT ISSUE

9   HERE, RIGHT?

10  **A.**   CORRECT.

11  **Q.**   ON ANOTHER ONE, 560.528, VERY RECENTLY THEY ENACTED A

12  LAW ALLOWING, WITH A SPECIFIC LICENSE, THE EXPORT OF GOODS FOR

13  THE SAFETY OF CIVILIAN AVIATION IN IRAN, CORRECT?

14  **A.**   I DO RECALL A CIVIL AVIATION GENERAL LICENSE, YES.

15  **Q.**   I WANT TO GO BACK TO 560.204.  THAT'S THE GENERAL

16  PROHIBITION, CORRECT?

17  **A.**   ON EXPORTATION AND RE-EXPORTATION.

18  **Q.**   IT COVERS EXPORTATION, RE-EXPORTATION, SALE OR SUPPLY TO

19  IRAN OR THE GOVERNMENT OF IRAN, CORRECT?

20  **A.**   DIRECTLY OR INDIRECTLY.

21  **Q.**   OKAY.  RIGHT.  THROUGH A THIRD PARTY, BUT THE EVENTUAL

22  DESTINATION HAS TO BE IRAN.  AND THAT MEANS THE TERRITORY OF

23  IRAN, CORRECT?

24  **A.**   CORRECT.

25  **Q.**   AND WE HAVE ALREADY TALKED ABOUT THE GOVERNMENT OF IRAN.

APRIL 13, 2015

MILLER – CROSS–EXAMINATION

1   SO UNDER THE REGULATIONS IT IS NOT A VIOLATION OF 204 TO SEND

2   GOODS OR SERVICES TO AN IRANIAN CITIZEN, AS LONG AS THOSE

3   GOODS DON'T GO TO THE TERRITORY OF IRAN OR THE GOVERNMENT OF

4   IRAN, CORRECT?

5   **A.**   I WOULD FEEL MORE COMFORTABLE IF I COULD LOOK AT THE

6   DEFINITION OF –– OR IF WE HAVE IT, OF IRAN IN THE REGS, AS

7   WELL AS THE GOVERNMENT OF IRAN, FOR ANSWERING THAT QUESTION.

8   **Q.**   SURE.  I BELIEVE I HAVE GOT THAT.  IF YOU WOULD HOLD ON

9   ONE SECOND.

10   **A.**   AND ACTUALLY IF YOU HAVE 204 AS WELL THAT WOULD BE

11   HELPFUL.

12   **Q.**   I AM HANDING YOU WHAT HAS BEEN MARKED AS DEFENDANT'S

13   EXHIBIT B.  FLIP THROUGH THE PAGES.  YOU WOULD AGREE THAT

14   THESE ARE SEVERAL EXCERPTED REGULATIONS UNDER 560 31 CFR,

15   RIGHT?

16           (EXHIBIT B MARKED FOR IDENTIFICATION)

17   **A.**   THAT'S CORRECT.

18   **Q.**   OKAY.  SO IF YOU WILL TURN TO 560.303.  LET ME KNOW WHEN

19   YOU FOUND IT.

20   **A.**   SORRY.  YOU SAID 303?

21   **Q.**   YUP.

22   **A.**   OKAY.

23   **Q.**   OKAY.  SO THAT SAYS THAT THE TERM IRAN MEANS THE

24   TERRITORY OF IRAN AND ANY OTHER TERRITORY OR MARINE AREA

25   INCLUDING THE EXCLUSIVE ECONOMIC ZONE, CONTINENTAL SHELF, OVER

APRIL 13, 2015

MILLER – CROSS-EXAMINATION

1  WHICH THE GOVERNMENT OF IRAN CLAIMS SOVEREIGNTY, SOVEREIGN

2  RIGHTS, OR JURISDICTION, IN PART, CORRECT?

3  **A.**    CORRECT.

4  **Q.**    OKAY.  IF YOU WILL FLIP BACK THE PAGE IMMEDIATELY

5  BEFORE.  IT IS ON A DOUBLE-SIDED SHEET.  SAVING PAPER.

6        THERE YOU FIND 560.204, CORRECT?

7  **A.**    YES.

8  **Q.**    OKAY.  SO THIS IS THE PROHIBITION, RIGHT, ON EXPORT,

9  SALE -- SORRY -- EXPORT, RE-EXPORT, SALE OR SUPPLY, DIRECT OR

10 INDIRECT, TO IRAN OR THE GOVERNMENT OF IRAN, CORRECT?

11 **A.**    CORRECT.

12 **Q.**    SO THIS MEANS THAT GOODS CANNOT BE EXPORTED FROM THE

13 UNITED STATES TO THE TERRITORY OF IRAN OR TO THE GOVERNMENT OF

14 IRAN, CORRECT?

15 **A.**    CORRECT.

16 **Q.**    OKAY.  IT DOES NOT MENTION IRANIAN CITIZENS.

17 **A.**    NO, IT DOES NOT.

18 **Q.**    OKAY.  SO IT WOULD NOT BE A VIOLATION OF SECTION 204 FOR

19 A PERSON TO SEND GOODS FROM THE UNITED STATES TO AN IRANIAN

20 CITIZEN LIVING ABROAD AS LONG AS THOSE GOODS DON'T GO TO THE

21 TERRITORY OF IRAN OR THE GOVERNMENT OF IRAN, CORRECT?

22 **A.**    I AM ONLY HESITATING BECAUSE I HAVE NOT RUN INTO THAT

23 FACT PATTERN BEFORE IN A -- IF I MAY.  IN A COMPARABLE

24 CONTEXT, IN SUDAN WE WOULD VIEW A SUDANESE PERSON AS PART OF

25 THE TERRITORY OF SUDAN WHEREVER LOCATED, BUT I CAN SEE THAT IT

APRIL 13, 2015

MILLER – CROSS-EXAMINATION

1    DOESN'T SPELL THAT OUT IN THE REGULATIONS.

2    **Q.**    DOESN'T SAY TO A IRANIAN PERSON, RIGHT?

3    **A.**    IT DOES NOT SAY THAT IN THE REGULATIONS.

4    **Q.**    OR TO AN IRAN PRIVATE CORPORATION.

5    **A.**    THAT IS CORRECT, IT DOES NOT SAY THAT IN THE

6    REGULATIONS.

7    **Q.**    AND ALSO, AS WE DISCUSSED ABOUT THE DEFINITION OF

8    GOVERNMENT OF IRAN, EVEN AN IRANIAN CORPORATION WOULD NOT BE

9    CONSIDERED THE GOVERNMENT OF IRAN UNLESS THE GOVERNMENT –– THE

10   STATE OWNED A CONTROLLING STAKE IN THE CORPORATION, CORRECT?

11   **A.**    NO.  BUT PRESUMABLY IF IT IS AN IRANIAN COMPANY IT IS

12   LOCATED IN IRAN AND WOULD BE SUBJECT TO THE TERRITORIAL

13   PROHIBITION.

14   **Q.**    YOU ARE AWARE THAT THERE ARE COMPANIES THAT ARE

15   HEADQUARTERED IN IRAN THAT OPERATE ABROAD?

16   **A.**    I PRESUME THERE ARE.

17   **Q.**    OFAC DOES PUBLISH A LIST OF ENTITIES THAT THE SECRETARY

18   OF THE TREASURY HAS DETERMINED TO BE PART OF THE GOVERNMENT OF

19   IRAN, CORRECT?

20   **A.**    THAT'S CORRECT.

21   **Q.**    OKAY.  YOU DON'T HAPPEN TO KNOW –– THOSE ARE PUBLISHED

22   IN A FEDERAL REGISTER, CORRECT?

23   **A.**    THAT'S CORRECT.  AND THEY ARE ALSO MAINTAINED ON OUR

24   S.D.M. LIST, OUR SPECIALLY DESIGNATED NATIONALS LIST, WHICH

25   COVERS ALL OF OUR PROGRAMS.

APRIL 13, 2015

MILLER - CROSS-EXAMINATION

1  **Q.**    RIGHT.  AND IT HAS CODE SECTIONS AT THE END, FOR EXAMPLE

2  IRAN.

3  **A.**    TAGS, YES.

4  **Q.**    TAGS.  AND SO YOU ARE AWARE THAT THERE IS A LIST OF

5  PEOPLE WHOM THE SECRETARY OF TREASURY HAS DETERMINED TO BE

6  PART OF THE GOVERNMENT OF IRAN.

7  **A.**    YES.

8  **Q.**    IT IS A NON-EXHAUSTIVE LIST, CORRECT?

9  **A.**    THAT'S CORRECT.

10  **Q.**    I AM HANDING YOU WHAT HAS BEEN MARKED DEFENDANT'S

11  EXHIBIT C.  DO YOU RECOGNIZE THIS PAPER?

12           (EXHIBIT C MARKED FOR IDENTIFICATION)

13  **A.**    IT IS APPENDIX 8 OF PART 560.

14  **Q.**    CORRECT.  RIGHT.  AND IT LISTS THE PERSONS WHOM THE

15  SECRETARY OF THE TREASURY HAS DETERMINED TO BE PART OF THE

16  GOVERNMENT OF IRAN, CORRECT?

17  **A.**    YES.

18  **Q.**    IN ALPHABETICAL ORDER, RIGHT?

19  **A.**    YES.

20  **Q.**    IS TIG MARINE ON THIS LIST?

21  **A.**    NO, IT IS NOT.

22  **Q.**    IS ERGUN YILDIZ ON THIS LIST?

23  **A.**    NO.

24  **Q.**    IS KOORUSH TAHERKHANI ON THIS LIST?

25  **A.**    NO.

APRIL 13, 2015

| | |
|---|---|
| 1 | **MR. CAMDEN:** NO FURTHER QUESTIONS, YOUR HONOR. |
| 2 | **MR. HARRIGAN:** YOUR HONOR, I WOULD OBJECT. THIS IS |
| 3 | A REGULATION FROM 1997. I DON'T KNOW IF IT IS THE MOST |
| 4 | CURRENT. |
| 5 | **THE COURT:** ARE YOU SEEKING TO MOVE IT INTO |
| 6 | EVIDENCE? |
| 7 | **MR. CAMDEN:** NO, YOUR HONOR. THAT WAS JUST FOR HER |
| 8 | REFERENCE. THIS IS PART OF THE CFR, SO -- |
| 9 | **MR. HARRIGAN:** YOUR HONOR, AGAIN, HE IS TESTIFYING. |
| 10 | I AM NOT FAMILIAR WITH THIS, UNLESS I HAVE MORE TIME TO |
| 11 | DETERMINE THE LIST. I AM NOT OBJECTING TO THE TESTIMONY HERE, |
| 12 | IT IS JUST THAT I DON'T KNOW THIS IS A COMPLETE LIST. |
| 13 | **THE WITNESS:** IT SAYS IT IS NON-EXHAUSTIVE, ALSO. |
| 14 | **THE COURT:** ABSENT AN ATTEMPT TO INTRODUCE THE |
| 15 | DOCUMENT, I WILL SIMPLY RESERVE FURTHER RULING ON THAT. THE |
| 16 | TESTIMONY WILL STAND AS GIVEN. |
| 17 | IS THERE ANY REDIRECT AT THIS TIME? |
| 18 | **MR. COUGHLIN:** JUST BRIEFLY, YOUR HONOR. |
| 19 | REDIRECT EXAMINATION |
| 20 | **Q.** **(MR. COUGHLIN)** THE PERSON WOULD BE IN VIOLATION OF A |
| 21 | SANCTION IF IN FACT THE FINAL END USER WAS IRAN AND THEY WERE |
| 22 | TAKING DELIVERY OUTSIDE OF IRAN, CORRECT? IF THEY WERE -- A |
| 23 | U.S. GOOD BEING SENT IF THE FINAL END USER WAS IRAN. |
| 24 | **A.** THAT'S CORRECT. |
| 25 | **MR. CAMDEN:** OBJECTION, YOUR HONOR. VAGUENESS AND |

APRIL 13, 2015

MILLER − REDIRECT EXAMINATION

1    COMPOUND.

2              **THE COURT:**  OVERRULED.  THE ANSWER WILL STAND.

