UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>          PLAINTIFF,<br><br><br><br>ARASH GHAHREMAN,<br>          DEFENDANT. | ) <br>)  CASE NO. 13CR4228-DMS<br>)<br>)  SAN DIEGO, CALIFORNIA<br>)TUESDAY, APRIL 14, 2015<br>)   8:30 A.M. CALENDAR<br>)<br>)<br>)<br>)      VOLUME II |

_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL/DAY TWO

INTERPRETERS:                    BADI BADIOZAMANI
                                 ASLAN ASLANIAN


REPORTED BY:                     LEE ANN PENCE,
                                 OFFICIAL COURT REPORTER
                                 UNITED STATES COURTHOUSE
                                 333 WEST BROADWAY ROOM 1393
                                 SAN DIEGO, CALIFORNIA 92101

```
COUNSEL APPEARING:

FOR PLAINTIFF:          LAURA E. DUFFY,
                        UNITED STATES ATTORNEY
                        BY:  SHANE P. HARRIGAN
                             TIMOTHY D. COUGHLIN
                        ASSISTANT U.S. ATTORNEYS
                        880 FRONT STREET
                        SAN DIEGO, CALIFORNIA 92101

FOR DEFENDANT           FEDERAL DEFENDERS OF SAN DIEGO, INC.
GHAHREMAN:                   BY:  ELLIS M. JOHNSTON
                                  JOSEPH S. CAMDEN
                        TRIAL ATTORNEYS
                        225 BROADWAY, SUITE 900
                        SAN DIEGO, CALIFORNIA 92101
```

TOPCZEWSKI – DIRECT EXAMINATION

1   SAN DIEGO, CALIFORNIA – TUESDAY, APRIL 14, 2015 – 8:30 A.M.

2                              *   *   *

3            **THE CLERK:**  CALLING NO. 1 ON CALENDAR, CASE NO.

4   13CR4228, UNITED STATES OF AMERICA VERSUS ARASH GHAHREMAN; ON

5   FOR JURY TRIAL, DAY TWO.

6            **THE COURT:**  GOOD MORNING.

7            **MR. HARRIGAN:**  GOOD MORNING, YOUR HONOR.

8            **THE COURT:**  GOOD MORNING, LADIES AND GENTLEMEN.

9            WE HAVE ALL JURORS PRESENT, ALL COUNSEL,

10  MR. GHAHREMAN.  WE WILL PICK UP WHERE WE LEFT OFF YESTERDAY

11  WITH THE GOVERNMENT'S WITNESS, MR. TOPCZEWSKI.

12           **MR. HARRIGAN:**  YES, YOUR HONOR.

13           **THE COURT:**  GOOD MORNING, SIR.

14           I WOULD SIMPLY REMIND YOU YOU REMAIN UNDER OATH FROM

15  YESTERDAY'S PROCEEDINGS.

16           **THE WITNESS:**  YES, SIR.

17           **THE COURT:**  THANK YOU.

18           MR. HARRIGAN.

19           **MR. HARRIGAN:**  THANK YOU, YOUR HONOR.

20                    DIRECT EXAMINATION (RESUMED)

21  **Q.**    **(MR. HARRIGAN)** MR. TOPCZEWSKI, I THINK WHERE WE LAST

22  LEFT OFF YOU WERE TESTIFYING ABOUT A SUSPICIOUS CONTACT REPORT

23  YOU RECEIVED DECEMBER 18TH, 2012.

24  **A.**    YES.

25  **Q.**    ALL RIGHT.  AND AGAIN SHOWING YOU WHAT HAS BEEN MARKED

APRIL 14, 2015

261
TOPCZEWSKI – DIRECT EXAMINATION

1   AS GOVERNMENT'S 451 FOR IDENTIFICATION.

2           **MR. COUGHLIN:**  MAY I APPROACH, YOUR HONOR?

3           **THE COURT:**  YES.

4   **Q.**    **(MR. HARRIGAN)** DO YOU SEE GOVERNMENT EXHIBIT 451?

5           (EXHIBIT 451 MARKED FOR IDENTIFICATION)

6   **A.**    YES, I DO.

7   **Q.**    AND YOU RECEIVED THAT FROM WHO?

8   **A.**    DAVID GARRETT, SALES MANAGER FOR NORTHROP GRUMMAN SPERRY

9   MARINE.

10  **Q.**    THAT WAS IN REGARD TO A SUSPICIOUS CONTACT REGARDING

11  WHAT ITEM?

12  **A.**    A NAVIGAT-2100.

13  **Q.**    AND REQUESTED BY WHO?

14  **A.**    TIMCO.

15  **Q.**    AND WHO WAS THAT SENT BY, AGAIN?

16  **A.**    IT WAS SENT BY TAMMY FARNSLEY FROM TIMCO MARINE.

17  **Q.**    ALL RIGHT.

18          **MR. HARRIGAN:**  YOUR HONOR, I THINK WHERE WE LEFT OFF

19  I MOVED TO ADMIT THIS.

20          **THE COURT:**  YES.

21          **MR. HARRIGAN:**  IS IT MOVED INTO EVIDENCE?

22          **THE COURT:**  IT IS RECEIVED.

23          (EXHIBIT 451 RECEIVED INTO EVIDENCE)

24          **MR. HARRIGAN:**  AND IS THAT PUBLISHED TO THE JURY?

25          **THE CLERK:**  YES.

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1            **MR. HARRIGAN:**   OKAY.  ALL RIGHT.  ONE MOMENT, YOUR

2   HONOR.  I APOLOGIZE.

3   **Q.     (MR. HARRIGAN)** FIRST DIRECTING YOUR ATTENTION TO THE

4   HEADER.

5   **A.**    YES.

6   **Q.**    WOULD YOU DESCRIBE WHAT THAT INDICATES?

7   **A.**    YES.  IT IS FROM DAVID GARRETT, WHO WAS THE SALES

8   MANAGER FOR SPERRY MARINE.  THE DATE, DECEMBER 18TH.  SENT TO

9   ME, GREG TOPCZEWSKI.

10        THE SUBJECT LINE IS MY NOTES.  THAT IS THE CASE NUMBER,

11  THE DATE, WHAT IT WAS REGARDING AND WHO IT WAS REQUESTING.

12  AND THEN THE ATTACHMENT WAS THE END USER AGREEMENT, WHICH IS

13  WORDED AS THE FOG APPROVAL FORM.

14  **Q.**    WHAT DOES FOG STAND FOR?

15  **A.**    FIBER OPTIC GYROCOMPASS.

16  **Q.**    AND IT ALSO HAS IMPORTANCE STATED AS HIGH.

17  **A.**    YES.

18  **Q.**    WHAT DOES THAT MEAN?

19  **A.**    THAT MEANS I WOULD GIVE IT IMMEDIATE ATTENTION.

20  **Q.**    AND DID YOU GIVE IMMEDIATE ATTENTION ON THIS?

21  **A.**    YES.  WE HAD A ONE-DAY TURNAROUND TIME ON THIS CASE.

22  **Q.**    IN ADDITION TO SENDING YOU THE END USER FORM, WHICH WE

23  DISCUSSED YESTERDAY, DID MR. GARRETT PROVIDE YOU ANY MORE

24  INFORMATION ABOUT HIS CONCERNS REGARDING THE REQUEST BY TIMCO

25  MARINE?

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1    **A.**    YES.  IN THE BODY OF THE REPORT HE MENTIONED AS NOT A

2    TYPICAL PLATFORM FOR A NAVIGAT-3000.

3    **Q.**    AND NOW SHOWING YOU THE BODY OF THAT EMAIL.

4    **A.**    YES.

5    **Q.**    WHAT DID HE TELL YOU HE DID IN TERMS OF DETERMINING

6    WHETHER IT WAS A TYPICAL PLATFORM?

7    **A.**    THERE IS A WEBSITE WHERE YOU CAN LOOK UP THE SERIAL

8    NUMBER OF ANY VESSEL IN THE WORLD, BASICALLY, AND FIND OUT

9    WHAT IT IS –– WHAT ITS USES ARE.

10         AND THAT IS A TYPICAL TOOL THAT SALESPEOPLE USE TO

11    DETERMINE WHAT KIND OF EQUIPMENT IS APPROPRIATE.  AND IN THIS

12    CASE, DAVID IS TELLING ME THAT IT IS NOT A TYPICAL PLATFORM.

13    **Q.**    IN TERMS OF WHAT YOU TALKED ABOUT YESTERDAY, IN TERMS OF

14    YOUR TRAINING AND EXPERIENCE IN LOOKING AT SUSPICIOUS CONTACT

15    REPORTS AND THEN GETTING TRAINED ON THE JOB, WAS THAT

16    SOMETHING THAT WAS DONE JUST FOR YOU OR FOR NORTHROP GRUMMAN

17    IN THE U.S.?

18    **A.**    NORTHROP GRUMMAN IN THE U.S.

19    **Q.**    AND WERE THE SALES MANAGERS ALSO TRAINED IN IDENTIFYING

20    WHEN SUSPICIOUS CONTACTS MIGHT OCCUR?

21              **MR. CAMDEN:**  OBJECTION.  LEADING, YOUR HONOR.

22              **THE COURT:**  SUSTAINED.  LEADING.

23    **Q.**    **(MR. HARRIGAN)** YOU SAID YESTERDAY THAT IN MAKING YOUR

24    DETERMINATION ABOUT A SUSPICIOUS CONTACT YOU OFTEN CONTACTED

25    THE SALESPEOPLE THEMSELVES.  WHY IS THAT?

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1    **A.**    IT WAS A LEARNING PROCESS THAT STARTED WITH THE FIRST

2    CASE IN 2003 THAT WE HAD TO DETERMINE WHY THESE PRODUCTS WERE

3    BEING ASKED FOR, AND ESPECIALLY IN THE QUANTITY THAT THEY WERE

4    BEING ASKED FOR.

5    **Q.**    LET ME ASK YOU THIS.  WHAT SPECIALIZED KNOWLEDGE DO THE

6    SALESPEOPLE HAVE?

7    **A.**    KNOWLEDGE OF THE SHIPPING INDUSTRY.  THE MANUFACTURER OF

8    THE SHIPS, THE SIZE, THE USAGE.

9    **Q.**    SO THEY HAVE SPECIALIZED KNOWLEDGE AS TO THE USE OF THE

10   NAVIGAT-2100?

11   **A.**    YES.

12   **Q.**    DIRECTING YOUR ATTENTION TO THE ATTACHMENT TO

13   GOVERNMENT EXHIBIT 451.  FIRST, CAN YOU GENERALLY DESCRIBE

14   WHAT THAT IS?

15   **A.**    YES.  THIS WAS A FORM THAT WAS CREATED BY ONE OF THE

16   SPERRY MARINE VICE PRESIDENTS AFTER THE FIRST ENCOUNTER, WHICH

17   WAS IN 2003, TO ENSURE THAT ALL THE IMPORTANT INFORMATION WAS

18   CAPTURED ON ONE FORM; WHICH INCLUDES THE CUSTOMER, THE

19   LOCATION WHERE IT WAS BEING SENT, AND ITEMS LIKE THAT.

20   **Q.**    ALL RIGHT.  AND, AGAIN, WHAT TYPE OF INFORMATION IS

21   INCLUDED IN THIS FORM?  DIRECTING YOUR ATTENTION FIRST TO THE

22   FIRST BOX.

23   **A.**    OKAY.

24   **Q.**    AT THE TOP OF THE ATTACHMENT.

25   **A.**    YES.  THAT FIRST BOX INDICATES WHO THE CUSTOMER IS THAT

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   IS REQUESTING THE PRODUCT.

2   **Q.**    AND IN THIS CASE THE CUSTOMER WAS WHO?

3   **A.**    TIG MARINE ENGINEERING.

4   **Q.**    LOCATED WHERE?

5   **A.**    DUBAI.

6   **Q.**    DOES THAT FORM ALSO INCLUDE A DESIGNATION FOR COUNTRY OF

7   ULTIMATE DESTINATION?

8   **A.**    YES, IT DOES.

9   **Q.**    WHAT DID THE END USER OR THE CUSTOMER PUT AS THE

10  ULTIMATE DESTINATION IN THAT CASE?

11  **A.**    ALSO DUBAI.

12  **Q.**    AND LOOKING AT THE SECOND BOX, WHAT DOES THAT PROVIDE?

13  **A.**    THAT IS THE SHIP THAT WAS DESIGNATED TO RECEIVE THIS

14  PRODUCT.

15  **Q.**    THE SECOND BOX HERE.  WOULD YOU LOOK AT THE BOX THERE

16  THAT HAS JUST BEEN HIGHLIGHTED.

17  **A.**    THE NAME AND ADDRESS OF THE END USER.  YES.  THAT IS WHO

18  WAS GOING TO RECEIVE THE PRODUCT.

19  **Q.**    SO IN THIS CASE THE CUSTOMER WAS DIFFERENT THAN THE NAME

20  AND ADDRESS OF THE END USER.

21  **A.**    YES.

22  **Q.**    AND WHERE DOES THIS INDICATE THE NAME AND ADDRESS OF --

23  OR WHAT THE NAME AND ADDRESS OF THE END USER IS?  WHAT DOES IT

24  LIST.  STAYING WITH THE SAME BOX.

25  **A.**    IT LISTS THE SHIP, WESAL SHIPPING.

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   **Q.**    I AM SORRY, SIR.

2   **A.**    YES.

3   **Q.**    WOULD YOU LOOK AT THE SCREEN.

4   **A.**    YEAH.

5   **Q.**    THERE IS A BOX THAT SAYS NAME AND ADDRESS OF END USER.

6   AND WHAT DOES THE FORM SAY?

7   **A.**    WESAL SHIPPING, LLC, DUBAI, UAE.

8   **Q.**    SO BOTH THE CUSTOMER AND THE END USER WERE IN UNITED

9   ARAB EMIRATES.

10  **A.**    YES.

11  **Q.**    AND LOOKING AT THE NEXT BOX –– AND THAT'S ALWAYS

12  INCLUDED IN THIS END USER FORM?

13  **A.**    YES.

14  **Q.**    AND WHAT DOES THAT DENOTE?

15  **A.**    THAT DENOTES THAT IT SHIPPED TO TIG MARINE ENGINEERING

16  SERVICES, DUBAI, MARITIME CITY.  A POST OFFICE BOX.  AND

17  DUBAI, UNITED ARAB EMIRATES.

18  **Q.**    AND THE INFORMATION THAT IS LOCATED DIRECTLY BELOW THAT,

19  WHAT DOES THAT INDICATE?

20  **A.**    THAT IS THE DESCRIPTION OF THE PRODUCT THAT WAS BEING

21  REQUESTED, WHICH WAS THE NAVIGAT-2100.  ONE UNIT.  THE SERIAL

22  NUMBER OF THE SHIP, AND THE SHIP NAME.

23  **Q.**    AND THE SHIP NAME IN THIS CASE WAS WHAT?

24  **A.**    WESAL-V.

25  **Q.**    AND WAS THIS FORM ALSO SIGNED –– PURPORTEDLY SIGNED BY

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1  CUSTOMER TIG MARINE?

2  **A.**    YES.

3  **Q.**    IS THAT DENOTED ON THE END USER STATEMENT?

4  **A.**    YES, IT IS.

5  **Q.**    AND WHAT DID EXHIBIT 451 SHOW AS TO THE INDIVIDUAL WHO

6  PURPORTEDLY SIGNED THE TIG MARINE CERTIFICATE?

7  **A.**    THE NAME IS ERGUN YILDIZ, MANAGER FOR TIG MARINE.

8  **Q.**    THE DATE SAYS 1/11/2012?

9  **A.**    YES.

10 **Q.**    IS THAT NOVEMBER 1 OR JANUARY 11?

11 **A.**    I WOULD BELIEVE THAT WOULD BE JANUARY 11TH.

12 **Q.**    OFTEN WHEN YOU DEAL IN FOREIGN COUNTRIES THEY PUT THE

13 DATE BEFORE THE COURT, SO IT MAY BE 1/11?

14 **A.**    IT COULD BE, YES.

15 **Q.**    BECAUSE THIS OCCURRED ON DECEMBER 2012.

16 **A.**    YES.

17 **Q.**    CORRECT?

18 **A.**    YES.

19 **Q.**    ALL RIGHT.  AFTER HAVING LOOKED AT THAT INFORMATION, DID

20 THAT CAUSE YOU, IN YOUR TRAINING AND EXPERIENCE, ANY CONCERNS

21 THAT THE NAVIGAT-2100 REQUESTED BY TIG MARINE IN THIS END USER

22 FORM WAS GOING TO BE DIVERTED TO A PROHIBITED COUNTRY?

23 **A.**    YES.

24 **Q.**    OKAY.  AND WHAT DID THAT CAUSE YOU TO DO?

25 **A.**    IT CAUSED ME TO LOOK FURTHER INTO THE INFORMATION.  I

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

```
1    REACHED OUT TO DEFENSE SECURITY SERVICES, THOSE ARE THE
2    PRIMARY PEOPLE THAT WE HAVE TO REPORT THESE TYPE OF CASES
3    TO, AND ALSO TO HOMELAND SECURITY FOR ADDITIONAL
4    INFORMATION.
5    Q.   AND WHO DID YOU REACH OUT TO AT HOMELAND SECURITY?
6    A.   KEVIN HAMAKO.
7    Q.   DO YOU SEE HIM IN THE COURTROOM HERE TODAY?
8    A.   YES, I DO.
9    Q.   HAD YOU HAD PRIOR CONTACT WITH KEVIN HAMAKO?
10   A.   YES, I HAVE.
11   Q.   WHO DOES HE WORK FOR?
12   A.   HOMELAND SECURITY SERVICES.
13   Q.   AND HE IS AN AGENT WITH HOMELAND SECURITY?
14   A.   YES.
15   Q.   DID YOU CALL HIM OR DID YOU EMAIL HIM?
16   A.   I BELIEVE I CALLED HIM FIRST TO TELL HIM I HAD A CASE,
17   THEN I EMAILED HIM THE INFORMATION.
18   Q.   WHAT DID YOU EMAIL TO HIM?
19   A.   BASICALLY THE COPY OF THE EMAIL THAT I RECEIVED AND THE
20   END USER REPORT.
21   Q.   AND WHAT DID YOU REQUEST OF HIM?
22   A.   JUST TO SEE IF HE HAD ANY ADDITIONAL INFORMATION TO
23   SUPPORT THE FACT THAT I WAS GOING TO RECOMMEND A NO SALE
24   IN THIS CASE, JUST BASED ON THE INFORMATION THAT I HAD
25   ALREADY.
```

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

```
 1        MR. CAMDEN:  YOUR HONOR, AS TO THIS TESTIMONY, A

 2   BEST EVIDENCE OBJECTION.

 3        THE COURT:  OVERRULED.  THE ANSWER WILL STAND.

 4   Q.   (MR. HARRIGAN) LET ME SHOW YOU WHAT IS MARKED AS

 5   GOVERNMENT'S EXHIBIT 452 FOR IDENTIFICATION.

 6        (EXHIBIT 452 MARKED FOR IDENTIFICATION)

 7        MR. HARRIGAN:  I APOLOGIZE, YOUR HONOR.

 8        IF I NEED TO MUTE FROM HERE I WILL MUTE FROM HERE.

 9        THE CLERK:  IT IS MUTED.

10        MR. HARRIGAN:  IT IS.  OKAY.  THANK YOU.

11   Q.   (MR. HARRIGAN) FIRST, WITHOUT DESCRIBING THE CONTENTS

12   OF WHAT'S LOCATED THEREIN, DO YOU RECOGNIZE THAT EMAIL?

13   A.   YES, I DO.

14   Q.   AND GENERALLY WHAT IS -- WHO IS THAT EMAIL TO?

15   A.   THAT EMAIL IS GOING TO AGENT KEVIN HAMAKO.

16   Q.   IS THAT THE EMAIL THAT YOU JUST REFERRED TO?

17   A.   YES.

18   Q.   COMMUNICATION?

19   A.   YES.

20   Q.   IS THAT YOUR FIRST COMMUNICATION WITH HIM?

21   A.   I BELIEVE SO, YES.

22   Q.   AS WITH THE OTHER EMAIL WE TALKED ABOUT YESTERDAY, WAS

23   IT REQUIRED FOR YOU TO KEEP THESE TYPE OF EMAILS?

24   A.   YES.

25   Q.   AS PART OF YOUR REGULAR COURSE OF DUTIES?
```

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   **A.**    YES.

2   **Q.**    AND PART OF THE REGULAR COURSE OF BUSINESS AT NORTHROP

3   GRUMMAN?

4   **A.**    YES.

5   **Q.**    AND AGAIN, THESE EMAILS THAT YOU SENT OR RECEIVED FROM

6   INDIVIDUALS WHO KNEW THE INFORMATION?

7   **A.**    CORRECT.

8   **Q.**    CONTAINED IN THE EMAIL?

9   **A.**    YES.

10          **MR. HARRIGAN:**  AT THIS TIME I WOULD MOVE TO ADMIT

11   THIS EMAIL, YOUR HONOR.

12          **THE COURT:**  ANY OBJECTION?

13          **MR. CAMDEN:**  NO OBJECTION, YOUR HONOR.

14          **THE COURT:**  IT IS RECEIVED.

15          (EXHIBIT 452 RECEIVED INTO EVIDENCE)

16          **MR. HARRIGAN:**  ALL RIGHT.  AGAIN, I WOULD LIKE TO

17   MOVE AND PUBLISH THAT TO THE JURY.

18          **THE COURT:**  YES.

19   **Q.    (MR. HARRIGAN)** I WOULD LIKE TO FIRST LIKE YOU TO AGAIN

20   LOOK AT THE HEADER INFORMATION AT THE TOP.  WE WILL BLOW THAT

21   UP FOR YOU.  CAN YOU DESCRIBE WHO THIS IS FROM AND WHO IT IS

22   TO.

23   **A.**    YES.  IT IS FROM ME, ON THE SAME DATE, DECEMBER 18TH, TO

24   AGENT KEVIN HAMAKO.  AND AGAIN THE CASE NUMBER, 117.  THIS

25   TIME IT IS 03, WHICH INDICATES IT IS THE THIRD EMAIL REGARDING

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1    THIS CASE.  A DESCRIPTION -- BRIEF DESCRIPTION.  AND THEN THE

2    ATTACHMENT, WHICH WAS THE END USER AGREEMENT.  AND AGAIN THE

3    IMPORTANCE WAS HIGH.

4    Q.    AND LOOKING AT THE CONTENT OF THAT EMAIL, CAN YOU

5    DESCRIBE FOR THE LADIES AND GENTLEMEN OF THE JURY WHAT YOU

6    RELAYED TO AGENT HAMAKO IN THAT EMAIL?

7    A.    YES.  BASICALLY WHAT I HAVE DONE IS RESTATED WHAT DAVID

8    GARRETT, THE SALES MANAGER, HAD TOLD ME.  AND ASKED AGENT

9    HAMAKO IF THERE WAS ANY MORE INFORMATION THAT HE COULD

10   PROVIDE, INDICATING TO HIM THAT THE SALES MANAGER HAD ALREADY

11   IDENTIFIED THE FACT THAT THIS IS NOT THE TYPICAL PLATFORM FOR

12   A NAVIGAT 3000.

13   Q.    AND PLATFORM, IS THAT A TERM OF ART?

14   A.    YES.  THAT IS JUST THE VESSEL.

15   Q.    CAN YOU DESCRIBE, IN LAYMAN'S TERMS, WHAT THAT MEANS?

16   A.    IT IS A MISMATCH FOR THE TYPE OF VESSEL COMPARED TO THE

17   TYPE OF TECHNOLOGY THAT THEY ARE REQUESTING.

18   Q.    AND, AGAIN, YOU MADE THE COMMENT PREVIOUSLY THAT YOU HAD

19   ALREADY DETERMINED, BASED ON YOUR TRAINING AND EXPERIENCE,

20   THAT THIS IS GOING TO BE A NO BID.

21   A.    YES.

22   Q.    AND NO BID MEANS WHAT?

23   A.    SIMPLY THAT WE ARE NOT GOING TO HONOR THEIR REQUEST FOR

24   THE SALE.

25   Q.    AND WHY IS IT, THEN, THAT YOU REACHED OUT TO AGENT

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   HAMAKO OF THE DEPARTMENT OF HOMELAND SECURITY FOR MORE

2   INFORMATION?

3   **A.**   SPERRY MARINE, NORTHROP GRUMMAN ARE IN THE BUSINESS OF

4   SELLING PRODUCTS.   IN ORDER TO GO BACK TO MANAGEMENT AND SAY

5   WE DON'T WANT TO SELL THIS PRODUCT THERE HAS GOT TO BE SOME

6   LEGITIMATE REASON FOR THAT.   THAT IS COUNTER TO, YOU KNOW, OUR

7   BUSINESS.   SO I FELT I JUST NEEDED MORE INFORMATION, OTHER

8   THAN EVEN THE SALES MANAGER'S INTUITION THAT IT WAS

9   INAPPROPRIATE.

10   **Q.**   AND EVEN MORE THAN YOUR OWN?

11   **A.**   YES.

12   **Q.**   AND IS THAT FOR THE PURPOSE OF JUSTIFYING IT TO OTHER

13   PEOPLE WITHIN --

14   **A.**   CORRECT, YES.

15   **Q.**   -- NORTHROP GRUMMAN SPERRY MARINE?

16   **A.**   YES.

17   **Q.**   AND SHOWING YOU THE -- WAS THERE AN ATTACHMENT TO THIS

18   EMAIL?

19   **A.**   YES.   I ATTACHED THE END USER AGREEMENT.

20   **Q.**   SHOWING THE ATTACHMENT, IS THAT THE SAME ATTACHMENT WE

21   SAW IN GOVERNMENT EXHIBIT 451?

22   **A.**   YES, IT IS.

23   **Q.**   THE END USER FORM FILLED OUT BY -- FOR CUSTOMER TIG

24   MARINE TO WESAL SHIPPING?

25   **A.**   YES.

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   **Q.**    TO BE SHIPPED TO TIG MARINE ENGINEERING SERVICES FOR ONE

2   NAVIGAT-2100?

3   **A.**    CORRECT, YES.

4   **Q.**    FOR USE ON A SHIP BY THE NAME OF THE WESAL-5 OR WESAL-V,

5   ROMAN NUMERAL V?

6   **A.**    YES.

7   **Q.**    AND, AGAIN, THE VESSEL IDENTIFICATION NUMBER IS WHAT?

8   **A.**    8849359.

9   **Q.**    SO AFTER YOU SENT THIS TO AGENT HAMAKO DID YOU HEAR BACK

10  FROM HIM?

11  **A.**    YES, I DID.

12  **Q.**    HOW SOON?

13  **A.**    THE SAME DAY.

14  **Q.**    WITHIN HOURS?

15  **A.**    YES.

16  **Q.**    AND DID HE PROVIDE YOU WITH MORE INFORMATION IN ORDER

17  FOR YOU TO MAKE YOUR DETERMINATION, FOR NORTHROP GRUMMAN,

18  WHETHER THIS WAS GOING TO BE A NO SALE?

19  **A.**    YES, HE DID.

20  **Q.**    AND WHAT INFORMATION DID HE PROVIDE YOU?

21  **A.**    HE PROVIDED ME INFORMATION --

22          **MR. CAMDEN:**  SAME OBJECTION.  BEST EVIDENCE RULE.

23          **THE COURT:**  OVERRULED.

24          YOU MAY ANSWER.

25          **THE WITNESS:**  HE PROVIDED ME WITH INFORMATION ON THE

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   SIGNATURE ON THE END USER AGREEMENT, WHICH WAS MR. YILDIZ,

2   THAT HE HAD A TRADING COMPANY OF HIS OWN, WHICH IS JUST

3   ANOTHER RED FLAG THAT THIS PRODUCT WAS PROBABLY BOUND TO BE

4   DIVERTED SOMEPLACE ELSE.  IT JUST MAKES IT THAT MUCH EASIER TO

5   SHIP IT TO ONE PLACE AND HAVE ANOTHER TRADING COMPANY PASS IT

6   ON SOMEPLACE ELSE.

7          HE ALSO INFORMED ME THAT SOME OF THE PRINCIPALS IN

8   THE COMPANY WERE OF IRANIAN DESCENT, WHICH IS ANOTHER RED FLAG

9   THAT THE PRODUCT WAS GOING TO BE DIVERTED.

10  **Q.**   **(MR. HARRIGAN)** AND HE FORWARDED THIS TO YOU IN AN

11  EMAIL?

12  **A.**   YES, HE DID.

13  **Q.**   LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT EXHIBIT 453

14  FOR IDENTIFICATION.

15         AGAIN, DO YOU RECOGNIZE THAT EMAIL?

16            (EXHIBIT 453 MARKED FOR IDENTIFICATION)

17  **A.**   YES, I DO.

18  **Q.**   AND WHAT IS THAT EMAIL?

19  **A.**   THAT IS THE RESPONSE FROM KEVIN TO MY REQUEST FOR

20  ADDITIONAL INFORMATION.

21  **Q.**   AND AS WITH THE OTHER EMAILS YOU TESTIFIED ABOUT, WAS

22  THIS KEPT FOR THE SAME REASONS AS YOUR MAINTENANCE OF THE

23  OTHER EMAILS REGARDING SUSPICIOUS CONTACTS?

24  **A.**   YES.

25            **MR. HARRIGAN:**  I WOULD MOVE TO ADMIT THIS, YOUR

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

```
 1    HONOR.
 2              THE COURT:  ANY OBJECTION?
 3              MR. CAMDEN:  NO OBJECTION, YOUR HONOR.
 4              THE COURT:  IT IS RECEIVED.
 5              (EXHIBIT 453 RECEIVED INTO EVIDENCE)
 6    Q.   (MR. HARRIGAN) AGAIN GOING TO THE HEADER --
 7              MR. HARRIGAN:  I MOVED TO ADMIT IT.  IT IS
 8    PUBLISHED?
 9              THE COURT:  YES.
10    Q.   (MR. HARRIGAN) AGAIN, LOOKING AT THE HEADER
11    INFORMATION.
12    A.   YES.
13    Q.   WOULD YOU DESCRIBE THAT?
14    A.   YES.  THIS IS FROM AGENT KEVIN HAMAKO ON DECEMBER 18TH.
15    IT IS ADDRESSED TO ME.  AND AGAIN I HAD CHANGED THE SUBJECT
16    LINE TO BE CONSISTENT WITH THE FLOW OF THE REPORT, THE REPORTS
17    AT THIS TIME.  IT IS STILL CASE NO. 117, AND NOW WE ARE UP TO
18    EMAIL NO. 05.  AND AGAIN THE SAME HEADING LINE, NAVIGAT-2100,
19    TIMCO MARINE.
20    Q.   SO AT THE TIME YOU WERE REACHING OUT TO KEVIN HAMAKO YOU
21    WERE REACHING OUT TO OTHER PEOPLE?
22    A.   YES.
23    Q.   WERE THE INDIVIDUALS IN THE COMPANY OR OUTSIDE THE
24    COMPANY?
25    A.    THEY WERE OUTSIDE THE COMPANY AT THAT POINT.  THAT WAS
```

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1  DEFENSE SECURITY SERVICES.

2  **Q.**   WERE THERE ALSO INDIVIDUALS THAT YOU COMMUNICATED WITH

3  WITHIN THE COMPANY REGARDING THE REQUEST?

4  **A.**   AT THIS POINT JUST DAVID GARRETT.

5  **Q.**   ALL RIGHT.  AND LOOKING AT THE CONTENT OF THAT EMAIL,

6  COULD YOU DESCRIBE THAT FOR THE LADIES AND GENTLEMEN OF THE

7  JURY, WHAT MR. HAMAKO, OR AGENT HAMAKO, INDICATED TO YOU BASED

8  ON HIS OWN INVESTIGATION.

9  **A.**   YES.  HE BASICALLY JUST THANKED ME FOR PASSING THIS

10  ALONG TO HIM.  AND HE DID SOME DIGGING, AS HE PUT IT, FOUND A

11  FEW THINGS THAT I THINK ARE CONCERNING.  THE FOUNDER OF TIG

12  MARINE ENGINEERING SERVICES IS KOORUSH TAHERKHANI –– SORRY

13  ABOUT THE PRONUNCIATION.

14  **Q.**   TAHERKHANI?

15  **A.**   TAHERKHANI.  WHO APPEARS TO BE AN IRANIAN, POSSIBLY

16  NATURALIZED TO UAE CITIZENSHIP.  I ALSO FOUND ANOTHER IRANIAN

17  NATIONAL WHO WORKED FOR TIG MARINE ENGINEERING UNTIL LAST

18  SUMMER AND PREVIOUSLY WORKED FOR A UTILITIES COMPANY IN IRAN.

19      ERGUN YILDIZ, THE INDIVIDUAL WHO SIGNED THE END USER AS

20  A MANAGER FOR TIG MARINE IS, ALSO LISTED AS BEING EMPLOYED BY

21  GLOBAL COMMERCIAL SERVICES GCS FCZ IN THE U.A.E.  GCS FCZ

22  APPEARS TO BE A GENERAL TRADING COMPANY WHICH LISTS A HOTMAIL

23  ACCOUNT ON ONE OF THEIR BUSINESS PROFILES.

24      I DO NOT HAVE ANYTHING CONCRETE OR DEFINITE THAT PROVES

25  THESE GUYS ARE TRYING TO PROCURE THE NAVIGAT-2100 FOR AN

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1  IRANIAN END USER.  HOWEVER, THERE ARE A LOT OF RED FLAGS.  THE

2  END USER IS IN DUBAI.  USE NOT CONSISTENT WITH TECHNOLOGY.

3  MULTIPLE IRANIAN NATIONALS WORKING FOR CUSTOMER.  END USE

4  SIGNATORY ALSO EMPLOYED BY A GENERAL TRADING COMPANY IN DUBAI.

5       WERE THESE GUYS LOOKING FOR THE 2100 OR 3000?

6  **Q.**   SO IN ADDITION TO THE INFORMATION YOU ALREADY HAD, DID

7  THE INFORMATION THAT HE PROVIDED TO YOU AID YOU IN DETERMINING

8  WHETHER, IN YOUR OPINION, THESE –– THE NAVIGAT–2100 WAS GOING

9  TO BE DIVERTED FROM DUBAI TO ANOTHER LOCATION?

10 **A.**   YES.

11 **Q.**   AND THE LAST STATEMENT HE SAYS:  WERE THE GUYS LOOKING

12 FOR THE 2100 OR THE 3000?

13      CAN YOU EXPLAIN THAT IN THE CONTEXT OF YOUR

14 INVESTIGATION.

15 **A.**   YES.  THE 2100 IS A VERY, VERY POPULAR FIBER OPTIC

16 GYROCOMPASS.  IT HAS BEEN IN THE INDUSTRY FOR, I DON'T KNOW,

17 15, 20 YEARS.  IT WAS IN THE PROCESS OF BEING PHASED OUT BY

18 THE 3000, WHICH IS A HIGHER TECHNOLOGY.  PROBABLY $20,000 MORE

19 IN EXPENSE.  HAS A LOT MORE CAPABILITIES, WHICH I DON'T HAVE

20 THE TECHNICAL KNOWLEDGE TO EXPLAIN.  BUT IF A 2100 WAS AN

21 INAPPROPRIATE PLATFORM, THE 3000 WAS WAY OVER THE TOP.

22 **Q.**   WAS THERE SOME INDICATION FROM DAVID GARRETT THAT THEY

23 WERE LOOKING FOR THE 3000?

24 **A.**   YES.  HE MENTIONED THAT IN HIS ORIGINAL EMAIL, EVEN

25 THOUGH THE END USER STATEMENT ASKED FOR A 2100.

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   **Q.**    THEY WERE ALSO LOOKING, IF THEY COULD, FOR A 3000?

2   **A.**    YES.

3   **Q.**    SO AFTER GETTING ALL THIS INFORMATION, DID YOU THEN COME

4   TO A DETERMINATION OF WHETHER NORTHROP GRUMMAN SHOULD SELL

5   THIS PRODUCT TO TIG MARINE?

6   **A.**    YES, I DID.

7   **Q.**    OKAY.  WHAT WAS YOUR DETERMINATION?

8   **A.**    NO, WE SHOULDN'T.

9   **Q.**    AND THAT WAS BASED ON WHAT FACTORS?

10  **A.**    IT WAS BASED ON THE FACTORS THAT THE END USER WAS IN

11  DUBAI AND --

12  **Q.**    LET ME STOP YOU THERE.  THE END USER IN DUBAI.

13       WHY, BASED ON YOUR TRAINING AND EXPERIENCE, WAS THE FACT

14  THAT THE END USER WAS IN DUBAI A FACTOR THAT WOULD CAUSE YOU

15  AND NORTHROP GRUMMAN CONCERN?

16  **A.**    BY THIS TIME IN 2012 WE WERE SEVEN, EIGHT YEARS IN THE

17  PROCESS OF DEALING WITH THESE TYPE OF REQUESTS, AND WE HAD

18  KNOWN FROM TALKING TO DIFFERENT GOVERNMENT AGENCIES THAT DUBAI

19  WAS A PRIMARY LOCATION FOR RECEIVING PRODUCT AND THEN PASSING

20  IT ALONG INAPPROPRIATELY TO COUNTRIES THAT IT SHOULDN'T GO TO.

21  SO WE WERE VERY CAUTIOUS OF SHIPPING ANYTHING THERE.

22  **Q.**    PARTICULARLY WHAT COUNTRY IN PARTICULAR?

23  **A.**    FROM DUBAI TO IRAN.

24  **Q.**    OKAY.  AND AGAIN, DID THE NAVIGAT-2100 REQUIRE A LICENSE

25  TO GO TO DUBAI?

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1   **A.**    THERE WAS A LICENSING PROCEDURE, BUT I AM NOT FAMILIAR

2   WITH THE EXACT PROCESS.

3   **Q.**    LET ME ASK YOU THIS.  WAS IT PERMITTED FOR THE

4   NAVIGAT-2100 TO GO TO IRAN WITHOUT A LICENSE?

5   **A.**    NO.

6   **Q.**    AND ONE OF THE OTHER FACTORS THAT YOU TALKED ABOUT WAS

7   THE EQUIPMENT MISMATCH, I THINK WAS YOUR WORDS.  WHY WAS THAT

8   IMPORTANT, BASED ON YOUR TRAINING AND EXPERIENCE?

9   **A.**    THERE ARE SHIPS THAT ARE OUT THERE IN THE UNITED STATES

10  MARITIME MERCHANT MARINE SYSTEM AND THE CANADIAN COAST GUARD

11  THAT USE THIS TYPE OF EQUIPMENT IN LIEU OF MORE EXPENSIVE

12  MILITARIZED VERSIONS OF THE FIBER OPTIC GYROCOMPASS THAT THE

13  UNITED STATES NAVY USES.

14      THE TECHNOLOGY IS VERY CLOSE, IT IS JUST NOT AS HEAVY

15  DUTY EQUIPMENT.  SO A LOT OF THE USES THAT THE MILITARY WOULD

16  USE COULD ALSO BE ADAPTED FOR FOREIGN MILITARIES, BASED ON THE

17  TYPE OF ATTACHMENTS.

18          **MR. CAMDEN:**  OBJECTION.  RELEVANCE.

19  **Q.**   **(MR. HARRIGAN)** MY QUESTION IS, THOUGH --

20          **THE COURT:**  OVERRULED.

21  **Q.**   **(MR. HARRIGAN)** MY QUESTION IS, JUST THE FACT THAT THERE

22  IS AN EQUIPMENT MISMATCH, WHAT DOES THAT TELL YOU IN TRAINING

23  AND EXPERIENCE?

24  **A.**    IT SHOULDN'T BE SOLD TO THEM.

25  **Q.**    WHY?

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1  **A.**    WE DON'T WANT TO TAKE THE RISK, AS A COMPANY, OF HAVING

2  IT FALL INTO A COUNTRY OR INTO HANDS THAT IT SHOULDN'T GO TO.

3  **Q.**    WHAT DOES THE FACT THAT IT IS AN EQUIPMENT MISMATCH TELL

4  YOU?  DOES IT TELL YOU THAT IT IS GOING TO WHERE THEY SAY IT

5  IS GOING?

6  **A.**    NO; IT TELLS US THAT IT IS NOT.

7  **Q.**    AND THERE WAS ALSO THE CONCERN, I THINK WHAT YOU SAID,

8  THAT THE INFORMATION THAT MR. HAMAKO GAVE YOU, WHICH WAS THERE

9  WERE MULTIPLE IRANIAN NATIONALS OR APPARENT IRANIAN NATIONALS

10 WORKING FOR TIG MARINE.  WHY WAS THAT A CONCERN?

11 **A.**    IT WAS JUST AN INDICATION THAT IT WOULD BE THAT MUCH

12 EASIER FOR THE PRODUCT TO BE PASSED ALONG.

13 **Q.**    IN YOUR TRAINING AND EXPERIENCE IN OTHER SUSPICIOUS

14 CONTACT REPORTS, HAD YOU COME ACROSS SIMILAR --

15 **A.**    YES.

16 **Q.**    -- SITUATIONS?

17 **A.**    YES.  WE HAVE HAD REQUESTS FROM ENGINEERING COMPANIES

18 DIRECTLY IN IRAN FOR THE PRODUCT.  WE HAD A REQUEST FROM --

19 AGAIN I DON'T KNOW THE PRONUNCIATION -- BUT FEDERALE [PH.]

20 UNIVERSITY IN IRAN FOR THE PURPOSE OF REENGINEERING THE

21 PRODUCT.

22 **Q.**    HAD YOU HAD REQUESTS FROM COUNTRIES OUTSIDE OF IRAN

23 WHERE THERE WERE APPARENT IRANIAN NATIONALS CONNECTED TO THAT

24 COMPANY?

25 **A.**    YES.

APRIL 14, 2015

1    **MR. CAMDEN:**  OBJECTION ON RELEVANCE, IN LIMS.

2    **THE COURT:**  OVERRULED.

3  **Q.    (MR. HARRIGAN)** YOUR ANSWER?

4  **A.    YES, CORRECT.  WE ACTUALLY HAD TWO IRANIAN U.S. CITIZENS**

5  COME TO OUR FACILITY IN PERSON THINKING THAT THEY WOULD BE

6  ABLE TO BUY ONE OF THESE OFF THE SHELF.

7    **MR. CAMDEN:**  SAME OBJECTION, YOUR HONOR.

8  RELEVANCE.

9    **THE COURT:**  OVERRULED.

10 **Q.    (MR. HARRIGAN)** AND IN TERMS OF THE GENERAL TRADING

11 COMPANY THAT YOU TALKED ABOUT, THAT IT APPEARED THAT SIGNATORY

12 ON THIS END USER STATEMENT FOR TIG MARINE ALSO MAY HAVE BEEN

13 EMPLOYED BY GENERAL TRADING COMPANY HAD -- IN YOUR PREVIOUS

14 SUSPICIOUS CONTACT REPORTS WHERE YOU DENIED A SALE HAD YOU

15 SEEN SIMILAR --

16 **A.    YES.**

17 **Q.    -- ACTIVITY?**

18 **A.    YES.  IT WAS VERY UNUSUAL FOR A TRADING COMPANY TO**

19 REQUEST THIS PRODUCT BECAUSE IT WAS PRIMARILY A DIRECT SALE

20 FROM A SHIPYARD TO SPERRY MARINE.  THERE WERE NO

21 INTERMEDIARIES, NO BROKERS.

22    **MR. CAMDEN:**  OBJECTION.  RELEVANCE.

23    **THE COURT:**  OVERRULED.

24 **Q.    (MR. HARRIGAN)**  SO AFTER YOU MADE YOUR DETERMINATION OF

25 NO SALE, DID YOU THEN CONVEY THAT TO ANYBODY?

APRIL 14, 2015

282

TOPCZEWSKI – DIRECT EXAMINATION

1    **A.**    YES.  I CHECKED WITH OUR EXPORT MANAGER TO MAKE SURE

2    THEY WERE IN CONCURRENCE, AND THEY WERE.  THEN WE SENT OFF AN

3    EMAIL TO GERMANY, TO THE MANAGER OUT THERE, JUST RECOMMENDING

4    THIS IS A NO SALE.  AND WITHIN A MATTER OF A FEW HOURS THEY

5    ALL CONFERRED.

6            **MR. CAMDEN:**  BEST EVIDENCE OBJECTION, YOUR HONOR.

7            **THE COURT:**  OVERRULED.

8    **Q.**    **(MR. HARRIGAN)** DID YOU THEN RELAY YOUR DETERMINATION TO

9    DAVID GARRETT?

10   **A.**    YES, I DID.

11   **Q.**    AND DID DAVID GARRETT THEN TELL YOU THERE WAS A -- WHAT

12   DID HE TELL YOU?

13   **A.**    HE SAID HE IS GOING TO NO BID THE REQUEST.  HE WAS GOING

14   TO REFUSE THE SALE.

15   **Q.**    LET ME SHOW YOU GOVERNMENT EXHIBIT 454 FOR

16   IDENTIFICATION.

17        DO YOU RECOGNIZE THAT EMAIL?

18            (EXHIBIT 454 MARKED FOR IDENTIFICATION)

19   **A.**    YES, I DO.

20   **Q.**    OKAY.  AND DID YOU SEND THAT EMAIL?

21   **A.**    YES.

22   **Q.**    AND WHO DID YOU SEND IT TO?

23   **A.**    I SENT IT TO A MICHAEL FRACKIEWICZ, DAVID GARRETT AND

24   EXPORT CONTROL IN THE EU.  AND HEATHER MARKIN, WHO IS THE

25   EXPORT MANAGER AT THE CHARLOTTESVILLE, VIRGINIA FACILITY.

APRIL 14, 2015

1  **Q.**    IS THIS THE EMAIL THAT YOU SENT NOTIFYING OTHER

2  INDIVIDUALS IN THE COMPANY OF YOUR RECOMMENDATION?

3  **A.**    YES.

4  **Q.**    AND AS WITH THE OTHER EMAILS THAT YOU KEPT REGARDING

5  THIS SUSPICIOUS CONTACT, WAS THIS A PART OF YOUR REGULAR

6  COURSE AND DUTIES TO KEEP SUCH EMAILS?

7  **A.**    YES.

8  **Q.**    AND WAS IT THE PRACTICE OF NORTHROP GRUMMAN TO KEEP

9  THESE EMAILS AND RECORD ANY COMMUNICATIONS REGARDING

10  SUSPICIOUS CONTACTS?

11  **A.**    YES.

12         **MR. HARRIGAN:**  YOUR HONOR, I MOVE TO ADMIT

13  GOVERNMENT EXHIBIT 454 AND PUBLISH IT TO THE JURY.

14         **MR. CAMDEN:**  NO OBJECTION.

15         **THE COURT:**  IT IS RECEIVED.

16         (EXHIBIT 454 RECEIVED INTO EVIDENCE)

17  **Q.**   **(MR. HARRIGAN)** FIRST LOOKING AT THE HEADER INFORMATION

18  OF THAT EMAIL, WHEN DID YOU SEND THAT EMAIL?

19  **A.**    DECEMBER 18TH.

20  **Q.**    19TH?

21  **A.**    19TH.  I AM SORRY.  DECEMBER 19TH.

22  **Q.**    SO THIS IS WITHIN A DAY AFTER GETTING THE SUSPICIOUS

23  CONTACT REPORT?

24  **A.**    YES.

25  **Q.**    IN LOOKING AT THE BODY OF THE EMAIL, WHAT DO YOU TELL

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1    INDIVIDUALS IN YOUR EXPORT CONTROL, DAVID GARRETT, MICHAEL

2    FRACKIEWICZ IN THE UNITED KINGDOM AND HEATHER MARKIN WHO YOU

3    REFERRED TO?

4    **A.**    I JUST DID A QUICK SUMMARY OF THE KEY POINTS TO GIVE

5    THEM THE JUSTIFICATION TO MAKE A DETERMINATION.  I SAID, AFTER

6    DOING SOME ADDITIONAL CHECKING THERE ARE SEVERAL REASONS WHY

7    THIS REQUEST DOES NOT APPEAR TO BE LEGITIMATE.  END USER

8    CLAIMS TO BE IN DUBAI.  EQUIPMENT MISMATCH, END-USE NOT

9    CONSISTENT WITH TECHNOLOGY.  MULTIPLE IRANIAN NATIONALS

10   WORKING FOR CUSTOMER, TIG MARINE ENGINEERING SERVICES.  THE

11   END USER SIGNATORY, ERGUN YILDIZ, IS ALSO EMPLOYED BY A

12   GENERAL TRADING COMPANY IN DUBAI, GLOBAL COMMERCIAL SERVICES

13   GCS FCZ.  AND THE SHIPPING COMPANY WOULD BE EXPECTED TO DEAL

14   DIRECTLY WITH SPERRY MARINE INSTEAD OF AN OBSCURE THIRD PARTY

15   LIKE TIMCO.

16   **Q.**    CAN YOU EXPLAIN THAT LAST FACTOR?

17   **A.**    YES.  IT IS THE CUSTOM OF SPERRY MARINE TO DEAL WITH

18   LARGE SHIPYARDS WHO ARE BUILDING NEW SHIPS, BASICALLY.  THAT

19   IS WHERE THIS EQUIPMENT WOULD BE PROVIDED.  THAT IS WHY IT IS

20   LIMITED TO ABOUT 100 OF THIS PRODUCT A YEAR, BECAUSE THERE IS

21   JUST NOT THAT GREAT OF A DEMAND.

22        A BROKER WOULD BE PAYING MORE IN COMMISSION, AND A

23   SHIPYARD WOULD CERTAINLY BE WATCHING THEIR EXPENSES AND GOING

24   DIRECTLY TO THE PROVIDER RATHER THAN SEEING HOW MUCH MORE

25   MONEY THEY CAN TACK ON TO A PURCHASE.

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1    Q.    WOULD IT BE CHEAPER TO GO DIRECTLY TO SPERRY MARINE --

2    A.    YES.

3    Q.    -- THAN GO TO A BROKER?

4    A.    YES, CONSIDERABLY.

5    Q.    AND HAD YOU EVER DEALT WITH TIMCO MARINE --

6    A.    NO.

7    Q.    -- IN YOUR PRIOR CONTACTS?

8    A.    NO.

9    Q.    AND THEY ARE LOCATED WHERE?

10   A.    I BELIEVE THEY ARE LOCATED IN NEW ALBANY, INDIANA.

11   Q.    AND THIS IS FOR MARINE NAVIGATION EQUIPMENT, CORRECT?

12   A.    CORRECT.

13   Q.    SO THIS COMPANY IS LOCATED IN THE MIDWEST?

14   A.    YES.

15   Q.    AND AFTER YOU SENT THIS EMAIL DID YOU GET CONFIRMATION

16   FROM DAVID GARRETT THAT HE IN FACT HAD NO BID OR NO SALE TO

17   CUSTOMER?

18   A.    YES, I DID.

19   Q.    HOW DID HE COMMUNICATE THAT TO YOU?

20   A.    BASICALLY IN A ONE-SENTENCE STATEMENT JUST SAYING, WE

21   HAVE NO BID THIS REQUEST.

22   Q.    WAS THAT THROUGH THE TELEPHONE OR BY EMAIL?

23   A.    EMAIL.

24   Q.    LET ME SHOW YOU GOVERNMENT EXHIBIT 455 FOR

25   IDENTIFICATION.

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

```
 1        IS THAT THE EMAIL WE JUST TALKED ABOUT?

 2            (EXHIBIT 455 MARKED FOR IDENTIFICATION)

 3   A.   YES.

 4   Q.   OKAY.  AND WAS THAT ADDRESSED TO YOU OR WERE YOU CARBON

 5   COPIED?

 6   A.   I WAS COPIED.

 7   Q.   OKAY.  AND AGAIN, AS PART OF YOUR DUTIES DID YOU

 8   MAINTAIN THIS EMAIL, AND NORTHROP GRUMMAN MAINTAIN THIS EMAIL?

 9   A.   YES, I DID.

10   Q.   FOR THE SAME REASONS YOU MAINTAINED THE PREVIOUS EMAILS?

11   A.   YES.

12        MR. HARRIGAN:  YOUR HONOR, I MOVE TO ADMIT

13   GOVERNMENT EXHIBIT 455.

14        MR. CAMDEN:  NO OBJECTION.

15        THE COURT:  RECEIVED.

16            (EXHIBIT 455 RECEIVED INTO EVIDENCE)

17   Q.   (MR. HARRIGAN) NOW, AGAIN LOOKING AT THE HEADER

18   INFORMATION, THIS IS FROM THE SALES MANAGER, DAVID GARRETT?

19   A.   YES.

20   Q.   TO ALL OF THE INDIVIDUALS YOU MENTIONED PREVIOUSLY?

21   A.   YES.

22   Q.   INCLUDING YOURSELF?

23   A.   RIGHT.

24   Q.   THAT WAS SENT, AGAIN, ON DECEMBER 19TH?

25   A.   YES.
```

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1    **Q.**    AND LOOKING AT THE BODY.  AND WHAT DOES DAVID GARRETT

2    TELL YOU ALL IN THAT EMAIL?

3    **A.**    HE IS BASICALLY ADDRESSING IT TO GO HEATHER MARKIN, WHO

4    IS THE EXPORT MANAGER.  AND HE IS TELLING HER THAT -- WELL,

5    FIRST OF ALL SHE HAD SENT HIM AN EMAIL TELLING HIM THAT SHE

6    WAS IN SUPPORT OF THE DECISION TO NOT SELL THE PRODUCT.  AND

7    HE IS TELLING HER:  THANK YOU, HEATHER.  I HAVE NO BID THE

8    CUSTOMER.

9    **Q.**    SO AFTER YOU HAD THIS EMAIL DID YOU ALSO HAVE CONTACT

10   WITH AGENT HAMAKO?

11   **A.**    YES.

12   **Q.**    WHAT DID YOU INFORM HIM?

13   **A.**    I INFORMED HIM THAT I WAS GOING TO TYPE UP AN EMAIL, A

14   FORMAL EMAIL, TO DEFENSE SECURITY SERVICES BASICALLY RESTATING

15   THE SAME INFORMATION THAT WE HAVE TALKED ABOUT.  AND THAT IT

16   WOULD BE A CASE IN THEIR HANDS, THEY TAKE IT FROM THERE.

17   **Q.**    OKAY.  AND WHEN YOU MAKE A DETERMINATION IN TERMS OF

18   MAKING NO SALE, IT IS NOT A LAW ENFORCEMENT DETERMINATION, IS

19   IT?

20   **A.**    OH, NO.  NO.

21   **Q.**    AND YOU ARE MAKING THE DETERMINATION BASED ON YOUR

22   COMPANY'S CONCERNS?

23   **A.**    YES.

24   **Q.**    AND TO MAKE SURE YOU ARE, AS YOU TESTIFIED BEFORE, THAT

25   YOU COMPLY WITH THE U.S. EXPORT LAWS.

APRIL 14, 2015

TOPCZEWSKI – DIRECT EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    AND YOU FORWARDED THIS TO DEPARTMENT OF HOMELAND

3    SECURITY?

4    **A.**    YES.

5    **Q.**    AND DEFENSE SECURITY SERVICES?

6    **A.**    YES.

7              **MR. HARRIGAN:**  ONE MOMENT, YOUR HONOR.

8              I HAVE NO FURTHER QUESTIONS AT THIS TIME, YOUR

9    HONOR.

10             **THE COURT:**  CROSS-EXAMINATION.

11                          CROSS-EXAMINATION

12   **Q.**    **(MR. CAMDEN)**  HI.  MR. TOPCZEWSKI?

13   **A.**    YES.  THANK YOU.

14   **Q.**    SO SPERRY MARINE -- NORTHROP GRUMMAN SPERRY MARINE IS A

15   BUSINESS, CORRECT?

16   **A.**    CORRECT.

17   **Q.**    AND THE POINT OF THE BUSINESS IS TO MAKE MONEY.

18   **A.**    CORRECT.

19   **Q.**    AND SPERRY MARINE MAKES MONEY BY MAKING THINGS AND

20   SELLING THEM, CORRECT?

21   **A.**    YES.

22   **Q.**    NOW I WANT TO TALK ABOUT DUBAI A LITTLE BIT.

23             SO DUBAI IS A PORT CITY.  YOU ARE AWARE OF THAT, RIGHT?

24   **A.**    YES.

25   **Q.**    THERE ARE A LOT OF SHIPS THAT COME IN?  THERE IS A LOT

APRIL 14, 2015

288

TOPCZEWSKI – CROSS–EXAMINATION

1    OF TRADE?

2    **A.**    YES.

3    **Q.**    CORRECT?

4    **A.**    CORRECT.

5    **Q.**    THERE ARE DRY DOCKS THERE?

6    **A.**    YES.

7    **Q.**    ARE YOU FAMILIAR AT ALL WITH DUBAI MARITIME CITY?

8    **A.**    NOT INTIMATELY FAMILIAR, NO.  I HAVE HEARD OF IT.

9    **Q.**    YOU HAVE HEARD OF IT.

10   **A.**    AS A SHIPPING PORT.

11   **Q.**    ARE YOU AWARE THAT DUBAI BUILT DUBAI MARITIME CITY, THEY

12   DREDGED IT UP FROM THE HARBOR AS AN ISLAND?

13   **A.**    NO.

14   **Q.**    ARE YOU AWARE THAT THERE ARE DRY DOCKS AND PORTS IN

15   DUBAI?

16   **A.**    YES.

17   **Q.**    SO EVERY TIME -- YOU TESTIFIED ABOUT -- A LITTLE BIT

18   ABOUT THE PROCESS, AND I WANT TO GET INTO THAT.

19           SO EVERY TIME SPERRY MARINE MAKES A NO BID OR SAYS NO TO

20   A POSSIBLE SALE, THAT SALE DOESN'T HAPPEN, CORRECT?

21   **A.**    CORRECT.

22   **Q.**    SO SPERRY MARINE DOESN'T MAKE MONEY ON THAT.

23   **A.**    CORRECT.

24   **Q.**    SO WHEN YOU RECOMMEND A NO BID TO MANAGEMENT, YOU HAVE

25   TO BE ABLE TO JUSTIFY YOUR -- THAT JUDGMENT TO MANAGEMENT.

APRIL 14, 2015

TOPCZEWSKI – CROSS–EXAMINATION

1    **A.**    YES.

2    **Q.**    BECAUSE IF YOU DENY TOO MANY BIDS SPERRY MARINE COULD

3    LOSE MONEY, CORRECT?

4    **A.**    CORRECT, YES.

5    **Q.**    AND YOU ARE AWARE THAT NORTHROP GRUMMAN ACTUALLY DOES

6    SELL PRODUCTS IN –– TO DUBAI, CORRECT?

7    **A.**    YES.

8    **Q.**    IN FACT, NORTHROP GRUMMAN PARTICIPATES IN THE GLOBAL

9    DEFENSE CAPABILITIES CONFERENCE EVERY YEAR THAT IS HELD IN

10   DUBAI?

11   **A.**    YES.

12   **Q.**    THAT IS IN THE UNITED ARAB EMIRATES.

13   **A.**    YES.

14   **Q.**    SO YOU SAID TO MAKE YOUR RECOMMENDATION TO MANAGEMENT

15   RELIABLE, OR FOR THEM TO BE ABLE TO RELY ON IT, YOU RELY ON A

16   LOT OF RESOURCES.  SO I WANT TO TALK ABOUT THOSE.  LET'S START

17   WITH YOUR TRAINING.

18        THE GOVERNMENT WENT OVER A LITTLE BIT ABOUT YOUR

19   BACKGROUND BUT I WANT TO GO INTO A LITTLE MORE DETAIL.

20        SO YOU STARTED OFF WITH 10 YEARS IN THE CHICAGO POLICE

21   DEPARTMENT, CORRECT?

22   **A.**    CORRECT.

23   **Q.**    YOU HAVE AN ASSOCIATE DEGREE IN SECURITY, SAFETY AND

24   TECHNOLOGY?

25   **A.**    YES.

APRIL 14, 2015

TOPCZEWSKI – CROSS-EXAMINATION

1   Q.    AFTER YOUR 10 YEARS AT THE CHICAGO POLICE DEPARTMENT YOU

2   WORKED FOR LOUISIANA POWER AND LIGHT COMPANY, CORRECT?

3   A.    CORRECT.

4   Q.    AND THAT ACTUALLY INCLUDED -- THEY RAN A NUCLEAR

5   FACILITY, CORRECT?

6   A.    YES.

7   Q.    AND PART OF YOUR JOB WAS THE NUCLEAR PERSONNEL SCREENING

8   PROGRAM.

9   A.    YES.

10  Q.    AFTER THAT, IN 1986, YOU WENT TO BAILEY HENCHY DOWNS AND

11  ASSOCIATES [PH.]?

12  A.    CORRECT.

13  Q.    AND WHILE YOU WERE THERE YOU DID BACKGROUND

14  INVESTIGATIONS?

15  A.    YES.

16  Q.    YOU RECEIVED TRAINING AT THAT JOB?

17  A.    YES.

18  Q.    OKAY.  AFTER THAT YOU WENT TO ANOTHER SPECIALIZED

19  SECURITY FIRM, INDUSTRIAL SECURITY SPECIALISTS, FROM '90 TO

20  '91, RIGHT?

21  A.    YES.

22  Q.    YOU RECEIVED MORE TRAINING THERE?

23  A.    YES.

24  Q.    IN FACILITIES SECURITY?

25  A.    YES.

APRIL 14, 2015

TOPCZEWSKI – CROSS-EXAMINATION

1   **Q.**    AND IN GENERAL CORPORATE SECURITY?

2   **A.**    YES.

3   **Q.**    AFTER THAT, IN 1991, IS WHEN YOU STARTED AT NORTHROP

4   GRUMMAN, CORRECT?

5   **A.**    CORRECT.

6   **Q.**    YOU WERE A CERTIFIED FACILITY SECURITY OFFICER.

7   **A.**    CORRECT.

8   **Q.**    YOU HAD TO GO THROUGH SOME KIND OF PROCESS AND TRAINING?

9   **A.**    YES.

10  **Q.**    THEN FOR THE LAST NINE OF THE 22 YEARS AT NORTHROP YOU

11  WERE AT THE NAVAL AND MARINE DIVISION HEADQUARTERS.

12  **A.**    CORRECT.

13  **Q.**    AND YOU HAVE BEEN FOCUSING FOR MOST OF THAT TIME ON

14  SUSPICIOUS CONTACT REPORTS?

15  **A.**    NO, THAT WAS A VERY SMALL PART OF THE JOB.  IT WAS AN

16  IMPORTANT PART BUT A VERY SMALL PART.

17  **Q.**    YOU DID TESTIFY A LITTLE BIT ABOUT IN 2003 YOU STARTED

18  GETTING LARGER VOLUME REQUESTS FOR THE NAVIGAT-2100, RIGHT?

19  **A.**    2003 WAS THE FIRST CASE THAT CAME IN THAT WAS RECOGNIZED

20  AS AN INAPPROPRIATE REQUEST, AND THAT IS WHEN THE TRACKING

21  STARTED.

22  **Q.**    RIGHT.  SO THE RESPONSE WAS TO CONSULT WITH THE

23  GOVERNMENT, RIGHT?

24  **A.**    CORRECT.

25  **Q.**    SO YOU SAID YOUR TRAINING AT THAT POINT -- OR THE

APRIL 14, 2015

TOPCZEWSKI – CROSS-EXAMINATION

```
 1   TRAINING PROVIDED TO SPERRY MARINE EMPLOYEES WAS PROVIDED BY
 2   DSS, DEFENSE -- WHAT IS IT AGAIN?
 3   A.   DEFENSE SECURITY SERVICES.
 4   Q.   RIGHT.  THE FBI, YOU SAID.
 5   A.   YES.
 6   Q.   HOMELAND SECURITY?
 7   A.   YES.
 8   Q.   NCIS?
 9   A.   YES.
10   Q.   ALL OF THOSE AGENCIES WERE INVOLVED IN TRAINING SPERRY
11   MARINE AND NORTHROP GRUMMAN PERSONNEL TO RECOGNIZE THESE
12   REQUESTS.
13   A.   YES.  I DON'T WANT TO MISREPRESENT THAT.  THERE WASN'T A
14   MEETING WHERE NORTHROP GRUMMAN EMPLOYEES WOULD COME IN AND
15   MEET WITH THESE INDIVIDUALS.  THESE INDIVIDUALS WOULD COME IN
16   AND TALK TO MYSELF AND CERTAIN MANAGEMENT LEVEL PEOPLE, AND
17   THEN WE WOULD DISSEMINATE THE TRAINING.
18   Q.   YOU WERE ONE OF THE FIRST PEOPLE.  YOU GOT THE TRAINING
19   FROM THE GOVERNMENT AND PASSED THAT ON.
20   A.   YES.  I JUST WANTED TO MAKE THAT CLEAR.
21   Q.   OKAY.  THE NEXT THING I WANT TO TALK ABOUT IS THE
22   RESOURCES.  SO YOU TESTIFIED -- SO WHEN DAVID GARRETT SENT YOU
23   THE FIRST EMAIL SAYING, I GOT THIS REQUEST FOR A NAVIGAT-2100,
24   HE SAID HE LOOKED UP THE BOAT ON SEA-WEB.  REMEMBER THAT?
25   A.   YES.
```

APRIL 14, 2015

TOPCZEWSKI – CROSS-EXAMINATION

1    **Q.**    SO I WANT TO TALK ABOUT SEA-WEB A LITTLE BIT.

2           SEA-WEB IS A WEBSITE THAT ALLOWS USERS TO LOOK UP A

3    PARTICULAR SHIP AND GET DETAILS ABOUT THE SHIP, RIGHT?

4    **A.**    CORRECT.

5    **Q.**    AND THAT IS A SUBSCRIPTION SERVICE.  IT IS PAID, RIGHT?

6    **A.**    YES.

7    **Q.**    AND NORTHROP GRUMMAN SPERRY MARINE HAS A SUBSCRIPTION

8    UNDER THAT SERVICE.

9    **A.**    YES.

10   **Q.**    AND IT WAS THROUGH THIS PAID SUBSCRIPTION SERVICE THAT

11   NORTHROP GRUMMAN LEARNED DETAILS ABOUT THE WESAL-V.

12   **A.**    YES.

13   **Q.**    NORTHROP GRUMMAN ALSO -- SO IN DETERMINING WHETHER A

14   SALE MIGHT EXPOSE THE COMPANY TO SOME KIND OF RISK YOU ALSO

15   HAVE ACCESS TO EASE NORTH AMERICA DATABASE [PH.], RIGHT?

16   **A.**    I AM NOT FAMILIAR WITH THAT ONE.

17   **Q.**    OCR SOLUTIONS?

18   **A.**    NO, I HADN'T HEARD THAT TERM.  I KNOW THEY HAD OTHER

19   AVENUES TO GO, BUT I WASN'T FAMILIAR WITH THEM.

20   **Q.**    BUT YOU KNOW THERE ARE DATABASES WHERE YOU CAN LOOK UP

21   THE DETAILS OF A PROPOSED SALE, YOU CAN ENTER THEM IN AND IT

22   WILL GIVE YOU BACK ANY KIND OF RED FLAGS THAT MIGHT COME UP,

23   CORRECT?

24   **A.**    NO, I NEVER DEALT WITH THAT.

25   **Q.**    I AM GOING TO SHOW YOU WHAT HAS BEEN MARKED JUST FOR

APRIL 14, 2015

TOPCZEWSKI – CROSS-EXAMINATION

1    IDENTIFICATION AS DEFENDANT'S EXHIBIT D.

2         IF YOU COULD TURN IN THAT PACKET -- ONE, TWO -- TO THE

3    THIRD PAGE OF THAT PACKET -- SORRY -- THE FOURTH PAGE.  IT IS

4    MARKED AT THE BOTTOM TIG NGC000022.  YOU FOUND THAT PAGE?

5              (EXHIBIT D MARKED FOR IDENTIFICATION)

6    **A.**   YES.

7    **Q.**   NOW, THIS IS INFORMATION THAT WAS PROVIDED TO YOU

8    PREVIOUSLY ON DECEMBER 19TH, 2012, CORRECT?

9    **A.**   NO, NOT TO ME.

10   **Q.**   IF YOU FLIP BACK TO THE FRONT PAGE.  DO YOU RECOGNIZE

11   THIS AS AN EMAIL THAT WAS SENT BY MICHAEL FRACKIEWICZ TO DAVID

12   GARRETT, AND ON WHICH YOU WERE CC'D, THAT WAS SENT ON

13   DECEMBER 19TH, 2012?

14   **A.**   YES.

15   **Q.**   SO YOU RECEIVED A COPY OF THIS EMAIL, RIGHT?

16   **A.**   YES, IT WOULD APPEAR THAT I DID.

17   **Q.**   AND THE SUBJECT LINE DOES HAVE 117-08.  AND YOU SAID

18   THAT YOU MARKED THESE EMAILS AS THEY COME IN.

19   **A.**   YES, CORRECT.

20   **Q.**   SO THIS WOULD BE AN EMAIL THAT YOU RECEIVED, THEN.

21   **A.**   YES.

22   **Q.**   AND WERE REQUIRED TO KEEP AS PART OF YOUR COMPILING THE

23   RECORD FOR A SUSPICIOUS CONTACT REPORT.

24   **A.**   YES.

25   **Q.**   SO THIS IS JUST TO REFRESH YOUR RECOLLECTION.  LOOK AT

APRIL 14, 2015

1    PAGE 3 OF THIS PACKET.

2    **A.**    3?

3    **Q.**    YEAH.  THE THIRD -- SORRY -- FOURTH PAGE.

4    **A.**    YES.

5    **Q.**    OKAY.  SO THIS WAS THE ATTACHMENT IN THE EMAIL THAT WAS

6    SENT TO YOU, CORRECT?

7    **A.**    CORRECT.

8    **Q.**    AND THIS IS A PRINTOUT FROM A WEBSITE, OCR-INC.COM,

9    CORRECT?

10    **A.**    THAT IS NOT -- YES.  I SEE ON THE BOTTOM HERE, CORRECT.

11    **Q.**    SO YOU WOULD AGREE AT THIS POINT THAT SPERRY MARINE DOES

12    HAVE ACCESS TO -- SORRY.  THIS IS, IN GENERAL, A SCREENING

13    DETAIL ON THE REQUEST, CORRECT?

14    **A.**    YES.

15    **Q.**    AND THIS WAS COMPLETED NOT BY YOU BUT BY MICHAEL

16    FRACKIEWICZ, CORRECT?

17    **A.**    YES.

18    **Q.**    YOU WOULD AGREE THAT PEOPLE AT SPERRY MARINE, LIKE

19    MICHAEL FRACKIEWICZ, WOULD HAVE ACCESS TO DATABASES LIKE THIS.

20    **A.**    YES, I AGREE.

21    **Q.**    A DATABASE WHERE THEY CAN ENTER INFORMATION, AND GET

22    BACK AS PART OF THE DATABASE ANY KIND OF RED FLAGS.

23    **A.**    YES.

24    **Q.**    AND THAT IS WHERE THE RED FLAG FOR DUBAI CAME UP,

25    CORRECT?

TOPCZEWSKI – CROSS–EXAMINATION

1    **A.**    NO, NOT TO MY KNOWLEDGE, NO.  BECAUSE I DIDN'T USE THIS

2    FORM IN ANY OF MY DETERMINATIONS.

3    **Q.**    OKAY.  SO IN ADDITION TO SEA–WEB AND THE OCR DATABASE

4    AND YOUR TRAINING AND BACKGROUND, YOU HAVE HAD 40 YEARS,

5    ESSENTIALLY, OF WORKING EITHER IN LAW ENFORCEMENT OR CLOSELY

6    WITH LAW ENFORCEMENT, CORRECT?

7    **A.**    CORRECT.

8    **Q.**    AND IN YOUR NINE YEARS AT NAVAL AND MARINE DIVISION

9    HEADQUARTERS YOU DEVELOPED PROFESSIONAL RELATIONSHIPS WITH

10   FEDERAL LAW ENFORCEMENT OFFICERS.

11   **A.**    YES.

12   **Q.**    BRUCE RAINEY AT THE DEFENSE SECURITY SERVICE.

13   **A.**    YES.

14   **Q.**    AND KEVIN HAMAKO?

15   **A.**    YES.

16   **Q.**    AND KEVIN HAMAKO WORKS AS HOMELAND SECURITY

17   INVESTIGATIONS?

18   **A.**    YES.

19   **Q.**    AND WHEN YOU CALLED HIM ABOUT RECEIVING THIS REQUEST ON

20   DECEMBER 18TH, YOU WERE ABLE TO SPEAK WITH HIM PERSONALLY,

21   RIGHT?

22   **A.**    I BELIEVE SO, YES.  I DON'T RECALL FOR A FACT THAT I DID

23   CALL HIM FIRST OR EMAIL HIM.

24   **Q.**    AND AGENT HAMAKO IS THE ONE WHO DID THE BACKGROUND

25   RESEARCH, THE FACTUAL INVESTIGATION, CORRECT?

APRIL 14, 2015

TOPCZEWSKI – CROSS-EXAMINATION

1    **A.**    YES.

2    **Q.**    HE IS THE ONE WHO FOUND OUT THAT TIG HAD EMPLOYED

3    IRANIAN NATIONALS, RIGHT?

4    **A.**    YES.

5    **Q.**    AND HE WAS THE ONE WHO FOUND OUT THAT ERGUN YILDIZ, THE

6    PERSON WHO SIGNED THE END USER REQUEST, WAS ALSO EMPLOYED WITH

7    THE GENERAL TRADING COMPANY IN DUBAI.

8    **A.**    YES.

9    **Q.**    AND YOU INCORPORATED THAT INFORMATION YOU GOT FROM AGENT

10   HAMAKO INTO YOUR DECISION AND YOUR RECOMMENDATION TO

11   MANAGEMENT TO NO BID THIS REQUEST.

12   **A.**    CORRECT.

13           **MR. CAMDEN:**  GOVERNMENT'S 456.

14           (EXHIBIT 456 MARKED FOR IDENTIFICATION)

15           **MR. HARRIGAN:**  YOUR HONOR, I THINK, FOR THE RECORD,

16   THAT THE DEFENSE WANTS TO USE GOVERNMENT EXHIBIT 456, WHICH IS

17   MARKED FOR IDENTIFICATION.  THE PARTIES WOULD STIPULATE THAT

18   THAT CAN BE ADMITTED INTO EVIDENCE.

19           **THE COURT:**  ALL RIGHT.  IT IS RECEIVED.

20           **MR. CAMDEN:**  IT IS MARKED AT THE TOP AS A

21   GOVERNMENT'S EXHIBIT AND BOTTOM AS A DEFENSE EXHIBIT.

22           **THE COURT:**  THANK YOU.  456 WILL BE RECEIVED.

23           (EXHIBIT 456 MARKED AND RECEIVED INTO EVIDENCE)

24           **MR. CAMDEN:**  MAY I HAVE PERMISSION TO PUBLISH IT TO

25   THE JURY?

APRIL 14, 2015

TOPCZEWSKI – CROSS-EXAMINATION

1        **THE COURT:**  YES.

2   **Q.**    **(MR. CAMDEN)** SO TAKE A LOOK AT THIS EMAIL.  THIS IS

3   FROM YOU, CORRECT?

4   **A.**    YES.

5   **Q.**    TO BRUCE RAINEY, WHO IS AT DEFENSE SECURITY SERVICES?

6   **A.**    YES.

7   **Q.**    AND IT IS DATED DECEMBER 19TH, 2012?

8   **A.**    CORRECT.

9   **Q.**    AND THIS IS THE END PRODUCT SUSPICIOUS CONTACT REPORT,

10  CORRECT?

11  **A.**    YES.

12  **Q.**    SO ONCE YOU HAVE COMPLETED YOUR NO BID PROCESS AND

13  COMPLETED YOUR INVESTIGATION WITH THE HELP OF AGENT HAMAKO,

14  THAT IS WHEN YOU FILED A FORMAL REPORT WITH THE DEFENSE

15  SECURITY SERVICES.

16  **A.**    CORRECT.

17  **Q.**    AND YOU WROTE -- AND THIS IS A RECORD THAT YOU KEEP AS

18  PART OF YOUR ORDINARY BUSINESS PRACTICE, CORRECT?

19  **A.**    CORRECT.

20  **Q.**    AND YOU HAVE KNOWLEDGE OF ALL OF THE FACTS REGARDING

21  THIS.

22  **A.**    YES.

23  **Q.**    I WANT TO TALK ABOUT THIS A LITTLE BIT.

24        YOU SAID THAT ON DECEMBER 19TH THE REQUEST WAS CHANGED

25  FROM A NAVIGAT-2100 TO A NAVIGAT-3000.

APRIL 14, 2015

TOPCZEWSKI – CROSS–EXAMINATION

1   **A.**   YES.

2   **Q.**   YOU NEVER RECEIVED INFORMATION CHANGING THAT REQUEST

3   FROM TAMMY FARNSLEY AT TIMCO.

4   **A.**   PERSONALLY, NO, I DIDN'T.

5   **Q.**   NOR FROM MR. GHAHREMAN.

6   **A.**   NO.

7   **Q.**   YOU NEVER HAD ANY CONTACT WITH MR. GHAHREMAN.

8   **A.**   NO.

9   **Q.**   YOU NEVER ANY DIRECT CONTACT WITH TIMCO MARINE?

10   **A.**   NO.

11   **Q.**   YOU NEVER HAD ANY DIRECT CONTACT WITH TIG MARINE.

12   **A.**   NO.

13   **Q.**   OR ERGUN YILDIZ.

14   **A.**   NO.

15   **Q.**   OKAY.  AND SO YOU WROTE THE –– YOU RESEARCHED IT AND YOU

16   VETTED IT AND YOU WROTE THAT YOU ARE RECOMMENDING A NO SALE,

17   CORRECT?

18   **A.**   CORRECT.

19   **Q.**   AND YOU LISTED THE REASONS.

20   **A.**   YES.

21   **Q.**   AND THOSE WERE THE SAME REASONS THAT YOU HAD RECEIVED

22   FROM OFFICER HAMAKO AND FROM DAVID GARRETT?

23   **A.**   YES.

24   **Q.**   NOW, AT THIS POINT YOU HAD RECEIVED THE REQUEST, YOU

25   SAID, FROM TIMCO MARINE, RIGHT?

APRIL 14, 2015

391

TOPCZEWSKI – CROSS-EXAMINATION

1  **A.**   YES.

2  **Q.**   AND THAT HAD AN END USER CERTIFICATE ATTACHED, CORRECT?

3  **A.**   CORRECT.

4  **Q.**   AND THAT LISTED ERGUN YILDIZ AS THE OWNER OF TIG MARINE.

5  **A.**   YES.

6  **Q.**   THE MANAGER OF TIG MARINE.

7  **A.**   YES, MANAGER.

8  **Q.**   AND IT LISTED THE WESAL-V AS THE VESSEL, AND IT STATED

9  THAT THE VESSEL WAS IN DUBAI.

10  **A.**   YES.

11  **Q.**   AND IT SAID THAT TIG MARINE WAS IN DUBAI, RIGHT?

12  **A.**   YES.

13  **Q.**   AND THAT IS ALL INFORMATION THAT TIMCO MARINE FORWARDED

14  TO NORTHROP GRUMMAN.

15  **A.**   YES.

16  **Q.**   AND YOU WROTE IN YOUR OFFICIAL REPORT TO BRUCE RAINEY AT

17  THE DEFENSE SECURITY SERVICES:  WE SUSPECT THAT THE U.S.

18  COMPANY TIMCO MARINE IS UNAWARE OF THE IMPLICATIONS OF THIS

19  TRANSACTION.

20       CORRECT?

21  **A.**   YES.

22       **MR. CAMDEN:**  NO FURTHER QUESTIONS, YOUR HONOR.

23       **THE COURT:**  REDIRECT?

24       **MR. HARRIGAN:**  NO, YOUR HONOR.

25       **THE COURT:**  ALL RIGHT.  THANK YOU VERY MUCH.  YOU

APRIL 14, 2015

TOPCZEWSKI – CROSS–EXAMINATION

```
1    WOULD BE EXCUSED AT THIS TIME.
2              GOVERNMENT'S NEXT.
3              MR. HARRIGAN:  YOUR HONOR, MAY MR. TOPCZEWSKI BE
4    EXCUSED?
5              THE COURT:  YES.  THANK YOU.
6              MR. COUGHLIN:  YOUR HONOR, AT THIS TIME THE
7    GOVERNMENT IS CALLING BACK TO THE STAND MS. MOLLY MILLER.
8              THE COURT:  ALL RIGHT.  THANK YOU.
9              MS. MILLER.
10             GOOD MORNING, MS. MILLER.  I WOULD REMIND YOU REMAIN
11   UNDER OATH FROM YESTERDAY'S PROCEEDINGS.
12             THE WITNESS:  YES, YOUR HONOR.
13                  DIRECT EXAMINATION (RESUMED)
14   Q.   (MR. COUGHLIN) GOOD MORNING, MS. MILLER.
15   A.   GOOD MORNING.
16   Q.   YESTERDAY WE BEGAN TO DISCUSS CERTIFIED LICENSE
17   DETERMINATIONS AND CERTIFIED LICENSING HISTORY CHECKS; IS THAT
18   CORRECT?
19   A.   YES.
20   Q.   AND IS THAT RESPONSIBILITY AND DETERMINATION CONDUCTED
21   BY OFAC?
22   A.   YES.
23   Q.   ARE YOU PERSONALLY FAMILIAR WITH OFAC'S LICENSING
24   PROCESS, BOTH AS TO THE GENERAL LICENSES AND SPECIFIC LICENSES
25   THAT IT ISSUES?
```

APRIL 14, 2015

MILLER – DIRECT EXAMINATION

1   **A.**   YES.

2   **Q.**   AND ARE YOU PERSONALLY FAMILIAR WITH THE RECORDS THAT

3   ARE KEPT AND MAINTAINED BY OFAC THAT THEY SEARCH IN RELATION

4   TO MAKING DETERMINATIONS AND ISSUING LICENSES AS REQUESTED AND

5   GRANTED?

6   **A.**   YES.

7   **Q.**   HOW ARE THOSE RECORDS MAINTAINED?

8   **A.**   WE KEEP RECORDS OF ALL INCOMING CORRESPONDENCE AND ALL

9   RESPONSES, WHETHER THEY ARE DENIALS OR LICENSES, DATING BACK

10  TO ABOUT 1990.

11  **Q.**   ARE THOSE KEPT IN A WAY THAT YOU, AS AN EMPLOYEE OF

12  OFAC, WOULD HAVE ACCESS TO?

13  **A.**   YES.   THEY ARE IN AN ELECTRONIC DATABASE.

14  **Q.**   WHAT IS THE DATE RANGE, AGAIN, OF THE DATA THAT IS KEPT

15  BY OFAC?

16  **A.**   BEGINNING AROUND 1990 TO PRESENT.

17  **Q.**   WOULD THE RECORDS THAT OFAC MAINTAINS AND KEEPS, WOULD

18  THEY REVEAL WHETHER A LICENSE WAS EVER SOUGHT TO EXPORT

19  TECHNOLOGY OR A SPECIFIC GOOD TO A SANCTIONED OR EMBARGOED

20  COUNTRY?

21  **A.**   YES.

22  **Q.**   DO YOU HAVE EXPERIENCE SEARCHING OFAC LICENSING RECORDS?

23  **A.**   YES, I DO.

24  **Q.**   DO YOU ALSO –– DID YOU ALSO SUPERVISE A STAFF THAT ALSO

25  DID THE SEARCHING AND CHECKING OF LICENSES?

APRIL 14, 2015

MILLER - DIRECT EXAMINATION

1    **A.**    YES.

2    **Q.**    ARE YOU AWARE IF YOUR OFFICE RECEIVED A REQUEST FROM THE

3    UNITED STATES ATTORNEY'S OFFICE FOR THE SOUTHERN DISTRICT OF

4    CALIFORNIA TO PERFORM A CERTIFIED LICENSE DETERMINATION AS

5    WELL AS A CERTIFIED HISTORY CHECK?

6    **A.**    YES.

7    **Q.**    AND ARE YOU AWARE OF WHETHER THERE WAS A RESPONSE ISSUED

8    PREVIOUSLY?

9    **A.**    YES, THERE WAS.

10   **Q.**    AND WERE YOU PERSONALLY INVOLVED IN RUNNING THE RECORDS

11   OR PREPARING THE RECORDS OF THAT RESPONSE?

12   **A.**    NOT OF THE PRIOR ONE.

13   **Q.**    HAVE YOU HAD AN OPPORTUNITY TO CHECK AND SEE IF YOU

14   WOULD BE ABLE TO ACCESS THE RECORDS HERE FROM SAN DIEGO WITH

15   REGARD TO YOUR AGENCY?

16   **A.**    YES, I DID.

17   **Q.**    AND WERE YOU ABLE TO DO THAT?

18   **A.**    YES.

19   **Q.**    ARE YOU AUTHORIZED, AS PART OF YOUR DUTIES AND

20   RESPONSIBILITIES AT OFAC, TO RUN CERTIFIED LICENSE

21   DETERMINATIONS AS WELL AS CERTIFIED LICENSE HISTORY CHECKS?

22   **A.**    YES.

23   **Q.**    NOW, WITH REGARD TO THE REQUEST THAT WAS PREVIOUSLY

24   MADE, DID YOU HAVE AN OPPORTUNITY TO RUN THAT REQUEST?

25   **A.**    YES, I DID.

APRIL 14, 2015

MILLER – DIRECT EXAMINATION

1   **Q.**    AND DID YOU GET A DETERMINATION WITH REGARD TO THE

2   DETERMINATION THAT WAS SOUGHT AS WELL AS THE HISTORY CHECK?

3   **A.**    YES.  BOTH.

4   **Q.**    AND HAVE YOU PREPARED A DOCUMENT IN RELATION TO THE WORK

5   THAT YOU PERFORMED?

6   **A.**    YES.

7           **MR. COUGHLIN:**  MAY I APPROACH, YOUR HONOR?

8           **THE COURT:**  YES.

9           **MR. COUGHLIN:**  CAN WE HAVE THE NEXT EXHIBIT IN THE

10  400 SERIES THAT WE MIGHT USE?

11          **THE CLERK:**  457.

12          **MR. COUGHLIN:**  457.  OKAY.

13          **MR. HARRIGAN:**  PARDON ME.  IF I MAY APPROACH?

14          **THE COURT:**  YES.

15          **MR. COUGHLIN:**  WE ARE GOING TO MARK THIS AS

16  GOVERNMENT EXHIBIT 403.

17          (EXHIBIT 403 MARKED FOR IDENTIFICATION)

18  **Q.**    **(MR. COUGHLIN)** SHOWING YOU WHAT HAS BEEN PREVIOUSLY

19  MARKED AS GOVERNMENT'S EXHIBIT 403, DO YOU RECOGNIZE WHAT THAT

20  IS?

21  **A.**    I DO.

22  **Q.**    COULD YOU TELL US WHAT THAT IS?

23  **A.**    IT IS THE CERTIFIED LICENSE DETERMINATION AND CERTIFIED

24  LICENSE HISTORY CHECK THAT I PERFORMED LAST NIGHT.

25  **Q.**    AND CAN YOU TELL US IF YOU IN FACT ARE THE SIGNATOR OF

APRIL 14, 2015

MILLER - DIRECT EXAMINATION

```
 1   THAT?
 2   A.    I AM.
 3   Q.    SO YOU COMBINED THE TWO PREVIOUS SEARCHES INTO ONE
 4   DOCUMENT?
 5   A.    THAT'S CORRECT.
 6   Q.    CAN YOU TELL US WHAT YOU DETERMINED WITH REGARD TO THE
 7   CERTIFIED LICENSE DETERMINATION?
 8   A.    I DETERMINED THAT THE EXPORT --
 9         MR. CAMDEN:  IF I COULD ASK TWO QUESTIONS ON VOIR
10   DIRE.
11         THE COURT:  YES.
12                   VOIR DIRE EXAMINATION
13   Q.    (MR. CAMDEN) MS. MILLER, I AM GOING TO ASK YOU A COUPLE
14   OF QUESTIONS.
15         DID YOU PERSONALLY RUN THE CHECK, PERSONALLY ACCESS THE
16   DATABASES THAT OFAC MAINTAINS ABOUT LICENSING?
17   A.    YES, I DID.
18         MR. CAMDEN:  THAT'S ALL.
19         THE COURT:  MR. COUGHLIN.
20         MR. COUGHLIN:  THANK YOU.
21              DIRECT EXAMINATION (RESUMED)
22   Q.    (MR. COUGHLIN) WITH REGARD TO -- WE WERE TALKING ABOUT
23   WHAT YOU FOUND.  CAN YOU TAKE US THROUGH WHAT YOU FOUND IN
24   TERMS OF PERSONALLY RUNNING THE RECORDS.
25   A.    WELL, THE DOCUMENT CONTAINS TWO ACTIONS.  ONE IS A
```

APRIL 14, 2015

MILLER – VOIR DIRE EXAMINATION

1    DETERMINATION THAT THE EXPORTATION OF EITHER A GYROCOMPASS AND

2    ATTITUDE REFERENCE SYSTEM OR A PLANAR TRIODE, DIRECTLY OR

3    INDIRECTLY, FROM THE UNITED STATES OR BY A U.S. PERSON TO IRAN

4    IS PROHIBITED UNDER THE IRAN REGULATIONS.

5          AND I ALSO CHECKED SIX INDIVIDUALS AND ENTITIES TO

6    CONFIRM THAT THERE WERE NO RESPONSIVE RECORDS OF APPLICATIONS

7    SUBMITTED BY OR ON BEHALF OF, AND NO OFAC LICENSES ISSUED TO

8    ANY OF THOSE PARTIES.

9    **Q.**    CAN YOU TELL US WHO THOSE PARTIES WERE.

10   **A.**    THEY ARE KOORUSH TAHERKHANI, TIG MARINE ENGINEERING

11   SERVICES, ERGUN YILDIZ, ARASH GHAHREMAN, WESAL SHIPPING LLC,

12   MAE DAYSO.

13   **Q.**    AND WITH REGARD TO THOSE PERSONS, WHAT DOES YOUR FINDING

14   MEAN IN TERMS OF THE HISTORY CHECK?

15   **A.**    IT MEANS NONE OF THOSE INDIVIDUALS OR ENTITIES HAVE

16   APPROACHED THE AGENCY FOR PERMISSION TO DO ANYTHING, LET ALONE

17   THE EXPORT IN QUESTION HERE.

18          **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME I WOULD MOVE

19   INTO EVIDENCE GOVERNMENT'S EXHIBIT 403.

20          **THE COURT:**  ANY OBJECTION?

21          **MR. CAMDEN:**  NO OBJECTION, YOUR HONOR.

22          **THE COURT:**  IT IS RECEIVED.

23          (EXHIBIT 403 RECEIVED INTO EVIDENCE)

24   **Q.**    **(MR. COUGHLIN)** ONE OF THE THINGS THAT WE TALKED BRIEFLY

25   ABOUT YESTERDAY WAS THE QUESTION ABOUT CIVILIAN AVIATION; IS

APRIL 14, 2015

MILLER – DIRECT EXAMINATION

1   THAT CORRECT?

2   **A.**    YES.

3   **Q.**    DID YOU HAVE AN OPPORTUNITY TO MAKE -- GIVE SOME MORE

4   THOUGHT TO THAT PARTICULAR QUESTION?

5   **A.**    YES.  THE PROVISION IN THE IRAN REGULATIONS THAT RELATES

6   TO CIVIL AVIATION IS WHAT WE REFER TO AS A STATEMENT OF

7   LICENSING POLICY.  AND IT SAYS THAT SPECIFIC LICENSES, WHICH

8   ARE THE CASE-BY-CASE LICENSES, MAY BE ISSUED FOR THE

9   EXPORTATION OR RE-EXPORTATION OF GOODS, TECHNOLOGY OR SERVICES

10  IN THE EVENT THAT THEY RELATE TO ENSURING SAFETY OF U.S.

11  ORIGIN COMMERCIAL PASSENGER AIRCRAFT.  SO IT BASICALLY IS

12  MAKING CLEAR THE AGENCY'S POSTURE TO VIEW THOSE TYPES OF

13  APPLICATIONS FAVORABLY; BUT IT IS NOT, IN AND OF ITSELF, AN

14  AUTHORIZATION.  IT STILL REQUIRES THE PARTY TO COME BEFORE THE

15  AGENCY AND ASK FOR SPECIFIC PERMISSION FOR THAT ACTIVITY.

16          **MR. COUGHLIN:**  NOTHING FURTHER OF THIS WITNESS, YOUR

17  HONOR.

18          **THE COURT:**  CROSS-EXAMINATION.

19                        CROSS-EXAMINATION

20  **Q.**    **(MR. CAMDEN)** MS. MILLER, JUST A COUPLE OF QUESTIONS

21  FIRST ABOUT THE DATABASE THAT OFAC MAINTAINS.  IS IT AN

22  ON-LINE DATABASE OR IS IT A COMPUTER DATABASE OR IS IT PAPER?

23  **A.**    THEY ARE ELECTRONIC RECORDS.  IS THAT WHAT YOU MEAN?

24  **Q.**    YES.

25  **A.**    YES, THEY ARE ELECTRONIC RECORDS.

APRIL 14, 2015

MILLER – CROSS–EXAMINATION

1    Q.    HOW DOES THE SEARCH FUNCTION WORK WHEN YOU ARE SEARCHING

2    FOR AN INDIVIDUAL TO SEE HOW -- WHETHER OR NOT OFAC HAS ISSUED

3    A LICENSE FOR THAT INDIVIDUAL?

4    A.    YOU CAN SEARCH ANY PERMUTATION OF NAMES, YOU CAN LOOK

5    FOR EXACT MATCHES OR CLOSE MATCHES.  AND YOU CAN SEARCH

6    SPECIFICALLY BY MODULE, SUCH AS LICENSING.

7    Q.    OKAY.  SO THIS LISTS SIX INDIVIDUALS OR ENTITIES -- THIS

8    IS GOVERNMENT'S EXHIBIT 403.  LISTS SIX INDIVIDUALS OR

9    ENTITIES FOR WHICH YOU PERFORMED THE LICENSE CHECKS.

10   A.    YES.

11   Q.    DID YOU CHECK FOR LICENSES FOR ANYONE ELSE IN RELATION

12   TO THIS CASE?

13   A.    NO, NOT IN RELATION TO THIS CASE.

14   Q.    SO YOU DID NOT CHECK FOR A LICENSE FOR SOUTH STAR

15   TRADING?

16   A.    NO.

17   Q.    YOU DIDN'T CHECK FOR A LICENSE FOR DAVID MILLS?

18   A.    NO.

19   Q.    YOU DIDN'T CHECK FOR A LICENSE FOR DAVID COLE?

20   A.    NO.

21   Q.    YOU DIDN'T CHECK FOR A LICENSE FOR JOHN HELSING?

22   A.    NO.

23        **MR. CAMDEN:**  NO FURTHER QUESTIONS, YOUR HONOR.

24        **THE COURT:**  REDIRECT?

25        **MR. COUGHLIN:**  NO REDIRECT, YOUR HONOR.

APRIL 14, 2015

MILLER - CROSS-EXAMINATION

```
 1              THE COURT:  THANK YOU VERY MUCH.
 2              MAY THIS WITNESS BE EXCUSED?
 3              MR. COUGHLIN:  YES, YOUR HONOR.
 4              MR. CAMDEN:  YES, YOUR HONOR.
 5              THE COURT:  THANK YOU.
 6              MR. COUGHLIN:  YOUR HONOR, AT THIS TIME THE
 7    GOVERNMENT CALLS TO THE STAND TOM COX.
 8              THE CLERK:  SIR, PLEASE RAISE YOUR RIGHT HAND.
 9              YOU DO SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE
10    YOU SHALL GIVE IN THE CAUSE NOW BEFORE THIS COURT SHALL BE THE
11    TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?
12              THE WITNESS:  I DO.
13              THE CLERK:  PLEASE TAKE THE STAND.
14              PLEASE STATE YOUR FULL NAME, AND SPELL YOUR FIRST
15    AND LAST NAMES.
16              THE WITNESS:  THOMAS COX.  T-H-O-M-A-S.  C-O-X.
17              THE COURT:  THANK YOU.  GOOD MORNING.
18              COUNSEL.
19                     DIRECT EXAMINATION
20    Q.    (MR. COUGHLIN) MR. COX, WHO DO YOU WORK FOR?
21    A.    I WORK FOR COMMUNICATIONS & POWER INDUSTRIES, MICROWAVE
22    PRODUCTS DIVISION.
23    Q.    WHERE ARE THEY LOCATED?
24    A.    PALO ALTO, CALIFORNIA.
25    Q.    WHAT IS YOUR POSITION WITH COMMUNICATIONS & POWER
```

APRIL 14, 2015

COX – DIRECT EXAMINATION

1    INDUSTRIES?

2    **A.**    I AM THE GOVERNMENT CONTRACTS MANAGER AND MARKETING

3    MANAGER FOR THE POWER GRID PRODUCTS.

4    **Q.**    AND WHEN WE TALK ABOUT YOUR COMPANY, IS IT FAIR TO REFER

5    TO THEM AS CPI?

6    **A.**    CORRECT.

7    **Q.**    CAN YOU PROVIDE US A VERY BRIEF DESCRIPTION OF YOUR

8    EDUCATION AND TRAINING AND BACKGROUND?

9    **A.**    I ATTENDED UNIVERSITY OF OREGON IN THE EARLY 1980'S.

10   SUBSEQUENT TO THAT, OR AFTER THAT, I ATTENDED GEORGE

11   WASHINGTON SCHOOL OF LAW FOR CONTRACT CONTRACTING, AS WELL AS

12   UCLA EXTENSION FOR GOVERNMENT CONTRACTING.

13   **Q.**    AND IS THERE ANY SPECIFIC TRAINING THAT YOU HAVE HAD

14   PRIOR TO ENGAGING IN THE WORK YOU ARE CURRENTLY INVOLVED IN?

15   **A.**    NO.

16   **Q.**    CAN YOU PROVIDE US, THEN, WITH A LITTLE BIT OF

17   BACKGROUND FOR YOUR WORK AT CPI, AND HOW LONG YOU HAVE WORKED

18   THERE.

19   **A.**    I HAVE WORKED FOR COMMUNICATIONS & POWER INDUSTRIES FOR

20   20 YEARS.  MY CURRENT POSITION IS GOVERNMENT CONTRACTS

21   MANAGER, MARKETING MANAGER FOR THE EIMAC OR POWER GRID

22   PRODUCTS.

23        IN MY ROLE I DO ALL OF THE PROCESSING AND HANDLING OF

24   GOVERNMENT SOLICITATIONS AND NEGOTIATIONS OF GOVERNMENT

25   SOLICITATIONS MANAGING THE CONTRACTS.  I AM ALSO RESPONSIBLE

APRIL 14, 2015

COX – DIRECT EXAMINATION

1   FOR ALL OF THE MARKETING ACTIVITIES, INCLUDING NEW PRODUCT

2   DEVELOPMENT, PRICING AND CUSTOMER SERVICE FOR THE POWER GRID

3   PRODUCTS, AS WELL AS FAILURE ANALYSIS REQUESTS FOR OUR

4   PRODUCTS.

5   **Q.**    IS THERE JUST 24 HOURS IN YOUR DAY, MR. COX, OR ARE

6   THERE MORE HOURS THAN THE REST OF US DEAL WITH?

7   **A.**    WE TYPICALLY WORK SEVEN DAYS A WEEK.

8   **Q.**    HOW BIG IS CPI?

9   **A.**    CPI HAS, I BELIEVE, NINE DIVISIONS IN THE U.S. AND SALES

10  OFFICES THROUGHOUT THE WORLD.  WE HAVE ABOUT 3500 EMPLOYEES

11  ALTOGETHER.

12  **Q.**    AND WHAT KIND OF INCOME OR WHAT KIND OF SALES DOES CPI

13  DO ON AN ANNUAL BASIS, ROUGHLY?

14  **A.**    I CAN SPEAK MAINLY FOR OUR DIVISION, WHICH I AM EMPLOYED

15  AT.  WE DO ABOUT 170 MILLION A YEAR IN SALES.  OVERALL MY

16  ROUGH ESTIMATE WOULD BE RIGHT AROUND 600 MILLION A YEAR IN

17  SALES.

18  **Q.**    WITH REGARD TO CPI IN CONNECTION WITH THE PARTICULAR

19  DIVISION THAT YOU WORK IN, CAN YOU TELL US A LITTLE BIT ABOUT

20  THAT DIVISION.

21  **A.**    OUR DIVISION IS LOCATED IN PALO ALTO.  WE HAVE FOUR

22  OPERATIONS THAT MAKE UP OUR DIVISION.  THERE IS THE KLYSTRON,

23  GYROTRON DIVISION, THE COUPLED CAVITY DIVISION, THE TWT OR

24  TRAVELING WAVE TUBE DIVISION, AND THE EIMAC OR POWER GRID

25  DIVISION.

APRIL 14, 2015

COX – DIRECT EXAMINATION

 1          OUR PRODUCTS SERVE IN THE MILITARY MAINLY, MEDICAL,

 2   INDUSTRIAL AND SCIENTIFIC MARKETPLACES, AND BROADCAST.  AND I

 3   AM SPECIFICALLY ASSOCIATED WITH THE EIMAC OR THE POWER GRID

 4   DIVISION WHERE WE SUPPORT THE MILITARY, MEDICAL, SCIENTIFIC

 5   AND BROADCAST INDUSTRIES, MAINLY.

 6   **Q.**    WITH REGARD TO THE KIND OF WORK THAT YOU DO THERE IN

 7   THAT PARTICULAR -- THE EIMAC DIVISION, DO YOU HAVE INDIVIDUALS

 8   THAT MONITOR EXPORTS FOR YOU?

 9   **A.**    YES, WE DO.  WE HAVE A STAFF THAT IS EXPORT CONTROL.  WE

10   HAVE, I THINK, FOUR OR FIVE EXPORT CONTROL OFFICERS AND AN

11   EXPORT CONTROL MANAGER THAT OVERSEES THAT DEPARTMENT.

12   **Q.**    AND DO YOU WORK CLOSELY WITH THOSE INDIVIDUALS?

13   **A.**    YES, WE DO.

14   **Q.**    DO YOU PERSONALLY WORK CLOSELY?

15   **A.**    YES, I DO.

16   **Q.**    CAN YOU TELL US WHAT KIND OF INTERACTION YOU MIGHT HAVE,

17   AS AN EXAMPLE, WITH AN EXPORT OFFICER?

18   **A.**    WELL, MAINLY WE -- OUR INTERACTION IS WHEN WE ARE

19   QUOTING OR ACCEPTING OR GETTING READY TO SHIP AN ORDER WE

20   FIND -- WE MAKE SURE WE ARE IN COMPLIANCE WITH ITAR

21   REGULATIONS FOR THE EXPORT OF THESE PRODUCTS.

22          SPECIFICALLY DURING THE QUOTATION OR THE SOLICITATION

23   STAGE OF THE ORDER PROCESS, WE WILL GO TO THEM, FIND OUT IF WE

24   CAN EXPORT TO THESE CUSTOMERS.  WE WOULD HAVE ALREADY

25   REQUESTED AN END USE STATEMENT FROM THE CUSTOMER AND WE WILL

APRIL 14, 2015

COX – DIRECT EXAMINATION

1   PRESENT IT TO THE EXPORT CONTROL OFFICE.  AND ULTIMATELY THE

2   DECISION WHETHER WE QUOTE IT OR NOT WOULD BE MINE.

3        AND THEN WHEN WE ARE IN THE SALES PORTION OF IT WE WILL

4   WORK WITH THEM TO MAKE SURE THAT OUR CUSTOMER HAS GOTTEN A

5   LICENSE TO EXPORT THE PRODUCT PROPERLY BEFORE WE WILL RELEASE

6   THE SHIPMENT.

7   **Q.**    NOW, YOU SPOKE -- OR YOU MENTIONED AN END USER.  IS THAT

8   A COMMON TERM IN YOUR INDUSTRY?

9   **A.**    YES.  AN END USE STATEMENT IS A COMMON TERM.

10  **Q.**    COULD YOU EXPLAIN WHAT AN END USE STATEMENT IS.

11  **A.**    AN END USE STATEMENT IS A DOCUMENT THAT WE REQUEST FROM

12  THE CUSTOMER.  IT CAN COME IN VARIOUS FORMATS, BUT IT

13  BASICALLY HAS THREE PORTIONS THAT WE WANT TO SEE.  WE WANT TO

14  SEE WHO THE EXPORTER IS.  WHAT THE END USE COUNTRY IS, NOT --

15  THE EXPORTER MAY BE IN THE UNITED STATES OR MAY BE IN, YOU

16  KNOW, ENGLAND, FOR EXAMPLE, BUT WE WANT TO KNOW WHAT THE END

17  USE CUSTOMER IS.  AND MOST IMPORTANTLY WE WANT TO KNOW WHAT

18  THE END USE APPLICATION IS.

19       SO THOSE THREE ITEMS ARE ON THE END USE STATEMENT.

20  **Q.**    WITH REGARD TO THE END USE APPLICATION, CAN YOU EXPAND

21  ON THAT A LITTLE BIT.

22  **A.**    WE ASK FOR THE END USE APPLICATIONS BECAUSE SOME OF OUR

23  PRODUCTS -- OR MOST OF OUR PRODUCTS, ESPECIALLY THE ONES THAT

24  ARE BEING EXPORTED, ARE REALLY APPLICATION SPECIFIC.  AND WE

25  CAN LOOK AT AN APPLICATION AND TELL IF THAT PARTICULAR PRODUCT

APRIL 14, 2015

COX – DIRECT EXAMINATION

1    IS INTENDED FOR THAT USE.  AND IF SOMETHING THROWS UP A RED

2    FLAG WE SIMPLY DON'T QUOTE IT.

3    **Q.**    IN CONNECTION WITH NOT QUOTING IT, THEN YOU ARE LOSING

4    MONEY FOR CPI, CORRECT?

5    **A.**    CORRECT, BUT IT IS BETTER THAN THE ALTERNATIVE OF

6    GETTING THE DEPARTMENT OF STATE ON YOU.

7    **Q.**    NOW LET'S TALK A LITTLE BIT ABOUT YOUR DIVISION.  WHICH

8    DIVISION MANUFACTURES AND SELLS AND MARKETS AND MAINTAINS THE

9    Y-690?

10   **A.**    THAT IS THE MICROWAVE POWER PRODUCTS DIVISION IN PALO

11   ALTO.

12   **Q.**    AND WHO IS IN CHARGE OF THAT DIVISION?

13   **A.**    FOR THE MARKETING AND SALES, I AM.

14   **Q.**    AND IS THERE SOMEBODY OVER YOU THAT IS AN EXECUTIVE?

15   **A.**    I REPORT TO MR. TOM GRANT, WHO IS THE VICE PRESIDENT OF

16   ENGINEERING.

17   **Q.**    WITH REGARD TO YOUR DUTIES, JOBS -- YOUR DUTIES AND YOUR

18   RESPONSIBILITIES, DO YOU INTERACT REGULARLY WITH ENGINEERS OR

19   TECHNICIANS AT PALO ALTO THERE AT CPI?

20   **A.**    YES, I DO, ON A DAILY BASIS.

21   **Q.**    CAN YOU TELL US WHY SOMEBODY IN MARKETING OR SOME KIND

22   OF SALES POSITION WOULD NECESSARILY NEED TO INTERFACE WITH AN

23   ENGINEER?

24   **A.**    THERE IS A LOT OF DIFFERENT REASONS WHY WE INTERFACE

25   WITH ENGINEERING.  IT COULD BE NEW PRODUCT DEVELOPMENT, WE ARE

APRIL 14, 2015

COX – DIRECT EXAMINATION

1    DEVELOPING A PRODUCT FOR A SPECIFIC APPLICATION, OR A CUSTOMER

2    IS HAVING PROBLEMS WITH AN APPLICATION.  I AM THE INTERFACE

3    WITH THE CUSTOMER, SO THEY WILL COME TO ME.  TYPICALLY I CAN

4    ANSWER MOST OF THE TECHNICAL QUESTIONS, HOWEVER I WILL HAVE TO

5    GO TO THE ENGINEERS FROM TIME TO TIME.  AND THEN I INTERACT

6    WITH THEM REGULARLY ON FAILURE ANALYSIS.

7        WHEN WE HAVE WARRANTY RETURNS OF OUR PRODUCTS AND WE

8    HAVE TO DO A FAILURE ANALYSIS FOR OUR CUSTOMERS, THE ENGINEERS

9    WILL DO AN ANALYSIS OF THE PRODUCT, AND THEN I WILL BE THE ONE

10   WRITING THE ACTUAL FAILURE ANALYSIS REPORT TO OUR CUSTOMERS.

11   SO I INTERACT WITH THE ENGINEER TO TRY TO PULL ADDITIONAL

12   INFORMATION FOR MY REPORTS.

13   **Q.**    IT SOUNDS LIKE YOU ARE JUST NOT A PRETTY FACE, MR. COX,

14   IN TERMS OF JUST SALES AND MARKETING.

15   **A.**    NO, NOT REALLY.

16   **Q.**    WITH REGARD TO THAT SITUATION, THEN, I HEARD YOU SAY

17   THAT SOMETIMES IF THERE IS A RETURN BY A CUSTOMER YOU TAKE

18   ACTION; IS THAT CORRECT?

19   **A.**    CORRECT.

20   **Q.**    CAN YOU TELL US A LITTLE BIT ABOUT THAT?

21   **A.**    WELL, WHEN A PRODUCT COMES BACK, WHETHER IT IS

22   AN IN-WARRANTY OR OUT-OF-WARRANTY RETURN IT COMES BACK THROUGH

23   OUR FAILURE -- RETURNED PRODUCT ANALYSIS SYSTEM.  IT GETS

24   RECEIVED, IT GETS CHECKED FOR PHYSICAL DAMAGES.

25       IF EVERYTHING IS GOOD AND THE PRODUCT IS STILL HOLDING A

APRIL 14, 2015

COX – DIRECT EXAMINATION

1  VACUUM IT IS RELEASED TO THE FLOOR FOR TESTING.  IT IS TESTED

2  TO COMPLETE NEW TUBE CRITERIA, AND THEN FROM THAT POINT IT

3  GOES TO THE ENGINEERING GROUP.

4        THE ENGINEERING GROUP WILL REVIEW ALL OF THAT DATA.  IF

5  THEY ARE ABLE TO COME TO A CONCLUSION, BASED ON THAT DATA,

6  THEY WILL WRITE THE REPORT.  OR AT THAT POINT THEY WILL CUT

7  THE TUBE OPEN AND DO FURTHER ANALYSIS.  SO THEY WILL START

8  DOING SECTIONING OF THE COMPONENTS, SEE IF THEY CAN FIND OUT

9  WHY THE TUBE FAILED, IF IT DID FAIL, INDEED.

10       AFTER THE ENGINEER HAS COMPLETED HIS ANALYSIS HE WILL

11  FORWARD THE FILE –– EACH TUBE WILL HAVE A FILE –– BACK THROUGH

12  THE SYSTEM.  AND IT WILL ULTIMATELY COME TO MY DESK WHERE I

13  WILL TAKE THAT, I WILL ANALYZE ALL OF THE DATA, AND I WILL

14  WRITE A FAILURE ANALYSIS AND SUBMIT IT TO OUR CUSTOMER.  AND I

15  WILL EITHER ACCEPT THE WARRANTY CLAIM OR DENY THE WARRANTY

16  CLAIM.

17  **Q.**   WITH REGARD TO THAT WHOLE PROCESS, ARE YOU INTERACTING

18  SIGNIFICANTLY WITH THE CUSTOMER?

19  **A.**   YES.

20  **Q.**   NOW, IS IT MORE LIKELY THE PERSON YOU ARE INTERACTING

21  WITH IS WHERE THE APPLICATION –– OR WHERE THE PARTICULAR

22  PRODUCT WAS PUT INTO APPLICATION?

23  **A.**   YES.

24  **Q.**   SO THE ACTUAL REAL END USER OF A PARTICULAR PRODUCT,

25  CORRECT?

APRIL 14, 2015

COX – DIRECT EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    SO HAS THERE EVER BEEN AN OCCASION WHERE THE END USER OF

3    A PARTICULAR PRODUCT THAT YOU ARE DEALING WITH IS A SURPRISE

4    TO YOU?

5    **A.**    NO.

6    **Q.**    NOW, DOES CPI HAVE DISTRIBUTORS FOR THE Y-690?

7    **A.**    YES.  THE POWER GRID PRODUCTS –– IN FACT, CPI HAS ONE

8    DISTRIBUTOR.  OUR ONLY AUTHORIZED DISTRIBUTOR IS RICHARDSON

9    ELECTRONICS, AND THEY ONLY DISTRIBUTE THE POWER GRID PRODUCTS.

10   **Q.**    AND THOSE ARE THE PRODUCTS THAT YOU ARE MOST FAMILIAR

11   WITH.

12   **A.**    CORRECT.

13   **Q.**    I WOULD LIKE TO HAVE YOU TAKE A LOOK AT GOVERNMENT

14   EXHIBIT 551 FOR IDENTIFICATION FIRST.

15            (EXHIBIT 551 MARKED FOR IDENTIFICATION)

16            **MR. COUGHLIN:**  IF YOU WOULD PULL THAT UP AND PUT IT

17   IN FRONT OF HIM.

18   **Q.**    **(MR. COUGHLIN)** DO YOU RECOGNIZE WHAT THAT IS?

19   **A.**    YES, THAT IS A Y-690-A.

20            **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

21   TO MOVE INTO EVIDENCE GOVERNMENT'S EXHIBIT 551.

22            **THE COURT:**  ANY OBJECTION?

23            **MR. CAMDEN:**  NO OBJECTION, YOUR HONOR.

24            **THE COURT:**  IT IS RECEIVED.

25            (EXHIBIT 551 RECEIVED INTO EVIDENCE)

APRIL 14, 2015

COX – DIRECT EXAMINATION

1    Q.      **(MR. COUGHLIN)** NOW, CAN YOU TELL US A LITTLE BIT ABOUT

2    THIS PRODUCT IN TERMS OF WHAT IT DOES AND HOW LONG IT HAS BEEN

3    IN EXISTENCE AND SOME OF THE ITERATIONS IT HAS HAD OVER THE

4    YEARS?

5    **A.**    THE Y-690-A IS A PLANAR TRIODE, MEANING THAT IT IS A

6    PLANAR GRID.  IT IS A CERAMIC-TO-METAL VACUUM TUBE.  IT IS

7    HIGH ENERGY.  IT AMPLIFIES ENERGY.  COMES IN -- A LOW POWER

8    COMES IN, HIGH POWER COMES OUT.  IT IS USED IN RF

9    APPLICATIONS.

10   **Q.**    WHEN YOU SAY RF, WHAT DO YOU MEAN?

11   **A.**    RADIO FREQUENCY.

12   **Q.**    OKAY.

13   **A.**    LOW RADIO FREQUENCY.  NOT IN THE MICROWAVE RANGE.

14   **Q.**    WHEN DID IT FIRST COME ON THE MARKET?

15   **A.**    THE Y-690 WAS DEVELOPED IN THE LATE 1960'S, EARLY 1970'S

16   TO A RAYTHEON SPECIFICATION.

17   **Q.**    AND SO IN CONNECTION WITH THE Y-690'S, THEN, IT IS

18   SOMETHING THAT IS SOLD THROUGH ONE DISTRIBUTOR; IS THAT

19   CORRECT?

20   **A.**    CORRECT.  IT IS SOLD -- WE SELL DIRECT TO MILITARY

21   APPLICATIONS, AND THEN ANY OTHER APPLICATIONS WOULD BE SOLD

22   THROUGH DISTRIBUTION.

23   **Q.**    NOW, WITH REGARD TO DISTRIBUTION, IS THAT SOMETHING THAT

24   YOU HAVE ANY CONTROL OVER WHEN YOUR DISTRIBUTOR MAKES A

25   DECISION ABOUT EXPORTING IT OR SENDING IT ON?

APRIL 14, 2015

COX – DIRECT EXAMINATION

1   **A.**     YES, BECAUSE WHEN THEY COME IN FOR A QUOTE ON THESE

2   PARTICULAR PRODUCTS WE ASK THEM TO OBTAIN AN END USE

3   STATEMENT.

4   **Q.**     IS THAT A SYSTEM, A PROCESS, BY WHICH YOU GAIN

5   COMPLIANCE?

6   **A.**     YES.

7   **Q.**     NOW, CAN YOU TELL ME A LITTLE BIT ABOUT THE PROCESS WHEN

8   A SALE IS ACTUALLY MADE.  IS THERE AN INVOICE THAT IS CREATED?

9   **A.**     YES.  WHEN WE SELL A PRODUCT, WHEN WE ACTUALLY SHIP IT

10  FROM OUR FACTORY, THE SHIPPING DEPARTMENT WILL GO IN OUR

11  SYSTEM.  THEY WILL PICK THE ORDER BY THE SALES ORDER NUMBER,

12  THEY WILL APPLY THE PRODUCT THAT IS SHOWING IN OUR INVENTORY.

13  DO A PROCESS CALLED BACK FLUSHING WHICH WILL ACTUALLY RELIEVE

14  THE PRODUCT FROM OUR INVENTORY, AND SHOW IT AS SHIPPED AGAINST

15  THAT SALES NUMBER.  AT THAT TIME THE SYSTEM WILL AUTOMATICALLY

16  PRINT AN INVOICE, WHICH WILL BE REVIEWED BY THE ACCOUNTS

17  PAYABLE DEPARTMENT AND MAILED OUT.

18  **Q.**     WHO IS THE INVOICE MAILED OUT TO?

19  **A.**     THE INVOICE IS MAILED OUT TO THE CUSTOMER WHO PURCHASED

20  IT.

21  **Q.**     AND YOU HAVE A DOCUMENT THAT ALSO IS USED TO ACKNOWLEDGE

22  A SALE THAT HAS BEEN ENTERED INTO OR A CONTRACT THAT HAS BEEN

23  ENTERED INTO?

24  **A.**     YES, WE DO.  THE ACTUAL ACKNOWLEDGMENT IS IDENTICAL TO

25  THE INVOICE, EXCEPT IT SAYS ACKNOWLEDGMENT INSTEAD OF INVOICE.

APRIL 14, 2015

COX - DIRECT EXAMINATION

1      WHEN THAT DOCUMENT IS GENERATED IT IS GENERATED WHEN WE

2  ENTER THE ORDER.  WHEN WE RECEIVE THE PURCHASE ORDER FROM THE

3  CUSTOMER AND WE HAVE REVIEWED IT AND ACCEPTED THE ORDER, WE

4  WILL ENTER IT INTO OUR SYSTEM.

5      AT THAT TIME IT WILL GENERATE THE SALES ORDER WHICH

6  DRIVES THE MANUFACTURING, BUT IT ALSO GENERATES THE

7  ACKNOWLEDGMENT.  THE ACKNOWLEDGMENT IS PRINTED AUTOMATICALLY.

8  AND THE CUSTOMER SERVICE REPRESENTATIVE WHO ENTERED THE ORDER

9  WILL REVIEW THAT, MAKE SURE IT IS ACCURATE TO THE PURCHASE

10 ORDER, AND MAIL IT OUT TO THE CUSTOMER.

11 **Q.**   DOES THAT PARTICULAR ACKNOWLEDGMENT, OR EVEN THE INVOICE

12 ITSELF, CONTAIN ANY KIND OF WARNING, IF YOU WILL, REGARDING

13 LICENSING REQUIREMENTS OR ANYTHING LIKE THAT?

14 **A.**   ABSOLUTELY.  THE FIRST THING IN THE BODY OF THE INVOICE

15 IS WHAT WE CALL OUR ITAR STATEMENT.  IT IS A PARAGRAPH THAT

16 BASICALLY SAYS THAT THIS ITEM MAY OR MAY NOT BE CONTROLLED.

17 AND THEN IT STATES IF THE LEVEL -- IF CONTROL LEVEL E IS NOTED

18 ON THE ACKNOWLEDGMENT OR IN THE INVOICE, THEN A STATE

19 DEPARTMENT LICENSE IS REQUIRED.

20 **Q.**   AND IS THAT PUT ON BOTH AN INVOICE AND AN

21 ACKNOWLEDGMENT?

22 **A.**   YES, IT IS.

23 **Q.**   AND IN CONNECTION WITH THE Y-690, WOULD THAT HAVE BEEN

24 SOMETHING THAT WOULD HAVE BEEN ON BOTH AN INVOICE AND AN

25 ACKNOWLEDGMENT?

APRIL 14, 2015

COX – DIRECT EXAMINATION

1   **A.**     YES, IT WOULD.

2          **MR. CAMDEN:**  I AM GOING TO OBJECT UNDER 403 AND THE

3   PROPOSED INSTRUCTION.

4          **THE COURT:**  OVERRULED.

5          YOU MAY CONTINUE.

6   **Q.**    **(MR. COUGHLIN)** MR. COX, ARE YOU FAMILIAR WITH THE TECH

7   DATA THAT GOES ALONG WITH THE Y-690?

8   **A.**     YES, I AM.

9   **Q.**     WHY IS IT YOU ARE FAMILIAR WITH THAT?

10  **A.**     THE TECHNOLOGICAL DATA SHEETS, I BELIEVE IS WHAT YOU ARE

11  REFERRING TO, ARE SOMETHING THAT I MAINTAIN CONTROL OVER THAT

12  WE PROVIDE TO OUR CUSTOMERS AS A TECHNICAL GUIDELINES FOR

13  CUSTOMERS TO DEVELOP THEIR PRODUCTS OR CIRCUITS.

14  **Q.**     WOULD SOMETHING LIKE THAT BE USED, IF YOU WILL, TO MAKE

15  A DETERMINATION ON WHETHER OR NOT A PARTICULAR PRODUCT WOULD

16  BE RIGHT FOR AN APPLICATION?

17  **A.**     ABSOLUTELY.

18  **Q.**     SO IF SOMEBODY WAS TRYING TO DETERMINE WHETHER -- WHY

19  THEY WANT TO USE A PARTICULAR PRODUCT, THEY MIGHT ASK FOR A

20  DATA SHEET; IS THAT RIGHT?

21  **A.**     YES.

22  **Q.**     WITH REGARD TO THE DATA SHEET, WOULD YOU RECOGNIZE YOUR

23  DATA SHEET IF YOU SAW IT AGAIN?

24  **A.**     YES.

25  **Q.**     I AM GOING TO -- TAKE A LOOK AT EXHIBIT 552, NOT

APRIL 14, 2015

COX – DIRECT EXAMINATION

```
 1    PUBLISHED YET.
 2              (EXHIBIT 552 MARKED FOR IDENTIFICATION)
 3         MR. COUGHLIN:  AND IF YOU COULD TURN THE PAGES,
 4    PLEASE.  SEVERAL OF THE PAGES.  GO AHEAD.  GO AHEAD.  GO BACK
 5    TO THE FIRST PAGE, IF YOU WILL.
 6    Q.    (MR. COUGHLIN) NOW, MR. COX, DO YOU RECOGNIZE THAT
 7    PARTICULAR TECH SHEET?
 8    A.    THAT PARTICULAR PAGE I AM LOOKING AT NOW IS A SNAPSHOT
 9    OF OUR DISTRIBUTOR'S WEBSITE PAGE ADVERTISING THE Y-690 PLANAR
10    TRIODE.
11    Q.    AND WHEN YOU TALK ABOUT THAT, ARE YOU TALKING ABOUT
12    RICHARDSON?
13    A.    RICHARDSON ELECTRONICS, CORRECT.
14    Q.    WHERE DOES THE ACTUAL TECH SHEET FOR YOUR COMPANY START?
15    A.    IF YOU LOOK DOWN HERE UNDER THE HEADING, DATA SHEETS,
16    THERE IS A PDF LINK.  YOU CLICK ON THAT, AND THAT TAKES IT TO
17    OUR DATA SHEET.
18    Q.    AND IS THAT WHAT IS CONTAINED STARTING AT PAGE 2 OF THIS
19    DOCUMENT?
20    A.    YES.
21              MR. COUGHLIN:  I WOULD LIKE TO MOVE INTO EVIDENCE
22    GOVERNMENT'S EXHIBIT 552.
23              MR. CAMDEN:  NO OBJECTION, YOUR HONOR.
24              THE COURT:  IT IS RECEIVED.
25              (EXHIBIT 552 RECEIVED INTO EVIDENCE)
```

APRIL 14, 2015

COX – DIRECT EXAMINATION

1   **Q.     (MR. COUGHLIN)** NOW, I WOULD LIKE -- YOU ARE LOOKING AT

2   PAGE 2.

3           **MR. COUGHLIN:**  AT THIS TIME I WOULD LIKE TO PUBLISH

4   IT TO THE JURY.

5           **THE COURT:**  YES.

6   **Q.     (MR. COUGHLIN)** YOU ARE ON PAGE 2 THERE.  CAN YOU TELL

7   US A LITTLE BIT ABOUT WHAT SOMEBODY WHO WAS A POTENTIAL

8   CUSTOMER WOULD BE LOOKING AT HERE?

9   **A.**    REALLY WHAT THEY ARE GOING TO LOOK AT HERE IS WHAT

10  THE -- WHAT FREQUENCIES IT CAN HANDLE UP TO.  IN THIS CASE IT

11  IS UP TO 2 GIGAHERTZ, YOU KNOW, WHAT THE POWER RATING IS.  IN

12  THIS CASE APPLICATIONS TO 12 KV.  KV IS KILOVOLTS, OR

13  12,000 VOLTS.

14          THEN IT LISTS BASICALLY CAPACITANCE IN, CAPACITANCE OUT.

15  THESE ARE ALL TERMS ELECTRICAL ENGINEERS OR RADIO FREQUENCY

16  ENGINEERS WILL USE TO DEVELOP A CAVITY TO GO INTO A CIRCUIT.

17  **Q.**    SO IN CONNECTION WITH THIS, WOULD SOMEBODY USE A

18  TECHNICAL DATA SHEET LIKE THIS TO MAKE A DETERMINATION OF HOW

19  THEY WOULD USE THE Y-690?

20  **A.**    YES.  AN EXPERIENCED RF ENGINEER WOULD.

21  **Q.**    I WOULD LIKE TO DIRECT YOUR ATTENTION TO GOVERNMENT'S

22  EXHIBIT 554, JUST FOR PURPOSES OF IDENTIFICATION.

23          DO YOU RECOGNIZE THAT EXHIBIT?

24          (EXHIBIT 554 MARKED FOR IDENTIFICATION)

25  **A.**    YES, I DO.

APRIL 14, 2015

225

COX - DIRECT EXAMINATION

1    **Q.**    IS THERE A SIGNATURE ON THAT EXHIBIT?

2    **A.**    YES, THERE IS.

3    **Q.**    DO YOU RECOGNIZE THE SIGNATURE?

4    **A.**    THAT IS MY SIGNATURE.

5    **Q.**    DO YOU RECOGNIZE THE HANDWRITING IN THIS PARTICULAR

6    DOCUMENT?

7    **A.**    YES, THAT IS MY HANDWRITING.

8         **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

9    TO MOVE INTO EVIDENCE GOVERNMENT'S EXHIBIT 554.

10        **MR. CAMDEN:**  403 OBJECTION.

11        **THE COURT:**  OVERRULED.  IT IS RECEIVED.

12        (EXHIBIT 554 RECEIVED INTO EVIDENCE)

13   **Q.**    **(MR. COUGHLIN)** MR. COX, DO YOU REMEMBER WHO MADE THIS

14   REQUEST OF YOU TO FILL THIS OUT?

15   **A.**    I RECEIVED THIS DOCUMENT VIA EMAIL FROM KEVIN HAMAKO,

16   WHO WORKS FOR THE DEPARTMENT OF HOMELAND SECURITY.

17   **Q.**    AND DID YOU FILL OUT THIS DOCUMENT?

18   **A.**    YES, I DID.

19   **Q.**    CAN YOU TAKE US THROUGH IT, STARTING WITH -- LET'S SEE,

20   STARTING WITH UP TO NO. 2 THERE?

21   **A.**    NO. 2 --

22   **Q.**    IN OTHER WORDS, START FROM THE TOP, TAKE US DOWN TO

23   NO. 2.

24   **A.**    OKAY.  IT IS ASKING FOR THE PART NUMBER, WHICH IS THE

25   Y-690.  IT IS ASKING FOR THE FORMAL PART NAME.  WE JUST REFER

APRIL 14, 2015

COX – DIRECT EXAMINATION

1  TO THEM AS AN ELECTRON TUBE.

2      THE NAME OF MANUFACTURER IS COMMUNICATIONS & POWER

3  INDUSTRIES.

4      WAS THIS ARTICLE DESIGNED FOR OR CONFIGURED FOR A

5  MILITARY APPLICATION, THAT IS YES.

6      ORIGINALLY FOR WHAT PROGRAM.  AND I PUT IN AIRBORNE

7  RADAR.

8  **Q.**    NOW, IS THIS BECAUSE -- WHY DID YOU PUT AIRBORNE RADAR

9  THERE?

10 **A.**    BECAUSE IT WAS ORIGINALLY DESIGNED IN COLLABORATION WITH

11 RAYTHEON COMPANY FOR THE ALQ-99 SYSTEM.

12 **Q.**    WHAT IS THE ALQ-99?

13         **MR. CAMDEN:**  403, YOUR HONOR.

14         **THE COURT:**  OVERRULED.

15         YOU MAY ANSWER.

16         **THE WITNESS:**  TACTICAL JAMMING.

17 **Q.**    **(MR. COUGHLIN)** ALL RIGHT.  IF WE COULD MOVE ON TO

18 NO. 3, 3 THROUGH 7.  WHY DID YOU CHECK "MILITARY" THERE IN

19 QUESTION NO. 3?

20 **A.**    BECAUSE IT WAS -- IS THIS A MILITARY OR CIVILIAN

21 PROGRAM.  THE ALQ-99 IS A TACTICAL JAMMER IN THE MILITARY.

22         **MR. CAMDEN:**  OBJECTION.  403.

23         **THE COURT:**  OVERRULED.

24 **Q.**    **(MR. COUGHLIN)** TELL US WHY YOU ANSWERED NO IN NO. 4.

25 **A.**    BECAUSE THE PRODUCT -- THE Y-690 TUBE WAS DEVELOPED

APRIL 14, 2015

COX – DIRECT EXAMINATION

1   MANY, MANY YEARS AGO.  OVER TIME THIS PRODUCT HAS BEEN NOW

2   USED IN COMMERCIAL APPLICATIONS AS WELL AS MILITARY

3   APPLICATIONS, SO IT IS NO LONGER UNIQUE AT THE TIME I SIGNED

4   THIS DOCUMENT.

5   **Q.**   ALL RIGHT.  AND GOING ON TO NO. 5, IF YOU COULD TAKE US

6   THROUGH – FIRST OF ALL, WHAT IS THIS ASKING?

7   **A.**   IS ITAR -- ARTICLE IS MILITARY IS IT LISTED AS AN ITAR

8   CATEGORY.  AND, YES, XI(C), WHICH MEANS IT IS ITAR CONTROLLED.

9          **MR. CAMDEN:**  403.

10         **THE COURT:**  OVERRULED.

11  **Q.**   **(MR. COUGHLIN)** WHEN YOU SAY XI(C), CAN YOU EXPLAIN THAT

12  TO THE JURY IN TERMS OF WHAT THAT MEANS TO YOU?

13  **A.**   WHAT THAT MEANS TO ME, THIS PARTICULAR ITEM AT THE TIME

14  WAS CONTROLLED BY THE DEPARTMENT OF STATE, AND IT REQUIRES A

15  DEPARTMENT OF STATE EXPORT LICENSE TO BE EXPORTED OUT OF THE

16  UNITED STATES, BEING A MILITARY DEFENSE ARTICLE.

17         **MR. CAMDEN:**  403, YOUR HONOR.

18         **THE COURT:**  OVERRULED.

19  **Q.**   **(MR. COUGHLIN)** NO. 6, TAKE US THROUGH THAT.  YOU HAVE

20  BOTH OPPORTUNITY TO ADDRESS MILITARY OR CIVILIAN USES, IS THAT

21  -- APPLICATIONS; IS THAT CORRECT?

22  **A.**   YES.

23  **Q.**   IS THAT ALL YOU DID RIGHT THERE, YOU JUST SAID IT COULD

24  BE USED IN BOTH MILITARY AND CIVILIAN AIRBORNE?

25  **A.**   YES.

APRIL 14, 2015

COX - DIRECT EXAMINATION

1   **Q.**    WE COULD GO ON, THEN, AND GO ON TO NO. 8 THROUGH 10.

2        CAN YOU EXPLAIN WHAT THIS REQUEST AND YOUR ANSWER IS?

3   **A.**    NO. 8.  THE QUESTION IS ASKING ME IF WE EVER DID A

4   COMMODITY JURISDICTION, OR A CJ, FOR THIS ARTICLE; AND THE

5   ANSWER TO THAT WAS NO.

6        WE, AS AN ORIGINAL EQUIPMENT MANUFACTURER, HAVE THE

7   ABILITY TO SELF CLASSIFY OUR PRODUCTS, WHETHER THEY ARE ITAR

8   OR ARE NOT ITAR CONTROLLED.  WE ALWAYS ERR TO THE SIDE OF

9   CAUTION AND CONTROL THESE ARTICLES UNTIL THE DEPARTMENT OF

10  STATE TELLS US DIFFERENTLY.

11  **Q.**    OKAY.  AND AS OF THE DATE YOU FILLED THIS OUT, WHICH WAS

12  JANUARY OF 2013, HAD YOU HEARD DIFFERENTLY FROM THE DEPARTMENT

13  OF STATE?

14  **A.**    FROM THAT TIME, YES, WE HAVE.

15  **Q.**    BUT I MEAN AT THAT TIME, WHEN YOU FILLED IT OUT, HAD YOU

16  HEARD --

17  **A.**    NO, WE HAD NOT.

18  **Q.**    CAN YOU TELL US WHAT YOU HAVE HEARD MORE RECENTLY?

19  **A.**    MORE RECENTLY WE HAVE BEEN TOLD THAT A COMMERCIAL

20  JURISDICTION HAD BEEN FILED AND THE DEPARTMENT OF STATE HAD

21  GRANTED THAT CJ, OR COMMERCIAL JURISDICTION.  AND AS OF

22  JANUARY 1ST OF THIS YEAR THE U.S. LAWS ON EXPORT HAVE CHANGED

23  AND THESE PRODUCTS ARE NO LONGER CONTROLLED BY THE DEPARTMENT

24  OF STATE, THEY ARE NOW CONTROLLED BY THE DEPARTMENT OF

25  COMMERCE.

APRIL 14, 2015

COX – DIRECT EXAMINATION

1    **Q.**    NOW, IF WE COULD JUST GO TO THE LAST SECTION OF THIS

2    PARTICULAR EXHIBIT, THE OFFICIAL VERIFICATION AND

3    CERTIFICATION.  AND TELL US JUST, IS THAT YOUR SIGNATURE?

4    **A.**    YES, IT IS.

5    **Q.**    IS THAT YOUR TITLE THERE?

6    **A.**    YES, IT IS.

7    **Q.**    AND YOUR CONTACT INFORMATION AS WELL?

8    **A.**    YES, IT IS.

9    **Q.**    NOW, WITH REGARD TO THIS PARTICULAR DOCUMENT, ONCE YOU

10   HAD FILLED IT OUT, WHAT DID YOU DO WITH IT?

11   **A.**    I SCANNED IT AND EMAILED IT BACK TO KEVIN HAMAKO.

12   **Q.**    WOULD THIS HAVE BEEN SOMETHING OF AN OFFICIAL

13   DETERMINATION WHETHER OR NOT THIS WAS A DOCUMENT THAT WAS

14   SOMEHOW CONTROLLED, OR REQUIRED AN EXPORT LICENSE?

15   **A.**    I AM SORRY.  COULD YOU REPEAT THE QUESTION?

16   **Q.**    SURE.  THE PARTICULAR DOCUMENT, THIS DOCUMENT, ONCE YOU

17   FINISHED IT AND EMAILED IT TO KEVIN, WHAT WOULD IT HAVE TOLD

18   HIM?

19   **A.**    THIS PARTICULAR DOCUMENT WOULD HAVE --

20          **MR. CAMDEN:**  OBJECTION, YOUR HONOR.  SPECULATION AND

21   HEARSAY.

22          **THE COURT:**  OVERRULED.

23          YOU ARE ASKING WHAT THE DOCUMENT --

24          **MR. COUGHLIN:**  YES.

25          **THE COURT:**  -- IS STATING, NOT THE AGENT.

APRIL 14, 2015

COX - DIRECT EXAMINATION

```
 1            MR. COUGHLIN:  WHAT THE DOCUMENT IS STATING, NOT
 2   WHAT HE TOOK FROM IT.
 3            THE COURT:  YOU MAY ANSWER.
 4            THE WITNESS:  A REASONABLE PERSON WOULD TAKE THIS
 5   DOCUMENT AND READ IT --
 6            MR. CAMDEN:  OBJECTION, YOUR HONOR, TO THAT ANSWER.
 7            THE COURT:  SUSTAINED.
 8   Q.   (MR. COUGHLIN) WHAT DOES THE DOCUMENT STATE?
 9   A.   THE DOCUMENT STATES THAT IT IS AN ITAR CONTROLLED ITEM.
10   Q.   NOW, WITH REGARD TO THE AVAILABILITY OF THE PARTICULAR
11   TECH MATERIAL THAT WE WERE TALKING ABOUT PREVIOUSLY, WOULD IT
12   SURPRISE YOU THAT THAT IS AVAILABLE ON THE INTERNET?
13   A.   NO.
14            MR. COUGHLIN:  NOTHING FURTHER OF THIS WITNESS, YOUR
15   HONOR.
16            THE COURT:  CROSS-EXAMINATION.
17                       CROSS-EXAMINATION
18   Q.   (MR. CAMDEN) MR. COX, IF YOU COULD TAKE A LOOK AT
19   GOVERNMENT'S EXHIBIT 554.  QUESTION 6 IS HIGHLIGHTED.
20            SO YOU HAVE WRITTEN -- YOU WROTE ON THIS ARTICLE -- OR
21   ON THIS PAPER THAT THE MILITARY APPLICATION IS AIRBORNE RADAR
22   AND THE CIVILIAN APPLICATION IS ALSO AIRBORNE RADAR, CORRECT?
23   A.   CORRECT.
24   Q.   THERE ARE CIVILIAN USES FOR THE Y-690.
25   A.   CORRECT.
```

APRIL 14, 2015

COX – CROSS–EXAMINATION

1   Q.   SCIENTIFIC RESEARCH IS ONE AREA OF USE?

2   A.   HIGH ENERGY SCIENTIFIC RESEARCH.

3   Q.   RIGHT.  LIKE THE LARGE HADON COLLIDER.

4   A.   THEY HAVE BEEN SOLD TO CERN.

5   Q.   RIGHT.  EXACTLY.  I WANT TO TAKE A LITTLE BIT OF A STEP

6   BACK.

7        SO YOU HAVE BEEN WORKING AT CPI FOR A VERY LONG TIME,

8   CORRECT?

9   A.   YES.

10  Q.   SO YOU ARE FAMILIAR WITH THE PHENOMENON THAT ITEMS

11  DEVELOPED ORIGINALLY FOR MILITARY USE CAN EVENTUALLY, OVER

12  TIME, ACQUIRE CIVILIAN USE AS WELL, RIGHT?

13  A.   YES.

14  Q.   FOR EXAMPLE, THE INTERNET?

15  A.   ABSOLUTELY.

16  Q.   GPS, YOU WOULD AGREE?

17  A.   YES.

18  Q.   MICROWAVE OVENS WERE ORIGINALLY THE PRODUCT OF WORLD WAR

19  TWO RESEARCH WHERE THEY FOUND THAT RADAR UNITS THAT THEY HAD

20  WOULD HEAT FOOD; IS THAT CORRECT?

21  A.   BY ACCIDENT, YES.

22  Q.   RIGHT.  SO THE CURRENT USE FOR Y-690'S IS NOT

23  EXCLUSIVELY MILITARY, IT INCLUDES CIVILIAN TRANSPONDER

24  APPLICATIONS, CORRECT?

25  A.   I DON'T HAVE ANY DIRECT KNOWLEDGE OF CIVILIAN

APRIL 14, 2015

COX – CROSS–EXAMINATION

1  TRANSPONDERS, BUT THEY CAN BE USED IN THAT APPLICATION.

2  **Q.**    IN YOUR PART OF THE JOB, THOUGH, YOU WORK FOR CPI

3  DIRECTLY, NOT FOR RICHARDSON THE DISTRIBUTOR --

4  **A.**    CORRECT.

5  **Q.**    -- RIGHT?  SO YOU ONLY DEAL WITH MILITARY CLIENTS,

6  CORRECT?

7  **A.**    NO.

8  **Q.**    YOU SAID THAT MOSTLY COMMERCIAL APPLICATIONS WILL GO

9  THROUGH RICHARDSON AND MILITARY BUYERS WILL COME TO CPI

10  DIRECTLY?

11  **A.**    CORRECT.

12  **Q.**    OKAY.  YOU ALSO SAID THAT CPI LEANS ON THE CONSERVATIVE

13  SIDE IN MAKING ITS CLASSIFICATIONS, CORRECT?

14  **A.**    CORRECT.

15  **Q.**    WHEN IT DECIDES TO CLASSIFY SOMETHING AS A MUNITION, YOU

16  SAID THAT IS BETTER THAN GETTING THE STATE DEPARTMENT ON YOUR

17  BACK.

18  **A.**    ABSOLUTELY.

19  **Q.**    AND ONE OF THE REASONS CPI IS ESPECIALLY CAUTIOUS IS

20  BECAUSE CPI WAS ACTUALLY SANCTIONED BY THE OFFICE OF FOREIGN

21  ASSETS CONTROLS FOR VIOLATIONS OF THE IRAN EXPORT REGULATIONS

22  RECENTLY.

23  **A.**    I BELIEVE SO, ALTHOUGH I DON'T HAVE DIRECT KNOWLEDGE OF

24  IT.

25  **Q.**    RIGHT.  SINCE THEN, OBVIOUSLY, CPI HAS TAKEN STEPS TO

APRIL 14, 2015

COX – CROSS–EXAMINATION

1   ENSURE THAT IT ERRS ON THE SIDE OF --

2       **MR. COUGHLIN:**  OBJECTION.  THE WITNESS HAS SAID HE

3   HAS NO KNOWLEDGE OF THIS.

4       **MR. CAMDEN:**  HE SAID HE BELIEVED SO.

5       **THE COURT:**  YOU MAY ASK THIS QUESTION, YOU CAN

6   FINISH THE QUESTION.

7   **Q.    (MR. CAMDEN)** IF YOU KNOW, SINCE THE INCIDENT WITH OFAC

8   WHERE A PENALTY WAS IMPOSED ON CPI, CPI HAS TAKEN STEPS SINCE

9   THEN TO IMPLEMENT RIGOROUS REVIEW AND SCREENING OF REQUESTS

10  FOR VIOLATIONS OF THE EXPORT REGULATIONS.

11  **A.**    ABSOLUTELY.

12  **Q.**    OKAY.

13      **MR. CAMDEN:**  NO FURTHER QUESTIONS, YOUR HONOR.

14      **THE COURT:**  REDIRECT.

15      **MR. COUGHLIN:**  NO REDIRECT, YOUR HONOR.

16      **THE COURT:**  ALL RIGHT.  THANK YOU VERY MUCH.  YOU

17  MAY BE EXCUSED.

18      GOVERNMENT'S NEXT.

19      **MR. HARRIGAN:**  THE GOVERNMENT CALLS DAVID COLE, YOUR

20  HONOR.

21      YOUR HONOR, MAY I HAVE A BRIEF SIDEBAR?

22      **THE COURT:**  YES.

23      (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

24      OPEN COURT, OUT OF THE HEARING OF THE JURY)

25      **MR. HARRIGAN:**  YOUR HONOR, I APOLOGIZE.  OUR INTENT

APRIL 14, 2015

COX – CROSS–EXAMINATION

```
 1    WAS TO CALL RALF MAGNER.  I WAS HOPING WE COULD RAISE AN ISSUE
 2    BEFORE WE PUT HIM ON THE STAND, SIMILAR TO THE ISSUE WE HAD
 3    YESTERDAY WITH MS. MILLER, THAT I AM CONCERNED THAT DEFENSE
 4    HAS OBJECTIONS.  IT AFFECTS WHETHER I AM GOING TO CALL HIM OR
 5    WHETHER CERTAIN EVIDENCE WILL COME INTO PLAY.
 6             I AM WILLING TO PUT ON DAVID COLE AT THIS POINT IN
 7    TIME TO KEEP THINGS GOING.  I WOULD LIKE TO HAVE AN
 8    OPPORTUNITY, IF THE COURT HAS TIME, TO DISCUSS THAT ISSUE.
 9    MR. MAGNER IS HERE UNTIL TOMORROW.  IT WOULD MEAN WE WOULD
10    START WITH DAVID COLE.  I WOULD CALL HIM OUT OF ORDER, IF THAT
11    IS OKAY WITH THE COURT.  I WANTED TO GIVE THE COURT A HEADS
12    UP.
13             THE COURT:  THAT'S ALL RIGHT.  OKAY.
14             (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN
15             OPEN COURT, IN THE HEARING OF THE JURY)
16             THE CLERK:  SIR, PLEASE STEP FORWARD.
17             PLEASE RAISE YOUR RIGHT HAND.
18             YOU DO SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE
19    YOU SHALL GIVE IN THE CAUSE NOW BEFORE THIS COURT SHALL BE THE
20    TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?
21             THE WITNESS:  YES.
22             THE CLERK:  PLEASE TAKE THE STAND.
23             PLEASE STATE YOUR FULL NAME, AND SPELL YOUR FIRST
24    AND LAST NAMES.
25             THE WITNESS:  DAVID COLE, D-A-V-I-D.  C-O-L-E.
```

APRIL 14, 2015

COX – CROSS–EXAMINATION

| | |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | **Q.** **(MR. HARRIGAN)** GOOD MORNING, MR. COLE. |
| 3 | **A.** GOOD MORNING. |
| 4 | **Q.** HOW ARE YOU EMPLOYED, SIR? |
| 5 | **A.** I AM CURRENTLY EMPLOYED BY THE DEPARTMENT OF HOMELAND |
| 6 | SECURITY, HOMELAND SECURITY INVESTIGATIONS. |
| 7 | **Q.** AND HOW LONG HAVE YOU BEEN EMPLOYED WITH THE DEPARTMENT |
| 8 | OF HOMELAND SECURITY? |
| 9 | **A.** SINCE 2007. |
| 10 | **Q.** AND YOU SAID YOU WERE WITH HOMELAND SECURITY |
| 11 | INVESTIGATIONS.  WHAT IS YOUR TITLE WITH THEM? |
| 12 | **A.** THE TITLE IS SPECIAL AGENT. |
| 13 | **Q.** AND PRIOR TO 2007 DID YOU HAVE ANY OTHER LAW ENFORCEMENT |
| 14 | EXPERIENCE? |
| 15 | **A.** I DID.  I WORKED PREVIOUSLY AS A UNITED STATES BORDER |
| 16 | PATROL AGENT, SINCE 2002. |
| 17 | **Q.** AND WITH THAT WERE YOU ALSO A SPECIAL AGENT? |
| 18 | **A.** NO, I WAS A PATROL AGENT. |
| 19 | **Q.** AND WHERE ARE YOU CURRENTLY ASSIGNED WITH THE DEPARTMENT |
| 20 | OF HOMELAND SECURITY, HOMELAND SECURITY INVESTIGATIONS? |
| 21 | **A.** I AM CURRENTLY ASSIGNED AT OUR OFFICE IN SALT LAKE CITY, |
| 22 | UTAH. |
| 23 | **Q.** AND YOU REFERRED TO HOMELAND SECURITY INVESTIGATIONS |
| 24 | OFTEN AS HSI. |
| 25 | **A.** HSI, CORRECT. |

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  Q.    HOW LONG HAVE YOU BEEN ASSIGNED TO YOUR SALT LAKE CITY
2  OFFICE?
3  A.    I BELIEVE I LEFT SAN DIEGO LATE 2012.
4  Q.    AND PRIOR TO YOUR POST IN SALT LAKE CITY YOU WERE IN SAN
5  DIEGO THEN, RIGHT?
6  A.    CORRECT.  FROM 2006 UNTIL THE TIME I LEFT -- OR 2007
7  UNTIL THE TIME I LEFT.
8  Q.    OKAY.  AND THAT IS THE SAN DIEGO DIVISION?
9  A.    SAN DIEGO DIVISION, CORRECT.
10 Q.    AND WHILE ASSIGNED TO THE SAN DIEGO DIVISION WERE YOU
11 ASSIGNED TO A SPECIFIC GROUP WITHIN HSI?
12 A.    YES, I WAS.
13 Q.    AND WHAT GROUP WAS THAT?
14 A.    I WAS ASSIGNED TO A GROUP WHERE WE FOCUSED ON ILLEGAL
15 EXPORTS THAT WAS CALLED COUNTER-PROLIFERATION INVESTIGATIONS.
16 Q.    YOU SAY YOU FOCUSED ON ILLEGAL EXPORTS.  CAN YOU EXPLAIN
17 WHAT TYPE OF CRIMES YOU INVESTIGATED WHILE WORKING FOR THAT
18 GROUP?
19 A.    YES.  SO WE MOSTLY FOCUSED ON ACTIVITY THAT CENTERED
20 AROUND TRADE SANCTIONS, COUNTRIES THAT HAD EMBARGOES IN PLACE,
21 OR COUNTRIES THAT HAD SPECIFIC ITEMS THAT WERE RESTRICTED FROM
22 BEING EXPORTED FROM THE UNITED STATES TO THOSE COUNTRIES.
23 Q.    SO DID YOUR INVESTIGATION INCLUDE INVESTIGATING
24 VIOLATIONS OF U.S. EXPORT LAWS RELATING TO THE EMBARGO ON
25 SENDING GOODS TO IRAN?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    YES.

2    **Q.**    INCLUDING VIOLATIONS OF THE INTERNATIONAL ECONOMIC --

3    EMERGENCY ECONOMIC POWERS ACT?

4    **A.**    YES.

5    **Q.**    AND THE IRAN TRANSACTIONS AND SANCTIONS REGULATIONS?

6    **A.**    YES.

7    **Q.**    DURING YOUR CAREER WITH HSI, CAN YOU ESTIMATE -- HOW

8    MANY INVESTIGATIONS INVOLVING VIOLATIONS OF U.S. EXPORT LAWS

9    YOU HAVE BEEN INVOLVED IN, DIRECTLY, INDIRECTLY, OVERALL.

10   **A.**    MANY.  I WOULD SAY AT LEAST OVER 30.

11   **Q.**    AND DOES THAT INCLUDE INVESTIGATIONS OF INDIVIDUALS OR

12   COMPANIES THAT ARE TRYING TO ACQUIRE GOODS IN THE UNITED

13   STATES FOR ILLEGAL EXPORT OR END USE IN IRAN?

14   **A.**    YES.  MANY TIMES.

15   **Q.**    HAVE YOU EVER ACTED AS THE LEAD OR CASE AGENT IN THOSE

16   INVESTIGATIONS?

17   **A.**    YES, I HAVE.

18   **Q.**    DURING THE COURSE OF WORKING AS A SPECIAL AGENT HAVE YOU

19   EVER ACTED OVERALL IN AN UNDERCOVER CAPACITY?

20   **A.**    YES.

21   **Q.**    ON HOW MANY OCCASIONS WOULD YOU SAY YOU HAVE ACTED IN

22   WHAT IS CALLED AN UNDERCOVER CAPACITY?

23   **A.**    I WOULD SAY AT LEAST 50 TIMES.

24   **Q.**    AND CAN YOU GENERALLY DESCRIBE FOR THE JURY WHAT IT

25   MEANS WHEN YOU ARE ACTING IN AN UNDERCOVER CAPACITY?

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1   **A.**    IN A GENERAL SENSE YOU ARE ASSIGNED TO PLAY A ROLE THAT

2   WOULD LEAD THE TARGET OF THE INVESTIGATION TO BELIEVE THAT

3   EITHER YOU WERE INVOLVED IN A CRIMINAL ACTIVITY WITH HIM OR

4   YOU ARE SOMEONE WHO COULD ASSIST HIM IN FURTHERING THEIR

5   GOALS, IN AN ATTEMPT TO GATHER MORE EVIDENCE.  SO ANYTHING

6   FROM ILLEGAL EXPORTS TO -- IT COULD BE ANY GENERAL TYPE OF

7   SMUGGLING, OR WHAT HAVE YOU.

8   **Q.**    IN YOUR TRAINING AND EXPERIENCE, IS IT AN EFFECTIVE TOOL

9   FOR LAW ENFORCEMENT?

10  **A.**    I BELIEVE IT IS VERY EFFECTIVE.

11  **Q.**    AND DID YOU EVER ACT IN AN UNDERCOVER CAPACITY WHEN YOU

12  WERE WORKING WITH COUNTER-PROLIFERATION INVESTIGATION CASES?

13  **A.**    YES.

14  **Q.**    AND GENERALLY IN THOSE TYPE OF CASES, EXPORT VIOLATION

15  CASES, WHAT WERE YOU POSING AS?

16  **A.**    I TYPICALLY POSED AS A BROKER OR

17  BROKER/IMPORTER/EXPORTER.  SOMEONE WHO FOCUSED ON THE ABILITY

18  TO NOT ONLY OBTAIN ITEMS BUT ALSO SUCCESSFULLY SMUGGLE THE

19  ITEMS OUT OF THE UNITED STATES.

20  **Q.**    IN VIOLATION OF U.S. LAW?

21  **A.**    IN VIOLATION OF U.S. LAWS.

22  **Q.**    SO IN A SENSE YOU ARE REPRESENTING YOU CAN HELP COMMIT A

23  CRIME.

24  **A.**    YEAH.  IN ESSENCE, WE ARE REPRESENTING -- OR MYSELF,

25  SPECIFICALLY, THAT I WAS A GUY WHO COULD GET THINGS DONE.  AND

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    IN THIS CASE GET THINGS DONE QUIETLY THAT WOULD VIOLATE U.S.

2    EXPORT LAWS AND SPEED ALONG THE BUSINESS THAT THEY WERE HOPING

3    TO ACHIEVE.

4    **Q.**    NOW, GENERALLY WHEN WORKING IN AN UNDERCOVER CAPACITY,

5    DO YOU MAKE MISREPRESENTATIONS TO THE INDIVIDUALS YOU ARE

6    DEALING WITH?

7    **A.**    YES.

8    **Q.**    WHY?

9    **A.**    BECAUSE IN AN UNDERCOVER CAPACITY THE GOAL IS TO GAIN

10   THE CONFIDENCE OF THE INDIVIDUAL SO THEY ARE MORE LIKELY TO

11   GIVE US INFORMATION THAT WE ARE ATTEMPTING TO OBTAIN IN THE

12   COURSE OF OUR INVESTIGATION.

13   **Q.**    DO YOU TELL THEM THAT YOU WORK FOR THE POLICE?

14   **A.**    NO, I DO NOT.

15   **Q.**    DO YOU GIVE THEM YOUR REAL NAME?

16   **A.**    NO, I DO NOT.

17   **Q.**    IN TERMS OF DISCUSSING MATTERS OVER THE PHONE ABOUT

18   CRIMINAL ACTIVITY, DO YOU PLAY A ROLE?

19   **A.**    YES.

20   **Q.**    WHAT ARE SOME OF THE THINGS YOU DO, TYPICALLY, IN AN

21   UNDERCOVER CAPACITY TO PLAY THAT ROLE?

22   **A.**    WELL, I WILL TYPICALLY USE TELEPHONE CALLS, TEXT

23   MESSAGES.  SOMETIMES OTHER FORMS OF COMMUNICATION, BE EMAIL OR

24   SKYPE.  BUT TYPICALLY IN THE ROLE OF AN UNDERCOVER AGENT,

25   ESPECIALLY EARLY ON, YOU ALMOST HAVE A DANCE WHERE YOU TRY TO

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    AVOID BEING TOO OVERT OR TOO BLUNT, AND AVOID CERTAIN

2    CONVERSATIONS VIA THE TELEPHONE OR OTHER MEANS OF

3    COMMUNICATION THAT COULD BE MONITORED.

4    **Q.**    ARE YOU CONCERNED ABOUT THEM BEING MONITORED AS AN

5    AGENT?

6    **A.**    AS AN AGENT, NO; BUT PLAYING THE ROLE OF AN UNDERCOVER

7    AGENT, THEN YES.  OFTEN I PLAY THE ROLE OF OUR COMMUNICATIONS

8    COULD BE MONITORED, AND I ACT ACCORDINGLY.

9    **Q.**    WHY DO YOU ACT THAT WAY?

10   **A.**    BECAUSE IT IS PART OF THE ROLE OF AN UNDERCOVER AGENT,

11   AND KNOWING THAT THE PEOPLE WE INVESTIGATE OFTEN FEEL AND ACT

12   THAT WAY, IT WOULD BE NOT CONGRUENT TO ACT THAT WAY AND IT

13   WOULD MAKE IT DIFFICULT TO DEVELOP A BOND WITH THAT

14   INDIVIDUAL.

15   **Q.**    IS THERE A CONCERN THAT THEY MIGHT THINK YOU ARE

16   ACTUALLY LAW ENFORCEMENT IF YOU OVERTLY SPOKE ABOUT THAT?

17   **A.**    CORRECT.  CORRECT.

18   **Q.**    SO BEGINNING IN 2012 DID YOU ACT IN AN UNDERCOVER

19   CAPACITY IN A COUNTER-PROLIFERATION INVESTIGATION OF

20   INDIVIDUALS NAMED ARASH GHAHREMAN, ERGUN YILDIZ, KOORUSH

21   TAHERKHANI AND A DUBAI COMPANY NAMED TIG MARINE ENGINEERING

22   SERVICES?

23   **A.**    YES.

24   **Q.**    AND DO YOU SEE ARASH GHAHREMAN IN THE COURTROOM HERE

25   TODAY?

APRIL 14, 2015

341

COLE – DIRECT EXAMINATION

1   **A.**     YES.

2   **Q.**     WOULD YOU PLEASE I.D. HIM BY INDICATING WHERE HE IS

3   SEATED AND WHAT HE IS WEARING, FOR THE RECORD?

4   **A.**     THE INDIVIDUAL SITTING TO MY LEFT, JUST STOOD UP.  AND

5   HAS A BLUE TIE ON.  SITTING, I BELIEVE, TO YOUR RIGHT, TWO

6   PEOPLE OVER.

7               **MR. HARRIGAN:**  MAY THE RECORD REFLECT HE HAS

8   IDENTIFIED THE DEFENDANT?

9               **THE COURT:**  YES.

10              MR. HARRIGAN, IT IS 10:15.  LET'S GO AHEAD AND TAKE

11  OUR MORNING BREAK HERE.  WE WILL PICK UP IN 15 MINUTES AT

12  10:30.

13              HERE AGAIN, YOU ARE WELCOME TO GO INTO THE JURY

14  LOUNGE OR OUT INTO THE HALLWAY.  THANK YOU.

15              (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

16              OPEN COURT, OUT OF THE HEARING OF THE JURY)

17              **THE COURT:**  OKAY.  WE ARE OUTSIDE THE PRESENCE OF

18  THE JURY.  WE HAVE 12 IN THE JURY ROOM AND TWO IN THE

19  HALLWAY.

20              ON THIS ISSUE WITH RESPECT TO THE ADMONITION OR

21  LIMITING INSTRUCTION, IS THAT STILL REQUESTED?  I MEAN, THE

22  ISSUE SEEMS TO BE WORKING ITSELF OUT THROUGH THE WITNESSES.

23  THEY ARE BRINGING CLARITY.

24              **MR. CAMDEN:**  I DON'T THINK IT IS.  IT IS STILL

25  REQUESTED, YOUR HONOR.  WE PROBABLY SHOULD HAVE DONE THAT AS

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    SOON AS MR. COLE WAS CALLED, REALIZING, I GUESS -- I THINK HE

2    IS BEING CALLED OUT OF ORDER, WE WERE EXPECTING MAGNER.

3            BUT, YEAH, WE ARE REQUESTING THAT INSTRUCTION STILL.

4    THE ISSUE IS THE CONFUSION -- THE POSSIBILITY OF CONFUSION

5    BETWEEN IEEPA AND ITAR.

6            **THE COURT:**  OKAY.  ONE PROPOSAL, THEN, IS TO READ --

7    ESSENTIALLY TO INFORM THE JURORS THAT AGENT COLE MISINFORMED

8    MR. GHAHREMAN ABOUT THE Y-690'S BEING CLASSIFIED AS MUNITIONS

9    AND THEY REQUIRE AN EXPORT LICENSE NO MATTER WHERE THEY GO,

10   AND TO INDICATE THAT THAT IS NOT THE CASE.  TO LET THE JURY

11   KNOW THAT IT IS ILLEGAL, HOWEVER, TO KNOWINGLY EXPORT ANY

12   GOODS, INCLUDING Y-690'S, DIRECTLY OR INDIRECTLY, TO IRAN OR

13   THE GOVERNMENT OF IRAN.

14           AND THEN TO STATE -- AND I THINK THIS IS THE HEART

15   OF THE REQUEST -- THAT THE JURY MAY NOT PRESUME THAT SINCE MR.

16   GHAHREMAN WAS ERRONEOUSLY TOLD THAT THE Y-690 REQUIRED A

17   LICENSE FOR EXPORT TO ANY COUNTRY THAT HE INTENDED THE

18   Y-690 TO BE EXPORTED TO IRAN SPECIFICALLY; RATHER, THE

19   GOVERNMENT MUST PROVE THAT ELEMENT OF THE CLAIM AGAINST MR.

20   GHAHREMAN.

21           **MR. HARRIGAN:**  YEAH, AS LONG AS I AM ABLE TO ARGUE,

22   YOUR HONOR -- I THINK YOU UNDERSTOOD MY ARGUMENT YESTERDAY WAS

23   I DON'T THINK WE -- AND I UNDERSTAND THEIR CONCERN, THE

24   DEFENSE'S CONCERN.  IT IS THAT WE CAN ARGUE THAT BECAUSE HE

25   VIOLATED THAT HE VIOLATED THE IRAN TRADE SANCTIONS.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1          WE CAN'T ARGUE THAT, YOU KNOW, THAT IS WHAT -- THE

2    ONLY THING.  AND A LIMITED PURPOSE I WOULD ARGUE IS WHAT WE

3    HAVE TO SHOW IS A WILLFULNESS.  IF HE IS WILLING TO WILLFULLY

4    VIOLATE THE ITAR THAT IS CIRCUMSTANTIAL EVIDENCE THAT HE WAS

5    WILLFULLY WILLING TO -- AND I THINK --

6          **THE COURT:**  THAT IS A FAIR ARGUMENT.

7          **MR. HARRIGAN:**  SO IF I CAN MAKE THAT ARGUMENT, I AM

8    OKAY.  I DON'T THINK THAT THE FIRST PART IS NECESSARY BECAUSE

9    I THINK AGENT COLE WILL EXPLAIN WHY HE TOLD THAT TO HIM.  THAT

10   IS MY ONLY OBJECTION TO THAT.

11         **THE COURT:**  I THINK THE ARGUMENT IS A FAIR ONE.  I

12   ALSO THINK THE ADMONITION IS FAIR IN THAT ALL IT DOES IS IT

13   INDICATES TO THE JURORS THAT THEY CANNOT PRESUME THAT IF MR.

14   GHAHREMAN IS TOLD HE CAN'T EXPORT TO ANY COUNTRY THEN HE MUST

15   HAVE ALSO INTENDED TO EXPORT ILLEGALLY TO IRAN.

16         **MR. HARRIGAN:**  I AGREE WITH THAT WHOLEHEARTEDLY.

17   THAT IS NOT GOING TO BE THE ARGUMENT OF THE GOVERNMENT.

18         **MR. CAMDEN:**  THE PROBLEM -- I PHRASED IT AS 403 HERE

19   BUT THERE IS ALSO, I THINK, A PROPENSITY FOR A 404 PROBLEM.

20   IF THE GOVERNMENT SAYS WELL, HE IS WILLING TO VIOLATE ONE LAW,

21   HE IS WILLING TO VIOLATE ANY LAW.

22         I DON'T THINK THAT ARGUMENT -- I DON'T THINK IT

23   COULD BE MADE EVEN AT THAT LEVEL, YOUR HONOR, FOR THE

24   GOVERNMENT TO SAY, WELL, HE IS WILLING TO VIOLATE ITAR

25   THEREFORE HE MUST BE WILLING TO VIOLATE --

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1          **MR. HARRIGAN:**  IT GOES BACK TO THE INEXTRICABLY

2    INTERTWINED, YOUR HONOR, THE ARGUMENTS WE MADE BEFORE.

3          **THE COURT:**  I THINK THE ARGUMENT IS A FAIR ONE.  AND

4    FOR THE REASONS STATED THE ADMONITION, I BELIEVE, IS

5    APPROPRIATE.

6          SO WHEN WE RECONVENE, BEFORE RESUMING THE DIRECT, I

7    WILL GIVE THIS ADMONITION.

8          **MR. HARRIGAN:**  YOUR HONOR -- AND I KNOW -- THE ISSUE

9    THAT I RAISED AT SIDEBAR, AND I CAN EXPLAIN THAT.  I APOLOGIZE

10   BECAUSE I WAS HOPING WE COULD RAISE IT THIS MORNING.

11         OUR NEXT WITNESS IS RALF MAGNER, WHO I PLAN TO CALL.

12   HE IS AN EXPERT FROM NORTHROP GRUMMAN.  ESSENTIALLY THE MEAT

13   OF HIS TESTIMONY IS THAT HE WOULD SAY, IN ADDITION TO WHAT MR.

14   TOPCZEWSKI HAS SAID, THAT HE ACTUALLY LOOKED AT THE VESSEL

15   THAT WAS CLAIMED TO BE THE INTENDED USE, AND WOULD SAY IN HIS

16   OPINION THAT IT WOULD BE VERY UNUSUAL FOR THEM TO USE THE

17   NAVIGAT-3000 OR 2100 ON THE WESAL-V.

18         I HAD PROVIDED DEFENSE COUNSEL WITH AN ARCHIVED

19   WEBSITE WHICH SHOWS WESAL SHIPPING, INCLUDES THE WESAL-V.  I

20   DON'T THINK THEY OBJECT TO THAT BEING AUTHENTIC.  I THINK THEY

21   MAY HAVE A HEARSAY OBJECTION TO ME INTRODUCING THAT AND

22   SHOWING THAT TO THE JURY.

23         AND THE LINK THAT I HAVE THAT TIES IT TO THIS CASE

24   IS THAT THAT WEBSITE CONTAINS THE SAME VESSEL NUMBER THAT

25   APPEARS ON THE END USER STATEMENT THAT I HIGHLIGHTED WITH GREG

APRIL 14, 2015

345

COLE - DIRECT EXAMINATION

```
 1   TOPCZEWSKI.
 2         THEY STILL MAY HAVE AN ARGUMENT.  IF IT IS GOING TO
 3   BE KEPT OUT, I REALLY DON'T WANT TO CALL MR. MAGNER AND GO
 4   THROUGH THE EXERCISE WE WENT THROUGH YESTERDAY WITH
 5   MS. MILLER.  IF IT IS GOING TO BE KEPT OUT, THEN THE
 6   GOVERNMENT WILL MOVE ON.
 7         THE COURT:  DO YOU OBJECT?
 8         MR. CAMDEN:  I DO, YOUR HONOR.  HE IS RIGHT, WE
 9   DON'T OBJECT -- SO THEY PROVIDED US CERTIFICATIONS USING --
10   THERE IS A WEBSITE, THE WAY-BACK MACHINE, THAT ARCHIVES
11   WEBSITES AS THEY WERE AT A CERTAIN POINT IN TIME.  SO THEY
12   SENT US THE ARCHIVES FOR --
13         THE COURT:  WHAT --
14         MR. CAMDEN:  -- WESAL SHIPPING FROM 1997.  IT IS
15   WWW.WESALSHIPPING.COM FROM 1997.  SO WE DON'T DISPUTE THAT
16   THAT WEBSITE ACTUALLY WAS UP ON THE INTERNET IN 1997.
17         MR. HARRIGAN:  IT IS ACTUALLY -- IT IS 2011.
18   JULY 6TH, 2011 ARE THE DATES FOR IT.
19         MR. CAMDEN:  I AM JUST LOOKING AT THE AFFIDAVIT OF
20   CHRISTOPHER BUTLER.
21         IN ANY CASE, WE DON'T DISPUTE THAT IT IS ACTUALLY
22   THE WWW.WESALSHIPPING.  THE PROBLEM IS, THERE IS NO FOUNDATION
23   FOR THIS AS A BUSINESS RECORD.  THERE IS NOBODY FROM WESAL
24   SHIPPING THAT IS GOING TO BE SAYING, YES, WE MAINTAIN THIS
25   WEBSITE AS PART OF OUR BUSINESS AND IN THE ORDINARY COURSE OF
```

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1  OPERATIONS.  SO THERE IS NOBODY THAT CAN INDEPENDENTLY LAY THE

2  FOUNDATION OF WHAT WWW.WESALSHIPPING.COM IS.

3         **THE COURT:**  SO WHAT SPECIFICALLY IS THE EXHIBIT?

4  TELL ME THAT AGAIN.

5         **MR. HARRIGAN:**  IT IS GOVERNMENT'S EXHIBIT 51.  IT IS

6  A WESAL SHIPPING.  I CAN GIVE YOUR HONOR A COPY OF IT.

7         **THE COURT:**  50 -- WHICH IS IT AGAIN?

8         **MR. HARRIGAN:**  I APOLOGIZE, YOUR HONOR.  502.

9         IT IS APPROXIMATELY 17 PAGES.  IT IS DESCRIBED THAT

10 IT IS THE WESAL HOME SITE WHICH EXPLAINS WHAT WESAL SHIPPING

11 IS.

12        **THE CLERK:**  WE HAVE A JUROR PRESENT.

13        **THE COURT:**  COULD YOU WAIT OUTSIDE FOR JUST ONE

14 MOMENT?  I AM SORRY.  WE WILL BE DONE IN JUST A MINUTE.

15        **MR. HARRIGAN:**  IT IS THE WESAL SHIPPING WEBSITE.

16 THE SECOND PAGE WOULD BE THE -- THERE ARE SOME CERTIFICATES

17 AHEAD OF IT, BUT GOING TO THE MEAT, THE SECOND PAGE WOULD BE A

18 WEB PAGE SHOWING THAT THEY HAD SIX VESSELS, ONE INCLUDED THE

19 WESAL-V.  AND THE REMAINING DOCUMENTS ARE DATA SHEETS THAT

20 GIVE THE SPECIFICATIONS FOR THE VARIOUS SHIPS.

21        ESSENTIALLY WHAT MR. MAGNER WOULD SAY IS LOOKING AT

22 ALL OF THAT INFORMATION, AND GIVEN HIS EXPERTISE AS A

23 DESIGN -- CHIEF DESIGN ENGINEER FOR NORTHROP GRUMMAN SPERRY

24 MARINE IN HAMBURG WHERE THIS IS MANUFACTURED, THAT THE

25 APPLICATION OR INTENDED USE DOESN'T MAKE SENSE IN TERMS OF

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1   ECONOMICS, PURPOSE, TYPE OF VESSEL AND MANY OTHER FACTORS.

2   SIZE AND SPEED OF THE VESSEL.  IT WOULD -- WELL, IT COULD BE

3   USED --

4           THE COURT:  HOW WOULD IT QUALIFY, THOUGH?  AREN'T

5   YOU MISSING THE --

6           MR. HARRIGAN:  WELL, THE CONNECTION I WOULD HAVE --

7   AND THIS IS WHAT I WOULD HAVE, YOUR HONOR.  IS THAT THAT SAME

8   WEBSITE WAS VIEWED BY KEVIN HAMAKO, MY CASE AGENT, IN DECEMBER

9   OF 2012 WHEN HE FIRST GOT THE CASE.

10          AND THE TIE TO WESAL -- THE TIE TO THE DEFENDANT

11  IS -- AND HIS CO-CONSPIRATORS -- THEY MADE AN ADMISSION THAT

12  WESAL -- THIS IS GOING TO WESAL-V WITH THIS SERIAL NUMBER.

13  AND WE HAVE A DOCUMENT ARCHIVED FROM THAT TIME WHICH SHOWS

14  WESAL-V.  I WOULD ARGUE IT GOES TO THE WEIGHT.

15          THE COURT:  BUT THIS DOCUMENT COMES FROM A WESAL

16  WEBSITE?

17          MR. HARRIGAN:  IT COMES FROM WESAL.COM.

18          THE COURT:  AND MR. MAGNER IS NOT AN APPROPRIATE

19  CUSTODIAN OF WESAL.  SO THERE BEING AN OBJECTION, I WOULD

20  SUSTAIN IT.

21          MR. HARRIGAN:  THANK YOU, YOUR HONOR.

22          THE COURT:  WHY DON'T WE TAKE AN EXTRA FIVE MINUTES,

23  SO WE WILL PICK UP AT 10:35.

24          AND, JAMIE, WILL YOU LET THE OTHER JUROR KNOW SHE

25  CAN GO BACK.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1          **MR. HARRIGAN:**  THANK YOU.  I AM SORRY TO INTERRUPT

2     THE BREAK.

3               (RECESS)

4          **THE COURT:**  WELCOME BACK.

5          WE HAVE ALL JURORS PRESENT, COUNSEL, AND MR.

6     GHAHREMAN.

7          BEFORE WE CONTINUE WITH THE TESTIMONY OF AGENT COLE

8     I HAVE THE FOLLOWING TO STATE.

9          YOU WILL HEAR STATEMENTS FROM AGENT COLE TO ARASH

10    GHAHREMAN THAT THE Y-690 TRIODE TUBES ARE CLASSIFIED AS

11    MUNITIONS BY THE UNITED STATES GOVERNMENT, AND THAT THE Y-690

12    TRIODE TUBES REQUIRE AN EXPORT LICENSE NO MATTER WHICH COUNTRY

13    THEY ARE SENT TO.  THESE ARE STATEMENTS THAT WERE ATTRIBUTED

14    TO AGENT COLE THAT HE MADE TO ARASH GHAHREMAN DURING EARLIER

15    PERIODS IN TIME.

16         THE Y-690 TRIODE TUBES, HOWEVER, ARE NOT CLASSIFIED

17    AS MUNITIONS BY THE UNITED STATES GOVERNMENT AND THEY DO NOT

18    REQUIRE AN EXPORT LICENSE TO BE SENT TO A THIRD COUNTRY, SUCH

19    AS PANAMA OR THE CZECH REPUBLIC.  HOWEVER, AS I WILL INSTRUCT

20    YOU AT THE END OF THE CASE, IT IS ILLEGAL TO KNOWINGLY EXPORT

21    ANY GOODS, INCLUDING Y-690'S, DIRECTLY OR INDIRECTLY, TO THE

22    COUNTRY OF IRAN OR THE GOVERNMENT OF IRAN WITHOUT A LICENSE.

23         YOU MAY NOT PRESUME THAT SINCE MR. GHAHREMAN WAS

24    ERRONEOUSLY INFORMED THAT THE Y-690 REQUIRED A LICENSE FOR

25    EXPORT TO ANY COUNTRY THAT HE INTENDED THE Y-690 TO BE

APRIL 14, 2015

COLE – DIRECT EXAMINATION

```
 1   EXPORTED TO IRAN SPECIFICALLY; RATHER, THE GOVERNMENT HAS TO
 2   PROVE KNOWLEDGE BEYOND A REASONABLE DOUBT.
 3           WITH THAT, WE WILL PROCEED WITH THE DIRECT
 4   TESTIMONY.
 5           MR. HARRIGAN:  THANK YOU, YOUR HONOR.
 6   Q.    (MR. HARRIGAN) I THINK WHERE WE LAST LEFT OFF, AGENT
 7   COLE, YOU INDICATED THAT YOU WORKED IN AN UNDERCOVER CAPACITY
 8   IN THE INVESTIGATION OF DEFENDANT AND OTHERS.
 9   A.    YES.
10   Q.    AND WHAT TIME PERIOD DID THAT OCCUR?
11   A.    THAT TIME PERIOD OCCURRED BEGINNING IN LATE DECEMBER OF
12   2012, AND RAN THROUGHOUT JUNE OF 2013.
13   Q.    AND WHAT WAS YOUR ROLE?  WHO WERE YOU POSING AS IN THAT
14   UNDERCOVER CAPACITY?
15   A.    I WAS POSING AS A BROKER FOR A COMPANY CALLED SOUTH STAR
16   TRADING.  AND I WAS POSING SPECIFICALLY AS AN INDIVIDUAL WHO
17   COULD OBTAIN EQUIPMENT THEY WERE INTERESTED IN PURCHASING, AND
18   I COULD HELP THEM EXPORT THOSE ITEMS OUT OF THE U.S. BY
19   CIRCUMVENTING THE U.S. EXPORT LAWS.
20   Q.    SO YOU HELD YOURSELF OUT AS HAVING SPECIALIZED
21   ABILITIES?
22   A.    YES.
23   Q.    AND THAT WAS TO EVADE U.S. EXPORT LAWS?
24   A.    YES.
25   Q.    DID YOU USE YOUR REAL NAME?
```

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  **A.**   NO, I DID NOT.

2  **Q.**   WHAT NAME DID YOU USE?

3  **A.**   I USED THE NAME DAVID MILLS.

4  **Q.**   AND YOU SAID THE COMPANY'S NAME WAS?

5  **A.**   SOUTH STAR TRADING.

6  **Q.**   AND THAT IS NOT A REAL NAME, IS IT?

7  **A.**   IT IS NOT A REAL -- NO.

8  **Q.**   REAL COMPANY, I MEAN.

9  **A.**   NO.

10  **Q.**   DID YOU OR OTHER HSI AGENTS TAKE STEPS TO MAKE THIS

11  COMPANY LOOK LIKE IT WAS A REAL COMPANY AND NOT BEING OPERATED

12  BY GOVERNMENT AGENTS?

13  **A.**   YES.  WE MADE A COMPANY WEBSITE.  WE HAD DEDICATED

14  TELEPHONE LINES, BOTH CELL PHONE AND LAND LINES.  WE HAD

15  OFFICE SPACE RENTED.  AND THEN WE HAD ALSO INCORPORATED THE

16  COMPANY, AND HAD MADE EFFORTS TO HAVE THE COMPANY PUT ON DUNN

17  AND BRADSTREET, AND OTHER BUSINESS AREAS SOMEONE COULD CHECK

18  ABOUT A BUSINESS.

19  **Q.**   WERE THERE ALSO OTHER AGENTS WHO ARE POSING AS EMPLOYEES

20  OF SOUTH STAR TRADING?

21  **A.**   CORRECT.

22  **Q.**   DURING THE SIX MONTHS THAT YOU ACTED, APPROXIMATELY SIX

23  MONTHS, IN AN UNDERCOVER CAPACITY, DID YOU COMMUNICATE WITH

24  THE DEFENDANT?

25  **A.**   YES.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   **Q.**    BY WHAT MEANS DID YOU COMMUNICATE WITH THE DEFENDANT

2   WHEN YOU WERE ACTING AS AN UNDERCOVER AGENT?

3   **A.**    INITIALLY VIA TELEPHONE AND EMAIL COMMUNICATIONS AND

4   OCCASIONAL TEXT MESSAGE.  AND THEN EVENTUALLY WE MET IN PERSON

5   ON TWO OCCASIONS AND TALKED FACE TO FACE.

6   **Q.**    SO DURING THAT SIX MONTHS YOU HAD NUMEROUS

7   COMMUNICATIONS WITH HIM.

8   **A.**    YES, NUMEROUS.

9   **Q.**    AND DURING THAT PERIOD, HOW DID DEFENDANT REPRESENT

10  HIMSELF?  WHAT DID HE TELL YOU ABOUT HIMSELF?

11  **A.**    THE DEFENDANT INFORMED ME THAT HE WAS LIVING IN NEW

12  YORK.  THAT HE WORKED IN THE SHIPPING INDUSTRY, SPECIFICALLY.

13  AND THAT HE WAS ORIGINALLY FROM IRAN.

14  **Q.**    AND IN TERMS OF HIS RELATIONSHIP TO TIG MARINE

15  ENGINEERING SERVICES, WHAT DID HE TELL YOU ABOUT HIS

16  RELATIONSHIP WITH TIG MARINE?

17  **A.**    HE TOLD ME THAT HE WAS BOTH FRIENDS WITH THE OWNER AND

18  THAT HE WAS THEIR U.S. BASED REPRESENTATIVE ON BEHALF OF TIG

19  MARINE.

20  **Q.**    NOW, YOU INDICATED HE TOLD YOU HE HAD SHIPPING

21  EXPERIENCE OR WORKED IN THE SHIPPING INDUSTRY WHILE IN THE

22  UNITED STATES.  DID HE TELL YOU IF HE HAD ANY OTHER SHIPPING

23  EXPERIENCE?

24  **A.**    HE DID.  HE STATED THAT HE HAD BOTH SHIPPING EXPERIENCE

25  HERE IN THE U.S., AND AS WELL, PREVIOUSLY TO HIS TIME IN THE

APRIL 14, 2015

352
COLE – DIRECT EXAMINATION

1   U.S., THAT HE HAD EXTENSIVE SHIPPING EXPERIENCE AND WORKED IN

2   THE SHIPPING INDUSTRY WHILE HE WAS LIVING IN IRAN.

3   **Q.**    BY SHIPPING INDUSTRY, YOU MEAN MARINE VESSELS?

4   **A.**    CORRECT.  MARINE VESSELS IN THE ACTUAL –– NOT SHIPPING

5   ITEMS FROM ONE PLACE TO ANOTHER BUT ACTUAL SHIPS AND MOVEMENT

6   OF VESSELS AND CARGO.

7   **Q.**    AND DURING YOUR COMMUNICATIONS WITH HIM DURING THIS

8   SIX-MONTH PERIOD, DID HE ALSO INDICATE WHETHER HE STILL HAD

9   CONTACT WITH INDIVIDUALS IN IRAN?

10  **A.**    YES.  HE INDICATED THAT HE HAD NUMEROUS CONTACTS

11  THROUGHOUT VARIOUS INDUSTRIES IN IRAN.

12  **Q.**    AND WHEN YOU INITIALLY CONTACTED –– WHEN HE INITIALLY

13  CONTACTED YOU WAS IT FOR THE PURPOSE OF ACQUIRING GOODS?

14  **A.**    YES, IT WAS.

15  **Q.**    AND WHAT GOODS DID HE INITIALLY EXPRESS INTEREST IN

16  OBTAINING FOR TIG MARINE?

17  **A.**    UPON INITIAL CONTACT HE EXPRESSED INTEREST IN OBTAINING

18  A PRODUCT KNOWN AS A NAVIGAT-2100 GYROCOMPASS.

19  **Q.**    AND DID HE ALSO, DURING THAT SIX-MONTH PERIOD, MAKE

20  REQUESTS TO OBTAIN OTHER GOODS FROM YOU ACTING –– WHILE ACTING

21  AS AN AGENT FOR TIG MARINE?

22  **A.**    HE DID.  HE MADE INQUIRIES LOOKING FOR ELECTRONIC

23  COMPONENTS, FOR VALVES, METALS.  AND HE MADE NUMEROUS REQUESTS

24  FOR DIFFERENT TYPES OF OIL AND DIESEL OIL AS WELL.

25          **MR. JOHNSTON:**  OBJECTION, YOUR HONOR.  RELEVANCE.

APRIL 14, 2015

COLE - DIRECT EXAMINATION

```
 1          THE COURT:  OVERRULED.  THE ANSWER WILL STAND.
 2   Q.    (MR. HARRIGAN) WERE THE ITEMS LIMITED TO ELECTRONIC
 3   EQUIPMENT AND JUST THE NAVIGAT-2100, IS MY QUESTION.
 4   A.    NO, THEY WERE NOT.
 5   Q.    WERE THERE A FEW OTHER ITEMS OR NUMEROUS OTHER ITEMS?
 6   A.    THERE WAS NUMEROUS OTHER ITEMS.
 7   Q.    WHAT DID THOSE GENERALLY RELATE TO?
 8   A.    THEY GENERALLY RELATED TO THE EITHER SHIPPING OR VESSEL
 9   TYPE OCEAN INDUSTRY, MINING, OR OIL.
10   Q.    OVER THE SIX-MONTH COMMUNICATION WITH DEFENDANT WHAT --
11   REGARDING THE GOODS HE WANTED TO OBTAIN, WHAT WAS THE PRIMARY
12   FOCUS OF YOUR DISCUSSIONS AND NEGOTIATIONS?
13   A.    THE PRIMARY FOCUS OF OUR NEGOTIATIONS CENTERED ON
14   OBTAINING THE NAVIGAT-2100 GYROCOMPASS AND A SECONDARY PRODUCT
15   THAT WE USE MANY NAMES TO REFER TO, BUT THEY WERE TRIODE LAMPS
16   CALLED Y-690'S.
17   Q.    AND FOR THE LADIES AND GENTLEMEN OF THE JURY, WHEN YOU
18   AND THE DEFENDANT DISCUSSED THEM, CAN YOU MENTION SOME OF THE
19   OTHER NAMES THAT YOU USED?
20   A.    YEAH.  SO SOMETIMES WE CALLED IT LAMPS, SOMETIMES WE
21   CALLED THEM THE TRIPODS, SOMETIMES WE JUST CALLED THEM THE
22   Y-690'S, AND SOMETIMES WE CALLED THEM A VARIATION OF ALL OF
23   THE ABOVE.
24   Q.    OKAY.  AND DURING THE ENTIRE TIME YOU COMMUNICATED WITH
25   HIM, DID YOU REPRESENT TO DEFENDANT THAT YOU COULD OBTAIN
```

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  THESE GOODS?

2  **A.**    YES.

3  **Q.**    FROM U.S. MANUFACTURERS?

4  **A.**    YES, I DID.

5  **Q.**    AND SELL THEM TO TIG MARINE?

6  **A.**    YES.

7  **Q.**    AND EXPORT THEM OUT OF THE UNITED STATES, OR HELP EXPORT

8  THOSE OUT OF THE UNITED STATES?

9  **A.**    YES.

10  **Q.**    AND DURING THAT TIME PERIOD DID YOU EVENTUALLY REACH AN

11  AGREEMENT AS TO BETWEEN YOURSELF AND DEFENDANT, ACTING AS THE

12  AGENT FOR TIG MARINE, REGARDING THE PURCHASE AND EXPORT OF

13  NAVIGAT-2100'S?

14  **A.**    YES.

15  **Q.**    AND APPROXIMATELY HOW MANY DID YOU AGREE TO SELL AND

16  PROVIDE TO DEFENDANT AND TIG MARINE?

17  **A.**    WE FINALLY AGREED ON A NUMBER OF FOUR UNITS OF THE 2100.

18  **Q.**    AND APPROXIMATELY WHAT WAS THE ASKING PRICE FOR THOSE?

19  **A.**    THE TOTAL WAS ROUGHLY 200 AND MAYBE $84,000.  I COULD BE

20  OFF A LITTLE BIT, BUT AROUND THAT PRICE.

21  **Q.**    SO ABOUT $71,000 PER UNIT?

22  **A.**    I BELIEVE SO, CORRECT.

23  **Q.**    AND WITH REGARD TO THE Y-690 TRIODE LAMP OR ELECTRON

24  TUBE, OR WHATEVER TERM YOU USED, DID YOU REACH AN AGREEMENT

25  WITH THE DEFENDANT, AS THE AGENT OF TIG MARINE, TO ALSO

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   ACQUIRE THOSE FOR HIM FOR EXPORT OUT OF THE UNITED STATES?

2   **A.**    YES.

3   **Q.**    AND WHAT WAS THE QUANTITY THERE?

4   **A.**    THE QUANTITY ULTIMATELY FINISHED AT AN ORDER OF 50

5   UNITS.

6   **Q.**    YOU SAID IT FINISHED AT.  WHAT DO YOU MEAN BY THAT?

7   **A.**    THEY HAD ASKED FOR MORE, AND THEN EVENTUALLY WE DID A

8   CONTRACT FOR 50 UNITS.

9   **Q.**    OKAY.  AND WHAT WAS THE APPROXIMATE PRICE OR COST THAT

10  YOU WERE CHARGING DEFENDANT AND TIG MARINE FOR THE SALE AND

11  EXPORTATION OF THOSE ITEMS?

12  **A.**    ABOUT 2,200 PER ACTUAL LAMP.  SO ABOUT A LITTLE OVER

13  $100,000 FOR THE ENTIRE ORDER.

14  **Q.**    AND DURING THE COURSE OF YOUR NEGOTIATIONS WITH

15  DEFENDANT DID YOU –– WHAT DID YOU STATE THAT YOU AND YOUR

16  COMPANY WOULD HAVE TO DO IN ORDER TO ACQUIRE THESE GOODS FOR

17  DEFENDANT AND TIG MARINE?

18  **A.**    I INFORMED HIM THAT WE WOULD NEED TO PROVIDE FALSE AND

19  MISLEADING END USER INFORMATION TO THE MANUFACTURERS.

20  **Q.**    FOR THE PURPOSE OF WHAT?

21  **A.**    FOR THE PURPOSE OF EVADING U.S. EXPORT LAWS.

22  **Q.**    NOW, AT THE TIME WAS IT ILLEGAL TO SHIP OR EXPORT THE

23  NAVIGAT Y–690 –– OR THE Y–690 –– LET ME ASK YOU FIRST, THE

24  NAVIGAT–2100 TO DUBAI?

25  **A.**    NO, IT WAS NOT.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **Q.**    SO WHY DID YOU TELL THE DEFENDANT YOU WOULD HAVE TO LIE

2    TO THE MANUFACTURER?

3    **A.**    WELL, IT WAS VERY SIMPLE, BECAUSE AT THE TIME THAT THE

4    DEFENDANT APPROACHED ME AND MY COMPANY IN AN UNDERCOVER

5    CAPACITY THEY HAD ALREADY ATTEMPTED TO PURCHASE THE

6    NAVIGAT-2100.

7    **Q.**    YOU SAY THEY.

8    **A.**    THE DEFENDANT AND TIG MARINE.  AND THEY HAD ATTEMPTED TO

9    MAKE A PURCHASE FROM NORTHROP GRUMMAN, THE MANUFACTURER.  AND

10   THEY PROVIDED PAPERWORK WHICH GAVE AN END USER AND A SPECIFIC

11   VESSEL AS THE END USE.  AND UPON REVIEW, NORTHROP GRUMMAN HAD

12   REFUSED THEIR END USE AND REJECTED THEIR ORDER.

13       SO IN OUR INITIAL COMMUNICATIONS I EXPLAINED UNLESS THEY

14   HAD DIFFERENT AND/OR BETTER END USER INFORMATION IT WOULD BE

15   IMPOSSIBLE FOR ME TO GO BACK TO THE MANUFACTURER, ATTEMPT TO

16   MAKE THE SAME PURCHASE USING THE EXACT SAME REJECTED END USER.

17   **Q.**    DID DEFENDANT REPRESENT TO YOU WHETHER HE HAD KNOWLEDGE

18   OF WHY NORTHROP GRUMMAN REJECTED THE END USE FOR THE WESAL-V?

19   **A.**    YES.

20   **Q.**    WHAT DID HE TELL YOU?

21   **A.**    THEY DID NOT LIKE --

22   **Q.**    YOU SAID AGAIN THEY.  WHO DID NOT LIKE?

23   **A.**    THAT NORTHROP GRUMMAN DID NOT LIKE THE END USE THEY

24   STATED.

25   **Q.**    AND DID YOU HAVE DISCUSSIONS ABOUT -- DURING THOSE

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    COMMUNICATIONS WHETHER DEFENDANT HAD GONE DIRECTLY TO NORTHROP

2    GRUMMAN OR GONE TO SOMEBODY ELSE?

3    **A.**    WE DID.  AND HE STATED THAT HIS INTENTION AND HIS GOAL

4    WAS NEVER TO COMMUNICATE DIRECTLY WITH THE MANUFACTURER AT

5    NORTHROP GRUMMAN, THAT HE ONLY WANTED TO ATTEMPT TO PURCHASE

6    IT VIA AN INTERMEDIARY BY THE NAME OF TIMCO MARINE.  AND THAT

7    HE WANTED TO PURCHASE IT FROM THEM FROM INVENTORY ALREADY IN

8    STOCK, OR I THINK HE REFERRED TO IT AS OFF THE SHELF.

9         AND THAT ONCE TIMCO MARINE COMMUNICATED ON TO NORTHROP

10   GRUMMAN THE DEFENDANT'S REQUEST, HE FELT COMPELLED OR HE FELT

11   THAT IT WOULD LOOK MORE SUSPICIOUS TO REFUSE TO GIVE END USER

12   INFORMATION.  AND IT WAS AT THAT POINT HE PROVIDED END USER

13   INFORMATION TO TIMCO, WHO IN TURN PROVIDED IT TO THE

14   MANUFACTURER.

15   **Q.**    AND DURING THE COURSE OF YOUR UNDERCOVER NEGOTIATIONS

16   REGARDING THE NAVIGAT-2100 AND THE Y-690 DID YOU EVER TELL

17   DEFENDANT THAT YOU KNEW HE WAS INTENDING TO SHIP THE GOODS TO

18   IRAN?

19   **A.**    YES.

20   **Q.**    AND DID YOU TELL THIS TO HIM ON MORE THAN ONE OCCASION?

21   **A.**    YES.

22   **Q.**    ON THE TELEPHONE?

23   **A.**    YES.

24   **Q.**    AND IN PERSONAL MEETINGS?

25   **A.**    CORRECT.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **Q.**    DURING THE COURSE OF YOUR COMMUNICATIONS DID DEFENDANT

2    ADMIT TO YOU THAT THE NAVIGAT-2100 AND THE Y-690'S WERE

3    ACTUALLY GOING TO IRAN RATHER THAN DUBAI?

4    **A.**    YES.

5    **Q.**    DID HE INITIALLY ADMIT THIS TO YOU?

6    **A.**    NO.

7    **Q.**    CAN YOU DESCRIBE HOW THOSE NEGOTIATIONS WENT OR HOW

8    THOSE COMMUNICATIONS WENT IN GENERAL FROM YOUR INITIAL

9    TELEPHONE COMMUNICATIONS TO WHEN YOU MET WITH HIM LATER.

10   **A.**    INITIALLY, ON THE TELEPHONE, HE WAS VERY HESITANT OR

11   GUARDED.  AND HE WOULD LISTEN AND SAY THINGS SUCH AS, I AM NOT

12   GOING TO SAY IF YOU ARE RIGHT OR YOU ARE WRONG.

13         AND THEN AS IT EVOLVED HE WOULD SAY THINGS SUCH AS, I

14   DON'T NEED TO WORRY ABOUT OR ASK EXACTLY WHERE THEY ARE GOING

15   BECAUSE I HAVE MY OWN CONTACTS.  I KNOW WHERE THEY ARE GOING

16   OR I KNOW WHERE THEY ARE GOING TO BE USED AFTER THEY ARE

17   ALREADY DELIVERED.

18         THEN EVENTUALLY, AS IT EVOLVED AND WE MET IN PERSON, WE

19   OPENLY DISCUSSED THE FACT THAT HE KNEW THE GOODS WERE ALL

20   BEING USED IN IRAN, AND THEY WERE ALWAYS INTENDED TO BE USED

21   IN IRAN.

22   **Q.**    SO DURING YOUR INITIAL TELEPHONE CONVERSATION DID HE

23   APPEAR WILLING TO TALK ABOUT IT OR WAS HE RELUCTANT?

24   **A.**    HE WAS RELUCTANT.

25   **Q.**    DID HE EVER EXPRESS THAT RELUCTANCE VERBALLY TO YOU

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    DURING A CONVERSATION?

2    **A.**    YES.

3    **Q.**    DURING THE COURSE OF COMMUNICATIONS, THE SIX MONTHS YOU

4    NEGOTIATED WITH HIM, DID YOU DISCUSS WITH HIM THE CONSEQUENCES

5    OF LYING TO THE MANUFACTURERS -- THAT IS CPI AND NORTHROP

6    GRUMMAN -- REGARDING THE END USE, WHERE THESE GOODS WERE

7    GOING?

8    **A.**    YES, I DID.

9    **Q.**    AND WHAT DID YOU TELL HIM?

10   **A.**    I TOLD HIM THERE WAS NUMEROUS COMPLICATIONS THAT IF

11   ONE -- SINCE WE WERE LYING TO THEM AND PROVIDING FALSE

12   INFORMATION THAT WOULD THEN BE USED TO HELP US ILLEGALLY

13   EXPORT THE ITEMS TO EVADE U.S. EXPORT LAWS, IF THE GOODS

14   SOMEHOW MADE IT SUCCESSFULLY TO IRAN AND ANYBODY IN IRAN THEN

15   HAD A REQUEST FOR SERVICE OR REPAIR AND THEY CONTACTED THE

16   MANUFACTURER DIRECTLY, THAT WOULD CAUSE US GREAT PROBLEMS.

17          I ALSO LET HIM KNOW THAT IF WE WERE TO GET CAUGHT WE

18   WOULD GO TO JAIL.  SIMPLY AS THAT.

19   **Q.**    DID YOU DISCUSS THAT WITH HIM ON MORE THAN ONE OCCASION?

20   **A.**    YES, I DID.

21   **Q.**    DID HE INDICATE THAT HE UNDERSTOOD HE WOULD BE GOING TO

22   JAIL?

23   **A.**    YES, HE DID.

24   **Q.**    CAN YOU GIVE AN EXAMPLE OF WHAT HE SAID AT ANY GIVEN

25   TIME?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    I KNOW ONE TIME IN PARTICULAR WHEN HE –– OR WHEN WE

2    DISCUSSED THAT IF WE WERE TO GET CAUGHT AND OUR SCHEME WERE TO

3    BE FOUND OUT, THAT NOT ONLY WOULD HE GO TO JAIL, THAT WE WOULD

4    ALL BE IN THE SAME CELL TOGETHER.  AND I UNDERSTOOD THAT TO

5    MEAN THE SAME JAIL CELL.

6    **Q.**    NOW, YOU INDICATED THAT YOU ULTIMATELY REACHED AN

7    AGREEMENT WITH THE DEFENDANT AND TIG MARINE TO ACQUIRE FOR

8    THEM FOUR NAVIGAT–2100 GYROCOMPASSES AND 50 Y-690'S.  WAS

9    THERE EVER A DELIVERY TO THE DEFENDANT OF THOSE GOODS OR PART

10   OF THOSE GOODS?

11   **A.**    YES.

12   **Q.**    AND WHERE DID THAT OCCUR?

13   **A.**    IT OCCURRED IN A MEETING THAT TOOK PLACE IN LAS VEGAS,

14   NEVADA IN A HOTEL ROOM.

15   **Q.**    OKAY.  AND CAN YOU JUST GENERALLY DESCRIBE THE AMOUNT OF

16   GOODS THAT WERE DELIVERED AT THAT POINT IN TIME AND SHOWN?

17   **A.**    SURE.  SO AT THAT POINT IN TIME WE DELIVERED ONE FULL

18   UNIT OF THE NAVIGAT–2100, WHICH CONSISTED OF THE GYROCOMPASS,

19   A POWER SUPPLY AND THE ACCESSORIES NECESSARY TO OPERATE IT,

20   INCLUDING THE USER MANUAL WHICH WAS PLACED ELECTRONICALLY ON A

21   DISK.

22        THEN WE ALSO SUPPLIED OR BROUGHT TO THE MEETING TWO

23   COMPLETE UNITS OF THE Y-690'S, WHICH WERE NOTHING MORE THAN

24   VERY SMALL BOXES, ABOUT THE SIZE OF MAYBE A LARGE CIGARETTE

25   PACK.  AND HAD, FOR LACK OF BETTER DESCRIPTION, VERY

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    LIGHTWEIGHT SORT OF ELECTRONIC ITEMS INSIDE.

2    **Q.**    AND THAT MEETING OCCURRED WHERE?

3    **A.**    THAT MEETING OCCURRED IN NEVADA, LAS VEGAS.

4    **Q.**    AND YOU WERE PRESENT?

5    **A.**    I WAS PRESENT.

6    **Q.**    WAS THE DEFENDANT PRESENT?

7    **A.**    YES, HE WAS.

8    **Q.**    WHO ELSE WAS PRESENT?

9    **A.**    ANOTHER UNDERCOVER AGENT, AND ANOTHER INDIVIDUAL THAT

10   WORKED FOR TIG MARINE BY THE NAME OF ERGUN YILDIZ.

11   **Q.**    AND DID YOU -- WHAT DID YOU GENERALLY DISCUSS IN THAT

12   MEETING?  JUST TOPICS.

13   **A.**    WE DISCUSSED THE DELIVERY OF THE PRODUCTS.  WE DISCUSSED

14   SOME SNAFUS WE HAD HAD AT THAT POINT OVER DELAYED PAYMENTS.

15   AND BY AND LARGE WE DISCUSSED HOW WE WERE GOING TO GET OR SHIP

16   OR SMUGGLE THOSE EXACT UNITS OUT OF THE U.S., SAFELY, ON TO

17   THEIR CUSTOMERS IN IRAN.  AND WE ALSO DISCUSSED WHO WAS GOING

18   TO USE IT IN IRAN, AND THE METHOD OF PAYMENT BY WHICH THEY

19   RECEIVED THEIR MONEY FROM THE BUYERS IN IRAN.

20   **Q.**    DID YOU DISCUSS FUTURE BUSINESS WITH THE DEFENDANT AND

21   MR. YILDIZ?

22   **A.**    YES, WE DID.

23   **Q.**    AND AFTER THAT MEETING DID YOU AND OTHER AGENTS PROVIDE

24   DEFENDANT AND MR. YILDIZ WITH THE TWO Y-690'S AND THE

25   NAVIGAT-2100?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    YES, WE DID.

2    **Q.**    WAS THAT AFTER RECEIVING ANYTHING?

3    **A.**    YES, THAT IS AFTER WE RECEIVED ANOTHER PAYMENT.

4    **Q.**    NOW, DURING THE COURSE OF ACTING AS AN UNDERCOVER AGENT

5    AND COMMUNICATING WITH DEFENDANT, DID HE EVER IDENTIFY OTHER

6    INDIVIDUALS WHO HEADED UP TIG MARINE OR WERE INVOLVED IN TIG

7    MARINE?

8    **A.**    YES, HE DID.

9    **Q.**    WHO ARE THOSE INDIVIDUALS HE IDENTIFIED?

10   **A.**    HE IDENTIFIED AN INDIVIDUAL BY THE NAME OF KOORUSH

11   TAHERKHANI, AND AN INDIVIDUAL BY THE NAME OF ERGUN YILDIZ.

12   **Q.**    LET ME START WITH MR. TAHERKHANI, OR KOORUSH TAHERKHANI.

13         DID HE TELL YOU WHAT KOORUSH TAHERKHANI'S ROLE WAS IN

14   TIG MARINE?

15   **A.**    YEAH.  HE ESSENTIALLY DESCRIBED MR. TAHERKHANI AS THE

16   GENERAL OWNER OR THE PERSON THAT MADE IT RUN.  AND THAT THEY

17   WERE CLOSE PERSONAL FRIENDS, BUT THAT HE BASICALLY WAS THE GUY

18   BEHIND THE COMPANY.

19   **Q.**    SO HE DESCRIBED HIM AS A FRIEND.  AND DID DEFENDANT TELL

20   YOU HOW LONG HE HAD KNOWN KOORUSH TAHERKHANI, THE OWNER OF TIG

21   MARINE?

22   **A.**    HE SAID THAT HE HAD KNOWN HIM FOR OVER 20 YEARS.  AND I

23   BELIEVE HE REFERRED TO HIM AS CLASSMATES OR EVEN ROOMMATES

24   TOGETHER AT SOME POINT IN TIME.

25   **Q.**    AT WHERE?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    IN IRAN.  WHILE THEY WERE IN COLLEGE.

2    **Q.**    IN A COLLEGE?

3    **A.**    CORRECT.

4    **Q.**    DID HE ALSO DESCRIBE WHETHER KOORUSH HAD WORKED IN IRAN?

5    **A.**    YES, HE DID.

6    **Q.**    WHAT DID HE SAY ABOUT MR. TAHERKHANI'S EMPLOYMENT IN

7    IRAN IN THE PAST?

8    **A.**    HE SAID THAT KOORUSH TAHERKHANI WORKED FOR AN IRANIAN

9    SHIPPING LINE, AND THAT HE KNEW HIM WHEN HE WORKED THERE.  AND

10   THAT THE DEFENDANT HIMSELF WORKED FOR A SUBSIDIARY OF THAT

11   SAME SHIPPING LINE.

12   **Q.**    SO DID HE DESCRIBE THAT THEY HAD BOTH BEEN IN THE

13   MARITIME BUSINESS AT THE SAME TIME IN IRAN?

14   **A.**    YES.

15   **Q.**    DURING THIS SIX MONTHS OF NEGOTIATION, DID THE DEFENDANT

16   ULTIMATELY INTRODUCE YOU TO TAHERKHANI?

17   **A.**    ONLY VIA TELEPHONE.

18   **Q.**    AND DURING THE COURSE OF YOUR NEGOTIATIONS DID DEFENDANT

19   EVER STATE WHERE TAHERKHANI WAS LOCATED IN THE WORLD WHILE

20   YOUR NEGOTIATIONS WERE GOING ON?

21   **A.**    HE STATED THAT BUSINESS WAS LOCATED IN DUBAI.  AND HE

22   ALSO STATED THAT MR. TAHERKHANI SPENT A GOOD DEAL AMOUNT OF

23   TIME IN IRAN ITSELF.

24   **Q.**    DURING YOUR DISCUSSIONS WITH DEFENDANT WAS THERE EVER --

25   DID YOU EVER HAVE A CONVERSATION WITH HIM ABOUT WHO MR.

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    TAHERKHANI'S CUSTOMER BASE WAS?

2    **A.**    YES.

3    **Q.**    AND WHAT DID HE TELL YOU?

4    **A.**    HE TOLD ME THAT HIS CUSTOMER BASES WERE BASICALLY IN

5    IRAN, IN THE MARITIME BUSINESS, IN THE OIL AND MINING

6    BUSINESS.

7    **Q.**    NOW, YOU SAID YOU SPOKE WITH TAHERKHANI BY PHONE.  DID

8    YOU COMMUNICATE WITH HIM BY OTHER MEANS?

9    **A.**    BY EMAIL AS WELL.

10   **Q.**    DID YOU EVER MEET WITH HIM IN PERSON?

11   **A.**    NO, I DID NOT.

12   **Q.**    NOW, I THINK YOU MENTIONED A MR. YILDIZ TOO.

13   **A.**    CORRECT.

14   **Q.**    HOW DID DEFENDANT DESCRIBE MR. YILDIZ'S ROLE IN TIG

15   MARINE?

16   **A.**    HE DESCRIBED MR. YILDIZ'S ROLE IN TIG MARINE AS BEING

17   THE INDIVIDUAL, OR CEO, THAT ACTUALLY SAT IN DUBAI PHYSICALLY

18   IN THE OFFICE.

19   **Q.**    AND DURING THE COURSE OF YOUR NEGOTIATIONS WITH

20   DEFENDANT FOR THE SALE AND EXPORT OF THE NAVIGAT-2100'S AND

21   THE Y-690'S, DID YOU EVER COMMUNICATE WITH YILDIZ?

22   **A.**    YES, I DID.

23   **Q.**    AND DID THAT OCCUR EARLY IN THE NEGOTIATIONS?

24   **A.**    NO.  IT DIDN'T OCCUR UNTIL, I GUESS YOU WOULD SAY, THE

25   11TH HOUR.

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1  Q.   AND YOU COMMUNICATED HOW?

2  A.   SO COMMUNICATED WITH HIM VERY, VERY BRIEFLY, MAYBE ONCE

3  OR TWICE, VIA EMAIL.  AND THEN I ACTUALLY MET WITH HIM IN

4  PERSON IN LAS VEGAS, NEVADA.

5  Q.   WHEN YOU AND OTHER UNDERCOVER AGENTS SHOWED THE Y-690

6  AND THE -- THE TWO Y-690'S AND THE NAVIGAT-2100?

7  A.   CORRECT.

8  Q.   I WOULD LIKE TO SHOW YOU GOVERNMENT'S EXHIBIT 600,

9  601 -- 601 FIRST -- 602.  602 AND 603.

10        **MR. COUGHLIN:**  MAY I APPROACH, YOUR HONOR?

11        **THE COURT:**  YES.

12        **MR. COUGHLIN:**  602, 603.

13        **THE WITNESS:**  OKAY.

14        (EXHIBIT 602, 603 MARKED FOR IDENTIFICATION)

15  Q.   **(MR. HARRIGAN)** YOU SAID YOU NEVER MET WITH MR.

16  TAHERKHANI IN PERSON.

17  A.   CORRECT.

18  Q.   BUT DURING YOUR EMAIL COMMUNICATIONS DID YOU RECEIVE ANY

19  IDENTIFICATION DOCUMENT FROM HIM?

20  A.   YES, I DID.

21  Q.   AND SHOWING YOU GOVERNMENT'S EXHIBIT 602.  DO YOU

22  RECOGNIZE THAT?

23  A.   YES, I DO.

24  Q.   WHAT IS THAT?

25  A.   IT IS A PHOTOGRAPH OF MR. TAHERKHANI.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1      **MR. HARRIGAN:**  AND I WOULD MOVE TO ADMIT AND PUBLISH

2  THAT TO THE JURY, YOUR HONOR.

3           **THE COURT:**  ANY OBJECTION?

4           **MR. JOHNSTON:**  NO OBJECTION, YOUR HONOR.

5           **THE COURT:**  IT IS RECEIVED.

6           (EXHIBIT 602 RECEIVED INTO EVIDENCE)

7  **Q.    (MR. HARRIGAN)** AND NEXT SHOWING YOU GOVERNMENT'S

8  EXHIBIT NO. 603 FOR IDENTIFICATION.  DO YOU SEE THAT PHOTO,

9  AGENT COLE?

10 **A.**    YES.

11 **Q.**    DO YOU RECOGNIZE THE INDIVIDUAL DEPICTED IN THAT

12 PHOTOGRAPH?

13 **A.**    YES.

14 **Q.**    WHO IS THAT?

15 **A.**    MR. YILDIZ.

16          **MR. HARRIGAN:**  YOUR HONOR, AT THIS TIME I WOULD MOVE

17 TO ADMIT AND PUBLISH TO THE JURY GOVERNMENT'S EXHIBIT 603.

18          **MR. JOHNSTON:**  NO OBJECTION.

19          **THE COURT:**  RECEIVED.

20          (EXHIBIT 603 RECEIVED INTO EVIDENCE)

21 **Q.    (MR. HARRIGAN)** SO LET ME ASK YOU THIS.  DURING YOUR

22 COMMUNICATION WHEN YOU MET WITH MR. YILDIZ, DID YOU LEARN

23 WHERE HE RESIDED?

24 **A.**    I DID.

25 **Q.**    AND WHERE DID HE TELL YOU HE RESIDED?

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    **A.**    IN DUBAI.

2    **Q.**    THE UNITED ARAB EMIRATES?

3    **A.**    CORRECT.  SORRY.

4    **Q.**    DID HE ALSO DISCUSS WITH YOU HIS CITIZENSHIP?

5    **A.**    HE DID.

6    **Q.**    WHAT DID HE TELL YOU?

7    **A.**    HE SAID THAT HE WAS A GERMAN CITIZEN, HAD A GERMAN

8    PASSPORT.  AND THAT MADE IT EASIER FOR HIM NOT ONLY TO TRAVEL

9    BUT TO RUN THEIR BUSINESS.

10   **Q.**    NOW, YOU TESTIFIED PREVIOUSLY THAT WHILE ACTING IN AN

11   UNDERCOVER CAPACITY YOU HAD COMMUNICATED WITH THE DEFENDANT,

12   MR. YILDIZ AND MR. TAHERKHANI.  AND CAN YOU ESTIMATE,

13   APPROXIMATELY OVER THE SIX-MONTH PERIOD, HOW MANY UNDERCOVER

14   EMAIL COMMUNICATIONS YOU HAD WITH THOSE INDIVIDUALS IN TOTAL?

15   **A.**    OH, IT WAS A LOT.  ON EMAILS, I WOULD SAY PROBABLY MAYBE

16   MORE THAN 200.

17   **Q.**    AND WERE MOST OF THOSE WITH THE DEFENDANT AND OTHER

18   INDIVIDUALS?

19   **A.**    CORRECT.

20   **Q.**    EITHER DEFENDANT ALONE OR WITH DEFENDANT AND OTHER

21   INDIVIDUALS?

22   **A.**    EITHER THE DEFENDANT ALONE OR AT THE VERY LEAST WITH MR.

23   TAHERKHANI.

24   **Q.**    DID YOU MAINTAIN A RECORD OF ALL OF YOUR UNDERCOVER

25   EMAILS WITH EACH OF THESE INDIVIDUALS?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    YES.

2    **Q.**    WHAT ADDRESS, EMAIL ADDRESS, DID YOU USE?

3    **A.**    I USED AN EMAIL ADDRESS AT SOUTHSTARTRADING.COM.

4    **Q.**    IS THIS ONE OF THOSE EMAIL ADDRESSES THAT EITHER YOU OR

5    HSI SET UP TO BACKSTOP YOUR UNDERCOVER ROLE?

6    **A.**    YES.  CORRECT.

7    **Q.**    AND IN SENDING EMAILS TO MR. –– SENDING EMAILS TO

8    DEFENDANT OR RECEIVING EMAILS, WHAT EMAIL ACCOUNT DID HE

9    GENERALLY USE?

10   **A.**    HE GENERALLY USED AN EMAIL ACCOUNT FROM TIG MARINE.

11   **Q.**    DO YOU RECALL WHAT THAT WAS?

12   **A.**    I DON'T REMEMBER EXACTLY, BUT IT WAS –– I BELIEVE IT WAS

13   ARASH SOMETHING @TIG MARINE.

14   **Q.**    AND WHAT EMAIL ACCOUNT DID MR. TAHERKHANI USE WHEN

15   COMMUNICATING WITH YOU?

16   **A.**    I BELIEVE HE USED AN EMAIL ACCOUNT CALLED MD, AND IT WAS

17   MANAGING DIRECTOR @TIGMARINE.

18   **Q.**    AND FINALLY AS TO MR. YILDIZ, WHAT EMAIL ACCOUNT DID HE

19   USE WHEN COMMUNICATING WITH YOU?

20   **A.**    THE ONLY COMMUNICATIONS I HAD WITH HIM, HE USED A YAHOO

21   ACCOUNT, I BELIEVE.  IT WAS A VARIATION OF HIS NAME, MAYBE ––

22   **Q.**    WAS IT YAHOO OR HOTMAIL?

23   **A.**    HOTMAIL.  LIKE ERGUNYIL@HOTMAIL.COM.

24   **Q.**    I WANT TO SHOW YOU A BINDER.  I DON'T KNOW IF IT IS IN

25   FRONT OF YOU.  IT HAS BEEN MARKED AS –– IT CONTAINS

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1   APPROXIMATELY 35 EXHIBITS.  SEE IT?

2   **A.**   OKAY.

3   **Q.**   THEY ARE GOVERNMENT EXHIBIT NUMBERS 101 THROUGH 135.

4        (EXHIBIT 101 THROUGH 135 MARKED FOR IDENTIFICATION)

5   **A.**   OKAY.

6   **Q.**   NOW, I WANT YOU TO TAKE A LOOK AT THAT.  YOU HAVE SEEN

7   THAT BINDER BEFORE, CORRECT?

8   **A.**   CORRECT.

9   **Q.**   YOU REVIEWED THOSE EXHIBITS BEFORE YOU CAME TO COURT

10  HERE IN PREPARATION FOR YOUR TESTIMONY?

11  **A.**   I HAVE.

12  **Q.**   AND CAN YOU GENERALLY DESCRIBE, WITHOUT TALKING ABOUT

13  THE CONTENTS OF THEM, WHAT THOSE EXHIBITS ARE?

14  **A.**   THESE EXHIBITS APPEAR TO BE EMAIL COMMUNICATIONS THAT

15  WERE SENT AND/OR RECEIVED BY MYSELF WITH THE DEFENDANT AND MR.

16  TAHERKHANI.

17  **Q.**   OR MR. YILDIZ?

18  **A.**   OR MR. YILDIZ.

19  **Q.**   DO EACH OF THOSE EXHIBITS REPRESENT TRUE AND ACCURATE

20  COPIES OF UNDERCOVER EMAIL COMMUNICATIONS YOU HAD WITH

21  DEFENDANT, MR. YILDIZ AND/OR MR. TAHERKHANI?

22  **A.**   YES, THEY DO.

23  **Q.**   HAVE YOU LOOKED AT THOSE BEFORE?  DO THE DATES THAT ARE

24  REFLECTED ON THOSE EMAILS ACCURATELY REFLECT THE DATES WHEN

25  YOU EITHER RECEIVED OR SENT THE EMAIL?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    YES.

2    **Q.**    NOW, YOU TESTIFIED ALSO PREVIOUSLY THAT --

3          **MR. HARRIGAN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

4    TO MOVE TO ADMIT THOSE EMAILS, BUT I WILL ONLY PUBLISH THEM

5    UPON PERMISSION OF THE COURT.

6          **THE COURT:**  ANY OBJECTION?

7          **MR. JOHNSTON:**  WELL, YOUR HONOR, I WOULD RESERVE THE

8    RIGHT TO OBJECT TO ANY PARTICULAR EMAIL ON THE GROUNDS OF

9    FOUNDATION THAT HAS BEEN LAID BY SPECIAL AGENT COLE.

10          **MR. HARRIGAN:**  FAIR ENOUGH, THEN.  I WILL SHOW THEM

11    TO THE DEFENDANT FIRST TO -- I MEAN TO MR. COLE FIRST TO GIVE

12    DEFENSE COUNSEL AN OPPORTUNITY TO OBJECT BEFORE WE SHOW THEM

13    TO THE JURY.

14          **THE COURT:**  ALL RIGHT.

15    **Q.**    **(MR. HARRIGAN)** YOU TESTIFIED PREVIOUSLY WHILE ACTING IN

16    AN UNDERCOVER CAPACITY YOU SPOKE WITH THE DEFENDANT BY

17    TELEPHONE, RIGHT?

18    **A.**    CORRECT.

19    **Q.**    AND YOU ALSO SAID YOU SPOKE ONCE WITH MR. TAHERKHANI BY

20    TELEPHONE.

21    **A.**    YES.

22    **Q.**    AND YOU ALSO SPOKE TO MR. YILDIZ.

23    **A.**    I DID.

24    **Q.**    CAN YOU ESTIMATE HOW MANY TELEPHONE CONVERSATIONS YOU

25    HAD?

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    **A.**    WITH MR. TAHERKHANI, TO MY RECOLLECTION, ONLY ONE.

2         WITH THE DEFENDANT IT WAS A LOT, I WOULD SAY MAYBE 100.

3    WE SPOKE QUITE A BIT.

4    **Q.**    CAN YOU DESCRIBE WHY THAT IS, WHY YOU SPOKE QUITE A BIT?

5    **A.**    I THINK -- WELL, AS PART OF THE ROLE OF AN UNDERCOVER

6    AGENT I WAS PLAYING A BUSINESSMAN, AND HE WAS WANTING TO GET A

7    BUSINESS TRANSACTION COMPLETED.  AND SO PART OF THAT REQUIRED

8    ME TO ANSWER HIS CALLS OR RETURN HIS CALLS WHEN I RECEIVED

9    THEM.

10   **Q.**    AND CAN YOU ESTIMATE, IN TERMS OF PERCENTAGE OF CALLS,

11   HOW MANY TIMES YOU WERE THE ONE INITIATING THE CALLS AS

12   OPPOSED TO DEFENDANT?

13   **A.**    I WOULD SAY, WITHOUT HAVING IT IN FRONT OF ME, AT LEAST

14   PROBABLY 80 PERCENT OF THE TIME THE DEFENDANT INITIATED THE

15   CALLS TO ME.

16   **Q.**    NOW, WERE ALL OF THOSE TELEPHONE CONVERSATIONS RECORDED?

17   **A.**    ALL OF THE CALLS WERE RECORDED, COMPLETELY.

18   **Q.**    INCLUDING VOICE MAIL MESSAGES TO YOUR PHONE?

19   **A.**    YES.

20   **Q.**    AND HOW WAS THAT DONE?

21   **A.**    IT IS DONE VIA A THIRD PARTY SOFTWARE THAT THE NUMBER IS

22   SET UP, SO ANY CALL MADE OR RECEIVED OR TEXT MESSAGE

23   AUTOMATICALLY GETS RECORDED.  THERE IS NOTHING THAT AN AGENT

24   NEEDS TO DO OR ANY BUTTONS YOU NEED TO HIT, IT IS JUST

25   AUTOMATICALLY RECORDED AND STORED ON AN EXTERNAL HARD DRIVE.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **Q.**   AND DID YOU OR OTHERS MAINTAIN A RECORD OF ALL YOUR

2    TELEPHONE CONVERSATIONS?

3    **A.**   YES.

4    **Q.**   I WANT TO SHOW YOU WHAT HAS, I THINK, BEEN PLACED IN

5    FRONT OF YOU, GIVE YOU ONE MOMENT TO TAKE A LOOK AT IT.  IT IS

6    A BINDER WHICH CONTAINS, I BELIEVE, GOVERNMENT'S EXHIBITS 301

7    THROUGH 317.

8          (EXHIBIT 301 THROUGH 317 MARKED FOR IDENTIFICATION)

9    **A.**   YOU SAID 301.  OKAY.  CORRECT.

10   **Q.**   SO FIRST LOOKING AT THOSE EXHIBITS THAT ARE MARKED AS

11   GOVERNMENT 301 THROUGH 315, NOT THE LAST TWO.

12      NOW, YOU REVIEWED THOSE BEFORE COMING HERE TODAY,

13   CORRECT?

14   **A.**   YES, SIR, I DID.

15   **Q.**   OKAY.  SO WHAT IS CONTAINED IN 301 THROUGH 315,

16   GENERALLY?

17   **A.**   GENERALLY, CONTAINS DISKS THAT HAVE EXCERPTS OF

18   TELEPHONE CALLS BETWEEN MYSELF AND THE DEFENDANT AND/OR MR.

19   TAHERKHANI.

20   **Q.**   AND THESE ARE DISKS WHICH CONTAIN AUDIO FILES?

21   **A.**   AUDIO FILES.

22   **Q.**   AND THE DATES RANGE FROM WHEN FOR THOSE TELEPHONE

23   CONVERSATIONS?

24   **A.**   IT WOULD APPEAR DECEMBER 21ST, 2012.

25      AND YOU SAID THROUGH 15, CORRECT?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   **Q.**    YES.

2   **A.**    ALL THE WAY TO MAY 29TH 2013 -- I AM SORRY -- MAY 30TH,

3   2013.

4   **Q.**    SO FROM DECEMBER 21, 2012 THROUGH MAY 30, 2013?

5   **A.**    CORRECT.

6   **Q.**    AND PRIOR TO TESTIFYING HERE TODAY DID YOU LISTEN TO

7   EACH OF THE AUDIO FILES CONTAINED ON EACH OF THOSE DISKS?

8   **A.**    YES, I DID.

9   **Q.**    AND ON THOSE DISKS, IS IT THE COMPLETE RECORDING OF THAT

10  ENTIRE TELEPHONE CONVERSATION?

11  **A.**    NO.  THEY ARE JUST EXCERPTS ON THESE DISKS.

12  **Q.**    AND YOU REVIEWED THE ENTIRE TELEPHONE CONVERSATION,

13  CORRECT?

14  **A.**    CORRECT.

15  **Q.**    IN PREPARATION FOR TODAY YOU REVIEWED THOSE EXCERPTS

16  ALSO.

17  **A.**    AS WELL, YES.

18  **Q.**    AND DO THE RECORDINGS OF THE EXCERPTS CONTAINED IN

19  GOVERNMENT EXHIBIT 301 THROUGH 315 ACCURATELY REFLECT THE

20  CONVERSATIONS THAT YOU HAD WITH DEFENDANT AND POSSIBLY MR.

21  TAHERKHANI DURING THAT SAME TIME RANGE?

22  **A.**    YES, THEY DO.

23  **Q.**    AND DOES EACH FILE, EACH AUDIO FILE THAT YOU LISTENED

24  TO, ACCURATELY LIST THE DATE ON WHICH THAT TELEPHONE

25  CONVERSATION OCCURRED?

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    **A.**    YES.

2    **Q.**    AND IS THAT DATE ALSO REFLECTED ON THE DISK?

3    **A.**    IT IS INDEED.

4    **Q.**    IS THAT CONSISTENT WITH THE AUDIO FILE?

5    **A.**    YES.

6    **Q.**    AND ARE ALL OF THESE CONVERSATIONS, THESE EXCERPTS, IN

7    ENGLISH?

8    **A.**    YES.

9    **Q.**    WHEN YOU SPOKE WITH MR. GHAHREMAN, DID HE SPEAK IN

10   ENGLISH?

11   **A.**    YES, HE DID.

12   **Q.**    DURING THE COURSE OF THE NEGOTIATIONS, YOU ALWAYS SPOKE

13   IN ENGLISH?

14   **A.**    WE ONLY SPOKE IN ENGLISH.

15   **Q.**    DID YOU ALSO CAUSE TRANSCRIPTS OF THE EXCERPTS IN THOSE

16   EXHIBITS TO BE PREPARED TO AID YOU IN EXPLAINING YOUR

17   TESTIMONY TO THE GRAND JURY?

18   **A.**    YES.

19   **Q.**    TO THE JURY.  EXCUSE ME.

20   **A.**    YES.

21   **Q.**    AND DID YOU REVIEW THOSE TRANSCRIPTS ALONG WITH

22   LISTENING TO THE EXCERPTS PRIOR TO TESTIFYING TODAY?

23   **A.**    YES.

24   **Q.**    AND DO THE TRANSCRIPTS THAT HAVE BEEN PREPARED

25   REASONABLY AND ACCURATELY REFLECT WHAT'S SAID IN THOSE

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  TELEPHONE CONVERSATIONS?

2  **A.**    YES, THEY DO.

3  **Q.**    SO I WOULD LIKE YOU TO ALSO LOOK AT THE SAME BINDER, AND

4  BEHIND EACH DISK SHOULD BE AN EXCERPT, DOCUMENTS THAT ARE

5  MARKED 301-A THROUGH 315-A.

6           (EXHIBIT 301-A THROUGH 315-A MARKED FOR

7           IDENTIFICATION)

8  **A.**    CORRECT.

9  **Q.**    YOU HAVE SEEN THOSE BEFORE, RIGHT?

10 **A.**    YES, I HAVE, SIR.

11 **Q.**    ARE THOSE THE EXCERPTS THAT YOU REVIEWED?

12 **A.**    YES.

13          **MR. HARRIGAN:**  YOUR HONOR, AGAIN AT THIS TIME I

14 WOULD MOVE TO ADMIT THOSE.

15          **MR. JOHNSTON:**  MAY I HAVE A BRIEF MOMENT WITH MR.

16 HARRIGAN?

17          **THE COURT:**  YES.

18          (DISCUSSION OFF THE RECORD)

19          **MR. JOHNSTON:**  YOUR HONOR, THERE IS NO OBJECTION TO

20 THE INTRODUCTION OF THOSE EXHIBITS, BUT I DO MAINTAIN MY

21 POSITION THAT WE ARE NOT NECESSARILY AGREEING TO THE ACCURACY

22 OF THE TRANSCRIPTS.  CERTAINLY THE BEST EVIDENCE WOULD BE THE

23 RECORDINGS THEMSELVES.

24          **THE COURT:**  YES.  SO THIS WOULD BE EXHIBITS 301 --

25          **MR. HARRIGAN:**  THROUGH 315.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

 1          **THE COURT:**  THROUGH 315.  THEY WILL BE RECEIVED.

 2          AND THEN ARE WE GOING TO BE GOING THROUGH THE AUDIO

 3   AT THIS TIME WITH THE TRANSCRIPT?

 4          (EXHIBIT 301 THROUGH 315 RECEIVED INTO EVIDENCE)

 5          **MR. HARRIGAN:**  WE WILL SHORTLY.  THEN, ALTHOUGH WE

 6   HAVE THE TRANSCRIPTS, WE HAVE A SANCTIONS PROGRAM WHERE IT

 7   WILL SHOW UP ON THE SCREEN.

 8          **THE COURT:**  YES.

 9          **MR. HARRIGAN:**  ALONG WITH THE VOICE.  THAT IS OUR

10   INTENTION.  BUT IT IS JUST AS AN AID, NOT TO GO BACK TO THE

11   JURY WHEN THEY DELIBERATE.

12          **THE COURT:**  YES.  SO WHEN WE START THE AUDIO VERSION

13   FOR THE MEMBERS OF THE JURY TO HEAR, THERE WILL BE A

14   TRANSCRIPT AS WELL.

15          THE TRANSCRIPT IS NOT EVIDENCE, AND IT WON'T BE

16   GIVEN TO YOU IN EVIDENCE, IT IS SIMPLY AN AID TO ASSIST YOU IN

17   YOUR UNDERSTANDING OF WHAT IS BEING SAID BETWEEN THE

18   INDIVIDUALS ON THE AUDIO.

19          MR. HARRIGAN.

20          **MR. HARRIGAN:**  THANK YOU, YOUR HONOR.

21   **Q.**    **(MR. HARRIGAN)** SO, AGENT COLE, AFTER WE GOT THAT OUT OF

22   THE WAY, LET ME ASK YOU.  WHEN DID YOU FIRST COMMUNICATE WITH

23   THE DEFENDANT?

24   **A.**    I BELIEVE THE FIRST COMMUNICATION WAS ON DECEMBER 21ST,

25   2012.

APRIL 14, 2015

377

COLE - DIRECT EXAMINATION

1   **Q.**    AND WAS THAT BY TELEPHONE OR EMAIL COMMUNICATION OR

2   BOTH?

3   **A.**    BY EMAIL.

4   **Q.**    OKAY.  CAN YOU EXPLAIN HOW THAT CONTACT CAME ABOUT?

5   **A.**    SO THE CONTACT CAME ABOUT BECAUSE TIMCO MARINE, THE

6   COMPANY THAT THE DEFENDANT ATTEMPTED TO PURCHASE THE NAVIGATS

7   FROM, HAD THEN IN TURN ATTEMPTED TO SUBMIT AN ORDER TO THE

8   MANUFACTURER, NORTHROP GRUMMAN.  AND TIMCO GAVE THE DEFENDANT

9   MY UNDERCOVER INFORMATION, MY TELEPHONE NUMBER, EMAIL ADDRESS

10  AND BUSINESS.  AND THEN SHORTLY THEREAFTER I RECEIVED A COUPLE

11  OF EMAILS FROM THE DEFENDANT.

12  **Q.**    AND THE PURPOSE OF HOMELAND SECURITY INVESTIGATIONS,

13  HSI, PROVIDING THAT EMAIL TO TIMCO MARINE WAS FOR WHAT?

14  **A.**    IT WAS TO GIVE US A CHANCE TO -- CLEARLY SEEING THERE

15  WAS ACTIVITY GOING ON THAT DEEMED THAT WE LOOK INTO IT MORE,

16  SO IT WAS GIVEN SO WE WOULD HAVE A CHANCE TO DEVELOP AND SEE

17  IF THERE WAS EVIDENCE THAT WOULD VALIDATE A CRIME WAS IN

18  THE -- AT LEAST BEING ATTEMPTED OR BEING CONTEMPLATED.

19  **Q.**    SO AT THAT POINT IN TIME, YOU DIDN'T KNOW.

20  **A.**    I DID NOT KNOW.

21  **Q.**    I AM GOING TO SHOW YOU GOVERNMENT'S 101 --

22          (EXHIBIT 101 MARKED FOR IDENTIFICATION)

23  **A.**    OKAY.

24  **Q.**    -- FOR IDENTIFICATION.  AND WE WILL PUT IT ON THE SCREEN

25  THERE FOR YOU.

APRIL 14, 2015

COLE - DIRECT EXAMINATION

```
 1          DO YOU RECOGNIZE THAT, WHAT APPEARS TO BE AN EMAIL?
 2   A.    YES.
 3              MR. HARRIGAN:  YOUR HONOR, I MOVE --
 4   Q.    (MR. HARRIGAN) IS THAT YOUR FIRST COMMUNICATION WITH
 5   THE DEFENDANT -- OR FIRST COMMUNICATION YOU GOT FROM THE
 6   DEFENDANT?
 7   A.    YES.
 8              MR. HARRIGAN:  I MOVE TO ADMIT THIS INTO EVIDENCE,
 9   YOUR HONOR.
10              THE COURT:  ANY OBJECTION?
11              MR. JOHNSTON:  NO OBJECTION.
12              THE COURT:  IT IS RECEIVED.
13          (EXHIBIT 101 RECEIVED INTO EVIDENCE)
14   Q.    (MR. HARRIGAN) FIRST LOOKING AT THAT EMAIL, THE HEADER.
15   A.    OKAY.
16   Q.    THAT WAS RECEIVED FROM WHO?
17   A.    IT WAS RECEIVED FROM THE DEFENDANT, SENT TO ME ON
18   DECEMBER 21ST, 2012.
19   Q.    SO THAT IS YOUR SOUTH STAR TRADING ADDRESS.
20   A.    CORRECT.
21   Q.    AND THE SUBJECT MATTER IS?
22   A.    TIG MARINE REQUISITION LIST.
23   Q.    AND LOOKING AT THE HEADER INFORMATION AT THE TOP, THE
24   FROM, THE AGHAHREMAN@GMDSHIPYARD, IS THAT AN EMAIL THAT DURING
25   THE NEXT SIX MONTHS YOU COMMUNICATED WITH THE DEFENDANT?
```

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    **A.**    NO, IT WAS NOT.

2    **Q.**    LET'S LOOK AT THE CONTENT OF THE EMAIL.

3         WHAT DOES DEFENDANT TELL YOU IN THAT EMAIL, BRIEFLY?

4    **A.**    IN ESSENCE, THAT HE RECEIVED MY INFORMATION FROM A LADY

5    BY THE NAME OF TAMMY, AND HER EMAIL IS BELOW.  THAT HE HAS A

6    FRIEND IN DUBAI, UNITED ARAB EMIRATES, WHO NEEDS SIX

7    NAVIGAT-2100'S.  AND WOULD LIKE TO KNOW AS SOON AS POSSIBLE IF

8    THEY WOULD BE AVAILABLE TO GET THEM IN STOCK, AND TO GET

9    STARTED ON THE FIRST STEP.

10   **Q.**    AND IN TERMS OF HOW HE SIGNS IT, DOES HE SIGN THAT --

11   EVEN THOUGH THE SUBJECT MATTER SAYS TIG MARINE, HOW DOES HE

12   SIGN IT?

13   **A.**    HE SIGNED IT AS PROJECT MANAGER @ GMD SHIPYARD.

14   **Q.**    AND AT THAT POINT DOES HE IDENTIFY WHO HIS FRIEND IN

15   DUBAI IS?

16   **A.**    HE DOES NOT.

17   **Q.**    AND SINCE THIS INVESTIGATION IS JUST STARTING OUT, WAS

18   THERE ANY SIGNIFICANCE TO YOU, FROM AN INVESTIGATION

19   STANDPOINT, THAT, ONE, HE WANTED THEM AS SOON AS POSSIBLE,

20   AND, TWO, IF YOU HAD THEM AVAILABLE IN STOCK?

21   **A.**    YES, THERE WAS.

22   **Q.**    AND WHAT IS THE FIRST TALKING ABOUT, AS SOON AS

23   POSSIBLE?

24   **A.**    WELL, FOR US, AS INVESTIGATORS, ANY TIME SOMEBODY IS

25   LOOKING FOR EQUIPMENT THAT IS TYPICALLY MADE TO ORDER AND THEY

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    WANT THEM EITHER IN A HURRY OR WANT TO KNOW IF THEY ARE IN

2    STOCK IT GIVES US AN INDICATION THAT PERHAPS THERE IS

3    SOMETHING THAT WE NEED TO INVESTIGATE FURTHER, BECAUSE

4    SOMETHING COULD NOT BE –– OR IT IS VERY LIKELY IS PROBABLY

5    WRONG WITH THE ORDER.

6    **Q.**    BY IN STOCK THEY MEAN DON'T GO TO THE MANUFACTURER,

7    RIGHT?

8    **A.**    CORRECT.

9    **Q.**    AND YOU KNEW AT THIS POINT WHAT?

10   **A.**    I KNEW AT THIS POINT THAT THEY WERE OBVIOUSLY, A, IN A

11   HURRY.  AND, B, THAT THEY –– EVEN WITHOUT THE DEFENDANT'S

12   DESIRE, THAT TIMCO HAD ALREADY GONE TO THE MANUFACTURER WITH

13   THEIR END USER INFORMATION.

14   **Q.**    AND WHAT HAPPENED?

15   **A.**    IT HAD BEEN REJECTED.

16   **Q.**    AND GENERALLY DO DISTRIBUTORS CHARGE MORE THAN THE

17   MANUFACTURER?

18   **A.**    YES.

19   **Q.**    NOW, THE GMD SHIPYARD ADDRESS –– AND HE SENT THIS EMAIL

20   ON DECEMBER 21ST AT 6:37 A.M.  DID DEFENDANT LATER PROVIDE YOU

21   A DIFFERENT ADDRESS?

22   **A.**    YES, HE DID.

23   **Q.**    LET ME SHOW YOU WHAT IS GOVERNMENT EXHIBIT 102, WHICH

24   YOU PREVIOUSLY IDENTIFIED.

25        AND IF THERE IS NO OBJECTION, I MOVE TO ADMIT IT.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1      **THE COURT:**  ANY OBJECTION?

2      **MR. JOHNSTON:**  NO, YOUR HONOR.

3      **THE COURT:**  RECEIVED.

4           (EXHIBIT 102 MARKED FOR IDENTIFICATION AND RECEIVED

5           INTO EVIDENCE)

6  **Q.    (MR. HARRIGAN)** LOOKING AT THE HEADER INFORMATION, WHEN

7  WAS THAT EMAIL SENT?

8  **A.**    IT WAS SENT ON DECEMBER 21ST, 2012.

9  **Q.**    AND BY WHO?

10 **A.**    BY THE DEFENDANT, BUT THIS TIME FROM A TIG MARINE EMAIL

11 ACCOUNT.

12 **Q.**    OKAY.  AND BY THIS TIME YOU HADN'T RESPONDED TO THE

13 FIRST EMAIL, CORRECT?

14 **A.**    NO, IT WAS STILL THE SAME DATE.

15 **Q.**    LET'S LOOK AT THE CONTENT OF THAT EMAIL.

16 **A.**    OKAY.

17 **Q.**    AND IN TERMS OF THAT, WHAT IS HE -- WHAT INFORMATION

18 DOES THE DEFENDANT ASK OF YOU?

19 **A.**    ESSENTIALLY THE SAME THING.  HE WANTED TO KNOW IF I HAD

20 RECEIVED HIS PREVIOUS EMAIL THAT HE SENT FROM HIS OTHER EMAIL

21 ACCOUNT.  THAT HE IS STILL INTERESTED IN PURCHASING SIX UNITS

22 OF THE GYRO NAVIGAT-2100.  AND THAT TO PLEASE CONTACT HIM IF

23 YOU HAVE ANY AVAILABLE UNITS IN STOCK.

24 **Q.**    NOW, YOU HAD SEEN THE END USER STATEMENT THAT HE HAD

25 PROVIDED TO TIG MARINE, CORRECT?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    AND HOW MANY HAD HE APPLIED FOR AT THAT POINT IN TIME?

3    **A.**    I BELIEVE THEY HAD APPLIED FOR AROUND THE SAME NUMBER,

4    POSSIBLY 10.  I DON'T RECALL EXACTLY.

5    **Q.**    YOU DON'T RECALL.  ALL RIGHT.

6          WHAT DOES HE SIGN HIS -- DEFENDANT SIGN HIS NAME AS THIS

7    TIME?

8    **A.**    HE SIGNS HIS NAME AS CONSULTANT AND U.S. OFFICE

9    REPRESENTATIVE.

10    **Q.**    RIGHT.  AND HE ASKED YOU NOT TO USE THE GMD SHIPYARD

11    ACCOUNT.

12    **A.**    CORRECT.

13    **Q.**    AND IS THAT THE EMAIL, AGHAHREMAN@TIGMARINE.COM, THAT

14    YOU THEN COMMUNICATED WITH HIM IN THE FUTURE?

15    **A.**    YES, IT IS.

16    **Q.**    DID YOU SPEAK WITH DEFENDANT, FINALLY, AFTER THESE TWO

17    EMAILS?

18    **A.**    I DID.

19    **Q.**    DIRECTING YOUR ATTENTION TO GOVERNMENT EXHIBIT 301.

20    **A.**    OKAY.

21    **Q.**    WHICH YOU HAVE ALREADY IDENTIFIED.

22          JUST LOOK AT -- CAN YOU LOOK AT THE DISK?

23    **A.**    UH-HUH.

24    **Q.**    THE FIRST DISK.

25          WHEN DID THAT CALL OCCUR?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   **A.**   IT OCCURRED ON DECEMBER 21ST, 2012.

2   **Q.**   OKAY.  SO THAT VERY NIGHT?

3   **A.**   THAT VERY NIGHT.

4   **Q.**   AND THAT WAS RECORDED, RIGHT?

5   **A.**   THAT WAS RECORDED.

6   **Q.**   AND WHAT DID YOU DISCUSS IN THAT FIRST CONVERSATION, DO

7   YOU RECALL?

8   **A.**   YEAH, I DO.  GENERALLY HIS REQUEST FOR THE NAVIGAT AND

9   THE FACT THAT THEY HAD ALREADY ATTEMPTED TO PURCHASE IT FROM

10  OTHER MEANS AND WERE REJECTED.

11  **Q.**   DID YOU EXPLAIN TO HIM, HAVE ANY DISCUSSION ABOUT

12  NORTHROP GRUMMAN AND WHO NORTHROP GRUMMAN GENERALLY SUPPLIES

13  NAVIGATS TO?

14  **A.**   I DID.

15  **Q.**   CAN YOU SUMMARIZE THAT DISCUSSION.

16  **A.**   THEY WERE -- I EXPLAINED THEY WERE A LARGE DEFENSE

17  CONTRACTOR, AND TYPICALLY THEY RECEIVE AND FIELD ORDERS FROM

18  FOREIGN GOVERNMENTS, MILITARIES, COAST GUARDS, AND PEOPLE OF

19  THAT NATURE.

20  **Q.**   NOW I WANT TO PLAY YOU AN EXCERPT FROM THAT TELEPHONE

21  CONVERSATION AND ASK YOU SOME QUESTIONS ABOUT THAT.

22  **A.**   OKAY.

23          **THE COURT:**  WHAT EXHIBIT WILL THIS BE?

24          **MR. HARRIGAN:**  THIS WILL BE EXHIBIT 301.

25          (AUDIO PLAYED)

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  **Q.     (MR. HARRIGAN)** AGENT COLE, IN THE CONTEXT OF YOUR

2  ENTIRE CONVERSATION CAN YOU EXPLAIN WHAT YOU ARE REPRESENTING

3  TO THE DEFENDANT IN YOUR ROLE AS AN UNDERCOVER AGENT AND THE

4  COMMUNICATION?

5  **A.**    YEAH.  I WAS SIMPLY EXPLAINING TO HIM THAT I UNDERSTOOD

6  WHAT THEY WANTED, I UNDERSTOOD WHAT HE WAS TRYING TO PURCHASE.

7  AND THAT I BELIEVED I HAD THE ABILITY TO HELP HIM FULFILL HIS

8  ORDER.  AND THAT BASED ON THE FACT HIS INFORMATION AND END

9  USER HAD ALREADY BEEN PROVIDED TO NORTHROP GRUMMAN AND BEEN

10 DENIED, THAT I WOULD ATTEMPT TO PURCHASE IT FOR THE DEFENDANT

11 USING MY OWN INFORMATION, AND PROVIDE FALSE END USER

12 INFORMATION TO THE MANUFACTURER.

13 **Q.**    NOW, IN THAT EXCERPT YOU SAY YOU DON'T WANT HIM TO

14 CONTACT NORTHROP GRUMMAN AND CREATE A NEGATIVE IMAGE.  IN YOUR

15 ROLE AS AN UNDERCOVER AGENT, WHAT WERE YOU TRYING TO IMPLY TO

16 HIM OR TELL HIM?

17 **A.**    WELL, I WAS TRYING TO IMPLY TO HIM WE DID NOT NEED ANY

18 MORE HEAT BECAUSE NORTHROP GRUMMAN HAD ALREADY BEEN CONTACTED

19 AND HAD DENIED THEIR ORDER.  THE LAST THING I WANTED WAS FOR

20 HIM TO ATTEMPT OR HAVE SOMEBODY ELSE IN THEIR CHAIN ATTEMPT TO

21 CONTACT NORTHROP GRUMMAN AGAIN, AND AGAIN PROVIDE END USER

22 INFORMATION THAT WOULD BE DENIED.  AND THEN MAKE IT EVEN MORE

23 DIFFICULT FOR US TO OBTAIN THE ORDER.

24 **Q.**    AND DID DEFENDANT, IN THAT EXCERPT, DESCRIBE TO YOU HIS

25 ATTEMPTS TO GET THE GYROCOMPASS THROUGH TIMCO MARINE?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  **A.**    YES, HE DID.

2  **Q.**    WHAT DID HE SAY ABOUT WHAT HE TOLD TAMMY FROM TIMCO

3  MARINE, HOW YOU WERE GOING TO ACQUIRE IT?

4  **A.**    HE TOLD HER THAT HE –– AND TOLD ME HE WANTED TO GET IT

5  DIRECTLY FROM HER, FROM TIMCO MARINE, FROM STOCK THAT WAS

6  AVAILABLE.  AND HE NEVER ASKED HER NOR DID HE WANT HER TO GO

7  CONTACT THE MANUFACTURER, BUT ONCE IT HAD ALREADY HAPPENED HE

8  SORT OF FELT COMPELLED TO MINIMIZE THE PROBLEMS.

9  **Q.**    AND WHAT WAS THE DESCRIPTION HE GAVE OF WHY –– HE SAID

10  HE KNEW WHY IN THAT EXCERPT IT WAS DENIED, BUT WHAT WAS THE

11  DESCRIPTION HE GAVE?

12  **A.**    HE GAVE THE DESCRIPTION BECAUSE THEY ALL BELIEVE IT IS

13  GOING OVER TO THE MIDDLE EAST, AND THEY WON'T LIKE THAT.  AND

14  THEN HE SAID, IT IS ONLY BUSINESS, IT IS ONLY BUSINESS, BUT

15  THEY DON'T WANT TO LET THE BUSINESS GO.

16  **Q.**    NOW, AT THIS POINT YOU HAVE AN INKLING, IS IT FAIR TO

17  SAY AN INKLING, THAT IT MAY BE GOING TO IRAN?

18  **A.**    YES, I DID.

19  **Q.**    WHY DON'T YOU OPENLY DISCUSS THAT WITH THE DEFENDANT?

20  **A.**    BECAUSE AS AN UNDERCOVER AGENT, AND IN MY EXPERIENCE, I

21  KNEW THAT WOULD PROBABLY BE A BAD IDEA BECAUSE WE DID HAVE A

22  RELATIONSHIP SATISFACTORY AT THAT POINT TO GAIN HIS TRUST.

23  AND MORE THAN LIKELY I BELIEVED HE WOULD THINK I WAS AN

24  UNDERCOVER COP TRYING TO GET HIM IN TROUBLE.

25  **Q.**    AND YOU INDICATED THAT YOU SAID YOU COULD PROVIDE AN END

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1   USER, MAYBE PROVIDE YOUR OWN END USER?

2   **A.**   YES.

3   **Q.**   DURING THAT CONVERSATION ABOUT PROVIDING -- POSSIBLY

4   PROVIDING FALSE END USER, OR ANY OTHER CONVERSATION YOU HAD

5   WITH THE DEFENDANT, DID HE EVER EXPRESS CONCERN ABOUT THE FACT

6   THAT YOU WERE GOING TO PROVIDE FALSE INFORMATION TO NORTHROP

7   GRUMMAN IN ORDER TO ACQUIRE IT FOR HIM?

8   **A.**   NO.  NEVER.

9   **Q.**   DID HE EVER OBJECT TO IT?

10  **A.**   NEVER DID.

11  **Q.**   SO DID YOU HAVE FURTHER COMMUNICATIONS WITH HIM AFTER

12  THAT IN WHICH HE IDENTIFIED HIS FRIEND?

13  **A.**   YES.

14  **Q.**   OKAY.  LET ME SHOW YOU WHAT'S MARKED AS GOVERNMENT'S

15  EXHIBIT 103 AND 1 -- LET'S LOOK AT 103 FIRST.

16  **A.**   OKAY.  OKAY.

17       **MR. HARRIGAN:**  AND, YOUR HONOR, IF THERE IS NO

18  OBJECTION, I WOULD MOVE TO ADMIT IT.

19       **THE COURT:**  ANY OBJECTION?

20       **MR. JOHNSTON:**  NO OBJECTION, YOUR HONOR.

21       **THE COURT:**  RECEIVED.

22       (EXHIBIT 103 RECEIVED INTO EVIDENCE)

23       **MR. HARRIGAN:**  OKAY.

24  **Q.**   **(MR. HARRIGAN)** AND, GENERALLY, IS THIS AN EMAIL WHERE

25  HE IDENTIFIED OR EMAIL CHAIN IN WHICH YOU HAD THE DISCUSSION

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    ABOUT THE IDENTITY OF DEFENDANT'S FRIEND?

2    **A.**    YES, IT IS.

3    **Q.**    AND CAN YOU GENERALLY DESCRIBE THIS EMAIL OR WHAT

4    OCCURRED, AND THEN WE WILL LOOK AT THE CONTENTS.

5    **A.**    YEAH.  SO I RECEIVED AN EMAIL FROM THE DEFENDANT.  THE

6    EMAIL HAD ON IT ANOTHER EMAIL AT THE BOTTOM, AND THAT EMAIL

7    WAS SIGNED BY AN INDIVIDUAL BY THE NAME KOORUSH TAHERKHANI.

8         AND SO THEN I ALSO, ON TOP, HAVE THE EMAIL FROM THE

9    DEFENDANT INDICATING THAT THEY WANTED JUST MORE INFORMATION,

10   ESSENTIALLY, ABOUT THE NAVIGAT-2100, THEY WANTED FIVE UNITS,

11   ET CETERA.

12   **Q.**    LET'S GO TO THE BOTTOM OF GOVERNMENT'S EXHIBIT 103

13   LOOKING AT THE HEADER INFORMATION FIRST.

14   **A.**    OKAY.

15   **Q.**    ALL RIGHT.  AND THAT'S AN EMAIL FROM THE DEFENDANT TO

16   YOU.

17   **A.**    CORRECT.

18   **Q.**    ON DECEMBER 28TH?

19   **A.**    YES.

20   **Q.**    EARLY IN THE NEGOTIATIONS?

21   **A.**    YES, IT IS.

22   **Q.**    THAT WAS SIGNED BY WHO?  GOING TO THE SECOND PAGE.

23   **A.**    IT WAS SIGNED BY KOORUSH TAHERKHANI, MANAGING DIRECTOR,

24   TIG MARINE ENGINEERING SERVICES.

25   **Q.**    AND THE DISCUSSION WAS ABOUT GYROCOMPASSES.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    AND HOW MANY GYROCOMPASSES OR WHAT TYPE OF GYROCOMPASSES

3    THEY MIGHT NEED?

4    **A.**    YES.

5    **Q.**    HOW DID YOU RESPOND TO THAT EMAIL?

6    **A.**    I RESPONDED TO THE EMAIL BASICALLY BY SAYING I

7    UNDERSTOOD HIS REQUEST, THAT I WOULD BEGIN WORKING ON THE

8    REQUEST FOR THEM.  YOU KNOW, GAVE THEM SOME DETAILS ABOUT THE

9    FEASIBILITY OF OBTAINING THEM, OTHER OPTIONS.  AND THEN I ALSO

10   ASKED THEM WHO MR. TAHERKHANI WAS.

11   **Q.**    LET'S GO TO THE TOP OF THE EMAIL.

12   **A.**    OKAY.

13   **Q.**    HEADER INFORMATION.

14         YOU SENT A REPLY EMAIL --

15   **A.**    I DID.

16   **Q.**    -- RESPONDING TO HIM.  AND LET'S LOOK AT THE LAST

17   PARAGRAPH.

18   **A.**    OKAY.

19   **Q.**    AND EXPLAIN THAT, WHAT YOU ARE TELLING THE DEFENDANT IN

20   THAT PARAGRAPH.

21   **A.**    I JUST SIMPLY EXPLAINED TO THE DEFENDANT I WAS CONFUSED

22   BY THE EMAIL SIGNATURE ON THE ATTACHED EMAIL, THAT I THOUGHT

23   OUR BUSINESS WAS PRIVATE BETWEEN THE TWO OF US.  AND THAT WAS

24   KOORUSH TAHERKHANI SIMPLY ANOTHER NAME THAT HE USED IN HIS

25   HOME COUNTRY, OR WHO EXACTLY WAS IT.  AND THAT I BELIEVED IF

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   WE WERE GOING TO CONTINUE BUSINESS TOGETHER IT WAS IMPORTANT
2   WE KEEP IT PRIVATE AND CONFIDENTIAL.
3   **Q.**   AGAIN, YOU WERE PLAYING A ROLE HERE.
4   **A.**   CORRECT.
5   **Q.**   AND IN MAKING THOSE STATEMENTS TO THE DEFENDANT, IN YOUR
6   ROLE AS A BROKER WHO CAN GET GOODS OUT OF THE COUNTRY, WHAT
7   ARE YOU TELLING THE DEFENDANT?
8   **A.**   YEAH.  I MEAN, AS A BROKER PLAYING A ROLE I WAS TELLING
9   HIM, LISTEN, IF WE ARE GOING TO DO THIS WE ARE GOING TO BE
10  DEALING WITH DEFENSE CONTRACTORS, ALL OF THE PEOPLE THAT ARE
11  GOING TO BE CHECKING AND DOUBLE CHECKING.  IT IS IMPORTANT
12  THAT WE ARE SMART AND WE KEEP THINGS TIGHT AND WE DON'T GET
13  SLOPPY, BECAUSE THAT IS HOW WE ARE GOING TO GET CAUGHT.  SO IT
14  MADE ME NERVOUS THAT RIGHT AWAY, ON ONE OF OUR VERY FIRST
15  EMAILS, THERE IS A THIRD PERSON INVOLVED THAT I KNEW NOTHING
16  ABOUT.
17  **Q.**   DID IT MAKE YOU PERSONALLY NERVOUS, OR DID IT MAKE DAVID
18  MILLS NERVOUS?
19  **A.**   IT MADE DAVID MILLS NERVOUS.  I WAS NOT PERSONALLY
20  NERVOUS, NO.  THANK YOU.
21  **Q.**   DID HE REPLY -- DID THE DEFENDANT REPLY TO THIS EMAIL?
22  **A.**   YEAH, HE DID.
23  **Q.**   DID HE REPLY TO YOUR CONCERNS ABOUT YOU GOT TO KEEP
24  THINGS PRIVATE AND CONFIDENTIAL?
25  **A.**   YES, HE DID.

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1   **Q.**   LET ME SHOW YOU GOVERNMENT EXHIBIT 104.

2   **A.**   OKAY.

3   **Q.**   ALL RIGHT.

4         **MR. HARRIGAN:**  AND I WOULD MOVE TO ADMIT THIS EMAIL,

5   UNLESS THERE IS AN OBJECTION.

6         **MR. JOHNSTON:**  NO OBJECTION.

7         **THE COURT:**  RECEIVED.

8         (EXHIBIT 104 RECEIVED INTO EVIDENCE)

9   **Q.**   **(MR. HARRIGAN)** AGAIN, LET'S LOOK FIRST AT THE HEADER.

10  **A.**   OKAY.

11  **Q.**   IS THAT AN EMAIL FROM DEFENDANT TO YOU?

12  **A.**   YES, IT IS.

13  **Q.**   ON DECEMBER 28TH?

14  **A.**   CORRECT.

15  **Q.**   ALL RIGHT.  AND IN THAT EMAIL DOES DEFENDANT RESPOND TO

16  YOUR CONCERNS ABOUT KEEPING YOUR BUSINESS RELATIONSHIP PRIVATE

17  AND CONFIDENTIAL?  DOES HE IDENTIFY WHO -- LET ME ASK YOU THAT

18  FIRST.  DOES HE?

19  **A.**   YES, HE DOES.

20  **Q.**   DOES HE IDENTIFY ALSO WHO THE SIGNATOR, KOORUSH

21  TAHERKHANI, IS?

22  **A.**   YES.

23  **Q.**   LET'S LOOK AT THE CONTENT OF THAT.

24  **A.**   OKAY.

25  **Q.**   WHAT DOES HE EXPLAIN ABOUT WHY KOORUSH TAHERKHANI'S NAME

APRIL 14, 2015

321

COLE - DIRECT EXAMINATION

1    APPEARS AT THE BOTTOM OF THE EMAIL?

2    **A.**    HE SAYS THAT HE IS A FRIEND, AND THAT HE WAS TIRED.

3    THAT HE FORWARDED THE EMAIL ALONG AND THAT ESSENTIALLY HE

4    FORGOT TO CHANGE THE SIGNATURE.  AND THAT ARASH GHAHREMAN IS

5    THE ONLY NAME THAT HE USES OR GOES BY.  AND THAT HE UNDERSTOOD

6    THE NEED TO KEEP OUR BUSINESS RELATIONSHIP CONFIDENTIAL.

7    **Q.**    LET'S LOOK AT THAT.  WHAT ARE HIS WORDS?

8    **A.**    I APPRECIATE YOUR CONCERNS ABOUT REMAINING OUR BUSINESS

9    RELATIONSHIP CONFIDENTIAL.

10   **Q.**    AFTER YOU HAD THOSE EMAIL COMMUNICATIONS -- AND DURING

11   THOSE EMAIL COMMUNICATIONS, THAT EMAIL COMMUNICATION, HOW MANY

12   UNITS DID HE SAY HE NEEDED AT THIS POINT, WAS IT SIX OR FOUR?

13   **A.**    SIX -- AT THIS POINT HE IS SAYING FOUR.

14   **Q.**    SO AFTER HE -- AT THAT POINT HE SAID HE WANTED FOUR, DID

15   YOU HAVE FURTHER COMMUNICATION WITH THE DEFENDANT REGARDING

16   THE NUMBERS OF NAVIGAT-2100'S THAT HE WANTED?

17   **A.**    YES, WE DID.

18   **Q.**    WAS THAT IN A TELEPHONE CONVERSATION?

19   **A.**    YES.

20   **Q.**    AT THIS POINT IN THAT CONVERSATION WAS IT FOUR, WAS IT

21   SIX, OR WAS IT MORE?

22   **A.**    IT WAS MORE.

23   **Q.**    HOW MUCH?

24   **A.**    IT WAS 100.

25   **Q.**    I ASK YOU TO TAKE A LOOK AT GOVERNMENT'S EXHIBIT 302.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   **A.**   OKAY.

2   **Q.**   JUST THE DISK.

3   **A.**   OKAY.

4   **Q.**   IS THAT THE TELEPHONE CONVERSATION OR AUDIO FILE OF THE

5   TELEPHONE CONVERSATION IN WHICH YOU DISCUSSED A QUANTITY OF

6   100?

7   **A.**   YES.

8   **Q.**   WHAT DATE DID THAT OCCUR ON?

9   **A.**   ON JANUARY 3RD, 2013.

10  **Q.**   SO THIS IS WITHIN WEEKS AFTER YOUR FIRST CONTACT WITH

11  HIM.

12  **A.**   CORRECT.

13  **Q.**   IT HAS GONE FROM HOW MANY GYROCOMPASSES?

14  **A.**   FOUR, SIR, FOUR, 100.

15       **MR. HARRIGAN:**  AND WITH THE COURT'S PERMISSION I

16  WOULD LIKE TO PLAY THAT EXCERPT.

17       **THE COURT:**  YES.  WHAT EXHIBIT?

18       **MR. HARRIGAN:**  IT IS 302, I BELIEVE.

19       (AUDIO PLAYED)

20  **Q.**   **(MR. HARRIGAN)** DURING THAT EXCERPT YOU HAVE A

21  CONVERSATION WITH THE DEFENDANT ABOUT HIS REQUEST FOR 100

22  UNITS.  AND AGAIN, AS AN UNDERCOVER AGENT, YOU TELL HIM THAT

23  WOULDN'T WORK.

24       EXPLAIN WHAT ROLE YOU ARE PLAYING, HOW THAT WORKS IN

25  TERMS OF YOUR ROLE AS AN UNDERCOVER AGENT.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    OKAY.  YEAH.  AS AN UNDERCOVER AGENT I AM TRYING TO

2    EXPLAIN TO HIM THERE IS A COUPLE OF PROBLEMS.  ONE, THE

3    PRODUCT THEY ARE WANTING TO PURCHASE WAS ESSENTIALLY BEING

4    DISCONTINUED, SO TRYING TO PURCHASE 100 WOULD BE DIFFICULT.

5        THE BIGGER PROBLEM I WAS TRYING TO EXPLAIN TO HIM WAS TO

6    GO TO THE MANUFACTURER AND SAY WE WANT 100 UNITS OF THESE

7    GYROCOMPASSES THAT ARE FOR LARGE SHIPS, IT WOULD BE IMPOSSIBLE

8    FOR ME, AS AN UNDERCOVER AGENT PLAYING A ROLE, TO CONVINCE THE

9    MANUFACTURER WE HAD AN END USER THAT WAS ANYBODY OTHER THAN A

10   FOREIGN GOVERNMENT/MILITARY.  AND IT WOULD PUT ME IN A BAD

11   SPOT, IT WOULD PUT THE DEFENDANT IN A BAD SPOT.  AND MOST

12   CERTAINLY THE MANUFACTURER WOULD BE LIKELY TO RAISE A MILLION

13   RED FLAGS AND PROBABLY REPORT US TO SOMEBODY.

14   **Q.**   AND BY FOREIGN GOVERNMENT, WITHOUT SAYING YOU INTENDED

15   TO IMPLY WHAT FOREIGN GOVERNMENT?

16   **A.**    IRAN.

17   **Q.**   NOW, YOU DIDN'T SAY IRAN.

18   **A.**    I DID NOT SAY IT.

19   **Q.**   WHY NOT?

20   **A.**    BECAUSE AT THAT POINT STILL WE WERE ONLY DAYS IN OUR

21   COMMUNICATION TOGETHER, AND I DIDN'T FEEL LIKE IT WAS TIME OR

22   THE TRUST WAS BUILT FOR US TO BE ABLE TO HAVE THAT SORT OF

23   OVERT CONVERSATION OVER THE TELEPHONE.

24   **Q.**   DID DEFENDANT DISAGREE WITH YOUR EXPLANATION?

25   **A.**    NO, HE DID NOT.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **Q.**    AT ANY POINT IN TIME DURING THAT ENTIRE TELEPHONE

2    CONVERSATION DID HE ASK YOU, WHAT DO YOU MEAN BY FOREIGN

3    GOVERNMENT?

4    **A.**    NO, HE DID NOT.

5    **Q.**    DID HE AGREE TO GO WITH A SMALLER REQUEST?

6    **A.**    YES.  HE ACTUALLY SAID HE WASN'T HAPPY WITH THE IDEA OF

7    TRYING TO GET 100, EITHER.

8    **Q.**    WHAT AMOUNT DID HE WANT?

9    **A.**    WELL, HE SAID FOUR.  BUT THEN HE SAID FIVE.  IF YOU CAN

10   GET MORE, THAT WOULD BE GOOD TOO.

11   **Q.**    OKAY.  AND FOLLOWING THAT TELEPHONE CONVERSATION IN

12   WHICH DEFENDANT INITIALLY REQUESTED 100 GYROCOMPASSES BUT

13   AGREED IT WASN'T A GOOD IDEA, DID YOU SEND HIM A QUOTE FOR THE

14   COST OF FOUR GYROCOMPASSES?

15   **A.**    YES.

16   **Q.**    OKAY.  AND LET ME SHOW YOU GOVERNMENT EXHIBIT 105.

17   **A.**    OKAY.

18        **MR. HARRIGAN:**  IF THERE IS NO OBJECTION, I MOVE TO

19   ADMIT IT.

20        **MR. JOHNSTON:**  NO, YOUR HONOR.

21        **THE COURT:**  IT IS RECEIVED.

22        (EXHIBIT 105 RECEIVED INTO EVIDENCE)

23   **Q.**    **(MR. HARRIGAN)** LOOKING AT THE HEADER INFORMATION FIRST,

24   AGENT COLE.

25   **A.**    OKAY.

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1  **Q.**   ON WHAT DATE WAS THAT SENT?

2  **A.**   ON JANUARY 3RD, 2013.

3  **Q.**   AND FROM WHO?

4  **A.**   IT WAS SENT BY ME TO THE DEFENDANT.

5  **Q.**   OKAY.  AND LOOKING AT THE CONTENT OF IT.

6  **A.**   OKAY.

7  **Q.**   IS THIS THE EMAIL IN WHICH YOU PROVIDED A QUOTE FOR THE

8  FOUR NAVIGAT-2100'S?

9  **A.**   YES, IT IS.

10  **Q.**   DID YOU ALSO PROVIDE A DELIVERY TIME ONCE THEY WERE

11  ORDERED?

12  **A.**   YES.

13  **Q.**   WHAT WAS THAT?

14  **A.**   ROUGHLY 90 TO 120 DAYS.

15  **Q.**   AND YOU DISCUSSED POSSIBLE GENERAL CONTRACT TERMS.

16  **A.**   I DID.

17  **Q.**   FOR PAYMENTS.

18  **A.**   YES.

19  **Q.**   DID YOU ATTACH A QUOTE TO THAT?

20  **A.**   YES, I DID.

21  **Q.**   LET ME SHOW YOU THE ATTACHMENT.

22  **A.**   OKAY.

23  **Q.**   AGAIN, CAN YOU GENERALLY DESCRIBE, DID YOU USE THIS FORM

24  WHEN YOU ARE ACTING AS AN UNDERCOVER AGENT?

25  **A.**   YES, I DID.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **Q.**    IS IT THE STANDARD FORM YOU WOULD USE?

2    **A.**    IT IS.

3    **Q.**    IT IS MARKETED AFTER ANY OTHER TYPES OF FORMS?

4    **A.**    IT IS MARKETED OFF OF OTHER BUSINESS ACQUISITION FORMS

5    THAT OTHER COMPANIES USED.  WE JUST SORT OF COPIED THE

6    BUSINESS STANDARD.

7    **Q.**    IS THIS WHAT IS CALLED A PROFORMA INVOICE?

8    **A.**    CORRECT.

9    **Q.**    IN THAT DOES IT CONTAIN YOUR COMPANY'S NAME?

10   **A.**    YES, IT DOES.

11   **Q.**    THE CUSTOMER'S NAME.  IN THIS CASE LET'S LOOK AT THE

12   CUSTOMER AND THE TO.

13   **A.**    OKAY.

14   **Q.**    AND HERE IT IS ARASH GHAHREMAN, TIG MARINE?

15   **A.**    YES.

16   **Q.**    OKAY.  AND BELOW THAT DOES IT CONTAIN THE ITEM REQUESTED

17   AND PRICE QUOTES?

18   **A.**    YES, IT DOES.

19   **Q.**    AND YOUR FOUR PRICE QUOTES -- THE PRICE QUOTES FOR FOUR

20   GYROS WAS APPROXIMATELY?

21   **A.**    $71,000 EACH.

22   **Q.**    OR $254,000?

23   **A.**    YES.

24   **Q.**    AFTER YOU GAVE THAT PRICE QUOTE TO DEFENDANT, DID YOU

25   SPEAK WITH HIM BY TELEPHONE ABOUT HOW YOU WERE ACTUALLY GOING

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   TO ORDER THOSE FOUR GYROCOMPASSES?

2   **A.**    YES.

3   **Q.**    WHAT DID YOU TELL HIM IN THAT PHONE CALL?

4   **A.**    I TOLD HIM THAT I WAS GOING TO PLACE THE ORDER WITH THE

5   MANUFACTURER, AND THAT I WAS GOING TO PROVIDE FALSE END USER

6   INFORMATION TO THE MANUFACTURER IN AN EFFORT TO HELP SECURE

7   THE ORDER.

8   **Q.**    DID DEFENDANT AGREE?

9   **A.**    YES.

10  **Q.**    I WILL SHOW YOU WHAT -- I WOULD LIKE YOU TO TAKE A LOOK

11  AT THE DISK THAT WAS MARKED GOVERNMENT'S EXHIBIT 304.

12  **A.**    OKAY.

13  **Q.**    IS THAT AN EXCERPT FROM THE AUDIO RECORDING?

14  **A.**    304, YES.

15  **Q.**    AND WHAT WAS THE DATE OF THAT CONVERSATION?

16  **A.**    THE DATE ON 304 SAYS -- 304 OR 303?

17  **Q.**    303.  EXCUSE ME.

18  **A.**    THAT'S ALL RIGHT.

19          THE DATE IS JANUARY 4TH, 2013.

20  **Q.**    ALL RIGHT.

21          **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION, I WOULD

22  MOVE TO PLAY --

23          **THE COURT:**  YES.

24          **MR. HARRIGAN:**  -- THAT EXCERPT.

25          (AUDIO PLAYED)

APRIL 14, 2015

COLE - DIRECT EXAMINATION

```
1   Q.      (MR. HARRIGAN) IN THAT CONVERSATION YOU DISCUSS THE

2   ORDER OF GYROCOMPASSES --

3   A.      YES.

4   Q.      -- FROM NORTHROP GRUMMAN.

5           YOU TELL THE DEFENDANT YOU DIDN'T FEEL COMFORTABLE

6   ORDERING MORE THAN 10.  IN YOUR ROLE AS AN UNDERCOVER AGENT,

7   WHY WERE YOU TELLING HIM THAT?

8   A.      I WAS TELLING HIM THAT BECAUSE I DID NOT WANT TO SPUR

9   SUSPICION BY THE MANUFACTURER.  AND ALSO BY THE FACT THAT THE

10  MANUFACTURER WAS DISCONTINUING THE PRODUCT SOON, IT WOULD SEEM

11  WEIRD TO SUDDENLY WE NOT ONLY WANTED IT BUT WE WANTED A LARGE

12  AMOUNT.

13  Q.      NOW PERSONALLY, AGAIN, THAT WAS NOT DAVE COLE, THAT WAS

14  DAVID MILLS.

15  A.      DAVID MILLS.  DAVID MILLS, AS AN UNDERCOVER, WAS

16  NERVOUS.

17  Q.      WHY DID YOU TELL THE DEFENDANT YOU WERE GOING TO USE

18  FALSE INFORMATION, NOT PUT DOWN THE END USER.  YOU WEREN'T

19  GOING TO MENTION WESAL, YOU WEREN'T GOING TO MENTION DUBAI,

20  YOU WEREN'T GOING TO MENTION THE MIDDLE EAST?

21  A.      BASED ON THE FACT THAT THEY INITIALLY HAD APPROACHED THE

22  MANUFACTURER, PROVIDED DUBAI, PROVIDED AN END USE WITH A

23  SHIPPING COMPANY CALLED WESAL, AND IT WAS ALL DENIED AND

24  DENIED FLATLY, I FELT THAT OUR ONLY CHANCE TO BE SUCCESSFUL

25  WAS TO PROVIDE FALSE AND FRAUDULENT END USER INFORMATION.
```

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1   **Q.**    AGAIN WHEN YOU SAY I FELT.

2   **A.**    AS AN UNDERCOVER AGENT I FELT.

3   **Q.**    YOU WERE PLAYING A ROLE?

4   **A.**    PLAYING A ROLE, CORRECT.

5   **Q.**    AND, AGAIN, DID DEFENDANT OBJECT -- FIRST, DID HE

6   INDICATE HE UNDERSTOOD YOU WERE GOING TO USE A FALSE END USER?

7   **A.**    YES, HE STATED HE UNDERSTOOD.

8   **Q.**    AND DURING THAT ENTIRE CONVERSATION DID HE EVER OBJECT

9   TO THAT?

10  **A.**    NEVER.

11  **Q.**    AFTER YOU PROVIDED DEFENDANT WITH A PRICE QUOTE FOR THE

12  FOUR NAVIGAT-2100'S, DID YOU SUBSEQUENTLY ENTER INTO A

13  CONTRACT WITH THE DEFENDANT, MR. TAHERKHANI AND TIG MARINE FOR

14  THE SALE OF THOSE GYROS?

15  **A.**    YES.

16  **Q.**    AND INITIALLY WHAT WAS THAT CONTRACT FOR?

17  **A.**    INITIALLY THE CONTRACT WAS FOR, I BELIEVE, SIX

18  NAVIGAT-2100'S.

19  **Q.**    AND THEN IT WAS LATER MODIFIED?

20  **A.**    IT WAS MODIFIED.

21  **Q.**    TO HOW MANY?

22  **A.**    TO FOUR.

23  **Q.**    AT WHOSE REQUEST?

24  **A.**    AT THE REQUEST OF THE DEFENDANT AND MR. TAHERKHANI.

25  **Q.**    AND DID THE PAYMENT TERMS REMAIN THE SAME?

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    **A.**    THEY REMAINED THE SAME.

2    **Q.**    AND DELIVERY TERMS FOR THE CONTRACT?

3    **A.**    CORRECT.

4    **Q.**    CAN YOU GENERALLY DESCRIBE THE PAYMENT TERMS WHEN THE

5    DOWN PAYMENT WAS TO BE MADE, IF ANY, SUBSEQUENT PAYMENTS AND

6    THE FINAL PAYMENTS?

7    **A.**    YES.  SO THE PAYMENT TERMS WERE, WE WERE TO RECEIVE, AT

8    OUR UNDERCOVER BUSINESS, 10 PERCENT DOWN PAYMENT FOR THE

9    ENTIRE PURCHASE OF THE FOUR GYROCOMPASSES, WHICH WAS ROUGHLY

10   $28,000.  AT THAT POINT WE WOULD MAKE THE ORDER TO THE

11   MANUFACTURER.

12       UPON THAT HAPPENING, TIG MARINE AND THE DEFENDANT WOULD

13   HAVE 30 DAYS TO MAKE AN ADDITIONAL PAYMENT, AND THEN 30 DAYS

14   AFTER THAT TO MAKE AN ADDITIONAL PAYMENT, BRINGING THEIR TOTAL

15   INVESTMENT TO 50 PERCENT OF THE TOTAL ORDER.

16       WE WOULD THEN SHIP THE GOODS OVER TO DUBAI, AND UPON

17   THEIR RECEIPT, INSPECTION AND APPROVAL OF THE EQUIPMENT THEY

18   WOULD PAY THE FINAL 50 PERCENT.

19   **Q.**    NOW, DURING THE ENTIRE NEGOTIATIONS DID DEFENDANT

20   REQUEST ANY SPECIAL GUARANTEES FOR THE PERFORMANCE OF YOUR

21   COMPANY, SOUTH STAR TRADING, IN DEPLOYING THOSE GYROS AND

22   MAKING SURE THEY GOT TO DUBAI?

23   **A.**    YES.

24   **Q.**    WHAT DID DEFENDANT REQUEST?

25   **A.**    AT A CERTAIN POINT IN TIME THE DEFENDANT, MR.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

 1   TAHERKHANI, REQUESTED THAT WE IMPLEMENT A STANDBY LETTER OF

 2   CREDIT OR AN ITEM BASICALLY REFERRED TO AS A BANK GUARANTEE.

 3   **Q.**    WHAT WAS THAT TO APPLY TO, WHICH PAYMENTS?

 4   **A.**    THAT WOULD APPLY TO NOT THE DOWN PAYMENT OF THE

 5   10 PERCENT, THE TWO SUBSEQUENT PAYMENTS OF 20 AND 20 THAT

 6   WOULD BRING IT TO THE 50 PERCENT.

 7   **Q.**    RIGHT.  AND DURING THE ENTIRE TIME THAT YOU WERE

 8   COMMUNICATING ONCE YOU HAD THE CONTRACT, WERE THERE

 9   DISCUSSIONS ABOUT MAKING PAYMENTS?

10   **A.**    YES, THERE WERE.

11   **Q.**    AND WERE THERE CONCERNS EXPRESSED BY DEFENDANT, AND

12   DEFENDANT ON BEHALF OF MR. TAHERKHANI, ABOUT MAKING PAYMENTS?

13   **A.**    YES.

14   **Q.**    AND ULTIMATELY WHEN YOU MET WITH THE DEFENDANT IN LAS

15   VEGAS DID YOU HAVE OVERT DISCUSSIONS ABOUT THOSE PAYMENTS?

16   **A.**    YES.

17   **Q.**    AND EXPERIENCES YOU HAD.

18   **A.**    YES, WE DID.

19   **Q.**    CAN YOU DESCRIBE FOR THE LADIES AND GENTLEMEN OF THE

20   JURY WHAT WAS DISCUSSED IN THOSE LATER MEETINGS ABOUT PAYMENTS

21   BY DEFENDANT AND MR. TAHERKHANI?

22   **A.**    YES.  WE DISCUSSED THE FACT THAT THE PAYMENT BECAME

23   DIFFICULT FOR NUMEROUS REASONS, ONE BECAUSE MR. TAHERKHANI IS

24   DIFFICULT AS A BUSINESSMAN.  THAT AT TIMES IT IS DIFFICULT TO

25   GET MONEY FROM THE GOVERNMENT OF IRAN.  ALSO DISCUSSED THE

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1  FACT THAT IT IS DIFFICULT SOMETIMES TO MOVE MONEY FROM IRAN.

2       AND THEN LASTLY THAT THERE WAS A CERTAIN AMOUNT OF

3  NERVES BECAUSE MR. TAHERKHANI, AROUND THAT SAME TIME PERIOD,

4  HAD LOST MONEY OR BEEN TAKEN ADVANTAGE OF BY DIFFERENT

5  BUSINESSMEN THAT NEVER DELIVERED THE GOODS, UNRELATED TO OUR

6  INVESTIGATION.

7  **Q.**    IN SUMMARY, WHAT DID YOU TELL DEFENDANT ABOUT YOUR

8  UNDERSTANDING OF WHY THEY WOULDN'T MAKE TIMELY PAYMENTS?

9  **A.**    I EXPLAINED TO HIM THAT BECAUSE I KNEW THEY WERE IN IRAN

10  IT WAS ALWAYS GOING TO BE DIFFICULT BECAUSE OF BANKING

11  SANCTIONS, MONEY.  AND THEN ALSO THEIR FEAR THAT IF WE FAILED

12  TO PROVIDE OR COMPLETE OUR CONTRACT, THAT THEY REALLY HAD NO

13  WAY TO HAVE ANY RECOURSE, BECAUSE IT WASN'T LIKE AS IF THEY

14  COULD GO TO THE COURT AND SAY, I WANT TO SUE THIS GUY FOR NOT

15  ILLEGALLY EXPORTING ME GOODS TO IRAN AS ORIGINALLY PROMISED.

16  **Q.**    BECAUSE IT WAS ILLEGAL.

17  **A.**    BECAUSE IT WAS ALL ILLEGAL.

18  **Q.**    SO I WOULD LIKE TO SHOW YOU GOVERNMENT'S EXHIBIT 131 --

19  **A.**    OKAY.

20  **Q.**    -- AND ASK YOU TO TAKE A LOOK AT THAT.

21  **A.**    (WITNESS COMPLIES).

22  **Q.**    EXCUSE ME.  106.  I AM SORRY.  106.

23  **A.**    106?

24  **Q.**    YES?

25  **A.**    ALL RIGHT.  GIVE ME A SECOND.  SORRY.

APRIL 14, 2015

COLE - DIRECT EXAMINATION

```
 1        ALL RIGHT.  GOT IT.
 2   Q.   DO YOU RECOGNIZE THIS EMAIL?
 3   A.   I DO.
 4   Q.   DOES THIS EMAIL CONTAIN AN ATTACHMENT?
 5   A.   IT DOES.
 6   Q.   AND WHAT IS THAT ATTACHMENT?
 7   A.   THE ATTACHMENT IS A CONTRACT BETWEEN MYSELF AND THE
 8   DEFENDANT AND MR. TAHERKHANI AND TIG MARINE.
 9        MR. HARRIGAN:  IF THERE IS NO OBJECTION BY DEFENSE I
10   MOVE TO PUBLISH IT.
11        MR. JOHNSTON:  NO OBJECTION.
12        THE COURT:  RECEIVED.
13        (EXHIBIT 106 RECEIVED INTO EVIDENCE)
14   Q.   (MR. HARRIGAN) AND THIS CONTRACT WAS SENT BY WHO,
15   LOOKING AT THE HEADER?
16   A.   THIS ATTACHMENT WAS SENT BY THE DEFENDANT.
17   Q.   TO YOU?
18   A.   TO ME.
19   Q.   WHAT DATE?
20   A.   ON JANUARY 31ST, 2013.
21   Q.   ALL RIGHT.  AND LOOKING AT THE CONTRACT ITSELF.  IT IS A
22   LITTLE FADED, BUT YOU HAVE SEEN THIS BEFORE.  IT IS HOW MANY
23   PAGES?
24   A.   IT IS SEVERAL.  ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN,
25   EIGHT -- EIGHT PAGES.
```

APRIL 14, 2015

404

COLE – DIRECT EXAMINATION

1   **Q.**    AND CAN YOU SUMMARIZE FOR THE LADIES AND GENTLEMEN OF

2   THE JURY ESSENTIALLY WHAT THE CONTRACT TERMS ARE AND THE

3   AMOUNT OF GYROCOMPASSES.

4   **A.**    YES.

5   **Q.**    WHO THIS IS BETWEEN.

6   **A.**    YEAH.  SO ESSENTIALLY THIS IS JUST A CONTRACT BETWEEN

7   THE DEFENDANT, TIG MARINE, MR. TAHERKHANI AND SOUTH STAR

8   TRADING THAT WE WOULD AGREE TO SELL THEM THE GYROCOMPASSES

9   THEY REQUESTED, AND A TOTAL ORDER, AT THIS POINT, OF SIX.  AND

10  THAT WE WOULD DO IT VIA THE TERMS I SAID, A 10 PERCENT DOWN

11  PAYMENT AND THEN SUBSEQUENT PAYMENTS OF 20 PERCENT AND

12  20 PERCENT, AND THE FINAL 50 UPON RECEIVING THE GOODS OVER IN

13  DUBAI.

14  **Q.**    AND IS EACH PAGE SIGNED?

15  **A.**    IT IS.

16  **Q.**    AND LOOKING AT THE FINAL PAGE HERE.

17  **A.**    OKAY.

18  **Q.**    PAGE 9.

19  **A.**    OKAY.

20         **MR. HARRIGAN:**  IF WE CAN BLOW UP THAT SIGNATURE.

21  **Q.**    **(MR. HARRIGAN)** HOW IS IT PURPORTEDLY SIGNED?

22  **A.**    IT IS SIGNED BY THE DEFENDANT.  SAYS, WITNESSED BY.

23  **Q.**    THERE IS A SQUIGGLE THERE.

24  **A.**    CORRECT.

25  **Q.**    THEN WHO ELSE SIGNS IT?

APRIL 14, 2015

**A.**    IT SAYS, K. TAHERKHANI, DIRECTING MANAGER.

**Q.**    AND THERE IS TIG MARINE SEAL THERE?

**A.**    CORRECT.

**Q.**    AND YOU RECEIVED THIS FROM DEFENDANT.

**A.**    I DID.

**Q.**    AFTER RECEIVING THAT SIGNED CONTRACT AT THE END OF JANUARY FOR THE GYROCOMPASSES, DID YOU HAVE OTHER DISCUSSIONS WITH DEFENDANT ABOUT PAYMENTS DUE UNDER THE CONTRACT?

**A.**    YES.

**Q.**    DID YOU RECEIVE ANY PAYMENTS?

**A.**    YES, WE DID.

**Q.**    AND THAT WOULD HAVE BEEN THE DOWN PAYMENT?

**A.**    THE DOWN PAYMENT.

**Q.**    WAS IT IMMEDIATELY FORTHCOMING AFTER THE JANUARY 30TH SIGNATURE?

**A.**    NO, IT WAS NOT.

**Q.**    WHEN DID YOU RECEIVE THE DOWN PAYMENT OR DOWN PAYMENTS?

**A.**    I RECEIVED A PORTION OF THE DOWN PAYMENT IN FEBRUARY 2013.

**Q.**    THEN WHEN DID YOU RECEIVE THE REMAINING PORTION OF THE DOWN PAYMENT?

**A.**    I RECEIVED THE REMAINING PORTION OF THE PAYMENT SEVERAL WEEKS LATER, I BELIEVE IN MARCH OF 2013.

**Q.**    BEFORE YOU RECEIVED THE OTHER DOWN PAYMENT, HAD THE CONTRACT TERMS BEEN MODIFIED AGAIN?

APRIL 14, 2015

1    **A.**    CORRECT.

2    **Q.**    IN TERMS OF WHAT?

3    **A.**    THE ONLY WAY THE CONTRACT WAS MODIFIED WAS EVERYTHING

4    REMAINED THE SAME AS FAR AS OUR PERFORMANCE, THEIR PERFORMANCE

5    OF PAYMENT TERMS.  WE HAD SIMPLY CHANGED IT YET AGAIN FROM SIX

6    UNITS TO A TOTAL OF FOUR UNITS.

7    **Q.**    AND SO THERE WAS APPROXIMATELY HOW MUCH DUE UNDER THE

8    CONTRACT FOR FOUR UNITS?

9    **A.**    FOR FOUR UNITS, AGAIN WE WERE BACK TO AROUND $284,000.

10   **Q.**    ABOUT 28,000 DUE?

11   **A.**    FOR THE 10 PERCENT DOWN PAYMENT THAT HE OWED US,

12   $20,000, CORRECT.

13   **Q.**    SO YOU RECEIVED THOSE?

14   **A.**    OVER TWO INSTALLMENTS WE RECEIVED CLOSE TO.  I THINK IT

15   WAS A FEW HUNDRED DOLLARS SHORT, BUT BY AND LARGE, YES.

16   **Q.**    I WOULD LIKE TO SHOW YOU WHAT IS MARKED AS GOVERNMENT'S

17   EXHIBIT 604-A AND 604-B.  LET'S LOOK FIRST AT 604-A.  AND IF

18   YOU CAN LOOK THROUGH, GO THROUGH THE PAGES FOR ME.

19           (EXHIBIT 604-A, 604-B MARKED FOR IDENTIFICATION)

20   **A.**    OKAY.

21   **Q.**    OKAY.  GOING BACK TO THE FIRST PAGE.  ALL RIGHT.  DO YOU

22   RECOGNIZE THIS?

23   **A.**    I DO.

24           **MR. HARRIGAN:**  YOUR HONOR, I WOULD, IF THERE IS NO

25   OBJECTION, I MOVE TO ADMIT 604-A.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1           **THE COURT:**  ANY OBJECTION?

2           **MR. JOHNSTON:**  NO.  AS I PREVIOUSLY TOLD THE

3    GOVERNMENT, WE STIPULATE TO THIS.

4           **THE COURT:**  IT IS RECEIVED.

5           (EXHIBIT 604-A RECEIVED INTO EVIDENCE)

6    **Q.**   **(MR. HARRIGAN)** AND THIS FIRST PAGE HERE OF 604-A,

7    DESCRIBE WHAT THIS IS.

8    **A.**   IT IS AN ELECTRONIC WIRE TRANSFER FORM FROM THE BANK

9    THAT WE USED FOR OUR UNDERCOVER COMPANY.

10   **Q.**   NO.  ARE YOU LOOKING AT PAGE 1?

11   **A.**   OH, I AM SORRY.  ON THE SCREEN?

12   **Q.**   YES.

13   **A.**   YEAH.  SO ON THE SCREEN IT SHOWS A SUMMARY.

14   **Q.**   THIS IS A BANK RECORD FROM CHASE BANK.

15   **A.**   FROM CHASE BANK, YES.

16   **Q.**   FOR WHAT ACCOUNT?

17   **A.**   FOR SOUTH STAR TRADING.

18   **Q.**   IS THAT YOUR UNDERCOVER ACCOUNT THAT YOU HAD WHEN

19   WORKING AS AN UNDERCOVER AGENT IN THIS CASE?

20   **A.**   YES.

21   **Q.**   DOES IT SHOW WHEN A PAYMENT OF -- PAYMENT ON

22   FEBRUARY 20TH?

23   **A.**   CORRECT, IT DOES.

24   **Q.**   AND WHAT DOES THAT PAYMENT REFLECT?

25   **A.**   IT REFLECTS $9,900 -- AND I BELIEVE SAYS 65 DOLLARS.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  **Q.**    AND FROM WHAT BANK?

2  **A.**    FROM A BANK IN DUBAI, MASHREQ BANK.

3  **Q.**    TO WHERE?

4  **A.**    TO NEW YORK, AND THEN TO OUR ACCOUNT.

5  **Q.**    AND THE SECOND PAGE?

6  **A.**    THE SECOND PAGE IS FURTHER DETAILS FOR THAT TRANSACTION.

7  **Q.**    ARE THOSE HIGHLIGHTED?

8  **A.**    YES, THEY ARE.

9  **Q.**    SO THE CREDIT PARTY WAS SOUTH STAR TRADING?

10  **A.**    YES.

11  **Q.**    THE ORDER CUSTOMER WAS TIG MARINE?

12  **A.**    CORRECT.

13  **Q.**    AND THE ORDER BANK WAS MASHREQ BANK IN DUBAI?

14  **A.**    YES, IT IS.

15  **Q.**    AND THIS TRANSFER TO YOUR ACCOUNT REPRESENTED WHAT?

16  **A.**    IT REPRESENTED THE FIRST PORTION OF THE 10 PERCENT DOWN

17  PAYMENT THEY NEEDED TO MAKE IN ORDER FOR US TO MAKE THE ORDER

18  WITH NORTHROP GRUMMAN.

19  **Q.**    DID YOU HAVE COMMUNICATIONS WITH DEFENDANT ABOUT THAT

20  DOWN PAYMENT?

21  **A.**    YES.

22  **Q.**    SHOWING YOU 604-B.  AGAIN, IS THIS A BANK STATEMENT FROM

23  THE SOUTH STAR UNDERCOVER ACCOUNT?

24  **A.**    YES.

25  **Q.**    DOES THAT SHOW THE SECOND PAYMENT YOU REFERRED TO MADE

APRIL 14, 2015

1    IN MARCH OF 2013?

2    **A.**    YES.

3    **Q.**    GOING TO THE SECOND PAGE.  WHAT DOES IT SHOW?

4    **A.**    IT SHOWS THE BANK RECEIVING THE FUNDS FOR SOUTH STAR

5    TRADING, WHICH IS OUR UNDERCOVER BANK ACCOUNT.  AND THAT THE

6    BANK –– OR THE PARTY SENDING IT WAS TIG MARINE FROM THE SAME

7    BANK, MASHREQ BANK, IN DUBAI.

8    **Q.**    AND THE AMOUNT OF THAT WIRE TRANSFER WAS THAT?

9    **A.**    WAS –– I DON'T SEE IT DOWN THERE.

10   **Q.**    AT THE TOP OF THE PAGE.

11   **A.**    I AM SORRY.  MY BAD.  $18,000.

12   **Q.**    OKAY.  SO THAT REPRESENTED THE TOTAL, THE 10 PERCENT

13   DOWN PAYMENT FOR THE FOUR GYROCOMPASSES.

14   **A.**    YES, IT DID.

15   **Q.**    DID YOU HAVE EMAIL COMMUNICATIONS WITH DEFENDANT ABOUT

16   THOSE PAYMENTS CONCURRENTLY WITH THESE WIRE TRANSFERS?

17   **A.**    YES.

18   **Q.**    SHOWING YOU GOVERNMENT'S EXHIBIT 107.

19           **MR. HARRIGAN:**  YOUR HONOR, IF 604 HASN'T BEEN

20   ADMITTED, I WOULD MOVE TO ADMIT.  I THINK THERE IS A

21   STIPULATION AS TO 604-A, 604-B AND 604-C.

22           **THE COURT:**  YES, THEY ARE ALL ADMITTED.

23           **MR. HARRIGAN:**  I THOUGHT IT HAD BEEN PUBLISHED TO

24   THE JURY.  JUST CHECKING.

25   **Q.**    **(MR. HARRIGAN)** SHOWING YOU GOVERNMENT EXHIBIT 107.

APRIL 14, 2015

420

COLE – DIRECT EXAMINATION

1   **A.**    OKAY.

2   **Q.**    DO YOU RECOGNIZE THAT EMAIL?

3   **A.**    YES.

4   **Q.**    OKAY.

5          **MR. HARRIGAN:**  AND IF THERE IS NO OBJECTION, I WOULD

6   MOVE TO ADMIT.

7          **MR. JOHNSTON:**  NO, YOUR HONOR.

8          **THE COURT:**  RECEIVED.

9          (EXHIBIT 107 RECEIVED INTO EVIDENCE)

10  **Q.**   **(MR. HARRIGAN)** SHOWING YOU THE HEADER.  WOULD YOU

11  DESCRIBE WHO THIS EMAIL IS FROM AND WHO IT IS TO?

12  **A.**    THE EMAIL IS SENT FROM KOORUSH TAHERKHANI TO ME AND TO

13  THE DEFENDANT.

14  **Q.**    ALL RIGHT.  AND IN THAT EMAIL, LOOKING AT THE BODY OF

15  THE EMAIL, WHAT IS KOORUSH TELLING YOU?

16  **A.**    IT IS SIMPLY HIM OR MR. TAHERKHANI SAYING THAT, FIND THE

17  ATTACHED PAYMENT RECEIPT FOR THE ACCOUNT.  AND THAT HE

18  EXPLAINS THE SITUATION TO THE DEFENDANT.  AND THEY ARE LOOKING

19  FOR AN EASY AND WORKABLE METHOD BY WHICH PAYMENTS COULD HAPPEN

20  WITHOUT ANY FUTURE PROBLEMS OR DELAYS.

21  **Q.**    HAD THERE BEEN DELAYS UP TO THIS POINT?

22  **A.**    THERE HAD BEEN DELAYS, YES.

23  **Q.**    AND LOOKING AT THE ATTACHMENT, WHAT DOES THAT REFLECT?

24  **A.**    THE ATTACHMENT REFLECTS THE ACTUAL PAYMENT PAPERWORK

25  THAT WAS COMPLETED AT THE MASHREQ BANK IN DUBAI BY TIG MARINE.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   **Q.**    SHOWING YOU NEXT GOVERNMENT'S EXHIBIT 108.  OKAY.

2        **MR. HARRIGAN:**  AND WITHOUT OBJECTION, I MOVE TO

3   ADMIT.

4        **MR. JOHNSTON:**  NO OBJECTION, YOUR HONOR.

5        **THE COURT:**  RECEIVED.

6        (EXHIBIT 108 RECEIVED INTO EVIDENCE)

7   **Q.**    **(MR. HARRIGAN)** IS THIS AN EMAIL YOU SENT?  LOOKING AT

8   THE HEADER INFORMATION.

9   **A.**    YES, IT IS.

10  **Q.**    AND WHAT DOES IT REPLY TO?

11  **A.**    IT IS IN REPLY TO THE RECEIPT OF THE PAYMENT.

12  **Q.**    A PAYMENT OF APPROXIMATELY $10,000?

13  **A.**    $10,000, CORRECT.

14  **Q.**    AND WHO IS IT TO?

15  **A.**    IT IS TO MR. TAHERKHANI AND THE DEFENDANT.

16  **Q.**    AND DO YOU ACKNOWLEDGE RECEIPT OF THE $10,000 DOWN

17  PAYMENT?

18  **A.**    YES.

19  **Q.**    WHAT DO YOU ALSO TELL HIM?

20  **A.**    THAT THEY NEED TO HURRY AND SEND THE REMAINING 18,400 IN

21  ORDER FOR US TO SECURE THE ORDER WITH THE MANUFACTURER.

22  **Q.**    YOU TELL HIM ABOUT TIME CONSTRAINTS?

23  **A.**    I DID.

24  **Q.**    WHY DID YOU DO THAT IN YOUR ROLE AS AN UNDERCOVER AGENT?

25  **A.**    ROLE AS AN UNDERCOVER AGENT, BECAUSE I WAS TRYING TO

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    MAINTAIN A REALISTIC ROLE.  AND IN REALITY THIS PRODUCT WAS

2    BEING DISCONTINUED BY THE MANUFACTURER SO I WANTED TO KEEP IT

3    BELIEVABLE THAT WE COULD STILL HAVE THE CHANCE TO PLACE THE

4    ORDER BEFORE IT WOULD NO LONGER BE AVAILABLE FOR PURCHASE

5    BECAUSE THEY HAD ALREADY MADE PLANS TO MOVE ON TO A NEWER

6    MODEL OF THAT SAME GYROCOMPASS.

7    **Q.**    WAS THE ADDITIONAL $18,000 DUE FOR THE DOWN PAYMENT

8    IMMEDIATELY FORTHCOMING?

9    **A.**    NO, IT WAS NOT.

10   **Q.**    DID YOU RECEIVE IT LATER?

11   **A.**    I DID.

12   **Q.**    APPROXIMATELY HOW LONG LATER?

13   **A.**    A COUPLE OF WEEKS.  ABOUT TWO WEEKS.

14   **Q.**    AND WAS THERE EMAIL COMMUNICATIONS WITH THE DEFENDANT

15   ABOUT THAT FURTHER DOWN PAYMENT?

16   **A.**    YES.

17   **Q.**    AND SHOWING YOU GOVERNMENT'S EXHIBIT 109.

18            **MR. HARRIGAN:**  AND IF THERE IS NO OBJECTION, I MOVE

19   TO ADMIT.

20            **MR. JOHNSTON:**  NO, YOUR HONOR.

21            **THE COURT:**  RECEIVED.

22            (EXHIBIT 109 RECEIVED INTO EVIDENCE)

23   **Q.**    **(MR. HARRIGAN)** SHOWING THE HEADER.  IS THAT AN EMAIL

24   FROM DEFENDANT?

25   **A.**    YES.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   **Q.**   TO YOU?

2   **A.**   CORRECT.

3   **Q.**   ON WHAT DATE?

4   **A.**   ON MARCH 6TH, 2013.

5   **Q.**   AND THE SUBJECT IS WHAT?

6   **A.**   2ND FUND TRANSFER.

7   **Q.**   THE SUBJECT LINE ABOVE THAT.

8   **A.**   SORRY.  BALANCE PAYMENT.  I APOLOGIZE.

9   **Q.**   AND DOES DEFENDANT HAVE AN ATTACHMENT TO THIS EMAIL?

10  **A.**   YES.

11  **Q.**   AND WHAT IS IT?

12  **A.**   IT IS THE PAPERWORK FOR THE SECOND PAYMENT.

13  **Q.**   AND IS THAT FROM WHAT BANK?

14  **A.**   FROM THE SAME BANK, THE MASHREQ BANK IN DUBAI.

15  **Q.**   I KNOW IT IS VERY FAINT TO READ, BUT DOES THAT DOCUMENT

16  INDICATE THAT –– IS THAT DOCUMENT CONSISTENT WITH THE

17  INFORMATION IN THE SOUTH STAR TRADING BANK ACCOUNT AS TO THE

18  WIRE TRANSFER?

19  **A.**   YES.

20  **Q.**   OKAY.  SO IS TIG MARINE, DUBAI CITY, $18,000.

21  **A.**   CORRECT.

22  **Q.**   AFTER RECEIVING THAT DOWN PAYMENT, WHAT DID YOU TELL

23  DEFENDANT?

24  **A.**   I TOLD THE DEFENDANT THAT THE ORDER WILL BE PLACED WITH

25  NORTHROP GRUMMAN FOR THE FOUR GYROCOMPASSES.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **Q.**    DID YOU DO THAT VIA EMAIL?

2    **A.**    I DID.

3    **Q.**    SHOWING YOU GOVERNMENT EXHIBIT 110.

4          **MR. HARRIGAN:**  IF THERE IS NO OBJECTION, I MOVE TO

5    ADMIT THAT, YOUR HONOR.

6          **MR. JOHNSTON:**  NO OBJECTION.

7          **THE COURT:**  RECEIVED.

8          (EXHIBIT 110 RECEIVED INTO EVIDENCE)

9    **Q.**    **(MR. HARRIGAN)** IS THAT THE EMAIL YOU JUST REFERRED TO?

10   **A.**    YES.

11   **Q.**    AND THAT IS -- LOOKING AT THE HEADER INFORMATION.

12   **A.**    OKAY.

13   **Q.**    THAT IS SENT FROM WHOM?

14   **A.**    SENT BY ME TO THE DEFENDANT.

15   **Q.**    ON THE SAME DAY YOU RECEIVED THE CONFIRMATION OF FINAL

16   PAYMENT?

17   **A.**    CORRECT.

18   **Q.**    AND DID YOU HAVE AN ATTACHMENT TO THAT?

19   **A.**    YES.

20   **Q.**    ALL RIGHT.  AND LOOKING AT THE BODY FIRST, THOUGH.  WHAT

21   DO YOU TELL THE DEFENDANT YOU ARE GOING TO DO NOW THAT YOU

22   RECEIVED THE FIRST DOWN PAYMENT?

23   **A.**    THAT I WOULD PLACE THE ORDER WITH THE MANUFACTURER FOR

24   THE FOUR GYROCOMPASSES.

25   **Q.**    AND WHAT DO YOU TELL DEFENDANT ABOUT FURTHER PAYMENTS?

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1   **A.**    THAT STARTING NOW, THE NEXT PAYMENT WOULD BE DUE IN 30

2   DAYS.

3   **Q.**    AND SHOWING YOU THE ATTACHMENT.  ALL RIGHT.  AND CAN YOU

4   DESCRIBE FOR THE LADIES AND GENTLEMEN OF THE JURY WHAT THAT

5   IS?

6   **A.**    IT IS SIMPLY A PURCHASE ORDER FROM NORTHROP GRUMMAN

7   INDICATING THAT THEY HAD AGREED TO SELL SOUTH STAR TRADING

8   FOUR UNITS OF THE GYROCOMPASS, AND SOME OF THE EQUIPMENT THAT

9   WOULD COME WITH IT.

10  **Q.**    IS THAT -- WAS THAT -- WHO MADE THAT UP?  OR WHO PUT

11  TOGETHER THAT PURCHASE ORDER?

12  **A.**    THAT PURCHASE ORDER WAS PUT TOGETHER BY NORTHROP GRUMMAN

13  WITH INFORMATION THAT WE PROVIDED THEM.

14  **Q.**    BUT IT IS A FAKE PURCHASE ORDER.

15  **A.**    YEAH, IT IS A FAKE PURCHASE ORDER.  CORRECT.

16  **Q.**    WHAT DOES IT SHOW AS THE PRODUCTION DATE OR -- YEAH, THE

17  PRODUCTION DATE OR DUE DATE FOR NORTHROP GRUMMAN TO PRODUCE

18  THE --

19  **A.**    IT SHOWS A PRODUCTION DATE OF JULY 4TH, 2013.

20  **Q.**    AND AGAIN, WAS THAT REAL?

21  **A.**    NO, IT WAS NOT.

22  **Q.**    DID YOU EVER ORDER FOUR GYROCOMPASSES FROM NORTHROP

23  GRUMMAN?

24  **A.**    NO, WE DID NOT.

25  **Q.**    NOW, IN ADDITION TO THE GYROCOMPASSES, YOU INDICATED

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  THAT DEFENDANT REQUESTED TO OBTAIN OTHER ITEMS FOR TIG MARINE.

2  DID THIS INCLUDE ELECTRONIC COMPONENTS?

3  **A.**   YES.

4  **Q.**   I WANT TO DIRECT YOUR ATTENTION TO GOVERNMENT'S

5  EXHIBIT 111.

6  **A.**   OKAY.

7  **Q.**   IF THERE IS NO -- LET ME ASK YOU FIRST.  IS THAT AN

8  EMAIL REGARDING OTHER REQUESTS BY DEFENDANT?

9  **A.**   YES, IT IS.

10       **MR. HARRIGAN:**  AND IF THERE IS NO OBJECTION I WOULD

11  MOVE TO ADMIT, YOUR HONOR, AND PUBLISH TO THE JURY.

12       **MR. JOHNSTON:**  NO OBJECTION.

13       **THE COURT:**  RECEIVED.

14       (EXHIBIT 111 RECEIVED INTO EVIDENCE)

15  **Q.**   **(MR. HARRIGAN)** AND SHOWING THAT TO THE JURY, FIRST THE

16  HEADER INFORMATION.  WHO SENT THAT EMAIL?

17  **A.**   THE DEFENDANT.

18  **Q.**   WHO DID HE SEND IT TO?

19  **A.**   TO ME.

20  **Q.**   AND WHEN WAS THIS SENT?

21  **A.**   JANUARY 2ND, 2013.

22  **Q.**   SO IN TERMS OF YOUR NEGOTIATIONS WITH THE DEFENDANT, WAS

23  THIS THE EARLY PART OF THE NEGOTIATIONS WITH THE DEFENDANT?

24  **A.**   IT WAS.

25  **Q.**   AT THE TIME THIS EMAIL WAS SENT WERE YOU ALSO TALKING TO

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1   HIM ABOUT OTHER ITEMS?

2   **A.**    YEAH.  WE WERE TALKING ABOUT -- HEAVILY TALKING ABOUT

3   THE NAVIGAT-2100, AND ALONG WITH OTHER ITEMS IN GENERAL.

4   **Q.**    OKAY.  AND LOOKING AT THE CONTENT OF THAT EMAIL, WHAT IS

5   DEFENDANT ASKING OF YOU?

6   **A.**    HE IS ASKING IF I COULD PROVIDE HIM OR PURCHASE FOR HIM

7   A QUOTE FOR FIVE DIFFERENT PIECES OF ELECTRONIC EQUIPMENT,

8   WITH ONE OF THEM BEING OF EXPLICIT OR EXTRA IMPORTANCE.

9   **Q.**    AND IF YOU CAN IDENTIFY WHICH ITEM IS MARKED AS

10  SIGNIFICANT IMPORTANCE OR IMPORTANT.

11  **A.**    WELL, I WAS JUST GUESSING WHEN I RECEIVED THE EMAIL

12  NO. 5 BECAUSE HE PUT IT IN RED LETTERING, AND THEN HE PUT AT

13  THE END IMPORTANT.

14  **Q.**    WHAT IS THE ITEM THEY ARE ASKING FOR THERE -- OR

15  DEFENDANT IS ASKING FOR THERE?

16  **A.**    THE TRIOD LAMP Y-690, MAKER CPI U.S.A., 100 PIECES.

17  **Q.**    AFTER THAT HE PUTS WHAT?

18  **A.**    HE PUTS, IN PARENTHESES, IMPORTANT.

19  **Q.**    OKAY.

20          **THE COURT:**  MR. HARRIGAN, IS THIS A GOOD PLACE TO

21  BREAK?

22          **MR. HARRIGAN:**  SURE IS, YOUR HONOR.

23          **THE COURT:**  LET'S TAKE 15 MINUTES HERE.  WE WILL

24  PICK UP AT 12:30.  THANK YOU.

25          (RECESS)

APRIL 14, 2015

COLE - DIRECT EXAMINATION

```
 1              THE COURT:  WE ARE BACK ON THE RECORD WITH ALL
 2    PRESENT.
 3              MR. HARRIGAN.
 4              MR. HARRIGAN:  THANK YOU, YOUR HONOR.
 5    Q.    (MR. HARRIGAN) I SHOWED YOU 111 ON THE SCREEN REGARDING
 6    DEFENDANT'S EMAIL CONCERNING VARIOUS ELECTRONIC PARTS,
 7    INCLUDING 100 PIECES TRIOD LAMP Y-690.
 8    A.    CORRECT.
 9    Q.    DID YOU SUBSEQUENTLY SEND HIM A QUOTE FOR THOSE
10    ELECTRONIC PARTS, INCLUDING THE Y-690?
11    A.    I DID.
12    Q.    AND WAS THAT SHORTLY AFTER THAT EMAIL OR A LITTLE WHILE
13    AFTER?
14    A.    SHORTLY AFTER.
15    Q.    I AM GOING TO SHOW YOU GOVERNMENT'S EXHIBIT 112 FOR
16    IDENTIFICATION.
17          IS THAT AN EMAIL THAT RELATES TO THE QUOTATION YOU SENT?
18    A.    YES, IT DOES.
19              MR. HARRIGAN:  IF THERE IS NO OBJECTION, I WOULD
20    MOVE TO ADMIT AND PUBLISH TO THE JURY.
21              MR. JOHNSTON:  NO OBJECTION.
22              THE COURT:  RECEIVED.
23              (EXHIBIT 112 RECEIVED INTO EVIDENCE)
24    Q.    (MR. HARRIGAN) AGAIN LOOKING AT THE HEADER INFORMATION.
25    THAT IS AN EMAIL FROM?
```

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1   **A.**    IT IS FROM MYSELF, SENT TO THE DEFENDANT.

2   **Q.**    OKAY.  AND ON WHAT DATE?

3   **A.**    JANUARY 8TH, 2013.

4   **Q.**    AND THE SUBJECT MATTER OF IT IS?

5   **A.**    NEW QUOTE.

6   **Q.**    OKAY.  AND LOOKING AT THE ATTACHMENT TO THAT.  AGAIN, IS

7   THAT A FORM SIMILAR TO THE FORM OF WHAT YOU PREVIOUSLY CALLED

8   A PROFORMA INVOICE?

9   **A.**    CORRECT.

10  **Q.**    WHICH IS ESSENTIALLY A QUOTE?

11  **A.**    A QUOTE.

12  **Q.**    AND THIS QUOTE RELATES TO WHAT?

13  **A.**    IT RELATED TO HIS REQUEST FOR THOSE FIVE PIECES OF

14  ELECTRONIC EQUIPMENT.

15  **Q.**    WERE YOU ABLE TO GET QUOTES FOR ALL FIVE AT THAT TIME?

16  **A.**    NO.  I FAILED TO GET PRICING FOR ONE OF THE FIVE ITEMS

17  HE ASKED FOR.

18  **Q.**    IS THAT QUOTE DEPICTED IN GOVERNMENT EXHIBIT 112, RIGHT?

19  DOES THAT REFLECT THE QUOTE THAT YOU PROVIDED FOR 100 UNITS OF

20  THE Y-690?

21  **A.**    IT PROVIDED A QUOTE FOR 50 UNITS.

22  **Q.**    50 UNITS.  ALL RIGHT.  AND WHY 50 UNITS RATHER THAN 100?

23  **A.**    THEY HAD CHANGED THEIR AMOUNT.

24  **Q.**    AGAIN, THE QUOTATION FOR THAT WAS?

25  **A.**    FOR 2,045 PER Y-690 WITH THE 18 LEAD TIME, FOR A TOTAL

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    OF ABOUT $102,000.

2    **Q.**    AFTER YOU PROVIDED THAT QUOTE TO DEFENDANT FOR 50

3    Y-690'S, DID DEFENDANT REQUEST ANY OTHER INFORMATION ABOUT THE

4    Y-690'S?

5    **A.**    YES, HE DID.

6    **Q.**    LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S

7    EXHIBIT 113 FOR IDENTIFICATION.

8    **A.**    OKAY.

9    **Q.**    IS THAT AN EMAIL?

10   **A.**    YES, IT IS.

11   **Q.**    DOES IT RELATE TO YOUR FURTHER COMMUNICATION WITH THE

12   DEFENDANT ABOUT THE Y-690?

13   **A.**    YES, IT DOES.

14           **MR. HARRIGAN:**  I WOULD MOVE TO ADMIT THAT, IF THERE

15   ARE NO OBJECTIONS.

16           **MR. JOHNSTON:**  NO, YOUR HONOR.

17           **THE COURT:**  RECEIVED.

18           (EXHIBIT 113 RECEIVED INTO EVIDENCE)

19           **MR. HARRIGAN:**  AND PUBLISH IT TO THE JURY.

20   **Q.**    **(MR. HARRIGAN)** OKAY.  LOOKING AT THE HEADER AGAIN --

21   LET ME ASK YOU FIRST A QUESTION.  IS THIS ONE EMAIL OR A CHAIN

22   OF EMAILS?

23   **A.**    IT IS AN EMAIL CHAIN.

24   **Q.**    BUT AT THE TOP OF THE EMAIL IS AN EMAIL YOU SENT IN

25   RESPONSE TO ANOTHER EMAIL?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    ALL RIGHT.  LET'S LOOK AT THE EMAIL JUST BELOW THAT

3    FIRST.

4    **A.**    ALL RIGHT.

5    **Q.**    IN THE MIDDLE OF THE PAGE.

6    **A.**    YEAH.

7    **Q.**    FIRST LOOK AT THE HEADER INFORMATION, PLEASE.  AND

8    THAT'S AN EMAIL FROM WHO?

9    **A.**    FROM THE DEFENDANT, AND IT WAS SENT TO ME.

10   **Q.**    WHAT DATE?

11   **A.**    JANUARY 14TH, 2013.

12   **Q.**    APPROXIMATELY A WEEK AFTER YOU PROVIDED THE QUOTE?

13   **A.**    YES.

14   **Q.**    OKAY.  AND IN THE BODY OF THAT EMAIL WHAT DOES HE

15   REQUEST?

16   **A.**    HE REQUESTS THAT I PROVIDE A BROCHURE OR DRAWING FOR THE

17   PRODUCT MADE BY CPI.  AND HE REFERS TO IT AS THE TRIOD LAMP

18   Y-690.

19   **Q.**    DID YOU RESPOND TO THAT EMAIL?

20   **A.**    I DID.

21   **Q.**    IS THAT THE EMAIL DIRECTLY ABOVE?

22   **A.**    YES, IT IS.

23   **Q.**    WHAT DID YOU TELL HIM?

24   **A.**    I TOLD HIM THAT I COULD NOT PROVIDE HIM WITH TECHNICAL

25   DATA OR DRAWINGS BECAUSE THE SALES DEPARTMENT FROM CPI, THE

APRIL 14, 2015

COLE – DIRECT EXAMINATION

 1  MANUFACTURER, DID NOT RELEASE THEM.

 2  **Q.**    NOW, WERE YOU PLAYING A ROLE OR WAS THAT ACTUALLY TRUE?

 3  **A.**    I WAS PLAYING A ROLE.  AS AN UNDERCOVER AGENT I PLAY THE

 4  ROLE OF BROKER.  CPI WOULD NOT RELEASE THEM TO ME.  THEY WOULD

 5  HAVE GIVEN THEM TO ME AS AN AGENT, HOWEVER THEY DID NOT WANT

 6  THAT INFORMATION OUT AND ABOUT ON THE INTERNET.

 7  **Q.**    BUT THERE WAS INFORMATION ON THE INTERNET, RIGHT?

 8  **A.**    CORRECT.

 9  **Q.**    DID DEFENDANT RESPOND TO YOUR STATEMENT, THAT EMAIL,

10  THAT YOU COULDN'T GET A BROCHURE FROM CPI?

11  **A.**    YES.

12  **Q.**    DID YOU HAVE FURTHER COMMUNICATIONS WITH HIM?

13  **A.**    YES.

14  **Q.**    SHOWING YOU WHAT IS MARKED AS GOVERNMENT EXHIBIT 114.

15  IS THAT DEFENDANT'S RESPONSE TO YOUR EMAIL?

16  **A.**    YES.

17  **Q.**    WHICH WAS DEPICTED IN GOVERNMENT EXHIBIT 113?

18  **A.**    YES.

19  **Q.**    AND LOOKING AT THE HEADER INFORMATION FIRST.  WHEN DID

20  DEFENDANT SEND THAT EMAIL TO YOU?

21  **A.**    ON JANUARY 15TH, 2013.

22  **Q.**    AND WHAT DID HE SAY IN RESPONSE TO YOUR STATEMENT THAT

23  CPI WOULD NOT GIVE YOU A BROCHURE?

24  **A.**    HE SAID HE UNDERSTOOD, BUT THAT HE REALLY NEEDED A

25  DRAWING OR DATA SHEET FOR THE PRODUCT, ESPECIALLY FOR THE

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   TRIODE LAMP, IN ORDER TO FINALIZE THE DEAL AND GET THE

2   CONTRACT WITH THE CUSTOMER.

3           **THE COURT:**  IS 114 ADMITTED?  IS IT MOVED?

4           **MR. JOHNSTON:**  THERE IS NO OBJECTION.

5           **THE COURT:**  IT IS RECEIVED.

6           (EXHIBIT 114 RECEIVED INTO EVIDENCE)

7   **Q.**   **(MR. HARRIGAN)** AND SO AFTER HE TOLD YOU THAT --

8   DEFENDANT TOLD YOU THAT HE NEEDED THE TECHNICAL DATA AND

9   SHEETS OR DRAWINGS TO FINALIZE THE DEAL AND CONTRACT WITH THE

10  CUSTOMER, DID YOU RESPOND?

11  **A.**   YES.

12  **Q.**   SHOWING YOU GOVERNMENT'S EXHIBIT 115 FOR IDENTIFICATION.

13  **A.**   OKAY.

14  **Q.**   IS THAT YOUR RESPONSIVE EMAIL?

15  **A.**   YES, IT IS.

16          **MR. HARRIGAN:**  IF THERE ARE NO OBJECTIONS, I WOULD

17  MOVE TO ADMIT AND PUBLISH GOVERNMENT EXHIBIT 115.

18          **MR. JOHNSTON:**  NO, YOUR HONOR.

19          **THE COURT:**  RECEIVED.

20          (EXHIBIT 115 RECEIVED INTO EVIDENCE)

21  **Q.**   **(MR. HARRIGAN)**  AGAIN SHOWING YOU THE HEADER.

22  **A.**   OKAY.

23  **Q.**   YOU SENT THAT EMAIL TO DEFENDANT WHEN?

24  **A.**   ON JANUARY 15TH, 2013.

25  **Q.**   AND WHAT DID YOU PROVIDE DEFENDANT WITH, LOOKING AT THE

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   CONTENT?

2   **A.**    A COUPLE OF WEB LINKS THAT WERE GIVEN TO ME BY THE

3   MANUFACTURER OFF OF THEIR WEBSITE.

4   **Q.**    WHO DID YOU TALK TO IN ORDER TO GET THAT, DO YOU RECALL?

5   **A.**    I SPOKE TO AN INDIVIDUAL FROM THE COMPANY, CPI.

6   **Q.**    AND, BASICALLY, LET'S TAKE A LOOK AT THE ATTACHMENT,

7   FIRST ATTACHMENT TO THAT.  DO YOU RECOGNIZE THAT?  OKAY.

8        THAT'S THE FIRST ATTACHMENT.  IS THAT INFORMATION YOU

9   GOT FOR THE WEB LINK ADDRESS FOR INFORMATION ON THE Y-690?

10   **A.**    YES.

11   **Q.**    AND THAT CONTAINS -- AND LOOK AT THE SECOND ATTACHMENT.

12   **A.**    SAME.

13   **Q.**    IS THAT ALSO A WEB LINK FOR DATA OBTAINED FROM A WEB

14   LINK THAT YOU PROVIDED TO THE DEFENDANT?

15   **A.**    CORRECT.

16   **Q.**    AGAIN, FOR THE Y-690.

17   **A.**    CORRECT.

18   **Q.**    ALL RIGHT.  AFTER PROVIDING DEFENDANT WITH THE WEB LINK

19   FOR THE Y-690, DID YOU HAVE FURTHER COMMUNICATION WITH THE

20   DEFENDANT REGARDING HOW HE WANTED TO ACQUIRE THE Y-690 FROM

21   CPI?

22   **A.**    YES.

23   **Q.**    WAS THAT BY PHONE?

24   **A.**    BY PHONE.

25   **Q.**    WAS THERE ALSO EMAIL COMMUNICATIONS?

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1  **A.**    THERE WERE BOTH.

2  **Q.**    SHOWING YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S

3  EXHIBIT 304, IT IS A DISK IN THE BINDER.  JUST LOOKING AT THE

4  OUTSIDE OF THE DISK.

5  **A.**    OKAY.

6  **Q.**    YOU RECOGNIZE THAT DISK, RIGHT?

7  **A.**    YES.

8  **Q.**    HAVE YOU REVIEWED THE CONTENTS OF THAT DISK?

9  **A.**    I HAVE.

10  **Q.**    DOES THAT DISK CONTAIN A CONVERSATION -- EXCERPTS OF A

11  CONVERSATION YOU HAD WITH DEFENDANT REGARDING THE Y-690?

12  **A.**    YES.

13  **Q.**    IS IT THE ENTIRE TELEPHONE CONVERSATION?

14  **A.**    NO, JUST TWO EXCERPTS.

15  **Q.**    SO THERE IS TWO CLIPS.  WHAT DATE DID THAT OCCUR?

16  **A.**    ON FEBRUARY 21ST, 2013.

17          **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION, I WOULD

18  PLAY THE FIRST CLIP.

19          **THE COURT:**  YES.

20          (AUDIO PLAYED)

21  **Q.**    **(MR. HARRIGAN)** OKAY.  DURING THAT PHONE CONVERSATION

22  WITH THE DEFENDANT YOU EXPLAINED THAT THE Y-690 OR TRIODE LAMP

23  NEEDS A LICENSE TO GO ANYWHERE OUTSIDE OF THE UNITED STATES.

24  WHY WERE YOU TELLING THE DEFENDANT THAT?

25  **A.**    I TOLD HIM THAT BECAUSE AT THE TIME THE INFORMATION WE

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    RECEIVED FROM THE MANUFACTURER AND FROM THE GOVERNMENT AGENCY

2    THAT DETERMINES WHAT PRODUCTS DO AND DON'T NEED THOSE TYPES OF

3    LICENSES, THAT IT WAS CONSIDERED A MILITARY ITEM AND THAT IT

4    WOULD REQUIRE A LICENSE TO BE EXPORTED ANYWHERE OUTSIDE OF THE

5    U.S.  SO I USED THE INFORMATION I HAD AT THE TIME.

6    **Q.**    IN FACT DID YOU HAVE INFORMATION FROM THE LICENSING

7    AGENCY ITSELF?

8    **A.**    YES, CORRECT.  THEY GAVE ME A FIRST-LEVEL LICENSE

9    DETERMINATION.

10   **Q.**    DID YOU LATER COME TO FIND OUT THAT WHEN THE LICENSING

11   AGENCY DID A FURTHER EXAMINATION OF THE Y-690 THEY CAME TO A

12   DIFFERENT CONCLUSION?

13   **A.**    YES, I DID.  AFTER THE INVESTIGATION WAS OVER AND

14   SEVERAL MONTHS HAD GONE BY, THEY CAME BACK AND DETERMINED THAT

15   THEY CHANGED THEIR DETERMINATION AND IT DID NOT REQUIRE THAT

16   SPECIFIC EXPORT LICENSE.

17   **Q.**    NOW, DID YOU GIVE DEFENDANT THE OPTION TO -- THAT YOU

18   WOULD GO TO THE MANUFACTURER AND GET A LICENSE AND USE

19   WHATEVER END USER THEY WANTED TO USE, DEFENDANT OR KOORUSH OR

20   TIG MARINE?

21   **A.**    YES.  I TOLD HIM IF HE HAD IT OR IF TIG MARINE OR MR.

22   TAHERKHANI, OR WHOEVER, IF THEY PROVIDED ME THE END USER

23   INFORMATION THEY FELT WOULD PASS THEN I WOULD USE THAT

24   INFORMATION.

25   **Q.**    OKAY.  AND EXPLAIN WHAT YOU WERE DOING IN YOUR ROLE AS

APRIL 14, 2015

1  DAVID MILLS.

2  **A.**    IN MY ROLE AS DAVID MILLS I WAS TRYING TO DETERMINE AND

3  GATHER MORE EVIDENCE ON WHAT THEIR INTENTIONS WERE.  IF THEY

4  ACTUALLY HAD BONA FIDE AND LEGITIMATE LEGAL INTENTION OF

5  GETTING THESE PRODUCTS THE PROPER WAY, OR IF IN FACT THEY WERE

6  LOOKING TO CIRCUMVENT U.S. EXPORT LAWS AND BREAK THE LAW.

7  **Q.**    ALL RIGHT.  AND WHAT DID DEFENDANT ASK YOU TO DO, USE

8  THEIR END USER?

9  **A.**    NO.  HE MADE IT VERY CLEAR THAT THEY DID NOT FEEL

10  COMFORTABLE AND THAT HE WOULD NOT RELEASE THE END USER

11  INFORMATION FOR THAT PRODUCT.  HE TOLD ME WHERE HE WAS SURE IT

12  WOULD BE USED, BUT TOLD ME NUMEROUS TIMES THAT WAS NOT

13  SOMETHING THAT THEY WOULD RELEASE AS FAR AS END USER

14  INFORMATION WAS CONCERNED.

15  **Q.**    DURING THAT CONVERSATION YOU ASKED DEFENDANT, YOU KNOW,

16  IF THEY COULD PROVIDE AN END USER WHERE KOORUSH –– THAT YOU

17  WOULD PROVIDE AN END USER IF KOORUSH DID NOT FEEL COMFORTABLE

18  THAT HE CAN GET –– IS ABLE TO GIVE GOOD END USER INFO, ONE

19  THAT WILL CHECK OUT AND BE VERIFIED AND MAKE SENSE THAT WILL

20  NOT CAUSE FURTHER PROBLEMS.

21       IN YOUR ROLE AS DAVID MILLS, WHAT DID YOU MEAN?

22  **A.**    WELL, SIMPLY PUT, IN MY ROLE AS DAVID MILLS, THE FURTHER

23  PROBLEMS WOULD BE THAT IF THE LICENSING AGENCY DID THEIR

24  CHECKS, WHICH THEY ROUTINELY DO, THEY WOULD FIGURE OUT WE DID

25  NOT SHIP THE GOODS OR DELIVER THE GOODS WHERE WE SAID.  AND

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  THE FURTHER PROBLEMS WOULD BE US GETTING ARRESTED AND GOING TO

2  JAIL.  SIMPLE AS THAT.

3  **Q.**    WHEN DEFENDANT TOLD YOU IN THAT EXCERPT THEY WERE NOT

4  COMFORTABLE RELEASING THEIR END USER, DID HE EVER TELL YOU

5  OTHERWISE, THAT THEY WANTED TO USE THEIR REAL END USER?

6  **A.**    NEVER.

7  **Q.**    AND IN THAT CONVERSATION THAT YOU HAD ON FEBRUARY 21ST,

8  DID YOU ALSO LATER DISCUSS AGAIN WHAT END USER DEFENDANT

9  WANTED YOU TO USE?

10  **A.**    YES.

11  **Q.**    LET ME PLAY YOU THE SECOND EXCERPT, WITH THE COURT'S

12  PERMISSION.

13            **THE COURT:**  YES.

14            (AUDIO PLAYED)

15  **Q.**    **(MR. HARRIGAN)** IN THAT EXCERPT OF YOUR TELEPHONE

16  CONVERSATION WITH THE DEFENDANT ON FEBRUARY 21ST YOU DISCUSS

17  WITH DEFENDANT THAT YOU WANT TO MAKE SURE THAT DEFENDANT OR

18  MR. TAHERKHANI, IF YOU USE A FALSE END USER, DON'T HAVE THAT

19  FALSE END USER -- OR HAVE THE REAL END USER GO BACK TO THE

20  MANUFACTURER SO IT WILL CREATE PROBLEMS.

21            IN YOUR ROLE AS DAVID MILLS, WHAT WERE YOU TRYING TO

22  CONVEY?

23  **A.**    I WAS TRYING TO CONVEY THE FACT THAT WE BOTH WERE

24  UNDERSTANDING WE WERE GOING TO SUPPLY THE GOODS TO WHOEVER THE

25  REAL USER WAS, WHO OBVIOUSLY WAS NOT GOING TO BE THE END USER

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   PROVIDED TO THE MANUFACTURER.

2        SO IF DOWN THE ROAD A REQUEST WAS NEEDED FOR UPDATING

3   SOFTWARE, REPAIR, ET CETERA, THEY COULD NEVER CONTACT THE

4   MANUFACTURER DIRECTLY, BECAUSE THE MANUFACTURER WOULD KNOW

5   IMMEDIATELY THAT CUSTOMER NEVER SHOULD HAVE HAD THE PRODUCT;

6   WHICH WOULD THEN BRING TO LIGHT OUR FRAUDULENT PAPERWORK THAT

7   I PROVIDED THEM, AND GET US ALL ARRESTED.

8   **Q.**    AND DURING THE COURSE OF YOUR CONVERSATION WITH THE

9   DEFENDANT DID HE APPEAR TO UNDERSTAND, BASED ON THE CONTEXT OF

10   YOUR CONVERSATION, WHAT YOU WERE TELLING HIM?

11   **A.**    YES.  HE UNDERSTOOD.

12   **Q.**    WHAT DID HE TELL YOU HE WOULD DO ABOUT THAT INFORMATION?

13        **MR. JOHNSTON:**  OBJECTION.  LACK OF PERSONAL

14   KNOWLEDGE.

15            **THE COURT:**  SUSTAINED.

16            **MR. JOHNSTON:**  MOVE TO STRIKE.

17            **THE COURT:**   THE TESTIMONY IS STRICKEN.

18   **Q.**    **(MR. HARRIGAN)** ONCE YOU TOLD DEFENDANT THAT, WHAT DID

19   HE SAY HE WOULD DO WITH THAT INFORMATION?

20   **A.**    THAT HE WOULD KEEP IT PRIVATE, AND THEN HE WOULD DISCUSS

21   IT WITH KOORUSH.

22   **Q.**    AND AT ANY POINT IN TIME AFTER YOU TOLD HIM YOU DIDN'T

23   WANT TO CREATE PROBLEMS, DID DEFENDANT EVER ASK YOU DURING

24   THAT CONVERSATION, WHAT PROBLEMS?  WHAT PROBLEMS ARE YOU

25   TALKING ABOUT?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    NEVER.

2    **Q.**    DID HE EVER, IN THAT CONVERSATION OR ANY POINT DURING

3    THE MONTHS LATER THAT YOU MET WITH HIM, EVER SAY OR TELL YOU,

4    I WANT YOU TO USE OUR REAL END USER WHEN YOU GET THE Y-690'S

5    FROM THE MANUFACTURER?

6    **A.**    NEVER.

7    **Q.**    SO FOLLOWING THAT TELEPHONE CONVERSATION, DID YOU HAVE

8    FURTHER COMMUNICATION WITH DEFENDANT AND KOORUSH TAHERKHANI

9    REGARDING THE NATURE OF THE Y-690 TRANSACTION?

10   **A.**    YES.

11   **Q.**    OKAY.  LET ME SHOW YOU GOVERNMENT'S EXHIBIT 116.

12   **A.**    OKAY.

13   **Q.**    DO YOU RECOGNIZE THAT EMAIL?

14   **A.**    YES.

15   **Q.**    AND IS THAT AN EMAIL WITH WHOM?

16   **A.**    IT IS SENT BY ME TO THE DEFENDANT AND TO MR. TAHERKHANI.

17   **Q.**    AND IT IS REGARDING WHAT?

18   **A.**    THE CONTRACTS FOR THE Y-690.

19   **Q.**    OKAY.  ALL RIGHT.

20           **MR. HARRIGAN:**  AND IF THERE IS NO OBJECTION, I WOULD

21   MOVE TO ADMIT, YOUR HONOR.

22           **MR. JOHNSTON:**  NO OBJECTION.

23           **THE COURT:**  IT IS RECEIVED.

24           (EXHIBIT 116 RECEIVED INTO EVIDENCE)

25   **Q.**    **(MR. HARRIGAN)** OKAY.  FIRST LOOKING AT THE HEADER

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   INFORMATION.  IS THAT SENT BY YOU?

2   **A.**    YES.

3   **Q.**    TO DEFENDANT AND MR. TAHERKHANI?

4   **A.**    YES.

5   **Q.**    ON FEBRUARY 26TH?

6   **A.**    CORRECT.

7   **Q.**    NEAR THE TIME YOU HAD THIS TELEPHONE CONVERSATION WITH

8   HIM, CORRECT?

9   **A.**    CORRECT.

10  **Q.**    AND DIRECTING YOUR ATTENTION TO THE SECOND PARAGRAPH OF

11  THE CONTENT —— THIRD PARAGRAPH.  SECOND AND THIRD.  LOOKING AT

12  THE THIRD PARAGRAPH.  WHAT WERE YOU CONVEYING TO BOTH THE

13  DEFENDANT AND MR. TAHERKHANI IN THAT PARAGRAPH?

14  **A.**    THE MOST IMPORTANT THING WAS I WAS CONVEYING TO HIM THAT

15  BECAUSE THE TRIPOD LAMPS WERE CONSIDERED MORE SENSITIVE AND A

16  MORE RESTRICTIVE CATEGORY, THAT IT WAS IMPORTANT THAT WE

17  HANDLE IT PRIVATELY.  AND THAT WE NOT PUT THE FACT THAT WE

18  WERE BUYING THE TRIPOD LAMPS IN OUR BANKING PAPERWORK.

19  **Q.**    AND WHAT —— WHY DID YOU EXPLAIN TO HIM THAT WOULD ——

20  WHAT DID YOU SAY WOULD HAPPEN IF YOU DID SOMETHING LIKE THAT?

21  **A.**    MY FEAR WAS THAT ——

22  **Q.**    LOOKING AT THE EMAIL, SAYING THIS COULD CAUSE A PROBLEM

23  IN THE FUTURE.

24  **A.**    YEAH.  I SAID I FELT IT COULD CAUSE A PROBLEM IN THE

25  FUTURE BECAUSE IF OUR BANKING PAPERWORK WERE TO BE EXAMINED OR

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   REVIEWED THEN IT WOULD SHOW THAT WE LIED, AND THAT WE IN FACT

2   DID A TRANSACTION FOR THE Y-690'S.  I THOUGHT BEST PERHAPS THE

3   PAYMENT COULD REFLECT FOR SERVICES RENDERED AND NOT

4   SPECIFICALLY FOR THE Y-690'S.

5   **Q.**    AND DID YOU GET A RESPONSE TO THIS EMAIL?

6   **A.**    YES.

7   **Q.**    SHOWING YOU GOVERNMENT EXHIBIT 127 -- 117.  EXCUSE ME.

8   AND IS THAT A RESPONSE TO YOUR EMAIL?

9   **A.**    YES.

10  **Q.**    AND WHO IS THAT FROM?

11  **A.**    IT IS FROM MR. TAHERKHANI.

12  **Q.**    AND WHO IS IT TO?

13  **A.**    SENT TO ME.

14  **Q.**    AND WHO ELSE?

15  **A.**    AND TO THE DEFENDANT.

16  **Q.**    OKAY.

17          **MR. HARRIGAN:**  AND IF THERE IS NO OBJECTION, I MOVE

18  TO ADMIT.

19          **MR. JOHNSTON:**  NO OBJECTION.

20          **THE COURT:**  RECEIVED.

21          (EXHIBIT 117 RECEIVED INTO EVIDENCE)

22  **Q.**    **(MR. HARRIGAN)** SHOWING YOU THE HEADER.

23  **A.**    OKAY.

24  **Q.**    AND THAT WAS SENT THE SAME DAY YOU SENT YOUR EMAIL?

25  **A.**    CORRECT.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **Q.**    REPLY TO YOUR EMAIL?

2    **A.**    YES.

3    **Q.**    I AM LOOKING AT THE BODY OF THE EMAIL.

4    **A.**    OKAY.

5    **Q.**    WHAT IS MR. TAHERKHANI TELLING YOU AND DEFENDANT?

6    **A.**    HE TELLS US THAT HE APPRECIATES MY COMMENT REGARDING THE

7    LAMPS, AND THAT HE AGREES THAT WE NEED TO BE CAREFUL AND MAKE

8    SURE THE DEAL IS DONE SAFE IN ALL ASPECTS.  AND THAT PLEASE

9    ARRANGE WITH THE DEFENDANT FOR THE BEST METHOD OF WRITING THE

10   CONTRACTS.

11   **Q.**    AND DURING THE COURSE OF YOUR NEGOTIATIONS FOR THE

12   Y-690'S, YOU CONTINUED TO DEAL WITH DEFENDANT.

13   **A.**    CORRECT.

14   **Q.**    ON THE MEANS TO MAKE IT THE BEST WAY TO MAKE IT SAFE IN

15   ALL RESPECTS.

16   **A.**    YES.

17   **Q.**    EVENTUALLY DID YOU REACH A CONTRACT AGREEMENT FOR THE

18   PURCHASE OF -- I MEAN FOR THE SALE OF Y-690'S TO DEFENDANT AND

19   TIG MARINE AND MR. TAHERKHANI?

20   **A.**    EVENTUALLY, YES.

21   **Q.**    DO YOU RECALL WHEN THAT OCCURRED?

22   **A.**    IT OCCURRED SEVERAL WEEKS AFTER THIS, I BELIEVE.

23   **Q.**    IN LATE FEBRUARY, EARLY MARCH?

24   **A.**    CORRECT.

25   **Q.**    AND AFTER YOU -- AND FOR HOW MANY Y-690'S WAS THAT?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    FOR 50.

2    **Q.**    AND DID YOU EMAIL THE CONTRACT TO THEM, OR WAS IT

3    SHIPPED?

4    **A.**    EMAILED, AND IT WAS SENT IN ACTUAL MAIL, HARD COPY.

5    **Q.**    AFTER YOU REACHED AN AGREEMENT WITH DEFENDANT AND MR.

6    TAHERKHANI, DID YOU HAVE A FURTHER DISCUSSION WITH DEFENDANT

7    REGARDING HOW TO HANDLE THE ACTUAL DELIVERY OF THE Y-690'S TO

8    THEM WITHOUT CAUSING ANY PROBLEMS?

9    **A.**    YES.

10   **Q.**    OKAY.  I WOULD LIKE TO SHOW YOU WHAT'S MARKED AS

11   GOVERNMENT'S EXHIBIT 305.  IT IS A DISK IN YOUR BINDER BEFORE

12   YOU OF TELEPHONE RECORDINGS.

13   **A.**    OKAY.

14   **Q.**    YOU RECOGNIZE THAT DISK, DON'T YOU?

15   **A.**    YES, SIR.

16   **Q.**    IS THAT A DISK CONTAINING FURTHER TELEPHONE

17   CONVERSATIONS YOU HAD WITH THE DEFENDANT?

18   **A.**    YES.

19   **Q.**    REGARDING THE Y-690?

20   **A.**    YES.

21   **Q.**    IS IT THE ENTIRE TELEPHONE CONVERSATION?

22   **A.**    NO, JUST ONE EXCERPT.

23        **MR. HARRIGAN:**  AND WITH THE COURT'S PERMISSION, I

24   WOULD MOVE TO ADMIT -- I MEAN PUBLISH THAT TO THE JURY.

25        **THE COURT:**  YES.

APRIL 14, 2015

```
 1              (AUDIO PLAYED)
 2    Q.    (MR. HARRIGAN) IN THAT CONVERSATION DEFENDANT ASKED YOU
 3    IF IT WAS POSSIBLE TO DELIVER THE Y-690'S TO CHINA.
 4    A.    CORRECT.
 5    Q.    PRIOR TO THAT TIME HAD THERE BEEN ANY DISCUSSIONS ABOUT
 6    DELIVERING ANY GOODS TO CHINA?
 7    A.    NEVER.
 8    Q.    THE CONTRACT FOR THE Y-690 WAS FOR DELIVERY WHERE?
 9    A.    TO DUBAI.
10    Q.    AND IN YOUR ROLE, AGAIN AS DAVID MILLS, YOU TELL
11    DEFENDANT, WELL, LOOK, WE ARE SAYING IT IS GOING TO LATIN
12    AMERICA, YOU KNOW, AND THAT IS THE END USER INFORMATION WE
13    PROVIDED.  RIGHT?
14    A.    CORRECT.
15    Q.    IN YOUR ROLE AS DAVID MILLS, WHY ARE YOU TELLING HIM
16    THAT?
17    A.    I WAS TELLING HIM THAT BECAUSE AT THAT TIME I WAS UNDER
18    THE ASSUMPTION THE ITEMS NEEDED AN EXPORT LICENSE TO LEAVE THE
19    U.S.  AND SINCE WE WERE PROVIDING FALSE END USER INFORMATION
20    TO THE MANUFACTURER THE GOODS WERE GOING TO BE LEAVING THE
21    U.S. BY MEANS OF LATIN AMERICA, THAT WAS GOING TO BE THE
22    SMUGGLING ROUTE WE WERE GOING TO USE.
23    Q.    YEAH.  IN YOUR ROLE AS DAVID MILLS YOU ARE DOING THAT TO
24    AVOID WHAT?
25    A.    TO AVOID -- I WAS DOING THAT AS A METHOD OF SMUGGLING TO
```

COLE – DIRECT EXAMINATION

1  AVOID U.S. EXPORT LAWS, WHICH WOULD HAVE PREVENTED US FROM

2  LEGALLY TAKING THE GOODS OUT OF THE U.S.

3  **Q.**    NOW, YOU DISCUSS WITH HIM OPTIONS ABOUT GETTING IT TO

4  CHINA OR ELSEWHERE.  AND ONE OF THE THINGS YOU DISCUSS, THEY

5  ARE SMALL ENOUGH YOU CAN CARRY THEM ONBOARD A PLANE.

6      IN YOUR ROLE AS DAVID MILLS, WHAT ARE YOU TELLING THE

7  DEFENDANT?

8  **A.**    I WAS EXPLAINING TO HIM THAT SINCE THEY ARE SO SMALL AND

9  SOMEWHAT BENIGN LOOKING, I BELIEVED IT WOULD BE EASY ENOUGH TO

10  SIMPLY STICK THEM IN A TRAVEL BAG, CARRY THEM ON A PLANE, AND

11  FLY IT DIRECTLY TO WHEREVER WOULD BEST SUIT DEFENDANT AND

12  TAHERKHANI.

13  **Q.**    WHAT WAS DEFENDANT'S REACTION TO THAT?

14  **A.**    HE DIDN'T SEEM TO LIKE THE IDEA.

15  **Q.**    WHAT DID HE TELL YOU WHY HE DIDN'T LIKE THE IDEA?

16  **A.**    HE SAID THAT THEY WERE VERY VALUABLE, AND IF THERE WAS

17  ANY PROBLEMS THAT COULD BE AN ISSUE.

18  **Q.**    AND IN THE CONTEXT OF YOUR COMMUNICATION, WHAT DID YOU

19  UNDERSTAND PROBLEMS?

20  **A.**    I UNDERSTOOD THE PROBLEMS TO MEAN IF IN THE ROUTE FROM

21  GOING FROM THIS AIRPORT TO THE NEXT AIRPORT, WHEREVER, IF

22  SOMEONE GOT CAUGHT BY CUSTOMS IT COULD BE ISSUES OR PROBLEMS.

23  **Q.**    SHOWING YOU NEXT GOVERNMENT'S EXHIBIT –– MAKE SURE I GOT

24  THIS RIGHT.  BEEN A LONG DAY.  120.

25  **A.**    OKAY.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1      **MR. HARRIGAN:**  ONE MOMENT, YOUR HONOR.

2   **Q.**   **(MR. HARRIGAN)** SHOWING YOU GOVERNMENT'S EXHIBIT 120 FOR

3   IDENTIFICATION.

4   **A.**    OKAY.

5   **Q.**    DO YOU RECOGNIZE THAT EMAIL?

6   **A.**    YES, I DO.

7   **Q.**    AND IS THAT AN EMAIL YOU HAD IN CONNECTION WITH YOUR

8   DISCUSSIONS ABOUT THE Y-690?

9   **A.**    YES.

10  **Q.**    OKAY.

11     **MR. HARRIGAN:**  YOUR HONOR, IF THERE IS NO OBJECTION,

12  I MOVE TO ADMIT 120.

13     **MR. JOHNSTON:**  NO OBJECTION, YOUR HONOR.

14     **THE COURT:**  RECEIVED.

15     (EXHIBIT 120 RECEIVED INTO EVIDENCE)

16  **Q.**   **(MR. HARRIGAN)** THAT'S AN EMAIL OF MARCH 26; IS THAT

17  CORRECT?

18  **A.**    CORRECT.

19  **Q.**    OKAY.  AND THAT'S FROM WHO TO WHOM?

20  **A.**    IT IS FROM THE DEFENDANT TO ME AND TO MR. TAHERKHANI,

21  AND THEN ANOTHER EMAIL ACCOUNT.

22  **Q.**    DO YOU RECOGNIZE THAT OTHER EMAIL ACCOUNT?

23  **A.**    AGLOBALMARINE.COM, I AM NOT SURE IF I DO OR NOT.

24  **Q.**    LOOKING AT THE CONTENT OF THIS EMAIL.

25  **A.**    OKAY.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **Q.**    WHAT IS HE TELLING YOU?

2    **A.**    HE IS TELLING ME THAT HE RECEIVED THE STANDBY LETTER OF

3    CREDIT TODAY.  PLEASE FIND ATTACHED THE DIGITAL SIGNED COPIES

4    OF THE CONTRACT.  AND THAT FOR ME TO SIGN THEM AND THEN RETURN

5    THE CONTRACT.

6    **Q.**    AND ATTACHED TO THIS EMAIL, IS THAT THE CONTRACT FOR THE

7    Y-690'S?

8    **A.**    YES, IT IS.

9    **Q.**    THIS IS A LITTLE BETTER QUALITY, BUT IT APPEARS TO BE ON

10    THE SAME TYPE OF FORMAT AS THE GYRO CONTRACT?

11    **A.**    YES, IT IS.

12    **Q.**    CAN YOU DESCRIBE FOR THE LADIES AND GENTLEMEN OF THE

13    JURY WHAT THE AMOUNT WE ARE LOOKING, THE 1.3.1?

14    **A.**    I AM SORRY.  WHAT WAS THAT?

15    **Q.**    WHAT AMOUNT?

16    **A.**    I AM SORRY.  FOR 50 UNITS.  SO AT THE TIME WE DID THE

17    CONTRACT THE NUMBER HAD BECOME AGREED TO FOR A UNIT OF 50.

18    **Q.**    WERE THE PRICE TERMS GENERALLY THE SAME?

19    **A.**    THE PRICE TERMS ARE THE SAME, PAYMENT TERMS ARE THE

20    SAME.

21    **Q.**    WERE THE PAYMENT TERMS FOR THIS CONTRACT IDENTICAL TO

22    THE PAYMENT TERMS YOU HAD SET IN PLACE FOR THE GYROCOMPASS

23    CONTRACT?

24    **A.**    YES, THEY WERE.  CORRECT.

25    **Q.**    AND GOING TO THE FINAL PAGE, SIGNATURE PAGE.  AND YOU

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    HAD NOT SIGNED THIS YET, CORRECT?

2    **A.**    CORRECT.

3    **Q.**    AND WHO SIGNS ON BEHALF OF THE BUYER?

4    **A.**    THE DEFENDANT.

5    **Q.**    ARASH GHAHREMAN ON BEHALF OF TIG MARINE ENGINEERING

6    SERVICES?

7    **A.**    CORRECT.

8    **Q.**    AND DID YOU SUBSEQUENTLY SIGN THIS CONTRACT AND PROVIDE

9    TO DEFENDANT?

10   **A.**    YES, I DID.

11   **Q.**    DO YOU RECALL HOW YOU DID THAT?

12   **A.**    I SIGNED IT, AND THEN THE CONTRACT WAS SENT VIA COURIER

13   TO AN ADDRESS IN NEW YORK.

14   **Q.**    DID DEFENDANT PROVIDE YOU HIS RESIDENCE ADDRESS IN NEW

15   YORK?

16   **A.**    YES, HE DID.

17   **Q.**    AT SOME POINT AFTER YOU FINALIZED THE DEAL FOR THE

18   Y-690'S AND THE NAVIGAT-2100'S, DID YOU INVITE DEFENDANT AND

19   MR. TAHERKHANI TO MEET WITH YOUR PARTNERS IN THE UNITED

20   STATES?

21   **A.**    YES, I DID.

22   **Q.**    HOW DID YOU MAKE THAT INVITE?

23   **A.**    VIA EMAIL.

24   **Q.**    AND IN YOUR ROLE AS DAVID MILLS, WHAT DID YOU TELL

25   DEFENDANT AND MR. TAHERKHANI THE PURPOSE OF THAT MEETING WAS?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  **A.**     I TOLD THEM WE WERE HAVING A BUSINESS RETREAT FOR OUR

2  CUSTOMERS.  NOT JUST THEM, BUT OTHER CUSTOMERS THAT WERE

3  WORKING WITH SOUTH STAR TRADING.  AND WE WOULD USE IT AS A

4  METHOD TO CULTIVATE THE BUSINESS WE WERE ALREADY WORKING ON,

5  AND HOPEFULLY DEVELOP A MORE TIGHT RELATIONSHIP THAT WOULD

6  MAKE FUTURE BUSINESS MORE SMOOTH, SEEING AS THAT WE WERE

7  HAVING SOME ISSUES WITH TIMELINESS IN PAYMENTS THAT WERE DUE.

8  **Q.**     AND IN TERMS OF YOUR ROLE AS AN UNDERCOVER -- AS AGENT

9  DAVID COLE, WHAT WERE YOU HOPING TO DO FROM THIS MEETING?

10 **A.**     AS AN AGENT HOPE THEY COME TO THE MEETING.  TAKE THE

11 TIME TO, IN A FACE-TO-FACE SETTING, DEVELOP MORE TRUST.  AND

12 THEN BE ABLE TO SPEAK MORE FREELY TO OBTAIN THE EVIDENCE THAT

13 WE BELIEVE EXISTED; OR DETERMINE THAT THE EVIDENCE WE BELIEVED

14 EXISTED DIDN'T EXIST.  AND THAT WAS OUR GOAL OF PROGRESSING

15 THE INVESTIGATION.

16 **Q.**     DID DEFENDANT ACCEPT?

17 **A.**     YES, HE DID.

18 **Q.**     DID MR. TAHERKHANI ACCEPT?

19 **A.**     YES, HE DID.

20 **Q.**     DID MR. TAHERKHANI LATER CHANGE HIS MIND?

21 **A.**     YES, HE DID.

22 **Q.**     WHAT WAS THE REASON THAT -- WERE YOU PROVIDED A REASON

23 WHY HE CHANGED HIS MIND?

24 **A.**     YES.

25 **Q.**     AND WHO TOLD YOU OF THAT REASON?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

```
 1   A.    WELL, HE DID -- HE DID VIA EMAIL, TO SOME EXTENT.  AND
 2   THEN THE DEFENDANT DID IN MORE DETAIL.
 3   Q.    I WILL FIRST SHOW YOU GOVERNMENT EXHIBIT 118 --
 4   A.    OKAY.
 5   Q.    -- FOR IDENTIFICATION.  DO YOU RECOGNIZE THAT EMAIL?
 6   A.    YES.
 7   Q.    YOU HAVE SEEN IT BEFORE YOU CAME HERE TODAY?
 8   A.    YES.
 9   Q.    YOU REVIEWED IT IN PREPARATION FOR YOUR TESTIMONY?
10   A.    YES, I DID.
11   Q.    AND LOOKING AT THE HEADER INFORMATION.
12   A.    OKAY.
13   Q.    THIS IS AN EMAIL FROM YOU?
14   A.    YES.
15   Q.    TO WHO?
16   A.    TO THE DEFENDANT.
17   Q.    WHEN?
18   A.    ON MARCH 19TH, 2013.
19   Q.    AND THE SUBJECT LINE IS?
20   A.    ACCOUNT SERVICES RETREAT 2013.
21   Q.    AND WHAT IS THAT PURPORTEDLY REFERRING TO?
22   A.    TO THE RETREAT I JUST DISCUSSED.  AN INVITATION TO HAVE
23   A MORE FORMAL, SIT-DOWN, FACE-TO-FACE, LUNCH, DINNER AND
24   BETTER MORE THOROUGH BUSINESS NEGOTIATIONS.
25   Q.    THIS IS A FAIRLY LENGTHY EMAIL, BUT CAN YOU SUMMARIZE
```

APRIL 14, 2015

COLE - DIRECT EXAMINATION

 1  WHAT YOU TOLD DEFENDANT IN THAT EMAIL?

 2  **A.**    YEAH.  IT IS JUST -- IT IS A SUMMARY THAT IT WAS CLEAR,

 3  IT APPEARED, WE WERE GOING TO CONDUCT A LOT OF BUSINESS

 4  TOGETHER, IT WAS GOING TO RANGE INTO THE HUNDREDS OF THOUSANDS

 5  OF DOLLARS, PERHAPS INTO THE MILLIONS.  AND THAT BECAUSE THE

 6  DEFENDANT WAS IN NEW YORK, HIS PARTNER WAS IN DUBAI, THAT IT

 7  WOULD BE -- OR IRAN, IT WOULD BE EASIER TO DEVELOP MORE TRUST

 8  AND ULTIMATELY BE MORE SUCCESSFUL AS BUSINESSMEN IF WE HAD A

 9  CHANCE TO MEET FACE-TO-FACE.

10  **Q.**    DID YOU TELL DEFENDANT TO LET MR. TAHERKHANI KNOW OF

11  YOUR INVITATION?

12  **A.**    YES.

13          **THE CLERK:**  COUNSEL, IS THIS IN EVIDENCE?

14          **MR. HARRIGAN:**  YES, I WOULD MOVE IT INTO EVIDENCE.

15          **MR. JOHNSTON:**  NO OBJECTION.

16          **THE COURT:**  IT IS RECEIVED.

17          (EXHIBIT 118 RECEIVED INTO EVIDENCE)

18  **Q.    (MR. HARRIGAN)** AND DID DEFENDANT ACCEPT YOUR

19  INVITATION?

20  **A.**    YES.

21  **Q.**    WAS THAT A LONG TIME COMING OR QUICKLY?

22  **A.**    NO.  QUICKLY.

23  **Q.**    SHOWING YOU GOVERNMENT'S EXHIBIT NO. 119 FOR

24  IDENTIFICATION.

25  **A.**    OKAY.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   Q.    DO YOU RECOGNIZE THAT EMAIL?

2   A.    YES.

3   Q.    ALL RIGHT.  AND IS THAT DEFENDANT'S REPLY EMAIL TO YOUR

4   INVITATION?

5   A.    YES.

6         MR. HARRIGAN:  WITH THE COURT'S PERMISSION, I MOVE

7   TO ADMIT AND PUBLISH.

8         THE COURT:  ANY OBJECTION?

9         MR. JOHNSTON:  NO, YOUR HONOR.

10        THE COURT:  RECEIVED.

11        (EXHIBIT 119 RECEIVED INTO EVIDENCE)

12  Q.    (MR. HARRIGAN) AND WHEN DID DEFENDANT SEND THAT REPLY

13  EMAIL TO YOU?

14  A.    ON MARCH 20TH, 2013.

15  Q.    THE VERY NEXT DAY?

16  A.    VERY NEXT DAY.

17  Q.    DID HE ACCEPT, LOOKING AT THE CONTENT?

18  A.    YES, HE DID.

19  Q.    AND DID HE PROVIDE CONTACT INFORMATION?

20  A.    YES.

21  Q.    OKAY.  AND AS WELL AS HOTEL PREFERENCE?

22  A.    YES, HE DID.

23  Q.    WHERE DID HE WANT TO STAY?

24  A.    AT THE WYNN.

25  Q.    AT SOME POINT IN TIME DID YOU HAVE LATER COMMUNICATIONS

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  WITH DEFENDANT REGARDING MR. TAHERKHANI COMING TO THE RETREAT?

2  **A.**    YES, I DID.

3  **Q.**    LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT EXHIBIT 121

4  FOR IDENTIFICATION.

5  **A.**    OKAY.

6  **Q.**    DO YOU RECOGNIZE THAT EMAIL?

7  **A.**    YES, I DO.

8  **Q.**    IS THAT EMAIL REGARDING FURTHER COMMUNICATION WITH

9  DEFENDANT?

10  **A.**    YES.

11  **Q.**    AT THE LAS VEGAS RETREAT?

12  **A.**    YES.

13          **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION, I MOVE

14  TO ADMIT AND PUBLISH TO THE JURY.

15          **MR. JOHNSTON:**  NO OBJECTION.

16          **THE COURT:**  RECEIVED.

17          (EXHIBIT 121 RECEIVED INTO EVIDENCE)

18  **Q.**    **(MR. HARRIGAN)** ADDRESSING YOURSELF FIRST, LOOKING AT

19  THE HEADER CONTENT.  OKAY.  THIS IS AN EMAIL FROM WHO?

20  **A.**    IT IS AN EMAIL FROM THE DEFENDANT SENT TO ME ON

21  APRIL 4TH.

22  **Q.**    WHAT'S THE SUBJECT?

23  **A.**    INVITATION LETTER.

24  **Q.**    DID YOU SEND A FORMAL INVITATION LETTER -- YOU SEND A

25  FORMAL INVITATION LETTER TO EITHER DEFENDANT OR MR.

APRIL 14, 2015

445

COLE – DIRECT EXAMINATION

1  TAHERKHANI?

2  **A.**    I DID SEND A FORMAL INVITATION LETTER TO MR. TAHERKHANI

3  THAT WOULD HELP HIM SECURE A VISA TO VISIT THE UNITED STATES.

4  **Q.**    AND THIS EMAIL PERTAINS TO THAT INVITATION LETTER YOU

5  SENT?

6  **A.**    CORRECT.

7  **Q.**    IT ALSO CONTAINS AN ATTACHMENT?

8  **A.**    IT DOES.

9  **Q.**    WHAT IS THE ATTACHMENT?

10  **A.**    THE ATTACHMENT IS THE BIO PAGE OF A PASSPORT FROM MR.

11  TAHERKHANI.

12  **Q.**    NOT GOING TO THE ATTACHMENT YET, BUT LET'S LOOK AT THE

13  CONTENT FIRST.

14  **A.**    OKAY.

15  **Q.**    WHAT DOES THE DEFENDANT REQUEST OF YOU REGARDING THE

16  INVITATION LETTER YOU SENT TO MR. TAHERKHANI?

17  **A.**    THEY REQUEST THAT I REVISE THE INVITATION LETTER SENT TO

18  KOORUSH, AND THAT THEY WOULD –– OR HE WOULD APPRECIATE IT IF I

19  KEEP CONFIDENTIAL THE CONTENT OF THE ATTACHED EMAIL.

20  **Q.**    THE DEFENDANT REQUESTED YOU TO KEEP CONFIDENTIAL THE

21  CONTENT OF THE ATTACHED EMAIL.  AND WHO WAS THAT EMAIL FROM?

22  **A.**    FROM MR. TAHERKHANI.

23  **Q.**    SO IS THAT BELOW ON GOVERNMENT EXHIBIT 121?

24  **A.**    YES, IT IS.

25  **Q.**    LET'S FIRST LOOK AT THE HEADER INFORMATION.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    OKAY.

2    **Q.**    AGAIN, WHAT DATE DID MR. TAHERKHANI SEND THAT?

3    **A.**    ON APRIL 4TH.

4    **Q.**    TO WHOM?

5    **A.**    TO THE DEFENDANT.

6    **Q.**    HIS TIG MARINE ACCOUNT?

7    **A.**    HE SENT IT TO HIS TIG MARINE AND TO HIS YAHOO ACCOUNT.

8    **Q.**    GOING TO THE CONTENT OF THAT.  WHAT DOES -- IN THIS

9    EMAIL, WHAT DOES MR. TAHERKHANI TELL THE DEFENDANT ABOUT THE

10   INVITATION LETTER?

11   **A.**    HE EXPRESSED CONCERNS ABOUT THE INVITATION LETTER THAT I

12   HAD SENT TO HIM SAYING HE WILL BE GOING TO THE EMBASSY SOON,

13   BUT IF POSSIBLE IF I COULD CHANGE THE LETTER SOMEHOW FROM

14   DIRECTING MANAGER TO BUSINESS DEVELOPMENT MANAGER OR OWNER

15   BECAUSE DUE TO HIS NATIONALITY, IN PARENTHESES, AND FOR SMOOTH

16   OPERATION OF THE COMPANY, HE HAD ASSIGNED A GERMAN GUY AS

17   MANAGER ON THE LICENSE.

18   **Q.**    NOW, UP UNTIL THIS POINT WHO HAD YOU BEEN DEALING WITH

19   AS THE DIRECTOR/MANAGER OF TIG MARINE?

20   **A.**    MR. TAHERKHANI.

21   **Q.**    HAD YOU DEALT WITH A GERMAN GUY?

22   **A.**    NO, NEVER.  NO.

23   **Q.**    AND IN YOUR INVITATION TO MR. TAHERKHANI, HOW DID YOU

24   IDENTIFY HIM, HIS POSITION IN TIG MARINE?

25   **A.**    WELL, BASED ON HIS EMAILS AND TITLE HE HAD GIVEN HIMSELF

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    I ADDRESSED HIM AS THE MANAGING DIRECTOR OF TIG MARINE.

2    **Q.**    AND BASED ON YOUR UNDERCOVER ROLE PLAYING DAVID MILLS,

3    THE STATEMENT TO YOU, DUE TO MY KNOWN REASON MY NATIONALITY

4    AND FOR SMOOTH OPERATION OF THE COMPANY, DID THAT HAVE ANY

5    SIGNIFICANCE TO YOU IN TERMS OF YOUR INVESTIGATION?

6    **A.**    YES, IT DID.

7    **Q.**    CAN YOU EXPLAIN THAT?

8    **A.**    WELL, IT HAD A SIGNIFICANCE BECAUSE BASED ON MY

9    EXPERIENCE INVESTIGATING FRONT COMPANIES AND PEOPLE WHO USE

10   FRONT COMPANIES TO PROCURE U.S. GOODS IT IS VERY COMMON THEY

11   PLACE SOMEBODY WHO IS NOT OF THE NATIONALITY IN QUESTION.  IN

12   THIS CASE THEY PLACE SOMEBODY WHO PERHAPS IS NOT IRANIAN TO BE

13   THE HEAD OR THE FOCAL POINT.

14           **MR. JOHNSTON:**  YOUR HONOR, I WILL OBJECT ON THE

15   PREVIOUS IN LIMS, YOUR HONOR'S INSTRUCTION.

16           **THE COURT:**  OVERRULED.

17           THE ANSWER WILL STAND.

18           **MR. HARRIGAN:**  COULD YOU REPEAT THAT LAST PART?

19           **THE WITNESS:**  SO, IN OTHER WORDS, THEY VERY COMMONLY

20   WILL PLACE AN INDIVIDUAL WHO IS OF A DIFFERENT NATIONALITY TO

21   SIT AS THE HEAD OF THE COMPANY.  THAT WOULD MAKE IT EASIER FOR

22   THEM AND LESS SUSPICIOUS TO COMMUNICATE WITH COMPANIES THAT

23   ARE BASED IN THE U.S., EUROPE OR OTHER LOCATIONS.

24   **Q.**    **(MR. HARRIGAN)** NOW LOOKING AT THE ATTACHMENT TO THIS

25   EMAIL.  ALL RIGHT.  AND DO YOU RECOGNIZE THAT?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   **A.**    YES, I DO.

2   **Q.**    IS THAT THE PASSPORT THAT WAS ATTACHED TO THE EMAIL SENT

3   BY DEFENDANT?

4   **A.**    YES, IT IS.

5   **Q.**    AND THAT IS OF WHO?

6   **A.**    OF MR. TAHERKHANI.

7   **Q.**    ALL RIGHT.  AND WHERE DOES IT SHOW HIS PLACE OF BIRTH?

8   **A.**    IS IN IRAN.

9   **Q.**    AND THIS ACTUALLY SHOWS IT IS AN ISLAMIC REPUBLIC OF

10  IRAN PASSPORT?

11  **A.**    IT DOES.

12  **Q.**    AND THE PHOTO WE SHOWED YOU EARLIER CAME FROM THIS

13  PASSPORT, CORRECT?

14  **A.**    YES, IT DID.  CORRECT.

15  **Q.**    DID YOU REPLY TO THE DEFENDANT'S REQUEST THAT YOU KEEP

16  THE INFORMATION YOU FORWARDED FROM MR. TAHERKHANI PRIVATE AND

17  CONFIDENTIAL?

18  **A.**    YES.

19  **Q.**    AT SOME POINT IN TIME DID YOU HAVE FURTHER DISCUSSIONS

20  WITH THE DEFENDANT REGARDING MR. TAHERKHANI ATTENDING THE

21  VEGAS RETREAT OF SOUTH STAR TRADING COMPANY?

22  **A.**    YES.

23  **Q.**    WAS THAT PURSUANT TO A TELEPHONE CONVERSATION OR EMAIL?

24  **A.**    YES.

25  **Q.**    WHICH ONE?

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1    **A.**    THROUGH A TELEPHONE CALL THAT WE HAD.

2    **Q.**    OKAY.  SHOWING YOU WHAT IS BEFORE YOU, LOOKING AT

3    GOVERNMENT'S EXHIBIT 306.  IT IS ANOTHER DISK IN THAT BINDER.

4    **A.**    OKAY.

5    **Q.**    AND DO YOU RECOGNIZE THAT DISK AND WHAT IT CONTAINS?

6    **A.**    YES.

7    **Q.**    IS THAT ONE OF THE TELEPHONE CONVERSATIONS WE JUST

8    TALKED ABOUT?

9    **A.**    YES, IT IS, SIR.

10   **Q.**    WHEN DID THAT OCCUR?

11   **A.**    ON MAY 2ND, 2013.

12   **Q.**    AND THAT OCCURRED WITH WHO?

13   **A.**    WITH THE DEFENDANT.

14   **Q.**    AND YOU REVIEWED THAT BEFORE TESTIFYING HERE TODAY?

15   **A.**    YES.

16   **Q.**    IS THAT THE ENTIRE TELEPHONE CONVERSATION?

17   **A.**    NO.

18   **Q.**    IS IT ONE EXCERPT?

19   **A.**    IT APPEARS TO BE TWO EXCERPTS.

20   **Q.**    AND YOU LISTENED TO BOTH EXCERPTS?

21   **A.**    YES, SIR.

22          **MR. HARRIGAN:**  I WOULD LIKE TO, WITH THE COURT'S

23   PERMISSION, PLAY THE FIRST EXCERPT FROM GOVERNMENT'S

24   EXHIBIT 306.

25          **THE COURT:**  YES.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

```
 1              (AUDIO PLAYED)
 2   Q.    (MR. HARRIGAN) IN THE ENTIRE CONTEXT OF THAT, OR THE
 3   ENTIRE CONVERSATION, DID DEFENDANT INDICATE TO YOU WHETHER MR.
 4   TAHERKHANI NOW WAS GOING TO COME TO THE UNITED STATES?
 5   A.    HE INDICATED MR. TAHERKHANI WAS NO LONGER GOING TO
 6   TRAVEL TO THE U.S.
 7   Q.    AND HE TELLS YOU, WHEN YOU TALK TO HIM, WE HAVE NEWS
 8   THAT SOMEBODY WANT TO PURCHASE SOMETHING FROM THE U.S. OR GO
 9   TO JAIL OR SOMETHING.
10   A.    CORRECT.
11   Q.    AND THOSE WERE DEFENDANT'S WORDS?
12   A.    YES.
13   Q.    AND YOU SAY, IN RESPONSE TO THAT, I DON'T KNOW WHY YOU
14   WOULD THINK THAT.  CORRECT?
15   A.    CORRECT.
16   Q.    NOW, WERE YOU SAYING THAT IN YOUR ROLE AS DAVID MILLS OR
17   SPECIAL AGENT DAVID COLE?
18   A.    NO, I WAS SAYING THAT IN THE ROLE OF DAVID MILLS.
19   Q.    COULD YOU EXPLAIN THAT TO THE JURY?
20   A.    WELL, BECAUSE THAT IS WHERE, OBVIOUSLY, TIMES WHEN YOU
21   ARE DOING UNDERCOVER IT BECOMES, I DON'T KNOW DIFFICULT, BUT
22   OBVIOUSLY THE ROLE OF DAVID COLE, THAT WAS VERY POSSIBLE.
23         IN THE ROLE OF DAVID MILLS AND WHAT I WAS SELLING WE
24   VERY MUCH WANTED TO HAVE A BUSINESS MEETING, AND DAVID MILLS
25   HAD NO INTEREST IN ARRESTING HIM.
```

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   **Q.**   SO AFTER YOU RECEIVED THE 28,000 DOWN PAYMENT IN, I

2   GUESS, MARCH OF 2013, WHEN WAS THE NEXT PAYMENT DUE?

3   **A.**   30 DAYS AFTER THAT PAYMENT.

4   **Q.**   SO EARLY APRIL 2013?

5   **A.**   CORRECT.

6   **Q.**   AND AFTER YOU FINALIZED THAT CONTRACT YOU SHOWED US FOR

7   THE 50 Y-690'S IN, I THINK, APRIL 2013, WAS A DOWN PAYMENT

8   DUE?

9   **A.**   YES.

10   **Q.**   HOW MUCH?

11   **A.**   FOR THE Y-690'S, ROUGHLY $10,000.

12   **Q.**   SO BY APRIL DID DEFENDANT KOORUSH OR TIG MARINE MAKE ANY

13   ADDITIONAL PAYMENTS ON THE CONTRACT FOR THE GYROCOMPASSES?

14   **A.**   NO.

15   **Q.**   BY MAY?

16   **A.**   NOPE.

17   **Q.**   WHAT ABOUT THE Y-690'S, WAS THERE ANY DOWN PAYMENT IN

18   APRIL?

19   **A.**   NOPE.

20   **Q.**   HOW ABOUT MAY?

21   **A.**   NO.  NO MORE PAYMENTS.

22   **Q.**   DURING THE TIME PERIOD DID YOU HAVE DISCUSSIONS WITH

23   DEFENDANT ABOUT THEIR FAILURE TO MAKE ADDITIONAL PAYMENTS

24   UNDER THE CONTRACT?

25   **A.**   YES, I DID.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   **Q.**   DID YOU ALSO HAVE COMMUNICATIONS WITH MR. TAHERKHANI?

2   **A.**   YES.

3   **Q.**   THOSE ARE BY AN EMAIL?

4   **A.**   BY EMAIL.

5   **Q.**   WERE THERE MANY OR FEW?

6   **A.**   NO, THERE WERE MANY.

7   **Q.**   GENERALLY, WHAT WERE DEFENDANT'S EXPLANATIONS TO YOU WHY

8   THEY COULDN'T MAKE THE PAYMENTS?

9   **A.**   OH, I MEAN, THERE WERE MANY.  BANKING ISSUES,

10   INTERNATIONAL BANKING REGULATIONS, DELAYS IN TRANSFERS,

11   DIFFICULTY MOVING MONEY.  THERE WAS A LITANY OF DIFFERENT

12   REASONS.

13   **Q.**   AND DID THEY WANT MODIFICATIONS?  DID THE DEFENDANT WANT

14   MODIFICATIONS TO THE CONTRACT?

15   **A.**   YES.

16   **Q.**   AND THAT WAS RELATED TO YOU BY DEFENDANT?

17   **A.**   CORRECT.

18   **Q.**   WHAT ARE SOME OF THE THINGS THEY WANTED YOU TO DO?

19   **A.**   THE MAIN CRUX OF THE MODIFICATIONS WAS THEY WANTED --

20   AND I AM NO BANKING EXPERT, BUT SOME SORT OF A BANKING

21   GUARANTEE PUT IN OR A LETTER OF CREDIT THAT WOULD SOMEHOW

22   INSULATE THEM IN THE EVENT THAT THEY DID NOT GET THEIR GOODS

23   DELIVERED SUCCESSFULLY, THEY COULD SOMEHOW GET THEIR MONEY

24   BACK.

25   **Q.**   THEY WANTED MORE SECURITY.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  **A.**    MORE SECURITY.

2  **Q.**    DID THAT HAVE ANY SIGNIFICANCE TO YOU IN YOUR UNDERCOVER

3  INVESTIGATION?

4  **A.**    IT DID.  IT HAD A LOT OF SIGNIFICANCE.

5  **Q.**    WHAT IS THAT SIGNIFICANCE?

6  **A.**    IT IS SOMETHING WE SEE VERY COMMONLY BECAUSE WHEN A

7  BUYER IS IN A LOCATION THAT IS EMBARGOED AND THEY KNOW THEY

8  ARE ENGAGED IN ILLEGAL ACTIVITY, THEY ARE ALWAYS VERY PANICKED

9  TO MAKE A LARGE INVESTMENT FINANCIALLY BECAUSE THEY KNOW IF

10 THEY ARE RIPPED OFF --

11         **MR. JOHNSTON:**  YOUR HONOR, SAME OBJECTION,

12 INSTRUCTION.

13         **THE COURT:**  OVERRULED.

14         **THE WITNESS:**  WHICH HAPPENS VERY FREQUENTLY, THEY

15 ARE TAKEN ADVANTAGE OF, THEN THEY HAVE NO RECOURSE; WHEREAS A

16 NORMAL PERSON COULD WALK INTO COURT AND FILE A LAWSUIT, THEY

17 DON'T HAVE THOSE MEANS.  NO DIFFERENT THAN A DRUG TRAFFICKER

18 COULD WALK IN AND SAY HE DIDN'T DELIVER ME MY DRUGS.

19         **MR. JOHNSTON:**  OBJECTION.  403.

20         **THE COURT:**  SUSTAINED ON THE LAST ONE.

21         **MR. JOHNSTON:**  MOVE TO STRIKE.

22         **MR. HARRIGAN:**  STRIKE WHAT PORTION?  THE LAST

23 PORTION I HAVE NO OBJECTION.

24         **THE COURT:**  THE LAST PORTION IS STRICKEN.

25 **Q.**    **(MR. HARRIGAN)** NOW, DID THEY HAVE ANY DISCUSSIONS ABOUT

COLE – DIRECT EXAMINATION

 1    THE BANK YOU WERE USING, DID DEFENDANT HAVE ANY DISCUSSIONS

 2    WITH YOU?

 3    **A.**    YES.

 4    **Q.**    FOR THE BANK GUARANTEE?

 5    **A.**    YES.

 6    **Q.**    AND WHAT DID DEFENDANT REQUEST OF YOU?

 7    **A.**    THE DEFENDANT REQUESTED THAT WE USE A DIFFERENT BANK IN

 8    ORDER TO EFFECTUATE THE BANK GUARANTEE.

 9    **Q.**    AND THAT WAS DONE AT –– HE TOLD YOU AT TAHERKHANI'S

10    REQUEST?

11    **A.**    CORRECT.

12    **Q.**    AND WHAT DID YOU EXPLAIN TO DEFENDANT ABOUT WHY HIS ––

13    ABOUT HIS AND DEFENDANT'S REQUEST –– TAHERKHANI'S AND

14    DEFENDANT'S REQUEST TO CHANGE BANKS?

15    **A.**    I EXPLAINED THAT IS A BAD IDEA BECAUSE THE BANK THAT WE

16    WERE USING WE HAD AN INSIDE CONNECTION WITH THAT WOULD

17    INSULATE OUR ILLEGAL ACTIVITY FROM BEING EXPOSED.  AND THAT IF

18    WE WENT TO A LARGE PUBLICALLY TRADED BANK, SOMEBODY FROM THE

19    UNDERWRITING DEPARTMENT OR A LAWYER WOULD REVIEW THE CONTRACT

20    BEFORE GIVING A BANK GUARANTEE, AND MOST CERTAINLY CONTACT THE

21    MANUFACTURER; AT WHICH TIME NORTHROP GRUMMAN OR CPI WOULD SAY

22    NO, THAT IS INCORRECT, SOUTH STAR TRADING DID NOT PURCHASE

23    THAT FOR DELIVERY TO DUBAI, THEY PURCHASED THAT FOR DELIVERY

24    TO PANAMA OR TO THE CZECH REPUBLIC.

25         I TOLD THEM THAT WOULD MOST CERTAINLY GET US CAUGHT IF

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   WE WERE TO DO THAT.

2   **Q.**    AND DID YOU ULTIMATELY TELL DEFENDANT, WHAT WOULD THE

3   RISK BE?

4   **A.**    THE RISK WOULD BE THAT WE WOULD ALL GET CAUGHT AND WE

5   WOULD ALL GO TO JAIL.

6   **Q.**    NOW, AT ANY POINT IN TIME DURING THIS TWO–MONTH PERIOD

7   WHEN YOU ARE WAITING FOR FURTHER PAYMENTS, DID YOU COMMUNICATE

8   WITH EITHER THE DEFENDANT OR MR. TAHERKHANI THAT YOU AND SOUTH

9   STAR TRADING WOULD TAKE ANY ACTION BECAUSE OF THEIR FAILURE TO

10  MAKE PAYMENTS UNDER THE CONTRACT?

11  **A.**    YES, I DID.

12  **Q.**    WHAT DID YOU TELL THEM –– WHAT DID YOU TELL DEFENDANT?

13  **A.**    I TOLD THE DEFENDANT THAT BASED ON THE FACT WE HAD A

14  CONTRACT IN PLACE, SIGNED BY ALL PARTIES, AND THEY HAD FAILED

15  TO LIVE UP TO THEIR END OF THE CONTRACT, AT NO FAULT OF OURS,

16  THAT WE ARE GOING TO BE FORCED TO MOVE ON AND SELL OR ENGAGE

17  IN A CONTRACT TO SELL THE GYROCOMPASSES TO A DIFFERENT BUYER.

18       AND THAT IF HE WANTED, THE MONEY THAT THEY HAD ALREADY

19  PAID COULD BE CREDITED TOWARDS THE PURCHASE OF THE Y–690'S OR

20  A DIFFERENT PRODUCT THEY WANTED, BUT WE WERE NO LONGER GOING

21  TO HOLD THE GYROCOMPASSES ON THEIR BEHALF.

22  **Q.**    LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S

23  EXHIBIT 123 FOR IDENTIFICATION.

24  **A.**    OKAY.

25  **Q.**    TAKING A LOOK AT THAT –– IT IS AN EMAIL.  TAKING A LOOK

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  AT THAT EMAIL, DO YOU RECOGNIZE THAT?

2  **A.**    YES.

3  **Q.**    IS THAT YOUR EMAIL COMMUNICATIONS THAT YOU JUST

4  DISCUSSED?

5  **A.**    YES.

6  **Q.**    AND THAT IS AN EMAIL CHAIN, CORRECT?

7  **A.**    CORRECT.

8  **Q.**    MORE THAN ONE EMAIL, RIGHT?

9  **A.**    CORRECT.

10  **Q.**    OKAY.

11          **MR. HARRIGAN:**  FIRST, IF THERE IS NO OBJECTION, I

12  MOVE TO ADMIT INTO EVIDENCE.

13          **MR. JOHNSTON:**  NO OBJECTION.

14          **THE COURT:**  RECEIVED.

15          (EXHIBIT 123 RECEIVED INTO EVIDENCE)

16          **MR. HARRIGAN:**  PUBLISH IT TO THE JURY.

17  **Q.**    **(MR. HARRIGAN)** LET'S START AT THE BOTTOM OF THE

18  GOVERNMENT EXHIBIT PAGE 1 OF 123.

19  **A.**    OKAY.

20  **Q.**    OKAY.  AND THAT'S AN EMAIL FROM WHO?

21  **A.**    IT WAS AN EMAIL SENT BY ME TO THE DEFENDANT AND TO MR.

22  TAHERKHANI.

23  **Q.**    OKAY.  AND IN THAT DO YOU DISCUSS WHAT YOU JUST

24  SUMMARIZED?

25  **A.**    CORRECT.  THAT THEY BREACHED THE CONTRACT, WE WERE

APRIL 14, 2015

COLE – DIRECT EXAMINATION

```
 1   ALMOST TWO MONTHS LATE.  AND THERE WAS NO MORE TIME TO DISCUSS
 2   BANKING PROBLEMS, ERRORS, OR WHATEVER ELSE.
 3   Q.    DID THEY RESPOND TO YOUR EMAIL?
 4   A.    YES.
 5   Q.    GOING TO THE TOP OF THE EMAIL.  AND THIS IS AN EMAIL
 6   FROM WHO?
 7   A.    FROM MR. TAHERKHANI.
 8   Q.    WHAT DATE?
 9   A.    MAY 2ND, 2013.
10   Q.    SO COUPLE DAYS AFTER YOUR EMAIL?
11   A.    CORRECT.
12   Q.    TO YOU?
13   A.    TO ME, TO THE DEFENDANT, AND ANOTHER INDIVIDUAL.
14   Q.    OKAY.  AND WHAT DOES MR. TAHERKHANI TELL YOU ABOUT
15   CANCELING THE DEAL?
16   A.    IN SHORT THAT THAT WOULD BE BAD FOR HIM, THAT THE DEAL
17   IS VERY MUCH ALIVE FOR HIM.  IT WOULD RESULT IN PROBLEMS FOR
18   HIM.  AND THAT HE WAS MAKING EVERY EFFORT TO GET THE PAYMENT
19   MADE.  AND THAT HE WAS NOW GOING TO TRY AND USE AN INDIVIDUAL
20   IN GERMANY TO HELP MOVE THE MONEY ALONG.
21   Q.    PRIOR TO THIS POINT HAD YOU BEEN DEALING WITH ANYBODY IN
22   GERMANY?
23   A.    NO, NEVER.
24   Q.    DID YOU CANCEL THE CONTRACT --
25   A.    NO.
```

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1   **Q.**     -- AT THAT TIME?

2   **A.**     NO, I DID NOT.

3   **Q.**     OR ANY TIME?

4   **A.**     NO.

5   **Q.**     IN YOUR ROLE AS DAVID COLE UNDERCOVER AGENT, WHY NOT?

6   **A.**     IN MY ROLE AS DAVID COLE, BECAUSE WE ARE STILL GATHERING

7   EVIDENCE.  AT THIS POINT WE HAD A LOT OF EVIDENCE TO INDICATE

8   WHAT WE THOUGHT WAS HAPPENING WAS, SO WE CONTINUED TO

9   NEGOTIATE IN AN EFFORT TO OBTAIN EVEN MORE EVIDENCE.

10  **Q.**     SO DID YOU HAVE FUTURE CONVERSATIONS REGARDING THE

11  EFFORTS TO SOLVE THE LATE PAYMENT PROBLEMS?

12  **A.**     YES.

13  **Q.**     LET ME SHOW YOU -- OR HAVE YOU TAKE A LOOK AT THE DISK

14  MARKED GOVERNMENT'S EXHIBIT 307 BEFORE YOU.

15  **A.**     OKAY.

16  **Q.**     DO YOU RECOGNIZE THAT DISK?

17  **A.**     YES.

18  **Q.**     IS THAT A TELEPHONE -- RECORDED TELEPHONE CONVERSATION?

19  **A.**     YES.

20  **Q.**     THAT IS CONTAINED THEREON?

21  **A.**     YES, SIR.

22  **Q.**     WITH WHO?

23  **A.**     WITH MYSELF AND THE DEFENDANT.

24  **Q.**     OF WHAT DATE?

25  **A.**     MAY 3RD, 2013.

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1  **Q.**    AND YOU LISTENED TO THAT BEFORE COMING HERE TODAY?

2  **A.**    YES.

3  **Q.**    IS IT THE ENTIRE CONVERSATION?

4  **A.**    NO, JUST ONE EXCERPT.

5          **MR. HARRIGAN:**  ONE MOMENT, YOUR HONOR.

6  **Q.**    **(MR. HARRIGAN)** AND IN THAT TELEPHONE CONVERSATION YOU

7  HAD FURTHER DISCUSSIONS REGARDING THE PAYMENT PROBLEMS?

8  **A.**    YES.

9          **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION, I WOULD

10  MOVE TO PUBLISH THAT FOR THE JURY.

11          **THE COURT:**  YES.

12          (AUDIO PLAYED)

13  **Q.**    **(MR. HARRIGAN)** NOW, DURING THAT EXCERPT CONVERSATION

14  DEFENDANT TALKS ABOUT USING HIS OWN BANK ACCOUNT.  CAN YOU

15  EXPLAIN THAT IN THE CONTEXT OF THE ENTIRE CONVERSATION?

16  **A.**    YEAH.  SO IN THE ENTIRE CONTEXT, THERE WAS A PROPOSAL

17  THAT MR. TAHERKHANI COULD POSSIBLY TRANSFER MONEY DIRECTLY TO

18  THE DEFENDANT IN THE U.S., AND THEN DEFENDANT THEN WOULD BE IN

19  CHARGE OF MAKING THE PAYMENTS FROM NEW YORK TO US IN

20  CALIFORNIA.

21  **Q.**    WAS THIS A SUGGESTION MADE IN TERMS TO RELIEVE THE

22  STALEMATE?

23  **A.**    TO RELIEVE THE STALEMATE, EXACTLY.

24  **Q.**    WAS DEFENDANT AGREEABLE TO THAT?

25  **A.**    YES, HE WAS.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  **Q.**    AND DURING THAT CONVERSATION DEFENDANT SAID HE WOULD DO

2  THAT, BUT HE DIDN'T WANT TO BE THE EXPORTER.

3       BASED ON THE CONTEXT OF THE ENTIRE CONVERSATION, WHAT

4  WAS YOUR UNDERSTANDING OF WHAT HE SAID WHEN HE TOLD YOU, I

5  DON'T WANT TO BE THE EXPORTER.

6  **A.**    THAT HE WAS HAPPY TO CONTINUE THE DEAL AS SET.  AND HE

7  WOULD HELP FACILITATE THE PAYMENT BUT HE DIDN'T WANT HIS HANDS

8  PHYSICALLY TO BE THE PERSON WHO EXPORTED OR SMUGGLED THE GOODS

9  OUT OF THE U.S.

10 **Q.**    DID HE EVER TELL YOU THAT HE DIDN'T WANT THE GOODS TO

11 GET OUT OF THE U.S.?

12 **A.**    NEVER.

13 **Q.**    IN THAT CONVERSATION?

14 **A.**    NEVER.

15 **Q.**    IN ANY FUTURE CONVERSATION?

16 **A.**    NEVER.

17 **Q.**    AS OF MID MAY, HAD THE DEFENDANT OR MR. TAHERKHANI MADE

18 ANY PAYMENTS ON THE Y-690?

19 **A.**    NO.

20 **Q.**    AT THAT POINT IN TIME, IN YOUR ROLE AS DAVID MILLS, DID

21 YOU HAVE A DISCUSSION WITH DEFENDANT ABOUT THE AVAILABILITY OF

22 Y-690'S FOR PURCHASE?

23 **A.**    YES.

24 **Q.**    CAN YOU DESCRIBE THAT TO THE LADIES AND GENTLEMEN OF THE

25 JURY.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    ESSENTIALLY EXPLAINED THAT THERE WAS GOING TO BE A
2    POSSIBILITY FOR US TO PICK UP A DECENT AMOUNT OF Y-690'S THAT
3    WERE BEING PRODUCED ON ANOTHER ORDER, AND THAT IF THEY WANTED
4    US TO GET IN ON THAT, THAT WE COULD.  HOWEVER, IF WE AGREED TO
5    DO THAT, THEY WOULD AGREE TO THEN SEND THE DOWN PAYMENT
6    IMMEDIATELY AFTER WE GAVE THEM PROOF ON PAPER THAT THE ORDER
7    HAD BEEN MADE AND PAID FOR.
8    **Q.**    DID YOU THEN HAVE DISCUSSIONS WITH DEFENDANT ABOUT THAT
9    PROPOSAL?
10   **A.**    YES.
11   **Q.**    AND ULTIMATELY DID DEFENDANT AND MR. TAHERKHANI AGREE?
12   **A.**    YES.
13   **Q.**    AND WHAT DID THEY AGREE TO?
14   **A.**    THEY AGREED TO DO THE DEAL AND MAKE THE FULL 10 PERCENT
15   DOWN PAYMENT AFTER WE PROVIDED PAPERWORK SHOWING THAT WE HAD
16   PURCHASED AND PAID THE MANUFACTURER.
17   **Q.**    AND DID YOU -- ARE THESE COMMUNICATIONS REPRESENTED IN
18   PHONE CALLS AND EMAILS THAT YOU HAD WITH DEFENDANT?
19   **A.**    YES, THEY ARE.
20   **Q.**    SHOWING YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 308.
21   IT IS IN THE BINDER BEFORE YOU.  IT IS ANOTHER CD CONTAINING
22   AN AUDIO EXCERPT, A TELEPHONE CALL.
23   **A.**    OKAY.
24   **Q.**    YOU HAVE SEEN THAT BEFORE?
25   **A.**    YES, SIR.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **Q.**    HAVE YOU REVIEWED THE CONTENTS OF THAT AUDIO DISK?

2    **A.**    YES.

3    **Q.**    AND DOES THAT CONTAIN AN UNDERCOVER TELEPHONE

4    CONVERSATION YOU HAD?

5    **A.**    YES.

6    **Q.**    WITH WHO?

7    **A.**    WITH THE DEFENDANT.

8    **Q.**    ON WHAT DATE?

9    **A.**    ON MAY 13TH, 2013.

10   **Q.**    AND WAS IT REGARDING THE Y-690 TRANSACTION?

11   **A.**    YES.

12          **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION, I MOVE

13   TO PUBLISH THAT TO THE JURY.

14          **THE COURT:**  YES.

15          (AUDIO PLAYED)

16   **Q.**    **(MR. HARRIGAN)** DURING THAT CONVERSATION YOU TALK ABOUT

17   BECAUSE OF THE STATUS OF THE Y-690 AND THE EXPORT

18   RESTRICTIONS, THAT DEFENDANT AND KOORUSH HAVE TO REMEMBER TO

19   KEEP THINGS PRIVATE AND CONFIDENTIAL.

20   **A.**    CORRECT.

21   **Q.**    ALL RIGHT.  DID DEFENDANT INDICATE THAT HE UNDERSTOOD

22   WHAT YOU WERE SAYING?

23   **A.**    YES.

24   **Q.**    DID HE EVER, DURING THAT ENTIRE CONVERSATION, EXPRESS

25   ANY SURPRISE TO YOUR COMMENTS TO KEEP THIS PRIVATE AND

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    CONFIDENTIAL?

2    **A.**    NO.

3    **Q.**    DID HE EVER OBJECT TO YOUR REQUEST TO KEEP IT PRIVATE

4    AND CONFIDENTIAL?

5    **A.**    NO, NEVER.

6    **Q.**    AND, IN YOUR ROLE AS DAVID MILLS, YOU WERE TELLING

7    DEFENDANT TO KEEP IT PRIVATE AND CONFIDENTIAL.  AGAIN, WHY?

8    **A.**    BECAUSE WHAT WE WERE DOING WAS ILLEGAL.

9    **Q.**    AND AFTER THE TELEPHONE CONVERSATION OF MAY 13TH, DID

10   YOU HAVE A FURTHER TELEPHONE CONVERSATION WITH THE DEFENDANT

11   ABOUT THE Y-690 TRANSACTION?

12   **A.**    YES.

13   **Q.**    AND SHOWING YOU WHAT IS MARKED AS GOVERNMENT'S

14   EXHIBIT 309.  AGAIN, THIS IS IN THE BINDER BEFORE YOU.  IT IS

15   A CD.

16   **A.**    OKAY.

17   **Q.**    ALL RIGHT.  DO YOU RECOGNIZE THAT CD?

18   **A.**    YES.

19   **Q.**    DOES IT CONTAIN AN AUDIO FILE OF AN EXCERPT OF A

20   RECORDED TELEPHONE CONVERSATION YOU MADE?

21   **A.**    YES, IT DOES.

22   **Q.**    AND WHO WAS THAT PHONE CALL WITH?

23   **A.**    WITH THE DEFENDANT.

24        **MR. HARRIGAN:**  AND WITH THE COURT'S PERMISSION, I

25   WOULD MOVE TO PUBLISH AND PLAY THAT FOR THE JURY.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1        **THE COURT:**  YES.

2            (AUDIO PLAYED)

3    **Q.    (MR. HARRIGAN)** SO CAN YOU EXPLAIN TO US THAT DISCUSSION

4    AND THAT CONVERSATION ABOUT EXPORT LAWS AND YOUR REQUEST TO

5    DEFENDANT TO REMIND KOORUSH OF THOSE EXPORT LAWS?

6    **A.**    YEAH.  I SIMPLY WANTED HIM TO REMIND KOORUSH OF THE RISK

7    THAT THE DEFENDANT AND I WERE TAKING BECAUSE WE WERE THE ONES

8    PHYSICALLY LOCATED IN THE U.S.  AND IF SOMETHING WERE TO GO

9    SIDEWAYS WE WOULD BE THE ONES TO IMMEDIATELY FEEL THE PROBLEM

10   OF THAT.

11   **Q.**    AND BY RISK YOU MEANT WHAT?

12   **A.**    ABOUT GETTING ARRESTED.

13   **Q.**    AND GOING TO JAIL?

14   **A.**    AND GOING TO JAIL.

15   **Q.**    DID YOU LATER HAVE MORE OVERT DISCUSSIONS WITH DEFENDANT

16   ABOUT SPECIFICALLY GOING TO JAIL?

17   **A.**    YES, WE DID.  NUMEROUS TIMES.

18   **Q.**    AFTER THAT CONVERSATION DID YOU HAVE FURTHER EMAIL

19   COMMUNICATIONS WITH DEFENDANT REGARDING THE Y-690 TRANSACTION?

20   **A.**    YES.

21   **Q.**    AND I KNOW WE ARE TREATING THIS SEPARATELY, BUT AT THE

22   SAME TIME YOU WERE HAVING THE Y-690 DISCUSSIONS WERE YOU

23   CONTINUING TO HAVE DISCUSSIONS ABOUT THE PAYMENTS FOR THE

24   GYROCOMPASSES?

25   **A.**    YEAH, THEY WERE GOING SIMULTANEOUSLY.  THEY NEVER

APRIL 14, 2015

COLE - DIRECT EXAMINATION

1   STOPPED.  THEY WERE ALWAYS GOING AT THE SAME TIME.

2   **Q.**    SHOWING YOU GOVERNMENT'S EXHIBIT 124.  DO YOU RECOGNIZE

3   THAT EMAIL?

4   **A.**    YES.

5   **Q.**    IS THAT AN EMAIL THAT YOU SENT OR RECEIVED?

6   **A.**    IT IS AN EMAIL THAT I SENT.

7   **Q.**    TO WHOM?

8   **A.**    TO THE DEFENDANT.

9   **Q.**    REGARDING WHAT?

10  **A.**    REGARDING THE PURCHASE ORDER THAT I PLACED WITH THE

11  MANUFACTURER OF THE Y-690.

12  **Q.**    OKAY.

13          **MR. HARRIGAN:**  IF THERE IS NO OBJECTION, I WOULD

14  MOVE TO PUBLISH THIS.

15          **MR. JOHNSTON:**  NO OBJECTION.

16          **MR. HARRIGAN:**  AND ADMIT IT.

17          **THE COURT:**  RECEIVED.

18          (EXHIBIT 124 RECEIVED INTO EVIDENCE)

19  **Q.**    **(MR. HARRIGAN)** FIRST STARTING WITH THE HEADER

20  INFORMATION.  AND WHEN DID YOU SEND THAT EMAIL?

21  **A.**    ON MAY 16TH, 2013.

22  **Q.**    AND THE SUBJECT IS?

23  **A.**    IS Y-690 ORDER.

24  **Q.**    AND AGAIN YOU ATTACHED WHAT TO IT?

25  **A.**    A PURCHASE ORDER THAT I HAD PLACED WITH THE

APRIL 14, 2015

1   MANUFACTURER.

2   **Q.**    IS THIS BASED ON PREVIOUS DISCUSSIONS YOU HAD HAD WITH

3   THEM ABOUT THE OPPORTUNITY TO PLACE AN ORDER IF THEY WERE TO

4   PUT THE DOWN PAYMENT DOWN?

5   **A.**    CORRECT.  EXACTLY WHAT HAPPENED.

6   **Q.**    LET'S LOOK AT THE CONTENT OF THAT EMAIL.

7   **A.**    OKAY.

8   **Q.**    WHAT DO YOU TELL DEFENDANT ABOUT HOW YOU WOULD OBTAIN

9   THOSE Y-690'S?

10   **A.**    THAT BECAUSE OF THE SENSITIVITY OF THE ORDER THAT I

11   OBTAINED THEM BY USING FALSE END USER INFORMATION, AND THAT WE

12   WERE GOING TO GET A LICENSE TO GET THEM OUT OF THE U.S. BY

13   MEANS OF USING A FALSE END USER IN THE CZECH REPUBLIC.

14   **Q.**    AND YOU ALSO SAID -- YOUR LAST SENTENCE AGAIN?

15   **A.**    WE WILL TALK TOMORROW AFTER BRIAN HAS FORWARDED --

16   **Q.**    THE LAST --

17   **A.**    SORRY.  SORRY.  SORRY.

18         IT IS IMPORTANT ALL PARTIES KEEP THIS INFORMATION VERY

19   PRIVATE.

20   **Q.**    FAIR TO SAY THAT WAS A REPEATED THEME OF YOUR

21   COMMUNICATIONS?

22   **A.**    YEAH.  THROUGHOUT WE ALWAYS MADE AN EFFORT TO MAKE SURE

23   THINGS WERE KEPT PRIVATE AND CONFIDENTIAL.

24   **Q.**    DID THE DEFENDANT EVER QUESTION WHY YOU WERE KEEPING

25   THINGS PRIVATE AND CONFIDENTIAL?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **A.**    NO, NEVER.

2    **Q.**    THERE IS ALSO MENTION, WORD OF BRIAN IN THAT EMAIL AND

3    THE SBLC.  AND CAN YOU FIRST EXPLAIN WHAT SBLC IS?

4    **A.**    SBLC STANDS FOR STANDBY LETTER OF CREDIT, WHICH IS A

5    BANKING TERM USED TO HELP ASSIST CONTRACTS AND THE FLOW OF

6    PAYMENTS.

7    **Q.**    IS IT A PRIMARY METHOD OF PAYMENT?

8    **A.**    IT IS NOT A PRIMARY, NO.  IT IS A SECONDARY.

9    **Q.**    IN CASE A PARTY DOES NOT --

10   **A.**    IN CASE A PARTY FAILS TO PERFORM ON THE PRIMARY METHOD

11   OF PAYMENT.

12   **Q.**    AND IN TERMS OF BRIAN, WHO IS BRIAN?

13   **A.**    BRIAN IS ANOTHER UNDERCOVER AGENT THAT WAS PLAYING THE

14   ROLE OF A FINANCIAL EXPERT.

15   **Q.**    AND IN TERMS OF FINANCIAL EXPERT, HELPING YOUR COMPANY

16   DO WHAT?

17   **A.**    HELPING OUR COMPANY COMPLETE THIS DEAL WITH THE

18   DEFENDANT AND MR. TAHERKHANI, AND USE A LETTER OF CREDIT THAT

19   WOULD NOT GET US FOUND OUT BY THE BANKS AND GET US ARRESTED.

20   **Q.**    WAS HE PLAYING INSIDE MAN IN A BANK FOR YOU?

21   **A.**    HE WAS.

22   **Q.**    SO LOOKING AT THE ATTACHMENT TO THIS EMAIL.

23   **A.**    OKAY.

24   **Q.**    OKAY.  DO YOU RECOGNIZE THAT ATTACHMENT?

25   **A.**    YES, I DO.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    **Q.**    AND CAN YOU DESCRIBE GENERALLY WHAT IT IS?

2    **A.**    IT IS A PURCHASE ORDER FROM THE MANUFACTURER, CPI, TO

3    SOUTH STAR TRADING FOR 50 OF THE Y-690'S.

4    **Q.**    IS THIS A REAL FORM OR BASED ON A REAL CPI FORM?

5    **A.**    IT IS A REAL PURCHASE ORDER THAT THEY WOULD USE, SIMPLY

6    IT NEVER WAS FILED.

7    **Q.**    DID YOU OR SOMEONE ELSE MOCK UP THIS FORM?

8    **A.**    CORRECT.  THE SALESPERSON FROM THE MANUFACTURER.

9    **Q.**    AND YOU ATTACHED THIS EMAIL TO DEFENDANT AS PROOF OF

10   WHAT?

11   **A.**    PROOF THAT WE HAD ACTUALLY FOLLOWED THROUGH AND MADE THE

12   PURCHASE FOR THE ORDER THEY REQUESTED.

13   **Q.**    OKAY.

14   **A.**    AND WE PAID FOR IT.

15   **Q.**    AND IN THE BODY OF --

16        **MR. HARRIGAN:**  CAN WE GO BACK TO THE EMAIL ITSELF.

17   I AM SORRY.  OKAY.

18   **Q.**    **(MR. HARRIGAN)**  THE SECOND PARAGRAPH YOU SAY, AS YOU

19   WILL SEE ON THE INVOICE THE MANUFACTURER ADDED SEVERAL LINES

20   OF EXPORT INFORMATION.

21        AND LET'S GO BACK TO THE ATTACHMENT AND FOCUS ON WHAT

22   YOU WERE REFERRING TO.

23   **A.**    OKAY.

24   **Q.**    CAN YOU POINT THAT OUT?

25   **A.**    YEAH, IT IS RIGHT THERE.  YEAH.

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   Q.    OKAY.  AND WHAT LICENSING INFORMATION WERE YOU REFERRING

2   TO?

3         MR. JOHNSTON:  YOUR HONOR, IF I COULD HAVE ONE

4   MOMENT?

5         (DISCUSSION OFF THE RECORD BETWEEN COUNSEL)

6         THE COURT:  YES.

7         MR. HARRIGAN:  ONE MOMENT.  I THINK WE DIDN'T GET

8   THE ATTACHMENT IN THAT EXHIBIT.

9         MR. JOHNSTON:  YOUR HONOR, WE DO RAISE AN OBJECTION

10  TO THIS PART OF THE EMAIL.  IT WAS A PREVIOUSLY RAISED

11  OBJECTION THAT WE MAINTAIN.  THIS GOES TO THE LIMITING

12  INSTRUCTION ISSUE.  I WOULD HAVE RAISED IT EARLIER, BUT I

13  DIDN'T HAVE THE PAGE.

14        THE COURT:  THIS WAS THE SUBJECT OF THE LIMITING

15  INSTRUCTION?

16        MR. JOHNSTON:  YES.

17        THE COURT:  IN THAT REGARD I WOULD OVERRULE THE

18  OBJECTION, SINCE WE HAVE GIVEN AN ADMONITION.

19        MR. HARRIGAN:  ONE MOMENT, YOUR HONOR.  I APOLOGIZE.

20        MR. JOHNSTON:  JUST TO BE CLEAR, WE MAINTAIN OUR 403

21  AND 404(B) OBJECTION.

22        THE COURT:  YES.

23  Q.    (MR. HARRIGAN) WE WERE TALKING ABOUT THE SPECIFIC

24  EXPORT LANGUAGE ON THE CPI PURCHASE ORDER FORM.  WHAT WERE YOU

25  REFERRING TO IN YOUR EMAIL, LOOKING AT THAT PURCHASE ORDER?

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1  **A.**    I WAS REFERRING TO THE PARAGRAPH WHERE THE MANUFACTURER

2  LISTED OUT NUMEROUS LINES OF EXPORT LITERATURE, STATING THAT

3  THE ITEM REQUIRED AN EXPORT LICENSE, TO EXPORT WITHOUT ONE WAS

4  ILLEGAL, TO TRANSSHIP IT ON TO SOMEBODY ELSE WAS ILLEGAL, ET

5  CETERA.

6  **Q.**    IT JUST SAYS, THE LICENSE LEVEL IDENTIFIED BELOW IS E.

7  THE EXPORT OF THE HARDWARE IS SUBJECT TO REGULATIONS BY THE

8  U.S. DEPARTMENT OF STATE AND CAN'T BE SHIPPED OUTSIDE OF THE

9  UNITED STATES WITHOUT APPROVAL.  CORRECT?

10  **A.**    CORRECT.

11  **Q.**    WAS THIS LICENSE LEVEL LABELED E HERE?

12  **A.**    YES.

13  **Q.**    AND AGAIN, WHEN YOU DRAFTED UP THAT PURCHASE ORDER, WAS

14  THAT BASED ON INFORMATION YOU HAD RECEIVED BOTH FROM --

15  **A.**    THE MANUFACTURER AND THE STATE DEPARTMENT AT THAT TIME.

16       **MR. HARRIGAN:**  COULD WE BROADEN THAT SO YOU CAN SEE

17  THE E DOWN BELOW.  THANK YOU.

18       **MR. JOHNSTON:**  RENEWED OBJECTION.  401, 403.

19       **THE COURT:**  YES, IT IS NOTED.

20       **MR. HARRIGAN:**  ONE MOMENT, YOUR HONOR.

21  **Q.**    **(MR. HARRIGAN)** SO DID DEFENDANT SEND A REPLY EMAIL TO

22  YOUR PURCHASE ORDER?

23  **A.**    YES.

24  **Q.**    SHOWING YOU GOVERNMENT'S EXHIBIT 125.  IS THAT THE REPLY

25  EMAIL?

APRIL 14, 2015

COLE — DIRECT EXAMINATION

1  **A.**    YES, IT IS.

2         **MR. HARRIGAN:**  AND WITH THE COURT'S PERMISSION AND

3  IF THERE IS NO OBJECTION, I MOVE TO ADMIT IT AND PUBLISH IT TO

4  THE JURY.

5         **MR. JOHNSTON:**  NO OBJECTION, YOUR HONOR.

6         **THE COURT:**  RECEIVED.

7         (EXHIBIT 125 RECEIVED INTO EVIDENCE)

8  **Q.**    **(MR. HARRIGAN)** SHOWING THE HEADER.  WHEN DID DEFENDANT

9  SEND THAT EMAIL TO YOU?

10  **A.**    ON MAY 17TH.

11  **Q.**    AND GOING TO THE CONTENT OF THAT EMAIL.

12  **A.**    OKAY.

13  **Q.**    AND WHAT IS HE REQUESTING IN THAT EMAIL?

14  **A.**    HE SIMPLY REQUESTS ADDITIONAL PROOF, I GUESS, LACK OF A

15  BETTER WORD, THAT NOT ONLY WE HAD PLACED THE ORDER WITH THE

16  MANUFACTURER, BUT THAT WE HAD ALSO PAID IN FULL.

17         AND THAT HE STATES THAT HE IS —— HE IS MAKING THIS

18  REQUEST BECAUSE KOORUSH IS ASKING HIM TO DO SO.

19  **Q.**    BEFORE DOING WHAT?

20  **A.**    BEFORE MAKING THE PAYMENT, THE 10 PERCENT.

21  **Q.**    OKAY.  ALL RIGHT.  DID YOU SUBSEQUENTLY HAVE A TELEPHONE

22  CONVERSATION WITH DEFENDANT ABOUT HIS REQUEST TO CONTACT CPI

23  DIRECTLY TO VERIFY THE ORDER?

24  **A.**    YES.

25  **Q.**    I WOULD LIKE YOU TO TAKE A LOOK AT GOVERNMENT'S

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   EXHIBIT 310.

2   **A.**    OKAY.

3   **Q.**    AND DO YOU RECOGNIZE THAT CD?

4   **A.**    YES, I DO.

5   **Q.**    AGAIN, DOES IT CONTAIN AN AUDIO RECORDING OF A TELEPHONE

6   CONVERSATION YOU HAD WITH DEFENDANT?

7   **A.**    YES.

8   **Q.**    AND IS THAT REGARDING THEIR REQUEST OR HIS REQUEST TO

9   CONTACT CPI TO VERIFY THE ORDER?

10  **A.**    YES.

11        **MR. HARRIGAN:**  YOUR HONOR, WITH THE COURT'S

12  PERMISSION, I WOULD MOVE TO PUBLISH THAT TO THE JURY.

13        **THE COURT:**  YES.

14        (AUDIO PLAYED)

15  **Q.**    **(MR. HARRIGAN)** OKAY.  CAN YOU DESCRIBE, IN THE CONTEXT

16  OF PLAYING DAVID MILLS, WHAT THAT DISCUSSION WAS ABOUT?

17  **A.**    AS PLAYING DAVID MILLS I WAS TRYING TO EXPLAIN TO HIM

18  THAT IF YOU WANT TO FURTHER VERIFY –– EXCUSE ME –– THAT WE HAD

19  PLACED THE ORDER AND PAID THE MANUFACTURER, BY ALL MEANS FEEL

20  FREE TO DO SO.  BUT TO, ONE, NOT USE A TIG MARINE ACCOUNT IN

21  DUBAI BECAUSE OBVIOUSLY I HAD TOLD THE MANUFACTURER IT WAS FOR

22  AN END USER IN CZECH REPUBLIC.  AND THAT I RECOMMEND HE NOT

23  MAKE A PHONE CALL BECAUSE HE HAS AN ACCENT THAT WOULD CLEARLY

24  NOT INDICATE SOMEBODY WHO WAS BORN OR RAISED IN THE CZECH

25  REPUBLIC.  SO I WAS TRYING TO PROTECT US FROM THEIR GETTING US

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1    CAUGHT IN OUR SCHEME.

2    **Q.**    AND YOU ALSO REQUESTED THAT, IN PLAYING DAVID MILLS,

3    THAT THEY NOT EMAIL FROM TIG MARINE OR --

4    **A.**    CORRECT.

5    **Q.**    -- OUTSIDE THE U.S.

6    **A.**    CORRECT.

7    **Q.**    AND THE REASON WAS?

8    **A.**    BECAUSE THEN THE MANUFACTURER WOULD KNOW, OBVIOUSLY, I

9    HAD LIED TO THEM AND GIVEN FALSE INFORMATION.  AND THAT MY END

10   USER INFORMATION WAS ERRONEOUS AND A LIE.

11   **Q.**    DID DEFENDANT EVER DURING THIS CONVERSATION EXPRESS

12   SURPRISE BY YOUR REQUEST?

13   **A.**    NO.

14   **Q.**    OR OBJECT TO YOUR REQUEST?

15   **A.**    NO.

16   **Q.**    AND ULTIMATELY WHAT DID HE TELL YOU ABOUT WHAT THEY

17   WOULD DO?

18   **A.**    HE STATED THAT EVERYTHING WOULD BE FINE, AND THAT HE

19   DIDN'T THINK THERE WOULD BE A NEED TO REALLY FOLLOW UP MORE.

20   **Q.**    OKAY.  NOW, YOU MENTIONED THAT YOU HAD MADE THE ORDER

21   FOR THE Y-690, AND TOLD DEFENDANT THAT -- AND KOORUSH THAT

22   UPON PROMISE OF A DOWN PAYMENT.  WHEN THAT DOWN PAYMENT DIDN'T

23   COME, DID YOU HAVE FURTHER DISCUSSIONS WITH THE DEFENDANT?

24   **A.**    YES.

25   **Q.**    AND SHOWING YOU GOVERNMENT'S EXHIBIT 311.

APRIL 14, 2015

474

COLE – DIRECT EXAMINATION

1   **A.**   OKAY.

2   **Q.**   WHICH IS ANOTHER DISK.

3   **A.**   OKAY.

4   **Q.**   AND DO YOU RECOGNIZE THAT?

5   **A.**   YES.

6   **Q.**   OKAY.  IS THAT A CONVERSATION THAT YOU WITH THE

7   DEFENDANT?

8   **A.**   YES.

9   **Q.**   WHEN DID THAT OCCUR?

10  **A.**   ON MAY 20TH, 2013.

11  **Q.**   AFTER THE LAST TELEPHONE CONVERSATION?

12  **A.**   CORRECT.

13  **Q.**   OKAY.  AND THAT PERTAINS TO THE Y-690'S?

14  **A.**   YES.

15          **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION, WE WOULD

16  REQUEST TO PLAY THAT FOR THE JURY.

17          **THE COURT:**  YES.

18          (AUDIO PLAYED)

19          **THE COURT:**  MR. HARRIGAN, IT IS 2:00 O'CLOCK.  DO

20  YOU HAVE ANY FOLLOW-UP QUESTIONS ON THIS SPECIFIC?

21          **MR. HARRIGAN:**  NO.

22          **THE COURT:**  ALL RIGHT.

23          IT IS 2:00 O'CLOCK.  WE ARE GOING TO RECESS FOR THE

24  AFTERNOON.

25          I WANT TO THANK YOU VERY MUCH FOR YOUR FULL

APRIL 14, 2015

COLE – DIRECT EXAMINATION

1   ATTENTION TODAY.  WE WILL HAVE A SIMILAR SCHEDULE TOMORROW,

2   8:30 TO 2:00.  ONCE AGAIN, YOU ARE WELCOME TO BRING ANYTHING

3   YOU WOULD LIKE TO CONSUME OR DRINK DURING THE BREAK.

4           THANK YOU VERY MUCH.  HAVE A NICE AFTERNOON, A NICE

5   EVENING.  WE WILL SEE YOU ALL TOMORROW MORNING, 8:30.

6           AGAIN, PLEASE KEEP IN MIND ALL OF THE ADMONITIONS

7   NOT TO DISCUSS THE CASE, FORM OR EXPRESS ANY OPINIONS OR

8   CONCLUSIONS.

9           THANK YOU.

10          **JUROR NO. 3:**  I DID CONTACT THE COMPANY, AND THEY

11  ARE STANDING FIRM.  I TOLD THEM YOU WOULD BE GIVING THEM A

12  CALL.

13          AND I DON'T THINK YOU WILL GET MUCH FURTHER THAN I

14  DID, BUT, YOU KNOW, YOU ARE WELCOME TO DO IT.

15          **THE COURT:**  WOULD YOU LEAVE THE CONTACT PERSON AND A

16  TELEPHONE NUMBER?

17          **THE CLERK:**  I WILL WALK OUT WITH YOU.

18          **JUROR:**  OKAY.

19          (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

20          OPEN COURT, OUT OF THE HEARING OF THE JURY)

21          **THE COURT:**  WE ARE OUTSIDE OF THE JURY.

22          JUROR NO. 3, (NAME REDACTED), INDICATED SHE IS

23  HAVING DIFFICULTY WITH HER EMPLOYER PAYING.  SO I WILL FOLLOW

24  UP THIS AFTERNOON, AND REPORT TO YOU TOMORROW.

25          ARE THERE ANY OTHER MATTERS WE NEED TO ADDRESS?

APRIL 14, 2015

```
 1              MR. HARRIGAN:  NOT ON BEHALF OF THE GOVERNMENT, YOUR

 2   HONOR.

 3              MR. CAMDEN:  JUST ONE LITTLE THING.  THIS MAY SEEM

 4   KIND OF SMALL BUT --

 5              THE COURT:  JUROR COMING THROUGH.

 6              MR. HARRIGAN:  THEY ARE COMING OUT OF THE WOODWORK.

 7   THEY HAVE DONE THAT TWICE TO US.

 8              MR. CAMDEN:  JUST THE GOVERNMENT HAS BEEN REFERRING

 9   TO MR. GHAHREMAN AS THE DEFENDANT THROUGH THE TESTIMONY.  AND

10   ALTHOUGH I WOULD OBJECT NORMALLY TO THAT, BUT I THINK IN THIS

11   CASE THERE IS A SPECIAL PROBLEM BECAUSE I THINK THERE IS SOME

12   CONFUSION BETWEEN WHETHER THEY ARE TALKING ABOUT DEFENDANT

13   KOORUSH TAHERKHANI OR ARASH GHAHREMAN OR DEFENDANT YILDIZ.

14   THEY WERE ALL THREE CHARGED IN THE INDICTMENT.

15              I WROTE DOWN, THERE WAS ONE EXAMPLE, AT LEAST.  THE

16   QUESTION WAS:  WHAT WERE DEFENDANTS EXPLANATIONS TO YOU AS TO

17   WHY THEY WEREN'T MAKING THE PAYMENTS?

18              THIS IS IN THE CONTEXT THE OFFICER JUST TESTIFIED HE

19   IS EMAILING ALONG WITH KOORUSH AND EMAILING WITH MR.

20   GHAHREMAN.  SO I WONDER IF WE COULD JUST HAVE MR. GHAHREMAN OR

21   MR. TAHERKHANI OR MR. YILDIZ, INSTEAD OF DEFENDANTS.  I THINK

22   IT IS INTRODUCING SOME AMBIGUITY HERE.

23              MR. HARRIGAN:  THE ONLY DEFENDANT I AM REFERRING TO

24   IS THAT DEFENDANT.

25              NOW, I GET TONGUE TIED SOMETIMES SAYING WORDS, BUT I
```

APRIL 14, 2015

1   HAVE ALWAYS BEEN CONSISTENT, DEFENDANT IS THE DEFENDANT.  I

2   HAVE BEEN CAREFUL WHEN HE SAYS THEY, MAKE SURE IT IS DEFENDANT

3   AND THIS DEFENDANT TALKING A FEW TIMES.

4          SO I WILL DO MY BEST TO MAKE SURE THAT IT IS

5   CLEAR, BUT IT IS JUST EASIER FOR ME.  GHAHREMAN IS A MOUTHFUL,

6   I DON'T WANT TO HAVE TO SAY TAHERKHANI.  SO DEFENDANT IT

7   IS A LITTLE EASIER, YOUR HONOR.  I DON'T DO IT TO BE

8   PEJORATIVE.

9          **THE COURT:**  ON THAT OBJECTION, I WOULD OVERRULE IT

10  IN THAT DEFENDANT IS A TERM OF ART, IT IS NOT PEJORATIVE.  IT

11  IS NOT, FOR EXAMPLE, LIKE IN A 1326 CASE REFERRING IN A

12  NEGATIVE WAY TO THE DEFENDANT AS THE ALIEN.

13         SO IT IS A TERM OF ART, AND IT IS USED THROUGHOUT,

14  IN THE READING OF THE INDICTMENT BY THE COURT, IN THE JURY

15  INSTRUCTIONS AND OTHERWISE.  SO I THINK IT HAS BEEN

16  APPROPRIATELY USED AS A TERM OF IDENTIFICATION IN THE TRIAL.

17         IF THERE IS ANY VAGUENESS TO THE TERM IN THAT

18  THERE ARE A NUMBER OF DEFENDANTS, ALTHOUGH THE JURY HAS

19  BEEN INSTRUCTED THAT THAT ONLY DEFENDANT IN THIS CASE IS

20  MR. GHAHREMAN, BUT IF THERE IS ANY VAGUENESS, THEN I WOULD

21  INVITE YOU TO MAKE THE OBJECTION AND THE RECORD CAN BE

22  CLARIFIED.

23         **MR. CAMDEN:**  YES, YOUR HONOR.

24         **THE COURT:**  ARE THERE ANY SPECIAL INSTRUCTIONS FROM

25  THE DEFENSE THAT YOU HAVE READY AT THIS TIME, OR ANY

APRIL 14, 2015

478

```
 1   OBJECTIONS?
 2          MR. CAMDEN:  I HAVE BEEN SPENDING 12 TO 14 HOURS A
 3   DAY JUST ON THE CROSSES, YOUR HONOR.  SO I PLAN TO WORK ON THE
 4   JURY INSTRUCTIONS AND GET THEM TO THE COURT AS SOON AS
 5   POSSIBLE.
 6          THE COURT:  I JUST READ THROUGH THE GOVERNMENT'S
 7   INSTRUCTIONS ON THE COUNTS.  ARE YOU GOING TO HAVE A LOT OF
 8   OBJECTION THERE, OR ARE YOU IN AGREEMENT?
 9          MR. CAMDEN:  NO, BUT I WOULD LIKE TO PROPOSE --
10   THERE MAY BE A COUPLE OF OBJECTIONS JUST AS TO HOW A FEW
11   THINGS ARE PHRASED.  I WOULD LIKE TO PROPOSE INSTRUCTING A
12   DIFFERENT WAY JUST BECAUSE WE HAVE GROUPS OF COUNTS; THERE IS
13   1, 3 AND 4, AND THEN 2, 5 AND 6.
14          THE COURT:  BUT THE SUBSTANCE, YOU DON'T HAVE TOO
15   MUCH?
16          MR. CAMDEN:  RIGHT.  AND THEY ALL INCORPORATE, IN
17   SOME WAY OR ANOTHER, THIS 203 -- 560.203 AND 204.  WE CAN COPY
18   AND PASTE THAT WHOLE SECTION IN THE INSTRUCTION OR THERE
19   COULD BE A SEPARATE INSTRUCTION HOW TO REFER TO IT.  I HAVE
20   BEEN WORKING ON THAT, I DON'T HAVE A COHERENT SET OF
21   INSTRUCTIONS.
22          MR. HARRIGAN:  YOUR HONOR, ALSO, THEY CAN TALK TO
23   US.  I MAY SIMPLIFY THE INSTRUCTION PARTICULARLY AS TO THE
24   ATTEMPTED EXPORT COUNTS, NOT TO HAVE TWO ELEMENTS, JUST HAVE
25   THE ONE ELEMENT.
```

APRIL 14, 2015

1          **THE COURT:**  OKAY.

2          **MR. HARRIGAN:**  I THINK THAT IS APPROPRIATE.  I CAN

3   WORK WITH -- JUST FOR THE COURT'S INFORMATION, MY

4   UNDERSTANDING WHAT THEY HAVE BEEN SAYING IS THEY REALLY OBJECT

5   TO MULTIPLES.  WE CAN PROBABLY ULTIMATELY WORK OUT THE OTHER.

6   WE ARE ALL IN AGREEMENT WILLFULNESS APPLIES TO THE COUNTS IN

7   SOME MANNER.

8          **THE COURT:**  YES.  OKAY.  VERY GOOD.  THANK YOU.

9

10                      *   *   *

11          I CERTIFY THAT THE FOREGOING IS A CORRECT
            TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
12          IN THE ABOVE-ENTITLED MATTER.

13          S/LEEANN PENCE                     6/8/20151

14          LEEANN PENCE, OFFICIAL COURT REPORTER   DATE

15

16

17

18

19

20

21

22

23

24

25

                          APRIL 14, 2015

```
1
2                    INDEX OF WITNESSES
3   TOPCZEWSKI, GREG
4     BY MR. HARRIGAN    260
5     BY MR. CAMDEN                288
6
7   MILLER, MOLLY J.
8     BY MR. COUGHLIN   302, 306
9     BY MR. CAMDEN              306(VOIR DIRE), 308
10
11  COX, THOMAS
12    BY MR. COUGHLIN   310
13    BY MR. CAMDEN              330
14
15  COLE, DAVID.
16    BY MR. HARRIGAN   334
17
18
19
20
21
22
23
24
25
```

APRIL 14, 2015

```
 1
 2
 3                         INDEX OF EXHIBITS
 4
 5    EXHIBIT     IDENTIFIED RECEIVED
 6
 7    451           261          261
 8    452           269          270
 9    453           274          275
10    454           282          283
11    455           286          286
12    D             295
13    456           298          298
14    403           305          307
15    551           318          318
16    552           322          323
17    554           324          325
18    602           365          366
19    603           365          366
20    101           369          378
21    102           369          381
22    103           369          386
23    104           369          390
24    105           369          394
25    106           369          403
```

APRIL 14, 2015

| | | | |
|---|---|---|---|
| 1 | 107 | 369 | 410 |
| 2 | 108 | 369 | 411 |
| 3 | 109 | 369 | 412 |
| 4 | 110 | 369 | 414 |
| 5 | 111 | 369 | 416 |
| 6 | 112 | 369 | 418 |
| 7 | 113 | 369 | 420 |
| 8 | 114 | 369 | 423 |
| 9 | 115 | 369 | 423 |
| 10 | 116 | 369 | 430 |
| 11 | 117 | 369 | 432 |
| 12 | 118 | 369 | 442 |
| 13 | 119 | 369 | 443 |
| 14 | 120 | 369 | 437 |
| 15 | 122 | 369 | |
| 16 | 123 | 369 | 456 |
| 17 | 124 | 369 | 465 |
| 18 | 125 | 369 | 471 |
| 19 | 126 | 369 | |
| 20 | 127 | 369 | |
| 21 | 128 | 369 | |
| 22 | 129 | 369 | |
| 23 | 130 | 369 | |
| 24 | 131 | 369 | |
| 25 | 132 | 369 | |

APRIL 14, 2015

| | | | |
|---|---|---|---|
| 1 | 133 | 369 | |
| 2 | 134 | 369 | |
| 3 | 135 | 369 | |
| 4 | 301 THROUGH | | |
| 5 | 317 | 372 | 376 |
| 6 | 301-A | 375 | |
| 7 | 302-A | 375 | |
| 8 | 303-A | 377 | |
| 9 | 304-A | 375 | |
| 10 | 305-A | 375 | |
| 11 | 306-A | 377 | |
| 12 | 307-A | 375 | |
| 13 | 308-A | 375 | |
| 14 | 309-A | 377 | |
| 15 | 310-A | 375 | |
| 16 | 311-A | 375 | |
| 17 | 312-A | 377 | |
| 18 | 313-A | 375 | |
| 19 | 314-A | 375 | |
| 20 | 315-A | 377 | |
| 21 | 604-A | 406 | 407 |
| 22 | 604-B | 406 | 407 |
| 23 | 604-C | 406 | 407 |
| 24 | | | |
| 25 | | | |

APRIL 14, 2015