UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                       )
UNITED STATES OF AMERICA,              )
            PLAINTIFF,                 )   CASE NO. 13CR4228-DMS
                                       )
                                       )   SAN DIEGO, CALIFORNIA
                                       )WEDNESDAY APRIL 15, 2015
                                       )    8:30 A.M. CALENDAR
ARASH GHAHREMAN,                       )
            DEFENDANT.                 )
_____)        VOLUME III


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL/DAY THREE




INTERPRETERS:                    BADI BADIOZAMANI
                                 ASLAN ASLANIAN


                                 LEE ANN PENCE,
REPORTED BY:                     OFFICIAL COURT REPORTER
                                 UNITED STATES COURTHOUSE
                                 333 WEST BROADWAY ROOM 1393
                                 SAN DIEGO, CALIFORNIA 92101

```
COUNSEL APPEARING:

FOR PLAINTIFF:          LAURA E. DUFFY,
                        UNITED STATES ATTORNEY
                        BY:   SHANE P. HARRIGAN
                              TIMOTHY D. COUGHLIN
                        ASSISTANT U.S. ATTORNEYS
                        880 FRONT STREET
                        SAN DIEGO, CALIFORNIA 92101

FOR DEFENDANT           FEDERAL DEFENDERS OF SAN DIEGO, INC.
GHAHREMAN:                    BY:   ELLIS M. JOHNSTON
                                    JOSEPH S. CAMDEN
                        TRIAL ATTORNEYS
                        225 BROADWAY, SUITE 900
                        SAN DIEGO, CALIFORNIA 92101
```

485

```
 1    SAN DIEGO, CALIFORNIA — WEDNESDAY, APRIL 15, 2015 — 8:30 A.M.
 2                              *   *   *
 3              (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN
 4         OPEN COURT, OUT OF THE HEARING OF THE JURY)
 5         THE CLERK:  NO. 1 ON CALENDAR, CASE NO. 13CR4228,
 6    UNITED STATES OF AMERICA VERSUS ARASH GHAHREMAN; ON FOR JURY
 7    TRIAL, DAY THREE.
 8              THE COURT:  GOOD MORNING.
 9              WE HAVE COUNSEL AND MR. GHAHREMAN PRESENT.  WE ARE
10    OUTSIDE OF THE PRESENCE OF THE JURY.
11              I WANTED TO MEET WITH COUNSEL JUST BRIEFLY BEFORE WE
12    BRING IN THE JURY.
13              I DID CONTACT JUROR NO. 3'S, (NAME REDACTED),
14    EMPLOYER, AND THEY ARE HOLDING FAST.  THEY HAVE A NEWLY
15    IMPLEMENTED POLICY OF THREE DAYS, NO EXCEPTIONS.
16              SO WE CAN INQUIRE OF (NAME REDACTED), WE CAN FORCE
17    HER TO STAY; BUT GIVEN THE COMPANY POSITION, THEY WON'T PAY
18    HER.  THE REALITY IS IF WE FORCE HER TO STAY THEY PROBABLY
19    WILL PAY HER, BUT THEY ARE JUST NOT TELLING ME THAT.
20              I CAN INQUIRE OF HER, BUT I DON'T WANT TO PUT HER IN
21    THAT BOX.  SO IF SHE SAYS SHE IS VERY UNCOMFORTABLE SERVING
22    WITH THE PROSPECT OF NOT BEING PAID, WHAT'S COUNSEL VIEW?  ANY
23    OBJECTION TO EXCUSING HER?
24              MR. JOHNSTON:  NONE, YOUR HONOR.  I WOULD BE MORE
25    CONCERNED IF SHE STAYED AND WAS THINKING MORE ABOUT HER
```

APRIL 15, 2015

1    FINANCIAL WELL-BEING THAN WHAT HAS TO BE DECIDED IN THIS

2    CASE.

3              **MR. HARRIGAN:**  NO OBJECTION BY THE GOVERNMENT, YOUR

4    HONOR.

5              **THE COURT:**  THEY ALSO INDICATED THAT THEY ARE HAVING

6    A REAL CRUNCH TIME AND I THINK THEY REALLY NEED HER, SO THEY

7    WERE RESPECTFULLY DECLINING TO PAY MORE THAN THREE DAYS.

8              OKAY.  LET'S BRING IN JUST (NAME REDACTED).

9              **JUROR:**  GOOD MORNING.

10             **THE COURT:**  GOOD MORNING.

11             (NAME REDACTED), I CONTACTED YOUR EMPLOYER.  YEARS

12   AGO I USED TO REPRESENT THEM -- IT IS A SMALL WORLD -- IN THE

13   LATE 80'S, EARLY '90'S.

14             THEY ARE HOLDING FAST TO THEIR POLICY, AS YOU TOLD

15   ME YESTERDAY.  AND I HAD A NICE CHAT WITH MS. HOFT, SANDRA

16   HOFT, BUT SHE EXPLAINED THE POLICY AND SAID THAT THEY WOULD

17   NOT PAY BEYOND THE THREE DAYS.

18             IT MAY BE THAT IF YOU ARE ASKED TO STAY ON THIS JURY

19   THEY WOULD PAY.  I DON'T KNOW THAT.  IT MAY ALSO BE THAT THEY

20   WILL HOLD FAST, AND IF WE FORCED YOU TO STAY HERE THEY WOULD

21   NOT PAY.  I DON'T WANT TO PUT YOU IN THAT HOBSON'S CHOICE, SO

22   I WILL LEAVE IT TO YOU.

23             THE PARTIES WOULD LIKE TO HAVE YOUR SERVICES, BUT

24   THERE IS NO OBJECTION.  IF YOU FEEL THAT THIS IS A REAL

25   POSSIBILITY THAT YOU WOULD NOT BE PAID AND IT IS A FINANCIAL

APRIL 15, 2015

```
 1    HARDSHIP THAT YOU CANNOT ENDURE, THEN YOU WOULD BE EXCUSED.
 2    SO I WOULD LEAVE IT TO YOU.
 3             JUROR:  I HAD RECEIVED A CALL FROM HER, AND SHE HAD
 4    BASICALLY STATED THE SAME THING, THAT, YOU KNOW, THEY SAID
 5    THAT THEY COULD NOT DO THAT.  AND SHE HAD ALSO SPOKE WITH THE
 6    OWNER OF THE COMPANY, SO IT SOUNDED LIKE SHE HAD GONE TO THE
 7    DEGREE OF TRYING TO, YOU KNOW, TO GET THIS CLEARED.  BUT SHE
 8    SAID NO.
 9             THE COURT:  YES.
10             JUROR:  I DO NOT BELIEVE THAT I WOULD BE PAID FOR
11    IT.  AND SHE DID SAY I COULD TAKE SICK TIME BUT, YOU KNOW, AT
12    THE SAME TIME, IF I NEED IT DOWN THE ROAD, THEN IT WOULDN'T BE
13    AVAILABLE.
14             THE COURT:  RIGHT.
15             JUROR:  I THINK I WOULD HAVE TO, YOU KNOW, NOT BE
16    ABLE TO STAY.
17             THE COURT:  ALL RIGHT.  SO THAT WOULD BE YOUR
18    DECISION.  UNDER THESE CIRCUMSTANCES, YOU WOULD REQUEST TO BE
19    EXCUSED.
20             JUROR:  YES.
21             THE COURT:  ALL RIGHT.  AND WE WOULD HONOR THAT
22    REQUEST.  I DON'T WANT TO PLACE YOU IN THAT POSITION, GIVEN
23    THE POTENTIAL THAT WE COULD BE HERE ANOTHER, YOU KNOW, THROUGH
24    A WEEK FROM FRIDAY.
25             JUROR:  RIGHT.  I WISH I COULD STAY, BUT, YOU KNOW,
```

APRIL 15, 2015

488

```
 1    UNFORTUNATELY, JUST NOT KNOWING WHEN THE END DATE IS, WOULD BE
 2    A BURDEN.
 3              THE COURT:  YES.  OKAY.  WELL, THANK YOU VERY MUCH.
 4    THANK YOU FOR BEING HERE THIS MORNING.
 5              JUROR:  SURE.  THANK YOU VERY MUCH FOR MAKING THE
 6    FOLLOW-UP CALL.
 7              THE COURT:  YOU ARE WELCOME.
 8              I WILL ASK THAT YOU LEAVE YOUR NOTEBOOK HERE.  WE
 9    WILL SHRED ALL OF THE INFORMATION, SO NO ONE WILL READ IT OR
10    HAVE ANY ACCESS TO IT.  IT WILL ALL BE SHREDDED.
11              YOU WOULD BE EXCUSED AT THIS TIME, SO YOU CAN REPORT
12    DOWN TO THE JURY LOUNGE, CHECK OUT.  YOU WILL GET CREDIT FOR
13    THREE DAYS.
14              JUROR:  OKAY.
15              THE COURT:  AND YOU WILL BE DONE WITH YOUR SERVICE
16    IN THIS CASE.  IT MAY BE THAT YOU WILL BE -- YOU ARE ON CALL,
17    I THINK, FOR ABOUT A MONTH, RIGHT?
18              JUROR:  YES.
19              THE COURT:  ORDINARILY THEY TRY TO NOT RE-CALL YOU
20    ONCE YOU HAVE ACTUALLY SERVED.  I CAN'T MAKE THAT PROMISE, BUT
21    THAT IS USUALLY HOW THAT WORKS.
22              SO THANK YOU VERY MUCH.  YOU WOULD BE EXCUSED AT
23    THIS TIME.
24              JUROR:  THANK YOU.
25              THE COURT:  JAMIE, WE WILL HAVE TO RANDOMLY DRAW
```

APRIL 15, 2015

480

```
 1    BETWEEN THE TWO ALTERNATES.
 2              THE CLERK:  OKAY.
 3              MR. JOHNSTON:  WOULD WE NOT GO NEXT IN ORDER, YOUR
 4    HONOR?
 5              THE COURT:  IS THERE ANY OBJECTION TO GOING NEXT IN
 6    ORDER?
 7              MR. HARRIGAN:  I WOULD JUST LIKE TO DRAW RANDOMLY.
 8              THE COURT:  THAT IS WHAT I HAD INDICATED AT THE
 9    OUTSET, WE WOULD JUST DRAW.  WE WILL HAVE TWO NAMES, AND I
10    WILL PICK ONE.
11              SO THERE IS AN OBJECTION TO JUST GOING IN ORDER?
12              MR. HARRIGAN:  I THOUGHT THE COURT'S INTENTION WAS
13    TO DRAW RANDOMLY.
14              THE COURT:  THAT'S WHAT I SAID, BUT --
15              MR. HARRIGAN:  I THOUGHT DEFENSE COUNSEL --
16              THE COURT:  MR. JOHNSTON WAS PROPOSING THAT WE
17    SIMPLY PLUG IN ALTERNATE NO. 1.
18              MR. HARRIGAN:  WE WOULD LIKE TO RANDOMLY DRAW.
19    THANK YOU.
20              THE COURT:  ALL RIGHT.
21              MS. KLOSTERMAN JUST WROTE TWO NAMES.
22              THE CLERK:  JUST 1 AND 2.
23              THE COURT:  ALTERNATE 1 AND 2.  I PICKED FROM THE
24    FOLDED PAPERS.
25              IT IS NO. 2, (NAME REDACTED).  SO (NAME REDACTED)
```

APRIL 15, 2015

```
 1   WOULD BE SUBSTITUTING IN PLACE OF (NAME REDACTED), AND SHE

 2   WILL NOW BE ASSIGNED JUROR SEAT NO. 3.  OKAY.

 3           LET'S GO AHEAD AND BRING IN THE JURY.  WE WILL GET

 4   STARTED.

 5           WE ARE PICKING UP WITH AGENT COLE?

 6       MR. HARRIGAN:  YES, WE ARE.

 7       THE COURT:  HOW MUCH MORE TIME DO YOU ANTICIPATE ON

 8   DIRECT?

 9           MR. HARRIGAN:  ABOUT ANOTHER HOUR, YOUR HONOR.

10           (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

11           OPEN COURT, IN THE HEARING OF THE JURY)

12       THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.

13   WELCOME BACK.

14           WE HAVE ALL JURORS PRESENT.

15           JUROR NO. 3, (NAME REDACTED), WAS EXCUSED.  AND SO

16   AT THIS TIME WE DID A RANDOM DRAW BETWEEN THE TWO ALTERNATES,

17   AND (NAME REDACTED) WAS RANDOMLY DRAWN FROM THE LOT.

18           SO WHAT THAT MEANS, (NAME REDACTED), I AM GOING TO

19   ASK THAT YOU RELOCATE AND TAKE SEAT NO. 3 IN THE JURY BOX.

20           (NAME REDACTED), YOU WILL BE THE LAST REMAINING

21   ALTERNATE.

22           OKAY.  AND WITH THAT --

23           THANK YOU VERY MUCH.

24           -- WE WILL RESUME WHERE WE LEFT OFF YESTERDAY, WITH

25   THE DIRECT EXAMINATION OF AGENT COLE.
```

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1           AND, SIR, I WOULD REMAIN YOU YOU REMAIN UNDER OATH

2    FROM THE PROCEEDINGS YESTERDAY.

3           **THE WITNESS:**  YES, YOUR HONOR.

4           **THE COURT:**  THANK YOU.

5                  DIRECT EXAMINATION(RESUMED)

6    **Q.**    **(MR. HARRIGAN)** GOOD MORNING, AGENT COLE.

7    **A.**    GOOD MORNING.

8    **Q.**    I THINK WHEN WE LEFT OFF YESTERDAY I JUST PLAYED YOU AN

9    EXCERPT FROM A MAY 20TH, 2013 TELEPHONE CONVERSATION BETWEEN

10   YOU AND THE DEFENDANT, CORRECT?

11   **A.**    CORRECT, SIR.

12   **Q.**    AND AT THE TIME OF THAT DISCUSSION HAD YOU RECEIVED THE

13   $10,000 DOWN PAYMENT FOR THE 50 Y-690'S?

14   **A.**    NO, SIR.

15   **Q.**    YOU HADN'T RECEIVED IT THROUGH DEFENDANT'S BANK ACCOUNT?

16   **A.**    NO.

17   **Q.**    OR WIRED BY MR. TAHERKHANI?

18   **A.**    NO.

19   **Q.**    AND IN YOUR ROLE AS DAVID MILLS, DID YOU EXPRESS

20   FRUSTRATION IN THAT TELEPHONE CONVERSATION?

21   **A.**    YES, I DID.

22   **Q.**    AND I THINK YOU STATED THAT IF YOU DO NOT DO THINGS

23   RIGHT TWO THINGS WILL HAPPEN.  WHAT WERE THOSE?

24   **A.**    ONE, WE WOULDN'T GET THE PRODUCT.  AND, TWO, THAT WE

25   WOULD GO TO JAIL.

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1    **Q.**    DID DEFENDANT ACKNOWLEDGE THAT RISK?

2    **A.**    YES, HE DID.

3    **Q.**    WHAT DID YOU TELL HIM TO DO WITH THAT INFORMATION?

4    **A.**    TO COMMUNICATE THAT TO MR. TAHERKHANI.

5    **Q.**    IS THIS THE FIRST TIME IN YOUR UNDERCOVER COMMUNICATIONS

6    THAT YOU OPENLY USED THE TERM JAIL?

7    **A.**    YES.

8    **Q.**    FOLLOWING THAT CONVERSATION DID YOU SUBSEQUENTLY RECEIVE

9    AN EMAIL FROM DEFENDANT REGARDING THE $10,000 PAYMENT THAT WAS

10   DUE?

11   **A.**    YES.

12   **Q.**    LET ME SHOW YOU GOVERNMENT'S 127.

13          **MR. HARRIGAN:**  PARDON ME, YOUR HONOR.  I PUSHED THE

14   WRONG BUTTON.  SORRY.

15   **Q.**    **(MR. HARRIGAN)** SHOWING YOU THAT EMAIL, DO YOU RECOGNIZE

16   THAT EMAIL?

17   **A.**    YES, I DO.

18   **Q.**    AND IS THAT AN EMAIL YOU RECEIVED FROM THE DEFENDANT?

19   **A.**    YES -- NO, NO.  SORRY.  IT WAS SENT BY ME TO THE

20   DEFENDANT.

21   **Q.**    RIGHT.  DOES THAT INCLUDE AN EMAIL CHAIN?

22   **A.**    YEAH, I AM SORRY.  YES, IT IS.

23   **Q.**    OKAY.  IN OTHER WORDS, AN EMAIL RECEIVED FROM THE

24   DEFENDANT AND YOU SENT A REPLY EMAIL?

25   **A.**    YES, SIR.  I APOLOGIZE.

APRIL 15, 2015

COLE – DIRECT EXAMINATION

```
 1   Q.    NO NEED TO APOLOGIZE.
 2         MR. HARRIGAN:  IF THERE IS NO OBJECTION, I MOVE TO
 3   ADMIT THAT, YOUR HONOR.
 4         MR. JOHNSTON:  NO OBJECTION, YOUR HONOR.
 5         THE COURT:  RECEIVED.
 6         (EXHIBIT 127 RECEIVED INTO EVIDENCE)
 7   Q.    (MR. HARRIGAN) AND LET'S FIRST START LOOKING AT THE
 8   EMAIL TO YOU, WHICH IS AT THE BOTTOM OF GOVERNMENT'S
 9   EXHIBIT 127, THE HEADER INFORMATION.
10         THE CLERK:  I AM SORRY.  WAS THAT ADMITTED?
11         MR. HARRIGAN:  YES.
12   Q.    (MR. HARRIGAN) AND WHAT DATE WAS THAT SENT TO YOU?
13   A.    ON MAY 21ST, 2013.
14   Q.    THE DAY AFTER YOU HAD YOUR TELEPHONE CONVERSATION
15   REGARDING JAIL?
16   A.    CORRECT.
17   Q.    AND THAT WAS SENT BY DEFENDANT?
18   A.    YES.
19   Q.    TO YOU?
20   A.    YES.
21   Q.    AND WAS ANYBODY CC'D OR CARBON COPIED?
22   A.    YES, MR. TAHERKHANI.
23   Q.    AND LOOKING AT THE CONTENT OF THE EMAIL, WHAT DOES THE
24   DEFENDANT ASK OF YOU?
25   A.    THAT HE ASKED THAT I SEND AN INVOICE TO HIM FOR THE
```

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1    $10,000, ROUGHLY, FOR THE CONTRACT.

2    **Q.**    FOR THE PURPOSE OF WHAT?

3    **A.**    FOR THE PURPOSE OF PRESENTING -- BECAUSE TIG MARINE --

4    TO HAVE THE INVOICE FOR MASHREQ BANK FOR DEPOSIT THE MONEY TO

5    SOUTH STAR TRADING.

6    **Q.**    MASHREQ BANK IN DUBAI?

7    **A.**    YES.

8    **Q.**    HE ALSO SAYS, IN THE SECOND SENTENCE, IN THIS WAY YOU

9    ARE ABLE TO CONSIDER AND WRITE DOWN A --

10   **A.**    YEAH.  SAYS, A SUBJECT FOR THE PAYMENT.

11   **Q.**    SUBJECT FOR THE PAYMENT.

12           **MR. HARRIGAN:**  ONE MOMENT, YOUR HONOR.

13           **THE JURY PANEL:**  YOUR HONOR, THE MONITORS ARE

14   BLANK.

15           **THE COURT:**  ARE ALL OF THE MONITORS OFF?

16           **JUROR:**  IT IS BLANK.

17           **THE CLERK:**  LET ME TRY TO RESET THE SYSTEM.  IT WILL

18   TAKE JUST A MINUTE.

19           **THE COURT:**  SO THE MONITORS ARE ON, BUT NOTHING IS

20   COMING UP?

21           **JUROR:**  A COUPLE OF THEM ARE WORKING.

22           **MR. HARRIGAN:**  IT IS RESETTING RIGHT NOW, IT SHOWS.

23           **THE COURT:**  ARE THEY ALL WORKING?

24           **JUROR:**  YES.

25           **THE COURT:**  VERY GOOD.  THANK YOU.

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1          MR. HARRIGAN.

2          THANK YOU, YOUR HONOR.

3    **Q.**    **(MR. HARRIGAN)** GOING BACK TO THE CONTENT OF THE EMAIL

4    SENT TO YOU BY DEFENDANT ON MAY 21ST WHERE HE ASKED YOU TO

5    PROVIDE AN INVOICE SO THEY COULD WIRE TRANSFER MONEY, I WAS

6    ASKING YOU ABOUT THE SENTENCE:  IN THIS WAY YOU ARE ABLE TO

7    CONSIDER AND WRITE DOWN A SUBJECT FOR THE PAYMENT.

8          BASED ON THE CONTEXT OF COMMUNICATIONS YOU HAD PRIOR,

9    WHAT WAS YOUR UNDERSTANDING OF WHAT WAS BEING REQUESTED

10   HERE?

11   **A.**    THAT THE INVOICE REFLECT SOMETHING OTHER THAN THE

12   Y-690'S BY NAME SPECIFICALLY.

13   **Q.**    TO PUT -- OKAY.  AND DID YOU SEND A REPLY EMAIL TO THE

14   DEFENDANT?

15   **A.**    YES, I DID.

16   **Q.**    GOING TO THE TOP OF THE DOCUMENT, GOVERNMENT

17   EXHIBIT 127.  WAS THAT SENT TO DEFENDANT THE SAME DAY?

18   **A.**    YES.

19   **Q.**    DID IT INCLUDE MR. TAHERKHANI?

20   **A.**    YES, IT DID.

21   **Q.**    AND LOOKING AT THE CONTENT OF THAT EMAIL.

22   **A.**    OKAY.

23   **Q.**    WHAT DID YOU TELL THE DEFENDANT IN THAT EMAIL?

24   **A.**    I SAID BASICALLY THAT, AS DISCUSSED BEFORE, AND FOR

25   OBVIOUS REASONS, WE CAN'T PUT DOWN THE Y-690 ON THE INVOICE,

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   SO INSTEAD I LISTED THE INVOICE WOULD REFLECT IPODS.

2   **Q.**   AFTER THAT YOU ASKED HIM WHAT?

3   **A.**   I ASKED HIM, IT IS IMPORTANT THERE ARE NO MISTAKES SO

4   THE BANK DOESN'T KNOW THE REAL PRODUCT THAT WE ARE -- THAT I

5   AM SELLING AND THAT THEY ARE BUYING.

6   **Q.**   BEFORE THAT YOU ALSO ASKED HIM, IN THE SENTENCE BEFORE

7   THAT.

8   **A.**   OH, I AM SORRY.  IF YOU HAVE ANY QUESTIONS, TO PLEASE

9   LET ME KNOW.

10  **Q.**   AND YOU DID ATTACH AN INVOICE?

11  **A.**   I DID.

12  **Q.**   AND SHOWING YOU THAT INVOICE THAT IS ATTACHED TO THIS

13  EMAIL, DO YOU RECOGNIZE GENERALLY THAT INVOICE?

14  **A.**   YES.

15  **Q.**   WAS THAT PREPARED BY YOU OR SOMEONE ELSE?

16  **A.**   YES.

17  **Q.**   AND AGAIN TAKING A LOOK AT THE DESCRIPTION IN THE

18  INVOICE, IS THIS THE INVOICE YOU PROVIDED THEM IN ORDER TO

19  WIRE THE $10,000 PAYMENTS?

20  **A.**   YES.

21  **Q.**   DID YOU LIST THAT IT WAS GOING TO BE 50 Y-690'S?

22  **A.**   NO, I DID NOT.

23  **Q.**   WHAT DID YOU LIST ON THE INVOICE?

24  **A.**   I LISTED APPLE I-POD TOUCH, 16 GIGABYTE, 4TH GENERATION,

25  BLACK.

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1    **Q.**    AT A UNIT PRICE OF WHAT?

2    **A.**    $200 PER I-POD.

3    **Q.**    AND FOR A TOTAL PRICE OF?

4    **A.**    $10,000.

5    **Q.**    WHY DID YOU PICK 50 APPLE IPODS AT $200?

6    **A.**    IT JUST MADE MATHEMATICAL SENSE ON A PRODUCT THAT

7    WAS BENIGN OFF THE SHELF AT WALMART OR ANYWHERE ELSE.

8    SOMETHING THAT WOULD BE LOW -- THAT WOULD BRING ATTENTION TO

9    NOBODY.

10   **Q.**    AND AFTER YOU SENT THIS EMAIL, DID DEFENDANT EVER TAKE

11   YOU UP ON YOUR REQUEST IF HE HAD ANY QUESTIONS ABOUT THE

12   INVOICE YOU WERE SENDING HIM?

13   **A.**    NO.

14   **Q.**    DID HE EVER ASK YOU, WHY ARE YOU PUTTING APPLE I-POD

15   TOUCHES IN THE INVOICE RATHER THAN THE Y-690'S?

16   **A.**    NO.  NEVER DID.

17   **Q.**    AFTER YOU SENT THAT INVOICE, WAS THE $10,000 DOWN

18   PAYMENT FORTHCOMING FROM EITHER DEFENDANT OR MR. TAHERKHANI?

19   **A.**    NO.

20   **Q.**    ALL RIGHT.  AND TOWARD THE END OF MAY, SAY A WEEK LATER,

21   HAD YOU RECEIVED A DOWN PAYMENT?

22   **A.**    NO.

23   **Q.**    FROM DEFENDANT?

24   **A.**    NO.

25   **Q.**    OR MR. TAHERKHANI?

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1    **A.**    NO, SIR.

2    **Q.**    AT THIS POINT IN TIME HAD YOU RECEIVED THE INSTALLMENT

3    PAYMENTS THAT WERE DUE FOR THE FOUR GYROCOMPASSES?

4    **A.**    NO.

5    **Q.**    FROM EITHER DEFENDANT?

6    **A.**    NO.

7    **Q.**    OR MR. TAHERKHANI?

8    **A.**    NO, SIR.

9    **Q.**    DID YOU COMMUNICATE FURTHER WITH THE DEFENDANT ABOUT WHY

10   PAYMENTS WEREN'T FORTHCOMING?

11   **A.**    YES.

12   **Q.**    AND GENERALLY WHAT DID HE EXPLAIN TO YOU?

13   **A.**    AGAIN SIMILAR PROBLEMS:  BANKING ISSUES, ONE BANK NOT

14   BEING ABLE TO WORK WITH ANOTHER BANK, INTERNATIONAL BANKING

15   PROBLEMS, LETTER OF CREDIT, ACCEPTANCE, THINGS OF THAT NATURE.

16   **Q.**    DID YOU SUBSEQUENTLY, THEN, HAVE TELEPHONE

17   COMMUNICATIONS WITH HIM?

18   **A.**    YES.

19   **Q.**    HOW WOULD YOU DESCRIBE THOSE DISCUSSIONS AS OPPOSED TO

20   PREVIOUS TELEPHONE COMMUNICATIONS?

21   **A.**    I WOULD DESCRIBE IT AS SOMEWHAT TENSE OR AGGRAVATED.

22   **Q.**    WERE YOU CLOSED OR MORE OPEN IN THOSE?

23   **A.**    I WAS VERY, VERY MUCH MORE OPEN IN COMPARISON TO THE

24   PREVIOUS TELEPHONE CALLS.

25   **Q.**    WOULD YOU DESCRIBE WHAT YOU MEAN BY THAT?

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1    **A.**    AT THAT POINT I FELT THERE WAS NO MORE REASON TO HOLD

2    BACK, AND DISCUSSED MORE OPENLY THE RISKS WE WERE TAKING, THE

3    ILLEGAL ACTIVITY WE WERE ENGAGED IN, AND THE POSSIBILITY OF

4    GOING TO JAIL.

5    **Q.**    AND SHOWING YOU WHAT'S IN THE BINDER BEFORE YOU AS

6    GOVERNMENT'S EXHIBIT MARKED 312 AND 313, THEY ARE TWO DISKS.

7    **A.**    OKAY.

8    **Q.**    FIRST TAKE A LOOK AT 312.

9    **A.**    OKAY.

10   **Q.**    DO YOU RECOGNIZE THAT?

11   **A.**    YES.

12   **Q.**    AND IS THAT A RECORDED CONVERSATION YOU HAD WITH THE

13   DEFENDANT?

14   **A.**    YES.

15   **Q.**    IN WHICH YOU HAD MORE OPEN DISCUSSIONS?

16   **A.**    YES.

17   **Q.**    AND THAT OCCURRED WHEN?

18   **A.**    ON MAY 28TH, 2013.

19   **Q.**    AND IS THAT THE ENTIRE CONVERSATION?

20   **A.**    NO, SIR.

21   **Q.**    DOES IT CONTAIN EXCERPTS OF THAT TELEPHONE CONVERSATION?

22   **A.**    YES, IT CONTAINS EXCERPTS.

23   **Q.**    APPROXIMATELY HOW MANY?

24   **A.**    IT APPEARS IT CONTAINS FOUR.

25   **Q.**    AND TAKING A LOOK AT GOVERNMENT'S EXHIBIT 313.

COLE – DIRECT EXAMINATION

1    **A.**    OKAY.

2    **Q.**    IS THAT A RECORDED -- OR WOULD YOU DESCRIBE WHAT THAT

3    IS.

4    **A.**    IT IS ANOTHER RECORDED TELEPHONE CALL THAT CONTAINS ONE

5    EXCERPT FROM A TELEPHONE CALL THAT SAME DAY.  I BELIEVE IT IS

6    THE SAME TELEPHONE CALL, AND WE LOST OUR CONNECTION AND THEN

7    THE CALL CONTINUED.

8    **Q.**    SO THESE ALL PERTAIN TO ESSENTIALLY ONE TELEPHONE

9    CONVERSATION YOU HAD WITH THE DEFENDANT.

10   **A.**    CORRECT.

11   **Q.**    WAS IT A LENGTHY TELEPHONE CONVERSATION?

12   **A.**    IT WAS LENGTHY.

13   **Q.**    AND THESE AUDIO RECORDINGS CONTAIN EXCERPTS.

14   **A.**    CORRECT.

15        **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION, I MOVE

16   TO PLAY FIRST GOVERNMENT'S EXHIBIT 312 TO THE JURY.

17        **THE COURT:**  YES.

18        (AUDIO PLAYED)

19   **Q.**    **(MR. HARRIGAN)** ALL RIGHT.  IN THAT CONVERSATION YOU

20   OPENLY TELL DEFENDANT THAT YOU KNOW BOTH THE Y-690 AND THE

21   GYROCOMPASS WERE GOING TO IRAN.  AND AFTER YOUR SOLILOQUY TO

22   DEFENDANT, HOW DID HE RESPOND AT THAT POINT?

23   **A.**    HE DIDN'T ARGUE.

24   **Q.**    OKAY.  AND DOES THIS NEXT CLIP THAT WE ARE ABOUT TO PLAY

25   REFLECT WHAT HE SAID AFTER YOU WERE DONE TELLING HIM THAT YOU

APRIL 15, 2015

COLE – DIRECT EXAMINATION

 1   KNEW IT WAS GOING TO IRAN?

 2   **A.**   YES.

 3           **MR. HARRIGAN:**   COULD WE PLAY THE NEXT CLIP.

 4           (AUDIO PLAYED)

 5   **Q.**   **(MR. HARRIGAN)** ALL RIGHT.  DEFENDANT'S RESPONSE IS, I

 6   AM NOT GOING TO SAY THAT YOU ARE RIGHT OR NOT.

 7   **A.**   CORRECT.

 8   **Q.**   AND HE ALSO SAYS, MAYBE HE THINK THAT IT IS NOT PROBLEM

 9   FOR HIM.  AND HE SAID, NO NEED TO EXPOSE ANYTHING.

10   BASED ON THE CONTEXT OF YOUR CONVERSATION, WHAT DID YOU

11   UNDERSTAND THE DEFENDANT TO SAY WHEN HE SAID "HE" FIRST.

12   **A.**   I BELIEVED HE WAS REFERRING TO MR. TAHERKHANI.

13   **Q.**   AND CAN YOU FURTHER EXPLAIN YOUR UNDERSTANDING OF WHAT

14   HE MEANT WHEN HE WAS REFERRING TO MR. TAHERKHANI?

15   **A.**   THAT MR. TAHERKHANI --

16           **MR. JOHNSTON:**   OBJECTION.  LACK OF PERSONAL

17   KNOWLEDGE.

18   **Q.**   **(MR. HARRIGAN)** YOUR UNDERSTANDING.  I AM SORRY.

19           **THE COURT:**   I WOULD OVERRULE THE OBJECTION.  THE

20   TESTIMONY IS OFFERED TO EXPLAIN AGENT COLE'S UNDERSTANDING OF

21   THE CONVERSATION ONLY.

22           SO YOU MAY RESPOND.

23           **THE WITNESS:**   I UNDERSTOOD IT TO MEAN THAT

24   MR. TAHERKHANI PERHAPS DIDN'T SEE THE PROBLEM BASED ON THE

25   FACT HE WAS NOT IN THE U.S., AND THEREFORE THERE WAS DIFFERENT

APRIL 15, 2015

COLE − DIRECT EXAMINATION

1    ISSUES FOR HIM AND LESS RISK AS THERE WAS FOR US.

2    **Q.**    **(MR. HARRIGAN)** HE IS NOT IN THE U.S. LIKE YOU AND

3    DEFENDANT.

4    **A.**    AND THE DEFENDANT, CORRECT.

5    **Q.**    AND THAT CONVERSATION CONTINUED, CORRECT?

6    **A.**    CORRECT.

7    **Q.**    LET ME PLAY YOU THE NEXT CLIP.

8    **A.**    OKAY.

9            **MR. HARRIGAN:**  GOVERNMENT'S EXHIBIT 312, THAT WOULD

10   BE.

11           (AUDIO PLAYED)

12   **Q.**    **(MR. HARRIGAN)** IN THAT CONVERSATION WITH DEFENDANT

13   DEFENDANT SAYS −− PARAPHRASING −− THE WAY THEY DO BUSINESS IN

14   THE U.S. IS VERY DIFFERENT FROM OVER THERE.

15       BASED ON THE CONTEXT OF YOUR PRIOR CONVERSATIONS AND

16   THAT CONVERSATION, WHAT DID YOU UNDERSTAND DEFENDANT TO MEAN

17   BY THE TERM OVER THERE?

18   **A.**    I UNDERSTOOD IT TO MEAN IRAN.

19   **Q.**    AND DEFENDANT REFERS TO KOORUSH, OR MR. TAHERKHANI, AND

20   AGAIN SAYS YOU SHOULD −− HE TOLD MR. TAHERKHANI, YOU SHOULD

21   HAVE ACCEPTED THESE PAID TRANSACTION BECAUSE YOU WANT

22   SOMETHING THIS COUNTRY TO THAT AREA OR SOMETHING.  BUT, YOU

23   KNOW, HE DOESN'T WANT TO ACCEPT THE RISKS SOMETIMES.

24       AGAIN, BASED ON THE CONTEXT OF THAT TELEPHONE

25   CONVERSATION AND YOUR PRIOR CONVERSATIONS, WHAT DID YOU

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1  UNDERSTAND THE DEFENDANT TO MEAN?

2  **A.**    I UNDERSTOOD THE DEFENDANT WAS SAYING THAT SINCE

3  KOORUSH, MR. TAHERKHANI, WANTED PRODUCTS FROM THE U.S.

4  DELIVERED OVER TO IRAN THAT HE SHOULD ACCEPT THE RISKS

5  INVOLVED AND MAKE THE PAYMENTS.

6  **Q.**    AND I WANT TO PLAY YOU NEXT WHAT I THINK IS THE FINAL

7  CLIP FROM THIS FIRST PART OF THE TELEPHONE CONVERSATION.

8  **A.**    OKAY.

9          (AUDIO PLAYED)

10  **Q.**    **(MR. HARRIGAN)** OKAY.  DURING THE COURSE OF THAT

11  EXCERPT, WHAT DOES DEFENDANT SAY ABOUT HIS KNOWLEDGE OF MR.

12  TAHERKHANI'S FINANCING OF THE PURCHASE FOR GOODS FROM THE

13  UNITED STATES?

14  **A.**    HE SAID THAT HE KNOWS THAT HE HAS OTHER INVESTORS, AND

15  NOT ALL OF THE MONEY IS COMING DIRECTLY FROM MR. TAHERKHANI.

16  **Q.**    AND HE DESCRIBES THAT HOW?  AS WHAT?

17  **A.**    AS A TEAM WORK.

18  **Q.**    OKAY.  AND WHEN YOU USED THE TERM HOME COUNTRY –– AGAIN,

19  YOUR HOME COUNTRY, REFERRING TO DEFENDANT –– WHAT ARE YOU

20  REFERRING TO?

21  **A.**    REFERRING TO IRAN.

22  **Q.**    AND YOU ALSO SAY IN THAT CONVERSATION THAT YOU HAVE ALSO

23  DEALT WITH INDIVIDUALS IN HIS HOME COUNTRY BEFORE WHO WERE

24  AFRAID OF BEING RIPPED OFF.

25  **A.**    CORRECT.

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   **Q.**   WERE YOU PLAYING THE ROLE OF DAVID MILLS OR --

2   **A.**   YEAH.  I WAS PLAYING THE ROLE OF DAVID MILLS, CORRECT.

3   **Q.**   AND YOU SAY, BUT WE NEED TO BE HONEST WITH EACH OTHER

4   ABOUT WHAT'S GOING ON SO WE CAN TRUST EACH OTHER.

5        IN OTHER WORDS, MR. TAHERKHANI NEEDS TO BE MORE HONEST

6   WITH YOU ABOUT WHERE THEY ARE GOING.

7        WHAT DOES THE DEFENDANT SAY TO THAT?

8   **A.**   HE SAYS THAT ESSENTIALLY SOMETIMES THERE IS NO NEED --

9   WHEN YOU ALREADY KNOW WHAT IS GOING ON AND WHAT IS HAPPENING

10  THERE IS NO NEED TO ACTUALLY VERBALIZE IT OR TO TALK ABOUT IT.

11  **Q.**   AND REFERRING YOU BACK TO YOUR CONVERSATION DID

12  DEFENDANT TELL YOU, HONEST WITH YOU SOMETIMES, NO NEED TO

13  DISCLOSE EVEN OUR FOREIGN WHEN WE KNOW WHAT IS GOING ON.

14  **A.**   CORRECT.

15  **Q.**   THOSE WERE DEFENDANT'S WORDS?

16  **A.**   CORRECT.

17  **Q.**   HE ALSO TELLS YOU, I WANT TO TELL YOU, I KNOW KOORUSH, I

18  KNOW HIS COMPANY, I KNOW SO MANY PEOPLE OVER THERE.

19        AGAIN, BASED ON THE CONTEXT OF YOUR CONVERSATION, WHEN

20  DEFENDANT SAYS OVER THERE, WHAT DID YOU UNDERSTAND HIM TO

21  MEAN?

22  **A.**   TO MEAN IRAN.

23  **Q.**   AND HE ALSO TELLS YOU, AND THEY LET ME KNOW HOW KOORUSH

24  IS.  KOORUSH IS VERY HARD, BUT HE HAS SUCCESSFUL BUSINESS

25  AROUND THERE.  EVERYBODY KNOWS.

APRIL 15, 2015

COLE - DIRECT EXAMINATION

```
 1         AGAIN, CAN YOU EXPLAIN THAT -- YOUR UNDERSTANDING OF
 2   THAT STATEMENT TO YOU IN THE CONTEXT OF YOUR ENTIRE
 3   CONVERSATION?
 4   A.    MY UNDERSTANDING, BASED ON THE CONTEXT OF THE
 5   CONVERSATION, WAS THAT BECAUSE HE HAS SO MANY CONTACTS, THE
 6   DEFENDANT HAS CONTACTS IN IRAN, THAT HE KNOWS PEOPLE THAT KNOW
 7   MR. TAHERKHANI.  AND THEY ALREADY LET HIM KNOW HE IS A
 8   DIFFICULT BUSINESSMAN TO WORK WITH, BUT HE IS ALSO VERY
 9   SUCCESSFUL.
10   Q.    AT ANY POINT DURING THAT CONVERSATION DID THE DEFENDANT
11   CORRECT YOU AND SAY, YOU ARE WRONG, DAVID, THESE GOODS ARE NOT
12   GOING TO IRAN.
13   A.    NEVER.
14   Q.    NOW, THAT CONVERSATION GOT CUT OFF.  IS THAT WHAT YOU
15   SAID?
16   A.    CORRECT.
17   Q.    AND DID IT CONTINUE FURTHER IN GOVERNMENT EXHIBIT 313?
18   A.    YES, IT DID.
19         MR. HARRIGAN:  WITH THE COURT'S PERMISSION, I WOULD
20   LIKE TO PLAY THAT CLIP FOR THE JURY.
21         THE COURT:  YES.
22         (AUDIO PLAYED)
23   Q.    (MR. HARRIGAN) ALL RIGHT.  DURING THAT CLIP DEFENDANT
24   TELLS YOU, DAVID, THERE IS SOMETHING THAT YOU ARE NOT GOING
25   WRONG, I AM NOT GOING WRONG, YOU KNOW, IF YOU SELL SOMETHING
```

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1    IN THIS COUNTRY TO ME TODAY, AND SIX MONTHS LATER IS THIS

2    GOING TO AFRICA, SUDAN, OR SOME CIVIL WAR COUNTRY OR SOMETHING

3    THERE, THIS IS NOT YOUR FAULT -- EXCUSE ME.  IF HE KNOWS THAT

4    THIS IS GOING TO OWN COUNTRY OR SOMETHING HIS PROBLEM AND --

5           **MR. JOHNSTON:**  YOUR HONOR, I WOULD OBJECT.  I THINK

6    THE EVIDENCE SPEAKS FOR ITSELF.  HE CAN ASK THE AGENT.

7           **MR. HARRIGAN:**  LET ME REPHRASE THE QUESTION, YOUR

8    HONOR.

9           **THE COURT:**  ALL RIGHT.

10   **Q.**   **(MR. HARRIGAN)** DURING THAT CONVERSATION DEFENDANT TELLS

11   YOU, ESSENTIALLY -- COULD JUST YOU EXPLAIN DURING THE CONTEXT

12   OF THAT CONVERSATION WHAT YOU UNDERSTOOD DEFENDANT TO MEAN?

13   **A.**    SURE.  WHAT I UNDERSTOOD IT TO MEAN WAS HE, I FEEL, WAS

14   TRYING TO EXPLAIN TO US, OR TO ME, THE TWO OF US, THAT WE WERE

15   INSULATED BECAUSE MR. TAHERKHANI, HE HAD GIVEN US THE END USER

16   INFORMATION.  SO IF IN FACT THE PRODUCTS WIND UP IN IRAN SIX

17   MONTHS LATER OR A YEAR LATER, OR IN HIS EXAMPLE IN A CIVIL WAR

18   COUNTRY, AND THEY ARE FOUND OUT AND IT IS A BAD THING, THAT I

19   AM INSULATED, HE IS INSULATED, BECAUSE MR. TAHERKHANI GAVE US

20   THAT IN HIS INFORMATION.  SO HE SHOULD BE IN TROUBLE OVER

21   THERE, BUT WE KEEP OUR HANDS OUT OF IT.

22          THAT IS WHAT I UNDERSTOOD HIM TO BE TELLING ME.

23   **Q.**    AND HE SAYS, AND HE IS GOING TO JAIL OVER THERE, NOT

24   HERE.

25   **A.**    CORRECT.

APRIL 15, 2015

597

COLE – DIRECT EXAMINATION

1   **Q.**    AND BY HE, WHO DID YOU UNDERSTAND HIM TO REFER TO?

2   **A.**    MR. TAHERKHANI.

3          **MR. HARRIGAN:**  ONE MOMENT YOUR HONOR.

4   **Q.**   **(MR. HARRIGAN)** NOW, FOLLOWING THAT TELEPHONE

5   CONVERSATION ON MAY 28TH, DID YOU SEND AN EMAIL TO THE

6   DEFENDANT AND MR. TAHERKHANI DESIGNED TO ADDRESS THE RISKS YOU

7   RAISED IN YOUR TELEPHONE CONVERSATIONS WITH DEFENDANT ON MAY

8   28TH?

9   **A.**    YES.

10  **Q.**    LET ME SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S

11  EXHIBIT 128.

12  **A.**    OKAY.

13  **Q.**    AND DO YOU RECOGNIZE THAT EMAIL?

14  **A.**    YES, I DO.

15  **Q.**    AND THAT EMAIL CONSISTS OF HOW MANY PAGES?

16  **A.**    IT APPEARS IT IS TWO PAGES.

17  **Q.**    AND DID YOU SEND THIS EMAIL TO THE DEFENDANT?

18  **A.**    YES.

19  **Q.**    AND MR. TAHERKHANI?

20  **A.**    YES.

21  **Q.**    AND WHEN WAS IT SENT?

22  **A.**    ON MAY 29TH, 2013.

23          **MR. HARRIGAN:**  I WOULD MOVE TO ADMIT THIS OR PUBLISH

24  IT TO THE JURY, YOUR HONOR.

25          **THE COURT:**  ANY OBJECTION?

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1          **MR. JOHNSTON:**  NO, YOUR HONOR.

2          **THE COURT:**  RECEIVED.

3          (EXHIBIT 128 RECEIVED INTO EVIDENCE)

4    **Q.**    **(MR. HARRIGAN)** AGAIN, SHOWING YOU THE HEADER, YOU SENT

5    THIS ON MAY 29TH, YOU SAID?

6    **A.**    CORRECT.

7    **Q.**    AND THE SUBJECT IS?

8    **A.**    CONTRACT STATUS, BUSINESS RELATIONSHIPS.

9    **Q.**    NOW, THIS IS A VERY LONG EMAIL, RIGHT?

10   **A.**    IT IS.

11   **Q.**    WOULD YOU SUMMARIZE WHAT YOU TOLD DEFENDANT AND MR.

12   TAHERKHANI IN THIS EMAIL?

13   **A.**    THE EMAIL BASICALLY PROPOSES A NEW METHOD BY WHICH WE

14   CAN CONTINUE OUR BUSINESS RELATIONSHIP AND YET REDUCE THE

15   FINANCIAL RISK FOR THE DEFENDANT AND MR. TAHERKHANI, AND AT

16   THE SAME TIME AVOID EXPOSING THE ILLEGAL ASPECTS OF OUR DEAL

17   TO A BANKING UNDERWRITING PROCESS.

18        SO ESSENTIALLY I PROPOSED THE MONEY THEY HAD ALREADY

19   PAID UP FRONT AS A DEPOSIT FOR THE FIRST FOUR GYROCOMPASSES

20   COULD BE APPLIED TOWARDS THE PURCHASE OF ONE GYROCOMPASS.

21        WE COULD MEET IN LAS VEGAS.  THE DEFENDANT AND MR.

22   TAHERKHANI OR ANOTHER REPRESENTATIVE COULD SEE ALL OF THE

23   EQUIPMENT.  IF THEY APPROVED OF IT THEY COULD MAKE THE FINAL

24   40 PERCENT PAYMENT AS ORIGINALLY AGREED TO FOR THE FOUR

25   GYROCOMPASSES, ALL AT ONCE.  AND THEN ANY UNITS WE HAD OF THE

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1    Y-690'S THEY COULD PAY FOR IN WHOLE AND WALK AWAY FROM THE

2    MEETING WITH THE EQUIPMENT, ESSENTIALLY.

3    **Q.**    THIS WAS A MODIFIED PROPOSAL?

4    **A.**    IT WAS A MODIFIED PROPOSAL.  SO IT WAS ONE LONG EMAIL TO

5    SORT OF MODIFY ALL OF OUR STUFF UP TO THAT POINT.

6    **Q.**    AND THE MODIFIED PROPOSAL WAS TO SELL ONE OR FOUR

7    GYROCOMPASSES FIRST?

8    **A.**    TO SELL ONE.

9    **Q.**    OKAY.  AND ESSENTIALLY HOW MUCH MONEY WERE YOU

10   REQUESTING TO DELIVER THAT ONE GYROCOMPASS AND WHATEVER

11   Y-690'S WERE AVAILABLE?

12   **A.**    WE WERE REQUESTING 100 PERCENT PAYMENT FOR HOWEVER MANY

13   Y-690'S THAT WE HAD AT THE TIME IN VEGAS.  AND THEN WE WERE

14   STILL REQUESTING A FULL 50 PERCENT PAYMENT FOR THE ONE

15   GYROCOMPASS, WHICH I BELIEVE WOULD HAVE WORKED OUT TO MAYBE

16   30,000, ROUGHLY, GIVEN OR TAKE.

17   **Q.**    YOU HAD ALREADY GIVEN HIM CREDIT FOR THE 10 PERCENT THEY

18   HAD MADE FOR THAT ONE GYRO?

19   **A.**    CORRECT.

20   **Q.**    AND YOU EXPLAINED THIS IS ALL TO DO WHAT?

21   **A.**    TO SORT OF GET OVER THE HURDLE OF THE TRUST FOR THE

22   PAYMENT, AND TO AVOID THE NEED FOR THE LETTER OF CREDIT WHICH

23   WOULD HAVE EXPOSED OUR CONTRACT AND OUR ILLEGAL ACTIVITY TO A

24   BANK.

25   **Q.**    SO AFTER YOU SENT THIS EMAIL, DID YOU HAVE A FOLLOW-UP

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1    CONVERSATION WITH THE DEFENDANT?

2    **A.**    YES.

3    **Q.**    IN WHICH YOU DISCUSSED THESE SAME FACTS?

4    **A.**    CORRECT.

5    **Q.**    LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT

6    EXHIBIT 314.

7    **A.**    OKAY.

8    **Q.**    IS THAT A RECORDING OF THAT TELEPHONE CONVERSATION?

9    **A.**    YES.

10   **Q.**    AND THAT OCCURRED ON WHAT DATE?

11   **A.**    ON MAY 29TH, 2013.

12   **Q.**    AND DOES THAT CD CONTAIN THE ENTIRE CONVERSATION?

13   **A.**    NO, SIR.

14   **Q.**    JUST AN EXCERPT?

15   **A.**    YES.

16   **Q.**    ONE EXCERPT, OR MORE?

17   **A.**    JUST ONE.

18        **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION, I WOULD

19   MOVE TO PUBLISH THAT FOR THE JURY.

20        **THE COURT:**  YES.

21        (AUDIO PLAYED)

22   **Q.**    **(MR. HARRIGAN)** AFTER THAT TELEPHONE CONVERSATIONS –– IN

23   THAT TELEPHONE CONVERSATION YOU ASK DEFENDANT TO DISCUSS THIS

24   WITH TIG MARINE MANAGEMENT.  BY THAT YOU MEANT?

25   **A.**    MR. TAHERKHANI.

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1   **Q.**    OKAY.  DID YOU SUBSEQUENTLY SPEAK WITH MR. TAHERKHANI?

2   **A.**    YES.

3   **Q.**    AND HOW DID THAT OCCUR?

4   **A.**    VIA TELEPHONE.

5   **Q.**    AND WHO SET THAT UP?

6   **A.**    THE DEFENDANT.

7   **Q.**    OKAY.  AND WHO WAS ON THE TELEPHONE IN THAT TELEPHONE

8   CONVERSATION?

9   **A.**    MYSELF, THE DEFENDANT AND MR. TAHERKHANI.

10  **Q.**    AND IT WAS A CONFERENCE CALL?

11  **A.**    IT WAS.

12  **Q.**    AND YOUR PURPOSE OF CALLING MR. TAHERKHANI AND

13  DISCUSSING, OR REQUESTING TO SPEAK WITH HIM WAS WHAT?

14  **A.**    WAS TO REHASH OUR BUSINESS TROUBLE TO THAT POINT, AND TO

15  TRY AND SET UP A MORE SUCCESSFUL, SMOOTH OPERATION GOING

16  FORWARD.  AND TO DISCUSS THE FACT THAT HE IS IN IRAN, AND THAT

17  IF WE ARE GOING TO DO BUSINESS THIS WAY WE NEED TO BE MORE

18  TRUSTING AND MORE SMOOTH.

19  **Q.**    ALL RIGHT.  DURING THAT TELEPHONE CONVERSATION YOU SPOKE

20  WITH MR. TAHERKHANI, CORRECT?

21  **A.**    CORRECT.

22  **Q.**    ALL RIGHT.  AND DID YOU THEN EXPLAIN TO HIM WHAT YOU

23  JUST RELATED TO THE JURY?

24  **A.**    NO, I DID NOT.

25  **Q.**    WHY NOT?

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1  **A.**    WHEN I ATTEMPTED TO DISCUSS WITH HIM ABOUT HIM BEING IN

2  IRAN AND THE BUSINESS BEING FOR IRAN, THE DEFENDANT STOPPED

3  ME.

4  **Q.**    WHAT DID DEFENDANT SAY?

5  **A.**    THAT THERE IS -- DON'T TALK ABOUT THAT SORT OF THING

6  OVER THE TELEPHONE.

7  **Q.**    ALL RIGHT.  AND YOU UNDERSTOOD HIM TO MEAN WHAT?

8  **A.**    TO MEAN DON'T DISCUSS BUSINESS IN IRAN VIA THE

9  TELEPHONE.

10      **MR. HARRIGAN:**  AND WITH THE COURT'S PERMISSION --

11  EXCUSE ME.

12  **Q.**    **(MR. HARRIGAN)** LET ME SHOW YOU GOVERNMENT'S EXHIBIT 315

13  BEFORE YOU.

14  **A.**    OKAY.

15  **Q.**    THAT SHOULD BE A CD.

16  **A.**    OKAY.

17  **Q.**    AND DO YOU RECOGNIZE THAT?

18  **A.**    YES, SIR.

19  **Q.**    AND IS THAT THE TELEPHONE CONVERSATION YOU HAD, OR

20  CONFERENCE CALL, WITH DEFENDANT AND MR. TAHERKHANI?

21  **A.**    YES.

22  **Q.**    AND WHEN DID THAT OCCUR?

23  **A.**    ON MAY 30TH, 2013.

24  **Q.**    AND DOES THAT CONTAIN THE ENTIRE CONVERSATION?

25  **A.**    NO, SIR.

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   **Q.**   WILL WE HEAR MR. TAHERKHANI'S VOICE ON THAT?

2   **A.**   YOU WILL NOT.

3   **Q.**   DOES THIS CONVERSATION TAKE PLACE AFTER YOU HAD BRIEFLY

4   SPOKEN WITH HIM?

5   **A.**   CORRECT.

6        **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION, I MOVE

7   TO PLAY GOVERNMENT'S EXHIBIT 315.

8        **THE COURT:**  YES.

9        (AUDIO PLAYED)

10  **Q.**   **(MR. HARRIGAN)** IN THAT CONVERSATION WHO SAYS, I CUTTING

11  YOU, I DON'T WANT OVER THE PHONE WE TALK ABOUT THIS ISSUE --

12  OR THAT ISSUE?

13  **A.**   THE DEFENDANT.

14  **Q.**   THOSE ARE HIS WORDS YOU HEARD?

15  **A.**   CORRECT.

16  **Q.**   FOLLOWING THIS TELEPHONE CONVERSATION, DID MR.

17  TAHERKHANI AGREE TO THE MODIFIED PROPOSAL?

18  **A.**   YES.

19  **Q.**   NOW, THERE WAS REFERENCE IN THERE TO A MR. YILDIZ.  CAN

20  YOU EXPLAIN -- AND MR. YILDIZ' TRAVEL.  CAN YOU EXPLAIN THAT

21  TO THE LADIES AND GENTLEMEN OF THE JURY?

22  **A.**   YEAH.  SO MR. TAHERKHANI, AT SOME POINT AS YOU HEARD,

23  HAD DECIDED NOT TO TRAVEL TO THE U.S. FOR FEARS HE PERHAPS

24  WOULD BE ARRESTED.  SO INSTEAD HE SENT A BUSINESS PARTNER, MR.

25  YILDIZ, THE GENTLEMAN HE REFERRED TO IN THE EMAIL AS A GERMAN

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   MAN.  HE SENT HIM TO ATTEND OUR BUSINESS MEETING IN LAS VEGAS.

2   **Q.**   AND SHOWING YOU GOVERNMENT'S EXHIBIT 126 FOR

3   IDENTIFICATION.  DO YOU RECOGNIZE THAT EMAIL?

4   **A.**   YES.

5   **Q.**   IS THAT AN EMAIL FROM MR. TAHERKHANI TO YOU?

6   **A.**   YES.

7   **Q.**   REGARDING MR. YILDIZ?

8   **A.**   CORRECT.

9        **MR. HARRIGAN:**  I MOVE TO ADMIT THIS, IF THERE ARE NO

10  OBJECTIONS.

11       **THE COURT:**  ANY OBJECTION?

12       **MR. JOHNSTON:**  NO, YOUR HONOR.

13       **THE COURT:**  IT IS RECEIVED.

14       (EXHIBIT 126 RECEIVED INTO EVIDENCE)

15  **Q.**   **(MR. HARRIGAN)** AND SHOWING YOU THE HEADER.  AGAIN, THAT

16  IS FROM MR. TAHERKHANI TO YOU.  AND WHO IS CC'D?

17  **A.**   THE DEFENDANT AND MR. YILDIZ.

18  **Q.**   ALL RIGHT.  AND THE SUBJECT IS?

19  **A.**   TRAVEL TO U.S.

20  **Q.**   AND IS THERE AN ATTACHMENT?

21  **A.**   CORRECT.

22  **Q.**   RIGHT.  IN THE –– LOOKING AT THE CONTENT OF THAT, WHAT

23  DOES MR. TAHERKHANI TELL YOU?

24  **A.**   ESSENTIALLY, SORRY FOR HIS LATE REPLY.  AND THAT MR.

25  YILDIZ WILL BE THE ONE WHO WILL BE ATTENDING OUR BUSINESS

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1    MEETING.

2    **Q.**    AND YOUR BUSINESS MEETING YOU PREVIOUSLY TESTIFIED

3    ABOUT.

4    **A.**    CORRECT.

5    **Q.**    WHERE YOU INVITED MR. TAHERKHANI.

6    **A.**    CORRECT.

7    **Q.**    DID HE ATTACH A PASSPORT TO THAT?

8    **A.**    HE DID.

9    **Q.**    WHOSE PASSPORT DID HE ATTACH?

10   **A.**    THE PASSPORT OF MR. YILDIZ.

11   **Q.**    AND TAKING A LOOK AT THAT PASSPORT.  NOW, THAT'S A

12   GERMAN PASSPORT, RIGHT?

13   **A.**    CORRECT.

14   **Q.**    THAT IS MR. YILDIZ?

15   **A.**    IT IS.

16   **Q.**    YOU MET WITH HIM SUBSEQUENTLY?

17   **A.**    I DID.

18   **Q.**    AFTER YOUR DISCUSSION ABOUT THE MODIFIED PROPOSAL

19   COMMUNICATIONS AND MR. TAHERKHANI AND DEFENDANT'S AGREEMENT TO

20   THE MODIFIED PROPOSAL, DID MR. YILDIZ WEIGH IN?

21   **A.**    YES.

22   **Q.**    SHOWING YOU GOVERNMENT'S EXHIBIT 130 FOR

23   IDENTIFICATION -- 129.  EXCUSE ME.

24        DO YOU RECOGNIZE THAT EMAIL?

25   **A.**    YES.

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   **Q.**    AND IS THAT EMAIL FROM MR. YILDIZ TO YOU?

2   **A.**    YES.

3            **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION, I WOULD

4   MOVE TO ADMIT THAT AND PUBLISH THAT TO THE JURY, IF THERE ARE

5   NO OBJECTIONS.

6            **THE COURT:**  ANY OBJECTION?

7            **MR. JOHNSTON:**  NO, YOUR HONOR.

8            **THE COURT:**  IT IS RECEIVED.

9            (EXHIBIT 129 RECEIVED INTO EVIDENCE)

10  **Q.**    **(MR. HARRIGAN)** ALL RIGHT.  STARTING WITH THE HEADER

11  INFORMATION, IF YOU WOULD LOOK AT THAT.

12           NOW, IS THIS YOUR FIRST COMMUNICATION WITH ERGUN YILDIZ?

13  **A.**    YES.

14  **Q.**    AND PRIOR TO THAT TIME, ALTHOUGH YOU HEARD HIS NAME, HAD

15  YOU EVER HAD EMAIL COMMUNICATION WITH HIM?

16  **A.**    NO.

17  **Q.**    THIS EMAIL IS FROM WHOM TO WHOM?

18  **A.**    IT WAS FROM YILDIZ, AND IT IS TO MR. TAHERKHANI.  AND IT

19  IS CC'D, OR INCLUDE, ME AND THE DEFENDANT.

20  **Q.**    AND LOOKING AT THE CONTENT OF THAT EMAIL.  AND WHAT DOES

21  MR. YILDIZ TELL YOU?

22  **A.**    THAT HE READ AND UNDERSTOOD THE EMAIL.  THAT EVERYTHING

23  SEEMS OKAY TO HIM.  THAT HE THINKS IT IS A GOOD IDEA TO MEET

24  WHERE THEY COULD TEST THE EQUIPMENT AND ELIMINATE ANY SECOND

25  THOUGHTS RIGHT ON THE SPOT SO IT WOULD BE EASIER TO MORE

APRIL 15, 2015

COLE – DIRECT EXAMINATION

 1   COMFORTABLY MOVE FORWARD WITH THE WIRE TRANSFER.

 2   **Q.**   AND DOES HE REFER TO ANYBODY ELSE IN THE EMAIL?

 3   **A.**   YES, HE DOES.

 4   **Q.**   WHO DOES HE REFER TO?

 5   **A.**   THE DEFENDANT.

 6   **Q.**   WHAT DID HE SAY ABOUT WHAT HE AND DEFENDANT WILL BE

 7   DOING?

 8   **A.**   THAT THEY WILL VERIFY THE PRODUCT.  WE WILL –– WE WILL

 9   WIRE THE MONEY AND TAKE PRODUCT WITH US.

10   **Q.**   AND FOLLOWING THAT EMAIL COMMUNICATION DID –– WERE THERE

11   TRAVEL ARRANGEMENTS FOR DEFENDANT AND MR. YILDIZ TO TRAVEL TO

12   VEGAS?

13   **A.**   YES.

14   **Q.**   AND DEFENDANT WAS COMING FROM WHERE?

15   **A.**   FROM DUBAI –– I AM SORRY.  I AM SORRY.  THE DEFENDANT

16   WAS COMING FROM, I BELIEVE, THE NEW YORK AREA.  I THINK NEWARK

17   AIRPORT.

18   **Q.**   AND MR. YILDIZ?

19   **A.**   FROM DUBAI.

20   **Q.**   ALL RIGHT.  AND DID YOU –– AFTER THEY AGREED TO TRAVEL

21   DID YOU SEND HIM ANY EMAILS REGARDING THEIR TRAVEL AND THE

22   MEETING?

23   **A.**   YES, I DID.  I SENT AN EMAIL WITH SORT OF AN OUTLINE OF

24   DATES AND TIMES, AND SENT THEM THE AIRLINE TICKETS THAT WE HAD

25   PURCHASED FOR THEM.

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1  **Q.**   LET ME SHOW YOU GOVERNMENT EXHIBIT 130.

2  **A.**   OKAY.

3  **Q.**   AND DO YOU RECOGNIZE THIS EMAIL?

4  **A.**   YES.

5  **Q.**   AND IS THIS -- WHO IS THIS FROM AND TO WHO?

6  **A.**   IT WAS SENT BY ME TO THE DEFENDANT AND MR. YILDIZ AND TO

7  MR. TAHERKHANI.

8  **Q.**   AND DOES IT REGARD THE MEETING IN VEGAS?

9  **A.**   CORRECT.

10        **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION, I MOVE

11  TO ADMIT THAT EXHIBIT, 130.

12        **MR. JOHNSTON:**  NO OBJECTION.

13        **THE COURT:**  RECEIVED.

14        (EXHIBIT 130 RECEIVED INTO EVIDENCE)

15  **Q.**   **(MR. HARRIGAN)** AND FIRST LOOKING AT THE HEADER.

16  **A.**   OKAY.

17  **Q.**   THIS WAS SENT ON JUNE 11TH BY YOU?

18  **A.**   CORRECT.

19  **Q.**   TO DEFENDANT?

20  **A.**   CORRECT.

21  **Q.**   MR. YILDIZ?

22  **A.**   YES.

23  **Q.**   MR. TAHERKHANI?

24  **A.**   YES, SIR.

25  **Q.**   AND CAN YOU SUMMARIZE WHAT'S IN THE CONTENT WITH REGARDS

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   TO WHAT WILL HAPPEN?

2   **A.**    THAT ESSENTIALLY WE PLAN ON MEETING IN VEGAS, AND IF

3   EVERYTHING GOES SMOOTHLY WOULD LIKE TO HAVE THE MEETINGS

4   WRAPPED UP.  AND THAT WAY THEY CAN VERIFY THE PRODUCTS BY NO

5   LATER THAN THURSDAY SO THE WIRE TRANSFER CAN BE COMPLETED AND

6   WE CAN MOVE ON WITH THAT FIRST PHASE OF BUSINESS.

7   **Q.**    AND ONCE THE GOODS WERE VIEWED, THE WIRE TRANSFER WAS

8   MADE, WHAT WAS THE PROPOSED PLAN?

9   **A.**    THAT THE DEFENDANT AND MR. YILDIZ COULD SHIP AND/OR TAKE

10  THE GOODS WITH THEM DIRECTLY.

11  **Q.**    SO DID YOU SUBSEQUENTLY MEET WITH BOTH THE DEFENDANT AND

12  MR. YILDIZ IN LAS VEGAS?

13  **A.**    YES.

14  **Q.**    AND WHEN DID THAT OR THOSE MEETINGS OCCUR?

15  **A.**    SHORTLY AFTER THE EMAIL.

16  **Q.**    OKAY.  DID YOU MEET WITH DEFENDANT FIRST, OR BOTH OF

17  THEM TOGETHER?

18  **A.**    FIRST WITH THE DEFENDANT, AND THEN THE FOLLOWING DAY I

19  MET WITH BOTH OF THEM TOGETHER.

20  **Q.**    AND THIS EMAIL WAS SENT ON TUESDAY, JUNE 11.

21  **A.**    CORRECT.

22  **Q.**    WHEN DID YOU MEET WITH THE DEFENDANT FIRST?

23  **A.**    ON WEDNESDAY, JUNE 12TH.

24  **Q.**    AND WHERE DID THAT MEETING OCCUR?

25  **A.**    IT OCCURRED AT A RESTAURANT IN A HOTEL IN LAS VEGAS.

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1   **Q.**    ALL RIGHT.   AND WAS IT JUST YOU AND THE DEFENDANT?

2   **A.**    IT WAS JUST THE TWO OF US.   THE RESTAURANT HAD A LOT OF

3   OTHER PEOPLE THERE.

4   **Q.**    WERE THERE ANY SURVEILLANCE AGENTS IN THE RESTAURANT?

5   **A.**    CORRECT, THERE WERE.

6   **Q.**    AND DID ANYBODY ELSE SHOW UP AND MEET WITH THE

7   DEFENDANT?

8   **A.**    YES.   AT THE CONCLUSION OF OUR DINNER TIME TOGETHER

9   ANOTHER UNDERCOVER AGENT, WHO WAS PLAYING THE ROLE OF MY

10  BUSINESS PARTNER, HE JOINED US AT THE VERY END.

11  **Q.**    WHO IS THAT UNDERCOVER AGENT?   HIS REAL NAME?

12  **A.**    HIS REAL NAME IS JOHN HELSING.

13  **Q.**    AND IS HE AN AGENT WITH HOMELAND SECURITY

14  INVESTIGATIONS?

15  **A.**    NO, HE IS NOT.

16  **Q.**    WHO IS HE WITH?

17  **A.**    HE IS A SPECIAL AGENT WITH THE DEPARTMENT OF DEFENSE.

18  **Q.**    THAT IS CRIMINAL INVESTIGATIVE SERVICES?

19  **A.**    CORRECT.   THE DEFENSE CRIMINAL INVESTIGATIVE SERVICE.

20  **Q.**    WAS THAT MEETING RECORDED?

21  **A.**    YES, IT WAS.

22  **Q.**    BY AUDIO?

23  **A.**    BY AUDIO.

24  **Q.**    CAN YOU DESCRIBE HOW THAT WAS DONE?

25  **A.**    IT WAS DONE BY A COUPLE OF DIFFERENT METHODS, DEVICES

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   THAT WE HAVE THAT ARE DISCREET THAT WE USE TO RECORD AUDIO.

2   **Q.**   AND APPROXIMATELY HOW LONG DID THAT MEETING LAST?

3   **A.**   THE ACTUAL TIME THAT WE WERE TOGETHER WAS JUST, I THINK,

4   OVER AN HOUR.

5   **Q.**   AND THE RECORDING WAS LONGER?

6   **A.**   THE RECORDING WAS LONGER TO ACCOUNT FOR THE TIME THAT WE

7   WALKED IN TOGETHER, OR AND I WAITED.  AND THEN WHEN MYSELF AND

8   MR. HELSING LEFT, THE TIME THAT WE WALKED AWAY TO MAKE SURE WE

9   WERE NOT BEING FOLLOWED, ET CETERA.

10  **Q.**   AFTER THAT MEETING DID YOU HAVE A CHANCE TO REVIEW THAT

11  AUDIO RECORDING?

12  **A.**   YES.

13  **Q.**   TO DETERMINE IF IT ACCURATELY RECORDED WHAT YOU SAID,

14  WHAT DEFENDANT SAID, AND WHAT MR. HELSING SAID ON THAT DATE?

15  **A.**   YES.

16  **Q.**   I AM GOING TO SHOW YOU THE CD THAT IS MARKED

17  GOVERNMENT'S EXHIBIT 316.  I DON'T THINK YOU HAVE IDENTIFIED

18  THAT BEFORE.

19          (EXHIBIT 316 MARKED FOR IDENTIFICATION)

20  **A.**   OKAY.  OKAY.  I HAVE IT.

21  **Q.**   DO YOU RECOGNIZE THAT CD?

22  **A.**   YES, SIR.

23  **Q.**   HAVE YOU SEEN IT BEFORE YOU CAME TO COURT HERE TODAY?

24  **A.**   YES.

25  **Q.**   OKAY.  DOES THAT CONTAIN RECORDINGS FROM THE MEETING YOU

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1   HAD WITH DEFENDANT ON JUNE 12 AT THE LAS VEGAS RESTAURANT?

2   **A.**   YES.

3   **Q.**   DOES IT CONTAIN THE ENTIRE RECORDING?

4   **A.**   NO, IT DOES NOT.

5   **Q.**   DOES IT CONTAIN EXCERPTS?

6   **A.**   YES.

7   **Q.**   APPROXIMATELY HOW MANY EXCERPTS?

8   **A.**   APPROXIMATELY SEVEN EXCERPTS.

9   **Q.**   OKAY.  AND DID YOU HAVE A CHANCE TO REVIEW THOSE

10  EXCERPTS ALONG WITH A TRANSCRIPT THAT HAD BEEN PREPARED OF

11  THOSE EXCERPTS?

12  **A.**   YES.

13  **Q.**   TO DETERMINE IF THE TRANSCRIPTS REASONABLY AND

14  ACCURATELY DEPICTED WHAT WAS SAID THAT NIGHT?

15  **A.**   YES.

16  **Q.**   CAN YOU DESCRIBE, FIRST, WHAT GENERALLY WAS DISCUSSED AT

17  THAT MEETING WITH THE DEFENDANT?

18  **A.**   GENERALLY WE DISCUSSED ALL OF OUR TRANSACTIONS UP TO

19  THAT POINT, BUT THE MAIN THING WAS WE WERE ABLE TO SPEAK AND

20  CONVERSE MORE OPENLY.  AND DISCUSSED MR. TAHERKHANI, HIS

21  BUSINESS OVER IN IRAN, PERHAPS WHO AND WHERE THE PRODUCTS THEY

22  WERE PURCHASING WOULD BE USED IN IRAN.  THINGS OF THAT NATURE.

23  **Q.**   OKAY.

24          **MR. HARRIGAN:**  YOUR HONOR, WITH THE COURT'S

25  PERMISSION I WOULD MOVE TO ADMIT GOVERNMENT EXHIBIT 316 AND

APRIL 15, 2015

```
 1   THEN PLAY THOSE EXCERPTS ALONG WITH A TRANSCRIPT AS AN AID IN
 2   EXPLAINING AGENT COLE'S TESTIMONY TO THE JURY.
 3            THE COURT:  ANY OBJECTION?
 4            MR. JOHNSTON:  NO OBJECTION TO THE ADMISSION OF 316.
 5   BUT, AGAIN, THE DEFENSE DOESN'T AGREE TO THE ACCURACY,
 6   NECESSARILY, OF THE TRANSCRIPT.
 7            THE COURT:  ALL RIGHT.  316 IS RECEIVED, WITH THE
 8   SAME ADMONITION THAT THE AUDIO IS BEING RECEIVED INTO
 9   EVIDENCE.  THE TEXT IS NOT EVIDENCE BUT SIMPLY AN AID TO
10   ASSIST YOUR UNDERSTANDING OF WHAT IS ACTUALLY BEING SAID.
11            (EXHIBIT 316 RECEIVED INTO EVIDENCE)
12            (AUDIO PLAYED)
13   Q.   (MR. HARRIGAN) SO IN THAT PORTION OF YOUR CONVERSATION
14   YOU ARE DISCUSSING GENERALLY WHAT?
15   A.   GENERALLY JUST THE PLAN FOR AFTER THE MEETING TAKES
16   PLACE, HOW THEY WANT TO SHIP THE GOODS OUT OF THE U.S.
17   Q.   AND DEFENDANT ASKED YOU, WE CAN PUT ANY NAME ON THAT.
18        WHAT WAS YOUR UNDERSTANDING OF DEFENDANT'S STATEMENT?
19   A.   I UNDERSTOOD IT TO MEAN WHEN FILLING OUT THE PAPERWORK
20   WE COULD PUT DOWN THAT THE BOX CONTAINS ANYTHING WE WANT.
21   Q.   AND THEN DEFENDANT ASKS ABOUT INSURANCE FOLLOWING THAT.
22   AND YOU EXPLAINED YOUR UNDERSTANDING OF DEFENDANT'S STATEMENT,
23   I DON'T HAVE A LICENSE FOR EXPORT.
24   A.   CORRECT.
25   Q.   RIGHT?
```

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    AND WHAT DO YOU DISCUSS ABOUT INSURANCE?

3    **A.**    I SIMPLY DISCUSSED THE PROBLEM WITH THE INSURANCE WAS

4    THAT IF WE PUT DOWN ANY NAME, IN OTHER WORDS YOU PUT DOWN SOME

5    SORT OF FALSE CONTENT IN THE BOX, AND THEN YET FILE FOR, LET'S

6    SAY, $80,000 OF INSURANCE, IT IS GOING TO CREATE A PROBLEM.

7    BECAUSE THEN UPS IS GOING TO ASK, IN MY LOGIC, WHY DOES A BOX

8    HAVE A VALUE OF $80,000 IF THE BOX CONTAINS NOTHING OF

9    INTEREST.

10   **Q.**    AND WHEN DEFENDANT TELLS YOU, I DON'T HAVE A LICENSE FOR

11   EXPORT, YOU EXPLAIN TO HIM WHAT?

12   **A.**    THAT THAT PRODUCT DOESN'T NEED A LICENSE TO BE EXPORTED

13   OUT OF THE U.S. OR TO DUBAI.  IT WOULD OBVIOUSLY -- JUST TO

14   GET OUT OF THE COUNTRY, THERE WOULD BE NO LICENSE REQUIRED.

15   **Q.**    AND YOU ARE REFERRING TO WHAT?

16   **A.**    TO THE GYROCOMPASS.

17   **Q.**    DID YOU AGAIN TALK ABOUT HOW THE Y-690 WAS DIFFERENT?

18   **A.**    CORRECT.

19   **Q.**    AND WHAT DID YOU TELL HIM?

20   **A.**    THAT IT WAS UP TO THEM HOW THEY WANTED TO DO IT.  AND HE

21   SUGGESTED PERHAPS WE COULD PUT THE GYROCOMPASS IN ONE BOX WITH

22   THE Y-690'S MIXED IN WITH IT.

23        I SAID THAT WOULD BE FINE.  I SUGGESTED MR. YILDIZ COULD

24   TAKE IT WITH HIM ON HIS PERSON, AND HE DIDN'T LIKE THAT IDEA.

25   **Q.**    AND HAD HE EXPRESSED THAT SAME CONCERN BEFORE TO YOU?

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1   **A.**    CORRECT.  HE HAD EXPRESSED BEFORE HE DIDN'T LIKE THAT

2   IDEA.

3   **Q.**    AND YOUR UNDERSTANDING OF WHY HE DIDN'T LIKE THAT IDEA?

4   **A.**    THAT THERE WOULD BE A HIGH POSSIBILITY OF BEING CAUGHT

5   LEAVING AN AIRPORT AND CUSTOMS OR SOMEWHERE WHERE HE MIGHT BE

6   INSPECTED.

7   **Q.**    I WANT TO PLAY YOU NEXT ANOTHER EXCERPT FROM THAT

8   CONVERSATION, CLIP NO. 2.

9   **A.**    OKAY.

10          (AUDIO PLAYED)

11  **Q.**    **(MR. HARRIGAN)** IN THAT CONVERSATION DEFENDANT TELLS

12  YOU, IN THE BUSINESS, EVEN IN THE UNITED STATES TODAY, IF YOU

13  KNOW NOTHING ABOUT THAT IS SOMETHING IT IS BETTER FOR YOU.

14  YOU ARE PROTECTED.

15          BASED ON THE CONTEXT OF YOUR CONVERSATION, WHAT DID YOU

16  UNDERSTAND DEFENDANT --

17  **A.**    I UNDERSTOOD HIM TO MEAN THAT IT IS BETTER OFF YOU ASK

18  LESS AND YOU KNOW LESS, THAT WAY IF SOMETHING GOES WRONG YOU

19  ARE MORE PROTECTED.

20  **Q.**    AND DOES DEFENDANT FURTHER EXPLAIN -- RELATE THAT TO THE

21  CURRENT SITUATION, THE CURRENT DEALINGS WITH MR. TAHERKHANI?

22  **A.**    CORRECT.  THEN HE PROCEEDED TO SAY SOMETIMES HE HIMSELF

23  DIDN'T EVEN ASK KOORUSH WHERE IT WAS GOING BECAUSE HE HAS SO

24  MANY CONNECTIONS ALREADY OVER THERE THAT HE KNEW BY HIS OWN

25  CHANNELS WHERE IT WAS BEING USED OR FOR WHAT.

APRIL 15, 2015

526

COLE - DIRECT EXAMINATION

1  **Q.**    DID HE TELL YOU, I KNOW WHERE IT IS GOING AND WHICH

2  USER?

3  **A.**    CORRECT.

4  **Q.**    LET ME PLAY YOU THE NEXT EXCERPT FROM THAT CONVERSATION.

5  **A.**    OKAY.

6          (AUDIO PLAYED)

7  **Q.    (MR. HARRIGAN)** ALL RIGHT.  CAN YOU EXPLAIN, BASED ON

8  THE CONTEXT OF THE ENTIRE CONVERSATION, WHAT DEFENDANT IS --

9  WHAT YOU UNDERSTOOD DEFENDANT TO MEAN WHEN HE TALKS ABOUT

10  KOORUSH AND HIS KNOWLEDGE OF KOORUSH'S ACTIVITIES?

11  **A.**    SO HE IS SAYING THAT THEY HAVE KNOWN EACH OTHER FOR MORE

12  THAN 20 YEARS, THEY WERE CLASSMATES TOGETHER.  THEY BOTH

13  WORKED IN THE MARINE INDUSTRY TOGETHER, AND THAT THEY BOTH

14  HAVE A LOT OF CONNECTIONS.  AND THAT OFTENTIMES THE DEFENDANT

15  DIDN'T NEED TO ASK OR THERE WAS NO REASON TO ASK KOORUSH WHERE

16  THE PRODUCTS WERE GOING BECAUSE HE PERHAPS KNEW THE PRESIDENT

17  OF THE COMPANY THAT KOORUSH WAS SUPPLYING IT FOR, OR TWO OR

18  THREE MONTHS LATER THEY WOULD SAY, YEAH, WE GOT IT, VIA

19  KOORUSH.  SO HE DIDN'T EVEN BOTHER TO HAVE TO ASK MANY OF THE

20  TIMES.

21  **Q.**    DID HE SAY, NORMALLY DON'T ASK, BUT SOMETIMES KOORUSH

22  WILL TELL ME WHERE IT IS NEEDED?

23  **A.**    CORRECT.

24  **Q.**    WHEN HE SAID THEY WORKED IN THE SHIPPING INDUSTRY

25  TOGETHER, YOU USED THE TERM IRISL.

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   **A.**    YES.

2   **Q.**    ARE YOU FAMILIAR WITH A COMPANY BY THE NAMED IRISL?

3   **A.**    YES.

4   **Q.**    AND THAT IS AN ACRONYM?

5   **A.**    IT IS AN ACRONYM.

6   **Q.**    DO YOU KNOW WHAT THAT STANDS FOR?

7   **A.**    I BELIEVE IT STANDS FOR THE ISLAMIC REPUBLIC OF IRAN

8   SHIPPING LINE.

9   **Q.**    AND DEFENDANT SAID MR. TAHERKHANI DID WHAT WITH IRISL?

10  **A.**    HE WAS A CHIEF ENGINEER.

11  **Q.**    AND WHERE DID DEFENDANT REPRESENT HE WORKED?

12  **A.**    FOR A SUBSIDY OF IRISL.

13  **Q.**    OR A SUBSIDIARY?

14  **A.**    SUBSIDIARY, I ASSUMED -- YES, HIS WORDS WERE SUBSIDY.

15  **Q.**    LET ME PLAY THE FOURTH TRANSCRIPT EXCERPT FROM THIS

16  CONVERSATION.

17  **A.**    OKAY.

18           (AUDIO PLAYED)

19  **Q.**    **(MR. HARRIGAN)** ALL RIGHT.  DURING THAT CONVERSATION YOU

20  ARE DISCUSSING THE Y-690'S OR THE GYROCOMPASSES?

21  **A.**    AT THIS POINT THE Y-690'S.

22  **Q.**    AND YOU ASKED DEFENDANT WHERE THE Y-690'S OR THE TRIPOD

23  LAMPS ARE GOING TO BE USED OVER THERE.

24           YOU USED THE TERM AGAIN, OVER THERE.  WHAT DID YOU MEAN

25  BY OVER THERE?

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1   **A.**   BY OVER THERE I MEANT IRAN.

2   **Q.**   DID YOU MEAN DUBAI?

3   **A.**   NO, I DID NOT.

4   **Q.**   AT ANY POINT IN TIME DURING THIS CONVERSATION DID THE

5   DEFENDANT SAY THESE ARE GOING TO DUBAI?

6   **A.**   NEVER.  AT NO POINT IN TIME.

7   **Q.**   AND HE TELLS YOU HE DOESN'T KNOW WHETHER THEY ARE GOING

8   TO MILITARY, RIGHT?

9   **A.**   CORRECT.

10  **Q.**   BUT HE KNOWS THEY ARE GOING TO THE GOVERNMENT.

11  **A.**   TO THE GOVERNMENT.

12  **Q.**   ALL RIGHT.  BASED ON THE CONTEXT OF THAT CONVERSATION,

13  YOUR PRIOR CONVERSATION, WHAT DID YOU UNDERSTAND DEFENDANT TO

14  MEAN BY THE GOVERNMENT?

15  **A.**   I UNDERSTOOD THAT HE MEANT IT WAS GOING TO BE USED BY

16  THE GOVERNMENT OF IRAN.  MOST LIKELY AT AN AIRPORT.

17  **Q.**   PLAYING YOU THE NEXT EXCERPT.

18        (AUDIO PLAYED)

19  **Q.**   **(MR. HARRIGAN)** DURING THAT EXCERPT DEFENDANT DISCUSSES

20  WITH YOU KOORUSH AND HIS CONTACTS IN IRAN.  CAN YOU DESCRIBE

21  YOUR UNDERSTANDING OF WHAT DEFENDANT WAS TELLING YOU HERE?

22  **A.**   YES.  WHAT I UNDERSTOOD WAS THAT KOORUSH HAS MANY

23  CONTACTS IN IRAN AND INVESTORS, AND HAS ROUGHLY 2 OR

24  $3 MILLION BEHIND HIM.  AND THAT THAT IS NECESSARY BECAUSE

25  OFTENTIMES WHEN THEY RECEIVE ORDERS THEY DON'T GET PAID UNTIL

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   THE GOODS ARE DELIVERED.  SO THERE NEEDS TO BE A FLOW OF MONEY

2   SO THEY CAN HAVE ORDERS IN THE PROCESS.

3   **Q.**    AND DEFENDANT SAYS, I KNOW KOORUSH, KOORUSH WORKS FOR A

4   COMPANY IN IRAN.

5   **A.**    CORRECT.

6   **Q.**    OKAY.  AND DOES HE DESCRIBE THE COMPANIES THAT HE WORKS

7   FOR?

8   **A.**    YES, HE DOES.

9   **Q.**    AND WHAT WERE THOSE?

10   **A.**    HE LISTS THE MARITIME INDUSTRY, OIL AND MINING.

11   **Q.**    LET ME PLAY YOU THE NEXT EXCERPT.

12   **A.**    OKAY.

13          (AUDIO PLAYED)

14   **Q.**    **(MR. HARRIGAN)** LET ME STOP IT HERE.

15          DO YOU RECOGNIZE AT WHAT POINT THIS EXCERPT TOOK PLACE?

16   **A.**    THIS IS THE VERY END.  DINNER HAD CONCLUDED AND WE WERE

17   WRAPPING UP OUR CONVERSATION.

18   **Q.**    AND DID ANYONE ELSE SHOW UP AT THE MEETING AT THE VERY

19   END?

20   **A.**    YES.  AT THIS POINT THE OTHER UNDERCOVER AGENT THAT WE

21   MENTIONED, JOHN HELSING, HAD JUST ARRIVED.

22   **Q.**    SO THE INDIVIDUAL IDENTIFIED AS JOHN ON THIS EXCERPT IS

23   AGENT HELSING?

24   **A.**    CORRECT.

25          **MR. HARRIGAN:**  COULD WE START AT THE BEGINNING

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1     AGAIN.

2                (AUDIO PLAYED)

3     **Q.    (MR. HARRIGAN)** ALL RIGHT.  DURING THAT CONVERSATION

4     DEFENDANT RELATES TO YOU WHAT?

5     **A.**   THE DEFENDANT RELATES TO US THAT HE UNDERSTANDS THE RISK

6     INVOLVED WITH OUR BUSINESS, AND THAT IF WE RUSH OR WE GET

7     CAUGHT THAT WE WILL ALL BE IN THE SAME CELL TOGETHER.

8     **Q.**   AND BY CELL YOU UNDERSTOOD HIM TO MEAN WHAT?

9     **A.**   THE SAME JAIL CELL.

10    **Q.**   NOW, FOLLOWING THAT MEETING THAT NIGHT ON THE 12TH, DID

11    YOU THEN MEET WITH THE DEFENDANT AND MR. YILDIZ THE NEXT DAY?

12    **A.**   YES, SIR.

13    **Q.**   OKAY.  AND WAS THAT -- WHERE DID THAT OCCUR, THAT

14    MEETING?

15    **A.**   IT OCCURRED AT A HOTEL SUITE AT THE GREEN VALLEY RANCH.

16    **Q.**   IS THE GREEN VALLEY RANCH IN LAS VEGAS?

17    **A.**   IT IS JUST OUTSIDE, IN HENDERSON.

18    **Q.**   HENDERSON, NEVADA?

19    **A.**   CORRECT.

20    **Q.**   WHERE WERE DEFENDANT AND MR. YILDIZ STAYING?

21    **A.**   THEY WERE STAYING IN LAS VEGAS ON THE STRIP, MAYBE

22    10 MILES AWAY.

23    **Q.**   AND CAN YOU EXPLAIN WHAT YOU AND OTHER AGENTS DID IN

24    PREPARATION FOR THAT MEETING?

25    **A.**   SO IN PREPARATION FOR THE MEETING, IN THE ROOM WE PLACED

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1  CAMERAS AND AUDIO/VIDEO DEVICES THROUGHOUT THE HOTEL ROOM IN

2  ORDER TO BE ABLE TO CAPTURE OUR MEETING TOGETHER.

3  **Q.**    AND DID YOU BRING ANY EQUIPMENT WITH YOU?

4  **A.**    YES.  SO WE BROUGHT ONE ENTIRE SET OF THE NAVIGAT-2100

5  GYROCOMPASS AND THE DIFFERENT ACCESSORIES THAT OPERATE WITH

6  IT, AND TWO UNITS OF THE Y-690.

7  **Q.**    LET'S FIRST TALK ABOUT FIRST THE NAVIGAT-2100'S.  WAS IT

8  A WORKABLE SET?

9  **A.**    IT WAS NOT A WORKABLE SET, NO.

10  **Q.**    WHY DON'T YOU BRING A WORKABLE SET OF GYROCOMPASSES?

11  **A.**    JUST IN THE EVENT THAT IF WE WERE TO LOSE IT, IT GOT

12  STOLEN, WHATEVER ELSE, THEN THE TECHNOLOGY WOULD BE OUT.  IT

13  JUST MAKES IT EASIER FOR US AND LESS RISK.  SO IT LOOKS

14  IDENTICAL.  NO ONE WOULD KNOW THE DIFFERENCE.  BUT IT DOESN'T

15  ACTUALLY PERFORM THE FUNCTION THAT IT SHOULD.

16  **Q.**    WHO MOCKED THAT UP FOR YOU, THAT GYROCOMPASS?

17  **A.**    AN ENGINEER.

18  **Q.**    AND WITH SPECIFICATION FROM WHO?

19  **A.**    WITH SPECIFICATIONS DIRECTLY FROM NORTHROP GRUMMAN.

20  **Q.**    YOU SAID IT CONTAINED DIFFERENT PARTS.  YOU HAVE THE

21  GYROCOMPASS.

22  **A.**    CORRECT.

23  **Q.**    WHAT COMES WITH A GYROCOMPASS?

24  **A.**    SO YOU HAVE A GYROCOMPASS.  YOU HAVE A POWER SUPPLY.

25  YOU HAVE A DISPLAY UNIT.  AND THEN YOU HAVE DIFFERENT CABLING

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1    THAT MAKES IT ALL INTERFACE TOGETHER.

2    **Q.**    AND THE DISPLAY UNIT IS WHAT WOULD GO ON, LIKE, FOR

3    EXAMPLE, THE DASHBOARD OF A CAR?

4    **A.**    CORRECT.

5    **Q.**    IN THIS CASE THE DASHBOARD OF A VESSEL?

6    **A.**    OF A VESSEL.

7    **Q.**    AND HOW MANY BOXES WERE USED FOR THIS GYROCOMPASS

8    EQUIPMENT?

9    **A.**    THERE WAS SEVERAL.  THERE WAS TWO LARGE BOXES AND THEN

10   SOME SMALLER BOXES.

11   **Q.**    SO THREE BOXES ALTOGETHER?

12   **A.**    I THINK THAT IS PROBABLY ACCURATE.

13   **Q.**    AND IN TERMS OF THE Y-690 -- LET ME ASK YOU.

14        HOW BIG IS A GYROCOMPASS AND HOW MUCH DOES IT WEIGH?

15   **A.**    THE GYROCOMPASS IS LARGE.  I DON'T KNOW.  I AM NOT VERY

16   STRONG, BUT IT IS PRETTY HEAVY.  I MEAN, MY GUESS IS PROBABLY,

17   ALL OF IT TOGETHER, MAYBE 35 POUNDS, 40 POUNDS.

18   **Q.**    OKAY.  AND, IN COMPARISON, WHAT ABOUT THE Y-690'S, ARE

19   THOSE SMALL?

20   **A.**    VERY SMALL.  ABOUT THE SIZE OF A CIGARETTE PACK.

21   **Q.**    AND THOSE WERE IN A SEPARATE BOX?

22   **A.**    IN A SEPARATE BOX.

23   **Q.**    WERE THOSE ALSO ACTUAL WORKING Y-690'S?

24   **A.**    NO.  THEY WERE TWO Y-690'S THAT LOOKED IDENTICAL.  NO

25   ONE WOULD KNOW THE DIFFERENCE.  THEY JUST SIMPLY WOULD NOT

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1  PERFORM THEIR FUNCTION IF YOU TRIED TO PLUG THEM INTO WHATEVER

2  YOU PLUG THEM INTO.

3  **Q.**    HOW DID YOU MOCK UP THOSE Y-690'S?

4  **A.**    VIA COOPERATION FROM THE MANUFACTURER, THEY MADE THEM

5  FOR US.

6  **Q.**    COMMUNICATIONS & POWER INDUSTRIES?

7  **A.**    CORRECT.

8  **Q.**    WHO WAS PLANNED TO BE PRESENT AT THAT MEETING?

9  **A.**    PLANNED TO BE PRESENT AT THAT MEETING WAS MYSELF, AGAIN

10  THE SAME AGENT THAT YOU HEARD, MR. HELSING, THE DEFENDANT AND

11  MR. YILDIZ.

12  **Q.**    AND WHAT WAS AGENT HELSING'S UNDERCOVER ROLE?

13  **A.**    AGENT HELSING'S UNDERCOVER ROLE WAS THE ROLE OF MY

14  PARTNER IN OUR TRADING BUSINESS, SOUTH STAR TRADING.

15  **Q.**    OKAY.  AND DID YOU MEET WITH DEFENDANT AND MR. YILDIZ AT

16  THAT HOTEL SUITE THAT DAY?

17  **A.**    YES.

18  **Q.**    AND YOU SAID THAT ENTIRE MEETING WAS VIDEOTAPED?

19  **A.**    CORRECT.

20  **Q.**    DID YOU HAVE AN OPPORTUNITY TO REVIEW THE VIDEOTAPED

21  RECORDING OF THAT MEETING?

22  **A.**    CORRECT.

23  **Q.**    TO DETERMINE IF IT ACCURATELY REFLECTED NOT ONLY WHAT

24  WAS SAID BUT WHAT PEOPLE DID THAT DAY?

25  **A.**    YES.

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   **Q.**    ALL RIGHT.  AND SHOWING YOU GOVERNMENT'S EXHIBIT –– I

2   BELIEVE IT IS 317.

3              (EXHIBIT 317 MARKED FOR IDENTIFICATION)

4   **A.**    YES, SIR.

5   **Q.**    I WOULD ASK YOU TO TAKE A LOOK AT THAT CD.

6   **A.**    OKAY.

7   **Q.**    AND TELL ME IF YOU RECOGNIZE THAT CD.

8   **A.**    I DO.

9   **Q.**    WHAT IS THAT, SIR?

10  **A.**    IT IS EXCERPTS FROM OUR MEETING ON JUNE 13TH AT THE

11  GREEN VALLEY RANCH.

12  **Q.**    SO DIFFERENT FROM THE OTHER EXCERPTS, THESE ARE

13  VIDEOTAPES?

14  **A.**    THESE ARE ACTUAL VIDEO, CORRECT.

15  **Q.**    IT IS NOT THE ENTIRE ––

16  **A.**    NO, JUST EXCERPTS.

17  **Q.**    OKAY.  APPROXIMATELY HOW MANY EXCERPTS?

18  **A.**    APPROXIMATELY EIGHT.

19  **Q.**    AND AS WITH THE OTHER RECORDINGS, DID YOU CAUSE

20  TRANSCRIPTS TO BE PREPARED FOR THOSE EXCERPTS?

21  **A.**    YES, SIR.

22  **Q.**    AND DID YOU REVIEW THOSE TRANSCRIPTS WHILE LISTENING AND

23  WATCHING THE EXCERPTS TO MAKE SURE THAT THEY WERE REASONABLY

24  ACCURATE DEPICTIONS OF WHAT WAS SAID?

25  **A.**    YES, I DID.

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1    **MR. HARRIGAN:**  YOUR HONOR, AT THIS POINT I WOULD

2    MOVE TO ADMIT GOVERNMENT'S EXHIBIT 317 INTO EVIDENCE.  AND

3    ALONG WITH THAT ASK PERMISSION TO PUBLISH THE TRANSCRIPTS,

4    JUST AN AID IN EXPLAINING AGENT COLE'S TESTIMONY TO THE JURY.

5            **THE COURT:**  ANY OBJECTION?

6            **MR. JOHNSTON:**  NO OBJECTIONS TO THE EXHIBITS.  SAME

7    CONCERNS ABOUT THE ACCURACY OF THE TRANSCRIPTS.

8            **THE COURT:**  EXHIBIT 317 IS RECEIVED WITH THE SAME

9    ADMONITION WITH RESPECT TO THE TRANSCRIPTS.

10           (EXHIBIT 317 INTO EVIDENCE)

11   **Q.**    **(MR. HARRIGAN)** I WANT TO START WITH THE FIRST EXHIBIT

12   -- OR FIRST EXCERPT.  AND BEFORE WE START PLAYING IT I JUST

13   WANT YOU TO TAKE A LOOK AT THE SCREEN AND MAYBE ASK YOU SOME

14   QUESTIONS ABOUT THAT.  OKAY, AGENT COLE?

15   **A.**    ABSOLUTELY.

16           **MR. HARRIGAN:**  CAN WE ENLARGE IT, CAN WE MAKE THAT

17   SCREEN LARGER?  OKAY.  ALL RIGHT.

18   **Q.**    **(MR. HARRIGAN)** YOU SEE WHAT'S DEPICTED IN THE FIRST

19   CLIP OF GOVERNMENT'S EXHIBIT 316?  OKAY.  AND CAN YOU DESCRIBE

20   WHAT, GENERALLY, THAT DEPICTS.

21   **A.**    SO YOU SEE MY BACK ON THE SCREEN, TO THE LEFT.

22   **Q.**    RIGHT.

23   **A.**    TO MY RIGHT IS THE OTHER AGENT, AGENT HELSING.

24   **Q.**    WOULD YOU DO ME A FAVOR?  YOU CAN ACTUALLY JUST TAP IT

25   AND IT WILL LEAVE A MARK THERE.

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1    **A.**    SO RIGHT THERE WOULD BE ME.  RIGHT HERE IS AGENT

2    HELSING.

3    **Q.**    LET ME STOP YOU THERE.

4         FACING THE SCREEN HERE, THE BACK LEFT-HAND CORNER, THAT

5    IS YOUR BACK?

6    **A.**    CORRECT.

7    **Q.**    SEATED?

8    **A.**    AND IN THE BACK RIGHT-HAND CORNER, SEATED, WOULD BE

9    AGENT HELSING.  DIRECTLY ACROSS TO THE TOP RIGHT-HAND CORNER

10   OF THE SCREEN, RIGHT HERE, WOULD BE THE DEFENDANT.  AND THEN

11   ACROSS FROM HIM WOULD BE MR. YILDIZ.

12   **Q.**    SO, FOR THE RECORD, THIS SHOWS YOU SEATED DOWN WITH YOUR

13   BACK TO THE CAMERA, AS WELL AS AGENT HELSING TO YOUR RIGHT.

14   DIRECTLY ACROSS FROM YOU IS MR. YILDIZ?

15   **A.**    CORRECT.

16   **Q.**    AND DIRECTLY ACROSS FROM AGENT HELSING IS THE DEFENDANT.

17   **A.**    THAT IS CORRECT.

18   **Q.**    AND CAN YOU -- YOU MENTIONED PREVIOUSLY THAT YOU BROUGHT

19   THE GYROCOMPASSES AND THE Y-690'S.  ARE THOSE VISIBLE IN THIS

20   VIDEO?

21   **A.**    YES, THEY ARE.

22   **Q.**    COULD YOU SHOW WHERE THOSE ARE LOCATED?

23   **A.**    THEY ARE RIGHT OVER HERE.  YOU CAN SEE THE TOP OF THE

24   BOX KIND OF BEHIND THE COUCH.

25   **Q.**    SO NOW YOU ARE POINTING TO THE LEFT OF THE SCREEN BEHIND

APRIL 15, 2015

COLE - DIRECT EXAMINATION

```
 1   THE OTTOMAN, RIGHT?
 2   A.    CORRECT.
 3   Q.    WHERE AT LEAST YOU SEE ONE BOX?
 4   A.    YES, SIR.
 5   Q.    IS THAT FAIR?
 6   A.    THAT IS FAIR.
 7   Q.    AND IN ADDITION TO THE BOXES WERE THERE ANY MANUALS OR
 8   OTHER THINGS THAT YOU BROUGHT WITH THAT PERTAIN TO EITHER THE
 9   GYROCOMPASSES OR THE Y-690'S?
10   A.    YEAH.  WE BROUGHT A COMPACT DISK THAT CONTAINED THE USER
11   MANUAL AND ALL OF THE STUFF NEEDED TO OPERATE THE GYROCOMPASS.
12   Q.    ALL RIGHT.
13         NOW WE ARE GOING TO PLAY THE EXCERPT FOR YOU.
14         (VIDEOTAPE PLAYED)
15   Q.    ALL RIGHT.  DURING THIS PART OF THE MEETING YOU ARE
16   TALKING DIRECTLY TO MR. YILDIZ, RIGHT?
17   A.    CORRECT.
18   Q.    AND WHAT ARE YOU RELATING TO HIM?
19   A.    JUST SIMPLY RELATING TO HIM THAT THE ISSUE CONCERNS THAT
20   FIRST CAUSED A PROBLEM WITH THE ATTEMPTED PURCHASE OF THE
21   GYROCOMPASS, AND THAT WHY IT WAS DENIED.  AND THAT GOING
22   FORWARD IF WE USE A LETTER OF CREDIT WE HAVE TO USE A LETTER
23   OF CREDIT WITH THE BANK WHERE WE HAVE AN INSIDE MAN SO OUR
24   CONTRACTS ARE NOT EXPOSED AND WE DON'T HAVE PROBLEMS.
25   Q.    AND DURING THIS DISCUSSION WITH MR. YILDIZ, WHERE WAS
```

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1    THE DEFENDANT SEATED?

2    **A.**    RIGHT NEXT TO HIM.

3    **Q.**    WAS HE LOOKING AT YOU WHILE YOU WERE TALKING?

4    **A.**    YES.

5    **Q.**    AND LET ME PLAY YOU THE NEXT EXCERPT.

6            **THE COURT:**  MR. HARRIGAN, IT IS TIME FOR A BREAK.

7    WHY DON'T WE BREAK HERE, AND WE WILL PICK UP WITH THE NEXT

8    EXCERPT IN 15 MINUTES AT 10:30.

9            PLEASE KEEP IN MIND ALL OF THE ADMONITIONS.

10           THANK YOU.

11           (RECESS)

12           **THE COURT:**  WE ARE BACK ON THE RECORD WITH ALL

13   PRESENT.  WE WILL RESUME WITH THE DIRECT EXAMINATION.

14           COUNSEL.

15   **Q.**    **(MR. HARRIGAN)** AGENT COLE, I WOULD NEXT LIKE TO PLAY

16   YOU ANOTHER EXCERPT FROM YOUR JUNE 13 MEETING WITH DEFENDANT

17   AND MR. YILDIZ.

18           **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION I WILL

19   PLAY THE SECOND CLIP FROM GOVERNMENT'S EXHIBIT 317.

20           **THE COURT:**  YES.

21           (VIDEOTAPE PLAYED)

22   **Q.**    **(MR. HARRIGAN)** WHEN MR. YILDIZ TELLS YOU AT THE END OF

23   THAT CLIP THAT, FOR US IT IS IMPORTANT WE FIND TRUSTABLE

24   PARTNERS.

25           BASED ON THE CONTEXT OF YOUR CONVERSATIONS WITH

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   DEFENDANT AND MR. YILDIZ, WHAT DID YOU UNDERSTAND HIM TO MEAN?

2   **A.**   THAT THEY COULD FIND PARTNERS THEY COULD TRUST THAT

3   WOULD NOT RIP THEM OFF AND SUCCESSFULLY SUPPLY THEM GOODS TO

4   THEIR CUSTOMERS IN IRAN.

5   **Q.**   AND DID MR. YILDIZ REPRESENT TO YOU WHETHER HE OR HIS

6   PARTNERS HAD BEEN RIPPED OFF BEFORE?

7   **A.**   YES.  HE SAID MANY TIMES.

8   **Q.**   AND WHEN HE SAID THIS, WHERE WAS DEFENDANT SEATED?

9   **A.**   RIGHT NEXT TO HIM.

10  **Q.**   AND YOU HAD DISCUSSION WITH MR. YILDIZ AGAIN ABOUT GOING

11  TO JAIL.

12  **A.**   CORRECT.

13  **Q.**   AND MR. YILDIZ TOLD YOU WHAT WAS HIS RISK.

14  **A.**   HIS RISK WAS OBVIOUSLY LESS THAN OURS BECAUSE HE WAS NOT

15  IN THE U.S.  HIS RISK WAS MORE THE MONEY.

16  **Q.**   DID HE SAY HE COULD END UP IN A JAIL IN UAE?

17  **A.**   HE DID, CORRECT.

18  **Q.**   AND WHAT DID DEFENDANT SAY IN RESPONSE TO YOUR

19  CONVERSATION WITH MR. YILDIZ ABOUT GOING TO JAIL?

20  **A.**   THE DEFENDANT THEN LOOKED AT MYSELF AND THE OTHER AGENT,

21  HELSING, AND SAID THAT HE WOULD BE IN THE SAME CELL WITH US.

22  AND THAT WE WOULD BE –– WHAT, I DON'T KNOW, WHAT I –– SOME

23  SORT OF CHASTISING OF HIM AS WE SHARED A CELL TOGETHER.

24          **MR. HARRIGAN:**  LET ME NEXT PLAY TO YOU EXCERPT

25  NO. 3.

APRIL 15, 2015

COLE - DIRECT EXAMINATION

```
 1              (VIDEOTAPE PLAYED)
 2    Q.    (MR. HARRIGAN) AND WHEN -- IN THAT CLIP WHEN DEFENDANT
 3    SAYS, EVERY SERIAL NUMBER, EVERYTHING IS, WILL BE REMOVED,
 4    DESTROYED.
 5         BASED ON THE CONTEXT OF YOUR CONVERSATION WHAT DID YOU
 6    UNDERSTAND HIM TO MEAN BY THAT?
 7    A.    I UNDERSTOOD THAT TO MEAN THAT EVERYTHING THAT WOULD
 8    IDENTIFY THE PRODUCT, TO WHO PURCHASED IT, TO THE
 9    MANUFACTURER, WOULD BE REMOVED AND DESTROYED, THEREBY
10    INSULATING US FROM GETTING CAUGHT.
11    Q.    AND I WANT TO PLAY YOU THE NEXT TRANSCRIPT -- THE NEXT
12    EXCERPT.  EXCUSE ME.
13    A.    OKAY.
14    Q.    BEFORE I PLAY THAT, THE AUDIO, I WOULD FIRST JUST LIKE
15    TO PLAY APPROXIMATELY ONE MINUTE OF JUST THE PICTURE SO YOU
16    CAN DESCRIBE FOR THE LADIES AND GENTLEMEN OF THE JURY WHAT'S
17    GOING ON.
18    A.    OKAY.
19         MR. HARRIGAN:  IF WE COULD MAKE THAT LARGER.
20    Q.    (MR. HARRIGAN) OKAY.  YOU ARE ALL STILL SEATED IN THE
21    SAME POSITIONS; IS THAT CORRECT?
22    A.    CORRECT.  NOW --
23    Q.    GO AHEAD.
24    A.    SO NOW WE ARE ALL MOVING OVER.  MR. YILDIZ, THE
25    DEFENDANT AND AGENT HELSING AND --
```

APRIL 15, 2015

541

COLE - DIRECT EXAMINATION

1    **Q.**    AND DEFENDANT HAS BEEN HANDED A BOX; IS THAT RIGHT?

2    **A.**    CORRECT.  HE HAS THE BOX CONTAINING THE TWO Y-690'S.

3    **Q.**    OKAY.  AND YOU AND WHO ELSE IS IN THE TOP LEFT CORNER?

4    **A.**    MR. YILDIZ.  RIGHT THERE IS AGENT HELSING AND MYSELF.

5    **Q.**    ALL RIGHT.

6              **MR. HARRIGAN:**  CONTINUE.

7              (VIDEOTAPE PLAYED)

8    **Q.**    **(MR. HARRIGAN)** AND WHERE ARE BOXES GOING TO BE PLACED?

9    YOU JUST THREW SOMETHING ON THE OTTOMAN.

10   **A.**    I DID.  I THREW THE COMPACT DISK CONTAINING THE USER

11   MANUAL SOFTWARE FOR THE NAVIGAT GYROCOMPASSES.  AND THEN

12   EVERYTHING IS GOING TO BE KIND OF PILED UP ON THAT OTTOMAN AT

13   THE CENTER OF THE ROOM.

14             **MR. HARRIGAN:**  AT THIS POINT, IF WE COULD STOP IT

15   THERE, ABOUT 45 SECONDS IN.

16   **Q.**    **(MR. HARRIGAN)** WHAT IS THE DEFENDANT INSPECTING?

17   **A.**    RIGHT NOW THE DEFENDANT ACTUALLY HAS OUT OF THE BOX THE

18   TWO ACTUAL SMALLER BOXES THAT CONTAIN THE ACTUAL Y-690 LAMPS

19   THEMSELVES.

20             **MR. HARRIGAN:**  CAN YOU ROLE THAT LONGER.

21             (VIDEO PLAYED)

22   **Q.**    **(MR. HARRIGAN)** SO YOU ARE TAPED DOING WHAT RIGHT NOW?

23   **A.**    WE ARE NOW REMOVING ALL OF THE PACKAGING AND THE

24   DIFFERENT, LIKE, FOAM THAT CAME WITH THE BOXES THAT HAD THE

25   GYROCOMPASSES INSIDE.  AND THEY ARE STARTING TO LOOK AT THE

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   GOODS AND DISCUSS THE EQUIPMENT.

2   **Q.**    OKAY.

3        **MR. HARRIGAN:**  THAT'S GOOD ENOUGH.  LET'S GO BACK

4   AND NOW PLAY THIS WITH THE AUDIO.

5        (VIDEOTAPE PLAYED)

6   **Q.**   **(MR. HARRIGAN)** ALL RIGHT.  DURING THAT CLIP DOES

7   DEFENDANT EXAMINE ANY OF THE ITEMS?

8   **A.**    YES, HE DOES.

9   **Q.**    WHAT IS HE EXAMINING?

10  **A.**    HE EXAMINES SPECIFICALLY THE Y-690 TRIPOD LAMPS.

11  **Q.**    LATER ON DOES HE ALSO LOOK AT THE GYROCOMPASS?

12  **A.**    CORRECT.

13  **Q.**    AND WHEN YOU FIRST OPENED UP THE BOXES AND PUT THEM ON

14  THAT CENTER OTTOMAN MR. YILDIZ SAYS, TO BE HONEST, HE IS THE

15  EXPERT.

16       BASED ON YOUR PRESENCE IN THAT MEETING, WHO WAS HE

17  REFERRING TO?

18  **A.**    HE WAS REFERRING TO THE DEFENDANT SAYING, HE IS THE

19  EXPERT.

20  **Q.**    AND WHILE THE DEFENDANT IS LOOKING AT THE Y-690'S HE

21  SAYS, I THINK WE SHOULD REMOVE THE BOXES.

22       AGAIN, BASED ON YOUR UNDERSTANDING OF THE ENTIRE

23  CONVERSATION, WHAT DID YOU UNDERSTAND HIM TO MEAN BY THAT?

24  **A.**    I UNDERSTOOD HIM TO MEAN REMOVE THE BOXES THAT HAD THE

25  MANUFACTURER OR THE PRODUCT DESCRIPTION, THEREFORE MAKING IT

APRIL 15, 2015

COLE - DIRECT EXAMINATION

```
 1   EASIER TO SMUGGLE OUT OF THE U.S. BECAUSE IT WOULD BE LESS --
 2   OR MORE DIFFICULT TO IDENTIFY WHAT THE PRODUCTS WERE.
 3   Q.    LET ME PLAY YOU THE NEXT CLIP.
 4   A.    OKAY.
 5              (VIDEOTAPE PLAYED)
 6   Q.    (MR. HARRIGAN) CAN YOU DESCRIBE YOUR DISCUSSIONS IN
 7   THAT EXCERPT.
 8   A.    YEAH.  JUST SIMPLY THAT WE ARE DISCUSSING FURTHER
 9   SHIPPING ARRANGEMENTS, THE BEST METHOD BY WHICH TO SMUGGLE
10   THEM OUT OF THE U.S. TO AVOID PROBLEMS.  GETTING RID OF THE
11   BOXES THAT SAY NORTHROP GRUMMAN.  AND BASED ON THE FACT THAT
12   THE GYROS DON'T NEED A LICENSE TO GO OUT OF THE U.S., THEY
13   WOULD TO IRAN, WE COULD EVEN STICK THE TRIPOD LAMPS IN WITH
14   THEM, AND PERHAPS AN INSPECTOR WOULDN'T KNOW THE DIFFERENCE.
15              MR. HARRIGAN:  LET ME PLAY YOU THE NEXT TRANSCRIPT
16   OR THE NEXT EXCERPT.
17              (VIDEOTAPED PLAYED)
18   Q.    (MR. HARRIGAN) AT THIS POINT IN THE CONVERSATION YOU
19   ARE STILL DISCUSSING WHAT?
20   A.    WE ARE STILL DISCUSSING THE DIFFERENT SHIPPING OPTIONS
21   FOR THE PRODUCTS.
22   Q.    AND YOU ARE DISCUSSING THAT WITH MR. YILDIZ?
23   A.    AND THE DEFENDANT, CORRECT.
24   Q.    AND IS THE DEFENDANT SHOWN IN THE VIDEO HERE?
25   A.    YES, HE IS.
```

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1   **Q.**    AND THERE IS A PHONE CALL TAKEN BY MR. YILDIZ AT THIS

2   POINT, RIGHT?

3   **A.**    CORRECT.

4   **Q.**    NOW, WITH THE REST OF THIS TRANSCRIPT DOES IT TRANSCRIBE

5   ALL OF THE CONVERSATIONS GOING ON?

6   **A.**    NO, IT JUST FOCUSES ON THE TELEPHONE CALL BETWEEN MR.

7   YILDIZ AND KOORUSH.

8   **Q.**    AND SO WE HEAR MR. YILDIZ' CONVERSATION?

9   **A.**    CORRECT.

10  **Q.**    BUT NOT WHAT MR. TAHERKHANI IS SAYING.

11  **A.**    CORRECT.

12          **MR. HARRIGAN:**  CAN WE CONTINUE THAT.

13          (VIDEOTAPE PLAYED)

14  **Q.**   **(MR. HARRIGAN)** OKAY.  AND DURING HIS PHONE CONVERSATION

15  ERGUN TELLS KOORUSH, WE HAVE A GOOD STRATEGY FOR SENDING THE

16  PACKAGES.

17          BASED ON, AGAIN, YOUR MEETING THAT DAY, YOUR MEETING

18  WITH MR. YILDIZ AND THE DEFENDANT, WHAT DID YOU UNDERSTAND HIM

19  TO MEAN BY THAT?

20  **A.**    I UNDERSTOOD IT TO MEAN THAT WE HAD A GOOD STRATEGY OF

21  HOW WE WOULD ILLEGALLY EXPORT THE GOODS OUT OF THE U.S.

22  **Q.**    RIGHT.  AND THERE IS A CONVERSATION ABOUT WIRING MONEY.

23  WHAT WAS THE PLAN THAT DAY AFTER THEY REVIEWED THE PRODUCTS

24  AND WERE SATISFIED WITH THE PRODUCTS?

25  **A.**    THE PLAN WAS THEY WOULD HAVE THE MONEY READY TO GO AND

COLE – DIRECT EXAMINATION

1    MAKE THE WIRE IMMEDIATELY.

2    **Q.**    AND WHEN WOULD YOU DELIVER THE PRODUCTS TO THEM, BEFORE

3    OR AFTER THAT MONEY WAS WIRED?

4    **A.**    AFTER THE MONEY WAS RECEIVED IN OUR ACCOUNT.

5    **Q.**    OKAY.  LET ME PLAY YOU THE NEXT EXCERPT FROM THAT

6    JUNE 13TH, 2013 MEETING.

7    **A.**    OKAY.

8             (VIDEOTAPE PLAYED)

9    **Q.**    **(MR. HARRIGAN)** THE CONVERSATION IS ON, BUT PEOPLE ARE

10   OFF TO THE LEFT OR RIGHT?

11   **A.**    YEAH.  THEY ARE OFF THE CAMERA TO THE RIGHT.

12            (VIDEOTAPE PLAYED)

13   **Q.**    **(MR. HARRIGAN)** IN THAT EXCERPT OF THE MEETING, IS THERE

14   DISCUSSION ABOUT MANUALS?

15   **A.**    CORRECT.

16   **Q.**    CAN YOU DESCRIBE, AGAIN BASED ON YOUR PRESENCE AT THAT

17   MEETING, THAT DISCUSSION.

18   **A.**    YEAH.  SO THE DISCUSSION WAS TO HAVE THE PRODUCTS, THE

19   HARDWARE, SEND IT ONE WAY, AND SEND IT WITHOUT THE MANUAL.

20   THAT WAY IF AN INSPECTOR SAW IT IT WOULD MAKE IT DIFFICULT FOR

21   HIM TO KNOW WHAT IT WAS.  BUT IF HE SAW THE MANUAL THEN HE

22   WOULD THINK IT WAS BAD, OR HE COULD PUT TWO AND TWO TOGETHER.

23   **Q.**    IN THAT MEETING, ALTHOUGH IT IS OFF CAMERA, SOMEONE

24   SAYS, WE SHIP THE MANUALS SEPARATE.

25            WHO SAYS THAT?

APRIL 15, 2015

546

COLE - DIRECT EXAMINATION

1    **A.**    THAT WAS THE DEFENDANT.

2    **Q.**    HE ALSO SAYS -- SOMEONE SAYS, THEY SEE THE MANUAL AND

3    THEN THEY SAY THIS IS VERY NAUGHTY.

4         WHO SAID THAT?

5    **A.**    THAT WAS THE DEFENDANT.

6    **Q.**    ALL RIGHT.  LET ME PLAY FOR YOU NEXT THE FINAL EXCERPT

7    FROM THAT MEETING.

8    **A.**    OKAY.

9    **Q.**    EXCERPT 8.

10        (VIDEOTAPE PLAYED)

11   **Q.**    **(MR. HARRIGAN)** OKAY.  DESCRIBE WHAT'S DISCUSSED IN THE

12   EXCERPT.

13   **A.**    SO WE ARE SIMPLY DISCUSSING WHERE THE PRODUCTS ARE GOING

14   TO BE USED, AND THE DEFENDANT SAYS THAT THE Y-690'S WILL BE

15   USED AT THE AIRPORT IN IRAN.

16   **Q.**    AND WHERE DOES MR. YILDIZ SAY THE GYRO WILL BE USED?

17   **A.**    ON SOME SORT OF A FERRY.

18   **Q.**    ALL RIGHT.  AT THE END OF THIS MEETING WERE THERE

19   FURTHER DISCUSSIONS THAT YOU AND MR. YILDIZ OR DEFENDANT HAD

20   WITH MR. TAHERKHANI?

21   **A.**    YES.

22   **Q.**    AND WHO HAD DISCUSSION WITH MR. TAHERKHANI?

23   **A.**    I BELIEVE MR. -- I BELIEVE THEY BOTH DID.

24   **Q.**    OKAY.  AND DID THEY REPRESENT, AT LEAST FROM THE

25   CONVERSATION YOU HEAR, THAT THEY WERE SATISFIED WITH THE

APRIL 15, 2015

547

COLE — DIRECT EXAMINATION

1    PRODUCTS?

2    **A.**    YES.

3    **Q.**    AND WAS THERE DISCUSSION THAT YOU HAD WITH DEFENDANT AND

4    WITH MR. YILDIZ REGARDING FURTHER PAYMENTS?

5    **A.**    YES.

6    **Q.**    AND WAS THE PAYMENT GOING TO BE DONE THAT DAY?

7    **A.**    IT WAS NOT GOING TO BE DONE THAT DAY.  BASED ON

8    INTERNATIONAL BANKING THEY WERE ALREADY IN THEIR WEEKEND, ET

9    CETERA.

10   **Q.**    SO THEY INDICATED THAT THE BANK WAS OPEN OR CLOSED?

11   **A.**    IT WAS CLOSED.

12   **Q.**    AND WHAT DID YOU TELL THEM?

13   **A.**    THAT WE WOULD HAVE TO FORGO SHIPPING UNTIL WE RECEIVED

14   PAYMENT, AS ALL PARTIES HAD AGREED.

15   **Q.**    AND THIS WAS TOWARD THE END OF THE WEEK, CORRECT?

16   **A.**    CORRECT.

17   **Q.**    AND WHAT DID YOU TELL THEM HOW LONG YOU WOULD BE IN LAS

18   VEGAS?

19   **A.**    THROUGH THE WEEKEND.

20   **Q.**    AND WHAT WAS SUGGESTED TO THEM?

21   **A.**    THAT WE ALL RECONVENE IN SAN DIEGO ON MONDAY WHEN THE

22   BANKS OPEN UP IN CALIFORNIA.  IF THE MONEY WAS CONFIRMED

23   TRANSFERRED THAT WE COULD THEN COMPLETE THE SHIPPING OF THE

24   GOODS.

25   **Q.**    OKAY.  AND DID DEFENDANT AGREE TO THAT PROPOSAL?

APRIL 15, 2015

COLE – DIRECT EXAMINATION

```
 1   A.    YES.

 2   Q.    AND MR. YILDIZ?

 3   A.    YES.

 4   Q.    OKAY.  AND DID YOU HAVE FURTHER EMAIL COMMUNICATIONS

 5   WITH EITHER OF THEM OVER THE WEEKEND?

 6   A.    YES.

 7   Q.    OKAY.  LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT

 8   EXHIBIT 130 FOR IDENTIFICATION.

 9   A.    YOU SAID 130?

10   Q.    I THINK IT IS 130.  I WILL CHECK.  131, PARDON ME.

11   A.    I THINK IT IS 130.

12   Q.    NO, IT IS 131.

13   A.    I AM SORRY.

14   Q.    ALL RIGHT.

15         DO YOU RECOGNIZE THAT EMAIL?

16   A.    YES.

17   Q.    ALL RIGHT.  WHO IS THAT EMAIL FROM?

18   A.    IT IS FROM MR. YILDIZ.

19   Q.    OKAY.  AND TO WHO?

20   A.    TO ME, TO MR. TAHERKHANI.

21   Q.    AND WHO ELSE?

22   A.    AND TO THE DEFENDANT.

23   Q.    AND WAS THAT SENT AFTER YOUR MEETING?

24   A.    YES, IT WAS.

25              MR. HARRIGAN:  IF THERE IS NO OBJECTION, I MOVE TO
```

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1    ADMIT IT, YOUR HONOR.

2              **MR. JOHNSTON:**  NO, YOUR HONOR.

3              **THE COURT:**  RECEIVED.

4              (EXHIBIT 130 RECEIVED INTO EVIDENCE)

5    **Q.**    **(MR. HARRIGAN)** SO THAT WAS SENT ON WHAT DAY?

6    **A.**    ON JUNE 15TH.

7    **Q.**    THAT WAS A SATURDAY?

8    **A.**    CORRECT.

9    **Q.**    OKAY.  AND LOOKING AT THE CONTENT, WHAT IS MR. YILDIZ

10   TELLING YOU?

11   **A.**    HE IS BASICALLY SAYING THAT THIS FOLLOWING BANK HAS MADE

12   THE PAYMENT, AND IT SHOULD BE FORTHCOMING.

13   **Q.**    OKAY.

14   **A.**    AND HE WANTED US TO CONFIRM THAT IT WAS ALL CORRECT.

15             **MR. HARRIGAN:**  CAN WE LOOK AT THE ATTACHMENT TO

16   THAT?  ALL RIGHT.

17   **Q.**    **(MR. HARRIGAN)** SO THIS WAS FOR THE PURPOSE OF WHAT?

18   **A.**    OF COMPLETING THE REMAINING PAYMENTS DUE FOR THE TWO

19   Y-690'S AND THE 50 PERCENT REMAINING -- OR THE 40 PERCENT

20   REMAINING PAYMENT FOR THE NAVIGAT-2100.

21   **Q.**    APPROXIMATELY HOW MUCH MONEY ARE WE TALKING ABOUT?

22   **A.**    ABOUT 32 AND A HALF THOUSAND DOLLARS.

23   **Q.**    AND SUBSEQUENT TO THAT, DID THEY ASK FOR ANYTHING FROM

24   YOU, OR DURING THIS TIME PERIOD, IN ORDER TO FACILITATE THAT

25   WIRE TRANSFER?

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1    **A.**    THEY ASKED FOR JUST THE BANKING INFORMATION AGAIN.  THAT

2    WAS IT.

3    **Q.**    DID THEY EVER ASK FOR AN INVOICE?

4    **A.**    THEY DID ASK FOR AN INVOICE.

5    **Q.**    LET ME SHOW WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 132.

6    **A.**    OKAY.

7          **MR. HARRIGAN:**  AND IF WE COULD GO TO THE SECOND

8    PAGE.  GO BACK TO THE FIRST PAGE, PLEASE.

9    **Q.**    **(MR. HARRIGAN)** AFTER YOU RECEIVED THAT REMITTANCE FORM

10   IN THE PRIOR EXHIBIT, YOU HAD FURTHER COMMUNICATION WITH MR.

11   YILDIZ?

12   **A.**    CORRECT.

13   **Q.**    AND WAS THAT REGARDING PROVIDING AN INVOICE?

14   **A.**    CORRECT.

15   **Q.**    IS THAT -- THOSE EMAIL COMMUNICATIONS REFLECTED IN

16   GOVERNMENT'S EXHIBIT 132?

17   **A.**    YES.

18          **MR. HARRIGAN:**  WITH THE COURT'S PERMISSION, I WOULD

19   MOVE TO PUBLISH GOVERNMENT EXHIBIT 132.

20          **MR. JOHNSTON:**  NO OBJECTION.

21          **THE COURT:**  YES.

22          (EXHIBIT 132 RECEIVED INTO EVIDENCE)

23   **Q.**    **(MR. HARRIGAN)** AND THIS IS A CHAIN EMAIL, CORRECT?

24   **A.**    YES.

25   **Q.**    IT CONSISTS OF APPROXIMATELY FOUR EMAILS?

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1    **A.**    YES.

2    **Q.**    I WOULD LIKE TO GO TO THE THIRD EMAIL DOWN.

3    **A.**    OKAY.

4    **Q.**    OKAY.  AND THE HEADER INFORMATION.  THIS WAS AN

5    ATTACHMENT TO THE EMAIL FROM MR. YILDIZ, CORRECT?

6    **A.**    YES, SIR.

7    **Q.**    AND BASICALLY, ALTHOUGH IT APPEARS TO BE IN GERMAN, WHAT

8    DOES IT SAY AT THE TOP, AFTER VON?

9    **A.**    THE TOP SAYS MANAGING DIRECTOR.

10   **Q.**    AND WHO IS CC'D?

11   **A.**    CC'D IS MR. YILDIZ.

12   **Q.**    OKAY.  AND WHAT -- AND THAT WAS SENT ON JUNE 16TH?

13   **A.**    CORRECT.

14   **Q.**    COULD WE LOOK AT THE CONTENT OF THAT.

15   **A.**    OKAY.

16   **Q.**    IN THE CONTENT OF THAT EMAIL, WHAT DOES MR. TAHERKHANI

17   ASK OF MR. YILDIZ?

18   **A.**    HE SAYS, PLEASE EDIT THE INVOICE.  THERE MUST BE ITEM

19   DESCRIPTION AND QUANTITY.  PLEASE ASK DAVID TO DO SO.  YOU MAY

20   ASK HIM TO INSERT SHIP SPARES OR ANYTHING.

21   **Q.**    ALL RIGHT.  AND BASED ON YOUR UNDERSTANDING OF THE PRIOR

22   CONVERSATION WITH MR. YILDIZ AND YOUR DISCUSSIONS ABOUT HOW

23   YOU ARE GOING TO SHIP THIS, WHAT WAS YOUR UNDERSTANDING OF HIS

24   REQUEST TO INSERT SHIP SPARES OR ANYTHING?

25   **A.**    THAT IT WAS ANOTHER STEP BEING USED TO INSULATE OR

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1   SAFEGUARD US IN OUR SMUGGLING, THE ILLEGAL EXPORT OF THE

2   GOODS.

3   **Q.**    WAS THE DEFENDANT A PARTY TO THIS EMAIL?

4   **A.**    THIS EMAIL, I DON'T KNOW IF HE WAS OR NOT.  I DON'T SEE

5   HIM ON THERE.

6   **Q.**    THERE IS ANOTHER EMAIL ABOVE IT, CORRECT?

7   **A.**    CORRECT.

8   **Q.**    WE SEE THE HEADER TO THAT.

9   **A.**    OKAY.  YES.

10  **Q.**    AGAIN, THAT IS AN EMAIL FROM MR. YILDIZ TO WHO?

11  **A.**    TO -- IT WAS SENT TO ME AND TO THE DEFENDANT, AND TO MR.

12  TAHERKHANI.

13  **Q.**    AND WHAT DOES IT INSTRUCT YOU TO DO?

14  **A.**    BASICALLY THE SAME THING.  IT SAYS TO REFERENCE THE

15  EMAIL BELOW AND TO MAKE AN INVOICE, AND REQUESTING THE

16  DESCRIPTION AS THE EMAIL SAYS BELOW.  AND IT SAYS, WE HAVE TO

17  SHOW THE BANK FOR PURPOSES OF PAYMENTS, SO PLEASE -- SAYS

18  DESCRIBE IT SHIP SPARE PARTS.

19  **Q.**    AND IN THE TOP EMAIL DID YOU THEN SEND AN EMAIL TO ALL

20  PARTIES?

21  **A.**    YES.

22  **Q.**    INCLUDING THE DEFENDANT?

23  **A.**    YES.

24  **Q.**    AND DID THAT EMAIL CONTAIN AN ATTACHMENT?

25  **A.**    YES, IT DID.

APRIL 15, 2015

COLE - DIRECT EXAMINATION

1  **Q.**    THAT IS GOVERNMENT 132.

2         **MR. HARRIGAN:**  CAN WE LOOK AT THE ATTACHMENT?

3  **Q.**    **(MR. HARRIGAN)** AND CAN YOU DESCRIBE WHAT THIS IS?

4  **A.**    YES.  IT IS THE INVOICE THAT THEY REQUESTED THAT WE SEND

5  FOR THEIR PURPOSES TO SHOW THE BANK SO THEY CAN MAKE THE

6  PAYMENT.  AND THE TOTAL ADDS UP TO THE AMOUNT THEY ARE

7  SENDING.  WE PUT TWO LINE ITEMS, AND ON BOTH LINE ITEMS WE

8  DESCRIBED THE GOODS AS THEY REQUESTED AS SHIP SPARE PARTS.

9  **Q.**    NOW, THE Y-690'S AREN'T SHIP SPARE PARTS, CORRECT?

10 **A.**    NO.

11 **Q.**    AND THE FOUR NAVIGAT GYROCOMPASSES WEREN'T SPARE PARTS.

12 **A.**    NO.

13 **Q.**    AND THIS WAS DONE FOR WHAT PURPOSE?

14 **A.**    AGAIN, TO --

15        **MR. JOHNSTON:**  OBJECTION.  FOUNDATION.

16 **Q.**    **(MR. HARRIGAN)** IN YOUR ROLE AS DAVID MILLS.

17        **THE COURT:**  OVERRULED.

18        **THE WITNESS:**  IN MY ROLE OF DAVID MILLS IT IS DONE

19 TO ASSIST IN FURTHERING OUR SMUGGLING EFFORTS.

20 **Q.**    **(MR. HARRIGAN)** NOW, AT SOME POINT AFTER THE WEEKEND DID

21 YOU RECEIVE, IN FACT, CONFIRMATION THAT MONEY HAD BEEN WIRED

22 INTO THE SOUTH STAR UNDERCOVER BANK ACCOUNT?

23 **A.**    YES.

24 **Q.**    SHOWING YOU WHAT HAS BEEN PREVIOUSLY ADMITTED AS 604-C.

25 **A.**    OKAY.

COLE – DIRECT EXAMINATION

1  **Q.**    DO YOU RECOGNIZE THAT?

2  **A.**    YES.

3  **Q.**    IS THAT A BANK STATEMENT FROM THE CHASE BANK?

4  **A.**    YES.

5  **Q.**    FOR WHOSE ACCOUNT?

6  **A.**    SOUTH STAR TRADING.

7  **Q.**    AND WHAT DOES IT SHOW IF YOU GO TO THE BOTTOM IN

8  DEPOSITS AND ADDITIONS?

9  **A.**    IT SHOWS A DEPOSIT OF $32,565.

10 **Q.**    FROM WHERE TO WHERE?

11 **A.**    IT SHOWS FROM A BANK IN DUBAI, TO NEW YORK, TO OUR

12 ACCOUNT IN CALIFORNIA.

13 **Q.**    OKAY.  AND LOOKING AT THE SECOND PAGE OF 604-C.  IS THAT

14 FURTHER INFORMATION ABOUT THAT WIRE TRANSFER?

15 **A.**    CORRECT.

16 **Q.**    AND AGAIN, THE AMOUNT AT THE TOP IS WHAT?

17 **A.**    IS 32,565.

18 **Q.**    AND THE DATE OF THE TRANSACTION?

19 **A.**    IS JUNE 17TH.

20 **Q.**    AND THE CREDIT PARTY, YOU RECOGNIZE THAT I.D.?

21 **A.**    YEAH.  IT IS OUR UNDERCOVER COMPANY, SOUTH STAR TRADING.

22 **Q.**    AND THE ORDER CUSTOMER NOW IS WHAT?

23 **A.**    THE ORDER CUSTOMER IS GOLD NEFT FZE.

24 **Q.**    AND PREVIOUSLY IT HAD BEEN TIG MARINE, CORRECT?

25 **A.**    CORRECT.  IT HAD BEEN UP TO THAT POINT.

APRIL 15, 2015

COLE – DIRECT EXAMINATION

1    **Q.**    OKAY.  DO YOU KNOW WHAT GOLD NEFT FZE WAS?

2    **A.**    I DID NOT.  I ASSUMED AT THE TIME ANOTHER TRADING

3    COMPANY, PERHAPS.

4    **Q.**    NOW, THAT WAS THE SAME GOLD NEFT FZE THAT THEY PROVIDED

5    TO YOU IN TERMS OF THE REMITTANCE FORM, CORRECT?

6    **A.**    CORRECT.

7    **Q.**    AND THE ORDER BANK IS WHERE?

8    **A.**    THE ORDER BANK IS IN DUBAI, UNITED ARAB EMIRATES.

9    **Q.**    NOW, DID YOU PERSONALLY SUBSEQUENTLY MEET WITH THE

10   DEFENDANT AND MR. YILDIZ IN SAN DIEGO AFTER THE CONFIRMATION

11   OF THIS WIRE TRANSFER?

12   **A.**    NO, I DID NOT.

13   **Q.**    WHO DID?

14   **A.**    AGENT HELSING.

15   **Q.**    AND THE PURPOSE OF THAT MEETING WAS?

16   **A.**    TO SHIP THE GOODS AS PROMISED AT OUR MEETING IN LAS

17   VEGAS.

18          **MR. HARRIGAN:**  I HAVE NO FURTHER QUESTIONS AT THIS

19   TIME, YOUR HONOR.

20          **THE COURT:**  CROSS-EXAMINATION.

21                     CROSS-EXAMINATION

22   **Q.**    **(MR. JOHNSTON)** GOOD MORNING, AGENT COLE.

23   **A.**    GOOD MORNING, SIR.

24   **Q.**    AGENT COLE, YOU ARE A SPECIAL AGENT FOR THE DEPARTMENT

25   OF HOMELAND SECURITY.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    OKAY.  AND TO BECOME A SPECIAL AGENT FOR THE DEPARTMENT

3    OF HOMELAND SECURITY YOU HAVE TO GO THROUGH A BIT OF TRAINING,

4    RIGHT?

5    **A.**    YES, SIR.

6    **Q.**    YOU HAVE TO GO THROUGH SOME SPECIAL TRAINING TO BE A

7    SPECIAL AGENT IN THE DEPARTMENT OF HOMELAND SECURITY.

8    **A.**    CORRECT.

9    **Q.**    YOU HAVE TO GO THROUGH SPECIAL TRAINING TO LEARN HOW TO

10   BECOME AN UNDERCOVER AGENT.

11   **A.**    AS WELL.

12   **Q.**    YES.  IN ADDITION TO THE OTHER TRAINING THAT YOU GET AS

13   AN AGENT FOR HOMELAND SECURITY.

14   **A.**    CORRECT.

15   **Q.**    AND ONE OF THE THINGS THAT YOU ARE TRAINED TO DO IS TO

16   WRITE REPORTS?

17   **A.**    CORRECT.

18   **Q.**    TO DOCUMENT YOUR ACTIONS?

19   **A.**    CORRECT.

20   **Q.**    BE IT A FORMAL REPORT OR WRITTEN NOTES?

21   **A.**    CORRECT.

22   **Q.**    AND THAT IS SOMETHING THAT YOU LEARNED -- I BELIEVE YOU

23   TESTIFIED YESTERDAY THAT YOU ALSO WERE A MEMBER OF BORDER

24   PATROL.

25   **A.**    CORRECT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **Q.**    YOU HAD TRAINING FOR THAT JOB AS WELL?

2   **A.**    INDEED.

3   **Q.**    TRAINING FOR WRITING REPORTS?

4   **A.**    YES.

5   **Q.**    COMPLETE REPORTS?

6   **A.**    CORRECT.

7   **Q.**    ACCURATE REPORTS?

8   **A.**    CORRECT.

9   **Q.**    AND IN THIS CASE, DID YOU WRITE ANY REPORTS?

10  **A.**    NO.

11  **Q.**    DID YOU TAKE ANY NOTES?

12  **A.**    NO.

13  **Q.**    OVER A SIX-MONTH LONG INVESTIGATION, YOU DIDN'T WRITE

14  DOWN A SINGLE THING?

15  **A.**    NO.

16       **MR. JOHNSTON:**  YOUR HONOR, AT THIS TIME I WOULD

17  STILL MAKE A JENCKS REQUEST FOR ANY WRITTEN MATERIALS THAT MAY

18  EXIST BY AGENT COLE.

19       **THE COURT:**  IT WOULD BE NOTED, AND I WILL RESERVE.

20       **MR. JOHNSTON:**  THANK YOU.

21  **Q.**    **(MR. JOHNSTON)** NOW, TO BE FAIR, ONE OF THE REASONS YOU

22  MAY NOT HAVE DOCUMENTED YOUR ACTIONS HERE IS THAT EVERYTHING

23  WAS RECORDED IN YOUR INTERACTIONS WITH MR. GHAHREMAN.

24  **A.**    CORRECT.

25  **Q.**    WITH MR. YILDIZ.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    WITH TAHERKHANI.

3    **A.**    CORRECT.

4    **Q.**    BEFORE YOU MET MR. GHAHREMAN IN LAS VEGAS, YOU HAD NEVER

5    SEEN HIM FACE TO FACE BEFORE.

6    **A.**    NO.

7    **Q.**    OKAY.  ALL OF YOUR CONVERSATIONS WERE OVER THE PHONE.

8    **A.**    CORRECT.

9    **Q.**    AND YOU TESTIFIED YESTERDAY THAT YOU HAD A SYSTEM SET UP

10   SO THAT ALL OF THOSE CONVERSATIONS WOULD BE RECORDED.

11   **A.**    CORRECT.

12   **Q.**    AND ALL OF THOSE CONVERSATIONS WERE IN FACT RECORDED.

13   **A.**    YES.

14   **Q.**    HUNDREDS OF CONVERSATIONS.

15   **A.**    I BELIEVE THERE MAY BE HUNDREDS, YES.

16   **Q.**    EVERY WORD?

17   **A.**    TO MY UNDERSTANDING, EVERY WORD.

18   **Q.**    NO EMAILS WERE LOST?

19   **A.**    TO MY UNDERSTANDING NO EMAILS WERE LOST, NO.

20   **Q.**    YOU DIDN'T HAVE A PRIVATE EMAIL SERVER IN YOUR HOME?

21   **A.**    NO.  NO, SIR.

22   **Q.**    YOU DIDN'T HAVE SOMEBODY CHOSE THE ONES THEY WANTED TO

23   KEEP AND THEN SEND THE REST TO THE PROSECUTOR?

24   **A.**    NO, SIR.

25   **Q.**    SO JUST TO BE FAIR, ALL WRITTEN COMMUNICATION BETWEEN

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   YOU AND MR. GHAHREMAN WAS VIA EMAIL AT THAT POINT.

2   **A.**    CORRECT.

3   **Q.**    AND ALL OF THOSE WERE PRESERVED.

4   **A.**    CORRECT.

5   **Q.**    NOW, YOU ALSO PRESERVED EVERYTHING THAT WAS SAID AT ALL

6   OF YOUR MEETINGS THAT YOU HAD FACE-TO-FACE WITH MR. GHAHREMAN.

7   **A.**    CORRECT.

8   **Q.**    ALL OF YOUR MEETINGS THAT YOU HAD WITH MR. YILDIZ.

9   **A.**    CORRECT.

10  **Q.**    THE DINNER ON JUNE 12TH, YOU RECORDED EVERY WORD THAT

11  MR. GHAHREMAN SAID TO YOU AND JOHN HELSING AT THE DINNER ON

12  JUNE 12TH, 2013 IN LAS VEGAS.

13  **A.**    YES.

14  **Q.**    IN FACT, YOU HAD MULTIPLE DEVICES TO ENSURE YOU RECORDED

15  EVERY WORD.

16  **A.**    CORRECT.

17  **Q.**    LIKEWISE, AT THE GREEN VALLEY RANCH ON JUNE 13TH, 2013,

18  YOU RECORDED EVERY CONVERSATION THAT YOU HAD WITH THESE

19  INDIVIDUALS.

20  **A.**    CORRECT.

21  **Q.**    YOU RECORDED IT BY VIDEO, AS WELL?

22  **A.**    WE DID.

23  **Q.**    OKAY.  BUT WE ONLY HAVE ONE ANGLE OF VIDEO, CORRECT?

24  **A.**    THAT I DON'T KNOW.  I WAS NOT A TECH AGENT SO I COULDN'T

25  ANSWER THAT QUESTION.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    Q.    YOU DON'T KNOW IF THERE WAS POTENTIALLY ANOTHER CAMERA
2    IN THAT ROOM.
3    A.    TO MY UNDERSTANDING THE ONLY CAMERA IN THE ROOM WAS THE
4    ONE SHOWN, BUT I WOULD NOT BE THE BEST TO ANSWER THAT
5    QUESTION.
6    Q.    YOU DON'T KNOW THAT.  THAT WOULD BE UP TO THE GOVERNMENT
7    OR, I GUESS, THE CASE AGENT?
8    A.    I SUSPECT THE CASE AGENT WOULD KNOW BETTER THAN I.
9    Q.    THE ONLY ANGLE YOU HAVE SEEN IS THE ONE PROVIDED HERE IN
10   THE COURTROOM TODAY TO THE JURY?
11   A.    CORRECT.
12          MR. JOHNSTON:  GIVE ME ONE SECOND.
13          (DISCUSSION OFF THE RECORD BETWEEN MR. JOHNSTON AND
14   MR. HARRIGAN)
15          MR. JOHNSTON:  I AM GOING TO ASK TO PLAY CLIP 7 FROM
16   THE GREEN VALLEY RANCH, IF WE COULD DO THAT, PLEASE.
17          THAT'S FINE IF YOU DON'T DO THE TRANSCRIPT, JUST
18   PLAY THE VIDEO.
19          (VIDEOTAPE PLAYED)
20   Q.    (MR. JOHNSTON) LET'S GO THROUGH A FEW PARTS OF THAT
21   AUDIO THAT WE LISTENED TO.
22   A.    OKAY.
23   Q.    YOU CAN DISTINGUISH THE VOICES IN THAT AUDIO.  YOU HAD
24   BEEN TALKING TO MR. GHAHREMAN FOR APPROXIMATELY SIX MONTHS.
25   A.    CORRECT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **Q.**    HE HAS A SOMEWHAT DEEPER VOICE THAN MR. YILDIZ.

2    **A.**    I WOULD AGREE.

3    **Q.**    IS THAT FAIR?

4    **A.**    YES.

5    **Q.**    AND WITH REGARD TO THE CERTIFICATE AT 122:13, ERGUN

6    SAYS, THIS CERTIFICATE WE SHOULD KEEP AWAY, MAYBE, NO?

7         AND JOHN HELSING SAID, WELL, THAT'S WHAT WE TALKED

8    ABOUT.

9         ERGUN:  WE SHOULDN'T KEEP THIS TOGETHER.

10        AND THEN 122:17 ON THE GOVERNMENT'S TRANSCRIPT ARASH

11   SAYS, NO, WE NEED THIS.

12        RIGHT?  YOU HEARD THAT.

13   **A.**    CORRECT.

14   **Q.**    THE TRANSCRIPT HAS, AT 123:03, ARASH SAYING, WE SHIP THE

15   MANUALS SEPARATE.

16        IS THAT REALLY YOUR RECOLLECTION OF WHO SAID THAT?

17   **A.**    I CAN'T SEE THAT, SO DO YOU HAVE, LIKE -- YOU KNOW WHAT

18   I AM SAYING?

19   **Q.**    IT IS HARD, WE ONLY HAVE ONE VIDEO ANGLE.

20   **A.**    NO, NO, I AM SAYING AS FAR AS THE TIME YOU ARE SAYING.

21   RUN IT BY ME AGAIN.

22   **Q.**    I AM TRYING TO RELY ON YOUR MEMORY AS OPPOSED TO THE

23   TRANSCRIPT.  I AM TRYING TO RELY ON WHAT YOU HEARD AS OPPOSED

24   TO --

25            **MR. HARRIGAN:**  OBJECTION, YOUR HONOR.  I THINK HE IS

APRIL 15, 2015

| | |
|---|---|
| 1 | ASKING TO PLAY THE VIDEO AGAIN AND HE WILL TELL HIM. |
| 2 |        **MR. JOHNSTON:**  I AM HAPPY TO DO THAT.  LET'S PLAY |
| 3 | THE VIDEO AGAIN. |
| 4 |        **THE WITNESS:**  YEAH.  AS FAR AS YOU KNOW WHAT YOU |
| 5 | WANT ME TO LISTEN FOR. |
| 6 |        **MR. HARRIGAN:**  CAN WE PLAY IT WITH THE TRANSCRIPT? |
| 7 |        **MR. JOHNSTON:**  YOUR HONOR, I PREFER FOR HIM TO |
| 8 | LISTEN. |
| 9 |        **THE WITNESS:**  THAT'S FINE. |
| 10 |        **MR. JOHNSTON:**  THANK YOU. |
| 11 |        (VIDEOTAPE PLAYED) |
| 12 | **Q.**   **(MR. JOHNSTON)** CAN YOU HEAR? |
| 13 | **A.**   PERFECT. |
| 14 | **Q.**   THAT WAS ERGUN WHO SAID, THE MANUALS SEPARATE, RIGHT? |
| 15 | **A.**   YES.  CORRECT. |
| 16 | **Q.**   THIS TRANSCRIPT REFLECTS ARASH AS SAYING THAT. |
| 17 | **A.**   OKAY. |
| 18 | **Q.**   I MEAN, I WOULD BE HAPPY TO SHARE IT WITH YOU. |
| 19 | **A.**   SURE. |
| 20 |        **MR. JOHNSTON:**  YOUR HONOR, I AM MARKING THIS AS -- I |
| 21 | AM SORRY, BUT WE PREMARKED A NUMBER OF EXHIBITS. |
| 22 |        **THE CLERK:**  NEXT WOULD BE F. |
| 23 |        **MR. JOHNSTON:**  IT IS GOING TO BE HH.  I AM NOT SURE |
| 24 | THAT WE GET THAT FAR. |
| 25 |        (EXHIBIT HH MARKED FOR IDENTIFICATION) |

APRIL 15, 2015

563

COLE CROSS-EXAMINATION

```
 1              MAY I APPROACH, YOUR HONOR?

 2         THE COURT:  YES.

 3         MR. JOHNSTON:  THANK YOU.

 4         WOULD YOU MIND IF I JUST HELP ORIENT AGENT COLE?

 5         THE COURT:  THAT'S FINE.

 6         THE WITNESS:  CORRECT.

 7  Q.    (MR. JOHNSTON) OKAY?

 8  A.    OKAY.  UH-HUH.

 9  Q.    SO THE TRANSCRIPT REFLECTS MR. GHAHREMAN SAYING THE

10  MANUALS SEPARATE, BUT INDEED WE JUST HEARD IT WAS ERGUN.

11  A.    CORRECT.

12  Q.    OKAY.  THANK YOU.

13         MR. JOHNSTON:  WE CAN CONTINUE PLAYING IT, RIGHT?

14  WE DON'T HAVE TO START OVER, DO WE?  GOOD.

15         (VIDEOTAPE PLAYED)

16  Q.    (MR. JOHNSTON) WE DON'T PUT IT TOGETHER.

17         AGAIN THAT WAS ERGUN, RIGHT?

18  A.    I THOUGHT THAT TIME IT WAS ARASH -- OR THE DEFENDANT.  I

19  AM SORRY.

20  Q.    OKAY.

21         MR. JOHNSTON:  WELL, WE CAN'T BACK UP?

22         (VIDEOTAPE PLAYED)

23         MR. JOHNSTON:  LET'S JUST STOP THERE, I DON'T WANT

24  TO CONFUSE EVERYONE.

25  Q.    (MR. JOHNSTON) YOU THINK MAYBE THAT WAS ARASH.  THE
```

564

COLE CROSS-EXAMINATION

1    TRANSCRIPT REFLECTS ERGUN, RIGHT?

2    **A.**    CORRECT.

3    **Q.**    BUT ONE THING I THINK EVERYBODY AGREES IS THAT -- AT THE

4    END -- AND YOU TALKED ABOUT THIS ON DIRECT.  ARASH'S STATEMENT

5    AT THE VERY END OF THIS CLIP, THAT HE SAYS, WHEN YOU SEND

6    THIS, WHEN YOU SEND THIS WITH THIS MANUAL RIGHT, THE GUY

7    TRUSTS.

8         DO YOU REMEMBER HIM SAYING THAT?

9    **A.**    I DO NOT.

10   **Q.**    YOU DON'T REMEMBER THAT.  YOU JUST TESTIFIED TO THE JURY

11   ABOUT --

12   **A.**    THAT HE SAID THAT THE GUY TRUST?  IF I SEE THE

13   TRANSCRIPT I COULD TELL YOU.  I DON'T HAVE A PERFECT MEMORY.

14   SORRY.  I HAVE LOOKED AT SO MANY DIFFERENT TRANSCRIPTS.

15   **Q.**    **(MR. JOHNSTON)** I WILL SHOW YOU.

16   **A.**    SHOW ME WHERE NOW.  SORRY.

17   **Q.**    RIGHT HERE.

18   **A.**    OKAY.  YES.

19   **Q.**    TAKE YOUR TIME TO REFRESH YOUR RECOLLECTION LOOKING AT

20   THAT.

21   **A.**    OKAY.

22   **Q.**    OKAY.  I AM SORRY.

23        (WITNESS STAND ALARM SOUNDS)

24            **THE WITNESS:**  DO I PUSH IT AGAIN?  IT IS JUST THE

25   BUTTON RIGHT THERE.  I APOLOGIZE.

APRIL 15, 2015

COLE CROSS-EXAMINATION

 1              **THE COURT:**  THAT'S ALL RIGHT.

 2              DO WE KNOW WHAT THAT IS?

 3              **THE WITNESS:**  THAT WAS NOT MY INTENTION.  I

 4     APOLOGIZE.

 5     **Q.**    **(MR. JOHNSTON)** LET'S GO BACK.  HOPEFULLY YOU REMEMBER

 6     WHAT YOU JUST REVIEWED IN THAT TRANSCRIPT.

 7     **A.**    YES.

 8     **Q.**    I WILL TRY TO STAY AWAY FROM THAT BUTTON AREA AS WELL.

 9     **A.**    ALL RIGHT.

10     **Q.**    ARASH SAID, WHEN YOU SEND THIS WITH THE MANUAL THE GUY

11     TRUSTS.  RIGHT?

12     **A.**    CORRECT.  HE DID SAY THAT, ACCORDING TO THE TRANSCRIPT.

13     **Q.**    THAT IS THE REASON BECAUSE THEY DON'T KNOW WHAT THIS IS

14     ALONE.  THEY DON'T -- AND THE WORDS IN THE TRANSCRIPT --

15     BECAUSE THEY DON'T WHAT IS THIS ALONE.

16             SO JUST TO BACK UP.

17             WHEN YOU SEND THIS WITH THE MANUAL THE GUY TRUST.  THAT

18     IS THE REASON BECAUSE THEY DON'T WHAT THIS IS ALONE.

19             IS THAT FAIR?

20     **A.**    THAT'S FAIR.

21     **Q.**    OKAY.  THEY SEE THE MANUAL AND THEN THEY SAY THIS IS

22     VERY --

23             YOUR WORDS TO THE JURY, WHAT YOU TOLD THEM YOU HEARD WAS

24     NAUGHTY.

25     **A.**    OKAY.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **Q.**    THAT IS WHAT YOU TOLD THEM.

2    **A.**    THAT IS WHAT I STILL HEAR, CORRECT.

3    **Q.**    OVER SIX MONTHS OF TALKING WITH MR. GHAHREMAN IN

4    RECORDED PHONE CONVERSATIONS DID YOU EVER ONCE HEAR HIM USE

5    THE WORD NAUGHTY?

6    **A.**    NO.

7    **Q.**    OKAY.  YOU DID, OVER THE COURSE OF YOUR CONVERSATION

8    WITH MR. GHAHREMAN, GET TO KNOW HIS USE OF ENGLISH, RIGHT?

9    **A.**    CORRECT.

10   **Q.**    YOU GOT TO HEAR HIS ACCENT.

11   **A.**    YES.

12   **Q.**    YOU GOT TO KNOW HIS MANNER OF TALKING.

13   **A.**    I WOULD AGREE.

14   **Q.**    AND HE FREQUENTLY WOULD USE THE WORD NOTHING.

15   **A.**    PERHAPS.

16   **Q.**    YES.  BECAUSE WHEN HE SAYS, WHEN YOU SEE THIS WITH THIS

17   MANUAL THIS GUY TRUST, THAT'S THE REASON BECAUSE THEY WOULDN'T

18   KNOW WHAT IT IS ALONE.  THEY SEE THE MANUAL AND THEN THEY SAY

19   THIS IS VERY NOTHING.

20        IS THAT A FAIR LISTENING OF WHAT HE MAY HAVE SAID THERE?

21   **A.**    I WOULD NOT AGREE.  THAT IS NOT WHAT I HEAR.  NOT WITH

22   THE INFLECTION NOR THE CONTEXT.

23   **Q.**    OKAY.  SO EVEN THOUGH IT SAYS, WHEN YOU SEND THIS WITH

24   THE MANUAL THE GUY TRUST, OTHERWISE HE WOULDN'T KNOW WHAT IT

25   IS ALONE; IT IS YOUR POSITION TO THE JURY THAT HE THEN SAID,

APRIL 15, 2015

COLE CROSS-EXAMINATION

 1   BUT IF THEY SEE THE MANUAL THEN THEY WILL THINK THIS IS VERY

 2   NAUGHTY.

 3   **A.**    I HEAR NAUGHTY.  THAT IS ALL I CAN TELL YOU.

 4   **Q.**    ALL RIGHT.  FAIR ENOUGH.

 5        NOW, YOU TESTIFIED -- YOU JUST NOW TESTIFIED ON

 6   DIRECT -- WELL, LET'S BACK UP TO YESTERDAY.

 7        YESTERDAY YOU TESTIFIED, I BELIEVE, THAT MR. GHAHREMAN

 8   EXPRESSLY SAID THAT CERTAIN ITEMS WERE GOING TO IRAN.

 9   **A.**    OKAY.

10   **Q.**    DO YOU REMEMBER SAYING THAT?  I AM ASKING YOU, DO YOU

11   REMEMBER SAYING THAT?

12   **A.**    YES.

13   **Q.**    THAT HE ACTUALLY SAID THEY ARE GOING TO IRAN; NOT TO

14   OVER THERE, NOT TO SOME CODE.  THAT YOU TOLD THE JURY THAT HE

15   TOLD YOU OVER THE COURSE OF YOUR INVESTIGATION THAT THESE

16   ITEMS WERE GOING TO IRAN.

17   **A.**    YES.

18   **Q.**    OKAY.  TODAY YOU PLAYED THIS CLIP.

19        **MR. JOHNSTON:**  CAN WE PLEASE PLAY CLIP 8 FROM THE

20   GREEN VALLEY RANCH.

21        (VIDEOTAPE PLAYED)

22        **MR. JOHNSTON:**  OKAY.

23   **Q.**    **(MR. JOHNSTON)** HE NEVER SAID AIRPORTS IN IRAN, DID HE?

24   **A.**    NO.

25   **Q.**    WHEN YOU SAID IN IRAN HE DIDN'T SAY YES, DID HE?

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **A.**    HE SAID THE AIRPORT.

2   **Q.**    HE SAID AIRPORTS, RIGHT?

3   **A.**    CORRECT.

4   **Q.**    YOU SAID IRAN, RIGHT?

5   **A.**    YES.

6   **Q.**    IN FACT, YOU SAID IRAN MANY TIMES OVER THE COURSE OF

7   YOUR INVESTIGATION WITH MR. GHAHREMAN, RIGHT?

8   **A.**    CORRECT.

9   **Q.**    NOW LET'S TALK ABOUT YOUR ROLE IN THIS CASE AS DAVID

10  MILLS.

11  **A.**    OKAY.

12  **Q.**    OKAY.  YOU HAVE PLAYED AN UNDERCOVER ROLE BEFORE,

13  HAVEN'T YOU?

14  **A.**    YES.

15  **Q.**    HOW MANY TIMES?

16  **A.**    I DON'T KNOW.  IT HAS BEEN SEVERAL.

17  **Q.**    SEVERAL.  YOU TOLD THE JURY THAT YOU TYPICALLY PLAY A

18  BROKER.

19  **A.**    CORRECT.

20  **Q.**    YOU ALSO TOLD THE JURY THAT YOU PLAY THE ROLE OF THE

21  EXPORTER.

22  **A.**    CORRECT.

23  **Q.**    AND EXPORTER BEING THE PERSON RESPONSIBLE FOR SHIPPING

24  GOODS OVERSEAS.

25  **A.**    YES.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    Q.    FOR SENDING GOODS OVERSEAS.

2    A.    YES.

3    Q.    FOR THE SELLING THOSE GOODS AND SHIPPING THEM AND

4    SENDING THEM OVERSEAS.

5    A.    CORRECT.

6    Q.    YOU SAID THAT IN YOUR ROLE AS DAVID MILLS, OR IN ANY

7    UNDERCOVER ROLE THAT YOU PLAY AS A BROKER OR AN EXPORTER, I

8    GUESS ANY ROLE, THAT YOU REPRESENT YOURSELF AS A GUY WHO CAN

9    GET THINGS DONE, RIGHT?

10   A.    CORRECT.

11   Q.    THOSE WERE YOUR WORDS, CORRECT?

12   A.    CORRECT.

13   Q.    AND YOU SPECIFICALLY SAID THAT YOU PLAYED THE ROLE OF AN

14   EXPORTER WHO SUCCESSFULLY SMUGGLES ITEMS OUT OF THE UNITED

15   STATES.

16   A.    CORRECT.

17   Q.    YOU PLAY THE ROLE OF THE SMUGGLER.

18   A.    CORRECT.

19   Q.    YOU PLAY THE ROLE OF THE PERSON WHO SMUGGLES GOODS OUT

20   OF THE UNITED STATES.

21   A.    YES.

22   Q.    IN VIOLATION OF THE LAW.

23   A.    YOU PLAY THAT ROLE, RIGHT?  AS AN UNDERCOVER AGENT.

24   Q.    OF COURSE.  AS DAVID MILLS.

25   A.    AS DAVID MILLS, YES.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  **Q.**    AND IN THIS CASE, AS THE EXPORTER, YOU HAD THE ROLE OF

2  OBTAINING THE EXPORT LICENSE, RIGHT?

3  **A.**    AS THE EXPORTER, YES.

4  **Q.**    AND YOU TOOK ON THAT ROLE IN THIS CASE.

5  **A.**    CORRECT.

6  **Q.**    AND YOU MADE CLEAR TO MR. GHAHREMAN THAT YOU WERE

7  PLAYING THE ROLE OF THE EXPORTER IN THIS CASE.

8  **A.**    CORRECT.

9  **Q.**    AND NOT JUST THE FICTITIOUS ROLE; YOU TOLD HIM, I AM THE

10 EXPORTER.  RIGHT?

11 **A.**    CORRECT.

12 **Q.**    I WILL EXPORT WHATEVER GOODS YOU ARE TRYING TO PROCURE

13 IN THIS CASE.  RIGHT?

14 **A.**    YES.

15 **Q.**    YOU WILL SEND THEM TO WHEREVER THEY ARE GOING.

16 **A.**    YES.

17 **Q.**    YOU WILL GET THE LICENSE TO EXPORT THEM.

18 **A.**    I TOLD HIM I WOULD GET THE LICENSE TO EXPORT THEM OUT OF

19 THE COUNTRY SO WE COULD GET THEM ON TO WHEREVER THEY WERE

20 GOING.

21 **Q.**    RIGHT.  BUT YOU SAID TO GET THEM OUT OF THE COUNTRY --

22 **A.**    CORRECT.

23 **Q.**    -- TO EXPORT THEM FROM THE UNITED STATES --

24 **A.**    CORRECT.

25 **Q.**    -- YOU WOULD GET THE LICENSE.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **A.**    YES.

2   **Q.**    AND YOU WERE PLAYING THE ROLE OF EXPORTER, RIGHT?

3   **A.**    CORRECT.

4   **Q.**    THAT MADE SENSE.

5   **A.**    CORRECT.

6   **Q.**    NOW, OBVIOUSLY, TO BE CLEAR, THE ROLE OF THE EXPORTER IS

7   JUST A ROLE THAT YOU PLAYED, RIGHT?

8   **A.**    CORRECT.

9   **Q.**    LIKE YOU SAID, YOU ARE DOING THIS AS AN UNDERCOVER

10  AGENT, RIGHT?

11  **A.**    YES.

12  **Q.**    THIS IS MADE UP.

13  **A.**    THIS IS MADE UP.

14  **Q.**    YOU NEVER INTENDED TO REALLY EXPORT ANYTHING IN THIS

15  CASE.

16  **A.**    IN THIS CASE, NO.

17  **Q.**    AND YOU CERTAINLY DIDN'T INTEND TO EXPORT ANYTHING IN

18  THIS CASE IN VIOLATION OF THE LAW, RIGHT?

19  **A.**    IN THIS CASE I WAS PLAYING THE ROLE OF A PERSON WHO

20  WOULD EXPORT THINGS IN VIOLATION OF THE LAW.

21  **Q.**    RIGHT.  I AM ASKING ABOUT -- OKAY.  LET ME ASK YOU AS

22  SPECIAL AGENT DAVID COLE.

23        IT WAS NEVER YOUR INTENTION TO EXPORT ANYTHING OUT OF

24  THE UNITED STATES ILLEGALLY, WAS IT?

25  **A.**    AS DAVID COLE, NO, IT WAS NOT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  **Q.**    IN FACT, THE PURCHASE ORDERS FROM SPERRY MARINE FOR THE

2  NAVIGATS, THOSE WERE MADE UP, RIGHT?  WE LOOKED AT THOSE

3  YESTERDAY.

4  **A.**    CORRECT.

5  **Q.**    YOU MADE THOSE UP OR --

6  **A.**    WE HAD THEM MADE UP.

7  **Q.**    YOU HAD THEM MADE UP.

8  **A.**    CORRECT.

9  **Q.**    THERE WERE NEVER ANY NAVIGATS ORDERED THAT WERE GOING TO

10  BE EXPORTED TO DUBAI, WERE THERE?

11  **A.**    NO.

12  **Q.**    AND THE CPI PURCHASE ORDER FOR THE Y-690'S, THOSE WERE

13  MADE UP TOO, RIGHT?

14  **A.**    CORRECT.

15  **Q.**    THE CPI PURCHASE ORDERS WITH THE LANGUAGE ABOUT THE ITAR

16  RESTRICTIONS, RIGHT?

17  **A.**    YES.

18  **Q.**    ITAR, I DON'T KNOW IF WE SAID THIS BEFORE, THE

19  INTERNATIONAL TRAFFIC IN ARMS REGULATIONS?

20  **A.**    I AM FAMILIAR WITH IT.

21  **Q.**    I MEAN, THAT IS WHAT ITAR STANDARDS FOR?

22  **A.**    YEAH, YOU ARE CORRECT.

23  **Q.**    AND IT IS ITAR THAT REQUIRES THE LICENSE FOR CERTAIN

24  MUNITIONS TO GO TO ANY COUNTRY, RIGHT?

25  **A.**    CORRECT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  **Q.**    NOW, PART OF YOUR ROLE AS AN UNDERCOVER IS -- BY

2  DEFINITION IT IS TO MAKE MISREPRESENTATIONS, RIGHT?

3  **A.**    CORRECT.

4  **Q.**    YOU ARE NOT DAVID MILLS.

5  **A.**    NO.

6  **Q.**    YOU ARE NOT A SMUGGLER EXPORTER.

7  **A.**    NO.

8  **Q.**    YOU ARE NOT REALLY A BROKER, EITHER.

9  **A.**    NO.

10  **Q.**    BUT YOU DO THIS SO THAT YOU CAN TRY TO GAIN INFORMATION

11  ABOUT CRIMINAL ACTIVITY, RIGHT?

12  **A.**    THAT IS CORRECT.

13  **Q.**    SO YOU PLAY A PRETEND ROLE TO TRY TO GAIN THAT

14  INFORMATION.

15  **A.**    CORRECT.

16  **Q.**    YOU ALSO MAKE OTHER MISREPRESENTATIONS AS PART OF YOUR

17  INVESTIGATION TO GAIN EVIDENCE, RIGHT?

18  **A.**    AT TIMES.

19  **Q.**    AT TIMES YOU DO THAT.

20  **A.**    CORRECT.

21  **Q.**    WELL, LET'S TALK ABOUT ONE OF THE MISREPRESENTATIONS

22  THAT WERE MADE.

23  **A.**    OKAY.

24  **Q.**    ON SEVERAL OCCASIONS IN THIS CASE YOU TOLD MR. GHAHREMAN

25  THAT THE Y-690'S REQUIRED A SPECIAL LICENSE TO BE EXPORTED TO

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   ANY COUNTRY, RIGHT?

2   **A.**    CORRECT.

3   **Q.**    EVEN TO THE UNITED ARAB EMIRATES.

4   **A.**    CORRECT.

5   **Q.**    BUT THIS IS NOT TRUE, CORRECT?

6   **A.**    AT THE TIME OF THE INVESTIGATION THAT WAS THE

7   INFORMATION THAT WE WERE GIVEN.

8   **Q.**    OKAY.  BUT I AM ASKING YOU, THAT IS NOT TRUE.  IT IS NOT

9   TRUE THAT YOU NEED A SPECIAL EXPORT LICENSE TO SHIP THE Y-690

10  TO DUBAI.

11  **A.**    CORRECT.

12  **Q.**    OKAY.  Y-690'S ARE NOT CLASSIFIED AS MUNITIONS.

13  **A.**    CORRECT.

14  **Q.**    THEY HAVE CIVILIAN APPLICATIONS.

15  **A.**    CORRECT.

16  **Q.**    BY DEFINITION, RIGHT?

17  **A.**    BY DEFINITION.

18  **Q.**    INCLUDING CIVILIAN AIRBORNE RADAR.

19  **A.**    CORRECT.

20  **Q.**    LIKE THE KIND OF RADAR THEY USE AT AIRPORTS.

21  **A.**    INDEED.

22  **Q.**    YES, INDEED.  YOU TOLD MR. GHAHREMAN THAT THESE WERE

23  NEVERTHELESS MUNITIONS, RIGHT?

24  **A.**    I DID.

25  **Q.**    THAT REQUIRE A SPECIAL EXPORT LICENSE.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    I DID.

2    **Q.**    AND YOU JUST TOLD ME THAT YOU SAID THIS NOT BECAUSE YOU

3    WERE INTENDING A MISREPRESENTATION BUT YOU WERE RELYING ON

4    INFORMATION.

5    **A.**    CORRECT.

6    **Q.**    OKAY.  AND I THINK YESTERDAY YOU SAID WHAT YOU WERE

7    RELYING ON WAS A FIRST-LEVEL DETERMINATION?

8    **A.**    CORRECT, FOR THE REGULATORY AGENCY.

9    **Q.**    SO LET ME --

10           **MR. JOHNSTON:**  THIS IS EXHIBIT II.

11           MAY I APPROACH?

12           (EXHIBIT II MARKED FOR IDENTIFICATION)

13           **THE COURT:**  YES.

14   **Q.**   **(MR. JOHNSTON)** HERE YOU GO.  I WILL COME OVER HERE.

15   **A.**    OKAY.

16   **Q.**    I WILL GET AWAY.

17           **MR. JOHNSTON:**  YOUR HONOR, I MOVE TO PUBLISH EXHIBIT

18   II.

19           **THE COURT:**  ANY OBJECTION?

20           **MR. HARRIGAN:**  I DON'T HAVE ANY OBJECTION, YOUR

21   HONOR.

22           (EXHIBIT II RECEIVED INTO EVIDENCE)

23   **Q.**   **(MR. JOHNSTON)** AND YOU RECOGNIZE THIS ITEM?

24   **A.**    YES, I DO.

25   **Q.**    THIS IS THE FIRST-LEVEL REVIEW THAT YOU RELIED UPON?

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    FROM THE DEPARTMENT OF STATE?

3    **A.**    CORRECT.

4    **Q.**    AND IN THE COMMENT SECTION IT SAYS THAT THE

5    MANUFACTURER -- THE MANUFACTURER HAS CERTIFIED THAT THIS ITEM

6    IS ITAR CONTROLLED, RIGHT?

7    **A.**    AS WELL.

8    **Q.**    ACCORDING TO THE MANUFACTURER THIS ITEM WAS SPECIALLY

9    DESIGNED AND DEVELOPED FOR MILITARY RADAR APPLICATIONS.

10   **A.**    THAT IS WHAT IT SAYS.

11   **Q.**    OKAY.  AND YOU RELIED ON THIS, RIGHT?

12   **A.**    I DID.

13   **Q.**    AND, OF COURSE, YOU PAID ATTENTION TO THIS DISCLAIMER AS

14   WELL, RIGHT?

15   **A.**    I DID.

16   **Q.**    DDTC HAS RECEIVED THE ATTACHED REQUEST FROM YOUR

17   DEPARTMENT, RIGHT?  HOMELAND SECURITY.

18   **A.**    CORRECT.

19   **Q.**    THE RESPONSE AND ADVICE IS PROVIDED ONLY AS A

20   PRELIMINARY REVIEW, RIGHT?

21   **A.**    CORRECT.

22   **Q.**    BASED ON THE INFORMATION PROVIDED BY THE DIRECTOR OF

23   DEFENSE TRADE CONTROLS BY YOUR DEPARTMENT, CORRECT?

24   **A.**    CORRECT.

25   **Q.**    WAS PROVIDED ONLY TO ASSIST YOUR DEPARTMENT IN

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   PROCESSING DETAINED CARGO.

2   **A.**    CORRECT.

3   **Q.**    AT THE TIME OF YOUR INVESTIGATION YOU DIDN'T HAVE ANY

4   DETAINED CARGO, DID YOU?

5   **A.**    NO, WE DID NOT.

6   **Q.**    BUT IF YOU HAD THE DETAINED CARGO YOU MIGHT WANT A

7   PRELIMINARY DETERMINATION BEFORE YOU LET IT GO, RIGHT?

8   **A.**    CORRECT.

9   **Q.**    BUT THAT WASN'T THE CASE HERE, WAS IT?

10  **A.**    CORRECT.

11  **Q.**    AND BOTH DEPARTMENTS AGREE THE INFORMATION IS NOT

12  BINDING ON EITHER AGENCY.

13  **A.**    CORRECT.

14  **Q.**    BUT YOU RELIED ON IT IN YOUR RUSE OF MR. GHAHREMAN.

15  **A.**    CORRECT.  THIS IS WHY WE NEVER CHARGED OR ARRESTED HIM

16  FOR THIS VIOLATION.

17  **Q.**    BECAUSE IT WASN'T A VIOLATION OF LAW, RIGHT?

18  **A.**    CORRECT.  NOT TO EXPORT IT OUT OF THE U.S.

19  **Q.**    RIGHT.  RIGHT.

20       SO YOU ARE PART OF THE COUNTER-PROLIFERATIONS UNIT OF

21  THE DEPARTMENT OF HOMELAND SECURITY INVESTIGATIVE SERVICES,

22  RIGHT?

23  **A.**    AT THE TIME, YES.

24  **Q.**    AT THE TIME YOU WERE.

25  **A.**    YES.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  **Q.**    BEFORE YOU WENT TO SALT LAKE.

2  **A.**    CORRECT.

3  **Q.**    AND AS A COUNTER-PROLIFERATION AGENT I THINK YOU SAID

4  YOU HAD ABOUT 30 INVESTIGATIONS UNDER YOUR BELT?

5  **A.**    YES.

6  **Q.**    WITH EXPERIENCE, I THINK YOU EVEN SAID, INVESTIGATING

7  ITAR VIOLATIONS?

8  **A.**    I DID.

9  **Q.**    REGULATIONS THAT YOU HAVE STUDIED AS PART OF YOUR

10  TRAINING --

11  **A.**    CORRECT.

12  **Q.**    -- AS A COUNTER-PROLIFERATION AGENT.

13  **A.**    CORRECT.

14  **Q.**    AND THE FACT IS THESE REGULATIONS ARE COMPLICATED; IS

15  THAT FAIR TO SAY?

16  **A.**    THEY TAKE TIME TO STUDY.

17  **Q.**    THEY TAKE TIME TO STUDY.  MISTAKES CAN EVEN BE MADE

18  ABOUT CLASSIFICATIONS, RIGHT?

19  **A.**    IT HAPPENS.

20         **MR. HARRIGAN:**  OBJECTION.  VAGUE, WHAT

21  CLASSIFICATIONS.

22         **THE COURT:**  SUSTAINED.

23  **Q.**    **(MR. JOHNSTON)** OKAY.  MISTAKES CAN BE MADE TO

24  CLASSIFICATIONS, SUCH AS IN THIS CASE THE CLASSIFICATION YOU

25  THOUGHT WAS MADE FOR THE Y-690.

APRIL 15, 2015

```
 1              MR. HARRIGAN:  SAME OBJECTION.  WHAT LAW, WHAT
 2    CLASSIFICATION ARE YOU TALKING ABOUT?
 3              THE COURT:  OVERRULED.
 4              YOU CAN ANSWER.
 5              THE WITNESS:  I SUPPOSE IT COULD HAPPEN BECAUSE
 6    OBVIOUSLY THIS WAS INITIALLY LISTED AS ITAR AND THEN LATER
 7    NOT.
 8    Q.    (MR. JOHNSTON) AND UNDER MORE SCRUTINY IT WAS
 9    DETERMINED THAT IT WAS NOT, IN FACT, A MUNITION.
10    A.    CORRECT.
11    Q.    IT HAD COMMERCIAL APPLICATIONS.
12    A.    YES.
13    Q.    AND TO BE FAIR, THIS CAN EVEN BE COMPLICATED FOR
14    MANUFACTURERS THEMSELVES.
15    A.    I DON'T KNOW.  I NEVER WORKED FOR THE MANUFACTURER, SO I
16    COULDN'T TELL YOU THAT.
17    Q.    FAIR ENOUGH.
18          BUT THE FACT IS, AT THE TIME YOU WERE TALKING TO MR.
19    GHAHREMAN, DAVID MILLS BELIEVED THAT THIS WAS A MUNITION.
20    A.    YES.
21    Q.    AND MUNITIONS CAN ONLY GET A LICENSE IF A LEGITIMATE
22    DEFENSE USE IS PROVIDED, RIGHT?
23    A.    CORRECT.
24    Q.    I THINK TODAY YOU SAID SOMETHING ABOUT ELECTRONIC
25    WARFARE --
```

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  **A.**    CORRECT.

2  **Q.**    -- FOR THIS ITEM.  THAT WAS DAVID MILLS' BELIEF, RIGHT?

3  **A.**    CORRECT.

4  **Q.**    AND IN ORDER TO GET AN ITAR LICENSE YOU CAN ONLY GET

5  THAT LICENSE IF YOU HAVE A LEGITIMATE DEFENSE USE IN AN

6  APPROVED COUNTRY, RIGHT?

7  **A.**    THAT IS PART OF THE PROCESS.

8  **Q.**    THAT IS PART OF THE PROCESS.  BUT YOU HAVE TESTIFIED

9  THAT MR. GHAHREMAN BELIEVED THAT THESE WERE FOR COMMERCIAL

10  AIRPORTS, RIGHT?

11  **A.**    CORRECT.

12  **Q.**    YOU TESTIFIED THAT MR. GHAHREMAN DID NOT BELIEVE THAT

13  THEY WERE GOING TO BE USED FOR MILITARY PURPOSE.

14  **A.**    CORRECT.

15  **Q.**    YOU OFFERED HIM -- YOU OFFERED HIM THE OPPORTUNITY TO

16  PROVIDE WHAT YOU CALLED A GOOD END USER, RIGHT?

17  **A.**    CORRECT.

18  **Q.**    ONE THAT COULD BE VERIFIABLE, RIGHT?

19  **A.**    CORRECT.

20  **Q.**    ONE THAT WOULD APPARENTLY HAVE AN APPROVED OR LEGITIMATE

21  DEFENSE USE TO GET AN EXPORT LICENSE, RIGHT?

22  **A.**    CORRECT.

23  **Q.**    IN AN APPROVED COUNTRY.

24  **A.**    CORRECT.

25  **Q.**    AND HE ACCEPTED YOUR OFFER OF AN END USER THAT HAD A

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   DEFENSE USE, RIGHT?

2   **A.**   AFTER HE DIDN'T WANT TO PROVIDE AN END USER, CORRECT.

3   **Q.**   YOU GAVE HIM THE OPTION OF PROVIDING HIS END USER,

4   RIGHT?

5   **A.**   I DID.

6   **Q.**   WHO HE TOLD YOU HE BELIEVED TO BE A COMMERCIAL AIRPORT.

7   **A.**   WHICH HE -- HE SAID THEY DIDN'T FEEL COMFORTABLE

8   RELEASING THAT INFORMATION.

9   **Q.**   OKAY.  BUT YOU HAVE ALREADY TESTIFIED THAT MR. GHAHREMAN

10  TOLD YOU, WE LISTEN TO HIM, THAT HE BELIEVED --

11  **A.**   BUT THAT WAS MONTHS LATER.

12          **MR. HARRIGAN:**  ARGUMENTATIVE, YOUR HONOR.

13          **THE WITNESS:**  YOU ARE TALKING ABOUT ONE MONTH TO SIX

14  MONTHS DOWN THE ROAD.

15  **Q.**   **(MR. JOHNSTON)** HE NEVER TOLD YOU THAT HE BELIEVED IT

16  WAS FOR A MILITARY APPLICATION, RIGHT?

17  **A.**   HE NEVER DID.

18  **Q.**   HE ACCEPTED YOUR OFFER OF A GOOD END USER.

19  **A.**   CORRECT.

20  **Q.**   NOW, WHEN YOU ASKED MR. GHAHREMAN ABOUT MAKING A CHOICE

21  BETWEEN PROVIDING HIS END USER OR YOUR END USER, YOU TRIED TO

22  EXPLAIN TO HIM WHY THAT WAS IMPORTANT, THAT CHOICE, RIGHT?

23  **A.**   YES.

24  **Q.**   ONE OF THE REASONS WHY IT WAS IMPORTANT TO GET THE END

25  USER RIGHT WAS BECAUSE YOU HAVE TO PROVIDE THAT INFORMATION

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    TO, IN THIS CASE, CPI, RIGHT?

2    **A.**    (WITNESS NODS HEAD)

3    **Q.**    IS THAT CORRECT?

4    **A.**    THAT'S CORRECT.

5    **Q.**    YOU HAVE TO SAY YES OR NO FOR THE COURT REPORTER.

6    **A.**    YES.

7    **Q.**    AND CPI HAS TO DETERMINE WHETHER THAT END USER MEETS

8    THEIR APPROVAL.

9    **A.**    CORRECT.

10   **Q.**    UNDER DAVID MILLS' -- UNDER DAVID MILLS' VIEW OF THINGS,

11   THEY WOULD HAVE TO DETERMINE IF THERE WAS AN APPROPRIATE

12   DEFENSE USE FOR THAT END USER, RIGHT?

13   **A.**    CORRECT.

14   **Q.**    OKAY.  AND IF THEY DID NOT APPROVE THAT END USER, YOU

15   TOLD MR. GHAHREMAN THERE WOULD BE A PROBLEM, RIGHT?

16   **A.**    YES.

17   **Q.**    YOU TOLD HIM THE PROBLEM WOULD BE THAT IF HE PROVIDED AN

18   END USER THAT DIDN'T HAVE AN APPROPRIATE DEFENSE USE FOR THE

19   ITEM, YOU WOULD HAVE TO GO BACK WITH YOUR GOOD END USER,

20   RIGHT?

21   **A.**    I TOLD HIM THAT IF HE DIDN'T HAVE AN END USER.  I DON'T

22   REMEMBER TALKING ABOUT A DEFENSE END USER.

23   **Q.**    RIGHT.

24   **A.**    JUST SIMPLY IF THEY HAD AN END USER.

25   **Q.**    BUT IF THEY DID PROVIDE END USER INFORMATION AND IT WAS

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  DENIED BY CPI --

2  **A.**    CORRECT.

3  **Q.**    AND HE WOULD BE PROVIDING IT TO YOU.  YOU WERE AN

4  INTERMEDIARY FOR THAT, RIGHT?

5  **A.**    YES.

6  **Q.**    AND IF THEY DENIED IT, YOU TOLD HIM, HE WOULD BE IN A

7  DIFFICULT POSITION, RIGHT?

8  **A.**    I TOLD HIM IT WOULD BE DIFFICULT TO NOW MAKE ANOTHER

9  ORDER FOR THE SAME QUANTITY, AND THEN PROVIDE A DIFFERENT END

10  USER.  IT WOULD COMPLICATE THINGS.

11  **Q.**    EXACTLY.  IT WOULD COMPLICATE THINGS, AND IT WOULD

12  COMPLICATE THINGS EVEN MORE BECAUSE YOU WOULD BE THE ONE GOING

13  BACK FOR ANOTHER ORDER OF 50 Y-690'S.

14  **A.**    CORRECT.

15  **Q.**    THIS TIME FOR YOUR GOOD END USER, YOUR VERIFIABLE END

16  USER.

17  **A.**    CORRECT.

18  **Q.**    THE ONE IN CZECH.

19  **A.**    YES.

20  **Q.**    AND THAT WOULD JEOPARDIZE TIG MARINE FROM GETTING THE

21  PRODUCT THAT THEY WERE SEEKING, RIGHT?

22  **A.**    I DON'T KNOW IF IT WOULD JEOPARDIZE THEM.  I MEAN, I

23  SUPPOSE.

24  **Q.**    YOU JUST SAID THE PROBLEM IS IF YOU HAD TO GO BACK WITH

25  A NEW END USER BUT ESSENTIALLY THE SAME ORDER THAT THEY

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  PROBABLY WOULDN'T HONOR --

2  **A.**     NOT --

3  **Q.**     -- THE DEAL, RIGHT?

4  **A.**     CORRECT.  BUT IT WAS EITHER HE PROVIDE AN END USER OR I

5  PROVIDE AN END USER.  IT WAS HIS DECISION.

6  **Q.**     RIGHT.  BUT WHAT YOU SAID IS, YOU DON'T GET TWO BITES OF

7  THE APPLE.  YOU CAN'T PROVIDE YOUR END USER, GET REJECTED AND

8  THEN EXPECT ME TO GO BACK.

9  **A.**     YEAH, I SAID IT WOULD BE VERY DIFFICULT.

10  **Q.**     RIGHT.  RIGHT.  THAT IS ALL I AM SAYING.

11  **A.**     OKAY.

12  **Q.**     ESSENTIALLY YOU TOLD HIM -- I THINK YOU SAID, WE ONLY

13  HAVE ONE SHOT AT THIS.

14  **A.**     SURE.

15  **Q.**     AND HE CHOSE TO GO WITH YOUR END USER.

16  **A.**     OKAY.

17  **Q.**     DID HE?

18  **A.**     YES.

19  **Q.**     IN ONE OF YOUR FIRST PHONE CALLS WITH MR. GHAHREMAN,

20  THAT WAS BACK IN DECEMBER OF 2012, WAS THAT --

21  **A.**     YES.

22  **Q.**     -- WHEN YOU FIRST MADE CONTACT WITH HIM?

23  **A.**     UH-HUH.

24  **Q.**     DO YOU RECALL EXPLAINING TO HIM YOUR UNDERSTANDING AS

25  DAVID MILLS, THE BROKER, HOW COMPANIES LIKE NORTHROP GRUMMAN

APRIL 15, 2015

1    WORK?

2    **A.**    I DO, I BELIEVE.

3    **Q.**    AND YOU EXPLAINED TO HIM HOW NORTHROP GRUMMAN IS

4    ESSENTIALLY A BIG COMPANY, RIGHT?

5    **A.**    CORRECT.

6    **Q.**    THEY ARE MAKING HUNDREDS OF MILLIONS OF DOLLARS, IF NOT

7    MORE, A YEAR.

8    **A.**    I DON'T KNOW IF I SAID THAT, BUT POSSIBLY.

9    **Q.**    BUT A BIG COMPANY, RIGHT?

10   **A.**    THEY ARE A LARGE COMPANY.

11   **Q.**    THEY ARE A LARGE COMPANY, AND YOU SAID THEY HAVE LARGE

12   CONTRACTS.

13   **A.**    CORRECT.

14   **Q.**    RIGHT.  THEY ORDINARILY DEAL WITH, I THINK YOUR WORDS

15   WERE, BIG CUSTOMERS, RIGHT?

16   **A.**    CORRECT.

17   **Q.**    AND THOSE BIG CUSTOMERS ARE THE U.S. GOVERNMENT, RIGHT?

18   **A.**    YES.

19   **Q.**    AND ITS MILITARY?

20   **A.**    YES.

21   **Q.**    AND YOU WERE EXPLAINING TO ARASH -- AND LET ME BACK UP.

22       ARASH CAME TO YOU AFTER HIS END USE INFORMATION WAS

23   REJECTED BY NORTHROP GRUMMAN, RIGHT?

24   **A.**    CORRECT.

25   **Q.**    AND YOU KNEW THAT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    I DID.

2    **Q.**    AND YOU WERE EXPLAINING TO HIM HOW NORTHROP GRUMMAN

3    WORKS, RIGHT?

4    **A.**    CORRECT.

5    **Q.**    I THINK AT SOME POINT YOU TOLD HIM, YEAH, I HAVE A

6    FRIEND WHO WORKS THERE.

7    **A.**    CORRECT.

8    **Q.**    YOU MAYBE EVEN TOLD HIM THAT YOU WORKED THERE AT SOME

9    POINT?

10   **A.**    I DON'T RECALL, BUT POSSIBLY.

11   **Q.**    BUT CERTAINLY HAD A FRIEND WHO WORKED THERE, SO YOU KNEW

12   HOW IT WORKED.

13   **A.**    CORRECT.

14   **Q.**    AND YOU TOLD HIM THAT THEY DEAL WITH THESE BIG

15   CUSTOMERS, RIGHT?

16   **A.**    (WITNESS NODS HEAD)

17   **Q.**    AND THAT THESE ARE CUSTOMERS THAT NORTHROP GRUMMAN

18   ALREADY HAS A RELATIONSHIP WITH, RIGHT?

19   **A.**    CORRECT.

20   **Q.**    BIG CUSTOMERS MEANING BIG TIME MONEY FOR NORTHROP

21   GRUMMAN.

22   **A.**    I JUST -- BIG CUSTOMERS.

23   **Q.**    OKAY.  BUT LARGE ORDERS FOR SOPHISTICATED, EXPENSIVE

24   EQUIPMENT.

25   **A.**    CORRECT.

APRIL 15, 2015

1    **Q.**    AND YOU TOLD MR. GHAHREMAN ON THIS PHONE CALL ON

2    DECEMBER 21ST, A BIG COMPANY LIKE NORTHROP GRUMMAN DOESN'T

3    WANT TO DEAL WITH PEOPLE WITH NAMES LIKE YOURS.  RIGHT?

4    **A.**    I DID.

5    **Q.**    AND YOU WERE SPECIFICALLY REFERRING TO MIDDLE EASTERN

6    NAMES, RIGHT?

7    **A.**    CORRECT.

8    **Q.**    YOU TOLD HIM, BUSINESSES FROM THAT PART OF THE WORLD

9    THAT THEY DON'T WANT TO DEAL WITH.

10   **A.**    I DON'T KNOW EXACTLY, BUT THAT IS POSSIBLE.

11   **Q.**    WELL, PERHAPS WE CAN LISTEN TO IT.

12   **A.**    OKAY.

13   **Q.**    SINCE YOU DON'T REMEMBER.

14   **A.**    I AM NOT SAYING I DIDN'T, I AM JUST SAYING --

15            (AUDIO PLAYED)

16   **Q.**    **(MR. JOHNSTON)** NORTHROP GRUMMAN ALREADY MAKES A LOT OF

17   MONEY.  RIGHT?

18   **A.**    CORRECT.

19   **Q.**    IF THERE IS AN UNFAMILIAR LAST NAME FROM THE MIDDLE EAST

20   THEY FORGET ABOUT THOSE PEOPLE.  RIGHT?

21   **A.**    I DON'T KNOW NORTHROP GRUMMAN -- THAT IS WHAT I SAID.  I

22   DON'T KNOW IF THEY DO.

23   **Q.**    RIGHT.  WE ARE TALKING ABOUT DAVID MILLS.

24   **A.**    CORRECT.

25   **Q.**    WHAT DID HE BELIEVE AND WHAT DID HE TELL MR. GHAHREMAN.

APRIL 15, 2015

1   **A.**    THAT IS WHAT I TOLD HIM.

2   **Q.**    OVER THE COURSE OF THIS INVESTIGATION.

3   **A.**    CORRECT.

4   **Q.**    AND DAVID MILLS TOLD MR. GHAHREMAN THAT A COMPANY LIKE

5   NORTHROP GRUMMAN CAN IGNORE PEOPLE LIKE HIM.

6   **A.**    CORRECT.

7   **Q.**    AND YOU DIDN'T SAY PEOPLE FROM IRAN WHO ARE TRYING TO

8   SHIP PRODUCTS TO IRAN, RIGHT?

9   **A.**    CORRECT.

10  **Q.**    YOU SAID PEOPLE IN THE MIDDLE EAST.

11  **A.**    AT THAT POINT IN TIME, YES.

12  **Q.**    THEY CAN ALREADY MAKE A LOT OF MONEY, AND THEY MAY JUST

13  DECIDE NOT TO DO BUSINESS WITH ANYONE WHO EVEN SEEMS CLOSE TO

14  A PROBLEM, RIGHT?

15  **A.**    CORRECT.

16  **Q.**    AND YOU TOLD HIM THAT IN DECEMBER OF 2012, RIGHT?

17  **A.**    CORRECT.

18  **Q.**    A COUPLE OF WEEKS LATER -- OR LET ME BACK UP.

19        YOU HAD A NUMBER OF PHONE CONVERSATIONS IN THIS

20  BEGINNING PERIOD WITH MR. GHAHREMAN?

21  **A.**    YES.

22  **Q.**    EXCHANGED A NUMBER OF EMAILS?

23  **A.**    A LOT.

24  **Q.**    A LOT OF EMAILS.

25        AND ON A COUPLE OF DIFFERENT OCCASIONS YOU EXPLAINED TO

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   MR. GHAHREMAN WHAT DAVID MILLS BELIEVED TO BE THE LAY OF THE

2   LAND FOR EXPORT LAWS, RIGHT?

3   **A.**    I BELIEVE SO.

4   **Q.**    THAT DEPARTMENT OF STATE, FOR INSTANCE, CONTROLS

5   MUNITIONS AND THOSE LICENSES, RIGHT?

6   **A.**    CORRECT.

7   **Q.**    THAT DEPARTMENT OF COMMERCE CONTROLS ALL OTHER ITEMS

8   THAT MIGHT NEED LICENSING, RIGHT?

9   **A.**    CORRECT.

10  **Q.**    BUT ON JANUARY 15TH YOU TOLD HIM SOMETHING ELSE, AS

11  WELL.  YOU TOLD HIM THAT SOME THINGS AREN'T RESTRICTED AT ALL,

12  RIGHT?

13  **A.**    OKAY.  I DON'T KNOW.

14  **Q.**    ALL RIGHT.

15  **A.**    I TRUST YOU, BUT --

16  **Q.**    LET'S PLAY IT.

17          **MR. JOHNSTON:**  CAN WE PLAY JANUARY 15TH, 221.

18          (AUDIO PLAYED)

19          **THE WITNESS:**  OKAY.

20  **Q.**    **(MR. JOHNSTON)** DOES THAT REFRESH YOUR RECOLLECTION?

21  **A.**    YES, IT DOES.

22  **Q.**    WE ALL KNOW WE CAN SHIP MANY THINGS FROM THE UNITED

23  STATES TO MANY COUNTRIES WITHOUT ANY LICENSE AT ALL.

24  **A.**    CORRECT.

25  **Q.**    BUT YOU TOLD MR. GHAHREMAN EARLY ON IN YOUR RELATIONSHIP

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   WITH HIM, HAVING HAD EXPERIENCE IN THE INDUSTRY YOURSELF,

2   RIGHT?

3   **A.**    CORRECT.

4   **Q.**    THAT SOME THINGS AREN'T RESTRICTED AT ALL, RIGHT?

5   **A.**    CORRECT.

6   **Q.**    BUT SOME COMPANIES ARE WEIRD ABOUT HOW THEY DEAL WITH

7   BUSINESS.

8   **A.**    CORRECT.

9   **Q.**    THEY ARE WEIRD ABOUT WHAT THEY ASK YOU TO GIVE THEM.

10   **A.**    CORRECT.

11   **Q.**    SOME OF THEM MAY ASK FOR END USER INFORMATION EVEN IF IT

12   IS NOT REQUIRED BY THE DEPARTMENT OF STATE.

13   **A.**    CORRECT.

14   **Q.**    EVEN IF IT IS NOT REQUIRED BY THE DEPARTMENT OF

15   COMMERCE.

16   **A.**    YES.

17   **Q.**    IT JUST IS SOME INTERNAL POLICY OF THAT COMPANY TO ASK

18   FOR THAT END USE.

19   **A.**    THAT IS POSSIBLE, YES.

20   **Q.**    YOU TOLD HIM THAT.

21   **A.**    YES, I AM SAYING.

22   **Q.**    AND THEY WILL REQUEST THIS END USER INFORMATION EVEN

23   WHEN IT IS NOT NEEDED.

24   **A.**    I AM SORRY?

25   **Q.**    THEY WILL REQUEST THIS END USER INFORMATION EVEN WHEN IT

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   IS NOT LEGALLY REQUIRED, RIGHT?

2   **A.**   YES.  SOMETIMES IT DOES HAPPEN, YES.

3   **Q.**   AND THEY MAY REJECT END USER INFORMATION FOR EQUALLY

4   WEIRD REASONS, RIGHT?

5   **A.**   IT IS POSSIBLE, YES.

6   **Q.**   IT IS QUITE POSSIBLE.

7   **A.**   CORRECT.

8   **Q.**   LET'S GO BACK TO YOUR ROLE AS AN UNDERCOVER.

9        AN ESSENTIAL ASPECT OF BEING AN UNDERCOVER AGENT IS TO

10  BE CONVINCING, RIGHT?

11  **A.**   CORRECT.

12  **Q.**   YOU HAVE TO CONVINCE THE PEOPLE YOU ARE INVESTIGATING

13  THAT YOU ARE WHO YOU ARE --

14  **A.**   CORRECT.

15  **Q.**   -- RIGHT?  AND NOT TO CALL YOU A CON MAN, BUT IT IS A

16  CONVINCING GAME, RIGHT?

17  **A.**   THAT'S THE IDEA.

18  **Q.**   YOU ARE TRYING TO CON THE PERSON INTO BELIEVING WHAT IT

19  IS YOU ARE SELLING OR TELLING THEM, RIGHT?

20  **A.**   YEAH.  YOU WANT THEM TO BELIEVE YOU ARE THE PERSON YOU

21  SAY YOU ARE.

22  **Q.**   RIGHT.  SO YOU MAKE EFFORTS AS AN AGENT PLAYING THE ROLE

23  OF DAVID MILLS, RIGHT?

24  **A.**   CORRECT.

25  **Q.**   TO BE CONVINCING.

APRIL 15, 2015

1   **A.**    UH-HUH.

2   **Q.**    AND YOU ARE PRETTY GOOD AT IT, RIGHT?

3   **A.**    I DON'T KNOW IF I AM OR NOT.  IF THAT IS YOUR OPINION,

4   THANK YOU.

5   **Q.**    WELL, I AM ASKING YOU.  YOU HAVE BEEN SUCCESSFUL AS AN

6   UNDERCOVER AGENT, NO?

7   **A.**    HAVE I BEEN SUCCESSFUL?

8   **Q.**    YES.

9   **A.**    I MEAN, I HAVE HAD SUCCESS.  I DON'T KNOW IF I WOULD

10  CONSIDER MYSELF GOOD AT IT.  THAT IS A TOUGH QUESTION TO

11  ANSWER.

12  **Q.**    OKAY.  FAIR ENOUGH.  YOU ARE NOT BAD AT IT, THOUGH,

13  RIGHT?

14  **A.**    DEPENDS ON WHO YOU ASK.  I MEAN, DEPENDS.  I MEAN, I

15  DON'T KNOW.  HONESTLY.  I GUESS I AM OKAY AT IT.

16  **Q.**    ALL RIGHT.  WELL, I APPRECIATE YOUR HUMILITY.  BUT YOU

17  DO WORK AT IT, RIGHT?

18  **A.**    I DO TRY AT IT, YES.

19  **Q.**    WHEN YOU ARE ASSIGNED AS AN UNDERCOVER AGENT YOU TAKE

20  THAT JOB SERIOUSLY.

21  **A.**    I DO.  ABSOLUTELY.

22  **Q.**    AND YOU DO EVERYTHING YOU CAN TO BE CONVINCING.

23  **A.**    ABSOLUTELY.

24  **Q.**    YOU USE ALL OF YOUR TRAINING TO BE AS CONVINCING AS YOU

25  CAN.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    YES.

2    **Q.**    ALL OF YOUR EXPERIENCE TO BE AS CONVINCING AS YOU CAN.

3    **A.**    I TRY.

4    **Q.**    AND IT IS NOT JUST YOU ON AN ISLAND, YOU WORK WITH MANY

5    OTHER AGENTS, RIGHT?

6    **A.**    CORRECT.

7    **Q.**    AND YOU DIDN'T JUST CONSTRUCT DAVID MILLS, RIGHT?

8    **A.**    NO.

9    **Q.**    YOU CONSTRUCTED SOUTH STAR TRADING.

10   **A.**    YES.

11   **Q.**    SOUTH STAR TRADING, WHICH HELD ITSELF OUT AS A

12   LEGITIMATE CORPORATION DOING BUSINESS HERE IN SAN DIEGO,

13   RIGHT?

14   **A.**    YES.

15   **Q.**    AND YOU WORKED ON MAKING SOUTH STAR TRADING APPEAR

16   LEGITIMATE TO THE PEOPLE YOU MIGHT BE INVESTIGATING, RIGHT?

17   **A.**    CORRECT.

18   **Q.**    I THINK YOU SAID YESTERDAY YOU RENTED OFFICE SPACE,

19   RIGHT?

20   **A.**    CORRECT.

21   **Q.**    YOU GOT DEDICATED PHONE LINES.

22   **A.**    YES.

23   **Q.**    YOU HAD DEDICATED EMAIL ACCOUNTS, RIGHT?

24   **A.**    THAT IS CORRECT.

25   **Q.**    IT WASN'T DAVID@DHS.USGOV.YOUAREINTROUBLE, RIGHT?

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    NO, THAT WAS NOT USED.

2    **Q.**    IT WAS DAVID AT SOUTH STAR TRADING, I THINK.

3    **A.**    THAT IS MORE OR LESS CORRECT, YEAH.

4    **Q.**    SO THERE WAS A DEDICATED EMAIL THAT APPEARED TO BE

5    CONSISTENT WITH THE BUSINESS YOU WERE REPRESENTING TO BE,

6    RIGHT?

7    **A.**    THAT IS CORRECT, UH-HUH.

8    **Q.**    YOU HAD LETTERHEAD.

9    **A.**    WE DID.

10    **Q.**    YOU HAD QUOTE FORMS WITH NICE LETTERHEAD.

11    **A.**    WE DID.

12    **Q.**    YOU WORKED ON IT, RIGHT?

13    **A.**    WE MADE AN EFFORT, YEAH.

14    **Q.**    AND YOU -- WELL, YEAH, YOU MADE AN EFFORT TO CONVINCE

15    THE PEOPLE YOU ARE INVESTIGATING THAT YOU ARE A LEGITIMATE

16    BUSINESS, RIGHT?

17    **A.**    THAT WAS THE DISCIPLINE, YES.

18    **Q.**    YOU CAN'T WRITE THESE THINGS DOWN ON COCKTAIL NAPKINS

19    AND SAY, HERE IS YOUR QUOTE.

20    **A.**    I SUPPOSE IN DIFFERENT DEALS, PERHAPS.  NOT ON THIS ONE,

21    NO.

22    **Q.**    NOT ON THIS ONE.  IN THIS ONE YOU MADE EFFORTS TO APPEAR

23    LEGITIMATE.

24    **A.**    CORRECT.

25    **Q.**    PROFESSIONAL.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **A.**   PROFESSIONAL.  THAT IS A GOOD WORD.

2   **Q.**   AND SOUTH STAR EVEN HAS A WEBSITE, RIGHT?

3   **A.**   AT THE TIME IT DID, YES.

4   **Q.**   YOU HAVEN'T BEEN ON IT IN THE LAST FEW DAYS?

5   **A.**   I DON'T KNOW IF IT IS STILL UP OR NOT.  I DON'T KNOW.

6   **Q.**   BUT IF YOU WENT TO SOUTHSTARTRADING.COM, AT THE TIME YOU

7   WOULD HAVE SEEN A WEBSITE, RIGHT?

8   **A.**   CORRECT.

9   **Q.**   AND THAT WEBSITE WOULD HAVE LISTED INDIVIDUALS WHO

10  WORKED THERE, RIGHT?

11  **A.**   YES.

12  **Q.**   SUCH AS YOURSELF?

13  **A.**   CORRECT.

14  **Q.**   IT WOULD HAVE LISTED THE BUSINESS THAT SOUTH START DOES.

15  **A.**   YEAH.  JUST A VERY BASIC SORT OF SHELL, NOT TOO SPECIFIC

16  TYPE OF A WEBSITE.

17  **Q.**   RIGHT.  WE ARE NOT TALKING ABOUT, LIKE, AMAZON'S SITE OR

18  SOMETHING WITH MULTIPLE LEVELS.

19  **A.**   NO.

20  **Q.**   BUT IT WAS A SITE THAT APPEARED APPROPRIATE FOR THE SIZE

21  OF BUSINESS THAT YOU WERE REPRESENTING YOURSELF TO BE, RIGHT?

22  **A.**   YEAH, IT WAS A LEGITIMATE WEBSITE.

23  **Q.**   AND IT APPEARED TO BE LEGITIMATE.  YOU WANTED IT TO BE.

24  **A.**   THAT WAS OUR GOAL.

25  **Q.**   THAT WAS YOUR GOAL.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1          AND THE REASON WHY YOU MADE THE EFFORT TO APPEAR

2     LEGITIMATE IN YOUR WEBSITE WAS TO CONVINCE PEOPLE LIKE MR.

3     GHAHREMAN, WHO YOU WERE INVESTIGATING, IF HE LOOKED UP YOUR

4     SITE THAT YOU ARE FOR REAL, RIGHT?

5     **A.**     OF COURSE.

6     **Q.**     OF COURSE.  SO THAT IS ALL PART OF THE WAY THAT YOU TRY

7     TO CONVINCE PEOPLE THAT YOU ARE NOT SIMPLY AN UNDERCOVER AGENT

8     FOR HOMELAND SECURITY.

9     **A.**     YES.

10    **Q.**     ONE OF MANY WAYS.

11    **A.**     THAT IS ONE OF THE WAYS.

12    **Q.**     ONE OF THE WAYS.  BUT YOU TOOK THAT SERIOUSLY, YOU AND

13    YOUR COLLEAGUES, RIGHT?

14    **A.**     CORRECT.

15    **Q.**     IN FACT, YOU EVEN EACH PLAYED DIFFERENT ROLES, RIGHT?

16    **A.**     WHAT DO YOU MEAN?

17    **Q.**     WELL, JOHN HELSING WAS YOUR BUSINESS PARTNER.

18    **A.**     YEAH.  THAT IS MORE FLUID, BUT I KNOW WHAT YOU ARE

19    SAYING, YES.

20    **Q.**     NOT YOUR COLLEAGUE FROM THE DEPARTMENT OF DEFENSE

21    CRIMINAL INVESTIGATION SERVICES.

22    **A.**     YES, CORRECT.

23    **Q.**     BRIAN SHULTZ, YOU KNOW, PLAYED THE FINANCIAL GUY, RIGHT?

24    **A.**     CORRECT.

25    **Q.**     SO THERE WAS MORE THAN ONE PERSON TO GIVE THE APPEARANCE

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  OF A COMPANY.

2  **A.**   YEAH, AS NEEDED, UH-HUH.

3  **Q.**   NOT JUST YOU WORKING FROM YOUR DESK AT HOME.

4  **A.**   NO.

5  **Q.**   THAT MIGHT NOT BE SO CONVINCING IF YOU ARE TRYING TO

6  SELL NAVIGAT-2100'S.

7  **A.**   POSSIBLY NOT, NO.

8  **Q.**   LIKELY NOT.

9  **A.**   LIKELY NOT.

10  **Q.**   OKAY.  AND YOU ASKED MR. GHAHREMAN, I BELIEVE, IN MARCH,

11  AFTER YOU HAD BEEN COMMUNICATING FOR -- IT WAS THE END OF

12  MARCH, RIGHT?  TO COME TO VEGAS?

13  **A.**   I THINK SO.  I BELIEVE.  I KNOW IT WAS AROUND THAT TIME.

14  **Q.**   AROUND THAT TIME.  YOU HAD BEEN COMMUNICATING WITH HIM

15  FOR ABOUT THREE MONTHS AT THAT POINT?

16  **A.**   CORRECT.

17  **Q.**   LOTS OF EMAILS?

18  **A.**   YES.

19  **Q.**   NUMEROUS PHONE CALLS.

20  **A.**   CORRECT.

21  **Q.**   OKAY.  AND MR. GHAHREMAN IMMEDIATELY -- I THINK YOU SAID

22  YESTERDAY IMMEDIATELY RESPONDED AND SAID, I AM COMING.

23  **A.**   HE DID.

24  **Q.**   HE DIDN'T SAY, HEY, WAIT, IS THERE SOMETHING FISHY WITH

25  YOU GOING ON, DID HE?

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **A.**   NO.

2   **Q.**   NO.  HE SAID, I GREATLY, WITH ENTHUSIASM, ACCEPT YOUR

3   INVITATION AND I WILL BE THERE.

4   **A.**   HE DID.

5   **Q.**   HE BELIEVED YOU AS DAVID MILLS, A SALES REPRESENTATIVE,

6   RIGHT?

7   **A.**   THAT WAS MY BELIEF, YES.

8   **Q.**   YESTERDAY YOU TALKED ABOUT MR. GHAHREMAN TELLING YOU A

9   LITTLE BIT MORE ABOUT HIMSELF, RIGHT?

10   **A.**   CORRECT.

11   **Q.**   YOU SAID EARLY ON THAT HE TOLD YOU HE WAS FROM IRAN,

12   RIGHT?

13   **A.**   CORRECT.

14   **Q.**   HE DIDN'T HIDE THAT FROM YOU, DID HE?

15   **A.**   NO.

16   **Q.**   HE MIGHT NOT HAVE BEEN ABLE TO TOO WELL WITH HIS ACCENT,

17   FAIR ENOUGH?

18   **A.**   HE NEVER HID IT, NO.

19   **Q.**   BUT HE DIDN'T SAY, I AM FROM IRAQ, OR, I AM FROM SOME

20   OTHER, YOU KNOW, PERSIAN COUNTRY.

21   **A.**   HE DID NOT.

22   **Q.**   HE DIDN'T SAY HE WAS FROM DUBAI, OR FROM ANYWHERE ELSE,

23   DID HE?

24   **A.**   NO.

25   **Q.**   NO.  HE TOLD YOU IMMEDIATELY, THIS IS WHO I AM.  I AM

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   IRANIAN, I AM FROM IRAN.

2   **A.**    CORRECT.

3   **Q.**    AND HE ALSO DIDN'T HIDE FROM YOU HIS PREVIOUS EXPERIENCE

4   IN IRAN, EITHER, DID HE?

5   **A.**    WHAT DO YOU MEAN?

6   **Q.**    HE TOLD YOU WHAT HE HAD DONE IN IRAN.

7   **A.**    OH, HIS BACKGROUND.  YES, HE DID.

8   **Q.**    BACKGROUND, RIGHT?

9   **A.**    YES.

10  **Q.**    HE SHARED THAT WITH YOU.

11  **A.**    HE DID.

12  **Q.**    HE DIDN'T SAY, I WAS BORN IN IRAN AND AT THE AGE OF ONE

13  CAME TO THE UNITED STATES.

14  **A.**    NO, NO.  HE SHARED WITH ME OVER THE COURSE OF US GETTING

15  TO KNOW EACH OTHER HIS BACKGROUND.

16  **Q.**    RIGHT.  OVER TIME HE TOLD YOU THINGS ABOUT HIMSELF AND

17  DIDN'T CONCEAL IT FROM YOU.

18  **A.**    CORRECT.

19  **Q.**    OKAY.  HE TOLD YOU ABOUT KOORUSH TAHERKHANI.

20  **A.**    HE DID.

21  **Q.**    HE DIDN'T TRY TO DISGUISE KOORUSH'S IDENTITY FROM YOU.

22  **A.**    NO.

23  **Q.**    HE TOLD YOU THAT THEY KNEW EACH OTHER IN COLLEGE.

24  **A.**    CORRECT.

25  **Q.**    I THINK YESTERDAY YOU SAID YOU THOUGHT THEY WERE

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    CLASSMATES, MAYBE ROOMMATES, RIGHT?

2    **A.**    HE SAID SOMETHING TO THAT EFFECT IN ONE OF THE CALLS.

3    **Q.**    DORM MATES.

4    **A.**    DORM MATES, SOMETHING, YEAH.

5    **Q.**    AND HE DIDN'T TRY TO HIDE ANY OF THAT FROM YOU EITHER,

6    DID HE?

7    **A.**    NOPE.

8    **Q.**    LET'S GO BACK FOR A MOMENT TO THE VEGAS DINNER.  WHAT

9    WAS THE RESTAURANT?  I CAN'T REMEMBER.

10   **A.**    IT WAS A STEAK HOUSE IN THE MGM GRAND.  I DON'T KNOW THE

11   NAME.

12   **Q.**    LET'S JUST CALL IT THE VEGAS DINNER.

13   **A.**    OKAY.

14   **Q.**    LET'S GO BACK TO THE VEGAS DINNER ON JUNE 12TH, RIGHT?

15          AND I THINK YOU PLAYED THIS CLIP TODAY.

16          CAN WE PLAY GOVERNMENT CLIP 3 FROM THE VEGAS DINNER.  I

17   HAVE IT AS CLIP 3 OF EXHIBIT 316; IS THAT RIGHT?

18          **MR. HARRIGAN:**  YES.

19          (VIDEOTAPE PLAYED)

20   **Q.**    **(MR. JOHNSTON)** AND, I AM SORRY.  THIS IS THE BEST AUDIO

21   WE HAVE, RIGHT, OF THIS MEETING?

22   **A.**    CORRECT.

23   **Q.**    THERE WERE SOME OTHER --

24   **A.**    THERE WAS A LOT OF NOISE.

25   **Q.**    -- MICROPHONES, BUT THEY WERE ACTUALLY WORSE THAN THIS

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   ONE, RIGHT?

2   **A.**   CORRECT.  IT IS TOUGH IN A NOISY ATMOSPHERE LIKE THAT.

3   **Q.**   OKAY.  AND YOU JUST SAID, SO BUT ON THIS DEAL THAT IS

4   WHY YOU SAID YOU NEVER HAVE TO ASK KOORUSH WHERE IT WAS GOING

5   TO IN THE HOME COUNTRY, YOU ALREADY KNEW BECAUSE OF OTHER

6   CONNECTIONS YOU HAD WHO IT WAS GOING TO.

7   **A.**   OKAY.

8   **Q.**   THAT IS WHAT YOU SAID TO HIM, RIGHT?

9   **A.**   YEAH, I BELIEVE SO.

10  **Q.**   THAT IS WHAT YOU SAID TO THE JURY THAT IS WHAT YOU

11  UNDERSTOOD HIM TO BE TELLING YOU.

12  **A.**   CORRECT.

13  **Q.**   IS THAT HE DIDN'T HAVE TO ASK KOORUSH WHERE IT WAS

14  GOING, BECAUSE HE ALREADY KNEW IT WAS GOING TO IRAN, RIGHT?

15  **A.**   CORRECT.

16  **Q.**   AND HE ALREADY KNEW IT WAS GOING TO IRAN BECAUSE HE HAD

17  SO MANY CONNECTIONS THERE HE ALREADY KNEW WHERE KOORUSH WAS

18  GOING TO SEND IT.  THAT IS WHAT YOU TOLD THE JURY TODAY,

19  RIGHT?

20  **A.**   CORRECT.

21  **Q.**   LET'S LISTEN CAREFULLY TO THE REST OF THIS CLIP.

22          (AUDIO PLAYED)

23  **Q.**   **(MR. JOHNSTON)** MR. GHAHREMAN SAID TO YOU, SOMETIMES

24  KOORUSH WILL TELL ME, RIGHT?  BUT HE DIDN'T SAY, I KNOW WHERE

25  THEY ARE GOING THIS TIME, DID HE?  IN RESPONSE TO YOUR

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    QUESTION, HE DID NOT SAY, I KNOW WHERE THEY ARE GOING THIS

2    TIME.

3    **A.**   HE DIDN'T SAY THOSE EXACT WORDS, NO.

4    **Q.**   I WILL APPROACH YOU WITH -- I WILL GIVE YOU A TRANSCRIPT

5    TO FOLLOW.

6    **A.**   OKAY.

7              **MR. JOHNSTON:**  JJ.

8              (EXHIBIT JJ MARKED FOR IDENTIFICATION)

9              **MR. JOHNSTON:**  MAY I APPROACH?

10   **Q.**   **(MR. JOHNSTON)** THERE YOU GO.

11   **A.**   OKAY.

12   **Q.**   SO KOORUSH WILL TELL ME WHERE IT IS NEEDED, BUT IT IS

13   NOT VERY CLEAR THAT HIS WORD IS RIGHT OR NOT.

14             **MR. HARRIGAN:**  OBJECTION.  THAT IS A MISSTATEMENT OF

15   WHAT IT READS.  VERY CLEAR.

16             **THE WITNESS:**  YEAH, I HAVE -- I AM CONFUSED.

17             **MR. HARRIGAN:**  I DON'T HAVE IT.

18             **THE WITNESS:**  THE ONE YOU GAVE ME SAYS VERY CLEAR.

19   **Q.**   **(MR. JOHNSTON)** I AM JUST USING AN OLD TRANSCRIPT

20   PROVIDED.  IT IS VERY CLEAR, RIGHT?

21   **A.**   YES.

22   **Q.**   BUT HE SAYS, BUT IT IS VERY CLEAR THAT HIS WORD IS RIGHT

23   OR NOT.  RIGHT?

24   **A.**   OKAY.

25   **Q.**   BECAUSE AFTER TWO MONTHS, OKAY, YOU RECEIVED THIS OR

APRIL 15, 2015

1    NOT.

2         WHAT MR. GHAHREMAN IS SAYING THERE IS IT WILL BECOME

3    VERY CLEAR --

4              **MR. HARRIGAN:**  OBJECTION.  TESTIFYING.

5              **THE COURT:**  OVERRULED.

6              **MR. JOHNSTON:**  THANK YOU.

7    **Q.     (MR. JOHNSTON)** LET'S BACK UP.  TO BE FAIR, MR.

8    GHAHREMAN SPEAKS ENGLISH, RIGHT?

9    **A.**    HE DOES.

10   **Q.**    IT IS NOT PERFECT ENGLISH?

11   **A.**    IT IS PRETTY GOOD.

12   **Q.**    PRETTY GOOD ENGLISH.

13   **A.**    CORRECT.

14   **Q.**    BUT YOU, JUST LOOKING HERE, THIS TRANSCRIPT, YOU CAN SEE

15   GRAMMATICAL ERRORS, RIGHT?

16   **A.**    GRAMMATICAL ERRORS, BUT I ALWAYS UNDERSTOOD HIM.

17   **Q.**    OKAY.  FAIR ENOUGH.  WHAT HE IS SAYING HERE IS IT IS

18   VERY CLEAR THAT HIS WORD WAS RIGHT OR NOT, RIGHT?

19   **A.**    YEAH.  BUT THEN HE GOES ON AND SAYS BUT HE KNOWS BECAUSE

20   HIS CONNECTIONS TELL HIM THE GOODS WERE DELIVERED TO IRAN.

21   **Q.**    WHAT HE SAYS AFTER RIGHT OR NOT IS, BECAUSE AFTER TWO

22   MONTHS, OKAY.  RIGHT?

23   **A.**    CORRECT.

24   **Q.**    YOU RECEIVED THIS OR NOT?  YEAH, BECAUSE KOORUSH BUY IT

25   FOR YOU.  OKAY.  YOU KNOW, NOBODY, BECAUSE I HAVE GOOD

APRIL 15, 2015

COLE CROSS-EXAMINATION

```
 1   CONNECTIONS.
 2   A.    CORRECT.
 3   Q.    HE IS SAYING AFTER TWO MONTHS OR SO HE WILL FIND OUT
 4   WHERE THESE ITEMS WERE GOING, IF KOORUSH WAS RIGHT OR WRONG,
 5   HE WILL KNOW, RIGHT?
 6   A.    CORRECT.
 7   Q.    HE DIDN'T SAY THIS TIME HE KNEW THAT THESE ITEMS WERE
 8   GOING TO IRAN.
 9   A.    NOT AT THAT CONVERSATION POINT, NO.
10   Q.    NO.  AT THE END OF THAT QUOTATION HE SAYS BECAUSE OF HIS
11   CONNECTIONS, RIGHT?
12   A.    YES.
13   Q.    AND THAT SENTENCE IS CUT OFF MID SENTENCE, ISN'T IT?
14   A.    YES.
15   Q.    RIGHT.  AND HE SAYS, AT THE END OF THAT SENTENCE, IF THE
16   BORDERS WERE OPEN I HAVE VERY GOOD CONNECTIONS.  RIGHT?  DO
17   YOU REMEMBER THAT?
18   A.    I DON'T, BUT I TAKE YOUR WORD FOR IT, I GUESS.  I DON'T
19   KNOW.  IS IT ON THE AUDIO OR TRANSCRIPT?  I AM NOT SAYING IT
20   IS NOT POSSIBLE.
21         MR. HARRIGAN:  OBJECT, YOUR HONOR.  I WOULD GIVE HIM
22   A CHANCE TO LOOK AT IT BEFORE IT IS PLAYED.
23         THE COURT:  WHAT ARE WE PLAYING?
24         MR. JOHNSTON:  THE CUT OFF SENTENCE AT THE END OF
25   THE GOVERNMENT CLIP.
```

APRIL 15, 2015

COLE CROSS-EXAMINATION

1     **THE WITNESS:**  RIGHT AFTER THIS, RIGHT?

2     **MR. JOHNSTON:**  I CAN MAYBE SHOW HIM A PARTIAL

3  TRANSCRIPT.

4     **THE COURT:**  SURE.

5     **MR. JOHNSTON:**  MAY I APPROACH?

6     **THE COURT:**  YES.

7     **THE WITNESS:**  OKAY.

8  **Q.    (MR. JOHNSTON)** I AM APPROACHING YOU WITH A TABLET WITH

9  WHAT HAS PREVIOUSLY BEEN PROVIDED AS GOVERNMENT DISCOVERY TIG

10 TRANSCRIPTS.

11 **A.**    OKAY.

12 **Q.**    AND THERE IS SOME HIGHLIGHTED WORDS THERE.

13 **A.**    I HAVE A LOT OF CONNECTIONS.  OKAY.

14 **Q.**    IT IS AN OPEN BORDER, OR OPEN BOARD IT SAYS THERE,

15 RIGHT?

16 **A.**    IT IS AN OPEN BOARD.

17 **Q.**    I HAVE A LOT OF CONNECTIONS.

18 **A.**    CORRECT.

19 **Q.**    DO YOU REMEMBER HIM SAYING THAT?

20 **A.**    I DON'T REMEMBER, BUT IT IS ON THERE.  SO, I MEAN, HE

21 MUST HAVE.

22 **Q.**    YEAH.  IF THE BORDERS WERE OPEN HE WOULD HAVE A LOT OF

23 CONNECTIONS THERE, RIGHT?

24 **A.**    I DON'T READ THAT.  I DON'T KNOW.  I DON'T UNDERSTAND

25 THAT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  **Q.**    YOU DIDN'T UNDERSTAND IT TO MEAN THAT IF THE SANCTIONS

2  WERE LIFTED THAT HE WOULD HAVE -- HE WOULD HAVE BUSINESS TO

3  PROVIDE TO YOU AND SOUTH STAR TRADING?

4  **A.**    THAT IS NOT MY INTERPRETATION, NO.

5  **Q.**    BUT YOU DON'T REMEMBER THAT PART OF YOUR CONVERSATION?

6  **A.**    I DON'T REMEMBER THAT PART OF THE CONVERSATION, BUT

7  SHOWING ME THAT TRANSCRIPT, THAT'S NOT MY INTERPRETATION.

8  **Q.**    OKAY.  DO YOU REMEMBER SAYING TO HIM -- YOU SAID TO HIM,

9  YOU SAID, IF YOU WANTED TO, ARASH, COULD YOU FIND MORE

10 BUSINESS FOR ME IN YOUR HOME COUNTRY?

11      YOU SAID THAT TO HIM AT THAT DINNER, RIGHT?

12 **A.**    I THINK I DID, YES.

13 **Q.**    YOU SAID TO ARASH, YOU HAVE CONNECTIONS OVER THERE, YOU

14 HAVE CONNECTIONS IN THE MARITIME BUSINESS.  RIGHT?

15 **A.**    OKAY.

16 **Q.**    DID YOU SAY THAT?

17 **A.**    I AM SURE I PROBABLY DID.

18 **Q.**    OKAY.  YOU DON'T REMEMBER WHAT YOU SAID EXACTLY?

19 **A.**    WELL, I MEAN, NOT EVERY LAST WORD.  IT HAS BEEN TWO

20 YEARS.

21 **Q.**    OKAY.

22          **MR. JOHNSTON:**  THIS TIME I WOULD PLAY THE CLIP, YOUR

23 HONOR.

24          **THE COURT:**  YES.

25          **MR. JOHNSTON:**  COULD WE PLAY VEGAS DINNER CLIP 3.

APRIL 15, 2015

1              **MR. HARRIGAN:**  IS THIS A DEFENSE EXHIBIT, YOUR

2    HONOR?  WHAT NUMBER IS IT?

3              **MR. JOHNSTON:**  I AM SORRY.

4              **MR. HARRIGAN:**  MAY I HAVE A COPY OF THAT, AS WELL?

5    I JUST DON'T HAVE THE SAME TRANSCRIPT.

6              **MR. CAMDEN:**  THIS IS FROM THE AUDIO, DEFENSE EXHIBIT

7    T, AS IN TOM.

8              (EXHIBIT T MARKED FOR IDENTIFICATION)

9              **THE COURT:**  DO WE HAVE A TRANSCRIPT?

10             **MR. JOHNSTON:**  YOUR HONOR, I DON'T HAVE A PAPER

11   TRANSCRIPT.

12             **MR. HARRIGAN:**  I DON'T KNOW WHAT WE ARE INTRODUCING,

13   YOUR HONOR.  THAT IS THE PROBLEM.  I SHOULD AT LEAST BE ABLE

14   TO VIEW IT.  I HAVE NO ISSUE WITH THE TRANSCRIPTS, IT IS JUST

15   HARD FOR ME TO HEAR IT FOR THE FIRST TIME.  I WOULD LIKE TO BE

16   ABLE TO READ ALONG.

17             **MR. JOHNSTON:**  I UNDERSTAND.  THE GOVERNMENT

18   PREVIOUSLY PROVIDED ME FULL TRANSCRIPTS OF ALL OF THESE

19   MEETINGS AND PHONE CONVERSATIONS.  I WOULD BE HAPPY TO DIRECT

20   THE GOVERNMENT, IF THAT HELPS, TO TIG TRANSCRIPTS --

21             **MR. HARRIGAN:**  YOUR HONOR, HERE IS --

22             **THE COURT:**  IS THIS A MATTER THAT WE CAN COME TO

23   AFTER THE BREAK?

24             **MR. JOHNSTON:**  THAT WOULD BE FINE.  WE CAN COME BACK

25   TO IT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  **MR. HARRIGAN:** I DON'T MEAN TO INTERRUPT DEFENSE

2  COUNSEL, I JUST DON'T KNOW WHAT IS BEING INTRODUCED.

3  **MR. JOHNSTON:** THAT IS A FAIR POINT. WE WILL WORK

4  IT OUT AT THE BREAK. THANK YOU.

5  **THE COURT:** ALL RIGHT.

6  **Q.** **(MR. JOHNSTON)** BUT TO GET BACK TO WHAT YOU ARE SAYING

7  IS, IS YOU THINK YOU MAY HAVE ASKED HIM ABOUT HIS CONNECTIONS

8  IN IRAN, RIGHT?

9  **A.** IT IS VERY POSSIBLE. I APOLOGIZE. IT IS TWO YEARS AGO,

10  SO I DON'T HAVE, LIKE, A PHOTOGRAPHIC MEMORY OF EVERYTHING WE

11  DISCUSSED.

12  **Q.** RIGHT. BUT AS DAVID MILLS IT IS FAIR TO SAY YOU WERE

13  SEEKING ALL -- OR AS DAVID COLE YOU WERE SEEKING ALL OF THE

14  EVIDENCE YOU COULD GET OF A CONNECTION TO IRAN, RIGHT?

15  **A.** YES.

16  **Q.** AS DAVID COLE YOU WERE SEEKING ALL OF THE EVIDENCE OF A

17  CONNECTION THAT MR. GHAHREMAN MAY HAVE HAD TO BUSINESS IN

18  IRAN.

19  **A.** CORRECT.

20  **Q.** AS SPECIAL AGENT COLE YOU WANTED DAVID MILLS TO ASK MR.

21  GHAHREMAN ABOUT MORE BUSINESS HE MIGHT SEND YOUR WAY FROM

22  IRAN.

23  **A.** YES.

24  **Q.** YOU WANTED TO CAST THE NET WIDER, RIGHT?

25  **A.** OR OBTAIN MORE EVIDENCE, YES.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  Q.    YEAH, OBTAIN MORE EVIDENCE.  AND YOU ASKED MR. GHAHREMAN

2  IF HE COULD PROVIDE YOU WITH ADDITIONAL CONNECTIONS BEYOND

3  KOORUSH TAHERKHANI IN IRAN.

4  A.    OKAY.

5  Q.    RIGHT?  YOU DID THAT.

6  A.    I AM ASSUMING I DID.  YOU ARE GOING TO PLAY THE

7  TRANSCRIPT, YOU SAID.

8  Q.    WELL, I CAN'T DO IT RIGHT NOW, SO I AM JUST GOING TO

9  FIND OUT WHAT --

10  A.    AS I SAID, I WILL TAKE YOU AT YOUR WORD.

11        MR. HARRIGAN:  I HAVE NO OBJECTION TO PLAYING THAT

12  PORTION, YOUR HONOR, FOR EXPEDIENCY.  I DON'T KNOW IF -- THE

13  QUESTION WAS I DIDN'T KNOW IF THE ENTIRE TRANSCRIPT WAS COMING

14  IN.

15        MR. JOHNSTON:  YEAH, THAT IS FINE.

16        THE COURT:  IF THERE IS NO OBJECTION, THEN YOU CAN

17  PROCEED.

18        MR. JOHNSTON:  THANK YOU, YOUR HONOR.

19        (AUDIO PLAYED)

20  Q.    (MR. JOHNSTON) YOU ASKED HIM ABOUT ADDITIONAL

21  CONNECTIONS IN IRAN?

22  A.    CORRECT.

23  Q.    SEEING IF THERE WAS ADDITIONAL EVIDENCE OF MR.

24  GHAHREMAN'S INTENT TO ENGAGE IN IEEPA VIOLATIONS, RIGHT?

25  A.    CORRECT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   Q.    TO VIOLATE THE TRADE SANCTIONS BETWEEN THE UNITED STATES

2   AND IRAN.

3   A.    CORRECT.

4   Q.    AND YOU ASKED HIM SPECIFICALLY ABOUT MARITIME

5   CONNECTIONS, RIGHT?

6   A.    YES.

7   Q.    HE TOLD YOU THERE WAS NO AMERICAN MARKET THERE, RIGHT?

8   A.    THAT IS WHAT IT SOUNDED LIKE.  IT WAS TOUGH AT THE END.

9   Q.    AT THE END WHAT HE TOLD YOU WAS IT CAN'T BE DONE BECAUSE

10  THERE IS SANCTIONS.

11  A.    I DON'T KNOW.  I COULDN'T HEAR IT, HONESTLY.

12  Q.    YOU COULDN'T HEAR IT?

13  A.    I WAS TRYING MY BEST.  THAT PART WAS --

14  Q.    IT IS HARD, I AGREE.  THESE TAPES ARE HARD.

15  A.    I APOLOGIZE.

16  Q.    NO, I APOLOGIZE.  I GUESS WE ALL APOLOGIZE WE DON'T HAVE

17  A BETTER AUDIO.

18  A.    YEAH I KNOW.

19          (AUDIO PLAYED)

20          **THE WITNESS:**  CAN IT BE ANY LOUDER OR NOT?

21          **MR. CAMDEN:**  IT IS AS LOUD AS IT COULD BE.

22          **THE WITNESS:**  OKAY.

23          (AUDIO PLAYED)

24  Q.    **(MR. JOHNSTON)** SANCTIONS, RIGHT?

25  A.    SOUNDS LIKE THAT, YES.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **Q.**    HE DIDN'T OFFER YOU ADDITIONAL CONNECTIONS TO IRAN.

2    **A.**    AT THAT MOMENT, NO.

3    **Q.**    HE DIDN'T CONVEY TO YOU AN INTENTION TO VIOLATE IEEPA

4    WITH ADDITIONAL MARITIME CONNECTIONS.

5    **A.**    NOT AT THAT MOMENT, NO.

6    **Q.**    HE SPECIFICALLY TOLD YOU THAT HE COULDN'T DO THAT

7    BECAUSE OF THE SANCTIONS.

8    **A.**    I DON'T KNOW IF THAT IS WHAT HE SPECIFICALLY SAID.  IT

9    IS UNCLEAR.

10   **Q.**    YOU TALKED ABOUT THE PHONE CALL FROM MAY 28TH.  REMEMBER

11   THE REALLY LONG PHONE CALL BEFORE VEGAS?

12   **A.**    YES.

13   **Q.**    I THINK YOU DESCRIBED IT AS TENSE?

14   **A.**    UH-HUH.

15   **Q.**    AND DURING THAT PHONE CALL YOU EXPRESSED FRUSTRATION,

16   ESSENTIALLY, WITH KOORUSH, RIGHT?

17   **A.**    CORRECT.

18   **Q.**    YOU TOLD MR. GHAHREMAN, I AM REALLY FRUSTRATED WITH

19   KOORUSH AND HOW THIS TRANSACTION IS NOT GOING DOWN.  RIGHT?

20   **A.**    YES.

21   **Q.**    BUT YOU DID TELL MR. GHAHREMAN THAT YOU APPRECIATED THE

22   DIFFICULT POSITION HE WAS IN, RIGHT?

23   **A.**    YES.

24   **Q.**    YOU TOLD HIM, YOU ARE IN THE MIDDLE.

25   **A.**    CORRECT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **Q.**    THAT'S A VERY DIFFICULT POSITION.

2   **A.**    IT COULD BE.

3   **Q.**    RIGHT.  BUT THAT IS WHAT YOU TOLD HIM, IT WAS A VERY

4   DIFFICULT POSITION.

5   **A.**    YES.

6   **Q.**    YOU TOLD HIM THAT YOU DIDN'T TRUST KOORUSH AT THE TIME,

7   RIGHT?

8   **A.**    I DIDN'T.

9   **Q.**    RIGHT.

10  **A.**    CORRECT.

11  **Q.**    THAT KOORUSH DIDN'T TRUST YOU AT THE TIME?

12  **A.**    CORRECT.

13  **Q.**    AND THAT MR. GHAHREMAN WAS HERE TRYING TO HELP YOU,

14  RIGHT?

15  **A.**    HE WAS TRYING TO MAKE THE DEAL WORK.

16  **Q.**    HE WAS TRYING TO HELP YOU WITH WHAT YOU WANTED OUT OF

17  THE DEAL OR WHAT -- SORRY -- DAVID MILLS WANTED OUT OF THE

18  DEAL, RIGHT?

19  **A.**    I THINK HE WAS TRYING TO MAKE THE DEAL HAPPEN FOR ALL

20  PARTIES, HIMSELF INCLUDED.

21  **Q.**    AND YOU TOLD HIM YOU RESPECTED HIM FOR THAT, RIGHT?

22  **A.**    SURE.

23  **Q.**    THAT YOU LIKED HIM FOR THAT.

24  **A.**    SURE.

25  **Q.**    GIVE ME ONE MOMENT, PLEASE.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    NO PROBLEM.

2    **Q.**    LET'S STICK WITH THE MAY 28TH CALL FOR A MOMENT.

3    **A.**    OKAY.

4    **Q.**    YOU DESCRIBED IT AS TENSE, AND SPECIFICALLY YOU WERE

5    TENSE, RIGHT?

6    **A.**    SURE.

7    **Q.**    I MEAN, FOR THE EASY-GOING GUY WE ARE TALKING TO TODAY,

8    WE ARE NOT HEARING THE SAME VOICE ON THAT PHONE CALL, ARE WE?

9    **A.**    NO, I WAS MORE AGGRAVATED.

10   **Q.**    YEAH.  WE HEAR DAVID MILLS, AND HE IS AGGRAVATED, RIGHT?

11   **A.**    SURE, UH-HUH.

12   **Q.**    AND YOU SPOKE -- AT THAT POINT YOU SAID IT WAS TIME TO

13   JUST LET IT ALL OUT, RIGHT?

14   **A.**    CORRECT.

15   **Q.**    TO CONFRONT THE OTHER PARTY OR MR. GHAHREMAN WITH WHAT

16   DAVID MILLS' BELIEF WAS OF WHAT WAS GOING ON.

17   **A.**    CORRECT.

18   **Q.**    TO TALK OPENLY ABOUT IRAN, RIGHT?

19   **A.**    CORRECT.

20   **Q.**    OR THAT BEING THE PLACE IT WAS GOING.

21        AND YOU REMEMBER MR. HARRIGAN PLAYED A LENGTHY PIECE,

22   ONE OF THE FIRST CLIPS FROM THAT, RIGHT?

23   **A.**    YES.

24   **Q.**    YOU ACTUALLY WENT ON FOR APPROXIMATELY 11 MINUTES IN

25   THAT PIECE, RIGHT?

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **A.**    OKAY.  I DON'T KNOW.  I DIDN'T TIME IT, BUT IT WAS --

2   **Q.**    IT WAS --

3   **A.**    IT WAS A CHUNK.

4   **Q.**    IT WAS A GENEROUS DESCRIPTION TO CALL IT A SOLILOQUY,

5   WASN'T IT?

6   **A.**    PROBABLY.

7   **Q.**    IT WAS MORE LIKE A CHAPTER OR TWO OF A NOVEL, RIGHT?

8   **A.**    THAT'S FAIR.

9   **Q.**    THAT'S FAIR.  AND I THINK WHEN WE LOOKED AT THE

10  TRANSCRIPT IT SHOWED -- IT SAID ARASH SAYING THINGS, BUT THERE

11  WERE NO SENTENCES IN BETWEEN THAT SOLILOQUY, RIGHT?

12  **A.**    IT WAS ME.

13  **Q.**    IT WAS YOU.  AND YOU HAD A LOT TO SAY, AS DAVID MILLS,

14  RIGHT?

15  **A.**    CORRECT.

16  **Q.**    PLAYING THE PART OF A FRUSTRATED EXPORTER, RIGHT?

17  **A.**    CORRECT.

18  **Q.**    BUT MR. GHAHREMAN DID TRY TO INTERRUPT YOU DURING THAT

19  SOLILOQUY.  WHEN YOU MADE THE FIRST MENTION OF IRAN HE SAID

20  NO.  DID YOU HEAR HIM SAY THAT?

21  **A.**    I DON'T RECALL.  I MEAN, I AM SURE IT IS POSSIBLE, BUT I

22  DON'T RECALL.

23  **Q.**    BUT YOU HAD WHAT YOU WANTED TO SAY AND YOU KEPT SAYING

24  IT, RIGHT?

25  **A.**    YES.  I WAS MAKING MY POINT.

APRIL 15, 2015

1        **THE COURT:**  MR. JOHNSTON, IS THIS A GOOD POINT TO

2   RECESS?

3        **MR. JOHNSTON:**  SURE, YOUR HONOR.

4        **THE COURT:**  WE WILL TAKE 15 MINUTES HERE, WE WILL

5   PICK UP AT 12:30.  PLEASE KEEP IN MIND ALL OF THE ADMONITIONS.

6        THANK YOU.

7        (RECESS)

8        **THE COURT:**  WE HAVE EVERYONE PRESENT.  WE WILL

9   RESUME WITH THE CROSS-EXAMINATION.

10       MR. JOHNSTON.

11       **MR. JOHNSTON:**  YES.  THANK YOU, YOUR HONOR.

12  **Q.**   **(MR. JOHNSTON)** GOOD AFTERNOON, AGENT COLE.

13  **A.**   GOOD AFTERNOON, SIR.

14       **MR. JOHNSTON:**  CAN WE SWITCH TO THE GOVERNMENT

15  MONITOR, PLEASE?

16  **Q.**   **(MR. JOHNSTON)** I AM SHOWING WHAT IS MARKED AND ENTERED

17  INTO EVIDENCE AS EXHIBIT 551.  DOES THAT LOOK FAMILIAR TO YOU?

18  **A.**   YEAH.

19  **Q.**   DO YOU RECOGNIZE THAT ITEM?

20  **A.**   I DO.

21  **Q.**   DO YOU RECOGNIZE THAT AS THE Y-690?

22  **A.**   IT APPEARS TO BE, YES.  THAT IS -- I REMEMBER IT TO LOOK

23  LIKE.

24  **Q.**   AND IT IS ABOUT ONE AND A HALF INCHES WIDE?

25  **A.**   YES.  VERY SMALL.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **Q.**    YEAH.  AND TWO AND A HALF INCHES TALL?

2   **A.**    CORRECT.

3   **Q.**    YOU CAN SEE THE MARKINGS IN THE UPPER LEFT-HAND CORNER,

4   UPSIDE DOWN, I THINK, Y-690, RIGHT?

5   **A.**    CORRECT.

6   **Q.**    NOTHING ON THAT SAYS MUNITION, DOES IT?

7   **A.**    NO.

8   **Q.**    NOTHING ON THAT SAYS HIGH TECHNOLOGY, DOES IT?

9   **A.**    NO.

10  **Q.**    IT IS WHAT IT IS, RIGHT?

11  **A.**    IT IS WHAT IT IS.

12  **Q.**    LET'S MOVE TO SOME OF THE EMAIL EXHIBITS, IF WE COULD.

13          **MR. JOHNSTON:**  COULD WE PULL UP EXHIBIT 102, PLEASE.

14  **Q.**    **(MR. JOHNSTON)**  IN PREPARATION FOR YOUR TESTIMONY YOU

15  REVIEWED ALL EMAILS THAT HAVE BEEN INTRODUCED INTO EVIDENCE

16  HERE, RIGHT?

17  **A.**    YES.

18  **Q.**    INCLUDING ALL OF THESE ONES THAT WE REVIEWED YESTERDAY,

19  RIGHT?

20  **A.**    CORRECT.

21  **Q.**    YOU READ THEM AS DAVID MILLS, AS WELL, RIGHT?

22  **A.**    CORRECT.

23  **Q.**    AND YOU MADE SURE YOU READ ALL OF THE EMAILS.

24  **A.**    AS DAVID MILLS?

25  **Q.**    AS DAVID MILLS, RIGHT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    YEAH, UH-HUH.

2    **Q.**    AND AS SPECIAL AGENT DAVID COLE, LOOKING FOR ANY

3    EVIDENCE OF VIOLATIONS OF LAW, RIGHT?

4    **A.**    CORRECT.

5         **MR. JOHNSTON:**  OKAY.  IF WE COULD JUST DO THE --

6    SURE, THAT IS FINE.

7    **Q.**    **(MR. JOHNSTON)** THIS IS -- WE LOOKED AT THIS YESTERDAY.

8    THIS IS AN EMAIL FROM ARASH -- SORRY -- MR. GHAHREMAN AT HIS

9    TIGMARINE.COM ACCOUNT, RIGHT?

10   **A.**    YES.

11   **Q.**    AND TO DAVID AT SOUTH STAR TRADING, ON DECEMBER 21ST.

12   **A.**    YES.

13        **MR. JOHNSTON:**  AND IF COULD JUST CALL OUT THE BODY.

14   **Q.**    **(MR. JOHNSTON)** AND IN THIS EMAIL, THIS WAS ONE OR TWO

15   DAYS AFTER HIS FIRST EMAIL TO YOU?

16   **A.**    I THINK IT WAS THE SAME DAY, BUT I DON'T REMEMBER.

17   **Q.**    MAYBE THE SAME DAY?

18   **A.**    I THINK THERE WERE TWO IN ONE DAY.

19   **Q.**    OKAY.  AND HE SAYS HE HOPED YOU RECEIVED HIS OTHER

20   EMAIL, AND THEN IN PARENTHESIS, FROM GMD SHIPYARD ACCOUNT,

21   RIGHT?

22   **A.**    YES.

23   **Q.**    THAT WAS THE EMAIL ACCOUNT HE FIRST MADE CONTACT WITH

24   YOU FROM.

25   **A.**    YEAH.  SO I THINK IT WAS THAT DAY FROM THAT ACCOUNT.  I

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    DIDN'T RESPOND YET.  SAME DAY FROM THIS NEW ACCOUNT.

2    **Q.**    AND YOU SAID ON DIRECT THAT YOU NOTICED SOMETHING WHICH

3    WAS THAT HE ASKED YOU IF YOU WOULD APPRECIATE USING THIS

4    CONTACT INFORMATION FOR HIM, MEANING THE TIG MARINE ACCOUNT,

5    RIGHT?

6    **A.**    CORRECT.

7    **Q.**    OKAY.  AND DID YOU EVER ASK HIM WHY HE ASKED YOU TO USE

8    THIS ACCOUNT GOING FORWARD INSTEAD OF GMD?

9    **A.**    NOT THAT I RECALL, NO.

10   **Q.**    WERE YOU AWARE THAT HE WAS A STUDENT AT SUNY MARITIME

11   COLLEGE?

12   **A.**    I KNEW HE WAS A STUDENT, I DIDN'T KNOW WHERE.

13   **Q.**    AND DID YOU KNOW HE HAD QUIT WORKING AT GMD SHIPYARD ON

14   THE 20TH?

15   **A.**    I DID NOT, NO.

16   **Q.**    YOU DIDN'T INQUIRE FURTHER ABOUT WHY HE WANTED YOU TO

17   USE TIG MARINE.

18   **A.**    NOPE, I DID NOT.

19   **Q.**    FAIR ENOUGH.

20        **MR. JOHNSTON:**  LET'S GO TO EXHIBIT 104, PLEASE.

21   **Q.**    **(MR. JOHNSTON)** THIS IS ANOTHER EMAIL FROM MR. GHAHREMAN

22   ON THE 28TH.  AND YOU SAID THAT YOU NOTICED IN THIS EMAIL THAT

23   MR. GHAHREMAN HAD LEFT THE SIGNATURE LINE FOR KOORUSH

24   TAHERKHANI.

25   **A.**    ON THE EMAIL CHAIN, YES.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **Q.**    RIGHT.  I BELIEVE ON MAYBE THE NEXT PAGE OF THIS ONE.

2   **A.**    YEAH, UH-HUH.  YES.

3   **Q.**    AND YOU EXPRESSED CONCERN ABOUT MR. GHAHREMAN POSSIBLY

4   HAVING A DIFFERENT NAME.  THAT IS WHAT YOU SAID IN RESPONSE TO

5   THIS, RIGHT?

6   **A.**    CORRECT.

7   **Q.**    MR. GHAHREMAN RESPONDED TO YOU, HE DIDN'T DENY KOORUSH

8   TAHERKHANI'S EXISTENCE, DID HE?

9   **A.**    NO.

10   **Q.**    HE IDENTIFIED HIM AS A FRIEND --

11   **A.**    YES.

12   **Q.**    -- RIGHT?  AND, HE SAID, QUOTE, I APPRECIATE YOUR

13   CONCERNS ABOUT REMAINING OUR BUSINESS RELATIONSHIP

14   CONFIDENTIAL.  RIGHT?

15   **A.**    CORRECT.

16   **Q.**    YOU HAD RAISED CONCERNS, HEY, I DON'T KNOW WHO THIS IS,

17   I WANT TO KNOW WHO I AM DEALING WITH, RIGHT?

18   **A.**    CORRECT.

19   **Q.**    AND HE SAID HE APPRECIATED YOUR CONCERNS, RIGHT?

20   **A.**    YES.

21   **Q.**    HE DIDN'T SAY HE SHARED YOUR CONCERNS, RIGHT?

22   **A.**    HE SAID HE APPRECIATES THEM -- SAYS -- YEAH -- I

23   APPRECIATE.

24   **Q.**    RIGHT.  NOW, AS DAVID MILLS YOU PLAYED THE ROLE OF A

25   BUSINESSMAN, RIGHT?

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    YES.

2    **Q.**    AND YOU HAVE ENOUGH EXPERIENCE PLAYING THIS ROLE TO KNOW

3    HOW LEGITIMATE BUSINESS IS SUPPOSED TO WORK, RIGHT?

4    **A.**    I MEAN, WE DON'T HAVE ANY TRAINING IN THAT, SO I JUST

5    SORT OF WING IT, I GUESS.

6    **Q.**    RIGHT.  BUT YOU KNOW THAT BUSINESS, AT ITS MOST BASIC,

7    IS TWO PARTIES COMING TOGETHER, RIGHT?

8    **A.**    CORRECT.

9    **Q.**    ONE OF THEM HAS SOMETHING THEY WANT TO SELL, RIGHT?

10   **A.**    CORRECT.

11   **Q.**    ONE OF THEM HAS SOMETHING THEY WANT TO BUY?

12   **A.**    CORRECT.

13   **Q.**    AND OFTEN BUSINESS IS FACILITATED BY PEOPLE IN BETWEEN,

14   RIGHT?

15   **A.**    YES.

16   **Q.**    INTERMEDIARIES, RIGHT?

17   **A.**    YEAH.  BROKERS.

18   **Q.**    BROKERS.  PEOPLE WHO FIND THE BUYER AND THE SELLER AND

19   MATCH THEM UP, RIGHT?

20   **A.**    YES.

21   **Q.**    AND THOSE BROKERS, BECAUSE THEY EXIST TO MATCH UP THOSE

22   PEOPLE, RECEIVE COMMISSIONS, RIGHT?

23   **A.**    YES.

24   **Q.**    AND THEY RECEIVE THOSE COMMISSIONS BECAUSE THEY DO PLAY

25   AN IMPORTANT PART IN MAKING BUSINESS HAPPEN, RIGHT?

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **A.**    CORRECT.

2   **Q.**    NOW, SOMEONE WHO IS A BROKER OR AN INTERMEDIARY WILL

3   HAVE TO GO TO ONE PARTY OR THE OTHER, RIGHT, WITH KNOWING THAT

4   THEY -- LET'S SAY THEY HAVE A BUYER WHO WANTS TO PURCHASE

5   SOMETHING.  OKAY?

6   **A.**    OKAY.

7   **Q.**    AND THEY WILL GO TO A SELLER OF THAT PRODUCT AND SAY,

8   HEY, I HAVE A BUYER.  RIGHT?

9   **A.**    OKAY.

10  **Q.**    I MEAN, THAT IS THE WAY THIS WORKS, RIGHT?

11  **A.**    YEAH, I THINK I FOLLOW YOU.

12  **Q.**    YEAH.  NOW, IF THAT INTERMEDIARY CAME TO YOU AND SAID,

13  HEY, HERE IS MY BUYER, AND HIS NAME IS DAVID MILLS.  AND HE

14  WANTS TO, YOU KNOW, BUY THIS ITEM FROM YOU.

15       AND I TELL THAT TO THE SELLER THE FIRST TIME I MEET HIM.

16  AND HE SAYS NO, I AM NOT GOING TO SELL TO HIM.

17       THAT SELLER COULD JUST GO ON AND CUT OUT THE MIDDLEMAN,

18  RIGHT?

19  **A.**    I AM NOT FOLLOWING YOU.  SO YOU ARE SAYING -- HELP ME

20  OUT AGAIN.

21  **Q.**    I AM SORRY.  THAT WAS A LITTLE LONG.  BUT BASICALLY THE

22  MIDDLEMAN CAN BE CUT OUT OF ANY DEAL, RIGHT?

23  **A.**    OF COURSE.

24  **Q.**    IF THE BUYER FINDS OUT WHO THE SELLER IS, THEY CAN JUST

25  COME TOGETHER, OR ATTEMPT TO COME TOGETHER.

APRIL 15, 2015

1    **A.**    IF THE BUYER AND SELLER THAT WERE GOING TO COME TOGETHER

2    HAD TRUST TO WHERE THAT WOULD WORK, I SUSPECT THAT COULD BE

3    POSSIBLE.

4    **Q.**    RIGHT.  BUT YOU KNOW IT IS NOT UNREASONABLE IN THE

5    BUSINESS PRACTICE TO PROTECT THE IDENTITY OF A BUYER OR SELLER

6    UNTIL YOU ARE A LITTLE FURTHER DOWN THE LINE WITH THE DEAL,

7    RIGHT?

8    **A.**    NOT UNREASONABLE.

9    **Q.**    AT LEAST UNTIL MAYBE A PRODUCT IS ORDERED OR A QUOTE IS

10   GIVEN, RIGHT?

11   **A.**    SURE.

12          **MR. JOHNSTON:**  IF WE COULD GO TO EXHIBIT 101,

13   PLEASE, PAGE 2.

14   **Q.**    **(MR. JOHNSTON)** I THINK YOU SAID ON DIRECT YESTERDAY --

15   AND CORRECT ME IF I AM WRONG -- THAT YOU THOUGHT THAT MR.

16   GHAHREMAN WAS SEEKING 10 UNITS OF THE NAVIGAT-2100 FROM TIMCO

17   MARINE.

18   **A.**    OKAY.

19   **Q.**    DO YOU RECALL SAYING THAT?

20   **A.**    I MEAN, I DON'T RECALL SAYING THAT, BUT IT IS VERY

21   POSSIBLE I DID.

22   **Q.**    DID YOU KNOW HOW MANY NAVIGATS HE WAS TRYING TO ORDER

23   FROM TIMCO IN THE BEGINNING?

24   **A.**    I KNOW HE WAS TRYING TO ORDER NUMEROUS.  I DON'T

25   REMEMBER.  IT CHANGED SO MANY TIMES, THE DIFFERENT NUMBERS.

APRIL 15, 2015

1  **Q.**    OKAY.  BUT IT IS FAIR TO SAY, IN THIS EMAIL CHAIN THAT

2  WAS ULTIMATELY SENT TO YOU -- LET'S GO BACK TO PAGE 1.  SET

3  THE FOUNDATION, I WILL GET YOU ORIENTED.

4  **A.**    ALL RIGHT.

5  **Q.**    THEN WE CAN CALL OUT THE TITLE BOX.

6      ARASH GHAHREMAN, BACK ON FRIDAY, DECEMBER 21ST, SENT YOU

7  AN EMAIL -- THIS MAY HAVE BEEN ONE OF THE FIRST EMAILS, NO?

8  **A.**    IT WAS DEFINITELY ONE OF THE FIRST ONES, YES.  I THINK

9  IT WAS THE FIRST ONE, ACTUALLY.

10      **MR. JOHNSTON:**  SO LET'S GO DOWN TO THE BODY OF THE

11  FIRST PART.

12  **Q.**    **(MR. JOHNSTON)** DEAR DAVID, I GOT YOUR EMAIL FROM TAMMY

13  FARNSLEY.

14      WE KNOW TAMMY FARNSLEY TO BE THE REPRESENTATIVE FROM

15  TIMCO?

16  **A.**    CORRECT.

17  **Q.**    YOU SPOKE PERSONALLY WITH TAMMY FARNSLEY AT SOME POINT,

18  NO?

19  **A.**    NO, I DID NOT, NO.

20  **Q.**    YOU DID NOT.  BUT YOU KNOW SHE WAS THE REPRESENTATIVE

21  FROM TIMCO WHO SUBMITTED THE ORDER REQUEST OR THE QUOTE

22  REQUEST TO NORTHROP GRUMMAN, RIGHT?

23  **A.**    CORRECT.

24  **Q.**    AND ARASH IS ASKING YOU, DAVID MILLS, I NEED SIX

25  NAVIGAT-2100'S.  CORRECT?

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    CORRECT.

2          **MR. JOHNSTON:**  LET'S BACK OUT OF THAT.  AND IN THIS

3    NEXT PART IF WE COULD JUST DO THE BODY AND THE TITLE TOGETHER.

4    ALL RIGHT.  THAT'S FINE.  YEAH, JUST FROM ALL THE WAY DOWN.  I

5    AM SORRY, I DON'T KNOW THE LINGO.

6    **Q.**    **(MR. JOHNSTON)** AND WAS FORWARDED AS AN EMAIL FROM TAMMY

7    FARNSLEY AT TIMCO MARINE TO MR. GHAHREMAN.  AND SHE IS

8    INTRODUCING YOU TO MR. GHAHREMAN, RIGHT?

9    **A.**    CORRECT.

10   **Q.**    YOU USED -- OR THE GOVERNMENT USED TIMCO MARINE TO GET

11   MR. GHAHREMAN TO COME TO YOUR COMPANY, RIGHT?  SHE PROVIDED

12   YOUR CONTACT INFORMATION.

13   **A.**    YES.

14   **Q.**    OKAY.  AND WHAT SHE TOLD MR. GHAHREMAN WAS, I KNOW FOR

15   SURE THIS GUY -- MEANING DAVID MILLS SOUTH START TRADING --

16   WAS SUPPOSED TO HAVE AT LEAST ONE OF THE 3000.  RIGHT?

17   **A.**    CORRECT.

18   **Q.**    I CAN'T REMEMBER IF WE TALKED ABOUT THIS YESTERDAY WITH

19   YOU OR NOT.  THERE IS THE NAVIGAT 3000, THE NEWER VERSION,

20   RIGHT?

21   **A.**    THE UPDATED VERSION, CORRECT.

22   **Q.**    UPDATED VERSION.  THEN THE 2100, RIGHT?

23   **A.**    CORRECT.

24   **Q.**    WHICH IS SOME 15 TO 20 YEARS OLDER THAN THE NEWER

25   VERSION, RIGHT?

APRIL 15, 2015

1   **A.**    I DON'T KNOW HOW OLD, BUT I KNOW IT IS THE ANTIQUATED

2   MODEL.

3   **Q.**    THE ANTIQUATED MODEL.  OKAY.  THANKS.

4         AND I THINK HERE TAMMY SAYS THE 2000, RIGHT?

5   **A.**    I UNDERSTAND --

6   **Q.**    WE ALL UNDERSTAND THAT TO MEAN THE 2100?

7   **A.**    YES.

8   **Q.**    AND SHE IS TELLING MR. GHAHREMAN THAT THE MANUFACTURER

9   SAID THEY HAD GONE TO THE NEW MODEL.  SHE SAYS, I KNOW FOR

10  SURE THAT THIS GUY, DAVID MILLS, IS SUPPOSED TO HAVE AT LEAST

11  ONE OF THE NEW ONES, THE 3000.  I NEVER ASKED ABOUT THE

12  ANTIQUATED ONE, THE 2100, SINCE THE MANUFACTURER SAID THEY HAD

13  BASICALLY GONE TO THE NEW MODEL.

14        RIGHT?

15  **A.**    CORRECT.

16  **Q.**    SHE SAYS, BUT IT IS POSSIBLE THAT DAVID MILLS WILL HAVE

17  THE ANTIQUATED MODEL IN STOCK.

18  **A.**    CORRECT.

19  **Q.**    SO ESSENTIALLY ADVISING MR. GHAHREMAN THAT THE

20  MANUFACTURER IS MOVING ON, RIGHT?

21  **A.**    I AM SORRY?

22  **Q.**    THE MANUFACTURER IS MOVING ON FROM PRODUCING THE 2100.

23  **A.**    CORRECT.

24        **MR. JOHNSTON:**  IF WE CAN BACK OUT OF THAT, PLEASE.

25  AND THEN JUST FILL OUT THE NEXT EMAIL.  PERFECT.

APRIL 15, 2015

1   **Q.    (MR. JOHNSTON)** AND BEFORE THAT MR. GHAHREMAN TO TAMMY

2   SAYS, THANK YOU, YOU ARE HELPING ME A LOT.

3        I AM TRYING TO PARAPHRASE WHAT IT SAYS HERE, BUT CORRECT

4   ME IF I DON'T GET IT RIGHT.

5        AT THE BEGINNING I WAS LOOKING FOR IN STOCK BECAUSE MY

6   FRIEND NEED 2000.  MY FRIEND NEEDS THE 2100, THE ANTIQUATED

7   ONE, NOT THE 3000.  RIGHT?

8   **A.**   YES.

9   **Q.**   SO THAT IS WHY HE SAYS HE WAS LOOKING FOR IN STOCK.

10           **MR. JOHNSTON:**  NOW, IF WE CAN GO TO PAGE 2.  THIS IS

11  ANOTHER EMAIL FROM TAMMY FARNSLEY.  IF WE COULD JUST DO THE

12  CONTENT, I THINK.

13  **Q.    (MR. JOHNSTON)** I THINK WE SEE HERE, I KNOW THE ORIGINAL

14  REQUEST WAS FOR A QUANTITY OF SIX, RIGHT?  TAMMY IS TELLING

15  ARASH, I UNDERSTAND THAT YOUR ORIGINAL ORDER WAS FOR SIX.

16  RIGHT?

17  **A.**   YES.

18  **Q.**   IT WASN'T FOR 10, IT WAS FOR THE SAME NUMBER THAT HE

19  REQUESTED.

20  **A.**   OKAY.

21  **Q.**   RIGHT?

22  **A.**   CORRECT.

23  **Q.**   OKAY.  NOW, YOU DID TESTIFY THAT THE QUANTITY CHANGED IN

24  YOUR NEGOTIATIONS WITH TIG MARINE, RIGHT?

25  **A.**   CORRECT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    Q.    AND THE ULTIMATE REQUEST WAS FOR FOUR UNITS, RIGHT?

2    A.    AT THE FINALITY, YES.

3    Q.    THE FINAL NUMBER WAS FOUR, RIGHT?

4    A.    YES.

5    Q.    OKAY.

6          MR. JOHNSTON:  AND IF WE COULD GO TO EXHIBIT 107,

7    PLEASE.

8    Q.    (MR. JOHNSTON)  THIS IS AN EMAIL ON FEBRUARY 19TH FROM

9    KOORUSH TO YOU WITH ARASH CC'D.

10         MR. JOHNSTON:  IF WE CAN JUST BLOW THAT OUT TO GET

11   ORIENTED.

12         FUND TRANSFER, FOG PDF.  IF WE BACK OUT OF THAT, DO

13   THE BODY.  THAT'S FINE.

14   Q.    (MR. JOHNSTON) PLEASE FIND THE ATTACHED RECEIPT OF

15   PAYMENT.  AND HE TALKS ABOUT A DELAY IN CONTRACT, RIGHT?

16         MR. JOHNSTON:  SO IF WE CAN GO TO PAGE 3 OF THIS

17   EMAIL CHAIN.

18   Q.    (MR. JOHNSTON) YOU KNEW, HAVING REVIEWED THESE EMAILS,

19   THAT KOORUSH TAHERKHANI, TIG MARINE, ORIGINALLY HAD TWO

20   CUSTOMERS FOR THE NAVIGAT-2100, RIGHT?

21   A.    I AM SORRY?

22   Q.    YOUR ULTIMATE ORDER WAS FOR FOUR, RIGHT?

23   A.    THE FINAL ORDER WAS FOR FOUR.

24   Q.    BUT YOU KNOW THE NUMBER WAS SIX PREVIOUSLY BECAUSE

25   KOORUSH TAHERKHANI CONVEYED TO YOU THAT HE HAD AN ADDITIONAL

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    CUSTOMER, RIGHT?

2    **A.**    I DON'T KNOW IF HE SAID HE HAD AN ADDITIONAL CUSTOMER.

3    THE NUMBER WAS 100, FOUR, SIX.

4    **Q.**    WE WILL GO TO 100 IN A SECOND, LET'S WORK ON THE FOUR

5    AND SIX.

6    **A.**    I DON'T KNOW THAT HE EVER SAID THERE WAS TWO SEPARATE

7    CUSTOMERS.

8    **Q.**    WELL, ARASH FORWARDED THIS EMAIL TO YOU.

9         **MR. JOHNSTON:**  IF WE CALL OUT IN BLUE ON TOP.  DEAR

10   ARASH.

11   **Q.**    **(MR. JOHNSTON)** AND THIS CAME IN THE CONTEXT OF, I

12   BELIEVE, A DELAY IN PAYMENT FOR THE FIRST --

13   **A.**    OKAY.

14   **Q.**    -- 10 PERCENT, RIGHT?

15   **A.**    YES.

16   **Q.**    WAS THAT AROUND THIS TIME, FEBRUARY 15TH?

17   **A.**    YES.

18   **Q.**    YOU WERE WONDERING WHEN THEY WERE GOING TO SEND THE

19   FIRST PAYMENT.  THERE WERE DELAYS, RIGHT?

20   **A.**    THERE WERE DELAYS.

21   **Q.**    AND ARASH CONVEYED TO YOU THAT AT LEAST KOORUSH

22   REPRESENTED THAT THE DELAY WAS BECAUSE OF HIS SECOND CUSTOMER.

23   **A.**    I SEE THAT.

24   **Q.**    FOR THE TWO EXTRA UNITS.

25   **A.**    CORRECT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **Q.**    SO YOU UNDERSTOOD -- WHETHER KOORUSH WAS TELLING THE

2   TRUTH OR NOT -- THAT THERE WAS A SECOND CUSTOMER FOR THE TWO,

3   BUT IN THE END THEY WENT WITH THE FOUR, RIGHT?

4   **A.**    THAT IS WHAT THE EMAIL SAYS, YES.

5   **Q.**    RIGHT.

6          **MR. JOHNSTON:**  NOW IF WE COULD GO BACK TO

7   EXHIBIT 103, PLEASE.

8   **Q.**    **(MR. JOHNSTON)** THIS IS AN EMAIL THAT YOU SENT ARASH.

9          **MR. JOHNSTON:**  IF WE CAN CALL OUT THE TITLE.

10  **Q.**    **(MR. JOHNSTON)**  ON FRIDAY, DECEMBER 28TH.  EARLY ON IN

11  YOUR NEGOTIATIONS FOR THE GYRO, RIGHT?

12  **A.**    CORRECT.

13         **MR. JOHNSTON:**  IF WE CAN BREAK DOWN TO THE BODY, THE

14  FIRST TWO PARAGRAPHS.  THAT'S PERFECT.

15  **Q.**    **(MR. JOHNSTON)** AND YOU ARE RESPONDING TO HIS REQUEST

16  FOR THE NAVIGAT-2100, RIGHT?

17  **A.**    CORRECT.

18  **Q.**    YOU COMPLETELY UNDERSTAND YOUR CUSTOMER WANTS THE 2100,

19  RIGHT?

20  **A.**    YES.

21  **Q.**    THAT HE WANTS NEW UNITS.

22  **A.**    YES.

23  **Q.**    RIGHT.  AND IN THE SECOND PARAGRAPH YOU TELL HIM THAT

24  YOU SPOKE TO YOUR FRIEND AT SPERRY MARINE, RIGHT?

25  **A.**    CORRECT.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **Q.**    AND YOU SPOKE WITH YOUR FRIEND AT SPERRY AT LENGTH.

2    **A.**    CORRECT.

3    **Q.**    AND YOU HAD TO SPEAK TO YOUR FRIEND AT SPERRY -- OR

4    DAVID MILLS REPRESENTED THAT HE HAD TO SPEAK TO HIS FRIEND AT

5    SPERRY BECAUSE SPERRY MARINE WAS TRANSITIONING FROM PRODUCING

6    OR MANUFACTURING THE 2100'S, RIGHT?

7    **A.**    CORRECT.

8    **Q.**    THAT YOU CONVEYED TO MR. GHAHREMAN THAT YOU HAD TO

9    BASICALLY PERSUADE YOUR FRIEND AT SPERRY TO EVEN TAKE ANOTHER

10   ORDER FOR 2100'S, RIGHT?

11   **A.**    CORRECT.

12   **Q.**    THEY ARE THE ANTIQUATED MODEL AND OBVIOUSLY SPERRY WANTS

13   TO GET PEOPLE ON THE NEW MODEL, RIGHT?

14   **A.**    YEAH, THAT AND THE GOAL OF THE CONVERSATION WAS THE ONLY

15   PEOPLE THAT WOULD WANT IT WERE PEOPLE THAT NEEDED ANTIQUATED

16   EQUIPMENT.

17   **Q.**    SURE.

18   **A.**    SUCH AS IRAN.

19   **Q.**    YOU CAN SAY THAT HERE, BUT IT IS NOT HERE IN THIS EMAIL.

20   **A.**    OKAY.  THAT'S FINE.

21   **Q.**    RIGHT?  OKAY.

22        WHAT YOU SAY IN THIS EMAIL IS THAT IF WE ARE ABLE TO

23   PLACE AN ORDER FOR THE 2100 YOU WILL NEED TO CONSULT WITH YOUR

24   CUSTOMER AND DETERMINE EXACTLY HOW MANY UNITS YOU WANT TO

25   PURCHASE AT THIS TIME.  RIGHT?

APRIL 15, 2015

621

COLE CROSS-EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    AND THEN SECOND LINE FROM THE BOTTOM.  BECAUSE WE WILL

3    NOT HAVE ANOTHER OPPORTUNITY TO PLACE ANY FUTURE ORDERS.

4    **A.**    CORRECT.

5    **Q.**    BASICALLY THIS IS LAST CALL FOR THE 2100, RIGHT?

6    **A.**    CORRECT.

7    **Q.**    AND YOU EVEN INDICATE THAT YOU HAVE ANOTHER CUSTOMER IN

8    MEXICO -- OR AT LEAST DAVID MILLS REPRESENTED THAT -- WHO

9    PICKED UP FIVE OF THE UNITS, RIGHT?

10   **A.**    CORRECT.

11   **Q.**    OR GOT FIVE OF THE 2100'S FROM YOU, RIGHT?

12   **A.**    CORRECT.

13   **Q.**    AND KEPT -- AS THEY WERE CONCERNED ABOUT NOT BEING ABLE

14   TO GET MORE OF THEM, KEPT SOME ON THE SHELF, RIGHT?

15   **A.**    YES.

16   **Q.**    BECAUSE THEY ARE NOT GOING TO MAKE THIS ONE ANY MORE.

17   **A.**    CORRECT.

18         **MR. JOHNSTON:**  IF WE CAN BLOW BACK OUT.

19   **Q.**    **(MR. JOHNSTON)** AND THAT WAS ON DECEMBER 28TH, RIGHT?

20   **A.**    CORRECT.

21   **Q.**    THAT YOU SENT THIS EMAIL.

22         YOU PLAYED A CONVERSATION -- OR WE LISTENED TO A

23   CONVERSATION PLAYED BY THE GOVERNMENT YESTERDAY THAT TOOK

24   PLACE FOUR DAYS LATER.

25   **A.**    OKAY.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  **Q.**    AND THIS WAS GOVERNMENT EXHIBIT 302.  I DON'T KNOW THAT

2  WE NEED TO PLAY IT QUITE YET.

3           **MR. JOHNSTON:**  JANUARY 2ND.  I JUST WANTED TO LOOK

4  AT THE DATE.  NO, WE DON'T NEED TO NECESSARILY PLAY IT.

5  **Q.**    **(MR. JOHNSTON)** IT WAS JANUARY 3RD, YOU HAD A PHONE CALL

6  ABOUT NAVIGATS AND THE NUMBER OF NAVIGATS THAT MR. GHAHREMAN

7  WANTED TO PROCURE FOR TIG MARINE, RIGHT?

8  **A.**    CORRECT.

9  **Q.**    THIS IS THE PHONE CALL WHERE THE NUMBER 100 CAME UP,

10 RIGHT?

11 **A.**    OKAY.  YES, I RECALL.

12 **Q.**    AND THIS WAS FOUR DAYS AFTER YOU TOLD MR. GHAHREMAN THAT

13 YOU NEED TO CONSULT WITH YOUR CUSTOMER ABOUT ANY ADDITIONAL

14 UNITS HE WANTS, RIGHT?

15 **A.**    CORRECT.

16 **Q.**    FOUR DAYS AFTER YOU TOLD HIM, BASICALLY, THIS IS LAST

17 CALL FOR THIS ONE, RIGHT?

18 **A.**    CORRECT.

19 **Q.**    AND ONE OF THE REASONS YOU SAID AN ORDER FOR THE 100

20 WOULD BE HARD WAS BECAUSE THE MANUFACTURER WAS DISCONTINUING

21 ITS MANUFACTURE OF THE 2100, RIGHT?

22 **A.**    CORRECT.

23 **Q.**    WE TALKED ABOUT YOUR INVITATION FOR MR. GHAHREMAN AND

24 MR. TAHERKHANI TO COME TO VEGAS.  THAT WAS LATE MARCH, EARLY

25 APRIL?

APRIL 15, 2015

1    **A.**    CORRECT.

2    **Q.**    RIGHT.  AND YOU SAID, AS AGENT DAVID COLE, AT THAT POINT

3    YOU WERE INVITING THEM TO VEGAS TO SEE WHETHER EVIDENCE

4    SUPPORTED A VIOLATION OF A CRIME OR NOT.

5    **A.**    CORRECT.

6    **Q.**    AT THAT POINT YOU HADN'T MADE A DECISION TO ARREST THESE

7    INDIVIDUALS?

8    **A.**    NO.

9    **Q.**    AND THIS WAS SOME TIME IN LATE MARCH, AFTER YOU HAD BEEN

10   TALKING TO MR. GHAHREMAN FOR SOME TIME, RIGHT?

11   **A.**    CORRECT.

12   **Q.**    YOU TALKED YESTERDAY ABOUT AN EMAIL THAT MR. GHAHREMAN

13   FORWARDED TO YOU ABOUT WHETHER KOORUSH TAHERKHANI WOULD COME

14   TO VEGAS.

15   **A.**    YES.

16         **MR. JOHNSTON:**  EXHIBIT 121, IF YOU COULD PULL THAT

17   UP.

18   **Q.**    **(MR. JOHNSTON)** FROM ARASH ON APRIL 4TH REGARDING THE

19   INVITATION LETTER, RIGHT?  AND BEFORE WE BLOW OUT

20   ATTACHMENTS -- PASSPORT, RIGHT?

21   **A.**    YES.

22         **MR. JOHNSTON:**  NOW IF WE COULD GO TO THE BODY.

23   **Q.**    **(MR. JOHNSTON)** PLEASE SEE THE ATTACHED EMAIL.  RIGHT?

24   AND I APPRECIATE IF YOU KEEP CONFIDENTIAL THE CONTENT OF THE

25   ATTACHED EMAIL.  RIGHT?

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    LET'S GO DOWN TO THE BODY OF THE ATTACHED EMAIL.

3          THAT'S FROM KOORUSH TAHERKHANI, RIGHT?

4    **A.**    YES.

5    **Q.**    NOW, AT THIS POINT KOORUSH IS GOING TO GO TO DUBAI TO

6    FOLLOW UP WITH THE EMBASSY ABOUT GETTING A VISA, RIGHT?

7    **A.**    YES.

8    **Q.**    IN THIS EMAIL YOU TALKED ABOUT YESTERDAY HE EXPRESSED A

9    DESIRE TO CHANGE HIS TITLE IN THE INVITATION LETTER THAT YOU

10   SENT, RIGHT?

11   **A.**    CORRECT.

12   **Q.**    AND THE INVITATION LETTER BEING IMPORTANT BECAUSE HE

13   WOULD HAVE TO PROVIDE IT TO THE EMBASSY OR WHOEVER WAS GOING

14   TO HELP HIM GET THE VISA, RIGHT?

15   **A.**    CORRECT.

16   **Q.**    AND HE WANTED HIS TITLE CHANGED FROM MANAGING DIRECTOR,

17   RIGHT?

18   **A.**    THAT IS WHAT IT SAYS.

19   **Q.**    HE SAID, YOU CAN CHANGE IT TO OWNER.  RIGHT?

20   **A.**    CORRECT.

21   **Q.**    OR BUSINESS DEVELOPMENT MANAGER?  THERE IS JUST

22   SOMETHING ABOUT -- SORRY.  OR BUSINESS DEVELOPMENT MANAGER?

23   **A.**    CORRECT.

24   **Q.**    THERE WAS JUST SOMETHING ABOUT MANAGING DIRECTOR THAT HE

25   DIDN'T WANT, RIGHT?

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    HE DIDN'T ASK TO TOTALLY DISASSOCIATE HIM FROM --

3    DISASSOCIATE HIS NAME FROM TIG MARINE.

4    **A.**    NO.

5    **Q.**    NO.  NOW, YOU ARE NOT FAMILIAR WITH THE EMPLOYMENT LAWS

6    OF THE UNITED ARAB EMIRATES, ARE YOU?

7    **A.**    NOT TREMENDOUSLY.

8    **Q.**    YOU ARE NOT FAMILIAR WITH THE RESTRICTIONS THAT THE UAE

9    MAY HAVE ON WORK VISAS, ARE YOU?

10   **A.**    I AM NOT.

11   **Q.**    BUT YOU DO KNOW THAT MR. TAHERKHANI WAS APPARENTLY

12   COMFORTABLE WITH YOU IDENTIFYING HIM AS THE OWNER OF THIS

13   COMPANY, RIGHT?

14   **A.**    THAT'S WHAT THE EMAIL SAYS.

15   **Q.**    JUST NOT THE PERSON WHO MANAGES THE BUSINESS IN THE UAE

16   ITSELF, RIGHT?

17   **A.**    CORRECT.

18   **Q.**    NOW, YOU PLAYED A CALL YESTERDAY FROM MAY 2ND ABOUT

19   KOORUSH TAHERKHANI COMING TO THE UNITED STATES.  DO YOU

20   REMEMBER THAT CALL?

21   **A.**    YES.

22   **Q.**    WHERE MR. GHAHREMAN SAID, LOOK, MR. TAHERKHANI WOULD

23   LOVE TO COME TO THE UNITED STATES.  RIGHT?

24   **A.**    YES.

25   **Q.**    BUT MR. GHAHREMAN, IN THAT CALL, MENTIONED A FEW

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   CONCERNS ABOUT THAT MR. TAHERKHANI WOULD HAVE COMING TO THE

2   UNITED STATES.

3   **A.**    HE DID.

4   **Q.**    HE MENTIONED THE NEWS, RIGHT?

5   **A.**    INDEED.

6   **Q.**    HE MENTIONED POLITICAL THINGS THAT HAD HAPPENED.

7   **A.**    HE -- HE SAID POLITICKING, I THINK HE SAID.

8   **Q.**    POLITICS?  SOMETHING TO DO WITH POLITICS?

9   **A.**    SOMETHING TO THAT EFFECT, YEAH.

10  **Q.**    NOW, HAVING DONE THIS COUNTER-PROLIFERATION FOR HOWEVER

11  MANY NUMBER OF YEARS, YOU ARE FAMILIAR WITH, GENERALLY, THE

12  POLITICS OF IRAN AND THE UNITED STATES, RIGHT?

13  **A.**    YES.

14  **Q.**    WE DON'T NEED TO HAVE A HISTORY LESSON TO KNOW THAT

15  THERE HAVE BEEN TENSIONS FOR DECADES, RIGHT?

16  **A.**    YES.

17  **Q.**    AND DECADES OF DISTRUST, RIGHT?

18  **A.**    CORRECT.

19  **Q.**    AMERICAN DISTRUST OF IRANIANS, RIGHT?

20  **A.**    I DON'T KNOW.  I CAN'T SPEAK TO AMERICANS, I CAN SPEAK

21  TO MYSELF, I GUESS.

22  **Q.**    BUT YOU ARE AWARE OF TENSIONS, RIGHT?

23  **A.**    BETWEEN THE TWO GOVERNMENTS?

24  **Q.**    BETWEEN THE TWO GOVERNMENTS, SURE.

25  **A.**    YES.

APRIL 15, 2015

1   Q.    OKAY.  TENSIONS THAT ARE SEATED IN CONCERNS ABOUT

2   HOSTAGES IN '79, RIGHT?

3   A.    YEAH, I THINK.  YES.

4   Q.    WE KNOW THAT AMERICANS WERE HELD HOSTAGE --

5   A.    YES.

6   Q.    -- IN IRAN, RIGHT?

7   A.    I SAW THE MOVIE.

8   Q.    RIGHT.  IT WAS GOOD, TOO.

9         AND IN THE NEWS.  WE KNOW THAT AMERICANS ARE ALLEGEDLY

10  BEING HELD, INNOCENT AMERICANS, IN IRAN, ACCUSED OF CRIMES,

11  RIGHT?

12  A.    CORRECT.

13  Q.    OKAY.  AND YOU WOULD AGREE THERE ARE CONCERNS THAT

14  IRANIANS MAY HAVE ABOUT HOW THE AMERICAN GOVERNMENT MAY TREAT

15  THEM WHEN THEY COME TO THE UNITED STATES.

16  A.    I SUPPOSE IT COULD BE POSSIBLE.

17  Q.    BUT NEVERTHELESS, YOU REMAINED FRUSTRATED ABOUT MR.

18  TAHERKHANI NOT WANTING TO COME TO THE UNITED STATES.

19  A.    NO.  I WAS FRUSTRATED BECAUSE I INTERPRETED HE WAS

20  SAYING I WANTED TO GET HIM ARRESTED.  SO I WAS PLAYING A ROLE

21  OF, WHY WOULD HE THINK THAT I WANT TO GET HIM ARRESTED.

22  Q.    MAYBE WE NEED TO PLAY THE CLIP AGAIN.  I AM SORRY.

23  EXHIBIT 306, PLEASE.

24        (AUDIO PLAYED)

25  Q.    **(MR. JOHNSTON)** HE DIDN'T SAY THAT KOORUSH WAS AFRAID

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   THAT YOU WOULD ARREST HIM, DID HE?

2   **A.**    NO.  I WAS SAYING MY INTERPRETATION WAS I SUSPECTED THAT

3   KOORUSH WAS THINKING I WAS AN UNDERCOVER AGENT.  SO MY ROLE, I

4   WAS TRYING TO PLAY OFF, IN ANY MANNER, THAT I HAD ANY INTEREST

5   OR HAD ANY CONCEPT OF THAT BEING A POSSIBILITY.

6   **Q.**    I UNDERSTAND YOUR ROLE, BUT THAT IS NOT WHAT MR.

7   GHAHREMAN TOLD YOU.  HE DIDN'T TELL YOU THAT KOORUSH WAS

8   AFRAID YOU WERE AN AGENT.

9   **A.**    NO, HE DIDN'T SAY THAT.  NOT IN THOSE EXACT WORDS.

10  **Q.**    IN FACT, YOU HAD ANOTHER CONVERSATION WITH MR. GHAHREMAN

11  THE NEXT DAY, ANOTHER PHONE CALL IN WHICH YOU DISCUSSED THE

12  CONCERNS THAT MR. TAHERKHANI HAD COMING TO THE UNITED STATES,

13  RIGHT?

14  **A.**    CORRECT.

15  **Q.**    AND IT WASN'T DESCRIBED TO YOU AS A FEAR OF HIM BEING

16  ARRESTED BY YOU OR SOME OTHER UNDERCOVER AGENT, RIGHT?

17  **A.**    I DON'T RECALL.

18  **Q.**    HE DIDN'T SAY THAT.  WELL, HE TOLD YOU THAT YOU JUST

19  NEVER FACED THE SAME PROBLEMS THAT PEOPLE WITH OUR NATIONALITY

20  HAVE IN THIS COUNTRY.

21  **A.**    OKAY.

22  **Q.**    DOES THAT SOUND RIGHT?

23  **A.**    IT SOUNDS FAMILIAR.

24  **Q.**    TRUST IS ESSENTIAL TO ANY BUSINESS BEING SUCCESSFUL,

25  RIGHT?

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    **A.**    SURE.

2    **Q.**    YOU MIGHT TRUST GETTING SOMETHING FROM, SAY, EBAY OR

3    AMAZON, OR ORDERING SOMETHING FROM EBAY BECAUSE EBAY IS A

4    TRUSTED SITE, RIGHT?

5    **A.**    CORRECT.

6    **Q.**    IT PROVIDES YOU PROTECTIONS IF YOU DON'T GET THE PRODUCT

7    THAT YOU ASK FOR, RIGHT?

8    **A.**    YES.

9    **Q.**    EBAY BACKS UP THE PRODUCTS SOLD BY OTHER INDIVIDUALS,

10   RIGHT?

11   **A.**    CORRECT.

12   **Q.**    BUT, FOR INSTANCE, IF YOU WENT ONTO CRAIGSLIST AND TRIED

13   TO BUY SOMETHING, YOU WOULDN'T JUST SEND SOMEBODY ON

14   CRAIGSLIST MONEY IF THEY SAID, YEAH, I HAVE GOT A -- LET'S SAY

15   A CAR FOR SALE.  SEND ME THE MONEY AND I WILL SEND YOU THE

16   CAR.  RIGHT?

17   **A.**    I THINK YOU WOULD BE SURPRISED.  I WOULDN'T, BUT I THINK

18   PEOPLE DO QUITE OFTEN.

19   **Q.**    LET'S LIMIT THE UNIVERSE TO THE WORLD OF REASONABLE

20   PEOPLE.  OKAY?

21   **A.**    OKAY.

22   **Q.**    IN THE WORLD OF REASONABLE PEOPLE, WE WOULDN'T WIRE

23   SOMEBODY MONEY FOR A CAR THAT THEY TELL US THEY WILL SHIP FROM

24   NEW YORK TO CALIFORNIA.

25   **A.**    NO, I WOULDN'T.  BUT, I MEAN, FRAUD DOES EXIST FOR A

APRIL 15, 2015

COLE CROSS-EXAMINATION

1  REASON.

2  **Q.**    NO, IT DOES.  AND SOME PEOPLE EVEN SEND MONEY TO --

3  **A.**    TO NIGERIA.

4  **Q.**    TO NIGERIAN PRINCES, RIGHT?

5  **A.**    EXACTLY.  THAT IS WHAT I WAS TRYING TO GET AT.

6  **Q.**    BUT THE FACT IS IS THAT BUSINESS, SERIOUS BUSINESS,

7  RIGHT?  PROFESSIONAL BUSINESS --

8  **A.**    CORRECT.

9  **Q.**    -- REQUIRES A CERTAIN LEVEL OF TRUST.

10  **A.**    YES.

11  **Q.**    OKAY.  AND IN BUSINESS THERE ARE A NUMBER OF WAYS TO

12  ENSURE THAT BOTH PARTIES GET WHAT THEY WANT, RIGHT?

13  **A.**    SURE.

14  **Q.**    YOU KNOW, INSURANCE IS ONE EXAMPLE, FOR ACCIDENTS,

15  RIGHT?

16  **A.**    CORRECT.

17  **Q.**    BUT LETTERS OF CREDIT ARE SOMETHING WE TALKED ABOUT

18  YESTERDAY THAT ARE ANOTHER BUSINESS TOOL USED TO ENSURE THAT

19  SOMEBODY GETS WHAT THEY WANT OR ARE REIMBURSED FOR IT, RIGHT?

20  **A.**    CORRECT.

21  **Q.**    A LETTER OF CREDIT IS ESSENTIALLY INSURANCE AGAINST THE

22  OTHER PARTY NOT SATISFYING THEIR TERMS OF THE DEAL, RIGHT?

23  **A.**    THAT IS MY UNDERSTANDING, YES.

24  **Q.**    LETTERS OF CREDIT HAVE BEEN USED IN BUSINESS FOR A LONG

25  TIME, RIGHT?

APRIL 15, 2015

COLE CROSS-EXAMINATION

```
 1   A.    CORRECT.
 2   Q.    THIS WASN'T THE FIRST TIME THAT A LETTER OF CREDIT HAS
 3   BEEN REQUESTED, IN YOUR DEALING TIG MARINE, RIGHT?
 4   A.    IN MY DEALING WITH TIG MARINE?
 5   Q.    NO, NO.  I MEAN, THAT ISN'T THE FIRST TIME ANYONE HAS
 6   EVER REQUESTED A LETTER OF CREDIT, RIGHT?
 7   A.    I DON'T UNDERSTAND THE QUESTION, I GUESS.
 8   Q.    THIS IS A COMMON TOOL USED IN BUSINESS.
 9   A.    YOU KNOW, I DON'T KNOW.  I MEAN, I DON'T WORK IN THE
10   BUSINESS.
11          MR. HARRIGAN:  LACK OF FOUNDATION.
12          THE WITNESS:  TAKE YOUR WORD FOR IT.
13   Q.    (MR. JOHNSTON) IF YOU DON'T KNOW JUST --
14   A.    I DON'T KNOW.  I NEVER USED A LETTER OF CREDIT BEFORE IN
15   MY LIFE, SO I CAN'T ANSWER THAT.
16   Q.    AND AS YOU SAID EARLIER, YOU ARE NOT A REAL BUSINESSMAN,
17   RIGHT?
18   A.    NO, I AM NOT.
19   Q.    YOU ARE A CAREER FEDERAL AGENT --
20   A.    CORRECT.
21   Q.    -- RIGHT?  AND YOU DO YOUR BEST TO PLAY THE ROLE OF A
22   BUSINESSMAN.
23   A.    CORRECT.
24   Q.    SO YOU DO HAVE YOUR LIMITATIONS ON WHAT YOU KNOW ABOUT
25   STANDARD BUSINESS VERSUS --
```

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **A.**    EXACTLY.  ONLY WHAT I HAVE COME ACROSS IN MY EXPERIENCE.

2   **Q.**    OKAY.  YOU SAID YESTERDAY THAT KOORUSH TAHERKHANI WANTED

3   THE STAND BY LETTER OF CREDIT FOR HIS BANK IN DUBAI, RIGHT?

4   **A.**    CORRECT.

5   **Q.**    BUT WHEN YOU USED THE BANK OF THE WEST, RIGHT -- OR WAS

6   THERE A BANK BEFORE THAT?  I CAN'T REMEMBER.

7   **A.**    I DON'T REMEMBER.  I THINK -- I BELIEVE IT WAS BANK OF

8   THE WEST.

9   **Q.**    BANK OF THE WEST.  THE BANK IN DUBAI DIDN'T RECOGNIZE

10  THAT BANK, RIGHT?

11  **A.**    CORRECT.

12  **Q.**    IT WAS TOO SMALL.

13  **A.**    TOO SMALL.

14  **Q.**    AND THE BANK THAT TIG MARINE WAS USING ASKED FOR A

15  LARGER BANK, RIGHT?

16  **A.**    CORRECT.

17  **Q.**    LIKE BANK OF AMERICA.

18  **A.**    YES.

19  **Q.**    WELLS FARGO?

20  **A.**    YES.

21  **Q.**    I THINK J.P. MORGAN WAS THE OTHER ONE.

22  **A.**    YES.

23  **Q.**    SO WHEN YOU SAID A DIFFERENT BANK, WHAT KOORUSH

24  TAHERKHANI WANTED WAS A BIGGER BANK, RIGHT?

25  **A.**    A BIGGER BANK.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **Q.**   A MORE REPUTABLE BANK?

2   **A.**   I DON'T KNOW MORE REPUTABLE, BUT MORE WELL-KNOWN.

3   **Q.**   OKAY.  FAIR ENOUGH.  A BANK THAT A FOREIGN BANK COULD --

4   EXCUSE ME.

5        A BANK THAT A FOREIGN BANK COULD WORK WITH AND KNOW AND

6   TRUST AS FAR AS LETTERS OF CREDIT GO, RIGHT?

7   **A.**   I DON'T KNOW HOW THAT OPERATES.  I JUST KNOW HE WANTED A

8   BANK OF THOSE THREE.  HE DIDN'T SPECIFY WHY.

9   **Q.**   YOU TALKED ABOUT HOW YOU TRIED TO TALK OUT -- EXCUSE ME.

10       YOU HAVE TALKED ABOUT HOW YOU TRIED TO CONVINCE MR.

11  GHAHREMAN TO CONVINCE KOORUSH TAHERKHANI THAT GOING WITH THE

12  BIG BANKS WASN'T A GOOD IDEA, RIGHT?

13  **A.**   CORRECT.

14  **Q.**   AND YOU TOLD THEM THAT IT WASN'T A GOOD IDEA BECAUSE OF

15  UNDERWRITING, RIGHT?

16  **A.**   CORRECT.

17  **Q.**   AND YOU SPECIFICALLY TOLD MR. GHAHREMAN THAT YOUR

18  CONCERN WAS NOT BECAUSE THEY THINK I AM BREAKING THE LAW,

19  RIGHT?

20  **A.**   I DON'T KNOW.  I DON'T REMEMBER.  WHAT PART ARE YOU

21  TALKING ABOUT?  HELP ME OUT.

22  **Q.**   WELL, CAN I HELP YOU OUT WITH A CLIP, A BRIEF CLIP?

23            **MR. HARRIGAN:**  I THINK HE SHOULD SHOW IT TO HIM

24  FIRST.

25            **THE WITNESS:**  I DON'T KNOW WHAT YOU ARE TALKING

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   ABOUT.

2          **MR. HARRIGAN:**  HE SAYS, I DON'T KNOW.

3          **THE COURT:**  MR. HARRIGAN.

4          DO YOU HAVE A CLIP IN MIND?

5          **MR. JOHNSTON:**  I DO.  I HAVE A BRIEF CLIP WITH

6   EXACTLY WHAT I JUST ASKED HIM IF HE SAID.

7          **THE COURT:**  DO YOU HAVE A REFERENCE SO IT CAN BE

8   PULLED UP?

9          **MR. JOHNSTON:**  I DON'T HAVE -- MY CORD DIDN'T WORK

10  FOR THE TRANSCRIPT TO PUT THE TRANSCRIPT UP.  WE CAN PLAY IT

11  LATER.

12         **MR. HARRIGAN:**  GO AHEAD AND PLAY IT, YOUR HONOR.

13  THAT IS FINE.

14         **THE WITNESS:**  THAT IS FINE.

15         **MR. JOHNSTON:**  5, 316.

16         YOUR HONOR, FOR THE RECORD I AM GOING TO PLAY

17  EXHIBIT H.

18         (EXHIBIT H MARKED FOR IDENTIFICATION)

19         **THE WITNESS:**  OKAY.

20         (AUDIO PLAYED)

21  **Q.**    **(MR. JOHNSTON)** DO YOU REMEMBER THAT NOW?

22  **A.**    YES, I DO.

23  **Q.**    YOU ARE PLAYING DAVID MILLS, A BROKER WHO TRIES TO KEEP

24  A REPUTATION IN THE INDUSTRY, RIGHT?

25  **A.**    CORRECT.

APRIL 15, 2015

1    **Q.**    A BROKER WHO WANTS TO MAINTAIN A RELATIONSHIP WITH

2    NORTHROP GRUMMAN, RIGHT?

3    **A.**    CORRECT.

4    **Q.**    DAVID MILLS WHO WASN'T NECESSARILY CONCERNED ABOUT

5    UNDERWRITERS THINK HE IS BREAKING THE LAW, RIGHT?

6    **A.**    WELL, NOT THINKING IN THAT PART WOULD BE BREAKING THE

7    LAW.

8    **Q.**    YOUR CONCERN WAS IS THAT IF SPERRY MARINE FOUND OUT THAT

9    YOU WERE MAKING THE SAME ORDER OVER AGAIN THEY MIGHT GET UPSET

10   AT DAVID MILLS, RIGHT?

11   **A.**    CORRECT.

12   **Q.**    YOU MIGHT LOSE FUTURE BUSINESS OF SPERRY MARINE.

13   **A.**    AND WE WOULD LOSE THE ORDER.

14   **Q.**    AND YOU WOULD LOSE THE ORDER.  OKAY.  FAIR ENOUGH.

15          WE ARE GETTING THERE, AGENT COLE.

16   **A.**    NO PROBLEM.  TAKE YOUR TIME.

17          **MR. JOHNSTON:**  EXHIBIT 127, PLEASE.

18   **Q.**    **(MR. JOHNSTON)** THIS IS AN EMAIL FROM YOU TO MR.

19   GHAHREMAN ON MAY 21ST?

20   **A.**    YES.

21   **Q.**    AND THIS IS THE EMAIL WHERE YOU TOLD HIM THAT YOU WERE

22   PUTTING IPODS IN THE INVOICE, RIGHT?

23   **A.**    CORRECT.

24   **Q.**    AND THEN YOU SHOWED EARLIER THE INVOICE SAYING IPODS,

25   RIGHT?

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   **A.**    CORRECT.

2   **Q.**    TIG MARINE NEVER ACTED ON THAT INVOICE, DID THEY?

3   **A.**    WHAT DO YOU MEAN?

4   **Q.**    THEY NEVER SENT MONEY IN RESPONSE TO THAT INVOICE.

5   **A.**    NO.

6   **Q.**    NO, THEY DIDN'T.

7          **MR. JOHNSTON:**  IF WE COULD PLAY ONE LAST CLIP FROM

8   THE VEGAS DINNER, CLIP 6 FROM THE GOVERNMENT.  IT IS 7 ON

9   MINE.

10         (AUDIO PLAYED)

11  **Q.**   **(MR. JOHNSTON)** OKAY.  THAT WAS JOHN HELSING TALKING,

12  RIGHT?

13  **A.**    IT WAS.

14  **Q.**    OKAY.  AND MAYBE WE WILL TRY TO DO THIS THIS WAY SO WE

15  CAN ALL FOLLOW WHAT IS HAPPENING.

16  **A.**    ALL RIGHT.

17  **Q.**    HE SAID, WE WANT TO PROCEED QUICKLY.  RIGHT?

18  **A.**    I THINK HE DID.

19  **Q.**    AND WE DON'T -- BUT WE DON'T WANT TO RUSH THINGS.

20  RIGHT?

21  **A.**    I AM NOT SURE.  HONESTLY, I DIDN'T HEAR THAT VERY WELL.

22  I DON'T KNOW WHERE MY SPEAKER IS.  I DIDN'T HEAR THAT VERY

23  WELL.

24          **MR. JOHNSTON:**  LET'S TRY IT WITH THE TRANSCRIPT.

25         I MAY HAVE SUCCEEDED IN BLOWING UP THE GOVERNMENT'S

APRIL 15, 2015

COLE CROSS-EXAMINATION

1    COMPUTER.

2              **THE WITNESS:**  WOULDN'T BE DIFFICULT.

3    **Q.    (MR. JOHNSTON)** WELL, LET'S GO BACK TO WHAT YOU -- LET'S

4    JUST GO BACK TO WHAT YOU TESTIFIED TO EARLIER.

5    **A.**    OKAY.  SURE.

6    **Q.**    JOHN WAS TALKING TO ARASH AFTER THE DINNER, RIGHT?

7    **A.**    CORRECT.

8    **Q.**    HE WAS TALKING ABOUT WANTING TO DO THINGS THE RIGHT WAY.

9    DO YOU REMEMBER HIM SAYING THAT?

10   **A.**    CORRECT.

11   **Q.**    AND THEN ARASH ANSWERED WHAT JOHN WAS TALKING ABOUT,

12   RIGHT?

13   **A.**    YES.

14   **Q.**    THIS IS THE SAME CELL COMMENT, RIGHT?

15   **A.**    CORRECT.

16   **Q.**    AND I BELIEVE WHAT YOU SAID WAS THAT, IN YOUR WORDS,

17   WHEN YOU WERE ASKED BY THE GOVERNMENT, IS MR. GHAHREMAN WAS

18   SAYING THAT IT WAS IMPORTANT THAT THE MONEY CAME FIRST FOR

19   KOORUSH.  IF YOU ARE NOT CAREFUL WE WILL BE IN THE SAME CELL.

20   **A.**    YEAH.  WHAT'S THE QUESTION?

21   **Q.**    WELL, THAT WAS YOUR INTERPRETATION OF WHAT WAS SAID,

22   RIGHT?

23   **A.**    THE MONEY NEEDS TO COME FIRST IN ORDER FOR US NOT TO BE

24   IN THE SAME CELL?

25   **Q.**    THAT DOESN'T MAKE SENSE, DOES IT?

APRIL 15, 2015

COLE CROSS-EXAMINATION

```
1              MR. HARRIGAN:  OBJECTION.

2              THE WITNESS:  NO.

3              MR. HARRIGAN:  THAT MISSTATES HIS TESTIMONY.

4              THE COURT:  I CAN'T RULE ON IT WITHOUT SEEING A

5      TRANSCRIPT.  YOU CAN CLARIFY ON REDIRECT, IF NECESSARY.

6              MR. JOHNSTON:  I AM GOING TO MARK THIS AS A DEFENSE

7      EXHIBIT.

8              MR. HARRIGAN:  IT IS REALLY -- IT IS 317.  WE HAVE

9      IT NOW, YOUR HONOR.

10             THE COURT:  317?

11             MR. HARRIGAN:  NO, IT IS 316.  WHAT CLIP?  317 --

12     16.  CLIP 7.  316, CLIP 7.

13             (AUDIO PLAYED)

14             THE WITNESS:  OKAY.

15     Q.    (MR. JOHNSTON) THE TRANSCRIPT SAYS, IT IS VERY

16     IMPORTANT THAT KOORUSH MONEY CAME FIRST.

17             DID YOU HEAR HIM SAY, IT IS VERY IMPORTANT THAT

18     KOORUSH'S MONEY IS CLEAN FIRST?

19     A.    YOU ARE ASKING ME WHAT --

20     Q.    IS THIS THE WAY YOU HEARD IT, IS CAME FIRST?

21     A.    THAT IS WHAT I THOUGHT I HEARD.

22     Q.    HOW DO YOU UNDERSTAND THAT TO MEAN -- WHAT DO YOU

23     UNDERSTAND THAT TO MEAN?

24     A.    THAT WE NEED TO GET PAID.

25     Q.    AND THAT IF YOU DON'T GET PAID THEN EVERYONE WILL BE IN
```

APRIL 15, 2015

COLE CROSS-EXAMINATION

1   THE SAME CELL?

2   **A.**    NO, THAT IF WE DON'T GET PAID, THE DEAL IS NOT GOING TO

3   WORK.  MAYBE I AM CONFUSED, I DON'T KNOW.  YOU COULD START

4   OVER.

5   **Q.**    I AM TRYING TO --

6   **A.**    I NEVER GOT THE DIRECT QUESTION, I GUESS.

7   **Q.**    YOU SAID THAT MR. GHAHREMAN SAID THAT, I AM A U.S.

8   CITIZEN, WE WILL BE IN THE SAME CELL; BECAUSE OF YOUR BELIEF

9   THAT HE BELIEVED THESE ITEMS WERE GOING TO IRAN, AND THAT IF

10  YOU DIDN'T DO THINGS RIGHT THAT HE COULD END UP IN JAIL WITH

11  YOU.

12  **A.**    CORRECT.

13  **Q.**    BUT WHAT HE IS SAYING THAT THE MOST IMPORTANT THING IS

14  THAT THE MONEY, AND EITHER CAME OR IS CLEAN, FIRST, RIGHT?

15  **A.**    SO WHAT'S THE QUESTION?  YOU ARE SAYING THAT HE IS

16  SAYING WHAT?

17  **Q.**    WELL, ON DIRECT YOU SAID THAT YOU READ ALL OF THIS TO

18  MEAN THAT HE THINKS HE IS VIOLATING THE IRANIAN LAW; AND I AM

19  ASKING YOU WHERE IN THERE YOU SEE THAT ABOUT --

20  **A.**    NO.

21  **Q.**    -- VIOLATIONS OF IRANIAN LAW.

22  **A.**    IT IS MY INTERPRETATION OF THE DINNER MEETING.

23  **Q.**    VERY WELL.

24  **A.**    THAT IS HOW I INTERPRETED IT.

25  **Q.**    FAIR ENOUGH.  HOW YOU, THE INVESTIGATING AGENT OR THE

APRIL 15, 2015

1    UNDERCOVER AGENT OF THIS CASE, INTERPRETS IT, RIGHT?

2    **A.**    CORRECT.

3    **Q.**    RESPONSIBLE FOR GATHERING EVIDENCE TO SECURE PROSECUTION

4    AGAINST MR. GHAHREMAN, RIGHT?

5    **A.**    CORRECT.

6    **Q.**    THAT IS THE WAY YOU VIEW IT.

7    **A.**    YES.

8    **Q.**    NOW, ON MANY OCCASIONS -- ON MANY OCCASIONS YOU TOLD MR.

9    GHAHREMAN YOU BELIEVED THESE ITEMS WERE GOING TO IRAN, RIGHT?

10   **A.**    YES.

11   **Q.**    DAVID MILLS TOLD HIM THAT NUMEROUS TIMES, RIGHT?

12   **A.**    YES.

13   **Q.**    AND ON MAY 28TH YOU HAD A VERY LONG CONVERSATION WITH

14   HIM, RIGHT?

15   **A.**    CORRECT.

16   **Q.**    YOU INDICATED THAT THERE WAS TENSION, RIGHT?

17   **A.**    YES.

18   **Q.**    TENSION ON DAVID MILLS' PART.

19   **A.**    YES.

20   **Q.**    HE WAS FRUSTRATED, RIGHT?

21   **A.**    CORRECT.

22   **Q.**    HE WAS UPSET.

23   **A.**    UH-HUH.

24   **Q.**    AND DAVID MILLS TOLD MR. GHAHREMAN, ON MAY 28TH, THAT

25   YOU DON'T LIKE BEING LIED TO ABOUT THINGS WHEN IT IS OBVIOUS

APRIL 15, 2015

1    TO YOU WHERE THEY ARE GOING.  RIGHT?

2    **A.**    YES.

3    **Q.**    YOU TOLD HIM YOU DIDN'T WANT TO BE LIED TO WHERE SOMEONE

4    TELLS YOU IT IS NOT GOING TO IRAN.  RIGHT?

5    **A.**    YES.

6    **Q.**    THEN AGAIN AT THE VEGAS DINNER ON JUNE 12TH YOU TOLD MR.

7    GHAHREMAN THAT IT WOULD BE DISRESPECTFUL FOR KOORUSH

8    TAHERKHANI TO SAY THAT THESE ITEMS WERE GOING ANYWHERE OTHER

9    THAN IRAN.  RIGHT?

10   **A.**    CORRECT.

11   **Q.**    YOU TOLD HIM THAT.

12   **A.**    YES.

13           **MR. JOHNSTON:**  THANK YOU.  NOTHING FURTHER.

14           **THE COURT:**  REDIRECT.

15           **MR. HARRIGAN:**  NO, YOUR HONOR.

16           **THE COURT:**  THANK YOU VERY MUCH.  YOU WOULD BE

17   EXCUSED AT THIS TIME, SUBJECT TO RE-CALL.

18           GOVERNMENT'S NEXT.

19           **MR. COUGHLIN:**  THE GOVERNMENT CALLS TO THE STAND

20   SPECIAL AGENT JOSEPH HONG.

21           **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

22           YOU DO SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE

23   YOU SHALL GIVE IN THE CAUSE NOW BEFORE THIS COURT SHALL BE THE

24   TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?

25           **THE WITNESS:**  I DO.

APRIL 15, 2015

COLE CROSS-EXAMINATION

1          **THE CLERK:**  PLEASE TAKE THE STAND.

2          PLEASE STATE YOUR FULL NAME, AND SPELL YOUR FIRST

3    AND LAST NAMES.

4          **THE WITNESS:**  MY NAME IS JOSEPH HONG.  J-O-S-E-P-H.

5    LAST NAME HONG, H-O-N-G.

6          **THE COURT:**  THANK YOU.

7                              DIRECT EXAMINATION

8    **Q.**    **(MR. COUGHLIN)** MR. HONG, WHO DO YOU WORK FOR?

9    **A.**    HOMELAND SECURITY INVESTIGATIONS.

10   **Q.**    HOW LONG HAVE YOU WORKED FOR THEM?

11   **A.**    APPROXIMATELY SIX YEARS.

12   **Q.**    WHAT IS YOUR TITLE THERE?

13   **A.**    SPECIAL AGENT.

14   **Q.**    PRIOR TO WORKING WITH HOMELAND SECURITY, WHAT KIND OF

15   WORK DID YOU DO?

16   **A.**    I WORKED IN FINANCE.

17   **Q.**    WHERE ARE YOU CURRENTLY ASSIGNED?

18   **A.**    SAN FRANCISCO.

19   **Q.**    AND WHAT ARE YOUR CURRENT DUTIES AND RESPONSIBILITIES

20   THERE?

21   **A.**    I AM IN THE COUNTER-PROLIFERATION INVESTIGATION CENTER,

22   I INVESTIGATE EXPORT VIOLATIONS.

23   **Q.**    AND WHERE WERE YOU ASSIGNED IN JUNE OF 2013?

24   **A.**    I WAS IN NEW YORK.

25   **Q.**    AGAIN WITH HOMELAND SECURITY?

APRIL 15, 2015

HONG – DIRECT EXAMINATION

1    **A.**    YES.

2    **Q.**    WHAT WERE YOUR DUTIES AND RESPONSIBILITIES THERE?

3    **A.**    I WAS ALSO PART OF THE COUNTER-PROLIFERATION

4    INVESTIGATIONS UNIT, AND I INVESTIGATED EXPORT VIOLATIONS.

5    **Q.**    I AM GOING TO DIRECT YOUR ATTENTION TO JUNE 18TH, 2013.

6    WERE YOU INVOLVED WITH THE EXECUTION OF A SEARCH WARRANT?

7    **A.**    YES, I WAS.

8    **Q.**    WAS THE SEARCH WARRANT PURSUANT TO A NEW YORK

9    INVESTIGATION?

10   **A.**    NO, IT WAS A SAN DIEGO INVESTIGATION.

11   **Q.**    SO YOU WERE ASSISTING A SAN DIEGO INVESTIGATION?

12   **A.**    YES.

13   **Q.**    WHERE DID THAT SEARCH WARRANT TAKE PLACE?

14   **A.**    IN ST. MARKS PLACE, IN STATEN ISLAND, NEW YORK.

15   **Q.**    CAN YOU DESCRIBE THE LOCATION THAT WAS SEARCHED.

16   **A.**    IT WAS A FIVE-STORY APARTMENT BUILDING.

17   **Q.**    SO THE LOCATION YOU WERE SEARCHING WAS AN APARTMENT; IS

18   THAT CORRECT?

19   **A.**    YES.

20   **Q.**    AND DID YOU COME TO FIND OUT WHOSE APARTMENT IT WAS?

21   **A.**    YES.

22   **Q.**    AND WHOSE APARTMENT WAS THAT?

23   **A.**    ARASH GHAHREMAN'S.

24   **Q.**    DO YOU REMEMBER WHAT DAY OF THE WEEK IT WAS?

25   **A.**    I BELIEVE IT WAS TUESDAY.

APRIL 15, 2015

HONG – DIRECT EXAMINATION

1   **Q.**    OKAY.  AND WHAT TIME OF DAY WAS THE SEARCH WARRANT

2   EXECUTED?

3   **A.**    LATE MORNING.

4   **Q.**    WERE THERE OTHER FEDERAL AGENTS INVOLVED WITH YOU IN THE

5   SEARCH?

6   **A.**    YES, THERE WERE.

7   **Q.**    PRIOR TO THE SEARCH WAS THERE A BRIEFING ON WHAT YOU

8   WERE SEARCHING FOR?

9   **A.**    YES.

10  **Q.**    WHO PROVIDED THAT?

11  **A.**    MY TEAM LEADER.

12  **Q.**    WHEN YOU ARRIVED AT THE LOCATION TO BE SEARCHED WAS

13  ANYONE ELSE PRESENT?

14  **A.**    YES, THERE WAS.

15  **Q.**    WHO WAS THAT?

16  **A.**    THE GIRLFRIEND OF MR. GHAHREMAN.

17  **Q.**    DID YOU HAVE A PARTICULAR ASSIGNMENT RELATED TO THE

18  SEARCH?

19  **A.**    YES.

20  **Q.**    WHAT ASSIGNMENT WAS THAT?

21  **A.**    I WAS THE SEIZING OFFICER.

22  **Q.**    WHAT STEPS DID THE SEARCH TEAM TAKE TO DOCUMENT THE

23  ITEMS THAT WERE TO BE SEIZED?

24  **A.**    THE SEARCH TEAM WAS ASSIGNED TO DIFFERENT LOCATIONS IN

25  THE APARTMENT, AND WHEN THEY FOUND SOMETHING THEY WOULD CALL

APRIL 15, 2015

HONG – DIRECT EXAMINATION

1   ME OVER AND I WOULD PLACE THE EVIDENCE INTO THE EVIDENCE BAG.

2   **Q.**    WHAT WAS ONE OF THE WAYS THEY DESIGNATED A PARTICULAR

3   AREA WITHIN THE APARTMENT?

4   **A.**    THEY WOULD ASSIGN LETTERS TO THE DIFFERENT LOCATIONS IN

5   THE APARTMENT.

6   **Q.**    CAN YOU GIVE US AN EXAMPLE?

7   **A.**    FOR EXAMPLE, THE FRONT CLOSET WAS LETTER A, THE BEDROOM

8   WAS LETTER E, THE CLOSEST WAS LETTER I.

9   **Q.**    AND WHEN SOMEBODY WOULD FIND SOMETHING PURSUANT TO THE

10  SEARCH WARRANT YOU WERE CALLED OVER?

11  **A.**    YES.

12  **Q.**    AND WHAT HAPPENED AT THAT POINT?

13  **A.**    AT THAT POINT I WOULD TAKE THE EVIDENCE AND PUT IT INTO

14  AN EVIDENCE BAG.

15  **Q.**    AND THAT IS BECAUSE YOU ARE THE SEIZING OFFICER?

16  **A.**    YES.

17  **Q.**    HOW MANY BAGS OF EVIDENCE WERE GATHERED PURSUANT TO THE

18  SEARCH WARRANT?

19  **A.**    SIX BAGS.

20  **Q.**    WHAT HAPPENED AFTER YOU GUYS COMPLETED THE SEARCH OF

21  THAT APARTMENT?

22  **A.**    I GATHERED ALL OF THE BAGS AND I SEALED THE BAGS.

23  **Q.**    AND AS PART OF THAT PARTICULAR PROCEDURE DO YOU PUT YOUR

24  NAME ON THE BAGS?

25  **A.**    YES, I DO.

APRIL 15, 2015

HONG - DIRECT EXAMINATION

1   **Q.**    HAVE YOU HAD A CHANCE TO REVIEW THE BAGS PRIOR TO YOUR

2   TESTIMONY HERE TODAY?

3   **A.**    YES, I DID.

4   **Q.**    ARE ALL OF THE ITEMS THAT YOU ARE PRESENTING HERE TODAY,

5   WERE THEY ITEMS SEIZED FROM THE SEARCH WARRANT EXECUTED AT THE

6   APARTMENT OF MR. ARASH GHAHREMAN?

7   **A.**    YES, THEY ARE.

8   **Q.**    AND THESE ARE THE ITEMS THAT YOU WERE THE SEIZING AGENT

9   FOR?

10  **A.**    YES, SIR.

11  **Q.**    I WOULD LIKE TO HAVE YOU TAKE A LOOK AT GOVERNMENT

12  EXHIBIT 701.  IT WILL BE RIGHT THERE IN FRONT OF YOU.  AND SEE

13  IF YOU RECOGNIZE THAT.

14          (EXHIBIT 701 MARKED FOR IDENTIFICATION)

15  **A.**    YES, SIR.

16  **Q.**    AND IS THAT ONE OF THE ITEMS THAT WAS SEIZED FROM THE

17  APARTMENT?

18  **A.**    YES, IT WAS.

19  **Q.**    AND DID YOU, IN COMING HERE TODAY, MAKE NOTATIONS ON THE

20  ORIGINALS IN CONNECTION WITH SOME TYPE OF STICKY NOTE OR

21  SOMETHING?

22  **A.**    I DID.

23          **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

24  TO MOVE INTO EVIDENCE GOVERNMENT'S EXHIBIT 701.

25          **MR. CAMDEN:**  IN LIMS, YOUR HONOR.

APRIL 15, 2015

657

HONG – DIRECT EXAMINATION

1         **THE COURT:**  I WOULD OVERRULE THE OBJECTION.  IT WILL

2   BE RECEIVED.

3         (EXHIBIT 701 RECEIVED INTO EVIDENCE)

4   **Q.**   **(MR. COUGHLIN)** AND WHAT IS THIS DOCUMENT, AGENT HONG?

5   **A.**   IT IS A BIRTH CERTIFICATE FOR ARASH GHAHREMAN.

6   **Q.**   AND WHERE DOES IT INDICATE HE WAS BORN?

7   **A.**   TEHRAN, IRAN.

8   **Q.**   I WOULD LIKE TO SHOW YOU WHAT HAS BEEN MARKED AS

9   GOVERNMENT EXHIBIT 702, AND ASK IF YOU RECOGNIZE THAT.

10        (EXHIBIT 702 MARKED FOR IDENTIFICATION)

11  **A.**   YES, I DO.

12  **Q.**   WAS THIS SEIZED FROM THE DEFENDANT'S APARTMENT?

13  **A.**   YES, IT WAS.

14  **Q.**   AND HOW DO YOU RECOGNIZE IT?

15  **A.**   WHILE REVIEWING THE EVIDENCE I PULLED THE EVIDENCE FROM

16  THE EVIDENCE BAG AND MADE A NOTATION.

17  **Q.**   AND IS THIS ONE OF THE PIECES OF EVIDENCE THAT YOU

18  PULLED?

19  **A.**   YES.

20        **MR. COUGHLIN:**  I WOULD LIKE TO GO BACK NOW TO

21  GOVERNMENT EXHIBIT 701 AND PUBLISH IT TO THE JURY.

22        **THE COURT:**  YES.

23  **Q.**   **(MR. COUGHLIN)** AND IF YOU WOULD TAKE A LOOK AT THIS,

24  GOVERNMENT'S EXHIBIT 701.  AND I HAVE ALREADY HIGHLIGHTED THE

25  NAME THERE.  AND WHAT IS THE NAME THAT IS INDICATED?

APRIL 15, 2015

HONG – DIRECT EXAMINATION

1    **A.**    ARASH GHAHREMAN.

2    **Q.**    WHAT IS THE BIRTHDATE?

3    **A.**    JANUARY 10TH, 1970.

4    **Q.**    AND PLACE OF BIRTH?

5    **A.**    TEHRAN.

6           **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

7    TO MOVE INTO EVIDENCE GOVERNMENT EXHIBIT 702.

8           **THE COURT:**  IS THERE A STANDING OBJECTION AS TO ALL

9    OF THE EXHIBITS SEIZED PURSUANT TO THE SEARCH WARRANT?

10          **MR. CAMDEN:**  YES, UNDER THE GROUNDS RAISED IN THE IN

11   LIMS.

12          **THE COURT:**  ALL RIGHT.  THOSE OBJECTIONS WOULD BE

13   OVERRULED.  702 IS RECEIVED.

14          (EXHIBIT 702 RECEIVED INTO EVIDENCE)

15   **Q.**    **(MR. COUGHLIN)** I WOULD LIKE YOU TO TAKE A LOOK AT WHAT

16   THIS IS.  WHAT IS THIS PARTICULAR DOCUMENT?

17   **A.**    IT IS A UNIVERSITY DEGREE.

18          **MR. COUGHLIN:**  AND IF YOU COULD HIGHLIGHT THE MIDDLE

19   OF THAT AREA, PLEASE.

20          **THE WITNESS:**  IT IS A DEGREE FOR SEA ENGINEERING AND

21   SHIPBUILDING.

22   **Q.**    **(MR. COUGHLIN)** AND WHO WAS THE RECIPIENT OF THE DEGREE?

23   **A.**    THAT WOULD BE ARASH GHAHREMAN.

24   **Q.**    DOES IT INDICATE WHERE THE DEGREE WAS RECEIVED AT?

25          **MR. COUGHLIN:**  IF YOU COULD MOVE DOWN ON THE

HONG - DIRECT EXAMINATION

1    DOCUMENT, PLEASE.

2              **THE WITNESS:**  AT AMIR KABIR INDUSTRIAL UNIVERSITY.

3    **Q.**    **(MR. COUGHLIN)** OKAY.  AND DO YOU -- HAVE YOU COME TO

4    UNDERSTAND WHERE THAT IS LOCATED?

5    **A.**    YES, IN IRAN.

6              **MR. CAMDEN:**  OBJECTION.  HEARSAY ON THAT LAST

7    QUESTION.

8    **Q.**    **(MR. COUGHLIN)** IS THAT ON THE DOCUMENT ITSELF?

9    **A.**    YES, SIR.

10   **Q.**    I WOULD LIKE TO SHOW YOU WHAT HAS BEEN MARKED AS 703 AND

11   ASK IF YOU RECOGNIZE IT?

12             (EXHIBIT 703 MARKED FOR IDENTIFICATION)

13   **A.**    YES, SIR.

14   **Q.**    WAS THIS SEIZED FROM THE DEFENDANT'S APARTMENT?

15   **A.**    YES, IT WAS.

16   **Q.**    HOW IS IT THAT YOU RECOGNIZE IT?

17   **A.**    WHEN I REVIEWED THE EVIDENCE I PULLED IT FROM THE

18   EVIDENCE BAG, AND I MADE A NOTATION.

19             **MR. COUGHLIN:**  I WOULD LIKE TO MOVE INTO EVIDENCE

20   GOVERNMENT'S EXHIBIT 703 AND PUBLISH IT TO THE JURY.

21             **THE COURT:**  YES, IT IS RECEIVED.

22             (EXHIBIT 703 RECEIVED INTO EVIDENCE)

23   **Q.**    **(MR. COUGHLIN)** AND WHAT IS THIS DOCUMENT?

24   **A.**    THEY APPEAR TO BE COURSE COMPLETION CERTIFICATES.

25   **Q.**    ARE THERE MORE THAN ONE?

APRIL 15, 2015

HONG - DIRECT EXAMINATION

1    **A.**    YES.

2    **Q.**    WHAT IS THIS FIRST ONE, THE COURSE COMPLETION

3    CERTIFICATE, FOR?

4    **A.**    ADVANCED FIREFIGHTING, SURVIVAL CRAFT AND RESCUE BOATS.

5    **Q.**    WHO WAS THE ENTITY THAT AWARDED THAT CERTIFICATE?

6    **A.**    THE ISLAMIC REPUBLIC OF IRAN SHIPPING LINES, TRAINING

7    INSTITUTE, ALSO KNOWN AS IRISL.

8    **Q.**    AND WHO WAS IT AWARDED TO?

9    **A.**    ARASH GHAHREMAN.

10   **Q.**    IS THERE A DATE ON THIS --

11              **MR. COUGHLIN:**   COULD YOU TAKE THAT DOWN, PLEASE.

12   **Q.**    **(MR. COUGHLIN)** IS THERE A DATE ON THIS DOCUMENT WHEN IT

13   WAS AWARDED?

14   **A.**    YES.  JANUARY 24TH, 2002.

15   **Q.**    OKAY.  AND COULD YOU GO TO THE NEXT CERTIFICATE.

16   **A.**    YES.

17   **Q.**    OKAY.  AND WHO WAS THIS AWARDED TO AND WHAT WAS IT FOR?

18   **A.**    AWARDED TO ARASH GHAHREMAN, AND IT WAS FOR THIRD

19   ENGINEER OFFICER EQUIVALENT.

20   **Q.**    AGAIN, WHERE WAS IT -- WHO WAS IT AWARDED BY?

21   **A.**    ISLAMIC REPUBLIC OF IRAN SHIPPING LINES TRAINING

22   INSTITUTE, ALSO KNOWN AS IRISL.

23   **Q.**    WHAT WAS THE DATE THAT IT WAS AWARDED?

24   **A.**    JANUARY 30TH, 2002.

25   **Q.**    AND AGAIN, WAS THERE A THIRD CERTIFICATE?

APRIL 15, 2015

661

1   **A.**    YES, SIR.

2   **Q.**    THESE ARE COURSE COMPLETION CERTIFICATES; IS THAT

3   CORRECT?

4   **A.**    YES, SIR.

5   **Q.**    AND WHO WAS THIS AWARDED TO, AND WHAT WAS IT FOR?

6   **A.**    IT WAS AWARDED TO ARASH GHAHREMAN FOR MEDICAL FIRST AID.

7   **Q.**    AND WHAT WAS THE DATE IT WAS AWARDED?

8   **A.**    IT WAS AWARDED ON JANUARY 4TH, 2002 -- 14TH.

9   **Q.**    I WOULD LIKE TO MOVE ON, HAVE YOU TAKE A LOOK AT

10  GOVERNMENT'S EXHIBIT 704, AND ASK YOU IF YOU RECOGNIZE IT.

11              (EXHIBIT 704 MARKED FOR IDENTIFICATION)

12  **A.**    YES, SIR.

13  **Q.**    AND WHAT IS GOVERNMENT'S EXHIBIT 704?

14  **A.**    THEY ARE WATCH KEEPING CERTIFICATES FROM IRAN O HIND

15  SHIPPING COMPANY.

16  **Q.**    WAS THIS A DOCUMENT THAT WAS RETRIEVED OR SEIZED FROM

17  THE DEFENDANT'S APARTMENT?

18  **A.**    YES.

19  **Q.**    AND HOW DO YOU RECOGNIZE THIS PARTICULAR DOCUMENT?

20  **A.**    WHEN I WAS REVIEWING THE EVIDENCE I PULLED IT FROM THE

21  EVIDENCE BAG AND MADE A NOTATION.

22              **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

23  TO MOVE INTO EVIDENCE GOVERNMENT'S EXHIBIT 704, AND PUBLISH IT

24  TO THE JURY.

25              **THE COURT:**  YES.

APRIL 15, 2015

HONG – DIRECT EXAMINATION

```
 1              (EXHIBIT 704 RECEIVED INTO EVIDENCE)
 2   Q.     (MR. COUGHLIN) AND GOING BACK TO THAT QUESTION, WHAT IS
 3   THIS PARTICULAR DOCUMENT?
 4   A.     THESE ARE WATCH KEEPING CERTIFICATES.
 5   Q.     AND WHO WAS THE PARTICULAR ENTITY THAT WAS AWARDING
 6   THESE?
 7   A.     THEY WERE -- IT WAS THE IRAN O HIND SHIPPING COMPANY.
 8   Q.     DOES IT INDICATE WHERE THAT IS LOCATED?  ARE YOU
 9   FAMILIAR WITH WHERE IT IS LOCATED?
10   A.     YES.
11   Q.     WHERE IS IT LOCATED?
12   A.     IN IRAN.
13   Q.     AND WHO WAS IT ISSUED TO?
14          MR. COUGHLIN:  IF YOU COULD TAKE THIS DOWN, PLEASE,
15   AND GO TO THE --
16          THE WITNESS:  TO ARASH GHAHREMAN.
17   Q.     (MR. COUGHLIN) DOES IT HAVE SOME DATES ON HERE WHEN IT
18   WAS ISSUED?
19   A.     THE CERTIFICATES RANGE FROM 2002 TO 2003.
20   Q.     IS THERE MORE THAN ONE?
21   A.     YES.
22   Q.     OKAY.  I WOULD LIKE TO SHOW YOU WHAT HAS BEEN MARKED AS
23   GOVERNMENT'S EXHIBIT 705, AND ASK IF YOU RECOGNIZE THAT.
24              (EXHIBIT 705 MARKED FOR IDENTIFICATION)
25   A.     YES, I DO.
```

APRIL 15, 2015

HONG – DIRECT EXAMINATION

1   Q.   AND HOW IS IT THAT YOU RECOGNIZE IT?

2   A.   WHILE REVIEWING EVIDENCE I PULLED IT FROM THE EVIDENCE

3   BAG AND MADE A NOTATION.

4   Q.   IS THERE, AGAIN, A DOCUMENT OR DOCUMENTS THAT WERE

5   SEIZED FROM THE DEFENDANT'S APARTMENT?

6   A.   YES.

7        **MR. COUGHLIN:**  I WOULD LIKE TO MOVE INTO EVIDENCE

8   GOVERNMENT'S EXHIBIT 705 AND PUBLISH IT TO THE JURY.

9        **THE COURT:**  YES.

10       (EXHIBIT 705 RECEIVED INTO EVIDENCE)

11  Q.   **(MR. COUGHLIN)** WHAT IS THIS PARTICULAR DOCUMENT?

12  A.   THIS IS A CERTIFICATE OF COMPETENCY.

13  Q.   IF YOU COULD GO TO THE NEXT PAGE, PLEASE.

14  A.   YES.

15  Q.   AND WHAT DOES IT SHOW?

16  A.   IT IS A CERTIFICATE OF COMPETENCY AS A WATCH KEEPING

17  ENGINEER OFFICER ON SEAGOING SHIPS.

18  Q.   WHO IS IT AWARDED TO?

19  A.   IT WAS AWARDED TO ARASH GHAHREMAN.

20  Q.   WHAT WAS THE DATE THAT IT WAS AWARDED?

21  A.   JANUARY 2000.

22  Q.   OKAY.  AND ARE THERE SEVERAL MORE CERTIFICATES IN THIS

23  DOCUMENT AS WELL?

24  A.   I BELIEVE THEY ARE DIFFERENT PAGES OF THE SAME.

25  Q.   OKAY.

APRIL 15, 2015

HONG – DIRECT EXAMINATION

```
 1              MR. CAMDEN:  I AM GOING TO OBJECT TO 705 JUST ON --
 2   I AM GOING ADD THE GROUNDS OF CUMULATIVE, YOUR HONOR.
 3              THE COURT:  OVERRULED.  THEY ARE ALL RECEIVED.
 4   Q.    (MR. COUGHLIN) I WOULD LIKE TO SHOW YOU WHAT HAS BEEN
 5   MARKED AS GOVERNMENT EXHIBIT 706 AND ASK IF YOU RECOGNIZE IT.
 6              (EXHIBIT 706 MARKED FOR IDENTIFICATION)
 7   A.    YES, I DO.
 8   Q.    WAS THIS SEIZED FROM THE GHAHREMAN APARTMENT?
 9   A.    YES.
10   Q.    HOW IS IT YOU RECOGNIZE IT?
11   A.    WHILE REVIEWING EVIDENCE I PULLED IT FROM THE EVIDENCE
12   BAG AND MADE A NOTATION.
13              MR. COUGHLIN:  I WOULD LIKE TO MOVE INTO EVIDENCE
14   GOVERNMENT'S EXHIBIT 706 AND PUBLISH IT TO THE JURY.
15              THE COURT:  YES.
16              (EXHIBIT 706 RECEIVED INTO EVIDENCE)
17              MR. COUGHLIN:  IF YOU WOULD HIGHLIGHT THE FIRST HALF
18   OF THIS DOCUMENT.
19   Q.    (MR. COUGHLIN) WHAT DOES THIS APPEAR TO BE?
20   A.    IT APPEARS TO BE A CONTRACT BETWEEN SOUTH STAR TRADING
21   AND ARASH GHAHREMAN.
22   Q.    AND WHO IS THE ENTITY LISTED THERE AS THE BUYER?
23   A.    ARASH GHAHREMAN.
24   Q.    AND IF YOU GO DOWN A LITTLE FARTHER, WHAT IS THE
25   CORPORATION THAT IS LISTED THERE?
```

APRIL 15, 2015

HONG – DIRECT EXAMINATION

1   **A.**    SOUTH STAR TRADING.

2   **Q.**    IS THE SELLER?

3   **A.**    YES, IS THE SELLER.

4   **Q.**    WHO WAS THE BUYER?

5   **A.**    TIG MARINE ENGINEERING SERVICES.

6         **MR. COUGHLIN:**  IF YOU CAN GO AND HIGHLIGHT THE GOODS

7   SECTION THERE, PLEASE.

8   **Q.**    **(MR. COUGHLIN)** DOES IT INDICATE WHICH PARTICULAR ITEM

9   IS BEING PURCHASED HERE?

10  **A.**    YES, IT DOES.

11        **MR. COUGHLIN:**  IF YOU COULD PULL OUT.

12  **Q.**    **(MR. COUGHLIN)** WHAT ITEM IS THAT?

13  **A.**    A NAVIGAT-2100 GYROCOMPASS.

14        **MR. COUGHLIN:**  YOU CAN GO BACK OUT TO THE FULL

15  DOCUMENT, AND GO TO THE END OF THIS DOCUMENT.

16  **Q.**    **(MR. COUGHLIN)** AND IS THERE A DATE AND SIGNATURE ON

17  THIS?

18  **A.**    YES, THERE ARE.

19  **Q.**    OKAY.  TAKE A LOOK AT THIS, PLEASE.

20        AND WHO ARE THE -- WHAT IS THE DATE -- WHAT IS THE

21  SIGNATURES, TO START WITH.

22  **A.**    ARASH GHAHREMAN.

23  **Q.**    AND ON THE OTHER SIDE?

24  **A.**    AND DAVID MILLS FROM SOUTH STAR TRADING.

25  **Q.**    IS THIS PARTICULAR DOCUMENT DATED?

APRIL 15, 2015

HONG – DIRECT EXAMINATION

1    **A.**    YEAH.  ON THE FIRST PAGE, MARCH 7, 2013.

2    **Q.**    IF YOU COULD GO -- WAS THERE TWO CONTRACTS THAT YOU

3    FOUND THERE?

4    **A.**    YES, THERE WERE.

5           **MR. COUGHLIN:**  GO ON TO THE SECOND CONTRACT, PLEASE.

6    AND CAN YOU HIGHLIGHT THE FIRST HALF OF THIS.

7    **Q.**    **(MR. COUGHLIN)** AND WHAT IS THIS A CONTRACT BETWEEN --

8    WHO IS THIS A CONTRACT BETWEEN?

9    **A.**    IT IS A CONTRACT BETWEEN ARASH GHAHREMAN AND SOUTH STAR

10   TRADING.

11   **Q.**    WHO IS THE BUYER IN THIS PARTICULAR CASE?

12   **A.**    THE BUYER WOULD BE TIG MARINE ENGINEERING SERVICES.

13   **Q.**    WHAT IS THE DATE OF THE CONTRACT?

14   **A.**    MARCH 7TH, 2013.

15   **Q.**    AND WHAT ARE THE GOODS THAT ARE BEING SOLD HERE?

16   **A.**    A Y-690 PLANAR TRIODE ELECTRON TUBE.

17          **MR. COUGHLIN:**  IF YOU COULD GO TO THE END OF THIS

18   DOCUMENT AND HIGHLIGHT THE SIGNATURES HERE.

19   **Q.**    **(MR. COUGHLIN)** AND WHO IS THE SELLER?

20   **A.**    DAVID MILLS.

21   **Q.**    AND THE BUYER?

22   **A.**    ARASH GHAHREMAN.

23   **Q.**    AND IS THERE A DATE HERE, AS WELL?

24   **A.**    YES.  MARCH 26TH, 2013.

25   **Q.**    AND WHAT DOES THE HANDWRITING INDICATE, IF YOU CAN READ

APRIL 15, 2015

HONG – DIRECT EXAMINATION

1    IT?

2    **A.**    IT SAYS ON BEHALF OF TIG MARINE.  AND THERE IS A

3    SIGNATURE BY ARASH GHAHREMAN.

4    **Q.**    I WOULD LIKE TO SHOW YOU WHAT HAS BEEN MARKED AS

5    GOVERNMENT'S EXHIBIT 707 AND ASK IF YOU RECOGNIZE IT.

6             (EXHIBIT 707 MARKED FOR IDENTIFICATION)

7    **A.**    YES, I DO.

8    **Q.**    WAS THIS SEIZED FROM THE GHAHREMAN APARTMENT?

9    **A.**    YES, SIR.

10   **Q.**    HOW IS IT YOU RECOGNIZE IT?

11   **A.**    WHILE REVIEWING EVIDENCE I PULLED IT FROM THE EVIDENCE

12   BAG, AND MADE A NOTATION.

13            **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

14   TO MOVE INTO EVIDENCE GOVERNMENT'S EXHIBIT 707.

15            **MR. CAMDEN:**  I WOULD ADD THE GROUNDS OF 404 AS AN

16   OBJECTION TO THAT.

17            **THE COURT:**  OVERRULED.

18            (EXHIBIT 707 RECEIVED INTO EVIDENCE)

19            **MR. CAMDEN:**  AND MOTIONS IN LIMINE.

20            **THE COURT:**  YES.  THANK YOU.

21   **Q.**    **(MR. COUGHLIN)** THE FIRST HALF OF THIS CONTRACT, WHAT

22   DOES THIS APPEAR TO BE?

23   **A.**    IT SAYS IT IS AN INTERNATIONAL OCCASIONAL INTERMEDIARY

24   CONTRACT.

25   **Q.**    WHO WAS IT BETWEEN?

APRIL 15, 2015

HONG – DIRECT EXAMINATION

```
 1   A.    BETWEEN PARADISE OFFSHORE COMPANY AND ARASH GHAHREMAN.

 2          MR. COUGHLIN:  IF YOU COULD GO BACK DOWN ON THAT.

 3   Q.   (MR. COUGHLIN) IS THERE A SIGNATURE PAGE ON THIS?

 4          MR. COUGHLIN:  GO TO THE END, IF YOU WOULD, PLEASE.

 5          THE WITNESS:  YES, SIR, THERE IS.

 6   Q.   (MR. COUGHLIN) AND WHAT WAS IT DATED?

 7   A.    THERE IS ONE SIGNATURE FOR JANUARY 18, 2012, AND ANOTHER

 8   SIGNATURE THAT SAYS ARASH FOR FEBRUARY 2ND, 2012.

 9   Q.    AND WHAT IS THE STAMP UNDERNEATH THE PRINCIPAL THERE?

10   A.    PARADISE OFFSHORE COMPANY LIMITED.

11   Q.    OKAY.  I WOULD LIKE TO SHOW YOU WHAT HAS BEEN MARKED AS

12   GOVERNMENT'S EXHIBIT 708, AND ASK IF YOU RECOGNIZE WHAT THAT

13   IS.

14          (EXHIBIT 708 MARKED FOR IDENTIFICATION)

15   A.    IT IS A TEXTBOOK FOR INTERNATIONAL BUSINESS LAW AND ITS

16   ENVIRONMENT.

17   Q.    WHERE WAS THIS SEIZED FROM?

18   A.    THAT WAS SEIZED FROM THE APARTMENT.

19   Q.    AND WOULD YOU RECOGNIZE THE ACTUAL TEXTBOOK IF YOU SAW

20   IT AGAIN?

21   A.    YES.

22          MR. COUGHLIN:  MAY I APPROACH, YOUR HONOR?

23          THE COURT:  YES.

24   Q.   (MR. COUGHLIN) DO YOU RECOGNIZE GOVERNMENT'S

25   EXHIBIT 708?
```

HONG – DIRECT EXAMINATION

1    **A.**    YES, SIR.

2    **Q.**    AND HOW IS IT YOU RECOGNIZE IT?

3    **A.**    IT WAS SEIZED DURING THE SEARCH WARRANT OF ARASH

4    GHAHREMAN'S APARTMENT.

5    **Q.**    DID YOU MAKE A NOTATION ON THIS PARTICULAR EXHIBIT, AS

6    WELL?

7    **A.**    I DID.

8    **Q.**    NOW, HAVE YOU TAKEN CERTAIN PAGES FROM THIS EXHIBIT

9    RELEVANT TO THE PROSECUTION HERE TODAY?

10   **A.**    YES, SIR.

11   **Q.**    WOULD YOU RECOGNIZE THOSE PAGES IF YOU SAW THEM AGAIN?

12   **A.**    YES, SIR.

13   **Q.**    DID YOU MAKE SURE THAT THE PAGES THAT WERE COPIED CAME

14   FROM THIS EXACT TEXTBOOK?

15   **A.**    YES, I DID, SIR.

16          **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

17   TO PUBLISH PAGES ONLY FROM THIS PARTICULAR TEXTBOOK, NOT MOVE

18   IN THE ACTUAL TEXTBOOK ITSELF.

19          **THE COURT:**  YES.

20          **MR. CAMDEN:**  SAME OBJECTIONS, YOUR HONOR.

21          **THE COURT:**  YES.

22          **MR. CAMDEN:**  AND JUST TO MAKE CLEAR, THE GOVERNMENT,

23   I BELIEVE –– WAS THERE A MOTION TO INTRODUCE 708 INTO

24   EVIDENCE?

25          **MR. COUGHLIN:**  NO, WE ARE NOT GOING TO PUT IT IN.

APRIL 15, 2015

HONG – DIRECT EXAMINATION

1            **MR. CAMDEN:**  ALSO WE ARE GOING TO OBJECT, THEN, TO

2     THE COPIES INSTEAD OF THE ACTUAL TEXTBOOK ITSELF.

3            **MR. COUGHLIN:**  THEN I WILL MOVE IN THE TEXTBOOK.

4            **THE COURT:**  ALL RIGHT.  IT WOULD BE RECEIVED.

5            (EXHIBIT 708 RECEIVED INTO EVIDENCE)

6     **Q.     (MR. COUGHLIN)** I AM GOING TO SHOW YOU WHAT IS MARKED AS

7     708-B AND ASK IF YOU RECOGNIZE WHAT THAT IS.

8            (EXHIBIT 708-B MARKED FOR IDENTIFICATION)

9     **A.**     CHAPTER 13, THE REGULATION OF EXPORTS.

10    **Q.**     WAS THAT TAKEN FROM THE TEXTBOOK THAT WAS BEFORE YOU AND

11    MARKED AS 708?

12    **A.**     YES, SIR.

13           **MR. COUGHLIN:**  YOUR HONOR, I WOULD LIKE TO MOVE INTO

14    EVIDENCE 708-B.

15           **THE COURT:**  ONE MOMENT, PLEASE.

16           **THE CLERK:**  THE PAGES ARE MOVED IN.

17           **THE COURT:**  THE PAGES, AS WELL.  IT IS RECEIVED.

18           (EXHIBIT 708-B RECEIVED INTO EVIDENCE)

19           **MR. COUGHLIN:**  I WOULD LIKE TO PUBLISH IT TO THE

20    JURY.

21           **THE COURT:**  YES.

22    **Q.     (MR. COUGHLIN)** WAS THIS A PARTICULAR CHAPTER THAT HAD

23    SIGNIFICANCE, AT LEAST TO THE PROSECUTORS IN THIS CASE, AND

24    THEY INDICATED THEY WOULD LIKE IT IN?

25    **A.**     YES, SIR.

APRIL 15, 2015

HONG – DIRECT EXAMINATION

```
 1    Q.    I WOULD LIKE TO SHOW YOU WHAT HAS BEEN MARKED AS EXHIBIT
 2    708-C AND ASK IF YOU RECOGNIZE THAT.
 3              (EXHIBIT 708-C MARKED FOR IDENTIFICATION)
 4    A.    YES, SIR, I DO.
 5    Q.    WAS THIS PART OF THE SAME CHAPTER?
 6    A.    YES, IT WAS.
 7    Q.    WHAT PART OF THE CHAPTER WAS IT?
 8    A.    IT IS PART 3.
 9    Q.    IN CONNECTION WITH THIS, WHAT DID THIS PARTICULAR PAGE
10    SEEM TO COVER?
11    A.    IT DEALS WITH TRADE CONTROLS OVER ARMS, MUNITIONS AND
12    DEFENSE SYSTEMS.
13    Q.    I WOULD LIKE TO MOVE ON AND ASK IF YOU RECOGNIZE
14    GOVERNMENT'S EXHIBIT 708-D.
15              (EXHIBIT 708-D MARKED FOR IDENTIFICATION)
16    A.    YES, I DO.
17    Q.    IS THIS ALSO TAKEN FROM CHAPTER 13?
18    A.    YES, SIR.
19        MR. COUGHLIN:  YOUR HONOR, I WOULD LIKE TO MOVE INTO
20    EVIDENCE GOVERNMENT'S EXHIBIT 708-D.
21            THE COURT:  YES.
22            (EXHIBIT 708-D RECEIVED INTO EVIDENCE)
23    Q.    (MR. COUGHLIN) WHAT DOES THIS PARTICULAR PAGE DEAL
24    WITH?
25    A.    NATIONAL SECURITY AND FOREIGN POLICY ISSUES.
```

APRIL 15, 2015

672

HONG – DIRECT EXAMINATION

1   **Q.**   I WOULD LIKE TO MOVE ON TO GOVERNMENT'S EXHIBIT 708-E,
2   AND ASK IF YOU RECOGNIZE THAT.
3               (EXHIBIT 708-E MARKED FOR IDENTIFICATION)
4   **A.**   YES, I DO.
5   **Q.**   WAS THIS A PAGE THAT WAS –– WAS THIS A PAGE THAT WAS
6   TAKEN OUT OF THE TEXTBOOK?
7   **A.**   YES, SIR.
8   **Q.**   CHAPTER 13 AS WELL?
9   **A.**   YES, SIR.
10  **Q.**   PART 3?
11  **A.**   YES, SIR.
12  **Q.**   WHAT AREAS DOES IT COVER?
13  **A.**   TRADE CONTROLS FOR REASONS OF NATIONAL SECURITY, AND
14  TRADE CONTROLS FOR REASONS OF FOREIGN POLICY.
15          **MR. COUGHLIN:**   I WOULD LIKE TO MOVE AND PUBLISH IT
16  TO THE JURY, YOUR HONOR?
17          **THE COURT:**   YES.
18          (EXHIBIT 708-E RECEIVED INTO EVIDENCE)
19  **Q.**   **(MR. COUGHLIN)** AND MOVE ON TO GOVERNMENT'S EXHIBIT
20  708-F, AND ASK IF YOU RECOGNIZE IT.
21          (EXHIBIT 708-F MARKED FOR IDENTIFICATION)
22  **A.**   YES, I DO.
23  **Q.**   AND WAS THIS A PAGE THAT WAS TAKEN FROM CHAPTER 13 OF
24  THE TEXTBOOK?
25  **A.**   YES, IT WAS, SIR.

APRIL 15, 2015

HONG – DIRECT EXAMINATION

1      **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

2  TO MOVE INTO EVIDENCE GOVERNMENT'S EXHIBIT 708-F.

3      **THE COURT:**  YES.

4      (EXHIBIT 708-F RECEIVED INTO EVIDENCE)

5  **Q.**  **(MR. COUGHLIN)** AND WHAT DID THIS PARTICULAR PAGE DEAL

6  WITH?

7  **A.**  THE EFFECTIVENESS OF TRADE SANCTIONS AND THE IMPACT OF

8  EXPORT CONTROLS ON BUSINESS AND TRADE.

9  **Q.**  I WOULD LIKE TO DIRECT YOUR ATTENTION TO 708-G, AND ASK

10  IF YOU RECOGNIZE IT.

11      (EXHIBIT 708-G MARKED FOR IDENTIFICATION)

12  **A.**  YES, SIR, I DO.

13  **Q.**  WAS THIS A PAGE TAKEN FROM THE TEXTBOOK?

14  **A.**  YES, SIR.

15  **Q.**  WAS THIS ALSO PART OF CHAPTER 13?

16  **A.**  YES.

17  **Q.**  WHAT -- IN THIS PARTICULAR PAGE, WHAT WERE SOME OF THE

18  IMPORTANT ASPECTS THAT YOU WERE ASKED TO PULL?

19  **A.**  THE THINGS TO LOOK FOR IN EXPORT TRANSACTIONS, RED FLAG

20  INDICATORS.

21  **Q.**  I WOULD LIKE TO DIRECT YOUR ATTENTION, THEN, TO THE NEXT

22  ONE, GOVERNMENT'S EXHIBIT 708-H.  DO YOU RECOGNIZE THIS

23  EXHIBIT?

24      (EXHIBIT 708-H MARKED FOR IDENTIFICATION)

25  **A.**  YES, I DO.

APRIL 15, 2015

HONG – DIRECT EXAMINATION

1    **Q.**    IS THIS TAKEN FROM CHAPTER 13 AS WELL?

2    **A.**    YES, IT IS.

3    **Q.**    AND PART 3 OF CHAPTER 13?

4    **A.**    YES, SIR.

5    **Q.**    AND WHAT IN THIS --

6            **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

7    TO MOVE INTO EVIDENCE GOVERNMENT'S EXHIBIT 708-H.

8            **THE COURT:**  IT IS RECEIVED.

9            (EXHIBIT 708-H RECEIVED INTO EVIDENCE)

10   **Q.**    **(MR. COUGHLIN)** AND WHAT ARE THE SIGNIFICANT THINGS THAT

11   ARE DEALT WITH ON THIS PAGE?

12   **A.**    THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT.

13   **Q.**    IS THAT ALSO KNOWN AS IEEPA?

14   **A.**    YES, IT IS.

15           **MR. COUGHLIN:**  YOUR HONOR, I WOULD LIKE TO MOVE ON

16   NOW TO GOVERNMENT'S EXHIBIT 708-I.

17           (EXHIBIT 708-I MARKED FOR IDENTIFICATION)

18   **Q.**    **(MR. COUGHLIN)** AND ASK IF YOU RECOGNIZE IT.

19   **A.**    YES, I DO.

20   **Q.**    AND WAS THIS ALSO TAKEN FROM CHAPTER 13?

21   **A.**    YES, IT WAS.

22   **Q.**    AND WHAT IS SIGNIFICANT ON THIS PARTICULAR PAGE?

23   **A.**    THE ECONOMIC SANCTIONS UNDER IEEPA.

24   **Q.**    AND THESE ARE ALL ITEMS THAT WERE FOUND IN THE TEXTBOOK;

25   IS THAT CORRECT?

APRIL 15, 2015

HONG – DIRECT EXAMINATION

1   **A.**   YES, SIR.

2          **MR. COUGHLIN:**  NOTHING FURTHER OF THIS WITNESS, YOUR

3   HONOR.

4          **THE COURT:**  CROSS-EXAMINATION.

5          **MR. CAMDEN:**  YOUR HONOR, I WOULD ALSO LIKE TO

6   ADDRESS AT SOME POINT THE POSSIBILITY OF A LIMITING

7   INSTRUCTION, GIVEN THE LEGAL ISSUES THAT ARE CONTAINED IN THE

8   TEXTBOOK.

9          **THE COURT:**  YES.

10                      CROSS-EXAMINATION

11  **Q.**   **(MR. CAMDEN)** SPECIAL AGENT HONG, DID YOU WRITE ANY

12  REPORTS IN CONNECTION WITH THIS CASE?

13  **A.**   NO, I DID NOT.

14  **Q.**   BUT YOU WERE PRESENT PHYSICALLY AT THE APARTMENT WHILE

15  THE SEARCH WAS BEING CONDUCTED?

16  **A.**   YES, SIR.

17  **Q.**   I WOULD LIKE TO GO OVER SOME OF THE EXHIBITS THAT YOU

18  HAVE INTRODUCED.  ACTUALLY, IF YOU COULD AVOID TOUCHING THAT

19  ANY MORE.

20  **A.**   YES, SIR.

21          **MR. CAMDEN:**  COULD I APPROACH, YOUR HONOR?

22          **THE COURT:**  YES.

23  **Q.**   **(MR. CAMDEN)** SO THIS IS THE TEXTBOOK THAT WAS FOUND IN

24  MR. GHAHREMAN'S APARTMENT?

25  **A.**   YES, SIR.

APRIL 15, 2015

HONG – CROSS-EXAMINATION

1  **Q.**    AND SOME OF THE PAGES YOU CITED ARE IN THIS TEXTBOOK,
2  CORRECT?
3  **A.**    YES, SIR.
4  **Q.**    DID YOU LOOK THROUGH THIS TEXTBOOK?
5  **A.**    I DID NOT.
6  **Q.**    SO YOU DIDN'T BROWSE THROUGH ANY OF IT?
7  **A.**    NOT DURING THE SEARCH WARRANT.
8  **Q.**    BUT AS WE ARE SITTING HERE TODAY, YOU DON'T SEE ANY
9  HIGHLIGHTING.
10 **A.**    NO, I DON'T.
11 **Q.**    YOU DO, HOWEVER, SEE –– AND I AM LOOKING AT PAGES 276,
12 277, 278.  YOU DO SEE SOME HANDWRITTEN PENCIL IN THE HEADINGS,
13 CORRECT?
14 **A.**    YES, SIR, I DO.
15 **Q.**    THERE ARE PENCIL MARKINGS ON CERTAIN PAGES.
16 **A.**    YES, SIR.
17 **Q.**    ON THE PAGES, HOWEVER, THAT YOU DESCRIBED AND
18 INTRODUCED, THERE ARE NO –– THERE IS NO HIGHLIGHTING?
19 **A.**    NOT THAT I RECALL.
20 **Q.**    AND THERE IS NO HANDWRITING?
21 **A.**    NO, SIR.
22 **Q.**    NONE OF THE PAGES ARE DOG-EARED?
23 **A.**    I WOULD HAVE TO TAKE ANOTHER LOOK.  I DIDN'T LOOK FOR
24 THAT.
25 **Q.**    TAKE A LOOK.

APRIL 15, 2015

HONG — CROSS-EXAMINATION

1   **A.**   YES, SIR.

2   **Q.**   TAKE A LOOK AT 413 -- 453, ACTUALLY.

3   **A.**   NO, IT DOESN'T SEEM TO BE DOG-EARED.

4   **Q.**   NO DOG-EARED.  THERE IS NO HIGHLIGHTING ON THAT PAGE?

5   **A.**   NO.  NO, SIR.

6   **Q.**   THERE ARE NO PENCIL MARKS ON THIS PAGE.

7   **A.**   NO, SIR.

8   **Q.**   THERE ARE NO SMUDGE MARKS, SPILLED COFFEE?

9   **A.**   NO, SIR.

10   **Q.**   NOTHING LIKE THAT.

11      I AM SHOWING YOU THE INSIDE OF THE FRONT COVER NOW -- OR

12   INSIDE THE BACK COVER.  YOU DON'T SEE ANY NAMES WRITTEN?

13   **A.**   NO, SIR.

14   **Q.**   SHOWING THE INSIDE OF THE FRONT COVER.  YOU DON'T SEE

15   ANY NAMES WRITTEN?

16   **A.**   NO, SIR.

17   **Q.**   AND YOU UNDERSTAND THAT TEXTBOOKS ARE VERY OFTEN

18   PURCHASED AS A REQUIRED TEXT FOR A CERTAIN COURSE, CORRECT?

19        **MR. COUGHLIN:**  OBJECTION.  LACK OF FOUNDATION.

20        **THE COURT:**  SUSTAINED.

21   **Q.**   **(MR. CAMDEN)** WERE YOU EVER A STUDENT?

22   **A.**   WAS I EVER A STUDENT?  YES, SIR.

23   **Q.**   HOW MANY YEARS OF SCHOOL DO YOU HAVE?

24   **A.**   I HAVE A BACHELOR'S DEGREE, FOUR YEARS.

25   **Q.**   SO YOU WENT TO UNIVERSITY?

APRIL 15, 2015

1   **A.**    YES, SIR.

2   **Q.**    YOU TOOK CLASSES AS PART OF YOUR UNIVERSITY EDUCATION?

3   **A.**    YES, I DID.

4   **Q.**    AND WHEN YOU WOULD -- ENROLLED IN THOSE CLASSES YOU

5   RECEIVED A SYLLABUS AT THE BEGINNING OF THE CLASS?

6   **A.**    YES, SIR.

7   **Q.**    VERY OFTEN?

8   **A.**    YES, SIR.

9   **Q.**    THE SYLLABUS WOULD OFTEN LIST THE REQUIRED TEXT FOR THE

10  COURSE?

11  **A.**    YES, SIR.

12  **Q.**    OKAY.  AND SOMETIMES THE PROFESSOR WOULD HAVE THE CLASS

13  READ THE ENTIRE TEXT?

14  **A.**    AT TIMES, YES.

15  **Q.**    BUT AT TIMES THE PROFESSOR WOULD GIVE YOU SELECTIONS OF

16  TEXT THAT YOU WERE SUPPOSED TO READ.

17  **A.**    YES, SIR.

18  **Q.**    OFTEN THAT WAS GIVEN IN CLASS.  IT WOULD BE WRITTEN ON

19  THE BOARD OR SPOKEN BY THE PROFESSOR, CORRECT?

20  **A.**    YES, SIR.

21  **Q.**    NEXT I WANT TO TURN TO GOVERNMENT'S EXHIBIT 706.

22          **MR. CAMDEN:**  IF YOU COULD PULL THAT UP.

23          **THE WITNESS:**  YES, SIR.

24  **Q.**    **(MR. CAMDEN)** SO THIS YOU DESCRIBED AS A CONTRACT,

25  RIGHT?

APRIL 15, 2015

HONG – CROSS–EXAMINATION

1   **A.**    YES, SIR.

2   **Q.**    SO I WANT TO JUST BRIEFLY DISCUSS WHAT A CONTRACT IS.  A

3   CONTRACT IS A WRITING, CORRECT?

4   **A.**    YES, SIR.

5          **MR. COUGHLIN:**  OBJECTION.  LACK OF FOUNDATION AS TO

6   THIS WITNESS, YOUR HONOR.

7          **THE COURT:**  SUSTAINED.

8          **MR. CAMDEN:**  MAYBE IT IS BEST IF I COULD ASK TO GO

9   TO SIDEBAR, YOUR HONOR.

10          **THE COURT:**  YOU CAN ATTEMPT TO LAY THE FOUNDATION.

11  **Q.**    **(MR. CAMDEN)** ARE YOU AWARE WHAT A CONTRACT IS?

12  **A.**    YES, SIR.

13  **Q.**    OKAY.  AND GIVEN THAT YOU ARE AWARE OF WHAT A CONTRACT

14  IS, YOU WOULD AGREE THAT IT IS A WRITING?

15  **A.**    YES, SIR.

16  **Q.**    IT IS AN AGREEMENT BETWEEN TWO OR MORE PEOPLE.

17  **A.**    YES, SIR.

18  **Q.**    AND THE TERMS ARE PUT IN WRITING.

19  **A.**    YES, SIR.

20  **Q.**    THE TERMS OF THE AGREEMENT.

21  **A.**    YES, SIR.

22  **Q.**    AND THE PARTIES ARE BOUND BY THOSE PROMISES OR

23  OBLIGATIONS THAT ARE EXCHANGED, RIGHT?

24  **A.**    YES, SIR.

25  **Q.**    AND THERE ARE PENALTIES OFTEN FOR BREAKING THE PROMISES

APRIL 15, 2015

HONG – CROSS–EXAMINATION

1    THAT ARE GIVEN AS PART OF THE CONTRACT.

2    **A.**    YES, SIR.

3    **Q.**    AND IN THIS PARTICULAR CONTRACT, THIS WAS A SALE

4    CONTRACT, CORRECT?

5    **A.**    YES, SIR.

6    **Q.**    FOR THE SALE OF GOODS FROM SOUTH STAR TRADING TO TIG

7    MARINE ENGINEERING SERVICES, CORRECT?

8    **A.**    YES, SIR.

9    **Q.**    THE BUYER HAS A COUNTRY OF INCORPORATION LISTED.  WHAT

10   COUNTRY IS THAT?

11           **MR. COUGHLIN:**  I WOULD OBJECT.  THIS WITNESS HAS NO

12   INFORMATION OR KNOWLEDGE ABOUT THIS CONTRACT, HE WAS JUST A

13   SEIZING AGENT.

14           **THE COURT:**  SUSTAINED.

15           **MR. CAMDEN:**  YOUR HONOR, HE IS –– COULD I ADDRESS

16   THAT NOW?

17           **MR. COUGHLIN:**  HE WAS THE SEIZING AGENT.

18           **THE COURT:**  YOU CAN READ FROM THE CONTRACT BUT GIVEN

19   ––

20           **MR. CAMDEN:**  THAT IS ALL I AM DOING.  SO I WILL

21   CLARIFY.

22           **THE COURT:**  HE HAS NO PERSONAL KNOWLEDGE ––

23           **MR. CAMDEN:**  YEAH.

24           **THE COURT:**  –– AS TO ––

25           **MR. CAMDEN:**  YEAH.

APRIL 15, 2015

HONG – CROSS-EXAMINATION

1   **Q.**    **(MR. CAMDEN)** SO READING FROM GOVERNMENT'S EXHIBIT 706,

2   WHICH WAS INTRODUCED AS EVIDENCE.

3   **A.**    YES, SIR.

4   **Q.**    YOU CAN IDENTIFY PARAGRAPH A LISTING THE SELLER.

5   **A.**    YES.

6   **Q.**    THAT SAYS THE SELLER IS SOUTH STAR TRADING.

7   **A.**    YES, SIR.

8   **Q.**    AND PARAGRAPH B LISTING THE BUYER?

9   **A.**    YES, SIR.

10  **Q.**    AND THE BUYER IS LISTED AS TIG MARINE ENGINEERING

11  SERVICES.

12  **A.**    THAT'S CORRECT, SIR.

13  **Q.**    AND THERE IS A FIELD FOR COUNTRY OF INCORPORATION IN

14  BOLD.  DO YOU SEE THAT?

15  **A.**    YES.  IT IS THE UAE.

16  **Q.**    UAE.  AND YOU UNDERSTAND -- OR ARE YOU AWARE THAT UAE

17  REFERS TO THE COUNTRY OF THE UNITED ARAB EMIRATES?

18  **A.**    YES, SIR.

19  **Q.**    AND THE -- I WOULD LIKE TO TAKE A LOOK AT THE NEXT PAGE

20  OF THAT CONTRACT.

21          **MR. CAMDEN:**  IF YOU COULD HIGHLIGHT PARAGRAPH 2.

22  **Q.**    **(MR. CAMDEN)** SO ONE OF THE PROMISES MADE IN THIS

23  CONTRACT REGARDS DELIVERY, CORRECT?  ONE OF THE TERMS, JUST ON

24  READING THE FACE OF THE CONTRACT, CORRECT?

25  **A.**    YES, SIR.

APRIL 15, 2015

HONG – CROSS-EXAMINATION

1   **Q.**    AND PARAGRAPH -- OR SECTION 2.2 LISTS PLACE OF DELIVERY,
2   COLON, DUBAI, COMMA, UAE.
3   **A.**    YES, SIR.
4   **Q.**    AND YOU UNDERSTAND THAT TO BE DUBAI UNITED ARAB
5   EMIRATES.
6   **A.**    YES, SIR.
7   **Q.**    SO THIS CONTRACT, ON ITS TERMS, CONTEMPLATES DELIVERY OF
8   THE GOODS THAT ARE BEING SOLD TO DUBAI.
9   **A.**    YES, SIR.
10  **Q.**    I WOULD LIKE TO LOOK AT -- LET'S SEE -- ONE, TWO,
11  THIRD -- LET'S GO TO 7.  GOVERNMENT'S 707.  AND SECOND PAGE OF
12  THAT.
13          I AM GOING TO REFER YOU NOW TO GOVERNMENT'S EXHIBIT 707.
14  **A.**    YES, SIR.
15  **Q.**    WHICH YOU INTRODUCED.
16  **A.**    YES, SIR.
17  **Q.**    I WOULD ASK YOU TO TAKE A LOOK HERE AT ARTICLE 5 OF THAT
18  CONTRACT.
19  **A.**    YES, SIR.
20  **Q.**    OKAY.  TO STEP BACK, THE PAPERWORK -- OR THIS PAPER
21  INDICATES IT IS AN OCCASIONAL INTERMEDIARY -- INTERNATIONAL
22  OCCASIONAL INTERMEDIARY CONTRACT, CORRECT?
23  **A.**    YES, SIR.
24  **Q.**    THAT IS THE TITLE.
25  **A.**    YES, SIR.

APRIL 15, 2015

HONG – CROSS-EXAMINATION

```
 1   Q.    AND THE PARTIES ARE PARADISE OFFSHORE COMPANY LIMITED ON
 2   THE ONE HAND?
 3   A.    YES, SIR.
 4   Q.    BACK TO THE FIRST PAGE.
 5         AND ARASH GHAHREMAN ON THE OTHER.
 6   A.    YES, SIR.
 7   Q.    AND ARTICLE 5 OF THAT CONTRACT, ARTICLE 5.1, THE
 8   CONTRACT THAT YOU FOUND IN MR. GHAHREMAN'S APARTMENT BETWEEN
 9   HIM AND PARADISE OFFSHORE SAYS, QUOTE, EACH PARTY AGREES NOT
10   TO DISCLOSE TO THIRD PARTIES ANY CONFIDENTIAL INFORMATION, AS
11   DEFINED HEREUNDER ARTICLE 5.2, DISCLOSED TO HIM BY THE OTHER
12   PARTY IN THE CONTEXT OF THIS CONTRACT, SUCH AS THE NAMES OF
13   CUSTOMERS.
14         IT SAYS THAT IN THE CONTRACT, RIGHT?
15   A.    YES, SIR.
16   Q.    AND CONFIDENTIAL INFORMATION, GOING TO PARAGRAPH 5.2,
17   MEANS INFORMATION WHICH HAS BEEN SUPPLIED TO THE OTHER PARTY
18   WITH AN INDICATION THAT IT IS CONFIDENTIAL.
19   A.    YES, SIR.
20   Q.    OR WHICH HAS BEEN INDICATED AS BEING CONFIDENTIAL.
21   A.    YES, SIR.
22   Q.    CORRECT?  OKAY.
23         MR. CAMDEN:  NO FURTHER QUESTIONS AT THIS TIME.
24         THE COURT:  REDIRECT?
25         MR. COUGHLIN:  NOTHING FURTHER OF THIS WITNESS, YOUR
```

APRIL 15, 2015

HONG – CROSS–EXAMINATION

```
 1   HONOR.
 2             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  YOU
 3   WOULD BE EXCUSED.
 4             GOVERNMENT'S NEXT?
 5        MR. COUGHLIN:  YOUR HONOR, AT THIS TIME THE
 6   GOVERNMENT WOULD CALL TO THE STAND ERGUN YILDIZ.  I AM NOT
 7   REALLY SURE, WE MADE ARRANGEMENTS FOR HIM TO BE HERE, BUT THIS
 8   MIGHT BE A BETTER PLACE TO TAKE A BREAK FOR THE DAY, IF
 9   POSSIBLE.
10             THE COURT:  HE IS NOT OUT IN THE HALLWAY?
11             MR. COUGHLIN:  NO, HE'S NOT.
12             THE COURT:  ALL RIGHT.  OKAY.  I THINK THAT WOULD
13   MAKE SENSE, THEN.
14             IT IS 10 MINUTES TO 2:00.  WE WILL RECESS A LITTLE
15   EARLY TODAY.  WE WILL PICK UP TOMORROW, SAME SCHEDULE, 8:30 TO
16   2:00.  I ANTICIPATE A FULL DAY OF TESTIMONY.  AND THEN FRIDAY,
17   OF COURSE, WE WILL NOT BE IN SESSION, BUT WE WILL HAVE A FULL
18   DAY TOMORROW.
19             DO KEEP IN MIND ALL OF THE ADMONITIONS, NOT TO
20   DISCUSS THE CASE, FORM OR EXPRESS OPINIONS OR CONCLUSIONS.
21             THANK YOU AGAIN FOR YOUR TIME AND ATTENTION.  HAVE A
22   WONDERFUL EVENING.  WE WILL SEE YOU TOMORROW MORNING.
23             MR. JOHNSTON:  YOUR HONOR, I HAVE ONE SMALL
24   HOUSEKEEPING MATTER.  IT WON'T NECESSARILY MATTER IF THE JURY
25   SNEAKS OUT.
```

APRIL 15, 2015

685

```
 1              I JUST WANTED TO MOVE TO INTRODUCE -- HAVING

 2    SPOKEN WITH THE GOVERNMENT AND I UNDERSTAND THERE IS NO

 3    OBJECTION -- THE FOUR CLIPS THAT I PLAYED DURING AGENT COLE'S

 4    TESTIMONY.

 5              THE COURT:  YES.

 6              MR. JOHNSTON:  THOSE WOULD BE EXHIBITS H, T, FF AND

 7    GG.

 8              MR. HARRIGAN:  I HAVE NO OBJECTION, YOUR HONOR, I

 9    JUST WANT TO SEE THE ACTUAL TRANSCRIPTS.  AND I DON'T THINK

10    THAT IS GOING TO BE A PROBLEM, I WOULD JUST LIKE TO LOOK AT

11    THEM.

12              MR. JOHNSTON:  WHAT I WILL DO IS I WILL PROVIDE HIM

13    WITH THE --

14              MR. HARRIGAN:  I THINK WE CAN WORK IT OUT.

15              THE COURT:  OKAY.  SO ABSENT ANY AFFIRMATIVE

16    OBJECTION BY THE GOVERNMENT, THEY WILL --

17              MR. HARRIGAN:  RIGHT.

18              THE COURT:  -- BE NOTED AS RECEIVED.

19              (EXHIBIT H, T, FF AND GG RECEIVED INTO EVIDENCE)

20              (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

21              OPEN COURT, OUT OF THE HEARING OF THE JURY)

22              THE COURT:  FOR TOMORROW --

23              WE ARE OUTSIDE OF THE PRESENCE OF THE JURY.

24              -- WE HAVE TWO MORE WITNESSES?

25              MR. COUGHLIN:  WE HAVE MR. YILDIZ.  AND HIS ATTORNEY
```

APRIL 15, 2015

686

```
 1    MR. WARWICK IS HERE TODAY.  WE DIDN'T KNOW WHAT TIME HE WOULD

 2    BE ON, HE HAS BEEN HERE SINCE ABOUT 1:00 O'CLOCK.

 3            WE HOPE TO HAVE HIM HERE.  WE MADE ARRANGEMENTS FOR

 4    HIM TO BE BROUGHT UP AND AVAILABLE, BUT I WASN'T SURE HOW HE

 5    COMES IN THE COURTROOM.  I WILL MAKE SURE HE IS HERE BY 8:30

 6    TOMORROW.

 7            THE COURT:  I THINK TOMORROW MORNING WE WILL JUST --

 8    HE IS IN CUSTODY, CORRECT?

 9            MR. COUGHLIN:  YES.

10            THE COURT:  WE WILL JUST HAVE HIM SEATED, AND WE

11    WILL START -- IF YOU CAN MAKE ARRANGEMENTS TO HAVE HIM HERE AT

12    8:20 OR SO.

13            MR. HARRIGAN:  WE WILL.  WE HAVE ACTUALLY THREE

14    WITNESSES LEFT FOR THE GOVERNMENT, AGENT HAMAKO, AGENT

15    HELSING.

16            THE COURT:  MR. WARWICK, GOOD AFTERNOON.

17            MR. WARWICK:  YOUR HONOR, I HAVE BEEN TRYING TO KEEP

18    MY CALENDAR OPEN.  I HAVE A MATTER AT 8:30 TOMORROW MORNING.

19    I CAN DELAY MAKING THE APPEARANCE, BUT IT IS A FELONY

20    SETTLEMENT CONFERENCE IN STATE COURT THAT HAS BEEN SCHEDULED

21    FOR A SUBSTANTIAL PERIOD OF TIME.

22            MY CLIENT IS OUT OF CUSTODY, BUT SOMETIME DURING THE

23    MORNING I AM GOING TO HAVE TO RUN OVER THERE AND, SOONER

24    RATHER THAN LATER, TRY TO EITHER CONTINUE IT OR -- OBVIOUSLY I

25    AM NOT GOING TO BE ABLE TO NEGOTIATE THE CASE, BUT I AM GOING
```

APRIL 15, 2015

```
 1    TO HAVE TO AT LEAST APPEAR.

 2            THE COURT:  WHAT IS THE TIME ESTIMATE FOR MR.

 3    YILDIZ?

 4            MR. COUGHLIN:  I THINK MR. YILDIZ WILL BE ON THE

 5    STAND ABOUT AN HOUR AND A HALF FOR THE GOVERNMENT'S DIRECT.

 6            THE COURT:  AND THE CROSS?

 7            MR. JOHNSTON:  AN HOUR.

 8            THE COURT:  CAN YOU MAKE ARRANGEMENTS TO HAVE YOUR

 9    8:30 STATE COURT MATTER TRAILED TO 10:30 OR 11:00?

10            MR. WARWICK:  I WILL DO MY BEST, YOUR HONOR.  JUDGE

11    SHAMOON HOPEFULLY WILL ACCOMMODATE THAT.

12            I WAS HOPING, IF WE ARE GOING TO TAKE A BREAK, I

13    COULD RUN OVER THERE AND ASK TO PUT OVER, MAYBE FIND COUNSEL

14    THAT WOULD APPEAR FOR ME.

15            THE COURT:  WE WILL TAKE A BREAK AT 10:15 BUT WE

16    WILL PICK UP AT 10:30, SO IT WOULD ONLY BE 15 MINUTES.

17            MR. WARWICK:  I APOLOGIZE, YOUR HONOR.  THIS IS

18    OBVIOUSLY SOMETHING WE HAVE NO CONTROL OVER, AT LEAST LESS

19    CONTROL THAN WE WOULD LIKE.

20            I WILL DO MY BEST THIS AFTERNOON TO SEE IF I CAN

21    FIND SOMEBODY WHO IS ON THE CALENDAR THAT MAY BE ABLE TO

22    APPEAR FOR ME TOMORROW.

23            THE COURT:  ONE OTHER OPTION, WHEN YOU FINISH DIRECT

24    IS THERE ANOTHER WITNESS THE GOVERNMENT CAN PUT ON?

25            MR. COUGHLIN:  YES, YOUR HONOR.  I CERTAINLY COULD
```

APRIL 15, 2015

688

```
 1    POTENTIALLY PUT ON A WITNESS FIRST, JOHN HELSING, WHO IS THE

 2    SHIPPING AGENT.

 3            THE COURT:  THAT WOULD BE THE OTHER OPTION.  HOW

 4    LONG DO YOU ANTICIPATE WITH MR. HELSING?

 5            MR. COUGHLIN:  MAYBE 15 OR 20 MINUTES ON DIRECT.

 6            THE COURT:  THEN ON CROSS?

 7            MR. CAMDEN:  HARD TO SAY, YOUR HONOR.  PROBABLY NO

 8    MORE THAN HALF HOUR.

 9            THE COURT:  SO PERHAPS WE CAN START FIRST WITH

10    HELSING.

11            MR. COUGHLIN:  OKAY.

12            THE COURT:  THAT WOULD GIVE YOU TIME --

13            MR. WARWICK:  PLENTY OF TIME.  I APPRECIATE THE

14    COURTESY.

15            THE COURT:  THEN WHAT WE WILL NEED TO DO, WHEN

16    WE FINISH THE TESTIMONY OF AGENT HELSING, IS RECESS

17    BRIEFLY TO ALLOW THE MARSHALS TO PUT MR. YILDIZ IN THE WITNESS

18    BOX.

19            MR. WARWICK:  YOUR HONOR, I WILL DO MY BEST THIS

20    AFTERNOON TO FIND SOMEBODY TO APPEAR FOR ME.  I WILL CONTACT

21    THE U.S. ATTORNEYS IF I AM ABLE TO DO THAT SO WE CAN START

22    WITH MY CLIENT FIRST THING, WHICH I THINK IS THE DESIRE OF THE

23    U.S. ATTORNEY.

24            THERE IS A REAL GOOD CHANCE I WILL BE ABLE TO DO

25    THAT.  LET ME CONTACT THE U.S. ATTORNEY AND CONFIRM THAT.
```

APRIL 15, 2015

```
 1              THE COURT:  OKAY.
 2              MR. COUGHLIN:  THANK YOU.
 3              MR. HARRIGAN:  THANK YOU, YOUR HONOR.
 4              THE COURT:  THANK YOU.
 5          SO FOR TOMORROW, WE HAVE THREE WITNESSES?
 6              MR. HARRIGAN:  YES.
 7              THE COURT:  DO YOU ANTICIPATE -- ARE WE ON TIME?  IT
 8   APPEARS WE ARE.
 9              MR. HARRIGAN:  WE ARE.  COULD GO OVER A LITTLE, I
10   THINK, BUT CERTAINLY WE WOULD BE DONE BY MONDAY.
11              THE COURT:  DO YOU THINK YOU WILL FINISH TOMORROW?
12              MR. HARRIGAN:  THAT IS MY HOPE.  THERE IS
13   APPROXIMATELY 28 EMAILS TO SHOW AGENT HAMAKO, WHICH SOMETIMES
14   I TRY -- THEY GO SLOWLY.  I THINK HE SHOULD BE -- HE MIGHT BE
15   A COUPLE OF HOURS ON DIRECT.  HE IS THE CASE AGENT.  I THINK,
16   JUDGING FROM THE UNDERCOVER AGENT, ABOUT AN HOUR AND A HALF,
17   AT LEAST, I THINK, THAT THERE WOULD BE AN HOUR AND A HALF OR
18   MORE.
19              THE COURT:  IT MAY BE WITH AGENT HAMAKO, ALL OF THE
20   EXHIBITS ARE COMING IN, IT MAY BE THAT WE CAN SIMPLY HAVE AN
21   AGREEMENT THAT THEY COME INTO EVIDENCE, AND THEN THE
22   GOVERNMENT CAN SIMPLY CALL OUT THE NUMBER.
23              MR. JOHNSTON:  YOUR HONOR, MY ONLY CONCERN WAS --
24   AND I HOPE I WASN'T DELAYING ANYTHING BY HAVING HIM DO THEM
25   ONE BY ONE, BUT I JUST WANT TO MAKE SURE -- THERE IS A BIG
```

APRIL 15, 2015

620

```
1    BOOK OF EXHIBITS.

2              THE COURT:  YES.

3              MR. JOHNSTON:  AND I BELIEVE I HAVE GONE THROUGH ALL

4    OF THEM, BUT I ALREADY FOUND ONE INSTANCE WHERE THERE WASN'T A

5    PAGE IN THERE.

6              THERE WAS NO OBJECTION.  WHEN I SAW THE PAGE IT WAS

7    SOMETHING I WANTED TO OBJECT TO.  SO I WOULD HATE TO AGREE TO

8    THE ADMISSION OF ALL OF THESE DOCUMENTS AND THEN SEE ONE THAT

9    I MISSED.

10             THE COURT:  THAT IS FAIR ENOUGH.  IT IS MOVING

11   QUICKLY, IN ANY EVENT, BUT IT COULD BE EXPEDITED A LITTLE BIT.

12   BUT I UNDERSTAND.

13             ARE YOU PREPARED TO INDICATE WHETHER OR NOT THERE

14   WILL BE AN AFFIRMATIVE DEFENSE?

15             MR. JOHNSTON:  WELL, YOUR HONOR, WE ARE STILL GOING

16   TO HOLD THE GOVERNMENT TO THEIR BURDEN, BUT WE WILL HAVE

17   WITNESSES.  I WOULD BE HAPPY TO DISCUSS EX PARTE AT SIDEBAR IN

18   MORE DETAIL, BUT I ANTICIPATE OUR CASE TAKING PROBABLY NO MORE

19   THAN A DAY.

20             AND EVEN IF THE GOVERNMENT FINISHED ON MONDAY I

21   THINK WE WOULD BE ARGUING ON TUESDAY AND HAVE IT SUBMITTED TO

22   THE JURY.

23             THE COURT:  YOU WILL BE READY TO -- AS SOON AS THE

24   GOVERNMENT RESTS, YOU WILL BE READY TO START?

25             MR. JOHNSTON:  WELL, I KNOW FOR AT LEAST ONE WITNESS
```

APRIL 15, 2015

621

```
 1    THE MARSHALS HAVE ARRANGED TRAVEL BASED ON WHAT MY BEST
 2    REPRESENTATION WAS OF THE GOVERNMENT'S CASE, WHICH I
 3    ANTICIPATE TO HAVE GONE THROUGH THE END OF TOMORROW.  SO THAT
 4    WITNESS ISN'T GETTING HERE UNTIL SATURDAY OR SUNDAY.
 5          WHAT ELSE I COULD DO, IF WE HAD 30 MINUTES OR AN
 6    HOUR AT THE END OF TOMORROW, I HAVEN'T DECIDED.
 7          THE COURT:  I WOULD BE MORE CONCERNED ABOUT MONDAY.
 8          MR. JOHNSTON:  MONDAY WE ARE READY TO GO.  NO
 9    PROBLEM.
10          THE COURT:  IF THEY REST AT 10:00 IN THE MORNING WE
11    NEED TO FILL THE DAY.
12          MR. JOHNSTON:  YEAH, WE WILL HAVE WITNESSES HERE AND
13    READY TO GO.
14          THE COURT:  ALL RIGHT.
15          MR. HARRIGAN:  YOUR HONOR, MAYBE AT THAT TIME WE
16    COULD DO JURY INSTRUCTIONS IF THEY ARE NOT READY TO GO WHEN WE
17    FINISH TOMORROW.  THAT WOULD BE THE GOVERNMENT'S REQUEST.
18          AND JUST AS A HOUSEKEEPING MATTER, WE ARE REQUESTING
19    RECIPROCAL DISCOVERY.  IF THERE IS A WITNESS THEY KNOW OF THAT
20    THEY MIGHT HAVE RECIPROCAL DISCOVERY, I WOULD LIKE TO HAVE IT
21    TODAY.
22          MR. JOHNSTON:  YOUR HONOR, I WILL GIVE THEM ANYTHING
23    I ANTICIPATE INTRODUCING IN MY CASE IN CHIEF.
24          MR. HARRIGAN:  THAT INCLUDES -- RECIPROCAL DISCOVERY
25    WOULD BE JENCKS MATERIAL, OTHER THINGS THEY HAVE.  IF THEY
```

APRIL 15, 2015

622

```
 1    AREN'T GOING TO GIVE THAT TO ME UNTIL THE WITNESS TESTIFIES --
 2    WE HAVE FREELY GIVEN ALL OF THE JENCKS.
 3              MR. JOHNSTON:  I HAVE NO JENCKS.  IF THERE IS ANY
 4    THAT COMES UP, I WILL GIVE IT TO THEM.
 5              THE COURT:  IT IS USUALLY THE GOVERNMENT THAT SAYS
 6    THAT.
 7              (LAUGHTER)
 8              MR. JOHNSTON:  I KNOW MY OBLIGATIONS, YOUR HONOR.  I
 9    WILL COMPLY WITH THEM.
10              THE COURT:  ON THE JURY INSTRUCTIONS, ARE THERE ANY
11    DEFENSE PROPOSED INSTRUCTIONS?
12              MR. JOHNSTON:  WE ARE WORKING ON THOSE, YOUR HONOR.
13              THE COURT:  IT WOULD BE NICE -- WE CAN START THE
14    JURY INSTRUCTION CONFERENCE TOMORROW AFTERNOON, AND THEN I
15    WOULD LIKE TO MEET AGAIN ON FRIDAY IF WE CAN SET A TIME SO
16    THAT I CAN WORK THROUGH THEM.
17              MR. HARRIGAN:  WOULD THAT BE IN THE AFTERNOON?  I
18    HAVE GRAND JURY IN THE MORNING.
19              THE COURT:  YES.  YES.
20              ARE OTHER MATTERS?
21              MR. CAMDEN:  I WILL BE WORKING ON THE JURY
22    INSTRUCTIONS.  I HAVE GOT SOME MORE THINGS TO DO, BECAUSE I
23    WILL BE CROSS-EXAMINING THE CASE AGENT.
24              THE COURT:  YES.
25              MR. CAMDEN:  I THINK FRIDAY I WOULD BE MORE
```

APRIL 15, 2015

1    COMFORTABLE HAVING SOMETHING, A FULL PACKET OF JURY

2    INSTRUCTIONS PROPOSED.

3            **THE COURT:**  YOU HAD MENTIONED A LIMITING INSTRUCTION

4    ON THE TEXTBOOK.  WOULD YOU PROPOSE SOMETHING?

5            **MR. CAMDEN:**  I CAN PUT SOMETHING IN WRITING AND SEND

6    A COPY TO OPPOSING COUNSEL.  MY WORRY IS IT DOES DISCUSS

7    SUBSTANTIVE LAW, AND I DON'T WANT THE JURY TAKING INSTRUCTION

8    FROM THE TEXTBOOK.

9            **THE COURT:**  I AGREE.  ANY OTHER MATTERS?

10           **MR. HARRIGAN:**  NO OTHER MATTERS, YOUR HONOR.  THANK

11   YOU.

12           **THE COURT:**  ALL RIGHT.  THANK YOU.

13                        *   *   *

14           I CERTIFY THAT THE FOREGOING IS A CORRECT
             TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
15           IN THE ABOVE-ENTITLED MATTER.

16           S/LEEANN PENCE                    6/10/2015

17           LEEANN PENCE, OFFICIAL COURT REPORTER   DATE

18

19

20

21

22

23

24

25

                        APRIL 15, 2015

1

2                     INDEX OF WITNESSES

3    COLE, DAVID

4      BY MR. HARRIGAN    491

5      BY MR. JOHNSTON                555

6

7    HONG, JOSEPH

8      BY MR. COUGHLIN    652

9      BY MR. CAMDEN                  675

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                      APRIL 15, 2015

```
                        INDEX OF EXHIBITS


EXHIBIT      IDENTIFIED  RECEIVED


127                      493

128                      508

126                      514

129                      516

130                      518

316          521         523

317          534         307

132                      550

HH           562         685

II           575         575

JJ           602

T            607         685

H            644         685

701          656         657

702          657         658

703          659         659

704          661         662

705          662         663

706          664         664
```

APRIL 15, 2015

626

```
1    707          667          667
2    708          668          670
3    708-B        670          670
4    708-D        671          671
5    708-E        671          697
6    708-F        672          673
7    708-G        673
8    708-H        673          674
9    708-I        674
10   FF                        685
11   GG                        685
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

APRIL 15, 2015