UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                        )
UNITED STATES OF AMERICA,               )
                   PLAINTIFF,           )   CASE NO. 13CR4228-DMS
                                        )
                                        )   SAN DIEGO, CALIFORNIA
                                        )THURSDAY, APRIL 16, 2015
                                        )   8:30 A.M. CALENDAR
ARASH GHAHREMAN,                        )
                   DEFENDANT.           )
_____)       VOLUME IV


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL/DAY FOUR




INTERPRETERS:                    BADI BADIOZAMANI
                                 ASLAN ASLANIAN


                                 LEE ANN PENCE,
REPORTED BY:                     OFFICIAL COURT REPORTER
                                 UNITED STATES COURTHOUSE
                                 333 WEST BROADWAY ROOM 1393
                                 SAN DIEGO, CALIFORNIA 92101

```
COUNSEL APPEARING:

FOR PLAINTIFF:          LAURA E. DUFFY,
                        UNITED STATES ATTORNEY
                        BY:   SHANE P. HARRIGAN
                              TIMOTHY D. COUGHLIN
                        ASSISTANT U.S. ATTORNEYS
                        880 FRONT STREET
                        SAN DIEGO, CALIFORNIA 92101

FOR DEFENDANT           FEDERAL DEFENDERS OF SAN DIEGO, INC.
GHAHREMAN:                    BY:   ELLIS M. JOHNSTON
                                    JOSEPH S. CAMDEN
                        TRIAL ATTORNEYS
                        225 BROADWAY, SUITE 900
                        SAN DIEGO, CALIFORNIA 92101
```

```
 1     SAN DIEGO, CALIFORNIA - THURSDAY, APRIL 16, 2015 - 8:30 A.M.

 2                              *   *   *

 3          THE CLERK:   NO. 1 ON CALENDAR, CASE NO. 13CR4228,

 4     UNITED STATES OF AMERICA VERSUS ARASH GHAHREMAN; ON FOR JURY

 5     TRIAL, DAY FOUR.

 6          THE COURT:   GOOD MORNING, LADIES AND GENTLEMEN.

 7     WELCOME BACK.

 8          WE HAVE ALL JURORS PRESENT, COUNSEL, MR. GHAHREMAN.

 9          AND WE ARE GOING TO GET STARTED IMMEDIATELY THIS

10     MORNING WITH THE DIRECT TESTIMONY FROM MR. YILDIZ.

11          COUNSEL.

12          MR. HARRIGAN:   YOUR HONOR, SHOULD HE BE SWORN

13     FIRST?

14          THE COURT:   YES, THANK YOU.

15          MADAM CLERK.

16          THE CLERK:   SIR, PLEASE RAISE YOUR RIGHT HAND.

17          DO YOU SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE

18     YOU SHALL GIVE IN THE CAUSE NOW BEFORE THIS COURT SHALL BE THE

19     TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?

20          THE WITNESS:   YES.

21          THE CLERK:   SIR, PLEASE STATE YOUR NAME.

22          THE WITNESS:   ERGUN YILDIZ.

23          THE CLERK:   AND SPELL YOUR FIRST AND LAST NAMES.

24          THE WITNESS:   ERGUN, E-R-G-U-N, FIRST NAME.  LAST

25     NAME YILDIZ, Y-I-L-D-I-Z.
```

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

<u>DIRECT EXAMINATION</u>

1

2    **Q.**    **(MR. COUGHLIN)** GOOD MORNING, MR. YILDIZ.

3    **A.**    GOOD MORNING.

4    **Q.**    I WANT YOU TO BE COMFORTABLE UP THERE.  WHY DON'T YOU

5    MOVE UP AND JUST PULL THE MICROPHONE CLOSE TO YOU SO THAT YOU

6    ARE COMFORTABLE.

7    **A.**    OKAY.

8    **Q.**    YOU MIGHT BE ON THE STAND A WHILE TODAY.

9          WHERE WERE YOU BORN, MR. YILDIZ?

10   **A.**    IN AUSTRIA.

11   **Q.**    AND DID YOU ATTEND UNIVERSITY?

12   **A.**    YES.

13   **Q.**    WHERE WAS THAT?

14   **A.**    IN GERMANY.

15   **Q.**    AND DID YOU GRADUATE WITH A DEGREE?

16   **A.**    YES.

17   **Q.**    WHAT WAS THAT DEGREE IN?

18   **A.**    MECHANICAL ENGINEER.

19   **Q.**    DO YOU CURRENTLY HAVE A PASSPORT?

20   **A.**    YES.

21   **Q.**    FOR WHAT COUNTRY?

22   **A.**    GERMANY.

23   **Q.**    IF I SHOWED YOU A COPY OF THAT, WOULD YOU BE ABLE TO

24   RECOGNIZE IT?

25   **A.**    YES, I WOULD.

APRIL 16, 2015

760

YILDIZ – DIRECT EXAMINATION

```
 1          MR. COUGHLIN:  YOUR HONOR, AT THIS TIME I WOULD LIKE
 2   TO SHOW GOVERNMENT'S EXHIBIT 126 TO THE WITNESS.
 3   Q.    (MR. COUGHLIN) MR. YILDIZ, DO YOU RECOGNIZE THAT
 4   EXHIBIT?
 5   A.    YES.
 6   Q.    IS THAT YOUR PASSPORT?
 7   A.    YES.
 8          MR. COUGHLIN:  YOUR HONOR, AT THIS TIME -- THIS
 9   PASSPORT HAS ALREADY BEEN ADMITTED INTO EVIDENCE.
10          THE COURT:  YES.
11   Q.    (MR. COUGHLIN) IS THAT A GERMAN PASSPORT?
12   A.    YES.
13   Q.    ON JUNE 17TH OF 2013 WERE YOU ARRESTED?
14   A.    YES.
15   Q.    AND WHERE DID THAT ARREST TAKE PLACE?
16   A.    SAN DIEGO.
17   Q.    AND WERE YOU CHARGED IN A FEDERAL INDICTMENT?
18   A.    YES.
19   Q.    WERE YOU REPRESENTED BY AN ATTORNEY IN DEALING WITH
20   THOSE CHARGES?
21   A.    YES, I WAS.
22   Q.    DO YOU SEE YOUR ATTORNEY IN THE COURTROOM HERE TODAY?
23   A.    YES.  MR. WARWICK.
24   Q.    AFTER CONSULTING WITH YOUR ATTORNEY, WHAT DID YOU DECIDE
25   TO DO?
```

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1    **A.**    I DECIDE TO AGREE ON A PLEA DEAL.

2    **Q.**    AND DID THAT INVOLVE A PLEA TO A CONSPIRACY?

3    **A.**    YES, SIR.

4    **Q.**    AND WAS THAT A CONSPIRACY TO EXPORT, DIRECTLY OR

5    INDIRECTLY, FROM THE UNITED STATES TO IRAN OR THE GOVERNMENT

6    OF IRAN MARINE NAVIGATION EQUIPMENT AND MILITARY ELECTRONIC

7    EQUIPMENT, AND TO ENGAGE IN TRANSACTIONS WITHIN THE UNITED

8    STATES THAT HAVE A PURPOSE OF EVADING AND AVOIDING A

9    PROHIBITION AGAINST EXPORTING THOSE GOODS, DIRECTLY OR

10    INDIRECTLY, TO IRAN OR THE GOVERNMENT OF IRAN?

11    **A.**    YES, SIR.

12    **Q.**    WAS THAT A WRITTEN PLEA AGREEMENT?

13    **A.**    YES, SIR.

14    **Q.**    DID YOUR PLEA AGREEMENT IDENTIFY YOUR CO-CONSPIRATORS?

15    **A.**    YES, SIR.

16    **Q.**    WAS ARASH GHAHREMAN IDENTIFIED AS ONE OF YOUR

17    CO-CONSPIRATORS?

18    **A.**    YES, SIR.

19    **Q.**    DO YOU SEE HIM IN THE COURTROOM TODAY?

20    **A.**    YES, SIR.

21    **Q.**    CAN YOU PLEASE POINT HIM OUT AND DESCRIBE WHAT HE IS

22    WEARING.

23    **A.**    THE GENTLEMAN IN THE MIDDLE, WEARING A GRAY SUIT.

24         **MR. COUGHLIN:**  YOUR HONOR, IF THE COURT RECORD COULD

25    REFLECT THAT THE WITNESS HAS IDENTIFIED THE DEFENDANT?

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1     **THE COURT:**  YES.

2     **Q.     (MR. COUGHLIN)** BEFORE ENTERING YOUR GUILTY PLEA DID YOU

3     AND YOUR ATTORNEY REVIEW EACH PAGE OF YOUR PLEA AGREEMENT?

4     **A.**    YES, SIR.

5     **Q.**    DID YOU DISCUSS WITH YOUR ATTORNEY THE MAXIMUM

6     PUNISHMENT YOU FACE AS A RESULT OF YOUR --

7     **A.**    YES, SIR.

8     **Q.**    -- GUILTY PLEA?

9     **A.**    YES, SIR.

10    **Q.**    MR. YILDIZ, I WOULD ASK YOU WAIT UNTIL I FINISH MY

11    QUESTION -- I KNOW YOU ARE A LITTLE NERVOUS THIS MORNING --

12    AND THEN YOU CAN ANSWER.  OKAY?

13         DID YOU ALSO ENTER INTO A COOPERATION AGREEMENT WITH THE

14    UNITED STATES?

15    **A.**    YES, SIR.

16    **Q.**    ARE YOU HOPING TO GET A BENEFIT FROM THAT COOPERATION

17    AGREEMENT?

18    **A.**    YES, SIR.

19    **Q.**    IN FACT, ONE OF THE BENEFITS IS YOU WERE CHARGED IN NINE

20    COUNTS, YOU ONLY HAD TO PLEAD TO ONE; IS THAT CORRECT?

21    **A.**    YES, SIR.

22    **Q.**    HAS ANY BENEFIT BEEN PROMISED IN EXCHANGE FOR YOUR

23    COOPERATION?

24    **A.**    NO.

25    **Q.**    WHO MAKES THE FINAL DETERMINATION OF WHAT YOUR SENTENCE

APRIL 16, 2015

YILDIZ - DIRECT EXAMINATION

1   WILL BE?

2   **A.**     THE JUDGE.

3   **Q.**     PRIOR TO YOUR ARREST, WHERE WERE YOU RESIDING?

4   **A.**     IN DUBAI, UNITED ARAB EMIRATES.

5   **Q.**     AND HOW DID YOU EARN YOUR LIVING?

6   **A.**     I WAS PARTNERSHIP IN SEVERAL COMPANIES.

7   **Q.**     DID YOU START UP ANY OF THOSE COMPANIES IN THE UNITED

8   ARAB EMIRATES?

9   **A.**     YES, SIR.

10  **Q.**     AND WHAT WERE THEY?

11  **A.**     GERMAN COMPLETE SOLUTION, GCS, A TRADE COMPANY.

12  **Q.**     AND WHAT KIND OF SERVICES OR GOODS WERE THOSE TWO

13  COMPANIES INVOLVED IN DELIVERING?

14  **A.**     GCS WAS INTO ALUMINUM EXTRUSION BUSINESS.  AND I USED TO

15  REPRESENT A COMPANY FROM HOLLAND WHICH SUPPLIES THE LOCAL

16  MARKET IN ARAB EMIRATES FOR INDUSTRIAL EQUIPMENT.

17  **Q.**     WHAT ABOUT DITEC?

18  **A.**     DITEC WAS A MANUFACTURING COMPANY IN STEEL AND ALUMINUM

19  BUSINESS.

20  **Q.**     SO WERE THOSE TWO COMPANIES RELATED?

21  **A.**     NO.

22  **Q.**     AND WHO WERE YOUR CUSTOMERS FOR THOSE TWO COMPANIES?

23  **A.**     GCS WAS LOCAL ALUMINUM EXTRUSION MARKET, AND DITEC WAS

24  MOLD MAKING MAINLY, ALSO THE SAME SIMILAR COMPANIES.

25  **Q.**     AND WHERE WERE THOSE CUSTOMERS LOCATED THAT USED GCS AND

APRIL 16, 2015

704

YILDIZ – DIRECT EXAMINATION

1    DITEC?

2    **A.**    BOTH IN UNITED ARAB EMIRATES.

3    **Q.**    AND WHERE ELSE?  ANYWHERE ELSE?

4    **A.**    NOWHERE ELSE.

5    **Q.**    DID YOU HAVE INDIVIDUALS WHO SUPPORTED YOU FINANCIALLY

6    OR PROVIDED YOU LOANS IN SUPPORT OF THOSE TWO BUSINESSES?

7    **A.**    OCCASIONALLY, YES.

8    **Q.**    FROM TIME TO TIME DID YOU HAVE ANY IRANIAN CUSTOMERS

9    WITH THOSE PARTICULAR BUSINESSES, GCS OR DITEC?

10   **A.**    NO.

11   **Q.**    DO YOU KNOW A PERSON BY THE NAME OF KOORUSH TAHERKHANI?

12   **A.**    YES.

13   **Q.**    HOW DID YOU MEET HIM?

14   **A.**    I WAS ENGAGED IN A PROJECT, AND HE WAS RECOMMENDED AS A

15   CONSULTANT TO ME FROM MY POTENTIAL CUSTOMER.

16   **Q.**    CAN YOU TELL US A LITTLE BIT ABOUT THE PROJECT YOU WERE

17   ENGAGED IN?

18   **A.**    THAT WAS A REQUEST OF MANUFACTURING SOME SPARE PARTS FOR

19   POWER PLANTS, AND THE FINAL POWER PLANTS WAS IN IRAN, BUT THE

20   PRODUCTION SUPPOSED TO BE IN UNITED ARAB EMIRATES.

21   **Q.**    SO IN CONNECTION WITH THAT YOU ARE INDICATING THAT

22   ALTHOUGH THE CUSTOMER WAS IN IRAN, THE PRODUCTION AND

23   MANUFACTURING WOULD TAKE PLACE IN UNITED ARAB EMIRATES?

24   **A.**    YES, SIR.

25   **Q.**    BUT IN A SENSE THE CUSTOMERS WERE IRANIAN; IS THAT FAIR

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1   TO SAY?

2   **A.**    YES.

3   **Q.**    SO AT LEAST AS TO ONE SET OF CUSTOMERS THEY WERE IN

4   IRAN; IS THAT FAIR TO SAY?

5   **A.**    YES, SIR.

6   **Q.**    WOULD YOU RECOGNIZE A PHOTOGRAPH OF MR. TAHERKHANI?

7   **A.**    YES, SIR, I WOULD.

8   **Q.**    I AM GOING TO SHOW YOU WHAT HAS BEEN MARKED AND ADMITTED

9   AS GOVERNMENT EXHIBIT 121.

10          **MR. COUGHLIN:**  AND GO TO THE NEXT PAGE.

11  **Q.**    **(MR. COUGHLIN)** DO YOU RECOGNIZE THE PHOTOGRAPH HERE ON

12  THIS EXHIBIT?

13  **A.**    YES, SIR.

14  **Q.**    IS THAT MR. TAHERKHANI?

15  **A.**    YES, IT IS.

16  **Q.**    NOW, YOU INDICATED YOU MET HIM INITIALLY IN THIS DEAL

17  WITH THE IRANIAN POWER PLANT; IS THAT RIGHT?

18  **A.**    YES, SIR.

19  **Q.**    WHAT DID YOU UNDERSTAND HIS ROLE WAS WITH THE IRANIAN

20  POWER PLANT, IF YOU KNOW?

21  **A.**    HE WAS AN INTERMEDIARY.  SINCE HE WAS LIVING IN DUBAI HE

22  USED TO MAKE THE CONTRACTS OR ANY KIND OF TRADE NEEDED HE USED

23  TO -- SUPPOSED TO HANDLE IT.

24  **Q.**    THAT IS HOW HE WAS INTRODUCED TO YOU?

25  **A.**    YES.

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1  Q.    NOW, HAVE YOU EVER BEEN TO MR. TAHERKHANI'S HOME?

2  A.    YES, I WAS.

3  Q.    AND WHERE IS IT LOCATED?

4  A.    IN TEHRAN.

5  Q.    DO YOU KNOW IF HE IS MARRIED?

6  A.    YES.

7  Q.    DOES HE HAVE ANY CHILDREN?

8  A.    YES, HE HAS.

9  Q.    AND WHAT KIND OF BUSINESS DID YOU UNDERSTAND MR.

10 TAHERKHANI WAS INVOLVED IN -- ASIDE AND APART FROM THE IRANIAN

11 POWER PLANT, WHAT KIND OF GENERAL BUSINESS DID YOU UNDERSTAND

12 MR. TAHERKHANI WAS INVOLVED IN WHEN YOU FIRST MET HIM?

13 A.    WHAT I UNDERSTOOD HE WAS INTO SHIP BUSINESS AND MAINLY

14 INTO SPARE PARTS, RESOURCING OF SPARE PARTS AND REPAIR OF SHIP

15 PARTS.

16 Q.    ARE YOU FAMILIAR WITH A CITY CALLED BANDAR ABBAS?

17 A.    YES, I AM.

18 Q.    WHERE IS THAT LOCATED?

19 A.    IN THE SOUTH OF IRAN.

20 Q.    AND DO YOU KNOW WHETHER MR. TAHERKHANI WOULD EVER BE

21 IN -- AT BANDAR ABBAS?

22 A.    YES, HE IN -- SEVERAL TIMES HE USED TO CALL ME AND TOLD

23 ME HE IS THERE.

24 Q.    IN BANDAR ABBAS?

25 A.    YES.

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1   **Q.**   SO WHAT WOULD YOU SAY IS MR. TAHERKHANI'S AREA OF

2   EXPERTISE FROM WHAT YOU KNEW?

3   **A.**   HE WAS INTO SHIP MAINTENANCE AND RESOURCING OF SPARE

4   PARTS.

5   **Q.**   DO YOU KNOW IF HE HAD PREVIOUSLY WORKED IN IRAN?

6   **A.**   YES.

7   **Q.**   WHAT COMPANIES, IF YOU KNOW, DID HE WORK AT, IF YOU

8   KNOW?

9   **A.**   AS MUCH TO MY KNOWLEDGE HE WAS EMPLOYED BY IRISL, WHICH

10  IS IRANIAN SHIPPING COMPANY, I THINK GOVERNMENT COMPANY.  AND

11  AFTER THAT HE WAS SELF EMPLOYED, MAINLY.

12  **Q.**   NOW, WITH REGARD TO THE COMPANY HE WAS EMPLOYED BY, IS

13  THAT AN IRANIAN GOVERNMENT COMPANY?

14  **A.**   TO MY KNOWLEDGE, YES.

15  **Q.**   DID THE BUSINESS RELATIONSHIP WITH MR. TAHERKHANI

16  EVENTUALLY EVOLVE INTO A FRIENDSHIP?

17  **A.**   YES, IT DID.

18  **Q.**   AND DID YOU ENGAGE IN SOCIAL OUTINGS WITH MR. TAHERKHANI

19  IN ADDITION TO BUSINESS OUTINGS?

20  **A.**   YES.

21  **Q.**   DID THERE COME A TIME WHEN MR. TAHERKHANI OFFERED YOU A

22  BUSINESS OPPORTUNITY?

23  **A.**   YES, HE DID.

24  **Q.**   WHAT WAS HIS OFFER TO YOU?

25  **A.**   HE HAD RUNNING COMPANY CALLED TIG, AND HE WANTED TO

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1  CHANGE HIS PARTNERSHIPS.  AND OFFERED ME TO TAKE IT OVER AND

2  HOLD WITH HIM THE STAKES.  AND PROMISED ME THAT WE WILL HAVE A

3  LONG-TERM RUN GOOD MANUFACTURING AND MAINTENANCE BUSINESS

4  TOGETHER.

5  **Q.**    DO YOU REMEMBER WHEN, APPROXIMATELY, THAT OFFER WAS MADE

6  TO YOU?

7  **A.**    IN 2010.

8  **Q.**    WAS THERE ANY FINANCIAL COMPONENT TO THAT OFFER?

9  **A.**    YES.  WE SUPPOSED TO SHARE THE REMAINING COST OF THE

10  BUILDING AND THE BUYING THE -- BUYING EQUIPMENT FOR THE SHOP.

11  AND UNTIL THE BUSINESS RUNS HE WOULD GRANT ME BENEFITS IN

12  FINANCIAL WAY TO KEEP HOLDING ON IT.

13  **Q.**    AND WHAT WERE SOME OF THE BENEFITS THAT HE AGREED TO

14  GRANT YOU?

15  **A.**    HE SUPPOSED TO PAY ME AROUND $80,000 A YEAR.

16  **Q.**    WAS THERE ANY DISCUSSION ABOUT WHY -- THE FACT THAT YOU

17  WERE A GERMAN NATIONAL, DID THAT ENTER INTO IT?

18  **A.**    YES, IT WAS.

19  **Q.**    CAN YOU TELL ME A LITTLE BIT ABOUT WHY THAT WAS A

20  FACTOR?

21  **A.**    IRANIAN NATIONALS WERE BANNED TO OWN ANY KIND OF

22  COMPANY -- NEW COMPANY LICENSES.  AND ALSO NO MORE VISAS WERE

23  ISSUED FROM THE GOVERNMENT OF UNITED ARAB EMIRATES IN THAT

24  PERIOD.  AND HE WAS NOT ABLE TO KEEP THE COMPANY UNDER HIS

25  NAME, SO IT WAS, FOR HIM, BENEFICIAL THAT I HOLD THE COMPANY

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1    UNDER MY NATIONALSHIP.

2    **Q.**    AND IN THAT PARTICULAR ROLE THAT YOU PLAYED, DID YOU

3    HAVE A TITLE?

4    **A.**    YES.  AS OWNER OF THE COMPANY I WAS RESPONSIBLE FOR

5    EVERYTHING.  AND IN UNITED ARAB EMIRATES IT IS CALLED THE

6    MANAGER.

7    **Q.**    HAD YOU -- PRIOR TO MR. TAHERKHANI TALKING TO YOU ABOUT

8    TIG MARINE, HAD YOU EVER HEARD ABOUT TIG MARINE?

9    **A.**    NO, I DIDN'T.

10   **Q.**    DID TIG MARINE HAVE AN ACTUAL LOCATION?

11   **A.**    YES.  IT WAS LOCATED IN THE DMC, DUBAI MARITIME CITY,

12   WHICH IS SEMI FREE ZONE NEXT TO THE DRY DOCKS OF DUBAI WORLD.

13   **Q.**    IN CONNECTION WITH THIS LOCATION, HOW MANY BUILDINGS DID

14   IT OCCUPY?

15   **A.**    TIG WAS UNDER THE -- WAS RENTING ONE ENTIRE HANGAR,

16   WHICH WAS APPROXIMATELY 5,000 SQUARE FOOT.

17   **Q.**    WERE THERE ANY EMPLOYEES THAT YOU WERE AWARE OF WHEN YOU

18   FIRST CAME ON BOARD AT TIG?

19   **A.**    THERE WAS ONE SECRETARY PRESENT.

20   **Q.**    DO YOU REMEMBER WHAT HER NAME WAS?

21   **A.**    I KNOW HER FIRST NAME WAS MAE.

22   **Q.**    DID YOU EVER RECEIVE ANY OF THIS PROMISED $80,000

23   COMPENSATION?

24   **A.**    NO.

25   **Q.**    DID YOU MAKE A FINANCIAL INVESTMENT IN TIG MARINE?

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1    **A.**    YES, I DID.

2    **Q.**    AND APPROXIMATELY HOW MUCH DID YOU INVEST IN TIG?

3    **A.**    APPROXIMATELY $100,000.

4    **Q.**    AND WHY DID YOU INVEST IN TIG?

5    **A.**    IT WAS NECESSARY TO BUILD UP THE COMPANY TO KEEP IT UP

6    AND RUNNING FOR FUTURE MAINTENANCE BUSINESS.

7    **Q.**    PRIOR TO JOINING TIG, WERE YOU AWARE OF MR. TAHERKHANI'S

8    PREVIOUS PARTNERS?

9    **A.**    I MET THEM.

10   **Q.**    OKAY.  AND WHAT CITIZENSHIP WERE THEY?

11   **A.**    THEY WERE IRANIAN NATIONALS.

12   **Q.**    DO YOU KNOW IF THEY WERE ABLE TO EVER CONDUCT ANY

13   BUSINESS THAT YOU HEARD ABOUT?

14   **A.**    I DIDN'T KNOW ABOUT ANY DONE BUSINESS, BUT THEY WERE NOT

15   TALKING ANY ENGLISH SO IT WAS HARD FOR ME TO COMMUNICATE WITH

16   THEM.

17   **Q.**    AFTER YOU JOINED THE COMPANY IN APPROXIMATELY 2010, HOW

18   OFTEN DID YOU COME TO THE LOCATION?

19   **A.**    I OCCASIONALLY VISITED JUST TO LOOK AFTER EVERYTHING IS

20   CLEAN, BECAUSE THE COMPANY WASN'T RUNNING DUE TO

21   ADMINISTRATIVE PROBLEMS FROM DUBAI MARITIME CITY.

22   **Q.**    WERE YOU AWARE OF WHETHER OR NOT MR. TAHERKHANI, AFTER

23   YOU JOINED, WAS USING THE COMPANY TO SECURE CUSTOMERS OR MAKE

24   DEALS?

25   **A.**    YES, I WAS AWARE OF IT.

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1  **Q.**    IS THE ANSWER THAT HE WAS OR WAS NOT?

2  **A.**    HE WAS.

3  **Q.**    DID YOU SHARE IN ANY OF THE PROFITS OF THOSE DEALS?

4  **A.**    NO.

5  **Q.**    DID TIG MARINE HAVE A WEBSITE?

6  **A.**    YES, HE DID.

7  **Q.**    AND WERE YOU -- WERE YOU INVOLVED IN PUTTING IT TOGETHER

8  IN ANY WAY?

9  **A.**    NO, I WASN'T.

10 **Q.**    DID YOU EVER MAKE ANY CORRECTIONS OR SUGGESTIONS AS TO

11 WHAT SHOULD BE ON THE WEBSITE?

12 **A.**    NO, I WASN'T.

13 **Q.**    DID YOU SPEND ANY TIME REVIEWING THE WEBSITE?

14 **A.**    MAYBE IN ONE, TWO OCCASIONS I HAD TO LOOK ON IT.  IT WAS

15 AROUND FIVE PAGES.

16 **Q.**    OKAY.  IS YOUR NAME ON THE WEBSITE?

17 **A.**    I DON'T THINK SO.

18 **Q.**    WAS IT IN EXISTENCE WHEN YOU JOINED THE COMPANY?

19 **A.**    YES, IT WAS.

20 **Q.**    AFTER YOU CAME INTO THE COMPANY AND TOOK ON THE ROLE OF

21 MANAGER, WHAT WAS MR. TAHERKHANI'S TITLE OR ROLE, IF YOU WILL?

22 **A.**    HE SHOWED HIMSELF AS THE MANAGING DIRECTOR.

23 **Q.**    IN CONNECTION WITH MR. TAHERKHANI, WAS THERE EVER A

24 POINT IN TIME WHERE YOU LEARNED THAT HE HAD SUFFERED A

25 SIGNIFICANT LOSS IN A BUSINESS TRANSACTION?

APRIL 16, 2015

1    **A.**    YES, HE DID.

2    **Q.**    AND DID HE EVER DISCUSS THAT LOSS WITH YOU?

3    **A.**    YES, HE DISCUSSED IT WITH ME.

4    **Q.**    AND WHO WERE THE PARTIES THAT WERE INVOLVED IN THE DEAL?

5    **A.**    THERE WAS ONE GENTLEMAN FROM SOUTH AFRICA.  HE

6    INTRODUCED ME TO HIM, AND WE HAD A SMALL TALK, NOT MAJOR

7    SPEECH.  AND THAT THEY WERE PLANNING TO DO SOME BUSINESS

8    TOGETHER, SHIPPING SOME SPARE PARTS FROM SOUTH AFRICA TO IRAN.

9    **Q.**    AND IN CONNECTION WITH THAT SITUATION, DID MR.

10   TAHERKHANI PAY SOME MONEY?

11   **A.**    YES, HE DID.

12   **Q.**    DO YOU REMEMBER HOW MUCH IT WAS?  IF HE TOLD YOU.

13   **A.**    I REMEMBER AROUND $200,000.

14          **MR. JOHNSTON:**  YOUR HONOR, I WILL OBJECT ON

15   FOUNDATION GROUNDS, AS WELL AS HEARSAY.

16          **THE COURT:**   IT IS OFFERED UNDER 801(D)(2)(E) AS TO

17   THE STATEMENTS ATTRIBUTED TO MR. TAHERKHANI?

18          **MR. COUGHLIN:**  YES.

19          **THE COURT:**  I WOULD OVERRULE THE HEARSAY OBJECTION.

20   I WOULD SUSTAIN THE OBJECTION ON FOUNDATION AS TO THE DOLLAR

21   AMOUNT.

22          **MR. JOHNSTON:**  I AM SORRY, YOUR HONOR.  JUST WITH

23   REGARD TO 801, I DON'T BELIEVE THAT INCORPORATES CONSPIRACY

24   CHARGES.

25          **THE COURT:**  I DO BELIEVE IT COULD BE IN FURTHERANCE

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1    OF, SO I WOULD STAND ON THE RULING.

2            MR. COUGHLIN.

3            **MR. COUGHLIN:**  THANK YOU, YOUR HONOR.

4    **Q.**    **(MR. COUGHLIN)** BASED ON THAT EXPERIENCE, DID MR.

5    TAHERKHANI INDICATE TO YOU HOW HE WOULD PROCEED IN THE FUTURE

6    IN CONDUCTING HIS BUSINESS?

7    **A.**    YES.  HE SAID HE WOULDN'T NO MORE TRUST NOBODY BECAUSE

8    HE COULDN'T CLAIM, AFTER IT WOULD GO WRONG, ANY BUSINESS, HE

9    COULDN'T CLAIM NOWHERE BECAUSE OF HIS IRANIAN CITIZENSHIP AND

10   DUE TO THE NATURE OF THE BUSINESS.

11   **Q.**    AND WHEN YOU MEAN THE NATURE OF THE BUSINESS, THE FACT

12   THAT GOODS WERE GOING TO IRAN?

13   **A.**    YES.

14   **Q.**    IF YOU RECALL, WHEN WAS APPROXIMATELY THE TIME YOU HEARD

15   ABOUT A DEAL INVOLVING A NAVIGAT-2100?

16   **A.**    SOMETIME BEGINNING OF 2013.

17   **Q.**    AND IF YOU KNOW, WAS MR. TAHERKHANI INVOLVED IN THAT

18   TRANSACTION?

19   **A.**    YES, SIR.

20   **Q.**    WERE YOU INITIALLY CONSULTED ABOUT THAT TRANSACTION?

21   **A.**    NO.

22   **Q.**    MR. YILDIZ, AGAIN I WOULD ASK YOU TO JUST LISTEN TO MY

23   QUESTION.  YOU ARE VERY ANXIOUS TO GIVE THE ANSWER, BUT JUST

24   MAKE SURE YOU UNDERSTAND THE QUESTION.  THANK YOU.

25           WAS HE WORKING WITH ANYONE ELSE ON THE NAVIGAT DEAL?

APRIL 16, 2015

714

YILDIZ – DIRECT EXAMINATION

1   **A.**    YES, SIR.

2   **Q.**    AND DID YOU COME TO FIND OUT WHO THAT WAS?

3   **A.**    YES.  MR. GHAHREMAN.

4   **Q.**    AND IS THAT ARASH GHAHREMAN?

5   **A.**    YES, SIR.

6   **Q.**    WHAT DID YOU LEARN ABOUT MR. GHAHREMAN FROM MR.

7   TAHERKHANI WITH REGARD TO THE NAVIGAT?

8   **A.**    I HAVE BEEN TOLD FROM MR. KOORUSH THAT HE WAS HIS OLD

9   FRIEND AND ROOMMATE OR CLASSMATE FROM THE SCHOOL TIMES.  THAT

10  HE IS LIVING IN NEW YORK.  AND THEY HAVEN'T SEEN EACH OTHER

11  FOR LONG TIME BUT THEY KNOW EACH OTHER VERY GOOD, AND HE WOULD

12  BE REPRESENTING TIG IN UNITED STATES.

13  **Q.**    SO MR. TAHERKHANI TOLD YOU THAT?

14  **A.**    YES, SIR.

15  **Q.**    DID ANYTHING HE TOLD YOU INDICATE THAT YOU NEEDED TO

16  BECOME MORE INVOLVED IN THE DEAL AT ALL, AT THAT TIME?

17  **A.**    IN REGARDS OF THE MONEY TRANSACTION, YES.

18  **Q.**    NOW, WERE YOU AWARE THAT IN DECEMBER OF 2013 THAT TIG

19  MARINE SIGNED AN END USER STATEMENT AFFIXING YOUR NAME AND A

20  SIGNATURE ON YOUR BEHALF?

21  **A.**    I HAVE BEEN TOLD THAT, YES.

22  **Q.**    BUT WERE YOU AWARE AT THE TIME OF THAT?

23  **A.**    YES, SIR.

24  **Q.**    SO AS EARLY AS DECEMBER YOU KNEW THAT AN END USER

25  STATEMENT HAD BEEN SENT WITH YOUR NAME ON IT?

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1   **A.**    NO.  I KNEW ABOUT IT IN JANUARY, SINCE I WAS THE FIRST

2   TIME CONTACTED ABOUT THIS BUSINESS IN JANUARY, NOT IN

3   DECEMBER.

4   **Q.**    NOT IN DECEMBER OF 2012?

5   **A.**    NO.

6   **Q.**    ARE YOU FAMILIAR WITH THE TERM A LETTER OF CREDIT, OR A

7   ANOTHER TERM USED TO SECURE A LOAN?

8   **A.**    YES.  THERE ARE TWO WAYS, WHICH IS LOC, LETTER OF

9   CREDIT, INTERNATIONAL BANK GUARANTEES, AND SBLC, STANDBY

10  LETTER OF CREDIT.

11  **Q.**    DO YOU UNDERSTAND WHAT THOSE ARE?

12  **A.**    YES, SIR.

13  **Q.**    CAN YOU GIVE US JUST A LITTLE BIT OF INFORMATION ABOUT

14  WHAT THOSE ARE?

15  **A.**    INTERNATIONALLY, WE MAKE ANY KIND OF ITEMS BIGGER THAN

16  USUAL AMOUNTS, LIKE MACHINES, AND SUPPLY COUNTRIES

17  INTERNATIONAL LIKE BETWEEN UNITED ARAB EMIRATES OR GERMANY,

18  YOU SECURE YOUR PAYMENTS ALWAYS WITH A LETTER OF CREDIT, WHICH

19  MEANS ONE BANK GIVES THE OTHER BANK A GUARANTEE THAT YOU WILL

20  GET YOUR PAYMENT AS SOON AS THE GOODS ARRIVE AT THE CUSTOMER'S

21  SITE.

22  **Q.**    AND WHAT ABOUT A STANDBY LETTER OF CREDIT, WHAT DOES

23  THAT MEAN?

24  **A.**    THAT'S A KIND OF SECONDARY CHOICE AS MUCH -- AS TO MY

25  KNOWLEDGE FROM MY BANK CONSULTANT.  AND IT IS NOT REALLY

APRIL 16, 2015

YILDIZ - DIRECT EXAMINATION

1    APPRECIATED TO USE IT THAT WAY.

2    **Q.**    HAVE YOU EVER USED A STANDBY LETTER OF CREDIT?

3    **A.**    NO, I DIDN'T.

4    **Q.**    DID THERE COME A TIME THAT YOU LEARNED THAT MR.

5    TAHERKHANI WAS THINKING ABOUT TRAVELING TO THE UNITED STATES

6    IN RELATION TO THE NAVIGAT DEAL?

7    **A.**    YES, SIR.

8    **Q.**    WHAT DID HE SAY ABOUT THAT?

9    **A.**    THAT HE WAS INVITED BY THE SUPPLIER TO COME OVER AND SEE

10   THE COMPANY, AND ALSO IN THE SAME MANNER THAT THEY HAVE SOME

11   BUSINESS MEETINGS TOGETHER.  IT WAS INITIAL IDEA OF TRAVELING

12   TO UNITED STATES FROM HIM.

13   **Q.**    AND DO YOU KNOW WHETHER MR. GHAHREMAN WAS ALSO GOING TO

14   BE PRESENT AT THE MEETING?

15   **A.**    YES, HE WAS.

16   **Q.**    WHEN YOU WERE HAVING THESE CONVERSATIONS ABOUT MR.

17   TAHERKHANI TRAVELING TO THE UNITED STATES, DO YOU REMEMBER

18   APPROXIMATELY WHEN WAS THAT?

19   **A.**    SOMETIME IN APRIL OR MARCH.

20   **Q.**    OKAY.  DID HE, IN FACT, TRAVEL TO THE UNITED STATES?

21   **A.**    NO, HE DIDN'T.

22   **Q.**    DID YOU EVER UNDERSTAND WHY HE DID NOT TRAVEL TO THE

23   UNITED STATES TO CONDUCT THIS TRANSACTION?

24   **A.**    HE TOLD ME THAT HIS VISA WOULD TAKE TOO MUCH TIME.

25   **Q.**    DID SOMEONE GO IN HIS PLACE?

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1   **A.**    YES.

2   **Q.**    WHO WAS THAT?

3   **A.**    I DID.

4   **Q.**    WHY WERE YOU WILLING TO GO IN MR. TAHERKHANI'S PLACE?

5   **A.**    TO FULFILL THE BUSINESS, WHAT WE HAVE STARTED AT THE

6   TIME.

7   **Q.**    DID YOU VIEW THIS AS AN OPPORTUNITY FOR TIG TO MAKE SOME

8   MONEY?

9   **A.**    YES, SIR.

10  **Q.**    PRIOR TO THIS TRANSACTION, HAD YOU MADE ANY MONEY

11  YOURSELF --

12  **A.**    NO.

13  **Q.**    -- IN CONNECTION WITH TIG'S BUSINESS?

14  **A.**    NO, I DIDN'T.

15  **Q.**    AND AGAIN, YOU INDICATED BETWEEN 2011 AND 2013 YOU HAD

16  NOT RECEIVED YOUR PROMISED ANNUAL COMPENSATION?

17  **A.**    NO.  HE JUST COMPENSATE THE RENTAL, WHAT WAS DUE TO MY

18  PART.

19  **Q.**    SO YOU ARE SAYING PART OF HIS PAYMENT WAS PAY PART OF

20  THE RENT OF THE TIG MARINE LOCATION?

21  **A.**    YES, SIR.

22  **Q.**    AS YOU GOT CLOSER TO THE NAVIGAT-2100 DEAL IN TRAVELING

23  TO THE UNITED STATES, AT THAT TIME, IN 2013, HOW WAS MR.

24  TAHERKHANI USING TIG MARINE?

25  **A.**    HE WAS TRYING TO SOURCE SPARE PARTS FOR HIS CUSTOMERS.

APRIL 16, 2015

718

YILDIZ – DIRECT EXAMINATION

1  **Q.**    AND WHERE, TO YOUR KNOWLEDGE, WERE HIS CUSTOMERS

2  LOCATED?

3  **A.**    IRAN.  IRANIAN CUSTOMERS.

4  **Q.**    WAS THAT SOMETHING THAT YOU KNEW FULL WELL?

5  **A.**    YES, I KNEW.

6  **Q.**    DID HE DIRECT YOU TO GO TO THE UNITED STATES, OR DID YOU

7  MAKE THAT CHOICE YOURSELF?

8  **A.**    I MAKE THE INITIATION.

9  **Q.**    PRIOR TO LEAVING FOR THE UNITED STATES, DID YOU HAVE ANY

10  PERSONAL CONVERSATIONS WITH MR. GHAHREMAN?

11  **A.**    NO, I DIDN'T.

12  **Q.**    HOW MANY PRODUCTS WERE YOU AWARE WERE INVOLVED IN THE

13  NAVIGAT TRANSACTION?

14  **A.**    INITIALLY IT WAS JUST THE NAVIGAT ITSELF, AND THEN PRIOR

15  TO, TWO DAYS BEFORE I TRAVELED TO THE UNITED STATES, I WAS

16  TOLD THERE IS ANOTHER ITEM CALLED Y-690.

17  **Q.**    PRIOR TO THAT YOU WERE UNAWARE?

18  **A.**    I WAS UNAWARE OF IT.

19  **Q.**    WHAT WAS EXPLAINED TO YOU ABOUT WHAT THE Y-690 DID, IF

20  ANYTHING?

21  **A.**    IT WAS JUST A SMALL STATEMENT ABOUT IT WAS A TRANSMITTER

22  BETWEEN SHIP AND AIR TRAFFIC, OR SOMETHING LIKE THAT.

23  **Q.**    DO YOU HAVE ANY EXPERTISE IN THE NAVIGAT-2100 OR THE

24  Y-690?

25  **A.**    NO, I DON'T.

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1  **Q.**    BASED ON YOUR EXPERIENCE AND KNOWLEDGE OF MR.

2  TAHERKHANI, WHERE DID YOU UNDERSTAND THE PRODUCTS WOULD BE

3  GOING?

4  **A.**    THEY WOULD BE GOING TO IRAN.

5  **Q.**    WOULD THEY BE GOING DIRECTLY TO IRAN?

6  **A.**    HE TOLD ME THAT HE HAS END USER CERTIFICATES MADE UP IN

7  DUBAI, BUT I UNDERSTOOD THAT THE FINAL CUSTOMER WAS IN IRAN.

8  **Q.**    AT SOME POINT IN TIME DID YOU THEN TRAVEL TO THE UNITED

9  STATES?

10  **A.**    YES, SIR.

11  **Q.**    AND DO YOU REMEMBER WHEN THAT WAS?

12  **A.**    13TH JUNE, 2013.

13  **Q.**    AND DID YOU GO IN OR AROUND LAS VEGAS, NEVADA?

14  **A.**    YES, SIR.

15  **Q.**    AND WHERE WERE YOU STAYING?

16  **A.**    IN HOTEL BELLAGIO.

17  **Q.**    AND IF I WAS TO TELL YOU THAT IT APPEARS AS THOUGH YOU

18  TRAVELED ON THE DAY BEFORE, ON JUNE 12TH, WOULD THAT BE

19  APPROPRIATE AS WELL?

20  **A.**    WOULD BE, YEAH.

21  **Q.**    SO DID THERE COME A POINT IN TIME WHEN YOU HAD ARRIVED

22  IN LAS VEGAS THAT YOU MET MR. GHAHREMAN?

23  **A.**    YES, I DID.

24  **Q.**    DID YOU MEET HIM THE DAY YOU ARRIVED, OR THE NEXT DAY?

25  **A.**    THE DAY I ARRIVED.

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1   Q.   GOING TO DIRECT YOUR ATTENTION, THEN, TO THE NEXT DAY,

2   JUNE 12TH.  DID YOU ATTEND A MEETING?

3   A.   YES, I DID.

4   Q.   WAS THAT WITH THE BROKERS OF THE PRODUCTS?

5   A.   YES, SIR.

6   Q.   WAS MR. GHAHREMAN THERE AS WELL?

7   A.   YES, SIR.

8   Q.   WERE YOU AWARE THAT MR. GHAHREMAN WAS ACTING AS THE

9   AGENT OF TIG MARINE --

10   A.   YES, SIR.

11   Q.   -- IN THE UNITED STATES?

12        AND WHO TOLD YOU THAT?

13   A.   KOORUSH TOLD ME.

14   Q.   AND DID HE TELL YOU THAT IN JANUARY OF THAT YEAR, OR

15   LATER?

16   A.    IN JANUARY HE TOLD ME WE ARE GOING INTO A CONTRACT WITH

17   HIM BEING OUR REPRESENTATIVE IN THE UNITED STATES.

18   Q.   AND PRIOR TO MEETING WITH THE BROKER AND MR. GHAHREMAN

19   ON JUNE 13TH, WERE YOU AWARE IF ANY MONEY HAD BEEN PAID

20   TOWARDS THE PURCHASE OF THESE GOODS?

21   A.   YES, SIR.

22   Q.   AND HOW MUCH WAS PAID, IF YOU KNOW?

23   A.   $28,000.

24   Q.   AND WAS THAT MONEY THAT YOU HAD ANY INTEREST IN?

25   A.   NO.

APRIL 16, 2015

1  **Q.**    DID YOU DIRECT ANYONE TO SEND THAT MONEY ON BEHALF OF

2  TIG MARINE?

3  **A.**    I SUGGESTED HIM SOME INVESTORS.

4  **Q.**    AND DO YOU KNOW WHERE MR. TAHERKHANI ACTUALLY GOT THAT

5  28,000?

6  **A.**    NO, I DON'T KNOW.

7  **Q.**    WHAT WAS THE PURPOSE OF THE MEETING ON JUNE 13TH WITH

8  THE BROKER AND MR. GHAHREMAN?

9  **A.**    THAT TO INTRODUCE OUR COMPANY AND TO MEET THIS POTENTIAL

10  SUPPLIER WHICH WOULD BE A GOOD SOURCE IN FUTURE AS A SUPPLY

11  COMPANY.  AND THE SECOND REASON WAS TO VERIFY THE ITEMS.

12  **Q.**    DID YOU EVER -- DID YOU HAVE ANY DISCUSSION ABOUT

13  VERIFYING THE ITEMS WITH MR. GHAHREMAN?

14  **A.**    YES, WE DID.

15  **Q.**    BEFORE YOU ATTENDED THE MEETING?

16  **A.**    YES.

17  **Q.**    AND WHO WAS GOING TO BE DOING THE VERIFYING?

18  **A.**    MR. GHAHREMAN.

19  **Q.**    AT THE MEETING ON THE 13TH, WAS THAT WHERE YOU WERE

20  STAYING OR DID YOU GO TO A DIFFERENT LOCATION?

21  **A.**    WE WENT TO A DIFFERENT LOCATION.

22  **Q.**    AND WHAT WAS DISCUSSED AT THAT MEETING, IN GENERAL?

23  **A.**    GENERALLY ABOUT THE FUTURE BUSINESS AND THE CURRENT

24  BUSINESS WAS THE TIG MARINE AND BROKERS.  AND VERIFYING THE

25  ITEMS, AND JUST INTRODUCING EACH OTHER.

APRIL 16, 2015

YILDIZ - DIRECT EXAMINATION

1    **Q.**    DID YOU HAVE AN OPPORTUNITY TO LOOK AT THE ITEMS?

2    **A.**    YES, I DID.

3    **Q.**    AND DID MR. GHAHREMAN, TO YOUR KNOWLEDGE, HAVE AN

4    OPPORTUNITY TO LOOK AT THEM?

5    **A.**    YES, HE DID.

6    **Q.**    WAS THERE ANY DISCUSSION AT THOSE MEETINGS ABOUT THE

7    RISK OF ENGAGING IN THE TYPE OF TRANSACTIONS WITH THESE

8    PARTICULAR ITEMS?

9    **A.**    YES, IT WAS.

10   **Q.**    CAN YOU TELL US WHAT THAT DISCUSSION WAS ABOUT THAT?

11   **A.**    THE DISCUSSION WAS THAT THE ITEMS WERE QUITE SENSITIVE

12   ITEMS, AND THAT THE FINAL DESTINATION WAS IN IRAN.  AND WE

13   NEEDED TO BE CAREFUL WITH THE SHIPMENTS TO NOT EXPOSE THEM TO

14   THE CUSTOMS, ALSO TO THE GOVERNMENT OF THE UNITED STATES, DUE

15   TO THE SANCTIONS.

16          **MR. JOHNSTON:**  YOUR HONOR, I WILL OBJECT AS TO

17   VAGUENESS AS TO WHO PROVIDED THE STATEMENTS.

18          **THE COURT:**  SUSTAINED.  FOUNDATION.

19          **MR. COUGHLIN:**  OKAY.

20   **Q.**    **(MR. COUGHLIN)** WHO WAS INVOLVED IN THE DISCUSSION?

21   WERE THE BROKERS INVOLVED?

22   **A.**    YES, SIR.

23   **Q.**    WERE YOU INVOLVED?

24   **A.**    YES, SIR.

25   **Q.**    AND WAS MR. GHAHREMAN INVOLVED?

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1   **A.**   YES, SIR.

2   **Q.**   AND WHEN YOU SAY –– YOU ARE JUST TALKING ABOUT GENERALLY

3   WHAT WAS DISCUSSED; IS THAT CORRECT?

4   **A.**   YES.

5          **MR. JOHNSTON:**  SAME OBJECTION, YOUR HONOR.

6          **THE COURT:**  OVERRULED.  THE ANSWER WILL STAND.

7   **Q.**   **(MR. COUGHLIN)** WAS THERE –– AGAIN, WAS THERE GENERAL

8   DISCUSSION ABOUT SHIPPING THE ITEMS AS WELL?

9   **A.**   YES, SIR.

10  **Q.**   DO YOU RECALL IF THERE WAS ANY DISCUSSION ABOUT REMOVING

11  THE SERIAL NUMBERS ON THE PRODUCTS?

12  **A.**   YES, SIR.

13  **Q.**   DO YOU RECALL WHO OFFERED THAT SUGGESTION?

14  **A.**   MR. GHAHREMAN.

15  **Q.**   DO YOU RECALL IF THERE WAS ANY DISCUSSION ABOUT SHIPPING

16  THE NAVIGAT AND THE Y-690'S TO DIFFERENT LOCATIONS?

17  **A.**   YES, SIR.

18  **Q.**   AND WHY WOULD THEY HAVE BEEN SHIPPED TO DIFFERENT

19  LOCATIONS, IF YOU RECALL?

20  **A.**   TO NOT SHOW THE MANUFACTURER AND THE GOVERNMENT THAT THE

21  FINAL DESTINATION WOULD BE IN DUBAI AND THEN LINKED TO IRAN.

22          **MR. JOHNSTON:**  AGAIN, I HAVE A CONTINUING OBJECTION

23  AS TO VAGUENESS AS TO WHO IS SAYING WHAT STATEMENT TO WHO.

24          **THE COURT:**  THEN I WOULD SUSTAIN THAT OBJECTION AS

25  TO THAT QUESTION AND ANSWER.

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

```
 1              MR. COUGHLIN:  OKAY.
 2    Q.    (MR. COUGHLIN) DID THIS STRIKE YOU AS A NORMAL BUSINESS
 3    TRANSACTION?
 4    A.    I DIDN'T UNDERSTAND THE QUESTION.
 5    Q.    DID THIS BUSINESS WITH THE BROKERS AND THE NAVIGAT AND
 6    THE Y-690 AND ALL OF THE DISCUSSION, DID THIS STRIKE YOU AS A
 7    NORMAL BUSINESS TRANSACTION?
 8    A.    NO, IT WAS NOT A NORMAL BUSINESS TRANSACTION.
 9    Q.    NOW, AFTER YOU HAD VIEWED THE NAVIGAT AND THE Y-690'S
10    AND HAD YOUR DISCUSSION, WHAT WAS YOUR UNDERSTANDING ABOUT THE
11    ULTIMATE DESTINATION OF THESE PRODUCTS?
12    A.    AS BOTH ITEMS WOULD GO TO IRAN.
13    Q.    WERE THERE -- WERE THE BROKERS DUE SOME MORE MONEY AS IT
14    RELATED TO THESE ITEMS?  WAS MORE MONEY TO BE PAID TO THE
15    BROKERS AT SOME POINT AFTER --
16    A.    YES, IT WAS.
17    Q.    DID YOU KNOW HOW MUCH?
18    A.    $32,000.
19    Q.    AND HOW WAS THAT GOING TO BE HANDLED?
20    A.    I WOULD CALL KOORUSH TO CONFIRM THE ITEMS WERE GENUINE,
21    AND THEN HE WOULD CONTACT THE INVESTOR TO WIRE THE MONEY TO
22    THE ACCOUNT OF THE BROKERS.
23    Q.    DID YOU HAVE ANY HAND IN SECURING THE FUNDS OR THE
24    MONIES FOR THIS NEW WIRE THAT WAS GOING TO TAKE PLACE?
25    A.    YES, SIR.
```

APRIL 16, 2015

225

YILDIZ - DIRECT EXAMINATION

1   **Q.**    CAN YOU TELL US WHAT YOUR PARTICIPATION WAS?

2   **A.**    PRIOR TO MY TRAVELING I SPOKE TO THE INVESTOR AND WE

3   MADE LIKE USUAL A DEAL THAT HE WOULD FINANCE, AND THEN I WOULD

4   REPAY HIM THE AMOUNT WITH 10 PERCENT INTEREST.

5   **Q.**    SO EVENTUALLY -- HOW LONG DID THAT MEETING LAST, IF YOU

6   RECALL, APPROXIMATELY?

7   **A.**    BETWEEN ONE AND ONE AND A HALF HOURS.

8   **Q.**    AFTER YOU LEFT THE MEETING DID YOU HAVE AN OPPORTUNITY

9   TO HAVE SOME DISCUSSION WITH MR. GHAHREMAN ABOUT THE DEAL?

10  **A.**    YES, WE DID.

11  **Q.**    DID YOU HAVE ANY CONCERNS THAT YOU VOICED TO HIM?

12  **A.**    YES, I DID.

13  **Q.**    CAN YOU TELL US WHAT YOUR CONCERNS WERE?

14  **A.**    I TOLD HIM THAT I DON'T REALLY FEEL GOOD WITH THESE

15  PEOPLE BECAUSE THEY WEREN'T REALLY BEHAVING LIKE BUSINESS

16  PEOPLE, MORE LIKE GOVERNMENT PEOPLE.

17  **Q.**    WHAT WAS HIS RESPONSE TO THAT?

18  **A.**    HE SAID THAT I SHOULDN'T WORRY.  HE CHECKED THEM OUT AND

19  HE ASKED THEM IF THEY WERE GOVERNMENT AGENTS, AND THEY TOLD

20  HIM THEY WEREN'T.  AND HE TOLD ME THAT HE HAD CONSULTED BACK

21  IN NEW YORK FROM SOME LAWYER THAT THEY HAVE TO IDENTIFY

22  THEMSELF IF THEY WERE GOVERNMENT AGENTS.

23  **Q.**    LET ME BE SURE I UNDERSTAND WHAT YOU JUST SAID.

24      ARE YOU SAYING THAT MR. GHAHREMAN DID SOME RESEARCH INTO

25  GOVERNMENT AGENTS AND WHAT THEY HAD TO RESPOND IF THEY WERE

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1    ASKED?

2    **A.**    YES.

3    **Q.**    THAT'S WHAT HE TOLD YOU?

4    **A.**    YES.

5    **Q.**    AND DID HE INDICATE WHETHER OR NOT HE HAD ASKED THESE

6    AGENTS WHETHER THEY WERE GOVERNMENT AGENTS?

7    **A.**    YES, HE DID.

8    **Q.**    AND HE SAID HE HAD?

9    **A.**    YES, HE DID.

10   **Q.**    GIVEN YOUR CONCERNS AND YOUR RED FLAGS FOR YOU IN THIS

11   BUSINESS TRANSACTION, DID YOU PULL OUT?

12   **A.**    NO, I DIDN'T.

13   **Q.**    AND WHY NOT?

14   **A.**    I WAS ALREADY DOWN THE ROAD AND I THOUGHT I AM GOING TO

15   HANDLE IT, AND ONCE I AM BACK I WOULD TALK TO KOORUSH THAT WE

16   SHOULDN'T GO INTO THIS RISKY BUSINESSES.

17       I MADE A PHONE CALL TO KOORUSH RIGHT AFTER THE MEETING

18   TO EXPRESSING MY CONCERNS IN REGARDS WHAT I HAVE TOLD TO MR.

19   GHAHREMAN SAME CONCERNS, AND HE TOLD ME I SHOULDN'T WORRY

20   BECAUSE WE HAVE END USER CERTIFICATE AND EVERYTHING.  AND I

21   TOLD HIM TO SEND THOSE TO ME SO IN CASE THERE IS ANY TROUBLE

22   AT CUSTOMS, ME RETURNING BACK HOME, SO I HAD SOMETHING IN MY

23   HAND TO SECURE MYSELF.

24   **Q.**    DID YOU EVER RECEIVE THOSE?

25   **A.**    YES, I DID.

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1    **Q.**    DID MR. GHAHREMAN VOICE ANY CONCERNS OR PROBLEMS WITH

2    THE TRANSACTION OR THE DEAL WITH THESE BROKERS?

3    **A.**    NO, HE DIDN'T.

4    **Q.**    WAS THE FUNDING TO COMPLETE THIS PART OF THE TRANSACTION

5    ABLE TO COME THROUGH ON THAT DAY?

6    **A.**    NOT THE SAME DAY.  IT TOOK A COUPLE OF DAYS.

7    **Q.**    SO WHAT DID YOU DO IN THE MEANTIME?

8    **A.**    I CONTACTED KOORUSH SEVERAL TIMES WHEN THE BANK

9    TRANSACTION WAS DUE WHY IT DIDN'T HAPPEN.  AND HE WAS TELLING

10   ME HE IS WORKING ON IT WITH THE INVESTOR.

11   **Q.**    OKAY.  AFTER THAT MEETING, DID YOU HAVE ANY MORE CONTACT

12   WITH THE BROKERS?

13   **A.**    JUST IN REGARDS OF THE INVOICES AND TRANSACTION.

14   **Q.**    THAT WASN'T -- WAS THAT THERE IN LAS VEGAS IN THE LAS

15   VEGAS AREA?

16   **A.**    YES, IT WAS.

17   **Q.**    AT SOME POINT IN TIME DID YOU TRAVEL OUT OF LAS VEGAS?

18   **A.**    YES, WE DID.

19   **Q.**    WHERE DID YOU GO?

20   **A.**    TO SAN DIEGO.

21   **Q.**    WHY DID YOU COME TO SAN DIEGO?

22   **A.**    DURING THE MEETING WE AGREED THAT THE SHIPMENT OF THE

23   ITEMS WOULD BE GOING OUT OF SAN DIEGO, AND WE WOULD VISIT THE

24   SUPPLIER'S BUSINESS PREMISE.

25   **Q.**    OKAY.  SO I DIRECT YOUR ATTENTION TO THAT DAY, THE

APRIL 16, 2015

728

YILDIZ – DIRECT EXAMINATION

1   FOLLOWING –– ON JUNE 17TH.  WAS THAT THE DAY THAT YOU WENT TO

2   THE SHIPPING LOCATION?

3   **A.**   YES.

4   **Q.**   DID YOU IN FACT MEET WITH ONE OF THE BROKERS ON THAT

5   DAY?

6   **A.**   YES, WE DID.

7   **Q.**   AND WHEN YOU MET WITH THE BROKER THAT DAY, WHERE WERE

8   YOU?

9   **A.**   WE WERE WAITING AT THE HOTEL TO GET PICKED UP BY THE

10  SUPPLIER.

11  **Q.**   WAS MR. GHAHREMAN WITH YOU AS WELL?

12  **A.**   YES, WE WERE TOGETHER.

13  **Q.**   AND THE PURPOSE OF GOING WITH THE BROKER AT THAT TIME IN

14  THE MORNING WAS WHAT?

15  **A.**   TO MAKE SURE THAT THE ITEMS HAS BEEN SHIPPED.

16  **Q.**   WAS THERE ANY DISCUSSION ABOUT LOOKING AT THE ITEMS

17  AGAIN?

18  **A.**   YES, IT WAS.

19  **Q.**   AND WHO WANTED TO LOOK AT THE ITEMS AGAIN?

20  **A.**   IT WAS ME.

21  **Q.**   AND WHY WAS THAT?

22  **A.**   JUST TO MAKE SURE THAT THOSE ARE THE SAME ITEMS AS WE

23  HAVE SEEN THEM IN LAS VEGAS.

24  **Q.**   AFTER ARRIVING AT THE UPS STORE, WHAT HAPPENED?

25  **A.**   WE HAVE VERIFIED THE ITEM, OPENED THE CARTONS.  AFTER

APRIL 16, 2015

YILDIZ - DIRECT EXAMINATION

1   THAT WE FILLED OUT THE DELIVERY APPLICATION FORMS.  AND THEN

2   THE ITEMS WERE PAID BY THE SUPPLIER AND SHIPPED OUT.

3   **Q.**    OKAY.  LET'S BREAK THAT DOWN A LITTLE BIT.

4        SO WHEN YOU ARRIVED, WHO WAS IN THE VEHICLE THAT YOU

5   ARRIVED IN?

6   **A.**    ME AND MR. GHAHREMAN AND THE AGENT.

7   **Q.**    YOU DIDN'T KNOW HE WAS AN AGENT AT THAT TIME.

8   **A.**    I DIDN'T KNOW.

9   **Q.**    AND AFTER YOU ARRIVED DID YOU -- DID YOU GO INSIDE THE

10  UPS STORE?

11  **A.**    YES, I DID.

12  **Q.**    WHERE WERE THE BOXES OR THE PACKAGES THAT YOU WERE GOING

13  TO SHIP, WHERE WERE THEY?

14  **A.**    THEY WERE IN THE TRUNK OF THE TRUCK.

15  **Q.**    AND DID YOU ASSIST IN PUTTING THEM -- BRINGING THEM INTO

16  THE STORE?

17  **A.**    I THINK SO.  I CAN'T RECALL.

18  **Q.**    WERE THE BOXES KIND OF BIG AND BULKY?

19  **A.**    YES, THEY WERE.

20  **Q.**    AND THESE WERE THE SAME BOXES YOU HAD VIEWED IN LAS

21  VEGAS?

22  **A.**    YES.

23  **Q.**    DID YOU GET INSIDE THE STORE?

24  **A.**    YES, I DID.

25  **Q.**    WERE THE BOXES OPENED UP?

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1    **A.**    YES.

2    **Q.**    DO YOU REMEMBER IF YOU HAD AN OPPORTUNITY TO VIEW WHAT

3    WAS INSIDE THE BOXES?

4    **A.**    YEAH.  I HAD JUST A QUICK LOOK, AND I WAS CONVINCED

5    THOSE ARE THE SAME ITEMS AS WE HAD VERIFIED THEM IN LAS VEGAS.

6    **Q.**    DO YOU REMEMBER IF MR. GHAHREMAN LOOKED AT THE ITEMS TO

7    MAKE SURE?

8    **A.**    YES.

9    **Q.**    HE DID?

10   **A.**    YES.

11   **Q.**    NOW, YOU INDICATED THERE WAS SOME PAPERWORK INVOLVED; IS

12   THAT CORRECT?

13   **A.**    YES, SIR.

14   **Q.**    WERE YOU INVOLVED IN COMPLETING ANY OF THAT PAPERWORK?

15   **A.**    YES, SIR.

16   **Q.**    WOULD YOU RECOGNIZE THE PAPERWORK IF YOU SAW IT AGAIN?

17   **A.**    YES, I WOULD.

18          **MR. COUGHLIN:**  MAY HAVE A MOMENT, YOUR HONOR?

19          **THE COURT:**  YES.

20          **MR. COUGHLIN:**  THANK YOU.

21          (DISCUSSION OFF THE RECORD BETWEEN MR. COUGHLIN AND

22   MR. JOHNSTON)

23          **MR. COUGHLIN:**  MAY I APPROACH, YOUR HONOR?

24          **THE COURT:**  YES.

25   **Q.**    **(MR. COUGHLIN)** I AM GOING TO SHOW YOU WHAT HAS BEEN NOW

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

```
 1   MARKED AS 751-A, 751-B, 751 -- EXCUSE ME -- 751-D AND 751-E.
 2   FIRST TAKE A LOOK AT THESE, TAKE A LOOK AT ALL THREE OF THESE.
 3            (EXHIBIT 751-A, 751-B, 751-D, 751-E MARKED FOR
 4            IDENTIFICATION)
 5   A.   (WITNESS COMPLIES)
 6   Q.   HAVE YOU HAD A CHANCE TO LOOK AT ALL FOUR OF THESE
 7   ITEMS?
 8   A.   YES, SIR.
 9   Q.   DO YOU RECOGNIZE YOUR HANDWRITING ON THOSE ITEMS?
10   A.   YES, SIR.
11            MR. COUGHLIN:  YOUR HONOR, AT THIS TIME I WOULD LIKE
12   TO MOVE INTO EVIDENCE GOVERNMENT'S EXHIBIT 751-A, 751-B, 751-D
13   AND E.
14            THE COURT:  ANY OBJECTION?
15            MR. JOHNSTON:  NO OBJECTION.
16            THE COURT:  THEY ARE RECEIVED.
17            (EXHIBIT 751-A, 751-B, 751-D, 751-E RECEIVED INTO
18            EVIDENCE)
19            MR. COUGHLIN:  YOUR HONOR, AT THIS TIME WE ARE GOING
20   TO MAKE USE OF THE SANCTION.  I WOULD LIKE TO PUBLISH THEM TO
21   THE JURY.
22            THE COURT:  YES.
23   Q.   (MR. COUGHLIN) MR. YILDIZ, IF YOU WOULD LOOK AT THE
24   MONITOR THERE.
25            MR. COUGHLIN:  PULL UP 751, THE FIRST ONE.  OKAY.
```

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1  **Q.**    **(MR. COUGHLIN)** CAN YOU SEE THAT PARTICULAR -- HOLD THAT

2  IN FRONT OF YOURSELF.  CAN YOU SEE THAT?

3  **A.**    YES, SIR.  YES, I DO.

4  **Q.**    IS THAT THE FIRST ONE, 751?

5  **A.**    751-A.

6  **Q.**    OKAY.  I WOULD LIKE TO CIRCLE -- DO YOU RECOGNIZE YOUR

7  HANDWRITING ON HERE?

8  **A.**    NOT ON THIS ONE.

9  **Q.**    OKAY.  751, YOU SAID YOU RECOGNIZED YOUR HANDWRITING ON

10  ALL FOUR.

11  **A.**    I RECOGNIZE THE E AND THE D.

12  **Q.**    OKAY.  RIGHT THERE?

13  **A.**    NO, NOT THIS ONE.

14  **Q.**    OKAY.  AND 751-D?

15  **A.**    NO, I DON'T.

16  **Q.**    OKAY.

17  **A.**    THIS ONE.

18  **Q.**    OKAY.

19        **MR. COUGHLIN:**  I WOULD LIKE TO GO TO THE FOURTH

20  PART, IF YOU WOULD MOVE DOWN.  KEEP GOING.  ONE MORE.

21  **Q.**    **(MR. COUGHLIN)** DO YOU RECOGNIZE -- ON 751-D, DO YOU

22  RECOGNIZE YOUR HANDWRITING THERE?

23  **A.**    YES, I DO.

24        **MR. COUGHLIN:**  I WOULD LIKE TO GO AHEAD AND

25  HIGHLIGHT THE FIRST TWO BOXES, RIGHT THERE.

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1   **Q.**   **(MR. COUGHLIN)** AND IS THAT IN BOX 3 THERE, THE

2   CONSIGNEE, IS THAT WHERE YOU RECOGNIZE YOUR HANDWRITING?

3   **A.**   YES, SIR.

4   **Q.**   DID YOU FILL OUT ANYTHING ELSE ON THIS PARTICULAR WEIGH

5   BILL?

6   **A.**   NO, I DIDN'T.

7   **Q.**   BUT THERE IS MORE INFORMATION THAT IS CONTAINED ON THIS;

8   IS THAT CORRECT?

9   **A.**   YES, SIR.

10  **Q.**   DO YOU RECALL WHETHER OR NOT THE AGENT FILLED OUT PART

11  OF THIS PAPERWORK?

12  **A.**   I RECOGNIZE AND REMEMBER HE FILLED OUT THE FIRST –– THE

13  NAME OF THE SENDER PARTICULAR AREA.

14  **Q.**   SO HE FILLED THAT INFORMATION OUT?

15  **A.**   YES, SIR.

16         **MR. COUGHLIN:**  IF YOU WILL GO DOWN AGAIN.  IF YOU

17  WOULD GO DOWN TO THE THIRD BOX, ALL THE WAY ACROSS THE WHOLE

18  DOCUMENT THERE.

19  **Q.**   **(MR. COUGHLIN)** DO YOU SEE THAT?

20  **A.**   YES, SIR.

21  **Q.**   DO YOU REMEMBER WHO FILLED THAT OUT?

22  **A.**   I THINK MR. GHAHREMAN WAS THE ONE WHO FILLED OUT THE

23  DESCRIPTION OF THE ITEMS.

24  **Q.**   AND DID YOU HAVE ANY INFORMATION OR KNOWLEDGE ABOUT THE

25  VALUE OF THE UNITS?

APRIL 16, 2015

734

YILDIZ – DIRECT EXAMINATION

1   **A.**    YES, SIR.

2   **Q.**    I MEAN, DID YOU HAVE PERSONAL KNOWLEDGE ABOUT THE VALUE

3   THAT WAS GOING TO BE PUT IN THERE?

4   **A.**    YES, SIR.

5   **Q.**    BUT YOU ARE SAYING, WHO PUT THAT IN THERE?

6   **A.**    MR. GHAHREMAN PUT IT.

7   **Q.**    AND WHAT WAS THE TOTAL AMOUNT THAT WAS BEING PUT IN

8   THERE, APPROXIMATELY, VALUE?

9   **A.**    THE AGREED ON $25,000.

10  **Q.**    OKAY.  I WOULD LIKE YOU TO TAKE A LOOK AT -- THAT WAS

11  THE TOTAL VALUE OF THE INVOICE?

12  **A.**    YES, SIR.

13  **Q.**    AND I WOULD LIKE YOU TO TAKE A LOOK AT THE REMARK

14  SECTION AS WELL.  AND DO YOU RECALL -- DID YOU -- DO YOU

15  RECOGNIZE THIS AS YOUR HANDWRITING OR NOT?

16  **A.**    I DON'T THINK SO.  IT IS NOT MY HANDWRITING.

17  **Q.**    SO YOU DIDN'T PUT THIS PARTICULAR REMARK IN HERE,

18  REPLACEMENT EXISTING UNIT ON THE BOARD OF THE VESSEL.

19  **A.**    NO, SIR.

20  **Q.**    ON BOARD THE VESSEL?

21  **A.**    NO, SIR.

22         **MR. COUGHLIN:**  I WOULD LIKE TO MOVE TO THE NEXT

23  EXHIBIT.  OKAY.  I WOULD LIKE TO NOW TAKE A LOOK AT THE

24  RECEIVER SECTION OF THIS AND HIGHLIGHT THAT.

25  **Q.**    **(MR. COUGHLIN)** DO YOU RECOGNIZE THIS AS YOUR

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1   HANDWRITING?

2   **A.**    YES, SIR.

3   **Q.**    OKAY.  AND WHERE WAS THIS BEING SHIPPED?

4   **A.**    TO DUBAI MARITIME CITY IN UNITED ARAB EMIRATES TO OUR

5   COMPANY ADDRESS.

6   **Q.**    DID YOU UNDERSTAND WHAT WAS BEING SHIPPED THERE WAS THE

7   NAVIGAT?

8   **A.**    YES, SIR.

9   **Q.**    WAS THERE ANY OTHER PART OF THIS PARTICULAR WEIGH BILL

10  THAT HAD YOUR HANDWRITING ON IT?

11  **A.**    NO, SIR.

12           **MR. COUGHLIN:**  OKAY.  GO DOWN AGAIN.  CAN I ASK YOU,

13  DESCRIPTION OF THE GOODS.  IF YOU WOULD HIGHLIGHT DESCRIPTION

14  OF THE GOODS, PLEASE.  OVER HERE, IN THE MIDDLE.  DESCRIPTION

15  OF THE GOODS.  RIGHT THERE.

16  **Q.**    **(MR. COUGHLIN)** DO YOU SEE THAT PARTICULAR SECTION?

17  **A.**    YES, SIR.

18  **Q.**    IS THAT YOUR HANDWRITING IN DESCRIPTION OF THE GOODS?

19  **A.**    NO, SIR.

20  **Q.**    AND AGAIN THE VALUE THAT IS DECLARED IS WHAT?

21  **A.**    $25,000.

22  **Q.**    DO YOU KNOW WHO FILLED THAT OUT?

23  **A.**    MR. GHAHREMAN.

24           **MR. COUGHLIN:**  NOW I WOULD LIKE TO GO BACK TO THE

25  OTHER EXHIBITS, THE FIRST TWO EXHIBITS.

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1   **Q.**    **(MR. COUGHLIN)** NOW, YOU INDICATED THAT YOU HAVE LOOKED

2   CLOSELY NOW, YOU HAVE HAD AN OPPORTUNITY TO SEE THE ORIGINALS

3   AND YOU DON'T RECOGNIZE YOUR HANDWRITING ON EITHER OF THOSE,

4   THE INVOICE OR THE WEIGH BILL?

5   **A.**    NO, SIR.

6   **Q.**    SO ON THAT PARTICULAR DAY WHEN YOU HAD COMPLETED THE

7   SHIPPING, DO YOU REMEMBER WHO PAID FOR THE SHIPPING?

8   **A.**    THE SUPPLIER SUPPOSED TO PAY, AND HE PAID IT WITH HIS

9   CREDIT CARD.

10  **Q.**    DO YOU REMEMBER IF THERE WAS A QUESTION AS TO WHO WAS

11  GOING TO PAY AT THAT POINT IN TIME WHEN YOU WERE THERE AT THE

12  UPS STORE?

13  **A.**    YES, SIR.

14  **Q.**    DID THE AGENT, AS THE BROKER, ASK WHO WAS PAYING?

15  **A.**    YES.  THERE WAS A DISCUSSION ABOUT WHO WOULD PAY THE

16  SHIPMENT.

17  **Q.**    DO YOU REMEMBER WHO ANSWERED AS TO WHO WAS SUPPOSED TO

18  PAY?

19  **A.**    MR. GHAHREMAN MENTIONED THAT IT IS IN THE CONTRACT

20  INVOLVED, AND THE SENDER HAS TO PAY THE SHIPMENTS.

21  **Q.**    SO IT WAS MR. GHAHREMAN WHO SAID THE SENDER WOULD BE

22  PAYING?

23  **A.**    YES, SIR.

24  **Q.**    NOW, WERE YOU ARRESTED THAT SAME DAY?

25  **A.**    YES, SIR.

APRIL 16, 2015

YILDIZ – DIRECT EXAMINATION

1   **Q.**    AND AFTER YOUR ARREST, DID YOU SPEAK WITH THE AGENTS?

2   **A.**    YES, SIR.

3   **Q.**    WHAT WAS YOUR GENERAL STATE OF MIND AT THAT POINT IN

4   TIME?

5   **A.**    I WAS ANXIOUS AND SCARED, BECAUSE I WASN'T REALLY

6   THINKING THAT THIS WOULD HAPPEN.  AND THEN I GOT QUESTIONED,

7   INTERROGATED BY THE AGENTS.  AND I TRIED TO PROTECT MYSELF AT

8   THE TIME TO -- AND DIDN'T EXPOSE EVERYTHING, JUST TO WAIT SOME

9   TIME TO SEE A LAWYER LATER ON.

10  **Q.**    DID YOU GIVE A COMPLETE, TRUTHFUL AND ACCURATE STATEMENT

11  OF YOUR INVOLVEMENT?

12  **A.**    NO.  MY STATEMENT WAS TRUE, BUT NOT THE ENTIRE TRUENESS.

13  I MADE UP A LITTLE BIT STORIES JUST TO PROTECT MYSELF IN THE

14  MOMENT.

15  **Q.**    WAS ONE OF THE THINGS THAT YOU SAID THAT WASN'T TRUE WAS

16  THAT MR. TAHERKHANI WAS AN EMPLOYEE OF YOURS?

17  **A.**    YES, THAT WAS A MADE UP.

18  **Q.**    AND YOUR DESCRIPTION OF WHERE THE GOODS WERE ACTUALLY

19  GOING, WAS THAT MADE UP AS WELL?

20  **A.**    YES, SIR.

21      **MR. COUGHLIN:**  NOTHING FURTHER OF THIS WITNESS, YOUR

22  HONOR.

23      **THE COURT:**  CROSS-EXAMINATION.

24                  CROSS-EXAMINATION

25  **Q.**    **(MR. JOHNSTON)** GOOD MORNING.

APRIL 16, 2015

YILDIZ – CROSS–EXAMINATION

1  **A.**    GOOD MORNING.

2  **Q.**    HOW ARE YOU, MR. YILDIZ?

3  **A.**    THANK YOU VERY MUCH.

4  **Q.**    YOU FIND YOURSELF IN A DIFFICULT POSITION, DON'T YOU?

5  **A.**    YES, SIR.

6  **Q.**    YOU HAVE BEEN IN CUSTODY SINCE JUNE 17TH OF 2013?

7  **A.**    YES, SIR.

8  **Q.**    YOU HAVEN'T WORN YOUR OWN CLOTHES FOR ALMOST TWO YEARS?

9  **A.**    YES, SIR.

10  **Q.**    YOU ARE HERE TODAY IN AN ISSUED JUMPSUIT FROM THE M.C.C.

11  SAN DIEGO, RIGHT?

12  **A.**    YES, SIR.

13  **Q.**    YOU HAD TO WALK INTO THE COURTROOM TODAY WITH LEG

14  SHACKLES ON.

15  **A.**    YES, SIR.

16  **Q.**    IT IS EMBARRASSING.

17  **A.**    YES, IT IS.

18  **Q.**    IT IS HUMILIATING.

19  **A.**    YES, SIR.

20  **Q.**    AND THIS HAS BEEN YOUR EXPERIENCE FOR ALMOST TWO YEARS.

21  **A.**    YES, SIR.

22  **Q.**    BUT BEFORE YOU WERE ARRESTED ON JUNE 17TH, YOU HAD A

23  LIFE IN DUBAI.

24  **A.**    YES, SIR.

25  **Q.**    YOU HAD A GOOD LIFE IN DUBAI.

APRIL 16, 2015

YILDIZ - CROSS-EXAMINATION

1    **A.**    YES, SIR.

2    **Q.**    YOU HAD TRAVELED AROUND THE WORLD?

3    **A.**    YES.

4    **Q.**    YOU WERE BORN IN AUSTRIA, RIGHT?

5    **A.**    YES.

6    **Q.**    THE SON OF TURKISH PARENTS?

7    **A.**    YES.  MY PARENTS ARE TURKISH.

8    **Q.**    YOU LIVED IN GERMANY AND STUDIED THERE.

9    **A.**    YES, SIR.

10   **Q.**    YOU CAME TO DUBAI.

11   **A.**    YES.

12   **Q.**    YOU BEGAN TO BECOME SUCCESSFUL AS A BUSINESSMAN.

13   **A.**    YES, SIR.

14   **Q.**    ALL RIGHT.  AND YOU FOUND A WOMAN THAT YOU LOVED.

15   **A.**    YES, SIR.

16   **Q.**    IN FACT, YOU MARRIED THAT WOMAN SHORTLY BEFORE YOU WERE

17   ARRESTED IN THIS OFFENSE.

18   **A.**    YES, SIR.

19   **Q.**    WHEN WAS THAT?

20   **A.**    MAY 5TH, 2013.

21   **Q.**    MAY 5TH, 2013.  SO APPROXIMATELY FIVE WEEKS BEFORE YOU

22   WERE ARRESTED.

23   **A.**    YES.

24   **Q.**    YOU HAVEN'T SEEN HER IN ALMOST TWO YEARS.

25   **A.**    I DIDN'T.

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1  **Q.**    YOU MISS HER VERY BADLY.

2  **A.**    YES, I DO.

3  **Q.**    YOU REALLY WANT NOTHING MORE THAN TO GET HOME.

4  **A.**    YES, SIR.

5  **Q.**    AND YOUR HOPE -- YOUR HOPE IS THAT YOU WILL GET HOME

6  SOON.

7  **A.**    YES, SIR.

8  **Q.**    YOUR HOPE IS THAT IF EVERYTHING GOES WELL YOU MAY EVEN

9  GET A TIME-SERVED SENTENCE IN A FEW WEEKS.

10  **A.**    THE JUDGE MAY GRANT IT TO ME, YES.

11  **Q.**    BUT BEFORE THE JUDGE CAN GRANT IT TO YOU, THERE WILL

12  HAVE TO BE A FEW OTHERS THINGS, RIGHT?

13  **A.**    YES, SIR.

14  **Q.**    THERE WILL HAVE TO BE A RECOMMENDATION BY THE

15  PROSECUTOR.

16  **A.**    YES, SIR.

17  **Q.**    NOW, WHEN YOU WERE ARRESTED, YOU DIDN'T UNDERSTAND WHAT

18  THE POTENTIAL CONSEQUENCES WERE OF YOUR ACTIONS.

19  **A.**    NO, I DIDN'T.

20  **Q.**    YOU DIDN'T KNOW WHAT SORT OF CUSTODY YOU WOULD EVEN BE

21  LOOKING AT.

22  **A.**    NO, NOT IN THE FIRST MOMENT.  BUT ONE, TWO, DAYS AFTER,

23  YES, I WAS AWARE.

24  **Q.**    BECAUSE YOU WERE ABLE TO OBTAIN A LAWYER, RIGHT?

25  **A.**    YES, SIR.

APRIL 16, 2015

YILDIZ - CROSS-EXAMINATION

1   **Q.**    AND YOU WERE ABLE TO REVIEW WHAT THE POTENTIAL

2   CONSEQUENCES WERE OF THESE CHARGES.

3   **A.**    YES, SIR.

4   **Q.**    THAT WAS EVEN BEFORE YOU DECIDED TO -- I BELIEVE IN YOUR

5   WORDS -- AGREE TO A PLEA DEAL.

6   **A.**    YES, SIR.

7          **MR. JOHNSTON:**  AND I BELIEVE WE ARE AT KK, NEXT IN

8   ORDER.

9          (EXHIBIT KK MARKED FOR IDENTIFICATION)

10  **Q.**    **(MR. JOHNSTON)** I AM GOING TO APPROACH YOU WITH -- WITH

11  THE COURT'S PERMISSION -- EXHIBIT KK.

12         DO YOU RECOGNIZE THAT CHART?

13  **A.**    YES, I DO.

14  **Q.**    OKAY.  THAT'S THE CHART THAT YOU ACTUALLY STUDIED WITH

15  YOUR LAWYER, RIGHT?

16  **A.**    YEAH.

17  **Q.**    YOU HAVE GONE OVER IT.

18  **A.**    YEAH, WE HAVE GONE OVER IT.

19         **MR. JOHNSTON:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

20  TO INTRODUCE EXHIBIT KK INTO EVIDENCE.

21         **THE COURT:**  ANY OBJECTION?

22         **MR. COUGHLIN:**  OBJECTION, YOUR HONOR.  I DON'T MIND

23  THE QUESTIONING, BUT I WOULD RATHER HAVE IT NOT INTRODUCED.

24  IT IS A SENTENCING ISSUE, GOES TO THE SENTENCING.  I DON'T

25  HAVE ANY PROBLEM WITH THE QUESTIONING, BUT IN TERMS OF

APRIL 16, 2015

YILDIZ – CROSS–EXAMINATION

```
 1    INTRODUCING IT TO THE JURY I WILL OBJECT.
 2            THE COURT:  DO YOU HAVE AN EXTRA COPY?
 3            MR. JOHNSTON:  I DO, YOUR HONOR.  IT IS A BLANK
 4    SENTENCING SUMMARY CHART FROM THE SENTENCING GUIDELINES.
 5            AN ALTERNATIVE, YOUR HONOR, WOULD BE FOR ME TO USE
 6    IT AS A DEMONSTRATIVE.  IF YOU PREFER THAT, I AM HAPPY TO DO
 7    THAT.
 8            THE COURT:  OKAY.
 9            MR. COUGHLIN:  THAT IS FINE, YOUR HONOR.
10            MR. JOHNSTON:  OKAY.  IF I MAY, FOR DEMONSTRATIVE
11    PURPOSES ONLY.
12            THE COURT:  YES.
13    Q.    (MR. JOHNSTON)  DOESN'T COMPLETELY FIT.  I WILL START
14    WITH THAT.
15            THIS IS THE FEDERAL SENTENCING SUMMARY CHART, RIGHT?
16    A.    YES.
17    Q.    BUT EVEN BEFORE YOU LOOKED AT THIS, YOU CAME TO KNOW
18    THAT THE CRIMES YOU WERE CHARGED WITH CARRIED A MAXIMUM
19    PENALTY, RIGHT?
20    A.    YES, SIR.
21    Q.    THE GREATEST CHARGE THAT YOU ARE CHARGED WITH CARRIES A
22    MAXIMUM PENALTY OF 20 YEARS IN PRISON.
23    A.    YES, SIR.
24    Q.    AND YOU WERE CHARGED WITH NINE SEPARATE COUNTS.
25    A.    YES, SIR.
```

APRIL 16, 2015

743

1    Q.    AND, WELL, LET ME JUST GO TO THIS.

2          YOU COULD BE SENTENCED ANYWHERE FROM 20 YEARS ALL THE

3    WAY DOWN TO TIME SERVED.

4    A.    YES, SIR.

5    Q.    BUT THIS CHART TELLS YOU WHERE THE CALCULATIONS START,

6    RIGHT?

7    A.    YES, SIR.

8    Q.    OKAY.  AND YOU ARE FAMILIAR WITH THIS CHART AS IT

9    APPLIES TO YOU.

10   A.    YES, I AM.

11   Q.    OKAY.  ONE OF THE FIRST THINGS YOU HAVE TO LOOK AT ON

12   THIS CHART TO SEE WHAT YOUR RECOMMENDED SENTENCE IS IS WHAT

13   YOUR CRIMINAL HISTORY CATEGORY IS, RIGHT?

14   A.    YES.

15   Q.    THE TOP LINE.

16   A.    YEAH.

17   Q.    YOU HAVE NO PRIOR CONVICTIONS IN THE UNITED STATES.

18   A.    NO, I DON'T.

19   Q.    SO THAT WOULD PUT YOU IN CRIMINAL HISTORY CATEGORY I,

20   CORRECT?

21   A.    YES.

22   Q.    SO IN CRIMINAL HISTORY CATEGORY I, WE WILL LOOK DOWN

23   THAT COLUMN TO SEE WHAT YOUR RECOMMENDED SENTENCE IS FOR THIS

24   OFFENSE, RIGHT?

25   A.    YEAH.

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1   **Q.**    AND FOR THE IEEPA COUNT, THE TRADE SANCTIONS COUNT, THE

2   ONE THAT MR. COUGHLIN TALKED TO YOU ABOUT PLEADING GUILTY TO,

3   RIGHT?

4   **A.**    RIGHT.

5   **Q.**    YOU HAVE AGREED THAT THE STARTING POINT FOR THAT IS A

6   BASE OFFENSE LEVEL 26, RIGHT?

7   **A.**    YES, SIR.

8   **Q.**    OKAY.  THAT IS BASE OFFENSE LEVEL 26, WITH A GUIDELINE

9   RANGE OF 63 TO 78, RIGHT?

10  **A.**    YES.

11  **Q.**    THAT IS MONTHS.

12  **A.**    YEAH.

13  **Q.**    RIGHT.  SO A LITTLE OVER FIVE YEARS?

14  **A.**    YEAH.

15  **Q.**    TO UP TO SIX AND A HALF YEARS, RIGHT?

16  **A.**    YEAH.

17  **Q.**    WHEN YOU TALKED TO MR. COUGHLIN, THE PROSECUTOR, HE SAID

18  THAT ONE OF THE BENEFITS YOU GOT WAS THAT YOU ONLY HAD TO

19  PLEAD TO ONE OF THE NINE COUNTS.

20  **A.**    YES, SIR.

21  **Q.**    BUT YOU ARE AWARE THAT HAD YOU BEEN CONVICTED OF ALL OF

22  THE COUNTS, INCLUDING THE MONEY LAUNDERING COUNT --

23  **A.**    YES, SIR.

24  **Q.**    -- YOU WOULD ACTUALLY HAVE AN INCREASE OF AT LEAST TWO

25  LEVELS TO A LEVEL 28.

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1    **A.**    YES, SIR.

2    **Q.**    THE GUIDELINE RANGE IS 78 TO 97 MONTHS.

3    **A.**    YES, SIR.

4    **Q.**    AND YOU UNDERSTAND, UNDER THESE GUIDELINES, THAT

5    ADDITIONAL DEPARTURES CAN BE APPLIED, RIGHT?

6    **A.**    YES, SIR.

7    **Q.**    DOWNWARD DEPARTURES, RIGHT?

8    **A.**    YES, SIR.

9    **Q.**    BUT ALSO UPWARD DEPARTURES.

10   **A.**    YES.

11   **Q.**    AND YOU DESCRIBED YOUR ROLE WITH TIG MARINE AS THAT OF A

12   MANAGER, RIGHT?

13   **A.**    YES, SIR.

14   **Q.**    THE PERSON RESPONSIBLE FOR THE ACTIVITIES FOR THE

15   BUSINESS IN UAE.

16   **A.**    THE TITLE IS DESCRIBED LIKE THAT, YEAH.

17   **Q.**    AND YOU SAID THOSE WERE YOUR DUTIES, RIGHT?

18   **A.**    YEAH.  I WAS SUPPOSED TO BE THE FACE OF THE COMPANY AND

19   KOORUSH SUPPOSED TO HANDLE THE BUSINESS.

20   **Q.**    RIGHT.  AND YOU ARE AWARE THAT YOU CAN GET AN

21   AGGRAVATING ROLE ENHANCEMENT IF YOU ARE A MANAGER.

22   **A.**    YEAH.

23   **Q.**    A MINIMUM ENHANCEMENT.

24             **MR. COUGHLIN:**  YOUR HONOR, I OBJECT TO THE RELEVANCE

25   OF THIS AT THIS TIME.

APRIL 16, 2015

1          **THE COURT:**  OVERRULED.

2          YOU MAY PROCEED.

3          **MR. JOHNSTON:**  THANK YOU.

4   **Q.**    **(MR. JOHNSTON)** A MINIMUM ENHANCEMENT OF TWO LEVELS,

5   RIGHT?

6   **A.**    I WASN'T AWARE OF THAT.

7   **Q.**    YOU WEREN'T AWARE THAT BECAUSE OF YOUR ROLE AS MANAGER

8   YOU COULD BE LOOKING AT A GUIDELINE RANGE OF AT LEAST 97 TO

9   121 MONTHS?

10  **A.**    I WASN'T AWARE OF THAT.

11  **Q.**    BUT YOU ARE AWARE THAT BY PLEADING TO ONE COUNT YOU GET

12  A LEVEL 26.

13  **A.**    YES, SIR.

14  **Q.**    YOU GET A LITTLE OVER FIVE YEARS, SIX AND A HALF YEARS,

15  INSTEAD OF A LEVEL 28.

16  **A.**    YES, SIR.

17  **Q.**    WHICH WOULD BE SIX AND A HALF UP TO -- WHAT IS THAT --

18  EIGHT?  EIGHT YEARS.

19  **A.**    YEAH.

20  **Q.**    A SIGNIFICANT INCREASE.

21  **A.**    YES.

22  **Q.**    IS THAT FAIR TO SAY?

23  **A.**    I WOULD SAY SO.

24  **Q.**    AND WHEN YOU WERE FACED WITH THE PROSPECT OF SPENDING

25  ANYWHERE FROM A LITTLE OVER FIVE YEARS IN PRISON UP TO EIGHT

APRIL 16, 2015

YILDIZ – CROSS–EXAMINATION

1   YEARS IN PRISON, THAT PUT YOU IN A DIFFICULT POSITION, DIDN'T
2   IT?
3   **A.**    YES, SIR.
4   **Q.**    A DIFFICULT POSITION THAT MADE YOU, AS A BUSINESSMAN,
5   THINK ABOUT WHAT YOUR OPTIONS WERE.
6   **A.**    YES, SIR.
7   **Q.**    WHAT WOULD BE THE BEST OPPORTUNITY FOR YOU, RIGHT?
8   **A.**    YEAH.
9   **Q.**    AND YOU DECIDED THE BEST OPPORTUNITY FOR YOU WAS TO
10  AGREE TO A PLEA DEAL.
11  **A.**    YES, SIR.
12  **Q.**    NOT BECAUSE YOU KNEW THESE ITEMS WERE GOING TO IRAN,
13  RIGHT?
14  **A.**    NO, I KNEW THE ITEMS WERE GOING TO IRAN.
15  **Q.**    THAT IS YOUR TESTIMONY TODAY, RIGHT?
16  **A.**    YES, SIR.
17  **Q.**    HONESTLY YOU KNEW THEY WERE GOING TO IRAN.
18  **A.**    YES, SIR.
19  **Q.**    BUT YOU AGREED TO ENTER INTO A PLEA AGREEMENT WITH THE
20  GOVERNMENT, RIGHT?
21  **A.**    YES, SIR.
22  **Q.**    YOU WANTED TO AVOID THE PROSPECT OF SPENDING EIGHT YEARS
23  OR 10 YEARS IN PRISON.
24  **A.**    YES, SIR.
25  **Q.**    AND PART OF THE DEAL -- LET ME BACK UP.

APRIL 16, 2015

YILDIZ - CROSS-EXAMINATION

1      ON DIRECT YOU SAID YOU WERE ASKED IF YOU GOT ANY OTHER

2  BENEFIT FROM PLEADING TO ONE COUNT INSTEAD OF NINE; IS THAT

3  TRUE?

4  **A.**   ONE BENEFIT IS THAT THE GOVERNMENT WOULD WAIVE THE OTHER

5  COUNTS.  AND THE OTHER ONE IS A REDUCTION OF THREE POINTS FOR

6  ACCEPTANCE RESPONSIBILITY WOULD PUSH MY SENTENCING LOWER THAN

7  THE 26 POINTS.

8  **Q.**   LET'S TALK ABOUT THAT.  BUT FIRST WE TALKED ABOUT A

9  MAXIMUM PENALTY OF 20 YEARS, RIGHT?

10  **A.**   YES, SIR.

11  **Q.**   THERE IS ALSO A FINE PROVISION FOR THIS OFFENSE, RIGHT?

12  **A.**   YES, SIR.

13  **Q.**   UP TO $1 MILLION.

14  **A.**   YES, SIR.

15  **Q.**   AND YOU ENTERED INTO AN AGREEMENT WITH THE GOVERNMENT

16  ABOUT THE FINE PROVISION, TOO, RIGHT?

17  **A.**   YES, SIR.

18  **Q.**   THAT WAS ANOTHER BENEFIT THAT YOU GOT.

19  **A.**   I THINK SO.

20  **Q.**   THE GOVERNMENT AGREED NOT TO RECOMMEND A FINE IN YOUR

21  CASE.

22  **A.**   I THINK SO, YES.

23  **Q.**   WOULD IT REFRESH YOUR RECOLLECTION TO LOOK AT YOUR PLEA

24  AGREEMENT?

25  **A.**   I AM SORRY?

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1  **Q.**   WOULD IT REFRESH YOUR RECOLLECTION TO LOOK AT YOUR PLEA

2  AGREEMENT?

3  **A.**   YEAH.

4  **Q.**   DO YOU HAVE A COPY UP THERE?

5  **A.**   YES, SIR.

6  **Q.**   IF YOU COULD LOOK AT PAGE 13.

7  **A.**   YES, SIR.

8  **Q.**   LINE 9.

9  **A.**   YES, SIR.

10  **Q.**   ALL RIGHT.  IS THE GOVERNMENT GOING TO RECOMMEND A FINE

11  OF UP TO $1 MILLION IN YOUR CASE?

12  **A.**   NO, SIR.

13  **Q.**   THEY ARE NOT GOING TO RECOMMEND ANY FINE, ARE THEY?

14  **A.**   NO, SIR.

15  **Q.**   BUT YOU MENTIONED SOMETHING ABOUT THREE POINTS, RIGHT?

16  **A.**   YES, SIR.

17  **Q.**   LET'S GO TO PAGE 11 OF YOUR PLEA AGREEMENT.

18      **MR. JOHNSTON:**  YOUR HONOR, FOR DEMONSTRATIVE

19  PURPOSES, IF I MAY USE THE OVERHEAD.

20      **MR. COUGHLIN:**  NO OBJECTION.

21      **THE COURT:**  YES.

22  **Q.**   **(MR. JOHNSTON)** DOES THIS LOOK LIKE A FAIR AND ACCURATE

23  COPY OF THE PLEA AGREEMENT THAT YOU ARE LOOKING AT UP THERE?

24  **A.**   YES, SIR.

25  **Q.**   LET ME JUST MOVE IT UP A LITTLE BIT.

APRIL 16, 2015

YILDIZ – CROSS–EXAMINATION

1        DO YOU RECOGNIZE THOSE INITIALS AT THE BOTTOM?

2   **A.**   YES, SIR.

3   **Q.**   ARE THOSE YOUR INITIALS?

4   **A.**   YES, SIR.

5   **Q.**   AND YOU SEE THE NUMBER 26 THERE, RIGHT?

6   **A.**   YES, SIR.

7   **Q.**   THAT WAS THE OFFENSE LEVEL THAT YOU AGREED TO WITH THE

8   GOVERNMENT.

9   **A.**   YES, SIR.

10  **Q.**   YOUR SENTENCING RECOMMENDED RANGE.

11  **A.**   YES, SIR.

12  **Q.**   NOT A LEVEL 28.

13  **A.**   YES, SIR.

14  **Q.**   NOT A LEVEL 30.

15  **A.**   YES, SIR.

16  **Q.**   THERE IS NO ENHANCEMENT FOR YOUR ROLE AS A MANAGER.

17  **A.**   YES, SIR.

18  **Q.**   AND THERE IS NO ENHANCEMENT FOR YOUR ACTIONS ON OTHER

19  COUNTS, RIGHT?

20  **A.**   YES, SIR.

21  **Q.**   YOU GOT TO START AT A 26.

22  **A.**   YES, SIR.

23  **Q.**   AND BY PLEADING GUILTY, THE GOVERNMENT AGREED TO

24  RECOMMEND WHAT YOU GET THREE POINTS OFF, RIGHT?

25  **A.**   YES, SIR.

APRIL 16, 2015

751

YILDIZ – CROSS–EXAMINATION

1    **Q.**    AND I CANNOT SWITCH DOCUMENTS TO THE SENTENCING CHART WE

2    WERE LOOKING AT EARLIER.  THAT MEANS, AS PART OF YOUR DEAL

3    WITH THE GOVERNMENT, YOU GO FROM A LEVEL 26 TO A LEVEL 23,

4    RIGHT?

5    **A.**    YES, SIR.

6    **Q.**    INSTEAD OF MORE THAN FIVE YEARS AND UP TO SIX AND A HALF

7    YEARS YOU ARE LOOKING AT LESS THAN FOUR YEARS AS A

8    STARTING POINT, RIGHT?

9    **A.**    YES, SIR.

10   **Q.**    SO THE GOVERNMENT GAVE YOU THAT BENEFIT, AS WELL.

11   **A.**    YES, SIR.

12   **Q.**    THE GOVERNMENT GAVE YOU AN ADDITIONAL BENEFIT, IF YOU

13   LOOK AT PAGE 12 LINE 23, RIGHT?  SENTENCING RECOMMENDATION.

14   **A.**    YES, SIR.

15   **Q.**    THAT'S A RANGE OF A LITTLE UNDER FOUR YEARS UP TO 57

16   MONTHS THAT YOU ARE LOOKING AT, RIGHT?

17   **A.**    YES, SIR.

18   **Q.**    BUT THE GOVERNMENT AGREED TO RECOMMEND THE LOW END OF

19   THAT RANGE.

20   **A.**    YES, SIR.

21   **Q.**    ANOTHER BENEFIT THAT YOU GOT.

22   **A.**    YES, SIR.

23   **Q.**    BY PLEADING GUILTY.

24          NOW, MR. YILDIZ, YOU ARE HOPING TO DO LESS TIME THAN

25   EVEN 46 MONTHS.

APRIL 16, 2015

YILDIZ – CROSS–EXAMINATION

1    **A.**    YES, SIR.

2    **Q.**    THAT'S WHY YOU ARE HERE TODAY, RIGHT?

3    **A.**    YES, SIR.

4    **Q.**    THAT'S WHY YOU ARE HERE ON THE STAND TALKING TO THIS

5    JURY, RIGHT?

6    **A.**    YES, SIR.

7    **Q.**    BUT TO GET LESS TIME, CERTAIN THINGS HAVE TO HAPPEN,

8    RIGHT?

9    **A.**    YES, SIR.

10   **Q.**    YOU TALKED ABOUT THE JUDGE BEING THE ULTIMATE DETERMINER

11   OF YOUR SENTENCE, RIGHT?

12   **A.**    YES, SIR.

13   **Q.**    BUT YOU SOUGHT A BENEFIT FROM THE GOVERNMENT IN THIS

14   CASE, RIGHT?

15   **A.**    YES, SIR.

16   **Q.**    YOU WANTED THE GOVERNMENT TO AGREE TO SOMETHING LESS

17   THAN THE 46 MONTHS THAT THAT PLEA AGREEMENT SAYS.

18   **A.**    TO RECOMMEND, YEAH.

19   **Q.**    RIGHT.  BUT TO GET THEM TO RECOMMEND THAT YOU HAD TO

20   ENTER INTO AN ADDITIONAL AGREEMENT WITH THE GOVERNMENT, RIGHT?

21   **A.**    YES, SIR.

22            **MR. JOHNSTON:**  I BELIEVE WE ARE ON LL NOW.

23            (EXHIBIT LL MARKED FOR IDENTIFICATION)

24   **Q.**    **(MR. JOHNSTON)** FOR IDENTIFICATION PURPOSES, I AM

25   APPROACHING YOU WITH A DOCUMENT ENTITLED ADDENDUM TO PLEA

APRIL 16, 2015

YILDIZ – CROSS–EXAMINATION

1    AGREEMENT.

2         DO YOU RECOGNIZE THAT DOCUMENT?

3    **A.**   YES, SIR.

4    **Q.**   IS THAT YOUR SIGNATURE AT THE BOTTOM OF THAT DOCUMENT?

5    **A.**   YES, IT IS.

6    **Q.**   THIS IS AN ADDITIONAL AGREEMENT THAT YOU MADE WITH THE

7    GOVERNMENT, BEYOND THE BENEFITS YOU GOT FROM THAT PLEA

8    AGREEMENT, RIGHT?

9    **A.**   YES, SIR.

10   **Q.**   AND THIS ADDITIONAL AGREEMENT HAS SOME REQUIREMENTS,

11   RIGHT?

12   **A.**   YES.

13   **Q.**   ON PAGE 2 OF THAT DOCUMENT --

14   **A.**   YES, SIR.

15   **Q.**   -- IT SAYS THAT YOU HAVE INDICATED OR EXPRESSED A DESIRE

16   TO PROVIDE SUBSTANTIAL ASSISTANCE TO THE GOVERNMENT IN THE

17   INVESTIGATION AND PROSECUTION OF OTHERS.  RIGHT?

18   **A.**   WHICH LINES?

19   **Q.**   LINES 1 AND 2.

20   **A.**   YES, SIR.

21   **Q.**   AND SPECIFICALLY MR. GHAHREMAN HERE IN COURT TODAY.

22   **A.**   YES, SIR.

23   **Q.**   AND YOU HAVE AGREED TO PROVIDE SUBSTANTIAL ASSISTANCE TO

24   THE GOVERNMENT, RIGHT?

25   **A.**   YES, SIR.

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1  **Q.**    AND YOUR ASSISTANCE HAS TO BE SUBSTANTIAL TO GET

2  SOMETHING FROM THE GOVERNMENT FOR YOU, RIGHT?

3  **A.**    MY TOTAL TRUTH, ENTIRE TRUTH, WHAT I KNOW.

4  **Q.**    BUT WHAT YOU HAVE TO DO, EVEN IF IT IS TRUE, HAS TO BE

5  SUBSTANTIAL, RIGHT?

6  **A.**    I TELL THE TRUTH.  I DON'T KNOW WHAT IS SUBSTANTIAL,

7  THAT MEANS.

8  **Q.**    LET ME TURN YOU TO PAGE 3 OF THAT DOCUMENT, LINE 11.

9  **A.**    YES, SIR.

10 **Q.**    IF THE UNITED STATES ATTORNEY'S OFFICE DECIDES THAT YOU

11 HAVE PROVIDED SUBSTANTIAL ASSISTANCE -- RIGHT? -- AND HAS

12 FULLY COMPLIED WITH THIS PLEA AGREEMENT, THE U.S. ATTORNEY'S

13 OFFICE -- RIGHT? -- WILL FILE A MOTION FOR DOWNWARD DEPARTURE

14 IN YOUR CASE.  RIGHT?

15 **A.**    YES, SIR.

16 **Q.**    THIS AGREEMENT SAYS THAT YOU HAVE TO PROVIDE SUBSTANTIAL

17 ASSISTANCE TO THE PROSECUTORS, RIGHT?

18 **A.**    YES, SIR.

19 **Q.**    YOU HAVE TO PROVIDE SUBSTANTIAL ASSISTANCE TO THE

20 PROSECUTORS AGAINST MR. GHAHREMAN, RIGHT?

21 **A.**    YES, SIR.

22 **Q.**    AND ONLY IF THE GOVERNMENT BELIEVES THAT YOU HAVE

23 PROVIDED SUBSTANTIAL ASSISTANCE WILL YOU GET A BENEFIT FROM

24 THIS ADDITIONAL AGREEMENT.

25 **A.**    YES, SIR.

APRIL 16, 2015

755

YILDIZ - CROSS-EXAMINATION

1  **Q.**    THAT IS WHAT IT SAYS, RIGHT?

2  **A.**    YES, SIR.

3  **Q.**    OKAY.  AND YOU UNDERSTAND THAT SUBSTANTIAL ASSISTANCE

4  MEANS SOMETHING.  IT IS NOT WHAT YOU THINK IS SUBSTANTIAL,

5  RIGHT?

6  **A.**    YES, SIR.

7  **Q.**    IT MEANS THAT YOU HAVE TO -- IT MEANS THAT YOUR

8  ASSISTANCE HAS TO BE DIRECTED TO THE PROSECUTION OF ANOTHER

9  PERSON, RIGHT?

10  **A.**    I SAID I TELL THE TRUTH.  THAT IS THE ASSISTANCE I CAN

11  GIVE.

12  **Q.**    RIGHT.  YOU TELL THE TRUTH, AND YOU HOPE THAT THE TRUTH

13  IS SUBSTANTIAL ENOUGH --

14  **A.**    YES, SIR.

15  **Q.**    -- TO GET YOU UNDER.  AND YOU KNOW THAT THE ULTIMATE

16  JUDGE OF THE TRUTH IN THIS CASE FOR YOU ARE THESE GENTLEMEN

17  SITTING HERE, RIGHT?

18  **A.**    YES.

19  **Q.**    THAT'S THE TERMS OF YOUR DEAL.

20  **A.**    YES, SIR.

21  **Q.**    IF I BELIEVE YOU ARE TELLING THE TRUTH I CAN'T MAKE THIS

22  MOTION FOR SUBSTANTIAL ASSISTANCE, RIGHT?

23  **A.**    YES, SIR.

24  **Q.**    THE JUDGE CAN'T EVEN MAKE THAT MOTION FOR A DOWNWARD

25  DEPARTURE FOR SUBSTANTIAL ASSISTANCE, RIGHT?

APRIL 16, 2015

YILDIZ – CROSS–EXAMINATION

1    **A.**    YES, SIR.

2    **Q.**    YOU DISCUSSED THIS WITH YOUR ATTORNEY.

3    **A.**    YES, SIR.

4    **Q.**    YOU UNDERSTAND THE ONLY PERSON WHO CAN MAKE THAT MOTION

5    FOR SUBSTANTIAL ASSISTANCE ARE THE PEOPLE SITTING HERE TRYING

6    TO SECURE A PROSECUTION AGAINST THE MAN SITTING OVER HERE,

7    RIGHT?

8    **A.**    YES, SIR.

9    **Q.**    YOU HAVE TO PLEASE THESE PEOPLE TO GET THAT

10   RECOMMENDATION.

11   **A.**    YEAH.

12   **Q.**    THEY HAVE TO BELIEVE YOU ARE TELLING THE TRUTH TO MAKE

13   THAT RECOMMENDATION.

14   **A.**    EVERYBODY SHOULD BELIEVE IT, YEAH.

15   **Q.**    BUT THEY HAVE TO FOR YOU TO GET THIS BENEFIT, RIGHT?

16   IS THAT FAIR?

17   **A.**    I GUESS SO.

18   **Q.**    WELL, THAT'S THE TERMS OF YOUR AGREEMENT.  YOU ENTERED

19   INTO A WRITTEN AGREEMENT, RIGHT?

20   **A.**    YES, SIR.

21   **Q.**    YOU REVIEWED THAT WRITTEN AGREEMENT, RIGHT?

22   **A.**    YES, SIR.

23   **Q.**    AND THOSE ARE THE TERMS OF YOUR AGREEMENT.

24   **A.**    YEAH.

25   **Q.**    NOW, YOU MET WITH THE GOVERNMENT SEVERAL TIMES SINCE YOU

APRIL 16, 2015

YILDIZ – CROSS–EXAMINATION

1    WERE ARRESTED, RIGHT?

2    **A.**    YES, SIR.

3    **Q.**    HOW MANY WOULD YOU SAY, APPROXIMATELY?

4    **A.**    FOUR TIMES.

5    **Q.**    YOU HAVE ONLY MET WITH THE PROSECUTORS IN THIS CASE FOUR

6    TIMES SINCE YOU WERE ARRESTED?

7    **A.**    MAYBE, FROM LAST YEAR TO NOW, MAYBE IN TOTAL SIX TIMES,

8    THEN.

9    **Q.**    MAYBE SIX.  MAYBE MORE THAN THE FOUR, RIGHT?

10   **A.**    YEAH.  NO, NO, SIX TIMES.

11   **Q.**    OKAY.  AND LET ME BACK UP JUST TO BE CLEAR.

12   AFTER YOU WERE ARRESTED YOU SPOKE WITH AGENTS IN THIS

13   CASE, RIGHT?

14   **A.**    YES, SIR.

15   **Q.**    BEFORE YOU NECESSARILY KNEW WHAT THE CONSEQUENCES WERE.

16   **A.**    YES, SIR.

17   **Q.**    SOMETIME AFTER YOU SPOKE WITH THE AGENTS –– LET ME SEE

18   IF I CAN FIND.

19   IN JUNE OF LAST YEAR YOU DECIDED TO MEET WITH THE

20   PROSECUTORS.

21   **A.**    YES, SIR.

22   **Q.**    AND THE AGENTS.

23   **A.**    YES, SIR.

24   **Q.**    AND THIS IS BEFORE YOU PLED GUILTY, RIGHT?

25   **A.**    YES, SIR.

APRIL 16, 2015

YILDIZ – CROSS–EXAMINATION

1   **Q.**    BUT YOU ENTERED INTO AN AGREEMENT THEN, AS WELL.

2   **A.**    EXCUSE ME?

3   **Q.**    BEFORE YOU STARTED TALKING TO THE PROSECUTORS IN JUNE OF

4   LAST YEAR ––

5   **A.**    YES, SIR.

6   **Q.**    –– YOU HAD AN AGREEMENT WITH THEM, RIGHT?  THERE WAS A

7   SIGNED AGREEMENT THAT YOU ENTERED INTO WITH THEM.  DO YOU NOT

8   RECALL?

9   **A.**    NO, I DON'T RECALL.

10  **Q.**    LET ME APPROACH YOU WITH DEFENSE EXHIBIT MM.  TAKE A

11  LOOK AT THAT DOCUMENT, MR. YILDIZ, PLEASE.

12         DO YOU RECOGNIZE THAT DOCUMENT?

13            (EXHIBIT MM MARKED FOR IDENTIFICATION)

14  **A.**    YES, I DO.

15  **Q.**    ON THE SECOND PAGE, IS THAT YOUR SIGNATURE AT THE TOP?

16  **A.**    YES, SIR.

17  **Q.**    DATED JUNE 17TH, 2014?

18  **A.**    YES, SIR.

19  **Q.**    YOUR ATTORNEY'S SIGNATURE BELOW YOURS?

20  **A.**    YES, SIR.

21  **Q.**    MR. HARRIGAN'S SIGNATURE, WHO IS SEATED HERE AT THE

22  PROSECUTION TABLE?

23  **A.**    YES, SIR.

24  **Q.**    AND THE TITLE OF THAT DOCUMENT IS?

25  **A.**    PROFFER AGREEMENT.

APRIL 16, 2015

758

1   **Q.**    RIGHT.  SO YOU ENTERED INTO AN AGREEMENT WITH THE

2   GOVERNMENT BEFORE YOU SPOKE TO THEM IN JUNE OF 2014.

3   **A.**    YES, SIR.

4   **Q.**    NOW, YOU JUST TOLD ME WHAT IS IMPORTANT IS THAT YOU TELL

5   THE TRUTH, RIGHT?

6   **A.**    YES, SIR.

7   **Q.**    AND THERE ARE CONSEQUENCES FOR NOT TELLING THE TRUTH.

8   **A.**    YES, SIR.

9   **Q.**    THERE CAN BE ADDITIONAL PENALTIES FOR NOT TELLING THE

10  TRUTH.

11  **A.**    YES, SIR.

12  **Q.**    PENALTY OF PERJURY, RIGHT?

13  **A.**    YES, SIR.

14  **Q.**    FALSE STATEMENTS.

15  **A.**    YES, SIR.

16  **Q.**    NOW LET'S LOOK AT THIS AGREEMENT AT PARAGRAPH 2.

17        YOU SEE THAT LITTLE YELLOW DOT THERE?

18  **A.**    YES, SIR.

19  **Q.**    I UNDERSTAND THAT THE DECISION WHETHER I AM PERMITTED TO

20  COOPERATE AND WHETHER I MAY LATER RECEIVE ANY BENEFIT FOR

21  COOPERATION RESTS SOLELY WITH THE PROSECUTOR.

22        RIGHT?

23  **A.**    YES, SIR.

24  **Q.**    THAT MEANS ONLY WITH THE PROSECUTOR.

25  **A.**    YES, SIR.

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1   Q.    AND WILL BE MADE FOLLOWING YOUR PROFFER.

2   A.    YEAH.

3   Q.    AND YOU UNDERSTAND PROFFER TO MEAN WHAT YOU HAVE TO SAY.

4   A PROFFER, RIGHT?

5   A.    YEAH.

6   Q.    YOU UNDERSTAND THAT?

7   A.    NOW I DO.

8   Q.    JUST ASKING.

9         NOW PARAGRAPH 3 IS IMPORTANT, RIGHT?  IT GIVES YOU SOME

10  PROTECTIONS.

11  A.    YES, SIR.

12  Q.    WHEN YOU WENT TO THIS PROFFER SESSION AND AGREED TO TALK

13  TO THE GOVERNMENT, THE GOVERNMENT AGREED NOT TO PROSECUTE YOU

14  FOR ADDITIONAL CRIMES BASED ON WHAT YOU HAD TO SAY, RIGHT?

15  A.    YES, SIR.

16  Q.    THAT WAS IMPORTANT BEFORE YOU WENT INTO THIS MEETING

17  BEFORE YOU ARE GOING TO TELL THEM EVERYTHING YOU KNEW, RIGHT?

18  A.    I CONSULTED WITH MY LAWYER, AND IT WAS ALL RIGHT.

19  Q.    YOU DIDN'T WANT TO SAY THINGS ABOUT OTHER CRIMES AND

20  THEN WALK OUT OF THE MEETING WITH NEW CHARGES, DID YOU?

21  A.    IT WAS IN GENERAL JUST TO PROTECT MYSELF.

22  Q.    BUT THERE IS AN EXCEPTION TO THAT, RIGHT?

23  A.    YEAH.

24  Q.    PARAGRAPH 3.  AND IT SAYS THAT IF ANY OF THE STATEMENTS

25  MADE BY ME DURING THE PROFFER ARE -- SORRY.

APRIL 16, 2015

761

YILDIZ – CROSS–EXAMINATION

```
 1        IF ANY OF THE STATEMENTS MADE BY YOU IN THE PROFFER ARE
 2   UNTRUE, RIGHT?
 3   A.    YEAH.
 4   Q.    THAT THE GOVERNMENT CAN PROSECUTE YOU FOR FALSE
 5   STATEMENT, RIGHT?
 6   A.    YES, SIR.
 7   Q.    THE GOVERNMENT CAN PROSECUTE YOU FOR OBSTRUCTION OF
 8   JUSTICE.
 9   A.    YES, SIR.
10   Q.    THE GOVERNMENT CAN PROSECUTE YOU FOR PERJURY.
11   A.    YES, SIR.
12   Q.    AND THOSE ARE SERIOUS FEDERAL OFFENSES, RIGHT?
13   A.    YES, SIR.
14   Q.    THAT CARRY ADDITIONAL TIME TO ANYTHING YOU MIGHT GET FOR
15   WHAT YOU HAVE BEEN CHARGED WITH HERE.
16   A.    YES, SIR.
17   Q.    AND YOU SIGNED THIS AGREEMENT, RIGHT?
18   A.    YES, SIR.
19   Q.    YOU REVIEWED THIS AGREEMENT.
20   A.    YES, SIR.
21   Q.    AND YOU UNDERSTOOD THE TERMS OF THE AGREEMENT.
22   A.    YES, SIR.
23   Q.    AND THAT WAS JUNE 17TH, 2014.
24   A.    YES, SIR.
25   Q.    DO YOU REMEMBER THAT PROFFER SESSION?
```

APRIL 16, 2015

1    **A.**    YES, SIR, I DO.

2    **Q.**    AND IT WAS IMPORTANT FOR YOU TO TELL THE TRUTH.

3    **A.**    YES, SIR.

4    **Q.**    YOU KNEW THAT YOU COULD BE PROSECUTED IF YOU DIDN'T TELL

5    THE TRUTH.

6    **A.**    YES, SIR.

7    **Q.**    AND AT THAT PROFFER SESSION YOU DID TALK ABOUT YOUR

8    INVOLVEMENT IN THIS OFFENSE, RIGHT?

9    **A.**    YES, SIR.

10   **Q.**    BUT THAT PROFFER SESSION DIDN'T GO VERY WELL, DID IT?

11   **A.**    I WAS STILL HESITANT TO TELL THE ENTIRE TRUTH SINCE IT

12   WAS MY FIRST MEETING.

13   **Q.**    YOU TOLD THE PROSECUTORS THAT YOU DIDN'T HAVE EXTENSIVE

14   KNOWLEDGE ABOUT WHERE THESE PRODUCTS WERE GOING, RIGHT?

15   **A.**    YES, I WAS STILL TRYING TO PROTECT MYSELF.

16   **Q.**    YOU WERE STILL TRYING TO PUT YOURSELF IN THE BEST

17   POSITION, RIGHT?  PROTECT YOURSELF, PUT YOURSELF IN THE BEST

18   POSITION?

19   **A.**    I WAS JUST TRYING TO PROTECT MYSELF.

20   **Q.**    AND YOU TOLD THE GOVERNMENT THAT YOU DIDN'T HAVE ANY

21   IDEA THAT THESE ITEMS WERE NECESSARILY DESTINED FOR IRAN UNTIL

22   YOU GOT TO THE UNITED STATES, RIGHT?

23   **A.**    I CAN'T RECALL IT.

24   **Q.**    YOU DON'T RECALL?

25   **A.**    NO.

APRIL 16, 2015

1   **Q.**    BUT YOU DO RECALL THAT THAT SESSION DID NOT END WELL,
2   RIGHT?
3   **A.**    YEAH.
4   **Q.**    THAT SESSION DIDN'T END WELL BECAUSE THE PROSECUTOR TOLD
5   YOU HE DIDN'T BELIEVE YOU, RIGHT?
6   **A.**    YEAH.
7   **Q.**    HE SAID, YOU ARE NOT GOING TO GET ANY COOPERATION BASED
8   ON WHAT YOU TOLD US.  RIGHT?
9   **A.**    THAT HE DIDN'T BELIEVE ME.
10  **Q.**    RIGHT.  AND IF HE DIDN'T BELIEVE YOU, THAT MEANT TO YOU
11  YOU DON'T GET WHAT WE HAVE CALLED THE SUBSTANTIAL ASSISTANCE,
12  RIGHT?
13  **A.**    YEAH.
14  **Q.**    YOU DON'T GET THE MOTION FROM THE GOVERNMENT FOR LESS
15  TIME THAN WHAT YOU ARE ALREADY FACING, RIGHT?
16  **A.**    I DIDN'T KNOW THE DETAILS OF THE DEAL.
17  **Q.**    BUT YOU DID KNOW THE DETAILS OF YOUR PROFFER AGREEMENT.
18  **A.**    I WAS CONSULTED THAT IT IS OKAY FOR ME TO SIGN IT FROM
19  MY LAWYER.
20  **Q.**    OKAY.  BUT YOU KNEW IT WAS IMPORTANT TO TELL THE TRUTH,
21  RIGHT?
22  **A.**    YES, SIR.
23  **Q.**    YOU COULD BE PROSECUTED FOR NOT TELLING THE TRUTH.
24  **A.**    YES, SIR.
25  **Q.**    BUT AT THE END OF THAT MEETING THE GOVERNMENT WASN'T

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1    HAPPY WITH WHAT YOU HAD TO SAY, RIGHT?

2    **A.**    IT WASN'T, YEAH.

3    **Q.**    AND YOU LEFT THAT MEETING.

4    **A.**    YES, SIR.

5    **Q.**    AND YOU LEFT THAT MEETING WITHOUT THIS PLEA AGREEMENT,

6    RIGHT?

7    **A.**    YES, SIR.

8    **Q.**    YOU DIDN'T HAVE THIS PLEA AGREEMENT YET AT THAT MEETING.

9    **A.**    NO.

10   **Q.**    YOU DIDN'T HAVE THE GOVERNMENT'S RECOMMENDATION FOR EVEN

11   LESS TIME AFTER THAT MEETING, DID YOU?

12   **A.**    NO, SIR.

13   **Q.**    BUT YOU DID DECIDE TO GO BACK AND TALK TO THE GOVERNMENT

14   AFTER THIS MEETING, RIGHT?

15   **A.**    YES, SIR.

16   **Q.**    AND THAT ONE HAPPENED ABOUT A MONTH LATER, IN AUGUST,

17   RIGHT?

18   **A.**    YEAH.  I NEEDED TO RECOLLECT MYSELF.

19   **Q.**    RIGHT.  YOU NEEDED TO CONSIDER YOUR OPTIONS, KNOWING

20   WHAT YOUR PENALTIES WERE YOU WERE FACING, RIGHT?

21   **A.**    YES, SIR.

22   **Q.**    DURING THAT SECOND MEETING, IN AUGUST, YOU TOLD A

23   DIFFERENT STORY TO THE PROSECUTOR, RIGHT?

24   **A.**    NO, I JUST TOLD THE ENTIRE TRUTH.  I DIDN'T HESITATE TO

25   TELL THE TRUTH.

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1  **Q.**    IN THIS MEETING YOU DIDN'T SAY THAT YOU LEARNED THAT THE

2  ITEMS WERE GOING TO IRAN ONLY AFTER YOU WERE ARRESTED IN THE

3  UNITED STATES, RIGHT?  YOU DIDN'T SAY THAT.

4  **A.**    EXCUSE ME?

5  **Q.**    YOU DID NOT SAY, IN THE SECOND MEETING, THAT YOU DIDN'T

6  KNOW THE ITEMS WERE DESTINED FOR IRAN -- LET ME GET RID OF THE

7  NEGATIVES.

8        IN YOUR FIRST MEETING YOU SAID YOU DIDN'T KNOW THESE

9  ITEMS WERE GOING TO IRAN UNTIL YOU GOT TO THE UNITED STATES,

10  RIGHT?

11  **A.**    YEAH.

12  **Q.**    YOU DIDN'T SAY THAT IN THE SECOND MEETING, DID YOU?

13  **A.**    I DON'T THINK SO.

14  **Q.**    NO.  IN THE SECOND MEETING YOU TOLD THEM THAT YOU DID

15  HAVE PRIOR KNOWLEDGE THAT THESE ITEMS WERE GOING TO IRAN,

16  RIGHT?

17  **A.**    YES, SIR.

18  **Q.**    THIS MEETING WENT BETTER FOR YOU, DIDN'T IT?

19  **A.**    IT WAS THE TRUTH, SO IT WAS EASIER TO TELL THE TRUTH.

20  **Q.**    BUT THIS MEETING RESULTED IN AN OFFER FROM THE

21  GOVERNMENT, RIGHT?

22  **A.**    NOT IMMEDIATELY.

23  **Q.**    NOT IMMEDIATELY, BUT THEY CONSIDERED WHAT YOU SAID,

24  RIGHT?

25  **A.**    YEAH.

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

```
 1    Q.    BUT AFTER THEY CONSIDERED WHAT YOU SAID THEY OFFERED YOU

 2    A PLEA AGREEMENT, WHICH I BELIEVE YOU ENTERED INTO ON -- MAYBE

 3    YOU HAVE IT UP THERE BEFORE I FIND IT -- SEPTEMBER 12TH.  YOU

 4    PROBABLY SIGNED IT A FEW DAYS EARLIER, RIGHT?

 5    A.    I JUST LOOK.

 6    Q.    SEPTEMBER 10TH, RIGHT?

 7    A.    SOMETHING LIKE THAT, YEAH.  YEAH, 10TH OF THE SEPTEMBER.

 8    Q.    SO AFTER THAT SESSION WHERE YOU STARTED TELLING THE

 9    GOVERNMENT THAT YOU KNEW THESE THINGS WERE GOING TO IRAN --

10    A.    YES, SIR.

11    Q.    -- THEY OFFERED YOU THIS DEAL.

12    A.    YES, SIR.

13    Q.    THIS DEAL FOR POTENTIALLY LESS THAN EVEN 46 MONTHS,

14    RIGHT?

15    A.    YES, SIR.

16    Q.    A DEAL THAT IF THE GOVERNMENT MADE THE MOTION FOR

17    SUBSTANTIAL ASSISTANCE COULD MAYBE EVEN GET YOU TO TIME

18    SERVED, RIGHT?

19    A.    I WAS SEEKING FOR THE DEAL FROM THE BEGINNING, BECAUSE I

20    KNEW THAT I WAS GUILTY AND I WANTED TO ADMIT MY GUILT.

21    Q.    FROM THE BEGINNING?

22    A.    YES, SIR.

23    Q.    ON JUNE 17TH?

24    A.    YES, SIR.

25    Q.    YOU WERE SEEKING THE DEAL, AND BECAUSE YOU KNEW YOU WERE
```

APRIL 16, 2015

1    GUILTY.

2    **A.**    YES, SIR.

3    **Q.**    BUT YOU DIDN'T TELL THEM THAT YOU KNEW YOU WERE GUILTY

4    ON JUNE 17TH.

5    **A.**    I WANTED TO PROTECT MYSELF AND MINIMIZE MY ROLE.

6    **Q.**    OKAY.  IT WASN'T UNTIL AFTER YOUR AUGUST MEETING THAT

7    YOU GOT A DEAL.

8    **A.**    YES, SIR.

9    **Q.**    NOW, ONE OF THE THINGS YOU SAID IN THOSE PROFFER

10   MEETINGS WAS THAT YOU DIDN'T THINK THAT THESE AGENTS WERE

11   CHARGING ENOUGH FOR THE Y-690 –– FOR THE NAVIGATS, RIGHT?  ONE

12   OF THE THINGS YOU TOLD THE GOVERNMENT IN THIS MEETING WAS:  I

13   HAD SUSPICIONS ABOUT THESE GUYS BECAUSE THEY WEREN'T BUMPING

14   UP THE PRICE ENOUGH.

15          **MR. COUGHLIN:**  OBJECTION.  VAGUE.  WHICH MEETING ARE

16   WE TALKING ABOUT?

17          **THE COURT:**  SUSTAINED.

18   **Q.**    **(MR. JOHNSTON)** THE AUGUST MEETING, YOUR SECOND MEETING,

19   RIGHT?

20   **A.**    YEAH.

21   **Q.**    YOU SAID, YEAH, YOU KNOW, ACTUALLY THEY WEREN'T –– AND

22   THIS IS THE MEETING WHERE YOU SAID, LOOK, I DID KNOW IT WAS

23   GOING TO IRAN.  RIGHT?

24   **A.**    YES, SIR.

25   **Q.**    YOU SAID THAT THESE GUYS DIDN'T PUT ENOUGH OF A MARKUP

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1   ON THE ITEMS LIKE YOU WOULD NORMALLY DO IF YOU WERE DEALING IN
2   BUSINESS FOR IRAN, RIGHT?
3   **A.**   YES, SIR.
4   **Q.**   IN YOUR EXPERIENCE, IF YOU ARE DEALING IN BUSINESS FOR
5   IRAN THERE IS GOING TO BE A SIGNIFICANT MARK UP, RIGHT?
6   **A.**   YES, SIR.
7   **Q.**   YOU HAD $100,000 INVESTMENT IN TIG MARINE?
8   **A.**   YES, SIR.
9   **Q.**   YOU WERE PROMISED $80,000 BY KOORUSH TAHERKHANI?
10  **A.**   YES.
11  **Q.**   AND YOU HAVE NEITHER OF THOSE RIGHT NOW, DO YOU?
12  **A.**   NO.
13  **Q.**   IT IS FAIR TO SAY YOU ARE NOT VERY HAPPY WITH KOORUSH
14  TAHERKHANI?
15  **A.**   YEAH.
16  **Q.**   BUT YOU DID TESTIFY TODAY THAT KOORUSH TOLD YOU THAT THE
17  Y-690'S WERE FOR AIR TRAFFIC, RIGHT?
18  **A.**   HE TOLD TO ME THAT IT IS FOR HIS CUSTOMERS, I SHOULDN'T
19  WORRY.
20  **Q.**   BUT YOU TESTIFIED HERE TO THE JURY A LITTLE BIT AGO THAT
21  HE TOLD YOU THEY WERE INTENDED FOR AIR TRAFFIC, RIGHT?
22  **A.**   YEAH.  FOR SHIP-TO-AIR-COMMUNICATION, SOMETHING LIKE
23  THAT.
24  **Q.**   NOT FOR MILITARY USE.
25  **A.**   NO.

APRIL 16, 2015

1  **Q.**    COMMERCIAL USE.

2  **A.**    THAT IS WHAT HE SAID.

3  **Q.**    KOORUSH ALSO TOLD YOU THAT HE HAD END USER CERTIFICATES

4  FOR DELIVERY OF THESE ITEMS TO DUBAI, RIGHT?

5  **A.**    YEAH, THAT WE WILL SHOW THIS COMPANY AS END USER.

6  **Q.**    RIGHT.  BUT YOU TESTIFIED THAT YOU UNDERSTOOD THIS MEANT

7  THEY WERE GOING TO IRAN.

8  **A.**    YES, SIR.

9  **Q.**    AND THIS IS BECAUSE YOU HAVE HAD PREVIOUS EXPERIENCE

10  WITH KOORUSH, RIGHT?

11  **A.**    YES, HIS ENTIRE BUSINESS WAS SUPPLYING TO IRAN AND

12  IRANIAN CUSTOMERS.

13  **Q.**    AND YOU KNOW THAT INTIMATELY, RIGHT?

14  **A.**    YES, SIR.

15  **Q.**    AS PRESIDENT OF TIG MARINE.

16  **A.**    I KNEW THAT, YEAH.

17  **Q.**    YOU HAD BEEN INVOLVED IN DEALS WITH KOORUSH PREVIOUSLY

18  INVOLVING IRANIAN CLIENTS, RIGHT?

19  **A.**    I WAS ALWAYS NOTICED OF IT -- NOT ALWAYS, BUT MOST OF

20  THE TIME.

21  **Q.**    LET'S TALK ABOUT THE GREEN VALLEY RANCH MEETING.

22  **A.**    YES, SIR.

23  **Q.**    AT THE HOTEL ROOM --

24  **A.**    YES, SIR.

25  **Q.**    -- IN LAS VEGAS.

APRIL 16, 2015

1      YOU SAID THAT THERE WERE TWO GOALS.

2  **A.**   YEAH.

3  **Q.**   THE FIRST GOAL WAS TO INTRODUCE YOURSELF, RIGHT?

4  **A.**   YES, SIR.

5  **Q.**   AS THE FACE OF TIG MARINE?

6  **A.**   YES, SIR.

7  **Q.**   AND THE SECONDARY GOAL, OR ANOTHER GOAL, WAS TO VERIFY

8  THAT THESE PRODUCTS WERE WHAT THEY WERE REPRESENTED TO BE.

9  **A.**   YES, SIR.

10 **Q.**   THE ROLE THAT MR. GHAHREMAN PLAYED WAS SIMPLY TO VERIFY

11 THOSE PRODUCTS --

12 **A.**   YES, SIR.

13 **Q.**   -- RIGHT?  THAT'S THE REAL ROLE, THAT IS WHY HE WAS A

14 PART OF THIS DEAL, RIGHT?

15 **A.**   HE WAS THE LINK BETWEEN THE SUPPLIERS AND US, AND AS

16 WELL AS THE TECHNICAL MIND TO BE HAVING THE CAPABILITY OF

17 VERIFYING THE ITEMS.

18 **Q.**   HE HAD EXPERIENCE AS AN ENGINEER, RIGHT?

19 **A.**   HE WAS AN ENGINEER.

20 **Q.**   IN MARINE?

21 **A.**   YES.  IN MARINE BUSINESS, YEAH.

22 **Q.**   YOUR JOB WAS, THE FIRST PURPOSE, RIGHT, TO INTRODUCE TIG

23 MARINE TO SOUTH STAR TRADING.

24 **A.**   YES.

25 **Q.**   YOUR ROLE WAS TO TALK ABOUT FUTURE BUSINESS, RIGHT?

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1   **A.**    YES.

2   **Q.**    YOUR ROLE WAS TO MAKE ANY DECISIONS ABOUT THIS DEAL,

3   RIGHT?

4   **A.**    MY ROLE WAS TO INTRODUCE THE COMPANY, AND VERIFY THAT

5   THE PEOPLE ARE GOOD BUSINESS PEOPLE.

6   **Q.**    OKAY.  AND IF DECISIONS HAD TO BE MADE ON BEHALF OF TIG

7   MARINE, YOU WERE THERE TO MAKE THOSE, RIGHT?

8   **A.**    I WOULD HAVE CALLED KOORUSH TO MAKE THE DECISIONS

9   BECAUSE IT WAS HIS DEAL.

10  **Q.**    FAIR ENOUGH.  SO YOU WOULD HAVE TO CONSULT WITH KOORUSH,

11  RIGHT?

12  **A.**    YES, SIR.

13  **Q.**    BUT ARASH COULDN'T TELL YOU -- MR. GHAHREMAN COULDN'T

14  MAKE A DECISION ON BEHALF OF TIG MARINE.

15  **A.**    HE WAS THERE TO VERIFY THE ITEMS.

16  **Q.**    HE HAD A LIMITED ROLE, RIGHT?

17  **A.**    YES.

18  **Q.**    YOU TESTIFIED ON DIRECT THAT YOU DISCUSSED WITH JOHN

19  ERICKSON AND DAVID MILLS THE FACT THAT YOU WERE GOING TO SHIP

20  THESE ITEMS TO DUBAI AND THEN SHIP THEM TO THE UNITED STATES.

21  THAT WAS YOUR TESTIMONY TODAY, RIGHT?

22  **A.**    YEAH.

23          **MR. COUGHLIN:**  YOUR HONOR, I OBJECT.  THAT MISSTATES

24  THE TESTIMONY.  HE JUST SAID --

25          **MR. JOHNSTON:**  HE JUST AGREED THAT THAT IS --

APRIL 16, 2015

```
 1            MR. COUGHLIN:  -- SENT TO THE UNITED STATES.

 2            THE COURT:  YOU CAN CLARIFY.

 3            MR. JOHNSTON:  I AM SORRY.  DID I SAY UNITED STATES?

 4   DUBAI THEN TO -- THANK YOU.

 5   Q.    (MR. JOHNSTON) DUBAI THEN TO IRAN, RIGHT?

 6   A.    YES.

 7   Q.    OKAY.  LET'S PLAY --

 8            MR. JOHNSTON:  GIVE ME ONE MINUTE, PLEASE.

 9            DD FOR THE RECORD.

10            (EXHIBIT DD MARKED FOR IDENTIFICATION)

11            (VIDEOTAPE PLAYED)

12   Q.    (MR. JOHNSTON) DAVID MILLS ASKED YOU HOW YOU WERE GOING

13   TO GET THESE ITEMS FROM DUBAI TO IRAN, RIGHT?  THAT IS WHAT WE

14   JUST HEARD?

15   A.    YES, SIR.

16   Q.    YOU SAID BY SEA, RIGHT?

17   A.    YES, SIR.

18   Q.    BUT THEN YOU TOLD THEM THAT THESE ITEMS WERE NOT FOR

19   SHIPMENT TO IRAN.

20   A.    YES.  I GOT SUSPICIOUS.

21   Q.    BUT YOU SAID THAT THESE ITEMS WERE NOT FOR SHIPMENT TO

22   IRAN.

23   A.    YES.  AS I MENTIONED EARLIER, I HAD THE IMPRESSION THAT

24   THESE PEOPLE MIGHT BE FROM THE GOVERNMENT.  TO SECURE MYSELF I

25   CHANGED DURING THE MEETING THE STATEMENT.
```

APRIL 16, 2015

1  Q.    YOU SAID THESE STATEMENTS WERE DESTINED FOR SHIPMENT TO
2  AJMAN, RIGHT?
3  A.    YES, SIR.
4  Q.    A-J-M-A-N?
5  A.    A-J-M-A-N.
6  Q.    THAT IS IN DUBAI?
7  A.    IT IS ANOTHER EMIRATE IN UNITED ARAB EMIRATES.
8  Q.    AJMAN IS IN THE UNITED ARAB EMIRATES?
9  A.    YES, SIR.
10 Q.    YOU DID SAY IT WAS FOR AN IRANIAN, RIGHT?
11 A.    YES, SIR.
12 Q.    BUT NOT IRAN.
13 A.    YES, SIR.
14 Q.    YOU SAID IT WAS FOR AN IRANIAN NATIONAL.
15 A.    YES, SIR.
16 Q.    WHO HAD A COMPANY IN UAE.
17 A.    IT WAS A COMPANY WE WERE USING AS A FRONT COMPANY, AS
18 THE END USER CERTIFICATE STATED.
19 Q.    YOU DID NOT SAY, IN THAT MEETING, THAT THAT COMPANY WAS
20 A FRONT COMPANY, DID YOU?
21 A.    DURING THE MEETING I REALIZED MAYBE THESE PEOPLE MIGHT
22 BE FROM THE GOVERNMENT, AND CHANGED THE STORY TO SECURE
23 MYSELF.
24 Q.    AND YOU DID NOT SAY, AT ANY TIME DURING THAT MEETING,
25 THAT THIS COMPANY IN AJMAN WAS A FRONT COMPANY, DID YOU?

APRIL 16, 2015

1    **A.**    NO, I DIDN'T MENTION THAT.

2    **Q.**    YOU WERE INTERVIEWED AFTER YOUR ARREST AS WELL, RIGHT?

3    **A.**    YES, SIR.

4    **Q.**    BEFORE YOU KNEW WHAT PENALTIES YOU MIGHT BE FACING.

5    **A.**    YES, SIR.

6    **Q.**    AND YOU CLAIMED THAT YOU WERE -- YOU FELT SCARED AND

7    NERVOUS, RIGHT?

8    **A.**    YES, SIR.

9           **MR. JOHNSTON:**  LET'S PLAY.

10          (AUDIO PLAYED)

11          **MR. JOHNSTON:**  I AM SORRY.  THIS IS GOING TO BE NN.

12          (EXHIBIT NN MARKED FOR IDENTIFICATION)

13    **Q.**    **(MR. JOHNSTON)** YOU SOUNDED PRETTY RELAXED THERE, DIDN'T

14    YOU?

15    **A.**    I DON'T KNOW.

16    **Q.**    YOU DON'T KNOW.  OKAY.  FAIR ENOUGH.

17          BUT YOU REPEATED WHAT YOU SAID AT THE GREEN VALLEY RANCH

18    ABOUT WHERE THESE GYROS WERE DESTINED, RIGHT?

19    **A.**    YES, SIR.

20    **Q.**    YOU REPEATED WHAT YOU SAID AT THE GREEN VALLEY RANCH IN

21    FRONT OF MR. GHAHREMAN ABOUT WHERE THESE GYROS WERE INTENDED,

22    RIGHT?

23    **A.**    YES, SIR.

24    **Q.**    AND YOU EXPLAINED THAT THERE IS A SUBSTANTIAL AMOUNT OF

25    LEGITIMATE IRANIAN BUSINESS IN UAE, RIGHT?

APRIL 16, 2015

YILDIZ – CROSS–EXAMINATION

1    **A.**    THAT WAS MY BACKUP, YEAH.  I WANTED TO MAKE THE

2    IMPRESSION THAT THIS IS THE WAY HOW IT WORKS.

3    **Q.**    BUT IT IS TRUE THAT THERE ARE IRANIANS IN DUBAI.

4    **A.**    YEAH, THERE ARE.

5    **Q.**    WHO ARE DOING LEGITIMATE BUSINESS.

6    **A.**    YES, SIR.

7    **Q.**    WHO ARE NOT VIOLATING TRADE SANCTIONS.

8    **A.**    YEAH, THERE IS A SUBSTANTIAL AMOUNT OF PEOPLE LIVING IN

9    DUBAI.  I CAN'T JUDGE ALL OF THEM, YEAH.

10   **Q.**    BUT YOU TOLD THE AGENTS THAT THERE IS A LOT OF

11   LEGITIMATE IRANIAN BUSINESS IN DUBAI, RIGHT?

12   **A.**    THAT WAS MY BACKUP STORY.  FROM THE MOMENT I GET

13   ARRESTED UNTIL I GET INTERROGATED I MADE UP SOMETHING IN MY

14   MIND TO SECURE MYSELF.

15   **Q.**    ARE YOU SAYING IT IS NOT TRUE THERE IS NOT LOTS OF

16   IRANIANS IN --

17   **A.**    THERE IS, I MEAN, IRANIAN NATIONALS OR FORMER IRANIAN

18   NATIONALS LIVING IN DUBAI.

19   **Q.**    AND WORKING THERE LAWFULLY, RIGHT?

20   **A.**    YES, THEY DO.

21   **Q.**    AND DOING LAWFUL BUSINESS.

22   **A.**    YES, THEY DO.

23   **Q.**    YOU HAVE TRAVELED AROUND THE WORLD QUITE A BIT, RIGHT?

24   **A.**    YES, SIR.

25   **Q.**    YOU MET A LOT OF PEOPLE.

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1  **A.**    YES, SIR.

2  **Q.**    YOU SPEAK FLAWLESS ENGLISH.

3  **A.**    MEANWHILE, YES.  I LEARNED IT IN HERE, IN THE UNITED

4  STATES.

5  **Q.**    LEARNED IT IN THE UNITED STATES.

6        YOU ARE A PRETTY GOOD JUDGE OF CHARACTER?

7  **A.**    I WOULDN'T SAY SO, OTHERWISE I WOULDN'T BE IN THIS

8  TROUBLE.

9  **Q.**    FAIR ENOUGH.  BUT YOU DID DESCRIBE ARASH GHAHREMAN AS A

10  GOOD GUY.

11  **A.**    YES, HE IS A NICE PERSON.

12  **Q.**    YOU SAID AT ONE POINT HE IS A SIMPLE GUY, RIGHT?

13  **A.**    YES, SIR.

14  **Q.**    YOU DIDN'T MEAN THAT PEJORATIVELY, DID YOU?

15  **A.**    I AM SORRY?

16  **Q.**    YOU DIDN'T MEAN THAT IN A BAD WAY, DID YOU?

17  **A.**    NO, NO.  HE IS A NICE GENTLEMAN.

18  **Q.**    BUT NOT A BAD GUY, RIGHT?

19  **A.**    I DON'T THINK SO.

20  **Q.**    AND AS YOU SAID BEFORE, YOU UNDERSTOOD THAT HE WAS

21  INVOLVED IN THIS WHOLE TRANSACTION BECAUSE HE HAD MARITIME

22  KNOWLEDGE, RIGHT?

23  **A.**    YES, SIR.  AND DUE TO HIS KNOWLEDGE OF KOORUSH

24  PERSONALLY.

25  **Q.**    HIS OLD FRIEND?

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1   **A.**   YES, SIR.

2   **Q.**   HIS OLD FRIEND WHO HE HADN'T SEEN IN A LONG TIME?

3   **A.**   THAT IS WHAT I HEAR, YEAH.

4   **Q.**   THAT IS WHY -- I AM SORRY?

5   **A.**   THAT IS WHAT I HEARD FROM BOTH OF THEM.

6   **Q.**   AND YOU HADN'T KNOWN HIM BEFORE YOU CAME TO LAS VEGAS.

7   **A.**   NO, SIR.

8   **Q.**   BEFORE YOU -- YOU DIDN'T KNOW IF YOU COULD TRUST ARASH

9   TO DO BUSINESS FOR YOU OR TIG MARINE --

10  **A.**   YES, SIR.

11  **Q.**   -- BEFORE YOU CAME OVER, RIGHT?

12  **A.**   I DIDN'T.

13  **Q.**   YOU CAME OVER HERE ON KOORUSH'S BEHALF, RIGHT?

14  **A.**   YES, SIR.

15  **Q.**   IN PART TO CHECK ON ARASH, RIGHT?

16  **A.**   YES.

17  **Q.**   YOU WANTED TO MAKE SURE THAT HE WASN'T CHEATING ANY PART

18  OF THIS DEAL, RIGHT?

19  **A.**   YES.

20  **Q.**   AND PART OF THAT WAS BECAUSE HE HADN'T BEEN -- HE HAD

21  BEEN IN THE UNITED STATES FOR A LONG TIME, RIGHT?

22  **A.**   YES, SIR.

23  **Q.**   HE DIDN'T HAVE THE SAME CONNECTIONS THAT SOMEONE LIKE

24  YOU AND KOORUSH HAD WITH EACH OTHER, RIGHT?

25  **A.**   NO.

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1   **Q.**    HE DIDN'T MEET WITH KOORUSH ON A DAILY OR WEEKLY OR

2   MONTHLY BASIS.

3   **A.**    ACCORDING TO KOORUSH STATEMENT THEY HAD REGULAR SKYPE

4   CONVERSATIONS OVER THE PAST COUPLE MONTHS DUE TO THIS

5   BUSINESS.

6   **Q.**    RIGHT.  BUT HE WASN'T IN THE MIDDLE EAST, RIGHT?

7   **A.**    NO, NOT PERSONALLY AS MUCH, I KNOW.

8   **Q.**    LET'S TALK ABOUT -- YOU TESTIFIED ON DIRECT THAT YOU

9   TOLD MR. GHAHREMAN THAT YOU WERE WORRIED THAT THESE PEOPLE

10  WERE AGENTS.

11  **A.**    YES, SIR.

12  **Q.**    AND YOU TESTIFIED THAT MR. GHAHREMAN SAID HE HAD ASKED

13  THESE PEOPLE IF THEY WERE AGENTS?

14  **A.**    TWICE.

15  **Q.**    HE TOLD YOU THAT TWICE?

16  **A.**    HE SAID HE ASKED THEM TWICE, YEAH.

17  **Q.**    ASKED THEM TWICE IF THEY WERE AGENTS.  ON DIRECT -- SO

18  NOW IT IS TWICE, RIGHT?

19  **A.**    HE ASKED THEM TWICE HE TOLD ME, YEAH.

20  **Q.**    HE SAID THAT HE CONSULTED WITH AN ATTORNEY IN NEW YORK?

21  **A.**    YES.

22  **Q.**    ABOUT WHEN AGENTS MUST IDENTIFY THEMSELVES?

23  **A.**    THAT WAS HIS EXPLANATION.

24  **Q.**    OKAY.  YOU NEVER TOLD THE AGENTS THAT YOU OR ARASH HAD

25  CONCERNS THAT DAVID MILLS OR JOHN ERICKSON WERE AGENTS BEFORE

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1    YOUR MEETING AT THE GREEN VALLEY RANCH, RIGHT?

2    **A.**    NO.  WE THOUGHT MAYBE THEY COULD BE CHEATERS.

3    **Q.**    CHEATERS, RIGHT?

4    **A.**    LIKE SCAM, LIKE KIND OF SCAM.

5    **Q.**    AND THAT WAS THE MAJOR CONCERN THAT KOORUSH HAD, RIGHT?

6    **A.**    DUE TO HIS EXPERIENCE WITH THE SOUTH AFRICAN BUSINESS,

7    HE TOLD TO ME.

8    **Q.**    HE WAS WORRIED, BASED ON PREVIOUS EXPERIENCE, THAT THESE

9    PEOPLE MIGHT TRY TO CHEAT HIM, RIGHT?

10   **A.**    YES.

11   **Q.**    NOT NECESSARILY THAT THEY WERE AGENTS TRYING TO CATCH

12   HIM IN A VIOLATION OF LAW.

13   **A.**    THERE WERE TWO POSSIBILITIES.  ONE OF THEM WAS THAT THEY

14   WERE PURE SCAMMERS, AND THEY WOULD TAKE THE MONEY AND NOT GIVE

15   THE GOODS.  AND THE SECOND THING WAS THAT SINCE THEY KNOW IT

16   GOES TO IRAN, DUE TO THEIR CONVERSATIONS, I GUESS, THAT THEY

17   WOULD DO IT IN THAT WAY BECAUSE NOBODY COULD CLAIM ANYTHING

18   SINCE IT WAS A ILLEGAL BUSINESS.

19   **Q.**    BUT YOUR TESTIMONY TODAY IS BEFORE THE GREEN VALLEY

20   RANCH MEETING, YOU AND ARASH JUST TALKED ABOUT THE CONCERNS

21   THEY MIGHT BE CHEATERS, RIGHT?

22   **A.**    YES, SIR.

23           **THE COURT:**  MR. JOHNSTON, IT IS 10:15.  YOU HAVE A

24   FEW MORE MINUTES TO GO, AM I CORRECT?

25           **MR. JOHNSTON:**  YEAH.

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1          **THE COURT:**  SO WE WILL RECESS HERE.

2          WE WILL TAKE 15 MINUTES, PICK UP AT 10:30.

3          THANK YOU.

4          (RECESS)

5          **THE COURT:**  WE ARE BACK IN SESSION WITH ALL PRESENT.

6    WE WILL CONTINUE WITH THE CROSS-EXAMINATION.

7          MR. JOHNSTON.

8          **MR. JOHNSTON:**  THANK YOU, YOUR HONOR.

9    **Q.    (MR. JOHNSTON)** MR. YILDIZ, WHEN YOU WERE ARRESTED AND

10   INTERVIEWED BY THE AGENTS, BEFORE YOU KNEW WHAT SORT OF

11   PENALTIES YOU WERE FACING, YOU SPOKE WITH THEM, RIGHT?

12   **A.**    YES, SIR.

13   **Q.**    AND YOU TOLD THE JURY EARLIER YOU WERE LOOKING OUT FOR

14   YOURSELF.

15   **A.**    YES, SIR.

16   **Q.**    YOU ARE CONCERNED ABOUT NUMBER ONE, RIGHT?

17   **A.**    OF COURSE.

18   **Q.**    YOU.

19   **A.**    YES.

20   **Q.**    NOT NECESSARILY KOORUSH.

21   **A.**    YOU ALWAYS LOOK OUT FIRST FOR YOURSELF.  THAT IS

22   NATURAL, I GUESS.

23   **Q.**    NOT NECESSARILY FOR KOORUSH WHO HAS $180,000 OF YOUR

24   MONEY?

25   **A.**    I DIDN'T THINK ABOUT THAT AT THAT MOMENT.

APRIL 16, 2015

YILDIZ – CROSS–EXAMINATION

1  **Q.**    NOT NECESSARILY ARASH, EITHER, WHO YOU JUST MET.

2  **A.**    WE WERE ALL TOGETHER.  I TRIED TO PROTECT EVERYBODY.

3  **Q.**    WHEN YOU WERE INTERVIEWED BY THE AGENTS YOU TOLD THEM

4  THAT YOU DID RAISE A CONCERN ABOUT JOHN ERICKSON AND DAVID

5  MILLS WERE UNDERCOVER AGENTS.

6  **A.**    YES, SIR.

7  **Q.**    HOWEVER, YOU DID NOT TELL THEM THAT ARASH SAID, DON'T

8  WORRY, I ASKED THEM TWICE IF THEY WERE.

9  **A.**    NO.  IN THAT MOMENT I DIDN'T TELL THEM.

10  **Q.**    YOU DIDN'T SAY THAT THEN.

11  **A.**    YES, I DIDN'T.

12  **Q.**    BEFORE YOU KNEW WHAT THE CONSEQUENCES WERE YOU WERE

13  FACING, RIGHT?

14  **A.**    YES, SIR.

15  **Q.**    YOU DIDN'T SAY TO THE AGENTS THAT ARASH TOLD YOU THAT HE

16  HAD CONSULTED WITH AN ATTORNEY ABOUT WHEN AGENTS HAVE TO

17  IDENTIFY THEMSELVES, RIGHT?

18  **A.**    IN THAT MOMENT I TRIED TO PROTECT MYSELF AND DIDN'T WANT

19  TO DISCLOSE EVERYTHING.

20  **Q.**    YOU DIDN'T TELL THEM THAT, RIGHT?

21  **A.**    NO, I DIDN'T.

22  **Q.**    YOU THE TOLD THEM THAT YOUR CONCERN THEY MIGHT BE AGENTS

23  WASN'T NECESSARILY BECAUSE YOU FELT YOU HAD BROKEN THE LAW,

24  RIGHT?

25  **A.**    MY CONCERNS WAS BECAUSE OF THAT.  THE ENTIRE BUSINESS

APRIL 16, 2015

1    WAS BASICALLY SENSITIVE DUE TO ITS NATURE, IT GOES TO IRAN.

2    **Q.**    THAT IS NOT WHAT YOU TOLD THE AGENTS, RIGHT?

3    **A.**    NO, I DIDN'T IN THAT MOMENT.

4    **Q.**    YOU TOLD THE AGENTS THAT YOU AGREED WITH ARASH THAT

5    THERE WAS NOTHING TO WORRY ABOUT.

6    **A.**    YES.  ARASH ASSURED ME THAT.

7    **Q.**    YOU TOLD THEM THAT YOU AGREED THERE WAS NOTHING TO WORRY

8    ABOUT, RIGHT?  RIGHT?

9    **A.**    I THINK SO.

10            **MR. JOHNSTON:**  LET'S PLAY CLIP 101.

11            THIS IS, FOR THE RECORD, OO, DEFENSE EXHIBIT OO.

12            (EXHIBIT OO MARKED FOR IDENTIFICATION)

13            (AUDIO PLAYED)

14   **Q.**    **(MR. JOHNSTON)** ARASH'S CONCERN IS THEY WERE CHEATERS,

15   RIGHT?

16   **A.**    IT WAS ALL OF US THE CONCERN IN THE BEGINNING.

17   **Q.**    THAT IS WHAT YOU TOLD THE AGENTS, RIGHT?

18   **A.**    YES.

19   **Q.**    YOU TOLD THE AGENTS THAT YOU DIDN'T THINK THERE WAS

20   ANYTHING TO WORRY ABOUT BECAUSE YOU HAD AN END USER, RIGHT?

21   **A.**    YES, WE HAD AN END USER.

22   **Q.**    AND YOU EXPLAINED TO THEM CONCERNS THAT SOMEONE WITH

23   CONNECTIONS TO IRAN MIGHT HAVE WHO ISN'T BREAKING THE LAW,

24   RIGHT?

25   **A.**    YEAH.

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1  **Q.**    YOU TALKED WITH THE AGENTS ABOUT BEING CONCERNED THAT

2  PEOPLE WOULD BE SUSPICIOUS OF YOU JUST BY THE WAY YOU DRESSED,

3  RIGHT?

4  **A.**    YES, SIR.

5  **Q.**    YOU RECOUNTED TO THE AGENTS WHEN YOU GOT OFF THE PLANE

6  AT THE AIRPORT YOU WERE DETAINED FOR OVER AN HOUR, RIGHT?

7  **A.**    YES, SIR.

8  **Q.**    NOT BECAUSE THE CUSTOMS INSPECTOR AT THE AIRPORT WAS

9  WORKING WITH THE UNDERCOVER AGENTS, RIGHT?

10  **A.**    THAT IS COMMON PRACTICE, I HEARD.

11  **Q.**    BECAUSE YOU WERE WEARING CERTAIN CLOTHING THAT THE

12  OFFICER TOLD YOU THAT HE WAS GOING TO CHECK YOU OUT, RIGHT?

13  **A.**    YES, SIR.

14  **Q.**    FOR OVER AN HOUR YOU HAD TO WAIT.

15  **A.**    YES, SIR.

16  **Q.**    YOU WERE DETAINED, RIGHT?

17  **A.**    YES, SIR.

18  **Q.**    BECAUSE OF THE HAT YOU WERE WEARING.

19  **A.**    I GUESS SO.  MAYBE ENTIRE APPEARANCE.  I DON'T KNOW.

20  **Q.**    MAYBE YOUR BEARD?

21  **A.**    MAYBE.

22  **Q.**    THOSE ARE THE THINGS THAT YOU TOLD THE AGENT, RIGHT?

23  **A.**    YEAH.

24  **Q.**    NOT BECAUSE YOU WERE ENGAGED IN SOME SORT OF ILLEGAL

25  ACTIVITY.

APRIL 16, 2015

1   **A.**    THEY ASKED ME ABOUT MY TRIP REASONS.  I EXPLAINED THEM

2   THE TRIP, BUT JUST TO MAKE SURE THERE IS NO DANGER I TOLD THEM

3   THE REASONS WHY I TRAVELED.

4   **Q.**    AND YOU TOLD THE AGENTS THAT YOU THOUGHT THE AGENT WAS

5   SUSPICIOUS OF THE HAT YOU WERE WEARING, IT LOOKED A MILITARY

6   HAT.

7   **A.**    YEAH.  IT IS MY FAVORITE ONE.

8   **Q.**    YOU TOLD THE AGENTS COMING FROM THE MIDDLE EAST IT COULD

9   BE VERY UNCOMFORTABLE IN THE UNITED STATES.

10  **A.**    YES, SIR.

11  **Q.**    YOU TOLD THEM THAT EVEN DRIVING A CAR CAN MAKE YOU

12  UNCOMFORTABLE, RIGHT?

13  **A.**    I DIDN'T UNDERSTAND.

14  **Q.**    YOU TOLD THEM THAT YOU WOULD BE CONCERNED ABOUT JUST

15  BEING PULLED OVER FOR LOOKING DIFFERENT, RIGHT?

16  **A.**    THAT WAS THE IMAGE.  IT WAS MY FIRST TRIP TO THE UNITED

17  STATES.

18  **Q.**    YOU ALSO TOLD THEM THAT YOU KNOW THAT THINGS THAT GO TO

19  DUBAI GET SCRUTINIZED, RIGHT?

20  **A.**    SCRUTINIZED.  I DON'T KNOW THE WORD, SIR.

21  **Q.**    LOOKED AT CLOSELY.

22  **A.**    YES.

23  **Q.**    THAT YOU HAVE TO HAVE YOUR, IN ENGLISH, DUCKS IN A ROW.

24  YOU HEARD THAT EXPRESSION?

25  **A.**    I CAN UNDERSTAND IT.

APRIL 16, 2015

YILDIZ – CROSS-EXAMINATION

1   **Q.**    THAT YOU NEED TO HAVE GOOD PAPERWORK, RIGHT?

2   **A.**    YES, SIR.

3   **Q.**    NOW, YOU ALSO TOLD THEM THAT BASICALLY -- LET ME BACK

4   UP.

5        PEOPLE CAN BE SUSPICIOUS OF YOU BY THE WAY YOU APPEAR

6   AND WHERE YOU ARE FROM, RIGHT?

7   **A.**    YES, SIR.

8   **Q.**    AND THIS IS CONSISTENT WITH WHAT DAVID MILLS TOLD YOU AT

9   THE GREEN VALLEY RANCH.

10  **A.**    YES, SIR.

11  **Q.**    HE TOLD YOU THAT -- WITH ARASH SITTING THERE, RIGHT --

12  THAT COMPANIES LIKE NORTHROP GRUMMAN WERE BIG, RIGHT?

13  **A.**    YES, SIR.

14  **Q.**    THAT COMPANIES LIKE NORTHROP GRUMMAN GET HUNDREDS OF

15  REQUESTS FROM PEOPLE IN THE MIDDLE EAST, RIGHT?

16  **A.**    YES, SIR.

17  **Q.**    PEOPLE WITH FOREIGN SOUNDING NAMES FROM THE MIDDLE EAST,

18  RIGHT?

19  **A.**    MAYBE NOT IN PARTICULAR THE NAMES.  I DON'T RECALL THAT.

20  **Q.**    AND HE TOLD YOU THAT THEY CAN IGNORE LEGITIMATE REQUESTS

21  FROM THAT PART OF THE WORLD BECAUSE THEY HAVE BIGGER CLIENTS.

22  **A.**    YES, I REMEMBER THAT.

23  **Q.**    RIGHT?

24  **A.**    HE SAID THAT, YEAH.

25  **Q.**    YEAH.  LIKE THE U.S. GOVERNMENT, RIGHT?

APRIL 16, 2015

YILDIZ – CROSS–EXAMINATION

1  **A.**    YES, SIR.

2  **Q.**    AND TO USE YOUR WORDS, COMPANIES LIKE NORTHROP GRUMMAN

3  HAVE THE LUXURY TO BE PICKY ABOUT WHO THEY DO BUSINESS WITH.

4  **A.**    YES, SIR.

5  **Q.**    EVEN PEOPLE MAKING LEGITIMATE REQUESTS.

6  **A.**    YES, SIR.

7          **MR. JOHNSTON:**  NOTHING FURTHER, YOUR HONOR.

8          **THE COURT:**  REDIRECT?

9          **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME THE

10 GOVERNMENT, BASED ON THE QUESTIONING, WOULD LIKE TO MOVE INTO

11 EVIDENCE THE PLEA AGREEMENT AT THIS TIME IN CONNECTION WITH

12 THIS CASE.  AND NO FURTHER QUESTIONS.

13         **MR. JOHNSTON:**  YOUR HONOR, I DO OBJECT.

14         **THE COURT:**  I WILL RESERVE.

15         **MR. COUGHLIN:**  OKAY.  NO QUESTIONS, NO FURTHER

16 QUESTIONS.

17         **THE COURT:**  ALL RIGHT.

18         DO YOU REQUEST WE TAKE A BRIEF RECESS OR ARE WE ABLE

19 TO EXCUSE MR. YILDIZ AT THIS TIME?

20         **THE MARSHAL:**  IF HE IS DONE, I CAN GO AHEAD AND TAKE

21 HIM.

22         **THE COURT:**  THANK YOU, MR. YILDIZ.  YOU WILL BE

23 EXCUSED.

24         GOVERNMENT'S NEXT.

25         **MR. HARRIGAN:**  YES, YOUR HONOR, THE GOVERNMENT CALLS

APRIL 16, 2015

YILDIZ — CROSS-EXAMINATION

```
 1    KEVIN HAMAKO.
 2              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
 3              DO YOU SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE
 4    YOU SHALL GIVE IN THE CAUSE NOW BEFORE THE COURT SHALL BE THE
 5    TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?
 6              THE WITNESS:  I DO.
 7              THE CLERK:  PLEASE TAKE THE STAND.
 8              PLEASE STATE YOUR FULL NAME AND SPELL YOUR FIRST AND
 9    LAST NAMES FOR THE RECORD.
10              THE WITNESS:  KEVIN HAMAKO, H-A-M-A-K-O.
11              THE COURT:  THANK YOU.
12              COUNSEL.
13                        DIRECT EXAMINATION
14    Q.    (MR. HARRIGAN) GOOD MORNING, MR. HAMAKO.
15         HOW ARE YOU EMPLOYED?
16    A.    I AM EMPLOYED AS A SPECIAL AGENT WITH THE DEPARTMENT OF
17    HOMELAND SECURITY, HOMELAND SECURITY INVESTIGATIONS.
18    Q.    HOW LONG HAVE YOU BEEN EMPLOYED AS A SPECIAL AGENT WITH
19    HOMELAND SECURITY INVESTIGATIONS?
20    A.    SINCE MAY OF 2010.
21    Q.    APPROXIMATELY FIVE YEARS?
22    A.    CORRECT.
23    Q.    AND PRIOR TO WORKING FOR HOMELAND SECURITY
24    INVESTIGATIONS, DID YOU HAVE ANY PRIOR LAW ENFORCEMENT
25    EXPERIENCE?
```

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1  **A.**    I DID.  I WAS EMPLOYED AS A SPECIAL AGENT WITH THE

2  UNITED STATES AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS.

3  **Q.**    AND WHERE ARE YOU CURRENTLY ASSIGNED?

4  **A.**    I AM CURRENTLY ASSIGNED TO HOMELAND SECURITY

5  INVESTIGATIONS SAN DIEGO, COUNTER-PROLIFERATION INVESTIGATIONS

6  GROUP.

7  **Q.**    AND AS AN AGENT WITH COUNTER-PROLIFERATION GROUP, ARE

8  YOUR DUTIES THE SAME AS AGENT COLE'S DUTIES WHEN HE WAS

9  ASSIGNED THERE?

10  **A.**    CORRECT.

11  **Q.**    WHAT DOES YOUR WORK TYPICALLY INVOLVE?

12  **A.**    OUR WORK TYPICALLY INVOLVES CONDUCTING INVESTIGATIONS OF

13  INDIVIDUALS AND ORGANIZATIONS SUSPECTED OF VIOLATING U.S.

14  EXPORT LAWS.

15  **Q.**    IN YOUR FIVE YEARS AS A SPECIAL AGENT WITH THE

16  COUNTER-PROLIFERATIONS GROUP, APPROXIMATELY HOW MANY

17  INVESTIGATIONS WOULD YOU SAY YOU HAVE BEEN INVOLVED IN?

18  **A.**    SEVERAL DOZEN.

19  **Q.**    AND HAVE ANY OF THOSE CASES INVOLVED INVESTIGATION

20  INVOLVING INDIVIDUALS FROM IRAN OR OTHER INDIVIDUALS TRYING TO

21  PROCURE GOODS FOR ILLEGAL SHIPMENT TO IRAN?

22  **A.**    THEY HAVE.

23  **Q.**    IN 2012 AND 2013 WERE YOU INVOLVED IN A

24  COUNTER-PROLIFERATION INVESTIGATION OF ARASH GHAHREMAN,

25  KOORUSH TAHERKHANI, ERGUN YILDIZ AND TIG MARINE ENGINEERING

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    SERVICES?

2    **A.**    I WAS.  I WAS INVOLVED AS A CASE AGENT.

3    **Q.**    WHAT WAS THE TIME PERIOD OF THAT INVESTIGATION?

4    **A.**    THE TIME PERIOD OF THE INVESTIGATION WAS DECEMBER OF

5    2012 UNTIL APPROXIMATELY JUNE OF 2013.

6    **Q.**    ALL RIGHT.  AND YOU SAID YOU WERE A CASE AGENT?

7    **A.**    CORRECT.

8    **Q.**    WOULD YOU DESCRIBE, GENERALLY, WHAT YOUR DIFFERENT ROLES

9    ARE AS CASE AGENT, WHAT ARE YOUR RESPONSIBILITIES?

10   **A.**    AS A CASE AGENT MY RESPONSIBILITIES PRIMARILY INCLUDED

11   CONDUCTING RESEARCH INVESTIGATION, INCLUDING EXECUTING SEARCH

12   WARRANTS FOR EMAIL CONTENT, AS WELL AS ASSISTING THE

13   UNDERCOVER AGENT WITH THE RESULTS OF MY RESEARCH, TO ASSIST

14   AND ADVISE THEM ON HOW THEY COULD BEST CARRY OUT THEIR ROLE.

15   AS WELL AS PRESERVING UNDERCOVER COMMUNICATIONS, INCLUDING

16   EMAILS, PHONE CALLS AND VIDEO RECORDINGS.

17   **Q.**    SO THIS INVESTIGATION INVOLVED AN UNDERCOVER

18   INVESTIGATION?

19   **A.**    IT DID.

20   **Q.**    AND DID IT INVOLVE MEETINGS WITH ARASH GHAHREMAN?

21   **A.**    IT DID.

22   **Q.**    AND AS A RESULT WERE YOU ABLE TO WITNESS THOSE MEETINGS?

23   **A.**    I WAS.  VIA TECHNICAL ASSISTANCE WHERE I COULD VIEW THE

24   VIDEO FROM A DIFFERENT LOCATION.

25   **Q.**    DO YOU SEE ARASH GHAHREMAN IN THE COURTROOM TODAY?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **A.**    I DO.

2   **Q.**    WOULD YOU PLEASE IDENTIFY WHERE HE IS SEATED AND WHAT HE

3   IS WEARING, FOR THE RECORD?

4   **A.**    HE IS SEATED BETWEEN MR. CAMDEN AND MR. JOHNSTON WEARING

5   A GRAY SUIT.

6   **Q.**    AND I WANT TO ASK YOU A LITTLE BIT ABOUT HOW THIS

7   INVESTIGATION STARTED.  HOW DID IT START?

8   **A.**    IT STARTED WHEN I WAS CONTACTED BY GREG TOPCZEWSKI OF

9   NORTHROP GRUMMAN SPERRY MARINE, WHO I HAD KNOWN FROM PREVIOUS

10  INVESTIGATIONS.  HE CONTACTED ME AND INFORMED ME THAT HE HAD A

11  SUSPICIOUS INQUIRY HE WANTED ME TO LOOK INTO FURTHER.

12  **Q.**    AND DID YOU SPEAK WITH HIM BY PHONE?

13  **A.**    I DID.

14  **Q.**    AND DID YOU SUBSEQUENTLY HAVE ANY OTHER COMMUNICATION

15  WITH HIM?

16  **A.**    I DID.  AFTER THE PHONE CALL HE PROVIDED ME THE

17  SUSPICIOUS INQUIRY OVER EMAIL.

18  **Q.**    OKAY.  AND LET ME SHOW YOU WHAT HAS BEEN INTRODUCED AS

19  GOVERNMENT'S EXHIBIT 452.

20          DO YOU RECOGNIZE THAT EMAIL, AGENT HAMAKO?

21  **A.**    I DO.

22  **Q.**    AND IS THAT THE EMAIL THAT GREG TOPCZEWSKI FORWARDED TO

23  YOU?

24  **A.**    IT IS.

25  **Q.**    WHEN DID HE FORWARD THAT TO YOU?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1  **A.**    HE FORWARDED IT TO ME ON DECEMBER 18TH, 2012.

2  **Q.**    AND WHAT INFORMATION DID HE PROVIDE TO YOU IN THAT

3  EMAIL?

4  **A.**    HE PROVIDED TO ME INFORMATION REGARDING A U.S. COMPANY

5  THAT HAD REQUESTED THE NAVIGAT GYROCOMPASS ON BEHALF OF A

6  FOREIGN COMPANY.

7  **Q.**    OKAY.  AND WHAT WAS THE U.S. COMPANY?

8  **A.**    THE U.S. COMPANY WAS TIMCO MARINE IN NEW ALBANY,

9  INDIANA.

10  **Q.**    AND WHAT WAS THE FOREIGN COMPANY?

11  **A.**    THE FOREIGN COMPANY WAS TIG MARINE ENGINEERING SERVICES

12  IN DUBAI.

13  **Q.**    AND HAD YOU RECEIVED INFORMATION OF WHO AT TIMCO MARINE

14  HAD REQUESTED THAT ON BEHALF OF TIG MARINE?

15  **A.**    I DID.  MR. TOPCZEWSKI'S EMAIL INCLUDED TAMMY FARNSLEY

16  AS THE INDIVIDUAL THAT HAD SENT HIM THE INQUIRY.

17  **Q.**    YOU SAID HE FORWARDED YOU A SUSPICIOUS CONTACT REPORT.

18  IN YOUR EXPERIENCE AS AN HSI AGENT HAD YOU RECEIVED OTHER

19  SUSPICIOUS CONTACT REPORTS EITHER FROM MR. TOPCZEWSKI OR OTHER

20  INDIVIDUALS?

21  **A.**    CORRECT.  I REVIEWED SUSPICIOUS CONTACT REPORTS FROM MR.

22  TOPCZEWSKI, AND SEVERAL OTHER INDIVIDUALS AT OTHER COMPANIES

23  AS WELL.

24  **Q.**    OKAY.  AND WHAT DID MR. TOPCZEWSKI ASK YOU TO DO?

25  **A.**    HE ASKED ME TO JUST CONDUCT FURTHER INVESTIGATION TO

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    DETERMINE IF I FOUND IT SUSPICIOUS AS WELL.

2    **Q.**   AND, FIRST, WHAT DID HE TELL YOU INITIALLY ABOUT THIS

3    SUSPICIOUS CONTACT?

4    **A.**   WHEN WE SPOKE ON THE PHONE, I DON'T RECALL THE

5    SPECIFICS.  HE JUST MENTIONED IT WAS A SUSPICIOUS INQUIRY FOR

6    A NAVIGAT.

7    **Q.**   IN TERMS OF THE EMAIL, WHAT DID YOU LEARN?

8    **A.**   IN TERMS OF THE EMAIL I LEARNED THAT THE END USER FOR

9    THE DESIGNATED SHIP WAS THE WESAL-V.  MR. TOPCZEWSKI PROVIDED

10   A LINK TO SEA-WEB WHERE I COULD LOOK IT UP.  AND HE STATED IT

11   WASN'T A TYPICAL PLATFORM FOR THAT EQUIPMENT.

12   **Q.**   AND HE ALSO PROVIDED AN END USER STATEMENT?

13   **A.**   HE DID.

14   **Q.**   THAT WAS ATTACHED TO THE EMAIL?

15   **A.**   THAT'S CORRECT.

16          **MR. HARRIGAN:**   COULD WE TAKE A LOOK AT THAT.

17   **Q.**   **(MR. HARRIGAN)** AND DID YOU DO FURTHER INVESTIGATION ON

18   THE -- BASED ON THE INFORMATION PROVIDED IN THE END USER

19   STATEMENT?

20   **A.**   I DID.  I CONDUCTED RESEARCH --

21   **Q.**   YES, RIGHT?

22   **A.**   CORRECT.

23   **Q.**   AND FIRST IF WE COULD TAKE A LOOK -- WITH REGARD TO THE

24   CUSTOMER, TIG MARINE SERVICES.  AND WHERE WAS THAT LOCATED?

25   **A.**   THE DOCUMENT STATED IT WAS LOCATED IN DUBAI, UNITED ARAB

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    EMIRATES.

2    **Q.**    DID YOU DO SOME RESEARCH ON THAT FOR --

3    **A.**    I DID.

4    **Q.**    WHAT DID YOU DO?

5    **A.**    I INITIALLY CONDUCTED OPEN SOURCE RESEARCH, WHICH IS OUR

6    WAY OF SAYING JUST SEARCHING FOR INFORMATION ABOUT THE COMPANY

7    ON THE INTERNET.  AND I LOOKED FOR INFORMATION ABOUT THIS

8    COMPANY IN VARIOUS GOVERNMENT AND LAW ENFORCEMENT DATABASES.

9    **Q.**    AND WHAT DID YOU LEARN FROM THAT?

10   **A.**    I LEARNED FROM MY OPEN-SOURCE RESEARCH THAT TIG MARINE

11   HAD A WEB PAGE.  IT STATED IT WAS BASED IN DUBAI, UAE.  IT

12   LISTED TAHERKHANI'S NAME AS WELL AS SEVERAL OTHER NAMES.  THE

13   WEB PAGE STATED THAT THE COMPANY SERVICED REMOTE MARKETS

14   THROUGHOUT THE REGION.

15   **Q.**    BY THE REGION, THE MIDDLE EAST?

16   **A.**    CORRECT.

17   **Q.**    AND BASED ON YOUR -- WAS THERE ANYTHING OF SIGNIFICANCE

18   TO THE INDIVIDUALS THAT YOU IDENTIFIED OR THE NAMES?

19   **A.**    THERE WERE -- BASED ON MY LIMITED UNDERSTANDING OF FARSI

20   AND PERSIAN NAMES, I UNDERSTOOD THEM TO BE POSSIBLE IRANIAN

21   NAMES.

22   **Q.**    OKAY.  AND DID YOU THEN DO ANY FURTHER RESEARCH ON ANY

23   OF THOSE INDIVIDUALS NAMED IN THERE?

24   **A.**    I DID.

25   **Q.**    WHAT DID YOU FIND OUT?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **A.**    I FOUND INFORMATION FROM MR. TAHERKHANI, AS WELL AS SOME

2   INFORMATION FROM ONE OF THE OTHER INDIVIDUALS AS WELL.

3   **Q.**    IF YOU CAN RELATE WHAT YOU FOUND.

4   **A.**    I BELIEVE I FOUND A LINKEDIN PAGE FOR ONE OF THE OTHER

5   INDIVIDUALS THAT POSSIBLY SUGGESTED HE HAD BEEN EMPLOYED IN

6   IRAN PREVIOUSLY.

7   **Q.**    ALL RIGHT.  AND GOING TO THE SIGNATOR OF THAT END USER

8   STATEMENT, ERGUN YILDIZ.  DID YOU CONDUCT OPEN-SOURCE RESEARCH

9   ON THE PURPORTED SIGNATURE OF THAT DOCUMENT, THE MANAGER OF

10  TIG MARINE, ERGUN YILDIZ?

11  **A.**    I DID.

12  **Q.**    WHAT DID YOU FIND?

13  **A.**    I FOUND OPEN-SOURCE INFORMATION LISTING MR. YILDIZ AS

14  BEING INVOLVED WITH ANOTHER COMPANY, A GENERAL TRADING COMPANY

15  CALLED GCS IN UAE.

16  **Q.**    ALL RIGHT.  AND AFTER DISCOVERING THIS INFORMATION, DID

17  YOU THEN HAVE SUBSEQUENT EMAIL COMMUNICATION WITH MR.

18  TOPCZEWSKI?

19  **A.**    I DID.  I INFORMED HIM OF SOME OF THE FINDINGS OF MY

20  RESEARCH.

21  **Q.**    DID YOU DO THAT BY EMAIL OR BY PHONE?

22  **A.**    EMAIL.

23  **Q.**    SHOWING YOU GOVERNMENT'S EXHIBIT 453, WHICH HAS BEEN

24  ADMITTED INTO EVIDENCE.

25       AND IS THAT YOUR EMAIL THAT YOU SENT TO MR. TOPCZEWSKI?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1  **A.**    IT IS.

2  **Q.**    IT WAS SENT THAT SAME DAY?

3  **A.**    CORRECT.

4  **Q.**    AND DIRECTING YOUR ATTENTION TO THE LAST PORTION OF YOUR

5  EMAIL.  WHAT DID YOU TELL HIM?

6  **A.**    I TOLD MR. TOPCZEWSKI AT THAT TIME I DIDN'T HAVE

7  ANYTHING CONCRETE OR DEFINITIVE TO INDICATE THAT THE

8  NAVIGAT-2100 WAS FOR AN IRANIAN USER, BUT I STATED THERE ARE

9  SEVERAL RED FLAGS INCLUDING:  THE END USER BEING IN DUBAI; THE

10 END USE NOT BEING CONSISTENT WITH THE TECHNOLOGY; MULTIPLE

11 IRANIAN NATIONALS WORKING FOR THE CUSTOMER; AS WELL AS THE

12 SIGNATORY FOR THE END USER STATEMENT BEING EMPLOYED BY A

13 GENERAL TRADING COMPANY IN DUBAI.

14 **Q.**    LET'S GO THROUGH EACH OF THOSE.

15        IN TERMS OF END USER BEING IN DUBAI, WHY WAS THAT A RED

16 FLAG?

17 **A.**    THAT WAS A RED FLAG TO ME BECAUSE DUBAI HAS BEEN USED,

18 IN MY EXPERIENCE IN OTHER COUNTER-PROLIFERATION

19 INVESTIGATIONS, AS BEING WHAT WE CALL A TRANSSHIPMENT POINT

20 WHERE INDIVIDUALS AND ORGANIZATIONS SEEKING TO ILLEGALLY

21 OBTAIN U.S. PRODUCTS ON BEHALF OF IRANIAN CUSTOMERS WILL USE

22 DUBAI TO OBSCURE THE TRUE END USE LOCATION.

23        **MR. CAMDEN:**  YOUR HONOR, JUST TO INTERJECT AN

24 OBJECTION.  IN LIMS INSTRUCTION.

25        **THE COURT:**  OVERRULED.  THE ANSWER WILL STAND.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

```
 1   Q.     (MR. HARRIGAN) LET ME RESTATE THE QUESTION.

 2          DUBAI IS IN THE PERSIAN GULF?

 3   A.     IT IS.

 4   Q.     WHERE IS IT IN RELATIONSHIP TO IRAN?

 5   A.     IT IS SOUTH OF IRAN, ACROSS THE STRAIT OF HORMUZ.

 6   Q.     LET ME SHOW YOU GOVERNMENT'S EXHIBIT 235.

 7          DO YOU RECOGNIZE WHAT IS DEPICTED IN THAT MAP?

 8             (EXHIBIT 235 MARKED FOR IDENTIFICATION)

 9   A.     I DO.

10          MR. HARRIGAN:  AND I DON'T KNOW IF THIS HAS BEEN

11   ENTERED BEFORE, YOUR HONOR, BUT I MOVE TO ADMIT GOVERNMENT'S

12   EXHIBIT 235.

13             MR. CAMDEN:  NO OBJECTION.

14             THE COURT:  I THINK IT HAS ALREADY BEEN RECEIVED.

15   Q.     (MR. HARRIGAN) IF YOU CAN, CAN YOU POINT OUT WHERE

16   DUBAI IS, GENERALLY, IN THIS AREA?

17   A.     I HAVE CIRCLED IT IN RED.

18   Q.     IT IS ACTUALLY LABELED ON THE MAP AS DUBAI, RIGHT?

19   A.     CORRECT.

20   Q.     WHERE IS IRAN IN RELATIONSHIP TO DUBAI?

21   A.     IRAN IS IMMEDIATELY TO THE NORTH.

22   Q.     WHERE ARE THE STRAITS OF HORMUZ?

23   A.     THE STRAIT OF HORMUZ IS ROUGHLY NORTHEAST OF DUBAI AND

24   SOUTH OF IRAN.

25   Q.     OKAY.  AND WHAT CITIES ARE ALSO DEPICTED ON THE MAP FOR
```

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    IRAN?  CAN YOU CIRCLE --

2    **A.**    ANOTHER CITY DEPICTED ON THE MAP IS BANDAR ABBAS, WHICH

3    IS AN IRANIAN PORT CITY ACROSS THE STRAIGHT OF HORMUZ.

4    **Q.**    NOW, YOU ALSO, AS YOUR SECOND FACTOR, SAID, I BELIEVE,

5    THAT --

6            **MR. HARRIGAN:**  IF WE CAN GO BACK TO THE GOVERNMENT'S

7    EXHIBIT 453.

8    **Q.**    **(MR. HARRIGAN)** THAT THE END USE WAS NOT CONSISTENT WITH

9    TECHNOLOGY.  WAS THAT BASED ON INFORMATION MR. TOPCZEWSKI HAD

10   PROVIDED YOU?

11   **A.**    IT WAS, AS WELL AS MY EXPERIENCE WITH THIS TECHNOLOGY

12   FROM PREVIOUS INVESTIGATIONS.

13   **Q.**    WHY DID THAT CAUSE A RED FLAG?

14   **A.**    IT CAUSED A RED FLAG BECAUSE IF A CUSTOMER REQUESTS A

15   PRODUCT THAT ISN'T CONSISTENT WITH THE END USE THEY HAVE

16   PROVIDED IT CAN BE AN INDICATOR THAT THE PRODUCT IS DESTINED

17   FOR A DIFFERENT END USER OR DIFFERENT END USE.

18   **Q.**    THEN AS YOUR THIRD RED FLAG, OR INDICATOR, YOU SAID

19   MULTIPLE IRANIAN NATIONALS WORKING FOR CUSTOMER.  BY CUSTOMER

20   YOU MEANT WHO?

21   **A.**    TIG MARINE ENGINEERING SERVICES.

22   **Q.**    WHY WAS THAT A RED FLAG?

23   **A.**    THAT WAS A RED FLAG BECAUSE IF THERE ARE SUSPECTED

24   IRANIAN NATIONALS WORKING FOR THE COMPANY, WHILE NOT

25   DEFINITIVE IT COULD SUGGEST THAT THE PRODUCTS WERE DESTINED

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   FOR IRAN.

2   **Q.**    AND FINALLY YOU SAID THE END-USE SIGNATORY IS ALSO

3   EMPLOYED BY GENERAL TRADING COMPANY IN DUBAI.

4       BY END-USE SIGNATORY WHO ARE YOU REFERRING TO?

5   **A.**    MR. YILDIZ.

6   **Q.**    AND THE GENERAL TRADING COMPANY WAS WHAT?

7   **A.**    THE GENERAL TRADING COMPANY WAS LOCATED IN DUBAI.

8   **Q.**    WHY WAS THAT A RED FLAG INDICATOR?

9   **A.**    BASED ON PREVIOUS INVESTIGATIONS I WAS AWARE THAT

10  GENERAL TRADING COMPANIES WERE OFTEN USED BY PROCUREMENT

11  NETWORKS BASED ON THE FACT THAT GENERAL TRADING COMPANIES --

12       **MR. CAMDEN:**  OBJECTION.  THIS IS STRUCTURE, YOUR

13  HONOR.

14       **THE COURT:**  OVERRULED.

15  **Q.**    **(MR. HARRIGAN)** LET ME ASK YOU THIS QUESTION.  I WILL

16  RESTATE IT.

17       WHAT DID THAT TELL YOU OR WHY IS THAT AN INDICATOR AS TO

18  THE POSSIBILITY THAT THESE GOODS, THE NAVIGAT-2100, MIGHT BE

19  DIVERTED TO IRAN?

20  **A.**    BECAUSE GENERAL TRADING COMPANIES ARE OFTEN INVOLVED IN

21  IMPORT/EXPORT ACTIVITIES AS WELL AS OTHER NON-SHIPBUILDING

22  RELATED ACTIVITIES.

23  **Q.**    THANK YOU.  NOW, AFTER YOUR EMAIL TO MR. TOPCZEWSKI DID

24  YOU HAVE ANY FURTHER COMMUNICATIONS WITH HIM?

25  **A.**    I DID.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   Q.    WHEN DID HE TELL YOU WHETHER -- AS TO WHETHER NORTHROP

2   GRUMMAN WAS GOING TO GO FORWARD WITH THE SALE OR NOT TO TIG

3   MARINE THROUGH TIMCO MARINE?

4   A.    HE INDICATED TO ME THAT NORTHROP GRUMMAN WOULD NOT BE

5   COMPLETING THE SALE.

6   Q.    AND WHAT DID -- WHAT DID YOU TELL HIM YOU WOULD DO?

7   A.    I TOLD HIM THAT I WOULD REACH OUT TO TIMCO MARINE TO

8   CONDUCT FURTHER INVESTIGATION.

9   Q.    DID YOU SUBSEQUENTLY REACH OUT TO TIMCO MARINE?

10  A.    I DID.

11  Q.    AND WHO DID YOU CONTACT?

12  A.    I CONTACTED MS. FARNSLEY.

13  Q.    WHAT DID YOU ASK OF MS. FARNSLEY?

14  A.    I ASKED MS. FARNSLEY TO CONTACT THE DEFENDANT AND

15  PROVIDE CONTACT INFORMATION FOR ONE OF OUR UNDERCOVER AGENTS,

16  AND TO INFORM THE DEFENDANT THAT OUR UNDERCOVER AGENT COULD

17  POSSIBLY ASSIST IN THE SALE OF A NAVIGAT-2100.

18  Q.    WHY WERE YOU DOING THIS IF NORTHROP GRUMMAN ALREADY

19  DECIDED THEY WEREN'T GOING TO MAKE THE SALE?

20  A.    THE PURPOSE OF INTRODUCING AN UNDERCOVER AGENT IN THIS

21  CASE WAS TO DETERMINE IF THERE WAS ANY EVIDENCE THAT MR.

22  GHAHREMAN OR --

23          (JUROR'S PHONE)

24          **THE COURT:**  I LOVE THAT SONG.

25          (LAUGHTER)

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1          **MR. HARRIGAN:**  I THOUGHT WE WERE IN FENWAY PARK FOR

2    A SECOND THERE, YOUR HONOR.

3               **THE COURT:**  GREAT CHOICE.

4               **THE WITNESS:**  THE PURPOSE OF THE INTRODUCTION WAS TO

5    DETERMINE –– WELL, TO CONDUCT FURTHER INVESTIGATION TO

6    DETERMINE IF THERE WAS ANY EVIDENCE INDICATING THAT THE

7    DEFENDANT OR TIG MARINE WAS INVOLVED IN PROCURING THIS ON

8    BEHALF OF AN IRANIAN CUSTOMER.

9    **Q.**    **(MR. HARRIGAN)** AND DURING THE COURSE OF YOUR

10   INVESTIGATION, INCLUDING THE UNDERCOVER INVESTIGATION, DID YOU

11   IDENTIFY EMAIL ACCOUNTS USED BY DEFENDANT, KOORUSH TAHERKHANI

12   AND ERGUN YILDIZ?

13   **A.**    I DID.

14   **Q.**    OKAY.  WHAT WAS THE FIRST EMAIL ACCOUNT YOU IDENTIFIED

15   FOR DEFENDANT?

16   **A.**    THE FIRST EMAIL ACCOUNT I IDENTIFIED FOR THE DEFENDANT

17   WAS GHAHREMAN_ARASH@YAHOO.COM.

18   **Q.**    AND THAT WAS BASED ON OPEN-SOURCE RESEARCH?

19   **A.**    THAT'S CORRECT.

20   **Q.**    WHAT WAS THE FIRST EMAIL ACCOUNT YOU IDENTIFIED THAT

21   DEFENDANT USED IN COMMUNICATING WITH THE UNDERCOVER AGENT?

22   **A.**    THE FIRST WAS THE DEFENDANT'S GMD –– WELL, THE FIRST

23   ACCOUNT THAT THE DEFENDANT USED TO COMMUNICATE WITH THE

24   UNDERCOVER AGENT WAS A GMD SHIPYARDS ACCOUNT.

25   **Q.**    THEN HE SUBSEQUENTLY USED ANOTHER ACCOUNT?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1  **A.**    HE DID.

2  **Q.**    WHAT WAS THAT?

3  **A.**    AGHAHREMAN@TIGMARINE.COM.

4  **Q.**    AFTER IDENTIFYING THAT ACCOUNT, DID YOU OBTAIN AND

5  EXECUTE A SEARCH WARRANT ON THE ACCOUNT?

6  **A.**    I DID.

7  **Q.**    WHO WAS THE INTERNET SERVICE PROVIDER FOR THAT ACCOUNT?

8  **A.**    THE INTERNET SERVICE PROVIDER FOR THAT ACCOUNT WAS

9  NUTECH, A U.S. COMPANY.

10  **Q.**    AND OVER THE COURSE OF THE INVESTIGATION DID YOU EXECUTE

11  SEARCH WARRANTS ON THAT ACCOUNT?

12  **A.**    I DID.  I EXECUTED SEVERAL.

13  **Q.**    FOR EMAIL CONTENT?

14  **A.**    CORRECT.

15  **Q.**    AND AS A RESULT OF THAT SEARCH WARRANT AND YOUR OTHER

16  INVESTIGATION, DID YOU IDENTIFY OTHER EMAIL ACCOUNTS USED BY

17  THE DEFENDANT?

18  **A.**    I DID.

19  **Q.**    WAS THAT THE GHAHREMAN_ARASH@YAHOO.COM?

20  **A.**    IT WAS.

21  **Q.**    DID YOU ALSO OBTAIN AND EXECUTE A SEARCH WARRANT ON

22  YAHOO FOR EMAIL CONTENT FOR DEFENDANT'S YAHOO ACCOUNT?

23  **A.**    I DID, ON TWO OCCASIONS.

24  **Q.**    INCLUDING FEBRUARY 2013?

25  **A.**    CORRECT.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **Q.**     AND DURING THE COURSE OF YOUR INVESTIGATION YOU ALSO

2   IDENTIFIED ACCOUNTS RELATED TO MR. TAHERKHANI?

3   **A.**     I DID.

4   **Q.**     AND WHAT WAS THE FIRST EMAIL ACCOUNT YOU IDENTIFIED?

5   **A.**     THE FIRST ACCOUNT I IDENTIFIED WAS MD@TIGMARINE.COM.

6   **Q.**     WAS THERE ANY SIGNIFICANCE TO THE TERM MD, GIVEN THE

7   COURSE OF YOUR INVESTIGATION?

8   **A.**     THERE WAS.  WE LEARNED THAT TO MEAN OR TO BE AN ACRONYM

9   FOR MANAGING DIRECTOR.

10  **Q.**     HOW WERE YOU ABLE TO IDENTIFY THAT ACCOUNT?

11  **A.**     I WAS ABLE TO IDENTIFY THAT ACCOUNT THROUGH

12  COMMUNICATIONS I FOUND IN THE SEARCH OF THE

13  AGHAHREMAN@TIGMARINE.COM ACCOUNT.

14  **Q.**     IN ADDITION TO THE MD@TIGMARINE.COM ACCOUNT USED BY MR.

15  TAHERKHANI, DID YOU IDENTIFY ANY OTHER ACCOUNTS HE USED?

16  **A.**     I DID.  I NOTICED DURING THE REVIEW OF MY SEARCH

17  WARRANTS THAT HE WAS ALSO USING KOORUSH@TIGMARINE.COM, AS WELL

18  AS OCCASIONALLY USING INFO@TIGMARINE.COM.

19  **Q.**     AS A RESULT OF GATHERING THAT INFORMATION DID YOU OBTAIN

20  AND EXECUTE SEARCH WARRANTS ON NUTECH FOR THE EMAIL CONTENT OF

21  THOSE THREE ACCOUNTS USED BY MR. TAHERKHANI?

22  **A.**     I DID.

23  **Q.**     WHEN DID THAT, APPROXIMATELY, HAPPEN?

24  **A.**     THAT WOULD HAVE HAPPENED IN EARLY 2013.

25  **Q.**     THROUGH WHEN?

APRIL 16, 2015

803

HAMAKO - DIRECT EXAMINATION

1    **A.**    THROUGH MID 2013.

2    **Q.**    DURING THE COURSE OF THE INVESTIGATION DID YOU IDENTIFY

3    AN EMAIL ACCOUNT USED BY MR. YILDIZ?

4    **A.**    I DID.

5    **Q.**    WHAT WAS THAT ACCOUNT?

6    **A.**    ERGUNYIL@HOTMAIL.COM.

7    **Q.**    HOW DID YOU IDENTIFY THAT ACCOUNT?

8    **A.**    I IDENTIFIED THAT AFTER REVIEWS OF SEARCH WARRANT

9    CONTENT.

10    **Q.**    AND THROUGH COMMUNICATION WITH THE UNDERCOVER AGENT?

11    **A.**    CORRECT.

12    **Q.**    AND DID YOU ALSO EXECUTE A SEARCH WARRANT ON THAT

13    ACCOUNT?

14    **A.**    I DID.

15    **Q.**    FOR EMAIL CONTENT?

16    **A.**    CORRECT.

17    **Q.**    AND WAS THAT FOR PURPOSES OF CONDUCTING SEARCH WARRANTS

18    ON EMAIL ACCOUNTS OF DEFENDANT, MR. TAHERKHANI AND MR. YILDIZ?

19    **A.**    THE PURPOSE OF THAT WAS TO GATHER EVIDENCE, IF IT

20    EXISTED, REGARDING WHO THE END USER WAS, AND TO IDENTIFY ANY

21    ILLEGAL ACTIVITIES IN PROGRESS.

22    **Q.**    AND WAS IT ALSO TO IDENTIFY -- YOU SAID TO IDENTIFY END

23    USERS, SO IDENTIFY CUSTOMERS AND OTHER ASSOCIATES?

24    **A.**    CORRECT.

25    **Q.**    AS A RESULT OF YOUR SEARCH OF MR. TAHERKHANI'S ACCOUNT,

APRIL 16, 2015

804

HAMAKO - DIRECT EXAMINATION

1   WERE YOU ABLE TO IDENTIFY A CUSTOMER FOR PARTS REQUESTED BY

2   DEFENDANT AND MR. TAHERKHANI FROM THE UNDERCOVER AGENT?

3   **A.**    I WAS.

4   **Q.**    AND WHAT ITEMS IN PARTICULAR?

5   **A.**    IN PARTICULAR I IDENTIFIED THE CUSTOMER FOR THE Y-690.

6   **Q.**    OKAY.  AND WHAT DID YOU IDENTIFY AS TO THE CUSTOMER'S

7   LOCATION?

8   **A.**    I IDENTIFIED THAT THAT CUSTOMER WAS LOCATED IN IRAN.

9          **MR. CAMDEN:**  YOUR HONOR, I WOULD LIKE TO -- I THINK

10  THIS IS THE POINT TO START OBJECTING JUST BASED ON THE

11  PRETRIAL MOTIONS.  IF WE COULD MAKE THAT A STANDING OBJECTION

12  TO ANY OF THE EVIDENCE FROM THE SEARCH WARRANTS.

13         **THE COURT:**  YES.

14         **MR. CAMDEN:**  THANK YOU.

15  **Q.**    **(MR. HARRIGAN)** LET ME ASK YOU AGAIN.

16      WHERE DID YOU IDENTIFY THE LOCATION OF THE CUSTOMER AS

17  TO THE Y-690?

18  **A.**    THE CUSTOMER FOR THE Y-690 WAS IRAN -- WAS LOCATED IN

19  IRAN.

20  **Q.**    ALL RIGHT.  AND SO THERE WERE INDIVIDUALS COMMUNICATING

21  WITH MR. TAHERKHANI REGARDING THE Y-690?

22  **A.**    THERE WERE.

23  **Q.**    AND WHAT EMAIL ACCOUNT DID THEY USE?

24  **A.**    THEY USED KOHANDIAREMAD@GMAIL.COM.

25  **Q.**    THAT IS SPELLED K-O-H-A-N-D-I-A-R-E-M-A-D?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **A.**    CORRECT?

2   **Q.**    AND WHAT ELSE?

3   **A.**    M.SARKHOSH -- S-A-R-K-H-O-S-H -- 1010@GMAIL.COM.

4   **Q.**    AND DID YOU SUBSEQUENTLY OBTAIN AND EXECUTE SEARCH

5   WARRANTS ON THE INTERNET SERVICE PROVIDER -- THAT IS GMAIL OR

6   GOOGLE -- FOR THE EMAIL CONTENT OF EACH OF THOSE ACCOUNTS?

7   **A.**    I DID.

8   **Q.**    WHEN DID THAT OCCUR, APPROXIMATELY?

9   **A.**    THAT OCCURRED IN EARLY 2013.

10  **Q.**    NOW, IN TALKING ABOUT THE SEARCH WARRANTS CAN YOU

11  DESCRIBE WHAT YOU WOULD RECEIVE FROM AN INTERNET SERVICE

12  PROVIDER WHEN EXECUTING A SEARCH WARRANT FOR EMAIL CONTENT ON

13  A GIVEN USERS ACCOUNT?

14  **A.**    AFTER EXECUTING A SEARCH WARRANT FOR EMAIL CONTENT FOR A

15  PROVIDER WE WOULD RECEIVE EITHER A DISK CONTAINING THE EMAIL

16  CONTENT, OR AT TIMES WE WOULD RECEIVE LINKS TO DOWNLOAD THE

17  CONTENT FROM THE INTERNET.

18  **Q.**    AND WHEN YOU GET THAT CONTENT, DOES THAT INCLUDE ALL OF

19  THE EMAILS EVER SENT OR RECEIVED FROM THAT EMAIL ACCOUNT?

20  **A.**    NO, TYPICALLY IT DOES NOT.

21  **Q.**    WHAT DOES IT DEPEND ON?

22  **A.**    IT DEPENDS ON WHETHER OR NOT THE USER OF THAT ACCOUNT

23  HAS DELETED EMAILS FROM THEIR ACCOUNT.  AND IT DEPENDS

24  SOMETIMES ON THE PERIOD OF TIME THAT THE PROVIDER WILL GIVE US

25  BASED ON THE WARRANT.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    Q.    AND ONCE YOU RECEIVE THAT DATA IN ELECTRONIC FORM, WHAT
2    DO YOU DO?
3    A.    ONCE I RECEIVE THE DATA I WOULD UPLOAD IT INTO A PROGRAM
4    CALLED INTELLA, WHICH WE WOULD USE TO CONDUCT KEY WORD
5    SEARCHES AND OTHER FORENSIC SEARCHES OF THE EMAIL.  I WOULD
6    MARK CONTENT THAT I THOUGHT WAS PERTINENT AND RESPONSIVE TO
7    THE ATTACHMENT B OF THE SEARCH WARRANT.  AND THEN ONCE I HAD
8    DONE THAT AND BEFORE A DEADLINE LISTED IN THE SEARCH WARRANT I
9    WOULD PRESERVE THAT CONTENT.  AND THEN AFTER THE EXPIRATION
10   DATE LISTED IN THE WARRANT, IF I NEEDED TO REFER BACK TO THAT
11   CONTENT I WOULD ONLY REFER TO THE ITEMS I HAD EXTRACTED AND
12   MARKED AS PERTINENT.
13   Q.    SO ESSENTIALLY YOU GET THE ELECTRONIC DATA, EVERYTHING,
14   RIGHT?
15   A.    CORRECT.
16   Q.    AND YOU SAID YOU GO BACK, AND USED THE TERM SEARCH FOR
17   EVIDENCE THAT IS PERTINENT TO WHAT IS IN ATTACHMENT B, WHICH
18   IS A LITTLE BIT OF AGENT SPEAK.  SO IN PLAIN TERMS CAN YOU
19   EXPLAIN WHAT YOU MEAN BY THAT?
20   A.    I WOULD ONLY MARK ITEMS AS PERTINENT AND PRESERVE THEM
21   IF THEY TENDED TO BE EVIDENCE AS DESCRIBED IN THE SEARCH
22   WARRANT.  BASICALLY I COULD ONLY PRESERVE EVIDENCE IF IT
23   PERTAINED TO THE VIOLATIONS LISTED IN THE SEARCH WARRANT.
24   Q.    OKAY.  AND DID YOU USE THE SAME PROCEDURE FOR EACH OF
25   THE COUNTS THAT YOU MENTIONED?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**    I DID.

2    **Q.**    LET ME SHOW YOU WHAT SHOULD BE BEFORE YOU, GOVERNMENT'S

3    EXHIBIT 229 THROUGH 234 FOR IDENTIFICATION.  AND JUST ASK YOU

4    TO --

5             (EXHIBIT 229 THROUGH 234 MARKED FOR IDENTIFICATION)

6             **MR. HARRIGAN:**  MAY I APPROACH, YOUR HONOR?

7             **THE COURT:**  YES.

8             **MR. HARRIGAN:**  THERE IS ANOTHER BOOK.  GET THIS

9    RIGHT.

10   **Q.**    **(MR. HARRIGAN)** WOULD YOU TAKE A LOOK AT WHAT HAS BEEN

11   MARKED -- THEY ARE CD'S.  THEY HAVE BEEN MARKED AS

12   GOVERNMENT'S EXHIBIT 229 THROUGH 234 FOR IDENTIFICATION, AND

13   TELL ME IF YOU RECOGNIZE ALL THOSE.

14   **A.**    I DO RECOGNIZE THEM.

15   **Q.**    HOW IS IT YOU RECOGNIZE THEM?

16   **A.**    I RECOGNIZE MY HANDWRITING ON THE DISKS.

17   **Q.**    ARE THOSE THE ATTACHMENT B'S OF THE EMAIL ACCOUNTS YOU

18   CONDUCTED SEARCH WARRANTS ON?

19   **A.**    THEY ARE.

20   **Q.**    THAT YOU DESCRIBED PREVIOUSLY IN YOUR TESTIMONY?

21   **A.**    CORRECT, SIR.

22   **Q.**    WE WILL GO THROUGH THEM.  EXHIBIT 229, THAT IS THE

23   ATTACHMENT B FOR WHOSE ACCOUNT?

24   **A.**    THAT IS AN ATTACHMENT B CONTENT FOR

25   AGHAHREMAN@TIGMARINE.COM.

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1    **Q.**    SO FOR DEFENDANT'S TIG MARINE ACCOUNT.

2    **A.**    CORRECT.

3    **Q.**    FROM NUTECH.

4    **A.**    CORRECT.

5    **Q.**    AND LOOK AT GOVERNMENT'S EXHIBIT 230, WHAT IS THAT THE

6    ATTACHMENT B FOR, WHICH SEARCHES?

7    **A.**    THIS IS THE ATTACHMENT B FOR THE SEARCHES OF THE

8    DEFENDANT'S TIG MARINE ACCOUNT, THE DEFENDANTS YAHOO ACCOUNT,

9    AS WELL AS INFO@TIGMARINE AND KOORUSH@TIGMARINE.

10   **Q.**    SO DESCRIBE WHY YOU WOULD EXECUTE MORE THAN ONE SEARCH

11   WARRANT ON A GIVEN ACCOUNT.

12   **A.**    WE WOULD EXECUTE MORE THAN ONE SEARCH WARRANT ON A GIVEN

13   ACCOUNT TO CAPTURE COMMUNICATIONS THAT HAD HAPPENED AFTER THE

14   INITIAL SEARCH WARRANTS.

15   **Q.**    SO IN ADDITION TO THE THREE TIG MARINE ACCOUNTS YOU

16   DESCRIBED THAT WERE USED BY MR. TAHERKHANI AND DEFENDANT'S

17   YAHOO EMAIL ACCOUNT -- DID YOU SAY DEFENDANT'S YAHOO EMAIL

18   ACCOUNT TOO?

19   **A.**    CORRECT.

20   **Q.**    PLEASE LOOKING AT GOVERNMENT'S EXHIBIT 231.

21          WHAT DOES THAT ATTACHMENT B CONTAIN?

22   **A.**    THIS IS THE ATTACHMENT B FOR KOHANDIAREMAD@GMAIL.COM AS

23   WELL AS THE MSARKHOSH GMAIL ACCOUNT.

24   **Q.**    SO THOSE ARE THE EMAIL ACCOUNTS OF THE INDIVIDUALS IN

25   TEHRAN WHO WERE CUSTOMERS FOR THE Y-690?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**     CORRECT.

2    **Q.**     AND SHOWING YOU AGAIN GOVERNMENT'S EXHIBIT 232.  DO YOU

3    RECOGNIZE THAT?

4    **A.**     I DO.

5    **Q.**     AND WHAT DOES THAT IT CONTAIN?

6    **A.**     THIS IS THE ATTACHMENT B FOR THE DEFENDANT'S

7    TIGMARINE.COM ACCOUNT, ONE OF THE SUBSEQUENT SEARCHES,

8    MD@TIGMARINE AS WELL AS INFO@TIGMARINE.

9    **Q.**     SO IT CONTAINS SEARCHES ON BOTH DEFENDANT'S TIG MARINE

10   ACCOUNT AND MR. TAHERKHANI'S TIG MARINE ACCOUNT?

11   **A.**     CORRECT.

12   **Q.**     AND LOOKING AT GOVERNMENT'S EXHIBIT 233, WHAT DOES THAT

13   CD CONTAIN?

14   **A.**     THE CD CONTAINS THE ATTACHMENT B CONTENT FOR THE

15   DEFENDANT'S TIG MARINE ACCOUNT, AS WELL AS MD@TIGMARINE, WHICH

16   WAS TAHERKHANI'S ACCOUNT.

17   **Q.**     AND FINALLY LOOKING AT THE CD MARKED GOVERNMENT'S

18   EXHIBIT 234.  WOULD YOU DESCRIBE WHAT THAT CONTAINS?

19   **A.**     THIS CONTAINS ATTACHMENT B CONTENT FOR MR. YILDIZ'

20   HOTMAIL ACCOUNT.

21          **MR. HARRIGAN:**  YOUR HONOR, AT THIS TIME I WOULD

22   JUST –– STRIKE THAT.

23   **Q.**     **(MR. HARRIGAN)** HOW MANY SEARCH WARRANTS ON EMAIL

24   ACCOUNTS WOULD YOU SAY YOU HAVE EXECUTED IN YOUR CAREER AS AN

25   HSI AGENT?

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1    **A.**    SEVERAL DOZEN.

2    **Q.**    AND BASED ON YOUR TRAINING AND EXPERIENCE, DO YOU HAVE A

3    FAMILIARITY WITH HOW EMAILS ARE ROUTED FROM ONE USER TO

4    ANOTHER?

5    **A.**    I DO.

6    **Q.**    AND BASED ON THAT SAME TRAINING AND EXPERIENCE, ARE YOU

7    FAMILIAR WITH THE TYPE OF RECORDS THAT SERVICE PROVIDERS SUCH

8    AS GOOGLE MAINTAINS REGARDING EMAILS THAT ARE SENT AND

9    RECEIVED?

10   **A.**    I AM.

11   **Q.**    SO IN ADDITION TO WHEN THE ISP PROVIDES YOU, SAY, THE

12   CONTENT OF THE EMAIL ACCOUNT, WHAT OTHER INFORMATION IS

13   PROVIDED ELECTRONICALLY WITH THE CONTENT OF THAT EMAIL

14   ACCOUNT?

15   **A.**    IN ADDITION TO THE CONTENT, OR THE BODY OF THE EMAIL,

16   THE PROVIDER WOULD GIVE US WHAT WE CALL METADATA OR HEADER

17   DATA WHICH WOULD INCLUDE WHO SENT -- WELL, THE SENDING

18   ACCOUNT, RECEIVING ACCOUNTS, WHEN THE EMAIL WAS SENT, SUBJECT

19   LINE, AS WELL AS WHAT WE CALL INTERNET PROTOCOL ADDRESS

20   INFORMATION.

21   **Q.**    COULD YOU PLEASE EXPLAIN WHAT INTERNET PROTOCOL ADDRESS

22   INFORMATION IS?

23   **A.**    AN INTERNET PROTOCOL ADDRESS IS SIMILAR TO THE ADDRESS

24   OF A HOUSE, BUT IN THE CONTEXT OF THE INTERNET.  IT DESCRIBES

25   WHERE A USER IS LOGGING ON FROM.  IT IS THE UNIQUE IDENTIFIER

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

```
1    FOR THAT INTERNET CONNECTION.
2              MR. CAMDEN:  OBJECTION.  FOUNDATION.
3              THE COURT:  OVERRULED.  THE ANSWER WILL STAND.
4    Q.    (MR. HARRIGAN) SO EVERY END USER COMPUTER THAT IS
5    CONNECTED TO THE INTERNET HAS AN INTERNET PROTOCOL NUMBER WHEN
6    IT SIGNS ON TO THE INTERNET?
7    A.    YES.
8              MR. CAMDEN:  SAME OBJECTION.
9              THE COURT:  OVERRULED.
10   Q.    (MR. HARRIGAN) IS THAT INTERNET PROTOCOL NUMBER
11   SOMETIMES CALLED THE INTERNET PROTOCOL ADDRESS?
12   A.    IT IS.
13   Q.    AND IS THERE GENERALLY A WAY -- IS IT A SERIES OF
14   NUMBERS?  CAN YOU DESCRIBE WHAT IT LOOKS LIKE?
15   A.    AN IP ADDRESS IS TYPICALLY FOUR SETS OF NUMBERS
16   SEPARATED BY DOTS OR PERIODS.  THERE ARE NEWER VERSIONS THAT
17   COULD INCLUDE LETTERS AS WELL AS NUMBERS.
18   Q.    HOW IS THE INTERNET SYSTEM ORGANIZED, CAN YOU EXPLAIN,
19   IN RELATIONSHIP TO THE INTERNET PROTOCOL ADDRESSES?
20             MR. CAMDEN:  FOUNDATION ON THAT AS WELL.
21             THE COURT:  I WOULD SUSTAIN THE OBJECTION.
22   Q.    (MR. HARRIGAN) BASED ON YOUR TRAINING AND EXPERIENCE
23   AND YOUR KNOWLEDGE OF INTERNET PROTOCOL ADDRESSES, ARE YOU
24   AWARE OF HOW INTERNET PROTOCOL ADDRESSES ARE ALLOCATED?
25   A.    I AM.
```

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **Q.**     WOULD YOU PLEASE EXPLAIN HOW THEY ARE ALLOCATED.

2   **A.**     INTERNET PROTOCOL ADDRESSES ARE ALLOCATED IN LARGE

3   BLOCKS FROM A PRIVATE ORGANIZATION TO REGIONAL NETWORKS, AND

4   THEN THOSE REGIONAL NETWORKS WILL ASSIGN INTERNET PROTOCOL

5   ADDRESSES TO INTERNET SERVICE PROVIDERS.  THOSE PROVIDERS WILL

6   THEN ASSIGN IP ADDRESSES TO INDIVIDUAL END USERS OR CUSTOMERS

7   THAT ARE ACTUALLY LOGGING ON TO THE INTERNET.

8   **Q.**     AND HOW -- WHAT DO THEY REGIONAL INTERNET CUSTOMERS DO?

9   **A.**     THE REGIONAL NETWORKS WILL MAINTAIN A DATABASE AND THE

10  INFORMATION REGARDING WHAT INTERNET SERVICE PROVIDERS THEY

11  ASSIGNED EACH IP ADDRESS TO.  AND THOSE REGIONAL NETWORKS WILL

12  PROVIDE THOSE LISTS TO BE OPENLY SEARCHED ON THE INTERNET AS A

13  PUBLIC RECORD.

14  **Q.**     SO DO THEY PUT IT IN A DATABASE?

15  **A.**     THEY DO.

16  **Q.**     AND IS THAT DATABASE ACCESSIBLE TO MEMBERS OF THE

17  PUBLIC?

18  **A.**     IT IS.  TO ANYONE WITH AN INTERNET CONNECTION, YES.

19  **Q.**     IS IT ACCESSIBLE TO MEMBERS OF LAW ENFORCEMENT?

20  **A.**     IT IS.

21  **Q.**     AND WHAT WILL THE SEARCH TELL YOU IF YOU ACCESS THAT?

22  **A.**     IF YOU USE A SEARCH TOOL BASED ON THAT DATABASE

23  INFORMATION IT WILL TELL YOU WHO THE INTERNET SERVICE PROVIDER

24  IS THAT MAINTAINS THAT IP ADDRESS, AS WELL AS WHAT COUNTRY AND

25  SOMETIMES WHAT CITY THAT SERVICE PROVIDER IS LOCATED IN.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **Q.**    DO YOU AND OTHER AGENTS REGULARLY RELY ON THOSE WEB

2    PAGES THAT HAVE THAT SERVICE TO CONDUCT SEARCHES TO DETERMINE

3    WHETHER –– WHERE A GIVEN EMAIL IS SENT, WHERE A COMPUTER LOGS

4    ON TO AN INTERNET?

5    **A.**    WE DO.  ROUTINELY.

6    **Q.**    AND HOW OFTEN DO YOU USE THESE WEB PAGES?

7    **A.**    TYPICALLY ANY TIME WE HAVE A SEARCH WARRANT OR WHEN WE

8    ARE REVIEWING UNDERCOVER EMAILS FROM SUBJECTS.

9    **Q.**    DID YOU USE SUCH A WEB PAGE IN THIS CASE?

10   **A.**    I DID.

11   **Q.**    WHAT WEB SEARCH ENGINE OR WEB PAGE DID YOU USE?

12   **A.**    I USED MAXMIND.COM AS WELL AS WHATISMYIP.

13   **Q.**    AND THOSE SEARCH ENGINES ARE LINKED TO THIS DATABASE?

14   **A.**    THEY ARE.

15   **Q.**    THAT THESE REGIONAL INTERNET PROVIDERS MUST PUT

16   INFORMATION INTO?

17   **A.**    YES.

18   **Q.**    I WOULD NEXT LIKE TO TAKE A LOOK AT THE BINDER IN FRONT

19   OF YOU AND LOOK AT GOVERNMENT EXHIBIT 201 THROUGH 228.

20         YOU HAVE SEEN THAT BINDER BEFORE; IS THAT CORRECT?

21           (EXHIBIT 201 THROUGH 228 MARKED FOR IDENTIFICATION)

22   **A.**    I HAVE, YES.

23   **Q.**    IN PREPARATION FOR YOUR TESTIMONY TODAY DID YOU LOOK AT

24   THAT BINDER?

25   **A.**    I DID.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **Q.**    AND IN PREPARATION FOR YOUR TESTIMONY DID YOU PULL

2   CERTAIN EMAILS FROM ATTACHMENT B'S ON THE CD'S YOU IDENTIFIED

3   AS GOVERNMENT'S EXHIBIT 229 THROUGH 234?

4   **A.**    I DID.

5   **Q.**    AND IN THAT BINDER, DOES IT CONTAIN 28 EXHIBITS MARKED

6   AS GOVERNMENT'S EXHIBIT 201 THROUGH 228?

7   **A.**    IT DOES.

8   **Q.**    DO YOU RECOGNIZE THOSE?

9   **A.**    I DO.

10  **Q.**    ARE THOSE EMAILS YOU PULLED FROM THE ATTACHMENT B'S YOU

11  DESCRIBED?

12  **A.**    THEY ARE.

13  **Q.**    WITHOUT DESCRIBING THE SPECIFIC CONTENTS OF ANY OF THOSE

14  EMAILS, COULD YOU GENERALLY DESCRIBE WHAT THEY ARE?

15  **A.**    THEY ARE EMAILS FROM AND BETWEEN THE DEFENDANT, MR.

16  TAHERKHANI AS WELL AS OTHER INDIVIDUALS INCLUDING MR. YILDIZ

17  AND THE TWO INDIVIDUALS LOCATED IN IRAN.

18  **Q.**    AND ARE THESE PRINTOUTS ACCURATE?

19         **MR. CAMDEN:**  OBJECTION AS TO VAGUENESS, YOUR HONOR.

20  I CAN EXPLAIN.

21         **THE COURT:**  YES.

22         **MR. CAMDEN:**  BETWEEN CERTAIN INDIVIDUALS DOESN'T

23  REALLY ESTABLISH WHAT EMAILS WERE SENT OR RECEIVED

24  SPECIFICALLY OR WHO MR. GHAHREMAN SPECIFICALLY CORRESPONDED

25  WITH.  IF WE ARE INCLUDING THE END USERS IN IRAN, THERE IS

APRIL 16, 2015

815

HAMAKO – DIRECT EXAMINATION

1    NOTHING PROVIDED SO FAR.

2              **MR. HARRIGAN:**  THIS IS FOUNDATIONAL, YOUR HONOR.

3              **THE COURT:**  I WOULD OVERRULE THE OBJECTION.

4              YOU WILL ADDRESS THOSE ISSUES WITH RESPECT TO EACH

5    EXHIBIT.

6              **MR. HARRIGAN:**  YES, I WILL, YOUR HONOR.  THIS IS

7    JUST THE GENERAL.  THANK YOU.

8    **Q.    (MR. HARRIGAN)** AGAIN, ARE THESE EMAILS THAT ARE PRINTED

9    OUT ACCURATE REPRESENTATIONS OF THE EMAILS CONTAINED IN

10   ATTACHMENT -- THE ATTACHMENT B'S YOU DESCRIBED?

11   **A.**    THEY ARE.

12   **Q.**    DO SOME OF THE EXHIBITS CONTAIN ADDITIONAL EXHIBITS, FOR

13   EXAMPLE, 201-A AND 201-B?

14   **A.**    THEY DO.

15   **Q.**    AND WHAT ARE THOSE, GENERALLY?  CAN YOU GENERALLY

16   DESCRIBE WHAT THEY ARE?

17   **A.**    GENERALLY THOSE ARE THE METADATA OR THE HEADER FOR THE

18   EMAILS REFERENCED PREVIOUSLY THAT WOULD INCLUDE THE IP

19   ADDRESS, AND THERE ARE ALSO SUB EXHIBITS THAT SHOW THERE WAS

20   ALSO MY SEARCHES FOR WHERE THOSE IP ADDRESSES ARE LOCATED.

21             **MR. HARRIGAN:**  YOUR HONOR, I WOULD MOVE TO ADMIT

22   GOVERNMENT EXHIBIT 201 THROUGH 208.  BEFORE PUBLISHING EACH

23   EXHIBIT I WILL GIVE DEFENSE COUNSEL AN OPPORTUNITY TO LOOK AT

24   THOSE.

25             **MR. CAMDEN:**  I WONDER IF WE COULD JUST GO EMAIL BY

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

```
 1    EMAIL FOR THE OBJECTIONS.

 2             THE COURT:  YES.  THAT WOULD BE FINE.

 3             MR. HARRIGAN:  SORRY, YOUR HONOR.

 4    Q.    (MR. HARRIGAN) SO AGENT HAMAKO, DURING THE EXECUTION OF

 5    THE SEARCH WARRANT OF THE EMAIL ACCOUNTS YOU MENTIONED, DID

 6    YOU FIND EMAILS BETWEEN THE DEFENDANT AND MR. TAHERKHANI IN

 7    WHICH THEY DISCUSSED EFFORTS TO OBTAIN THE NAVIGAT-2100?

 8    A.    I DID.

 9    Q.    FIRST LET ME SHOW YOU EXHIBIT -- GOVERNMENT EXHIBIT 201

10    FOR IDENTIFICATION.

11          DO YOU RECOGNIZE THAT EMAIL, SIR?

12    A.    I DO.

13    Q.    IS THAT AN EMAIL BETWEEN WHO?

14    A.    IT IS AN EMAIL FROM TAHERKHANI TO THE DEFENDANT.

15    Q.    REGARDING, GENERALLY?

16    A.    REGARDING AN INQUIRY FOR THE NAVIGAT-2100.

17             MR. HARRIGAN:  YOUR HONOR, I WOULD MOVE TO ADMIT

18    GOVERNMENT'S EXHIBIT 201, AND PUBLISH IT TO THE JURY.

19             MR. CAMDEN:  JUST THE PREVIOUSLY STATED OBJECTION.

20             THE COURT:  OVERRULED.  IT IS RECEIVED.

21          (EXHIBIT 201 RECEIVED INTO EVIDENCE)

22    Q.    (MR. HARRIGAN) FIRST ADDRESSING YOUR ATTENTION TO THE

23    HEADER INFORMATION.  YOU SAID THAT IS FROM MR. TAHERKHANI TO

24    THE DEFENDANT.  AND THE DATE OF IT IS WHEN?

25    A.    DECEMBER 16TH, 2012.
```

APRIL 16, 2015

1  **Q.**    AND IN THE CONTEXT OF YOUR UNDERCOVER AGENT'S CONTACT

2  WITH THE DEFENDANT, WAS THIS EMAIL SENT BEFORE OR AFTER AGENT

3  COLE HAD CONTACT WITH THE DEFENDANT?

4  **A.**    THIS EMAIL WAS SENT BEFORE AGENT COLE HAD CONTACT WITH

5  THE DEFENDANT.

6  **Q.**    NOW I WANT TO DIRECT YOUR ATTENTION TO THE CONTENT OF

7  THE EMAIL.

8      CAN YOU DESCRIBE THE RELEVANCE OF THAT EMAIL TO YOUR

9  INVESTIGATION?

10  **A.**    THE RELEVANCE OF THIS TO MY INVESTIGATION WAS THAT

11  TAHERKHANI WAS INFORMING THE DEFENDANT THAT HE NEEDED SIX SETS

12  OF THE NAVIGAT-2100, AND HE HAD A HUGE BUSINESS FOR THEM.  AND

13  THE DEFENDANT COULD MAKE MONEY, AS WELL.  HE ALSO STATED IT

14  WAS VERY CRUCIAL AND HE NEEDED TO BUY IT AS SOON AS POSSIBLE.

15  **Q.**    AND HE SAYS HE HAS A HUGE BUSINESS, RIGHT?

16  **A.**    HE DOES.

17  **Q.**    AND HE DOESN'T SAY YOU CAN MAKE MONEY, BUT YOU CAN MAKE

18  GOOD MONEY TOO.

19  **A.**    THAT'S CORRECT.

20  **Q.**    AND DOES HE EXPLAIN ONE OF THE REASONS WHY MR.

21  TAHERKHANI WOULD BE REACHING OUT TO THE DEFENDANT?

22  **A.**    HE DOES.  HE STATES THAT YOU -- REFERRING TO THE

23  DEFENDANT -- IS IN SHIPBUILDING AND WORKING IN A SHIPYARD.

24  **Q.**    AND THIS IS GRATE?

25  **A.**    CORRECT.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    Q.    SPELLING.

2          IN THAT EMAIL MR. TAHERKHANI ALSO REQUESTS SOMETHING

3    ABOUT SKYPE.  CAN YOU DESCRIBE THAT?

4    A.    HE DOES.  HE ASKED THE DEFENDANT TO MAKE A SKYPE USER

5    I.D. SO THAT THEY CAN TALK ON SKYPE.  AND HE SAYS, I HAVE TO

6    TALK TO YOU ON SKYPE.

7    Q.    OKAY.  AND WHAT WAS THE SIGNIFICANCE OF THAT REQUEST TO

8    YOUR INVESTIGATION?

9    A.    THE SIGNIFICANCE OF THAT TO MY INVESTIGATION WAS THAT

10   MR. TAHERKHANI WANTED TO COMMUNICATE VIA METHOD OTHER THAN

11   EMAIL.

12   Q.    OKAY.  AND CAN YOU –– FOR THOSE LUDDITES HERE IN THE

13   COURTROOM, CAN YOU EXPLAIN WHAT SKYPE IS.

14   A.    SKYPE IS A PROGRAM THAT ALLOWS USERS TO SEND AND RECEIVE

15   MESSAGES WITH EACH OTHER OVER THE INTERNET, OR TALK, USE AUDIO

16   CHAT, SIMILAR TO A PHONE CALL, OR SPEAK OVER A VIDEO CHAT

17   SYSTEM.

18   Q.    I WANT TO SHOW YOU GOVERNMENT EXHIBIT 201–A.  AND DO YOU

19   RECOGNIZE THAT?

20   A.    I DO.

21   Q.    AND CAN YOU DESCRIBE WHAT THAT IS?

22   A.    THIS IS THE HEADER DATA FOR THAT SAME EMAIL, INCLUDING

23   THE IP ADDRESS INFORMATION.

24   Q.    OKAY.  AND IS THE IP ADDRESS LOCATED ON THERE?

25   A.    IT IS.

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1    **MR. HARRIGAN:**  IF WE CAN GET TO THAT.

2  **Q.   (MR. HARRIGAN)**  IS THAT HIGHLIGHTED IN YELLOW?

3  **A.**    IT IS.

4  **Q.**    THIS IS ESSENTIALLY THE SAME EMAIL WITH THE NUMBERS,

5  INCLUDING THE IP ORIGINATING ADDRESS.

6  **A.**    CORRECT.  IT INCLUDES THE FULL HEADER.

7    **MR. HARRIGAN:**  YOUR HONOR, I WOULD MOVE TO PUBLISH

8  THIS TO THE JURY.

9    **THE COURT:**  YOU WANT A STANDING OBJECTION ON THE

10  EXHIBITS?

11    **MR. CAMDEN:**  I THINK I WOULD, YES, YOUR HONOR.

12    **THE COURT:**  ALL RIGHT.

13    IT IS RECEIVED.

14    (EXHIBIT 201-A RECEIVED INTO EVIDENCE)

15  **Q.   (MR. HARRIGAN)** AND DIRECTING YOUR ATTENTION TO THE

16  SECOND PAGE OF 201-A, THAT HIGHLIGHTED NUMBER.  IS THAT THE IP

17  ORIGINATING ADDRESS?

18  **A.**    IT IS.

19  **Q.**    AND DID YOU RUN A CHECK, AS YOU DESCRIBED YOU HAVE DONE

20  IN OTHER CASES, TO DETERMINE WHERE MR. TAHERKHANI'S EMAIL THAT

21  HE SENT TO DEFENDANT ORIGINATED FROM?

22  **A.**    I DID.

23  **Q.**    IS THAT REFLECTED IN GOVERNMENT'S EXHIBIT 201-B?

24  **A.**    IT IS.

25    **MR. HARRIGAN:**  YOUR HONOR, I MOVE TO ADMIT 201-B AND

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

```
 1    PUBLISH THAT TO THE JURY.
 2             THE COURT:  YES.
 3             (EXHIBIT 201-B RECEIVED INTO EVIDENCE)
 4    Q.    (MR. HARRIGAN) AND AGAIN DIRECTING YOUR ATTENTION TO
 5    THE HIGHLIGHTED PORTIONS OF THAT -- FIRST DESCRIBE, THIS IS
 6    WHAT?
 7    A.    THIS IS A SCREEN SHOT PRINTOUT OF THE RESULTS OF MY
 8    SEARCH ON THE OPEN-SEARCH WEB PAGE WHATISMYIP TO DETERMINE
 9    WHERE THAT IP ADDRESS IS LOCATED.
10    Q.    IF WE -- WHAT DID YOUR IP SEARCH SHOW?
11    A.    IT SHOWED THAT THIS IP ADDRESS WAS LOCATED ON AN ISP IN
12    IRAN.
13    Q.    NOW, DURING YOUR EXECUTION OF THE SEARCH WARRANT ON THE
14    ACCOUNT DID YOU FIND AN EMAIL WHERE DEFENDANT RESPONDED TO
15    MR. TAHERKHANI'S REQUEST FOR HELPING HIM GET A NAVIGAT-2100?
16    A.    I DID.
17    Q.    I AM GOING TO SHOW YOU GOVERNMENT EXHIBIT 202.
18          IS THAT THE REPLY EMAIL?
19    A.    IT IS.
20    Q.    ALL RIGHT.
21             MR. HARRIGAN:  YOUR HONOR, I MOVE TO ADMIT 202 INTO
22    EVIDENCE AND PUBLISH IT TO THE JURY.
23             THE COURT:  IT IS RECEIVED, AND YES.
24             (EXHIBIT 202 RECEIVED INTO EVIDENCE)
25    Q.    (MR. HARRIGAN) THAT'S AN EMAIL CHAIN, CORRECT?
```

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**    IT IS.

2    **Q.**    SO LET'S START AT THE EMAIL AT THE BOTTOM, AND GOING TO

3    THE HEADER INFORMATION.

4        IS THAT THE REPLY EMAIL FROM THE DEFENDANT TO MR.

5    TAHERKHANI?

6    **A.**    IT IS.

7    **Q.**    AND IT WAS SENT, ESSENTIALLY, A COUPLE OF DAYS AFTER HE

8    RECEIVED THE EMAIL?

9    **A.**    THAT'S CORRECT.  ON THE 18TH OF DECEMBER 2012.

10   **Q.**    OKAY.  AND, AGAIN, THE SUBJECT?

11   **A.**    THE SUBJECT WAS REGARDING INQUIRY FOR NAVIGAT-2100.

12   **Q.**    SO LET'S GO TO THE BODY OF THAT EMAIL.

13       WHAT DID THE DEFENDANT TELL MR. TAHERKHANI ABOUT HIS

14   INQUIRIES INTO THE NAVIGAT-2100?

15   **A.**    HE INFORMED TAHERKHANI THAT IN ORDER TO GET A QUOTE ON

16   THIS OR TO GET PRICING FOR THE ITEM HE WOULD NEED MORE

17   INFORMATION, INCLUDING THE END USER, THE VESSEL NAME, THE

18   COUNTRY OF THE END USER, AND WHAT COUNTRY THE VESSEL WAS

19   REGISTERED IN.  AND HE STATED THAT WAS BECAUSE IT APPEARED TO

20   BE A VERY SENSITIVE SALE, TO THE POINT WHERE HOMELAND SECURITY

21   MIGHT HAVE TO BE NOTIFIED.

22   **Q.**    NOW, WHEN DEFENDANT STATES IT APPEARS TO BE A SENSITIVE

23   SALE TO THE POINT WHERE HOMELAND SECURITY MIGHT HAVE TO BE

24   NOTIFIED, HOW IS THAT SIGNIFICANT TO YOUR INVESTIGATION?

25   **A.**    IT WAS SIGNIFICANT TO OUR INVESTIGATION IN THAT IT

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    INDICATED TO ME THAT THE DEFENDANT WAS AWARE OF THE NATURE --

2         **MR. CAMDEN:** OBJECTION ON THIS.  SPECULATION.

3         **THE COURT:** SUSTAINED.

4    **Q.** **(MR. HARRIGAN)** WHO IS HOMELAND SECURITY?

5    **A.** HOMELAND SECURITY, IN THIS CASE, I TOOK TO REFER TO THE

6    DEPARTMENT OF HOMELAND SECURITY IN THE UNITED STATES.

7    **Q.** AND DOES DEFENDANT SAY WHETHER HE CAN EVEN GET A QUOTE

8    ON IT WITHOUT AN END USER STATEMENT BECAUSE OF THE SENSITIVE

9    NATURE OF IT?

10   **A.** HE STATES THAT WITHOUT THAT INFORMATION HE COULDN'T EVEN

11   GET AN ESTIMATE ON IT.

12   **Q.** AND DIRECTING YOUR ATTENTION TO THE TOP OF GOVERNMENT

13   EXHIBIT 202.  AGAIN, THIS IS AN EMAIL FROM WHO?

14   **A.** IT IS AN EMAIL FROM TAHERKHANI TO THE DEFENDANT IN

15   RESPONSE TO THAT PREVIOUS EMAIL THE SAME DAY.

16   **Q.** AND WHAT DOES THE BODY SAY?

17   **A.** THE BODY JUST STATES DEAR ARASH, FYI.  AND THEN INCLUDES

18   TAHERKHANI'S SIGNATURE BLOCK.

19   **Q.** WAS THERE AN ATTACHMENT TO THIS EMAIL?

20   **A.** THERE WAS.

21   **Q.** DIRECTING YOUR ATTENTION TO THAT ATTACHMENT.

22        AND DO YOU RECOGNIZE THAT ATTACHMENT?

23   **A.** I DO.

24   **Q.** HOW SO?

25   **A.** I RECOGNIZE IT AS BEING THE SAME DOCUMENT THAT MR.

APRIL 16, 2015

823
HAMAKO – DIRECT EXAMINATION

1    TOPCZEWSKI ORIGINALLY SENT ME AT THE BEGINNING OF THE

2    INVESTIGATION.

3    **Q.**    THE SAME END USER FORM?

4    **A.**    CORRECT.

5    **Q.**    AND AS TO GOVERNMENT EXHIBIT 202, DID YOU ALSO OBTAIN AN

6    ORIGINATING IP ADDRESS AS TO THE EMAIL SENT BY MR. TAHERKHANI

7    TO THE DEFENDANT ON DECEMBER 18TH?

8    **A.**    I DID.  IT WAS INCLUDED IN THE HEADER INFORMATION.

9    **Q.**    AND SHOWING YOU GOVERNMENT EXHIBIT 202-A, IS THAT THE

10   SAME EMAIL WITH THE METADATA CONTAINING THE HEADER

11   INFORMATION?

12   **A.**    IT IS.

13   **Q.**    DOES THAT REFLECT THE ORIGINATING IP ADDRESS?

14   **A.**    IT DOES.

15          **MR. HARRIGAN:**  GOING TO PAGE 2.

16          YOUR HONOR, I MOVE TO PUBLISH IT -- ADMIT AND

17   PUBLISH TO THE JURY.

18          **THE COURT:**  YES.

19          **MR. HARRIGAN:**  ALL RIGHT.

20          (EXHIBIT 202-A RECEIVED INTO EVIDENCE)

21   **Q.**    **(MR. HARRIGAN)** LOOKING AT THE SECOND PAGE, DOES THAT

22   REFLECT, HIGHLIGHTED IN YELLOW, THE IP ORIGINATING ADDRESS?

23   **A.**    CORRECT.

24   **Q.**    AND AS PREVIOUSLY, DID YOU RUN A WHATISMYIP SEARCH FOR

25   THAT IP ADDRESS?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**    YES, I DID.

2    **Q.**    IS THAT REFLECTED IN GOVERNMENT EXHIBIT 202-B FOR

3    IDENTIFICATION?

4    **A.**    YES, IT IS.

5    **Q.**    AND IF I COULD SHOW THAT TO YOU.

6          **MR. HARRIGAN:**  YOUR HONOR, I WOULD MOVE TO ADMIT AND

7    PUBLISH GOVERNMENT'S EXHIBIT 202-B.

8          **THE COURT:**  YES.

9          (EXHIBIT 202-B RECEIVED INTO EVIDENCE)

10   **Q.**    **(MR. HARRIGAN)** AGAIN, WHAT IS YOUR -- WHAT DID YOU FIND

11   AS TO THE IP AND THE COUNTRY OF ORIGIN FOR THE EMAIL SENT BY

12   MR. TAHERKHANI TO DEFENDANT ON DECEMBER 18TH?

13   **A.**    I FOUND THAT THE IP ADDRESS WAS LOCATED ON AN ISP IN

14   IRAN.

15   **Q.**    NOW, DURING THE EXECUTION OF YOUR SEARCH WARRANT OF THE

16   DEFENDANT'S ACCOUNT DID YOU FIND FURTHER EMAILS REGARDING

17   DEFENDANT'S ATTEMPT TO GET THE NAVIGAT-2100 FOR MR. TAHERKHANI

18   AND TIG MARINE?

19   **A.**    I DID.

20   **Q.**    LET ME SHOW YOU GOVERNMENT EXHIBIT 203 FOR

21   IDENTIFICATION.

22         DO YOU RECOGNIZE THAT EMAIL, SIR?

23   **A.**    I DO.

24   **Q.**    IS THAT A COMMUNICATION -- FURTHER COMMUNICATION BETWEEN

25   THE TWO?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1  **A.**    YES, IT IS.

2          **MR. HARRIGAN:**  YOUR HONOR, I WOULD MOVE TO ADMIT

3  GOVERNMENT EXHIBIT 203 INTO EVIDENCE.

4          **THE COURT:**  RECEIVED.

5          (EXHIBIT 203 RECEIVED INTO EVIDENCE)

6  **Q.**    **(MR. HARRIGAN)** LET'S FIRST, AGAIN, START WITH THE

7  HEADER INFORMATION.

8          THIS WAS SENT FROM WHOM TO WHOM?

9  **A.**    THIS IS SENT FROM THE DEFENDANT TO TAHERKHANI ON THE

10  19TH OF DECEMBER OF 2012.

11  **Q.**    A DAY AFTER THE PREVIOUS EMAIL?

12  **A.**    THAT'S CORRECT.

13  **Q.**    AND IS THIS -- IN TERMS OF CONTEXT OF YOUR UNDERCOVER

14  INVESTIGATION, WAS THIS BEFORE OR AFTER AGENT COLE FIRST

15  CONTACTED -- OR DEFENDANT FIRST CONTACTED AGENT COLE?

16  **A.**    I BELIEVE IT WAS SHORTLY AFTER.

17  **Q.**    DECEMBER 19TH?

18  **A.**    I AM SORRY.  SHORTLY BEFORE.

19  **Q.**    OKAY.  AND GOING TO THE CONTENT OF THAT EMAIL, WHAT DOES

20  MR. TAHERKHANI -- WHAT DOES DEFENDANT TELL MR. TAHERKHANI

21  ABOUT HIS EFFORTS TO OBTAIN THE GYROCOMPASS?

22  **A.**    DEFENDANT TOLD MR. TAHERKHANI THAT HE SENT THE

23  INFORMATION REGARDING THE GYRO, AND HE INCLUDED THE RESPONSE

24  TO THE REQUEST WHICH STATED THAT THE SECURITY GROUP HAD VETTED

25  THE END USE AND END USER AND DETERMINED THAT THEY WOULD NO BID

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   IT.

2       IT GOES ON TO STATE THE DECISION WAS BASED ON OUR REVIEW

3   OF THE COMPANY AND THEIR ASSOCIATIONS, AS WELL AS THE FACT

4   THAT THE END USE ON BOARD THAT SORT OF VESSEL WAS SUSPECT, AND

5   IT WOULD BE LIKE PUTTING A MERCEDES ENGINE IN A TRICYCLE.

6   **Q.**   COULD YOU READ WHAT HE SAYS, ALSO THE END USE BEING ON

7   BOARD SUCH A SMALL VESSEL, IN THEIR MIND, WAS SUSPECT.  IT

8   WOULD BE LIKE PUTTING A MERCEDES ENGINE IN A TRICYCLE IN THEIR

9   WORDS.

10       HOW DOES THIS RELATE TO THE COMMUNICATIONS YOU HAD WITH

11   MR. TOPCZEWSKI WHEN YOU SAW THIS EMAIL?

12   **A.**   IT WAS CONSISTENT WITH THE DISCUSSIONS I HAD WITH MR.

13   TOPCZEWSKI AND MY UNDERSTANDING OF THE FACT THAT THEY WOULD BE

14   NO BIDDING THEM ON THE SALE.

15   **Q.**   THIS RELATED BACK TO NORTHROP GRUMMAN'S STATEMENTS TO

16   YOU.

17   **A.**   CORRECT.

18   **Q.**   HE ALSO STATES, MY CONTACT HAS NOT EVEN ALLOWED TO

19   FORWARD A BROCHURE THEY SENT TO HIM.

20   **A.**   CORRECT.

21   **Q.**   IS THAT CORRECT?

22   **A.**   YES.

23   **Q.**   DID MR. TAHERKHANI RESPOND TO THE DEFENDANT'S EMAIL THAT

24   NORTHROP GRUMMAN WOULD NOT SELL TO THEM BASED ON THEIR END USE

25   INFORMATION?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**    HE DID.

2    **Q.**    DID HE DO SO IN AN EMAIL?

3    **A.**    HE DID.

4    **Q.**    DID YOU COME ACROSS THAT EMAIL IN YOUR SEARCH WARRANT?

5    **A.**    I DID.

6    **Q.**    SHOWING YOU GOVERNMENT EXHIBIT 204.  DO YOU RECOGNIZE

7    THAT EMAIL?

8    **A.**    YES, I DO.

9    **Q.**    IS THAT MR. TAHERKHANI'S RESPONSE?

10   **A.**    THAT IS CORRECT.

11           **MR. HARRIGAN:**  I MOVE TO ADMIT AND PUBLISH IT TO THE

12   JURY, YOUR HONOR.

13           **THE COURT:**  YES.

14           (EXHIBIT 204 RECEIVED INTO EVIDENCE)

15   **Q.    (MR. HARRIGAN)** ALL RIGHT.  FIRST STARTING WITH THE

16   HEADER INFORMATION.  AGAIN, THAT IS FROM MR. TAHERKHANI TO THE

17   DEFENDANT ON THE SAME DATE?

18   **A.**    IT IS.

19   **Q.**    AND IN THE CONTENT WHAT DOES MR. TAHERKHANI TELL

20   DEFENDANT?

21   **A.**    TAHERKHANI ASKS THE DEFENDANT WHO MADE THAT STATEMENT

22   AND WHAT HAPPENED TO THE SUPPLIER THAT HE FOUND.  AND HE SAYS

23   THAT THAT IS THE REASON HE ASKED HIM TO FIND DISTRIBUTORS OR

24   STOCKERS.

25   **Q.**    HE SAID THAT IS THE REASON HE ASKED WHO?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **A.**    I ASKED YOU, REFERRING TO THE DEFENDANT.

2   **Q.**    TO FIND DISTRIBUTORS OR STOCKERS.

3   **A.**    YES.

4   **Q.**    WHAT WAS THE SIGNIFICANCE OF THAT STATEMENT TO YOUR

5   INVESTIGATION?

6          **MR. CAMDEN:**  SPECULATION, YOUR HONOR.

7          **MR. HARRIGAN:**  I THINK IT EXPLAINS HIS FURTHER

8   ACTIONS.

9          **THE COURT:**  YOU ARE NOT ASKING HIM TO OPINE ON THE

10  STATE OF MIND OF MR. TAHERKHANI?

11         **MR. HARRIGAN:**  NO, I AM NOT.

12         **THE COURT:**  YOU MAY ANSWER.

13         **THE WITNESS:**  THE SIGNIFICANCE OF THAT TO MY

14  INVESTIGATION WAS THAT FREQUENTLY INDIVIDUALS WILL SEEK TO BUY

15  PRODUCTS FROM DISTRIBUTORS BECAUSE THEY PERCEIVE THERE TO BE

16  LESS SCRUTINY ON THOSE SALES.

17         **MR. CAMDEN:**  SAME OBJECTION AS TO STRUCTURE

18  EVIDENCE.

19         **THE COURT:**  OVERRULED.

20  **Q.**    **(MR. HARRIGAN)** AS TO GOVERNMENT EXHIBIT 204, DID YOU

21  ALSO OBTAIN ORIGINATING INTERNET PROTOCOL ADDRESS INFORMATION

22  AS TO THAT EMAIL SENT BY MR. TAHERKHANI TO THE DEFENDANT?

23  **A.**    I DID.

24  **Q.**    AND SHOWING YOU GOVERNMENT'S EXHIBIT 204-A.  DO YOU

25  RECOGNIZE THAT?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **A.**    I DO.

2   **Q.**    IS THAT THE SAME EMAIL WE JUST SAW WITH THE METADATA

3   INCLUDING THE IP ADDRESS?

4   **A.**    YES, IT IS.

5            **MR. HARRIGAN:**  COULD WE GO TO THE SECOND PAGE.

6   **Q.**    **(MR. HARRIGAN)** DO YOU SEE IT THERE?

7   **A.**    I DO.

8            **MR. HARRIGAN:**  MAY I MOVE TO PUBLISH THIS TO THE

9   JURY, YOUR HONOR?

10           **THE COURT:**  YES.

11           **MR. HARRIGAN:**  ADMIT IT AND PUBLISH IT.

12           (EXHIBIT 204-A RECEIVED INTO EVIDENCE)

13  **Q.**    **(MR. HARRIGAN)** AND HIGHLIGHTED IN YELLOW IS THE

14  ORIGINATING IP ADDRESS?

15  **A.**    YES, IT IS.

16  **Q.**    AND AS WITH THE OTHER EMAILS, DID YOU RUN AN WHATISMYIP

17  SEARCH FOR THAT IP ADDRESS?

18  **A.**    I DID.

19  **Q.**    IS THAT CONTAINED IN GOVERNMENT'S EXHIBIT 204-B?

20  **A.**    YES.

21  **Q.**    AND SHOWING THAT TO YOU, DO YOU RECOGNIZE THAT?

22  **A.**    I DO.

23           **MR. HARRIGAN:**  I MOVE TO ADMIT AND PUBLISH

24  GOVERNMENT EXHIBIT 204-B, YOUR HONOR.

25           **THE COURT:**  YES.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1          (EXHIBIT 204-B RECEIVED INTO EVIDENCE)

2   **Q.**   **(MR. HARRIGAN)** AND WHAT DID YOUR SEARCH SHOW AS TO THAT

3   EMAIL SENT BY TAHERKHANI TO DEFENDANT?

4   **A.**   MY SEARCH REVEALED THAT THE ISP FOR THAT IP ADDRESS IS

5   ALSO LOCATED IN IRAN.

6   **Q.**   AND YOU PREVIOUSLY TESTIFIED THAT AFTER NORTHROP GRUMMAN

7   NO BID THE SALE YOU CONTACTED TIMCO MARINE, TAMMY FARNSLEY,

8   AND THEY REQUESTED THAT -- AND REQUESTED THEY GIVE DEFENDANT

9   YOUR UNDERCOVER AGENT'S CONTACT INFORMATION?

10  **A.**   I DID.

11  **Q.**   AS AN INDIVIDUAL WHO MIGHT BE ABLE TO ASSIST THE

12  DEFENDANT.

13  **A.**   THAT'S CORRECT.

14  **Q.**   IN YOUR SEARCH OF DEFENDANT'S EMAIL ACCOUNT DID YOU FIND

15  ANY EMAILS RELATING TO THAT REQUEST?

16  **A.**   YES, I DID.

17  **Q.**   LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S

18  EXHIBIT 205.  DO YOU RECOGNIZE THAT EMAIL?

19  **A.**   YES.

20  **Q.**   OKAY.  IS THAT THE EMAIL WE JUST TALKED ABOUT?

21  **A.**   YES, IT IS.

22          **MR. HARRIGAN:**  I MOVE TO ADMIT GOVERNMENT

23  EXHIBIT 205 INTO EVIDENCE, YOUR HONOR, AND PUBLISH IT TO THE

24  JURY.

25          **THE COURT:**  YES.

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1    (EXHIBIT 205 RECEIVED INTO EVIDENCE)

2    **Q.**    **(MR. HARRIGAN)** I DIRECT YOUR ATTENTION TO THE HEADER

3    INFORMATION.  WHO IS THIS EMAIL SENT FROM AND TO?

4    **A.**    EMAIL SENT FROM THE DEFENDANT'S GMD SHIPYARD ACCOUNT TO

5    THE DEFENDANT'S YAHOO ACCOUNT.

6    **Q.**    AND WHAT DOES THE BODY OF THE EMAIL CONTAIN?

7    **A.**    THE BODY OF THE EMAIL CONTAINS A PREVIOUS EMAIL FROM

8    MS. FARNSLEY TO THE DEFENDANT THE SAME DAY.

9    **Q.**    OKAY.  AND DIRECTING YOUR ATTENTION TO THE CONTENT IN

10   THE EMAIL -- OR THE HEADER FOR THAT EMAIL, THAT IS AN EMAIL

11   FROM TAMMY FARNSLEY?

12   **A.**    IT IS.

13   **Q.**    TO DEFENDANT?

14   **A.**    YES, IT IS.

15   **Q.**    OKAY.  AND WHAT IS THE CONTENT OF THE EMAIL?

16   **A.**    THE CONTENT OF THE EMAIL CONTAINS CONTACT INFORMATION

17   FOR THE UNDERCOVER AGENT, AS WELL AS MRS. FARNSLEY INFORMING

18   THE DEFENDANT THAT THIS INDIVIDUAL MIGHT HAVE A COUPLE OF

19   UNITS OF THE NAVIGAT IN STOCK.

20   **Q.**    OKAY.  AND AS THE CASE AGENT DID YOU LEARN THAT AFTER

21   THAT EMAIL WAS SENT TO DEFENDANT, DID DEFENDANT CONTACT THE

22   UNDERCOVER AGENT IN ORDER TO OBTAIN THE NAVIGAT-2100'S?

23   **A.**    YES, I DID.

24   **Q.**    AND DURING THE EXECUTION OF YOUR SEARCH WARRANTS OF

25   DEFENDANT'S ACCOUNT AND MR. TAHERKHANI'S ACCOUNT, DID YOU FIND

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1   ANY EVIDENCE OF THAT COMMUNICATION?

2   **A.**    YES, I DID.

3   **Q.**    LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT

4   EXHIBIT 206.  DO YOU RECOGNIZE THAT EMAIL?

5   **A.**    I DO.

6   **Q.**    IS THAT EMAIL BETWEEN WHOM?

7   **A.**    IT IS AN EMAIL FROM THE DEFENDANT TO TAHERKHANI.

8   **Q.**    REGARDING THE NAVIGAT-2100?

9   **A.**    YES.

10  **Q.**    AND COMMUNICATION WITH THE UNDERCOVER AGENT?

11  **A.**    YES.

12         **MR. HARRIGAN:**  YOUR HONOR, I MOVE TO ADMIT

13  GOVERNMENT EXHIBIT 206 AND PUBLISH IT TO THE JURY.

14         **THE COURT:**  YES.

15         (EXHIBIT 206 RECEIVED INTO EVIDENCE)

16  **Q.**    **(MR. HARRIGAN)** THAT EMAIL, YOU SAID, WAS FROM DEFENDANT

17  TO MR. TAHERKHANI?

18  **A.**    CORRECT.

19  **Q.**    TO KOORUSH?

20  **A.**    CORRECT.

21  **Q.**    REGARDING?  THE SUBJECT?

22  **A.**    THE NAVIGAT-2100 QUOTATION.

23  **Q.**    AND WHEN WAS THAT SENT?

24  **A.**    THAT WAS SENT ON JANUARY 3RD, 2013.

25  **Q.**    AND DIRECTING YOUR ATTENTION TO THE CONTENT OF THAT

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1    EMAIL, WHAT DOES DEFENDANT TELL MR. TAHERKHANI ABOUT THE COSTS

2    OF THE NAVIGAT-2100?

3    **A.**    THE DEFENDANT INFORMS MR. TAHERKHANI THAT THE PRICE FOR

4    THE FOUR NAVIGAT-2100'S IS 78,000 EACH, AS WELL AS A

5    COMMISSION FEE FOR THE DEFENDANT OF 5,000 PER UNIT.

6         HE ALSO PROVIDES LEAD TIME INFORMATION AND FINANCING

7    INFORMATION THAT THE UNDERCOVER AGENT HAD PREVIOUSLY PROVIDED

8    TO THE DEFENDANT.

9    **Q.**    ALL RIGHT.  SO THE TOTAL COMMISSION FEE FOR THE FOUR

10   NAVIGAT-2100'S FOR DEFENDANT WAS WHAT?

11   **A.**    AT THAT TIME IT WAS LISTED AS $20,000.

12   **Q.**    OKAY.  AND HE ALSO, AT THE BOTTOM PARAGRAPH, MENTIONS

13   ANOTHER PRODUCT.

14   **A.**    HE DOES.

15   **Q.**    WHAT DOES HE SAY?

16   **A.**    THE DEFENDANT INFORMS TAHERKHANI THAT HE HAD MADE

17   SEVERAL CONTACTS TO COMPANIES ABOUT TAHERKHANI'S RECENT

18   REQUEST, AND THE DEFENDANT WAS WAITING FOR A PHONE CALL BACK

19   FROM A COMPANY THAT MANUFACTURED THE TRIPOD LAMP.  AND THAT HE

20   WOULD SEND HIM A QUOTATION WITH PRICING AS SOON AS HE RECEIVED

21   THAT INFORMATION.

22   **Q.**    NOW, THERE WAS AN ATTACHMENT TO THIS EMAIL?

23   **A.**    YES, THERE WAS.

24   **Q.**    WOULD YOU LOOK AT THAT.

25        AND YOU HAVE SEEN THAT ATTACHMENT BEFORE, CORRECT?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **A.**   YES.

2   **Q.**   DID YOU HELP PREPARE THAT ATTACHMENT?

3   **A.**   YES, I DID.

4   **Q.**   AND THAT IS AN ATTACHMENT THAT THE UNDERCOVER AGENT SENT

5   TO THE DEFENDANT?

6   **A.**   YES, IT IS.

7   **Q.**   AND DESCRIBE WHAT IT WAS.

8   **A.**   THIS IS A QUOTATION FOR FOUR UNITS OF THE NAVIGAT-2100

9   FROM THE UNDERCOVER AGENT TO THE DEFENDANT AND TIG MARINE.

10  **Q.**   NOW, IN GOVERNMENT 206 THAT WE JUST LOOKED AT DEFENDANT

11  TOLD MR. TAHERKHANI THAT HE WOULD RECEIVE A COMMISSION OF

12  $5,000 PER UNIT FOR THE GYROCOMPASS?

13  **A.**   YES.

14  **Q.**   SOLD TO TIG MARINE?

15  **A.**   CORRECT.

16  **Q.**   DURING THE EXECUTION OF YOUR WARRANT ON DEFENDANT'S

17  ACCOUNT, DID YOU FIND ANY OTHER EMAILS REGARDING PAYMENT TERMS

18  TO HIM FROM TIG MARINE FOR ACQUISITION OF EITHER THE

19  NAVIGAT-2100 OR OTHER ITEMS?

20  **A.**   I DID.

21  **Q.**   LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT

22  EXHIBIT 207.  DO YOU RECOGNIZE THAT EMAIL?

23  **A.**   YES, I DO.

24  **Q.**   IS THAT EMAIL COMMUNICATION BETWEEN MR. GHAHREMAN AND

25  DEFENDANT AND -- OR DOES THAT EMAIL COMMUNICATION CONTAIN

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

```
 1    COMMUNICATION BETWEEN DEFENDANT AND TIG MARINE?

 2    A.    YES, IT DOES.

 3            MR. HARRIGAN:  YOUR HONOR, I MOVE TO ADMIT

 4    GOVERNMENT EXHIBIT 207.

 5            THE COURT:  YES.

 6            MR. CAMDEN:  SAME OBJECTIONS, YOUR HONOR.

 7            THE COURT:  IT IS OVERRULED.  IT IS RECEIVED.

 8            (EXHIBIT 207 RECEIVED INTO EVIDENCE)

 9    Q.    (MR. HARRIGAN) CAN YOU GENERALLY DESCRIBE WHAT IS

10    CONTAINED IN THIS EMAIL?

11    A.    THIS IS AN EMAIL CHAIN THAT STARTS WITH INFO@TIGMARINE

12    EMAILING THE DEFENDANT, THEN THE DEFENDANT RESPONDING.  THEN

13    THE DEFENDANT FORWARDING THAT EMAIL TO HIMSELF.

14    Q.    OKAY.  AND DIRECTING YOUR ATTENTION TO THE BOTTOM EMAIL

15    CHAIN.  AND THAT IS AN EMAIL FROM INFO@TIGMARINE?

16    A.    YES, IT IS.

17    Q.    IS THAT AN ACCOUNT YOU RECOGNIZE?

18    A.    I DO RECOGNIZE THAT ACCOUNT.

19    Q.    THAT IS AN ACCOUNT THAT MR. TAHERKHANI SOMETIMES USED?

20    A.    SOMETIMES HE WOULD USE IT, AND MOST OF THE TIME MS. MAE

21    DAYSO OF TIG MARINE WOULD USE IT.

22    Q.    THAT IS TO THE DEFENDANT AT HIS TIG MARINE ACCOUNT?

23    A.    YES, IT IS.

24    Q.    AND IT SAYS, PLEASE FIND THE ATTACHED IOIC FOR YOUR

25    REFERENCE.
```

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **A.**   THAT'S CORRECT.

2   **Q.**   AND THE EMAIL ABOVE THAT, IS THAT A REPLY EMAIL TO MAE

3   DAYSO?

4   **A.**   IT IS.

5   **Q.**   BY THE DEFENDANT?

6   **A.**   CORRECT.

7   **Q.**   ON WHAT DATE?

8   **A.**   ON JANUARY 18TH, 2013.

9   **Q.**   AND WHAT DOES THE DEFENDANT TELL MS. DAYSO AT TIGMARINE?

10  **A.**   THE DEFENDANT TELLS MS. DAYSO, ATTACHED PLEASE FIND THE

11  SUBMITTED IOIC BY ME.

12  **Q.**   SO LET'S TAKE A LOOK AT THAT ATTACHMENT.  AND THAT

13  ATTACHMENT IS APPROXIMATELY SIX PAGES, CORRECT?

14  **A.**   CORRECT.

15  **Q.**   AND IT IS ON WHAT LETTERHEAD?

16  **A.**   IT IS ON TIG MARINE ENGINEERING SERVICES LETTERHEAD.

17  **Q.**   AND WHAT IS THE TITLE OF THE DOCUMENT?

18  **A.**   THE TITLE IS INTERNATIONAL OCCASIONAL INTERMEDIARY

19  CONTRACT.

20  **Q.**   AND THE PARTS ARE WHO?

21  **A.**   THE PARTIES IN THIS DOCUMENT ON THE FIRST PAGE ARE

22  LISTED AS ERGUN YILDIZ PRESIDENT OF TIG MARINE, AND ARASH

23  GHAHREMAN.

24  **Q.**   AND CAN YOU GENERALLY DESCRIBE WHAT THIS IS A CONTRACT

25  FOR?  YOU REVIEWED IT.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**    THIS IS A CONTRACT DESCRIBING TERMS FOR THE DEFENDANT TO

2    ACT AS AN INTERMEDIARY IN PROCURING GOODS FOR TIG MARINE?

3    **Q.**    AND WHERE IS HE ACTING AS AN INTERMEDIARY?

4    **A.**    IN THE UNITED STATES.

5    **Q.**    AND DOES IT SPECIFICALLY LIST SPECIFIC ITEMS HE IS GOING

6    TO OBTAIN FOR TIG MARINE?

7    **A.**    YES, IT DOES.

8    **Q.**    I DIRECT YOUR ATTENTION TO PAGE 6 OF THAT DOCUMENT.

9         **MR. HARRIGAN:**  ANOTHER PAGE.  KEEP GOING.  THEY ARE

10   OUT OF ORDER.

11        **THE WITNESS:**  NOW FORWARD.  IT IS AT THE END.

12        **MR. HARRIGAN:**  THERE IT IS.  YES.  PAGE 6.  ALL

13   RIGHT.

14   **Q.**    **(MR. HARRIGAN)** LOOKING AT THE SECTION TITLED PRODUCTS,

15   ALL RIGHT.  SO THE CONTRACT LISTED WHAT SPECIFIC ITEMS?

16   **A.**    LISTED THE NAVIGAT-2100, ANOTHER GYROCOMPASS, YAMAHA

17   MOTOR AND PARTS, EMERSON VALVE ACTUATOR, ELECTRONIC PARTS AND

18   SO ON.

19   **Q.**    RIGHT.  AND DOES IT ALSO CONTAIN COMMISSION?

20   **A.**    IT DOES.

21   **Q.**    IS THAT BELOW THAT?

22   **A.**    YES.

23        **MR. HARRIGAN:**  CAN WE SHOW THAT BRIEFLY.

24   **Q.**    **(MR. HARRIGAN)** SECTION (A)(3) HAS A COMMISSION?

25   **A.**    IT DOES.  IT LISTS -- SORRY.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   Q.    THAT IS DEPENDENT ON THE AMOUNT OR VOLUME OF MONEY?

2   A.    YES, IT IS.

3   Q.    AND LOOKING AT THIS --

4         MR. HARRIGAN:  COULD WE DRAW BACK NOW?

5   Q.    (MR. HARRIGAN) AT THE SIGNATURE STAMPS AT THE BOTTOM.

6   ON THE LEFT IS?

7   A.    THE LEFT, THE WORD ARASH AND THE DATE 18 JANUARY 2013

8   APPEARS.

9   Q.    AND ON THE RIGHT?

10  A.    THE TIG MARINE STAMP, AS WELL AS A SIGNATURE.

11  Q.    NOW, WAS THIS STAMP AND SIGNATURES ON EACH PAGE OF THE

12  CONTRACT?

13  A.    THEY WERE.

14  Q.    SHOWING YOU NEXT GOVERNMENT EXHIBIT 208.  DURING YOUR

15  EXECUTION OF YOUR SEARCH WARRANT OF DEFENDANT AND TAHERKHANI'S

16  ACCOUNT, DID YOU FIND THE EMAIL WHERE MR. TAHERKHANI RESPONDED

17  TO DEFENDANT'S EMAIL REGARDING THE PRICE QUOTE FOR BASIC

18  CONTRACT TERMS FOR THE GYROCOMPASSES?

19  A.    YES, I DID.

20  Q.    IS THIS SUCH AN EMAIL?

21  A.    IT IS.

22        MR. HARRIGAN:  YOUR HONOR, I MOVE TO ADMIT

23  GOVERNMENT EXHIBIT 208.

24        THE COURT:  YES.

25        (EXHIBIT 208 RECEIVED INTO EVIDENCE)

APRIL 16, 2015

829

HAMAKO - DIRECT EXAMINATION

1   **Q.    (MR. HARRIGAN)** FIRST DIRECTING YOUR ATTENTION TO THE --

2   CAN YOU GENERALLY DESCRIBE WHAT THIS EMAIL IS, ESSENTIALLY?

3   **A.**    IT IS AN EMAIL CHAIN INCLUDING COMMUNICATION FROM THE

4   DEFENDANT TO TAHERKHANI, AS WELL AS A RESPONSE FROM TAHERKHANI

5   TO THE DEFENDANT.

6   **Q.**    OKAY.  AND THE EMAIL AT THE BOTTOM, IS THAT THE EMAIL

7   WHERE -- THAT WE HAVE PREVIOUSLY SEEN WHERE HE IS --

8           **MR. HARRIGAN:**  THE ENTIRE EMAIL, PLEASE.

9   **Q.    (MR. HARRIGAN)** WHERE DEFENDANT SENT THE PRICE QUOTE?

10  **A.**    YES, THAT'S CORRECT.

11  **Q.**    OKAY.  AND DOES MR. TAHERKHANI RESPOND TO THE BASIC

12  TERMS AND THE PRICE QUOTE?

13  **A.**    HE DOES.

14          **MR. HARRIGAN:**  AND IF WE COULD GO TO THE TOP OF THE

15  EMAIL.

16  **Q.    (MR. HARRIGAN)** WHAT DOES MR. TAHERKHANI SAY?

17  **A.**    TAHERKHANI STATES TO THE DEFENDANT, PLEASE GO AHEAD AS

18  WE DISCUSSED.

19  **Q.**    AND AS WITH PREVIOUS EMAILS FROM MR. TAHERKHANI, DID YOU

20  LOOK TO SEE THE ORIGINATING ADDRESS ON THIS EMAIL?

21  **A.**    I DID.

22  **Q.**    IS THAT REFLECTED IN GOVERNMENT'S EXHIBIT 208-A?

23  **A.**    YES, IT IS.

24          **MR. HARRIGAN:**  YOUR HONOR, I MOVE TO ADMIT

25  GOVERNMENT EXHIBIT 208-A.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1            **THE COURT:**  YES.  IT IS RECEIVED.

2            **MR. HARRIGAN:**  AND PUBLISH IT TO THE JURY.

3            **THE COURT:**  YES.

4            (EXHIBIT 208-A RECEIVED INTO EVIDENCE)

5   **Q.    (MR. HARRIGAN)** LOOKING AT 208-A, DOES THAT, HIGHLIGHTED

6   IN YELLOW, SHOW THE ORIGINATING IP ADDRESS?

7   **A.**    YES.

8   **Q.**    AND AS WITH THE PREVIOUS SEARCHES, DID YOU CONDUCT A

9   WHATISMYIP SEARCH FOR THAT IP ADDRESS?

10  **A.**    YES, I DID.

11  **Q.**    IS THAT REFLECTED IN GOVERNMENT EXHIBIT 208-B?

12  **A.**    YES, THAT'S CORRECT.

13            **MR. HARRIGAN:**  I MOVE TO ADMIT AND PUBLISH 208-B.

14            **THE COURT:**  YES.

15            (EXHIBIT 208-B RECEIVED INTO EVIDENCE)

16  **Q.    (MR. HARRIGAN)** AND WHAT DID YOU FIND AS TO THE ISP AND

17  THE COUNTRY OF ORIGIN AS TO THE EMAIL SENT BY MR. TAHERKHANI

18  TO THE DEFENDANT?

19  **A.**    I FOUND THAT IP WAS ALSO LOCATED ON AN ISP IN IRAN.

20  **Q.**    AS THE CASE AGENT, FOLLOWING THE PRICE QUOTE PROVIDED TO

21  DEFENDANT, DID YOU THEN DIRECT THE UNDERCOVER AGENT TO PROVIDE

22  SPECIFIC TERMS FOR A CONTRACT?

23  **A.**    YES, I DID.  FINANCE TERMS.

24  **Q.**    AND WHAT WERE THOSE, GENERALLY?

25  **A.**    GENERALLY THOSE WERE TERMS SPECIFYING WHEN CERTAIN

APRIL 16, 2015

1    PAYMENTS WOULD BE MADE IN STAGES DURING THE TRANSACTION.

2    **Q.**    CAN YOU SUMMARIZE THOSE?

3    **A.**    GENERALLY THERE WOULD BE 10 PERCENT PAID BEFORE THE

4    ORDER OR AT THE TIME OF THE ORDER, AND THEN 20 PERCENT 30 DAYS

5    AFTER THAT.  AND THEN 20 PERCENT AFTER THE COMPLETION OF THE

6    ORDER BY THE MANUFACTURER, THEN THE REMAINING 50 PERCENT UPON

7    DELIVERY OF THE GOODS.

8    **Q.**    AND DURING YOUR SEARCH OF DEFENDANT AND TAHERKHANI'S

9    EMAIL ACCOUNTS, DID YOU FIND DISCUSSIONS BETWEEN THEM

10   REGARDING THE CONTRACT TERMS?

11   **A.**    I DID.

12   **Q.**    LET ME SHOW YOU GOVERNMENT EXHIBIT 209.  IS THAT AN

13   EXAMPLE OF DISCUSSIONS REGARDING THE CONTRACT TERMS OF THE

14   NAVIGAT-2100 DEAL?

15   **A.**    YES, THAT'S CORRECT.

16          **MR. HARRIGAN:**  YOUR HONOR, I MOVE TO ADMIT AND

17   PUBLISH TO THE JURY.

18          **THE COURT:**  YES.

19          (EXHIBIT 209 RECEIVED INTO EVIDENCE)

20   **Q.**   **(MR. HARRIGAN)** NOW, THIS IS AN EMAIL CHAIN, CORRECT?

21   **A.**    YES, IT IS.

22   **Q.**    AND STARTING AT THE BOTTOM, THAT'S AN EMAIL FROM WHO?

23   **A.**    IT IS AN EMAIL FROM THE UNDERCOVER AGENT TO THE

24   DEFENDANT.

25   **Q.**    DOES THAT CONTAIN THE CONTRACT TERMS YOU JUST DESCRIBED?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**     YES.

2    **Q.**     AND GOING ABOVE THAT.  DID DEFENDANT FORWARD THAT TO

3    ANYBODY?

4    **A.**     HE DID.  HE FORWARDED IT TO TAHERKHANI.

5    **Q.**     ON THE SAME –– ON THE NEXT DAY, JANUARY 8TH?

6    **A.**     YES, THE FOLLOWING DAY.

7    **Q.**     HOW DID MR. TAHERKHANI RESPOND?

8    **A.**     MR. TAHERKHANI RESPONDED BY SAYING, SALAM, THIS IS

9    EXACTLY WHAT I NEED IT IS PERFECT WE MOVE ASAP.

10   **Q.**     AND THAT WAS SENT ON THE SAME DATE?

11   **A.**     YES.

12   **Q.**     THAT IS REFLECTED AT THE TOP OF GOVERNMENT EXHIBIT 209.

13   **A.**     CORRECT.

14   **Q.**     AFTER GOVERNMENT EXHIBIT 209, DID YOU ALSO OBTAIN AN IP

15   ORIGINATING ADDRESS AS TO EMAILS SENT BY THE MANAGING DIRECTOR

16   WHERE HE TOLD DEFENDANT THE CONTRACT WAS PERFECT WE MOVE AS

17   SOON AS POSSIBLE?

18   **A.**     YES, I DID.

19   **Q.**     AND IS THAT REFLECTED IN GOVERNMENT'S EXHIBIT 209-A?

20   **A.**     YES.

21          **MR. HARRIGAN:**  YOUR HONOR, I MOVE TO ADMIT AND

22   PUBLISH 209-A.

23          **THE COURT:**  YES.

24          (EXHIBIT 209-A RECEIVED INTO EVIDENCE)

25   **Q.**     **(MR. HARRIGAN)** AND LOOKING AT 209-A, IS THE IP

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1   ORIGINATING ADDRESS HIGHLIGHTED IN YELLOW?

2   **A.**   YES, IT IS.

3   **Q.**   DID YOU RUN THAT ADDRESS THROUGH A WHATISMYIP SEARCH?

4   **A.**   I DID.

5   **Q.**   IS THAT CONTAINED IN GOVERNMENT'S EXHIBIT 209-B?

6   **A.**   YES.

7          **MR. HARRIGAN:**  AND I MOVE TO ADMIT AND PUBLISH TO

8   209-B.

9          **THE COURT:**  YES.

10          (EXHIBIT 209-B RECEIVED INTO EVIDENCE)

11  **Q.**   **(MR. HARRIGAN)** WHAT DID YOUR SEARCH FOR THE ORIGINATING

12  IP ADDRESS SHOW WITH REGARDS TO THE EMAIL SENT ON JANUARY 8 BY

13  MR. TAHERKHANI TO THE DEFENDANT?

14  **A.**   IT SHOWED THAT THE IP ADDRESS FOR THAT EMAIL WAS LOCATED

15  ON AN ISP IN IRAN.

16  **Q.**   OKAY.  NOW, AS THE CASE AGENT YOU WERE ALSO INVOLVED IN

17  THE DECISION TO HAVE AN UNDERCOVER MEETING WITH DEFENDANT AND

18  MR. YILDIZ IN JUNE 2013 IN LAS VEGAS, CORRECT?

19  **A.**   YES.

20  **Q.**   FOR THE PURPOSES OF VIEWING ONE NAVIGAT-2100 AND AS --

21  MAKING A PARTIAL PAYMENT AS A PRELUDE TO A LARGER DEAL?

22  **A.**   YES.

23  **Q.**   IN PREPARATION FOR THAT MEETING DID YOU DIRECT THE

24  UNDERCOVER AGENT TO PROVIDE PHOTOS OF THE NAVIGAT-2100'S TO

25  THE DEFENDANT?

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1   **A.**    YES, I DID.

2   **Q.**    THAT WERE ACTUALLY PURCHASED.

3   **A.**    CORRECT.

4   **Q.**    WERE THEY REALLY PURCHASED?

5   **A.**    NO, THEY WERE NOT ACTUALLY PURCHASED.

6   **Q.**    WERE PHOTOS SENT?

7   **A.**    YES.

8   **Q.**    WHAT WERE THOSE PHOTOS OF?

9   **A.**    THE PHOTO WAS OF ONE FAKE NAVIGAT-2100 THAT WE HAD

10  PREVIOUSLY OBTAINED FOR USE IN INVESTIGATIONS, AND IT HAD BEEN

11  PHOTOSHOPPED BY A PRIVATE COMPANY TO MAKE IT LOOK LIKE THERE

12  WERE ACTUALLY FOUR UNITS WHEN REALLY WE ONLY HAD ONE.

13  **Q.**    DURING THE SEARCH OF DEFENDANT AND MR. TAHERKHANI'S

14  EMAIL ACCOUNT, DID YOU FIND ANY EVIDENCE THAT THOSE

15  PHOTOGRAPHS WERE FORWARDED BY THE DEFENDANT TO MR. TAHERKHANI?

16  **A.**    YES, I DID.

17  **Q.**    LET ME SHOW YOU GOVERNMENT'S EXHIBIT 210.  IS THAT THE

18  EMAIL?

19  **A.**    YES, IT IS.

20  **Q.**    OKAY.

21        **MR. HARRIGAN:**  I MOVE TO ADMIT GOVERNMENT'S

22  EXHIBIT 210 INTO EVIDENCE, YOUR HONOR, AND PUBLISH TO THE

23  JURY.

24        **THE COURT:**  RECEIVED.

25        (EXHIBIT 210 RECEIVED INTO EVIDENCE)

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1   Q.    **(MR. HARRIGAN)** ALL RIGHT.  AGAIN GOING TO THE HEADER.

2   AND THAT IS AN EMAIL FROM WHO?

3   **A.**    AN EMAIL FROM THE DEFENDANT TO TAHERKHANI, YILDIZ AND

4   ANOTHER INDIVIDUAL.

5   **Q.**    AND THE ATTACHMENTS ARE?

6   **A.**    THE ATTACHMENT IS, FOR DAVE FROM DELIVERY INSPECTION.

7   **Q.**    AND BELOW THAT IS WHAT?  AN EMAIL THAT HE FORWARDED?

8   **A.**    YES.

9   **Q.**    AND THAT IS AN EMAIL FROM WHOM?

10  **A.**     IT IS AN EMAIL FROM THE UNDERCOVER AGENT TO THE

11  DEFENDANT.

12  **Q.**    WHICH IS REGARDING THE PHOTOGRAPHS WE JUST TALKED ABOUT?

13  **A.**    CORRECT.

14  **Q.**    AND ARE THOSE ATTACHMENTS --

15        **MR. HARRIGAN:**  IF WE CAN LOOK AT THE ATTACHMENTS

16  NOW.

17  **Q.**    **(MR. HARRIGAN)** DO YOU RECOGNIZE THAT PHOTOGRAPH?

18  **A.**    YES, I DO.

19  **Q.**    IS THAT THE PHOTOSHOPPED PHOTO OF FOUR GYROCOMPASSES

20  THAT WAS SENT BY THE UNDERCOVER AGENT TO THE DEFENDANT?

21  **A.**    YES.

22  **Q.**    NOW, DURING THE EXECUTION OF THE SEARCH WARRANTS ON THE

23  ACCOUNTS USED BY DEFENDANT, MR. TAHERKHANI AND INDIVIDUALS WHO

24  COMMUNICATED WITH MR. TAHERKHANI, DID YOU FIND ANY EMAILS

25  RELATING TO THEIR EFFORTS TO OBTAIN THE Y-690 TRIODE LAMPS

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    FROM THE UNITED STATES?

2    **A.**    YES.

3    **Q.**    LET ME SHOW YOU GOVERNMENT'S EXHIBIT 211.  IS THAT ONE

4    SUCH EMAIL?

5    **A.**    YES, IT IS.

6          **MR. HARRIGAN:**  I MOVE TO ADMIT THAT INTO EVIDENCE,

7    YOUR HONOR, AND PUBLISH IT TO THE JURY.

8          **THE COURT:**  YES.

9          (EXHIBIT 211 RECEIVED INTO EVIDENCE)

10   **Q.**    **(MR. HARRIGAN)** DIRECTING YOUR ATTENTION TO THE HEADER

11   INFORMATION, WHO IS THAT FROM?

12   **A.**    IT IS AN EMAIL FROM TAHERKHANI TO THE DEFENDANT, TWO OF

13   HIS EMAIL ACCOUNTS.

14   **Q.**    AND WHAT IS THE SUBJECT?

15   **A.**    THE SUBJECT IS, FORWARD ELECTRONIC PARTS.

16   **Q.**    AND DIRECTING YOUR ATTENTION TO THE CONTENT, WHAT DOES

17   MR. TAHERKHANI ASK OF DEFENDANT IN THAT EMAIL?

18   **A.**    TAHERKHANI ASKS THE DEFENDANT TO CHECK AND SEE IF HE CAN

19   SUPPLY THE BELOW PARTS, WHICH INCLUDES THE Y-690 AS WELL AS

20   FOUR OTHER PARTS.

21   **Q.**    AND THE Y-690 IS REFLECTED WHERE?

22   **A.**    IT IS REFLECTED AT THE BOTTOM OF THE LIST.

23   **Q.**    HOW IS IT DESCRIBED?

24   **A.**    IT IS DESCRIBED AS THE TRIOD LAMP.

25   **Q.**    Y-690?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **A.**    YES.

2   **Q.**    MAKER, WHO?

3   **A.**    CPI USA.

4   **Q.**    AND HOW MANY PIECES?

5   **A.**    100 PIECES.

6   **Q.**    WHAT IS THE SIGNIFICANCE OF THIS TO YOUR INVESTIGATION,

7   THE EMAIL FROM MR. TAHERKHANI FOR 100 UNITS OF THE Y-690 TO

8   THE DEFENDANT?

9   **A.**    THE SIGNIFICANCE OF THIS EMAIL IN MY INVESTIGATION WAS

10  IT SHOWED ANOTHER PRODUCT THAT TAHERKHANI WAS REQUESTING FROM

11  THE DEFENDANT, WHICH THE DEFENDANT LATER REQUESTED FROM THE

12  UNDERCOVER AGENT.

13  **Q.**    DID YOU SEE THIS LIST IN ANOTHER COMMUNICATION WITH THE

14  UNDERCOVER AGENT?

15  **A.**    YES, I DID.

16  **Q.**    FROM THE DEFENDANT?

17  **A.**    CORRECT.

18  **Q.**    DID YOUR SEARCH OF THE EMAIL ACCOUNTS REVEAL ANY

19  INFORMATION AS TO THE IDENTITY OR THE CUSTOMER, THE END USER,

20  OF THE Y-690'S REQUESTED BY DEFENDANT AND TAHERKHANI?

21  **A.**    YES, IT DID.  I DISCOVERED SEVERAL EMAILS INDICATING WHO

22  THE CUSTOMER WAS.

23  **Q.**    AND WHO WAS THE CUSTOMER REVEALED TO BE?

24  **A.**    THE CUSTOMER WAS A COMPANY CALLED KOHANDIAREMAD, WHICH

25  WAS LOCATED IN TEHRAN, IRAN.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **Q.**    CAN YOU EXPLAIN HOW YOU DISCOVERED THIS?

2    **A.**    I DISCOVERED EMAILS BETWEEN TAHERKHANI AND TWO EMAIL

3    ACCOUNTS ON WHICH THOSE ACCOUNTS SENT TAHERKHANI A PURCHASE

4    ORDER THAT WAS KOHANDIAREMAD LETTERHEAD.  THEY REQUESTED THE

5    SAME LIST OF PARTS.

6    **Q.**    WERE THERE EMAILS PRIOR TO THAT?

7    **A.**    YES, THERE WERE.

8    **Q.**    WHAT DID THOSE DISCUSS?

9    **A.**    GENERALLY THOSE DISCUSSED THE NEED FOR A PRODUCT

10   BROCHURE OR SOME OTHER PRODUCT INFORMATION IN ORDER TO

11   FINALIZE THE DEAL.

12           **MR. CAMDEN:**  BEST EVIDENCE OBJECTION AS TO THE

13   CONTENT OF THE PRIOR EMAIL.

14           **THE COURT:**  OVERRULED.

15   **Q.**    **(MR. HARRIGAN)** JUST WANT TO KIND OF LAY THE FOUNDATION

16   FOR WHEN WE GO THROUGH THESE EMAILS, AGENT HAMAKO.

17           YOU SAY THEY.  IF YOU CAN IDENTIFY THE PARTIES TOO.  WAS

18   THERE A REQUEST FOR INFORMATION TO THE UNDERCOVER AGENT ABOUT

19   TECHNICAL DATA OR BROCHURES?

20   **A.**    YES, THERE WAS.

21   **Q.**    AND WAS THERE A REQUEST BY MR. TAHERKHANI?

22   **A.**    YES.

23   **Q.**    AND WHO WAS THAT TO?

24   **A.**    TO THE DEFENDANT.

25   **Q.**    IN ORDER TO DO WHAT?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**    IN ORDER TO FINALIZE THE DEAL WITH THE CUSTOMER.

2    **Q.**    AND THEN ARE THERE EMAILS THAT REFLECT DEFENDANT REACHED

3    OUT TO THE UNDERCOVER AGENT TO GET THAT?

4    **A.**    YES.

5    **Q.**    AND ULTIMATELY GOT SOME INFORMATION.

6    **A.**    CORRECT.

7    **Q.**    AFTER THAT INFORMATION WAS PROVIDED TO THE DEFENDANT ARE

8    THERE EMAILS THAT YOU FOUND WHICH SUGGEST THAT -- OR WOULD

9    SHOW THAT THE CUSTOMER IN IRAN GOT THAT INFORMATION?

10            **MR. CAMDEN:**  OBJECTION.  LEADING.

11            **THE COURT:**  SUSTAINED.

12   **Q.**    **(MR. HARRIGAN)** LET'S JUST GO THROUGH THE EMAILS, THEN.

13   ALL RIGHT?  DO THAT.

14            GOVERNMENT EXHIBIT 213.  DO YOU RECOGNIZE THAT?

15   **A.**    I DO.

16   **Q.**    AND WHO IS THAT EMAIL BETWEEN?

17   **A.**    IT IS AN EMAIL FROM TAHERKHANI TO THE DEFENDANT'S TWO

18   EMAIL ACCOUNTS.

19   **Q.**    ALL RIGHT.  AND WHAT IS THAT IN REGARDS TO?

20   **A.**    REGARDING ELECTRONIC PARTS.

21   **Q.**    OKAY.

22            **MR. HARRIGAN:**  I MOVE TO ADMIT AND PUBLISH, YOUR

23   HONOR.

24            **THE COURT:**  YES.

25            (EXHIBIT 213 RECEIVED INTO EVIDENCE)

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **Q.**     **(MR. HARRIGAN)** AND THAT WAS SENT ON WHAT DATE?

2   **A.**    JANUARY 14TH, 2013.

3   **Q.**    AND WHAT DOES MR. TAHERKHANI ASK OF THE DEFENDANT IN

4   THAT EMAIL?

5   **A.**    TAHERKHANI TELLS THE DEFENDANT THAT HE NEEDS A DRAWING

6   OR A DATA SHEET OF THE PRODUCT, SPECIFICALLY THE TRIPOD LAMP,

7   TO FINALIZE THE DEAL AND THE CONTRACT WITH THE CUSTOMER.

8   **Q.**    AND THAT IS REFLECTED IN THE CONTENT?

9   **A.**    YES.

10  **Q.**    TO FINALIZE THE DEAL AND CONTRACT WITH THE CUSTOMER.

11  **A.**    YES.

12  **Q.**    AND SHOWING -- AND AS WITH THIS EMAIL, AS WITH OTHER

13  EMAILS SENT BY MR. TAHERKHANI, DID YOU DETERMINE THE IP

14  ORIGINATING ADDRESS?

15  **A.**    YES, I DID.

16  **Q.**    IS THAT IN 213-A?

17  **A.**    YES.

18          **MR. HARRIGAN:**  I MOVE TO PUBLISH AND ADMIT -- ADMIT

19  AND PUBLISH.

20          **THE COURT:**  YES.

21          (EXHIBIT 213-A RECEIVED INTO EVIDENCE)

22  **Q.**    **(MR. HARRIGAN)** IS THAT REFLECTED IN GOVERNMENT'S

23  EXHIBIT 213-A?

24  **A.**    YES.

25  **Q.**    DID YOU THEN RUN A WHATISMYIP SEARCH FOR THE IP ADDRESS?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1  **A.**    I DID.

2  **Q.**    IS THAT REFLECTED IN GOVERNMENT EXHIBIT 213-B?

3  **A.**    YES.

4          **MR. HARRIGAN:**  MOVE TO ADMIT AND PUBLISH 213-B.

5          **THE COURT:**  YES.

6          (EXHIBIT 213-B RECEIVED INTO EVIDENCE)

7  **Q.**    **(MR. HARRIGAN)** WHAT WAS THE ORIGINATING IP ADDRESS --

8  WHERE WAS THE ORIGINATING IP ADDRESS LOCATED?

9  **A.**    IT WAS LOCATED ON AN ISP IN IRAN.

10  **Q.**    SHOWING YOU GOVERNMENT'S EXHIBIT 214.  DO YOU RECOGNIZE

11  THAT EMAIL?

12  **A.**    I DO.

13  **Q.**    ALL RIGHT.  IS THAT A CHAIN EMAIL?

14  **A.**    YES, IT IS.

15  **Q.**    DOES THAT PERTAIN TO MR. TAHERKHANI'S REQUEST FOR

16  DEFENDANT TO PROVIDE ELECTRONIC DRAWINGS OR PARTS FOR THE

17  Y-690?

18  **A.**    YES.

19          **MR. HARRIGAN:**  I MOVE TO ADMIT AND PUBLISH THAT,

20  YOUR HONOR?

21          **THE COURT:**  YES.

22          (EXHIBIT 214 RECEIVED INTO EVIDENCE)

23  **Q.**    **(MR. HARRIGAN)** ALL RIGHT.  AND THAT IS AN EMAIL CHAIN,

24  CORRECT?

25  **A.**    YES, IT IS.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1  Q.    AND DIRECTING YOUR ATTENTION TO THE FOURTH EMAIL DOWN,

2  BE THE NEXT PAGE.  THAT IS AN EMAIL YOU PREVIOUSLY HAVE SEEN

3  IN COURT HERE TODAY, CORRECT?

4  A.    YES.

5  Q.    AND THAT IS AN EMAIL FROM DEFENDANT TO THE UNDERCOVER

6  AGENT?

7  A.    YES.

8  Q.    ASKING FOR A BROCHURE AND DRAWING FOR THE Y-690?

9  A.    CORRECT.

10 Q.    AND GOING TO THE EMAIL ABOVE THAT.  AND AGAIN, THAT IS

11 AN EMAIL YOU HAVE SEEN BEFORE TODAY IN COURT?

12 A.    YES.

13 Q.    THAT'S THE UNDERCOVER AGENT'S RESPONSE OF JANUARY 14TH?

14 A.    YES.

15 Q.    WHAT DOES HE ESSENTIALLY TELL HIM?

16 A.    THE UNDERCOVER AGENT TELLS THE DEFENDANT THAT HE CAN'T

17 PROVIDE HIM WITH A BROCHURE OR TECHNICAL INFORMATION FOR THAT

18 PRODUCT, BECAUSE HE SPOKE TO THE SALES DEPARTMENT FOR THE

19 COMPANY AND THEY WOULDN'T RELEASE IT TO HIM FOR THAT PRODUCT.

20 Q.    AND DOES THE EMAIL CHAIN CONTAIN AN EMAIL WHERE

21 DEFENDANT RELAYS THAT FACT TO MR. TAHERKHANI?

22 A.    YES, IT DOES.

23 Q.    IS THAT LOCATED DIRECTLY ABOVE THAT EMAIL ON GOVERNMENT

24 EXHIBIT 214?

25 A.    CORRECT.

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1  Q.    AND THAT WAS SENT ON WHAT DATE?

2  A.    JANUARY 15TH, 2013.

3  Q.    AND DIRECTING YOUR ATTENTION TO THE TOP OF THE EMAIL --

4  OF THE EXHIBIT.  EXCUSE ME.

5       IS THAT THE EMAIL WHERE MR. TAHERKHANI RESPONDED TO

6  DEFENDANT'S FORWARDING THAT INFORMATION?

7  A.    YES, IT IS.

8  Q.    WHAT DOES HE ASK OF DEFENDANT?

9  A.    HE ASKS THE DEFENDANT TO LET HIM KNOW THE WEBSITE WHERE

10  HE CAN GET ANY MORE INFORMATION ABOUT THE PRODUCT.  AND HE

11  SAYS HE THINKS ONLY A DATA SHEET WOULD BE ENOUGH AND HE CAN

12  GET IT FROM A WEBSITE.

13  Q.    OKAY.  AND AS TO THIS EMAIL FROM MR. TAHERKHANI, AS WITH

14  PREVIOUS EMAILS TO DEFENDANT AND MR. TAHERKHANI, DID YOU RUN

15  A -- DID YOU LOCATE AN IP ORIGINATING ADDRESS?

16  A.    YES, I DID.

17  Q.    IS THAT LOCATED ON 214-A?

18  A.    YES.

19       MR. HARRIGAN:  I MOVE TO ADMIT AND PUBLISH THAT TO

20  THE JURY, YOUR HONOR.

21       THE COURT:  YES.

22       (EXHIBIT 214-A RECEIVED INTO EVIDENCE)

23  Q.    (MR. HARRIGAN) AND IS THAT THE IP ADDRESS HIGHLIGHTED

24  IN YELLOW ON GOVERNMENT EXHIBIT 214-A?

25  A.    YES, IT IS.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1  **Q.**    AND AS WITH YOUR –– AS YOU PREVIOUSLY DID WITH OTHER

2  EMAILS, DID YOU RUN A WHATISMYIP SEARCH FOR THAT EMAIL OR THAT

3  IP ADDRESS?

4  **A.**    YES, I DID.

5  **Q.**    AND DOES 214–B CONTAIN RESULTS OF THAT SEARCH?

6         (EXHIBIT 214–B MARKED FOR IDENTIFICATION)

7  **A.**    IT DOES.

8  **Q.**    AND WHERE WAS THIS EMAIL SENT FROM?

9  **A.**    MY SEARCH SHOWED THAT IT WAS SENT FROM AN IP ADDRESS

10  LOCATED ON AN ISP IN IRAN.

11  **Q.**    NOW, FOLLOWING THAT EMAIL EXCHANGE WE WENT THROUGH WHERE

12  MR. TAHERKHANI ASKED DEFENDANT TO GET A WEB LINK ADDRESS FOR A

13  DATA SHEET FOR THE Y–690, DID YOU FIND OTHER EMAILS FROM THE

14  DEFENDANT IN REPLY TO THAT?

15  **A.**    I DID.

16  **Q.**    LET ME SHOW YOU GOVERNMENT'S EXHIBIT 215.  IS THAT THE

17  EMAIL?

18  **A.**    IT IS.

19         **MR. HARRIGAN:**  I MOVE TO ADMIT AND PUBLISH, YOUR

20  HONOR.

21         **THE COURT:**  YES.

22         (EXHIBIT 215 RECEIVED INTO EVIDENCE)

23  **Q.**    **(MR. HARRIGAN)** SHOWING YOU THAT EMAIL, FIRST LOOKING AT

24  THE HEADER.  THAT IS AN EMAIL FROM WHO?

25  **A.**    FROM THE DEFENDANT TO TAHERKHANI.

APRIL 16, 2015

855

HAMAKO - DIRECT EXAMINATION

1   **Q.**    AND LOOKING AT THE CONTENT.  WHAT IS CONTAINED IN THE

2   CONTENT?

3   **A.**    THE DEFENDANT TELLS TAHERKHANI TO LOOK AT THESE

4   WEBSITES, AND THEN HE PROVIDES TWO LINKS.

5   **Q.**    AND YOU ARE FAMILIAR WITH THOSE LINKS?

6   **A.**    YES, I AM.

7   **Q.**    ARE THOSE THE LINKS THAT YOU DIRECTED THE UNDERCOVER

8   AGENT TO PROVIDE TO MR. TAHERKHANI?

9   **A.**    YES.

10  **Q.**    THE DEFENDANT?

11  **A.**    YES.

12  **Q.**    NEXT SHOWING YOU GOVERNMENT EXHIBIT 216.  AND DO YOU

13  RECOGNIZE THAT EMAIL?

14  **A.**    YES, I DO.

15  **Q.**    AND DOES THAT EMAIL RELATE TO THE DATA SHEET AGAIN?

16  **A.**    YES, IT DOES.

17          **MR. HARRIGAN:**  AND WITH THE COURT'S PERMISSION I

18  WOULD MOVE TO ADMIT THAT INTO EVIDENCE AND PUBLISH IT TO THE

19  JURY.

20          **THE COURT:**  YES.

21          (EXHIBIT 216 RECEIVED INTO EVIDENCE)

22  **Q.**    **(MR. HARRIGAN)** THIS EMAIL SENT WHEN?

23  **A.**    SENT ON JANUARY 16TH, 2013.

24  **Q.**    A DAY AFTER THE PREVIOUS EMAIL WE SAW?

25  **A.**    THAT'S CORRECT.

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1    **Q.**    IN GOVERNMENT EXHIBIT 215?

2    **A.**    YES.

3    **Q.**    AND IT IS SENT TO WHOM?

4    **A.**    SENT TO TAHERKHANI.

5    **Q.**    OKAY.  WHAT IS THE SUBJECT?

6    **A.**    THE SUBJECT IS DETAIL OF TRIODE LAMP Y-690.

7    **Q.**    WHAT IS THE EMAIL ACCOUNT IT IS SENT FROM?

8    **A.**    IT IS SENT FROM PURCHASE80@SCI-COMPANY.COM.

9         **MR. HARRIGAN:**  AND COULD WE GO TO THE BODY OF THE

10   EMAIL.

11   **Q.**    **(MR. HARRIGAN)** AND DESCRIBE WHAT'S IN THAT EMAIL.

12   **A.**    IN THIS EMAIL AN INDIVIDUAL IDENTIFYING HIMSELF AS MEHDI

13   STATES, DATA SHEETS, Y-690 TUBE FROM CPI COMPANY ITS ACCEPT.

14   PLEASE SEND ME PI AND DELIVERY TIME FOR QUANTITY 100 PIECES AS

15   SOON AS POSSIBLE.

16   **Q.**    SO WHAT IS THE SIGNIFICANCE OF THE TIMING AND CONTENT OF

17   THAT EMAIL?

18   **A.**    THE SIGNIFICANCE OF THE TIMING AND CONTENT OF THAT EMAIL

19   INDICATED TO ME THAT --

20        **MR. CAMDEN:**  OBJECTION.  SPECULATION.

21        **THE COURT:**  OVERRULED.

22        YOU MAY ANSWER.

23        **THE WITNESS:**  IT INDICATED TO ME THAT MR. TAHERKHANI

24   HAD PREVIOUSLY SENT THE WEB LINKS TO THIS INDIVIDUAL NAMED

25   MEHDI.

APRIL 16, 2015

857

HAMAKO – DIRECT EXAMINATION

1    **Q.**     **(MR. HARRIGAN)** AND WHAT DOES PI MEAN?

2    **A.**    PI IS AN ABBREVIATION USED IN THE BUSINESS WORLD FOR

3    PROFORMA INVOICE.

4    **Q.**    AND SHOWING YOU GOVERNMENT'S EXHIBIT 216-A.  DID YOU

5    RUN -- DID YOU TAKE A LOOK AT THE METADATA AND TRY TO

6    DETERMINE WHAT THE IP ADDRESS WAS FOR THIS EMAIL SEND BY

7    MEHDI?

8    **A.**    YES.

9    **Q.**    AND IS THAT REFLECTED IN 216-A?

10   **A.**    YES, IT IS.

11   **Q.**    IS IT HIGHLIGHTED IN YELLOW?

12   **A.**    YES.

13          **MR. HARRIGAN:**  I MOVE TO ADMIT AND PUBLISH IT TO THE

14   JURY, YOUR HONOR.

15          **THE COURT:**  YES.

16          (EXHIBIT 216-A RECEIVED INTO EVIDENCE)

17   **Q.**     **(MR. HARRIGAN)** DID YOU RUN A WHATISMYIP SEARCH FOR THAT

18   IP ADDRESS?

19   **A.**    I DID.

20   **Q.**    IS THAT REFLECTED IN GOVERNMENT EXHIBIT 216-B?

21   **A.**    YES, IT IS.

22          **MR. HARRIGAN:**  I MOVE TO ADMIT AND PUBLISH, YOUR

23   HONOR.

24          **THE COURT:**  YES.

25          (EXHIBIT 216-B RECEIVED INTO EVIDENCE)

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **Q.**    **(MR. HARRIGAN)** WOULD YOU TELL THE JURY WHAT YOU FOUND

2   AS TO THAT EMAIL SENT BY MEHDI?

3   **A.**    I FOUND THAT THE IP ADDRESS FOR THAT EMAIL, WHERE IT WAS

4   SENT FROM, WAS LOCATED IN TEHRAN, IRAN.

5   **Q.**    DID YOU SUBSEQUENTLY UNDERCOVER ANOTHER EMAIL WHICH MORE

6   FULLY IDENTIFY MEHDI?

7   **A.**    I DID.

8   **Q.**    SHOWING YOU GOVERNMENT'S EXHIBIT 217.  IS THAT THE

9   EMAIL?

10  **A.**    YES.

11          **MR. HARRIGAN:**  I MOVE TO ADMIT AND PUBLISH IT TO THE

12  JURY, YOUR HONOR.

13          **THE COURT:**  YES.

14          (EXHIBIT 217 RECEIVED INTO EVIDENCE)

15  **Q.**    **(MR. HARRIGAN)** NOW LOOKING AT THE HEADER INFORMATION,

16  WHO IS THAT FROM?

17  **A.**    IT IS FROM AN INDIVIDUAL IDENTIFYING HIMSELF AS MEHDI

18  SARKHOSH, USING KOHANDIAREMAD@GMAIL.COM TO TAHERKHANI AND ONE

19  OTHER INDIVIDUAL.

20  **Q.**    AND THE DATE OF THAT EMAIL WAS?

21  **A.**    FEBRUARY 27TH, 2013.

22  **Q.**    AND WAS THERE AN ATTACHMENT TO THAT EMAIL?

23  **A.**    THERE WAS.

24  **Q.**    AND LOOKING AT THE ATTACHMENT, SHOWING YOU THE FIRST

25  PAGE.  CAN YOU DESCRIBE, GENERALLY, WHAT IS THAT ATTACHMENT IN

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

```
 1    THAT LETTER.  FIRST LET'S LOOK AT WHAT IS THE DATE -- IT IS A
 2    LETTER?
 3    A.    YES.
 4    Q.    WHAT'S THE DATE OF THE LETTER?
 5    A.    THE DATE OF THE LETTER IS FEBRUARY 27TH, 2013.
 6    Q.    WHAT IS THE SUBJECT OF THE LETTER?
 7    A.    REQUEST FOR QUOTATION.
 8    Q.    WHO IS IT ADDRESSED TO?
 9    A.    IT IS ADDRESSED TO TAHERKHANI.
10    Q.    WHAT DOES MEHDI ASK FOR?
11    A.    HE ASKS HIM TO KINDLY QUOTE HIS BEST PRICE AND DELIVERY
12    TIME FOR THE ATTACHED LIST OF EIGHT ITEMS NO LATER THAN MARCH
13    3RD, 2013.
14    Q.    AND LOOKING AT THE SIGNATURE, HOW IS THAT SIGNED?
15    A.    IT IS SIGNED MEHDI SARKHOSH, PDG AND GENERAL DIRECTOR.
16    Q.    LOOKING AT THE LETTERHEAD, WHICH ACTUALLY IS A FOOTER, I
17    THINK.
18    A.    YES.
19    Q.    IN TERMS OF IT.  DOES IT INDICATE WHAT COMPANY?
20    A.    IT DOES.
21    Q.    AND DOES IT INDICATE WHERE THIS COMPANY IS LOCATED?
22    A.    YES, IT DOES.
23    Q.    THE COMPANY IS IDENTIFIED AT THE TOP, CORRECT?
24    A.    CORRECT.
25          MR. HARRIGAN:  IT IS ALSO AT THE BOTTOM HERE, BUT
```

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1  LET'S GO TO THE TOP.

2  **Q.**    **(MR. HARRIGAN)** KOHANDIAREMAD INTERNATIONAL TRADING

3  COMPANY?

4  **A.**    YES.

5         **MR. HARRIGAN:**  GOING TO THE BOTTOM.

6  **Q.**    **(MR. HARRIGAN)** DOES THAT PROVIDE AN ADDRESS FOR

7  KOHANDIAREMAD?

8  **A.**    IT DOES.

9  **Q.**    WHERE IS THAT?

10  **A.**    TEHRAN, IRAN.

11         **MR. HARRIGAN:**  AND GOING TO THE ATTACHMENT.  NEXT

12  PAGE, IN QUOTATIONS.

13  **Q.**    **(MR. HARRIGAN)** CAN YOU DESCRIBE WHAT IS IN THAT LIST?

14  **A.**    THE LIST INCLUDES THE Y-690, LISTED AS COMPANY CPI, AND

15  ORDER 100.  AS WELL AS THE -- SEVERAL OF THE OTHER PARTS THAT

16  WERE JOINTLY REQUESTED BY TAHERKHANI TO THE DEFENDANT.

17  **Q.**    AND CAN YOU IDENTIFY WHICH PARTS THOSE ARE AND WHAT

18  NUMBERS?

19  **A.**    I BELIEVE IT WAS 4, 5 AND 6, IN ADDITION TO THE Y-690.

20         **MR. HARRIGAN:**  OKAY.  AND AGAIN GOING BACK TO THE

21  DOCUMENT.  ALL RIGHT.

22  **Q.**    **(MR. HARRIGAN)** THERE IS INDICATION ON THE SIDE OF WHERE

23  KOHANDIAREMAD IS LOCATED?

24  **A.**    THERE IS.

25  **Q.**    THAT IS WHERE?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**    IT IS ON THE RIGHT SIDE OF THE DOCUMENT.

2    **Q.**    ALL RIGHT.  AND AGAIN INDICATES THAT KOHANDIAREMAD IS

3    LOCATED WHERE?

4    **A.**    TEHRAN, IRAN.

5          **MR. HARRIGAN:**  ONE MOMENT, YOUR HONOR.

6    **Q.    (MR. HARRIGAN)** IN AND AROUND THE TIME THIS EMAIL WAS

7    SENT BY MEHDI TO TAHERKHANI IN LATE FEBRUARY AND MARCH OF 2013

8    DID YOU DIRECT THE UNDERCOVER AGENT TO INDICATE THAT HE COULD

9    PROVIDE 50 TO 100 UNITS OF THE Y-690 AS REQUESTED BY DEFENDANT

10   AND TIG MARINE?

11   **A.**    YES, I DID.

12   **Q.**    HOW DID YOU INSTRUCT THE UNDERCOVER AGENT -- OR WHAT DID

13   YOU INSTRUCT THE UNDERCOVER AGENT TO TELL THE DEFENDANT ABOUT

14   HOW SOUTH STAR TRADING WOULD ACQUIRE THE Y-690?

15   **A.**    I DIRECTED THE UNDERCOVER AGENT TO INFORM THE DEFENDANT

16   THAT HE WOULD PROCURE THOSE ITEMS FROM THE MANUFACTURER BY

17   PROVIDING FALSE END USER INFORMATION.

18   **Q.**    WHAT DID YOU DIRECTLY TELL HIM SPECIFICALLY ABOUT THE

19   ITEM?

20   **A.**    I DIRECTED THE UNDERCOVER AGENT TO INFORM THE DEFENDANT

21   THAT THESE WERE MORE SENSITIVE, AND THEY FELL UNDER A MORE

22   RESTRICTIVE EXPORT CONTROL CATEGORY.

23   **Q.**    WHY DID YOU TELL HIM THAT?

24   **A.**    I DID THAT BECAUSE I HAD RECEIVED INFORMATION FROM CPI,

25   THE MANUFACTURER, THAT THESE WERE A MILITARY ITEM CONTROLLED

APRIL 16, 2015

862

HAMAKO - DIRECT EXAMINATION

1    BY THE DEPARTMENT OF STATE.  AND I HAD RECEIVED INFORMATION

2    FROM THE DEPARTMENT OF STATE CONFIRMING TO ME AT THAT TIME

3    THAT THEY WERE CONTROLLED AS MUNITIONS LIST ITEMS AND HAVING A

4    MILITARY PURPOSE.

5    **Q.**    AND DURING THE SEARCH OF DEFENDANT'S AND MR.

6    TAHERKHANI'S EMAIL ACCOUNTS DID YOU UNCOVER EMAILS IN WHICH

7    THE FACT THAT IT WAS A MORE RESTRICTIVE EXPORT CATEGORY, THERE

8    WAS COMMUNICATION BETWEEN MR. TAHERKHANI AND DEFENDANT?

9    **A.**    YES.

10   **Q.**    ALL RIGHT.  I WANT YOU TO FIRST LOOK AT -- JUST LOOK AT

11   THEM IN YOUR BINDER -- 218, 220 AND 221.

12   **A.**    (WITNESS COMPLIES)

13   **Q.**    ARE THOSE ALL EMAILS IN WHICH DEFENDANT AND MR.

14   TAHERKHANI DISCUSS THE Y-690?

15   **A.**    YES, THEY ARE.

16   **Q.**    FIRST SHOWING YOU GOVERNMENT'S EXHIBIT 218.  DO YOU

17   RECOGNIZE THAT EMAIL?

18   **A.**    I DO.

19          **MR. HARRIGAN:**  YOUR HONOR, I MOVE TO ADMIT AND

20   PUBLISH TO THE JURY.

21          **THE COURT:**  YES.

22          (EXHIBIT 218 RECEIVED INTO EVIDENCE)

23   **Q.**    **(MR. HARRIGAN)** THIS IS AN EMAIL CHAIN, CORRECT?

24   **A.**    YES, IT IS.

25   **Q.**    AND THE EMAIL TO THE BOTTOM OF GOVERNMENT EXHIBIT 218 IS

APRIL 16, 2015

1    AN EMAIL FROM WHO?

2    **A.**    IT IS AN EMAIL FROM THE UNDERCOVER AGENT TO THE

3    DEFENDANT.

4    **Q.**    RIGHT.  AND IN THE CONTENT OF THAT EMAIL, WHAT IS THE

5    UNDERCOVER AGENT GENERALLY TELLING THE DEFENDANT?

6    **A.**    GENERALLY THE UNDERCOVER AGENT IS TELLING THE DEFENDANT

7    THAT THE Y-690'S FALL INTO A MORE RESTRICTIVE EXPORT CONTROL

8    CATEGORY.  AND BECAUSE OF THAT HE WILL BE PROVIDING THE END

9    USER INFORMATION FOR THAT HIMSELF.

10        AND THEN HE ALSO INSTRUCTS THE DEFENDANT TO MAKE SURE

11   THAT EVERYBODY UNDERSTANDS THAT THEY CAN'T MENTION THESE ITEMS

12   IN THEIR PAPERWORK, AND THAT THEY SHOULD DESCRIBE IT IN WIRE

13   TRANSFER PAPERWORK AS SERVICES RENDERED, OR ANOTHER PRODUCT.

14   **Q.**    AND DID DEFENDANT FORWARD THIS EMAIL TO MR. TAHERKHANI?

15   **A.**    YES, HE DID.

16   **Q.**    IS THAT REFLECTED IN THE EMAIL ABOVE?

17   **A.**    YES.

18   **Q.**    AND THAT WAS SENT THE SAME DAY?

19   **A.**    YES, IT WAS.

20   **Q.**    LET'S LOOK AT THE BODY OF THE EMAIL.

21        WHAT DOES THE DEFENDANT ASK OF MR. TAHERKHANI?

22   **A.**    DEFENDANT ASKS TAHERKHANI TO SEE THE ATTACHED EMAIL AND

23   TO CONTACT HIM AS SOON AS POSSIBLE.

24   **Q.**    AND SHOWING YOU NEXT GOVERNMENT'S EXHIBIT 220.  ALL

25   RIGHT.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

```
 1              MR. HARRIGAN:  AGAIN, YOUR HONOR, I MOVE TO ADMIT
 2   GOVERNMENT EXHIBIT 220.
 3              THE COURT:  YES.
 4              (EXHIBIT 220 RECEIVED INTO EVIDENCE)
 5   Q.    (MR. HARRIGAN) AGAIN, THIS IS AN EMAIL CHAIN?
 6   A.    YES, IT IS.
 7   Q.    AND DO YOU RECOGNIZE THE EMAIL AT THE BOTTOM OF
 8   GOVERNMENT EXHIBIT 220?
 9   A.    I DO.
10   Q.    AGAIN, IS THAT AN EMAIL COMMUNICATION FROM THE
11   UNDERCOVER AGENT TO DEFENDANT?
12   A.    YES, IT IS.
13   Q.    REGARDING THE Y-690 ORDER?
14   A.    YES.
15   Q.    LOOKING AT THE CONTENT, WHAT DOES HE DESCRIBE?
16   A.    IN THIS EMAIL THE UNDERCOVER AGENT INFORMS THE DEFENDANT
17   THAT HE HAS ATTACHED A FINAL INVOICE FOR THE Y-690, AND HE
18   MENTIONS PAYMENT.  AND HE ALSO DIRECTS THE DEFENDANT AND
19   TAHERKHANI TO AGAIN BE REMINDED ABOUT THE SENSITIVITY OF THE
20   ORDER.  AND HE DIRECTS THEM TO THE LANGUAGE ON THE INVOICE
21   ABOUT THE EXPORT CONTROL INFORMATION, AND REMINDS THEM IT IS
22   IMPORTANT FOR EVERYBODY TO REMEMBER THAT THE MANUFACTURER
23   THINKS THIS ORDER IS PLACED AND WILL BE DELIVERED TO AN END
24   USER IN THE CZECH REPUBLIC, AND THAT THEY NEEDED TO KEEP THAT
25   INFORMATION VERY PRIVATE.
```

APRIL 16, 2015

```
1   Q.    NOW, IN THE CONTEXT OF YOUR INVESTIGATION, WHEN WAS THIS
2   EMAIL SENT?
3   A.    IT WAS SENT ON MARCH 16TH, 2013.
4   Q.    MAY 16TH?
5   A.    YES.
6   Q.    AND WHAT WAS HAPPENING AT THIS POINT IN TIME IN THE
7   INVESTIGATION?
8   A.    AT THIS POINT IN TIME THERE WERE ONGOING NEGOTIATIONS
9   ABOUT DELIVERY OF THE PRODUCTS, AS WELL AS HOW THEY WOULD BE
10  PAID FOR.
11  Q.    DID DEFENDANT FORWARD THIS EMAIL TO MR. TAHERKHANI?
12  A.    HE DID.
13  Q.    AND SHOWING YOU THE TOP OF GOVERNMENT'S EXHIBIT 220.
14  DOES THAT REFLECT THAT?
15  A.    YES, IT DOES.
16  Q.    AND HE ALSO FORWARDED THE PURCHASE ORDER, CORRECT?
17  A.    HE DID.
18  Q.    SHOWING YOU NEXT GOVERNMENT EXHIBIT 221.  DO YOU
19  RECOGNIZE THAT EMAIL?
20  A.    YES, I DO.
21  Q.    IS THAT FURTHER COMMUNICATION BETWEEN THE DEFENDANT AND
22  MR. TAHERKHANI REGARDING THE Y-690?
23  A.    IT IS.
24          MR. HARRIGAN:  I MOVE TO ADMIT AND PUBLISH, YOUR
25  HONOR.
```

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1        **THE COURT:**  YES.

2              (EXHIBIT 221 RECEIVED INTO EVIDENCE)

3    **Q.**    **(MR. HARRIGAN)** WHO IS THAT SENT BY?

4    **A.**    IT IS SENT BY THE DEFENDANT TO TAHERKHANI.

5    **Q.**    WHAT DATE?

6    **A.**    MAY 22ND, 2013.

7    **Q.**    WHAT IS THE SUBJECT?

8    **A.**    PLEASE ACT ASAP.

9    **Q.**    AND DIRECTING YOUR ATTENTION TO THE CONTENT OF THE

10   INFORMATION, WHAT DOES THE DEFENDANT ASK OF MR. TAHERKHANI TO

11   ACT ON QUICKLY?

12   **A.**    THE DEFENDANT ASKS TAHERKHANI TO MAKE A TRANSACTION THAT

13   DAY FOR THE Y-690, OTHERWISE THE DEFENDANT WOULD HAVE TO HOLD

14   OFF ALL CONTRACTS BECAUSE HE MADE A GUARANTEE FOR THE PAYMENT.

15   **Q.**    ALL RIGHT.  AND WHAT DOES HE SAY ABOUT -- THIS IS ABOUT

16   THE Y-690 AND NAVIGAT-2100 CONTRACT, CORRECT?

17   **A.**    YES.

18   **Q.**    IN THAT EMAIL WHAT DOES HE SAY, IF ANYTHING, ABOUT THE

19   GYROCOMPASS CONTRACT?

20   **A.**    HE TELLS TAHERKHANI THAT THEY CAN'T CHANGE THE BANK FOR

21   THAT PAYMENT BECAUSE OF THE UNDERWRITING PROCESS, AND THAT

22   SOUTH STAR TRADING WOULD HAVE TO EXPOSE ALL OF THE INFORMATION

23   WHICH WOULDN'T BE GOOD FOR ANYONE.

24   **Q.**    AND EXPLAIN THE RELEVANCE OF THAT STATEMENT, WHICH

25   WOULDN'T BE GOOD TO ANYONE, TO YOUR INVESTIGATION.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **A.**   THE RELEVANCE OF THAT STATEMENT TO MY INVESTIGATION WAS

2   IT SHOWED THAT THE DEFENDANT DIDN'T WANT THE CONTRACT --

3           **MR. CAMDEN:**  OBJECTION, YOUR HONOR.  SPECULATION.

4           **THE COURT:**  SUSTAINED.

5   **Q.**   **(MR. HARRIGAN)** IN TERMS OF WHAT THE UNDERCOVER AGENT

6   HAD RELATED TO THE DEFENDANT.

7   **A.**   IT WAS CONSISTENT WITH WHAT THE UNDERCOVER AGENT TOLD

8   THE DEFENDANT, THAT IF THEY HAD TO GO THROUGH AN UNDERWRITING

9   PROCESS WITH A DIFFERENT BANK, THEN IT WAS POSSIBLE THAT WHAT

10  THEY WERE DOING COULD BE FOUND OUT.

11  **Q.**   AND WHICH WOULD EXPOSE THE UNDERCOVER AGENT TO WHAT?

12  **A.**   POTENTIAL JAIL TIME.

13  **Q.**   NOW, DURING THE COURSE OF YOUR SEARCH OF DEFENDANT'S

14  YAHOO ACCOUNT, DID YOU UNCOVER ANY COMMUNICATIONS IN WHICH

15  DEFENDANT DISCUSSED THE IRAN TRADE SANCTIONS?

16  **A.**   YES, I DID.

17  **Q.**   AND THE USE OF FRONT COMPANIES IN THIRD COUNTRIES IN

18  ORDER TO DIVERT GOODS TO IRANIAN CUSTOMERS?

19  **A.**   YES.

20  **Q.**   I WOULD FIRST SHOW YOU GOVERNMENT EXHIBIT NO. 222.

21          AND CAN YOU GENERALLY DESCRIBE WHAT THIS IS?

22  **A.**   THIS IS AN EMAIL THAT THE DEFENDANT SENT FROM ONE OF HIS

23  EMAIL ACCOUNTS.

24  **Q.**   SORRY.  GO AHEAD.

25  **A.**   TO ANOTHER ONE OF HIS EMAIL ACCOUNTS.  IT CONTAINED

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    PREVIOUS COMMUNICATIONS THAT THE DEFENDANT HAD HAD WITH AN

2    INDIVIDUAL LOCATED AT A COMPANY IN NORWAY.

3              **MR. CAMDEN:**  I CAN MAKE THE OBJECTION NOW, JUST NOT

4    TO HAVE TO INTERRUPT, UNDER 404(B) FOR THESE EMAILS, AS WELL

5    AS THE PREVIOUS OBJECTION.

6              **THE COURT:**  OVERRULED.  IT IS RECEIVED.

7              (EXHIBIT 222 RECEIVED INTO EVIDENCE)

8              **MR. HARRIGAN:**  YOUR HONOR, I WOULD MOVE TO ADMIT

9    GOVERNMENT'S EXHIBIT 222.

10             **THE COURT:**  YES.

11             **MR. HARRIGAN:**  AND PUBLISH IT TO THE JURY.

12             **THE COURT:**  YES.

13   **Q.   (MR. HARRIGAN)** NOW, AGENT HAMAKO, IS THIS AN EMAIL

14   CHAIN?

15   **A.**    YES, IT IS.

16   **Q.**    IS IT ONE OR MORE PAGES?

17   **A.**    IT IS SEVERAL PAGES, YES.

18   **Q.**    AND YOU SAID IT WAS AN EMAIL COMMUNICATION THAT

19   DEFENDANT HAD FORWARDED TO HIS OWN ACCOUNT REGARDING PREVIOUS

20   EMAIL COMMUNICATIONS WITH A COMPANY.

21   **A.**    YES.

22   **Q.**    LOCATED WHERE?

23   **A.**    IN NORWAY.

24   **Q.**    AND WHO WAS DEFENDANT SPEAKING WITH IN NORWAY, ACCORDING

25   TO THESE EMAILS?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1  **A.**    ACCORDING TO THESE EMAILS THE DEFENDANT WAS SPEAKING

2  WITH AN INDIVIDUAL NAMED MIKAEL RONES.

3  **Q.**    AND WHAT DID MICHAEL RONES' COMPANY DO, ACCORDING TO THE

4  EMAILS?

5  **A.**    ACCORDING TO THE EMAILS, RONES' COMPANY WAS INVOLVED IN

6  THE SALE OF LARGE OIL RIGS.

7  **Q.**    OKAY.  AND IN THAT EMAIL DID THE DEFENDANT DISCUSS HIS

8  KNOWLEDGE OF THE IRAN TRADE SANCTIONS?

9  **A.**    YES, HE DID.

10  **Q.**    SO THIS EMAIL IS 11 PAGES, AND I WANT TO START BY

11  DIRECTING YOUR ATTENTION TO PAGE 9 OF THAT EMAIL CHAIN.  ALL

12  RIGHT.

13          **MR. HARRIGAN:**  AND AT THE BOTTOM OF THAT PAGE, THE

14  HEADER INFORMATION.  JUST THE WHOLE EMAIL, I THINK IF WE CAN

15  SEE IT.  OKAY.

16  **Q.**    **(MR. HARRIGAN)** THAT IS AN EMAIL FROM WHO?

17  **A.**    IT IS AN EMAIL FROM THE DEFENDANT TO MR. RONES.

18  **Q.**    MR. RONES IS FROM A NORWEGIAN COMPANY?

19  **A.**    YES.

20  **Q.**    DO YOU RECALL THE NAME OF THAT?

21  **A.**    FRAZIER AS.

22  **Q.**    AND WHAT DOES THE DEFENDANT ASK OF MR. RONES IN THIS

23  EMAIL?

24  **A.**    THE DEFENDANT ASKS MR. RONES FOR INFORMATION ABOUT OIL

25  RIGS ON BEHALF OF WEALTHY -- A WEALTHY OIL COMPANY IN THE

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    PERSIAN GULF.

2    **Q.**    THE WORDS HE USES ARE EXACTLY WHAT?  WEALTHY OIL PRIVATE

3    COMPANY IN PERSIAN GULF?

4    **A.**    YES.

5    **Q.**    AND DOES HE INDICATE WHAT THEY ARE INTERESTED IN

6    PURCHASING?

7    **A.**    HE SAYS THEY ARE INTERESTED IN PURCHASING THREE SELF

8    ELEVATING RECENTLY UPGRADED OR NEW AVAILABLE FOR OPERATION.

9    THREE-LEGGED JACKUP RIGS WITH 350-FOOT USABLE LEG LENGTHS.

10   AND THAT THEY PREFERRED THEM TO BE FROM THE U.S. OR WESTERN

11   EUROPE.

12   **Q.**    IN THAT EMAIL CHAIN DID MR. RONES RESPOND TO DEFENDANT'S

13   STATEMENT THAT HIS CLIENT WAS A WEALTHY OIL PRIVATE COMPANY IN

14   THE PERSIAN GULF?

15   **A.**    YES, HE DID.

16   **Q.**    IS THAT IN THE EMAIL RESPONSE JUST ABOVE THAT?

17   **A.**    YES.

18        **MR. HARRIGAN:**  BACK THAT OUT.  TAKE A LOOK AT THAT

19   ENTIRE EMAIL.

20   **Q.**    **(MR. HARRIGAN)** AND THAT'S AN EMAIL FROM MR. RONES?

21   **A.**    IT IS.

22   **Q.**    TO WHOM?

23   **A.**    TO THE DEFENDANT.

24   **Q.**    SENT ON THE SAME DATE?

25   **A.**    YES.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

```
 1    Q.    WHAT DOES MR. RONES TELL DEFENDANT ABOUT THE FACT THAT

 2    HIS CLIENTS ARE IN THE PERSIAN GULF?

 3    A.    HE SAYS, I CAN SEE THAT YOUR CLIENT IS IN PERSIAN GULF.

 4    AS YOU KNOW THERE ARE SANCTIONS AGAINST IRAN AND THIS MAKES

 5    DELIVERY TO THAT AREA DIFFICULT.  BUT NEVERTHELESS THEY HAVE

 6    NO PROBLEM TO ARRANGE FOR THE OWNERS TO SELL TO AN

 7    INTERNATIONAL COMPANY FOR EXAMPLE IN THE UAE.

 8    Q.    YOU SKIPPED OVER A SENTENCE THERE IN THE SECOND

 9    PARAGRAPH.

10    A.    SORRY.

11          AT THIS POINT THE OWNERS IS NOT WILLING TO SELL INTO

12    SANCTION AREAS.  NEVERTHELESS WE HAVE NO PROBLEM TO ARRANGE

13    FOR THE OWNERS TO SELL TO INTERNATIONAL COMPANIES FRX IN UAE,

14    ET CETERA, ET CETERA.

15    Q.    NOW, UNITED ARAB EMIRATES IS IN THE PERSIAN GULF AREA,

16    CORRECT?

17    A.    YES.

18    Q.    NOW, DID DEFENDANT REPLY TO MR. RONES EMAIL THAT THE

19    OWNER WASN'T WILLING TO SELL TO CLIENTS IN THE PERSIAN GULF

20    AREA?

21    A.    YES.

22          MR. HARRIGAN:  I WANT TO GET TO PAGE 8 AND AN EMAIL

23    THAT IS AT THE BOTTOM THERE.  LET'S GO TO THE HEADER FIRST.

24    Q.    (MR. HARRIGAN) WAS A REPLY EMAIL SENT THAT DATE?

25    A.    THERE WAS.
```

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **Q.**    AND LOOKING AT THE BODY.

2         WHAT DOES THE DEFENDANT TELL MR. RONES ABOUT HIS

3    KNOWLEDGE OF SANCTIONS?

4    **A.**    HE SAYS HE KNOWS ABOUT THE SANCTIONS AGAINST IRAN.

5    **Q.**    AND HE IS –– WHAT ELSE DOES HE SAY?

6    **A.**    HE SAYS HE IS INTERESTED IN LEGAL STRAIGHTFORWARD

7    CONTRACT AND DEALS, AND THAT HE IS A U.S. RESIDENT AND NOT

8    LOOKING FOR TROUBLE.

9    **Q.**    WHAT DOES HE SAY ABOUT RELEASING COMPANY INFORMATION?

10   **A.**    HE SAYS, I WILL RELEASE THE COMPANY INFORMATION IF THEY

11   ARE INTERESTED TO YOUR JACKUP RIGS.

12   **Q.**    GO TO THE NEXT PAGE.

13   **A.**    BUT BEFORE THAT THEY DO NOT WANT THEIR INFORMATION

14   RELEASE BECAUSE THE STRONG MARKET AS YOU SAID.

15   **Q.**    SO AT THAT POINT IN TIME DEFENDANT DID NOT RELEASE THE

16   END USER INFORMATION?

17   **A.**    NO, HE DID NOT.

18         **THE COURT:**  ARE YOU THROUGH WITH THIS EXHIBIT?

19         **MR. HARRIGAN:**  NO, YOUR HONOR.

20         **THE COURT:**  IS THIS A GOOD POINT TO RECESS?

21         **MR. HARRIGAN:**  YES, IT IS.

22         **THE COURT:**  I HAVE ONE ADMONITION WITH RESPECT TO

23   EXHIBIT 222.

24         THIS DOCUMENT RELATES TO A DIFFERENT INCIDENT, NOT

25   INVOLVING THE CHARGES IN THIS CASE.  SO IF THIS EXHIBIT IS

APRIL 16, 2015

```
 1   BELIEVED BY THE JURORS IT CAN ONLY BE USED WITH RESPECT TO

 2   SHOW ANY INTENT, KNOWLEDGE, LACK OF MISTAKE AS ON THE PART OF

 3   MR. GHAHREMAN AS IT RELATES TO THE CHARGES IN THIS CASE, AND

 4   NOT FOR ANY OTHER PURPOSE.

 5            WE WILL TAKE 15 MINUTES HERE.

 6            PLEASE KEEP IN MIND ALL OF THE ADMONITIONS.

 7            THANK YOU.

 8            (RECESS)

 9            THE COURT:  WE ARE BACK ON THE RECORD WITH ALL

10   PRESENT.

11            MR. HARRIGAN.

12            MR. HARRIGAN:  THANK YOU, YOUR HONOR.

13   Q.    (MR. HARRIGAN) AGENT HAMAKO, WHEN WE LAST LEFT OFF WE

14   WERE TALKING ABOUT THE EMAIL CHAIN BETWEEN DEFENDANT AND

15   MR. RONES.  AND I THINK I LAST ASKED YOU WHETHER, IN THAT LAST

16   EMAIL, DEFENDANT IDENTIFIED HIS CLIENT TO MR. RONES, AND YOU

17   SAID HE DID NOT.

18        BUT DID HE LATER IDENTIFY THAT CLIENT IN THE SAME EMAIL

19   CHAIN?

20   A.    YES, HE DID.

21   Q.    AND THIS EMAIL CHAIN -- THE EMAILS WE JUST TALKED ABOUT

22   OCCURRED WHAT TIME PERIOD, AUGUST 2011?

23   A.    YES.

24   Q.    WAS THAT A LATER DATE?

25   A.    YES, IT WAS.
```

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1  **Q.**    SO LET'S GO TO PAGE 2, IF WE CAN, OF THAT SAME EMAIL

2  CHAIN.

3       AND DIRECTING YOUR ATTENTION TO THE EMAIL AT THE BOTTOM

4  OF THAT PAGE, IS THAT THE EMAIL WHERE DEFENDANT IDENTIFIES HIS

5  CLIENT?

6  **A.**    YES, IT IS.

7  **Q.**    AND THAT'S AN EMAIL FROM DEFENDANT?

8  **A.**    YES.

9  **Q.**    TO MR. RONES OR MIKAEL RONES?

10  **A.**    CORRECT.

11  **Q.**    ON WHAT DATE?

12  **A.**    JANUARY 19TH, 2012.

13  **Q.**    SO APPROXIMATELY FOUR MONTHS AFTER THE PRIOR EMAIL

14  EXCHANGE.

15  **A.**    YES.  THEREABOUTS.

16  **Q.**    AND WHAT DOES THE DEFENDANT SAY IN THAT EMAIL, IF

17  ANYTHING, ABOUT HIS CLIENT FOR THE OIL RIGS HE IS SEEKING TO

18  PURCHASE?

19  **A.**    THE DEFENDANT STATES THAT HE IS INTRODUCING THE PARADISE

20  OFFSHORE COMPANY, LOCATED IN THE MARSHALL ISLANDS, AS HIS

21  PRINCIPAL FOR PURCHASING THE OIL RIG.  AND THAT THEY WERE

22  INTERESTED IN THE NEGOTIATIONS FOR THE OIL RIGS, AND TO BE

23  PURCHASED FROM MALAYSIA.  AND THAT IF HE LIKED HE COULD

24  PROVIDE HIM WITH A SCANNED COMPANY OF HIS INTERMEDIARY

25  CONTRACT WITH THE PRINCIPAL.

APRIL 16, 2015

875

HAMAKO - DIRECT EXAMINATION

1   **Q.**   SO IS THE MARSHALL ISLANDS IN THE PERSIAN GULF?

2   **A.**   NO, IT IS NOT.

3   **Q.**   WHERE IS THE MARSHALL ISLANDS LOCATED?

4   **A.**   ROUGHLY NORTHEAST OF AUSTRALIA, I BELIEVE.

5   **Q.**   IN THE PACIFIC OCEAN?

6   **A.**   CORRECT.

7   **Q.**   NOW, DURING THE SEARCH OF DEFENDANT'S YAHOO ACCOUNT DID

8   YOU UNCOVER ANY OTHER EMAILS WHICH MORE FULLY DESCRIBE

9   DEFENDANT'S CUSTOMER THE PARADISE OFFSHORE COMPANY?

10  **A.**   YES, I DID.

11  **Q.**   SHOWING YOU GOVERNMENT'S EXHIBIT 223.  IS THAT THE

12  EMAIL?

13  **A.**   YES.

14          **MR. HARRIGAN:**  YOUR HONOR, I MOVE TO ADMIT

15  GOVERNMENT EXHIBIT 223.

16  **Q.**   **(MR. HARRIGAN)** BUT BEFORE WE DO SO, I WOULD LIKE TO ASK

17  YOU SOME QUESTIONS ABOUT THAT EMAIL.

18          **MR. CAMDEN:**  YOUR HONOR, THIS APPEARS TO BE EDITED

19  SO I DO HAVE AN OBJECTION ON THIS, AND 404(B) AS WELL.

20          **THE COURT:**  OVERRULED.

21          YOU MAY PROCEED.

22          (EXHIBIT 223 RECEIVED INTO EVIDENCE)

23          **MR. HARRIGAN:**  MAY I TALK TO COUNSEL?

24          **THE COURT:**  YES.

25          **MR. CAMDEN:**  NO.  I AM SORRY, I MISSED THE EXTRA

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1   PAGES.  I HAVE GOT THE EXTRA COPIES.  DOES NOT APPEAR TO BE

2   EDITED EXCEPT FOR THE ADDITIONAL TRANSLATIONS.

3          **MR. HARRIGAN:**  JUST A MISUNDERSTANDING, YOUR HONOR.

4   **Q.**   **(MR. HARRIGAN)** BEFORE I SHOW IT TO YOU, THIS IS AN

5   EMAIL CHAIN, CORRECT?

6   **A.**   YES, IT IS.

7   **Q.**   WAS IT ENTIRELY IN ENGLISH?

8   **A.**   NO, IT WAS NOT.

9   **Q.**   WHAT OTHER LANGUAGE IS IT IN?

10  **A.**   IT WAS ALSO IN THE FARSI LANGUAGE.

11  **Q.**   DID YOU, OR CAUSE OTHERS, TO OBTAIN A CERTIFIED

12  TRANSLATION OF THE FARSI PORTIONS OF THAT EMAIL INTO ENGLISH?

13  **A.**   YES.

14  **Q.**   ARE THEY ALSO CONTAINED IN THIS EXHIBIT?

15  **A.**   THEY ARE.

16  **Q.**   ON THE BACK OF THE EXHIBIT?

17  **A.**   CORRECT.

18  **Q.**   SO WHEN WE LOOK AT THE EMAIL HERE HAS THIS EMAIL BEEN

19  INTERLINEATED?

20  **A.**   YES, IT HAS.

21  **Q.**   TO INCLUDE THOSE TRANSLATIONS WITHIN THE EMAIL?

22  **A.**   YES.

23  **Q.**   WILL THAT AID YOU IN DESCRIBING THESE EMAILS TO THE

24  JURORS?

25  **A.**   YES, IT WILL.

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1    **Q.**    NOW LET ME SHOW YOU THAT EMAIL.

2          AND THIS IS AN EMAIL CHAIN, CORRECT?

3    **A.**    YES.

4    **Q.**    APPROXIMATELY FOUR OR FIVE PAGES?

5    **A.**    YES.

6    **Q.**    GENERALLY, WHO WAS IT BETWEEN?

7    **A.**    BETWEEN THE DEFENDANT AND AN INDIVIDUAL IDENTIFYING

8    HIMSELF AS SAEED SHAMI.

9    **Q.**    OKAY.  AND GENERALLY WHAT DOES THE EMAIL DISCUSS?

10   **A.**    THE EMAIL DISCUSSES THE PARADISE ISLAND OFFSHORE COMPANY

11   AS WELL AS THE OPERATION OF IRANIAN FRONT COMPANIES.

12   **Q.**    OKAY.  AND WHO IS -- WHAT ARE THE DISCUSSIONS BETWEEN,

13   GENERALLY, SAEED AND THE DEFENDANT ABOUT THE OIL RIGS?

14   **A.**    THE DISCUSSION GENERALLY PERTAINS TO OBTAINING THE OIL

15   RIGS FOR A CUSTOMER IN IRAN, AND THAT DUE TO THE SANCTIONS

16   THEY WOULD NEED TO USE A FRONT COMPANY.

17   **Q.**    LET'S LOOK AT PAGE 4 OF THAT EMAIL CHAIN, AND DIRECTING

18   YOUR ATTENTION TO THE EMAIL WITH THE TRANSLATION.  FIRST THE

19   HEADER.

20         AND THAT'S AN EMAIL FROM WHO?

21   **A.**    FROM THE DEFENDANT TO SAEED SHAMI.

22   **Q.**    AND DATED WHEN?

23   **A.**    JANUARY 19TH, 2012.

24   **Q.**    REGARDING WHAT?

25   **A.**    AGREEMENT.

APRIL 16, 2015

                                                                         879

HAMAKO – DIRECT EXAMINATION

1          **MR. HARRIGAN:**  AND GOING TO THE CONTENT OF THAT

2   EMAIL FIRST.  THAT'S GOOD.

3   **Q.**    **(MR. HARRIGAN)** THERE IS A PORTION OF THAT IN FARSI; IS

4   THAT CORRECT?

5   **A.**    YES.

6   **Q.**    AND BELOW THAT CONTENT IS THERE IS A TRANSLATION FOR THE

7   FARSI AND THE ENTIRE EMAIL?

8   **A.**    YES, THERE IS.

9          **MR. HARRIGAN:**  CAN WE SHOW THE TRANSLATION BELOW.

10  **Q.**    **(MR. JOHNSTON)** AND HOW IS IT TRANSLATION DENOTED?

11  **A.**    IT IS HIGHLIGHTED IN YELLOW.

12  **Q.**    SO WHAT DOES DEFENDANT TELL MR. SAEED IN THIS -- OR

13  MR. SAEED SHAMI IN THIS EMAIL?

14  **A.**    HE TELLS MR. SHAMI TO SEND AS SOON AS POSSIBLE BY DHL

15  THE CONTRACT.  HE WANTS THE ORIGINAL DOCUMENTS.  AND HE ALSO

16  AGREES TO .25 PERCENT AS -- AND HE ALSO REQUESTS

17  SPECIFICATIONS FOR THE RIG FROM THE CONTRACT.

18  **Q.**    DOES HE ASK WHERE THE COMPANY LOCATION IS?

19  **A.**    HE DOES.

20  **Q.**    AND DIRECTING YOUR ATTENTION TO PAGE 3.  AT THE TOP OF

21  THAT EMAIL CHAIN.  WHAT DOES SHAMI -- THIS IS AN EMAIL FROM

22  WHO?

23  **A.**    FROM SAEED SHAMI TO THE DEFENDANT.

24  **Q.**    OKAY.  ON THE SAME DATE?

25  **A.**    ON THE 26TH OF JANUARY, 2012.

APRIL 16, 2015

1          **MR. HARRIGAN:**  AND WHAT IS -- GOING TO THE CONTENT

2    AGAIN.  DO THE ENTIRE CONTENT.

3    **Q.**    **(MR. HARRIGAN)** BELOW IS A TRANSLATION, RIGHT?

4    **A.**    CORRECT.

5    **Q.**    AND ALL OF THE SALUTATION IS IN FARSI?

6    **A.**    YES.

7    **Q.**    WHAT DOES THE DEFENDANT -- OR MR. SAEED SHAMI ASK OF

8    DEFENDANT IN THAT EMAIL?

9    **A.**    HE ASKS THE DEFENDANT TO GET A LETTER FROM THE OWNER OF

10   THE RIG THAT INTRODUCES THE PARADISE COMPANY AS THEIR

11   REPRESENTATIVE FOR A DURATION OF THREE MONTHS OR MORE SO THAT

12   THEY CAN CLOSE THE DEAL.

13   **Q.**    RIGHT.  DID DEFENDANT RESPOND TO THIS EMAIL?

14   **A.**    YES, HE DID.

15          **MR. HARRIGAN:**  GOING TO PAGE 2.  ALL RIGHT.

16   **Q.**    **(MR. HARRIGAN)** IS THIS THE EMAIL WHERE HE RESPONDS?

17   **A.**    YES, IT IS.

18          **MR. HARRIGAN:**  FIRST GOING TO THE HEADER.

19   **Q.**    **(MR. HARRIGAN)** THAT IS FROM DEFENDANT TO MR. SAEED

20   SHAMI?

21   **A.**    YES, IT IS.

22          **MR. HARRIGAN:**  LET'S GO TO THE BODY.

23   **Q.**    **(MR. HARRIGAN)** AGAIN, THAT BODY IS PART IN ENGLISH AND

24   PART IN FARSI?

25   **A.**    YES.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **Q.**    DOES THE TRANSLATION OCCUR BELOW THAT?

2   **A.**    IT DOES.

3   **Q.**    AND HOW IS THE FARSI TRANSLATION TO ENGLISH DENOTED?

4   **A.**    IT IS HIGHLIGHTED IN YELLOW.

5   **Q.**    AND WHAT DOES DEFENDANT SAY IN RESPONSE TO MR. SHAMI'S

6   REQUEST TO INTRODUCE PARADISE COMPANY AS THE BUYER'S REP?

7   **A.**    THE DEFENDANT SAYS, WHAT, SIR, THEY TELL US WHO YOU ARE,

8   THEN YOU TELL ME TO TELL THEM TO INTRODUCE PARADISE COMPANY AS

9   THEIR REP.  ARE YOU INSANE OR AM I SO STUPID?  PLEASE EXPLAIN

10  MORE IF POSSIBLE.  WITH WHAT GUARANTEE?  HE/THEY SHOULD SEND

11  COMPANY BACKGROUND AND BANK ACCOUNTS, AND THEN I CAN MAKE SUCH

12  A REQUEST.

13  **Q.**    DOES MR. SHAMI RESPOND TO DEFENDANT'S EMAIL?

14  **A.**    HE DOES.

15  **Q.**    IS THAT REFLECTED ON PAGE 1?

16  **A.**    YES.

17  **Q.**    IS THAT SENT THE SAME DATE, LOOKING AT THE HEADER?

18  **A.**    YES, IT WAS.

19        **MR. HARRIGAN:**  AND GOING TO THE BODY.

20  **Q.**    **(MR. HARRIGAN)** NOW, THAT ENTIRE EMAIL IS IN FARSI,

21  CORRECT?

22  **A.**    CORRECT.

23  **Q.**    IS THE TRANSLATION DENOTED BELOW THAT IN HIGHLIGHTED

24  YELLOW?

25  **A.**    YES, IT IS.

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1  **Q.**    WHAT DOES MR. SHAMI TELL THE DEFENDANT --

2  **A.**    SHAMI TELLS THE DEFENDANT --

3  **Q.**    LET ME FINISH MY QUESTION.

4         -- ABOUT THE PARADISE OFFSHORE COMPANY?

5  **A.**    HE TELLS HIM THAT THE PARADISE OFFSHORE COMPANY IS --

6  **Q.**    YOU CAN READ IT FIRST.

7  **A.**    THEY FUNCTION LIKE THAT IN IRAN.  DUE TO THE SANCTIONS,

8  NOBODY KNOWS WHAT IS GOING ON.  THEY FORM FAKE FACTITIOUS

9  COMPANIES, BUT MONEY IS PAID, AND THIS IS NOT SOMETHING

10 STRANGE.  JUST THE OWNER OF PARADISE OFFSHORE COMPANY IS

11 INTRODUCED AS REPRESENTATIVE SO THAT HE CAN BRING CUSTOMERS

12 AND FUNCTION AS BROKERS.  YOU MUST BE ABLE TO GET THIS

13 UNDERSTOOD ACCEPTED.  THEY WILL NOT DELIVER ANYTHING UNLESS

14 THEY RECEIVE THE MONEY.

15 **Q.**   SO WHAT IS THE SIGNIFICANCE OF THAT STATEMENT IN THESE

16 EMAIL CHAINS THAT THE COMPANY IS LOCATED IN THE MARSHALL

17 ISLANDS, THEY TALK ABOUT SANCTIONS, AND THEY FUNCTION LIKE

18 THAT IN IRAN?

19 **A.**    THE SIGNIFICANCE WAS THAT IT DEMONSTRATED TO ME THAT

20 SHAMI WAS EXPLAINING HOW FRONT COMPANIES OPERATE BY

21 INTRODUCING ONE COMPANY AS A REPRESENTATIVE.  BECAUSE OF THE

22 SANCTIONS AGAINST IRAN, THEY WOULD USE FAKE OR FICTITIOUS

23 COMPANIES.

24 **Q.**    ALL RIGHT.  NOW, DURING THE SEARCH OF DEFENDANT'S YAHOO

25 ACCOUNT DID YOU UNCOVER ANY OTHER EMAILS THE DEFENDANT WAS

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    OBTAINING QUOTES FROM COMPANIES FOR SHIP PARTS WHERE THE

2    ULTIMATE DESTINATION WAS IRAN?

3    **A.**    YES, I DID.

4    **Q.**    LET ME SHOW YOU GOVERNMENT'S EXHIBIT 224.  IS THAT SUCH

5    AN EMAIL?

6    **A.**    YES, IT IS.

7         **MR. HARRIGAN:**  YOUR HONOR, I MOVE TO ADMIT

8    GOVERNMENT EXHIBIT 224 AND PUBLISH IT TO THE JURY.

9         **MR. CAMDEN:**  404(B) OBJECTION, YOUR HONOR.

10        **THE COURT:**  OVERRULED.  IT IS RECEIVED.

11        (EXHIBIT 224 RECEIVED INTO EVIDENCE)

12        **MR. HARRIGAN:**  AGAIN, THIS IS THE SAME INSTRUCTION,

13   YOUR HONOR, YOU GAVE THE JURY BEFORE, I THINK.

14        **THE COURT:**  YES.  ARE THESE ALL RELATED TO 222?

15        **MR. HARRIGAN:**  NO, THIS IS SEPARATE BUT IT STILL

16   RELATES.

17        **THE COURT:**  SO HERE AGAIN, EXHIBIT 224, LIKE 222 AND

18   223, RELATES TO A DIFFERENT INCIDENT, NOT CHARGED IN THIS

19   PROCEEDING.  IF IT IS BELIEVED TO BE TRUE BY THE JURY YOU MAY

20   USE THE INFORMATION ONLY AS IT WOULD DEMONSTRATE MR.

21   GHAHREMAN'S INTENT, KNOWLEDGE OR LACK OF MISTAKE AS IT RELATES

22   TO THE CHARGES IN THIS SPECIFIC PROCEEDING.

23   **Q.**    **(MR. HARRIGAN)** SO THIS -- SHOWING YOU GOVERNMENT

24   EXHIBIT 224.  THIS IS AN EMAIL CHAIN, CORRECT?

25   **A.**    YES.

APRIL 16, 2015

883

HAMAKO – DIRECT EXAMINATION

1    **Q.**    AND CAN YOU GENERALLY DESCRIBE THIS EMAIL CHAIN BEFORE I

2    GO INTO THE VARIOUS EMAILS?

3    **A.**    GENERALLY IT INCLUDES COMMUNICATIONS BETWEEN THE

4    DEFENDANT AND A COMPANY REGARDING A PRODUCT FOR A VESSEL.   AND

5    THEN THAT COMMUNICATION BEING RESPONDED TO BY MR. TAHERKHANI

6    TO THE DEFENDANT.

7    **Q.**    OKAY.   AND IT IS APPROXIMATELY FIVE PAGES, RIGHT?

8    **A.**    YES.

9    **Q.**    I DIRECT YOUR ATTENTION TO BASICALLY THE FIRST PAGE AND

10   EMAIL THERE, THE HEADER AT THE BOTTOM OF THE PAGE.   AND THAT

11   IS AN EMAIL FROM?

12   **A.**    IT IS AN EMAIL FROM AN INDIVIDUAL IDENTIFYING HIMSELF AS

13   PIETER BORG, TO THE DEFENDANT.

14   **Q.**    AND DURING THE COURSE OF THIS EMAIL CHAIN, DOES PIETER

15   BORG INDICATE HE WORKS FOR A COMPANY?

16   **A.**    YES, HE DOES.

17   **Q.**    WHERE IS THAT LOCATED?

18   **A.**    THE NETHERLANDS.

19   **Q.**    AND THIS EMAIL IS TO WHO?

20   **A.**    THE DEFENDANT.

21         **MR. HARRIGAN:**   AND LET'S GO BACK.   THANK YOU.

22   **Q.**   **(MR. HARRIGAN)** AND WHEN WAS IT SENT?

23   **A.**    FEBRUARY 14TH, 2013.

24   **Q.**    SO THIS IS DURING THE COURSE OF -- AT THE SAME TIME THE

25   UNDERCOVER AGENT IS HAVING DEALINGS WITH DEFENDANT, CORRECT?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **A.**   YES, IT IS.

2   **Q.**   WHAT DOES MR. BORG TELL DEFENDANT IN THIS EMAIL?

3   **A.**   MR. BORG INFORMS THE DEFENDANT TO BE INFORMED THAT THERE

4   IS AN ATTACHED QUOTATION FOR THE BARGE GENERATED BY HIS

5   COLLEAGUE.  AND HE STATES THAT HE IS RESPONSIBLE FOR THE ASIAN

6   REGION, AND HE WILL TAKE IT OVER FROM THERE.  AND HE ASKS THE

7   DEFENDANT TO INFORM HIM ABOUT THE SHIPYARD OR OWNER HE IS

8   WORKING FOR, BECAUSE AT THAT MOMENT THEY HAVE NO INFORMATION

9   ABOUT WHERE THE PROJECT WOULD TAKE PLACE.

10  **Q.**   SO THIS EMAIL REFERS TO AN ATTACHED QUOTATION.

11  **A.**   YES.

12  **Q.**   A PRICE QUOTE FOR THE ITEM THAT HIS COMPANY SELLS.

13  **A.**   CORRECT.

14  **Q.**   THAT HE IS FORWARDING TO DEFENDANT.

15  **A.**   YES.

16  **Q.**   AND WHAT DOES HE ASK DEFENDANT ABOUT DEFENDANT'S CLIENT?

17  **A.**   HE ASKS HIM FOR INFORMATION ABOUT THE SHIPYARD OR OWNER

18  THAT HE IS WORKING FOR, AND INFORMATION ABOUT WHERE THE

19  PROJECT WOULD TAKE PLACE.

20  **Q.**   WHAT DOES DEFENDANT DO IN RESPONSE TO THIS EMAIL?  IF

21  YOU WILL LOOK ABOVE.

22          **MR. HARRIGAN:**  THE NEXT EMAIL.  NO, NO.  IN THE

23  MIDDLE.

24  **Q.**   **(MR. HARRIGAN)** WHAT DOES THE DEFENDANT DO WITH THE

25  PRICE QUOTATION AND MR. BORG'S EMAIL?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**    HE FORWARDED IT THE SAME DAY TO TAHERKHANI.

2    **Q.**    AND AFTER DEFENDANT FORWARDED THAT PRICE QUOTE FOR THE

3    THERMAL FIRED HEATER FOR A BARGE TO MR. TAHERKHANI, WHAT DID

4    MR. TAHERKHANI DO?

5    **A.**    TAHERKHANI RESPONDED TO TWO OF THE DEFENDANT'S EMAIL

6    ADDRESSES, AND ALSO INCLUDED INFO@TIGMARINE.COM.

7    **Q.**    SO HE SENT IT TO INFO@TIGMARINE.COM AND CC'D WHO?

8    CARBON COPIED WHO?

9    **A.**    HE CC'D TWO OF THE DEFENDANT'S EMAIL ACCOUNTS.

10   **Q.**    HIS YAHOO ACCOUNT?

11   **A.**    CORRECT.

12   **Q.**    AND HIS TIG MARINE ACCOUNT?

13   **A.**    CORRECT.

14   **Q.**    LET'S LOOK AT THE CONTENT.  WHAT DOES MR. TAHERKHANI

15   DIRECT IN THAT EMAIL?

16   **A.**    HE ASKS, MAE PLEASE ADD 30 PERCENT ON PRICE INCLUDING

17   EVERYTHING FOR DELIVERY AT ISOICO YARD AND SEND TO MRS.

18   SABOURI.

19   **Q.**    AND BASED ON YOUR TRAINING AND EXPERIENCE, ARE YOU

20   FAMILIAR WITH WHAT ISOICO YARD IS?

21   **A.**    I AM THERE.

22   **Q.**    AND WHAT IS THAT?

23           **MR. CAMDEN:**  OBJECTION.  HEARSAY.

24           **THE COURT:**  SUSTAINED.  FOUNDATION.

25           **MR. HARRIGAN:**  ALL RIGHT.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   Q.    **(MR. HARRIGAN)** BASED ON YOUR TRAINING AND EXPERIENCE IN

2   INVESTIGATING COUNTER-PROLIFERATION CASES INVOLVING GOODS

3   GOING TO IRAN, ARE YOU FAMILIAR WITH VARIOUS SHIPPING

4   COMPANIES LOCATED IN IRAN?

5   **A.**    YES, I AM.

6   **Q.**    AND HOW SO?

7   **A.**    THROUGH RESEARCHING, GENERALLY, IRANIAN COMPANIES, AS

8   WELL AS ENCOUNTERING THE NAMES OF THOSE COMPANIES IN SEARCH

9   WARRANTS AND OTHER METHODS OF INVESTIGATION.

10  **Q.**    IN THIS CASE AND IN PREVIOUS CASES HAVE YOU ENCOUNTERED

11  A COMPANY BY THE NAME ISOICO?  WHICH IS AN ACRONYM, I TAKE IT.

12  **A.**    I HAVE NOT.  HOWEVER, I GOOGLED THAT ACRONYM AFTER I

13  RECEIVED THIS EMAIL.

14  **Q.**    OKAY.  WHAT DID YOU LEARN ABOUT ISOICO?

15          **MR. CAMDEN:**  OBJECTION.  HEARSAY, YOUR HONOR, AND

16  FOUNDATION.

17          **THE COURT:**  LET'S MEET BRIEFLY AT SIDEBAR.

18          (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD AT

19          THE BENCH, OUT OF THE HEARING OF THE JURY)

20          **THE COURT:**  IS HIS KNOWLEDGE BASED ON A GOOGLE

21  SEARCH?

22          **MR. HARRIGAN:**  BASED ON THAT, AND ALSO BASED ON THE

23  FACT THAT THE SUBSEQUENT EMAIL WILL BE FROM MR. TAHERKHANI

24  SAYING, I WAS AT ISOICO SHIPYARD IN BANDAR ABBAS.  THE NEXT

25  EMAIL WILL IDENTIFY IT AS A SHIPYARD IN BANDAR ABBAS.

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

```
1          THE COURT:  GIVEN THE SUBJECT OBJECTION AS TO THIS
2    AGENT'S KNOWLEDGE IS BASED ON HEARSAY, I WOULD SUSTAIN IT.  OF
3    COURSE, THE ADMISSION OF MR. GHAHREMAN COMES IN.
4          MR. HARRIGAN:  OR MR. TAHERKHANI.
5          THE COURT:  TAHERKHANI.
6          MR. CAMDEN:  THE EMAIL WE ARE DISCUSSING IS FEBRUARY
7    15TH, AND THE OTHER EMAIL THEY ARE GOING TO DISCUSS, BANDAR
8    ABBAS IN IRAN, IS FEBRUARY 27TH -- NO, MAY, MAY 1ST.  COULDN'T
9    RELATE BACK IN TIME.
10          THE COURT:  AS TO THE SPECIFIC OBJECTION HERE, I
11    WOULD SUSTAIN IT.
12          (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN
13          OPEN COURT, IN THE HEARING OF THE JURY)
14    Q.    (MR. HARRIGAN) AGENT HAMAKO, DID YOU LATER UNCOVER
15    ANOTHER EMAIL WHICH REFERENCED ISOICO?
16    A.    YES, I DID.
17    Q.    OKAY.  WAS THAT AN EMAIL COMMUNICATION BETWEEN DEFENDANT
18    AND MR. TAHERKHANI?
19    A.    YES, IT WAS.
20    Q.    OKAY.  AND DID MR. TAHERKHANI IDENTIFY WHERE ISOICO WAS
21    LOCATED, TO DEFENDANT, IN THAT EMAIL COMMUNICATION?
22    A.    HE DID.
23    Q.    WHAT DID HE SAY ABOUT ITS LOCATION?
24    A.    HE SAID IT WAS LOCATED IN BANDAR ABBAS.
25    Q.    AND HE ALSO DESCRIBED WHAT ISOICO HAD IN BANDAR ABBAS?
```

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**    HE DID.

2    **Q.**    WHAT DID HE SAY?

3    **A.**    A SHIPBUILDING YARD.

4    **Q.**    LET'S GO TO THE EMAILS.

5         **MR. CAMDEN:**  OBJECTION.  BEST EVIDENCE ON THAT

6    ANSWER, YOU HONOR.  RATHER WAIT UNTIL THE EMAIL COMES IN, I

7    THINK.

8         **THE COURT:**  OVERRULED.  THE ANSWER WILL STAND.

9         **MR. HARRIGAN:**  WE WILL GO TO THAT EMAIL.

10   **Q.**    **(MR. HARRIGAN)** LET ME SHOW YOU GOVERNMENT'S

11   EXHIBIT 225.  DO YOU RECOGNIZE THAT EMAIL?

12   **A.**    I DO.

13   **Q.**    AND IS THAT THE EMAIL IN WHICH MR. TAHERKHANI AND

14   DEFENDANT HAVE A DISCUSSION –– OR MR. TAHERKHANI INFORMS

15   DEFENDANT HE IS IN BANDAR ABBAS?

16   **A.**    YES, IT IS.

17        **MR. HARRIGAN:**  I WOULD MOVE TO ADMIT THIS EMAIL,

18   YOUR HONOR.

19        **THE COURT:**  YES.

20        (EXHIBIT 225 RECEIVED INTO EVIDENCE)

21   **Q.**    **(MR. HARRIGAN)** THIS IS AN EMAIL CHAIN AGAIN, CORRECT?

22        **MR. CAMDEN:**  SAME 404(B) OBJECTION, YOUR HONOR.

23        **THE COURT:**  OVERRULED.

24        **THE WITNESS:**  YES, IT IS.

25   **Q.**    **(MR. HARRIGAN)** ALL RIGHT.  AND IT IS APPROXIMATELY FIVE

APRIL 16, 2015

889
HAMAKO - DIRECT EXAMINATION

1    PAGES, CORRECT?

2    **A.**    CORRECT.

3    **Q.**    AND, AGAIN, PART OF THE EMAIL IS IN FARSI AND PART IS IN

4    ENGLISH.

5    **A.**    YES.

6    **Q.**    DOES GOVERNMENT EXHIBIT 225 CONTAIN ANNOTATIONS WHICH

7    TRANSLATE THE PARTS OF THE EMAIL THAT ARE IN FARSI INTO

8    ENGLISH?

9    **A.**    YES, IT DOES.

10   **Q.**    I WANT TO DIRECT YOUR ATTENTION TO PAGE 4, AN EMAIL FROM

11   MR. TAHERKHANI TO DEFENDANT.

12           AND THAT TOOK PLACE ON FEBRUARY 27TH, 2013, CORRECT?

13   **A.**    CORRECT.

14   **Q.**    AND THAT'S FROM MR. TAHERKHANI TO DEFENDANT?

15   **A.**    IT IS.

16   **Q.**    AND WHAT DOES MR. TAHERKHANI TELL DEFENDANT IN THAT

17   EMAIL?

18   **A.**    HE TELLS THE DEFENDANT THAT, I WAS IN BANDAR ABBAS SINCE

19   LAST NIGHT FOR CEREMONY.

20   **Q.**    HOLD OFF A SECOND.

21           SHOWING YOU THE CONTENT SO WE CAN BLOW IT UP HERE.

22           OKAY.  AGAIN, WHAT DOES MR. TAHERKHANI TELL DEFENDANT?

23   **A.**    HE TELLS THE DEFENDANT, I WAS IN BANDAR ABBAS SINCE LAST

24   NIGHT FOR CEREMONY OF LAUNCHING A TANKER VESSEL WHICH I WAS

25   INVITED BY ISOICO FOR THAT BECAUSE I HELPED THEM A LOT FOR

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    THAT PROJECT.

2    **Q.**    AND WHAT WAS THE SIGNIFICANCE OF THE FACT, TO YOUR

3    INVESTIGATION, THAT MR. TAHERKHANI WAS IN BANDAR ABBAS AT A

4    SHIP LAUNCHING CEREMONY?

5    **A.**    THE SIGNIFICANCE OF THAT TO OUR INVESTIGATION WAS IT

6    INDICATED TO ME THAT TAHERKHANI HAD INFORMED THE DEFENDANT

7    FIRST THAT HE WAS LOCATED IN BANDAR ABBAS AT THAT TIME.  ALSO

8    HE WAS AT THE ISOICO FACILITY.  HE HAD BEEN INVITED THERE FOR

9    THE LAUNCHING OF A MARITIME VESSEL BECAUSE HE HAD HELPED THEM

10   A LOT WITH THAT PROJECT.

11   **Q.**    IN THAT SAME EMAIL CHAIN DO DEFENDANT AND TAHERKHANI

12   HAVE DISCUSSIONS ABOUT THE NAVIGAT-2100?

13   **A.**    THEY DO.

14   **Q.**    DIRECTING YOUR ATTENTION TO THE TOP OF PAGE 3.

15        AND THAT IS AN EMAIL FROM WHO?

16   **A.**    IT IS AN EMAIL FROM THE DEFENDANT TO TAHERKHANI.

17   **Q.**    OF THAT SAME DATE?

18   **A.**    CORRECT.

19   **Q.**    ALL RIGHT.  AND GOING TO THE CONTENT OF THE EMAIL.  AND

20   AGAIN, IS THAT AN EMAIL THAT PART OF THE CONTENT IS IN FARSI?

21   **A.**    CORRECT.

22   **Q.**    MOST OF IT?

23   **A.**    YES.

24   **Q.**    IS THE EMAIL TRANSLATION SHOWN BELOW?

25   **A.**    IT IS.

APRIL 16, 2015

1    **Q.**    AND THAT PART THAT WAS ORIGINALLY IN ENGLISH IS IN

2    ITALICS?

3    **A.**    CORRECT.

4    **Q.**    WHAT DOES DEFENDANT TELL MR. TAHERKHANI IN THAT EMAIL?

5    **A.**    THE DEFENDANT TELLS TAHERKHANI, THANK YOU FOR THE MONEY

6    BUT DO NOT FORGOT ABOUT THE MONEY FOR THE GYRO.  THAT IF THEY

7    REALLY DO NOT WANT THE GYRO THEY SHOULDN'T WASTE TIME AND GO

8    AFTER OTHER CONTRACTS.

9         HE ALSO STATES, IF YOU WANT IT READ ITS AGREEMENT THAT I

10   SENT YOU AND CONFIRM, AND SEND THE REMAINDER OF MONEY.

11        THEN HE TELLS TAHERKHANI TO CALL HIM ON SKYPE WHEN HE

12   HAS TIME.

13   **Q.**    SO HE ASKED HIM TO SKYPE HIM?

14   **A.**    HE DOES.

15        **MR. HARRIGAN:**  AND GO TO THE HEADER OF –– THE TOP

16   HEADER, I THINK, OF THE FIRST PAGE.

17   **Q.**    **(MR. HARRIGAN)** NOW, THIS WAS ALL PART OF A LARGER EMAIL

18   CHAIN, CORRECT?

19   **A.**    CORRECT.

20   **Q.**    OF AN EMAIL SENT BY MR. TAHERKHANI TO DEFENDANT ON

21   MARCH 1ST?

22   **A.**    YES.

23   **Q.**    AS WITH PREVIOUS EMAILS, DID YOU LOCATE THE IP ADDRESS

24   FOR THAT?

25   **A.**    I DID.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **Q.**    DID YOU CONDUCT A WHATISMYIP SEARCH OF THAT IP ADDRESS?

2    **A.**    YES, I DID.

3    **Q.**    WHAT DID YOU DETERMINE?

4    **A.**    I DETERMINED THAT IP ADDRESS WAS LOCATED IN IRAN.

5    **Q.**    NOW, DURING THE COURSE OF YOUR SEARCH OF EMAIL ACCOUNTS

6    FOR DEFENDANT AND TAHERKHANI, DID YOU FIND RESUMES OR WHAT ARE

7    KNOWN AS CURRICULUM VITAE OF EITHER DEFENDANT OR MR.

8    TAHERKHANI?

9    **A.**    I DID.  ONE FOR EACH.

10   **Q.**    I AM GOING TO SHOW YOU FIRST WHAT IS MARKED AS

11   GOVERNMENT EXHIBIT 226.  AND DO YOU RECOGNIZE THAT EMAIL?

12   **A.**    I DO.

13   **Q.**    IS THAT AN EMAIL THAT CONTAINS THE RESUME OF EITHER

14   DEFENDANT OR MR. TAHERKHANI?

15   **A.**    IT DOES.

16   **Q.**    WHO DOES IT CONTAIN THE RESUME OF?

17   **A.**    TAHERKHANI.

18        **MR. HARRIGAN:**  YOUR HONOR, I MOVE TO ADMIT

19   GOVERNMENT EXHIBIT 226.

20        **THE COURT:**  YES.

21        (EXHIBIT 226 RECEIVED INTO EVIDENCE)

22   **Q.**  **(MR. HARRIGAN)** AND LOOKING AT THE HEADER, WHAT IS THE

23   DATE OF THAT EMAIL?

24   **A.**    DECEMBER 24TH, 2012.

25   **Q.**    AND IT IS FROM MR. TAHERKHANI TO A THIRD PARTY?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**    IT IS.

2    **Q.**    AND WHAT'S THE ADDRESS OF THE THIRD PARTY?

3    **A.**    ASAMADI@OICO.IR.

4    **Q.**    WHAT DOES .IR MEAN?

5    **A.**    THAT IS THE SUFFIX FOR WEB PAGES LOCATED IN IRAN.

6    **Q.**    AND THE ATTACHMENT IS WHAT?

7    **A.**    CURRICULUM VITAE.DOCX.

8    **Q.**    LET'S GO TO THE ATTACHMENT.

9          STARTING AT PAGE 1, LOOKING UNDER PERSONAL INFORMATION

10   FOR MR. TAHERKHANI, WHAT DOES IT SHOW AS HIS NATIONALITY?

11   **A.**    IRANIAN.

12   **Q.**    GOING NOW BELOW THAT TO THE ACADEMIC PROFILE AT ITEM

13   NO. 2.  WHERE DOES IT SAY HE ATTENDED SCHOOL?

14   **A.**    SAYS HE ATTENDED FOR HIS BACHELOR'S DEGREE AT AMIR KABIR

15   UNIVERSITY OF TECHNOLOGY.

16   **Q.**    IN TEHRAN?

17   **A.**    IN TEHRAN, CORRECT.

18   **Q.**    AND WHAT DOES HE SAY HE EARNED A DEGREE IN?

19   **A.**    MARINE ENGINEERING AND MARINE INDUSTRIES.

20   **Q.**    A BACHELOR OF SCIENCE?

21   **A.**    YES.

22   **Q.**    AND IN TERMS OF PAGE 2, IF WE CAN GO TO PAGE 2.

23         LOOKING UNDER ITEM NO. 4.  DOES IT SHOW WHEN HE RECEIVED

24   ANY TRAINING BY THE ISLAMIC REPUBLIC OF IRAN SHIPPING LINES?

25   **A.**    IT DOES.

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **Q.**    UNDER ITEM 4?

2   **A.**    YES.

3   **Q.**    AND LOOKING UNDER ITEM 5, WHICH IS AGAIN MANAGEMENT AND

4   ADMINISTRATION COURSES AND CERTIFICATIONS.  WHAT DOES IT SHOW

5   THERE IN REGARDS TO HIS TRAINING?

6   **A.**    IT LISTS FIVE COURSES BY THE ISLAMIC REPUBLIC OF IRAN

7   SHIPPING LINES FROM 1999 TO 2005.

8   **Q.**    AND GOING TO THE NEXT PAGE.  DOES IT PROVIDE HIS WORK

9   HISTORY?

10  **A.**    IT DOES.

11  **Q.**    GOING, I GUESS, TO PAGE 4.  ALL RIGHT.

12       AND CAN YOU GENERALLY SUMMARIZE WHAT IT SHOWS ON PAGE 4

13  IN TERMS OF HIS WORK HISTORY, STARTING WITH HIS MOST RECENT

14  WORK HISTORY LIST?

15  **A.**    LISTS THAT FROM NOVEMBER OF 2009 HE WAS THE DIRECTING

16  MANAGER OF TIG MARINE ENGINEERING SERVICES IN DUBAI.

17  **Q.**    AND PRIOR TO BEING THE DIRECTING MANAGER FOR TIG MARINE

18  ENGINEERING SERVICES, IN TERMS OF HIS WORKING IN THE SHIPPING

19  INDUSTRY, WHAT DOES IT SHOW?

20  **A.**    IT SHOWS EMPLOYMENT FROM 2004 UNTIL 2006 IN THE IRANIAN

21  SHIPPING INDUSTRY.

22  **Q.**    ALL RIGHT.  AND PRIOR TO THAT?

23  **A.**    PRIOR TO THAT IT SHOWS ADDITIONAL EXPERIENCE FROM 1994

24  UNTIL 2004 WITH THE ISLAMIC REPUBLIC OF IRAN SHIPPING LINES.

25  **Q.**    SO APPROXIMATELY 12 YEARS IT SHOWS EXPERIENCE WORKING IN

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   THE SHIPPING INDUSTRY IN IRAN.

2   **A.**    CORRECT.

3   **Q.**    AND AS WITH PREVIOUS EMAILS, DID YOU LOCATED THE IP

4   ORIGINATING INFORMATION FOR THIS EMAIL SENT BY MR. TAHERKHANI?

5   **A.**    I DID.

6   **Q.**    DID YOU RUN A SEARCH, WHATISMYIP SEARCH, FOR THAT?

7   **A.**    I DID.

8   **Q.**    WHAT DOES IT SHOW AS FAR AS WHERE MR. TAHERKHANI SENT

9   THIS EMAIL FROM?

10   **A.**    IT SHOWS IT WAS SENT FROM AN IP ADDRESS LOCATED ON AN

11   ISP IN IRAN.

12   **Q.**    NOW LET ME SHOW YOU NEXT WHAT IS MARKED AS GOVERNMENT'S

13   EXHIBIT 227.  DO YOU RECOGNIZE THAT EMAIL?

14   **A.**    I DO.

15   **Q.**    ALL RIGHT.  IS THAT AN EMAIL THAT CONTAINS THE RESUME

16   FOR EITHER DEFENDANT OR MR. TAHERKHANI?

17   **A.**    IT DOES.

18   **Q.**    WHO DOES IT CONTAIN A RESUME FOR?

19   **A.**    FOR THE DEFENDANT.

20   **Q.**    AND THAT IS AN EMAIL SENT BY DEFENDANT WHEN?

21   **A.**    IN SEPTEMBER OF 2012.

22          **MR. HARRIGAN:**  MOVE TO PUBLISH, YOUR HONOR.

23          **THE COURT:**  YES.

24          (EXHIBIT 227 RECEIVED INTO EVIDENCE)

25   **Q.**    **(MR. HARRIGAN)** JUST DIRECTING YOUR ATTENTION TO THE

APRIL 16, 2015

HAMAKO - DIRECT EXAMINATION

1  HEADER, NOT THE CONTENT OF THE EMAIL.

2      THAT WAS SENT BY DEFENDANT TO A THIRD PARTY ON WHAT

3  DATE?

4  **A.**    SEPTEMBER 10TH, 2012.

5  **Q.**    AND LOOKING AT THE ATTACHMENT, STARTING AT THE TOP.

6  WHAT DOES IT PROVIDE FOR DEFENDANT'S ADDRESS?

7  **A.**    IT PROVIDES AN ADDRESS FOR THE DEFENDANT IN STATEN

8  ISLAND, NEW YORK.

9  **Q.**    HIS YAHOO ACCOUNT?

10 **A.**    IT DOES.

11 **Q.**    WHAT IS HIS CAREER OBJECTIVE?

12 **A.**    PROJECT MARINE ENGINEER WITH 17 YEARS OF EXPERIENCES.

13         **MR. HARRIGAN:**  AND DOES IT -- IF YOU GO BACK OUT.

14 **Q.**   **(MR. HARRIGAN)** IN TERMS OF HIS EDUCATION, WHAT DOES IT

15 SAY ABOUT HIS EDUCATION?  FIRST, IS HE PRESENTLY ATTENDING

16 SCHOOL?

17 **A.**    CORRECT.

18 **Q.**    WHAT DOES IT SAY?

19 **A.**    IT LISTS SUNY MARITIME COLLEGE, NEW YORK, GRADUATE

20 STUDENT IN INTERNATIONAL MARITIME TRANSPORTATION MANAGEMENT

21 2011 TO 2014.

22 **Q.**    PROJECTED 2014, RIGHT?

23 **A.**    CORRECT.

24 **Q.**    AND PRIOR TO THAT DOES IT SHOW THAT HE HAD A COLLEGE

25 DEGREE FROM ANYWHERE?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1   **A.**    IT DOES.

2   **Q.**    AND WHERE?

3   **A.**    FROM AMIR KABIR UNIVERSITY OF TECHNOLOGY IN TEHRAN.

4   **Q.**    AND THAT IS THE SAME UNIVERSITY AS WHO ATTENDED?

5   **A.**    TAHERKHANI.

6   **Q.**    AND WHAT DID HE MAJOR IN?

7   **A.**    MARINE ENGINEERING WITH A CONCENTRATION IN SHIP

8   BUILDING.

9   **Q.**    BACHELOR OF SCIENCE IN MARINE ENGINEERING?

10  **A.**    CORRECT.

11  **Q.**    SAME DEGREE AS MR. TAHERKHANI?

12  **A.**    YES.

13  **Q.**    AND WHAT YEARS DID HE ATTEND?

14  **A.**    1988 TO 1994.

15  **Q.**    SAME YEARS AS MR. TAHERKHANI?

16  **A.**    ROUGHLY, YES.

17  **Q.**    DIRECTING YOUR ATTENTION TO HIS WORK EXPERIENCE.  LET'S

18  LOOK AT HIS WORK EXPERIENCE FIRST IN THE U.S., ITEMS 1 THROUGH

19  3.

20         FROM 2008 TO THE PRESENT, WHAT FIELD DOES HE SAY HE

21  WORKS IN?

22  **A.**    THE SHIPYARD AND DRY DOCK INDUSTRY.

23  **Q.**    AS FIRST A TEST ENGINEER?

24  **A.**    YES.

25  **Q.**    MARINE ENGINEER, PROJECT ESTIMATOR?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**    YES.

2    **Q.**    AND A PROJECT MANAGER.

3    **A.**    CORRECT.

4    **Q.**    DOES HE SHOW WORK HISTORY IN IRAN?

5    **A.**    HE DOES.

6    **Q.**    LOOKING AT ITEMS 4 THROUGH 6.  FIRST AT 4.  AND NOW LOOK

7    AT THE NEXT PAGE, 5 AND 6.

8         CAN YOU SUMMARIZE, BASED ON ITEMS 4 THROUGH 6, WHAT

9    DEFENDANT INDICATES HIS WORK EXPERIENCE WAS IN IRAN?

10   **A.**    HE WAS WORKING -- HIS WORK EXPERIENCE INCLUDES SHIP

11   ENGINEER OFFICER, OWNER'S REPRESENTATIVE AND OFFSHORE ENGINEER

12   FOR THREE DIFFERENT IRANIAN SHIPPING COMPANIES.

13   **Q.**    WHO ARE THOSE -- OR WHAT ARE THOSE IRANIAN COMPANIES?

14   **A.**    IRAN O HIND, BONYAD SHIPPING COMPANY, AND IRAN MARINE

15   INDUSTRIAL COMPANY, ALSO KNOWN AS SADRA.

16   **Q.**    FOR WHAT TIME PERIOD?  APPROXIMATELY HOW LONG FOR ALL

17   THREE?

18   **A.**    FROM OCTOBER OF 1997 UNTIL JANUARY OF 2007.

19   **Q.**    NOW, DURING YOUR SEARCH OF ALL OF THE EMAIL ACCOUNTS YOU

20   MENTIONED, TO INCLUDE MR. TAHERKHANI, DEFENDANT, AND ERGUN

21   YILDIZ, DID YOU UNCOVER ANY EMAILS TO OR FROM WESAL SHIPPING

22   REGARDING THE ACQUISITION OF A NAVIGAT-2100 FOR THE WESAL-V

23   SHIP?

24   **A.**    I DID.

25   **Q.**    DID YOU FIND ANY COMMUNICATIONS WITH WESAL SHIPPING?

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    **A.**    I DID.

2    **Q.**    HOW MANY EMAILS DID YOU FIND?

3    **A.**    I FOUND ONE EMAIL THAT INCLUDED A CHAIN OF EMAILS

4    PREVIOUSLY.

5    **Q.**    ONE EMAIL OUT OF ALL OF THE ACCOUNTS YOU SEARCHED?

6    **A.**    CORRECT.

7    **Q.**    SHOWING YOU GOVERNMENT'S EXHIBIT 228.  IS THAT THAT

8    EMAIL?

9    **A.**    YES, IT IS.

10            **MR. HARRIGAN:**  I WOULD MOVE TO ADMIT IT, YOUR HONOR.

11            **THE COURT:**  YES.

12            (EXHIBIT 228 RECEIVED INTO EVIDENCE)

13            **MR. HARRIGAN:**  AND GOING TO THE SECOND PAGE, PLEASE.

14    ALL RIGHT.

15    **Q.**    **(MR. HARRIGAN)** AND THIS IS AN EMAIL FROM WHO, TO WHOM?

16    **A.**    IT IS AN EMAIL FROM TAHERKHANI TO YILDIZ.

17    **Q.**    BUT ABOVE THAT, IT IS AN EMAIL -- FROM TAHERKHANI TO

18    YILDIZ?  YES.

19    **A.**    YES.

20    **Q.**    CAN YOU DESCRIBE WHAT'S IN THIS EMAIL?

21    **A.**    THIS EMAIL INCLUDES PREVIOUS COMMUNICATIONS BETWEEN

22    TAHERKHANI AND AN INDIVIDUAL AT WESAL SHIPPING.

23    **Q.**    FOR THE PURPOSE OF WHAT?

24    **A.**    FOR THE PURPOSE OF BUYING THREE SUPPLY BOATS.

25    **Q.**    AND WHAT ASSISTANCE IS MR. TAHERKHANI SEEKING FROM WESAL

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    SHIPPING?

2    **A.**    HE IS SEEKING WESAL SHIPPING'S ASSISTANCE IN PURCHASING

3    THE VESSELS.

4    **Q.**    LOCATING AND PURCHASING THE VESSELS?

5    **A.**    CORRECT.

6    **Q.**    WHAT IS THE SIGNIFICANCE TO ONLY FINDING ONE EMAIL FROM

7    2011 TO YOUR INVESTIGATION?

8    **A.**    THE SIGNIFICANCE OF FINDING THIS EMAIL AND THIS EMAIL

9    ALONE WAS THAT I DID NOT DISCOVER ANY COMMUNICATIONS WITH

10   WESAL SHIPPING ABOUT THE PURCHASE OF NAVIGAT-2100

11   GYROCOMPASSES ON THEIR BEHALF.

12   **Q.**    RIGHT.  I WOULD LIKE -- NEXT LIKE TO SHOW YOU

13   GOVERNMENT'S EXHIBIT 706 -- EXCUSE ME -- 707, WHICH WAS

14   PREVIOUSLY ADMITTED INTO EVIDENCE.  IT WAS TWO IOIC CONTRACTS

15   AND A PARADISE OFFSHORE COMPANY ENVELOPE?

16   **A.**    YES, SIR.

17   **Q.**    YOU HAVE SEEN THIS BEFORE, CORRECT?

18   **A.**    YES, I HAVE.

19   **Q.**    YOU ARE AWARE OF WHERE THIS WAS FOUND?

20   **A.**    I AM.

21   **Q.**    AND IT WAS FOUND IN THE DEFENDANT'S APARTMENT?

22   **A.**    YES.

23   **Q.**    ALL RIGHT.  AND THIS IS -- WHAT IS THIS?

24   **A.**    THIS IS AN INTERNATIONAL OCCASIONAL INTERMEDIARY

25   CONTRACT BETWEEN THE DEFENDANT AND THE PARADISE OFFSHORE

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

```
 1   COMPANY IN THE MARSHALL ISLANDS.
 2   Q.    AND THE SIGNIFICANCE OF YOU FINDING THIS IN HIS
 3   ACCOUNT -- IN HIS APARTMENT, WAS WHAT?
 4   A.    IT WAS CONSISTENT WITH THE EMAILS I DISCOVERED BETWEEN
 5   THE DEFENDANT AND SAEED SHAMI.
 6   Q.    AND DOES IT SPECIFY WHAT DEFENDANT'S ACTING AS, WHO HE
 7   IS ACTING AS AN AGENT FOR?
 8   A.    IT DOES.
 9   Q.    AND DOES IT ALSO INDICATE WHAT HE IS AUTHORIZED TO
10   ACQUIRE?
11   A.    IT DOES.
12   Q.    WHAT IS THAT?
13   A.    JACKUP OIL RIGS AS PER SPECIFICATION PROVIDED.
14   Q.    DOES DEFENDANT'S SIGNATURE APPEAR ON EACH PAGE OF THAT
15   CONTRACT?
16   A.    IT DOES.
17   Q.    IS THIS CONTRACT SIMILAR TO ANOTHER CONTRACT YOU
18   UNCOVERED IN YOUR INVESTIGATION?
19   A.    IT IS.
20   Q.    WHAT CONTRACT WAS THAT?
21   A.    SIMILAR TO THE INTERNATIONAL OCCASIONAL INTERMEDIARY
22   CONTRACT BETWEEN THE DEFENDANT AND TIG MARINE.
23   Q.    NEXT I WOULD LIKE TO SHOW YOU GOVERNMENT'S
24   EXHIBIT 708 -- EXCUSE ME.
25         MR. HARRIGAN:  YOUR HONOR, WE HAVE NO FURTHER
```

APRIL 16, 2015

HAMAKO – DIRECT EXAMINATION

1    QUESTIONS.

2              **THE COURT:**  CROSS-EXAMINATION.

3              **MR. CAMDEN:**  YES, YOUR HONOR.  COURT'S INDULGENCE.

4              **THE COURT:**  YES.

5                        CROSS-EXAMINATION

6    **Q.    (MR. CAMDEN)** SPECIAL AGENT HAMAKO, I JUST WANT TO START

7    BY TAKING A STEP BACK AND TALKING ABOUT YOUR EXPERIENCE

8    GENERALLY.

9         AS A SPECIAL AGENT IN HSI WORKING ON

10   COUNTER-PROLIFERATION YOU RECEIVE FORMAL TRAINING IN THE LAWS

11   AND REGULATIONS RELATING TO THE INTERNATIONAL EMERGENCY

12   ECONOMIC POWERS ACT.  THAT IS IEEPA, RIGHT?

13   **A.**    YES.

14   **Q.**    AND ALSO RELATING TO THE IRANIAN TRANSACTIONS AND

15   SANCTIONS REGULATIONS, RIGHT?

16   **A.**    YES.

17   **Q.**    AND YOU HAVE ALSO REVIEWED THE INDICTMENT IN THIS CASE,

18   CORRECT?

19   **A.**    I HAVE.

20   **Q.**    AND YOU KNOW THAT THE CHARGES RELATE TO -- RELATE TO

21   EXPORTING -- THE EXPORT, RE-EXPORTATION, SALE OR SUPPLY OF

22   GOODS FROM THE UNITED STATES TO IRAN.

23   **A.**    CORRECT.

24   **Q.**    MEANING TO THE COUNTRY OF IRAN OR THE GOVERNMENT OF

25   IRAN, RIGHT?

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1    **A.**    YES.

2    **Q.**    SO YOU ALSO UNDERSTOOD, AS YOU CONDUCTED YOUR

3    INVESTIGATION, THAT AS LONG AS THE GOODS ARE NOT GOING TO THE

4    TERRITORY OF IRAN OR THE GOVERNMENT OF IRAN, THE STATUTE ––

5    THE REGULATIONS WHICH ARE CHARGED IN THE INDICTMENT DON'T

6    PROHIBIT THE EXPORT, RE-EXPORT, SALE OR SUPPLY OF GOODS TO

7    IRANIAN NATIONALS.

8    **A.**    IF THEY WERE NOT LOCATED IN IRAN, CORRECT.

9    **Q.**    RIGHT.  WELL ––

10   **A.**    OR OTHERWISE ––

11   **Q.**    THE GOODS WEREN'T GOING TO IRAN, RIGHT?

12   **A.**    CORRECT.  OR IF THEY WERE GOING TO A SPECIFICALLY

13   DESIGNATED NATIONAL THAT WAS AN IRANIAN LOCATED ANYWHERE IN

14   THE WORLD, YES.

15   **Q.**    NOBODY IN THIS CASE CHARGED IS A SPECIFICALLY DESIGNATED

16   NATIONAL, ARE THEY?

17   **A.**    CORRECT.

18   **Q.**    I WANT TO START BY TALKING ABOUT SOME OF THE EMAILS THAT

19   OCCURRED FROM –– THAT RELATED TO PRIOR THINGS, THE ONES FROM

20   2012.

21          **MR. CAMDEN:**  IF YOU COULD PULL UP 224.

22   **Q.**    **(MR. CAMDEN)** IF YOU COULD TAKE A LOOK AT EXHIBIT 224.

23   SO IF YOU TAKE A LOOK AT THE HEADER –– IT SHOULD BE UP ON THE

24   SCREEN AT THIS POINT, YOU CAN SEE IT.

25          THIS IS FROM KOORUSH TAHERKHANI, RIGHT?

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1    **A.**    CORRECT.

2    **Q.**    THEN THE PRIMARY RECIPIENT, THE TO ADDRESS, IS

3    INFO@TIGMARINE.COM, RIGHT?

4    **A.**    YES.

5    **Q.**    AND YOU UNDERSTOOD THAT THAT WAS SOMETIMES USED BY

6    KOORUSH BUT MOSTLY USED BY MAE DAYSO, RIGHT?

7    **A.**    CORRECT.

8    **Q.**    AND MR. GHAHREMAN IS ONLY LISTED AS A CC ON THE EMAIL,

9    CORRECT?

10   **A.**    CORRECT.

11   **Q.**    AND IF YOU GO –– SORRY.  AND YOU HAVE REVIEWED THIS

12   ENTIRE EMAIL CHAIN, RIGHT?

13   **A.**    YES, I HAVE.

14   **Q.**    SO YOU KNOW THAT THE SUBJECT OF THESE NEGOTIATIONS WAS A

15   THERMAL OIL SYSTEM.

16   **A.**    CORRECT.

17   **Q.**    AND THE PEOPLE PARTICIPATING IN THIS DEAL OR THIS

18   NEGOTIATION WERE ALFA LAVAL?

19   **A.**    CORRECT.

20   **Q.**    THAT IS A COMPANY BASED IN THE NETHERLANDS, RIGHT?

21   **A.**    THAT WAS MY UNDERSTANDING, YES.

22   **Q.**    AND THE INITIAL EMAILS ARE THROUGH JOHN TAN?  DID YOU

23   SEE HIS PARTICIPATION IN THIS?

24   **A.**    YES.

25   **Q.**    AND JOHN TAN LISTS AN ADDRESS IN SINGAPORE, CORRECT?

APRIL 16, 2015

HAMAKO - CROSS-EXAMINATION

1    **A.**    YES, HE DOES.

2    **Q.**    HE IS WITH OCEAN SHIP MANAGEMENT?

3    **A.**    CORRECT.

4    **Q.**    SO AT A CERTAIN POINT THE ALFA LAVAL REPRESENTATIVE

5    SAYS, COULD YOU PLEASE INFORM ME ABOUT THE SHIPYARD OR OWNER

6    THAT YOU ARE WORKING FOR.

7         IF YOU CAN REFER TO --

8              **MR. HARRIGAN:**  PAGE 1.

9    **Q.**    **(MR. CAMDEN)** THAT IS PAGE 1, THE BOTTOM EMAIL AND IN

10   THE TEXT.

11        DO YOU SEE THAT QUESTION THERE, COULD YOU PLEASE INFORM

12   ME ABOUT THE SHIPYARD OR OWNER YOU ARE WORKING FOR?

13   **A.**    YES.

14   **Q.**    AND THAT'S PIETER BORG AT ALFA LAVAL, RIGHT?

15   **A.**    CORRECT.

16   **Q.**    MR. GHAHREMAN, WHEN HE RECEIVED THAT EMAIL, HE DID NOT

17   RESPOND TO IT, DID HE?  DIRECTLY BACK TO PIETER BORG.

18   **A.**    I DON'T RECALL.

19   **Q.**    IN THIS EMAIL CHAIN THERE IS NOTHING THAT FURTHER

20   COMMUNICATES -- THERE IS NO FURTHER COMMUNICATION FROM ARASH

21   GHAHREMAN BACK TO PIETER BORG, IS THERE?

22   **A.**    CORRECT.

23   **Q.**    AND WHAT HE DID, AS YOU CAN SEE FROM THE EMAIL ABOVE

24   THAT, IS HE FORWARDED THAT DIRECTLY TO MR. TAHERKHANI,

25   CORRECT?

APRIL 16, 2015

HAMAKO – CROSS–EXAMINATION

1   **A.**    YES.

2   **Q.**    HE DIDN'T INCLUDE A COMMENT.

3   **A.**    NO.

4   **Q.**    HE DIDN'T INCLUDE ANY QUESTIONS OF HIS OWN.

5   **A.**    NO.

6   **Q.**    HE WAS JUST A CONDUIT, HE FORWARDED THAT QUESTION

7   STRAIGHT ON TO KOORUSH TAHERKHANI.

8   **A.**    INDEED.

9   **Q.**    AND IN HIS RESPONSE KOORUSH TAHERKHANI IS ASKING MAE TO

10  ADD 30 PERCENT FOR DELIVERY TO ISOICO YARD, CORRECT?

11  **A.**    CORRECT.

12  **Q.**    IN THAT SENTENCE HE DOES NOT SAY IRAN.

13  **A.**    HE DOES NOT.

14  **Q.**    HE DOES NOT SAY BANDAR ABBAS.

15  **A.**    IN THAT SENTENCE, NO.

16  **Q.**    YOU DON'T KNOW EXACTLY HOW MANY SHIPYARDS ISOICO HAS?

17  **A.**    I DO NOT.

18  **Q.**    OR WHERE THEY ARE ALL LOCATED?

19  **A.**    I DO NOT.

20  **Q.**    AND YOU ALSO READ MR. GHAHREMAN'S CURRICULUM VITAE,

21  RIGHT?

22  **A.**    I DID.

23  **Q.**    AND YOU LISTED, JUST A COUPLE OF MINUTES AGO, ALL OF THE

24  PLACES HE PREVIOUSLY WORKED.

25  **A.**    CORRECT.

APRIL 16, 2015

HAMAKO - CROSS-EXAMINATION

1   **Q.**    AND HE NEVER WORKED FOR ISOICO.

2   **A.**    NOT THAT I NOTED IN THE RESUME, NO.

3   **Q.**    OKAY.  NOW, YOU REVIEWED, IN GENERAL, IN THIS CASE

4   THOUSANDS OF EMAILS, RIGHT.

5   **A.**    CORRECT.

6   **Q.**    IN FACT THE ONES THAT -- YOU TALKED ABOUT YOU DID A

7   PROCESS THAT YOU SELECTED OUT EMAILS THAT WERE RELEVANT?

8   **A.**    CORRECT.

9   **Q.**    AND JUST THE ONES YOU CULLED FROM THE SEARCH WARRANT

10  RETURNS AMOUNTED TO OVER 14,418 PAGES.  DOES THAT SOUND LIKE

11  PROBABLY A CORRECT ESTIMATE?

12  **A.**    I DON'T RECALL HOW MANY PAGES IT WAS, BUT THAT SOUNDS --

13  SOUNDS POSSIBLE, YES.

14  **Q.**    IF YOU WERE TO PRINT IT OUT, IT WOULD BE A HUGE STACK,

15  RIGHT?

16  **A.**    I DON'T PRINT THEM ALL OUT, BUT IT SOUNDS POSSIBLE.

17  **Q.**    OKAY.  AND OF THOSE 14,000-PLUS PAGES OF EMAILS, THIS

18  WAS THE ONLY ONE WHERE ARASH RECEIVED DEALING WITH A SPECIFIC

19  CLIENT IN IRAN.

20  **A.**    I AM NOT SURE I UNDERSTAND THAT QUESTION.

21  **Q.**    SO THIS IS THE ONLY EMAIL OUT OF THOSE 14,000 WHERE

22  KOORUSH TAHERKHANI SAYS THAT A CLIENT OF TIG MARINE IS IN

23  IRAN, TO ARASH.

24  **A.**    CORRECT.

25  **Q.**    OKAY.  NOW I WOULD LIKE TO TAKE A LOOK AT GOVERNMENT'S

APRIL 16, 2015

1    EXHIBIT 222.

2         I WOULD LIKE TO GET A LITTLE MORE INTO THE TIMING ON

3    THESE EMAILS.  SO THIS IS A LONG CHAIN, RIGHT, OF EMAILS.

4    **A.**    CORRECT.

5    **Q.**    IT IS A BACK AND FORTH JUST BETWEEN TWO PEOPLE, ARASH

6    GHAHREMAN AND MIKAEL RONES, RIGHT?

7    **A.**    YES.

8    **Q.**    THE LAST EMAIL IS JANUARY 20TH, 2012, RIGHT?

9    **A.**    CORRECT.

10   **Q.**    MEANING THE LAST IN TIME.  SORRY.  THE FIRST ON THE

11   PAGE.

12   **A.**    CORRECT, YES.

13   **Q.**    BUT THE FIRST EMAIL IS BACK FROM AUGUST 22ND, 2011,

14   RIGHT?

15   **A.**    CORRECT.

16   **Q.**    SO WE ARE TALKING OVER THE SPACE OF ABOUT FIVE, SIX

17   MONTHS, RIGHT?

18   **A.**    YES.

19        **MR. CAMDEN:**  I WOULD LIKE TO START BACK AT THE LAST

20   PAGE -- SORRY -- SECOND TO THE LAST PAGE.  SECOND TO THE LAST.

21   **Q.**    **(MR. CAMDEN)** SO THIS WAS A RESPONSE TO A REQUEST ON A

22   WEBSITE CALLED WORLDOILS.COM, RIGHT?

23   **A.**    I WOULD HAVE TO REVIEW.

24        **MR. CAMDEN:**  SORRY.  I DO NEED THE LAST PAGE.  THE

25   VERY LAST PAGE OF THAT EMAIL CHAIN.

APRIL 16, 2015

HAMAKO – CROSS–EXAMINATION

1   **Q.**     **(MR. CAMDEN)** SO THE FIRST EMAIL, AUGUST 22ND, 2011,

2   4:07 P.M., FROM MIKAEL RONES TO ARASH GHAHREMAN.

3   **A.**    I SEE IT, YES.

4   **Q.**    HE SAYS, THIS IS A RESPONSE TO YOUR REQUEST ON

5   WORLDOILS, RIGHT?

6        FIRST LINE, GREETINGS FROM NORWAY.

7        YOU CAN REFER TO THE SCREEN, AS WELL.

8   **A.**    CORRECT, YES.  SORRY.

9   **Q.**    SO MR. RONES IS THE ONE WHO CONTACTS MR. GHAHREMAN

10  FIRST, CORRECT?

11  **A.**    I AM NOT CERTAIN IF THE REQUEST TO WORLDOILS WOULD HAVE

12  GONE TO MR. RONES OR NOT.

13  **Q.**    SO YOU VISITED WORLDOILS AS PART OF YOUR INVESTIGATION?

14  **A.**    I DID NOT.

15  **Q.**    BUT, ANYWAY, THE REST OF THE EMAILS, GENERALLY SPEAKING,

16  ARE DISCUSSIONS ABOUT THE POSSIBLE PRICE AND AVAILABILITY OF

17  JACKUP RIGS.

18  **A.**    CORRECT.

19  **Q.**    AND AS THE SELLER, RONES -- YOU UNDERSTAND IN GENERAL

20  THAT WHEN SOMEBODY IS GOING TO SELL SOMETHING AND WHEN -- THE

21  SELLER'S INTEREST IS IN KEEPING THE PRICE AS HIGH AS POSSIBLE,

22  RIGHT?

23  **A.**    I WOULD AGREE IN MOST CIRCUMSTANCES, YES.

24  **Q.**    GENERALLY.

25  **A.**    GENERALLY.

APRIL 16, 2015

HAMAKO – CROSS–EXAMINATION

1 **Q.**    WE ARE NOT DEALING WITH FAMILY MEMBERS WHERE YOU GIVE

2 THEM A BREAK.  THIS IS ARM'S LENGTH BUSINESS, THE SELLER WANTS

3 AS HIGH AS PRICE AS POSSIBLE AND THE BUYER WANTS AS LOW A

4 PRICE AS POSSIBLE.

5 **A.**    CORRECT.

6 **Q.**    YOU ALSO WOULD AGREE THAT, IN GENERAL, THE AMOUNT OF

7 INFORMATION ONE OF THESE PEOPLE HAS CAN AFFECT THE PRICE.

8 **A.**    I WOULD AGREE.

9 **Q.**    SO, FOR EXAMPLE, IF I HAVE $100,000 IN GAMBLING DEBT AND

10 I NEED TO SELL MY HOUSE, AND THE BUYER OF THE HOUSE KNOWS I

11 HAVE GOT THAT DEBT, HE MIGHT BE ABLE TO DEMAND A LOWER PRICE

12 BECAUSE HE KNOWS I AM DESPERATE TO SELL THE HOUSE, RIGHT?

13 **A.**    THAT WOULD BE POSSIBLE, YES.

14 **Q.**    SO, IN GENERAL, INFORMATION CAN AFFECT THE PRICE OF

15 NEGOTIATIONS.

16 **A.**    YES.

17 **Q.**    AND SO RONES STARTS OUT BY SAYING TO ARASH, THE MARKET,

18 AS YOU KNOW, IS STRONG THESE DAYS AND THE DEMAND FOR RIGS IS

19 HIGH IN SEVERAL PARTS OF THE WORLD.  RIGHT?

20 **A.**    CORRECT.

21 **Q.**    AND HE LISTS ABOUT 11 DIFFERENT RIGS THAT HE HAD FOR

22 SALE.

23 **A.**    YES.

24 **Q.**    THIS IS ALL IN THE FIRST EMAIL ON -- VERY END EMAIL ON

25 AUGUST 23RD, RIGHT?

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1   **A.**    AUGUST 22ND, YES.

2   **Q.**    OKAY.  THEN IF YOU GO TO THE NEXT PAGE, ONE BACK.

3          TAKE A LOOK AT THE MIDDLE EMAIL, SO THE ONE AUGUST 23,

4   2:09 A.M.

5          SO AT THIS POINT RONES SAYS A COUPLE OF THINGS TO MR.

6   GHAHREMAN.  HE SAYS, THE SANCTIONS AGAINST IRAN MAKE DELIVERY

7   TO THAT AREA -- MEANING THE PERSIAN GULF -- DIFFICULT.  RIGHT?

8   **A.**    I AM NOT SURE IF HE IS REFERRING TO IRAN SPECIFICALLY OR

9   THE PERSIAN GULF MORE GENERALLY.

10  **Q.**    OKAY.  HE DOESN'T SAY, THOUGH, THAT IT IS IMPOSSIBLE,

11  DOES HE?  HE JUST SAYS DIFFICULT.

12  **A.**    CORRECT.

13  **Q.**    AND THEN THE NEXT SENTENCE HE SAYS, AT THIS POINT THE

14  OWNERS IS NOT WILLING TO SELL INTO SANCTIONS AREAS.  RIGHT?

15  **A.**    CORRECT.

16  **Q.**    HE DOESN'T SAY NEVER.

17  **A.**    NO.

18  **Q.**    HE SAYS AT THIS POINT.

19  **A.**    CORRECT.

20  **Q.**    SO THE LAST SENTENCE HE SAYS, BUT BEFORE WE GET ANY

21  FURTHER WE NEED TO CLARIFY THESE ISSUES.  RIGHT?

22  **A.**    CORRECT.

23  **Q.**    AND ARASH RESPONDED THE SAME DAY, RIGHT?

24  **A.**    CORRECT.

25  **Q.**    AND IF YOU GO -- THIS EMAIL IS SPLIT BETWEEN THE TWO

APRIL 16, 2015

HAMAKO — CROSS-EXAMINATION

1  PAGES.

2      HE SAYS HE KNOWS ABOUT THE SANCTIONS IN IRAN.

3  **A.**   CORRECT.

4  **Q.**   AGAINST IRAN.  BUT HE SAYS, I AM INTERESTED IN LEGAL

5  STRAIGHT FORWARD CONTRACTS AND DEALS.

6  **A.**   CORRECT.

7  **Q.**   YOU WOULD AGREE THAT IT MAY BE A FAIR READING THAT MR.

8  RONES WAS HINTING THAT HE MIGHT BE WILLING TO VIOLATE THE

9  SANCTIONS?

10         **MR. HARRIGAN:**  OBJECTION.  CALLS FOR SPECULATION.

11         **THE COURT:**  SUSTAINED.

12         **MR. CAMDEN:**  UNDERSTOOD, YOUR HONOR.

13  **Q.**   **(MR. CAMDEN)** BUT HE DOES SAY HE IS A U.S. RESIDENT.

14  **A.**   HE DOES.

15  **Q.**   AT THAT TIME HE HADN'T NATURALIZED YET, DO YOU KNOW?

16  **A.**   HE HAD NOT.

17  **Q.**   SO HE WAS STILL A LEGAL PERMANENT RESIDENT, CORRECT?

18  **A.**   AS FAR AS I UNDERSTAND, YES.

19  **Q.**   HE DID EVENTUALLY NATURALIZE TO BECOME A UNITED STATES

20  CITIZEN.

21  **A.**   CORRECT.

22  **Q.**   BUT HE SAYS HE IS NOT LOOKING FOR TROUBLE.

23  **A.**   YES.

24  **Q.**   BETWEEN AUGUST 23RD, 2011 AND NOVEMBER 21ST, 2011,

25  ACCORDING TO THESE EMAILS, IS THERE ANY FURTHER COMMUNICATION

APRIL 16, 2015

1   BETWEEN MIKAEL RONES AND ARASH GHAHREMAN?

2   **A.**     CORRECT.  NOT UNTIL NOVEMBER 21ST, 2011.

3   **Q.**     RIGHT.  THE REASON I ASK LIKE THAT IS JUST, THE EMAILS

4   ARE ALL ONE AFTER THE OTHER, CORRECT?

5   **A.**     CORRECT.

6   **Q.**     YOU GOT TO SORT OUT THE DATES TO SEE WHERE THE GAPS IN

7   COMMUNICATION ARE.

8   **A.**     CORRECT.

9   **Q.**     THIS IS A GAP FROM AUGUST 23RD TO NOVEMBER 11TH.

10  **A.**     NOVEMBER 21ST.

11  **Q.**     NOVEMBER 21ST.  SORRY.  YOU ARE RIGHT.

12          AND AFTER THE GAP IT IS RONES AGAIN THAT CONTACTS MR.

13  GHAHREMAN, NOT THE OTHER WAY AROUND?  BOTTOM OF THE ONE MARKED

14  PAGE 7 OF 10.

15  **A.**     CORRECT.  IN THIS EMAIL CHAIN RONES DOES CONTACT THE

16  DEFENDANT BACK.

17  **Q.**     HE IS THE ONE THAT INITIATES CONTACT AFTER THAT SPACE OF

18  A FEW MONTHS.

19  **A.**     IN THE CONTEXT OF THIS EMAIL, YES.

20  **Q.**     OKAY.  AND NOW HE IS SAYING, I HAVE GOT -- BEFORE HE

21  TALKED ABOUT HE HAD 11 DIFFERENT JACKUP RIGS, AND NOW HE SAYS,

22  WELL, NOW I HAVE GOT THREE DIFFERENT ONES.  RIGHT?

23  **A.**     YES.

24  **Q.**     IN THE FURTHER NEGOTIATIONS OR THE FURTHER DISCUSSIONS

25  ARASH ASKS WHERE THESE ARE LOCATED, AND HE SAYS THEY ARE IN

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1   BRAZIL, RIGHT?

2   **A.**    YES.

3   **Q.**    AND THE CURRENT CHARGES AGAINST MR. GHAHREMAN ARE

4   EXPORTING FROM THE UNITED STATES, CORRECT?

5   **A.**    CORRECT.

6   **Q.**    NOT FROM BRAZIL OR NOT FROM MALAYSIA.

7   **A.**    CORRECT.

8   **Q.**    AND THE TWO RIGS THAT THEY EVENTUALLY DISCUSS, THERE IS

9   A POINT WHERE MIKAEL RONES TELLS MR. GHAHREMAN THAT THE RIGS

10  ARE IN MALAYSIA AND BRAZIL, CORRECT?

11  **A.**    I BELIEVE SO, YES.

12  **Q.**    I WOULD LIKE TO MOVE ON TO GOVERNMENT'S EXHIBIT 223.

13         SO THE EMAILS BETWEEN MR. RONES AND MR. GHAHREMAN WAS

14  ONE SIDE OF THE CONVERSATION, AND THIS IS THE OTHER SIDE OF

15  THE CONVERSATION, RIGHT?  THIS IS THE CONVERSATION THAT HE IS

16  HAVING WITH SAEED SHAMI.

17  **A.**    CORRECT.

18  **Q.**    ABOUT THE PURCHASE OF THE OIL RIGS.

19  **A.**    CORRECT.

20  **Q.**    AND IN THIS ONE MR. GHAHREMAN ASKS MR. SHAMI, WHERE IS

21  THE LOCATION OF -- SORRY.  I AM ON PAGE 4.

22  **A.**    OKAY.

23         **MR. CAMDEN:**  IF I COULD HAVE ONE SECOND, YOUR HONOR.

24  I THINK THERE IS A DISCONNECT IN THE EXHIBIT AND WHAT WE HAVE.

25  OKAY.

APRIL 16, 2015

HAMAKO – CROSS–EXAMINATION

1    **Q.    (MR. CAMDEN)** SO, ONCE AGAIN, IT IS UNCLEAR WHERE THE

2    OIL RIGS THAT THEY ARE CONTEMPLATING BUYING AT THIS POINT ARE

3    LOCATED –– OR EVENTUALLY WE LEARN THAT THE OIL RIGS THEY ARE

4    CONTEMPLATING BUYING ARE IN MALAYSIA AND BRAZIL, CORRECT?

5    **A.**    CORRECT.  THE EMAIL SUGGESTS THAT, YES.

6    **Q.**    RIGHT.  SO THIS IS –– NOW, ON DIRECT EXAMINATION YOU

7    SPOKE ABOUT THIS EMAIL, THE REQUEST TO INTRODUCE PARADISE

8    COMPANY AS THEIR REP.

9    **A.**    YES.

10              **MR. HARRIGAN:**  PAGE 2.

11              **MR. CAMDEN:**  I AM SORRY, YOUR HONOR.  IF I COULD

12    JUST HAVE ONE SECOND.  RIGHT.

13              SO ON PAGE 3, PAGE 3, THE TOP EMAIL.  IF WE COULD

14    ZOOM IN ON THE –– YEAH, THAT WHOLE TOP EMAIL.  NOT THE HEADER,

15    JUST THE WHOLE EMAIL.  THANKS.

16    **Q.    (MR. CAMDEN)** OKAY.  YOU DISCUSS THIS AS IF THE PARADISE

17    OFFSHORE WOULD BE REPRESENTING –– OR A FRONT FOR THE BUYER OF

18    THE OIL RIG, CORRECT?

19    **A.**    CORRECT.

20    **Q.**    COULD YOU PLEASE READ THE FIRST LINE –– I WILL READ IT

21    AND JUST CONFIRM IF THIS IS CORRECT.  HE SAYS, ARASH, PLEASE

22    GET A LETTER FROM THE OWNER OF RIG WHICH INTRODUCING PARADISE

23    COMPANY AS THEIR REP FOR DURATION OF THREE MONTHS.

24              SO THAT MEANS THAT PARADISE OFFSHORE WOULD BE

25    REPRESENTING THE OWNER OF THE RIG, CORRECT?

APRIL 16, 2015

1   **A.**    CORRECT.

2   **Q.**    THAT IS THE SELLER IN THIS SITUATION, RIGHT?

3   **A.**    CORRECT.

4   **Q.**    THAT IS THE NORWEGIAN COMPANY THAT HAS RIGS IN MALAYSIA

5   AND BRAZIL, CORRECT?

6   **A.**    CORRECT.

7   **Q.**    SO PARADISE OFFSHORE WOULD BE REPRESENTING THE NORWEGIAN

8   COMPANY AND NOT -- AND THE BUYER.

9          **MR. HARRIGAN:**  OBJECTION, YOUR HONOR.  ASKING FOR

10  SPECULATION.

11         **MR. CAMDEN:**  THAT IS WHAT THE EMAIL SAYS.  I AM JUST

12  ASKING ABOUT THE CONTENTS OF THE EMAIL.

13         **THE COURT:**  YOU CAN ANSWER.

14         **THE WITNESS:**  I AM NOT SURE FROM THE CONTEXT OF THE

15  EMAIL IF THEY WOULD SOLELY BE THE REPRESENTATIVE FOR THE OWNER

16  OR IF THEY WOULD BE ACTING AS REPRESENTATIVE FOR BOTH PARTIES

17  OR WHAT EXACTLY THEY MEANT.

18  **Q.**    **(MR. CAMDEN)** HE DOESN'T PROVIDE A LETTER SAYING, HERE

19  IS A LETTER SAYING THE BUYER IS REPRESENTED BY PARADISE

20  OFFSHORE; HE ASKS HIM TO GET A LETTER FROM THE OWNER OF THE

21  RIG, CORRECT?

22  **A.**    CORRECT.

23  **Q.**    OKAY.  ANYWAY, NONE OF THESE EMAILS BETWEEN EXHIBITS 222

24  AND 223 REGARDING THE JACKUP OIL RIGS, NONE OF THEM SAY THAT

25  THE OIL RIGS ARE BOUND FOR THE TERRITORY OF IRAN?

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1   **A.**    THEY DO NOT.

2   **Q.**    AND THEY DON'T SAY THAT THEY ARE BOUND FOR AN IRANIAN OR

3   A GOVERNMENT CONTROLLED ORGANIZATION?

4   **A.**    CORRECT.

5   **Q.**    AND, AS WE AGREED AT THE BEGINNING, IT IS NOT ILLEGAL TO

6   SELL GOODS TO PRIVATELY OWNED IRANIAN CORPORATIONS AS LONG AS

7   THE GOODS AREN'T BEING DELIVERED TO IRAN OR THE GOVERNMENT OF

8   IRAN.

9   **A.**    PROVIDED THOSE INDIVIDUALS ARE NOT OTHERWISE

10  SPECIFICALLY SANCTIONED, YES.

11  **Q.**    EXACTLY.  OKAY.

12  **A.**    AND THAT THE GOODS WERE NOT, IN AND OF THEMSELVES,

13  REQUIRING AN EXPORT LICENSE FOR THE LOCATION THEY WERE BEING

14  SENT TO, YES.

15  **Q.**    AND THESE WERE IN MALAYSIA AND BRAZIL ANYWAY, CORRECT?

16  **A.**    CORRECT.

17  **Q.**    NOT IN THE UNITED STATES?

18  **A.**    CORRECT.

19  **Q.**    ALL RIGHT.  NOW I WOULD LIKE TO TAKE A LOOK AT

20  GOVERNMENT'S EXHIBIT 225.

21      SO THIS IS THE EMAIL FROM KOORUSH TAHERKHANI TO ARASH.

22  AND THE PART YOU HAD HIGHLIGHTED WHEN YOU SPOKE WAS HE SAYS,

23  ANY HOW ONE SIDE OF THE DEALS ARE HERE.  CORRECT?

24  **A.**    I AM SORRY.  SAY THAT AGAIN, SIR?

25  **Q.**    HE SAID, BE PATIENT IN THIS REGARD, ANY HOW ONE SIDE OF

APRIL 16, 2015

HAMAKO - CROSS-EXAMINATION

1   THE DEALS ARE HERE.

2   **A.**    I DON'T --

3           **MR. CAMDEN:**  COULD WE ZOOM IN ON THE TOP EMAIL.

4           IS THERE ANY WAY TO ERASE THAT?

5   **Q.**    **(MR. CAMDEN)** SO IF YOU LOOK IT IS THE FOURTH LINE DOWN

6   IN THE TEXT OF THE EMAIL.

7       WHERE KOORUSH SAYS TO ARASH, ONE SIDES OF THE DEALS ARE

8   HERE.

9   **A.**    YES.

10  **Q.**    OKAY.  YOU DETERMINED, WHEN YOU DID AN IP ADDRESS CHECK,

11  THAT THAT EMAIL WAS SENT BY MR. TAHERKHANI FROM IRAN, CORRECT?

12  **A.**    CORRECT.

13  **Q.**    OKAY.

14          **MR. CAMDEN:**  AND I WOULD LIKE TO GO BACK TO THE

15  FIRST EMAIL, SO THE LAST PAGE OF 225.  SECOND TO THE LAST PAGE

16  OF -- NEXT TO SECOND TO THE LAST PAGE.  IS THIS 225?  THAT'S

17  IT.  GOOD TOP EMAIL, IF YOU COULD PULL OUT THE TEXT.  THANKS.

18  **Q.**    **(MR. CAMDEN)** WHEN YOU SUMMARIZED THIS EMAIL YOU SAID

19  YOU TOOK IT TO MEAN THAT KOORUSH TAHERKHANI WAS IN BANDAR

20  ABBAS, WHICH YOU KNOW TO BE IN IRAN, CORRECT?

21  **A.**    CORRECT.

22  **Q.**    THE ACTUAL TEXT OF THE EMAIL SAYS, QUOTE, I WAS IN

23  BANDAR ABBAS, CORRECT?

24  **A.**    CORRECT.

25  **Q.**    TYPICALLY WHEN WE ARE SPEAKING ENGLISH --

APRIL 16, 2015

1    **MR. HARRIGAN:**  OBJECTION.  MISSTATES IT.  I WAS IN
2    BANDAR ABBAS SINCE LAST NIGHT.
3            **THE COURT:**  SUSTAINED.
4            **MR. CAMDEN:**   THAT IS FINE.
5    **Q.**    **(MR. CAMDEN)** IT SAYS, I WAS IN BANDAR ABBAS SINCE LAST
6    NIGHT.  RIGHT?
7    **A.**    CORRECT.
8    **Q.**    YOU HAVE A LITTLE BIT OF ENGLISH GRAMMAR, RIGHT?  YOU
9    KNOW THAT WAS THE PAST TENSE OF THE VERB TO BE, CORRECT?
10   **A.**    YES.
11   **Q.**    SO IF I SAY I WAS IN BANDAR ABBAS, TYPICALLY THAT MEANS
12   I AM NOT NOW IN BANDAR ABBAS, RIGHT?
13   **A.**    CORRECT.
14   **Q.**    THIS MORNING I WAS AT HOME.  I AM NOT AT HOME NOW.
15   **A.**    CORRECT.
16   **Q.**    THAT WOULD MAKE SENSE, RIGHT?
17   **A.**    CORRECT.
18   **Q.**    YOU SAY I AM SOMEWHERE WHEN YOU ARE THERE, AND YOU SAY I
19   WAS SOMEWHERE WHERE YOU ARE NO LONGER IN THAT PLACE.
20   **A.**    CORRECT.
21   **Q.**    OKAY.  HE ALSO SAYS HE IS THERE FOR A CEREMONY, RIGHT?
22   **A.**    CORRECT.
23   **Q.**    THAT IS ON FEBRUARY 27TH?
24   **A.**    THE EMAIL IS ON FEBRUARY 27TH.
25   **Q.**    THE EMAIL IS FEBRUARY 27TH.  AND HE SAYS, ACTUALLY, LAST

APRIL 16, 2015

HAMAKO – CROSS–EXAMINATION

1    NIGHT FOR A CEREMONY OF THE LAUNCHING, RIGHT?

2    **A.**    CORRECT.

3    **Q.**    SO THE CEREMONY COULD HAVE TAKEN PLACE FEBRUARY 26TH,

4    RIGHT?

5    **A.**    I WOULD AGREE THAT IS POSSIBLE, YES.

6    **Q.**    OKAY.  IT IS A FAIR READING, WHETHER OR NOT IT IS

7    ACTUALLY TRUE.

8    **A.**    CORRECT.

9    **Q.**    OKAY.  YOU ALSO –– YOU ARE FAMILIAR WITH THE GEOGRAPHY

10   OF THIS REGION, CORRECT?

11   **A.**    ROUGHLY, YES.

12   **Q.**    YOU LOOKED AT MAPS OF BANDAR ABBAS AND DUBAI, RIGHT?

13   **A.**    I HAVE.

14   **Q.**    YOU KNOW –– YOU HAVE DONE SOME RESEARCH SO YOU KNOW THAT

15   IT IS ONLY A FIVE–HOUR FERRY RIDE FROM BANDAR ABBAS TO DUBAI?

16   **A.**    I AM NOT SURE HOW LONG THE FERRY RIDE IS, BUT THAT

17   SOUNDS POSSIBLE, YES.

18   **Q.**    IT IS ABOUT –– FOR THAT DISTANCE THAT WOULD BE

19   REASONABLE, RIGHT?

20   **A.**    SURE.

21   **Q.**    AND IT WOULD ONLY BE A 55–MINUTE FLIGHT?

22   **A.**    SOUNDS POSSIBLE, YES.

23   **Q.**    SOUNDS REASONABLE, GIVEN THE DISTANCE THAT YOU HAVE SEEN

24   ON THE MAPS?

25   **A.**    YES.

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

**Q.**     IN THE EMAIL, IF WE GO ALL THE WAY BACK TO THE FIRST

PAGE, EXHIBIT 225.  THE EMAIL WHERE HE SAYS ONE SIDE OF THE

DEALS ARE HERE, THAT'S NOT SENT UNTIL MARCH 1ST, CORRECT?

**A.**     CORRECT.

**Q.**     SO THE CEREMONY WAS THE 26TH OR THE 27TH OF FEBRUARY AND

THIS EMAIL IS ON MARCH 1ST.

**A.**     CORRECT.

**Q.**     WE WILL GET YOU AN EXHIBIT IN A SECOND.  SORRY FOR THE

DELAY.  I THINK THAT MAY BE IT.  THERE WE ARE.  OKAY.

        I AM SHOWING YOU WHAT HAS BEEN PREVIOUSLY MARKED AS

GOVERNMENT'S EXHIBIT 121.  THIS IS KOORUSH TAHERKHANI'S

PASSPORT, RIGHT?

**A.**     CORRECT.

**Q.**     AND THE VERY TOP OF THE PASSPORT SAYS DOMICILE, RIGHT?

**A.**     CORRECT.

**Q.**     AND DOMICILE, WRITTEN IN ENGLISH IS UNITED ARAB

EMIRATES, CORRECT?

**A.**     YES.

**Q.**     OKAY.  YOU ALSO INTRODUCED A COMPANY OF -- WE DON'T NEED

TO PULL THIS UP.  I CAN JUST ASK THE QUESTIONS.

        YOU REVIEWED KOORUSH TAHERKHANI'S CURRICULUM VITAE, A

RESUME, RIGHT?

**A.**     I DID.

**Q.**     AND YOU ALSO SAW THAT THE VISA, LIKEWISE, MENTIONED THAT

HE WAS LIVING ON A VISA, CORRECT?

APRIL 16, 2015

HAMAKO – CROSS–EXAMINATION

1  **A.**    CORRECT.

2  **Q.**    THAT HE WAS AN IRANIAN CITIZEN BUT HE HAD –– HE HAD A

3  VISA NUMBER ON HIS CV.

4  **A.**    CORRECT.

5  **Q.**    YOU KNOW TYPICALLY VISAS ARE REQUIRED FOR PEOPLE THAT

6  ARE LIVING IN A COUNTRY OTHER THAN THE COUNTRY OF THEIR

7  CITIZENSHIP.

8  **A.**    I AM.

9  **Q.**    OKAY.  I WANT TO JUMP BACK A LITTLE BIT TO –– I WANT TO

10  JUST DISCUSS, IN GENERAL, YOUR INITIAL INVOLVEMENT.

11          **MR. CAMDEN:**  SO CAN WE MUTE THE SCREENS?  THANKS.

12  **Q.**    **(MR. CAMDEN)** SO YOUR INITIAL INVOLVEMENT IN THIS CASE

13  CAME WHEN YOU GOT A CALL FROM GREG TOPCZEWSKI, RIGHT?

14  **A.**    CORRECT.

15  **Q.**    AND HE WORKS AT NORTHROP GRUMMAN SPERRY MARINE.

16  **A.**    HE DID AT THAT TIME, YES.

17  **Q.**    AND THE INITIAL CALL WAS REGARDING A REQUEST FOR A

18  NAVIGAT–2100.

19  **A.**    CORRECT.

20  **Q.**    AND HE ASKED YOU TO DO SOME RESEARCH, TO DO SOME

21  DIGGING, RIGHT?

22  **A.**    HE DID.

23  **Q.**    DIGGING WAS THE WORD HE USED.

24  **A.**    I DON'T RECALL.

25  **Q.**    YOU REMEMBER EMAILING HIM BACK AND YOU SAID, I DID SOME

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1    DIGGING, AND HERE IS WHAT I FOUND.

2    **A.**    SOUNDS PLAUSIBLE, YES.

3    **Q.**    OKAY.  AND YOU PROVIDED HIM THE INFORMATION THAT ERGUN

4    YILDIZ WAS THE HEAD OF A GENERAL TRADING CORPORATION?

5    **A.**    I DID.

6    **Q.**    YOU PROVIDED HIM THE INFORMATION THAT SEVERAL OF THE

7    FOUNDERS OF TIG MARINE WERE IRANIAN NATIONALS?

8    **A.**    I DID.

9    **Q.**    YOU PROVIDED HIM THE -- ALL OF THAT INFORMATION, AND YOU

10   KNEW THAT HE WAS GOING TO USE THAT IN MAKING A DETERMINATION

11   WHETHER TO NO BID THE REQUEST FOR A QUOTE.

12   **A.**    I ASSUMED SO, YES.

13   **Q.**    OKAY.  BECAUSE YOU KNOW WHAT HIS JOB IS AT SPERRY

14   MARINE.

15   **A.**    I DO.

16   **Q.**    AND IT WAS AFTER YOU ARRIVED THAT INFORMATION -- SO YOU

17   PARTICIPATED IN THE BACKGROUND INVESTIGATION FOR THE NO BID TO

18   SPERRY MARINE, RIGHT?

19   **A.**    MY INVESTIGATION WAS SEPARATE, BUT I DID PROVIDE SOME OF

20   THE INFORMATION TO NORTHROP GRUMMAN, YES.

21   **Q.**    RIGHT.  KNOWING THAT THEY WERE CONSIDERING WHETHER TO

22   BID ON THIS OR TO GIVE A NO BID.

23   **A.**    CORRECT.

24   **Q.**    AND WHEN THEY GAVE THE NO BID, AFTER COLLECTING

25   INFORMATION THAT YOU PROVIDED, THAT IS WHEN YOU DIRECTED THEM

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1    TO THE UNDERCOVER OFFICER.

2    **A.**    CORRECT.  WELL, I SHOULD SAY I PROVIDED CONTACT

3    INFORMATION TO MS. FARNSLEY FOR THE UNDERCOVER AGENT.

4    **Q.**    RIGHT.  AND YOU ASKED HER TO PROVIDE THAT TO MR.

5    GHAHREMAN.

6    **A.**    I DID.

7    **Q.**    AND TO SAY THAT THEY HAD NAVIGAT-2100'S IN STOCK, RIGHT?

8    **A.**    POSSIBLY IN STOCK, YES.

9    **Q.**    NOW I WOULD LIKE TO TALK ABOUT THE Y-690 LICENSING

10   DETERMINATIONS.

11          SO ON JANUARY 4TH, 2013 IS AFTER YOU LEARNED ABOUT THE

12   REQUEST FROM MR. GHAHREMAN FOR Y-690'S TO THE UNDERCOVER

13   OFFICER, YOU REQUESTED A MANUFACTURER FORM FROM CPI U.S.A. IN

14   ORDER TO OBTAIN A LICENSE DETERMINATION FOR THAT ITEM, RIGHT?

15   **A.**    YES, I DID.

16   **Q.**    DO YOU HAVE A COPY OF THAT FORM?

17   **A.**    I BELIEVE IT IS IN ONE OF THE BOOKS, YES.

18   **Q.**    IS THAT THE FORM THAT MR. COX INTRODUCED?

19   **A.**    I BELIEVE IT WAS.  DO YOU HAVE A NUMBER?

20   **Q.**    I DON'T RIGHT THIS SECOND.  BUT LET ME ASK YOU IN

21   GENERAL HOW THAT PROCESS WORKS.

22          SO DID YOU SUBMIT THE LICENSING DETERMINATION REQUEST TO

23   THE DEPARTMENT OF STATE OR DID MR. COX?

24   **A.**    I DID.

25   **Q.**    OKAY.  YOU DID.  SO AT THAT POINT CPI HAD INDICATED TO

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1    YOU THAT THEY BELIEVED IT WOULD BE CLASSIFIED AS A MUNITION,

2    RIGHT?

3    **A.**    ON MUNITIONS LIST ITEM, YES.

4    **Q.**    BUT YOU KNOW THAT CPI IS NOT A GOVERNMENTAL ENTITY.

5    **A.**    I AM AWARE OF THAT, YES.

6    **Q.**    CPI DOESN'T HAVE FINAL AUTHORITY TO DETERMINE WHETHER A

7    GOOD IS A MUNITION OR NOT.

8    **A.**    THEY DO NOT.

9    **Q.**    AND YOU REQUESTED A DETERMINATION FROM THE DEPARTMENT OF

10   STATE BECAUSE THE DEPARTMENT OF STATE, NOT CPI, HAS THE

11   AUTHORITY TO MAKE THAT DETERMINATION.

12   **A.**    CORRECT.

13   **Q.**    I AM SHOWING YOU WHAT WAS PREVIOUSLY MARKED AS DEFENSE

14   EXHIBIT II.  TAKE A LOOK AT THAT.

15        DO YOU RECOGNIZE THIS PIECE OF PAPER?

16            (EXHIBIT II MARKED FOR IDENTIFICATION)

17   **A.**    I DO.

18   **Q.**    AND THIS IS THE RESPONSE YOU GOT BACK FROM THE STATE

19   DEPARTMENT IN YOUR REQUEST FOR A DETERMINATION, RIGHT?

20   **A.**    CORRECT.

21   **Q.**    WHAT DATE DOES THAT INDICATE THE REQUEST WAS RECEIVED BY

22   THE DEPARTMENT OF STATE?

23   **A.**    FEBRUARY 4TH, 2013.

24   **Q.**    AND WHAT DATE WAS THE FIRST-LEVEL REVIEW DETERMINATION

25   ISSUED?

APRIL 16, 2015

HAMAKO - CROSS-EXAMINATION

1    **A.**     FEBRUARY 5TH, 2013.

2    **Q.**     ONE DAY LATER, RIGHT?

3    **A.**     CORRECT.

4    **Q.**     NOW, YOU KNOW THAT -- YOU KNOW WHAT THE -- YOU RECEIVED

5    TRAINING IN ITAR, RIGHT?

6    **A.**     I DO.

7    **Q.**     SO YOU KNOW THAT THE CLASSIFICATION FOR A MUNITION

8    DEPENDS ON WHETHER THE GOOD HAS A PREDOMINANTLY CIVIL USE OR

9    APPLICATION OR NOT, RIGHT?

10   **A.**     PREDOMINANTLY MILITARY USE.

11   **Q.**     EVEN IF IT IS DESIGNED FOR MILITARY IF IT HAS A

12   PREDOMINATELY CIVILIAN APPLICATION THEN IT IS NOT CLASSIFIED

13   AS A MUNITION, CORRECT?

14   **A.**     I AM SORRY, SIR.  YOU ARE SAYING IF IT HAS PREDOMINANTLY

15   A CIVILIAN APPLICATION IT WOULD NOT BE CLASSIFIED A MUNITIONS

16   LIST ITEM.

17   **Q.**     THAT IS WHAT I AM ASKING YOU.

18   **A.**     IN GENERAL, YES.

19   **Q.**     OKAY.  THAT'S GOOD.  OKAY.

20           SO YOU ARE FAMILIAR WITH THE PROCESS TO GO THROUGH IN

21   THE STATE DEPARTMENT FOR GETTING AN ITEM CLASSIFIED OR A

22   DETERMINATION ON WHETHER IT IS CLASSIFIED AS A MUNITION,

23   RIGHT?

24   **A.**     IN GENERAL, YES.

25   **Q.**     THIS ISN'T THE FIRST ONE YOU HAVE DONE?

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1   **A.**    NO.

2   **Q.**    SO YOU KNOW THAT THE FIRST-LEVEL DETERMINATION IS BASED

3   ONLY ON EVIDENCE OR INFORMATION THAT YOU SUBMIT TO THE

4   DEPARTMENT OF STATE.

5   **A.**    I AM NOT AWARE OF THAT, NO.

6   **Q.**    COULD YOU REFER TO THE EXHIBIT I JUST HANDED YOU.  THE

7   DISCLAIMER AT THE BOTTOM, ACTUALLY.

8        OKAY.  TAKE A LOOK AT THE LAST PARAGRAPH THERE UNDER THE

9   WORD DISCLAIMER.

10  **A.**    OKAY.

11  **Q.**    ALL RIGHT.  THIS IS SAYS THE DIRECTORATE OF DEFENSE

12  TRADE CONTROLS -- THAT IS PART OF THE DEPARTMENT OF STATE,

13  RIGHT?

14  **A.**    YES, IT IS.

15  **Q.**    HAS RECEIVED THE ATTACHED REQUEST FROM THE DEPARTMENT OF

16  HOMELAND SECURITY.  THAT IS YOU, RIGHT?

17  **A.**    CORRECT.

18  **Q.**    FOR AN INITIAL REVIEW OF THE LISTED COMMODITY OR

19  COMMODITIES.  THE RESPONSE AND ADVICE PROVIDED IS ONLY A

20  PRELIMINARY REVIEW BASED ON THE INFORMATION PROVIDED TO THE

21  DEPARTMENT OF STATE BY DHS.  BY YOU, RIGHT?

22  **A.**    CORRECT.

23  **Q.**    OKAY.  SO YOU KNEW THAT THE DETERMINATION WOULD BE BASED

24  ONLY ON THE INFORMATION THAT YOU PROVIDED.

25  **A.**    CORRECT.

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1    **Q.**    OKAY.  AND IT IS PROVIDED ONLY TO ASSIST DEPARTMENT OF
2    HOMELAND SECURITY IN PROCESSING DETAINED CARGO.
3    **A.**    CORRECT.
4    **Q.**    THE Y-690'S AT THIS POINT WERE NOT DETAINED CARGO.
5    **A.**    NOT IN THIS CASE, NO.
6    **Q.**    AND YOU ALSO -- IT SAYS, BOTH DHS AND DDTC AGREE THAT
7    THE INFORMATION PROVIDED IS NOT BINDING ON EITHER AGENCY.
8    CORRECT?
9    **A.**    YES.
10   **Q.**    AND IT ALSO SAYS THAT IT DOESN'T OBLIGATE DDTC WITH
11   RESPECT TO FUTURE LICENSING DETERMINATIONS, RIGHT?
12   **A.**    CORRECT.
13   **Q.**    AND YOU KNEW THIS WOULDN'T BE THE FINAL DETERMINATION,
14   THIS IS A FIRST-LEVEL REVIEW, RIGHT?
15   **A.**    CORRECT.  WE DON'T -- JUST BECAUSE WE SUBMIT A
16   PRELIMINARY OR A FIRST-LEVEL LD WE DON'T NECESSARILY IN EVERY
17   CASE SUBMIT A PRETRIAL LICENSE DETERMINATION.
18   **Q.**    NO.  BUT EVENTUALLY THERE WAS A DETERMINATION IN THIS
19   CASE BY THE DEPARTMENT OF STATE, RIGHT?
20   **A.**    CORRECT.  IN THIS CASE, YES.
21   **Q.**    JUST TALKING ABOUT THE FIRST-LEVEL REVIEW, THEY RECEIVED
22   IT ON FEBRUARY 4TH, THEY ISSUED IT BACK ON FEBRUARY 5TH, BASED
23   ONLY ON THE INFORMATION YOU PROVIDED, AND CLASSIFIED IT AS A
24   MUNITION, RIGHT?
25   **A.**    CORRECT.

APRIL 16, 2015

HAMAKO - CROSS-EXAMINATION

1  Q.    AND YOU KNEW THAT THAT WAS GOING TO HAPPEN BECAUSE YOU

2  ARE FAMILIAR WITH THE STATE DEPARTMENT LICENSING PROCEDURES.

3  A.    INCORRECT.  I DID NOT KNOW THAT WAS GOING TO HAPPEN.

4  Q.    OKAY.  YOU KNOW THAT THEY ONLY MAKE THE DETERMINATION

5  BASED ON THE INFORMATION YOU PROVIDED.

6  A.    CORRECT.

7  Q.    AND THE INFORMATION YOU PROVIDED WAS ONLY THAT THIS WAS

8  DESIGNED FOR MILITARY APPLICATIONS, CORRECT?

9  A.    CORRECT.

10 Q.    YOU DIDN'T RESEARCH ANY CIVILIAN APPLICATIONS OF THE

11 Y-690?

12 A.    NO, I DID NOT.  THAT'S NOT MY JOB TO --

13 Q.    YOU DIDN'T RESEARCH ANY CIVILIAN APPLICATIONS FOR THE

14 Y-690 BEFORE SUBMITTING THIS REQUEST FOR CLASSIFICATION.

15 A.    NO, I DID NOT.

16 Q.    EVEN THOUGH YOU KNEW THAT THAT WAS PART OF THE CRITERIA

17 FOR CLASSIFYING SOMETHING AS A MUNITION.

18 A.    CORRECT.

19 Q.    SO WERE YOU INVOLVED AT ALL IN THE FINAL LICENSING

20 DETERMINATION THAT THE DEPARTMENT OF STATE MADE?

21 A.    I WAS NOT INVOLVED IN THE LICENSING; HOWEVER, I PREPARED

22 THE MEMORANDUM AND SUBMITTED THE REQUEST FOR THE

23 DETERMINATION, YES.

24 Q.    FOR THE SECOND-LEVEL DETERMINATION, THE FINAL REVIEW.

25 A.    CORRECT.

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1    **Q.**    OKAY.

2            **MR. CAMDEN:**  I THINK WE ARE UP TO EXHIBIT PP.

3            (EXHIBIT PP MARKED FOR IDENTIFICATION)

4    **Q.**   **(MR. CAMDEN)** PLEASE DON'T LAUGH AS I HAND YOU THIS.

5    THIS IS WHAT HAS BEEN MARKED AS DEFENSE EXHIBIT PP.

6            SO DO YOU RECOGNIZE THIS DOCUMENT?

7    **A.**    I DO.

8    **Q.**    IS THIS THE FINAL LICENSING DETERMINATION ISSUED BY THE

9    DEPARTMENT OF STATE?

10   **A.**    IN THIS CASE, YES.

11   **Q.**    REGARDING THE Y-690.

12   **A.**    CORRECT.

13   **Q.**    OKAY.

14           **MR. CAMDEN:**  I MOVE THAT INTO EVIDENCE, YOUR HONOR.

15           **THE COURT:**  ANY OBJECTION?

16           **MR. HARRIGAN:**  NO OBJECTION, YOUR HONOR.

17           **THE COURT:**  RECEIVED.

18           (EXHIBIT PP RECEIVED INTO EVIDENCE)

19           **MR. CAMDEN:**  PERMISSION TO PUBLISH TO THE JURY?

20           **THE COURT:**  YES.

21   **Q.**   **(MR. CAMDEN)** SO THIS IS ON -- THIS IS FROM THE UNITED

22   STATES DEPARTMENT OF STATE, CORRECT?

23   **A.**    CORRECT.

24   **Q.**    THE DATE OF THE LETTER IS JULY 3RD, 2013, RIGHT?

25   **A.**    CORRECT.

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1    **Q.**    AND THAT WAS ALREADY AFTER YOUR INVESTIGATION HAD ENDED,

2    CORRECT?

3    **A.**    IT WAS AFTER --

4    **Q.**    THIS IS AFTER CHARGES HAD BEEN FILED, ESSENTIALLY.

5    **A.**    CORRECT, YES.

6    **Q.**    AND THE INITIAL ARRESTS HAD TAKEN PLACE.

7    **A.**    YES.

8    **Q.**    OKAY.  AND IT DOES REFERENCE THE DATE THAT THE

9    SUBMISSION, THE REQUEST FOR THE DETERMINATION WAS MADE.  AND

10   THAT WAS MAY 20TH, CORRECT?

11   **A.**    CORRECT.

12   **Q.**    MAY 20TH, 2013.  TOP OF THE SCREEN.

13   **A.**    YES, CORRECT.  YEAH.

14   **Q.**    OKAY.  SO YOU SENT THE FIRST REQUEST FEBRUARY 4TH, YOU

15   GOT BACK A RESPONSE FEBRUARY 5TH, RIGHT?

16   **A.**    ACTUALLY I BELIEVE I SENT THE INITIAL REQUEST ON

17   JANUARY 15TH OF 2013.

18   **Q.**    JANUARY -- SORRY?

19   **A.**    JANUARY 15TH OF 2013.

20   **Q.**    IF YOU TAKE A LOOK AT -- DO YOU STILL HAVE DEFENSE

21   EXHIBIT -- I THINK IT WAS II.

22   **A.**    I DO.

23   **Q.**    THE DATE OF THAT WAS FEBRUARY 5TH, 2013.

24   **A.**    THAT WAS THE DATE THE DECISION WAS RENDERED BY THE

25   DEPARTMENT OF STATE.

APRIL 16, 2015

HAMAKO – CROSS–EXAMINATION

1    **Q.**    IT COULD NOT HAVE BEEN RENDERED ON THE 5TH BEFORE YOU

2    SUBMITTED AN APPLICATION ON THE 15TH, RIGHT?

3    **A.**    JANUARY 15TH.

4    **Q.**    OH, JANUARY 15TH.

5    **A.**    YES.

6    **Q.**    OKAY.  GOT IT.

7          THIS ONE SAYS YOUR SUBMISSION DATED MAY 20TH, CORRECT?

8    **A.**    CORRECT.

9    **Q.**    WHEN WAS THAT SUBMISSION ACTUALLY SENT BY YOU TO THE

10   DEPARTMENT OF STATE?

11   **A.**    I DON'T RECALL.  THAT COULD BE REFERENCING THE DATE OF

12   THE MEMORANDUM, BUT TYPICALLY ONCE I RECEIVE THE SIGNATURE

13   FROM MY CHAIN OF COMMAND FOR A PRETRIAL MEMORANDUM I WOULD

14   TRANSMIT IT THAT DAY, OR AS SOON AS POSSIBLE.

15   **Q.**    OKAY.  SO FEBRUARY 5TH YOU GET BACK THE FIRST–LEVEL

16   DETERMINATION, THAT IS II, RIGHT?

17   **A.**    CORRECT.

18   **Q.**    SO THE REST OF FEBRUARY GOES BY, AND YOU DON'T HAVE A

19   FINAL DETERMINATION, RIGHT?

20   **A.**    THAT'S CORRECT.

21   **Q.**    THEN MARCH GOES BY AND APRIL GOES BY, AND ALL THE WAY UP

22   TO MAY 20TH GOES BY AND YOU DIDN'T HAVE A FINAL DETERMINATION,

23   RIGHT?

24   **A.**    THAT'S CORRECT.

25   **Q.**    AND AT THE MEANTIME YOU ARE THE ONE THAT DIRECTED THE

APRIL 16, 2015

1    UNDERCOVER OFFICER TO REPRESENT TO MR. GHAHREMAN AND TO THE
2    OTHER PARTIES IN THIS THAT THE Y-690 WAS AN MUNITION.
3    **A.**    CORRECT.
4          **MR. CAMDEN:**  COULD I HAVE ONE SECOND, YOUR HONOR?
5          **THE COURT:**  YES.
6          **MR. CAMDEN:**  I AM GOING TO MARK TWO MORE EXHIBITS.
7    THIS WILL BE QQ.
8    **Q.**    **(MR. CAMDEN)** I AM GOING TO APPROACH AND HAND YOU TWO
9    EXHIBITS, ONE IS MARKED QQ AND THE OTHER IS MARKED RR.
10         DO YOU RECOGNIZE THESE DOCUMENTS?
11              (EXHIBIT QQ, RR MARKED FOR IDENTIFICATION)
12   **A.**    I DO.
13   **Q.**    ARE THESE BOTH EMAILS WHICH YOU DISCOVERED IN THE COURSE
14   OF YOUR EXECUTING THE SEARCH WARRANTS?
15   **A.**    THEY ARE.
16   **Q.**    TAKE A LOOK AT QQ.  THAT IS AN EMAIL FROM KOORUSH
17   TAHERKHANI TO MR. GHAHREMAN, CORRECT?
18   **A.**    CORRECT.
19   **Q.**    ON DECEMBER 26, 2012?
20   **A.**    YES.
21   **Q.**    OKAY.
22         **MR. CAMDEN:**  I WOULD LIKE TO MOVE THAT INTO
23   EVIDENCE.
24         **THE COURT:**  ANY OBJECTION?
25         **MR. HARRIGAN:**  NO OBJECTION.

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1      **THE COURT:**  RECEIVED.

2      (EXHIBIT QQ RECEIVED INTO EVIDENCE)

3   **Q.**   **(MR. CAMDEN)** IF YOU CAN GO ON AND TAKE A LOOK AT RR.

4      THIS IS ALSO AN EMAIL FROM KOORUSH TAHERKHANI, CORRECT?

5   **A.**   CORRECT.

6   **Q.**   THIS IS ALSO DATED DECEMBER 26, 2012?

7   **A.**   CORRECT.

8      **MR. CAMDEN:**  I WOULD LIKE TO MOVE THAT INTO EVIDENCE

9   AS WELL, YOUR HONOR.

10      **THE COURT:**  ANY OBJECTION?

11      **MR. HARRIGAN:**  NO OBJECTION, YOUR HONOR.

12      **THE COURT:**  RECEIVED.

13      (EXHIBIT RR RECEIVED INTO EVIDENCE)

14  **Q.**   **(MR. CAMDEN)** SO THESE ARE BOTH EMAILS FROM KOORUSH

15  TAHERKHANI, AND BOTH ARE DATED ON THE SAME DATE,

16  DECEMBER 26TH, 2012, RIGHT?

17  **A.**   CORRECT.

18  **Q.**   I WOULD LIKE TO START WITH RR.

19      RR IS A REQUEST FROM KOORUSH TAHERKHANI TO SOMEBODY

20  NAMED AMIR?  WELL, THERE ARE THREE PEOPLE ADDRESSED IN THE

21  EMAIL, CORRECT?

22  **A.**   I BELIEVE THERE ARE.

23  **Q.**   IN THE ACTUAL TEXT.  SO IF YOU LOOK AT THE SCREEN, I

24  HAVE IT UP THERE.

25  **A.**   IN THE TEXT, YES.

APRIL 16, 2015

HAMAKO – CROSS–EXAMINATION

1    Q.    DEAR AMIR, DEAR MAE, AND DEAR NASIM, RIGHT?

2    A.    CORRECT.

3    Q.    WHEN HE -- SO WHEN HE SAYS -- WHEN HE SAYS TO MAE, IN

4    THE MIDDLE, MR. AMIR IS OUR COLLEGE IN TEHRAN.

5          THAT COULD POSSIBLY MEAN COLLEAGUE?

6    A.    IT COULD POSSIBLY, YES.

7    Q.    FOR FOLLOWING UP OUR COSTUMERS AND INQUIRIES AND TENDERS

8    IN TEHRAN.

9          YOU KNOW TEHRAN IS IN IRAN, RIGHT?

10   A.    I AM AWARE OF THAT, YES.

11   Q.    PLEASE COOPERATE FULLY WITH HIM ASK FOR HIS SKYPE FOR

12   ANY FURTHER NEEDED COMMUNICATIONS.  RIGHT?

13   A.    CORRECT.

14   Q.    IF YOU GO TO THE NEXT PAGE OF THAT EMAIL, IT GIVES THE

15   SPECS FOR A PUMP STATION, CORRECT?

16   A.    IT DOES.

17   Q.    SO THESE ARE SPECIFICATIONS FOR A PUMPING STATION THAT

18   HE IS TRYING TO ACQUIRE, RIGHT?

19   A.    CORRECT.

20   Q.    NOW TAKE A LOOK AT THE EMAIL TO MR. GHAHREMAN ON THE

21   SAME DAY.  THIS IS THE QQ.  IF YOU TAKE A LOOK DOWN BELOW.

22         THESE ARE THE SAME SPECIFICATIONS, RIGHT?

23   A.    CORRECT.

24   Q.    LOOKING FOR A PUMP STATION?

25   A.    YES.

APRIL 16, 2015

HAMAKO – CROSS–EXAMINATION

1    Q.    NOW, IN THE FIRST EMAIL HE TOLD MAE THAT MR. AMIR IS OUR
2    COLLEAGUE IN TEHRAN FOR FOLLOWING UP ON CUSTOMERS AND
3    INQUIRIES, RIGHT?
4    A.    CORRECT.
5    Q.    DOES ANY OF THAT INFORMATION APPEAR IN THE EMAIL TO MR.
6    GHAHREMAN?
7    A.    IN THIS EMAIL IT DOES NOT.
8    Q.    NO.  IT IS THE SAME SPECIFICATIONS, CORRECT?
9    A.    CORRECT.
10   Q.    THE SAME REQUEST.
11   A.    CORRECT.
12   Q.    AND WHEN HE MAKES THE REQUEST OF MR. GHAHREMAN, HE
13   DOESN'T DISCUSS THE END USER?
14   A.    IN THIS EMAIL, NO, HE DOES NOT.
15   Q.    HE DOESN'T DISCUSS CONTACTS IN TEHRAN?
16   A.    IN THIS EMAIL, NO.
17   Q.    IT IS JUST, PLEASE FIND IF YOU MAY SOURCE BELOW INQUIRY
18   IN YOUR AREA.
19   A.    CORRECT.
20   Q.    AND THEN THE SPECIFICATIONS.
21   A.    YES.
22   Q.    AND NO MORE.
23   A.    CORRECT.
24   Q.    OKAY.
25         **MR. CAMDEN:**  IF WE COULD PULL UP 217.

APRIL 16, 2015

HAMAKO - CROSS-EXAMINATION

1  **Q.**    **(MR. CAMDEN)** SO THIS WAS THE EMAIL FROM MEHDI SARKHOSH,

2  RIGHT?

3  **A.**    CORRECT.

4  **Q.**    HE IS A REPRESENTATIVE OR A -- SOMEBODY WHO WORKS FOR

5  KOHANDIAREMAD, RIGHT?

6  **A.**    YES.

7  **Q.**    AND THAT IS BASED IN TEHRAN, ACCORDING TO THE EMAILS?

8  **A.**    YES.

9  **Q.**    AND THIS IS THE PERSON YOU IDENTIFIED AS THE ORIGINAL

10 REQUESTER OF THE Y-690, CORRECT?

11 **A.**    YES.

12 **Q.**    AND HE MADE THE REQUEST TO KOORUSH TAHERKHANI.

13 **A.**    HE DID.

14 **Q.**    AND THEN IF WE COULD GO -- AND THE ONLY PEOPLE THAT THIS

15 EMAIL WAS SENT TO WAS SOMEONE NAMED KOORUSH TAHERKHANI, THE MD

16 AT TIG MARINE, RIGHT?  CORRECT?

17 **A.**    IT WAS ALSO SENT TO ARKMOGHADAM@YAHOO.COM.

18 **Q.**    RIGHT, I PHRASED IT WRONG.  I WAS GOING TO SAY THAT IN A

19 SECOND.  BUT SO THERE WERE TWO RECIPIENTS, RIGHT?

20 **A.**    YES, SIR.

21 **Q.**    ONLY TWO.  AND ONE WAS KOORUSH TAHERKHANI, THE OTHER WAS

22 THE ARKMOGHADAM@YAHOO.COM.

23 **A.**    YES.

24        **MR. CAMDEN:**  IF WE COULD GO TO 211.

25 **Q.**    **(MR. CAMDEN)** SO WE ARE GOING TO TRY TO TRACE THIS

APRIL 16, 2015

HAMAKO – CROSS-EXAMINATION

1  REQUEST.  SO THIS ORIGINATED WITH KOHANDIAREMAD, IT WENT TO

2  KOORUSH TAHERKHANI, RIGHT?

3  **A.**    CORRECT.

4  **Q.**    AND THEN THIS IS THE EMAIL WHERE KOORUSH FORWARDED THAT

5  REQUEST ON TO ARASH GHAHREMAN, RIGHT?

6  **A.**    CORRECT.

7  **Q.**    HE FORWARDED THE REQUEST FOR THIS LIST OF PARTS HERE,

8  RIGHT?

9  **A.**    YES.

10  **Q.**    INCLUDING, AT THE BOTTOM, THE TRIODE LAMP Y-690, CPI

11  USA, 100 PIECES.  RIGHT?

12  **A.**    CORRECT.

13  **Q.**    DID THIS EMAIL FROM KOORUSH TAHERKHANI TO ARASH

14  GHAHREMAN ON JANUARY 2ND MENTION KOHANDIAREMAD?

15  **A.**    NO, IT DID NOT.

16  **Q.**    IT DIDN'T –– HE DIDN'T JUST FORWARD THE EMAIL OR THE

17  REQUEST.

18  **A.**    NO.

19  **Q.**    HE TOOK OUT THE SPECIFIC INFORMATION FOR THE PARTS HE

20  WAS LOOKING FOR –– KOORUSH TOOK THAT OUT AND FORWARDED IT TO

21  MR. GHAHREMAN, RIGHT?

22  **A.**    I AM SORRY, SIR.  THE SPECIFIC INFORMATION?

23  **Q.**    SO THIS IS THE SAME LIST OF PARTS THAT KOHANDIAREMAD HAD

24  REQUESTED FROM KOORUSH.

25  **A.**    CORRECT.

APRIL 16, 2015

HAMAKO – CROSS–EXAMINATION

1    Q.    IN THE PREVIOUS EXHIBIT, RIGHT?

2    A.    YES.

3    Q.    SO THIS IS THE SAME LIST OF PARTS AND NOW IT IS GOING

4    FROM KOORUSH TO MR. GHAHREMAN.

5    A.    CORRECT.

6    Q.    ON JANUARY 2ND.  BUT ALL OF THE INFORMATION ABOUT

7    KOHANDIAREMAD IS NOT IN THE EMAIL.

8    A.    IT IS NOT.

9    Q.    THERE IS NO MENTION OF THE END USE?

10   A.    IN THIS EMAIL, NO.

11   Q.    THERE IS NO MENTION OF THE LOCATION OF THE END USER?

12   A.    IN THIS EMAIL, NO.

13   Q.    SO YOU SEARCHED -- YOU EXECUTED SEARCH WARRANTS DURING

14   THE COURSE OF THE INVESTIGATION, RIGHT?

15   A.    I DID.

16   Q.    AND THOSE SEARCH WARRANTS INCLUDED MR. GHAHREMAN'S

17   PERSONAL EMAIL ACCOUNT, THE YAHOO ACCOUNT?

18   A.    CORRECT.

19   Q.    THEY INCLUDED HIS PROFESSIONAL EMAIL ACCOUNTS, THE

20   TIGMARINE.COM?

21   A.    TIG MARINE ACCOUNT, YES.

22   Q.    YOU SEARCHED THE EMAIL ACCOUNTS OF KOHANDIAREMAD, RIGHT?

23   A.    CORRECT.

24   Q.    AND KOORUSH TAHERKHANI?

25   A.    YES.

APRIL 16, 2015

HAMAKO - CROSS-EXAMINATION

1   **Q.**   AND ERGUN YILDIZ?

2   **A.**   CORRECT.

3   **Q.**   AND YOU RECEIVED -- WE SAID A FAIR ESTIMATE WAS OVER

4   14,000 PAGES OF RELEVANT EMAILS, RIGHT?

5   **A.**   THAT SOUNDS PLAUSIBLE, YES.

6   **Q.**   YOU REVIEWED -- AND YOU REVIEWED ALL OF THOSE EMAILS,

7   RIGHT?

8   **A.**   YES.

9   **Q.**   OVER THE COURSE OF THE MONTHS, OR THE TWO YEARS, EVEN --

10  **A.**   CORRECT, YES.

11  **Q.**   -- IT HAS BEEN SINCE THIS CHARGE WAS BROUGHT, CORRECT?

12        AND THERE IS NOT A SINGLE EMAIL WHERE KOORUSH TAHERKHANI

13  OR ERGUN YILDIZ TOLD ARASH GHAHREMAN THAT THE NAVIGATS WERE

14  GOING TO THE TERRITORY OR GOVERNMENT OF IRAN.

15  **A.**   I DID NOT DISCOVER SUCH AN EMAIL, NO.

16  **Q.**   AND THERE IS NOT A SINGLE EMAIL IN THE 14,000 PAGES OF

17  EMAILS FROM HIS PRIVATE ACCOUNT AND PROFESSIONAL ACCOUNT THAT

18  YOU REVIEWED WHERE KOORUSH SAYS WHO -- TELLS ARASH GHAHREMAN

19  WHO HIS CUSTOMER IS FOR THE TRIODE TUBES.

20  **A.**   CORRECT.

21        **MR. CAMDEN:**  NO FURTHER QUESTIONS.

22        **THE COURT:**  REDIRECT?

23        **MR. HARRIGAN:**  NO, YOUR HONOR.

24        **THE COURT:**  ALL RIGHT.  THANK YOU VERY MUCH.

25        THIS IS A GOOD POINT TO RECESS FOR THE WEEK.

APRIL 16, 2015

HAMAKO – CROSS–EXAMINATION

1              TODAY IS THURSDAY, SO WE WILL NOT BE IN SESSION
2      TOMORROW.

3              HERE AGAIN, I WANT TO THANK YOU ALL.  IT HAS BEEN A
4      LONG WEEK.  WE HAVE COVERED A LOT OF GROUND.  WE ARE WELL ON
5      TRACK, THE CASE IS MOVING VERY EFFICIENTLY.  I WILL GIVE YOU A
6      MORE PRECISE TIME ESTIMATE MONDAY, BUT I CAN TELL YOU AT THIS
7      TIME WE ARE DOING VERY WELL TIME WISE.

8              SO, HERE AGAIN, I WANT TO THANK YOU ALL FOR THE TIME
9      AND THE ATTENTION THAT YOU HAVE DEVOTED TO THESE PROCEEDINGS.
10     IT IS OBVIOUSLY A VERY SIGNIFICANT CASE, AND YOUR ATTENTION
11     AND CONSIDERATION IS MOST IMPORTANT, AND WE ARE VERY GRATEFUL
12     FOR IT.

13             IT WILL BE A THREE–DAY WEEKEND.  WE NEED ALL OF YOU
14     TO RETURN, SO REST WELL, TAKE GOOD CARE OF YOURSELVES.

15             PLEASE KEEP IN MIND THE ADMONITIONS NOT TO DISCUSS
16     THE CASE, FORM OR EXPRESS ANY OPINIONS OR CONCLUSIONS.

17             WE WILL MEET AGAIN HERE MONDAY AT 8:30.  WE WILL
18     HAVE ANOTHER FULL SCHEDULE, 8:30 TO 2:00.

19             THE GOVERNMENT WILL BE RESTING ITS CASE MONDAY
20     MORNING, AND THEN I ANTICIPATE THAT WE, AT THAT TIME, WILL BE
21     MOVING INTO OTHER PROCEEDINGS, BUT WE ARE WELL ON TRACK FOR
22     INSTRUCTION AND ARGUMENT PERHAPS MIDWEEK.

23             SO THANK YOU VERY MUCH.  HAVE A WONDERFUL WEEKEND.
24     WE WILL SEE YOU MONDAY AT 8:30.

25             (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

APRIL 16, 2015

```
 1              OPEN COURT, OUT OF THE HEARING OF THE JURY)

 2         THE COURT:  WE ARE OUTSIDE OF THE PRESENCE OF THE

 3    JURY.

 4              ON THE PLEA AGREEMENT, THE GOVERNMENT SEEKS TO

 5    INTRODUCE IT INTO EVIDENCE?

 6         MR. COUGHLIN:  I THINK AT THIS TIME, YOUR HONOR,

 7    MOSTLY BECAUSE OF THE WAY IT APPEARS AS THOUGH THE GOVERNMENT

 8    WAS IN COMPLETE CONTROL OF ACCEPTANCE OF RESPONSIBILITY.  WE

 9    THINK THE FULL PLEA AGREEMENT GIVES AN OPPORTUNITY TO SEE THAT

10    THERE WERE MANY TERMS IN THE PLEA AGREEMENT, AND IT WASN'T

11    SOMETHING THE GOVERNMENT WAS COMPLETELY IN CONTROL OF.  THE

12    TERMS ARE SET OUT, AND THEY ARE IN DEFENDANT'S HANDS AS WELL.

13    SO BASED ON THAT WE THINK IT IS APPROPRIATE.

14              WE ALSO THINK THAT THIS WAS REALLY AN ATTEMPT TO

15    INTRODUCE PUNISHMENT INTO THE TRIAL, ABOVE AND BEYOND JUST THE

16    NORMAL, WHAT IS THE MAXIMUM TERM YOU ARE LOOKING AT, BUT

17    THAT'S WHY WE THINK THE PLEA AGREEMENT IS APPROPRIATE IN THIS

18    CASE, AND THE COOPERATION AGREEMENT AS WELL.

19         THE COURT:  I THINK WHAT WOULD BE APPROPRIATE --

20    FIRST, I THINK THE CROSS-EXAMINATION WAS FAIR.  I MEAN, THAT'S

21    THE REALITY WHEN ONE COOPERATES IS THE DEFENSE CAN EXPLORE

22    FULLY WHAT THE CONSEQUENCES ARE.

23         MR. COUGHLIN:  WE WOULD AGREE WITH THAT.

24         THE COURT:  AND SO THE JURY LEARNS WHAT THE

25    PUNISHMENT IS GOING TO BE IF THERE IS AN ADVERSE VERDICT.
```

APRIL 16, 2015

```
 1              I WOULD PROPOSE THAT THE GOVERNMENT BE ABLE TO USE
 2    THE PLEA AGREEMENT, AS THE DEFENSE DID, AS A DEMONSTRATIVE.
 3    SO YOU CAN, IN CLOSING, LEAF THROUGH THE PAGES OF THE PLEA
 4    AGREEMENT AND THE ADDENDUM AND MAKE ALL OF THE ARGUMENTS YOU
 5    WANT TO MAKE.  BUT I DON'T BELIEVE IT WOULD BE APPROPRIATE TO
 6    ACTUALLY RECEIVE IT INTO EVIDENCE AND HAVE THE JURY GET THE
 7    PLEA AGREEMENT.
 8              MR. COUGHLIN:  FAIR ENOUGH.
 9              MR. HARRIGAN:  THAT IS GOING TO WORK, YOUR HONOR.
10    THANKS.
11              MR. JOHNSTON:  MAY I BE HEARD BRIEFLY ON THAT?
12              THE COURT:  I AM SORRY?
13              MR. JOHNSTON:  CAN I JUST BE HEARD ON THE PLEA
14    AGREEMENT?
15              THE COURT:  YES.
16              MR. JOHNSTON:  I MEAN, ONE CONCERN I HAVE IS THAT WE
17    DIDN'T DISCUSS A NUMBER OF THINGS FROM THE PLEA AGREEMENT THAT
18    DON'T APPEAR RELEVANT TO WHY HE MAY HAVE PLED GUILTY OR WHY HE
19    MIGHT BE COOPERATING.
20              IF THE GOVERNMENT IS GOING TO USE ALL OF THE PLEA
21    AGREEMENT THAT WE DIDN'T HAVE A CHANCE TO DISCUSS OR THE
22    GOVERNMENT DIDN'T TAKE THE OPPORTUNITY IN REDIRECT TO DISCUSS
23    WITH THE WITNESS, I DON'T HAVE AN OPPORTUNITY TO DETERMINE
24    WHAT THE AFFECT WAS ON HIM.  SO TO TAKE JUST SOME PART OF THE
25    PLEA AGREEMENT THAT WASN'T DISCUSSED BY THE WITNESS AND ARGUE
```

APRIL 16, 2015

```
 1    IT TO THE JURY, I HAVE A PROBLEM WITH THAT.
 2             I DON'T FEEL LIKE -- IF THE GOVERNMENT WANTED TO
 3    FIND SOMETHING IN THAT AGREEMENT THEY COULD HAVE, ON REDIRECT,
 4    SAID -- GONE UP AND SAID, OKAY, MR. JOHNSTON SAID THIS, BUT
 5    THIS PART SAYS THIS.
 6             AND THEN AT LEAST FROM THE WITNESS'S PERSPECTIVE WE
 7    KNOW WHAT HE THOUGHT ABOUT IT.
 8             EVERYTHING I DID WITH THE PLEA AGREEMENT WITH THE
 9    COOPERATING WITNESS WAS TO ASK HIM QUESTIONS TO GET WHAT HIS
10    UNDERSTANDING WAS OF PARTICULAR PARTS OF THE PLEA AGREEMENT,
11    SO THE PARTS THAT WE DIDN'T DISCUSS WE DON'T KNOW WHAT HE
12    THINKS OF THEM.
13             SO I DON'T THINK THE GOVERNMENT SHOULD BE ALLOWED TO
14    BRING IN OTHER PARTS THAT WEREN'T DISCUSSED AT ALL IN THE
15    TESTIMONY.  THEY HAD THEIR OPPORTUNITY AND DIDN'T TAKE IT
16    WHILE HE WAS HERE.
17             THE COURT:  WHAT WOULD BE THE PROFFER, WHAT WOULD BE
18    THE ARGUMENT?
19             MR. HARRIGAN:  THE ARGUMENT IS SIMPLY THIS.  I
20    THINK, NUMBER ONE, HE IS WRONG BECAUSE HE SAID, I REVIEWED THE
21    PLEA AGREEMENT, I READ IT, I AM AWARE OF ALL OF THE
22    OBLIGATIONS.
23             AND ESSENTIALLY, YOUR HONOR, THE ARGUMENT -- YOU
24    KNOW, MR. JOHNSTON DID A GOOD JOB OF CROSS-EXAMINING, HE
25    DIDN'T MENTION YOU HAVE AN OBLIGATION TO TELL THE TRUTH TOO.
```

APRIL 16, 2015

```
 1    ALL THIS IS OFF THE TABLE IF YOU DON'T TELL THE TRUTH.
 2              AND IT SAYS THAT NUMEROUS TIMES IN THE PLEA
 3    AGREEMENT.
 4              WE CAN'T GO INTO THAT, AS YOUR HONOR KNOWS, ON
 5    DIRECT UNLESS HE IS IMPEACHED.  IT IS ENTIRELY PROPER FOR THE
 6    GOVERNMENT, THE CASE LAW IS WELL SETTLED, THAT ONCE HE IS
 7    IMPEACHED BOTH THE PLEA AGREEMENT CAN COME IN, AND THE
 8    GOVERNMENT MAY MAKE THAT ARGUMENT IN REBUTTAL TO THE
 9    SUGGESTION THAT HE IS LYING.
10              NOW, WE DID EXPLORE IT IN THE PLEA AGREEMENT.  WE
11    DIDN'T COVER IT BEFORE.  I THINK MR. COUGHLIN AND I DECIDED
12    NOT TO GO ON REDIRECT BECAUSE WITHOUT TALKING TO THE COURT
13    ABOUT HOW WE CAN ARGUE THAT -- AND PLUS IF WE WANTED IT IN, WE
14    COULD DEAL WITH IT AT A LATER POINT, WHAT IS PERMISSIBLE
15    ARGUMENT.
16              BUT CERTAINLY THIS IS NOT AN ISSUE -- WE DIDN'T GO
17    INTO IT.  THE PLEA AGREEMENT, HE SAID -- HE SIGNED THE PLEA
18    AGREEMENT, SO THE ENTIRE PLEA AGREEMENT SHOULD COME IN.  IT
19    HAS OBLIGATIONS THAT MAY NOT BE RELEVANT, BUT ONE OBLIGATION
20    IS RELEVANT, IT IS THE OBLIGATION TO TELL THE TRUTH.  IT IS A
21    SMALL POINT, BUT WE SHOULD AT LEAST BE ABLE TO SAY, LOOK, ALL
22    BETS ARE OFF IF HE DOESN'T TELL THE TRUTH.  AND SUGGEST THAT
23    JUST TO POINT THE FINGER AT MR. GHAHREMAN IS HOW HE GETS A
24    DEAL IS NOT EXACTLY THE WHOLE CASE HERE.
25              SO I THINK THAT IS HOW WE WOULD LIKE TO USE IT.  I
```

APRIL 16, 2015

```
 1    DON'T THINK THAT IS UNTOWARD.  I DON'T THINK WE -- AGAIN, IT

 2    IS NOT -- IT IS NOT OUR EVIDENCE IN THE CASE, BUT WE SHOULD BE

 3    ABLE TO USE THAT.

 4            THE COURT:  ALL RIGHT.

 5            I THINK, GIVEN THE PROFFER, THAT IS A FAIR ARGUMENT.

 6    I THINK IT IS FAIR TO USE THE PLEA AGREEMENT AS A

 7    DEMONSTRATIVE.

 8            IF THERE IS SOME SURPRISE ARGUMENT BASED ON THE PLEA

 9    AGREEMENT THAT YOU DIDN'T ADDRESS IN YOUR CLOSING AND THE

10    GOVERNMENT RAISES IT IN REBUTTAL, THERE IS ALWAYS THE OPTION

11    OF A SURREBUTTAL ON PURELY THAT -- ON THAT ISSUE.  SO I THINK

12    THAT ISSUE WILL WORK OUT ACCORDINGLY.

13            ON THE JURY INSTRUCTIONS, WHERE ARE WE?

14            MR. CAMDEN:  WELL, YOUR HONOR, I MEAN, THE

15    GOVERNMENT STILL HAS GOT ONE WITNESS TO GO, I THINK.

16            THE COURT:  YES.

17            MR. CAMDEN:  JOHN HELSING.  AND THIS IS GOING TO

18    REGARD THE ACTUAL SHIPMENT OR THE SUBMISSION TO UPS FOR THE

19    SHIPMENT.

20            THE COURT:  YES.

21            MR. CAMDEN:  SO I AM GOING TO DO SOME MORE RESEARCH.

22    I AM NOT SURE I WILL BE ABLE TO ADDRESS ALL OF THE ISSUES THAT

23    MAY COME UP THROUGH MR. HELSING'S TESTIMONY, WHICH WE STILL

24    DON'T KNOW.  HE DIDN'T WRITE ANY REPORTS, EITHER.  SO WE HAVE

25    THE AUDIO SO I KNOW BASICALLY WHAT HAPPENED, BUT I AM NOT SURE
```

APRIL 16, 2015

```
 1    EXACTLY WHAT HE IS GOING TO SAY.
 2              THE COURT:  WHAT ABOUT AS TO THE JURY INSTRUCTIONS,
 3    GENERALLY, ON THE NINE COUNTS?
 4              MR. CAMDEN:  I THINK, YOU KNOW, IF THE COURT IS
 5    WILLING TO SET A STATUS.  I AM NOT PREPARED TO DISCUSS RIGHT
 6    THIS MOMENT, BUT IF THE COURT WANTED TO SET A STATUS FOR
 7    TOMORROW, I THINK I COULD ADDRESS THE WILLFULNESS ELEMENT,
 8    WHICH IS GOING TO BE THE BIG POINT OF CONTENTION, I THINK, AND
 9    THE -- JUST GENERAL INSTRUCTIONS ON THE ELEMENTS OF THE
10    SEPARATE OFFENSES, I THINK I COULD BE PREPARED.
11              THE COURT:  IN YOUR VIEW IS THE GOVERNMENT CLOSE, OR
12    IS THERE GOING TO BE A LOT OF DISAGREEMENT?
13              MR. CAMDEN:  I REVIEWED THEIR JURY INSTRUCTIONS,
14    YOUR HONOR, BUT I NEED TO DO SOME RESEARCH.  I NEED TO SPEND
15    SOME TIME ON WESTLAW, I THINK.
16              THE COURT:  HOW ABOUT TOMORROW AT 1:30.  IS THAT
17    CONVENIENT FOR YOU ALL?
18              MR. HARRIGAN:  YOUR HONOR, MR. COUGHLIN HAS A FAMILY
19    MATTER TO ATTEND TO.  I COULD ATTEND AND WILL BE ABLE TO
20    ATTEND.
21              ARE WE GOING TO GET THEM TOMORROW AT 1:30 AND TRY TO
22    GO THROUGH THEM?  YOU KNOW, THIS IS THE PROBLEM FOR THE
23    GOVERNMENT IS -- WE HAVE OUR TIME, TOO, SO IT IS NICE TO GET
24    THEM AHEAD OF TIME SO WE CAN THEN DISCUSS THEM.
25              THE COURT:  WHAT ARE YOU -- ARE YOU PROPOSING THAT
```

APRIL 16, 2015

```
 1   YOU WILL SUBMIT SOMETHING TONIGHT, OR DO YOU WANT TO JUST SHOW
 2   UP AND ARGUE?
 3           MR. CAMDEN:  MR. HARRIGAN HAS A VALID CONCERN.  I
 4   DON'T THINK, IF I DO MY TYPICAL THING AND WRITE THREE-PAGE
 5   JUSTIFICATION, THAT THEY WILL HAVE TIME TO ADEQUATELY ADDRESS
 6   IT OR REPLY TO IT.  I DON'T SEE BEING ABLE TO GET THEM
 7   ANYTHING SUBSTANTIVE BEFORE PROBABLY TOMORROW MORNING.
 8           THE COURT:  WHAT ABOUT -- WELL, I WOULD PROPOSE TWO
 9   TIMES.  ONE WOULD BE 11:30, THE OTHER WOULD BE 1:30.  AND WE
10   DON'T -- IT CAN SIMPLY BE THE START OF THE CONFERENCE SO THAT
11   I KNOW WHERE THE CONTESTED ISSUES ARE.  IT MAY BE THAT AFTER
12   YOU GET INTO THIS THERE IS NOT GOING TO BE VERY MUCH
13   DISAGREEMENT, EXCEPT AS TO PERHAPS WILLFULNESS.
14           MR. CAMDEN:  I CAN COME IN FOR A STATUS.  I DON'T
15   WANT MR. HARRIGAN TO THINK I AM PUTTING HIM ON THE SPOT AND
16   GIVING HIM A LATE SUBMISSION THAT HE HAS GOT TO DO RESEARCH
17   ON, SO I UNDERSTAND THEY MAY NOT BE PREPARED TO GIVE THEIR
18   POSITION.  BUT I THINK I WOULD BE PREPARED TO AT LEAST GIVE
19   OUR POSITION ON THE ELEMENTS AND THE WILLFULNESS, ESPECIALLY.
20           THE COURT:  HOW ABOUT 11:30?
21           MR. HARRIGAN:  YES, YOUR HONOR -- WELL --
22           THE COURT:  WHAT ARE THE --
23           MR. HARRIGAN:  I HAVE GRAND JURY TOMORROW WHICH IT
24   COULD GO -- I DON'T KNOW EXACTLY HOW LONG, BUT I WOULD LOVE TO
25   DO IT AT 11:30 AND GET DONE WITH IT.  SO CAN WE SET IT AT
```

APRIL 16, 2015

```
 1   11:30 AND IF IT IS A PROBLEM I WILL LET THE COURT KNOW.
 2             THE COURT:  THEN WE WILL MOVE IT TO 1:30.  THAT
 3   WOULD BE FINE WITH ME.
 4             MR. HARRIGAN:  I KNOW THE COURT WANTS TO GET IT DONE
 5   EARLIER THAN LATER.
 6             THE COURT:  YES.
 7             AND MR. GHAHREMAN DOES NOT NEED TO BE PRESENT.  YOU
 8   OBVIOUSLY HAVE A RIGHT TO BE PRESENT --
 9             DEFENDANT GHAHREMAN:  THANK YOU, SIR.
10             THE COURT:  -- BUT YOU DON'T NEED TO BE HERE.
11             WOULD YOU LIKE -- DO YOU WANT MR. GHAHREMAN HERE OR
12   DO YOU WANT TO TAKE A WAIVER AT THIS TIME?
13             MR. JOHNSTON:  YOUR HONOR, I CAN DISCUSS IT WITH
14   HIM, AND IF HE CHOOSES TO WAIVE I CAN LET THE COURT KNOW.  IF
15   YOU PREFER ON THE RECORD FROM HIM, THAT IS FINE, BUT I CAN
16   DISCUSS IT WITH HIM.
17             THE COURT:  ALL RIGHT.
18             SO IF YOU ARE NOT HERE TOMORROW FOR THE JURY
19   INSTRUCTIONS, THAT IS SIMPLY INDICATING TO ME THAT YOU ARE
20   WAIVING YOUR RIGHT TO BE PRESENT.  IS THAT FAIR?
21             DEFENDANT GHAHREMAN:  YES, SIR.  THANK YOU.
22             THE COURT:  SO WE WILL TRY FOR 11:30.  I AM FLEXIBLE
23   ON THIS, SO IF YOU ARE STUCK WITH GRAND JURY THEN WE WILL JUST
24   MOVE IT TO 1:30.
25             MR. HARRIGAN:  I DO APPRECIATE THAT.
```

APRIL 16, 2015

```
 1              THE COURT:  AND, OF COURSE, LET DEFENSE COUNSEL
 2    KNOW.
 3              OKAY.  THANK YOU.
 4
 5                            *   *   *
 6              I CERTIFY THAT THE FOREGOING IS A CORRECT
              TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
 7              IN THE ABOVE-ENTITLED MATTER.
 8              S/LEEANN PENCE                      6/11/2015
 9              LEEANN PENCE, OFFICIAL COURT REPORTER   DATE.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

APRIL 16, 2015

INDEX OF WITNESSES

YILDIZ, ERGUN

  BY MR. COUGHLIN   699

  BY MR. JOHNSTON             737


HAMAKO, KEVIN

  BY MR. HARRIGAN   787

  BY MR. CAMDEN               902

APRIL 16, 2015

252

```
 1
 2
 3                         INDEX OF EXHIBITS
 4
 5   EXHIBIT     IDENTIFIED RECEIVED
 6
 7   751-D        731          731
 8   751-B        731          731
 9   751-D        731          731
10   751-D        731          731
11   KK           741
12   LL           752
13   MM           758
14   DD           772
15   NN           774
16   OO           782
17   235          796
18   229 THROUGH
19   234          807
20   201          813          816
21   201-A        813          819
22   201-B        813          820
23   202          813          820
24   202-A        813          823
25   202-B        813          824
```

APRIL 16, 2015

| | | | |
|---|---|---|---|
| 1 | 203 | 813 | 825 |
| 2 | 204 | 813 | 827 |
| 3 | 204-A | 813 | 829 |
| 4 | 204-B | 813 | 829 |
| 5 | 205 | 813 | 830 |
| 6 | 206 | 813 | 832 |
| 7 | 207 | 813 | 835 |
| 8 | 208 | 813 | 838 |
| 9 | 208-A | 813 | 840 |
| 10 | 208-B | 813 | 840 |
| 11 | 209-A | 813 | 842 |
| 12 | 209-B | 813 | 843 |
| 13 | 210 | 813 | 844 |
| 14 | 211 | 813 | 846 |
| 15 | 213 | 813 | 849 |
| 16 | 213-A | 813 | 850 |
| 17 | 213-B | 813 | 851 |
| 18 | 214 | 813 | 851 |
| 19 | 214-A | 813 | 853 |
| 20 | 214-B | 813 | 854 |
| 21 | 215 | 813 | 854 |
| 22 | 216 | 813 | 855 |
| 23 | 216-A | 813 | 857 |
| 24 | 216-B | 813 | 857 |
| 25 | 217 | 813 | 858 |

APRIL 16, 2015

954

| | | | |
|---|---|---|---|
| 1 | 218 | 813 | 862 |
| 2 | 220 | 813 | 864 |
| 3 | 221 | 813 | 865 |
| 4 | 222 | 813 | 868 |
| 5 | 223 | 813 | 875 |
| 6 | 224 | 813 | 882 |
| 7 | 225 | 813 | 888 |
| 8 | 226 | 813 | 892 |
| 9 | 227 | 813 | 895 |
| 10 | 228 | 813 | 899 |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

APRIL 16, 2015