3              **MR. COUGHLIN:**  NOTHING FURTHER, YOUR HONOR.

4              **THE COURT:**  ALL RIGHT.

5         YOU WOULD BE EXCUSED AT THIS TIME, SUBJECT TO

6    RE-CALL.  THANK YOU.

7         MR. HARRIGAN, GOVERNMENT'S NEXT.

8              **MR. HARRIGAN:**  YES, YOUR HONOR.  THE GOVERNMENT

9    CALLS GREG TOPCZEWSKI.

10             **THE CLERK:**  SIR, PLEASE RAISE YOUR RIGHT HAND.

11        YOU DO SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE

12   YOU SHALL GIVE IN THE CAUSE NOW BEFORE THIS COURT SHALL BE THE

13   TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?

14             **THE WITNESS:**  YES, I DO.

15             **THE CLERK:**  PLEASE TAKE THE STAND.

16        PLEASE STATE YOUR FULL NAME AND SPELL YOUR FIRST AND

17   LAST NAMES.

18             **THE WITNESS:**  MY NAME IS GREG TOPCZEWSKI.  FIRST

19   NAME IS SPELLED G-R-E-G.  LAST NAME IS T-O-P-C-Z-E-W-S-K-I.

20             **THE COURT:**  THANK YOU.  GOOD AFTERNOON.

21        COUNSEL.

22             **MR. HARRIGAN:**  THANK YOU.

23                      DIRECT EXAMINATION

24   **Q.**    **(MR. HARRIGAN)** GOOD AFTERNOON, MR. TOPCZEWSKI.

25   **A.**    GOOD AFTERNOON.

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1  **Q.**   ARE YOU CURRENTLY EMPLOYED?

2  **A.**   NO, I AM RETIRED.

3  **Q.**   HOW LONG HAVE YOU BEEN RETIRED?

4  **A.**   ABOUT A YEAR AND A HALF.

5  **Q.**   AND HAVE YOU BEEN ENJOYING IT LONG ENOUGH?

6  **A.**   YES, I HAVE.  YES.

7  **Q.**   PRIOR TO YOUR RETIREMENT, WHERE DID YOU WORK?

8  **A.**   I WORKED FOR NORTHROP GRUMMAN IN CHARLOTTESVILLE,

9  VIRGINIA.

10  **Q.**   AND HOW LONG DID YOU WORK FOR NORTHROP GRUMMAN IN

11  CHARLOTTESVILLE, VIRGINIA?

12  **A.**   OVERALL 22 YEARS, I WAS IN CHARLOTTESVILLE FOR NINE

13  YEARS.

14  **Q.**   OKAY.  AND DURING YOUR 22-YEAR TENURE CAN YOU GENERALLY

15  DESCRIBE WHAT YOUR JOB WAS?

16  **A.**   I WAS IN SECURITY THE ENTIRE TIME.  MY TITLE WAS

17  BASICALLY SECURITY FACILITY OFFICER, WHICH IS THE MANAGER OF A

18  FACILITY.

19  **Q.**   WHAT DOES A SECURITY OFFICER AND MANAGER OF A FACILITY

20  GENERALLY DO?

21  **A.**   COMPLIANCE WITH THE DEPARTMENT OF DEFENSE REGULATIONS,

22  WHICH INCLUDE BACKGROUND CHECKS AND CLEARANCES, AND THE

23  DAY-TO-DAY INTERNAL AFFAIRS, INVESTIGATIONS, VISITOR ACCESS.

24  **Q.**   AND COULD YOU DESCRIBE WHAT TYPE OF COMPANY NORTHROP

25  GRUMMAN IS?

APRIL 13, 2015

1    **A.**    IT IS A DEFENSE CONTRACTOR.

2    **Q.**    OKAY.  AND DOES IT HAVE DIFFERENT BUSINESSES WITHIN IT?

3    **A.**    YES.  THE BUSINESS THAT I WORKED IN CHARLOTTESVILLE

4    WAS THE NAVAL MARINE DIVISION.  THEY ALSO HAVE AN ELECTRONICS

5    DIVISION, AND AEROSPACE, AIRCRAFT AND SPACE DIVISION.

6    **Q.**    SO YOU WORKED FOR -- IN THE ELECTRONICS SYSTEM.

7    **A.**    YES, I DID.

8    **Q.**    AND IS NORTHROP GRUMMAN A U.S. CORPORATION?

9    **A.**    YES.

10   **Q.**    WHERE IS IT HEADQUARTERED?

11   **A.**    IT IS HEADQUARTERED IN FALLS CHURCH, VIRGINIA.

12   **Q.**    DOES IT HAVE ITS DIVISIONS IN THE UNITED STATES?

13   **A.**    YES.

14   **Q.**    AND ABROAD?

15   **A.**    YES.

16   **Q.**    OKAY.  AND IN EUROPE?

17   **A.**    YES, IN EUROPE.

18   **Q.**    AND ARE THOSE SUBSIDIARIES OF NORTHROP GRUMMAN

19   INTERNATIONAL?

20   **A.**    YES, THEY ARE.

21   **Q.**    ALL RIGHT.  AND DO THEY MAKE PRODUCTS -- YOU SAID THEY

22   ARE A DEFENSE COMPANY.  DO THEY MAKE PRODUCTS FOR BOTH DEFENSE

23   AND HAVE ALSO CIVIL USES?

24   **A.**    YES.  CIVIL/COMMERCIAL.

25   **Q.**    PRIOR TO WORKING FOR NORTHROP GRUMMAN AS A FACILITIES

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1  SECURITY OFFICER, DID YOU HAVE ANY PRIOR WORK EXPERIENCE IN

2  PRIVATE OR CORPORATE SECURITY?

3  **A.**    YES.  I WORKED IN CORPORATE SECURITY FOR LOUISIANA POWER

4  AND LIGHT, A NUCLEAR POWER PLANT DOWN IN SOUTHERN LOUISIANA.

5  I WORKED FOR AN INVESTIGATIVE COMPANY OUTSIDE OF CHICAGO,

6  ILLINOIS.  AND PRIOR TO THAT I WAS A CHICAGO POLICE OFFICER

7  FOR 10 YEARS.

8  **Q.**    YOU WERE A PATROL OFFICER?

9  **A.**    YES.  PATROL AND SEARCH AND RESCUE.

10  **Q.**    AND SEARCH AND RESCUE?

11  **A.**    YES.

12  **Q.**    DO YOU HAVE ANY SPECIALIZED DEGREES AT ALL?

13  **A.**    I HAVE AN ASSOCIATE'S DEGREE IN SAFETY, SECURITY,

14  TECHNOLOGY FROM OHIO UNIVERSITY.

15  **Q.**    I AM SORRY, I THINK I INTERRUPTED YOU.  WOULD YOU REPEAT

16  THAT?

17  **A.**    YES.  I HAVE AN ASSOCIATE'S DEGREE IN SAFETY, SECURITY,

18  TECHNOLOGY FROM OHIO UNIVERSITY.

19  **Q.**    SO IN YOUR WORK HISTORY AT NORTHROP GRUMMAN, WERE YOU

20  EVER INVOLVED IN MANAGEMENT?

21  **A.**    YES.

22  **Q.**    OUT OF YOUR 22 YEARS, WHAT TIME PERIOD WAS SPENT IN

23  FACILITY SECURITY OFFICER MANAGEMENT?

24  **A.**    ABOUT 18 YEARS.

25  **Q.**    YOU SAID YOU WORKED FOR YOUR LAST NINE YEARS IN NORTHROP

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   GRUMMAN IN CHARLOTTESVILLE?

2   **A.**   YES, CORRECT.

3   **Q.**   AND WHAT IS THEIR FACILITY CALLED THERE IN

4   CHARLOTTESVILLE?

5   **A.**   SPERRY MARINE.

6   **Q.**   AND IS IT A SPECIAL DIVISION OF SPERRY MARINE?

7   **A.**   NAVAL MARINE DIVISION.

8   **Q.**   AND AS A NAVAL MARINE DIVISION, DO THEY MANUFACTURE

9   CERTAIN ELECTRONIC SYSTEMS THERE?

10  **A.**   YES.  THEY MANUFACTURE ELECTRONIC CHARTING SYSTEMS,

11  FIBER OPTIC GYROCOMPASSES.  EQUIPMENT THAT WOULD BE USED

12  EITHER FOR MILITARY OR COMMERCIAL PURPOSES.

13  **Q.**   AND ARE THOSE THE TWO MAIN ITEMS THAT THEY MANUFACTURE?

14  **A.**   YES.

15  **Q.**   FIBER OPTIC GYROCOMPASSES?

16  **A.**   YES.

17  **Q.**   AND YOU SAID MARINE?

18  **A.**   NAVIGATION SYSTEMS.  THE CHARTING SYSTEMS THAT YOU WOULD

19  SEE ON A CRUISE SHIP OR SOMETHING LIKE THAT THAT WOULD TELL

20  YOU WHERE YOU WERE GOING.

21  **Q.**   SO IS IT FAIR TO SAY THIS IS ALL IN THE MARINE

22  NAVIGATION FIELD?

23  **A.**   YES, IT IS.

24  **Q.**   NOW, YOU SAID PART OF YOUR JOB WAS FACILITY SECURITY?

25  **A.**   YES, CORRECT.

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   **Q.**    AND BACKGROUND CHECKS?

2   **A.**    YES.

3   **Q.**    DID YOU CONDUCT INVESTIGATIONS WITHIN THE PLANT ITSELF?

4   **A.**    YES.

5   **Q.**    OF EMPLOYEES?

6   **A.**    YES.  INTERNAL, EXTERNAL.

7   **Q.**    AND IS THERE ANY OTHER DUTY THAT YOU HAD?

8   **A.**    I AM SORRY.  COULD YOU REPEAT THAT?

9   **Q.**    IS THERE ANY OTHER DUTY THAT YOU HAD AS A FACILITY

10  SECURITY OFFICER?

11  **A.**    WELL, I HAD REPORTING REQUIREMENTS.  THE DEFENSE

12  CONTRACTORS REPORT IN TO THE DEPARTMENT OF DEFENSE, DEFENSE

13  INVESTIGATIVE SERVICES, SO WE HAVE A WHOLE MANUAL OF

14  REQUIREMENTS THAT WE HAVE TO REPORT CERTAIN ACTIVITIES TO THE

15  DEPARTMENT OF DEFENSE.

16  **Q.**    AND WHAT TYPE OF ACTIVITIES ARE THOSE THAT YOU HAVE TO

17  REPORT?

18  **A.**    SUSPICIOUS CONTACTS.  SUSPICIOUS ACTIVITY.  ANYTHING

19  THAT WOULD JEOPARDIZE THE SECURITY OF THE MATERIAL THAT WE ARE

20  WORKING WITH.

21  **Q.**    AND COULD YOU DESCRIBE MORE SPECIFICALLY WHAT YOU MEAN

22  BY SUSPICIOUS CONTACT ACTIVITIES?

23  **A.**    IT WOULD BE -- IN THE PARTICULAR CASE LIKE THIS HERE, IT

24  WOULD BE SOMEBODY ASKING FOR A PRODUCT THAT WAS INAPPROPRIATE

25  FOR THE APPLICATION.

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1  **Q.**    SO DO YOU GET DOCUMENTS THAT COME TO YOU THAT YOU HAVE

2  TO REVIEW?

3  **A.**    YES.

4  **Q.**    WHAT IS THAT CALLED, GENERALLY?

5  **A.**    AN END USER REPORT IS USUALLY THE MAIN DOCUMENT THAT I

6  WOULD GET TO REVIEW.

7  **Q.**    IN TERMS OF SUSPICIOUS CONTACT ACTIVITIES, HOW DO YOU

8  REFER TO THAT IN GENERAL?  IS IT A SUSPICIOUS CONTACT REPORT?

9  **A.**    YES, THAT WOULD BE THE END PRODUCT.

10  **Q.**    OKAY.  AND CAN YOU DESCRIBE HOW THAT COMES TO YOU AS A

11  FACILITY SECURITY OFFICER, WHO FROM AND WHAT IT CONTAINS.

12  **A.**    YES.  PRIMARILY IT WOULD COME FROM A SALES MANAGER WHO

13  WOULD BE CONTACTED EITHER BY EMAIL OR BY PHONE OR BY THE

14  NORTHROP GRUMMAN WEBSITE WHERE THERE WOULD BE THE REQUEST FOR

15  THE PURCHASE OF A PRODUCT.  AND THEN THEY WOULD TAKE A LOOK AT

16  THAT REQUEST AND DETERMINE WHETHER OR NOT IT WAS AN

17  APPROPRIATE SALE.  AND IF IT WASN'T THEY WOULD FORWARD THAT

18  INFORMATION ON TO ME.

19  **Q.**    YOU SAID THEY DETERMINE WHETHER IT WAS AN APPROPRIATE

20  SALE.  WHAT DO YOU MEAN BY THAT?  WHAT WERE THE CONCERNS?

21  **A.**    I JUST -- THE FIRST INDICATOR WOULD BE IS THE SHIP THE

22  PROPER TYPE OF A SHIP FOR WHATEVER EQUIPMENT THEY WERE

23  REQUESTING.

24  **Q.**    BUT GOING BACK GENERALLY, WHAT IS THE PURPOSE OF THE

25  SUSPICIOUS CONTACT REPORT FOR THE COMPANY, NORTHROP GRUMMAN?

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1  **A.**   OKAY.  IT IS TO PROTECT THE COMPANY FROM INAPPROPRIATE

2  SALES IN REGARDS TO EXPORT REGULATIONS PRIMARILY.  OR SOME OF

3  THE PRODUCTS THAT WE MADE, ESPECIALLY THE COMMERICIAL

4  PRODUCTS, ARE WHAT IS CALLED DUAL USE PRODUCT WHICH MEANS IT

5  IS A COMMERCIAL PRODUCT BUT IT COULD BE MILITARIZED.

6      SO, FOR EXAMPLE, THE NAVIGAT-2100 IS A COMMERCIAL

7  PRODUCT USED IN SHIPPING TANKERS, LARGE FERRY BOATS THAT YOU

8  WOULD SEE IN AUSTRALIA OR CANADA THAT GO ACROSS A GREATER BODY

9  OF WATER, BUT IT IS ALSO APPLICABLE TO WEAPONS SYSTEMS.

10      **MR. CAMDEN:**  I AM GOING TO OBJECT AT THIS POINT,

11  YOUR HONOR.  403, AS DISCUSSED IN THE IN LIMINES.

12      **THE COURT:**  THE ANSWER WILL STAND.  I WILL ADDRESS

13  THE ISSUES BY WAY OF JURY INSTRUCTION AND ADMONITION AT A

14  LATER TIME.

15      MR. HARRIGAN.

16      **MR. HARRIGAN:**  SURE.

17  **Q.**   **(MR. HARRIGAN)** SO YOU WANT TO MAKE SURE NORTHROP

18  GRUMMAN IS IN COMPLIANCE WITH U.S. EXPORT LAWS.

19  **A.**   YES, CORRECT.

20  **Q.**   ARE THERE OTHER CONCERNS THAT NORTHROP GRUMMAN HAS ABOUT

21  THEIR PRODUCTS BEING SOLD THAT YOU ARE LOOKING OUT FOR AS A

22  FACILITY SECURITY OFFICER?

23  **A.**   IN THE CASE OF OUR PARTICULAR PRODUCTS, THE SALES WOULD

24  COME DIRECTLY FROM A SHIPYARD, PRIMARILY.  SO IF THERE WAS A

25  MAJOR SHIPYARD SOMEPLACE IN THE WORLD THAT WAS BUILDING NEW

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1  TANKERS, FOR EXAMPLE, THEY WOULD REQUEST A CERTAIN NUMBER OF

2  THESE NAVIGAT-2100 FIBER OPTIC GYROCOMPASSES FOR THEIR NEW

3  BUILDS.  IT WAS VERY UNUSUAL TO HAVE A BROKER OR A TRADING

4  COMPANY OR SOME THIRD PARTY TRYING TO BROKER THE DEAL.  THEY

5  WOULD KNOW ENOUGH TO GO DIRECTLY TO SPERRY MARINE.

6  **Q.**   LET ME REPHRASE MY QUESTION.

7  **A.**   ALL RIGHT.

8  **Q.**   WE ARE TALKING ABOUT SUSPICIOUS CONTACT REPORTS, RIGHT?

9  **A.**   YES.

10  **Q.**   YOU GET THOSE FROM SALESPEOPLE, YOU TESTIFIED?

11  **A.**   YES.

12  **Q.**   OKAY.  AND WHAT IS THE TYPE OF INFORMATION THAT COMES TO

13  YOU?

14  **A.**    IT IS A VERY SIMPLE EMAIL BASICALLY SAYING, YOU KNOW, I

15  HAD THIS CONTACT WITH SO-AND-SO, AND I THINK THERE IS

16  SOMETHING WRONG WITH IT.  FOR EXAMPLE, THEY ARE ASKING FOR

17  THIS TYPE OF PRODUCT FOR THIS TYPE OF A SHIP, AND IT IS, IN MY

18  OPINION, A MISMATCH.  LOOK INTO IT AND LET ME KNOW.

19  **Q.**    AND ATTACHED TO THAT EMAIL DOES A SALESPERSON PROVIDE

20  YOU WITH ANY OTHER INFORMATION?

21  **A.**    YES.  THERE IS A FORM CALLED AN END USER AGREEMENT.  AND

22  ON THAT FORM, IT IS A SIMPLE ONE-PAGE FORM THAT HAS THE

23  REQUESTOR WHO WANTS TO MAKE A PURCHASE, THE SHIP THAT IT IS

24  GOING TO WITH THE PARTICULARS SO THE NUMBER CAN BE TRACED TO

25  SEE WHAT THE SHIP IS.  THE END USER, WHICH MEANS WHERE IS THIS

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1    PRODUCT GOING TO WIND UP.

2         AND THEN THE PERSON WHO WAS PURCHASING IT, HE WOULD HAVE

3    HIS SIGNATURE ON THERE BECAUSE THEY WOULD BE SUBMITTING THIS.

4    AND THEN THE VERY BOTTOM OF IT HAS SIGNATURE BLOCKS FOR

5    SEVERAL OF THE COMPANY REPRESENTATIVES.  IN ORDER TO MAKE SURE

6    THE SALE WAS NOT INAPPROPRIATE, THEY HAD TO SIGN OFF.  SO THEY

7    WERE VERY CAUTIOUS ABOUT SIGNING THOSE DOCUMENTS.

8    **Q.**    AND DURING YOUR NINE-YEAR TENURE WITH NORTHROP GRUMMAN

9    IN CHARLOTTESVILLE, DID YOU REGULARLY RECEIVE THESE SUSPICIOUS

10   CONTACT REPORTS FROM VARIOUS SALESPEOPLE?

11   **A.**    YES.

12   **Q.**    AND THEY WERE SALESPEOPLE WITHIN THE UNITED STATES?

13   **A.**    YES.

14   **Q.**    OKAY.  AND GENERALLY WAS THERE A SPECIFIC TYPE OF

15   PRODUCT OR A SPECIFIC PRODUCT THAT COMPRISED -- UPPED YOUR

16   SUSPICIOUS CONTACT REPORTS, OR WAS THERE A VARIETY OF

17   PRODUCTS?

18   **A.**    THERE WAS ONE PREDOMINANT PRODUCT.

19   **Q.**    AND WHAT WAS THAT?

20   **A.**    THAT WAS CALLED A NAVIGAT-2100, AND IT IS A FIBER OPTIC

21   GYROCOMPASS.

22   **Q.**    AND LET ME JUST SHOW YOU FIRST GOVERNMENT 501 FOR

23   IDENTIFICATION AND ASK YOU TO TAKE A LOOK AT IT.

24         (EXHIBIT 501 MARKED FOR IDENTIFICATION)

25   **A.**    YES, THAT'S A --

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   **Q.**    DO YOU RECOGNIZE THAT?

2   **A.**    YES.

3   **Q.**    HOW IS IT THAT YOU RECOGNIZE THAT?

4   **A.**    FROM EXPERIENCE.  I HAD THE BROCHURES.  THAT WAS THE

5   ONLY DESIGN OF THE MODEL SO I HAVE SEEN IT REPEATEDLY FOR

6   QUITE A FEW YEARS.

7   **Q.**    AND WHAT IS THAT?

8   **A.**    IT IS A FIBER OPTIC GYROCOMPASS.

9   **Q.**    IT IS A PHOTOGRAPH OF A FIBER OPTIC GYROCOMPASS?

10  **A.**    YES.

11          **MR. HARRIGAN:**  I MOVE TO ADMIT THIS AND PUBLISH THIS

12  TO THE JURY.

13          **THE COURT:**  ANY OBJECTION?

14          **MR. CAMDEN:**  NO OBJECTION, YOUR HONOR.

15          (EXHIBIT 501 RECEIVED INTO EVIDENCE)

16  **Q.**   **(MR. HARRIGAN)** AND LOOKING TO THE LEFT OF YOUR SCREEN

17  THERE, WHAT IS THAT A PICTURE OF?  THE FIRST PICTURE TO YOUR

18  LEFT.

19  **A.**    THAT IS THE CASING.

20  **Q.**    AND THE RIGHT JUST SHOWS THE --

21  **A.**    INTERNAL PARTS, THE ACTUAL.

22  **Q.**    IS THIS A SOPHISTICATED PIECE OF EQUIPMENT?

23  **A.**    OH, YES.  VERY MUCH SO.

24  **Q.**    WHAT DOES IT GENERALLY RUN, OR WHAT DID IT RUN IN 2012,

25  THE COST?

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   **A.**    ABOUT $60,000.

2   **Q.**    AND IS THIS MANUFACTURED IN THE UNITED STATES?

3   **A.**    NO.

4   **Q.**    WHERE IS IT MANUFACTURED?

5   **A.**    IN GERMANY.

6   **Q.**    HOW IS IT THAT -- AND BY WHO?

7   **A.**    BY SPERRY MARINE.

8   **Q.**    IS THAT A SUBSIDIARY OF THE UNITED STATES COMPANY --

9   **A.**    YES.

10  **Q.**    -- NORTHROP GRUMMAN INTERNATIONAL?

11  **A.**    YES.

12  **Q.**    HOW IS IT THAT YOU GOT REFERRALS ABOUT THE NAVIGAT-2100

13  IN THE UNITED STATES?

14  **A.**    THERE WAS AN INTERNATIONAL WEBSITE THAT IS BASICALLY A

15  VERY SIMPLE ON-LINE FORM THAT YOU WOULD FILL OUT TO REQUEST A

16  PRODUCT, THAT IS PROBABLY THE NUMBER ONE METHOD.  OTHER THAN

17  JUST AN EMAIL TO A SALES MANAGER, A PHONE CALL, THAT WOULD BE

18  THE PREDOMINANT WAY.

19  **Q.**    DID REQUESTS GO TO YOUR SALESPEOPLE IN THE UNITED STATES

20  FOR THE NAVIGAT-2100?

21  **A.**    YES.

22  **Q.**    WHERE THEY HANDLED THOSE?

23  **A.**    YES.

24  **Q.**    FREQUENTLY?

25  **A.**    YES.

APRIL 13, 2015

TOPCZEWSKI - DIRECT EXAMINATION

1   **Q.**   SO OVER A NINE-YEAR PERIOD, APPROXIMATELY HOW MANY

2   SUSPICIOUS CONTACT REPORTS DID YOU HANDLE REGARDING REQUESTED

3   SALES FOR THE NAVIGAT-2100?

4   **A.**   APPROXIMATELY 100 TO 125.

5   **Q.**   AND AGAIN, YOUR PURPOSE IN DETERMINING -- HAVING YOU

6   REVIEW THE DOCUMENTS IS FOR WHAT PURPOSE FOR THE COMPANY?

7   **A.**   THEY WANTED ONE MORE PERSON TO LOOK AT THE SALE JUST TO

8   MAKE SURE THERE WAS NOTHING INAPPROPRIATE ABOUT IT, SO IT WAS

9   A COMPLIANCE ISSUE.

10  **Q.**   BY COMPLIANCE YOU MEAN COMPLIANCE WITH WHAT?

11  **A.**   WITH THE EXPORT LAWS, AND ALSO JUST THAT THE COMPANY

12  ITSELF WAS NOT GETTING THEMSELVES IN TROUBLE BY SELLING A

13  PRODUCT THAT COULD POSSIBLY WIND UP IN WHAT WE CALLED AT THE

14  TIME -- THEY ARE PRESCRIBED COUNTRIES, WHICH ARE COUNTRIES

15  THAT ARE NOT ALLOWED TO HAVE DUAL USE PRODUCTS.

16  **Q.**   OR EMBARGOED COUNTRIES?

17  **A.**   EMBARGOED COUNTRIES, YES.

18  **Q.**   AND DURING YOUR NINE YEARS WORKING AT NORTHROP GRUMMAN

19  SPERRY MARINE, DID YOU RECEIVE TRAINING --

20  **A.**   YES.

21  **Q.**   -- IN REGARDS TO EXPORT LAWS?

22  **A.**   YES.

23  **Q.**   WAS THAT IN-HOUSE TRAINING?

24  **A.**   YES, IT WAS.

25  **Q.**   BY WHO?

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   **A.**   BY EXPORT MANAGEMENT PERSONNEL.

2   **Q.**   DID YOU ALSO RECEIVE TRAINING OUTSIDE?

3   **A.**   YES, YES.  IT WAS MORE ON-THE-JOB TRAINING BECAUSE AS A

4   RESULT OF THESE SUSPICIOUS CONTACTS THEY HAD THE TRAINING FROM

5   GOVERNMENT AGENCIES.

6   **Q.**   BY GOVERNMENT AGENCIES, FOR, LIKE, EXAMPLE, WHAT

7   GOVERNMENT AGENCIES?

8   **A.**   DEFENSE SECURITY SERVICES, WHICH IS A BRANCH OF THE

9   DEPARTMENT OF DEFENSE.  FBI.  HOMELAND SECURITY.  NAVAL

10  CRIMINAL INTELLIGENCE SERVICE.  THAT WAS BASICALLY IT.

11  **Q.**   ALL RIGHT.  DID YOU ALSO RECEIVE TRAINING IN DETERMINING

12  INDICATORS THAT SUGGESTED THAT A GIVEN PRODUCT, FOR EXAMPLE

13  THE NAVIGAT-2100, WAS BEING DIVERTED TO, AS YOU SAID, A

14  PROHIBITED COUNTRY?

15  **A.**   YES.

16  **Q.**   ALL RIGHT.  AND WAS THAT ON-THE-JOB TRAINING?

17  **A.**   YES.

18  **Q.**   HOW DID THAT COME ABOUT, IF YOU CAN DESCRIBE THE

19  ON-THE-JOB TRAINING?

20  **A.**   THE FIRST CASE THAT WE RECEIVED OF A SUSPICIOUS CONTACT

21  OF THIS NATURE WAS IN 2003.  AND OVER THE NEXT YEAR, YEAR AND

22  A HALF, THERE WERE NUMEROUS MEETINGS BETWEEN PERSONNEL FROM

23  SPERRY MARINE -- MYSELF INCLUDED -- AND GOVERNMENT AGENCIES

24  LIKE FBI, HOMELAND SECURITY, TO DETERMINE WHO AND WHAT AND WHY

25  THESE PRODUCTS WERE BEING REQUESTED.  IT WASN'T IMMEDIATELY

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1    APPARENT.

2    **Q.**    AS A RESULT OF THESE SUSPICIOUS ACTIVITY –– SUSPICIOUS

3    CONTACT REPORTS DID THE COMPANY INTERNALLY IMPOSE SOME POLICY

4    AS IT RELATES TO THE NAVIGAT-2100?

5    **A.**    YES.   THAT IS WHEN THEY IMPLEMENTED THAT FORM, THE END

6    USER AGREEMENT, TO MAKE IT JUST AN EXTRA SAFEGUARD ABOVE AND

7    BEYOND JUST THE SALESPERSON MAKING A DECISION ON HIS OWN, IT

8    REQUIRED SEVERAL LEVELS OF MANAGEMENT TO SIGN OFF ON A SALE.

9    **Q.**    AND AS A RESULT OF THAT, YOU REVIEWED HOW MANY

10   SUSPICIOUS CONTACT REPORTS, YOU SAID?

11   **A.**    ALTOGETHER ABOUT 125.

12   **Q.**    AND APPROXIMATELY HOW MANY WERE, AGAIN, INVOLVED THE

13   NAVIGAT-2100?

14   **A.**    AT LEAST 100 TO 110.

15   **Q.**    OKAY.   AND YOU TALKED ABOUT YOUR JOB ON-THE-JOB

16   TRAINING.   WHAT DID THAT INVOLVE, ON YOUR PART, IN LEARNING

17   ABOUT INDICATORS THAT WOULD SUGGEST A NAVIGAT-2100 WAS BEING

18   DIVERTED TO A PROHIBITED COUNTRY?

19   **A.**    THERE WAS SOME OBVIOUS INDICATORS THAT WE LEARNED TO

20   PICK UP ON VERY QUICKLY AND THAT ––

21   **Q.**    LET ME ASK YOU THIS.   STOP YOU THERE.

22        HOW DID YOU LEARN THAT?   WHO WOULD YOU TALK TO?

23   **A.**    I WOULD BE TALKING TO ENGINEERS, SALES PERSONNEL,

24   MANAGEMENT.   IT WAS PRETTY MUCH A COMPANY-WIDE EFFORT TO

25   BRAINSTORM TO SEE WHAT THE CRUX OF THE ISSUE IS, WHY THIS

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1    PRODUCT IS SO POPULAR AND WHY IS IT BEING REQUESTED.

2    **Q.**    WHEN YOU TALKED TO THE SALESPERSON DID YOU LEARN ABOUT

3    WHAT THE ACTUAL MARKET WAS FOR THE NAVIGAT-2100?

4    **A.**    YES.

5    **Q.**    WHAT IS THE MARKET FOR THE NAVIGAT-2100?

6    **A.**    TANKER SHIPS, LARGER OCEANGOING VESSELS, CRUISE SHIPS,

7    LARGE FAST FERRY BOATS, OIL RIGS.  VESSELS LIKE THAT.

8    **Q.**    DOES IT HAVE ANOTHER USE FOR SMALLER SHIPS?

9    **A.**    IT DOES, YES.  THERE ARE SOME APPLICATIONS FOR THE

10   COMMERCIAL VERSION OF THE NAVIGAT-2100.

11   **Q.**    AND ARE THERE MILITARY THAT YOU ACTUALLY SELL TO?

12   **A.**    YES.

13   **Q.**    AND WHO WOULD THAT BE?

14   **A.**    THE U.S. --

15            **MR. CAMDEN:**  OBJECTION, YOUR HONOR.  403.

16            **THE COURT:**  OVERRULED.

17            **MR. CAMDEN:**  COULD WE MAKE THE 403 A CONTINUING

18   OBJECTION?

19            **THE COURT:**  I WOULD PREFER THAT YOU MAKE THE

20   OBJECTION WITH THE QUESTION IF YOU BELIEVE IT IS

21   OBJECTIONABLE.

22            **MR. CAMDEN:**  UNDERSTOOD.

23            **THE COURT:**  YOU MAY ANSWER.

24            **THE WITNESS:**  IT SOLD TO THE U.S. MERCHANT MARINE,

25   THE CANADIAN COAST GUARD.  THERE ARE APPLICATIONS WITHIN NATO

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1    COUNTRIES, FOR EXAMPLE AUSTRALIA, CANADA, ITALY, THEY UTILIZE

2    THE NAVIGAT-2100.

3    **Q.    (MR. HARRIGAN)** THESE ARE FOR FAST MOVING SHIPS?

4    **A.**    NO, THESE ARE FOR MILITARY VESSELS.

5    **Q.**    BUT FAST MOVING MILITARY VESSELS.

6    **A.**    YES.

7             **MR. CAMDEN:**  OBJECTION, YOUR HONOR, TO THAT LAST

8    QUESTION.

9             **THE COURT:**  OVERRULED.

10            **MR. CAMDEN:**  403.  AND RELEVANCE, JUST TO GET OFF

11   THE GROUND.  SORRY.  IT WILL BE RELEVANCE AND 403 EVERY TIME.

12            **THE COURT:**  OVERRULED.

13   **Q.    (MR. HARRIGAN)** WHAT DID YOU LEARN FROM TALKING TO THE

14   SALESPEOPLE ABOUT THE QUANTITY THAT WAS NORMALLY ORDERED?

15   **A.**    TYPICALLY THE COMPANY ITSELF, WORLDWIDE, WOULD SELL

16   ABOUT 100 NAVIGAT-2100'S A YEAR.  AND IN THE VERY EARLY

17   NEGOTIATION --

18            **MR. CAMDEN:**  YOUR HONOR, JUST ON THIS POINT,

19   HEARSAY, I BELIEVE.

20            **THE COURT:**  SUSTAINED.  FOUNDATION.

21            **MR. HARRIGAN:**  HE IS EXPLAINING HIS OPINION LATER ON

22   AS TO THE ACTUAL SALE REQUEST HERE.

23            **THE COURT:**  WOULD YOU REPHRASE THE QUESTION?

24            **MR. HARRIGAN:**  OKAY.

25   **Q.    (MR. HARRIGAN)** YOU TESTIFIED PREVIOUSLY THAT YOU HAD

APRIL 13, 2015

TOPCZEWSKI - DIRECT EXAMINATION

1   TRAINING AND EXPERIENCE --

2   **A.**   YES.

3   **Q.**   -- IN LOOKING AT RED FLAG INDICATORS IN DETERMINING WHEN

4   A GOOD WAS BEING DIVERTED, AND ONE OF THE THINGS YOU DO IS

5   TALK TO YOUR SALESPEOPLE, CORRECT?

6   **A.**   CORRECT.

7   **Q.**   AND YOU TALK TO THE SALESPEOPLE ABOUT WHAT?  THE TYPICAL

8   CUSTOMER?

9   **A.**   YES, TRYING TO DEVELOP A PROFILE OF WHAT TO LOOK FOR SO

10  THAT WE HAVE A GUIDELINE AS FAR AS WHAT IS INAPPROPRIATE.

11  **Q.**   AND THE OTHER THING IS THE QUANTITY THAT THE TYPICAL

12  CUSTOMER ORDERS?

13  **A.**   YES.  AND BACK IN --

14  **Q.**   AND LET ME ASK YOU.  WOULD IT ALSO BE THE CUSTOMER

15  ITSELF, IS IT A REGULAR CUSTOMER?

16  **A.**   YES.

17  **Q.**   AND MAYBE THE LOCATION OF YOUR CUSTOMER?

18  **A.**   YES.

19          **MR. CAMDEN:**  OBJECTION.  THESE ARE ALL LEADING, YOUR

20  HONOR.

21          **THE COURT:**  IT IS FOUNDATIONAL.

22          YOU MAY PROCEED.

23  **Q.**   **(MR. HARRIGAN)** SO GOING BACK TO THE QUANTITY IN TRYING

24  TO AID YOURSELF IN REVIEWING THESE SUSPICIOUS CONTACT REPORTS,

25  WHAT DID YOU LEARN ABOUT THE TYPICAL QUANTITY THAT WAS SOLD?

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   **A.**    THE TYPICAL QUANTITY WOULD BE TWO ––

2           **MR. CAMDEN:**  OBJECTION.  HEARSAY, YOUR HONOR.

3           **THE WITNESS:**  –– AND THAT WOULD BE FOR A LARGER

4   VESSEL.

5           **THE COURT:**  OVERRULED.

6           YOU MAY ANSWER.

7           **THE WITNESS:**  YES.  THAT WOULD BE FOR THE PRIMARY

8   USE.  SO THEY HAVE ONE NAVIGAT-2100 THAT THEY WOULD ACTUALLY

9   HOOK UP, AND THE SECOND WOULD BE A BACKUP IN CASE IT FAILED SO

10  THEY WOULDN'T LOSE THEIR CAPABILITY.  THAT IS FOR A NEW SHIP,

11  A LARGE SHIP.

12  **Q.**    **(MR. HARRIGAN)** AND DID THEY GENERALLY SELL THESE TO

13  SMALL COMPANY SHIPYARDS, OR WHO WAS THE GENERAL CUSTOMER?

14  **A.**    THE SHIPYARDS.

15  **Q.**    OKAY.  AND IN TERMS OF THE LOCATION, THE TYPICAL

16  LOCATION OF THEIR CUSTOMERS, WHERE WAS THAT?

17  **A.**    THE CUSTOMERS WERE WORLDWIDE SO THERE WAS NO TYPICAL

18  LOCATION.  IT WAS –– FOR EXAMPLE, ON THE EAST COAST IT WOULD

19  BE NEWPORT NEWS SHIPBUILDING.  LOCATIONS LIKE THAT.

20  **Q.**    NOW, IN YOUR ON-THE-JOB TRAINING AND LOOKING FOR

21  INDICATORS OF WHEN ITEMS ARE BEING –– A NAVIGAT-2100 IS BEING

22  DIVERTED TO A PROHIBITED COUNTRY, DID YOU ALSO SPEAK WITH YOUR

23  EXPORT PEOPLE?

24  **A.**    YES, I DID.

25  **Q.**    OKAY.  AND BASED ON THAT, WERE YOU FAMILIAR WHERE THOSE

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1  COUNTRIES THAT THERE EXISTS SANCTIONS AGAINST TO WHICH THE

2  NAVIGAT-2100 COULD NOT GO?

3  **A.**   YES.

4       **MR. CAMDEN:**  OBJECTION.  HEARSAY AND FOUNDATION, AND

5  403 AS WELL.

6       **THE COURT:**  OVERRULED.

7       **MR. HARRIGAN:**  THIS ALL GOES BACK, AGAIN, TO HIS

8  ULTIMATE OPINION TESTIMONY.

9       **THE COURT:**  YOU CAN PROCEED.

10  **Q.**   **(MR. HARRIGAN)** AND WHAT DID YOU LEARN ABOUT THE ABILITY

11  TO SEND OR SELL THE NAVIGAT-2100 TO A COUNTRY FOR WHICH

12  SANCTIONS EXIST?

13  **A.**   WE WERE PROHIBITED FROM DOING THAT, SO WE HAD TO BE VERY

14  CAREFUL THAT IF WE HAD A REQUEST FOR A SALE THAT WE ABSOLUTELY

15  100 PERCENT KNEW THAT THE END USER WAS THE REQUESTER AS

16  OPPOSED TO GOING OFF SOMEPLACE ELSE.

17  **Q.**   NOW, IN 2004 APPROXIMATELY HOW MANY NAVIGAT-2100'S WAS

18  SPERRY MARINE MANUFACTURING IN EUROPE?

19  **A.**   ABOUT 100.

20  **Q.**   AND DURING THE COURSE OF RECEIVING THIS SUSPICIOUS

21  CONTACT REPORT, WHAT DID YOU FIND?

22  **A.**   ONE OF THE INDICATORS THAT WAS A VERY, VERY OBVIOUS RED

23  FLAG WAS WE WOULD GET REQUESTS FOR -- SOME OF THEM WERE FOR

24  50, 100, AND THE LARGEST ONE I EVER SAW WAS FOR 200, FROM ONE

25  BUYER.

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1    **Q.**    BASED ON YOUR TRAINING AND EXPERIENCE, WAS THERE A

2    COMMON THREAD, AT ALL, IN TERMS OF THE SUSPICIOUS CONTACT

3    REPORTS AND THE CUSTOMER OR THE LOCATION THEY WERE --

4    **A.**    YES.

5    **Q.**    -- SET TO GO?

6    **A.**    YES.

7    **Q.**    STATED IN THE USER FORM.

8    **A.**    THE COMMON THREAD WAS THAT THEY WERE ALL BEING REQUESTED

9    FOR THE COUNTRY OF IRAN.

10   **Q.**    DIRECTLY FOR THE COUNTRY OF IRAN OR THE MIDDLE EAST?

11   **A.**    THROUGH THE MIDDLE EAST TO IRAN.

12           **MR. CAMDEN:**  YOUR HONOR, THAT'S DEFINITELY A HEARSAY

13   OBJECTION.

14           **THE COURT:**  WELL, OVERRULED.  THE ANSWER WILL STAND.

15   **Q.**    **(MR. HARRIGAN)** IN DECEMBER 2012 DO YOU RECALL RECEIVING

16   A SUSPICIOUS CONTACT REPORT RELATING FOR A REQUEST FOR A

17   NAVIGAT-2100 FROM A COMPANY CALLED TIMCO MARINE?

18   **A.**    YES, I DO.

19   **Q.**    DO YOU RECALL THE EXACT DATE THAT WAS?

20   **A.**    DECEMBER 18TH, 2012.

21   **Q.**    AND HOW DID THAT SUSPICIOUS CONTACT REPORT COME TO YOU?

22   **A.**    IT CAME IN THE FORM OF AN EMAIL FROM A SALES MANAGER

23   LOCATED IN GEORGIA BY THE NAME OF DAVE GARRETT.

24   **Q.**    WERE YOU FAMILIAR WITH DAVE GARRETT?

25   **A.**    YES, WE WORKED TOGETHER FOR SEVERAL YEARS PRIOR TO THAT.

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   **Q.**    AND IN THAT EMAIL DID HE ASK YOU TO ACT UPON THE

2   SUSPICIOUS CONTACT REPORT?

3   **A.**    YES.

4   **Q.**    DID HE PROVIDE YOU INFORMATION OF WHY HE BELIEVED THAT

5   WAS A SUSPICIOUS CONTACT?

6   **A.**    YES.  I BELIEVE HIS WORDS --

7   **Q.**    JUST YES OR NO IS FINE.

8   **A.**    YES.

9   **Q.**    DID HE ALSO PROVIDE YOU WITH WHAT YOU CALL, I GUESS, AN

10  END USER STATEMENT?

11  **A.**    YES.

12  **Q.**    LET ME SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S

13  EXHIBIT 451 FOR IDENTIFICATION.

14          (EXHIBIT 451 MARKED FOR IDENTIFICATION)

15          **MR. CAMDEN:**  YOUR HONOR, JUST TO MAKE SURE THE

16  JURY'S SCREENS ARE NOT GETTING THIS BEFORE IT IS INTRODUCED OR

17  PUBLISHED.

18          **THE COURT:**  ARE THEY COMING UP ON YOUR SCREEN?

19          **THE JURY PANEL:**  YES.

20          **THE CLERK:**  SHOULD BE OFF NOW.

21          **THE COURT:**  PERHAPS WE CAN TAKE IT DOWN.

22          **THE CLERK:**  IS IT STILL ON?

23          **THE COURT:**  IT IS OFF NOW?

24          **THE JURY PANEL:**  YEAH.

25  **Q.**    **(MR. HARRIGAN)** DO YOU RECOGNIZE --

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1          **MR. HARRIGAN:**  I WAS TOLD SHE WAS GOING TO CONTROL

2    IT.

3               I APOLOGIZE, YOUR HONOR.  DOES YOUR CLERK WANT TO

4    CONTROL WHEN IT IS PUBLISHED?

5          **THE COURT:**  PERHAPS IF COUNSEL CAN DO THAT, THAT

6    MIGHT BE THE MOST DIRECT WAY, IF YOU ARE COMFORTABLE WITH THAT

7    DEVICE.

8          **MR. HARRIGAN:**  NO, I AM NOT RIGHT NOW BECAUSE I WAS

9    TOLD I WASN'T TO TOUCH IT.  BUT I WILL FIGURE IT OUT.  LET ME

10   CONTINUE AND ASK QUESTIONS.

11         **THE COURT:**  YES.

12   **Q.**   **(MR. HARRIGAN)** DO YOU RECOGNIZE THAT EMAIL?

13   **A.**   YES, I DO.

14   **Q.**   OKAY.  HOW IS IT YOU RECOGNIZE IT?

15   **A.**   IT IS ADDRESSED TO ME.  IT HAS GOT MY EMAIL ADDRESS.

16   AND I HAVE SEEN IT QUITE A FEW TIMES.

17   **Q.**   AND IS THAT THE EMAIL YOU JUST REFERRED TO?

18   **A.**   YES, IT IS.

19   **Q.**   LET ME ASK YOU THIS QUESTION.  WAS IT SENT AT OR NEAR

20   THE TIME OF DECEMBER 18TH?

21   **A.**   YES.

22   **Q.**   THE EVENTS RECORDED ON THAT EMAIL?

23   **A.**   YES.

24   **Q.**   YOU RECEIVED IT AT THE TIME?

25   **A.**   YES.

APRIL 13, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   **Q.**    AND WAS IT SENT BY SOMEONE WHO WOULD HAVE KNOWLEDGE OF

2   THE EVENTS?

3   **A.**    YES.

4   **Q.**    WAS IT SENT IN THE COURSE OF NORTHROP GRUMMAN BUSINESS

5   ACTIVITY?

6   **A.**    YES.

7   **Q.**    THAT IS, DID YOU HAVE A DUTY, AS A FORENSIC -- AS YOUR

8   FACILITY'S SECURITY OFFICER, TO REPORT AND MAINTAIN

9   COMMUNICATIONS REGARDING SUSPICIOUS CONTACT REPORTS?

10  **A.**    YES.

11  **Q.**    WAS IT A REGULAR PRACTICE OF NORTHROP GRUMMAN AND YOU TO

12  SEND OR RECEIVE EMAILS TO REPORT THIS TYPE OF EVENT?

13  **A.**    YES, IT WAS OUR PRACTICE.

14  **Q.**    ALL RIGHT.  AND YOU MAINTAINED THIS.

15  **A.**    YES.

16  **Q.**    ALL RIGHT.

17          **MR. HARRIGAN:**  AT THIS POINT IN TIME I WOULD MOVE TO

18  PUBLISH TO THE JURY, YOUR HONOR.

19          **THE COURT:**  ANY OBJECTION?

20          **MR. CAMDEN:**  NO PROBLEM WITH FOUNDATION, BUT

21  HEARSAY.

22          **THE COURT:**  LET ME RESERVE ON THAT.  WE WILL DISCUSS

23  IT IN JUST A MOMENT.  IT IS 4:30, SO WE WILL GO AHEAD AND

24  RECESS FOR THE AFTERNOON.

25          TOMORROW WE WILL PICK UP AT 8:30, SO IT WILL BE AN

APRIL 13, 2015

```
 1    8:30 TO 2:00 SCHEDULE.  YOU DON'T NEED TO CHECK INTO THE JURY

 2    CONFERENCE AREA DOWNSTAIRS, YOU CAN REPORT DIRECTLY HERE.

 3           IF YOU WANT TO BRING SOMETHING TO CONSUME DURING THE

 4    BREAK YOU ARE WELCOME TO DO THAT, AND WE CAN LET YOU IN A

 5    LITTLE EARLY SO YOU CAN PUT THINGS IN THE REFRIGERATOR OR GET

 6    ORIENTED IN THE JURY LOUNGE.

 7           PLEASE KEEP IN MIND THE ADMONITIONS NOT TO DISCUSS

 8    THE CASE, FORM OR EXPRESS ANY OPINIONS OR CONCLUSIONS.

 9           ONE REQUEST OF JUROR NO. 3, (NAME REDACTED), WOULD

10    YOU INQUIRE OF YOUR EMPLOYER AND -- YOU HAVE THE PAYMENT

11    ISSUE, THE THREE-DAY PAY ISSUE.

12           JUROR:  YES.

13           THE COURT:  AND MAKE A REQUEST ON THE COURT'S BEHALF

14    THAT THEY PAY FOR THE DURATION OF THIS TRIAL, WHICH AGAIN WE

15    EXPECT TO CONCLUDE SOMETIME LATE NEXT WEEK.

16           IF THAT DOESN'T WORK, WILL YOU LET ME KNOW AND THEN

17    I WILL FOLLOW UP --

18           JUROR:  YES.

19           THE COURT:  -- MYSELF.

20           JUROR:  YES.

21           THE COURT:  THANK YOU VERY MUCH.  HAVE A NICE

22    AFTERNOON, NICE EVENING, AND WE WILL SEE YOU ALL TOMORROW

23    MORNING AT 8:30.

24           (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

25           OPEN COURT, OUT OF THE HEARING OF THE JURY)
```

APRIL 13, 2015

```
 1              THE COURT:  WE ARE OUTSIDE THE PRESENCE OF THE JURY.

 2         WE CAN EXCUSE THE WITNESS PENDING TOMORROW'S

 3    TESTIMONY?

 4              MR. HARRIGAN:  YES.

 5              THE COURT:  THANK YOU VERY MUCH.

 6         ON THE EXHIBIT THAT WAS PROPOSED.  FIRST, WE ARE

 7    GETTING MORE AND MORE DISCUSSION.  I WOULD ASK COUNSEL SIMPLY

 8    TO STATE THE WORD OBJECTION AND GIVE ME THE LEGAL GROUNDS.

 9              THE TENTATIVE WOULD BE TO OVERRULE THE OBJECTION IN

10    THAT IT HAS A NON-HEARSAY PURPOSE.  IT IS NOT NECESSARILY

11    OFFERED FOR ITS TRUTH BUT SIMPLY AS A STATEMENT THAT WAS MADE

12    TO THIS WITNESS.  HE TOOK THAT INFORMATION, AND ACCORDING TO

13    HIS TESTIMONY IT RAISED HIS SUSPICION.

14              DO YOU SUBMIT ON THAT, OR IS THERE SOME OTHER

15    ASPECT?

16              MR. CAMDEN:  IN FACT, I THINK A LARGE PORTION WAS

17    ACTUALLY NOT HEARSAY JUST BECAUSE IT SAYS PLEASE SEE ATTACHED

18    AND LET ME KNOW YOUR THOUGHTS.  THAT IS A REQUEST, NOT AN

19    ASSERTION.

20              WHAT IS CONCERNING IS THE STATEMENT:  NOT A TYPICAL

21    PLATFORM FOR THE NAVIGAT-3000.  THAT IS A STATEMENT BY DAVID

22    GARRETT OUT OF COURT THAT -- IT COULD BE EITHER REDACTED OR

23    THERE COULD BE A LIMITING INSTRUCTION TO MAKE SURE THE JURY

24    DOESN'T TAKE THAT AS EVIDENCE THAT THIS ACTUALLY ISN'T A

25    PLATFORM FOR THE NAVIGAT-3000.
```

APRIL 13, 2015

1    **THE COURT:**  WHETHER IT IS TRUE OR NOT, THOUGH, I

2   THINK WHAT THE WITNESS IS GOING TO SAY IS IT CAUSED SUSPICION

3   ON THE WITNESS'S PART.  SO IN THAT RESPECT IT IS NOT OFFERED

4   FOR ITS THE TRUTH.  AM I MISSING --

5    **MR. HARRIGAN:**  NO, EXACTLY, YOUR HONOR.  I THINK WE

6   WILL HAVE EVIDENCE THAT LATER TIES THAT THE DEFENDANT RECEIVED

7   THAT MESSAGE BECAUSE HE WROTE AN EMAIL TO MR. TAHERKHANI AND

8   SAID THE SECURITY GROUP VETTED IT, THEY SAID IT WAS LIKE

9   PUTTING A MERCEDES ENGINE INTO A TRICYCLE.

10    **THE COURT:**  OKAY.  I WILL STAND ON THAT RULING.

11    ON THE LARGER ISSUE OF EXHIBIT 401 AND EXHIBIT

12   402 -- AND I NOW READ THE MELENDEZ-DIAZ.  IT DOES SEEM TO ME

13   THAT THAT CASE IS CONTROLLING.  AND THAT THIS WITNESS, GIVEN

14   WHAT SHE SAID, MS. MILLER, SHE CANNOT SATISFY THE PERSONAL

15   KNOWLEDGE COMPONENT.  SHE WAS ALMOST READY TO READ THE

16   DOCUMENT.

17    **MR. COUGHLIN:**  LET ME SAY ONE THING BEFORE WE START.

18   I WOULD SAY THAT I THINK THIS IS DIFFERENT.  I THINK THIS CASE

19   THAT COUNSEL HAS PROVIDED TO US HAS TO GO TO THE LAB REPORTS

20   THAT ARE PREPARED BY ANALYSTS AND THAT SORT OF THING AND THEY

21   ARE PREPARED SPECIFICALLY FOR TRIAL.

22    THIS PARTICULAR REPORT, THE LETTERS 401, 402, ARE

23   NOT PREPARED SPECIFICALLY FOR TRIAL, THEY ARE ACTUALLY PART OF

24   THE AGENCY'S NORMAL EVERYDAY PROCESS IN ADJUDICATING A

25   DETERMINATION OF WHETHER THERE IS A LICENSE NEEDED OR NOT.

APRIL 13, 2015

245

```
1    AND SO IT IS DIFFERENT AND DISTINGUISHABLE FROM A DOCUMENT

2    THAT IS PREPARED, IN AND OF ITSELF, FOR TRIAL.

3              AND THAT IS WHAT I WOULD SAY AS TO THIS

4    PARTICULAR -- BOTH 401 AND 402 SIMPLY WERE LICENSING CHECKS

5    AND HISTORY CHECKS.  AND THE WITNESS WOULD TESTIFY THOSE ARE

6    DONE REGULARLY AND THEY ARE NOT DONE WITH THE ANTICIPATION

7    THAT THIS IS GOING TO BE PART AND PRESENTED AS PART OF A TRIAL

8    IN CONNECTION WITH THIS.  I THINK THAT DISTINCTION --

9              THE COURT:  WHAT ABOUT THE FACT THAT THEY ARE

10   WRITTEN TO MR. HARRIGAN AND MS. DUFFY?  SO IT SEEMS TO ME --

11             MR. COUGHLIN:  I UNDERSTAND IN THIS PARTICULAR CASE

12   IT WAS THE U.S. ATTORNEY'S OFFICE MAKING THE REQUEST, BUT THAT

13   DOESN'T CHANGE THE FACT THAT IF THE HEAD OF THE AGENCY HAS TO

14   COME OUT EVERY TIME -- THIS IS A SIMILAR ARGUMENT THAT WAS

15   MADE IN THE CASE THAT THEY HAVE CITED.  BUT IN THIS PARTICULAR

16   CASE THIS IS THE AGENCY'S ROLE TO MAKE DETERMINATIONS AS TO

17   LICENSING, SO IT IS THE AGENCY TALKING AND THAT IS WHY IT IS

18   CERTIFIED.  IT IS JUST NOT A LETTER, IT IS A CERTIFIED LETTER

19   FROM THE AGENCY.

20             THE COURT:  THE FACT, THOUGH, THAT IT IS BEING

21   CERTIFIED IS SIGNIFICANT.  AND THAT IS THE CONFRONTATION

22   ISSUE, IS THIS PERSON, MR. FEDDO, IS CERTIFYING THAT

23   MR. GHAHREMAN, AMONG OTHERS, DOESN'T HAVE A LICENSE.

24             MR. COUGHLIN:  THAT IS CORRECT.

25             THE COURT:  THERE IS NO APPLICATION.
```

APRIL 13, 2015

```
1          AND THE WITNESS DOESN'T KNOW THAT.  SHE SIMPLY KNOWS

2    THAT EXHIBITS 401 AND 402 SAY THAT.  SHE DIDN'T ACTUALLY DO

3    THE WORK WHERE SHE CAN COME IN AND SAY, I RAN THE RECORDS AND

4    IN FACT MR. GHAHREMAN NEVER APPLIED FOR A LICENSE.

5          SO IT DOES SEEM TO ME -- I KNOW IT IS A BURDEN.  BUT

6    THE AGENCY APPARENTLY HAS MADE A DECISION THAT THE ASSISTANT

7    DIRECTOR IS GOING TO SIGN THESE RATHER THAN SOMEONE LIKE

8    MS. MILLER.  SO I THINK GIVEN THE OBJECTION --

9          MR. COUGHLIN:  I UNDERSTAND, YOUR HONOR.  THANK YOU.

10         THE COURT:  -- AND MELENDEZ-DIAZ, I WOULD SUSTAIN

11   THE OBJECTION.

12         MR. HARRIGAN:  YOUR HONOR, I GUESS ALL WE ASK IS

13   THAT WE WILL TALK TO MS. MILLER.  WE HAD ACTUALLY -- I WAS

14   UNDER THE MISUNDERSTANDING THE LAST TIME WE TALKED TO HER SHE

15   WAS GOING TO PERSONALLY RUN THE CHECKS -- I THINK BOTH

16   MR. COUGHLIN AND I WERE -- NOT THAT SHE WAS GOING TO LOOK TO

17   SEE WHETHER THE CHECKS WERE RUN.

18         I AM NOT AGREEING NECESSARILY THAT IT WAS REQUIRED

19   BUT MR. COUGHLIN IS CORRECT IN THE DISTINCTION, BUT I WANTED

20   TO EXPLAIN IT WOULD BE OUR REQUEST, IF NOT TOMORROW, TO

21   OPEN -- TO GIVE US LEAVE TO EITHER RE-CALL HER OR CALL

22   SOMEBODY WHO WOULD SATISFY, IF THERE IS A CONFRONTATION CLAUSE

23   PROBLEM, THE ISSUES RAISED BY THE DEFENSE.

24         THE COURT:  YES.  IF THE GOVERNMENT HAS THE WITNESS

25   THAT ACTUALLY RAN THE CHECK, EITHER MR. FEDDO OR SOMEONE ELSE,
```

APRIL 13, 2015

247

1    THEN THEY CAN --

2              **MR. HARRIGAN:**  WE UNDERSTAND --

3              **THE COURT:**  -- SO TESTIFY.

4              **MR. HARRIGAN:**  -- THE COURT'S RULING.  WE APPRECIATE

5    IT.  THANK YOU.

6              **THE COURT:**  THERE WAS A 403 OBJECTION AS TO THE DUAL

7    USE ASPECT OF THE NAVIGAT-2100, AND I OVERRULED THAT

8    OBJECTION.  THE GOVERNMENT'S ARGUMENT, AS I UNDERSTAND IT, IS

9    THAT MR. GHAHREMAN WAS AWARE THAT THERE WAS A DUAL USE FOR

10   BOTH THE Y-690 AND THE NAVIGAT-2100, AND THAT GOES TO HIS

11   KNOWLEDGE?

12             **MR. HARRIGAN:**  YES, HE WAS AWARE THAT THERE WAS

13   BOTH.  I THINK IT IS MORE, WHEN IT WAS RAISED BEFORE, THE

14   FIRST THING THAT -- ONE OF THE FIRST CONVERSATIONS THAT THE

15   UNDERCOVER AGENT HAD WITH HIM WAS, YOU UNDERSTAND THIS IS A

16   DEFENSE CONTRACTOR, NORTHROP GRUMMAN.  YOU CONTACTED A DEFENSE

17   CONTRACTOR.  AND THESE ARE PROBABLY USED ON COAST GUARD TYPE

18   VESSELS.

19             AND I WAS JUST ASKING HIM -- I DIDN'T EXPECT HIM TO

20   TALK ABOUT MILITARIZED, BUT JUST THAT THEY WERE USED ON COAST

21   GUARD VESSELS.  THAT IS ALL I INTENDED TO GET OUT FROM HIM,

22   BORDER PROTECTION TYPE VESSELS.  THAT IS RELEVANT TO, I THINK,

23   MR. GHAHREMAN'S KNOWLEDGE OF THIS.

24             WE ARE NOT SAYING THAT MR. GHAHREMAN INTENDED TO

25   SELL THESE TO THE MILITARY, BUT IT ALSO WAS RELEVANT TO HIS

APRIL 13, 2015

1   GENERAL TESTIMONY.  HE LOOKS AT THINGS FOR WHY IS THIS

2   SUSPICIOUS AND WHERE IS IT GOING.  AND IN ORDER TO EXPLAIN TO

3   THE JURY WHY THIS WAS DENIED, I THINK THAT IS IMPORTANT.

4            I WOULD ALSO ADD THAT WE ARE GOING TO HAVE ACTUALLY

5   AN EXPERT FROM NORTHROP GRUMMAN WHO WILL TALK ABOUT THE

6   VARIOUS USES, THE DUAL USES OF GOODS.

7            **THE COURT:**  IN ARGUMENT YOU ARE NOT GOING TO BE

8   ARGUING THAT THE END USE WAS FOR MILITARY PURPOSES OR THAT MR.

9   GHAHREMAN DIDN'T CARE ONE WAY OR ANOTHER, RATHER YOU ARE

10  ARGUING THAT THE --

11           **MR. HARRIGAN:**  MY ARGUMENT WOULD BE MR. GHAHREMAN

12  DIDN'T CARE ONE WAY OR THE OTHER, REALLY.  AND, YOU KNOW, IT

13  IS NOT, YOU KNOW, BECAUSE --

14           **THE COURT:**  YOU DON'T KNOW, I GUESS, THE END USER.

15  YOU DON'T KNOW WHETHER IT WOULD BE A COMMERCIAL USE OR LATER

16  TURNED INTO A MILITARY USE.

17           **MR. HARRIGAN:**  THAT IS -- YEAH, THAT IS THE CONCERN.

18           **THE COURT:**  ALL RIGHT.  I AM GOING TO STAND ON THAT

19  RULING.  THIS DUAL USE ISSUE IS NOT SUBSTANTIALLY OUTWEIGHED

20  BY UNDUE OR UNFAIR PREJUDICE.  IT IS INEXTRICABLY INTERTWINED

21  WITH THE FACTS OF THE CASE.  AND I AM ALWAYS RELUCTANT TO JUST

22  ARTIFICIALLY START CARVING OUT THE REAL WORLD EVIDENCE, THE

23  REAL CASE EVIDENCE.

24           THE REALITY IS THE NAVIGAT-2100 IS A DUAL USE

25  DEVICE.  THE PROFFER IS THAT MR. GHAHREMAN KNEW THAT.  THAT IS

APRIL 13, 2015

1    RELEVANT TO KNOWLEDGE.  WHAT ACTUALLY HAPPENS WHEN THESE

2    DEVICES ARE SOLD, EVEN IF THE MIDDLE PERSON BELIEVES IT IS

3    GOING TO A COMMERCIAL USER, HE OR SHE DOESN'T KNOW REALLY

4    WHERE IT IS GOING TO END UP.  IT COULD BE FOR COMMERCIAL USE

5    AND THEN A DAY LATER SOLD TO THE MILITARY.

6         SO I THINK, GIVEN THE PROFFER AS TO WHAT MR.

7    GHAHREMAN WAS TOLD, THAT IT IS A DUAL USE OR HAS MILITARY

8    ASPECTS TO IT, MAKES THIS ISSUE RELEVANT TO HIS KNOWLEDGE.  IT

9    IS NOT SUBSTANTIALLY OUTWEIGHED BY UNDUE OR UNFAIR PREJUDICE.

10        THE GOVERNMENT, AS MR. HARRIGAN HAS JUST POINTED

11   OUT, IS NOT GOING TO ARGUE THAT MR. GHAHREMAN WAS THE BROKER

12   FOR THESE PRODUCTS FOR THE MILITARY.  I THINK THE ARGUMENT IS

13   A FAIR ONE THAT, FROM THE GOVERNMENT'S PERSPECTIVE, MR.

14   GHAHREMAN DIDN'T CARE.  HE WAS AWARE THAT IT HAD DUAL USE

15   PURPOSES, HE WAS SIMPLY BROKERING THE DEAL TO MAKE MONEY.

16   THAT IS THE GOVERNMENT'S PERSPECTIVE.  BUT I WOULD NOT FIND

17   THAT THAT IS UNDUE OR UNFAIR.

18        **MR. CAMDEN:**  IF I COULD JUST -- I THINK THE

19   GOVERNMENT'S CLARIFICATION THAT IT -- MR. GHAHREMAN -- THEIR

20   POSITION IS THAT HE KNEW BUT DIDN'T CARE JUST MAKES IT ALL

21   THAT MUCH LESS RELEVANT.  SO IT DOESN'T MATTER IF IT IS DUAL

22   USE OR NOT, THEIR GOAL IS TO SHOW THAT HE KNEW THAT IT WAS

23   GOING TO THE TERRITORY OF IRAN OR THE GOVERNMENT OF IRAN.

24        I THINK THE COURT CAN UNDERSTAND A LOT OF MY

25   CONCERNS ARE COMING FROM WHAT MS. FLORES SAID THIS MORNING IN

APRIL 13, 2015

```
 1    VOIR DIRE, THAT IMMEDIATELY AS SOON AS SHE HEARS MARINE
 2    NAVIGATION EQUIPMENT AND MILITARY ELECTRONICS IN IRAN SHE
 3    THINKS -- YOU KNOW, SHE HAD A VERY EMOTIONAL, VISCERAL
 4    REACTION.  WHETHER OR NOT IT WAS SINCERE I DON'T KNOW.  BUT
 5    THE REST OF THE JURY HEARD THAT AS WELL.  SO I AM TRYING TO
 6    MITIGATE AS MUCH AS POSSIBLE, DURING THE COURSE OF THE TRIAL,
 7    THAT EMOTIONAL RESPONSE OR THAT PROBLEM, THAT BACKGROUND
 8    EMOTIONAL PROBLEM.
 9            ANOTHER POINT I JUST WANT TO MAKE CLEAR, IT DOESN'T
10    MATTER, IN THE END, WHETHER THE GOVERNMENT MAKES AN ARGUMENT
11    RELATED TO THAT OR NOT, THINGS CAN HAVE AN INDEPENDENT
12    SIGNIFICANCE TO THE JURY OR AN AFFECT OR PREJUDICE IF IT
13    AFFECTS THE JURY'S DETERMINATION REGARDLESS OF WHETHER THE
14    GOVERNMENT SPECIFICALLY ARGUES IT OR NOT.
15            THAT WAS THE WHOLE ISSUE -- I MEAN, THAT IS GOING
16    BACK STRAIGHT TO OLD CHIEF.  THE GOVERNMENT PUT IT IN FOR ONE
17    PURPOSE AND SAID, WE ARE NOT TRYING TO CREATE PREJUDICE; BUT
18    THE SUPREME COURT SAID REGARDLESS OF WHETHER YOU JUST WANT TO
19    LIMIT IT TO THAT USE, THE JURY HEARS IT, AND YOU CAN'T UN-HEAR
20    THAT, AND YOU CAN'T PREVENT THE JURY FROM HAVING AN EMOTIONAL
21    OVERREACTION TO THE INFORMATION.
22            **THE COURT:**  IT MAY BE THAT THIS AREA WILL WARRANT
23    ADDITIONAL INSTRUCTION OR ADMONITION, BUT AT THIS POINT,
24    SIMPLY GIVEN THE CHARGES AT ISSUE AND THE ELEMENTS AT ISSUE,
25    SPECIFICALLY KNOWLEDGE, IT SEEMS TO ME DUAL USE IS RELEVANT TO
```

APRIL 13, 2015

1   THAT.

2            SO AT THIS JUNCTURE I WOULD OVERRULE THE OBJECTION.

3   AND, OF COURSE, THAT IS ANOTHER REASON WHY I ASKED COUNSEL TO

4   MAKE THE OBJECTION AS WE GO ALONG, SO THAT WE CAN REVISIT THIS

5   IN REAL TIME.

6            ON THE Y-690 ISSUE, IN OPENING MR. JOHNSTON

7   REFERENCED THAT AGENT COLE INTENTIONALLY --

8            **MR. HARRIGAN:**  LIED.

9            **THE COURT:**  -- MISLED MR. GHAHREMAN.

10           **MR. HARRIGAN:**  RIGHT.

11           **MR. JOHNSTON:**  ALL I SAID THAT HE LIED ABOUT THE

12   TRUE REGULATIONS.  THE TRUTH IS THAT THOSE REGULATIONS DON'T

13   EXIST FOR THE Y-690.

14           **THE COURT:**  I WAS UNDER THE IMPRESSION THAT HE WAS

15   MISTAKEN, AND THE MISTAKE WAS ATTRIBUTED TO --

16           **MR. HARRIGAN:**  BOTH THE STATE DEPARTMENT AND THE

17   MANUFACTURER WILL TESTIFY.

18           **THE COURT:**  YES.  HE WAS RELYING ON TOM COX.

19           **MR. HARRIGAN:**  WHICH WAS MADE CLEAR IN THE TRIAL

20   MEMO.

21           **MR. JOHNSTON:**  WELL, I AM NOT SURE ABOUT THE TRIAL

22   MEMO, YOUR HONOR.  THERE WASN'T ANY INVESTIGATION OR ANY OTHER

23   DISCOVERY THAT SAYS THAT HE WAS RELYING ON THIS DETERMINATION.

24   WE SIMPLY HAVE THE AUDIO AND THE VIDEO OF HIM REPEATEDLY

25   SAYING THIS THING --

                            APRIL 13, 2015

252

1          **THE COURT:**  LET ME ASK THIS, BECAUSE I WAS TRYING TO

2    FASHION A LIMITING INSTRUCTION SOMETHING ALONG THESE LINES.

3    LET ME READ IT, AND THEN COUNSEL CAN THINK ABOUT IT.  I TOOK

4    WHAT MR. CAMDEN PROPOSED AND I MODIFIED IT SLIGHTLY.

5          BEFORE THE NEXT WITNESSES TESTIFY THERE ARE A

6    FEW POINTS THAT YOU SHOULD KEEP IN MIND AS YOU LISTEN TO THE

7    TESTIMONY.  YOU WILL HEAR STATEMENTS FROM HOMELAND SECURITY

8    UNDERCOVER AGENT DAVID COLE TO ARASH GHAHREMAN THAT HE MADE --

9    OR THAT HE ASSERTED, INADVERTENTLY OR BY MISTAKE, THAT THE

10   Y-690 TRIODE TUBES ARE CLASSIFIED AS MUNITIONS BY THE UNITED

11   STATES GOVERNMENT, AND THAT THE Y-690 TRIODE TUBES REQUIRE AN

12   EXPORT LICENSE NO MATTER WHERE THEY ARE TO BE SENT.  THE

13   Y-690'S, HOWEVER, ARE NOT CLASSIFIED AS MUNITIONS BY THE

14   UNITED STATES GOVERNMENT AND DO NOT REQUIRE AN EXPORT LICENSE

15   TO BE SENT TO A THIRD COUNTRY, SUCH AS PANAMA OR THE CZECH

16   REPUBLIC.  HOWEVER, AS I WILL INSTRUCT YOU AT THE END OF THE

17   CASE, IT IS ILLEGAL TO WILLFULLY EXPORT ANY GOODS, INCLUDING

18   Y-690'S, DIRECTLY OR INDIRECTLY, TO THE COUNTRY OF IRAN OR THE

19   GOVERNMENT OF IRAN WITHOUT A LICENSE.  SO YOU MAY NOT PRESUME

20   FROM THIS EVIDENCE THAT IF MR. GHAHREMAN BELIEVED THE Y-690'S

21   REQUIRED A LICENSE FOR EXPORT TO ANY COUNTRY THAT HE ALSO

22   INTENDED THE Y-690'S TO BE EXPORTED TO IRAN SPECIFICALLY.

23          **MR. JOHNSTON:**  FOR OUR PART, YOUR HONOR, I WOULD

24   HAVE NO OBJECTION.  WHETHER IT WAS INTENTIONAL OR MISTAKEN OR

25   NOT I THINK THE COURT CAN SIMPLY SAY THAT HE MISSTATED THAT

APRIL 13, 2015

1    THESE THINGS WERE EXPORT RESTRICTED, AND THEN THERE IS NO

2    ISSUE OF INTENTIONALLY.  IT IS NOT SAYING, ONE WAY OR THE

3    OTHER.

4            I AM NOT SURE THE EVIDENCE, HOW IT WILL PLAY OUT,

5    WHAT HE WILL SAY ON THE STAND, HE SINCERELY BELIEVED THIS,

6    WHETHER HE INDEED SAW THE SAME REPORTS THAT AGENT HAMAKO HAS

7    REPORTED ON.  BUT ALL WE NEED TO SAY IS HE MISTAKENLY SAID

8    THESE THINGS WITHOUT GETTING INTO INTENTIONALITY.  THEN SEE

9    WHAT THE EVIDENCE SHOWS ON THAT.

10           **MR. HARRIGAN:**  I THINK AFTER HIS OPENING STATEMENT

11   THE INSTRUCTION YOUR HONOR SUGGESTS EVEN MISTAKENLY -- HE

12   WASN'T EVEN MISTAKEN.  THIS IS WHAT HAPPENS ALL THE TIME IN

13   DEALING WITH ITAR COMPONENTS IS YOU GET A FIRST-LEVEL

14   DETERMINATION AND YOU GET A DETERMINATION FROM THE

15   MANUFACTURER, AND SOMETIMES BY THE TIME OF THE FINAL

16   DETERMINATION IT IS NOT THE SAME.  SO HE WAS ACTING ON

17   INFORMATION THAT WAS PROVIDED BY THE STATE DEPARTMENT THAT WAS

18   CORRECT AT THE TIME.

19           AND MR. JOHNSTON CAN SAY ALL HE WANTS, BUT HE KNEW

20   THAT.  WE TALKED ABOUT THIS AD NAUSEAM.  BUT PUTTING THAT

21   ASIDE, TO SUGGEST THAT -- THE ISSUE I GUESS I HAVE WITH IT, I

22   WILL HAVE TO READ IT, IS THAT IT SUGGESTS THAT THEY CAN'T

23   CONSIDER HIS WILLINGNESS TO VIOLATE ARMS EXPORT CONTROL ACT IS

24   RELEVANT.  IT IS RELEVANT TO HIS WILLFULNESS.

25           AND I SHOULD BE ABLE TO ARGUE, AS WE TALKED ABOUT

APRIL 13, 2015

```
1    LAST WEEK THAT, YOU KNOW, SURE, YOU KNOW, THE STATE DEPARTMENT
2    WAS WRONG, BUT HERE IS A GUY WHO WAS TOLD IT WAS MILITARY
3    ELECTRONICS, ALL RIGHT, AND IT NEEDED A LICENSE.  AND AS
4    EVIDENCE THAT HE WAS NEVER INTENDING TO GET ANY SORT OF A
5    LICENSE, FROM OFAC OR ANYBODY, JUST GO AHEAD AND GIVE HIM THE
6    FALSE END USER.  I THINK THAT IS AN APPROPRIATE ARGUMENT.
7            THE COURT:  YOUR REQUEST IS --
8            MR. HARRIGAN:  IT IS EVIDENCE OF HIS WILLFULNESS.
9    SO AS LONG AS WE CAN QUALIFY THAT, I DON'T HAVE A PROBLEM WITH
10   THEM -- I KNOW WHAT THEY WANT TO SAY IS THEY WANT TO SAY,
11   LOOK, YOU KNOW -- AND WE WOULDN'T ARGUE THAT IT WAS UNLAWFUL
12   UNDER ITAR.  WE WOULD HAVE CHARGED IT IF IT WOULD HAVE BEEN.
13   BUT IT IS STILL RELEVANT EVIDENCE TO HIS WILLFULNESS.  HIS
14   WILLFULNESS, HIS WILLINGNESS TO VIOLATE THE LAW.
15           THE COURT:  SO YOUR REQUEST IS THAT THE LAST
16   SENTENCE WOULD NOT BE GIVEN.
17           MR. HARRIGAN:  YES.  AND I THINK I WOULD SAY HE
18   INCORRECTLY STATED BASED ON INFORMATION PROVIDED BY.  BECAUSE
19   THAT IS WHAT HE IS GOING TO SAY, HE IS GOING TO SAY IT WAS
20   BOTH THE MANUFACTURER'S CERTIFICATION AND BOTH THE STATE
21   DEPARTMENT.  I TALKED TO DEFENSE COUNSEL ABOUT THIS ON
22   NUMEROUS OCCASIONS.  SO THAT IS WHAT HE WOULD SAY.  IT IS NOT
23   THAT, I WAS MISTAKEN, YOU KNOW, I READ THE WRONG EMAIL; IT IS
24   WHAT HE WAS TOLD AND IT IS JUST HOW THINGS WORK.
25           MR. CAMDEN:  YOUR HONOR, IF I COULD BRIEFLY.
```

APRIL 13, 2015

1          **THE COURT:**  YES.

2          **MR. CAMDEN:**  THERE IS GOING TO BE A CROSS ON THOSE

3     TOPICS.  I THINK AGENT HAMAKO WAS INVOLVED IN THE INITIAL

4     DETERMINATION LETTER, PROBABLY WITH THE UNDERCOVER AGENT,

5     ABOUT WHETHER HE LIED OR NOT.  SO IN ORDER TO AVOID HAVING TO

6     GET INTO THAT JUST A STATEMENT THAT YOU WILL HEAR STATEMENTS

7     THAT THE UNDERCOVER OFFICER MADE TO MR. GHAHREMAN ASSERTING

8     THAT -- DOESN'T HAVE TO BE MISTAKENLY ASSERTING OR NEGLIGENTLY

9     ASSERTING, JUST ASSERTING THAT THE Y-690'S WERE MUNITIONS.  IN

10    FACT THEY ARE NOT MUNITIONS.

11          I DON'T EVEN INCLUDE -- OR OBJECT TO THEM BEING TOLD

12    THAT THE OFFICERS ARE ALLOWED TO MAKE -- THE MODEL JURY

13    INSTRUCTION SAY OFFICERS ARE ALLOWED TO BE DECEPTIVE.  WE

14    DON'T EVEN NEED THAT, JUST THEY ARE ALLOWED TO MAKE STATEMENTS

15    THAT ARE NOT TRUE TO THE SUBJECTS IN THE INVESTIGATION.

16          BUT THIS ALL GOES BACK TO -- I MEAN, WE ARE GOING TO

17    HAVE TO HAVE THIS ARGUMENT SOONER OR LATER.  I HAVEN'T HAD A

18    CHANCE TO WRITE IT UP IN BRIEFING, WHICH I AM GOING TO DO FOR

19    OUR JURY INSTRUCTIONS, ABOUT HOW BROAD THE WILLFULNESS INTENT

20    IS.

21          THE GOVERNMENT SEEMS TO THINK THAT IT IS JUST AN

22    INTENT TO VIOLATE ANY LAW, AND THEN THE REST -- THAT SATISFIES

23    THE MENS REA OF THE STATUTE.  AND THEY CITED A COUPLE OF

24    SECTIONS OF MOUSAVI, IS THE CASE, THAT SAY THAT THE DEFENDANT

25    MUST KNOW THAT HIS CONDUCT IS UNLAWFUL, HE DOESN'T NEED TO

APRIL 13, 2015

1    KNOW ABOUT THE PARTICULAR LICENSING REQUIREMENTS.

2           BUT IF YOU GO BACK UP ABOUT THREE SENTENCES BEFORE

3    IT SAYS THAT THIS WHOLE CONCERN IS OBVIATED BY THE NEED FOR

4    THE GOVERNMENT TO PROVE THAT THE DEFENDANT KNEW THE GOODS WERE

5    GOING TO IRAN, OR SOME SIMILAR PHRASE.  I DON'T HAVE THE CASE

6    IN FRONT OF ME RIGHT NOW.

7           SO MOUSAVI CANNOT POSSIBLY BE READ AS BROADLY AS THE

8    GOVERNMENT IS TRYING TO ARGUE, THAT JUST THE INTENT TO VIOLATE

9    ANY LAW, EVEN IF IT IS A DIFFERENT LAW THAN THE ONE THAT IS

10   CHARGED, IS ENOUGH FOR A WILLFUL VIOLATION OF IEEPA.  A

11   WILLFUL VIOLATION OF IEEPA HAS TO BE AN INTENTIONAL VIOLATION

12   OF THE STATUTES THEY NAMED.

13          NOW, HE DOESN'T HAVE TO KNOW -- HE DOESN'T HAVE TO

14   HAVE READ THE STATUTES OR READ ALL OF THE LICENSE EXCEPTIONS

15   AND KNOW EXACTLY WHERE HE STANDS LEGALLY, GENERAL KNOWLEDGE OF

16   THE PROHIBITION AGAINST EXPORT TO IRAN AND AN INTENT TO

17   VIOLATE THAT PARTICULAR PROVISION IS ENOUGH.  BUT IT STILL HAS

18   TO BE EXPORT TO IRAN AND NOT EXPORT TO ANY COUNTRY BECAUSE IT

19   IS A MUNITION, WHICH WOULD BE A SEPARATE STATUTE.

20          SO THAT IS OUR POSITION ON THAT.

21          **THE COURT:**  I WILL TAKE A LOOK AT IT AGAIN TONIGHT,

22   AND LET'S MEET TOMORROW MORNING, PERHAPS AT 8:25, AND WE CAN

23   CLOSE OUT THIS ISSUE.

24          ARE THESE WITNESSES GOING TO BE TESTIFYING TOMORROW,

25   COLE AND COX?

APRIL 13, 2015

1          **MR. HARRIGAN:**  MR. COX WILL TESTIFY TOMORROW, AND

2    MR. COLE WILL FOLLOW HIM.  BEFORE THAT WE EXPECT TO CALL

3    MR. MAGNER FROM NORTHROP GRUMMAN.

4          **THE COURT:**  YES.

5          **MR. HARRIGAN:**  I BELIEVE THAT MR. COLE WILL TESTIFY

6    TOMORROW, AGENT COLE.  I AM HOPEFUL.

7          **THE COURT:**  VERY GOOD.

8          **MR. HARRIGAN:**  THANK YOU, YOUR HONOR.

9          **THE COURT:**  YOU ARE WELCOME.

10

11                              *   *   *

12          I CERTIFY THAT THE FOREGOING IS A CORRECT
           TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
13          IN THE ABOVE-ENTITLED MATTER.

14          S/LEEANN PENCE                      6/6/2015

15          LEEANN PENCE, OFFICIAL COURT REPORTER   DATE

16

17

18

19

20

21

22

23

24

25

                          APRIL 13, 2015

INDEX OF WITNESSES

MILLER, MOLLY J.

  BY MR. COUGHLIN   185                     217

  BY MR. CAMDEN                 208

TOPCZEWSKI, GREG

  BY MR. HARRIGAN   218

APRIL 13, 2015

```
 1
 2
 3                        INDEX OF EXHIBITS
 4
 5    EXHIBIT     IDENTIFIED RECEIVED
 6
 7      401         202
 8       A          211
 9       B          213
10       C          217
11     501          227        228
12     451          239
13
14
15
16
17
18
19
20
21
22
23
24
25
```

APRIL 13, 2015