UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                               )
UNITED STATES OF AMERICA,      )
            PLAINTIFF,         )  CASE NO. 13CR4228-DMS
                               )
                               )  SAN DIEGO, CALIFORNIA
                               )MONDAY, APRIL 20, 2015
                               )   8:30 A.M. CALENDAR
ARASH GHAHREMAN,               )
            DEFENDANT.         )
_____)     VOLUME VI


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL/DAY FIVE




INTERPRETERS:                  BADI BADIOZAMANI
                               ASLAN ASLANIAN


                               LEE ANN PENCE,
REPORTED BY:                   OFFICIAL COURT REPORTER
                               UNITED STATES COURTHOUSE
                               333 WEST BROADWAY ROOM 1393
                               SAN DIEGO, CALIFORNIA 92101

```
COUNSEL APPEARING:

FOR PLAINTIFF:          LAURA E. DUFFY,
                        UNITED STATES ATTORNEY
                        BY:   SHANE P. HARRIGAN
                              TIMOTHY D. COUGHLIN
                        ASSISTANT U.S. ATTORNEYS
                        880 FRONT STREET
                        SAN DIEGO, CALIFORNIA 92101

FOR DEFENDANT           FEDERAL DEFENDERS OF SAN DIEGO, INC.
GHAHREMAN:                    BY:   ELLIS M. JOHNSTON
                                    JOSEPH S. CAMDEN
                        TRIAL ATTORNEYS
                        225 BROADWAY, SUITE 900
                        SAN DIEGO, CALIFORNIA 92101
```

```
 1      SAN DIEGO, CALIFORNIA - MONDAY, APRIL 20, 2015 - 8:30 A.M.

 2                              *   *   *

 3            THE CLERK:  NO. 1 ON CALENDAR, CASE 13CR4228, UNITED

 4    STATES OF AMERICA VERSUS ARASH GHAHREMAN; ON FOR JURY TRIAL,

 5    DAY FIVE.

 6            THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.

 7            WE HAVE ALL JURORS PRESENT.

 8            WELCOME BACK.

 9            WE HAVE ALL COUNSEL AND MR. GHAHREMAN PRESENT, AS

10    WELL.

11            WE WILL PICK UP TODAY, THIS MORNING, WITH THE

12    GOVERNMENT'S NEXT AND LAST WITNESS.

13            AM I CORRECT?

14            MR. COUGHLIN:  THAT IS CORRECT.  AT THIS TIME THE

15    GOVERNMENT CALLS TO THE STAND SPECIAL AGENT JOHN HELSING.

16            THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

17            DO YOU SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE

18    YOU SHALL GIVE IN THE CAUSE NOW BEFORE THE COURT SHALL BE THE

19    TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?

20            THE WITNESS:  I DO.

21            THE CLERK:  PLEASE TAKE THE STAND.

22            PLEASE STATE YOUR FULL NAME AND SPELL YOUR FIRST AND

23    LAST NAMES.

24            THE WITNESS:  JOHN HELSING.  J-O-H-N.

25    H-E-L-S-I-N-G.
```

HELSING – DIRECT EXAMINATION

```
 1              THE COURT:  THANK YOU.  GOOD MORNING.
 2              THE WITNESS:  GOOD MORNING, YOUR HONOR.
 3              THE COURT:  COUNSEL.
 4                          DIRECT EXAMINATION
 5    Q.    (MR. COUGHLIN) GOOD MORNING, MR. HELSING.  WHO DO YOU
 6    WORK FOR?
 7    A.    I AM A SPECIAL AGENT WITH THE DEFENSE CRIMINAL
 8    INVESTIGATIVE SERVICE.
 9    Q.    AND YOUR TITLE IS SPECIAL AGENT?
10    A.    YES, IT IS.
11    Q.    WHAT ARE YOUR DUTIES AND RESPONSIBILITIES IN THAT ROLE?
12    A.    CURRENTLY MY DUTIES AND RESPONSIBILITIES ARE TO
13    INVESTIGATE FEDERAL CRIMES AS THEY RELATE TO THE ILLEGAL
14    EXPORT OF TECHNOLOGY FROM THE UNITED STATES.
15    Q.    HOW LONG HAVE YOU BEEN A SPECIAL AGENT WITH DCIS?
16    A.    THIS SUMMER WILL BE 13 YEARS.
17    Q.    I AM GOING TO DIRECT YOUR ATTENTION TO JUNE OF 2013.
18    WERE YOU INVOLVED IN AN INVESTIGATION TARGETING INDIVIDUALS
19    BELIEVED TO BE EXPORTING GOODS FROM THE UNITED STATES DESTINED
20    FOR IRAN IN VIOLATION OF U.S. SANCTIONS?
21    A.    YES.
22    Q.    AND WHAT ROLE DID YOU PLAY IN THAT INVESTIGATION?
23    A.    I PLAYED AN UNDERCOVER ROLE.  MY ROLE WAS TO BE THE BOSS
24    OF SPECIAL AGENT DAVID COLE.
25    Q.    AND HE WAS THE LEAD UNDERCOVER AGENT?
```

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1    **A.**    YES, HE WAS.

2    **Q.**    DID YOU HAVE AN OPPORTUNITY TO MEET WITH THE TARGETS IN

3    CONNECTION WITH THIS INVESTIGATION?

4    **A.**    YES, I DID.

5    **Q.**    HOW MANY TIMES DID YOU MEET WITH THE TARGETS?

6    **A.**    I MET WITH MR. ERGUN YILDIZ TWICE AND MR. ARASH

7    GHAHREMAN THREE TIMES.

8    **Q.**    DO YOU SEE MR. ARASH GHAHREMAN IN THE COURTROOM TODAY?

9    **A.**    YES, I DO.

10   **Q.**    CAN YOU PLEASE POINT HIM OUT AND DESCRIBE WHAT HE IS

11   WEARING?

12   **A.**    IT IS THE GENTLEMAN SITTING AT THE DEFENSE TABLE, MIDDLE

13   SEAT.  WEARING WHAT LOOKS LIKE A GRAY SUIT.

14          **MR. COUGHLIN:**  YOUR HONOR, IF THE RECORD WOULD

15   REFLECT THAT THE WITNESS HAS IDENTIFIED THE DEFENDANT.

16          **THE COURT:**  YES.

17   **Q.**    **(MR. COUGHLIN)** IN PARTICULAR, AGENT HELSING, I WOULD

18   LIKE TO DIRECT YOUR ATTENTION TO JUNE 17TH, 2013.  WERE YOU

19   PARTICIPATING IN AN INVESTIGATION IN AN UNDERCOVER CAPACITY ON

20   THAT DAY?

21   **A.**    YES, I WAS.

22   **Q.**    IN GENERAL, CAN YOU TELL US WHAT YOUR DUTIES AND YOUR

23   ACTIONS WERE IN RELATION TO THE JUNE 17TH ENCOUNTER WITH THE

24   DEFENDANT.

25   **A.**    ON JUNE 17TH MY ROLE WAS TO PICK UP THE DEFENDANT AND

HELSING – DIRECT EXAMINATION

1  MR. YILDIZ FROM THEIR HOTEL AND DRIVE THEM TO THE UPS FACILITY

2  IN THE KEARNEY MESA AREA OF SAN DIEGO TO FACILITATE THE

3  SHIPPING OF THE ITEMS THAT THEY HAD PREVIOUSLY PURCHASED.

4  **Q.**    AND WHAT WERE YOU DRIVING THAT PARTICULAR DAY?

5  **A.**    I WAS DRIVING A RENTED WHITE SUV.

6  **Q.**    AND YOU DID HAVE THE PACKAGES TO BE MAILED WITH YOU?

7  **A.**    YES, I DID.

8  **Q.**    AND WERE THOSE THE SAME PACKAGES THAT HAD BEEN

9  PREVIOUSLY SHOWN TO THE DEFENDANT AND MR. YILDIZ IN THE LAS

10  VEGAS AREA?

11  **A.**    YES, THEY WERE.

12  **Q.**    WHERE DID YOU MEET THE TARGETS?

13  **A.**    I PICKED THEM UP AT THEIR HOTEL.

14  **Q.**    WAS THAT IN SAN DIEGO?

15  **A.**    YES, IT WAS.

16  **Q.**    NOW, DID ANY OTHER UNDERCOVER AGENTS OR OTHER AGENTS

17  ACCOMPANY YOU TO MEET WITH THE TARGETS?

18  **A.**    NO.

19  **Q.**    AND EXACTLY WHERE WERE YOU GOING WITH THE TARGETS ONCE

20  THEY –– WITH THE DEFENDANT MR. YILDIZ ONCE THEY GOT IN THE VAN

21  WITH YOU?

22  **A.**    WE WERE GOING TO THE UPS SHIPPING HUB.  I BELIEVE IT IS

23  ON RUFFIN ROAD IN THE KEARNEY MESA AREA OF SAN DIEGO.

24  **Q.**    AND HOW FAR AWAY WAS IT FROM THE HOTEL WHERE YOU PICKED

25  THE DEFENDANT AND MR. YILDIZ UP FROM?

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1    **A.**    IT WAS APPROXIMATELY A 20-MINUTE DRIVE.

2    **Q.**    DID YOU HAVE AN OPPORTUNITY TO SPEAK WITH THE DEFENDANT

3    AND MR. YILDIZ DURING THE DRIVE?

4    **A.**    YES, I DID.

5    **Q.**    WHAT DO YOU RECALL IN, IN GENERAL, WHAT THE TOPICS OF

6    CONVERSATION WERE?

7    **A.**    WE DISCUSSED A WIDE RANGE OF TOPICS.  WE DISCUSSED THE

8    FACT THAT THE PREVIOUS WEEKEND HAD BEEN THE FATHER'S DAY

9    HOLIDAY.  WE DISCUSSED THE FACT THAT THE DEFENDANT AND MR.

10   YILDIZ WANTED TO REOPEN THE BOXES TO EXAMINE THE CONTENTS ONCE

11   WE GOT TO THE UPS FACILITY.  WE DISCUSSED SOME OF THE MILITARY

12   AIRCRAFT THAT WERE FLYING OVERHEAD.  WE DISCUSSED THE FACT

13   THAT THE DEFENDANT MADE SOME COMMENTS TO THE FACT THAT HE

14   THOUGHT IT MIGHT BE NECESSARY TO EITHER PURCHASE ADDITIONAL

15   ITEMS OR MODIFY EXISTING ITEMS TO KIND OF INCREASE THE

16   PERFORMANCE OF WHAT THEY HAD PURCHASED ONCE THEY WERE TESTED

17   ON THE END-USE VESSEL.  JUST GENERAL TOPICS ABOUT AIRCRAFT

18   CARRIERS.  THERE WAS SOME TALK ABOUT THE NUMBER OF AIRCRAFT

19   CARRIERS.  MR. YILDIZ COMMENTED ON --

20          **MR. CAMDEN:**  OBJECTION, YOUR HONOR.  403.

21          **THE COURT:**  OVERRULED.

22          **THE WITNESS:**  MR. YILDIZ MADE SOME COMMENTS ABOUT

23   SOME OF THE AIRCRAFT THAT WERE -- FLEW IN AND OUT OF DUBAI.

24   JUST THINGS OF THAT NATURE.

25   **Q.**    **(MR. COUGHLIN)** OKAY.  DID THEY DISCUSS WHETHER OR NOT

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1   YOU HAD RECEIVED PAYMENT, OR THE UNDERCOVER GROUP HAD RECEIVED

2   PAYMENT FOR THE GOODS THAT WERE BEING SHIPPED?

3   **A.**    YES, THEY DID.  THEY STATED THAT -- THEY CONFIRMED THAT

4   PAYMENT HAD BEEN RECEIVED.

5   **Q.**    DO YOU RECALL, IF YOU REMEMBER, WHO EXACTLY WAS THE

6   PERSON ASKED TO REOPEN THE PACKAGES?

7   **A.**    MR. YILDIZ ASKED TO REOPEN THE PACKAGES.

8   **Q.**    SO WHAT HAPPENED AFTER YOU ARRIVED TO THE UPS STORE?

9   **A.**    ONCE I PARKED THE SUV IN THE PARKING LOT IMMEDIATELY IN

10  FRONT OF THE UPS FACILITY WE EXITED THE VEHICLE.  I RETRIEVED

11  KIND OF A FLAT PUSH CART TYPE THING FROM THE FRONT OF THE

12  STORE.  THE THREE OF US UNLOADED THE BOXES FROM THE REAR OF

13  THE VEHICLE, PUT THEM ON THE PUSH CART.  AND THEN WE ENTERED

14  THE UPS FACILITY.

15  **Q.**    NOW, DID YOU -- YOU INDICATED THAT THEY ASSISTED

16  UNLOADING THE PACKAGES FROM THE SUV?

17  **A.**    YES, THEY DID.

18  **Q.**    WAS THAT BOTH THE DEFENDANT AND MR. YILDIZ?

19  **A.**    YES, THEY DID.  BOTH.

20  **Q.**    IN YOUR UNDERCOVER ROLE, WHAT WAS YOUR APPROACH TO

21  SHIPPING THE NAVIGAT AND THE Y-690'S THAT DAY?

22  **A.**    MY ROLE WAS BASICALLY TO COME IN -- THEY HAD ALREADY

23  PURCHASED THE ITEMS.  MY JOB WAS JUST TO GET THEM TO THE UPS

24  FACILITY, AND LET THEM FILL OUT ALL OF THE SHIPPING PAPERWORK

25  AND COMPLETE THE ACTUAL SHIPMENT THEMSELVES.

APRIL 20, 2015

886

HELSING – DIRECT EXAMINATION

1   **Q.**    DID THEY, IN FACT, HANDLE IT?

2   **A.**    YES.  WE ALL PARTICIPATED, BUT, YES, THE DEFENDANT AND

3   MR. YILDIZ PERFORMED THE SHIPPING.

4   **Q.**    OKAY.

5          **MR. CAMDEN:**  OBJECTION.  CONCLUSORY, YOUR HONOR.

6          **THE COURT:**  OVERRULED.  THE ANSWER WILL STAND.

7   **Q.**    **(MR. COUGHLIN)** SO ONCE YOU ENTERED THE UPS SHIPPING

8   STORE, WHAT HAPPENED NEXT?

9   **A.**    WELL, ONCE WE ENTERED THE UPS FACILITY WE PROCEEDED TO A

10  SIDE AREA WHERE THERE WAS A COUNTER AND SOME SELF-HELP KIOSKS

11  WHERE WE PROCEEDED TO OPEN THE BOXES AND TO EXAMINE THE

12  CONTENTS.

13  **Q.**    HOW DID YOU, IN FACT, GET THE BOXES OPEN?

14  **A.**    THE DEFENDANT HAD A SMALL KNIFE OR SOME SORT OF SMALL

15  CUTTING BLADE THAT WE USED TO CUT THE TAPE OFF THE BOXES.

16  **Q.**    DID THEY UNPACK THE BOXES OR JUST OPEN THEM AND VIEW

17  THEM?

18  **A.**    WE OPENED THEM JUST ENOUGH TO VERIFY THAT THE CONTENTS

19  WERE STILL IN THE BOXES.  WE DIDN'T DO A FULL UNPACKING OF THE

20  BOXES.

21  **Q.**    WERE EACH OF THE BOXES EXAMINED, THOUGH?

22  **A.**    YES, THEY WERE.

23  **Q.**    CAN YOU EXPLAIN HOW THE SHIPPING PAPERWORK WAS HANDLED,

24  IN GENERAL.

25  **A.**    IN GENERAL, WE BELIEVED THAT WE COULD USE THE SELF-HELP

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1    COMPUTER SCREEN KIOSK AREA.  SO WE WENT THROUGH ALMOST THE

2    ENTIRE PROCESS OF FILLING OUT THE REQUIRED PAPERWORK UNTIL WE

3    REALIZED THAT SINCE THE VALUE OF THE SHIPMENT WAS OVER $2,499

4    WE IN FACT HAD TO DO PAPER COPIES OF THE EXACT SAME THING.  SO

5    WE PROCEEDED TO FILL OUT THE PAPER COPIES THAT WERE REQUIRED

6    FOR SHIPPING THE BOXES.

7    **Q.**    SO WERE YOU PRESENT WHEN THE PAPER WAS FILLED OUT?

8    **A.**    YES, I WAS.

9    **Q.**    DO YOU RECALL WHO WAS HANDLING THE COMPUTER OR PUTTING

10   THE INFORMATION INTO THE COMPUTER?

11   **A.**    TO THE BEST OF MY RECOLLECTION, IT WAS THE DEFENDANT AND

12   MR. YILDIZ.

13   **Q.**    DID THEY TRADE OFF OR DID ONE DO IT PREDOMINANTLY?

14   **A.**    MY RECOLLECTION IS THAT IT WAS EQUAL PARTS, THE

15   DEFENDANT AND MR. YILDIZ.  IT WAS KIND OF A JOINT EFFORT.

16   **Q.**    DID BOTH THE DEFENDANT AND MR. YILDIZ PARTICIPATE IN

17   FILLING OUT THE PAPERWORK?

18   **A.**    YES, THEY DID.

19   **Q.**    THIS WAS THE HANDWRITTEN PORTION?

20   **A.**    YES.

21   **Q.**    SO HOW LONG WAS IT UNTIL YOU ACTUALLY GOT TO THE

22   HANDWRITTEN SHIPPING DOCUMENTS, IF YOU TAKE INTO ACCOUNT THE

23   UNSEALING AND OPENING AND LOOKING AND THEN WORKING THROUGH THE

24   COMPUTER?

25   **A.**    IT WOULD BE A FAIRLY ROUGH ESTIMATE, BUT I WOULD SAY

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

```
1   SOMEWHERE IN THE NEIGHBORHOOD OF 20 MINUTES, 25 MINUTES.
2   Q.    AND DURING THE PROCESS OF FILLING OUT THE SHIPPING
3   PAPERWORK, DID THE DEFENDANT AND MR. YILDIZ ENGAGE IN ANY
4   CONVERSATION THAT YOU WERE ALSO PARTY TO?
5   A.    YES, THEY DID.
6   Q.    WHAT WERE SOME OF THE TOPICS DISCUSSED AS YOU WERE
7   REDOING THE SHIPPING DOCUMENTS?
8   A.    THERE WAS A LOT OF DISCUSSION OF THE INSURANCE, WHETHER
9   TO PUT INSURANCE AND HOW MUCH INSURANCE.  THERE WAS A LOT OF
10  DISCUSSION ABOUT THE TOTAL VALUE OF THE ENTIRE SHIPMENT.
11  THERE WAS BACK AND FORTH CONCERNING THE ADDRESS IN THE CZECH
12  REPUBLIC THAT WE WERE GOING TO USE.  THE ADDRESS IN DUBAI THAT
13  WE WERE GOING TO USE.  THERE WAS JUST GENERAL CONVERSATION
14  ABOUT VALUE.
15        WE TALKED ABOUT -- WE WERE ASKED BY THE CLERK IN UPS
16  WHETHER THE SHIPMENT WAS DOMESTIC OR INTERNATIONAL.  GENERAL
17  CONVERSATION REFERRING TO THE SHIPMENT AND THE VALUE.
18  Q.    DID BOTH THE DEFENDANT AND MR. YILDIZ PARTICIPATE IN
19  THAT CONVERSATION?
20  A.    YES, THEY DID.
21  Q.    ALL THREE OF YOU WERE PRESENT DURING THAT CONVERSATION;
22  IS THAT CORRECT?
23  A.    THAT'S CORRECT.
24  Q.    WHAT, IF ANYTHING, DID YOU PLAN TO DO IN CONNECTION WITH
25  PARTICIPATING IN COMPLETING THE SHIPPING DOCUMENTS?
```

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

```
 1          MR. CAMDEN:  OBJECTION.  RELEVANCE, YOUR HONOR.
 2          THE COURT:  OVERRULED.
 3          YOU MAY ANSWER.
 4          THE WITNESS:  WHEN WE FILLED OUT THE PAPERWORK THE
 5  ONLY PARTS THAT I PUT, BECAUSE I KNEW THE ADDRESS, WAS THE
 6  SHIPPER ADDRESS, WHICH WAS MY ADDRESS.  AND THEN I ACTUALLY
 7  SIGNED THE DOCUMENTS AS THE SHIPPER.
 8  Q.    (MR. COUGHLIN) DO YOU RECALL WHO HAD THE ADDRESS FOR
 9  THE CZECH REPUBLIC?
10  A.    I ACTUALLY HAD THAT ADDRESS.
11  Q.    DID YOU PRODUCE THAT ADDRESS?
12  A.    YES, I DID.
13  Q.    DID YOU FILL IT IN OR DID SOMEONE ELSE?
14  A.    SOMEONE ELSE FILLED IT IN.
15  Q.    I AM GOING TO SHOW YOU WHAT HAS BEEN ADMITTED INTO
16  EVIDENCE AS GOVERNMENT'S EXHIBIT 751-A.
17          MR. COUGHLIN:  MAY I APPROACH, YOUR HONOR?
18          THE COURT:  YES.
19          MR. COUGHLIN:  751-A AND B.
20  Q.    (MR. COUGHLIN) PLEASE JUST LOOK AT THESE FOR RIGHT NOW.
21  A.    (WITNESS COMPLIES)
22  Q.    DO YOU RECOGNIZE THOSE?
23  A.    YES, I DO.
24  Q.    HOW IS IT THAT YOU RECOGNIZE THOSE?
25  A.    THIS IS THE PAPERWORK THAT WE FILLED OUT AT THE UPS
```

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

```
 1   FACILITY.
 2   Q.    DID YOU RECOGNIZE SOME OF THE HANDWRITING ON THERE?
 3   A.    YES, I DO.
 4         MR. COUGHLIN:  YOUR HONOR, I WOULD LIKE TO PUBLISH
 5   THESE TO THE JURY.
 6         THE COURT:  YES.
 7   Q.    (MR. COUGHLIN) I WOULD LIKE TO BEGIN BY PUBLISHING -- I
 8   WOULD LIKE TO BEGIN BY PUBLISHING THIS DOCUMENT.
 9         YOU INDICATED YOU RECOGNIZED THIS DOCUMENT; IS THAT
10   CORRECT?
11   A.    THAT'S CORRECT.
12   Q.    WHAT ABOUT THIS DOCUMENT DO YOU RECOGNIZE?
13   A.    I RECOGNIZE THAT THIS IS THE DOCUMENT THAT WE FILLED OUT
14   AT THE UPS FACILITY.
15   Q.    OKAY.  AND WHAT PART OF THIS DOCUMENT DID YOU FILL OUT?
16   A.    I FILLED OUT -- IT LOOKS TO BE BLOCK 1, THE SHIPPER
17   INFORMATION.
18   Q.    DO YOU RECOGNIZE THAT AS YOUR HANDWRITING?
19   A.    YES, I DO.
20   Q.    CAN YOU GO AHEAD AND CIRCLE THAT, IF YOU WOULD?
21   A.    (WITNESS COMPLIES)
22   Q.    AND WAS THERE SOMEPLACE ELSE ON THIS DOCUMENT THAT YOU
23   ALSO RECOGNIZE?
24   A.    YES.  AT THE VERY BOTTOM, THE SIGNATURE.
25   Q.    OKAY.  AND CAN YOU GO AHEAD AND CIRCLE THAT, IF YOU
```

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1    WOULD.

2    **A.**    (WITNESS COMPLIES)

3    **Q.**    SO ANYTHING ELSE ON THIS DOCUMENT YOU FILLED OUT?

4    **A.**    NO.

5    **Q.**    DO YOU RECALL WHO FILLED OUT -- DO YOU RECALL WHAT ITEM

6    THIS WAS?

7    **A.**    YES.  THESE WERE THE Y-690'S.

8    **Q.**    OKAY.  AND HOW DO YOU KNOW THAT?

9    **A.**    FROM THE DESCRIPTION AND VALUE OF CONTENTS BOX.

10   **Q.**    AS WELL AS WHERE THEY ARE BEING SHIPPED TO?

11   **A.**    YES, THAT'S CORRECT.

12   **Q.**    DO YOU KNOW WHO FILLED OUT THE CONSIGNEE INFORMATION?

13   **A.**    YES, I DO.

14   **Q.**    WHO WAS THAT?

15   **A.**    THE DEFENDANT.

16   **Q.**    AND DO YOU KNOW WHO FILLED OUT THE DESCRIPTION AND VALUE

17   OF THE CONTENTS?

18   **A.**    YES, I DO.

19   **Q.**    WHO WAS THAT?

20   **A.**    THE DEFENDANT.

21   **Q.**    LET ME SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S

22   EXHIBIT 751-B, AND ASK IF YOU RECOGNIZE THIS DOCUMENT.

23   **A.**    YES, I DO.

24   **Q.**    AND WHAT IS THE NAME OF THIS DOCUMENT HERE?  THE LAST

25   WAS THE INVOICE, WHAT IS THIS?

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1    **A.**    THIS IS A WEIGH BILL.

2    **Q.**    DID YOU FILL OUT A PORTION OF THE WEIGH BILL?

3    **A.**    YES, I DID.

4    **Q.**    WHICH PORTION OF THE WEIGH BILL DID YOU FILL OUT?

5    **A.**    I FILLED OUT THE SHIPPER BLOCK, SECTION 1, EXCEPT FOR

6    THE SHIPPER'S UPS ACCOUNT NUMBER, I DID NOT FILL THAT IN.  I

7    ALSO SIGNED AND DATED THE BOTTOM RIGHT, SECTION 8.

8    **Q.**    AND CAN YOU GO AHEAD AND CIRCLE THE PART THAT YOU FILLED

9    OUT ON THIS DOCUMENT AS WELL.

10   **A.**    (WITNESS COMPLIES)

11   **Q.**    DID YOU FILL OUT THE RECEIVER INFORMATION?

12   **A.**    NO, I DID NOT.

13   **Q.**    DID YOU FILL OUT THE DESCRIPTION OF THE GOODS?

14   **A.**    NO, I DID NOT.

15   **Q.**    THIS REFERRED TO THE Y-690?

16   **A.**    YES.

17   **Q.**    SO THIS IS IN CONJUNCTION WITH THE INVOICE?

18   **A.**    YES.

19   **Q.**    DO YOU KNOW WHO FILLED OUT THIS INFORMATION?

20   **A.**    YES, I DO.

21   **Q.**    WHO WAS THAT?

22   **A.**    THE DEFENDANT.

23            **MR. COUGHLIN:**  MAY I APPROACH THE WITNESS, YOUR

24   HONOR?

25            **THE COURT:**  YES.

APRIL 20, 2015

HELSING - DIRECT EXAMINATION

1   **Q.**    **(MR. COUGHLIN)** I AM GOING TO SHOW YOU WHAT HAS BEEN

2   MARKED AS GOVERNMENT'S EXHIBIT 751-D AND E.  IF YOU LOOK AT

3   THAT FIRST TO BEGIN WITH.

4   **A.**    (WITNESS COMPLIES)

5   **Q.**    DO YOU RECOGNIZE THOSE TWO EXHIBITS?

6   **A.**    YES, I DO.

7   **Q.**    HOW IS IT THAT YOU RECOGNIZE THEM?

8   **A.**    THESE ARE TWO OF THE DOCUMENTS THAT WE FILLED OUT AT THE

9   UPS FACILITY.

10  **Q.**    DID YOU PARTICIPATE IN FILLING OUT THOSE DOCUMENTS?

11  **A.**    YES, I DID.

12          **MR. COUGHLIN:**  YOUR HONOR, THESE HAVE BOTH BEEN

13  ADMITTED INTO EVIDENCE.  I WOULD LIKE TO PUBLISH THEM TO THE

14  JURY.

15          **THE COURT:**  YES.

16  **Q.**    **(MR. COUGHLIN)** SHOWING YOU WHAT HAS BEEN MARKED AS

17  751-D.  AND I ZOOMED IN ON THE SHIPPER AREA.

18          IS THAT THE AREA THAT YOU FILLED OUT?

19  **A.**    YES, IT IS.

20  **Q.**    I AM PUSHING THE DOCUMENT UP.

21          DO YOU SEE WHERE IT SAYS THE CONSIGNEE?

22  **A.**    YES, I DO.

23  **Q.**    AND WHO DOES IT SAY WAS THE CONTACT PERSON THERE?

24  **A.**    MR. ERGUN YILDIZ.

25  **Q.**    AND IT GIVES THE ADDRESS OF TIG MARINE; IS THAT CORRECT?

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1   **A.**   THAT'S CORRECT.

2   **Q.**   ON ALSO ON THE OTHER SIDE IT SAYS NAME OF THE CONTACT

3   PERSON; IS THAT CORRECT?

4   **A.**   THAT'S CORRECT.

5   **Q.**   THAT WAS ALSO LISTED AS ERGUN YILDIZ?

6   **A.**   YES, IT WAS.

7   **Q.**   DO YOU KNOW WHO FILLED OUT THIS INFORMATION?

8   **A.**   THAT WAS MR. YILDIZ.

9   **Q.**   MOVING DOWN THE INVOICE TO THE DESCRIPTION AND VALUE OF

10  THE CONTENTS.  DID YOU HAVE AN OPPORTUNITY TO SEE WHO FILLED

11  THIS OUT?

12  **A.**   YES, I DID.

13  **Q.**   DO YOU REMEMBER WHO FILLED IT OUT?

14  **A.**   TO THE BEST OF MY RECOLLECTION, THAT WAS ALSO MR.

15  YILDIZ.

16  **Q.**   AND GOING DOWN TO THE BOTTOM THERE, THE REMARK SECTION.

17  AGAIN, DO YOU HAVE ANY INFORMATION ABOUT THE REMARK SECTION?

18  **A.**   TO THE BEST OF MY RECOLLECTION, MR. YILDIZ ALSO FILLED

19  THAT OUT.

20  **Q.**   AGAIN, AS YOU INDICATED, THIS WAS SOMETHING YOU SIGNED

21  AT THE BOTTOM?

22  **A.**   YES, IT WAS.

23  **Q.**   SHOWING YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S

24  EXHIBIT 751-E, AND ASK AGAIN IF YOU RECOGNIZE WHAT THIS

25  DOCUMENT IS?

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1    **A.**    THAT IS THE WEIGH BILL.

2    **Q.**    IS THAT IN CONJUNCTION WITH THE INVOICE WE JUST LOOKED

3    AT?

4    **A.**    YES, IT IS.

5    **Q.**    CAN YOU GO AHEAD AND CIRCLE WHAT IT IS YOU FILLED OUT ON

6    THIS DOCUMENT?

7    **A.**    (WITNESS COMPLIES)

8         **MR. COUGHLIN:**   FOR PURPOSES OF THE RECORD, HE IS

9    CIRCLING THE SHIPPING INFORMATION AS WELL AS THE SHIPPER'S

10   SIGNATURE.

11   **Q.**    **(MR. COUGHLIN)** DO YOU KNOW WHO FILLED OUT THE RECEIVER

12   INFORMATION?

13   **A.**    YES, I DO.

14   **Q.**    WHO WAS THAT?

15   **A.**    MR. YILDIZ.

16   **Q.**    AS WELL AS THE DESCRIPTION OF THE GOODS?

17   **A.**    YES.

18   **Q.**    AND WHO WAS THAT?

19   **A.**    MR. YILDIZ.

20   **Q.**    WHAT ABOUT THE VALUE OF THE GOODS THAT WERE BEING

21   SHIPPED, DO YOU KNOW WHO FILLED THAT OUT?

22   **A.**    I BELIEVE THAT WAS ALSO MR. YILDIZ.

23   **Q.**    AT THE UPS STORE WAS THERE SOME DISCUSSION ABOUT WHO WAS

24   GOING TO PAY FOR THE SHIPPING?

25   **A.**    YES, THERE WAS.

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1   **Q.**    AND WHAT EXACTLY WAS THE DISCUSSION?

2   **A.**    THERE WAS SOME -- THE DISCUSSION WAS BASICALLY THAT IT

3   HAD BEEN PREVIOUSLY AGREED THAT WE WOULD PAY FOR THE SHIPPING,

4   MY COMPANY.

5   **Q.**    DID YOU ASK THE QUESTION AS A STARTING POINT?

6   **A.**    YES, I DID.

7   **Q.**    WHAT DID YOU ASK?

8   **A.**    I ASKED WHO WAS -- WHO WAS SUPPOSED TO PAY FOR THE

9   SHIPPING.

10  **Q.**    DO YOU REMEMBER WHO RESPONDED TO THAT?

11  **A.**    TO MY RECOLLECTION, THERE WAS TWO DISCUSSIONS ABOUT

12  THAT.  THE FIRST ONE MR. YILDIZ REPLIED THAT I WAS SUPPOSED TO

13  PAY FOR THE SHIPPING.

14  **Q.**    WHAT ABOUT IN THE SECOND DISCUSSION.

15  **A.**    IN THE SECOND DISCUSSION THE DEFENDANT REPLIED THAT I

16  WAS SUPPOSED TO PAY FOR THE SHIPPING, AS WELL.

17  **Q.**    IN CONNECTION WITH AFTER COMPLETING THE PAPERWORK, THERE

18  SEEMED TO BE SOME CONCERNS ABOUT CERTAIN INFORMATION RELATED

19  TO COMMERCE THAT NEEDED TO BE COMPLETED; IS THAT CORRECT?

20  **A.**    YES, THAT'S CORRECT.

21  **Q.**    AT SOME POINT WAS THAT CONCERN RESOLVED?

22  **A.**    YES, IT WAS.

23  **Q.**    HOW WAS IT RESOLVED?

24  **A.**    IT WAS RESOLVED BY ME JUST SIMPLY STATING THAT WE DIDN'T

25  NEED THE REQUIRED COMMERCE CODE THAT WE WERE BEING ASKED TO

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

```
1    PROVIDE.
2    Q.    AT SOME POINT IN TIME DID THE UPS EMPLOYEES TAKE
3    POSSESSION OF THE PACKAGES?
4    A.    YES, THEY DID.
5    Q.    WHAT DID YOU DO AT THAT POINT?
6    A.    ONCE WE GAVE -- ALL OF THE PAPERWORK WAS COMPLETED AND
7    WE GAVE THE PACKAGES TO THE UPS EMPLOYEES, WE EXITED THE UPS
8    FACILITY.
9    Q.    WHAT HAPPENED AFTER THE THREE OF YOU EXITED?
10   A.    WE WERE ALL ARRESTED.
11   Q.    NOW, IN CONNECTION WITH THE PACKAGES, WHAT HAPPENED TO
12   THE PACKAGES THAT WERE BEING MAILED THAT DAY?
13   A.    THEY WERE SEIZED BY AGENTS.
14   Q.    DID YOU HAVE AN OPPORTUNITY TO INSURE THE CHAIN OF
15   CUSTODY WAS MAINTAINED AS TO THOSE PACKAGES?
16   A.    YES, I DID.
17   Q.    HAVE YOU SEEN THOSE PACKAGES SINCE THAT DAY?
18   A.    YES, I HAVE.
19   Q.    ON MORE THAN ONE OCCASION?
20   A.    YES.
21   Q.    HAVE YOU HAD AN OPPORTUNITY TO OPEN THE PACKAGES AND
22   LOOK INSIDE?
23   A.    YES, I HAVE.
24   Q.    CAN YOU TELL US A LITTLE BIT AS TO HOW YOU DECIDED WITH
25   REGARD TO THE PACKAGING TO GET THEM READY FOR SHIPPING.
```

APRIL 20, 2015

HELSING - DIRECT EXAMINATION

1   **A.**    WE DECIDED THAT TO GET THEM READY FOR SHIPPING THAT WE

2   WOULD, IN FACT, KIND OF ENCASE THE ORIGINAL BOXES INTO

3   ALMOST -- LIKE CREATE AN EGGSHELL AROUND THE ORIGINAL BOXES

4   WITH TWO OTHER BOXES SLIDING OVER THEM.

5   **Q.**    I AM GOING TO SHOW YOU WHAT HAS BEEN --

6           **MR. COUGHLIN:**  MAY I APPROACH, YOUR HONOR?

7           **THE COURT:**  YES.

8           **MR. COUGHLIN:**  AT THIS TIME MAY I HAVE THE CASE

9   AGENT ASSIST THIS WITNESS IN DISPLAYING THE PACKAGING, IF IT

10  IS ADMITTED INTO EVIDENCE?

11          **THE COURT:**  YES.

12          **MR. COUGHLIN:**  I WILL CALL HIM UP IN A SECOND.

13  **Q.**   **(MR. COUGHLIN)** I AM GOING TO SHOW YOU WHAT IS MARKED AS

14  GOVERNMENT'S EXHIBIT 752, AND I WOULD LIKE YOU TO EXAMINE THAT

15  BRIEFLY.

16          (EXHIBIT 752 MARKED FOR IDENTIFICATION)

17  **A.**    (WITNESS COMPLIES)

18  **Q.**    DO YOU RECOGNIZE BOTH THE PACKAGING AND THE CONTENTS?

19  **A.**    YES, I DO.

20  **Q.**    AND HOW IS IT YOU RECOGNIZE THOSE?

21  **A.**    THESE WERE PRESENT AT THE MEETING IN LAS VEGAS AND ALSO

22  AT THE UPS FACILITY.

23  **Q.**    AND WHEN YOU SAY PRESENT, ARE YOU TALKING ABOUT IN

24  ADDITION TO THE ADDITIONAL PACKAGE THAT YOU PUT ON?

25  **A.**    I AM SORRY.  CAN YOU REPEAT THE QUESTION?

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1  **Q.**    WITH REGARD TO THE JUNE 17TH MEETING, WAS THAT THE SAME

2  BOX THEY WERE IN ON JUNE 13TH AS WELL, ON THAT PARTICULAR

3  EXHIBIT 752?

4  **A.**    THIS EXTERIOR BOX WAS PRESENT ON THE 17TH.

5          **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

6  TO MOVE INTO EVIDENCE GOVERNMENT EXHIBIT 752 AND THE CONTENTS.

7          **THE COURT:**  ANY OBJECTION?

8          **MR. JOHNSTON:**  NO, YOUR HONOR.

9          **THE COURT:**  THEY ARE RECEIVED.

10          (EXHIBIT 752 RECEIVED INTO EVIDENCE)

11  **Q.**    **(MR. COUGHLIN)** IF YOU COULD THEN COME DOWN, AND WITH

12  THE ASSISTANCE OF THE CASE AGENT -- CAN YOU STAND HERE IN THE

13  MIDDLE, IF YOU WOULD.

14  **A.**    (WITNESS COMPLIES)

15  **Q.**    YOU INDICATED THAT THE ORIGINAL PACKAGING WAS SOMETHING

16  THAT YOU ADDED, THE BOX; IS THAT CORRECT?

17  **A.**    THAT'S CORRECT.

18  **Q.**    WHAT WAS CONTAINED IN 752?

19  **A.**    INSIDE THE ORIGINAL BOX WERE THE Y-690'S.

20  **Q.**    OKAY.  AND THE BOX YOU ARE HOLDING IN YOUR HAND, WAS

21  THAT A BOX THAT WAS PRESENT ON JUNE 13TH IN LAS VEGAS?

22  **A.**    YES, IT WAS.

23  **Q.**    AND WHAT IS INSIDE THE BOX?

24  **A.**    THE Y-690'S.

25  **Q.**    AND HOW MANY ARE CONTAINED IN THERE?

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1    **A.**    TWO.

2    **Q.**    CAN YOU HOLD UP ONE, IF YOU WOULD?

3    **A.**    (WITNESS COMPLIES)

4    **Q.**    AND WHAT DOES IT SAY ON THE OUTSIDE OF THAT PACKAGING?

5    **A.**    IT SAYS, EIMAC, ELECTRON TUBE Y-690, WITH A DATE CODE.

6    **Q.**    IF YOU COULD BE SO KIND AS TO TAKE THAT OUT AND HOLD IT

7    UP FOR THE JURY.

8    **A.**    (WITNESS COMPLIES)

9    **Q.**    DID YOU HAVE AN APPROXIMATE UNDERSTANDING OF WHAT THE

10   PRICE OR THE VALUE WAS OF THAT PARTICULAR ITEM?

11   **A.**    AT THE TIME I DID.  I DON'T RECALL WHAT THE VALUE WAS.

12   **Q.**    OKAY.  AND WAS THERE MORE THAN ONE OF THOSE IN THAT

13   PARTICULAR PACKAGING?

14   **A.**    YES, THERE WAS.

15   **Q.**    WHERE WAS THAT PACKAGING BEING SENT?

16   **A.**    THIS PACKAGING WAS BEING SENT TO THE CZECH REPUBLIC.

17   **Q.**    WHY WAS IT BEING SENT TO THE CZECH REPUBLIC?

18   **A.**    THE STORY THAT WE HAD GIVEN THE DEFENDANT AND MR. YILDIZ

19   IS THAT WE HAD VALID EXPORT LICENSE FOR SHIPMENT TO THE CZECH

20   REPUBLIC.

21   **Q.**    DID THEY TAKE YOU UP ON THAT OFFER?

22   **A.**    YES, THEY DID.

23   **Q.**    YOU CAN PUT THAT BACK IN THERE.

24   **A.**    (WITNESS COMPLIES)

25   **Q.**    I AM GOING TO SHOW YOU WHAT HAS BEEN MARKED AS

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1    GOVERNMENT EXHIBIT 753, AND ASK IF YOU RECOGNIZE WHAT THAT IS.

2              (EXHIBIT 753 MARKED FOR IDENTIFICATION)

3    **A.**    THIS IS A --

4    **Q.**    JUST YES OR NO.

5    **A.**    YES.

6    **Q.**    IS THAT A PACKAGE THAT YOU KNOW ITS CONTENTS?

7    **A.**    YES, I DO.

8    **Q.**    HAVE YOU HAD A CHANCE TO EXAMINE IT BEFORE YOUR

9    TESTIMONY HERE TODAY?

10   **A.**    YES, I HAVE.

11             **MR. COUGHLIN:**  YOUR HONOR, I WOULD LIKE TO MOVE INTO

12   EVIDENCE THE PACKAGING OF 753 AND ITS CONTENTS.

13             **THE COURT:**  ANY OBJECTION?

14             **MR. JOHNSTON:**  NO OBJECTION.

15             **THE COURT:**  IT IS RECEIVED.

16             (EXHIBIT 753 RECEIVED INTO EVIDENCE)

17   **Q.**    **(MR. COUGHLIN)** THE CASE AGENT CAN HELP YOU TAKE THAT

18   APART.

19   **A.**    (WITNESS COMPLIES)

20   **Q.**    IS THAT THE ORIGINAL BOX THAT WAS SHOWN TO THE DEFENDANT

21   AND MR. YILDIZ IN THE LAS VEGAS AREA?

22   **A.**    YES, IT IS.

23   **Q.**    AND IF YOU COULD OPEN THAT BOX AND DISPLAY TO THE JURY

24   THE CONTENTS OF THE BOX.

25   **A.**    (WITNESS COMPLIES)

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1    **Q.**    WHAT IS THAT PARTICULAR BOX?

2    **A.**    THIS IS THE NAVIGAT-2100 GYROCOMPASS.

3    **Q.**    IS THERE A SERIAL NUMBER ON THERE?

4    **A.**    YES, THERE IS.

5    **Q.**    IS THERE ANYTHING ELSE IN THAT BOX?

6    **A.**    NO.

7    **Q.**    OKAY.  SO THAT'S THE ACTUAL PRODUCT ITSELF; IS THAT

8    CORRECT?

9    **A.**    THAT'S CORRECT.

10   **Q.**    THANK YOU.  YOU CAN PUT THAT BACK IN.

11   **A.**    (WITNESS COMPLIES)

12   **Q.**    I WOULD LIKE TO SHOW YOU WHAT HAS BEEN MARKED AS

13   GOVERNMENT EXHIBIT 754, AND ASK IF YOU RECOGNIZE WHAT THAT IS.

14          (EXHIBIT 754 MARKED FOR IDENTIFICATION)

15   **A.**    YES, I DO.

16   **Q.**    AND IS THIS SOMETHING THAT HAS BEEN IN YOUR CUSTODY AND

17   CONTROL SINCE ITS SEIZURE FROM THE UPS STORE?

18   **A.**    YES.

19   **Q.**    AND DO YOU KNOW WHAT THE CONTENTS OF THAT PARTICULAR

20   EXHIBIT ARE?

21   **A.**    YES.

22          **MR. COUGHLIN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

23   TO MOVE INTO EVIDENCE 754 AS WELL AS THE CONTENTS OF 754.

24          **MR. JOHNSTON:**  NO OBJECTION.

25          **THE COURT:**  RECEIVED.

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

```
 1              (EXHIBIT 754 RECEIVED INTO EVIDENCE)
 2   Q.    (MR. COUGHLIN) WHAT IS IN EXHIBIT 754?
 3   A.    THIS IS ALSO ONE OF THE COMPONENTS OF THE NAVIGAT-2100.
 4   Q.    IF YOU COULD PUBLISH THAT TO THE JURY, TAKE IT OUT OF
 5   THE BOX.
 6   A.    (WITNESS COMPLIES)
 7   Q.    WHAT EXACTLY WAS IN THIS PARTICULAR ITEM?
 8   A.    THIS IS THE POWER SUPPLY FOR THE NAVIGAT-2100.
 9   Q.    AND I NOTE THAT IT APPEARS TO BE -- THE INSIDE BOX
10   APPEARS TO HAVE NORTHROP GRUMMAN ON IT; IS THAT CORRECT?
11   A.    THAT'S CORRECT.
12   Q.    WAS THAT ALSO TRUE OF THE NAVIGAT ITSELF?
13   A.    YES.
14   Q.    YOU CAN CONTINUE TO PUT THAT BACK IN.
15   A.    (WITNESS COMPLIES)
16   Q.    AT THE SHIPPING STORE DID YOU ACTUALLY TAKE OUT THE
17   ITEMS THAT WAY WHEN THEY WERE BEING EXAMINED?
18   A.    NO.  WE JUST OPENED THE BOXES ENOUGH TO VERIFY THAT THE
19   CONTENTS WERE STILL INSIDE.  WE DIDN'T REMOVE THE ITEM.
20   Q.    OKAY.  I WOULD LIKE TO DIRECT YOUR ATTENTION TO
21   GOVERNMENT'S EXHIBIT 755.  DO YOU RECOGNIZE THAT EXHIBIT?
22              (EXHIBIT 755 MARKED FOR IDENTIFICATION)
23   A.    YES, I DO.
24   Q.    HAVE YOU SEEN THAT EXHIBIT BEFORE?
25   A.    YES, I HAVE.
```

APRIL 20, 2015

HELSING - DIRECT EXAMINATION

1    **Q.**    HAVE YOU HAD AN OPPORTUNITY TO LOOK AT THE CONTENTS OF

2    GOVERNMENT'S EXHIBIT 755?

3    **A.**    YES, I HAVE.

4    **Q.**    IN FACT, DID YOU PUT THE STICKER ON THAT PARTICULAR BOX?

5    **A.**    I BELIEVE I DID.

6    **Q.**    IN CONNECTION WITH THIS, ARE YOU FAMILIAR WITH WHICH

7    ITEM IT WENT WITH IN CONNECTION WITH THE TWO ITEMS THAT WERE

8    SHIPPED?

9    **A.**    YES.

10            **MR. COUGHLIN:**  YOUR HONOR, I WOULD LIKE TO MOVE INTO

11   EVIDENCE GOVERNMENT'S EXHIBIT 755.

12            **MR. JOHNSTON:**  NO OBJECTION, YOUR HONOR.

13            **THE COURT:**  RECEIVED.

14            (EXHIBIT 755 RECEIVED INTO EVIDENCE)

15   **Q.**    **(MR. COUGHLIN)** IF YOU CAN GO AHEAD AND UNPACKAGE IT,

16   DISPLAY IT TO THE JURY?

17   **A.**    (WITNESS COMPLIES)

18   **Q.**    WHAT EXACTLY IS IN GOVERNMENT EXHIBIT 755?

19   **A.**    THIS IS THE DISPLAY MONITOR, THE CONTROL PANEL.

20   **Q.**    AND AGAIN, WAS THIS AN ITEM THAT OBVIOUSLY HAD THE

21   NORTHROP GRUMMAN PACKAGING?

22   **A.**    YES.

23   **Q.**    OKAY.  YOU CAN PUT THAT AWAY NOW.

24   **A.**    (WITNESS COMPLIES)

25   **Q.**    NOW, WITH REGARD TO THE WAY THAT IT WAS PACKAGED FOR

APRIL 20, 2015

HELSING – DIRECT EXAMINATION

1  SHIPPING, WHAT WAS THE PURPOSE OF EGG SHELLING THE NORTHROP

2  GRUMMAN BOXES?

3  **A.**    THE PURPOSE WAS TO --

4         **MR. JOHNSTON:**  OBJECTION.  SPECULATION, YOUR HONOR.

5         **MR. COUGHLIN:**  IF HE KNOWS.

6         **THE COURT:**  WOULD YOU RESTATE THE QUESTION?

7  **Q.**    **(MR. COUGHLIN)** ARE YOU AWARE OF THE REASON FOR EGG

8  SHELLING THE ORIGINAL BOXING?

9  **A.**    YES.

10         **MR. JOHNSTON:**  SAME OBJECTION.

11         **THE COURT:**  OVERRULED.

12  **Q.**    **(MR. COUGHLIN)** WHAT WAS THE REASON?

13  **A.**    THE REASON WAS TO CONCEAL THE NORTHROP GRUMMAN BOX.

14  **Q.**    THANK YOU.  YOU CAN PUT THAT BACK INTO ITS ORIGINAL

15  STATE.

16  **A.**    (WITNESS COMPLIES)

17  **Q.**    YOU CAN TAKE THE WITNESS STAND AGAIN.

18  **A.**    (WITNESS COMPLIES)

19         **MR. COUGHLIN:**  NOTHING FURTHER OF THIS WITNESS.

20         **THE COURT:**  CROSS-EXAMINATION.

21                    CROSS-EXAMINATION

22  **Q.**    **(MR. CAMDEN)** I AM GOING TO START A LITTLE FURTHER BACK,

23  AGENT HELSING.

24         IN YOUR UNDERCOVER CAPACITY YOU WERE POSING AS A MEMBER

25  OR A PARTNER OF SOUTH STAR TRADING, CORRECT?

APRIL 20, 2015

HELSING - CROSS-EXAMINATION

1    **A.**    THAT'S CORRECT.

2    **Q.**    AND YOU WERE AWARE OF THE NEGOTIATIONS LEADING UP TO THE

3    SALE OF THE Y-690'S AND THE NAVIGAT-2100'S?

4    **A.**    I WAS GENERALLY AWARE THAT THERE WERE NEGOTIATIONS, YES.

5    **Q.**    AND YOU WERE AWARE, ALSO, OF THE TERMS OF THE SALE,

6    CORRECT?

7    **A.**    I HAD VERY LIMITED KNOWLEDGE OF THE TERMS, BUT I KNEW

8    SOME DETAILS.

9    **Q.**    YOU KNEW SOME DETAILS.  YOU KNEW, FOR EXAMPLE, THAT

10   SOUTH STAR TRADING HAD AGREED IN A CONTRACT THAT THE PLACE OF

11   DELIVERY WAS GOING TO BE DUBAI UNITED ARAB EMIRATES, CORRECT?

12   **A.**    FOR SOME OF THE ITEMS, YES.

13   **Q.**    FOR ALL OF THE ITEMS, IN FACT, CORRECT?

14   **A.**    MY UNDERSTANDING WAS THAT THAT WAS NOT THE INITIAL

15   DESTINATION FOR THE Y-690'S.

16   **Q.**    THE Y-690'S, YOU UNDERSTAND, WERE GOING TO BE SENT TO

17   THE CZECH REPUBLIC, RIGHT?

18   **A.**    THAT'S CORRECT.

19   **Q.**    THEN FORWARDED ON TO DUBAI.

20   **A.**    THAT'S CORRECT.

21   **Q.**    BUT THE EVENTUAL PLACE OF DELIVERY LISTED IN BOTH OF THE

22   CONTRACTS WAS DUBAI, UAE, CORRECT?

23   **A.**    I NEVER VIEWED THE CONTRACT.

24            **MR. CAMDEN:**  CAN WE PULL UP GOVERNMENT'S

25   EXHIBIT 120 -- ACTUALLY, NEVER MIND.

APRIL 20, 2015

HELSING - CROSS-EXAMINATION

1  **Q.**     **(MR. CAMDEN)** I AM SHOWING YOU WHAT HAS PREVIOUSLY BEEN

2  MARKED AS GOVERNMENT'S EXHIBIT -- AND INTRODUCED AS

3  GOVERNMENT'S EXHIBIT 120.

4        **MR. COUGHLIN:**  YOUR HONOR, I OBJECT.  LACK OF

5  FOUNDATION AS TO THE CONTRACT.

6        **MR. JOHNSTON:**  IT HAS ALREADY BEEN INTRODUCED, YOUR

7  HONOR.

8        **THE COURT:**  IT HAS BEEN INTRODUCED.  THE WITNESS HAS

9  INDICATED HE DIDN'T REVIEW THE DOCUMENTS.  BUT YOU CAN POSE

10 YOUR --

11 **Q.**     **(MR. CAMDEN)** HAVE YOU SEEN THIS DOCUMENT BEFORE?

12 **A.**    NO, I HAVE NOT.

13 **Q.**    BUT YOU WERE WORKING ON BEHALF OF SOUTH STAR TRADING IN

14 YOUR UNDERCOVER CAPACITY, RIGHT?

15 **A.**    YES.

16        **MR. CAMDEN:**  IF I CAN APPROACH THE WITNESS, YOUR

17 HONOR.

18        **THE COURT:**  YES.

19        **MR. CAMDEN:**  WITH WHAT THE GOVERNMENT JUST SHOWED.

20 **Q.**    **(MR. CAMDEN)** THESE BOXES HAVE TWO EGGSHELLS, RIGHT?  SO

21 IT IS TWO BOXES, WITH THE OPEN PARTS FACING EACH OTHER -- FOR

22 THE RECORD -- BOTH COVERING ANOTHER BOX INSIDE.

23 **A.**    THAT'S CORRECT.

24 **Q.**    AND THE BOX INSIDE IS WHAT HAS NORTHROP GRUMMAN WRITTEN

25 ON IT, CORRECT?

APRIL 20, 2015

HELSING – CROSS-EXAMINATION

1    **A.**    YES.

2    **Q.**    OKAY.

3           YOU DIDN'T BUY ANY BOXES AT THE UPS STORE?

4    **A.**    NO, I DID NOT.

5    **Q.**    AND WHEN YOU PICKED UP MR. GHAHREMAN AND MR. YILDIZ AT

6    THEIR HOTEL, YOU ALREADY HAD THE PACKAGES IN THE TRUNK OF THE

7    CAR, RIGHT?

8    **A.**    CORRECT.

9    **Q.**    AND THEY HAD BEEN IN THE CUSTODY OF YOU OR OTHER AGENTS

10   SINCE THE MEETING IN LAS VEGAS WHERE THEY WERE SHOWN TO BOTH

11   DEFENDANTS, CORRECT?

12   **A.**    CORRECT.

13   **Q.**    SO IT WAS AGENTS, EITHER YOU OR OTHER AGENTS, THAT PUT

14   THOSE EGGSHELL BOXES ONTO THE NORTHROP GRUMMAN BOXES, CORRECT?

15   **A.**    CORRECT.

16   **Q.**    NOW I WANT TO GET TO -- WHEN YOU WERE IN THE CAR WHO WAS

17   IN WHAT SEAT?  YOU WERE DRIVING THE SUV, CORRECT?

18   **A.**    CORRECT.

19   **Q.**    THE ENTIRE WAY FROM PICKING UP THE PACKAGES FROM THE

20   UNDERCOVER LOCATION -- OR THE AGENTS' LOCATION, WHEREVER THEY

21   WERE KEPT, TO PICKING UP MR. YILDIZ AND MR. GHAHREMAN, TO THE

22   UPS STORE, CORRECT?

23   **A.**    CORRECT.

24   **Q.**    WHEN YOU ARRIVED AT THE UPS STORE, YOU WERE THE ONE THAT

25   TOOK THE PACKAGES INTO THE UPS STORE, RIGHT?

APRIL 20, 2015

HELSING – CROSS-EXAMINATION

1   **A.**    I DON'T RECALL WHO ACTUALLY PHYSICALLY PUSHED THE CART

2   INTO, BUT WE ALL PROCEEDED INSIDE TOGETHER.

3   **Q.**    THIS ENTIRE SET OF EVENTS ON JUNE 17TH, FROM THE TIME

4   YOU GOT IN THE CAR UNTIL THE TIME OF ARREST, WAS RECORDED ON

5   AUDIO, CORRECT?

6   **A.**    CORRECT.

7   **Q.**    YOU WERE WEARING A RECORDING DEVICE.

8   **A.**    THAT'S CORRECT.

9   **Q.**    DID YOU REVIEW THAT RECORDING BEFORE YOU TESTIFIED

10  TODAY?

11  **A.**    YES, I DID.

12  **Q.**    DID YOU WRITE ANY REPORTS, BY THE WAY, IN CONNECTION

13  WITH THIS CASE?

14  **A.**    NO, I DID NOT.  TO THE BEST OF MY RECOLLECTION, NO, I

15  DID NOT.

16  **Q.**    DID YOU CHECK?

17  **A.**    I PROVIDED THE CASE FILE TO THE ASSISTANT U.S. ATTORNEY,

18  YES.

19  **Q.**    AND IF THERE WERE ANY REPORTS THEY WOULD BE IN THERE?

20  **A.**    THAT'S CORRECT.

21          **MR. CAMDEN:**  IF I COULD HAVE ONE SECOND, YOUR HONOR.

22          JUST TO BE SAFE, WE WILL GO TO ZZ FOR THIS.

23          (EXHIBIT ZZ-1 MARKED FOR IDENTIFICATION)

24  **Q.**    **(MR. CAMDEN)** I AM GOING TO PLAY A CLIP, AND I AM GOING

25  TO ASK YOU IF YOU RECOGNIZE THIS RECORDING.

APRIL 20, 2015

HELSING – CROSS-EXAMINATION

```
 1        (AUDIO PLAYED)
 2   Q.   THAT IS YOUR VOICE, CORRECT?
 3   A.   THAT'S CORRECT.
 4   Q.   THAT IS YOUR VOICE ON JUNE 17TH AFTER YOU ARRIVED AT THE
 5   UPS STORE?
 6   A.   THAT'S CORRECT.
 7   Q.   SO YOU ARE THE ONE THAT GOT THE CART, CORRECT?
 8   A.   YES.
 9   Q.   NOW LET'S TALK ABOUT OPENING THE BOXES.
10        YOU DID OPEN THE BOXES RIGHT THERE IN THE UPS STORE,
11   CORRECT?
12   A.   CORRECT.
13   Q.   AND IT WAS YOU THAT OPENED THOSE BOXES, CORRECT?
14   A.   THAT WAS A JOINT EFFORT BETWEEN THE DEFENDANT, MR.
15   YILDIZ AND MYSELF.
16   Q.   AGAIN, YOU REVIEWED THE RECORDING BEFORE YOU TESTIFIED
17   TODAY, RIGHT?
18   A.   YES.
19   Q.   I AM GOING TO PLAY ANOTHER CLIP AND I AM GOING TO ASK
20   YOU IF YOU CAN RECOGNIZE IT.
21        (AUDIO PLAYED)
22   Q.   SO YOU AGREE, AFTER LISTENING TO THAT, THAT YOU WERE THE
23   ONE THAT OPENED THE BOXES AT THE UPS STORE.
24   A.   LIKE I SAID EARLIER, IT WAS A JOINT EFFORT BETWEEN THE
25   DEFENDANT, MR. YILDIZ AND MYSELF.
```

APRIL 20, 2015

HELSING — CROSS—EXAMINATION

1   **Q.**    LET'S TALK ABOUT, AT THIS POINT, THE PAPERWORK.

2           **MR. CAMDEN:**  IF I COULD APPROACH, YOUR HONOR?

3           **THE COURT:**  YES.

4   **Q.**   **(MR. CAMDEN)** I AM GOING TO SHOW YOU WHAT HAS BEEN

5   MARKED AND PREVIOUSLY ENTERED AS GOVERNMENT'S EXHIBIT 751—B.

6           NOW, THAT'S THE WHOLE DOCUMENT.

7           WHEN YOU TESTIFIED YOU SAID THAT YOU FILLED OUT THE

8   INFORMATION THAT WAS HERE AND HERE, CORRECT?

9   **A.**    YES.  I DIDN'T COMPLETE THE VERY BOTTOM RIGHT—HAND BOXES

10  RECEIVED FOR UPS BY OR —

11  **Q.**    RIGHT.  SO JUST THE DATE OF SHIPMENT AND THE SHIPPER'S

12  SIGNATURE.

13  **A.**    THAT'S CORRECT.

14  **Q.**    AND YOU FILLED OUT NOTHING ELSE ON THIS FORM?

15  **A.**    NO, I DID NOT.

16          **MR. CAMDEN:**  WE ARE GOING TO AAA, I GUESS, AT THIS

17  POINT.

18          (EXHIBIT AAA MARKED FOR IDENTIFICATION)

19  **Q.**   **(MR. JOHNSTON)** I AM GOING TO SHOW YOU WHAT HAS BEEN

20  MARKED AS DEFENSE EXHIBIT AAA.

21          COMPARING THAT WITH WHAT'S ON THE SCREEN, ARE THESE TWO

22  COPIES, ESSENTIALLY, OF THE SAME FORM?

23  **A.**    THE —

24  **Q.**    WHY DON'T I GO BACK.

25          THIS FORM IS FILLED OUT IN TRIPLICATE, RIGHT?  THERE IS

APRIL 20, 2015

HELSING - CROSS-EXAMINATION

1    CARBON COPIES UNDERNEATH?

2    **A.**   I DON'T REMEMBER EXACTLY HOW MANY FORMS, BUT I BELIEVE

3    THERE WERE.

4    **Q.**   THERE WAS MORE THAN ONE, RIGHT?

5    **A.**   YES.

6    **Q.**   IS THE ONE YOU HAVE IN FRONT OF YOU MARKED AAA THE SAME

7    FORM AS 751-B?

8    **A.**   IT IS WITH THE EXCEPTION OF THE ENTER THIRD PARTY'S UPS

9    ACCOUNT NUMBER OR SHIPPER'S MAJOR CREDIT CARD NUMBER AND THE

10   EXPIRATION DATE THAT YOU CAN'T VIEW ON THE GOVERNMENT'S

11   EXHIBIT 751-B.

12   **Q.**   BUT YOU WOULD AGREE THAT DEFENSE EXHIBIT AAA IS AN

13   ACCURATE COPY OF THE SAME FORM BUT WITHOUT THAT INFORMATION.

14   **A.**   YES.

15   **Q.**   OKAY.

16           **MR. CAMDEN:**  MOVE TO ADMIT DEFENSE EXHIBIT AAA.

17           **MR. COUGHLIN:**  NO OBJECTION.

18           **THE COURT:**  IT IS RECEIVED.

19           (EXHIBIT AAA RECEIVED INTO EVIDENCE)

20           **MR. CAMDEN:**  SO IF I CAN GET THAT BACK FROM YOU FOR

21   A SECOND.

22           AND PERMISSION TO PUBLISH, YOUR HONOR?

23           **THE COURT:**  YES.

24   **Q.**   **(MR. CAMDEN)** SO WE HAVE GOT DEFENSE EXHIBIT AAA ON THE

25   TOP, AND GOVERNMENT'S EXHIBIT 751-B ON THE BOTTOM.

APRIL 20, 2015

HELSING – CROSS–EXAMINATION

1     ON 751–B YOU SEE THIS AREA WHERE THERE IS LIKE A MOTTLED

2 BLACK AND WHITE?  I AM POINTING TO IT.

3 **A.**     YES.

4 **Q.**     AND IN DEFENSE EXHIBIT AAA, THOUGH, IT LISTS AN ACTUAL

5 CREDIT CARD NUMBER, CORRECT?

6 **A.**     THAT'S CORRECT.

7 **Q.**     THAT WAS YOUR CREDIT CARD NUMBER.

8 **A.**     THAT'S MY WRITING, YES, AND I BELIEVE THAT WAS THE

9 CREDIT CARD NUMBER I USED.

10 **Q.**     SO YOU DID FILL THAT PART OF THE FORM OUT AS WELL.

11 **A.**     YES.

12 **Q.**     AND THAT IS A CREDIT CARD NUMBER FOR SOUTH STAR TRADING?

13 **A.**     THAT CREDIT CARD WAS MY UNDERCOVER CREDIT CARD.

14 **Q.**     OKAY.  SO IT WASN'T MR. ARASH'S CREDIT CARD.

15 **A.**     NO.

16 **Q.**     IT WASN'T MR. YILDIZ' CREDIT CARD.

17 **A.**     NO.

18 **Q.**     IT BELONGED TO THE GOVERNMENT THROUGH ITS UNDERCOVER

19 OPERATION SOUTH STAR.

20 **A.**     THAT'S CORRECT.

21 **Q.**     NOW I AM GOING TO HAVE YOU TAKE A LOOK AT WHAT THE

22 GOVERNMENT PREVIOUSLY MARKED AND INTRODUCED AS GOVERNMENT

23 EXHIBIT 751–A.

24     SO ON THIS DOCUMENT YOU SAID THAT YOU FILLED OUT BOX 1,

25 RIGHT?

APRIL 20, 2015

HELSING – CROSS-EXAMINATION

1   **A.**   CORRECT.

2   **Q.**   AND THAT'S THE SHIPPER'S BOX.

3   **A.**   YES.

4   **Q.**   BECAUSE SOUTH STAR TRADING WAS THE SHIPPER IN THIS CASE,

5   RIGHT?

6   **A.**   YES.

7   **Q.**   AND YOU SAID THAT MR. GHAHREMAN WROTE THIS.

8   **A.**   YES.

9        **MR. CAMDEN:**   AND I AM POINTING, FOR THE RECORD, TO

10   BOX 11 OF DESCRIPTION OF CONTENTS.

11   **Q.**   **(MR. CAMDEN)** AND THAT SAYS Y-690, CORRECT?

12   **A.**   YES.

13   **Q.**   OKAY.  THE Y-690 IS THE ACTUAL MODEL NUMBER FOR THE

14   PLANAR TRIODE THAT WAS THE SUBJECT OF THE DEAL, CORRECT?

15   **A.**   YES.

16   **Q.**   AND THE VALUE LISTED HERE, $2,045, THAT WAS THE CORRECT

17   VALUE FOR THE GOOD, CORRECT?

18   **A.**   I DON'T REMEMBER THE EXACT VALUE BUT THAT SOUNDS

19   CORRECT, VAGUELY CORRECT, THAT IT WAS AROUND $2,000.

20   **Q.**   NOW, THE PART OF THIS FORM THAT YOU SAID -- THE OTHER

21   PART YOU SAID MR. GHAHREMAN FILLED OUT WAS BOX 3, CORRECT?

22   **A.**   THAT'S CORRECT.

23   **Q.**   AND YOU SAID THAT HE FILLED THAT INFORMATION OUT.  BUT

24   ACTUALLY HE DIDN'T HAVE THAT INFORMATION PRIOR TO THE UPS

25   STORE VISIT, DID HE?

HELSING – CROSS-EXAMINATION

1    **A.**    NO, HE DID NOT.

2    **Q.**    YOU ARE THE ONE THAT BROUGHT THAT INFORMATION.

3    **A.**    YES, I DID.

4    **Q.**    IN FACT, YOU ARE THE ONE THAT DICTATED THAT INFORMATION

5    TO HIM AS HE WAS WRITING.

6    **A.**    I BOTH DICTATED AND I BELIEVE I HELD THE PHONE SO THAT

7    HE COULD SEE.

8    **Q.**    OKAY.  BUT HE DIDN'T HAVE THAT INFORMATION PRIOR TO YOU

9    SHOWING IT TO HIM THERE IN THE UPS STORE.

10   **A.**    NO, HE DID NOT.

11   **Q.**    THAT INFORMATION CAME FROM SOUTH STAR TRADING.

12   **A.**    THAT'S CORRECT.

13   **Q.**    A FEW OF THE OTHER THINGS.

14       YOU DID MENTION THE CONVERSATION IN THE DRIVE ON THE WAY

15   TO THE UPS STORE, CORRECT?  DO YOU REMEMBER THAT?

16   **A.**    YES.

17   **Q.**    YOU TALKED ABOUT AIRCRAFT CARRIERS, RIGHT?

18   **A.**    WE DID.

19   **Q.**    AND MILITARY AIRCRAFT?

20   **A.**    WE DID.

21   **Q.**    THAT WAS BECAUSE MR. YILDIZ SPOTTED A PLANE FLYING OVER,

22   RIGHT?

23   **A.**    RIGHT.

24   **Q.**    AND THERE WAS A DISCUSSION ABOUT WHETHER IT WAS AN F-16

25   OR F-18?

APRIL 20, 2015

HELSING — CROSS-EXAMINATION

1   **A.**    YES.

2   **Q.**    THERE WAS NO DISCUSSION OF MILITARY USE OF ANY OF THE

3   GOODS THAT WERE BEING SHIPPED, WAS THERE?

4   **A.**    NO.

5           **MR. CAMDEN:**  NO FURTHER QUESTIONS.

6           **THE COURT:**  REDIRECT?

7           **MR. COUGHLIN:**  NO, YOUR HONOR.

8           **THE COURT:**  THANK YOU.  YOU MAY BE EXCUSED.

9           **MR. CAMDEN:**  IF I COULD HAVE ONE SECOND TO MAKE SURE

10  I GET ALL OF THE EXHIBITS BACK IN ORDER.

11          **THE COURT:**  YES.

12          THE GOVERNMENT RESTS?

13          **MR. HARRIGAN:**  YES, YOUR HONOR.  ONE MOMENT.  I WANT

14  TO MAKE SURE ALL OF THE EXHIBITS THAT WE SHOWED THE JURY AND

15  ASKED TO BE ADMITTED ARE ADMITTED.  WE REST AT THIS TIME.  I

16  THINK THERE WAS A QUESTION ABOUT GOVERNMENT'S EXHIBIT 122.

17          **THE COURT:**  WE WILL REST SUBJECT TO EXHIBITS.

18          MR. JOHNSTON.

19          **MR. JOHNSTON:**  YOUR HONOR, THE DEFENSE DOES HAVE A

20  MOTION, AND PERHAPS EVEN A BRIEF SIDEBAR.

21          **THE COURT:**  ALL RIGHT.

22          (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD AT

23          THE BENCH, OUT OF THE HEARING OF THE JURY)

24          **THE COURT:**  MR. JOHNSTON.

25          **MR. JOHNSTON:**  YES, YOUR HONOR.  WE DO HAVE A RULE

APRIL 20, 2015

HELSING – CROSS–EXAMINATION

```
 1   29 MOTION AS TO ALL COUNTS, ALL ELEMENTS.  I ASK THE COURT TO
 2   CONSIDER RESERVING DECISION ON THAT UNTIL WE HAVE A CHANCE TO
 3   ARGUE.  WE ARE PREPARED TO PUT ON OUR CASE.
 4           THE COURT:  YES.  I WILL RESERVE ON THE RULE 29.
 5           MR. JOHNSTON:  THANK YOU.
 6           WE DO INTEND TO CALL MR. GHAHREMAN AS OUR FIRST
 7   WITNESS.  WE HAVE ONE OTHER WITNESS, A CHARACTER WITNESS, WHO
 8   CAME FROM VANCOUVER.  THE MARSHALS HAVE HIM FLYING OUT THIS
 9   EVENING OR LATE THIS AFTERNOON.
10           I DON'T INTEND THAT MY DIRECT OF MR. GHAHREMAN WILL
11   BE TOO TERRIBLY LONG; I CERTAINLY EXPECT A THOROUGH AND
12   PERHAPS LONG CROSS FROM THE GOVERNMENT.
13           MY REQUEST WOULD BE IF WE GET TO A POINT NEAR THE
14   END OF THE DAY WE COULD HAVE THE CHARACTER WITNESS TESTIFY, HE
15   COULD MAKE THE FLIGHT.  IF HE CAN'T, HE CAN'T.  HE IS
16   SCHEDULED TO WORK TOMORROW.  HE IS GOING TO BE MAYBE 10, 15
17   MINUTES FOR DIRECT.
18           THE COURT:  OKAY.
19           MR. JOHNSTON:  I JUST WANTED TO ALERT THE COURT.
20           THE COURT:  YOU THINK HE WOULD BE HERE THIS
21   AFTERNOON?
22           MR. JOHNSTON:  HE IS HERE.  HE IS SCHEDULED –– THE
23   MARSHALS SCHEDULED HIM TO FLY OUT ON THE 4:00 O'CLOCK TODAY.
24           THE COURT:  YOU WOULD LIKE TO PUT HIM ON TODAY?
25           MR. JOHNSTON:  IF AT ALL POSSIBLE.
```

APRIL 20, 2015

HELSING - CROSS-EXAMINATION

```
 1        THE COURT:  WE CAN TAKE HIM OUT OF ORDER IF
 2   NECESSARY OR BREAK UP THE EXAMINATION OF MR. GHAHREMAN.
 3        MR. HARRIGAN:  YOUR HONOR, MAYBE IT CAN BE RAISED AT
 4   A LATER TIME, BUT WE RESERVED ARGUMENT AS TO WHETHER MR.
 5   GHAHREMAN'S SERVICE IN THE NAVY, PARTICULARLY AS A TECHNICAL
 6   DESIGN OFFICER IN THE SHIPYARDS AT BANDAR ABBAS WHILE HE
 7   SERVED IN THE NAVY, WOULD BE ADMITTED IF HE TESTIFIED.  THE
 8   COURT SAID THEY WOULD CONSIDER THAT.  I WOULD RENEW THAT
 9   MOTION.
10        THE COURT:  I WILL RESERVE ON THAT, PENDING THE
11   DIRECT, SEE WHAT COMES OUT ON DIRECT.
12        MR. HARRIGAN:  THANK YOU.
13        MR. JOHNSTON:  YOUR HONOR, I DON'T INTEND TO BRING
14   THAT OUT ON DIRECT.  I AM EXPECTING THE GOVERNMENT NOT TO
15   BRING IT UP.  IF THEY BRING IT UP IN CROSS, I CAN'T IMAGINE
16   ANYTHING HE WOULD SAY THAT WOULD CAUSE THE COURT --
17        MR. HARRIGAN:  CROSS IS BROAD.
18        THE COURT:  IT IS NOT TO BE REFERENCED UNLESS WE
19   COME TO SIDEBAR FIRST.
20        MR. HARRIGAN:  RIGHT.
21        (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN
22         OPEN COURT, IN THE HEARING OF THE JURY)
23        THE COURT:  AT THIS POINT, LADIES AND GENTLEMEN, THE
24   GOVERNMENT HAS RESTED ITS CASE.  MR. GHAHREMAN HAS ELECTED TO
25   PRESENT A CASE.  HE HAS NO OBLIGATION TO DO THAT, BUT HE HAS
```

APRIL 20, 2015

HELSING – CROSS–EXAMINATION

```
 1   ELECTED TO PRESENT ONE, SO WE ARE GOING TO MOVE INTO THE

 2   DEFENSE AT THIS TIME.

 3          MR. JOHNSTON:  YOUR HONOR, AT THIS TIME THE DEFENSE

 4   CALLS ARASH GHAHREMAN TO THE STAND.

 5          THE COURT:  SIR, IF YOU WOULD PLEASE BE SWORN AT

 6   THIS TIME.

 7          THE CLERK:  SIR, PLEASE RAISE YOUR RIGHT HAND.

 8          YOU DO SOLEMNLY SWEAR THAT THE EVIDENCE YOU SHALL

 9   GIVE IN THE CAUSE NOW BEFORE THIS COURT SHALL BE THE TRUTH,

10   THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?

11          THE WITNESS:  YES, I DO.

12          THE CLERK:  PLEASE TAKE THE STAND.

13          THE COURT:  AND, MR. JOHNSTON, ARE WE GOING TO BE

14   PROCEEDING WITH MR. GHAHREMAN TESTIFYING IN ENGLISH?

15          MR. JOHNSTON:  YES, YOUR HONOR.  AND I THINK WE WILL

16   ESTABLISH THAT WITH JUST A FEW BACKGROUND QUESTIONS.  BUT,

17   YES, YOUR HONOR, WE WILL HAVE A STANDBY INTERPRETER IN THE

18   EVENT THAT HE FEELS HE NEEDS TO EXPLAIN SOMETHING IN HIS

19   NATIVE LANGUAGE.

20          THE COURT:  ALL RIGHT.

21          THE WAY WE ARE GOING TO PROCEED, LADIES AND

22   GENTLEMEN, IS MR. GHAHREMAN, AS YOU HAVE JUST HEARD, IS GOING

23   TO ATTEMPT TO TESTIFY IN ENGLISH.  IF THERE ARE AREAS WHERE HE

24   NEEDS ASSISTANCE WITH FARSI, THEN THE FARSI INTERPRETER WILL

25   BE AVAILABLE TO INTERPRET FROM ENGLISH TO FARSI, AND THEN
```

APRIL 20, 2015

HELSING – CROSS-EXAMINATION

1   FARSI TO ENGLISH.

2          IF THAT BECOMES NECESSARY, IF ANY ONE OF YOU SPEAK

3   FARSI, I HAVE AN ADMONITION.  AND THE ADMONITION WOULD BE THAT

4   THE EVIDENCE WOULD BE THE INTERPRETATION FROM FARSI TO

5   ENGLISH.

6          SOMETIMES, FOR EXAMPLE IF WE HAVE A SPANISH SPEAKING

7   WITNESS, WE MAY HAVE ONE OR MORE MEMBERS OF THE JURY WHO SPEAK

8   SPANISH, AND THERE MAY BE SOME DISAGREEMENT AS TO WHAT THE

9   ACTUAL INTERPRETATION IS FROM SPANISH TO ENGLISH.

10          AND WE INSTRUCT THE JURORS TO ACCEPT THE TRANSLATION

11   AS THE INTERPRETER GIVES IT FROM SPANISH TO ENGLISH, OR IN

12   THIS CASE FARSI TO ENGLISH, BECAUSE IT IS IMPORTANT THAT ALL

13   JURORS OPERATE OFF THE SAME EVIDENCE.  SO THE EVIDENCE WOULD,

14   OF COURSE, BE THE TESTIMONY FROM MR. GHAHREMAN IN ENGLISH, AND

15   TO THE EXTENT NECESSARY THE TRANSLATION FROM FARSI TO ENGLISH

16   FROM THE INTERPRETER, WITH ALL JURORS ACCEPTING THAT

17   TRANSLATION AS THE EVIDENCE.

18          ALL RIGHT.  THANK YOU.

19          MR. GHAHREMAN.

20          **THE WITNESS:**  GOOD MORNING, SIR.

21          GOOD MORNING, JURORS.  THANK YOU.

22          **THE CLERK:**  SIR, IF YOU WOULD PLEASE STATE YOUR NAME

23   AND SPELL YOUR FIRST AND LAST NAME.

24          **THE WITNESS:**  MY FIRST NAME ARASH, A-R-A-S-H.  MY

25   LAST NAME GHAHREMAN, G-H-A-H-R-E-M-A-N.

APRIL 20, 2015

HELSING - CROSS-EXAMINATION

DIRECT EXAMINATION

1

2  **Q.**    **(MR. JOHNSTON)** MR. GHAHREMAN, GOOD MORNING.

3  **A.**    GOOD MORNING, SIR.

4  **Q.**    HAVE YOU EVER TESTIFIED IN A COURT OF LAW BEFORE?

5  **A.**    NO, NEVER.

6  **Q.**    ARE YOU A LITTLE BIT NERVOUS TODAY?

7  **A.**    SURE I AM.

8  **Q.**    MR. GHAHREMAN, IS ENGLISH YOUR FIRST LANGUAGE?

9  **A.**    NO.

10 **Q.**    WHAT IS YOUR FIRST LANGUAGE?

11 **A.**    IT IS FARSI, PERSIAN.

12 **Q.**    BUT YOU HAVE LEARNED THE ENGLISH LANGUAGE OVER TIME?

13 **A.**    YES.  DURING MY SCHOOL TIME AND MY CAREER IN THE -- AT

14 SEA.

15 **Q.**    WELL, AS THE COURT SAID, IF YOU FEEL THE NECESSITY TO

16 USE THE INTERPRETER, PLEASE DO.

17 **A.**    THANK YOU.

18 **Q.**    MR. GHAHREMAN, WHERE DO YOU LIVE TODAY?

19 **A.**    I AM LIVING IN NEW YORK.  STATEN ISLAND, NEW YORK.

20 **Q.**    HOW LONG HAVE YOU LIVED THERE?

21 **A.**    ABOUT SEVEN YEARS.

22 **Q.**    AND ARE YOU CURRENTLY WORKING IN NEW YORK TODAY?

23 **A.**    YES, I AM.

24 **Q.**    WHO DO YOU WORK FOR?

25 **A.**    I AM WORKING FOR GMD SHIPYARD CORPORATION IN BROOKLYN,

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    NEW YORK AS A PROJECT MANAGER.

2    **Q.**    WHEN DID YOU FIRST START WORKING FOR GMD SHIPYARD?

3    **A.**    I STARTING WORK FOR GMD SHIPYARD IS AUGUST 2010.

4    **Q.**    AND HAVE YOU WORKED THERE CONTINUOUSLY SINCE

5    AUGUST 2010?

6    **A.**    NO.  I COULD -- OR I LEFT GMD SHIPYARD FOR SOME OFF

7    TIMES, AND THEY RECALLED ME BACK.

8    **Q.**    WHEN DID YOU LEAVE GMD SHIPYARD?

9    **A.**    IS DECEMBER 2012.

10   **Q.**    AND WHY DID YOU LEAVE AT THAT TIME?

11   **A.**    IT WAS SEVERAL REASONS, BUT THE MAIN REASONS IS I WANTED

12   TO FOCUS ON MY FULL-TIME STUDIES IN SUNY MARITIME COLLEGE FOR

13   MY MASTER DEGREE PROGRAM.

14   **Q.**    A MASTER'S DEGREE PROGRAM AT SUNY MARITIME COLLEGE?

15   **A.**    YES.

16   **Q.**    DID YOU ULTIMATELY COMPLETE THAT PROGRAM?

17   **A.**    YES, I DID.

18   **Q.**    DID YOU GRADUATE FROM THE PROGRAM?

19   **A.**    YES, SIR, I DID.

20   **Q.**    WHEN WAS THAT?

21   **A.**    I GRADUATED -- EXCUSE ME -- IT WAS IN JANUARY 2015.

22   **Q.**    THIS YEAR?

23   **A.**    YES, SIR.

24   **Q.**    A FEW MONTHS AGO.

25   **A.**    YES.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  Q.    OKAY.  GOOD.  NOW, MR. GHAHREMAN, WHERE WERE YOU BORN?

2  A.    I BORN IN TEHRAN, CAPITAL OF IRAN.

3  Q.    OKAY.  AND HOW LONG DID YOU LIVE IN IRAN?

4  A.    IS I WAS LIVING IN IRAN BEFORE I MOVE TO UNITED STATES.

5  IS 2007 I CAME TO UNITED STATES.  IT MEANS ABOUT 37 YEARS I

6  BEEN IN TEHRAN, I WAS LIVING AS RESIDENT OF IRAN.

7        THE COURT:  MR. JOHNSTON, LET ME INTERRUPT FOR JUST

8  A MINUTE.

9        THERE IS A CHAIR BEHIND YOU, YOU ARE WELCOME TO HAVE

10  A SEAT WHENEVER YOU DESIRE.

11        THE INTERPRETER:  THANK YOU, YOUR HONOR.

12  Q.    (MR. JOHNSTON) MR. GHAHREMAN, CAN YOU TELL THE JURY A

13  LITTLE BIT ABOUT YOUR EARLY LIFE IN TEHRAN GROWING UP?

14  A.    I BORN IN THE VERY ORDINARY FAMILY, BUT SOMEHOW THEY

15  WERE -- SOMEHOW IS MY FATHER'S SIDE WAS EDUCATION FAMILY.

16  THEY WERE ALL EDUCATED IN THE COLLEGE, UNIVERSITY.  THEY

17  WERE -- GAVE VALUE TO EDUCATIONS.

18    MY MOTHER'S FAMILY, THEY WERE VERY OLD ROOT FAMILY IN

19  TEHRAN, AND THEY VERY IN THE TRADITIONAL AS THE CASUAL

20  COMMERCIAL JOB OR BUSINESS.  AND ALSO THEY WERE SOME

21  EDUCATIONAL, BUT MY FATHER'S FAMILY MORE FOR THE EDUCATIONAL.

22  Q.    WHAT SORT OF SCHOOLING DID YOU GET AS A YOUNG CHILD IN

23  TEHRAN?

24  A.    SCHOOL, I GOT MY HIGH DIPLOMA -- A DIPLOMA FROM HIGH

25  SCHOOL IN SAJJAT IN TEHRAN.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **Q.**    I AM SORRY.  WHAT YEAR WERE YOU BORN?  WHAT YEAR WERE
2   YOU BORN?
3   **A.**    IS 1970, SIR.
4   **Q.**    OKAY.  NOW, THERE WERE EVENTS DURING YOUR CHILDHOOD THAT
5   HAPPENED IN IRAN.
6   **A.**    YES, YES.
7   **Q.**    POLITICAL EVENTS.
8   **A.**    YES.  THE MOST EVENTS HAPPENED IN IRAN, IT WAS THE
9   REVOLUTION IN 1979.
10  **Q.**    OKAY.  AND, FOR THE JURY, CAN YOU EXPLAIN WHAT THE
11  REVOLUTION WAS, BRIEFLY?
12  **A.**    THAT IS THE REVOLUTION IS WHAT AFFECTED IN OUR FAMILY.
13  IT WAS, YOU KNOW, IS THE LIMITED -- NOT LIKE SAY LIMITED BUT
14  LIMITED OUR FREEDOM OF CHOICE WE HAD BEFORE IN THE FAMILY.
15  AND THAT IS -- IT WAS NOT GOOD ECONOMICAL DROP FOR MY FAMILY.
16  **Q.**    AND HOW EXACTLY DID THAT AFFECT YOUR FAMILY
17  ECONOMICALLY?
18  **A.**    MY FATHER COULDN'T CORPORATE IN WHAT HE WAS WORKING.  HE
19  HAD EARLY RETIREMENT.  CAME OUT FROM THE JOB BECAUSE HE HAD TO
20  SOMEHOW, HE COULDN'T CONTINUE.
21  **Q.**    AND THAT WAS BECAUSE OF THE CHANGES THAT WERE HAPPENING
22  WITH THE REVOLUTION?
23  **A.**    YES, IT IS.
24  **Q.**    OKAY.
25  **A.**    AND MY MOTHER WAS A TEACHER BEFORE, AND SHE COULDN'T

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    CONTINUE.  SHE STAYED OUT TOO.

2    **Q.**    WERE YOU ABLE TO CONTINUE YOUR SCHOOLING AFTER THE

3    REVOLUTION?

4    **A.**    I WAS IN THE PRIVATE SCHOOL BEFORE REVOLUTION, BUT I

5    MOVED TO PUBLIC SCHOOL.  AND I CONTINUED IN PUBLIC SCHOOL.

6    **Q.**    AND WERE YOU ABLE TO CONTINUE YOUR EDUCATION AFTER HIGH

7    SCHOOL?

8    **A.**    YES, I DID, SIR.

9    **Q.**    WHAT DID YOU HAVE TO DO TO CONTINUE YOUR EDUCATION AFTER

10   HIGH SCHOOL?

11   **A.**    WE HAD THE NATIONWIDE ENTRANCE EXAM AFTER HIGH SCHOOL

12   FOR GOING TO COLLEGE AND UNIVERSITY.

13   **Q.**    OKAY.

14   **A.**    AND I PARTICIPATED IN THE EXAM, AND I HAD GOOD RANK FOR

15   CHOOSING MY PROGRAM.

16   **Q.**    WHAT PROGRAM DID YOU ULTIMATELY GET INTO?

17   **A.**    IS THE MARITIME ENGINEERING CONCENTRATION ON

18   SHIPBUILDING IN POLYTECHNIC UNIVERSITY, AND OTHER NAME IS AMIR

19   KABIR UNIVERSITY OF TECHNOLOGY.

20   **Q.**    AMIR TABIR?

21   **A.**    AMIR KABIR.

22   **Q.**    AND WHERE WAS THE CAMPUS THAT YOU ATTENDED FOR

23   UNIVERSITY?

24   **A.**    MY PROGRAM WAS A NEW PROGRAM.  AND, YOU KNOW, IS THE NEW

25   PROGRAM IS THE UNIVERSITY PUT IN THE PLACE, AND MY CAMPUS WAS

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   IN BANDAR ABBAS.

2   **Q.**    AND BANDAR ABBAS, WE HAVE HEARD EARLIER, IS ON THE COAST

3   OF IRAN?

4   **A.**    YES.

5   **Q.**    THE STUDENT BODY AT YOUR SCHOOL, WERE MOST OF THEM FROM

6   HIGH SCHOOL LIKE YOU, HAVING COMPLETED THE ENTRANCE EXAM?

7   **A.**    ALMOST THEY WERE LIKE ME.  WE HAD SOME FROM OTHER BODIES

8   ALSO CAME TO THE COLLEGE.

9   **Q.**    HOW DID THE OTHER PEOPLE GET INTO THE COLLEGE?  WHAT WAS

10  THE DIFFERENCE?

11  **A.**    FROM THE ORGANIZATION SCHOLARSHIPS OR THE GOVERNMENT

12  COLLEGE SHARES.  THEY HAD -- GOVERNMENTAL HAD SOME SHARES IN

13  THE -- THEY CAN INTRODUCE THE PEOPLE TO THE PROGRAM.

14  **Q.**    OKAY.  AND AT THIS TIME THE GOVERNMENT WAS WHAT

15  GOVERNMENT?

16  **A.**    PARDON?

17  **Q.**    AT THIS TIME, WHO WAS THE GOVERNMENT OF IRAN?  WAS IT

18  THE SHAH?

19  **A.**    NO, IT WAS THE -- I THINK 1988 IT WAS THE ISLAMIC --

20  ISLAMIC REPUBLIC.

21  **Q.**    OKAY.  WHILE YOU WERE AT SCHOOL DID YOU TRY TO GET A

22  SCHOLARSHIP?

23  **A.**    AFTER SCHOOL, YES.  NOT -- EXCUSE ME -- DURING SCHOOL I

24  TRIED TO GET MY SCHOLARSHIP WITH NIOTC.

25  **Q.**    WHY DID YOU TRY TO GET A SCHOLARSHIP?

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    **A.**    IT WAS TWO REASON.  THIS IS THE FIRST -- FIRST REASON I

2    CAN TELL YOU ECONOMICAL BECAUSE IF I GET TO A SCHOLARSHIP I

3    GET SOME PAYMENT, GO FASTER.  AND I COULD HAVE APPROVAL FROM

4    TO GO FOR TWO YEARS MILITARY SERVICE.

5    **Q.**    WAS THAT MANDATORY SERVICE?

6    **A.**    YES, MANDATORY SERVICE.

7    **Q.**    AND IF YOU GOT THE SCHOLARSHIP YOU COULD AVOID THAT?

8    **A.**    YES.

9    **Q.**    WERE YOU APPROVED FOR THE SCHOLARSHIP?

10   **A.**    NO.

11   **Q.**    WHAT HAPPENED?

12   **A.**    IT IS TECHNICALLY APPROVED, BECAUSE TECHNICALLY APPROVED

13   I AM GOING THROUGH, BUT THERE IS SCREENING, THERE IS SOME

14   ISLAMIC SCREENING, THEY CALL IT.  ISLAMIC SECURITY SCREENING.

15   AND THEY DENIED ME, THEY REJECTED ME.

16   **Q.**    SO YOU WERE TECHNICALLY APPROVED, MEANING YOUR GRADES

17   WERE GOOD ENOUGH?

18   **A.**    NO, MY GRADES WAS ENOUGH.  THAT IS THE HUMAN RESOURCE

19   AFTER TECHNICAL YOU HAVE TO GET YOUR GRADE AND EVERYTHING IS

20   APPROVED THEY SEND YOU, THAT IS THE NEXT LEVEL, THE MOST

21   IMPORTANT LEVEL IN IRAN FOR ADMISSIONS, THEY SEND YOU FOR

22   ISLAMIC SECURITY SCREENING.

23   **Q.**    SO EVEN IF YOU ARE TECHNICALLY APPROVED YOU HAVE TO DO

24   AN ADDITIONAL LAYER OF REVIEW.  IS THAT --

25   **A.**    YES.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **Q.**    -- WHAT YOU ARE SAYING?

2   **A.**    YES.

3   **Q.**    AND THAT IS BY ISLAMIC SECURITY SCREENING?

4   **A.**    YES.

5   **Q.**    AND YOU WEREN'T APPROVED BY THEM?

6   **A.**    NO.

7   **Q.**    DID YOU CONTINUE WITH YOUR EDUCATION?

8   **A.**    YES, I DID.

9   **Q.**    WHAT EXACTLY WERE YOU STUDYING AT YOUR COLLEGE?

10  **A.**    I WAS STUDYING MARINE ENGINEERING.

11  **Q.**    MARINE ENGINEERING?

12  **A.**    MARINE ENGINEERING.  AND MORE IN THE CONSTRUCTION, SHIP

13  CONSTRUCTION.

14  **Q.**    YOU WERE CONCENTRATING ON SHIP CONSTRUCTION?

15  **A.**    YEAH, SHIP.  YES.

16  **Q.**    OKAY.  AND DID YOU GRADUATE FROM YOUR PROGRAM?

17  **A.**    YES, I DID.

18  **Q.**    WHEN WAS THAT?

19  **A.**    IS 1994.

20  **Q.**    AND SOMETIME AFTER YOU GRADUATED WERE YOU ABLE TO FIND A

21  JOB IN THE MARITIME INDUSTRY?

22  **A.**    I APPLIED FOR -- IN 1976, I THINK, I APPLIED FOR THE

23  IHSC.

24  **Q.**    WHAT IS IHSC?

25  **A.**    IRAN O HIND SHIPPING COMPANY.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **Q.**   AND THAT WAS IN 1996, OR '76?

2   **A.**   IT WAS '96.  1996.

3   **Q.**   NOT WHEN YOU WERE FIVE YEARS OLD.  OKAY.

4         AND DID YOU ULTIMATELY GET A JOB WITH IRAN O HIND

5   SHIPPING?

6   **A.**   YES.  AFTER ONE YEAR I DID, I GOT THE JOB.

7   **Q.**   AND WHAT DID YOU DO FOR IRAN O HIND?

8   **A.**   I STARTING AS A JUNIOR CADET, JUNIOR ENGINEERING CADET

9   ON THE BOARD OF THE VESSELS, OCEAN GOING VESSELS.

10  **Q.**   ON BOARD OF OCEAN GOING VESSELS?

11  **A.**   YES.  CARGO VESSELS.

12  **Q.**   WHAT WAS THE WORK LIKE?

13  **A.**   IT WAS VERY HARD.

14  **Q.**   VERY HARD.  AND WHERE WERE YOUR SHIPS SAILING?  WERE YOU

15  PRIMARILY IN IRANIAN PORTS?

16  **A.**   NO, THAT IS THE -- YOU KNOW, THAT IS IN THE SHIP -- IT

17  WAS CHARTERING BETWEEN THE PORTS AS IT WAS NOT IN THE

18  HEADQUARTER IN THE COMMERCIAL MARKET.  IT WAS AROUND THE

19  PORTS, IS THE OVERSEA PORTS.  IT IS RARELY IT WAS IRANIAN

20  PORT.

21  **Q.**   RARELY IN IRANIAN PORTS BUT OVERSEAS?

22  **A.**   YES.  OVERSEAS.  ANY PORT THAT THEY FOUND CARGO TO

23  TRANSPORTATION, WE BEEN THERE.

24  **Q.**   AND HOW LONG DID YOU WORK FOR IRAN O HIND?

25  **A.**   IS FROM '97 TO 2003.

APRIL 20, 2015

GHAHREMAN - DIRECT EXAMINATION

1   **Q.**    OKAY.  SO FOR ABOUT SIX YEARS?

2   **A.**    YES.

3   **Q.**    WHAT DID YOU DO AFTER IRAN O HIND?

4   **A.**    AFTER IRAN O HIND I HAD OFFER FROM MY PREVIOUS MANAGER

5   TO GO FOR WORKING ON BOARD OF THE BONYAD SHIPPING, BONYAD

6   SHIPPING OWNED IRISL COMPANY.

7   **Q.**    THAT IS BONYAD, SPELLED B-O-N-Y-A-D?

8   **A.**    YES.

9   **Q.**    AND WHAT DID YOU DO WITH BONYAD SHIPPING?

10  **A.**    I DO THE SAME DUTIES ON THE BONYAD VESSELS, THE SHIP --

11  BUT SHIP MANAGEMENT WAS ITALIAN, BOGAZZI, ITALIAN COMPANY.

12  THAT IS -- THEY MADE -- THEY WERE MANAGED -- THE SHIP OWNED BY

13  THE BONYAD IRANIAN COMPANIES.

14  **Q.**    SO ON THE SHIP IT WAS RUN BY AN ITALIAN GROUP?

15  **A.**    YES.  THAT IS THEIR OVERSEAS GROUP.  ALWAYS THAT IS THE

16  INTERNATIONAL GROUPS ON THE BOAT.

17  **Q.**    HOW LONG DID YOU WORK FOR BONYAD?

18  **A.**    IS ABOUT TWO YEARS.

19  **Q.**    WHY DID YOU LEAVE BONYAD?

20  **A.**    I WAS INTERESTING TO GET MY SENIOR CERTIFICATE.

21  **Q.**    YOUR SENIOR CERTIFICATE IN WHAT?

22  **A.**    FOR SHIP ENGINEER.

23  **Q.**    FOR SHIP ENGINEER?

24  **A.**    YES.  SHIP ENGINEER SENIOR CERTIFICATE, THE SAME AS TO

25  STCW 95.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **Q.**    WHERE DID YOU GO TO SEEK THE CERTIFICATION?

2   **A.**    I ENTERED INTO THE UNITED KINGDOM, BECAUSE I THINK IT

3   WAS THE MOST CREDITED CERTIFICATE IN NATION, IN WORLD WIDE.

4   AND I ENTERED TO UNITED KINGDOM GLASGOW COLLEGE OF NAUTICAL

5   STUDIES.

6   **Q.**    GLASGOW COLLEGE OF NAUTICAL STUDIES?

7   **A.**    YES.

8   **Q.**    WHY, AGAIN, DID YOU LEAVE BONYAD?  DID YOU ENJOY THE

9   JOB?

10  **A.**    I ENJOYED THE JOB, BUT IT WAS A CHANCE FOR ME.  IT WAS A

11  CHANCE FOR ME TO TAKE MY SENIOR CERTIFICATE, IS THE BETTER

12  OPPORTUNITY FOR ME IN INTERNATIONAL MARKET TO KEEP AWAY FROM

13  WHERE I HAD BEEN IN IRAN.

14  **Q.**    KEEP AWAY FROM -- TO KEEP AWAY FROM WHAT?

15  **A.**    TO KEEP AWAY ME FROM IRAN AND COMING TO INTERNATIONAL

16  MARKET.  AND IS THAT I HAVE MORE FREEDOM OF CHOICES.

17  **Q.**    WHY WOULD YOU WANT TO BE AWAY FROM IRAN?

18  **A.**    IT WAS SEVERAL REASONS.  IS THE ECONOMICAL AND MOST OF

19  THE -- I HAVEN'T SEEN ANY FUTURE IN THE TOP RANKS OR

20  DEVELOPMENT MY CATEGORY IN TOP RANKS IN IRAN.

21  **Q.**    WHY NOT?  YOU SEEMED TO HAVE GOOD MARKS AND --

22  **A.**    I WAS ALWAYS LAWFUL MAN AND I WAS STRICT TO EVERY

23  MANNER, EVERY LAW, EVERY RELIGION, OR ANYTHING.  BUT I

24  COULDN'T PRETEND WHAT I WASN'T AS RELIGIOUS MAN.  I WASN'T

25  VERY ISLAMIC MAN, AND THEY WERE -- THEY NEEDED SOMEBODY TO BE

APRIL 20, 2015

GHAHREMAN - DIRECT EXAMINATION

1   RELIGIOUS AND ISLAMIC, AND I WASN'T.  AND --

2   **Q.**    AND WHY -- I'M SORRY, I DIDN'T MEAN TO INTERRUPT.

3        WHY DID THAT MATTER TO BE AN ISLAMIC MAN IN IRAN AT THE

4   TIME?  WHY WAS THAT WAS NECESSARY TO GET TO THE HIGHER RANKS?

5   **A.**    THIS IS, YOU KNOW, I DON'T WANT TO GO TO DETAILS BUT

6   THIS IS THEIR POLICY, THIS IS THEIR -- WHAT THEY ARE LOOKING

7   FOR FOR THE TOP RANK.  THIS IS THEIR -- WHAT THEY -- THEY ARE

8   RULING THE COUNTRY LIKE THAT.  AND, YOU KNOW, I AM NOT GOING

9   TO DIFFER BUT I SEE -- I APPLY FOR THE TOP RANK POSITION IN

10  2007 AND THEY -- AGAIN THE ISLAMIC SECURITY SCREENING DENIED

11  ME AND REJECTED ME IN THE TOP.

12  **Q.**    OKAY.  AND THAT WAS WHEN YOU WERE WORKING WHERE?

13  **A.**    IT WAS AFTER I BACK FROM GLASGOW.

14  **Q.**    OKAY.  LET ME ASK YOU, DID YOU COMPLETE THE STUDIES, THE

15  PROGRAM AT GLASGOW?

16  **A.**    I COMPLETED MY STUDIES AND COURSES IN THE GLASGOW.  IT

17  WAS SEVERAL COURSES.

18  **Q.**    OKAY.  AND WHILE YOU WERE IN GLASGOW DID YOU MAKE A

19  DECISION TO DO SOMETHING ELSE?

20  **A.**    NO.  BEFORE THAT I WAS VERY ENGAGED WITH MY WORK TO HELP

21  MY FAMILY AFTER LONG TIME BECAUSE REALLY I MAKE THE GOOD MONEY

22  AT SEA.  IT WAS HARD WORK BUT IT WAS GOOD MONEY, AND I COULD

23  HELP MY FAMILY.  I DIDN'T HAVE TIME FOR MYSELF.

24       IN GLASGOW IT WAS SOMEHOW IS A LITTLE, YOU KNOW, QUIET

25  AND FREEDOM FOR ME TO THINK ABOUT MYSELF, TO FACE WITH THE --

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    I HAVE BEEN AROUND THE WORLD BUT NEVER LIVING IN THE WESTERN

2    LIFE THAT IS AS THE U.K.  AND I WAS INTERESTED TO LIVE IN

3    GLASGOW.

4    **Q.**    DID YOU MAKE A DECISION TO SEEK RESIDENCE IN ANOTHER

5    COUNTRY?

6    **A.**    I HAD A CHANCE TO APPLY FOR DIVERSITY VISA FOR UNITED

7    STATES.  IT IS LOTTERY.  THEY CALL LOTTERY OUTSIDE THE UNITED

8    STATES.

9    **Q.**    DID YOU APPLY FOR THE LOTTERY?

10   **A.**    YES, I DID.

11   **Q.**    WHEN DID YOU DO THAT?

12   **A.**    IT WAS I THINK FALL 2005.

13   **Q.**    AND WERE YOU ULTIMATELY SUCCESSFUL IN GETTING ONE OF

14   THESE DIVERSITY VISAS TO THE UNITED STATES?

15   **A.**    I WAS LUCKY, AND I WON LOTTERY, YES.

16   **Q.**    YOU DID?

17   **A.**    YES.

18   **Q.**    YOU DID WIN THE LOTTERY?

19   **A.**    YES.

20   **Q.**    WAS THAT WHILE WERE YOU STILL IN GLASGOW?

21   **A.**    YES, I WAS STILL IN GLASGOW.

22   **Q.**    AND --

23   **A.**    AND MY MOTHER CALLED ME, THAT IS THE -- I THINK IS APRIL

24   2006.  SHE TOLD ME THE PAPER WERE COMING FOR ME.

25   **Q.**    OKAY.  WHAT DID YOU HAVE TO DO -- OR DID YOU DECIDE TO

GHAHREMAN – DIRECT EXAMINATION

1   GO THROUGH WITH THIS VISA AND MOVE TO THE UNITED STATES?

2   **A.**   YES, I DID.  I APPLIED, I FILL OUT ALL THE FORMS AND

3   EVERYTHING.

4   **Q.**   WERE YOU ABLE TO IMMEDIATELY GO TO THE UNITED STATES IN

5   2006?

6   **A.**   NO, IT WAS THE PAPERWORK PROCESS, AND ALSO SO MANY CHECK

7   UP AND SECURITY PROCESS FOR THE UNITED STATES EMBASSY, TOO.

8   **Q.**   AND WHAT DID YOU DO WHILE YOU WERE WAITING FOR THIS

9   PAPERWORK TO GO THROUGH?  DID YOU REMAIN IN SCOTLAND?  DID YOU

10  GO SOMEWHERE ELSE?

11  **A.**   NO.  YOU KNOW, BECAUSE SOME OF TIME I WAS IN THE U.K.

12  AND I USED MY -- THEY CALLED IS MONEY -- POCKET MONEY.  I USED

13  THAT, YOU KNOW, FROM MY SAVINGS.  AND I HAD TO BACK FOR SHORT

14  OF TIME FOR WORK.  AND I STARTING ON THE SADRA SUBSIDIES

15  COMPANY ON THE BOARD OF THE PIPELINE BARGE.

16  **Q.**   YOU WORKED FOR THE SADRA COMPANY, A SUBSIDIARY, ON A

17  PIPELINE BARGE?

18  **A.**   YES.

19  **Q.**   WHERE WERE YOU LOCATED?

20  **A.**   IT WAS WORKING IN THE PERSIAN GULF GAS FIELD.

21  **Q.**   WAS THAT IN ANY PARTICULAR PORT OR WAS THIS ACTUALLY OUT

22  --

23  **A.**   NO, IT WAS AT SEA IN THE -- FROM A DEEP WATER TO SHALLOW

24  WATER THAT IT WAS -- WE WERE PLACING THE PIPES ON THE BOTTOM

25  OF THE SEA FOR THE OIL TRANSPORTATION.

APRIL 20, 2015

GHAHREMAN - DIRECT EXAMINATION

1    **Q.**    OKAY.  SO YOU WERE AT SEA.

2    **A.**    YES.

3    **Q.**    OKAY.  WHEN DID YOU -- OR DID YOU ULTIMATELY COME TO THE

4    UNITED STATES?

5    **A.**    AFTER I HAD THE MEETING AND INTERVIEW IN THE UNITED

6    STATES EMBASSY, TWO TIMES, AND THE SECURITY CHECK, I GOT MY

7    VISA.  AND I CAME TO UNITED STATES APRIL 19, 2007.

8    **Q.**    WHERE DID YOU COME TO THE UNITED STATES IN APRIL OF

9    2007?

10   **A.**    I DISEMBARK IN LAX, LOS ANGELES.  AND I BEEN -- I LIVE

11   -- AND I WENT TO MY OLD NEIGHBORHOODS IN IRAN, THEY WERE

12   CITIZEN OF AMERICA IN CALABASAS.

13   **Q.**    OLD NEIGHBORS FROM IRAN?

14   **A.**    YES.

15   **Q.**    AND THEY LIVED IN CALABASAS?

16   **A.**    YEAH.

17   **Q.**    WHY DID YOU CHOOSE TO GO THERE?

18   **A.**    THEY WERE OFFERED FOR ME TO STAY FOR SOME OF TIME UNTIL

19   I STABLE IN THE UNITED STATES.

20   **Q.**    UNTIL YOU GOT SETTLED IN THE U.S.?

21   **A.**    SETTLED, YES.

22   **Q.**    WHAT DID YOU DO IN CALIFORNIA WHEN YOU CAME IN 2007?

23   **A.**    I WAS STARTING TO MAKE A -- PREPARE MY RESUME TO SEND

24   OUT.  I AM STARTING AFTER ONE, TWO WEEKS REST TIME AND GOOD

25   TIME TO SEND OUT MY RESUME.  AND I HAD AN OFFER IN ESCROW

APRIL 20, 2015

GHAHREMAN - DIRECT EXAMINATION

1  OFFICE BY THE OWNER.  SHE -- SHE SAW ME WITH A FRIEND AND SHE

2  OFFERED ME TO WORK WITH HER AS SALESPERSON.

3  **Q.**    OKAY.  YOU SAID YOU WERE WORKING ON YOUR RESUME TO SEND

4  OUT.  WAS THAT FOR ANY PARTICULAR JOB?

5  **A.**    NO, IT WAS BY ABOUT MY CAREER.

6  **Q.**    YOUR CAREER?

7  **A.**    AND THE BACKGROUND IN THE MARINE ENGINEER.

8  **Q.**    WHAT KIND OF JOB WERE YOU SEEKING?

9  **A.**    MARINE ENGINEERING.

10  **Q.**    MARINE ENGINEERING.  WHAT YOU HAD DONE BEFORE.

11  **A.**    WHICH I HAVE DONE, I HAD EXPERIENCE.

12  **Q.**    BUT YOU ACCEPTED A JOB WITH THIS ESCROW COMPANY IN THE

13  MEANTIME?

14  **A.**    YES, BECAUSE, YOU KNOW, IT IS HARD WITHOUT INCOME IN

15  THIS COUNTRY.

16  **Q.**    RIGHT.  AND SO YOU WERE WORKING IN AN ESCROW OFFICE

17  AROUND 2007?

18  **A.**    YES.

19  **Q.**    HOW WAS BUSINESS?

20  **A.**    I DON'T KNOW, IT WAS -- MAYBE I WAS LUCKY.  I THINK I

21  WAS LUCKY.  IT WAS RESCISSION HAPPENED, IT IS NOT GOOD FOR

22  EVERYONE, EVEN FOR THE REAL ESTATES.  BUT I HAD TO -- EVEN I

23  TRIED TO GET MY REAL ESTATE CERTIFICATE.  AND I GOT MY

24  TEMPORARY REAL ESTATE CERTIFICATE.  BUT BUSINESS WAS NOT GOOD

25  AND I FOCUSING IN MEANWHILE TO SEND MY RESUME OUT BECAUSE I

APRIL 20, 2015

1937

GHAHREMAN - DIRECT EXAMINATION

 1    HAD NOT INCOME.  FOR FIRST TWO MONTHS THE ESCROW OFFICE THEY

 2    PAID ME AS THEIR MINIMUM, BUT AFTER THAT I WAS IN COMMISSION.

 3    **Q.**    WERE YOU ABLE TO ULTIMATELY GET A JOB IN THE MARINE

 4    INDUSTRY?

 5    **A.**    YES, I DID.  I WAS LUCKY.

 6    **Q.**    WHERE DID YOU GET A JOB?

 7    **A.**    IN AKER PHILADELPHIA SHIPYARD.

 8    **Q.**    AKER?

 9    **A.**    AKER PHILADELPHIA SHIPYARD.

10    **Q.**    PHILADELPHIA SHIPYARD.

11    **A.**    YES.

12    **Q.**    I TAKE IT IN PHILADELPHIA?

13    **A.**    YES.

14    **Q.**    WHAT DID YOU DO AT AKER SHIPYARD?

15    **A.**    I STARTING AS THE TEST AND COMMISSIONING ENGINEER IN THE

16    AKER FOR THE TEST, RUNNING AND COMMISSIONING THE FIRST TIME

17    MACHINERY.  I WAS RESPONSIBLE AS THE CARGO HANDLING MACHINERY

18    AND EQUIPMENT AND SECURITY, SAFETY OF THE VESSELS.

19    **Q.**    SO YOU WERE TESTING THIS EQUIPMENT ON NEW VESSELS?

20    **A.**    YES.  I WAS IN CHARGE OF THE INITIAL TESTING AND RUNNING

21    THE EQUIPMENT, AND IN CHARGE OF THE COMMUNICATE WITH VENDORS

22    WHICH COMING FROM WORLDWIDE SOMETIMES, EURO, EVERYWHERE, TO

23    TEST AND RUN THE EQUIPMENT INSTALLED ON THE NEW TANKER.

24    **Q.**    DID YOU WORK ON ELECTRONIC EQUIPMENT WHEN YOU DID THIS

25    TESTING?

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    **A.**    NO.

2    **Q.**    DID YOU WORK ON NAVIGATION EQUIPMENT WHEN YOU DID THIS

3    TESTING?

4    **A.**    NO.

5    **Q.**    WHAT SORT OF EQUIPMENT WERE YOU WORKING ON?

6    **A.**    IT WAS PIPING, IS THE LIFEBOAT, IS THE DOCKING FOR

7    RESCUE BOATS, IS THE SEWAGE LEVEL, WATER LEVEL –– THE LEVEL

8    FOR THE GAGING OF THE ALL INSIDE.

9    **Q.**    HOW LONG DID YOU WORK FOR AKER?

10    **A.**    IS THE –– IT WAS FOR ONLY THE PART OF THE NEW SHIP, IT

11    WAS FOUR MONTHS.

12    **Q.**    OKAY.  SO YOU WERE ON A PARTICULAR PROJECT?

13    **A.**    YES.

14    **Q.**    WHAT DID YOU DO WHEN THAT PROJECT ENDED?

15    **A.**    PARDON ME?

16    **Q.**    WHAT DID YOU DO WHEN THAT PROJECT ENDED?

17    **A.**    I WAS SENDING MY RESUME ANYWHERE OUT.  THAT IS –– THAT

18    IS FOR –– BECAUSE I WAS LOOKING FOR OPPORTUNITY.  AND AKER WAS

19    ALSO VERY HARD WORK, BECAUSE IT WAS DANGEROUS.  AND I FOUND ––

20    I GOT ANOTHER OFFER FROM THE CADDELL'S DRY DOCK.

21    **Q.**    CADDELL, C-A-D-D-E-L-L?

22    **A.**    YES.

23    **Q.**    OKAY.  AND WHERE WAS CADDELL'S DRY DOCK LOCATED?

24    **A.**    IS IN STATEN ISLAND, NEW YORK.

25    **Q.**    DID YOU ACCEPT THAT JOB?

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    **A.**    YES, I DID.

2    **Q.**    WHAT DID YOU DO AT CADDELL'S DRY DOCK?

3    **A.**    I AM STARTING WITH THE NEW CAREER IN MY LIFE, WHAT IS

4    NEW CAREER IT MEANS THAT IS THE NEW TITLE.  IT WAS AS THE

5    ESTIMATOR AND PROJECT ESTIMATOR.

6    **Q.**    OKAY.  AND DID YOU LIKE THAT JOB?

7    **A.**    YES, I DID.

8    **Q.**    WERE YOU ENJOYING NEW YORK?

9    **A.**    YEAH, IT WAS NEW LIFE FOR ME.

10   **Q.**    AND HOW LONG DID YOU WORK AT CADDELL?

11   **A.**    IS ABOUT TWO YEARS.

12   **Q.**    OKAY.  WHAT HAPPENED?

13   **A.**    AGAIN, RECESSION THIS ONE -- THIS TIME MAYBE HAPPENED TO

14   ME TOO, VERY BAD.

15   **Q.**    I AM SORRY.  THE RECESSION?

16   **A.**    RECESSION.

17   **Q.**    BUT WHAT HAPPENED WITH THE JOB?

18   **A.**    NO PROJECTS.

19   **Q.**    OKAY.  WERE YOU LET GO, OR LAID OFF?

20   **A.**    I LAID OFF.  LACK OF THE WORK.

21   **Q.**    OKAY.  AROUND THAT TIME WHAT DID YOU DO DECIDE TO DO

22   WHEN YOU GOT LAID OFF?

23   **A.**    AGAIN IT WAS, YOU KNOW, WHEN YOU HAVE TIME TO THINK

24   AGAIN.  AND I TOOK DECISION TO CONTINUE MY EDUCATION.  AND I

25   WAS LOOKING FOR GOOD PROGRAM.  AND I WAS -- I REMEMBER I HAD

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   INITIAL COMMUNICATION WITH THE SUNY MARITIME COLLEGE.

2   **Q.**   WHICH WE TALKED ABOUT EARLIER, RIGHT?

3   **A.**   YES.

4   **Q.**   DID YOU APPLY TO SUNY?

5   **A.**   YES.

6   **Q.**   WHAT DID -- DID YOU DO ANY -- DID YOU FIND ANY OTHER

7   WORK WHILE YOU WERE APPLYING TO THE PROGRAM?

8   **A.**   YES.  AUGUST, AS I MENTIONED, IN ABOUT THE NEXT TWO

9   MONTHS, TWO MONTHS AND A HALF, I FOUND A JOB IN THE GMD

10  SHIPYARD CORP.

11  **Q.**   THAT WAS GMD, AND YOU STARTED WORKING THERE IN AUGUST OF

12  2010, I BELIEVE?

13  **A.**   YES.

14  **Q.**   WHAT DID YOU DO WITH GMD?

15  **A.**   GMD IT WAS MY -- I WAS AS PROJECT MANAGER.  I DO -- I

16  WAS DOING ESTIMATING, AS NOW AS I AM DOING.  AND I MANAGED THE

17  PROJECTS, THE SHIP FROM A TO Z, AND INVOICING THE SHIPS, TOO.

18  IS FOR THAT.  AND I WAS INVOLVED FOR, YOU KNOW, FOR THE BOATS

19  THEY COMING IN AND OUT, IS THE COMMERCIAL OR GOVERNMENT.  I AM

20  IN CHARGE OF THAT, TO TAKE CARE OF THE CONTRACT FROM POINT A

21  TO IN THE END TO INVOICE THE SHIPS.

22  **Q.**   SO YOU SAID FROM POINT A TO Z.  DID THAT MAKE YOU

23  FAMILIAR WITH EVERY ASPECT OF SHIP EQUIPMENT?

24  **A.**    IS SURE I AM FAMILIAR WITH ANY ASPECT OF THE SHIP

25  EQUIPMENT, YES.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **Q.**    SO DO YOU HAVE AN EXPERTISE IN ELECTRONICS?

2   **A.**    NO.  THIS IS THE -- DOESN'T MEAN I EXPERTISE TO

3   SOMETHING, THAT JUST MEANS I AM FAMILIAR WITH THE EQUIPMENT.

4   **Q.**    FAIR ENOUGH.  FAMILIAR.

5         AND YOU SAID EARLIER THAT YOU LEFT GMD IN DECEMBER 2012

6   TO FOCUS ON YOUR STUDIES?

7   **A.**    YES.

8   **Q.**    WHEN DID YOU BEGIN YOUR STUDIES AT SUNY?  WAS IT THEN IN

9   DECEMBER OF 2012?

10  **A.**    NO.  THAT IS MY STUDY BECAUSE I BACK TO THE WORK AND I

11  WAS FULL TIME WORK.  AFTER ALL THE -- BECAUSE IS THE PAPERWORK

12  FOR ME AND BECAUSE I HAD TO ENDORSE ALL MY DOCUMENTS FROM IRAN

13  TO THE UNITED STATES TO SEND TO SUNY MARITIME.  MY FIRST

14  SEMESTER STARTING IN SPRING OF 2011.

15  **Q.**    AND YOU WERE STILL WORKING FULL TIME AT GMD?

16  **A.**    YES.

17  **Q.**    HOW DID YOUR STUDIES GO?

18  **A.**    FIRST SEMESTER I WASN'T SUCCESSFUL BECAUSE THEY GAVE ME

19  THREE PROGRAMS ONLINE AND I HAD NO TIME FOR THAT.

20  **Q.**    SO ULTIMATELY YOU DECIDED TO FOCUS ON YOUR STUDIES FULL

21  TIME?

22  **A.**    I HAD THE -- YOU KNOW, AFTER THE SUMMER I TOOK ONE

23  COURSE, ONE COURSE.  AFTER A TIME I HAD OPTION ON MY TABLE TO

24  CONTINUE FULL TIME AT WORK OR TO CONTINUE FULL TIME AS A

25  STUDENT.  AND I SEE THE STUDIES IS BETTER.  THAT IS I WAS

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    INTERESTED IN.

2    **Q.**    OKAY.  LET'S TALK ABOUT YOUR RELATIONSHIP WITH KOORUSH

3    TAHERKHANI.

4    **A.**    YES.

5    **Q.**    OKAY.  LET ME JUST ASK YOU QUICK, BEFORE WE MOVE ON TO

6    THAT.

7           WHEN YOU LEFT GMD IN 2012 AND STARTED AS A FULL TIME

8    STUDENT, HOW WERE YOU SUPPORTING YOURSELF.

9    **A.**    IS HOWEVER I HAD SOME SAVING.  AND I WAS HOPED BECAUSE I

10   AM IN THE GRADUATE PROGRAM THAT I CAN TAKE SOME STUDENT LOAN.

11   **Q.**    OKAY.  AND WHEN DID KOORUSH CONTACT YOU FIRST IN

12   RELATION TO THE EVENTS OF THIS CASE?

13   **A.**    KOORUSH, THE FIRST CONTACT WAS BY EMAIL TO MY

14   PERSONAL –– MY PERSONAL YAHOO ACCOUNT.  AND HE SAID HE GOT IT

15   FROM OUR COMMON FRIEND MY PHONE NUMBER.  HE TRIED TO REACH ME.

16   IF HE CANNOT REACH ME, OR HE GAVE HIS SKYPE I.D.

17   **Q.**    I WAS JUST ASKING YOU WHEN.  WHEN DID HE CONTACT YOU?

18   **A.**    DECEMBER 2012.

19   **Q.**    NOW, THIS IS SOMEONE THAT YOU KNEW FROM BEFORE?

20   **A.**    YES.

21   **Q.**    WHERE DID YOU FIRST MEET KOORUSH TAHERKHANI?

22   **A.**    I CAN'T REMEMBER FIRST, BUT KOORUSH WAS MY CLASSMATE.

23   **Q.**    OKAY.

24   **A.**    IN THE –– DURING THE –– DURING THE –– MY –– MY COLLEGE

25   IN BANDAR ABBAS.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  **Q.**    OKAY.  WERE YOU -- DID YOU CONSIDER YOURSELF CLOSE

2  FRIENDS AT THE TIME?

3  **A.**    YOU KNOW, WE WERE LIVING IN THE ONE BUILDING DORM, AND

4  IN THE -- FOR FOUR, FIVE YEARS WE ALMOST WE SEE EACH OTHER

5  ALMOST -- WE HAD SOME COMMON COURSES.  BUT -- AND WE WERE

6  CLOSE, BUT NOT CLOSE FRIENDS.

7  **Q.**    WAS HE IN THE SAME CLASS AS YOU?

8  **A.**    SOME CLASSES.

9  **Q.**    I MEAN IN THE SAME LEVEL.

10  **A.**    NO, HE WAS JUNIOR.

11  **Q.**    HE WAS IN A JUNIOR CLASS TO YOU?

12  **A.**    YES.

13  **Q.**    OKAY.  AND YOU SAID YOU GRADUATED IN 1994?

14  **A.**    YES.

15  **Q.**    DID YOU MAINTAIN CONTACT WITH KOORUSH AFTER GRADUATION?

16  **A.**    NOT -- NOT -- I DIDN'T MAINTAIN CONTACT JUST -- BUT I

17  MET IN THE OCCASIONAL LOCATIONS KOORUSH BECAUSE WE WERE IN THE

18  SAME INDUSTRY.

19  **Q.**    SO YOU WOULD SEE HIM.

20  **A.**    YES.

21  **Q.**    WHEN KOORUSH CONTACTED YOU IN DECEMBER OF 2012, WHEN WAS

22  THE LAST TIME YOU HAD SEEN OR SPOKEN WITH HIM?

23  **A.**    THIS IS, AGAIN, I SAID THE LAST TIME I SEE HIM, WHEN IS

24  IT.  IT WAS EIGHT, NINE YEARS AGO I MET KOORUSH THE LAST TIME.

25  **Q.**    SO BEFORE THIS EMAIL YOU HADN'T SPOKEN WITH HIM FOR

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  EIGHT OR NINE YEARS?

2  **A.**    I THINK SO.

3  **Q.**    OKAY.  AND SPECIFICALLY WHAT DID KOORUSH GET IN TOUCH

4  WITH YOU ABOUT?  WHAT DID HE WANT YOUR HELP WITH?

5  **A.**    KOORUSH, AS HE TOLD ME, HE SEND ME IN THE EMAIL ONE

6  QUOTATION HE HAD FROM THE COMPANY IN THE BRONX, NEW YORK.

7  **Q.**    IN THE BRONX?

8  **A.**    BRONX, NEW YORK.

9  **Q.**    WHAT WAS THAT QUOTATION FOR?

10  **A.**    FOR GYRO, FOR PROVIDING -- FOR PURCHASING GYROCOMPASS

11  FROM THAT COMPANY.

12  **Q.**    AND WHAT DID HE WANT YOU TO DO WITH RESPECT TO THAT

13  COMPANY, OR THAT QUOTE?

14  **A.**    HE TOLD ME THAT IS WHAT I -- BECAUSE I ASKED HIM HOW I

15  CAN HELP YOU.  AND HE HAD SAID TO VERIFY THE COMPANY.  AND I

16  SAID WHY YOU WANT I VERIFY COMPANY?  HE SAID BECAUSE I FOUND

17  IN THE -- ON SEARCHING ON THE LINE THIS COMPANY.

18  **Q.**    I AM SORRY.  HE FOUND THIS COMPANY ONLINE?

19  **A.**    YES.

20  **Q.**    SEARCHING?

21  **A.**    SEARCHING.  SURFING OR SEARCHING.

22  **Q.**    DID YOU SEE ANYTHING SUSPICIOUS ABOUT THIS REQUEST FROM

23  KOORUSH TO SEE IF THIS COMPANY WAS LEGITIMATE?

24  **A.**    NO.

25  **Q.**    OKAY.  DID YOU FOLLOW UP WITH KOORUSH AND ASK HIM WHY HE

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   WAS SEEKING THIS PARTICULAR ITEM?

2   **A.**    YES.

3   **Q.**    OKAY.  AND WHY WAS HE SEEKING THIS ITEM?  WHAT WAS HE

4   DOING?

5   **A.**    WHEN WE WERE TALKING, BECAUSE I HEARD KOORUSH IS WORKING

6   IN DUBAI, YOU KNOW, WE ARE IN THE COMMUNITY OF THE MARITIME

7   AND WE ARE IN THE WORLD WIDE NOW, THAT IS MORE THAN 50 PERSONS

8   OF MY CLASSMATES IS THERE OUT OF IRAN.  THEY ARE IN AUSTRALIA,

9   AND I DON'T WANT -- WE HAVE SOME -- I HEARD THAT IS THE

10  KOORUSH WORKING IN THE DUBAI.  I DIDN'T KNOW WHERE IS WORKING

11  EXACTLY.

12  **Q.**    DID YOU LEARN WHERE HE WAS WORKING OR WHAT HE WAS DOING?

13  **A.**    HE EXPLAINED FOR ME THAT IS HE IS WORKING FOR THREE,

14  FIVE YEARS.  HE OPENED HIS COMPANY.  HE IS WORKING IN DUBAI.

15  HE HAS A VERY GOOD SUCCESSFUL BUSINESS HERE.  AND HE IS

16  LOOKING FOR THIS GYRO FOR ONE OF HIS CUSTOMERS HERE IN DUBAI.

17  **Q.**    AND THAT COMPANY WAS NAMED TIG MARINE, OR A DIFFERENT

18  COMPANY?

19          **MR. HARRIGAN:**  OBJECTION.  LEADING.

20          **MR. JOHNSTON:**  SORRY.

21          **THE WITNESS:**  TIG MARINE.  TIG MARINE SERVICE.

22  **Q.**    **(MR. JOHNSTON)** DID YOU KNOW OF KOORUSH WORKING FOR ANY

23  OTHER COMPANIES IN DUBAI?

24  **A.**    NO.

25  **Q.**    BUT YOUR TESTIMONY IS HE TOLD YOU THAT THIS WAS HIS

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  COMPANY?

2  **A.**    YES.  FOR YOUR INFORMATION, THAT'S WHEN WE WERE TALKING

3  HE DIDN'T MENTION ABOUT THE NAME OF THE COMPANY.  SAID HE

4  OPENED A COMPANY.

5  **Q.**    YOU SAID THAT HE TOLD YOU HE WAS LOOKING FOR THIS ITEM

6  FOR ONE OF HIS CUSTOMERS.  DID THAT RAISE ANY CONCERNS FOR

7  YOU, OR CAUSE YOU TO INQUIRE FURTHER?

8  **A.**    YES.  I ASKED HIM WHERE IS YOUR CUSTOMER?  AND HE SAID

9  IN DUBAI.  AND BECAUSE I ASKED HIM THAT, THAT IS THE FIRST

10  THING, THAT IS SOMETHING IS VERY CASUAL BETWEEN US, THAT IS

11  IRANIAN, BECAUSE WE KNOW THE PROBLEM OF THE SANCTIONS IRAN.

12      THE FIRST THING, YOU KNOW I CANNOT WORK FOR THE IRANIAN

13  COMPANY OR ANYTHING.  HE SAID NO ARASH, IT IS LONG TIME I CAME

14  OUT FROM THE IRISL.  I HAVE MY BUSINESS IN THE UAE.  I AM

15  LEGITIMATE.  I AM WORKING HERE FOR FOUR, FIVE YEARS.  I HAVE

16  THE -- I AM PARTNER WITH A GERMAN GUY.  HE EXPLAINED FOR ME.

17  AND HE IS LOOKING FOR THIS GYRO FOR THE RESALES IN THE UAE,

18  DUBAI.

19  **Q.**    SO YOU RAISED THIS WITH HIM, THAT YOU DIDN'T WANT TO

20  HAVE ANYTHING TO DO WITH BUSINESS IN IRAN?

21  **A.**    YES.

22  **Q.**    AND WHY DID YOU RAISE THAT WITH KOORUSH, BECAUSE HE WAS

23  IRANIAN OR DID YOU HAVE SOME OTHER REASON?

24  **A.**    IS THAT NOT BECAUSE HE IS IRANIAN, BECAUSE THE LAST TIME

25  I KNOW THAT KOORUSH WAS WORKING FOR THE IRANIAN COMPANY,

APRIL 20, 2015

GHAHREMAN - DIRECT EXAMINATION

1   IRISL.  I DIDN'T KNOW KOORUSH WHERE HE IS WORKING.  THAT IS
2   BECAUSE SOME PEOPLE ALSO THEY ARE WORKING DUBAI BUT THEY ARE
3   WORKING FOR IRISL COMPANY.  THIS IS -- YOU KNOW I DIDN'T -- I
4   HEARD THAT KOORUSH WORKING IN DUBAI, BUT WHAT HE IS WORKING I
5   DIDN'T KNOW.
6   **Q.**    NOW, AT SOME POINT DID HE TELL YOU THE NAME OF HIS
7   COMPANY?
8   **A.**    YES.
9   **Q.**    OKAY.
10  **A.**    HE GAVE ME.
11  **Q.**    DID YOU DO ANY FURTHER INVESTIGATION ABOUT THAT COMPANY
12  TO FIND OUT MORE ABOUT IT?
13  **A.**    I CHECKED THE WEBSITE.  AND HE ADDED THAT HIS COMPANY IS
14  VERY FAMOUS AND YOU CAN ASK EVERYBODY.
15  **Q.**    STOP FOR JUST ONE MINUTE.  YOU SAID YOU CHECKED THE
16  WEBSITE?
17          **MR. JOHNSTON:**  ONE SECOND, YOUR HONOR.
18          YOUR HONOR, I BELIEVE WE ARE AT BBB.
19          (EXHIBIT BBB MARKED FOR IDENTIFICATION)
20  **Q.**    **(MR. JOHNSTON)** MR. GHAHREMAN, I AM APPROACHING YOU --
21          **MR. JOHNSTON:**  WITH THE COURT'S PERMISSION.
22  **Q.**    **(MR. JOHNSTON)** -- WITH WHAT HAS BEEN MARKED AS DEFENSE
23  EXHIBIT BBB.
24          IF YOU CAN LOOK THROUGH THAT DOCUMENT AND TELL ME IF
25  THAT LOOKS FAMILIAR TO YOU.

GHAHREMAN – DIRECT EXAMINATION

1  **A.**    YES, IT IS.

2  **Q.**    OKAY.  IS THAT A COPY OF SOMETHING THAT YOU PREVIOUSLY

3  REVIEWED?

4  **A.**    YES.  TIG MARINE WEBSITE.

5  **Q.**    OKAY.  ARE THOSE PAGES THAT YOU HAVE REVIEWED IN THE TIG

6  MARINE WEBSITE?

7  **A.**    YES, SIR.

8  **Q.**    DO THOSE PAGES APPEAR TO LOOK THE WAY THAT YOU VIEWED

9  THEM WHEN YOU FIRST LOOKED AT THE TIG MARINE WEBSITE?

10  **A.**    YES, SIR.

11        **MR. JOHNSTON:**  YOUR HONOR, AT THIS TIME I WOULD MOVE

12  TO INTRODUCE EXHIBIT BBB INTO EVIDENCE.

13        **MR. HARRIGAN:**  OBJECTION, YOUR HONOR.  LACK OF

14  FOUNDATION AND ALSO HEARSAY.

15        **THE COURT:**  OVERRULED.  IT WILL BE RECEIVED.

16        (EXHIBIT BBB RECEIVED INTO EVIDENCE)

17        **MR. JOHNSTON:**  THANK YOU.

18  **Q.**    **(MR. JOHNSTON)** AND, MR. GHAHREMAN --

19  **A.**    YES, SIR.

20  **Q.**    -- WAS THERE ANYTHING IN THE TIG MARINE WEBSITE THAT

21  CAUSED YOU CONCERN ABOUT MR. TAHERKHANI'S INTENTIONS?

22  **A.**    NO, SIR.

23  **Q.**    WAS THERE ANYTHING IN THE WEBSITE THAT SUGGESTED HE WAS

24  WORKING WITH IRANIAN -- THE IRANIAN GOVERNMENT?

25  **A.**    NO, SIR.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    **Q.**    THAT HE WAS SENDING GOODS TO THE TERRITORY OF IRAN?

2    **A.**    NO, SIR.

3    **Q.**    OKAY.  LET'S TALK ABOUT THIS REQUEST THAT HE MADE FOR

4    THE GYROCOMPASS FROM THE COMPANY IN THE BRONX.

5    **A.**    YES.

6    **Q.**    DID YOU TRY TO CONTACT THIS COMPANY?

7    **A.**    YES.  EXCUSE ME.  I AM NOT –– THE QUOTATION KOORUSH SENT

8    ME IN THE BEGINNING?

9    **Q.**    THE COMPANY IN THE BRONX THAT HE ASKED YOU ––

10   **A.**    YES, YES, I TRIED TO CONTACT.

11   **Q.**    DID YOU GET ANY RESPONSE?

12   **A.**    NO, SIR.

13   **Q.**    OKAY.

14        **MR. JOHNSTON:**  MADAM CLERK, IF WE COULD GO TO THE

15   GOVERNMENT'S.

16   **Q.**    **(MR. JOHNSTON)** MR. GHAHREMAN, I AM SHOWING YOU WHAT HAS

17   BEEN PREVIOUSLY MARKED AS GOVERNMENT EXHIBIT 201–A.

18        **MR. JOHNSTON:**  IF WE COULD HIGHLIGHT THE BOTTOM

19   PART.

20   **Q.**    **(MR. JOHNSTON)** DO YOU RECOGNIZE THIS EMAIL?

21   **A.**    YES, SIR.

22   **Q.**    OKAY.  AND WHAT IS IT REGARDING?

23   **A.**    THIS IS REGARDING THE QUOTATION KOORUSH HAD IN HIS HAND

24   ON FOR WANT FOR ME TO VERIFY THE COMPANY.  I COULD –– I NEVER

25   HEARD –– BECAUSE I WAS WORKING IN THE REGION OF THE NEW YORK I

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   WAS INVOLVED WITH THE VENDORS AND ALL THE SUPPLIERS, I NEVER

2   HEARD ABOUT THIS COMPANY, AS MY EXPERIENCE.

3   **Q.**   SO WHAT DID YOU TELL KOORUSH YOU WOULD PREFER TO DO IF

4   YOU WANTED TO PURSUE THIS ITEM?

5   **A.**   I PREFER THAT IS TO GIVE HIM –– TO SUGGEST TO HIM GOING

6   WITH THE APPROVED QUALIFIED SUPPLIER.

7   **Q.**   OKAY.  DID YOU PROCEED TO HELP HIM?

8   **A.**   PARDON?

9   **Q.**   DID YOU PROCEED TO HELP HIM TRY TO FIND A QUALIFIED ––

10  **A.**   YEAH.  HE TOLD ME OKAY, ARASH, PLEASE HELP ME IN THIS

11  MATTER.  HE ASKED ME IN THE BEGINNING ALSO IF YOU CAN HELP ME

12  IN THIS MATTER.

13  **Q.**   WE WILL GET TO THAT IN A SECOND.

14          AND WHO DID YOU CONTACT TO SEE IF YOU COULD FIND THIS

15  PARTICULAR ITEM, THE NAVIGAT?

16  **A.**   I CALLED –– YOU KNOW, THAT'S –– AS MY –– I CALLED TAMMY

17  FARNSLEY IN TIMCO.

18  **Q.**   IS TAMMY FARNSLEY SOMEONE YOU HAD WORKED WITH BEFORE?

19  **A.**   YES, SIR.  TIMCO MARINE, NOT TAMMY.  BUT, YES, I WAS IN

20  CONTACT WITH TAMMY SEVERAL TIMES.

21  **Q.**   HAD YOU WORKED WITH TIMCO MARINE IN CONNECTION WITH

22  PERSONAL VENTURES?

23  **A.**   NO, FOR MY JOB.  DURING THESE LAST FOUR YEARS IN

24  CADDELL'S DRY DOCK AND GMD SHIPYARD.

25  **Q.**   SO THIS IS SOMEONE YOU HAD WORKED WITH BEFORE?

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    **A.**    YES.

2    **Q.**    NOW, WHEN YOU CONTACTED MS. FARNSLEY WERE YOU ASKING HER

3    TO MAKE A PURCHASE ORDER?  TO GET A QUOTE?  WHAT WERE YOU

4    ASKING HER TO DO?

5    **A.**    THE FIRST QUESTION I ASKED HER, DO YOU HAVE THE

6    INTERNATIONAL SALE, DO YOU EXPORT EQUIPMENT TO OVERSEAS.  SHE

7    SAID YES, OF COURSE.

8         I SAID I HAVE A FRIEND IN THE UAE.  HE NEEDS GYROS,

9    NAVIGAT-2100, AND PLEASE PROVIDE A QUOTE FOR ME.

10   **Q.**    DID MS. FARNSLEY RAISE ANY CONCERNS WITH YOU WHEN YOU

11   MENTIONED THAT YOU HAD A POTENTIAL BUYER IN THE UAE?

12   **A.**    PARDON?

13   **Q.**    DID SHE RAISE ANY CONCERNS WITH YOU WHEN YOU SAID THAT

14   THIS --

15   **A.**    NO.  SHE SAID SURE, ARASH.

16        **MR. JOHNSTON:**  NOW IF WE COULD GO TO EXHIBIT 202,

17   PLEASE, WHICH HAS BEEN PREVIOUSLY ENTERED INTO EVIDENCE BY THE

18   GOVERNMENT.  IF WE CAN HIGHLIGHT THE PART THAT STARTS WITH

19   KOORUSH.  THE BOTTOM HALF.  THANK YOU.

20   **Q.**    **(MR. JOHNSTON)** AT SOME POINT DID YOU GET A RESPONSE

21   FROM MS. FARNSLEY?

22   **A.**    YES, I DID.

23   **Q.**    OKAY.  LOOKING AT GOVERNMENT'S EXHIBIT 202, DO YOU

24   RECOGNIZE THIS EMAIL?

25   **A.**    YES, I DO.

GHAHREMAN – DIRECT EXAMINATION

1  **Q.**    OKAY.  THIS IS AN EMAIL FROM YOU TO KOORUSH, RIGHT?

2  **A.**    YES.

3         **THE COURT:**  MR. JOHNSTON, PERHAPS WE CAN TAKE OUR

4  BREAK HERE.  15 MINUTES.

5         **MR. JOHNSTON:**  GREAT.

6         **THE COURT:**  WE WILL RESUME AT 10:30.

7         (RECESS)

8         **THE COURT:**  WE ARE BACK ON THE RECORD WITH ALL

9  PRESENT, MR. JOHNSTON.

10         **MR. JOHNSTON:**  THANK YOU, YOUR HONOR.

11  **Q.**    **(MR. JOHNSTON)** MR. GHAHREMAN, WE WERE BEGINNING TO LOOK

12  AT THIS EMAIL SENT FROM YOU TO KOORUSH, EXHIBIT 202.

13  **A.**    YES, SIR.

14  **Q.**    DO YOU REMEMBER THIS EMAIL?

15  **A.**    YES, SIR.

16  **Q.**    OKAY.  AND YOU ADVISED KOORUSH IN THIS EMAIL THAT THERE

17  WAS SOME MORE INFORMATION THAT WILL BE NEEDED, RIGHT?

18  **A.**    I FORWARD, COPY AND PASTE THAT TAMMY FARNSLEY MESSAGE TO

19  ME TO KOORUSH.

20  **Q.**    SO THESE WORDS WERE TAMMY FARNSLEY'S WORDS?

21  **A.**    YES.

22  **Q.**    BUT YOU READ HER MESSAGE, RIGHT?

23  **A.**    YES, SURE.

24  **Q.**    AND FORWARDED IT TO KOORUSH?

25  **A.**    YES.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    **Q.**    DID ANYTHING ABOUT HOMELAND SECURITY NEEDING TO REVIEW

2    THIS ORDER CAUSE YOU ANY CONCERN?

3    **A.**    BECAUSE I AM WORKING MARITIME INDUSTRY IS ASK USUALLY

4    SOMETIMES THE HOMELAND SECURITY SHOULD BE NOTIFIED FOR THE

5    HIGH TECHNOLOGY EQUIPMENT AS THE GYRO IS THAT BECAUSE

6    ELECTRONIC IS THE HIGH TECHNOLOGY.

7    **Q.**    BECAUSE IT IS HIGH TECHNOLOGY?

8    **A.**    YES.

9    **Q.**    OKAY.  AND TAMMY ASKS THAT YOU MAY NEED TO PROVIDE END

10   USER INFORMATION?

11   **A.**    YES, SHE ASKED.

12   **Q.**    AND DID KOORUSH PROVIDE END USER INFORMATION?

13   **A.**    YES, HE DID.

14          **MR. JOHNSTON:**  IF WE CAN JUST GO TO PAGE —— I

15   BELIEVE IT IS TWO OF THIS EMAIL.

16   **Q.**    **(MR. JOHNSTON)** DID YOU FILL OUT THIS FORM?

17   **A.**    NO, SIR.

18   **Q.**    WHO FILLED OUT THIS FORM?

19   **A.**    THIS IS THE —— IN THE INDUSTRY I COULDN'T FOUND THERE,

20   BUT THIS IS THE —— KOORUSH PROVIDED TO ME.

21   **Q.**    OKAY.  AND YOU FORWARDED IT TO TAMMY FARNSLEY?

22   **A.**    YES, SIR.

23   **Q.**    NOW, AT SOME POINT DID MS. FARNSLEY GIVE YOU A RESPONSE

24   ABOUT THE REQUEST FOR A QUOTE ON THE NAVIGAT?

25   **A.**    YES, SIR.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    **MR. JOHNSTON:**  IF WE CAN GO TO EXHIBIT 203, PLEASE.

2  AND JUST HIGHLIGHT THE BODY THERE, DEAR KOORUSH.

3        THIS HAS BEEN PREVIOUSLY ENTERED INTO EVIDENCE, FOR

4  THE RECORD.

5  **Q.**    **(MR. JOHNSTON)** THIS IS AN EMAIL FROM YOU TO KOORUSH,

6  RIGHT?

7  **A.**    YES, SIR.

8  **Q.**    BUT WHOSE LANGUAGE ARE YOU QUOTING HERE IN THAT EMAIL?

9  **A.**    PARDON?  I DON'T UNDERSTAND.

10  **Q.**    ARE THESE YOUR WORDS:  THE SECURITY GROUP HAS VETTED THE

11  USE?

12  **A.**    IS THE TOP SIDE IS MY WORD.  AGAIN I FORWARD TAMMY

13  FARNSLEY IN THE BODY TO KOORUSH.

14  **Q.**    BUT TAMMY FARNSLEY TOLD YOU THAT IT WOULD BE LIKE

15  PUTTING A MERCEDES ENGINE IN A TRICYCLE IN THEIR WORDS, RIGHT?

16  **A.**    YES, SHE SAID.

17  **Q.**    DID THAT CAUSE YOU CONCERN?

18  **A.**    YES, SIR.  THAT IS -- I WAS SURPRISED AND I ASKED

19  KOORUSH WHY THEY ARE -- THEY DON'T MATCH, WHAT IS GOING ON

20  WITH THIS VESSEL.  KOORUSH SAID THAT NO, THEY NOT DESIGNED FOR

21  THIS TYPE OF THE VESSEL, BUT SUPERINTENDENT OR FOR THE WESAL

22  COMPANY, THEY ARE -- THEY USED TO WORK WITH THIS TYPE OF GYRO,

23  THEY ARE RELIABLE WITH THIS TYPE OF GYRO, AND THE TRAFFIC AND

24  DURATION IS GOOD.  AND I ALREADY ARRANGE WITH HIM.  HE ASKED

25  BECAUSE WHY I DON'T GO WITH IT.

APRIL 20, 2015

GHAHREMAN — DIRECT EXAMINATION

1   **Q.**    IF YOU CAN SPEAK SLOWLY.  THE SUPERINTENDENT --

2   **A.**    OF THE WESAL COMPANY.

3   **Q.**    OF THE WESAL COMPANY?

4   **A.**    ASK KOORUSH.

5   **Q.**    FOUND THAT THIS MODEL WAS A RELIABLE MODEL.

6   **A.**    YES.

7   **Q.**    NOW, AT SOME POINT IN YOUR COMMUNICATIONS WITH TAMMY WAS

8   THERE ANY CONFUSION ABOUT WHETHER THE REQUEST WAS FOR A

9   NAVIGAT 3000 OR NAVIGAT-2100?

10  **A.**    YES.  IT WAS BECAUSE I REQUESTED FOR THE NAVIGAT-2100

11  AND THE BILLING IN KOORUSH TOLD ME IS THAT HE APPLIED FOR

12  NAVIGAT-3000 IN SPERRY MARINE BRANCH IN DUBAI.

13  **Q.**    SLOW DOWN.  KOORUSH CONTACTED -- TOLD YOU THAT HE

14  CONTACTED SPERRY MARINE IN DUBAI?

15  **A.**    IS THAT I DON'T WANT TO -- IN THE BEGINNING OUR SPEAKING

16  ABOUT THE GYRO 2100 WAS HE WANTED.  HE MENTIONED -- I TOLD HIM

17  THAT WE HAVE THE SPERRY MARINE BRANCH EVERYWHERE IN THE WORLD.

18  I KNOW SPERRY MARINE BECAUSE I WAS USED TO WORKING IN THE

19  SHIPYARDS, SOMETIMES THE TECHNICIAN COME IN.  AND I TOLD HIM

20  WE HAVE EVERYTHING LIKE THE TECHNICIAN AND THE BRANCH.  HE

21  SAID -- HE ASKED NAVIGAT-2100 FROM THE BRANCH IN DUBAI, BUT

22  THEY DON'T HAVE 2100, THEY HAVE NEW ONE.

23  **Q.**    AND YOUR UNDERSTANDING WAS HE DIDN'T WANT THE NEW ONE?

24  **A.**    NO.

25  **Q.**    THE 3000?

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    **A.**    NO.

2    **Q.**    SO WAS IT YOUR –- WELL, WHEN THIS REQUEST WAS DENIED DID

3    YOU KNOW WHETHER THEY WERE DENYING IT FOR THE 3000 OR THE

4    2100?

5              **MR. HARRIGAN:**  OBJECTION.  LACK OF FOUNDATION.

6              **THE COURT:**  SUSTAINED.

7    **Q.**    **(MR. JOHNSTON)** DID YOU HAVE ANY COMMUNICATIONS WITH

8    TAMMY FARNSLEY THAT WOULD LEAD YOU TO BELIEVE THAT THIS

9    REQUEST CONCERNED THE 3000 VERSUS THE 2100?

10   **A.**    IS REALLY I DON'T RECALL, BUT I THINK I HAD DISCUSSION

11   WITH TAMMY.  I AM SURE I HAD DISCUSSION ABOUT 2100 AND 3000.

12   I DON'T KNOW AFTER THIS EMAIL, BEFORE THIS EMAIL, BUT I AM

13   SURE I HAD DISCUSSION ABOUT WE WANT 2100.

14   **Q.**    LET'S MOVE FORWARD.

15         AT SOME POINT WE HAVE HEARD IN THE GOVERNMENT'S CASE

16   THAT TAMMY FARNSLEY PUT YOU IN TOUCH WITH SOUTH STAR TRADING;

17   IS THAT RIGHT?

18   **A.**    YES.

19   **Q.**    WITH DAVID MILLS?

20   **A.**    SOUTH STAR TRADING COMPANY.  THAT IS THE CONTACT PERSON

21   IN THE SOUTH STAR TRADING IS DAVID MILLS.

22   **Q.**    OKAY.  IS DAVID MILLS?

23   **A.**    YES.

24   **Q.**    OKAY.  AND AT SOME POINT YOU BEGAN NEGOTIATING WITH HIM

25   ABOUT PURCHASING 2100'S, RIGHT?

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    **A.**    YES, SIR.

2    **Q.**    OKAY.  AND YOU RECALL IN THE GOVERNMENT'S CASE THEY

3    PLAYED A CLIP -- FOR IDENTIFICATION PURPOSES CLIP 302 -- ABOUT

4    A REQUEST FOR 100 NAVIGATS.

5    **A.**    YES, SIR.

6    **Q.**    AND DAVID MILLS IS CONCERNED THAT -- WHAT WERE DAVID

7    MILLS' CONCERNS IN THAT CALL?

8    **A.**    IS THAT I INFORMED TO HIM THAT IS KOORUSH SAID HE WANTS

9    100 NAVIGAT.

10   **Q.**    LET ME ASK YOU THIS.  DAVID MILLS HAD COMMUNICATED WITH

11   YOU PREVIOUSLY THAT THIS WAS THE LAST OPPORTUNITY TO MAKE AN

12   ORDER FOR THE 2100.

13          **MR. HARRIGAN:**  OBJECTION.  LEADING.

14          **THE WITNESS:**  YES.

15          **THE COURT:**  SUSTAINED.

16   **Q.**    (MR. JOHNSTON) DID DAVID MILLS, AT ANY POINT, INDICATE

17   TO YOU THE STATUS OF THE ORDER FOR 2100'S?

18          **MR. HARRIGAN:**  OBJECTION.  LEADING.

19          **THE COURT:**  OVERRULED.

20          YOU MAY ANSWER.

21          **THE WITNESS:**  YES, SIR.

22   **Q.**    (MR. JOHNSTON) OKAY.  WHAT DID HE ADVISE YOU ABOUT THE

23   STATUS OF THE ORDERS?

24   **A.**    DAVID MILLS, REGARDING 2100, HE SAID HE FOUND -- HE HAS

25   A GOOD FRIEND IN THE MANUFACTURE.  HE -- BECAUSE HIS GOOD

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    RELATIONSHIP WITH THE NORTHROP GRUMMAN AND PREVIOUS ORDERS AND

2    EVERYTHING, HE CAN MAKE HIS CUSTOMERS ORDER FOR US TO GO FOR

3    THE NAVIGAT-2100.  HE REACH -- IT WAS DISCONTINUE.  BUT THIS

4    IS NOT FOR TWO, THREE TIME, ONE SHOT, ONE ORDER.

5    **Q.**   OKAY.  SO HE TOLD YOU THAT THE NAVIGAT-2100 HAD BEEN

6    DISCONTINUED BUT THAT HE HAD A FRIEND AT SPERRY WHO COULD

7    PLACE A FINAL ORDER?

8    **A.**   YES.

9    **Q.**   AND THIS WAS WHAT YOU SAID, THE FINAL SHOT OR LAST CALL?

10   **A.**   YES, YES.

11   **Q.**   OKAY.  DID YOU CONVEY THAT INFORMATION TO KOORUSH?

12   **A.**   YES, I DID.

13   **Q.**   AND DID KOORUSH EVER CHANGE THE NUMBER OF NAVIGATS THAT

14   HE WANTED?  DID HE EVER REQUEST FROM YOU 100 NAVIGATS?

15   **A.**   WHEN I INFORMED TO HIM THAT IS MY CONTACT IS THE

16   SUPPLIER HE CAN MAKE LAST ORDER FOR THE 2100, HE SAID I WANT

17   100.

18   **Q.**   OKAY.  DID YOU BELIEVE THAT HE HAD END USERS FOR 100

19   NAVIGATS?

20           **MR. HARRIGAN:**  OBJECTION.  CALLS FOR SPECULATION.

21           **THE COURT:**  SUSTAINED.

22   **Q.**   **(MR. JOHNSTON)** BASED ON WHAT YOU KNEW ABOUT TIG MARINE

23   AND KOORUSH'S BUSINESS, DID IT APPEAR TO BE A LARGE COMPANY, A

24   SMALL COMPANY, MEDIUM?

25           **MR. HARRIGAN:**  OBJECTION.  LACK OF FOUNDATION.

APRIL 20, 2015

GHAHREMAN - DIRECT EXAMINATION

1    **THE COURT:**  OVERRULED.

2         YOU MAY ANSWER.

3  **Q.**   **(MR. JOHNSTON)** YOU CAN ANSWER THAT.

4  **A.**   COULD YOU REPEAT, BECAUSE THAT IS --

5  **Q.**   WHAT WAS YOUR UNDERSTANDING OF HOW BIG OF A COMPANY TIG

6  MARINE WAS?

7  **A.**   A SMALL BUSINESS TRADING COMPANY.  A SMALL BUSINESS.  HE

8  TOLD ME IT IS THREE, FOUR YEARS HE IS WORKING WITH HIS

9  INVESTMENT.

10 **Q.**   AT THE TIME WHAT WAS THE APPROXIMATE QUOTATION FOR ONE

11 OF THESE NAVIGAT-2100'S THAT WAS PROVIDED TO YOU?  HOW MUCH

12 FOR ONE UNIT?

13 **A.**   EXCUSE ME?  I DIDN'T --

14 **Q.**   HOW MUCH DID DAVID MILLS TELL YOU, APPROXIMATELY, IT

15 WOULD COST TO GET ONE UNIT OF A NAVIGAT-2100?

16 **A.**   $72,000.

17 **Q.**   AND 100 UNITS WOULD REQUIRE TIG MARINE TO HAVE HOW MUCH

18 MONEY?

19 **A.**   IF WE ARE GOING TO CUSTOMER PRODUCTION, MINIUM HE NEEDS

20 6.5 TO $6.8 MILLION.  SHIPPING IS EXTRA.

21 **Q.**   DID YOU HAVE ANY REASON TO BELIEVE THAT KOORUSH COULD

22 SATISFY THAT FINANCIAL NEED FOR THESE?

23 **A.**   NO, I DIDN'T.

24 **Q.**   BUT YOU ASKED DAVID MILLS FOR 100 NAVIGATS ANYWAY.

25 **A.**   IS MY JOB, MY DUTY WAS NOT TO JEOPARDIZE THE --

APRIL 20, 2015

1      **MR. HARRIGAN:**  OBJECTION.  NONRESPONSIVE.

2      **THE COURT:**  SUSTAINED.

3  **Q.    (MR. JOHNSTON)** DID YOU FORWARD THIS REQUEST TO DAVID

4  MILLS?  YES OR NO.

5  **A.**    YES, I DID.

6  **Q.**    AND WHY DID YOU FORWARD THIS REQUEST TO DAVID MILLS?

7  **A.**    BECAUSE THAT IS DOING MY JOB AS KOORUSH –– AS MY –– I

8  HAD THE CONTRACT WITH HIM TO FORWARD HIS WORDS TO THE SELLER.

9  **Q.**    AND WHAT SPECIFICALLY WAS YOUR ROLE FOR TIG MARINE?

10  **A.**    I WAS INTERMEDIARY PERSON.

11  **Q.**    AND YOU UNDERSTOOD YOUR ROLE TO REQUIRE YOU TO

12  COMMUNICATE WHAT?  I AM SORRY.

13  **A.**    IS TO MAKE EASIER COMMUNICATION BETWEEN TWO PARTIES.

14  **Q.**    OKAY.  DID YOU FEEL COMFORTABLE ASKING DAVID MILLS FOR

15  100 GYROS?

16  **A.**    PERSONALLY NO.

17  **Q.**    WHY NOT?

18  **A.**    IT WAS, FOR ME, IT IS VERY DIFFICULT JOB.  IT WAS NOT

19  CAPACITY OF THE WORK, I HAVEN'T DONE BEFORE.  AND I DON'T –– I

20  DIDN'T THINK SO EVEN KOORUSH DID BEFORE.

21  **Q.**    OKAY.

22  **A.**    OR THAT TIG MARINE DID BEFORE.  I DON'T WANT TO SAY

23  KOORUSH IS –– I DON'T WANT TO SAY KOORUSH OR TIG MARINE FOR

24  THE SAME.

25  **Q.**    NOW LET'S TURN TO THE Y-690'S.  THE GOVERNMENT ENTERED

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   INTO EVIDENCE A PHONE CALL FROM FEBRUARY 21ST, 2013,

2   EXHIBIT 304.  AND IN THAT CALL ON LINE 4:11, EXHIBIT 304-A,

3   DAVID MILLS EXPLAINS TO YOU THAT THE TRIOD TUBES, THE Y-690'S,

4   WILL REQUIRE A SPECIAL EXPORT LICENSE.  DO YOU RECALL THAT?

5   **A.**   YES.  I DON'T KNOW THE DATE EXACTLY BUT I REMEMBER HE

6   TOLD ME ABOUT THAT.

7   **Q.**   AND DO YOU RECALL WHAT SORT OF OPTIONS HE GAVE YOU FOR

8   PROVIDING END USER INFORMATION FOR THE Y-690?

9   **A.**   YES, I REMEMBER.

10  **Q.**   WHAT WERE THOSE OPTIONS?

11  **A.**   IS THAT I PROVIDE FOR HIM THE END USER, OR HE PROVIDE

12  HIS GOOD END USER, HE HASN'T HAD.

13  **Q.**   HAD YOU INDICATED WHO THE END USER WAS BEFORE THAT

14  CONVERSATION?

15  **A.**   YES, I TOLD HIM.

16  **Q.**   WHO WAS THE END USER?

17  **A.**   AS AGAIN THE TIG MARINE TOLD ME OR KOORUSH TOLD ME THAT

18  IS THE END USER WAS KOORUSH, HE NEEDS FOR HIS SHOP.  AND HE

19  SAID HE HAS THE CUSTOMER FOR THE AIRPORTS.

20  **Q.**   SO KOORUSH TOLD YOU THAT HE WANTED THE Y-690'S FOR HIS

21  SHOP?

22  **A.**   YES.

23  **Q.**   ALL OF THEM OR SOME OF THEM?

24  **A.**   SOME OF THEM.

25  **Q.**   OKAY.  AND DID HE GIVE YOU ANY MORE DETAIL ABOUT WHAT HE

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  WANTED TO USE THEM FOR IN HIS SHOP?

2  **A.**    HE SAID THAT HE WOULD USE FOR THE DEVELOPING HIS SHOP

3  FOR TESTING EQUIPMENT AND SB TEST EQUIPMENT, SBQ, SOMETHING

4  FOR THE LIQUID FOR VALVE AND FOR THE ENGINES.

5  **Q.**    OKAY.  BUT HE ALSO TOLD YOU THEY WOULD BE USED FOR

6  AIRPORTS?

7  **A.**    YES.  HE SAID THAT IS THE MAIN PURPOSE OF THIS IS FOR

8  AIRPORTS, FOR THE TAKE OFF, LANDING OF THE AIRPLANES.

9  **Q.**    NOW, WHEN DAVID MILLS CALLED YOU ON FEBRUARY 21ST YOU

10 TOLD HIM THAT YOU WERE NOT COMFORTABLE RELEASING THE END USER

11 INFORMATION.  DO YOU REMEMBER THAT?

12 **A.**    YES, I REMEMBER.

13 **Q.**    WHY DID YOU TELL HIM THAT YOU WEREN'T COMFORTABLE

14 RELEASING YOUR END USER INFORMATION?

15 **A.**    IT HAS THE BUSINESS REASONS IN THE --

16 **Q.**    WHAT WOULD THOSE BUSINESS REASONS BE?

17 **A.**    FIRST, I DIDN'T HAVE PERMISSION TO RELEASE THE THIRD

18 PARTY OR THE BUYER END USER TO THE -- FROM TIG MARINE, I

19 DIDN'T AUTHORIZE.

20 **Q.**    LET ME STOP YOU THERE.  DID YOU EVEN KNOW WHO ANY THIRD

21 PARTY --

22 **A.**    I DIDN'T HAVE ANY INFORMATION FIRST.

23 **Q.**    OKAY.

24 **A.**    IN THE BEGINNING I DIDN'T HAVE ANY INFORMATION.

25 **Q.**    OKAY.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **A.**    AND SECOND, IF I HAD INFORMATION I SHOULD TAKE THE

2   PERMISSION FROM THE TIG MARINE TO DISCLOSE THE INFORMATION TO

3   DAVID MILLS.

4   **Q.**    WHY IS IT?

5   **A.**    BECAUSE IS THAT CONFLICT OF INTEREST HAS HAPPENED, IT

6   MEANS IF I DISCLOSE THE END USER TO TIG -- TO SOUTH STAR AND

7   SOUTH STAR DIRECTLY GO TO CUSTOMERS AND -- WHO WANT TO -- THAT

8   CUT OFF TIG MARINE'S AND ME INVESTMENT, IS NORMALLY WE KEEP

9   CONFIDENTIAL FOR THESE REASONS.

10  **Q.**    LET ME STOP YOU THERE, AND TRY TO UNDERSTAND WHAT YOU

11  SAID.

12      THERE WAS A CONCERN THAT IF YOU REVEALED THE THIRD PARTY

13  TO TIG MARINE THEY COULD BYPASS --

14          **MR. HARRIGAN:**  OBJECTION.  LEADING.

15          **THE WITNESS:**  I SAID THE SAME.

16          **THE COURT:**  IT IS LEADING, BUT YOU CAN PROCEED.

17          **MR. JOHNSTON:**  DOING MY BEST, YOUR HONOR.  THANK

18  YOU.

19  **Q.**    **(MR. JOHNSTON)** YOU EXPLAINED THAT THERE IS A BUSINESS

20  REASON FOR NOT RELEASING END USER INFORMATION AT THIS POINT.

21  **A.**    YES.

22  **Q.**    AND YOU EXPRESSED THAT YOUR CONCERN WAS THAT SOUTH STAR

23  COULD DO WHAT TO TIG MARINE IF THEY DISCOVERED THE FINAL USER?

24  **A.**    SOUTH STAR, WHEN THEY HAVE THE END USER INFORMATION,

25  THEY CAN GO DIRECT TO CONTACT WITH THEM AND DIRECT TO SUPPLY

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   TO THEM AND BYPASS TIG MARINE AS THE TRADING COMPANY AND

2   SUPPLIER.

3   **Q.**   OKAY.

4   **A.**   HOWEVER I SAID I DIDN'T HAVE INFORMATION THAT TIME, THAT

5   IT WAS MY BEST ANSWER AND MY POSITION TO DAVID MILLS.

6   **Q.**   OKAY, NOW --

7   **A.**   AND AGAIN -- EXCUSE ME.

8   **Q.**   ONE MOMENT PLEASE.

9           **MR. JOHNSTON:**  LET'S GO TO EXHIBIT 117, PLEASE.  IF

10  WE CAN THE TOP PORTION.

11  **Q.**   **(MR. JOHNSTON)** DO YOU RECALL SEEING THIS EMAIL IN THE

12  GOVERNMENT'S CASE EARLIER?  AN EMAIL FROM, IT APPEARS, KOORUSH

13  TAHERKHANI TO DAVID MILLS WITH YOU CC'D?

14  **A.**   YES, SIR, I REMEMBER.

15  **Q.**   AND IN THE EMAIL BELOW DAVID MILLS HAD SENT YOU A

16  MESSAGE, RIGHT?  ABOUT --

17  **A.**   YES.  I THINK HE CC'D TO ME AND KOORUSH, SIR.

18  **Q.**   OKAY.  THAT THE TRIPOD LAMPS FALL UNDER A MORE SENSITIVE

19  RESTRICTIVE EXPORT CATEGORY AND THAT I -- DAVID MILLS -- WILL

20  BE HANDLING THE END USER INFORMATION MYSELF PERSONALLY.

21          RIGHT?

22  **A.**   YES.

23  **Q.**   IN THE PART BELOW.

24          NOW, THIS IS KOORUSH'S RESPONSE TO DAVID MILLS' CONCERNS

25  ABOUT RELEASING THAT INFORMATION IN BANK DOCUMENTS, RIGHT?

APRIL 20, 2015

1065

1   **A.**   YES, SIR.

2        **MR. JOHNSTON:**  IF WE CAN JUST HIGHLIGHT THE LAST

3   PARAGRAPH AT THE BOTTOM OF THIS PAGE, PLEASE.

4   **Q.**   **(MR. JOHNSTON)** SEE WHERE I PUT THIS RED D.O.T.?

5   **A.**   I DON'T SEE.

6        **MR. JOHNSTON:**  DOES IT NOT COME UP ON HIS?

7        **THE WITNESS:**  IT IS COMING.

8   **Q.**   **(MR. JOHNSTON)** BECAUSE THE TRIPOD LAMPS ARE MUCH MORE

9   SENSITIVE I DO NOT FEEL THAT IT WOULD BE A GOOD IDEA TO HAVE

10  ANY WIRE TRANSFER PAPERWORK DOCUMENT THE PAYMENTS ARE FOR

11  TRIPOD LAMPS.

12  **A.**   YES, I SEE.

13  **Q.**   AND YOU REVIEWED THAT EMAIL AND FORWARDED IT TO KOORUSH?

14  **A.**   YES, I DID.

15  **Q.**   NOW, WHAT DO YOU UNDERSTAND IN KOORUSH'S RESPONSE WHEN

16  HE SAYS:  I DO AGREE FOR THE SAME, AND PLEASE DO NEED FULL TO

17  MAKE SURE THE DEAL WILL BE DONE SAFE IN ALL ASPECTS.

18  **A.**   IS MY UNDERSTANDING THAT TIME IT WAS THAT KOORUSH WANTS

19  EVERYTHING PROPER, AND HE HAD LACK OF INFORMATION WHAT DAVID

20  MILLS TOLD TO HIM.  HE HAND OVER TO ME THE JOB.

21  **Q.**   LET ME ASK YOU THIS ABOUT THE NEXT SENTENCE:  PLEASE

22  ARRANGE WITH ARASH FOR BEST METHOD OF WRITING CONTRACTS.

23       THAT IS NOT IN THIS BLOWUP.

24  **A.**   YES, WRITING UP THE CONTRACT.

25  **Q.**   LET ME ASK YOU ABOUT YOUR ROLE AT TIG MARINE.  WAS YOUR

GHAHREMAN – DIRECT EXAMINATION

```
 1   ROLE TO TRANSFER MONEY TO THE SELLER PARTY?
 2   A.    NO.
 3   Q.    DID YOU EVER -- WERE YOU EVER RESPONSIBLE FOR FILLING
 4   OUT WIRE TRANSFER PAPERWORK?
 5   A.    NO.
 6   Q.    DID YOU EVER FILL OUT ANY WIRE TRANSFER PAPERWORK?
 7   A.    NO.
 8   Q.    WHO, TO THE BEST OF YOUR KNOWLEDGE, WOULD FILL OUT ANY
 9   WIRE TRANSFER PAPERWORK FOR MONEY SENT FROM THE BUYER, TIG
10   MARINE, TO THE SELLER?
11   A.    IS THE TIG MARINE.  I DON'T KNOW ALL THE PEOPLE OF.
12   KOORUSH, AS MY BEST KNOWLEDGE, IS KOORUSH THAT RESPONDS FOR
13   THE WIRE TRANSFERS.
14   Q.    BUT DO YOU AGREE THAT YOU WERE IN CHARGE OF FIGURING OUT
15   A WAY TO WRITE THE CONTRACTS IN THIS CASE?
16   A.    YES.  THE CONTRACTS I REVIEW AND I TRIED TO EDIT THE
17   CONTRACT ALMOST IN THE BEST PRACTICAL LEGAL CONTRACT FOR
18   INTERNATIONAL SALE.
19   Q.    LET ME ASK YOU THIS.  DID YOU EVER -- WHAT WAS THE
20   DESCRIPTION FOR THE Y-690'S IN THE CONTRACT THAT YOU WORKED ON
21   WITH DAVID MILLS?
22   A.    THE SAME DESCRIPTION AS EXISTING IN THE MARKET AND IS
23   THE Y-690 IS THE TRIPOD LAMP.
24   Q.    SO YOU USED THE EXACT SAME DESCRIPTION PROVIDED.
25   A.    THE EXACT DESCRIPTION FOR THE QUOTATION AND FOR
```

APRIL 20, 2015

1    EVERYTHING IN THERE.

2    **Q.**    LET ME ASK YOU THIS.  DID YOU EVER CHANGE THE

3    DESCRIPTION OF THAT ITEM IN THE CONTRACT?

4    **A.**    NO, I NEVER DID.

5    **Q.**    IN MAY -- OR THE GOVERNMENT PLAYED A PHONE CALL FROM MAY

6    3RD, 2013, GOVERNMENT EXHIBIT 307.  AND IN THE CALL THE

7    GOVERNMENT PLAYED DAVID SAID:  I WOULD PREFER, ARASH, YOU

8    ACCEPT PAYMENT FROM KOORUSH TO YOUR CORPORATION AND THEN YOU

9    PAY TO ME.

10       DO YOU REMEMBER HIM SAYING THAT?

11   **A.**    YES.

12   **Q.**    OKAY.  WERE YOU IN A POSITION TO DO THAT, TO BE THE --

13   **A.**    NO.

14   **Q.**    -- THE INTERMEDIARY BANK?

15   **A.**    NO, I WASN'T.  I TRIED MY HELP, I RESEARCH, BUT I

16   COULDN'T HELP BECAUSE IT WAS NOT MY POSITION AND I WASN'T ABLE

17   TO DO THIS.

18   **Q.**    WERE YOU IN A POSITION TO DO ANY OF THE EXPORT FUNCTIONS

19   IN THIS CASE?

20   **A.**    IS THAT JUST NEGOTIATING TO MAKE EASIER COMMUNICATION

21   BETWEEN THESE TWO PARTIES.  AND SOMEHOW NEGOTIATING ON BEHALF

22   OF TIG MARINE IN THE MATTER OF THE QUALITY AND PRODUCT

23   DESCRIPTION AND VERIFY PRODUCTS.

24   **Q.**    IN THIS PHONE CALL FROM MAY 3RD YOU TOLD DAVID MILLS, ON

25   LINE 18:03:  I DON'T WANT TO BE WORKING AS EXPORTER IN THIS

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    MATTER.

2        DO YOU REMEMBER TELLING HIM THAT?

3    **A.**    YES.

4    **Q.**    OKAY.  AND DAVID MILLS TOLD YOU THAT HE WOULD BE THE

5    EXPORTER IN THIS MATTER.

6    **A.**    IT WAS SEVERAL TIMES I TOLD HIM THAT, IS THAT I DON'T

7    KNOW ANYTHING ABOUT THE EXPORTING, I AM NOT EXPORTER.

8    **Q.**    WHY DIDN'T YOU WANT TO BE THE EXPORTER, OR WHY DID YOU

9    TELL HIM THAT?

10   **A.**    BECAUSE HE KNOWS THAT IS WHAT HE MUST DO.

11   **Q.**    THAT HE KNOWS WHAT?

12   **A.**    HE KNOWS THAT IS HIS DUTY, HIS TASK, AND HE MUST DOING

13   THAT EXPORTING DOCUMENT AND PAPERWORK.

14   **Q.**    DID YOU UNDERSTAND THAT YOU HAD ANY ROLE IN THE

15   EXPORTING OF THESE ITEMS --

16   **A.**    NO.

17   **Q.**    -- FROM THE UNITED STATES?

18   **A.**    NO, I DIDN'T HAVE.

19   **Q.**    BUT NOT TOO LONG LATER, ON MAY 20TH, 2013, YOU HAD

20   ANOTHER PHONE CALL WITH DAVID MILLS.  GOVERNMENT'S

21   EXHIBIT 311.

22        AND ON 311-A AT 14:12 DAVID MILLS TOLD YOU AND THE

23   JURY -- AND YOU HAVE HEARD THIS CLIP -- AND THEN WITHOUT BEING

24   SMART ENOUGH TO KNOW HOW TO GET AN EXPORT LICENSE FOR A

25   DIFFERENT COMPANY, FOR A DIFFERENT COUNTRY AND DO ALL THAT,

APRIL 20, 2015

GHAHREMAN - DIRECT EXAMINATION

1    AND LIKE AT THE END OF THE DAY WHAT I THINK KOORUSH NEEDS TO

2    UNDERSTAND IS THAT YOU AND I ARE DOING VERY SKILLED, DIFFICULT

3    BUSINESS.

4         DO YOU REMEMBER HIM TELLING YOU THAT?

5    **A.**    YES, I REMEMBER.

6    **Q.**    DID YOU UNDERSTAND THAT YOU HAD ANY RESPONSIBILITY AS

7    THE EXPORTER IN THAT CASE?

8    **A.**    NO.

9    **Q.**    DID YOU KNOW HOW TO GET AN EXPORT LICENSE?

10   **A.**    NO, I DIDN'T KNOW.

11   **Q.**    DID YOU PLAY A SKILLED ROLE IN THIS VENTURE?

12   **A.**    IS THAT I WAS INTERMEDIARY.  THAT IS VERY SIMPLE, TO

13   CONNECT TWO PEOPLE OR FORWARD MESSAGES.  IF IT IS NECESSARY

14   SKILL, IT WAS MY SKILL TO COMMUNICATE BETWEEN TWO PARTIES.

15   **Q.**    YOUR JOB WAS TO MAKE SURE THE PARTIES MAINTAINED

16   COMMUNICATION?

17   **A.**    YES.  THEY RECEIVED THE MESSAGES, THEY HAVE GOOD

18   COMMUNICATIONS.

19   **Q.**    OKAY.  BUT DAVID MILLS TOLD YOU:  IF WE WERE DUMB AND WE

20   GOT CAUGHT, WHICH WE WON'T, THEN YOU AND I WILL GO TO JAIL.

21        DO YOU REMEMBER HIM TELLING YOU THAT?

22   **A.**    YES.

23   **Q.**    DID YOU -- WAS IT YOUR BELIEF THAT YOU WOULD GO TO JAIL

24   IF --

25   **A.**    NO, I DIDN'T BELIEVE.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **Q.**    SORRY.  LET ME ASK THE QUESTION.

2          WAS IT YOUR BELIEF THAT YOU WOULD GO TO JAIL IF DAVID

3   MILLS DIDN'T DO THE EXPORTING LICENSES RIGHT?

4   **A.**    EXCUSE ME?  PARDON?  CAN YOU --

5   **Q.**    WHEN HE TOLD YOU THAT, YOU AND I WILL GO TO JAIL, DID

6   YOU BELIEVE THAT TO BE TRUE FOR YOU?

7   **A.**    NO, NOT FOR ME.

8   **Q.**    DID YOU UNDERSTAND WHEN HE WAS TALKING ABOUT GOING TO

9   JAIL THAT THAT MEANT THESE ITEMS WERE GOING TO IRAN?

10  **A.**    NO, SIR.

11  **Q.**    WHAT DID YOU THINK HE WAS TALKING ABOUT SPECIFICALLY IN

12  THAT REFERENCE TO JAIL?

13  **A.**    IS THE, YOU KNOW, THAT IS THE REFERENCE, THAT IS ANY

14  BUSINESS HAS A RISK, THAT IS THE -- I DON'T THAT HE -- THAT'S

15  ABOUT THE LICENSE AND HE WAS TALKING ABOUT THE LICENSING AND

16  THE WAY HE IS GETTING HIS LICENSE.  I THINK HE IS CONCERNED

17  ABOUT THAT.

18  **Q.**    AND THE LICENSE SPECIFICALLY FOR WHAT?

19  **A.**    FOR Y-690.

20  **Q.**    OKAY.  NOW, THE GOVERNMENT BROUGHT UP ANOTHER MENTION OF

21  JAIL WHEN THEY PLAYED EXHIBIT 306, A PHONE CALL FROM MAY 2ND,

22  2013.  DO YOU RECALL TALKING TO DAVID MILLS ABOUT WHETHER

23  KOORUSH WOULD COME TO THE UNITED STATES OR NOT?

24  **A.**    YES.

25  **Q.**    OKAY.  AND WHAT DID YOU TELL DAVID MILLS ABOUT KOORUSH'S

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  DESIRE TO COME TO THE UNITED STATES?

2  **A.**   I SAID TO CALL KOORUSH, THAT IS THE –– WITH MY

3  UNDERSTANDING TALKING WITH KOORUSH, HE WOULD LOVE COME TO

4  UNITED STATES, AND HE WANTS TO TRY TO COME TO UNITED STATES

5  AND –– BUT HE IS SCARED.

6  **Q.**   WHAT WAS YOUR UNDERSTANDING WHY KOORUSH MIGHT BE SCARED

7  TO COME TO THE UNITED STATES?

8        **MR. HARRIGAN:**  OBJECTION.  CALLS FOR SPECULATION.

9        **THE COURT:**  SUSTAINED.

10  **Q.**   **(MR. JOHNSTON)** THE GOVERNMENT HAS PLAYED THIS CLIP IN

11  WHICH YOU SAID, SOMETHING IS BEHIND, GOING TO POLITICS THINGS

12  THAT IS HAPPENED.

13        DO YOU REMEMBER SAYING THAT?

14  **A.**   YES, I DID SAY THAT.

15  **Q.**   WHAT DID YOU MEAN BY THAT?

16  **A.**   IS THAT –– IT WAS ABOUT THE 40-YEAR, 35-YEARS CRISIS

17  BETWEEN UNITED STATES AND IRAN, BETWEEN TWO GOVERNMENTS.  AND

18  IT WAS, YOU KNOW, IN THE MEDIA NEWS.  IT WAS DISTRUST BETWEEN

19  –– DISTRUST AND SOME UNBELIEFS IN THE PEOPLE, ORDINARY PEOPLE,

20  THAT IS MAYBE THEY WANT TO DO SOMETHING RIGHT BUT THE

21  CONSPIRACY AND POLITICS, THEY PUT THEM IN THE WRONG DIRECTION

22  OR PUT THEM IN THE JAIL.

23  **Q.**   YOU TOLD DAVID MILLS THAT:  WE HAVE A NEWS ALSO, IS THAT

24  SOMEBODY WANT TO PURCHASE SOMETHING FROM THE UNITED STATES GO

25  TO JAIL OR SOMETHING.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

```
1   A.    YES.
2   Q.    DID YOU BELIEVE THAT KOORUSH'S CONCERN WAS THAT HE WAS
3   BREAKING THE LAW?
4   A.    NO.
5         MR. HARRIGAN:  OBJECTION.  CALLS FOR SPECULATION.
6         THE COURT:  SUSTAINED.
7   Q.    (MR. JOHNSTON) DID YOU BELIEVE -- LET ME ASK YOU THIS.
8         DID KOORUSH'S STATEMENT ABOUT GOING TO JAIL MAKE YOU
9   THINK THAT YOU WERE BREAKING THE LAW?
10  A.    NO.
11  Q.    DID IT MAKE YOU THINK THAT HE WAS BREAKING THE LAW?
12  A.    NO.
13  Q.    DO YOU HAVE ANY IDEA WHY HE WOULD MENTION A CONCERN
14  ABOUT GOING TO JAIL?
15        MR. HARRIGAN:  OBJECTION.  CALLS FOR SPECULATION.
16        THE COURT:  SUSTAINED.
17  Q.    (MR. JOHNSTON) WHAT WAS -- WHAT IS KOORUSH TAHERKHANI'S
18  NATIONALITY?
19  A.    IRANIAN.
20  Q.    AND IN YOUR EXPERIENCE DO IRANIANS HAVE DISTRUST OF THE
21  UNITED STATES GOVERNMENT?
22  A.    YES, THEY HAVE.  SOME OF THEM.
23  Q.    NOT ALL OF THEM?
24  A.    NO.  SOME OF THEM.
25  Q.    DID YOU TRY TO ENCOURAGE KOORUSH TO, NEVERTHELESS, COME
```

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    TO THE UNITED STATES?

2    **A.**    YES, I DID.

3    **Q.**    WERE YOU SUCCESSFUL?

4    **A.**    I DIDN'T PUSH HIM BECAUSE SOMEHOW HE WAS IN THE TOP

5    RANK.  AND HIS BELIEF.  HIS BELIEF.  I COULDN'T PUSH HIM HIS

6    BELIEF, THAT IS THAT HE SAID ONE TIME, HE DIDN'T PUSH, I WAS

7    SUCCESSFUL SOMEHOW, AND HE AGREED LATER TO COME TO THE UNITED

8    STATES.

9    **Q.**    OKAY.  BUT YOU SAID THAT HE HAS A TOP RANK.  WHAT DO YOU

10   MEAN?

11   **A.**    IT MEANS HE WAS MY BOSS.

12   **Q.**    NOW, YOU HEARD DAVID COLE TESTIFY THE OTHER DAY THAT IT

13   RAISED HIS CONCERNS THAT TIG MARINE WAS ASKING FOR A LETTER OF

14   CREDIT.  DO YOU REMEMBER THAT?

15   **A.**    YES.

16   **Q.**    OKAY.  IN YOUR EXPERIENCE, ARE LETTERS OF CREDIT COMMON

17   IN INTERNATIONAL BUSINESS?

18   **A.**    YES.

19   **Q.**    BUT THERE ARE CONTRACTS IN INTERNATIONAL BUSINESS AS

20   WELL, TOO, RIGHT?

21   **A.**    YES.

22   **Q.**    DO THE CONTRACTS AFFORD CERTAIN PROTECTIONS FOR THE

23   PARTIES ON BOTH ENDS?

24   **A.**    IS THE CONTRACT ITSELF, THAT IS LETTER OF CREDIT, I CAN

25   CALL, IS THAT SECONDARY CONTRACT, IS THE INSURE THE MAIN

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   CONTRACT IN THE INTERNATIONAL SALE.

2   **Q.**    SO WHAT IS YOUR UNDERSTANDING OF A LETTER OF CREDIT?

3   HOW IS THAT A SECONDARY CONTRACT OR INSURANCE POLICY?

4   **A.**    A LETTER OF CREDIT, AS MY KNOWLEDGE, IS THE –– IS THE

5   LETTER OR THE BANK GUARANTEE ISSUED BY THE BUYER BANK IN HIS

6   LOCAL LOCATION OR HIS –– FOR EXAMPLE, IN THIS MATTER IS LETTER

7   OF CREDIT IN THE UAE, DUBAI, IS THE BANK OF THE TIG MARINE

8   SERVICES ISSUE A LETTER OF CREDIT.  WHO HANDLE THE CONTRACT ––

9   WE GIVE CONTRACT TO HIM, WHO HANDLE THE CONTRACT WITH THE ONE

10  BANK, THAT IS THE SOUTH STAR TRADING INTRODUCING HIS COUNTRY

11  IN THE U.S.A., AND THEY ARE HANDLING THE CONTRACT.

12  **Q.**    THAT IS A LETTER OF CREDIT.  WHAT IS A STANDBY LETTER OF

13  CREDIT.

14  **A.**    THE STANDBY LETTER OF CREDIT, THIS IS THE PRIVILEGE IS

15  THE BUYER GIVE TO SELLER TO –– BANK OF THE SELLER ISSUE THE

16  BANK GUARANTEE.  FOR EXAMPLE, SOUTH STAR IS THE ISSUE IS THE

17  STANDBY LETTER OF CREDIT, AND THE TIG MARINE SERVICE ACCEPT ––

18  THE TIG MARINE SERVICE BANK ACCEPT IN THE UAE.

19  **Q.**    SO A STANDBY LETTER OF CREDIT IS JUST THE GUARANTEE IN

20  REVERSE.

21  **A.**    YES.

22  **Q.**    OKAY.  IF A CONTRACT WASN'T FULFILLED, WHAT'S THE REMEDY

23  WITH THE LETTER OF CREDIT?  HOW DOES THAT REMEDY THE PROBLEM?

24  **A.**    I AM NOT PROFESSIONAL IN THIS MATTER, BUT ANY ISSUE

25  RAISES THE BANKS PUT ON HOLD THE TRANSACTION.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  **Q.**    THE BANKS ARE CONTROLLING THE MONEY BEFORE THEY GO TO

2  THE PARTY?

3  **A.**    YES.

4  **Q.**    WHAT ABOUT A LAWSUIT?  IS A LAWSUIT A POSSIBILITY WHEN

5  ONE PARTY DOESN'T FULFILL A CONTRACT?

6  **A.**    YES.

7  **Q.**    IS IT AN EASY SOLUTION?

8          **MR. HARRIGAN:**  OBJECTION.  CALLS FOR SPECULATION.

9          **THE COURT:**  SUSTAINED.

10  **Q.**    **(MR. JOHNSTON)** IN YOUR EXPERIENCE, WHAT WOULD YOU HAVE

11  TO DO TO BRING A SUIT IF A PARTY TO ONE OF THESE CONTRACTS DID

12  NOT COMPLY WITH THE TERMS?

13          **MR. HARRIGAN:**  OBJECTION.  LACK OF FOUNDATION.

14          **THE COURT:**  OVERRULED.

15          YOU MAY ANSWER.

16          **THE WITNESS:**  IS THAT, AS YOU KNOW, THAT IS THE -- I

17  MADE ALREADY THE CONTRACT OF INTERNATIONAL SALE.  AND IN THE

18  END OF THE -- IN THE CONTRACT I PUT THERE FOR ANY DISPUTE

19  BETWEEN TWO PARTIES THEY ARE GOING TO ARBITRATORS OR THE SUIT,

20  THAT IS THE LAWSUIT YOU SAID, TO THE NEW YORK TERRITORY IN THE

21  UNITED STATES.

22  **Q.**    **(MR. JOHNSTON)** YOU SAID ARBITRATORS?

23  **A.**    YES.  SORRY FOR MY ACCENT.

24  **Q.**    SO THERE WAS A PROVISION IN THE CONTRACT FOR THE

25  SETTLEMENT OF LEGAL ISSUES.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **A.**   YES.  IT WAS WITH MY KNOWLEDGE I PUT THAT.  THAT IS MY

2   EXPERIENCE AND MY KNOWLEDGE.

3   **Q.**   IN YOUR EXPERIENCE, HAVING WORKED FOR THE SHIPYARDS YOU

4   WORKED FOR ENGAGING IN THIS BUSINESS, DO YOU HAVE EXPERIENCE

5   OF WHAT IT WOULD COST TO BRING A LAWSUIT?

6   **A.**   IS THAT HOWEVER THAT TIME I WAS LIVING SIX YEARS IN THE

7   UNITED STATES, AND I WAS –– I WAS ESTIMATOR IN THE MARITIME

8   INDUSTRY, OR HOWEVER I KNEW THAT IS THE COST OF THE LAWYERS

9   AND ARBITRATORS TO HIRING AND EVERYTHING, ALL OF THE COSTS IS

10  HIGH.

11  **Q.**   AND LET'S JUST BE CLEAR ABOUT YOUR ROLE WITH TIG MARINE.

12  YOU WERE AN OCCASIONAL INTERMEDIARY?

13  **A.**   YES, I WAS.

14  **Q.**   WAS THERE ANYTHING IN YOUR CONTRACT WITH TIG MARINE THAT

15  WOULD ENABLE YOU TO ASSIST THEM IN ANY LITIGATION THAT MIGHT

16  COME UP WITH THE SELLER PARTY?

17  **A.**   NO, I WASN'T.

18  **Q.**   OKAY.  AND IF TIG MARINE WANTED TO BRING SUIT UNDER THE

19  TERMS OF THE CONTRACT YOU WORKED OUT, THEY WOULD HAVE TO COME

20  TO NEW YORK?

21  **A.**   IS THAT I DON'T KNOW WHAT THEY WANTED TO DO.

22  **Q.**   NO, NO.  I AM SAYING THAT THE CONTRACT REQUIRED ANY

23  DISPUTES TO HAPPEN IN THE UNITED STATES?

24  **A.**   YES.

25  **Q.**   OKAY.  UNDER THE CONTRACT THAT WAS NEGOTIATED WITH SOUTH

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    STAR, COULD TIG MARINE BRING SUIT IN DUBAI, THEIR HOME

2    COUNTRY?

3    **A.**    MAYBE THEY COULD.  I AM NOT IN THE LAW, BUT THAT IS

4    THE -- AS CONTRACT IT WAS MY -- I PUT IN THERE NEW YORK, IS I

5    AM NOT THE LAW, BUT, YOU KNOW, ATTORNEY OR SOMETHING TO KNOW

6    REALLY WHAT IS HAPPENING IN THE REAL WORLD.  IS THAT THEY CAN

7    DO FROM DUBAI, SURE THEY CAN DO FROM ANYWHERE THEY WANT.

8    **Q.**    NOW, I WANT TO FAST FORWARD TO MAY 28 OF 2013.  DO YOU

9    REMEMBER THE LONG PHONE CONVERSATION YOU HAD WITH DAVID MILLS?

10   **A.**    IS THE LAST CALL BEFORE THAT IS -- YES, SIR.  YES, I

11   REMEMBER.

12   **Q.**    ABOUT HOW LONG DID THAT PHONE CALL LAST, DO YOU

13   REMEMBER?

14   **A.**    TWO, AND TWO AND A HALF HOURS.  TWO AND TWO HALF HOUR, I

15   REMEMBER.

16   **Q.**    IS IT FAIR TO SAY IT WAS A LONG PHONE CALL?

17   **A.**    OH, YES.

18   **Q.**    OKAY.  WHAT WAS DAVID MILLS' TONE ON THAT PHONE CALL?

19   **A.**    DAVID MILLS WAS ANGRY AND UPSET.

20   **Q.**    OKAY.

21   **A.**    AND HE IS STARTING TO TELL HIS BELIEFS, WHATEVER HIS

22   BELIEF FROM THESE DEALS.

23   **Q.**    DID HE GIVE YOU MANY OPPORTUNITIES TO INTERJECT OR

24   RESPOND?

25   **A.**    NO.  IT WAS TWO AND A HALF HOURS.  SEVERAL TIMES I WAS

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  TALKING BUT TOTALLY THAT HE WAS TALKATIVE AND HE WAS TALK,

2  TALK, TALK, TALK.

3  **Q.**    OKAY.  BEFORE THIS PHONE CALL ON MAY 28, WHAT WAS THE

4  STATUS OF THE CONTRACT BETWEEN SOUTH STAR AND TIG MARINE?

5  **A.**    IS THE ISSUE RAISES IN BETWEEN THE SOUTH STAR AND THE

6  TIG MARINE.  TIG MARINE DELAYED IN THE PAYMENT, AS PER THE

7  CONTRACT.  IS THE SOUTH STAR COULDN'T PROVIDE A STANDBY LETTER

8  OF CREDIT, AS THEY ASKED FOR, AS CREDITED BANK IN THE UNITED

9  STATES.  THAT IS THE SOUTH STAR BANK REQUEST —— TIG MARINE

10 BANK REQUEST IT.

11 **Q.**    OKAY.

12 **A.**    AND TWO PARTY IS STARTING TO, BOTH SIDES, BECAUSE I

13 COULD HEAR BOTH SIDES, IS STARTING TO ACCUSE EACH OTHER FOR, I

14 DON'T KNOW WHAT WAS THEIR INTENTIONS REALLY.  I DON'T KNOW,

15 THAT IS IN MY WORD, BUT I PUT THE EMAIL OVER THERE BECAUSE

16 DAVID MILLS SAYS —— ACCUSE ME ALSO UNPROFESSIONAL OR

17 SOMETHING.  I PUT THE EMAIL OVER THERE THAT SAYS I PUT ON HOLD

18 THE CONTRACT.  IT IS IN MY POINT.  I AM NOT FOLLOWING THE

19 CONTRACT ANYMORE AND —— UNTIL THE TWO PARTY, THEY CAN SOLVE

20 THEIR ISSUES.

21 **Q.**    OKAY.

22 **A.**    AND DAVID MILLS WAS, AS MY VIEW, WHEN HE CALLED HE WAS

23 UPSET THAT THE DEAL IS NOT GOING THROUGH.

24 **Q.**    OKAY.  AND DURING THIS PHONE CONVERSATION YOU SAID THAT

25 HE BROUGHT UP WHAT HE BELIEVED WAS GOING ON.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    **A.**    YES.

2    **Q.**    OKAY.  AND WHAT DID DAVID MILLS BELIEVE WAS GOING ON?

3    **A.**    DAVID MILLS STARTING TO UPSET FROM THAT KOORUSH SAID

4    LIES.  HE WANTS TO -- THIS PRODUCT GOING TO HIS HOME COUNTRY

5    IRAN.  HE IS BEING SOMETHING THAT WAS NEW FOR ME ALSO.

6    **Q.**    THIS IS THE FIRST TIME YOU HAD HEARD HIM MENTION IRAN?

7    **A.**    YES.

8    **Q.**    YOU SAID HE TOLD YOU THAT DAVID MILLS -- THAT DAVID

9    MILLS TOLD YOU THAT HE THOUGHT KOORUSH WAS LYING TO HIM?

10   **A.**    YES.

11   **Q.**    AND DID DAVID MILLS EVER TELL YOU, I DON'T LIKE BEING

12   LIED TO?

13   **A.**    YES.  SO MANY TIMES.

14   **Q.**    AND WHEN -- THIS IS 312 CLIP 1-B.  ON LINE 43:19 HE

15   SAYS:  LET'S BE HONEST WITH THE OTHER.  WE ARE NOT DOING

16   NORMAL BUSINESS, RIGHT?  IF WE WERE DOING NORMAL.

17        YOU INTERJECT:  WELL.

18        HE CONTINUES:  BUSINESS, THIS WOULD NOT BE A PROBLEM.

19   NONE OF THIS WOULD BE A PROBLEM.  WE ARE DOING SPECIAL

20   BUSINESS, AND IF WE DON'T OPERATE THAT WAY THEN WE ARE WRONG.

21   TELL ME WHAT YOU THINK ABOUT THAT.

22        DO YOU REMEMBER HIM SAYING THOSE WORDS TO YOU?

23   **A.**    YES.

24   **Q.**    AND YOUR RESPONSE ON LINE 44:04 WAS:  ANYWAY, THAT IS

25   WHATEVER YOU SAID IS, DAVID, I UNDERSTOOD, IS I DON'T -- I'M

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  NOT, YOU KNOW, I'M NOT GOING TO SAY THAT YOU ARE RIGHT OR NOT.

2  **A.**    YES, I SAID TO HIM.

3  **Q.**    WAS DAVID MILLS STILL AUDIBLY UPSET AT THAT POINT?

4  **A.**    YES.

5  **Q.**    WAS HE AUDIBLY FRUSTRATED --

6  **A.**    YES.

7  **Q.**    -- WITH WHAT WAS GOING ON WITH THIS DEAL?

8  **A.**    YES.

9  **Q.**    AND YOU TOLD HIM:  I'M NOT GOING TO SAY THAT YOU ARE

10  RIGHT OR NOT.

11  **A.**    YES, SIR, I SAID.

12  **Q.**    WHY DID YOU SAY:  I'M NOT GOING TO TELL YOU THAT YOU ARE

13  RIGHT OR NOT?

14  **A.**    IT WAS MY BEST ANSWER TO DAVID MILLS AT THAT TIME.

15  **Q.**    WHY WAS IT THE BEST ANSWER?

16  **A.**    IS THAT YOU LISTENING TO ALL THE -- ALL CONVERSATION.  I

17  TOLD HIM I PUT MY STATEMENT REGARDING THE CONTRACT AND THE

18  DEAL ALREADY.  YES.  THAT IS MY FIRST UNDERSTANDING.  I DIDN'T

19  HAVE TO MAKE ANY STATEMENT OVER THERE BECAUSE I DID A

20  STATEMENT ALREADY.

21      SECOND, I TOLD HIM SO MANY TIMES THIS IS NOT FOR IRAN.

22  AND HE WAS UPSET AND HE SAID HIS STORY.  I SAY I DON'T HAVE

23  ANY MORE, TOO, BECAUSE I WAS NOT -- MY JOB WAS NOT TO FIGHT

24  WITH THE PARTIES, MY JOB WAS TO PEACE THE PARTIES.  AND I HAD

25  NOTHING TO FIGHT WITH HIM, ARGUE WITH HIM REGARDING TO SAY YOU

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

```
1   ARE RIGHT, YOU ARE WRONG, YOU ARE -- YOU ARE SAYING LIE OR
2   SOMETHING.  IT WAS MY BEST ANSWER.  I CANNOT TELL YOU ARE
3   RIGHT OR WRONG -- WRONG OR RIGHT.
4   Q.   BECAUSE YOU BELIEVED THOSE ITEMS WERE GOING TO IRAN?
5   A.   NO, SIR.
6   Q.   YOU SAID THAT DAVID SEEMED TO BE UPSET ABOUT THE
7   FINANCIAL SITUATION BETWEEN THE TWO PARTIES.
8   A.   YEAH.  IT WAS ALL THE -- THE ISSUES WAS THAT IS THE
9   FINANCIAL AND THE PAYMENTS, WAS NOT THE DISCUSSION OF THE
10  DELIVERY OR DESTINATION.  THAT IS DAVID MILLS ADDED THIS AGAIN
11  AND BRINGING NEW ISSUES.
12  Q.   AND ISSUES WITH THE LETTER OF CREDIT VERSUS THE STANDBY
13  LETTER OF CREDIT?
14  A.   YES, BECAUSE THEY COULDN'T PROVIDE A STANDBY LETTER OF
15  CREDIT.
16  Q.   BUT DAVID MILLS SUGGESTED A WAY TO RESOLVE THIS WAS A
17  CONFERENCE CALL BETWEEN YOU AND HIM AND KOORUSH?
18  A.   YES, HE DID.
19  Q.   THE GOVERNMENT PLAYED THIS STATEMENT IN THEIR CASE ON
20  CLIP 2 OF 528 LINE 57:07:  BUT DAVID IS THE SOMETHING IS THAT
21  LET'S SAY, LET'S SAY I SAID SOMETHING.  THAT IS MAYBE, THIS IS
22  MY WAY TO BUSINESS, IS THAT THEY ARE VERY DIFFERENT WITH THE
23  KOORUSH AND OVER THERE OR SOMETHING.  I, THAT IS MY WAY.  I
24  SAID TO KOORUSH YOU SHOULD HAVE ACCEPTED THESE FOR THIS
25  PAYMENT TRANSACTION BECAUSE YOU WANT SOMETHING IN FROM THAT IN
```

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    THIS COUNTRY TO THAT AREA OR SOMETHING.  BUT YOU KNOW HE

2    DOESN'T WANT TO ACCEPT THE RISK SOMETIMES.

3         DO YOU REMEMBER TELLING HIM THAT?

4    **A.**    YES, I REMEMBER.  IT IS TWO YEARS NOW, BUT I REMEMBER

5    THE WORDS.

6    **Q.**    ALL RIGHT.

7    **A.**    I REVIEW SOME THINGS.

8    **Q.**    YOU TOLD DAVID MILLS, THAT IS THE WAY THEY DO BUSINESS

9    OVER THERE.

10   **A.**    IS THAT I WAS TALKING ABOUT THE PRACTICE OF THE BUSINESS

11   IS OVER THERE.

12   **Q.**    WERE YOU TALKING ABOUT WHEN YOU SAID OVER THERE IRAN?

13   **A.**    NO, IN THE REGION.

14   **Q.**    WHAT WAS IT ABOUT THE PRACTICE OF THE BUSINESS OVER

15   THERE THAT WAS DIFFERENT OR CREATING A PROBLEM, YOU THOUGHT,

16   IN THIS CASE?

17   **A.**    IS THE METHOD OF THE FINANCING THE PAYMENTS.

18   **Q.**    WHAT SPECIFICALLY DID TIG MARINE ASK FROM SOUTH STAR

19   TRADING WITH RESPECT TO SECURING THE PAYMENTS?  WHAT EXACTLY

20   DID THEY ASK SOUTH STAR?

21   **A.**    IS THE ISSUE WAS KOORUSH, BECAUSE THE SOUTH STAR PROVIDE

22   FOR US A STANDBY LETTER OF CREDIT.

23   **Q.**    THAT'S WHAT TIG MARINE ASKED FOR FROM SOUTH STAR.

24   **A.**    THIS WAS SOUTH STAR SUGGESTED IS, THAT TIG MARINE ASKED

25   FOR THE TYPE OF THE GUARANTEE, BANK GUARANTEE, AND SOUTH STAR

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    SAID WE PROVIDE A STANDBY LETTER OF CREDIT.  AND KOORUSH --

2    **Q.**    LET ME STOP YOU THERE.

3         A STANDBY LETTER OF CREDIT MEANING A GUARANTEE FROM

4    THEIR BANK?

5    **A.**    THEIR BANK.

6    **Q.**    WHAT BANK DID THEY PRESENT TO TIG MARINE AS THE

7    GUARANTEE BANK?

8    **A.**    THE BANK OF WEST.

9    **Q.**    WERE YOU FAMILIAR WITH THE BANK OF THE WEST BEFORE THIS

10   CASE?

11   **A.**    NO, SIR.  I NEVER HEARD BANK OF WEST.

12   **Q.**    AND DID SOUTH STAR TRY TO PROVIDE THAT INFORMATION TO

13   TIG MARINE'S BANK?

14   **A.**    YES.

15   **Q.**    AND WAS BANK OF THE WEST ACCEPTED BY TIG MARINE'S BANK?

16   **A.**    PARDON?

17   **Q.**    WAS BANK OF THE WEST'S GUARANTEE, THEIR LETTER OF

18   CREDIT, ACCEPTED BY THE BANK THAT KOORUSH HAD IN DUBAI?

19   **A.**    NO.

20   **Q.**    OKAY.  WHAT DID TIG MARINE WANT?

21   **A.**    TIG MARINE WANTS, FROM THE SOUTH STAR, TO PROVIDE THIS

22   STANDBY LETTER OF CREDIT FROM THE ACCREDITED BANK IN THE

23   UNITED STATES, IS THE BIGGER BANK, LARGER BANK, WHO THEY ARE,

24   GET INVOLVED WITH THE INTERNATIONAL SALES LIKE CHASE, MORGAN,

25   AND BANK OF AMERICA.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **Q.**    JP MORGAN?

2   **A.**    JP MORGAN.  SORRY.

3   **Q.**    NOW, ALMOST AN HOUR AND IT LOOKS LIKE 16 MINUTES INTO

4   THIS PHONE CALL DAVID MILLS TELLS YOU:  KOORUSH NEVER TELLS

5   ME, DAVID, BY THE WAY, OKAY, MY REAL CUSTOMER IS IN IRAN, THEN

6   WE CAN'T TALK ABOUT THAT, AND THEN IT IS DIFFICULT FOR US TO

7   MAKE ALL OF THE DIFFERENT DECISIONS BASED ON THAT.  SEE WHAT I

8   AM SAYING?

9         DO YOU RECALL, GENERALLY, THIS CONVERSATION?

10   **A.**    I RECALL GENERAL CONVERSATION.  WORD BY WORD, IS I DON'T

11   REMEMBER.  BUT, YES, WHEN YOU SAID I REMEMBER THAT YOU SAID.

12   **Q.**    HE CONTINUED BY SAYING:  LIKE, IF YOU TELL ME, IF YOU

13   WERE TO TELL ME RIGHT AWAY ONCE YOU AND I TRUST EACH OTHER,

14   HEY DAVID, BY THE WAY, THERE'S GOING TO HAVE TO BE A SPECIAL

15   DEAL.

16         AND YOU INTERRUPTED HIM AND SAID:  NO, THAT, THIS IS

17   SOMETHING.

18         AND THEN YOU WENT ON TO SAY:  HONEST WITH YOU, THAT IS

19   SOMETHING IS SOMETIMES IS EVEN NO NEED TO DISCLOSE EVEN --

20         AND THE TRANSCRIPT SAYS ARE FOREIGN.

21         OR WHEN WE DON'T NEED TO DISCLOSE WHEN WE KNOW WHAT IS

22   GOING ON.

23   **A.**    IS THE -- IS THE -- IS THE TWO -- WHICH PART YOU WANT I

24   EXPLAIN?

25   **Q.**    LET ME ASK YOU A QUESTION.  WERE YOU TELLING DAVID

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   MILLS, WHEN YOU SAID THERE IS NO NEED TO DISCLOSE, THAT THESE
2   ITEMS WERE GOING TO IRAN?
3   **A.**   NO, SIR.  I DIDN'T SAY THIS.
4   **Q.**   DID YOU KNOW, NECESSARILY, WHERE THESE ITEMS WOULD END
5   UP?
6   **A.**   NO, SIR.  I DIDN'T KNOW.
7   **Q.**   DID YOU KNOW WHAT THE TERMS --
8   **A.**   I KNOW THAT IS GOING TO DUBAI.
9   **Q.**   DID YOU ULTIMATELY DISCLOSE TO DAVID MILLS EVERYTHING
10  YOU DID KNOW ABOUT WHERE THESE ITEMS WERE GOING?
11  **A.**   I DID ALREADY, I TOLD HIM THAT IS GOING TO DUBAI.
12  **Q.**   DID YOU TELL HIM THAT YOU BELIEVED THE NAVIGATS WERE FOR
13  FERRIES?
14  **A.**   PARDON?
15  **Q.**   DID YOU TELL HIM THAT YOU BELIEVED THE NAVIGATS WERE FOR
16  FERRIES?
17  **A.**   YES, SIR, I TOLD HIM.
18  **Q.**   DID YOU TELL HIM WHAT YOU THOUGHT THE ULTIMATE USE WAS
19  FOR THE Y-690'S?
20  **A.**   YES, I TOLD HIM.
21  **Q.**   EVEN IF YOU DIDN'T KNOW WHO THE END USER WAS?
22  **A.**   YES.
23  **Q.**   OKAY.  WHAT KIND OF PERSON WAS KOORUSH TO WORK FOR?  WAS
24  HE EASY TO WORK FOR?
25  **A.**   KOORUSH WAS THE VERY HARD WORK STUDENT WITH THE -- ONE

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    OF THE TOP OF THE STUDENT IN HIS CLASS.  AND HE WAS PROMOTING

2    VERY FAST AND GETTING HIS CHIEF ENGINEER CERTIFICATE AND

3    SAILING AS CHIEF ENGINEER IN THE BIG OCEAN VESSEL CARGOES.

4    AND PEOPLE WITH THE CHARACTER OF THE CHIEF ENGINEERING, AS

5    KOORUSH ALSO, I KNOW, THEY ARE HARD PEOPLE TO DEAL WITH.

6    **Q.**    OKAY.

7    **A.**    THEY ARE CONSIDER EVERY DETAIL, AND THEY DON'T PASS VERY

8    EASY.

9    **Q.**    YOU CONTINUED BY TELLING DAVID MILLS:  IF ANY

10   GOVERNMENTAL OR EMIRATES CONTRACT OR THAT THEY ARE VERY HARD

11   TO, EVEN IN THE UNITED STATES, IF THE GOVERNMENT IS THE

12   PAPERWORK ON EVERYTHING IT IS VERY HARD TO TAKE MONEY OR TO,

13   MONEY IS GOING FROM, THAT IS YOU AND ME KNOW THAT THAT IS,

14   THAT SOMETIMES IS SOME EQUIPMENT IS THE GOVERNMENT.

15        THEN THE TRANSCRIPT SAYS:  IRAN IS VERY HARD TO GET THE

16   MONEY OR SUCH.

17        DID YOU EVER TELL HIM ANYTHING ABOUT THE IRANIAN

18   GOVERNMENT?

19   **A.**    SIR, I DIDN'T SAY IT.  EVEN THAT IT WAS MY MEANING IS

20   THAT EVERYBODY KNOWS ABOUT THE GOVERNMENT.  THAT IS THAT --

21   THAT I WANTED TO TELL, YOUR SUSPECT IS MEANS NOTHING FOR ME.

22   **Q.**    WHEN YOU TOLD HIM, WHEN YOU WERE TALKING ABOUT THE

23   EMIRATES GOVERNMENT OR THE UNITED STATES GOVERNMENT AND

24   PAPERWORK, WHAT WERE YOU TRYING TO CONVEY TO DAVID MILLS AT

25   THAT POINT?

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **A.**    PARDON?

2   **Q.**    WHAT WERE YOU TRYING TO TELL HIM WHEN YOU WERE TALKING

3   ABOUT GOVERNMENTS AND PAPERWORK?

4   **A.**    ABOUT THE FINANCING AND THE PAYMENT METHOD.  WHAT IS

5   THE -- I WAS NOTHING THAT -- IN THE CARE OF THIS CONTRACT I

6   WAS TALKING WITH HIM.  HE WAS -- HE WAS TO BELIEVE THAT IS

7   BECAUSE OF KOORUSH MAKING THE PAYMENT THAT IS INVOLVED WITH

8   THE GOVERNMENT OF THE IRAN OR WHATEVER.  THAT IS THAT WHAT I

9   WANTED TO SAY, ANY GOVERNMENT IF IT IS -- THAT IS THE PAYMENT,

10  BUT KOORUSH IS NOT IN THE GOVERNMENT, THE PAYMENT OR FINANCE.

11  **Q.**    WHEN YOU SAID THAT KOORUSH HAS A SUCCESSFUL BUSINESS

12  AROUND THERE, WHAT WERE YOU REFERRING TO?

13  **A.**    IS I WAS REFERRING AND ASKING FROM MY -- REFERENCING

14  DUBAI THEY WERE WORKING.

15  **Q.**    DID DAVID MILLS EVER TELL YOU THAT IT WAS IMPORTANT FOR

16  YOU AND HIM TO GET PAID?

17  **A.**    YES, HE TOLD ME.

18  **Q.**    WAS IT IMPORTANT TO GET PAID?

19  **A.**    SURE, SIR.  I WORKING TO GET MONEY TO WORK AND FOR MY

20  LIFE.

21  **Q.**    DID YOU TELL HIM THAT THAT WAS THE MOST IMPORTANT THING

22  TO YOU?

23  **A.**    NO.

24  **Q.**    WHAT DID YOU TELL HIM?

25  **A.**    I WAS -- I TOLD HIM THE MOST IMPORTANT THINGS THAT IT IS

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  THE DEAL GOING PROPERLY AND AS PER THE CONTRACT AND LEGALLY.

2  **Q.**    WHERE DID YOU TELL HIM THAT YOU EXPECTED THESE ITEMS TO

3  BE DELIVERED?

4  **A.**    IS I TOLD HIM IS THAT BECAUSE I WAS TIRED TO EXPLAIN

5  THE –– LIKE TO HIM WORDS.  HE DIDN'T LET ME THAT TIME.  I SAID

6  DUBAI KOORUSH, DUBAI KOORUSH.  VERY SIMPLE WORDS.

7  **Q.**    YOUR PHONE CALL WAS INTERRUPTED ON MAY 28TH.  DO YOU

8  REMEMBER THAT?  OR IT WAS DISCONNECTED.

9  **A.**    IF THE SPEAKING OF THE PHONE CALL THAT I SAID IS –– IT

10 WAS WINDY AND STORMY AND I WAS WALKING WITH MY CELL PHONE.

11 AND I TOLD HIM MAYBE IT IS DISCONNECTED.  IT IS DISCONNECTED

12 ONCE MY PHONE, AND I USE MY –– ANOTHER CELL PHONE.

13 **Q.**    THIS IS TOWARDS THE END OF YOUR CONVERSATION?

14 **A.**    PARDON?

15 **Q.**    YOU CALLED HIM BACK ON ANOTHER NUMBER?

16 **A.**    YES.  IT CONTINUES OF THE SAME CONVERSATIONS.

17 **Q.**    AND THE GOVERNMENT PLAYED THIS QUOTE FROM THAT

18 CONVERSATION:  YOU KNOW, IF YOU SELL SOMETHING IN THIS COUNTRY

19 TO ME TODAY AND SIX MONTHS LATER IT IS GOING TO AFRICA, SUDAN

20 OR SOME CIVIL WAR COUNTRY OR SOMETHING OVER THERE, THAT IS NOT

21 YOUR FAULT.

22     THEN YOU WENT ON TO SAY:  IF HE KNOWS THAT THIS IS GOING

23 TO OWN COUNTRY OR SOMETHING, HIS PROBLEM.  AND HE –– THAT HE

24 SHOULD ANSWER TO UAE, NOT HERE.  AND HE IS GOING TO JAIL OVER

25 THERE, NOT HERE.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1          WHO WAS HE?

2   **A.**     KOORUSH.

3   **Q.**     DID YOU HAVE ANY REASON TO BELIEVE THAT THESE ITEMS WERE

4   GOING TO A CIVIL WAR COUNTRY?

5   **A.**     NO.

6   **Q.**     DID KOORUSH EVER PROVIDE YOU ANY INFORMATION TO BELIEVE

7   THAT THESE ITEMS WERE GOING TO IRAN?

8   **A.**     NO.

9   **Q.**     WHEN YOU SAY, IF THEY END UP SOMEWHERE IN SIX MONTHS, IS

10  THAT BECAUSE YOU BELIEVED THAT THEY MIGHT END UP IN ONE OF

11  THESE PLACES?

12  **A.**     NO, SIR.

13  **Q.**     WHY DID YOU SAY THAT TO DAVID MILLS?

14  **A.**     HE SAID, YOU KNOW, THE PUSH OF THE DAVID MILLS THAT IS I

15  WANTED TO MOVE ON FROM HIS TALKING, FIRST THAT IS I TRIED TO

16  MOVE ON FROM.  THE SECOND, I WANTED TO TELL HIM THAT IS THE --

17  IS REALLY I DON'T HAVE THE CONTROL OVER WHEN I DELIVER TO

18  DUBAI.  AFTER DELIVER TO DUBAI I DELIVER TO RIGHT PERSON, THAT

19  IS OUR JOB IS DONE TO DELIVER TO RIGHT PERSON, NOT WRONG

20  PERSON.  OUR RIGHT PERSON, THAT IS HE PROVIDE INFORMATION AND

21  EVERYTHING IS THE KOORUSH.  AND WE DELIVER TO KOORUSH.  BUT

22  REALLY AFTER THAT WE DON'T HAVE CONTROL OVER ANY ITEM.  EVEN

23  THE BOTTLE OF WATER WE BUY TO GIVE TO OUR BOY OR MY WIFE OR

24  WHOEVER, THAT IS HIS POSSESSION OF HIM.  HE OR HER.

25  **Q.**     AT THAT POINT DID YOU BELIEVE THAT THE GYROS WERE FOR

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  END-USE IN IRAN?

2  **A.**  NO, SIR.

3  **Q.**  DID YOU BELIEVE THAT THE Y-690'S WERE GOING TO END UP IN

4  IRAN?

5  **A.**  NO, SIR.

6  **Q.**  NOW, YOU MENTIONED EARLIER THAT IN THE VERY BEGINNING OF

7  THIS RELATIONSHIP WITH KOORUSH OR WHEN YOU TALKED TO HIM IN

8  DECEMBER, THAT YOU ASKED HIM IF ANY OF HIS BUSINESS WAS FOR

9  IRAN.

10  **A.**  IN THE BEGINNING, IS I CAN TELL YOU IT ONE IS OF OUR

11  QUESTIONS.  THE MOST IMPORTANT QUESTION NORMALLY WE ASK, OUR

12  NATIONALITY WE USED TO ASK.

13  **Q.**  LET ME ASK YOU THIS.  DID YOU EVER ASK HIM AGAIN IF ANY

14  OF THESE ITEMS WERE GOING TO IRAN?

15  **A.**  YES, TWICE MORE.  TWO TIMES MORE.

16  **Q.**  WHEN WAS THE NEXT OCCASION AFTER YOU TALKED TO HIM IN

17  DECEMBER, WHEN DID IT COME UP?

18  **A.**  IT WAS -- THIS IS THE -- WE WENT TO -- WE HAVE TO TAKE

19  DECISION, OR HE HAD TO TAKE DECISION, ABOUT THE QUANTITY OF

20  GYRO FROM FOUR TO SIX.

21  **Q.**  OKAY.

22  **A.**  AND I ASKED HIM, WHY YOU WANT FOUR OR SIX.

23  **Q.**  WHAT WAS YOUR UNDERSTANDING ABOUT THE FOUR GYROS?

24  **A.**  IS THAT I UNDERSTANDING IS THAT HE HAVE TWO CUSTOMERS.

25  **Q.**  FOR THE FOUR GYROS OR FOR --

APRIL 20, 2015

GHAHREMAN - DIRECT EXAMINATION

1  **A.**    FOR FOUR GYRO HE HAD, THE BEGINNING, IN THE CUSTOMER.

2  HE WAS WAITING FOR ANOTHER CUSTOMER TO CONFIRM FOR THE TWO

3  GYROS.

4  **Q.**    YOUR UNDERSTANDING WAS HE HAD ONE CUSTOMER FOR THE FOUR

5  GYROS?

6  **A.**    YES.

7  **Q.**    BUT HE WAS WAITING FOR CONFIRMATION --

8  **A.**    THAT IS THAT FOUR GYROS, THAT IS I DIDN'T KNOW.  HE

9  DISCLOSED TO ME THAT THE SIX GYRO IS NOT FOR THE END USER AND

10  THERE IS -- THERE IS TWO GYROS THAT IS FOR THE OTHER.

11  **Q.**    DID YOU QUESTION HIM ABOUT WHICH NUMBER YOU WERE GOING

12  TO GO WITH?

13  **A.**    YES.  I ASKED HIM WHICH NUMBER YOU ARE GOING.

14  **Q.**    DID YOU ASK HIM WHO THE END USERS WERE FOR THE SECOND

15  SET?

16  **A.**    YES.

17  **Q.**    AND DID HE TELL YOU?

18  **A.**    YES.

19  **Q.**    WHO DID HE SAY THEY WERE FOR?

20  **A.**    HE SAID IS IRANIAN SHIPPING FERRY.

21  **Q.**    IRAN SHIPPING FERRY.  DID HE SAY SHIPPING FERRY OWNED BY

22  THE IRANIAN GOVERNMENT?

23  **A.**    NO.  HE SAID IRANIAN SHIPPING FERRY.

24  **Q.**    DID THAT CAUSE YOU CONCERN?

25  **A.**    YES.

APRIL 20, 2015

GHAHREMAN - DIRECT EXAMINATION

1    **Q.**    WHAT DID YOU DO?

2    **A.**    I SAID, KOORUSH, FORGET ABOUT THAT.  THIS IS NOT IN MY

3    TERRITORY.  I CANNOT HELP YOU FOR THIS.  HE SAID OKAY, OKAY

4    FORGET IT.  FOUR GYRO.

5    **Q.**    DID HE GO FORWARD WITH THE SIX GYROS?

6    **A.**    PARDON?

7    **Q.**    DID HE DROP THAT CUSTOMER?

8    **A.**    YES.

9    **Q.**    AND YOU SAID YOU ASKED HIM ONE MORE TIME ONCE -- ABOUT

10   WHERE THESE ITEMS WERE GOING.  WHEN WAS THAT?

11   **A.**    IT WAS AFTER GREEN VALLEY MEETING.

12   **Q.**    AFTER THE MEETING AT THE GREEN VALLEY RANCH?

13   **A.**    AFTER MEETING IN THE GREEN VALLEY RANCH.

14   **Q.**    WHAT WAS IT THAT YOU HEARD DURING THE GREEN VALLEY RANCH

15   MEETING OR WHAT WAS IT THAT HAPPENED THAT MADE YOU THINK THAT

16   THERE MIGHT BE SOME POSSIBILITY THAT THESE ITEMS WERE GOING TO

17   IRAN?

18   **A.**    IT WAS THE ABOUT THE BUSINESS ORGANIZATION BACK IN SOUTH

19   STAR WITH THE TIG MARINE, WITH TALKING OF THE DAVID MILLS FOR

20   IN FUTURE BUSINESS OPPORTUNITY REGARDING IRAN AND SHIPPING, OR

21   WHATEVER I HEARD OVER THERE.  AND I CONCERNED WHAT IS GOING ON

22   BECAUSE AS I DIDN'T HAVE ANY POSITION TO INTERRUPT OVER THERE.

23   IT WAS ERGUN YILDIZ, AND HE WAS IN CHARGE OF EVERYTHING.  HE

24   COULD TALK, AND DAVID MILLS ALSO HE COULD TALK ABOUT

25   EVERYTHING.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **Q.**   THAT IS WHAT YOU HEARD ABOUT FUTURE BUSINESS?

2   **A.**   YES.

3   **Q.**   POTENTIALLY INVOLVING IRAN THAT CAUSED YOU TO CALL HIM?

4   **A.**   YES.

5   **Q.**   WHAT DID HE DO TO ALLAY YOUR CONCERNS, IF ANYTHING?

6   **A.**   HE SAYS –– PARDON?

7   **Q.**   HOW DID HE RESPOND TO YOUR CONCERNS?

8   **A.**   IS I CALLED KOORUSH.

9   **Q.**   YEAH.  HOW DID HE RESPOND TO YOUR CONCERNS?

10  **A.**   WHEN I CALLED KOORUSH I TOLD HIM THEY WERE TALKING ABOUT

11  WORKING WITH IRAN.  HE SAID –– HE SAID I DON'T LIKE IRANIAN, I

12  DON'T WANT TO –– IF I HAVE TO –– HE SAID, I DON'T WANT TO WORK

13  WITH IRAN.  I HATE WORK WITH THE IRANIAN AND THE IRANIAN

14  GOVERNMENT AND EVERYTHING.  YOU KNOW IRANIAN.  I DON'T WANT TO

15  WORK WITH THEM.  ALL MY BUSINESS IN DUBAI.

16      I SAID THAT ERGUN SAID SOMETHING.  SAID ERGUN WANTS TO,

17  THAT IS HIS DEALINGS WITH THIS.  HE KNOWS WHAT HE IS DOING.

18  HE SAID THAT IS THAT I DON'T LIKE WORKING WITH IRANIAN.  I AM

19  WORKING AND STAYING IN DUBAI FOR GOOD.

20  **Q.**   LET'S TURN TO THE DINNER YOU HAD WITH DAVID MILLS IN LAS

21  VEGAS.

22  **A.**   UM-HUM.

23  **Q.**   YOU JUST TESTIFIED EARLIER THAT HE TOLD YOU HE DIDN'T

24  LIKE BEING LIED TO ABOUT WHERE THESE THINGS WERE GOING, RIGHT?

25  **A.**   YES.

APRIL 20, 2015

GHAHREMAN - DIRECT EXAMINATION

1    Q.    ON THE MAY 28TH CALL.  DO YOU RECALL HIM SAYING ANYTHING
2    DURING THE VEGAS DINNER ABOUT HOW IT WOULD MAKE HIM FEEL IF
3    KOORUSH DIDN'T TELL HIM THESE THINGS WERE GOING TO IRAN.
4    A.    DAVID MILLS IS -- I DON'T KNOW.  THIS IS MY BELIEF.  HE
5    MADE THAT BELIEF FOR HIM FOR HIS STORY.  I DON'T KNOW.  FOR ME
6    HE MADE, FOR HIS PARTNERS HE MADE.  HE WANTS TO GIVE A STORY.
7    AND WHATEVER WE WANTED TO TELL HE WAS OPPOSING.  AND HE DIDN'T
8    LIKE WE SAID NO TO HIM.  HE WANTED TO SAY YES.  AND AS ALWAYS
9    I HAD TO SAID YES I UNDERSTOOD, TO GO WITH HIM, TO SATISFY HIM
10   SOMEHOW.
11   Q.    DURING THAT DINNER, THE GOVERNMENT PLAYED A TAPE IN
12   WHICH YOU SAID:  TO ME IT IS A LITTLE DISRESPECTFUL BECAUSE IF
13   YOU DON'T TRUST ME I UNDERSTAND.  BUT I FEEL LIKE WE HAVE DONE
14   SO MUCH WORK TOGETHER.  AT WHAT POINT DO YOU TRUST ME.
15   A.    PARDON?
16         MR. JOHNSTON:  CAN WE PLAY CLIP 2 FROM 6/12.
17         (AUDIO PLAYED)
18   Q.    (MR. JOHNSTON)  NOW, MR. GHAHREMAN, YOU JUST TESTIFIED
19   THAT YOU DID ASK KOORUSH ON SEVERAL OCCASIONS IF THESE ITEMS
20   WERE GOING TO IRAN.
21   A.    YES, I DID ASK.
22   Q.    BUT YOU TOLD DAVID MILLS THAT YOU DON'T ASK KOORUSH.
23   WHY DID YOU TELL THAT TO DAVID MILLS?
24   A.    MY RELATIONSHIP WITH MY BOSS, I SHOULD NOT DISCLOSE TO
25   EVERYONE.  I DON'T KNOW IF ANYBODY GOING TO DISCLOSE THAT

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   CONVERSATION BETWEEN THEIR BOSS TO OTHERS, THIS IS THEIR

2   INTEREST.  BUT I DIDN'T HAVE TO DISCLOSE MY RELATIONSHIP AND

3   MY CONVERSATION WITH THE CUSTOMERS.  ALWAYS THAT IS TO MAKE --

4   MY CONCERNS TO THE CLIENTS AND AGAINST ME, THAT IS BOTH

5   SITTING IN THE TABLE WITH ME.  THAT IS MY PERSONAL CONCERNS

6   AND NOT THAT MAYBE THAT -- IT WAS HIM OR NOT, THAT IS MY

7   PERSONAL WITH KOORUSH, WITH MY BOSS.

8   **Q.**    DID YOU FEEL IT WOULD BE DISRESPECTFUL TO TELL DAVID

9   MILLS WHAT -- SOMETHING DIFFERENT THAN WHAT HE WANTED TO HEAR?

10  **A.**    IS I TOLD HIM DIFFERENCE, BUT HE DOESN'T ACCEPT.  AND I

11  DIDN'T CONTINUE BECAUSE I SEE HE GETTING ANGRY AND SAID IF YOU

12  SAID -- HE CONSIDER I TELLING LIE TO HIM.  JUST I KEEP IT IN

13  THE WAY HE LIKES.

14  **Q.**    WERE YOU CONCERNED THAT YOU MIGHT LOSE HIS BUSINESS IF

15  YOU DIDN'T TELL HIM WHAT HE WANTED TO HEAR?

16  **A.**    PARDON?

17  **Q.**    WERE YOU CONCERNED THAT YOU WOULD LOSE HIS BUSINESS IF

18  YOU DIDN'T TRY TO GO ALONG?

19  **A.**    ANYWAY, WE WERE IN THE BUSINESS RELATIONSHIP.  SURE,

20  THAT IS -- I WAS CONCERNED TO LOSE BUSINESS OR TO -- WE PAY

21  ALREADY $28,000, WE LOSE THE PRODUCT.

22  **Q.**    BUT WOULDN'T IT JUST BE EASIER TO TELL HIM, SURE, THEY

23  ARE GOING TO IRAN, EVEN IF THAT WASN'T TRUE?

24  **A.**    IT WASN'T TRUE THIS STATEMENT.  IS THAT I TOLD -- I

25  DIDN'T WANT -- KNOW WHAT IS THERE TRULY HIS INTENTION.  HE

APRIL 20, 2015

GHAHREMAN - DIRECT EXAMINATION

1   MAKE THE STORY FOR HIM, FOR HIS PARTNER, BECAUSE IN THE

2   CONVERSATION ALSO IF YOU HEAR HE WANTS TO SAY TO HIS PERSON,

3   DID YOU SEE I TOLD THEM IT IS GOING TO IRAN?  THAT HE WANTS TO

4   MAKE HIS STORY.  I DON'T KNOW FOR WHICH PARTY HE WANTS TO MAKE

5   A STORY.  MAYBE HE WANTS TO BELIEVE TO THE OTHER PEOPLE.  BUT

6   IS MY CONCERN IS, OVER THERE, IT WAS NOT TO GOING TO IRAN.

7   AND I COULDN'T MAKE ANY STATEMENTS THAT IS IT IS NOT TRUE.

8   **Q.**    WAS THAT THE BEST STATEMENT YOU COULD MAKE?

9   **A.**    NORMALLY THAT IS -- YOU SEE I SAID, OKAY.  THAT IS MOVE

10  ON.  THAT IS I TRIED TO MOVE ON ALL HIS, YOU KNOW, FOR ALL OF

11  THE CONVERSATION.

12  **Q.**    NOW, AT THE END OF THE VEGAS DINNER YOU MET DAVID MILLS'

13  PARTNER, JOHN ERICKSON?

14  **A.**    YES, I DID.

15  **Q.**     DO YOU RECALL THE CLIP THAT THE GOVERNMENT PLAYED IN

16  YOUR CONVERSATIONS WITH JOHN ERICKSON AT THE END OF DINNER?

17  **A.**    YES.

18        **MR. JOHNSTON:**  CAN WE PLAY CLIP -- I BELIEVE IT

19  IS -- IT WAS IDENTIFIED AS CLIP 6 BY THE GOVERNMENT.

20        (AUDIO PLAYED)

21  **Q.**    **(MR. JOHNSTON)** SO WHEN JOHN ERICKSON TELLS YOU, WE WANT

22  TO DO THINGS THE RIGHT WAY, WHAT DID YOU UNDERSTAND HIM TO

23  MEAN?

24  **A.**    LIKE THE RIGHT WAY, THAT IS WHAT IS THE UNDERSTANDING OF

25  THE RIGHT WAY.  THE RIGHT WAY IS THE RIGHT WAY, IS LEGAL AND

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   PROPER WAY OF THE BUSINESS.

2   **Q.**    WHAT DID YOU -- WHAT DID YOU MEAN WHEN YOU SAY:  I

3   EXPLAIN IT TO YOU.  THE DELIVERY FOR US IS PER KOORUSH.  AND

4   FOR US IT IS VERY IMPORTANT THAT KOORUSH --

5        AND THE TRANSCRIPT SAYS, IT IS VERY IMPORTANT THAT

6   KOORUSH MONEY CAME FIRST.

7        IS THAT WHAT YOU SAID?

8   **A.**    NO, SIR.  I SAID MONEY CLEAN FIRST.

9   **Q.**    WHAT DO YOU MEAN BY THAT?

10   **A.**    IS THE MONEY CLEAN FIRST, THAT IS AS MY BELIEF, FROM MY

11   EXPERIENCE AND FROM CHILDHOOD, IS BAD MONEY IS THE MONEY FROM

12   WRONG INCOME, FROM THIEF, FROM THE BAD ORGANIZATION, IS THAT

13   MONEY THAT IS NOT ACCEPTED BY ANY TYPE OF THE INDIVIDUAL AND

14   BUSINESS IN THE WORLD.  AND THE MONEY CLEAN FIRST IT MEANS

15   LEGAL MONEY, IS FROM THROUGH THE BANK TRANSACTION.  AND IF YOU

16   KNOW THAT IS THE -- IN THE INTERNATIONAL BANK TRANSACTION ALL

17   THE MONEY TRANSACTION IS GOING THROUGH, AS MY BELIEF, AND

18   STILL I BELIEF THIS, IS GOING THROUGH THE TREASURY OF THE

19   UNITED STATES OF AMERICA, AND CHECKED, AND THEN COMING INTO

20   THE END DEPOSIT TO ANYBODY IN THE UNITED STATES OR AROUND THE

21   WORLD, BRANCHES IN THE WORLD.

22   **Q.**    LET ME ASK YOU THIS.  AT THE GREEN VALLEY RANCH, WHAT

23   WAS THE ROLE THAT YOU PLAYED IN THAT MEETING THAT YOU HAD WITH

24   DAVID MILLS, JOHN ERICKSON AND ERGUN YILDIZ?

25   **A.**    I WAS ONLY OVER THERE TO INTRODUCE TWO PARTIES, AND AS

GHAHREMAN – DIRECT EXAMINATION

1   THE VERIFIED -- TO VERIFY PRODUCTS.

2   **Q.**   WHAT WAS THE ERGUN'S ROLE?

3   **A.**   HUH?

4   **Q.**   WHAT WAS ERGUN YILDIZ' ROLE?

5   **A.**   HE WAS EVERYTHING FROM THE TIG MARINE SERVICE.  HE WAS

6   FULL -- HE WAS CEO.  AS MY VIEW, HE WAS CEO OF THE COMPANY.

7   **Q.**   WAS HE THE ONE THERE WHO COULD MAKE DECISIONS ABOUT

8   CHANGES IN THE CONTRACT?

9   **A.**   AS MY VIEW, HE WAS TIG MARINE.  IT MEANS EVERYTHING OF

10  THE TIG MARINE, HE WAS TIG MARINE OVER THERE.

11  **Q.**   NOW, AT SOME POINT DURING THAT MEETING JOHN ERICKSON

12  TALKED ABOUT THE CONCERN OF HAVING THE PRODUCTS RETURNED TO

13  NORTHROP GRUMMAN FOR REPAIR, AND I BELIEVE HE SAID FROM IRAN,

14  RIGHT?

15  **A.**   CAN YOU PLAY THIS?

16  **Q.**   JOHN ERICKSON SAID, QUOTE, IF THERE IS A PROBLEM WITH

17  THE ITEM IN IRAN WE DON'T WANT THEM SENDING IT BACK TO

18  NORTHROP GRUMMAN.

19  **A.**   YES, YES.

20  **Q.**   WHAT WAS YOUR UNDERSTANDING OF WHAT WAS GOING ON AT THAT

21  MOMENT?

22  **A.**   IT WAS IS I WAS A LITTLE FRUSTRATED FOR THIS DISCUSSION

23  THAT BECAUSE DAVID MILLS IS TALKING FROM THE BEGINNING, OH,

24  THE PRODUCT, IF END USER RETURN PRODUCT TO MANUFACTURER.  AND

25  THAT SAYS -- THEY CALL THIS PRODUCT IS NOT FROM WHAT WE TOLD

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  THEM, THAT MANUFACTURER GETTING UPSET FROM US.

2  **Q.**    BUT YOU TOLD HIM THAT EVERY SERIAL NUMBER, EVERYTHING

3  THAT SAYS WILL BE REMOVED, DESTROYED.

4       DO YOU REMEMBER TELLING HIM THAT?

5  **A.**    I MADE IT, AS HONEST, AS A STATEMENT, IT IS NOT TRUE.

6  IT DOESN'T HOLD TRUE.

7  **Q.**    LET ME ASK YOU THIS.  CAN YOU REMOVE THE SERIAL NUMBER

8  OFF THE NAVIGAT?

9  **A.**    FROM THE BOX MAYBE, YES.

10  **Q.**    IN YOUR EXPERIENCE IF -- WELL, ARE THERE OTHER

11  IDENTIFYING NUMBERS ON MARINE EQUIPMENT?

12  **A.**    YES.

13          **MR. HARRIGAN:**  OBJECTION.  LACK OF FOUNDATION.

14          **THE COURT:**  SUSTAINED.

15  **Q.**    **(MR. JOHNSTON)** IN YOUR EXPERIENCE HAVE YOU, AS A

16  PROJECT ESTIMATOR, AS A PROJECT MANAGER, HAD TO DEAL WITH

17  MARINE EQUIPMENT?

18  **A.**    YES.

19  **Q.**    HAVE YOU EVER HAD TO LOOK UNDER THE HOOD OF A PIECE OF

20  MARINE EQUIPMENT?

21  **A.**    SOMETIMES IT IS NOT IN THE HOOD.  WHAT YOU WOULD BE

22  CHECKING THE COMPARTMENT INSIDE ALL OF THE -- AND ALL OF THE

23  PARTS IS NORMALLY HAVE THE SERIAL NUMBERS AND IS MANUFACTURER

24  CAN FIND WHAT IS THE ORIGINAL SERIAL NUMBER.

25  **Q.**    DO YOU THINK THAT YOU COULD REMOVE ALL IDENTIFYING

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   INFORMATION FROM A PIECE OF MARINE EQUIPMENT?

2   **A.**    IF YOU LOOK AT THE COMPARTMENTS, IT IS NOT POSSIBLE.

3   **Q.**    LET ME ASK YOU THIS.  IN YOUR EXPERIENCE, IF YOU SEND A

4   PIECE OF MARINE HIGH TECH EQUIPMENT BACK TO THE MANUFACTURER

5   WITH OBLITERATED SERIAL NUMBERS, WOULD THEY EVEN WORK ON IT?

6   **A.**    NO, SIR.

7   **Q.**    BUT YOU TOLD JOHN ERICKSON THAT YOU WOULD REMOVE THESE

8   NUMBERS EVEN THOUGH YOU KNEW IT WASN'T POSSIBLE.  WHY?

9   **A.**    IT WAS BECAUSE THE, YOU KNOW, BECAUSE I WANTED TO STATE

10   TO WHAT I TOLD TO DAVID MILLS, NO, WE DON'T RETURN TO

11   MANUFACTURER, IS COMING THROUGH US AND TO TIG MARINE, AND FROM

12   TIG MARINE TO YOU GUYS.  AND I WANTED TO CLEAR FOR ERGUN,

13   SOMEHOW, AND TO OVER THE –– TO GIVE THEM THAT ONE EXPLANATION

14   TO MOVE FROM THIS SUBJECT TO REMOVE THEIR CONCERN.

15   **Q.**    LET ME ASK YOU THIS.  AT SOME POINT THERE WAS DISCUSSION

16   ABOUT HOW TO PACKAGE THE ITEMS.  DO YOU REMEMBER THAT DURING

17   THE GREEN VALLEY RANCH MEETING?

18   **A.**    YES.  SEVERAL DISCUSSIONS.

19   **Q.**    AND THERE WAS AN ISSUE ABOUT WHETHER THE MANUALS SHOULD

20   GO WITH THE PRODUCTS OR SEPARATELY.

21   **A.**    YES, SIR.

22   **Q.**    WHAT WAS YOUR OPINION?  WHAT DID YOU TELL EVERYONE

23   SHOULD HAPPEN?

24   **A.**    IT WAS –– IT IS SO MANY DISCUSSIONS, BUT I SAID THAT TO

25   KEEP MANUAL WITH THE ITEM.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1  **Q.**    YOU SAID KEEP MANUAL WITH THE ITEM?

2  **A.**    YES.

3  **Q.**    WHY?  WHY –– DID YOU REMEMBER EXPLAINING WHY YOU TOLD

4  THEM?

5  **A.**    I TOLD THEM KEEP THE MANUAL WITH THE ITEM BECAUSE

6  WHOEVER IS CHECK THIS MANUAL AT CUSTOM, I THINK THAT IS WHO IS

7  THE CHECK, READ THE MANUAL, KNOW WHAT IS THERE, THIS ITEM, AND

8  UNDERSTAND, IF THAT DOESN'T WORK, AND THIS IS VERY NOTHING.

9  **Q.**    VERY NAUGHTY?

10  **A.**    VERY NOTHING.

11  **Q.**    NOTHING.

12      NOW, PART OF YOUR JOB WITH TIG MARINE WAS TO MAKE SURE

13  THAT THIS TRANSACTION HAPPENED, RIGHT?

14  **A.**    PART OF MY JOB IS THE –– I WAS MONITORING THE STEPS OF

15  THE CONTRACT.  THAT IS MY.

16  **Q.**    RIGHT.  BUT YOU –– FOR THE CONTRACT TO BE COMPLETED

17  THESE ITEMS HAD TO ULTIMATELY END UP AT THEIR FINAL

18  DESTINATION, RIGHT?

19  **A.**    YES, SIR.

20  **Q.**    AND YOU RECOMMENDED PUTTING THE MANUAL WITH THE ITEM,

21  RIGHT?

22  **A.**    YES, I DID.

23  **Q.**    EVEN THOUGH THE MANUAL WOULD IDENTIFY THE ITEM FOR WHAT

24  IT IS.

25  **A.**    YES, SIR.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **Q.**    EVEN IF A CUSTOMS INSPECTOR LOOKED AT IT.

2   **A.**    YES, SIR.

3   **Q.**    WHY DID YOU WANT THE MANUAL TO BE WITH THE ITEM IF THESE

4   ITEMS WERE GOING SOMEWHERE ILLEGAL?

5   **A.**    IT WAS NOT GOING SOMEWHERE ILLEGAL, FIRST.  AND CUSTOM

6   CAN SEE WHAT IS THE MANUAL, CAN FIND WHO SEND THIS PRODUCT AND

7   WHERE IS THE DESTINATION.  WE DIDN'T HIDE ANYTHING FROM THE

8   BEGINNING.

9   **Q.**    THERE WERE OTHER DISCUSSIONS ABOUT THE PACKAGING, LIKE

10  PUTTING A TV MANUAL IN WITH THE ITEM OR DOING OTHER THINGS.

11  DO YOU REMEMBER SOME OF THOSE DISCUSSIONS?

12  **A.**    YES, IT WAS SOME -- DAVID MILLS SAID.  HE SAID.  HIS

13  IMAGINATION.

14  **Q.**    IN THE END WERE THOSE ITEMS SHIPPED THE WAY THAT YOU SEE

15  THEM HERE TODAY?

16  **A.**    YES.  BECAUSE SOMETHING I MENTIONED AND ALWAYS AND I

17  CONSIDERED.  FOR US --

18          **MR. HARRIGAN:**  OBJECTION.  NONRESPONSIVE.

19          **THE COURT:**  SUSTAINED.

20  **Q.**    **(MR. JOHNSTON)** DID YOU HAVE A FINAL SAY ON HOW THE

21  ITEMS WOULD BE DELIVERED OR -- LET ME ASK YOU THIS.

22          WAS ERGUN THE ONE IN CHARGE OF MAKING DECISIONS, FINAL

23  DECISIONS, ABOUT HOW THINGS WERE DONE?

24  **A.**    YES, SIR, HE WAS, IN THE SOUTH STAR AND THE TIG MARINE.

25  **Q.**    LET'S TALK ABOUT ERGUN YILDIZ FOR JUST A MOMENT.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1      WHEN DID YOU FIRST MEET HIM?

2  **A.**    AFTER HE –– HIS ARRIVAL TO THE LAS VEGAS.

3  **Q.**    HAD YOU EVER COMMUNICATED WITH HIM BEFORE HIS ARRIVAL IN

4  LAS VEGAS?

5  **A.**    NO, SIR.

6  **Q.**    BY EMAIL?

7  **A.**    NO, SIR.  I RECEIVE HIS EMAIL, BUT CC ME, BUT NOT

8  COMMUNICATION DIRECT WITH HIM.

9  **Q.**    AND DID YOU MEET UP WITH HIM THE NIGHT BEFORE THE GREEN

10  VALLEY RANCH MEETING?

11  **A.**    YES, I DID.

12  **Q.**    WAS THAT AFTER YOUR DINNER WITH DAVID MILLS?

13  **A.**    YES, SIR.  I FINISH VERY FAST MY MEAL WITH DAVID MILLS

14  BECAUSE ERGUN HAD PROBLEM WITH THE REGISTERING IN HOTEL.

15  **Q.**    DID YOU HAVE A CHANCE TO TALK WITH ERGUN ONCE YOU ––

16  **A.**    YES.  I GO TO MAKE –– SEE WHAT IS THE ISSUE AND TO MEET

17  HIM.

18  **Q.**    AND YOU SAID AN ISSUE WITH WHAT?  I AM SORRY.

19  **A.**    ISSUE WITH THE –– IT WAS SOMEHOW THAT IS THAT SOUTH STAR

20  TRADING SUPPOSED TO PAY FOR THE HOTEL.  THE CREDIT CARD DIDN'T

21  WORK AND I PAID FOR THE HOTEL.

22  **Q.**    DID YOU TALK ABOUT ANYTHING ELSE WITH ERGUN WHEN YOU MET

23  HIM THAT NIGHT?

24  **A.**    WE INTRODUCED EACH OTHER.  WE TALKING ABOUT A LITTLE

25  KOORUSH.  I SAID WHAT, THE LAST TIME I SAW HIM.  HE INTRODUCE

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   WHEN HE MET KOORUSH FROM HIS COMMON FRIEND, AND THEY ARE

2   STARTING BUSINESS TOGETHER.  HE IS TALKING ABOUT THIS OTHER

3   BUSINESS.  HE SAYS THAT IT WAS -- HE WAS TEXTING HIS NEWLY

4   WEDDING AND --

5   **Q.**   HE WAS TEXTING WHO?

6   **A.**   HIS WIFE.  SORRY.

7   **Q.**   NEWLYWED?

8   **A.**   YES, YES.

9   **Q.**   GO AHEAD -- OR LET ME GO AHEAD AND ASK YOU.

10      DID HE EVER RAISE ANY CONCERNS ABOUT DAVID MILLS OR

11  SOUTH STAR TRADING IN THAT MEETING?

12  **A.**   YOU KNOW, HE KNOWS -- DOESN'T KNOW PERSONALLY DAVID

13  MILLS.  HE HAD A STORY FROM THE KOORUSH AS MY BELIEF BECAUSE

14  HE SAID HE WAS BUSY WITH HIS OTHER BUSINESS AND SEE THE EMAILS

15  COMMUNICATIONS.  AND HE SAID THAT KOORUSH'S CONCERN ABOUT

16  THESE GUYS, THEY ARE CHEATER OR THEY AREN'T -- THEY DON'T WANT

17  TO PROVIDE PRODUCT.  AND HE SAID -- AND I TOLD TO -- EXPLAINED

18  TO HIM ALSO KOORUSH HAD DELAYED FOR PAYMENTS, NORMALLY IS NOT

19  HAPPEN.  MAYBE OVER THERE THEY CAN MAKE DELAY AND IN THE LAST

20  THEY PAY, BUT HERE IT DOESN'T ACCEPT IT.  THAT IS DELAYING

21  PAYMENT.

22  **Q.**   LET ME SLOW YOU DOWN.

23      HE EXPRESSED CONCERNS THAT THESE PEOPLE MIGHT BE

24  CHEATERS?  IS THAT WHAT YOU SAID?

25  **A.**   THAT IS KOORUSH, BECAUSE EXPLAINING FOR HIM THE TOTAL OF

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    THE --

2    **Q.**    DID HE EVER --

3    **A.**    -- ISSUE RAISES UP.

4    **Q.**    DID HE EVER MENTION ANYTHING ABOUT THEM BEING GOVERNMENT

5    AGENTS?

6    **A.**    NO.

7    **Q.**    AND DID YOU EVER TALK TO HIM THAT NIGHT -- DID YOU EVER

8    MENTION ANYTHING ABOUT A LAWYER?

9    **A.**    YES.

10   **Q.**    WHAT DID YOU TELL HIM?

11   **A.**    IS THAT I TOLD HIM I MET THIS GUY.  I EXPLAINED A LITTLE

12   THE SITUATION, WHAT IS GOING ON.  I SAID, IN THE END, IF THIS

13   THE -- YOU SEE THEY ARE NOT PROPER, YOU ARE NOT HAPPY, YOU ARE

14   HERE, WE CAN TAKE -- HIRE ATTORNEY WHEN YOU ARE HERE AND SUE

15   THEM.  AND WE ARE GOING FORWARD.

16   **Q.**    NOW, HOW MUCH MONEY, AT THAT TIME, DID SOUTH STAR

17   TRADING HAVE OF TIG MARINE'S?

18   **A.**    IT IS ALREADY $28,000, I BELIEVE.

19   **Q.**    OKAY.  IF IT TURNED OUT THAT THESE PEOPLE WEREN'T FOR

20   REAL YOUR SUGGESTION WAS YOU COULD TAKE A LAWYER?

21   **A.**    YES.  I COULD, YOU KNOW, I SHOULD TOUCH ALL OF THE

22   POSSIBILITY.  I TOLD HIM THEY ARE GOOD PEOPLE, GREAT PEOPLE.

23   I WAS IN MEETING WITH THEM.  YOU WILL MEET THEM TOMORROW.  AND

24   BUT IN THE END IF THEY COULDN'T PROVIDE AS KOORUSH SAID OR

25   SOMETHING, THIS IS YOUR CALL THAT YOU ARE -- YOU ARE HERE, WE

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1    CAN CALL A LAWYER AND HIRE A LAWYER FOR THE DISPUTE.

2    **Q.**   HOW ABOUT AFTER THE GREEN VALLEY RANCH MEETING, DID YOU

3    HAVE ANY DISCUSSIONS WITH ERGUN?

4    **A.**   YES.

5    **Q.**   WHAT WAS HIS IMPRESSION OF DAVID MILLS?

6    **A.**   HE SAID THEY ARE VERY GREAT GUY.  THEY ARE VERY –– LOOK

7    GENTLEMEN.  I AM HAPPY WITH THEM.

8    **Q.**   AFTER THE MEETING DID HE MENTION ANY CONCERNS THAT THEY

9    MIGHT BE AGENTS?

10   **A.**   NO.

11   **Q.**   DID YOU EVER TELL HIM THAT YOU HAD ASKED DAVID MILLS OR

12   ANY OF THE OTHER PEOPLE FROM SOUTH STAR IF THEY WERE AGENTS?

13   **A.**   NO.

14   **Q.**   DID YOU EVER ASK DAVID MILLS OR ANY OF THE OTHER PEOPLE

15   YOU INTERACTED WITH IF THEY WERE GOVERNMENT AGENTS?

16   **A.**   NO.

17   **Q.**   DID YOU EVER TELL ERGUN YILDIZ THAT YOU HAD CONSULTED

18   WITH AN ATTORNEY IN NEW YORK ABOUT WHEN AND UNDER WHAT

19   CIRCUMSTANCES A GOVERNMENT AGENT WOULD HAVE TO REVEAL THEMSELF

20   TO YOU?

21   **A.**   NO.

22   **Q.**   HOW MANY MORE DAYS DID YOU SPEND WITH ERGUN AFTER THE

23   GREEN VALLEY RANCH BEFORE YOU WERE ARRESTED?

24   **A.**   IS THURSDAY, FRIDAY, SATURDAY –– SUNDAY WE CAME TO LAS

25   VEGAS.  THREE –– FOUR NIGHTS, THREE DAYS.

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   **Q.**    SUNDAY YOU CAME TO?

2   **A.**    SAN DIEGO.

3   **Q.**    SAN DIEGO.  OKAY.

4          AND DURING THAT TIME DID ERGUN EVER TALK ABOUT THE FACT

5   THAT THESE ITEMS WERE GOING TO IRAN?

6   **A.**    NEVER.

7   **Q.**    DID HE EVER MENTION ANYTHING THAT MADE YOU SUSPECT THAT

8   THEY MIGHT BE GOING TO IRAN?

9   **A.**    NEVER.

10  **Q.**    MR. GHAHREMAN, THROUGHOUT THE COURSE OF THIS SIX MONTHS

11  DID YOU EVER KNOW THAT THESE ITEMS WERE ULTIMATELY DESTINED

12  FOR IRAN?

13  **A.**    NO.

14  **Q.**    DID YOU EVER FIND OUT THAT THEY WERE ULTIMATELY DESTINED

15  FOR THE GOVERNMENT OF IRAN?

16  **A.**    NEVER.

17  **Q.**    DID YOU EVER SUSPECT, THOUGH, THAT THEY MIGHT END UP IN

18  IRAN?

19  **A.**    I EXPRESSED MY SUSPECT ABOUT THE ISSUES AS COMING, AND I

20  WAS TALKING WITH KOORUSH AND HE SAID NO.

21  **Q.**    DID YOU FEEL YOU DID YOUR BEST THAT YOU COULD TO FIND

22  OUT WHERE THESE ITEMS WERE GOING?

23  **A.**    AS MY KNOWLEDGE AND ASKING THE FRIENDS ABOUT THE KOORUSH

24  BUSINESS AND THE KOORUSH AS THE SAILORS, AS THE CHIEF

25  ENGINEERS WHO WORK AT SEA, AND I RESPECT SAILORS, AND IS THERE

APRIL 20, 2015

GHAHREMAN – DIRECT EXAMINATION

1   SOMETHING THAT WE MUST ASK, OUR WORDS OUR BIND.  THIS IT IS IN

2   MARITIME CULTURE.

3   **Q.**    LET ME ASK YOU THIS.  IF YOU WERE TO FIND OUT THESE

4   ITEMS WERE GOING TO IRAN, WOULD YOU HAVE CONTINUED

5   PARTICIPATING IN THIS BUSINESS TRANSACTION?

6   **A.**    NO, SIR.  I DON'T.  I DIDN'T AND I DON'T.

7           **MR. JOHNSTON:**  NOTHING FURTHER.

8           **THE COURT:**  THANK YOU.

9           CROSS–EXAMINATION.

10                          CROSS–EXAMINATION

11  **Q.**    **(MR. HARRIGAN)** GOOD AFTERNOON, MR. ARASH.

12  **A.**    GOOD AFTERNOON, SIR.

13  **Q.**    I JUST WANT TO ASK YOU FIRST A LITTLE BIT ABOUT YOUR

14  ROLE WITH TIG MARINE.  OKAY?

15  **A.**    OF COURSE, SIR.

16  **Q.**    ALL RIGHT.  I THINK YOU TESTIFIED ON DIRECT THAT YOUR

17  ROLE WAS JUST TO ACT AS THE INTERMEDIARY, RIGHT?

18  **A.**    YES, SIR.

19  **Q.**    TO PUT PEOPLE TOGETHER AND HAVE THEM SIGN A CONTRACT.

20  **A.**    YES, SIR.

21  **Q.**    AND AS TO THOSE CONTRACTS, THE GYROCOMPASS CONTRACT WAS

22  SIGNED AT THE END OF JANUARY, CORRECT?

23  **A.**    YES, SIR.

24  **Q.**    AND THAT CONTAINED ALL OF THE TERMS.  THAT CONTAINED ALL

25  OF THE TERMS FOR THE CONTRACT, THE DEAL, RIGHT?

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1  **A.**   YES, SIR.

2  **Q.**   INCLUDING THE STANDBY LETTER OF CREDIT.  THAT WAS

3  ALREADY INCLUDED IN THE CONTRACT.

4  **A.**   IS AFTER SEVERAL REVISED WE GET THAT IN THE CONCLUSION,

5  THE FINAL VERSION OF THE CONTRACT.

6  **Q.**   RIGHT.  THAT WAS REQUESTED BY YOU THROUGH -- BECAUSE IT

7  WAS REQUESTED BY MR. TAHERKHANI.

8  **A.**   YES, SIR.

9  **Q.**   OKAY.  AND THAT WAS PLACED IN THE CONTRACT FOR SIX

10  GYROS, THAT WAS SIGNED JANUARY 31ST OF 2013, CORRECT?

11  **A.**   WE REVISED THE FINAL TO FOUR GYROS, SIR.

12  **Q.**   THEN YOU LATER REVISED IT TO FOUR GYROS, CORRECT?

13  **A.**   YES, SIR.

14  **Q.**   AS TO THE Y-690'S, THE CONTRACT FOR THAT, THAT WAS

15  SIGNED IN MARCH, CORRECT?

16  **A.**   IS I THINK SO IN THE MARCH.  IS THE DATE IS ON THE

17  PAPER, SIR.

18  **Q.**   OKAY.  AND SO YOUR JOB, AT THAT TIME, IN GETTING THE

19  CONTRACT SIGNED WAS DONE, CORRECT?

20  **A.**   IS MY JOB AS THE CONTRACT WILL BE UNDER PROPER LEGAL FOR

21  ALL THE PARTIES, YES, DONE.

22  **Q.**   BUT YOUR JOB DIDN'T STOP THERE, DID IT?

23  **A.**   THAT IS I SHOULD MONITORING THE CONTRACT IS GOING

24  THROUGH.

25  **Q.**   YOU MONITORED THE CONTRACT WAS GOING THROUGH.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **A.**   YES.

2   **Q.**   AND IT IS FAIR TO SAY YOU MONITORED QUITE EXTENSIVELY,

3   DIDN'T YOU?

4   **A.**   IS NO.

5   **Q.**   WELL --

6   **A.**   AS MY UNDERSTANDING, NO.

7   **Q.**   WELL, YOU HAD OVER 200 EMAIL COMMUNICATIONS WITH DAVID

8   MILLS, CORRECT?

9   **A.**   YES.

10  **Q.**   AND MANY OF THOSE OCCURRED AFTER BOTH THE CONTRACTS WERE

11  SIGNED.  THAT IS A FAIR STATEMENT, RIGHT?

12  **A.**   YES.

13  **Q.**   OKAY.  AND YOU CONTINUED TO CONTACT DAVID MILLS IN TERMS

14  OF MONEY THAT WAS TO BE PAID UNDER THE CONTRACT, RIGHT?

15  **A.**   YES.

16  **Q.**   THAT WAS A CONCERN OF DAVID MILLS, RIGHT?

17  **A.**   YES.

18  **Q.**   AND THAT WAS A CONCERN OF YOU, TOO, RIGHT?

19  **A.**   YES, SIR.

20  **Q.**   BECAUSE IN ORDER FOR YOU TO GET PAID THE CONTRACT HAD TO

21  BE SUCCESSFUL, RIGHT?

22  **A.**   SURE, SIR.

23  **Q.**   AND YOU WANTED TO GET PAID, RIGHT?

24  **A.**   SURE, SIR.

25  **Q.**   AND WITH THE FOUR GYROS YOU WERE EXPECTING APPROXIMATELY

APRIL 20, 2015

1   $20,000; IS THAT RIGHT?

2   **A.**     YES, SIR.  AFTER SIX, SEVEN MONTHS, YES.

3   **Q.**     AND DROPPING BACK.  WITH 100 GYROS, IF THAT HAD BEEN THE

4   CONTRACT, YOU WOULD GET 500,000; IS THAT RIGHT?

5   **A.**     I DON'T BELIEVE THAT IS RIGHT, SIR.

6   **Q.**     WOULD THAT BE UNDER THE OCCASIONAL INTERMEDIARY

7   CONTRACT?

8   **A.**     YES, SIR.  IT HAS A RATE OVER THERE IF YOU LOOK AT THE

9   RATE.

10  **Q.**     SO IF IT IS A $6 MILLION CONTRACT, RIGHT?

11  **A.**     YES.

12  **Q.**     AND YOUR RATE WAS 2 PERCENT?

13  **A.**     IT WAS 2 PERCENT.

14  **Q.**     THAT WOULD BE $120,000.

15  **A.**     YES, SIR.

16  **Q.**     FAIR TO SAY THAT IS HUGE BUSINESS?

17  **A.**     SURE, SIR.  THAT IS THE -- I HAD THE EXPERIENCE IN THIS

18  MARITIME INDUSTRY.  I AM NOT FREE PEOPLE, FREE OF CHARGE.

19  **Q.**     THAT'S RIGHT.  YOU ARE DOING WORK.

20  **A.**     YES, SIR.

21  **Q.**     AND YOU WANT TO GET PAID.

22  **A.**     YES, SIR.

23  **Q.**     AND GOING BACK TO THAT.  YOU DID A LOT OF WORK HERE,

24  RIGHT?

25  **A.**     NO, SIR.  THIS IS THE PEOPLE TRUST ME.

GHAHREMAN – CROSS–EXAMINATION

1   **Q.**    WELL, IS IT FAIR TO SAY THAT FROM DECEMBER, WHEN YOU
2   WERE FIRST CONTACTED WITH KOORUSH, THROUGH JUNE, YOU HAD OVER
3   100 TELEPHONE CONVERSATIONS WITH DAVID MILLS?
4   **A.**    YES, SIR.
5   **Q.**    THAT IS A LOT OF TELEPHONE CONVERSATIONS.
6   **A.**    IT WAS REGARDING DIFFERENT QUOTATIONS AND NOT ABOUT THE
7   TUBES.
8   **Q.**    MY QUESTION WAS, THAT IS A LOT OF TELEPHONE
9   CONVERSATIONS.
10  **A.**    YES.  IF YOU CAN CONSIDER, YES.
11  **Q.**    AND SOME OF THEM WEREN'T SHORT CONVERSATIONS, CORRECT?
12  **A.**    YES, SIR.
13  **Q.**    I MEAN, YOU DESCRIBED ONE THAT WENT ON FOR TWO HOURS,
14  RIGHT?
15  **A.**    IT IS THE LAST PHONE CALL, I THINK IT WAS TWO HOURS.
16  **Q.**    I THINK THAT WAS IN MAY, 29TH OR 28TH, CORRECT?
17  **A.**    YES, SIR.
18  **Q.**    OKAY.  AND KOORUSH ONLY SPOKE WITH DAVID MILLS ONCE,
19  CORRECT?
20  **A.**    YES, SIR.
21  **Q.**    AND YOU WERE PRESENT IN THAT -- DURING THAT CONFERENCE
22  CALL, CORRECT?
23  **A.**    YES, SIR.
24  **Q.**    AND IN TERMS OF ERGUN YILDIZ, BEFORE COMING TO THE
25  UNITED STATES HE HAD NEVER MET DAVID MILLS, CORRECT?

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1  **A.**    YES, SIR.

2  **Q.**    NEVER SPOKE WITH HIM?

3  **A.**    ERGUN YILDIZ, NO.

4  **Q.**    IN FACT, THAT'S THE FIRST TIME YOU MET OR SPOKE WITH

5  ERGUN YILDIZ, CORRECT?

6  **A.**    IN THE LAS VEGAS, THE FIRST NIGHT OF HIS ARRIVAL, YES.

7  **Q.**    YOU SAID HE WAS KNOWN AS THE CEO?

8  **A.**    AS THE –– YES.

9  **Q.**    AND YOU HAD SEEN HIS NAME BEFORE, THOUGH, RIGHT?

10  **A.**    IS I THINK IN MY CONTRACT, YES.

11  **Q.**    IN YOUR CONTRACT, RIGHT?

12  **A.**    (WITNESS NODS HEAD)

13  **Q.**    THAT WOULD BE YOUR OCCASIONAL INTERMEDIARY CONTRACT.

14  **A.**    YES, SIR.

15  **Q.**    BUT YOU NEVER DISCUSSED THAT CONTRACT WITH ERGUN YILDIZ,

16  CORRECT?

17  **A.**    NO.

18  **Q.**    YOU DISCUSSED THAT WITH KOORUSH TAHERKHANI, CORRECT?

19  **A.**    YES, SIR.

20  **Q.**    AND YOU ALSO SAW ERGUN YILDIZ'S NAME WAS THE SIGNER OF

21  THE END USER STATEMENT, RIGHT?

22  **A.**    IS I DIDN'T KNOW HIM OVER THERE.  BUT, YES, I SEE NOW.

23  BUT I COULDN'T RECOGNIZE HIS SIGNATURE OF THE ERGUN YILDIZ.

24  **Q.**    AND WHEN YOU GOT THE EMAIL FROM TAMMY FARNSLEY YOU

25  DIDN'T SPEAK TO ERGUN YILDIZ, DID YOU?

APRIL 20, 2015

GHAHREMAN − CROSS−EXAMINATION

1    **A.**    NO.

2    **Q.**    THE SIGNER OF THE END USER STATEMENT, RIGHT?

3    **A.**    NO.

4    **Q.**    YOU SPOKE WITH KOORUSH TAHERKHANI.

5    **A.**    YES.  ASSOCIATE OF TIG MARINE.

6    **Q.**    HIS TITLE IN THAT SIGNATURE IS MANAGER, RIGHT?

7    **A.**    IS YES, SIR.

8    **Q.**    AND KOORUSH TAHERKHANI ALSO USED THE NAME OR THE TITLE

9    DIRECTING MANAGER, CORRECT?

10   **A.**    YES, SIR.

11   **Q.**    AND YOU RECALL AN EMAIL THAT YOU RECEIVED FROM MR.

12   TAHERKHANI REGARDING COMING TO THE UNITED STATES TO VEGAS TO

13   MEET WITH THE UNDERCOVER AGENT.

14   **A.**    YES.

15   **Q.**    DAVID MILLS.

16   **A.**    YES, SIR.

17   **Q.**    OKAY.  AND HE WANTED THE INVITATION CHANGED; ISN'T THAT

18   RIGHT?

19   **A.**    HE WANTED INVITATION CHANGED, YES.

20   **Q.**    HE ASKED THAT THEY CHANGE HIS TITLE, RIGHT?

21   **A.**    YES, SIR.

22   **Q.**    FROM DIRECTING MANAGER.

23   **A.**    YES.

24   **Q.**    ALL RIGHT.  AND EVERY DOCUMENT THAT YOU SAW HIM SIGN,

25   RIGHT −−

APRIL 20, 2015

1   **A.**    YES.

2   **Q.**    -- HE PUT DIRECTING MANAGER ON IT, DIDN'T HE?

3   **A.**    YES.

4   **Q.**    AND HE ALSO INDICATED THAT HE IDENTIFIED ERGUN YILDIZ

5   IN THAT EMAIL, DIDN'T HE?

6   **A.**    YES.

7   **Q.**    NOT BY NAME.  HE DIDN'T MENTION ERGUN YILDIZ, DID HE?

8   HE SAID A GERMAN GUY.

9   **A.**    I DIDN'T UNDERSTAND, I MISSED, WHAT IS YOUR NAME.

10  **Q.**    IN THAT EMAIL WHERE HE TALKED ABOUT ERGUN YILDIZ, DID HE

11  REFER TO ERGUN YILDIZ BY HIS NAME OR -- HE DIDN'T, DID HE?

12  **A.**    NO.

13  **Q.**    HE REFERENCED, I PUT A GERMAN GUY AS THE HEAD OF THE

14  COMPANY.  CORRECT?

15  **A.**    YES.  AS I REMEMBER HE SAID THE GERMAN.

16  **Q.**    OKAY.  THE ANSWER IS YES.  OKAY?

17  **A.**    YES.

18  **Q.**    HE SAID, I DID SO BECAUSE OF MY NATIONALITY.  RIGHT?

19  **A.**    YES, HE SAID.

20  **Q.**    AND YOUR ROLE WAS NOT JUST LIMITED TO THE CONTRACT

21  BECAUSE YOU ALSO SAID YOU WERE THERE TO VERIFY THE PRODUCT --

22  **A.**    YES.

23  **Q.**    -- RIGHT?  BECAUSE YOU HAD AN EXPERTISE, RIGHT?

24  **A.**    I AM EXPERTISE IN MARITIME, MARINE ENGINEERING.

25  **Q.**    SO YOU HAD A SPECIAL EXPERTISE BECAUSE ONE OF THE ITEMS

APRIL 20, 2015

1    THAT MR. TAHERKHANI WAS ACQUIRING WAS MARINE NAVIGATION
2    EQUIPMENT, RIGHT?
3    **A.**    YES, SIR.
4    **Q.**    AND YOU HAVE SOME WORKING KNOWLEDGE OF MARINE NAVIGATION
5    EQUIPMENT.
6    **A.**    THAT IS I KNOW THE -- I AM FAMILIAR WITH THE MARINE
7    EQUIPMENTS, TOTALLY.
8    **Q.**    YOU HAVE A FAMILIARITY WITH MARINE NAVIGATION EQUIPMENT,
9    THOUGH, TOO, RIGHT?
10   **A.**    I AM FAMILIAR WITH THE MARINE EQUIPMENTS.  I KNOW IF YOU
11   CALL ME ABOUT THE ENGINES I CAN TELL YOU THAT.  I KNOW
12   ENGINES, SULZER, MAN.  IF YOU TELL ME CATERPILLAR, I SAID I
13   KNOW ENGINES, HOW IS THE WORKING ENGINES, HOW IS THEY WORK.
14   BUT I AM NOT A SPECIALIST OR EXPERT FOR THE CATERPILLAR
15   ENGINES.
16   **Q.**    FAIR ENOUGH.  FAIR ENOUGH.  BUT YOU KNEW, BASED ON
17   TALKING TO ERGUN YILDIZ, THAT HE DIDN'T HAVE THE SAME
18   BACKGROUND AS YOU IN MARITIME ENGINEERING, RIGHT?
19   **A.**    YES, I HAD -- I SAID I HAVE EXPERIENCE IN MARITIME
20   INDUSTRY AND MARITIME EQUIPMENTS.
21   **Q.**    RIGHT.  AND IN FACT YOU RECALL THE MEETING IN HENDERSON,
22   RIGHT?  AT THE HOTEL SUITE IN LAS VEGAS WHERE YOU VIEWED THE
23   EQUIPMENT, RIGHT?
24   **A.**    SORRY.  CAN YOU REPEAT?
25   **Q.**    DO YOU RECALL THE JUNE 13TH MEETING AT THE SPRING VALLEY

APRIL 20, 2015

1  -- OR THE GREEN VALLEY RANCH?

2  **A.**    YES.

3  **Q.**    OKAY.  WHERE YOU MET WITH DAVID MILLS AND JOHN ERICKSON?

4  **A.**    YES.

5  **Q.**    WHO WE NOW KNOW ARE UNDERCOVER AGENTS?

6  **A.**    YES.

7  **Q.**    AND YOU MET WITH ERGUN YILDIZ, TOO?

8  **A.**    YES, SIR.

9  **Q.**    AND YOUR PURPOSE -- ONE OF YOUR PURPOSES, YOU SAID, WAS

10  TO VERIFY THE EQUIPMENT.

11  **A.**    YES, SIR.

12  **Q.**    AND YOU IN FACT LOOKED AT THE EQUIPMENT.

13  **A.**    YES, I DID.

14  **Q.**    AND IN FACT ONE OF THE THINGS YOU WANT TO DO WAS POWER

15  IT UP TO MAKE SURE THAT IT WORKED.

16  **A.**    IS KOORUSH CAUSED THAT FOR ME.  THAT IS HE SAID TO POWER

17  UP.  I SAID IF THE PLUG IN IS EASY I WILL DO.

18  **Q.**    BECAUSE KOORUSH WANTED TO MAKE SURE HE DIDN'T GET

19  CHEATED, RIGHT?

20  **A.**    THAT IS KOORUSH WANTS THE PRELIMINARY TEST OF THE

21  EQUIPMENT.

22  **Q.**    IS THAT A YES OR A NO?

23  **A.**    CAN YOU REPEAT YOUR QUESTION, PLEASE?

24  **Q.**    KOORUSH WANTED YOU TO TEST THE EQUIPMENT TO MAKE SURE HE

25  WASN'T GETTING CHEATED, THAT THE EQUIPMENT ACTUALLY WORKED.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1   YES OR NO?

2   **A.**   IS THE -- IF YOU BREAK YOUR QUESTION, I ANSWER.  BECAUSE

3   YOU ASKED TWO QUESTIONS, I CANNOT ANSWER YES OR NO.

4   **Q.**   FAIR ENOUGH.

5       YOU WERE TESTING THE EQUIPMENT BECAUSE KOORUSH WAS

6   CONCERNED THAT IT WOULDN'T WORK, RIGHT?

7   **A.**   YES, SIR.

8   **Q.**   BECAUSE HE WAS CONCERNED HE WAS GOING TO BE CHEATED,

9   RIGHT?

10   **A.**   I DIDN'T THINK ABOUT THAT.

11   **Q.**   YOU JUST TESTED IT.

12   **A.**    YES.  THAT WAS MY DUTY.

13   **Q.**   AND YOU WERE ACTING AS THE EXPERT, RIGHT?

14   **A.**   YES.

15   **Q.**   THAT IS HOW MR. YILDIZ, IN FACT, REFERRED TO YOU AT THE

16   MEETING.

17   **A.**   YES.

18   **Q.**   DO YOU REMEMBER THAT?

19   **A.**   YES.

20   **Q.**   SO YOUR INVOLVEMENT IN THIS DEAL STARTED FROM THE VERY

21   BEGINNING, RIGHT?

22   **A.**   YES.

23   **Q.**   TO THE VERY END.

24   **A.**   YES.

25   **Q.**   AND THAT INVOLVED SIX MONTHS.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1    **A.**    YES.

2    **Q.**    OF NEGOTIATIONS.

3    **A.**    NOT NEGOTIATIONS.  IF YOU ATTEND TO CONTRACT IT WAS

4    DELIVER THE ITEMS 120 DAYS.

5    **Q.**    FAIR ENOUGH.  NOT NEGOTIATIONS, OF EXTENDED

6    COMMUNICATIONS.  IS THAT FAIR?

7    **A.**    IS FAIR FOR YOU, YES.

8    **Q.**    IT IS NOT WHETHER IT IS FAIR FOR ME, SIR, REALLY.  IS IT

9    A FAIR STATEMENT THAT YOU HAD EXTENDED COMMUNICATIONS WITH

10    DAVID MILLS OVER SIX MONTHS?

11    **A.**    YES.  I HAVE THE NEGOTIATION FOR SEVERAL DIFFERENT

12    BUSINESS OPPORTUNITY AND DIFFERENT -- OTHER OCCASIONAL INQUIRY

13    THAT TIG MARINE HAD.

14    **Q.**    BUT THE FOCUS OF THOSE COMMUNICATIONS, SIR, WAS THE

15    Y-690 CONTRACT AND THE GYRO CONTRACT, WASN'T IT?

16    **A.**    NO.  IT WAS THESE TWO ALSO IN OUR DISCUSSION.

17    **Q.**    LET ME ASK YOU THE QUESTION AGAIN.  YES OR NO.  WAS THE

18    --

19    **A.**    YES, SIR.  YES.

20    **Q.**    FAIR ENOUGH.  OKAY.

21        NOW, FOLLOWING YOUR ARREST YOU WERE INTERVIEWED BY

22    AGENTS OF THE DEPARTMENT OF HOMELAND SECURITY, RIGHT?

23    **A.**    PARDON, SIR?

24    **Q.**    FOLLOWING YOUR ARREST YOU WERE INTERVIEWED BY AGENTS,

25    RIGHT?

APRIL 20, 2015

GHAHREMAN - CROSS-EXAMINATION

1    **A.**    YES, SIR.

2    **Q.**    AND ONE OF THOSE WAS AGENT HAMAKO, SITTING RIGHT HERE.

3    **A.**    YES, SIR.

4    **Q.**    AND YOU LEARNED THAT THE AGENTS RECORDED YOUR INTERVIEW,

5    CORRECT?

6    **A.**    YES, SIR.

7    **Q.**    AND IN FACT --

8    **A.**    AS HE TOLD ME.

9    **Q.**    HE TOLD YOU.

10   **A.**    YES.

11   **Q.**    AND IN FACT YOU HAVE HAD AN OPPORTUNITY TO REVIEW THAT

12   RECORDING, RIGHT?

13   **A.**    YES, SIR.

14   **Q.**    OKAY.  AND LISTEN TO IT ON MORE THAN ONE OCCASION?

15   **A.**    YES, SIR.

16          **MR. HARRIGAN:**  ONE MOMENT.

17   **Q.**   **(MR. HARRIGAN)** ONE OF THE FIRST THINGS AGENT HAMAKO

18   ASKED YOU IF YOU KNEW WHETHER THE CUSTOMER FOR THE

19   NAVIGAT-2100 WAS AN IRANIAN COMPANY, CORRECT?  THAT IS WHAT HE

20   ASKED YOU?

21   **A.**    YES, HE ASKED.

22   **Q.**    AND YOU TOLD HIM THAT KOORUSH TOLD YOU IT GO TO IRAN OR

23   SOMETHING.

24          **MR. JOHNSTON:**  YOUR HONOR, I WILL JUST MAINTAIN MY

25   PREVIOUS PRETRIAL OBJECTIONS.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

```
 1            THE COURT:  YES.

 2            MR. JOHNSTON:  THANK YOU.

 3            THE WITNESS:  IS IF YOU PLAY -- REPLAY THAT.  THAT

 4   IS I DON'T REMEMBER WHAT YOU SAID EXACTLY.

 5   Q.   (MR. HARRIGAN) OKAY.  FAIR ENOUGH.

 6   A.   THAT IS MY WORDS.

 7            MR. HARRIGAN:  I JUST WANT TO SHOW THIS TO THE

 8   DEFENDANT, ALL RIGHT?  NOT THE JURY.  OKAY?

 9            THE CLERK:  OKAY.

10   Q.   (MR. HARRIGAN) I AM GOING TO SHOW YOU A TRANSCRIPT.

11   A.   YES, SIR.

12   Q.   THAT IS MARKED GOVERNMENT'S EXHIBIT 901 FOR

13   IDENTIFICATION.  CAN YOU SEE THAT, SIR?

14            (EXHIBIT 901 MARKED FOR IDENTIFICATION)

15   A.   YES, SIR.

16            MR. HARRIGAN:  PAGE 2.

17   Q.   (MR. HARRIGAN) AND DIRECTING YOUR ATTENTION TO LINE 18

18   OF THAT TRANSCRIPT, AGENT HAMAKO ASKED YOU THE FOLLOWING

19   QUESTION:  WHO EXACTLY DID KOORUSH TELL YOU THEY WERE GOING

20   TO, THE NAVIGAT-2100'S?

21        YOU REMEMBER THAT, SIR, RIGHT?

22   A.   YES, SIR.

23   Q.   AND YOUR ANSWER WAS:  THE NAVIGAT-2100, THAT IS I CAN'T

24   TELL YOU THAT IS IT GO TO IRAN OR SOMETHING.

25        THAT WAS YOUR WORDS, RIGHT?
```

APRIL 20, 2015

1   **A.**   YES, SIR.

2   **Q.**   AND WHEN ASKED ABOUT WHO WAS GOING TO USE THE

3   NAVIGAT-2100.  ALL RIGHT?  YOU SAID IT WAS GOING TO A COMPANY

4   CALLED VALFAJR, RIGHT?

5   **A.**   I REMEMBER I CALLED VALFAJR-HASHT.

6   **Q.**   THE QUESTION IS, WHEN ASKED WHICH COMPANY IT WAS GOING

7   TO IN IRAN YOU SAID VALFAJR, CORRECT?

8   **A.**   YES.

9   **Q.**   THAT IS VALFAJR-HASHT?

10   **A.**   YES.

11   **Q.**   THAT MEANS -- HASHT MEANS 8 IN FARSI?

12   **A.**   YES.

13   **Q.**   AND THAT IS HEADQUARTERED IN IRAN, RIGHT?  VALFAJR.  YOU

14   KNEW THAT.

15   **A.**   IS THE VALFAJR IS I SAID THE SUBSIDIARY AS THE IRISL.

16   **Q.**   AND YOU SAID YOU KNEW IT WAS AN IRANIAN COMPANY,

17   CORRECT?

18   **A.**   IS THE PART OF THE COMPANY, I SAID, THIS IS PARTIAL

19   IRANIAN.

20   **Q.**   IT IS PARTIALLY IRANIAN.  YOU KNEW IT WAS AN IRANIAN

21   SHIPPING COMPANY, CORRECT?

22   **A.**   YES.  THAT IS THE PART OF THE IRISL THAT IS THE -- IS

23   THE -- I EXPERIENCED THAT.  I DON'T KNOW ABOUT THE WHAT IS THE

24   OWNERSHIP IN THAT AREA MAYBE.  BUT WE WERE TALKING ABOUT

25   VALFAJR AND I GAVE MY INFORMATION TO THEM.

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1   **Q.**    LET'S LOOK AT THAT, THEN.  I WANT TO DIRECT YOUR

2   ATTENTION TO PAGE 6.  ALL RIGHT?  THE TOP OF THE PAGE.

3        AGENT HAMAKO ASKED:  BUT YOU KNEW THAT VALFAJR WORKS

4   WITH IRISL, THAT IS THE ISLAMIC REPUBLIC OF IRAN SHIPPING

5   LINES, AND IS PART OF IRISL, ISLAMIC REPUBLIC OF IRAN SHIPPING

6   LINES, YES?

7   **A.**    YES, I SAID.

8   **Q.**    HE ASKED YOU THAT.

9   **A.**    YES, I SAID THAT.

10  **Q.**    AND YOU ANSWERED THAT AS, YES, THAT I KNOW.

11  **A.**    YES.

12  **Q.**    AND LATER ON, AT THE BOTTOM OF THE PAGE, AT LINE 24, HE

13  ASKED YOU:  AND YOU KNEW THAT VALFAJR IS AN IRANIAN SHIPPING

14  COMPANY, YES?

15       HE ASKED YOU THAT QUESTION, RIGHT?

16  **A.**    IS THE –– YES.

17  **Q.**    AND YOUR RESPONSE WAS:  YES, THIS IS A LIE IF I SAID NO.

18  **A.**    YES, THAT IS I KNOW THAT IS THE PARTIAL WITH THE IRISL

19  COMPANY.

20  **Q.**    SO YOU TOLD AGENT HAMAKO VALFAJR WAS AN IRANIAN SHIPPING

21  COMPANY, CORRECT?

22  **A.**    I SAID –– HE SAID, AND I CONFIRM YES, IT IS PARTIALLY

23  FROM IRANIAN, YES.

24  **Q.**    SIR, MY QUESTION WAS NOT PARTIALLY.  YOU TOLD HIM HERE

25  THAT VALFAJR WAS AN IRANIAN SHIPPING COMPANY.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1    **A.**    YES, I SAID THAT YOU SEE.

2            **THE COURT:**  MR. HARRIGAN, IS THIS A GOOD POINT TO

3    BREAK?

4            **MR. HARRIGAN:**  YES.

5            WE WILL TAKE 15 MINUTES HERE, WE WILL PICK UP AT

6    12:30.  THANK YOU.

7            (RECESS)

8            **THE COURT:**  WE ARE BACK ON THE RECORD WITH ALL

9    PRESENT.

10           MR. HARRIGAN.

11   **Q.**    **(MR. HARRIGAN)** I THINK, MR. GHAHREMAN, WHEN WE LEFT OFF

12   I WAS ASKING ABOUT YOUR POST-ARREST INTERVIEW.

13   **A.**    YES.

14   **Q.**    AND AGENT HAMAKO ASKED YOU ABOUT THE CUSTOMER OR END

15   USER FOR THE NAVIGAT-2100, CORRECT?

16   **A.**    YES.

17   **Q.**    OKAY.  AND HE ALSO ASKED YOU, IN ADDITION TO WHAT

18   COMPANY, WHAT VESSEL IT WAS GOING TO GO ON, RIGHT?

19   **A.**    IS THE --

20   **Q.**    WHAT SHIP.  WHAT VESSEL IT WAS GOING TO BE USED ON.

21   **A.**    CAN YOU REPLAY OR SAY WITH THE TRANSCRIPTION?

22   **Q.**    WELL, LET ME REPHRASE THE QUESTION.

23           WHEN AGENT HAMAKO ASKED YOU WHAT VESSEL IT WAS GOING TO

24   BE INSTALLED ON YOU SAID YOU DIDN'T KNOW, RIGHT?  YOU DIDN'T

25   KNOW THE NAME OF THE SHIP, RIGHT?

APRIL 20, 2015

GHAHREMAN — CROSS-EXAMINATION

1   **A.**   I DIDN'T SAY THAT IS THE —— I DON'T REMEMBER I SAID THAT

2   HE ASKED WHICH VESSEL AND I SAID I DIDN'T KNOW WHICH VESSEL.

3   **Q.**   YES, YOU DIDN'T KNOW WHAT VESSEL, RIGHT?

4   **A.**   I DIDN'T REMEMBER WHAT YOU SAID.  I DIDN'T RECALL WHAT

5   YOU SAID.  THE WORDS YOU SAID, I DIDN'T RECALL.

6   **Q.**   OKAY.  SO YOU DON'T RECALL BEING ASKED WHICH VESSEL IT

7   WENT ON.

8   **A.**   THAT IS THE VESSEL WAS THE WESAL-5 OR WESAL SHIPPING

9   COMPANY.

10   **Q.**   AND WHAT I AM ASKING ABOUT, WERE YOU TOLD BY KOORUSH THE

11   SPECIFIC VESSEL IT WAS GOING TO GO ON, THE NAME OF THE VESSEL?

12   **A.**   NO.

13   **Q.**   OKAY.  AND IN FACT YOU HAD NO IDEA WHERE IT WAS GOING TO

14   BE INSTALLED, RIGHT?

15   **A.**   THAT TIME IT WAS NOT THE CONVERSATION OF ME AND MR.

16   WIFE[PH].  IF YOU REFER TO THAT CONVERSATION, I DON'T KNOW

17   WHAT YOU ARE TALKING ABOUT.

18   **Q.**   OKAY.  WELL, AGAIN LET ME DIRECT YOU TO GOVERNMENT'S

19   EXHIBIT 901, WHICH IS THE TRANSCRIPT.  AND IN THAT I WILL

20   DIRECT YOUR ATTENTION TO THE HIGHLIGHTED PORTION.  YOU SAY:

21   IF THEY INSTALL IN THE COLUMBIA OR CHILE, I DON'T CARE.

22        THOSE ARE YOUR WORDS, RIGHT?

23   **A.**   THAT IS, YES, MY WORDS.

24   **Q.**   RIGHT.  IN OTHER WORDS, YOU HAD NO IDEA WHERE THIS

25   GYROCOMPASS THAT WAS BEING PROVIDED TO TIG MARINE WAS GOING TO

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1   BE INSTALLED, RIGHT?

2   **A.**   IT DOESN'T MY MEANING THESE WORDS.

3   **Q.**   THAT IS YOUR MEANING, RIGHT?

4   **A.**   NO.

5   **Q.**   SO YOU KNEW WHERE IT WAS GOING TO BE INSTALLED.

6   **A.**   THAT IS WHAT THE KOORUSH INFORMED TO ME, YES.

7   **Q.**   AND HE ONLY TOLD YOU IT WAS GOING TO VALFAJR, RIGHT?

8   **A.**   NO, NOT VALFAJR.  GIVE FOR THE END USER INFORMATION

9   WESAL SHIPPING COMPANY.

10  **Q.**   I AM TALKING ABOUT YOUR POST-ARREST INTERVIEW.  VALFAJR

11  IS NOT WESAL SHIPPING, CORRECT?

12  **A.**   NO.

13  **Q.**   AND IN YOUR POST-ARREST INTERVIEW YOU SAID THE

14  NAVIGAT-2100 WAS GOING TO VALFAJR, AN IRANIAN SHIPPING

15  COMPANY, RIGHT?

16  **A.**   I EXPRESS MY GUESS AND WHAT IS THE MY ANALYZED, BECAUSE

17  AGENT HAMAKO, AGENT PUSH ME TO HELP HIM.  AND AS THE HOMELAND

18  SECURITY WHEN HE IS PUSH ME, THAT'S THE ONLY PERSON I CAN

19  TRUST THAT TIME TO GIVE ALL MY THINGS, MY ANALYZES, AND MY

20  GUESSES TO HIM.

21  **Q.**   OKAY.

22  **A.**   THAT IS I GAVE MY --

23  **Q.**   YOUR GUESS WAS BASED ON WHAT KOORUSH TAHERKHANI TOLD

24  YOU, RIGHT?

25  **A.**   ONCE HE TOLD ME THAT IS THE IRANIAN SHIPPING COMPANY.

APRIL 20, 2015

GHAHREMAN — CROSS-EXAMINATION

1  **Q.**    THAT DIDN'T COME FROM AGENT HAMAKO, CORRECT?

2  **A.**    HUH?

3  **Q.**    VALFAJR SHIPPING COMPANY DIDN'T COME FROM AGENT HAMAKO,

4  RIGHT?

5  **A.**    NO, THAT CAME --

6  **Q.**    IT CAME FROM YOU, RIGHT?

7  **A.**    YES, SIR.

8  **Q.**    AND IT IS A FAIR STATEMENT THAT YOU HEARD THAT FROM

9  KOORUSH TAHERKHANI.

10  **A.**    IS I NEVER HEARD FROM KOORUSH TAHERKHANI.

11  **Q.**    YOU TOLD AGENT HAMAKO THAT YOU HEARD FROM KOORUSH

12  TAHERKHANI THAT IT WAS GOING TO VALFAJUR, CORRECT?

13  **A.**    YES.  I EXPRESS ALL OF MY GUESS AND EVERYTHING I SAID I

14  HEARD FROM KOORUSH TAHERKHANI.

15  **Q.**    FINE.  AGENT HAMAKO ALSO ASKED YOU ABOUT THE ULTIMATE

16  END USER OR CUSTOMER FOR THE Y-690 DURING THAT INTERVIEW,

17  CORRECT?

18  **A.**    YEAH, HE ASKED ME.

19  **Q.**    RIGHT.  AND YOU SAID YOU HEARD IT WAS FOR AN AIRPORT IN

20  IRAN, CORRECT?

21  **A.**    I DIDN'T SAY THAT I HEARD FOR IRAN.

22  **Q.**    WELL, AGAIN LET ME SHOW YOU THE TRANSCRIPT, AT PAGE 17,

23  STARTING AT LINE 11.  CAN YOU FOLLOW ME?  SEE THAT?  IT IS

24  HIGHLIGHTED.

25  **A.**    YES.

APRIL 20, 2015

GHAHREMAN - CROSS-EXAMINATION

1  **Q.**    AGENT HAMAKO ASKED YOU:  BUT YOU KNEW IT WAS AN AIRPORT

2  IN IRAN.

3       AND YOUR RESPONSE WAS:  THAT IS WHAT I HEARD.

4       THOSE WERE YOUR WORDS, RIGHT?  THAT IS WHAT I HEARD.

5  **A.**    YOU LISTEN TO NEXT ALSO.

6  **Q.**    WE CAN GO ON.  BUT THAT IS WHAT YOU SAID THERE, RIGHT?

7  THAT IS WHAT I HEARD.

8  **A.**    THAT IS THE -- YES, THAT IS WHAT I HEARD.  THAT IS MY

9  NORMAL IMPRESSION, BUT YOU SHOULD LISTEN TO NEXT.

10  **Q.**    MY QUESTION, THOUGH, IS YOUR INITIAL RESPONSE TO AGENT

11  HAMAKO --

12  **A.**    I APPROVE THESE WORDS YOU PUT IN HERE, YELLOW CONTENT.

13  **Q.**    I AM SORRY, MR. GHAHREMAN.  I DON'T MEAN TO INTERRUPT

14  YOU.  I REALLY DON'T.  I KNOW YOU WANT TO ANSWER, BUT PLEASE

15  LISTEN TO MY QUESTION.  I WILL GIVE YOU THE OPPORTUNITY TO

16  ANSWER, I KNOW YOU WANT TO ANSWER.  BUT I HAVE TO ASK THE

17  QUESTION, THEN YOU ANSWER.  OTHERWISE THE COURT REPORTER IS

18  GOING TO SHOOT PROBABLY BOTH OF US.  ALL RIGHT?

19  **A.**    SORRY FOR INTERRUPTION.  I DIDN'T WANT TO --

20  **Q.**    NO, NO APOLOGY --

21  **A.**    I DON'T WANT TO INTERRUPT YOU, BUT THIS IS MY FIRST TIME

22  IN COURT TOO.

23  **Q.**    NO APOLOGIES NEEDED.  ALL RIGHT?

24  **A.**    SORRY, SIR.

25  **Q.**    SIR, YOUR ANSWER WAS, AT THAT POINT, IN FAIRNESS, YOU

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1    SAID:  THAT IS WHAT I HEARD.

2    **A.**    THAT IS WHAT I HEARD.

3    **Q.**    YES?

4    **A.**    YES, SIR.

5    **Q.**    THANK YOU.  I APPRECIATE THAT.

6          AND THEN LATER WHEN YOU WERE PRESSED YOU SAID:  ITS

7    REALLY THAT MY UNDERSTANDING, LIKE YOUR UNDERSTANDING, WHEN

8    SAID AIRPORT I SUSPECTED TO IRANIAN AIRPORT.

9          RIGHT?

10   **A.**    YES, SIR.

11   **Q.**    THOSE ARE YOUR WORDS?

12   **A.**    THAT IS MY WORDS.

13   **Q.**    SO YOU SUSPECTED THAT THE Y-690 WAS GOING TO AN IRANIAN

14   AIRPORT.

15   **A.**    YES, SIR.  AND I PREFER TO LISTEN NEXT, IN THE BODY, IN

16   THE CONTEXT OF ALL OF MY WHAT I SAID.

17   **Q.**    SO THE ANSWER TO THAT IS YES, YOU TOLD AGENT HAMAKO THAT

18   YOU SUSPECTED IT WAS GOING TO AN IRANIAN AIRPORT.

19   **A.**    YES.

20   **Q.**    NOW, ON DIRECT YOU SAID YOU KNEW ABOUT THE PROBLEMS OF

21   SANCTIONS, RIGHT?

22   **A.**    YES, I KNEW.

23   **Q.**    ALL RIGHT.  AND YOU KNEW VERY WELL BECAUSE YOU LIVED

24   UNDER THEM, RIGHT?

25   **A.**    YES, I WAS IN IRAN.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1   Q.   UNTIL THE AGE OF 37, RIGHT?

2   A.   YES, SIR.

3   Q.   SO, IN FACT, YOU WERE BORN IN 1970, RIGHT?

4   A.   YES, SIR.

5   Q.   AND YOU NOW -- AND THE SANCTIONS, AS THEY NOW ARE IN

6   PLACE, WERE IN PLACE SINCE 1995, CORRECT?

7   A.   I DON'T KNOW EXACTLY WHAT DATE BECAUSE THE DATE OF THE

8   SANCTION IN UNITED STATES PUT SANCTION I WAS IN IRAN.  THIS IS

9   THE LAW IN THE UNITED STATES.  I HEARD ABOUT THE SANCTION

10  MAYBE YEARS LATER, OR WE KNOW THAT AMERICA DOESN'T GIVE ANY

11  PRODUCT TO IRAN.  THAT IS MY UNDERSTANDING OF SANCTION.

12  Q.   RIGHT.  AND YOU KNEW ABOUT THAT WHILE YOU WERE IN IRAN

13  FOR SOME TIME, RIGHT?

14  A.   PARDON?  I DON'T UNDERSTAND.

15  Q.   WHILE YOU WERE GOING TO SCHOOL YOU KNEW ABOUT THE

16  SANCTIONS.  WHILE YOU WERE WORKING -- PARDON ME.  WHILE YOU

17  WERE WORKING FOR THE SHIPPING INDUSTRY YOU KNEW ABOUT THE

18  IRANIAN SANCTIONS.

19  A.   I HEARD.

20  Q.   YOU HEARD.  AND YOU EXPERIENCED THEM FIRSTHAND, RIGHT?

21  A.   PARDON?

22  Q.   YOU EXPERIENCED THEM FIRST HAND BY BEING A RESIDENT OF

23  IRAN, CORRECT?

24  A.   YES.

25  Q.   BECAUSE MANY GOODS THAT IRAN USED TO RELY ON BEFORE THE

1    FALL OF THE SHAH CAME FROM THE UNITED STATES.

2    **A.**    YES, SIR.

3    **Q.**    AND, IN FACT, BEFORE THE FALL OF THE SHAH MOST OF THE

4    IRANIAN FLEET WAS U.S. BUILT SHIPS, CORRECT?

5    **A.**    LACK OF KNOWLEDGE.

6    **Q.**    YOU HAVE LACK OF KNOWLEDGE OF THAT?

7    **A.**    YES, SIR.

8    **Q.**    SO --

9    **A.**    AS I KNOW SOMETHING THAT IS ABOUT THIS, IS MY KNOWLEDGE.

10   **Q.**    OKAY.

11   **A.**    ITALIAN, BRITISH, IS GERMAN NAVY SHIPS, OR WHAT IS

12   AVAILABLE IN MAYBE IN THE IRANIAN FLEETS.

13   **Q.**    OKAY.

14   **A.**    SHIPPING.

15   **Q.**    AND INCLUDING THE UNITED STATES, RIGHT?

16   **A.**    IS INCLUDING --

17   **Q.**    WESTERN PARTS.

18   **A.**    IS HONEST WITH YOU, LACK OF KNOWLEDGE.  I KNOW THAT IS

19   UNITED STATES ALSO WAS INVOLVED IN THE EXPORT FOR THAT TO

20   IRAN, YES.

21   **Q.**    THE UNITED STATES WAS A SUPPORTER OF IRAN BEFORE THE

22   FALL OF THE SHAH, CORRECT?

23   **A.**    MY AGE IS I WAS SEVEN, EIGHT YEARS.  I DON'T KNOW.

24   **Q.**    WELL, YOU KNOW THE RELATIONSHIP SOURED AFTER THE SHAH

25   LEFT, RIGHT?  YOU TESTIFIED TO THAT.  AFTER THE FALL OF THE

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1   SHAH YOU AND YOUR FAMILY EXPERIENCED PROBLEMS; ISN'T THAT
2   RIGHT?
3   **A.**    YES, BUT IS --
4   **Q.**    OKAY.
5   **A.**    BUT BECAUSE IT IS OF U.S.?
6   **Q.**    ALL RIGHT.  SO AT THE TIME -- LET'S GO BACK TO WHAT YOU
7   KNEW WHILE YOU WERE DEALING WITH DAVID MILLS.  YOU KNEW ABOUT
8   THE IRAN TRADE SANCTIONS, RIGHT?
9   **A.**    YES, SIR.
10  **Q.**    AND YOU KNEW, AS YOU SAID, GOODS WERE PROHIBITED FROM
11  GOING TO IRAN, RIGHT?
12  **A.**    PARDON?
13  **Q.**    YOU KNEW GOODS WERE PROHIBITED FROM GOING TO IRAN.
14  **A.**    YES.
15  **Q.**    FROM THE U.S.
16  **A.**    YES.
17  **Q.**    OKAY.  INCLUDING ITEMS LIKE THE NAVIGAT-2100, RIGHT?
18  **A.**    FOR ME THAT IS I DIDN'T LOOK AT WHAT TYPE PRODUCT.  IS
19  TOTALLY I KNEW THAT ALMOST ALL PRODUCTS IS FORBIDDEN FROM
20  AMERICA GO TO --
21  **Q.**    FAIR ENOUGH.  AND THAT INCLUDED THE NAVIGAT-2100.
22  **A.**    YES, SIR.
23  **Q.**    AND THE Y-690'S.
24  **A.**    YES, SIR.
25  **Q.**    OKAY.  AND YOU PROBABLY ALSO GAINED SOME OF THIS

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1   KNOWLEDGE FROM YOUR WORK IN THE U.S. SHIPPING INDUSTRY,

2   CORRECT?

3   **A.**    YES.

4   **Q.**    YOU GAINED SOME OF THIS KNOWLEDGE FROM YOUR WORK IN THE

5   U.S. SHIPPING INDUSTRY, RIGHT?

6   **A.**    NO, SIR.

7   **Q.**    WELL, YOU WORKED AS A VENDOR, RIGHT?  WHERE YOU HAD TO

8   BUY PRODUCTS?

9   **A.**    I USE AS VENDOR WHERE, SIR?

10  **Q.**    YOU DEALT WITH VENDORS WHERE YOU HAD TO GET PRODUCTS FOR

11  REPAIRING SHIPS, RIGHT?

12  **A.**    CAN YOU MENTION TIMING OF THIS, SIR?

13  **Q.**    WHEN YOU WERE IN THE U.S.

14  **A.**    YES.

15  **Q.**    WHEN YOU WORKED FOR EITHER AKER SHIPYARD OR CADDELL DRY

16  DOCK OR GMD SHIPYARD.

17  **A.**    YES, SIR.

18  **Q.**    PART OF YOUR JOB RESPONSIBILITIES WORKING FOR SOME OF

19  THOSE COMPANIES WAS SHIP REPAIR.

20  **A.**    SUPPLIER, VENDORS, YES, SIR.

21  **Q.**    YOU DEALT WITH SUPPLIERS AND VENDORS.

22  **A.**    YES, SIR.

23  **Q.**    AND YOU KNEW OFTEN THEY WANTED TO KNOW WHERE THE ITEM

24  WAS GOING, RIGHT?

25  **A.**    IS THE NORMALLY WE HAD THE COMMUNICATION, SOMETIMES THEY

APRIL 20, 2015

1   ASKED FOR THE SHIP'S INFORMATION AND THEN --

2   **Q.**   SOMETIMES THEY ASKED FOR THAT.

3   **A.**   YES.

4   **Q.**   AND YOU KNEW THAT ONE OF THE REASONS THEY ASKED FOR THAT

5   SHIP INFORMATION BECAUSE THEY WANTED TO MAKE SURE THEY ARE

6   COMPLYING WITH U.S. EXPORT LAWS, RIGHT?

7   **A.**   IS THAT AS MY UNDERSTANDING THE POLICY OF SOME COMPANY

8   THEY NEED THE END USER FOR SECURITY PURPOSES.  THAT IS THE

9   SECURITY PURPOSES IS SURE IS CONSTANT LAW.  WHICH LAW, I DON'T

10  KNOW.

11  **Q.**   EXPORT LAWS, RIGHT?

12  **A.**   I DON'T KNOW.  THAT'S THE EXPORT LAW, IMPORT LAW.  IS

13  THAT BECAUSE SOMETIMES IS THE EQUIPMENT COMING FROM AROUND THE

14  WORLD FOR THE SHIPS INSIDE THE UNITED STATES.  THAT IS -- THIS

15  IS NOT IN MY EXPERTISE TO KNOW WHICH LAW.  JUST I WANT THE

16  SECURITY PURPOSES IT MEANS THAT IS FOR POLICY THE COMPANY TO

17  PUT TO FOLLOW THE LAW AND THE LEGAL THINGS.

18  **Q.**   NOW, IN ADDITION TO KNOWING ABOUT THE TRADE SANCTIONS

19  FROM LIVING IN IRAN, YOU ALSO RECEIVED EDUCATION ON THE

20  SANCTIONS HERE IN THE UNITED STATES; ISN'T THAT RIGHT?

21  **A.**   YES, SIR.

22  **Q.**   OKAY.  AND BECAUSE YOU WERE GOING TO SCHOOL AT SUNY

23  MARITIME COLLEGE, CORRECT?

24  **A.**   YES, SIR.

25  **Q.**   AND YOU WERE A GRADUATE STUDENT IN INTERNATIONAL

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1   MARITIME TRANSPORTATION?

2   **A.**    YES, SIR.

3   **Q.**    ONE OF THE COURSES YOU TOOK WAS A COURSE TAUGHT BY

4   PROFESSOR JANIS SCHULMEISTERS?

5   **A.**    YES, SIR.

6   **Q.**    AND THAT WAS CALLED INTERNATIONAL BUSINESS AND

7   TRANSPORTATION LAW?

8   **A.**    IT IS ONE OF MY COURSES.

9   **Q.**    AND THERE WAS ASSIGNED TEXT FOR THAT, CORRECT?

10   **A.**    PARDON?

11   **Q.**    THERE WAS AN ASSIGNED TEXT, REQUIRED READING FOR THAT,

12   CORRECT?

13   **A.**    IS THAT THEY HAVE SYLLABUS, YES.

14   **Q.**    IS THE ANSWER YES, SIR?

15   **A.**    I DON'T UNDERSTAND YOUR QUESTION FOR THIS.  I SAID -- I

16   THINK YOU SAID ABOUT THE SYLLABUS AND I SAID SYLLABUS.  CAN

17   YOU REPEAT THE QUESTION?

18   **Q.**    WAS THERE A SYLLABUS FOR THE COURSE?

19   **A.**    I SAID THAT IS THAT WE HAD SYLLABUS.  I ANSWERED IN THE

20   BEGINNING WE HAD SYLLABUS.

21   **Q.**    I DIDN'T HEAR YOUR ANSWER, SIR.

22   **A.**    SORRY, SORRY, SIR.

23   **Q.**    I ASKED A DIFFERENT QUESTION ABOUT THE TEXT, SO NOW I AM

24   ASKING ABOUT THE SYLLABUS.  WAS THERE A SYLLABUS FOR THE

25   COURSE?

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **A.**     YES, SIR.

2   **Q.**     THAT SYLLABUS HAD REQUIRED READING, RIGHT?

3   **A.**     YES.

4   **Q.**     AND ONE OF THE THOSE -- AND THE ONLY REQUIRED READING

5   FOR THAT COURSE WAS A BOOK THAT YOU SAW INTRODUCED IN COURT

6   HERE TODAY.

7   **A.**     IS THE TEXT -- YES, THE TEXTBOOK ALSO FOR THE -- ANY

8   PROFESSOR IS THAT SUCH AS TWO, THREE TEXTBOOKS FOR THE COURSE.

9   **Q.**     THERE WAS TWO OR THREE TEXTBOOKS ASSIGNED FOR THIS

10  COURSE?

11  **A.**     I DON'T REMEMBER THAT IS FOR THAT COURSE, BUT IS MAYBE

12  IS ONE PROFESSOR INTRODUCE ONE TEXTBOOK, OR TWO, THREE.  YOU

13  KNOW, THIS IS SOMETIMES THEY GOING TO TWO, THREE BECAUSE THE

14  STUDENT WITH -- THE STUDENT AVAILABILITY -- OR BOOK

15  AVAILABILITY FOR STUDENTS.

16  **Q.**     LET ME SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S

17  EXHIBIT 902 FOR IDENTIFICATION, AND ASK YOU TO TAKE A LOOK AT

18  THAT.  IT IS A SYLLABUS FOR INTERNATIONAL BUSINESS AND

19  TRANSPORTATION LAW FOR PROFESSOR JANIS SCHULMEISTERS.  DO YOU

20  RECOGNIZE THAT?

21            (EXHIBIT 902 MARKED FOR IDENTIFICATION)

22  **A.**     I AM SURE I DID THAT, THE SYLLABUS.

23  **Q.**     DOES THIS APPEAR TO BE THE SAME SYLLABUS THAT YOU GOT

24  FOR THE COURSE?

25  **A.**     I CANNOT RECALL THAT IS THE SAME SYLLABUS IN MY READING

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1    THAT TIME, BUT THEY DON'T CHANGE.  NORMALLY, THEY DON'T

2    CHANGE.  BUT, YOU KNOW, IS JUST IN THE SOMETIMES IS BECAUSE

3    THE SCHOOL GIVE THEM SOME INSTRUCTION TO CHANGE THE SYLLABUS

4    THAT PROFESSOR THEY WILL CHANGE THE SYLLABUS.

5    **Q.**    LOOKING AT PAGE 2, YOU SEE THE REQUIRED READING FOR

6    THAT, CORRECT?  DIRECTING YOUR ATTENTION TO --

7    **A.**    YES.

8    **Q.**    OR REQUIRED TEXT.

9    **A.**    YES.

10   **Q.**    ALL RIGHT.

11   **A.**    YES.

12   **Q.**    AND THAT'S THE SAME REQUIRED TEXT YOU HAD WHEN YOU TOOK

13   THE COURSE, RIGHT?  AND IT WAS FOUND IN YOUR APARTMENT?

14   **A.**    YES.  I DON'T REMEMBER WHICH EDITION I HAD, YES.

15   **Q.**    YOU DON'T REMEMBER WHAT EDITION YOU HAD.

16   **A.**    YEAH.

17   **Q.**    ALL RIGHT.  DID YOU HAVE THE SEVENTH EDITION?

18   **A.**    IS I LOANED THIS BOOK FROM MY FRIEND, THAT IS MY

19   CLASSMATE.  IS THAT REALLY THIS ONE I DON'T KNOW.  I THINK IT

20   IS SEVENTH EDITION I HAVE.

21   **Q.**    YOU THINK IT IS SEVENTH EDITION?

22   **A.**    YES.  IT IS HERE, YOU CAN CHECK IT.  I THINK IT IS.

23   **Q.**    AND DIRECTING YOUR ATTENTION TO THE THIRD PAGE WHICH

24   TALKS ABOUT REQUIRED READING.  ONE OF THEM IS CHAPTER 13,

25   RIGHT?  REQUIRED TEXT AND READING.  AND THAT INVOLVES THE

GHAHREMAN – CROSS-EXAMINATION

1   REGULATION OF EXPORTS, RIGHT?

2   **A.**    YES.

3   **Q.**    SO THAT WAS PART OF YOUR COURSE WHEN YOU TOOK THAT IN --

4   I BELIEVE IT WAS THE SPRING OF 2013?

5   **A.**    YES.

6   **Q.**    I WANT TO TALK TO YOU A LITTLE BIT ABOUT YOUR

7   RELATIONSHIP WITH MR. TAHERKHANI --

8   **A.**    YES.

9   **Q.**    -- AND YOUR FIRST CONTACT WITH HIM, BEFORE YOUR CONTACT

10  WITH DAVID MILLS, YOU NOW KNOW AS AGENT COLE, OKAY?

11  **A.**    YES.

12  **Q.**    YOU BOTH GREW UP IN IRAN, RIGHT?

13  **A.**    YES, SIR.

14  **Q.**    YOU BOTH WENT TO THE SAME COLLEGE, CORRECT?

15  **A.**    YES, SIR.

16  **Q.**    YOU BOTH MAJORED IN THE SAME DEGREE, MARINE ENGINEERING,

17  RIGHT?

18  **A.**    IS THE MAJOR, YES, SIR.

19  **Q.**    OKAY.  AND YOU BOTH GRADUATED FROM AMIR KABIR

20  UNIVERSITY.

21  **A.**    YES, SIR.

22  **Q.**    WHICH IS IN BANDAR ABBAS.

23  **A.**    OUR CAMPUS OR OUR MARITIME COLLEGE WAS IN BANDAR ABBAS.

24  **Q.**    AND YOUR EMPHASIS WAS IN SHIPBUILDING, RIGHT?

25  **A.**    YES, MY CONCENTRATION IN SHIPBUILDING.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **Q.**    AND YOU WERE DORM MATES, CORRECT?

2   **A.**    YES, SIR.

3   **Q.**    THAT MEANS YOU SAW HIM FOR APPROXIMATELY FOUR YEARS ON A

4   DAILY BASIS?

5   **A.**    IS LIKE PER -- MAYBE TWO, THREE TIMES WE SEE.  SOMETIMES

6   MAYBE MORE.  BUT, YES, WE WERE IN THE ONE BUILDING, SIR.

7   **Q.**    AND YOU WERE FRIENDLY.

8   **A.**    SURE.  WE CLASSMATE AND FRIEND.

9   **Q.**    YOU CONSIDERED HIM A FRIEND AT THAT TIME, CORRECT?

10  **A.**    THAT TIME, YES.

11  **Q.**    AND AFTER YOU GRADUATED YOU BOTH WORKED IN THE SAME

12  INDUSTRY.

13  **A.**    YES, SIR.

14  **Q.**    AND HE WAS CHIEF ENGINEER -- HE BECAME CHIEF ENGINEER

15  FOR IRISL, RIGHT?

16  **A.**    YES, SIR.

17  **Q.**    AND YOU, AS YOU DESCRIBED, WORKED AS A MARINE

18  ENGINEER --

19  **A.**    YES.

20  **Q.**    -- IN VARIOUS SHIPPING COMPANIES, CORRECT?

21  **A.**    PARDON, SIR.

22  **Q.**    IN VARIOUS IRANIAN SHIPPING COMPANIES.

23  **A.**    YES, SIR.

24  **Q.**    OKAY.  AND FROM TIME TO TIME YOU WOULD RUN INTO EACH

25  OTHER --

APRIL 20, 2015

GHAHREMAN - CROSS-EXAMINATION

1    **A.**    YES, SIR.

2    **Q.**    -- RIGHT?  AND TALK ABOUT WHAT YOU ARE DOING.

3    **A.**    YES.

4    **Q.**    SO WHILE YOU WERE IN IRAN YOU MAINTAINED SPORADIC

5    CONTACT WITH HIM, IS THAT TRUE?  AFTER YOU GRADUATED FROM --

6    YOU MAINTAINED SOME CONTACT WITH HIM AFTER YOU GRADUATED FROM

7    COLLEGE?

8    **A.**    WE MET EACH OTHER SOMETIMES IN THE --

9    **Q.**    AND YOU KNEW WHAT HE WAS DOING.

10   **A.**    YES.

11   **Q.**    AND WHAT HIS WORK EXPERIENCE WAS.

12   **A.**    YES.  WE WORKED CHECKING ABOUT THE RANKING, THAT IS

13   NORMALLY WE DO.

14   **Q.**    AND THEN WHEN YOU MOVED TO THE UNITED STATES IN 2007,

15   ALL RIGHT.  AND THEN LATER WENT TO NEW YORK.  IN DECEMBER 2012

16   HE CONTACTED YOU.

17   **A.**    YES, SIR.

18   **Q.**    OKAY.  AND THAT WAS BY EMAIL, RIGHT?

19   **A.**    YES, SIR.

20   **Q.**    OKAY.  AND ONE OF THE FIRST EMAILS HE SENT YOU WAS.

21        **MR. HARRIGAN:**  COULD WE SHOW THAT, GOVERNMENT'S

22   EXHIBIT 201.

23   **Q.**    **(MR. HARRIGAN)** AND HE ASKED YOU TO QUOTE FOUR TO SIX

24   SETS OF GYROCOMPASSES, CORRECT?

25   **A.**    YES.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **Q.**    YES?

2   **A.**    YES.

3   **Q.**    OKAY.  AND IN FACT HE SAID:  I HAVE A HUGE BUSINESS.

4   RIGHT?

5   **A.**    YES, HE SAID.

6   **Q.**    IF YOU HELP.  RIGHT?

7   **A.**    I HAVE HUGE BUSINESS AND IF YOU HELP, YES.

8   **Q.**    AND BY YOU HE MEANT YOU.  THAT WAS ADDRESSED TO YOU,

9   RIGHT?

10  **A.**    PARDON?  I DIDN'T UNDERSTAND YOU.

11  **Q.**    HE WAS ASKING FOR YOUR HELP.

12  **A.**    YEAH, HE WAS ASKING FOR MY HELP.

13  **Q.**    AND HE TOLD YOU YOU COULD MAKE GOOD MONEY TOO, RIGHT?

14  **A.**    YES.

15  **Q.**    AND ONE OF THE REASONS HE WAS REACHING OUT TO YOU

16  BECAUSE YOU WERE IN THE SHIPBUILDING INDUSTRY IN THE UNITED

17  STATES, RIGHT?

18  **A.**    HE DIDN'T SAY UNITED STATES.  YOU ARE WORKING IN THE

19  SHIPBUILDING, THAT IS HERE.

20  **Q.**    HE KNEW YOU WERE IN THE UNITED STATES, RIGHT?

21  **A.**    HE KNEW I AM IN THE UNITED STATES, YES.

22  **Q.**    AND THAT IS WHERE YOU WERE WORKING, IN THE UNITED

23  STATES.

24  **A.**    THAT IS I AM WORKING IN THE UNITED STATES, MAYBE, YES,

25  HE SAID KNOW THAT.  AND HE --

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1    **Q.**    AND HE REACHED OUT TO YOU BECAUSE HE WANTED SHIP PARTS,

2    SHIP SPARE PARTS FROM UNITED STATES COMPANIES, CORRECT?

3    **A.**    IS WHAT HE WANTED TO HAVE FOR THE SPARE PARTS AND

4    MARITIME MAYBE IN THE SHIPYARD AND SHIPBUILDING BECAUSE HE

5    MENTIONED THAT, YES.

6    **Q.**    IN THE UNITED STATES, SIR, RIGHT?

7    **A.**    IS DIDN'T MENTION HERE, THAT IS THERE REGION, BUT HE

8    WANTED MY HELP.  SO MAYBE I CAN HELP HIM IN THE UNITED STATES.

9    THIS IS NOT THE SUBJECT OF THE REGION HERE IN THE –– I DON'T

10   SEE.

11   **Q.**    BY THAT POINT IN TIME YOU WERE WORKING IN THE UNITED

12   STATES IN THE SHIPBUILDING INDUSTRY, RIGHT?

13   **A.**    YES, I WAS.

14   **Q.**    NOT ELSEWHERE.

15   **A.**    NO ELSEWHERE, SIR.

16   **Q.**    YOU WEREN'T IN DUBAI.

17   **A.**    NO, I WASN'T.

18   **Q.**    YOU WEREN'T IN CHINA.

19   **A.**    NO.

20   **Q.**    YOU WEREN'T IN GERMANY.

21   **A.**    NO.

22   **Q.**    YOU WERE IN THE UNITED STATES.

23   **A.**    YES, I WAS.

24   **Q.**    OKAY.  AFTER YOU GOT –– ALSO IN THAT EMAIL HE SAYS:

25   PLEASE MAKE A SKYPE USER I.D. AND LET'S TALK ON SKYPE.

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1          RIGHT?

2     **A.**     YES, SIR.

3     **Q.**     AND YOU MADE A SKYPE ACCOUNT, RIGHT?

4     **A.**     I HAD A SKYPE ACCOUNT ALREADY.

5     **Q.**     YOU HAD ONE ALREADY, RIGHT?

6     **A.**     YES.

7     **Q.**     AND YOU SPOKE WITH HIM AFTER THAT EMAIL, CORRECT?

8     **A.**     IS OPPORTUNITY, YES, I WAS TALKING WITH KOORUSH, PHONE

9     OR THE SKYPE.

10    **Q.**     AFTER THAT EMAIL YOU SPOKE WITH HIM BY SKYPE.  YES OR

11    NO, SIR.

12    **A.**     YES.

13    **Q.**     OKAY.  ALL RIGHT.

14          NOW, YOU WENT TO SOURCE THESE GYROCOMPASSES, CORRECT?

15    TO GET THE PRICES FOR HIM, RIGHT?

16    **A.**     YOU ARE TALKING ABOUT MY CONVERSATION WITH TIMCO MARINE?

17    **Q.**     AFTER MR. TAHERKHANI CONTACTED YOU, YOU THEN AGREED TO

18    GO AND TRY TO GET PRICING FOR GYROCOMPASSES, CORRECT?

19    **A.**     YES.

20    **Q.**     OKAY.  AND YOU DIDN'T GO TO THE MANUFACTURER SPERRY

21    MARINE, DID YOU?

22    **A.**     NO.

23    **Q.**     OKAY.  YOU WENT TO A SUBCONTRACTOR, RIGHT?

24    **A.**     IT IS THE SUPPLIER.

25    **Q.**     PARDON ME?

APRIL 20, 2015

1   **A.**    SUPPLIER.  SUPPLIER.

2            **THE INTERPRETER:**  SUPPLIER.

3   **Q.**   **(MR. HARRIGAN)** OKAY.  A SUPPLIER.  ALL RIGHT.

4        NOT THE MANUFACTURER, RIGHT?  TO GET SOMETHING THEY HAD

5   IN STOCK, RIGHT?

6   **A.**    YES.

7   **Q.**    OKAY.  AND WORKING IN THE SHIPPING INDUSTRY YOU KNOW IT

8   IS CHEAPER TO GO TO THE MANUFACTURER, CORRECT?

9   **A.**    IT DEPENDS ON WHAT YOU NEEDED.

10  **Q.**    WELL, IN FACT YOU REMEMBER TALKING TO AGENT COLE ABOUT

11  THIS FACT THAT YOU USED TAMMY AT TIMCO -- YOU SAID THE PRICES

12  WERE HIGHER BUT THAT IS WHO YOU WOULD GO TO, RIGHT?

13  **A.**    THAT IS BECAUSE OF THE SERVICE THEY GIVE TO US.

14  **Q.**    HAVE YOU KNOWN A MANUFACTURER TO CHARGE MORE THAN A

15  SUPPLIER?

16  **A.**    SOMETIMES IT IS THE LESS, SOMETIMES MORE.  BUT THAT IS

17  THE -- I NEEDED THE SERVICES OF THE SUPPLIER.

18  **Q.**    SO IN YOUR EXPERIENCE YOU CAN OFTEN GO TO SUPPLIERS AND

19  GET CHEAPER PRODUCTS THAN ACTUALLY GOING TO THE MANUFACTURER

20  WHERE IT IS MADE?  IS THAT YOUR TESTIMONY?

21  **A.**    SOMETIMES, YES.

22  **Q.**    GENERALLY THAT IS WHAT HAPPENS.

23  **A.**    THAT SOMETIMES HAPPENS.

24  **Q.**    DOES IT HAPPEN MOST OF THE TIME THAT WAY, SIR?

25  **A.**    PARDON?

1   **Q.**    DOES IT HAPPEN MOST OF THE TIME THAT WAY, SIR?

2   **A.**    NO, SIR.

3   **Q.**    MOST OF THE TIME YOU GET IT CHEAPER FROM GOING TO THE

4   MANUFACTURER --

5   **A.**    YES, SIR.

6   **Q.**    -- ISN'T THAT RIGHT?

7   **A.**    YES, SIR.

8   **Q.**    YOU UNDERSTAND THAT, RIGHT?

9   **A.**    YES, SIR.

10  **Q.**    BECAUSE YOU WERE IN THE BUSINESS.

11  **A.**    YES, SIR.

12  **Q.**    OF DEALING WITH VENDORS.

13  **A.**    YES, SIR.

14  **Q.**    CORRECT.  AND TYPICALLY YOU WOULD AGREE IT IS NOT A GOOD

15  WAY TO RUN A BUSINESS IF YOU ARE TRYING TO GET COSTS TO GO FOR

16  A MORE EXPENSIVE SUPPLIER RATHER THAN A CHEAPER MANUFACTURER.

17  **A.**    THAT IN THIS CASE I MENTIONED ALSO, SIR, IT DEPENDS WHAT

18  SERVICES YOU NEEDED.

19  **Q.**    I UNDERSTAND THAT.  BUT I AM SAYING ASSUMING THAT IT IS

20  CHEAPER TO GO TO THE MANUFACTURER THAN GOING TO THE SUPPLIER,

21  MOST OF THE TIMES YOU WANT TO GO TO THE MANUFACTURER, RIGHT?

22  **A.**    YES.  SURE.

23  **Q.**    AND IN FACT YOU KNEW THE PRICES WOULD BE HIGHER FROM

24  TAMMY AT TIMCO FOR THE GYROCOMPASSES, DIDN'T YOU?

25  **A.**    I DIDN'T HAVE ANY PRICE TO KNOW.  LACK OF THE KNOWLEDGE,

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1    SIR, IN THIS MATTER.

2    **Q.**    AFTER YOU TALKED TO HER YOU DIDN'T GO TO THE

3    MANUFACTURER DIRECTLY, DID YOU?

4    **A.**    I DIDN'T GO TO MANUFACTURER DIRECTLY, NO.

5    **Q.**    AND WHEN YOU TALKED TO TAMMY, YOU SPECIFICALLY TOLD HER

6    THAT YOU WANTED SOMETHING IN STOCK --

7    **A.**    YES.

8    **Q.**    -- RIGHT?

9         YOU DIDN'T WANT TO GO TO THE MANUFACTURER.

10   **A.**    NO, SIR.

11   **Q.**    ALL RIGHT.  IN FACT, YOU TOLD HER THAT HE, MR.

12   TAHERKHANI, DOESN'T WANT TO GO TO THE MANUFACTURER, HE WANTS

13   WHAT IS IN STOCK.  RIGHT?

14   **A.**    MR. TAHERKHANI TOLD ME --

15   **Q.**    SIR, YES OR NO.

16   **A.**    YES.

17   **Q.**    OKAY.  AND IN RESPONSE TO MR. TAHERKHANI'S REQUEST TO

18   GET PRICING, YOU LATER CAME BACK TO HIM AND SAID IT WOULD BE A

19   VERY SENSITIVE SALE, RIGHT?

20   **A.**    YES.

21   **Q.**    TO THE POINT WHERE HOMELAND SECURITY MIGHT HAVE TO BE

22   NOTIFIED, RIGHT?

23   **A.**    YES, SIR.

24   **Q.**    AND YOU KNEW THAT HOMELAND SECURITY WAS, AS YOU SAY,

25   INVOLVED IN PROTECTING SECURITY, NATIONAL SECURITY?

APRIL 20, 2015

1   **A.**    YES, SIR.

2   **Q.**    OKAY.  AND THAT YOU -- I THINK, IN YOUR WORDS, GOODS

3   COMING IN OR THINGS GOING OUT OF THE COUNTRY?

4   **A.**    IS THERE ANYTHING IN THE PROFIT OF THE U.S. PEOPLE, U.S.

5   COUNTRY AND THE SECURITY OF THE NATION, RIGHT.

6   **Q.**    OKAY.  AND YOU TOLD HIM, LOOK, WE ARE GOING TO NEED AN

7   END USER CERTIFICATE.  RIGHT?

8   **A.**    I FORWARDED THAT WE NEED INFORMATION AS IS THE END USER

9   INCLUDED ALSO.

10  **Q.**    OKAY.  AND HE PROVIDED THAT TO YOU, RIGHT?

11  **A.**    YES.

12  **Q.**    YOU SENT HIM THAT FORM, RIGHT?

13  **A.**    YES.

14  **Q.**    OKAY.  YOU SENT IT TO TAMMY AT TIMCO MARINE.

15  **A.**    YES, SIR.

16  **Q.**    AND VERY QUICKLY, WITHIN A DAY, YOU GOT BACK A RESPONSE

17  FROM TAMMY AT TIMCO MARINE, RIGHT?

18  **A.**    I DON'T REMEMBER THE DATE AND TIMING, BUT, YES, I

19  RECEIVED THAT -- THIS ONE FROM TAMMY FARNSLEY.

20  **Q.**    FAIR TO SAY IT WAS PROBABLY A DAY OR SO, WITHIN A DAY?

21  **A.**    PARDON?

22  **Q.**    FAIR TO SAY THAT IT WAS A DAY?

23  **A.**    I THINK IT IS LATE BECAUSE I WAS FOLLOWING UP HER

24  ANSWER.

25  **Q.**    FAIR ENOUGH.  LET'S TAKE A LOOK AT IT.  LET'S FIRST LOOK

APRIL 20, 2015

1    AT GOVERNMENT'S EXHIBIT 202.

2         YOU RECOGNIZE THAT EMAIL, RIGHT?

3    **A.**   YES.

4    **Q.**   IT IS AN EMAIL YOUR DEFENSE COUNSEL SHOWED YOU

5    CONTAINING THE END USER FORM THAT MR. TAHERKHANI SENT YOU,

6    CORRECT, SIR?

7    **A.**   YES, SIR.

8    **Q.**   DO YOU NEED TO SEE THE SECOND PAGE AGAIN?

9    **A.**   NO, I KNOW THAT IS THE END USER, YES.

10   **Q.**   THAT WAS SENT TO YOU ON DECEMBER 18TH.

11   **A.**   YES, SIR.

12   **Q.**   LET'S LOOK AT THE NEXT EXHIBIT, GOVERNMENT'S

13   EXHIBIT 203.  ALL RIGHT.

14        AND THAT IS YOUR EMAIL TO MR. TAHERKHANI, CORRECT?

15   **A.**   YES.

16   **Q.**   YOU HAVE SEEN THIS BEFORE, RIGHT?

17   **A.**   YES.

18   **Q.**   AND THAT WAS SENT -- YOU SENT THAT TO MR. TAHERKHANI ONE

19   DAY LATER, ON DECEMBER 19TH, RIGHT?

20   **A.**   YES, SIR.

21   **Q.**   INFORMING HIM THAT THE MANUFACTURER -- AND YOU KNEW TO

22   BE NORTHROP GRUMMAN, RIGHT?

23   **A.**   YES.

24   **Q.**   HAD DENIED THE SALE.

25   **A.**   YES, SIR.  DENIED TO BID.  OR DENIED TO SELL, AS YOUR

APRIL 20, 2015

1    WORDS.

2    **Q.**   I AM SORRY, SIR.  IT WAS A YES OR NO QUESTION.  ALL

3    RIGHT?

4    **A.**   THEN --

5    **Q.**   TRY TO LISTEN TO MY QUESTION.  ALL RIGHT?

6    **A.**   YES.

7    **Q.**   IT SIMPLY WAS THIS.  I DON'T MEAN TO INTERRUPT YOU, BUT,

8    YOU KNOW, THIS EMAIL WAS SENT A DAY AFTER YOU SUBMITTED THE

9    END USER INFORMATION TO TAMMY AT TIMCO.

10   **A.**   YES.

11   **Q.**   AND IT TOOK LESS THAN A DAY FOR NORTHROP GRUMMAN TO DENY

12   YOUR REQUEST AND TIG MARINE'S REQUEST, CORRECT?

13   **A.**   MANUFACTURER DENIED, YES.

14   **Q.**   ONE DAY.

15   **A.**   YES.

16   **Q.**   OKAY.  AND THE REASON THEY GAVE YOU WAS BECAUSE OF

17   COMPANY'S ASSOCIATIONS, RIGHT?

18   **A.**   IS THE COMPANY -- THE COMPANY NAME OR THE COMPANY CREDIT

19   AND THE COMPANY ASSOCIATION, YES.

20   **Q.**   BY ASSOCIATION YOU KNEW IT WAS BECAUSE THEY WERE LOCATED

21   IN DUBAI, RIGHT?

22   **A.**   I DIDN'T CONSIDER THAT.

23   **Q.**   YOU WEREN'T CONCERNED ABOUT THAT AT ALL?

24   **A.**   NO.

25   **Q.**   YOU ARE AWARE THAT DUBAI IS VERY CLOSE TO IRAN, RIGHT?

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1    **A.**    YES.

2    **Q.**    OKAY.  AND YOU ARE AWARE THAT IF GOODS ARE SENT TO DUBAI

3    IT IS JUST A SHORT TRIP TO IRAN, CORRECT?

4    **A.**    YES.

5    **Q.**    ALL RIGHT.  IF YOU ARE IN DUBAI IT IS APPROXIMATELY

6    92 MILES FROM DUBAI TO BANDAR ABBAS BY FERRY OR BOAT, CORRECT?

7    **A.**    I DON'T KNOW THAT IS EXACTLY HOW MANY MILES.  BUT, YES,

8    IT IS SHORT.

9    **Q.**    A LOT CLOSER THAN THE UNITED STATES, RIGHT?

10   **A.**    YES.

11   **Q.**    OKAY.  AND, YOU KNOW, WHEN YOU GOT THIS EMAIL IT SAID --

12   IT RAISED YOUR SUSPICIONS, RIGHT?

13   **A.**    THIS, YES.

14   **Q.**    OKAY.  BECAUSE THERE WAS AN EQUIPMENT MISMATCH, RIGHT?

15   **A.**    YES.

16   **Q.**    THEY DESCRIBE IT AS PUTTING THAT GYROCOMPASS IN THE

17   VESSEL, THE WESAL-5, WOULD BE LIKE PUTTING A MERCEDES ENGINE

18   IN A TRICYCLE, IN THEIR WORDS.

19   **A.**    YES, THAT IS THE WORD OF MOUTH.

20   **Q.**    RIGHT.  THAT WOULD BE A LITTLE OVERSPENDING, DON'T YOU

21   THINK, TO PUT A MERCEDES ENGINE IN A TRICYCLE WHETHER IT

22   WAS --

23   **A.**    YES.

24   **Q.**    AND IN RESPONSE TO THAT, DESPITE YOUR SUSPICIONS, WHAT

25   YOU DID IS -- LET'S LOOK AT THE NEXT EMAIL.  204.

APRIL 20, 2015

1        YOU SIMPLY FORWARDED THAT TO MR. TAHERKHANI, CORRECT?

2  **A.**   YES.

3  **Q.**   CORRECT?

4  **A.**   YES.

5  **Q.**   DIDN'T SAY TO HIM IN THAT EMAIL, WHAT DO YOU MEAN?  WHY

6  ARE THEY SAYING THIS?

7        YOU NEVER TOLD THAT TO MR. TAHERKHANI IN YOUR EMAIL THAT

8  YOU SENT ON DECEMBER 19TH FORWARDING THAT RESPONSE BY NORTHROP

9  GRUMMAN, DID YOU?

10 **A.**   PARDON?

11 **Q.**   WHEN YOU FORWARDED THIS EMAIL YOU NEVER –– IN THIS EMAIL

12 YOU NEVER QUESTIONED MR. TAHERKHANI AS TO WHY ARE THEY SAYING

13 THIS?  WHY ARE THEY SAYING THERE IS AN EQUIPMENT MISMATCH?

14 **A.**    THIS IS THE ANSWER THAT I FORWARD TO MR. TAHERKHANI, AND

15 IT LOOKS VERY CLEAR ANSWER.

16 **Q.**   AND NOWHERE IN THAT EMAIL, SIR, DO YOU SAY, PLEASE

17 EXPLAIN WHY THERE IS EQUIPMENT MISMATCH, WHY THEY ARE SAYING

18 THIS, DO YOU?

19 **A.**   NO.

20 **Q.**   NOWHERE IN THIS EMAIL.

21 **A.**   NO.

22 **Q.**   IN FACT, IN MR. TAHERKHANI'S RESPONSE TO YOU HE DOESN'T

23 QUESTION WHY THEY SAID THERE WAS AN EQUIPMENT MISMATCH, DOES

24 HE?

25        LET'S TAKE A LOOK AT HIS RESPONSE.

GHAHREMAN – CROSS–EXAMINATION

1          DO YOU AGREE WITH THAT?  HE DOESN'T QUESTION WHY.

2   **A.**    YES.

3   **Q.**    THE ONLY THING HE TELLS YOU IS, THAT WAS THE REASON I

4   ASKED YOU TO FIND DISTRIBUTORS OR STOCKERS, RIGHT?

5   **A.**    YES.

6   **Q.**    OKAY.  HE WAS REAFFIRMING WHAT HE TOLD YOU BEFORE IS, I

7   DON'T WANT YOU TO GO TO THE MANUFACTURERS, I JUST WANT YOU TO

8   GO TO DISTRIBUTORS OR STOCKERS.  RIGHT, SIR?

9   **A.**    YES, HE TOLD ME.

10  **Q.**    NOW, LATER WHEN YOU GOT IN CONTACT WITH DAVID MILLS, THE

11  UNDERCOVER AGENT, AGENT COLE --

12  **A.**    YES.

13  **Q.**    -- ALL RIGHT?  YOU HAD -- AFTER YOUR FIRST CONTACT YOU

14  HAD CONVERSATIONS WITH HIM -- LET ME BACK UP A LITTLE BIT.

15          AND, SIR, WHEN YOU PROVIDED -- BACK WHEN YOU PROVIDED

16  THAT END USER STATEMENT TO TAMMY TIMCO -- TAMMY AT TIMCO TO

17  GIVE TO NORTHROP GRUMMAN, YOU DIDN'T WANT TO GIVE IT TO HER,

18  DID YOU?  THE END USER STATEMENT.

19  **A.**    PARDON?  I DON'T KNOW THIS.

20  **Q.**    YOU DIDN'T WANT TO PROVIDE END USER STATEMENT TO TAMMY

21  AT TIMCO, DID YOU, WHEN SHE ASKED FOR IT AND TOLD YOU NORTHROP

22  GRUMMAN NEEDED IT.

23  **A.**    I DON'T UNDERSTAND YOUR QUESTION.

24  **Q.**    WELL, LET ME DIRECT YOUR ATTENTION.  YOU REMEMBER A

25  TELEPHONE CONVERSATION YOU HAD WITH AGENT COLE ON

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1  DECEMBER 21ST, YOUR FIRST CONTACT WITH HIM?

2  **A.**    YES.

3  **Q.**    OKAY.  AND YOU EXPLAINED WHAT HAPPENED IN THAT

4  CONVERSATION WITH TAMMY AT TIMCO AND HOW IT HAD BEEN DENIED,

5  RIGHT?

6  **A.**    YES.

7  **Q.**    OKAY.  AND YOU TOLD -- I AM DIRECTING YOUR ATTENTION TO

8  301–A.

9         **MR. HARRIGAN:**  IF WE CAN SWITCH.

10  **Q.**    **(MR. HARRIGAN)** DO YOU SEE WHERE IT IS HIGHLIGHTED

11  THERE, SIR?

12  **A.**    YES.

13  **Q.**    AND YOU TELL AGENT COLE:  AS I SAID TO TAMMY, TAMMY, HE

14  DOESN'T WANT IS THEY GOING TO MANUFACTURER.  HE WANTS

15  SOMETHING IN THE STOCK.

16         THOSE ARE YOUR WORDS, RIGHT?

17  **A.**    YES.

18  **Q.**    AND YOU WERE REFERRING TO MR. TAHERKHANI, RIGHT?

19  **A.**    YES.

20  **Q.**    AND YOU CONTINUE, YOU SAY:  AND TAMMY SAID THIS TOO,

21  INFORMATION OVER AND OVER.  AND YOU KNOW, BECAUSE I HAD

22  STARTED, AND THEY HAD ASKED FOR PERMISSION, I DIDN'T WANT TO

23  STOP THE JOB THERE BECAUSE, I SAID, IF I STOP THE THING I HAVE

24  PROBLEMS.

25         THOSE ARE YOUR WORDS, RIGHT, SIR?

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1    **A.**    YES, SIR.

2    **Q.**    SO YOU BELIEVED FROM THE GET–GO THAT IF YOU DIDN'T

3    PROVIDE IT TO THE MANUFACTURER, WHAT THEY HAD REQUESTED, THERE

4    WERE GOING TO BE PROBLEMS.

5    **A.**    NO.

6    **Q.**    I WANT TO TALK ABOUT YOUR REQUEST FOR 100 GYROS.  DO YOU

7    REMEMBER THAT CONVERSATION?

8    **A.**    YES, I REMEMBER.

9    **Q.**    AND I THINK YOU SAID THAT IT WOULD BE A CONTRACT FOR

10   ABOUT 6.5 TO 8 MILLION; IS THAT RIGHT?

11   **A.**    IS THE MR. TRIP ASKED ME WHAT IS THAT, AND I ESTIMATED

12   FOR HIM HERE.

13   **Q.**    OKAY.  AND WHEN YOU ASKED DAVID MILLS FOR THE 100, HE

14   TOLD YOU THAT ONE OF THE PROBLEMS WAS IS THAT NORTHROP GRUMMAN

15   WILL NOT BELIEVE THAT ANY CUSTOMER, OTHER THAN A FOREIGN

16   GOVERNMENT, WANTS TO BUY 100.  CORRECT?

17   **A.**    HE SAID BELIEF OF THE NORTHROP GRUMMAN, YES.

18   **Q.**    AND YOU HEARD THAT, RIGHT?

19   **A.**    YES.

20   **Q.**    AND HE THEN ASKED YOUR OPINION, RIGHT?

21   **A.**    HE GAVE HIS OPINION.

22   **Q.**    NO.  HE ASKED YOUR OPINION, RIGHT?

23   **A.**    IS THAT HE ASKED MY OPINION, YES.

24   **Q.**    HE ASKED YOU, DO WE REALLY WANT TO GO DOWN THAT ROAD?

25   **A.**    IS YES.

APRIL 20, 2015

GHAHREMAN — CROSS-EXAMINATION

```
 1   Q.    THOSE ARE HIS WORDS HE USED, RIGHT?

 2   A.    YES.  HE USED, YES.

 3   Q.    AND YOU SAID YOU UNDERSTOOD, AND YOU WERE NOT HAPPY WITH

 4   THAT REQUEST, CORRECT?

 5   A.    YES.

 6   Q.    AND THAT YOU WERE OKAY WITH ASKING FOR FOUR.

 7   A.    YES.

 8   Q.    OR MAYBE SIX.

 9   A.    YES.

10   Q.    OKAY.  AT NO TIME IN THAT CONVERSATION, SIR, DID YOU ASK

11   DAVID MILLS, WHAT DO YOU MEAN FOREIGN GOVERNMENT?  DID YOU?

12   A.    NO.

13   Q.    AT NO TIME DID YOU SAY, FOREIGN GOVERNMENT?  THIS IS

14   GOING TO WESAL SHIPPING OR SOME OTHER COMPANY, IT IS NOT GOING

15   TO A FOREIGN GOVERNMENT.

16   A.    IT WAS NOTHING, ALL OF THESE THINGS YOU SAID.

17   Q.    SO YOU NEVER SAID THAT TO HIM.

18   A.    (WITNESS SHAKES HEAD)

19   Q.    YOU JUST LET IT LIE, RIGHT?

20   A.    PARDON?

21   Q.    YOU JUST -- YOU JUST WENT WITH THE FLOW.

22   A.    IS THAT HE WAS -- HE SAID THAT THEY THINK IS THE FOREIGN

23   GOVERNMENT.  BUT I -- I WAS LETTING FLOW, AS YOU SAID.

24   Q.    YOU JUST WENT ALONG.

25   A.    PARDON?
```

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1   **Q.**   YOU JUST WENT ALONG WITH WHATEVER HE SAID.

2   **A.**   CAN YOU HIGHER, SIR?  THAT IS I DON'T HEAR YOU.

3   **Q.**   YOU JUST WENT ALONG WITH WHATEVER HE SAID.

4   **A.**   JUST I LISTEN TO HIM.

5   **Q.**   BUT YOU AGREED WITH HIM.

6   **A.**   HUM?

7   **Q.**   YOU AGREED WITH HIM, THOUGH.  YOU SAID, I UNDERSTOOD.

8   **A.**   YEAH, I UNDERSTOOD.

9   **Q.**   I THINK YOU SAID THAT -- WHEN ASKED, YOU DIDN'T BELIEVE

10  THAT KOORUSH TAHERKHANI HAD THE FUNDS OR ANYTHING TO SATISFY

11  AND PAY FOR 100 GYROS, RIGHT?

12  **A.**   IT WAS TRUE THAT IS IT WAS NOT FOREIGN GOVERNMENT.  IT

13  WAS KOORUSH AND TIG MARINE.  AND I HAVEN'T SEEN THIS CAPACITY

14  IN THE TIG MARINE, AS MY KNOWLEDGE.

15  **Q.**   YOU HAVEN'T SEEN THE CAPACITY OF TIG MARINE BECAUSE YOU

16  SAID IT WAS A SMALL COMPANY, RIGHT?

17  **A.**   A SMALL BUSINESS.

18  **Q.**   AND YOU DEFINED IT AS A TRADING COMPANY, IS YOUR WORDS.

19  **A.**   YES, TRADING COMPANY.  SUPPLIER IN ENGINEERING SERVICES.

20  **Q.**   AND BY TRADING COMPANY YOU MEAN THEY TRADE IN GOODS,

21  THEY GET GOODS FOR OTHER PEOPLE.

22  **A.**   IT IS ENGINEERING SERVICES, TOO.

23  **Q.**   SO THEY TRADE ENGINEERING SERVICES.

24  **A.**   THAT IS HE IS WORKING IN THE ENGINEERING MAINTENANCE AND

25  IN WHAT HE EXPLAINED FOR ME.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1  Q.    AND THEY GET PRODUCTS FOR OTHER SHIPPING COMPANIES,

2  RIGHT?

3  A.    THAT IS HE INSTALLED THE PRODUCT ON THE VESSELS, BUT HIS

4  -- AND THIS IS PART OF THE GOOD DEAL WHEN YOU PROVIDE THE

5  PRODUCT AND INSTALL YOURSELF IS MAKE GOOD MONEY.  WHEN YOU

6  INSTALL -- PROVIDE THE PRODUCT AND INSTALL, BECAUSE YOU MAKE

7  TWO TIMES THE MONEY.

8  Q.    BUT, NONETHELESS, YOU SAID, I STILL WANT TO ASK FOR 100

9  BECAUSE THAT WAS REQUIRED UNDER MY CONTRACT.  RIGHT?

10 A.    SORRY?

11 Q.    YOU TESTIFIED ON DIRECT --

12 A.    SORRY I ASK YOU TO REPEAT, REPEAT.  SOMETIMES IS REALLY

13 I AM MISSING THAT.

14 Q.    I THINK YOU TESTIFIED ON DIRECT THAT DESPITE THE FACT

15 THAT YOU DIDN'T BELIEVE MR. TAHERKHANI HAD THE FINANCIAL

16 ABILITY TO GO FORWARD WITH 100 --

17 A.    YES.

18 Q.    -- YOU WENT FORWARD ANYWAY BECAUSE YOU WERE DUTY BOUND

19 UNDER YOUR CONTRACT WITH TIG MARINE, RIGHT?

20 A.    HUM.  I WAS FORWARD HIS WORD BECAUSE HE SAID 100.  AND,

21 AS YOU SAID, IN THE CONTRACT I HAD TO FORWARD HIS WORD TO THE

22 SELLER.

23 Q.    BECAUSE YOU SAID, ON DIRECT, YOU WERE BOUND BY CONTRACT,

24 RIGHT?

25 A.    PARDON?

APRIL 20, 2015

 1   **Q.**   YOU WERE BOUND BY CONTRACT.  YOU WERE OBLIGATED BY YOUR

 2   CONTRACT.

 3   **A.**   YES, I WAS OBLIGATED TO FORWARD HIS WORDS TO THE OTHER

 4   PARTY.

 5   **Q.**   AND THAT CALL OCCURRED ON JANUARY 3RD, RIGHT?

 6   **A.**   I DON'T REMEMBER THE DATES, BUT I REMEMBER THIS

 7   CONVERSATION.

 8   **Q.**   OKAY.  WELL, YOU DO REMEMBER WHEN YOUR CONTRACT WAS

 9   ENTERED INTO, DON'T YOU, SIR?  THE INTERMEDIARY -- OCCASIONAL

10   INTERMEDIARY CONTRACT YOU ENTERED INTO?

11   **A.**   IT WAS IS THE -- ABOUT THE -- SUBMITTED ABOUT JANUARY

12   13TH, 16TH SOMETHING.

13        **MR. HARRIGAN:**  CAN WE PULL THAT UP.  THIS IS

14   GOVERNMENT'S EXHIBIT --

15        I APOLOGIZE, YOUR HONOR.

16   **Q.**   **(MR. HARRIGAN)** DO YOU SEE THAT, SIR?  DO YOU RECOGNIZE

17   THAT?

18   **A.**   YES, SIR.

19        **MR. HARRIGAN:**  AND LET'S GO TO THE FINAL SIGNATURE

20   PAGE.

21   **Q.**   **(MR. HARRIGAN)** THAT IS YOUR INTERNATIONAL OCCASIONAL

22   INTERMEDIARY CONTRACT, RIGHT?  AND THAT WAS SIGNED ON

23   JANUARY 18TH, CORRECT, SIR?

24   **A.**   YES, SIR.

25   **Q.**   YES?

APRIL 20, 2015

1    **A.**    YES, SIR.

2    **Q.**    OKAY.  OVER TWO WEEKS AFTER YOUR CONVERSATION ABOUT THE

3    100 GYROCOMPASSES, RIGHT?

4    **A.**    YES, SIR.

5    **Q.**    OKAY.  SO YOU HAD THAT CONVERSATION WITH AGENT MILLS

6    BEFORE YOU HAD ENTERED INTO THE INTERNATIONAL OCCASIONAL

7    INTERMEDIARY CONTRACT WE SEE HERE, CORRECT?  YES?

8    **A.**    IS THERE –– THIS IS RECORDED, YES.

9    **Q.**    IT IS RECORDED, YES.

10   **A.**    THIS IS WRITING IS RECORD FOR THE FUTURE REFERENCE.

11   **Q.**    YES.

12          NOW I WANT TO TALK TO YOU ABOUT DISCUSSIONS RE THE END

13   USERS THAT WERE USED TO ACQUIRE THE –– BOTH THE NAVIGAT-2100

14   AND THE Y-690.

15          YOU HAD MANY CONVERSATIONS WITH DAVID MILLS ABOUT THAT,

16   DIDN'T YOU?

17   **A.**    I HAD.

18   **Q.**    THAT'S A YES?

19   **A.**    YES, SIR.

20   **Q.**    OKAY.  AND AFTER AGENT MILLS TOLD YOU –– OR YOU TOLD

21   AGENT MILLS YOU ALREADY TRIED TO GET THE GYROCOMPASSES FROM

22   NORTHROP GRUMMAN THROUGH TIMCO BUT THEY DIDN'T BELIEVE YOUR

23   END USER, HE TOLD YOU HE WASN'T GOING TO PUT WESAL DOWN AS AN

24   END USER, RIGHT?

25   **A.**    CAN YOU REPLAY, RESTATE WHICH TIME, WHERE THAT IS THE

APRIL 20, 2015

1  DISCUSSION?

2  **Q.**   WELL, I WILL REFER YOU TO A JANUARY 4TH CONVERSATION YOU

3  HAD, RIGHT?  YOU RECALL THAT, RIGHT?

4  **A.**   LET'S HEAR YOU REPLAY AND I WILL --

5  **Q.**   LET ME SHOW YOU GOVERNMENT EXHIBIT 303-A.  THIS IS A

6  TRANSCRIPT THAT -- THIS IS A CONVERSATION OF JANUARY 4TH,

7  2013, CLIP 1.

8       DO YOU SEE THAT, SIR?

9  **A.**   YES.  YES, SIR.

10  **Q.**   AND THAT IS A CONVERSATION YOU EXPLAINED TO -- WHERE

11  AGENT MILLS EXPLAINS TO YOU WHAT YOU TOLD HIM, RIGHT?  YOU

12  START HERE:  AND SHE TALKED TO NORTHROP, AND THEY ALREADY

13  DIDN'T LIKE YOUR END USER.  SO I AM GOING TO USE MY OWN END

14  USER AND MY OWN INFORMATION ON ALL OF THE PAPERWORK.  RIGHT?

15  **A.**   HE GOT INFORMATION FROM TAMMY FARNSLEY, HE TOLD ME.

16  **Q.**   OKAY.  ABOUT WHAT HAPPENED, ABOUT THEM NOT BELIEVING

17  YOUR END USER STATEMENT.

18  **A.**   YES.  HE SAID THAT HE ASKED HIS FRIEND IN NORTHROP

19  GRUMMAN TAMMY FARNSLEY.

20  **Q.**   EXACTLY.  AND HE TELLS YOU:  I AM NOT EVEN GOING TO PUT

21  YOU DOWN, I AM NOT GOING TO PUT DOWN DUBAI OR WESAL.  I'M NOT

22  GOING TO PUT ANYBODY ALONG THOSE LINES.  RIGHT?

23  **A.**   YES, WHAT HE SAID.

24  **Q.**   THAT IS WHAT HE TOLD YOU.

25  **A.**   YES.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1  **Q.**    AND YOU NEVER OBJECTED TO THAT, RIGHT?

2  **A.**    THAT WAS CONVERSATION, HE WAS TALKING, AND I LET FLOW

3  THE CONVERSATION.

4  **Q.**    THE QUESTION, THOUGH, WAS, YOU NEVER EXPRESSED ANY

5  OBJECTION TO HIM USING A FALSE END USER IN ORDER TO GET THE

6  NAVIGAT-2100'S.

7  **A.**    EXCUSE ME, SIR.  NO, YOUR ANSWER.

8  **Q.**    WHEN DID YOU RAISE AN OBJECTION TO AGENT MILLS ABOUT

9  USING A FALSE END USER, SIR?

10  **A.**    I DIDN'T OBJECT.

11  **Q.**    THAT'S RIGHT, YOU DIDN'T OBJECT.

12  **A.**    IS --

13  **Q.**    THEN, RIGHT?  OR AT ANY TIME IN THE FUTURE, RIGHT?

14  **A.**    IS THE I ASKED ANY TIME, YOU SAID ANY TIME I DON'T KNOW

15  WHAT IS ANY TIME.  ANY TIME HAS THE DATE, TIME AND DATE.

16  **Q.**    FAIR ENOUGH.  ANY TIME IN YOUR FUTURE COMMUNICATIONS

17  WITH AGENT COLE, OR DAVID MILLS.

18  **A.**    I GAVE THAT END USER DESTINATION, DUBAI.  AND I DON'T

19  HAVE ANY WORDS MORE FOR DAVID MILLS REGARDING THIS.

20  **Q.**    SIR, MY QUESTION WAS THIS.  AND I WILL REPHRASE IT.

21  **A.**    YOU ASKED ME AND I ANSWERED, HONEST ANSWER, SIR.

22  **Q.**    LET ME REPHRASE THE QUESTION, SIR.  ALL RIGHT?  OR

23  RESTATE THE QUESTION.

24       AT ANY TIME AFTER DAVID MILLS TOLD YOU HE WAS GOING TO

25  USE A FALSE END USER AND PROVIDE A FALSE END USER TO NORTHROP

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

```
 1   GRUMMAN, DID YOU EVER OBJECT TO HIM USING THAT FALSE END USER?
 2   A.    I DIDN'T OBJECT, I DIDN'T ACT.
 3   Q.    YOU DID NOTHING.
 4   A.    I DID NOTHING.
 5   Q.    YOU ACQUIESCED.
 6   A.    THAT IS YOUR UNDERSTANDING.
 7   Q.    I WANT -- WHAT DID YOU DO, SIR?  TELL ME.  I DON'T WANT
 8   TO PUT WORDS IN YOUR MOUTH.
 9   A.    THAT IS I SAID -- AND I GAVE END USER TO MR. DAVID, THAT
10   IS WHAT I SAID.
11   Q.    AND HE TOLD YOU HE WASN'T GOING TO USE THAT END USER,
12   RIGHT?
13   A.    YEAH, HE SAID.
14   Q.    OKAY.  HE WASN'T GOING TO USE THE END USER THAT NO ONE
15   BELIEVED, RIGHT?
16   A.    THAT IS HIS BELIEF.
17   Q.    WELL, THAT WAS NORTHROP GRUMMAN'S BELIEF, RIGHT?
18   A.    I DON'T KNOW.
19   Q.    WELL, THEY TOLD YOU SO, SIR, DIDN'T THEY?
20   A.    THAT IS THAT I HAD THE EMAIL THEY DIDN'T WANT TO -- THEY
21   DIDN'T RECOGNIZE THE COMPANY AND ASSOCIATES.
22   Q.    AND IT WAS LIKE PUTTING A MERCEDES ENGINE IN A TRICYCLE.
23   REMEMBER THAT, SIR?
24   A.    SIR, NORTHROP GRUMMAN GIVE THESE TECHNICAL ANSWERS, YOU
25   BELIEVE SO?  THIS IS WORD OF MOUTH, NOT TECHNICAL ANSWER FROM
```

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1    NORTHROP GRUMMAN.  IF YOU ARE IN THIS BUSINESS.

2    **Q.**   LET'S TALK ABOUT THE Y-690'S.  ALL RIGHT?

3         NOW, YOU WERE ASKED ON DIRECT ABOUT THE REASON WHY YOU

4    DIDN'T WANT TO GIVE END USERS TO AGENT MILLS, OR DAVID MILLS,

5    FOR THE Y-690'S, RIGHT?

6    **A.**   YES, SIR.

7    **Q.**   YOU SAID YOU WERE BOUND BY CONTRACT.

8    **A.**   YES, SIR.

9    **Q.**   OKAY.  ALL RIGHT.  NOW, THAT CONTRACT DIDN'T STOP YOU

10   FROM PROVIDING THE END USER INFORMATION TO TAMMY AT TIMCO, DID

11   IT?

12   **A.**   THAT IS WHEN KOORUSH LET ME –– GIVE ME THE END USER

13   INFORMATION, I GIVE THE END USER INFORMATION.

14   **Q.**   WELL, AT THIS POINT YOU DIDN'T EVEN CONSULT WITH

15   KOORUSH, RIGHT?  YOU JUST TOLD HIM, I CAN'T GIVE IT TO YOU.

16   RIGHT?

17   **A.**   IF YOU BACK TO THE PREVIOUS CONVERSATION, I GIVE HIM THE

18   TIG MARINE AS THE END USER.

19   **Q.**   BUT HE WASN'T ASKING FOR TIG MARINE FOR THE END USER,

20   WAS HE?  HE WANTED TO KNOW WHO WAS THE ULTIMATE END USER OF

21   THE Y-690, RIGHT?

22   **A.**   IS THAT HE WANTS TO KNOW THAT IS THE –– WHAT –– HE

23   EXPRESS THAT TIG MARINE IS NOT GOOD END USER.

24   **Q.**   LET'S GO BACK TO THAT CONVERSATION YOU HAD WITH HIM.

25   **A.**   YES.

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

1    **Q.**    SO WE ARE ALL CLEAR.

2    **A.**    YES.

3    **Q.**    YOU CAN CORRECT ME IF I AM WRONG.  BUT DURING THAT

4    CONVERSATION HE FIRST TOLD YOU THE Y-690 WAS A SENSITIVE

5    PRODUCT, CORRECT?

6    **A.**    YES, SIR.

7    **Q.**    AND HE TOLD YOU IT REQUIRED A SPECIAL LICENSE, CORRECT?

8    **A.**    YES, HE SAID.

9    **Q.**    TO GO ANYWHERE OUTSIDE OF THE UNITED STATES, CORRECT?

10   **A.**    I REMEMBER, YES, HE SAID.

11   **Q.**    I THINK HE SAID CANADA, YOU KNOW, ANYWHERE, RIGHT?

12   **A.**    IS THAT I DON'T REMEMBER WHICH COUNTRY, HE SAID OUTSIDE

13   THE UNITED STATES.

14   **Q.**    FAIR ENOUGH.  FAIR ENOUGH.

15       AND HE ALSO TOLD YOU THAT, DIFFERENT FROM THE

16   GYROCOMPASS, THAT NOT ONLY WOULD THE MANUFACTURER LOOK AT IT

17   BUT A GOVERNMENT AGENCY WOULD LOOK AT IT, RIGHT?  HE TOLD YOU

18   THAT?

19   **A.**    I DON'T RECALL THE ALL WORDS, IT IS THE TWO YEARS.  BUT

20   IS THERE FOR ME IS THERE ANYBODY OF THE LAW IS THE SAME, THAT

21   IS THE FOR ME, IS THAT THEY ARE LEGAL AND THEY ARE AUTHORIZED

22   TO LOOK AT.

23   **Q.**    THE QUESTION WAS, SIR, HE ALSO TOLD YOU THAT THE

24   INFORMATION WOULD HAVE TO GO TO A GOVERNMENT AGENCY.  DO YOU

25   RECALL THAT?

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1    **A.**    IS THAT I AGREE WITH YOU.  THAT IS -- I DON'T RECALL THE

2    WORDS THAT IS GOVERNMENT AGENCY.  I DON'T RECALL THAT.  THAT

3    IS THE TWO YEARS NOW PASSED.  BUT IF YOU SAID I BELIEVE SO,

4    YES.  YES.

5    **Q.**    IT IS NOT WHAT I SAY, SIR, IT IS WHAT YOU SAY.  IF YOU

6    DON'T REMEMBER, I WILL SHOW YOU THE TRANSCRIPT.

7    **A.**    YES, I ASK THAT YOU SHOW THE TRANSCRIPT.

8    **Q.**    OKAY.  FAIR ENOUGH.  AND I WILL DIRECT TO GOVERNMENT

9    EXHIBIT 304-A, AND THE HIGHLIGHTED PORTION.

10           THE MANUFACTURER WILL SUBMIT THAT INFORMATION --

11           AND THIS IS DAVID MILLS SPEAKING.

12           -- TO THE GOVERNMENT AGENCY THAT GIVES THE LICENSES, AND

13   THEY'LL CHECK INTO IT.

14           HE GOES ON TO STAY:  IF WE DO NOT FEEL COMFORTABLE OR

15   YOU DO NOT FEEL COMFORTABLE OR KOORUSH DOES NOT FEEL

16   COMFORTABLE THAT HE HAS, CAN, OR IS ABLE TO GIVE GOOD END USER

17   INFORMATION THAT WILL CHECK OUT, THAT THEY CAN VERIFY AND MAKE

18   SENSE ON THEN YOU CAN LET ME KNOW, LIKE, SOONER THAN LATER.

19           RIGHT?

20   **A.**    YES.

21   **Q.**    NOW, YOU RECALL HIM SAYING THAT, CORRECT?

22   **A.**    YES, SIR.

23   **Q.**    THOSE ARE HIS WORDS TO YOU?

24   **A.**    YES, SIR, THAT'S --

25   **Q.**    AND HE TELLS YOU THAT A GOVERNMENT AGENCY HAS GOT TO

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1   CHECK INTO IT, CORRECT?

2   **A.**    AS HERE IS THAT IN THIS -- THE TRANSCRIPT ACTUALLY, YES.

3   **Q.**    IS THE ANSWER YES, SIR?

4   **A.**    YES, SIR.  I SEE THAT IS HERE, IS YES, SIR.

5   **Q.**    ALL RIGHT.  AND YOU RESPOND -- AGAIN HIGHLIGHTED

6   PORTION -- I KNOW THAT IS, WE ARE NOT COMFORTABLE WITH, TO

7   RELEASE THE END USER.

8   **A.**    YES, SIR.

9   **Q.**    AND THAT, YOU SAID, IS WE.

10  **A.**    YES, SIR.

11  **Q.**    BOTH YOU AND MR. TAHERKHANI.

12  **A.**    YES, SIR.

13  **Q.**    NOW, BY THE END OF MAY YOU HAD TWO CONTRACTS, RIGHT?

14  **A.**    YES, SIR.

15  **Q.**    OKAY.  AND ONE WAS THE Y-690, THE OTHER WAS THE

16  NAVIGAT-2100?

17  **A.**    YES, SIR.

18  **Q.**    AND IS IT FAIR TO SAY THAT AT THAT TIME THE DOWN PAYMENT

19  FOR THE Y-690 CONTRACT WAS LONG OVERDUE?

20  **A.**    Y-690, YES, IT WAS.

21  **Q.**    THERE WERE NO PAYMENTS MADE, DOWN PAYMENTS MADE,

22  CORRECT?

23  **A.**    NO.

24  **Q.**    YOU REMEMBER THAT.

25  **A.**    YES, I REMEMBER THAT.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1  **Q.**    OKAY.  AND IT IS FAIR TO SAY THAT THERE WERE AT LEAST

2  TWO INSTALLMENT PAYMENTS DUE UNDER THE GYROCOMPASS CONTRACT.

3  **A.**    IS IT WAS THE ISSUE BUT FOR THE PAYMENTS BECAUSE FIRST

4  THEY SHOULD PROVIDE THE STANDBY LETTER OF CREDIT AFTER KOORUSH

5  PAID IT, TWO INSTALLMENT.

6  **Q.**    AGAIN, PLEASE LISTEN TO MY QUESTION.  WHEN THEY CALL FOR

7  A YES OR NO ANSWER, YES OR NO.

8        AGAIN, IS THAT A YES THAT THERE WERE PAYMENTS DUE STILL,

9  OR NO?

10  **A.**    NO.

11  **Q.**    THERE WERE NO MORE PAYMENTS DUE?

12  **A.**    IS Y-690 IT WAS -- AS PER THE CONTRACT, IT WAS NOT DUE

13  THAT GYRO.

14  **Q.**    WE ARE PAST THE Y-690 NOW, I AM ASKING YOU ABOUT THE

15  GYROCOMPASS.

16  **A.**    OKAY.

17  **Q.**    I AM ASKING YOU ABOUT THE INSTALLMENT PAYMENTS THAT WERE

18  DUE, SIR.

19  **A.**    YES.

20  **Q.**    AND AS OF MAY OF 2013 HAD ANY INSTALLMENT PAYMENTS BEEN

21  MADE?

22  **A.**    INSTALLMENT PAYMENT MADE ALREADY TO THE SOUTH STAR

23  TRADING.

24  **Q.**    I AM NOT TALKING ABOUT THE DOWN PAYMENT, I AM TALKING

25  ABOUT THE INSTALLMENT PAYMENT.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **A.**     IS I THINK INSTALLMENT PAYMENT, SECOND INSTALLMENT

2   PAYMENT, IT WAS BASED ON THE STANDBY LETTER OF CREDIT, THAT IS

3   WHEN IS APPROVED THEY CAN MAKE THE SECOND INSTALLMENT PAYMENT.

4   **Q.**     HAD THEY MADE A SECOND INSTALLMENT PAYMENT?

5   **A.**     PARDON?

6   **Q.**     HAD THEY MADE A SECOND INSTALLMENT PAYMENT?

7   **A.**     NO, SIR.

8   **Q.**     NO ONE HAD, RIGHT?

9   **A.**     YES.

10  **Q.**     IS IT FAIR TO SAY THAT MR. TAHERKHANI MADE A LOT OF

11  PROMISES ABOUT PAYMENTS?

12  **A.**     YES, SIR.

13  **Q.**     AND THOSE NEVER HAPPENED?

14  **A.**     IS THE BOTH PARTIES THEY MADE PROMISES, BUT NEVER

15  HAPPENED.

16  **Q.**     WHAT PROMISES DID AGENT MILLS MAKE AT THAT POINT IN

17  TIME?

18  **A.**     THAT IS THE STANDBY LETTER OF CREDIT.

19  **Q.**     OKAY.  AND THERE WAS AN AGREED STANDBY LETTER OF CREDIT,

20  RIGHT?

21  **A.**     YES.

22  **Q.**     AND AGENT MILLS WANTED TO USE BANK OF THE WEST --

23  **A.**     YES.

24  **Q.**     -- RIGHT?

25  **A.**     YES.

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **Q.**    BUT MR. TAHERKHANI WANTED TO USE A DIFFERENT BANK,

2   RIGHT?

3   **A.**    MR. TAHERKHANI DOESN'T WANT TO USE DIFFERENT.  MR.

4   TAHERKHANI BANK OF THE MASHREQ DIDN'T ACCEPT THE BANK OF THE

5   WEST.  IT DOESN'T MEAN THAT THIS IS KOORUSH TAHERKHANI.

6   **Q.**    AND AGENT COLE WAS NOT HAPPY WITH THAT BECAUSE HE TOLD

7   YOU THAT IF YOU WENT TO A DIFFERENT BANK VERY PRIVATE

8   INFORMATION THAT HE HAD ABOUT WHERE THEY WERE GOING, THE Y-690

9   AND THE NAVIGAT-2100, WOULD BE MADE PUBLIC, WHICH WOULD CAUSE

10  PROBLEMS FOR HIM, RIGHT?

11  **A.**    NO.

12  **Q.**    HE TOLD YOU THAT.

13  **A.**    NO, IT IS NOT RIGHT, SIR.  IT WAS NOT THE LOCATION OR

14  SOMETHING.  IS THE SOUTH STAR JUST CONCERNED ABOUT THEMSELVES

15  THAT THEY ARE GOING ON UNDERWRITING OF THE PROCESS.  AND MY

16  THINKING WAS THEY ARE -- MAYBE THEY DON'T WANT TO EXPOSE THEIR

17  FINANCIAL TO ANY BANKS.  THAT IS NOT --

18  **Q.**    IS IT YOUR TESTIMONY HERE TODAY THAT AGENT MILLS NEVER

19  EXPRESSED CONCERN ABOUT DISCLOSING PRIVATE INFORMATION TO

20  BANKS OTHER THAN BANK OF THE WEST?

21  **A.**    HE WAS CONCERN DOESN'T INVOICE FOR GOING UNDERWRITING IN

22  OTHER BANKS.

23  **Q.**    YES, HE WAS CONCERNED.  AND THE REASON HE WAS CONCERNED,

24  SIR -- AND HE TOLD YOU, SIR, RIGHT?  HE TOLD YOU THE REASON HE

25  WAS CONCERNED, RIGHT?

APRIL 20, 2015

1    **A.**    HE WAS CONCERNED THAT WITH THE MANUFACTURER.  THAT IS

2    WHAT HE TOLD ME.

3    **Q.**    RIGHT.  BECAUSE HE HAD TOLD THE MANUFACTURERS THAT THE

4    NAVIGAT-2100'S WERE GOING TO PANAMA, RIGHT?

5    **A.**    THAT IS WHAT HE SAID.

6    **Q.**    RIGHT.  AND HE TOLD YOU THAT, RIGHT?

7    **A.**    YES.

8    **Q.**    AND YOU UNDERSTOOD THAT, RIGHT?

9    **A.**    THAT IS THE -- I UNDERSTOOD WHAT HE SAID.

10   **Q.**    RIGHT.  AND YOU UNDERSTOOD THAT TO BE A FALSE

11   REPRESENTATION, RIGHT?

12   **A.**    THAT'S HE SAID, YES.

13   **Q.**    WELL, YOU UNDERSTOOD THEY WEREN'T GOING TO PANAMA,

14   RIGHT?

15   **A.**    AS PER THE CONTRACT DELIVERY WAS DUBAI.

16   **Q.**    WELL, THE MANUFACTURER DIDN'T THINK THEY WERE GOING TO

17   DUBAI, RIGHT?

18   **A.**    I DIDN'T KNOW ABOUT THE MANUFACTURER.  LACK OF

19   INFORMATION.

20   **Q.**    WELL, AGENT COLE TOLD YOU THE --

21   **A.**    AGENT COLE, THEY HAVE HIS BUSINESS, HIS CONNECTION, AND

22   I DIDN'T KNOW ABOUT HIS CONNECTION WITH ANYONE.  AND WHATEVER

23   HE SAID IT WAS NOT THE END OF THE -- I CAN LISTEN TO HIM BUT I

24   BELIEVE OR NOT, I COULD NOT -- I COULD NOT BELIEVE HIM.

25   **Q.**    SO WHEN AGENT COLE TOLD YOU THAT HE PROVIDED FALSE

APRIL 20, 2015

 1   INFORMATION TO THE MANUFACTURER, YOU DIDN'T BELIEVE HIM?

 2   **A.**   THAT IS THE YES.

 3   **Q.**   SO YOU THOUGHT HE GAVE THE MANUFACTURERS THE CORRECT

 4   INFORMATION?

 5   **A.**   YES.

 6   **Q.**   OKAY.

 7   **A.**   PARDON?

 8   **Q.**   YOU THOUGHT HE TOLD NORTHROP GRUMMAN, THIS IS GOING TO

 9   DUBAI AND WESAL SHIPPING.  RIGHT?

10   **A.**   THAT IS I DIDN'T KNOW.  LACK OF INFORMATION WHAT HE WAS

11   TALKING WITH THE MANUFACTURER.

12   **Q.**   SO, SIR, THE RECORDINGS THAT YOU HEARD HERE TODAY IN

13   WHICH -- OR A FEW DAYS AGO ARE INCORRECT.  IS THAT YOUR

14   TESTIMONY?

15   **A.**   I DON'T KNOW WHICH -- SO MANY CONVERSATIONS, I DON'T

16   KNOW WHICH ONE YOU ARE TALKING, SIR.

17   **Q.**   FAIR ENOUGH.  ALL RIGHT.

18       AND AS TO THE -- NOW I WANT TO TALK TO YOU ABOUT AGENT

19   COLE AND WHEN HE OPENLY DISCUSSES WITH YOU THAT HE BELIEVES

20   THESE GOODS ARE GOING TO IRAN, RIGHT?  YOU REMEMBER THAT

21   CONVERSATION?

22   **A.**   WHAT DATE?  IS THAT FIRST TIME HE SAID IN IRAN, I THINK

23   THE LONG CONVERSATION MAY 28TH AFTER I SENT EMAIL.

24   **Q.**   OKAY.  AND I THINK THAT IS THE DATE WE ARE TALKING

25   ABOUT, IS MAY 28.  ALL RIGHT?

GHAHREMAN – CROSS-EXAMINATION

1          AND BEFORE TELLING YOU HE THOUGHT IT WAS GOING TO IRAN

2    HE TOLD YOU THAT HE WAS TELLING YOU IT WAS GOING TO IRAN

3    BECAUSE HE KNEW THAT IS WHY TAHERKHANI WASN'T MAKING THE

4    PAYMENTS, RIGHT?

5    **A.**    THAT IS HE -- BEING THE REASON OF THE PAYMENT AS THAT

6    THIS IS THE DESTINATION OF THE CARGO IN IRAN.  THAT IS HIS

7    BELIEF.

8    **Q.**    HE TOLD YOU THAT WAS HIS BELIEF.

9    **A.**    YES.

10   **Q.**    THAT THE REASON TAHERKHANI WOULDN'T PAY, BECAUSE THE

11   GOODS WERE GOING TO IRAN.

12   **A.**    YES, SIR.

13   **Q.**    AND BECAUSE OF THAT FACT IF TAHERKHANI TOLD HIM THEY

14   WERE GOING TO IRAN HE FELT THAT TAHERKHANI BELIEVED HE COULD

15   RIP HIM OFF OR CHARGE HIM HIGHER PRICES, RIGHT?

16   **A.**    THAT IS HIS BELIEF, YES.

17   **Q.**    AND HE DISCUSSED THIS WITH YOU IN A LONG CONVERSATION,

18   CORRECT?

19   **A.**    YES.

20   **Q.**    OKAY.  AND THEN AFTER HE GAVE YOU THAT EXPLANATION --

21   HIS BELIEF, HE ASKED YOU WHAT YOU THOUGHT ABOUT WHAT HE JUST

22   SAID, RIGHT?

23   **A.**    AFTER, I THINK, 10, 15 MINUTES, YES.

24   **Q.**    FAIR.  AND YOU TOLD HIM YOU UNDERSTOOD WHAT HE WAS

25   SAYING, RIGHT?

APRIL 20, 2015

GHAHREMAN - CROSS-EXAMINATION

1  **A.**    THAT I SHOULD -- JUST TO TELL HIM, I AM LISTENING TO

2  YOU.  IT WAS PHONE CONVERSATION, SIR.

3  **Q.**    DID YOU TELL HIM YOU UNDERSTOOD WHAT HE WAS SAYING?

4  **A.**    THAT IS I THINK I SAID.

5  **Q.**    YOU THINK YOU SAID THAT?

6  **A.**    YOU CAN PLAY IT, IT IS BETTER, I THINK.  IT WILL BE

7  BETTER.  OR TRANSCRIPT.

8  **Q.**    I THINK YOUR COUNSEL SHOWED THIS TO YOU, AND I WILL SHOW

9  IT TO YOU AGAIN.  IT IS 312-A, CLIP 1.

10      YOU SEE WHERE IT IS HIGHLIGHTED THERE, SIR?  THOSE ARE

11  YOUR WORDS, CORRECT?

12  **A.**    WE DISCUSS ABOUT THIS, YES.  YES, I SAID I DON'T SAY YOU

13  ARE RIGHT OR NOT.

14  **Q.**    YOU SAID, SIR, DIDN'T YOU, THAT:  ANYWAY THAT IS

15  WHATEVER YOU SAID IS, DAVID, I UNDERSTOOD.

16      THOSE ARE YOUR WORDS, CORRECT?

17  **A.**    YES.

18  **Q.**    SO YOU UNDERSTOOD.  YOU TOLD HIM YOU UNDERSTOOD.

19  **A.**    YES, SIR.  THAT IS HE WAS SPEAKING TO SOMETHING THAT --

20  **Q.**    YES OR NO AGAIN, SIR.

21  **A.**    YES.

22  **Q.**    OKAY.  AND YOU SAY:  I'M NOT GOING TO SAY THAT YOU ARE

23  RIGHT OR WRONG -- RIGHT OR NOT.  RIGHT?

24  **A.**    YES, SIR.

25  **Q.**    YOU NEVER DENY WHAT HE SAYS.

APRIL 20, 2015

GHAHREMAN - CROSS-EXAMINATION

1   **A.**   I EXPLAIN ALREADY AND I DON'T CONCEDE WHAT YOU WANT.  I

2   EXPLAIN AGAIN, YOU WANT YES OR NOT?

3   **Q.**   THE QUESTION IS:  DID YOU EVER DENY WHAT HE SAID?

4   **A.**   YES, I DENY BECAUSE I TOLD IS THE DUBAI.

5   **Q.**   DID YOU EVER TELL HIM, NO, THIS IS NOT GOING TO IRAN?

6   **A.**   I TOLD HIM THAT IS NOT GOING TO ANY ILLEGAL COUNTRY.

7   **Q.**   AND WHAT CONVERSATION WAS THAT, SIR, WHERE YOU SAID IT

8   WASN'T -- THOSE ARE THE WORDS YOU USED?  IT IS NOT GOING TO AN

9   ILLEGAL COUNTRY?

10  **A.**   I THINK I -- MAYBE MY LAWYER WILL FIND AND SHOW IT TO

11  YOU LATER.  THAT YOU CAN TAKE MY WORD HERE, AND I CAN REFER TO

12  IT LATER.

13  **Q.**   I AM ASKING YOU, SIR, DO YOU RECALL WHAT CONVERSATION?

14  WAS IT IN MAY?  WAS IT IN APRIL?  WAS IT IN MARCH?  WAS IT IN

15  FEBRUARY?  WAS IT AT THE MEETING AT THE GREEN VALLEY RANCH?

16  **A.**   I THINK IS SO MANY TIMES I SAID FROM THE BEGINNING TO

17  HIM.

18  **Q.**   YOU SAID FROM THE BEGINNING IT IS NOT GOING TO IRAN?

19  **A.**   I DIDN'T MENTION IRAN BECAUSE IT WAS -- I WANTED THE

20  LEGAL, IT IS, AND NOT ANY COUNTRY, I MENTIONED IN THE DUBAI.

21  IS IT WAS NOT THE DISCUSSION ABOUT THE PRODUCT FOR GOING TO

22  IRAN, THIS IS GOVERNMENT RAISED UP.

23  **Q.**   ALL RIGHT.

24          **THE COURT:**  COUNSEL, FOR SCHEDULING, DO WE NEED TO

25  CALL THE OTHER WITNESS?

APRIL 20, 2015

GHAHREMAN – CROSS–EXAMINATION

```
 1            MR. JOHNSTON:  I KNOW THAT HE WOULD APPRECIATE IT,
 2    YOUR HONOR.
 3            MR. HARRIGAN:  THAT IS FINE, YOUR HONOR.
 4            THE COURT:  DO YOU HAVE ANY OBJECTION?
 5            MR. HARRIGAN:  NO, YOUR HONOR.
 6            THE COURT:  IS HE AVAILABLE?
 7            MR. JOHNSTON:  I WILL CHECK.
 8            THE COURT:  OKAY.  MR. GHAHREMAN, YOU CAN STEP DOWN.
 9    THANK YOU.
10            LADIES AND GENTLEMEN, WE ARE GOING TO INTERRUPT THE
11    TESTIMONY OF MR. GHAHREMAN.  THERE IS ONE ADDITIONAL WITNESS
12    THAT WILL BE CALLED IN THE DEFENSE, AND IN ORDER TO
13    ACCOMMODATE SCHEDULING OF THIS PARTICULAR WITNESS WE ARE GOING
14    TO TAKE HIS TESTIMONY AT THIS TIME.  AND I ANTICIPATE WE WILL
15    BE CONCLUDED CLOSE TO 2:00.  WE MIGHT GO SLIGHTLY BEYOND, BUT
16    IT WILL BE CLOSE.
17            MR. JOHNSTON.
18            MR. JOHNSTON:  THE DEFENSE NOW CALLS YOU EBRAHIM
19    SHAYEI.
20            THE COURT:  DO WE NEED AN INTERPRETER?
21            MR. JOHNSTON:  NO, YOUR HONOR.
22            THE COURT:  ALL RIGHT.
23            SIR, IF YOU WOULD PLEASE BE SWORN AT THIS TIME.
24            THE CLERK:  SIR, PLEASE RAISE YOUR RIGHT HAND.
25            DO YOU SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE
```

APRIL 20, 2015

GHAHREMAN – CROSS-EXAMINATION

```
 1    YOU SHALL GIVE IN THE CAUSE NOW BEFORE THE COURT SHALL BE THE
 2    TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?
 3              THE WITNESS:  I SWEAR.
 4              THE CLERK:  PLEASE TAKE THE STAND.
 5              PLEASE STATE YOUR NAME AND SPELL YOUR FIRST AND LAST
 6    NAMES.
 7              THE WITNESS:  MY NAME IS EBRAHIM SHAYEI.  THE FIRST
 8    NAME IS E-B-R-A-H-I-M.  AND THE LAST NAME, S-H-A-Y-E-I.
 9              THE COURT:  THANK YOU.  GOOD AFTERNOON.
10              THE WITNESS:  GOOD AFTERNOON TO YOU.
11                        DIRECT EXAMINATION
12    Q.    (MR. JOHNSTON) MR. SHAYEI, GOOD AFTERNOON.
13    A.    GOOD AFTERNOON TO YOU, SIR.
14    Q.    WHERE ARE YOU COMING FROM TODAY?
15    A.    I AM COMING FROM VANCOUVER CANADA, BRITISH COLOMBIA,
16    CANADA.
17    Q.    IS THAT WHERE YOU LIVE TODAY CURRENTLY?
18    A.    YES, THAT IS WHERE I LIVE TODAY.
19    Q.    HOW LONG HAVE YOU LIVED IN VANCOUVER?
20    A.    EIGHT YEARS NOW.
21    Q.    AND WHAT DO YOU DO IN VANCOUVER?
22    A.    I WORK -- I AM A CHIEF ENGINEER, WORK FOR BC FERRIES.
23    AND I GOT MY JOB SINCE END OF 2007 OVER THERE, SAME AS I MOVED
24    TO CANADA.
25    Q.    YOU MOVED TO CANADA IN 2007?
```

APRIL 20, 2015

SHAYEI – DIRECT EXAMINATION

1   **A.**    YES, I DID.

2   **Q.**    WHERE DID YOU MOVE FROM?

3   **A.**    FROM IRAN.  FROM TEHRAN, IRAN.

4   **Q.**    IS THAT WHERE YOU ARE FROM ORIGINALLY?

5   **A.**    YES, I AM.

6   **Q.**    DO YOU KNOW ARASH GHAHREMAN?

7   **A.**    I DO KNOW ARASH GHAHREMAN, YES.

8   **Q.**    HOW LONG HAVE YOU KNOWN HIM?

9   **A.**    LIKE FOR OVER 25 YEARS NOW.

10  **Q.**    AND WHERE DID YOU FIRST MEET HIM?

11  **A.**    IN THE SCHOOL, IN THE SAME SCHOOL THAT ARASH WAS THERE.

12  I WENT THERE FOR A SHORT TERM, FOR A SEMESTER.  AND THAT IS

13  THROUGH A MUTUAL FRIEND I MET ARASH.

14  **Q.**    AND DID YOU GET TO KNOW HIM?

15  **A.**    OH, YES, I GOT TO KNOW HIM.  AND THEN I WAS THERE FOR A

16  SHORT TIME, LIKE, YOU KNOW.  BUT I KEPT ON SEEING HIM, LIKE,

17  BECAUSE I WORKED IN DEEP SEA, AND EVERY TIME I CAME BACK TO

18  BANDAR ABBAS WHERE THE SCHOOL WAS, I WOULD MEET WITH HIM.  AND

19  ALSO I CONTINUED TO TEHRAN, HIS HOME, I USED TO GO.  ANY TIME

20  I WAS HOME IN TEHRAN, I WOULD GO AND SEE HIM.  WE WOULD

21  CONTINUE TO SEE EACH OTHER AFTER THAT.

22  **Q.**    SO WHEN YOU KNEW HIM IN SCHOOL YOU KNEW HIM WITH A

23  MUTUAL GROUP OF FRIENDS --

24  **A.**    RIGHT.

25  **Q.**    -- IS THAT RIGHT?  AND YOU KEPT IN TOUCH WITH HIM AFTER

APRIL 20, 2015

SHAYEI – DIRECT EXAMINATION

1   YOU LEFT THE UNIVERSITY?

2   **A.**   YES, I DID.

3   **Q.**   AND YOU SAID THAT YOU SAW HIM WHEN YOU WERE IN BANDAR

4   ABBAS.

5   **A.**   RIGHT.

6   **Q.**   AND YOU MENTIONED AGAIN IN TEHRAN.

7   **A.**   RIGHT.

8   **Q.**   WHAT WERE THE CIRCUMSTANCES?  HOW DID YOU KNOW ARASH IN

9   TEHRAN?

10  **A.**   WELL, AS I SAID, WE JUST KEPT IN CONTACT.  SO, LIKE,

11  AFTER HE WENT TO IRAN, LIKE –– TO TEHRAN HE INVITED ME OVER.

12  SO HE INTRODUCED ME TO HIS FAMILY AS HIS FRIEND.  AND VICE

13  VERSA, I DID THE SAME THING.  WE HAD AGAIN OTHER MUTUAL

14  FRIENDS THERE.  WE KEPT A GROUP.  WE DID A LOT OF THINGS

15  TOGETHER, YOU KNOW, HIKING, PLAYING SOCCER, YOU KNOW.

16  SPENDING TIME TOGETHER, WATCHING MOVIES TOGETHER.  AND, YES,

17  WE KEPT IN TOUCH, WE WERE IN CONTACT ALL THE TIME.

18  **Q.**   DID YOU BECOME CLOSE WITH HIS FAMILY AS WELL?

19  **A.**   YES.  I KNOW HIS FAMILY AND HIS RELATIVES.  WE HAVE BEEN

20  LONG ENOUGH TO WHERE HE KNEW THE SAME WAY HE KNEW.  SO HE WAS

21  LIKE EVEN MY BEST MAN IN MY WEDDING, YOU KNOW.

22  **Q.**   BEST MAN IN YOUR WEDDING?

23  **A.**   YES.

24  **Q.**   COULD YOU MOVE THE MICROPHONE A LITTLE BIT?  YOU HAVE A

25  VERY SOFT VOICE.

APRIL 20, 2015

SHAYEI – DIRECT EXAMINATION

1    **A.**    SORRY.

2    **Q.**    SO DURING YOUR TIME IN TEHRAN YOU CAME TO KNOW HIM AND

3    HIS FAMILY?

4    **A.**    RIGHT.

5    **Q.**    AND YOU PARTICIPATED IN MEANINGFUL EVENTS TOGETHER, LIKE

6    YOUR WEDDING?

7    **A.**    RIGHT.

8    **Q.**    AND WHEN YOU CAME TO NORTH AMERICA, TO CANADA, DID YOU

9    MAINTAIN CONTACT WITH MR. GHAHREMAN?

10   **A.**    YES, WE DID.  YES, I DID MAINTAIN CONTACT.  BOTH BY,

11   LIKE, TELEPHONE CALLS.  THEN IN 2009, CHRISTMAS 2009, HE CAME

12   OVER TO VANCOUVER, SPEND THE CHRISTMAS WITH US.  AND CHRISTMAS

13   2012 I WENT TO NEW YORK WITH MY WIFE AND KID, WE WENT TO HIS

14   PLACE, SPENT CHRISTMAS WITH HIM.  SO WE HAVE BEEN IN CONTACT,

15   AND THEN EMAIL, TELEPHONE.

16   **Q.**    DO YOU STAY IN TOUCH WITH THE PEOPLE WHO YOU KNEW HIM

17   WITH BEFORE, SUCH AS HIS FAMILY?

18   **A.**    YES.

19   **Q.**    FORMER FRIENDS?

20   **A.**    YES, WE ARE.  I CALL HIS PARENTS EVEN, SOMETIMES, YOU

21   KNOW.

22   **Q.**    AND WOULD YOU CONSIDER MR. GHAHREMAN TO BE A CLOSE

23   FRIEND OF YOURS?

24   **A.**    I DO.

25   **Q.**    NOW, MR. SHAYEI, HAVE YOU HAD EXPERIENCES WITH MR.

APRIL 20, 2015

SHAYEI – DIRECT EXAMINATION

1    GHAHREMAN OR HIS FRIENDS, CLASSMATES, FAMILY MEMBERS, THAT

2    WOULD ALLOW YOU TO HAVE AN OPINION ABOUT HIS CHARACTER FOR

3    HONESTY?

4    **A.**    ARASH, YES, ARASH IS AN HONEST PERSON.  MR. GHAHREMAN IS

5    AN HONEST PERSON.  AND THIS IS NOT ONLY I BELIEVE, ALL OTHER

6    FRIENDS BELIEVE SO.  BECAUSE HE IS A PERSON THAT -- BECAUSE

7    YOU DON'T SEE HIM LIE.  THAT IS EVERYBODY AROUND HIM, LIKE,

8    THINKS THE SAME WAY ABOUT HIM.  THAT IS NOT ONLY ME.  BECAUSE

9    HE DOESN'T LIE.  HE IS VERY HONEST, AND HE IS LIKE AN OPEN

10   BOOK.  LIKE EVERYBODY HAS SEEN ARASH FOR SOME TIME KNOWS HIM

11   THAT HE IS SO HONEST AND HE TELLS THE TRUTH.  AND, YES, I

12   BELIEVE SO.

13   **Q.**    DOES HE HAVE A REPUTATION IN THAT SAME COMMUNITY OF

14   PEOPLE THAT YOU KNOW FOR HAVING CHARACTER FOR HONESTY?

15   **A.**    YES, DEFINITELY.  DEFINITELY.  AS I SAID ALL OF MY

16   FRIENDS THINKS THE SAME ABOUT HIM.  LIKE, MY BROTHER-IN-LAW

17   WORK WITH HIM, HE WAS A FOURTH ENGINEER IN DEEP SEA, MY

18   BROTHER-IN-LAW WAS A THIRD ENGINEER.  AND, LIKE, ONCE I ASKED

19   HIM, HOW IS ARASH DOING?  HE SAID, LOOK, HE IS DOING GREAT.

20   HE IS SOMEBODY WHO IS HONEST.

21        AND HE MENTIONED THAT HE IS HONEST AND HE DOES HIS JOB

22   HONESTLY.  AND, LIKE, IF SOMETHING GOES WRONG, LIKE, YOU KNOW,

23   ASK HIM, HE DOESN'T LIE THAT, I DIDN'T DO IT, YOU KNOW.  AND

24   HE WOULD STAY TO FINISH THE JOB PROPERLY, IN THE RIGHT WAY,

25   RATHER THAN DOING THE JOB LIKE MICKEY MOUSE JOB AND JUST

APRIL 20, 2015

SHAYEI – DIRECT EXAMINATION

1   FINISH IT AND JUST LEAVE IT.  EVEN IF HE HAD TO STAY BEYOND

2   HIS WATCH HE WOULD HAVE STAYED BEYOND HIS WATCH AND FINISH THE

3   JOB.

4   **Q.**   LET ME ASK YOU, BASED ON YOUR EXPERIENCE WITH ARASH, HIS

5   FRIENDS, CLASSMATES, FAMILY MEMBERS, HAVE YOU FORMED AN

6   OPINION ABOUT HIS CHARACTER FOR LAW ABIDINGNESS?

7   **A.**   I BELIEVE ARASH IS LAW ABIDING.  THE REASON I SAY THAT,

8   BECAUSE I HAVEN'T SEEN HIM BREAKING ANY LAWS.  SO SAME WAY IF

9   YOU SEE SOMEBODY DOESN'T LIE TO YOU SO WE THINK HE IS HONEST,

10  SAME WAY BECAUSE I DON'T SEE HIM BREAKING THE LAW.  I HAVEN'T

11  SEEN HIM BEING IN TROUBLE WITH ANY POLICE OR ANYTHING.  SO I

12  DEFINITELY BELIEVE THAT HE IS LAW ABIDING TOO.

13  **Q.**   IS THAT HIS REPUTATION AMONG YOUR FRIENDS, FAMILY

14  MEMBERS, FORMER COLLEAGUES?

15  **A.**   I DO BELIEVE THAT THEY FEEL THE SAME WAY, BECAUSE I WAS

16  TALKING THE OTHER DAY WITH SOME OF THE FRIENDS, WITH ARASH.

17  AND IT IS VERY INTERESTING THAT WE ALL THOUGHT THE SAME WAY,

18  LIKE, YOU KNOW, IT IS JUST -- EVEN WHEN THE WORDS WE USE IN

19  FARSI, WE WERE SPEAKING FARSI, WAS EXACT SAME WORDS.  SO WE

20  ALL HAD SAME OPINION ABOUT HIM AND BEING -- AND I BELIEVE IT

21  IS NOT ONLY ME, HIS FRIENDS ALSO BELIEVE THAT HE IS LAW

22  ABIDING.

23          **MR. JOHNSTON:**  THANK YOU.  NOTHING FURTHER.  THANK

24  YOU MR. SHAYEI.

25          **THE COURT:**  CROSS-EXAMINATION.

APRIL 20, 2015

SHAYEI – DIRECT EXAMINATION

| | |
|---|---|
| 1 | CROSS-EXAMINATION |
| 2 | **Q.**    **(MR. COUGHLIN)** GOOD AFTERNOON, MR. SHAYEI. |
| 3 | **A.**    GOOD AFTERNOON SIR. |
| 4 | **Q.**    YOU CONSIDER MR. GHAHREMAN A GOOD FRIEND? |
| 5 | **A.**    I BELIEVE HE IS A GOOD FRIEND OF MINE, YES, SIR. |
| 6 | **Q.**    YOU WISH HIM VERY WELL, CORRECT? |
| 7 | **A.**    I DO WISH HIM VERY WELL. |
| 8 | **Q.**    OKAY.  NOW, YOU SAID YOU CAME DOWN IN DECEMBER TO NEW |
| 9 | YORK AND VISITED HIM WITH YOUR WIFE; IS THAT CORRECT? |
| 10 | **A.**    YES.  MY WIFE AND SON, YES. |
| 11 | **Q.**    DID YOU SPEND ANY TIME AT HIS EMPLOYMENT? |
| 12 | **A.**    WE STAY IN HIS RESIDENCE, IN HIS APARTMENT WITH HIM. |
| 13 | **Q.**    DID YOU EVER GO TO WHERE HE WORKS? |
| 14 | **A.**    NO, I DID NOT GO TO HIS PLACE OF WORK. |
| 15 | **Q.**    DO YOU KNOW THE NAME OF THE PLACE THAT HE WORKED AT? |
| 16 | **A.**    HE WAS IN A SHIPYARD, BUT I CAN'T REMEMBER THE NAME OF |
| 17 | THE SHIPYARD.  HE WORKED AT THE SHIPYARD. |
| 18 | **Q.**    DID YOU KNOW WHERE HE WORKED PRIOR TO THE SHIPYARD?  HE |
| 19 | WAS THERE IN 2012.  DO YOU RECALL THE NAME GMD?  DOES THAT |
| 20 | RING A BELL WITH YOU? |
| 21 | **A.**    NO.  WHEN WE TALK I WOULD REALLY, LIKE, YOU KNOW, WE |
| 22 | GENERALLY IF WE TALKED ABOUT WORK HE WOULD SAY, LIKE, I WORK |
| 23 | IN THE SHIPYARD.  IT IS JUST ABOUT SHIP OR SOMETHING.  BUT |
| 24 | REALLY I NEVER ASKED WHAT IS THE NAME OF YOUR SHIPYARD OR -- |
| 25 | BECAUSE I WASN'T REALLY CURIOUS.  WE NEVER TALKED ABOUT THE |

APRIL 20, 2015

SHAYEI – CROSS-EXAMINATION

1   NAME OF THE PLACE.

2   **Q.**    OKAY.  DID YOU KNOW THAT HE HAD WORKED AT CADDELL DRY

3   DOCK AT ALL?  PROBABLY NOT.

4   **A.**    I KNOW IT WAS DRY DOCK, SHIPYARDS, BUT DON'T KNOW THE

5   NAME.  SORRY, NO, SIR.

6   **Q.**    DID YOU EVER MEET ANY OF HIS COLLEAGUES FROM THERE?

7   **A.**    NO.

8   **Q.**    HAVE YOU EVER HEARD OF THE COMPANY TIG MARINE?

9   **A.**    TIG MARINE.  NOT SURE.  I THINK FOR MY OWN WORK, BECAUSE

10  I WORK, LIKE, I AM A MARINE ENGINEER TOO.  I AM NOT SURE, BUT

11  I THINK MAYBE THEY ARE A MARINE NAVIGATION EQUIPMENT.  I AM

12  NOT SURE, I THINK MAYBE THEY ARE.

13  **Q.**    DID YOU EVER DEAL WITH THEM?

14  **A.**    NO.  NOT PERSONALLY, NO.

15  **Q.**    HOW WAS IT YOU WOULD HAVE HEARD OF THEM?

16  **A.**    WELL, I AM A CHIEF ENGINEER SO ONBOARD THE SHIP WE HAVE

17  EQUIPMENTS, RIGHT?  SO AND THEN IF YOU USE SOME OF THE

18  EQUIPMENTS OF –– I HAVE BEEN, LIKE, IN DEEP SEA FOR, LIKE,

19  OVER 25 YEARS NOW, RIGHT.  SO I MIGHT HAVE SEEN THE MANUAL OF

20  THE MAKER.  YOU SEE THE MANUALS, YOU KNOW.  SO IT SAYS THE

21  MAKER NAME THERE.  I THINK, AS I SAID, BECAUSE I DON'T REALLY

22  DEAL –– WE DON'T REALLY DEAL WITH THE NAVIGATIONAL EQUIPMENT

23  BUT WE HAVE THE MANUALS IN ORDER IF WE HAVE TO ORDER PARTS WE

24  MIGHT HAVE.

25  **Q.**    NOW, DID YOU KNOW WHETHER OR NOT THAT MR. GHAHREMAN HAD

APRIL 20, 2015

SHAYEI – CROSS–EXAMINATION

1  OPERATED AS AN AGENT FOR COMPANIES LOCATED IN THE UNITED ARAB

2  EMIRATES.  DID YOU KNOW THAT?

3  **A.**    NO, I DIDN'T KNOW HE WAS AN AGENT.  NO, I JUST –– BUT I

4  THINK I KNOW THAT HE WAS –– A FRIEND OF HIS WAS ASKING HIM TO

5  DO HIM A FAVOR, DO SOMETHING FOR HIM.  BUT NOTHING OTHER,

6  LIKE, IN DEPTH LIKE THAT.

7  **Q.**    YOU DIDN'T KNOW WHAT THE FRIEND HAD ASKED HIM TO DO,

8  CORRECT?

9  **A.**    NO, I DIDN'T KNOW.

10  **Q.**    DIDN'T TALK TO HIM ABOUT THAT?

11  **A.**    NO.

12  **Q.**    DID MR. GHAHREMAN TELL YOU THAT HE HAD AN OPPORTUNITY IN

13  DECEMBER OF 2012 TO MAKE OVER HALF A MILLION DOLLARS?

14  **A.**    NO.

15  **Q.**    WHAT WAS HIS ECONOMIC SITUATION WHEN YOU WERE VISITING

16  HIM IN NEW YORK?

17  **A.**    HE WAS STUDYING, I THINK.  HE WAS –– I THINK HE WANTED

18  TO STUDY.  AND BEFORE THAT HE WAS WORKING.  AND I THINK HE

19  HAD –– I AM NOT TOO SURE, PROBABLY I THINK HE HAD QUITTED HIS

20  JOB, BUT HE WANTED TO STUDY.  HE SAID THAT HE WANTS TO STUDY

21  AND GET HIS, LIKE, A MASTER'S OR SOMETHING.

22  **Q.**    NOW, DID YOU HAVE AN OPPORTUNITY TO MEET SOME OF HIS

23  FRIENDS THERE IN NEW YORK?

24  **A.**    THE ONLY PERSON I MET FROM HIS FAMILY –– WELL, WAS HIS

25  ROOMMATE WAS THERE.

APRIL 20, 2015

SHAYEI – CROSS-EXAMINATION

1   **Q.**    WHO IS HIS ROOMMATE?

2   **A.**    IT WAS COMRADE WHO WAS LIVING THERE, LIKE.  ALSO WE MET

3   HIS COUSIN AND HER HUSBAND, NO.  WHO WENT TO A RESTAURANT.

4   AND THEN WE ALSO WENT TO IRANIAN -- IT WAS A PARTY, LIKE, FOR

5   NEW YEAR PARTY, NEW JERSEY.  SO WE WENT AND JUST HAD SOME GOOD

6   TIME.

7   **Q.**    OKAY.  SO IN CONNECTION WITH INDIVIDUALS IN IRAN, HAVE

8   YOU KEPT UP CONTACT WITH INDIVIDUALS IN IRAN YOURSELF?

9   **A.**    I HAVE MY OWN FRIENDS, YES.

10  **Q.**    DO YOU KNOW AN INDIVIDUAL BY THE NAME OF KOORUSH

11  TAHERKHANI?

12  **A.**    I KNOW KOORUSH TAHERKHANI BECAUSE KOORUSH WAS IN THE

13  SAME SCHOOL AS ARASH WAS, BUT JUST FAMILIAR WITH HIM.  I

14  NEVER -- I DON'T HAVE ANY CONTACTS WITH HIM.

15  **Q.**    DID YOU HAVE CONTACTS WITH HIM WHEN YOU WERE IN THE

16  SCHOOL?

17  **A.**    JUST I SAY, HI.  HELLO, THIS IS KOORUSH.  AS I SAID,

18  NOTHING MORE THAN THAT.

19  **Q.**    DO YOU KNOW WHAT HE HAD BEEN DOING THE LAST SIX OR SEVEN

20  YEARS?

21  **A.**    NO, SIR.

22  **Q.**    DO YOU KNOW AN INDIVIDUAL BY THE NAME OF ERGUN YILDIZ?

23  **A.**    NO, SIR.

24  **Q.**    NOW, IN CONNECTION WITH YOUR JOB, YOU SAID YOU ARE THE

25  CHIEF ENGINEER --

APRIL 20, 2015

SHAYEI – CROSS–EXAMINATION

1   **A.**   RIGHT.

2   **Q.**   –– IN BRITISH COLOMBIA WITH FERRIES?

3   **A.**   BC FERRIES, YES.

4   **Q.**   DOES YOUR JOB, IN ANY WAY, REQUIRE YOU TO BE A VENDOR?

5        **MR. JOHNSTON:**   YOUR HONOR, I AM GOING TO OBJECT.

6   BEYOND THE SCOPE AT THIS POINT.

7        **THE COURT:**   OVERRULED.

8   **Q.**   **(MR. COUGHLIN)** DO YOU HAVE TO PURCHASE ANYTHING IN YOUR

9   JOB WITH BC FERRIES?

10  **A.**   WE DON'T PURCHASE ANYTHING DIRECTLY, SO I MAKE A –– IF I

11  WANT A PART OR EQUIPMENT, I MAKE A REQUISITION THEN SEND IT TO

12  THE PURCHASING DEPARTMENT.  THEY WILL DO IT.

13  **Q.**   SO YOU ARE NOT INVOLVED IN ANYTHING LIKE THAT.

14  **A.**   NO.

15       **MR. COUGHLIN:**   NOTHING FURTHER OF THIS WITNESS, YOUR

16  HONOR.

17       **THE COURT:**   REDIRECT?

18       **MR. JOHNSTON:**   NONE, YOUR HONOR.  THANK YOU.

19       **THE COURT:**   THANK YOU VERY MUCH.  YOU WOULD BE

20  EXCUSED.

21       LET'S MEET BRIEFLY AT SIDEBAR TO DISCUSS SCHEDULING.

22       (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD AT

23       THE BENCH, OUT OF THE HEARING OF THE JURY)

24       **THE COURT:**   HOW MUCH LONGER WILL YOU BE WITH THE

25  WITNESS?

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1          MR. HARRIGAN:  HOW MUCH LONGER AM I GOING TO BE?  I
 2   THINK ONLY ABOUT A HALF HOUR, I REALLY DO.
 3          THE COURT:  REDIRECT?
 4          MR. JOHNSTON:  YEAH, THERE IS GOING TO BE SOME.
 5          THE COURT:  I AM THINKING ABOUT HAVING THE JURY COME
 6   BACK ON WEDNESDAY.
 7          MR. HARRIGAN:  THAT WOULD BE GOOD.
 8          THE COURT:  I JUST GOT THE DEFENSE INSTRUCTIONS, I
 9   DON'T THINK WE CAN FINISH THEM TONIGHT.
10          MR. JOHNSTON:  WE DON'T HAVE ANY OBJECTION TO THAT,
11   YOUR HONOR.
12          THE COURT:  IT SEEMS TO ME WE COULD WRAP UP ALL OF
13   THE TESTIMONY WITHIN AN HOUR.
14          MR. HARRIGAN:  YES.
15          MR. JOHNSTON:  YES.
16          THE COURT:  CROSS AND DIRECT.
17          MR. JOHNSTON:  YES.  ASSUMING HE IS HALF HOUR.
18          MR. HARRIGAN:  I WILL GO WITH A TIME LIMIT, HALF
19   HOUR.
20          THE COURT:  WE CAN INSTRUCT AND ARGUE, HAVE IT
21   SUBMITTED TO THE JURY ON WEDNESDAY.  OKAY.  I WILL HAVE THEM
22   DELIBERATE THURSDAY AND FRIDAY IF NECESSARY.
23          MR. HARRIGAN:  PERFECT.
24          (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN
25          OPEN COURT, IN THE HEARING OF THE JURY)
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1      **THE COURT:**  LADIES AND GENTLEMEN, WE ARE GOING TO
2   FINISH FOR THE DAY.

3          I AM ANTICIPATING THAT WE HAVE ABOUT ONE MORE HOUR
4   OF TESTIMONY BEFORE WE INSTRUCT AND ARGUE.  WE ARE AHEAD OF
5   SCHEDULE, WHICH IS THE GOOD NEWS.

6          WHAT I WOULD LIKE TO DO IS TAKE TOMORROW OFF FROM
7   THE JURORS' STANDPOINT.  I NEED TO WORK ON JURY INSTRUCTIONS
8   AND OTHER MATTERS RELATED TO THIS CASE, AND I FEAR THAT IF I
9   ATTEMPT TO GET ALL OF THAT DONE TONIGHT I MAY NOT FINISH AND
10  WON'T BE IN A POSITION TO GIVE YOU THE JURY INSTRUCTIONS
11  TOMORROW.  SO I WOULD RATHER PROCEED IN A MORE ORDERLY
12  FASHION, PARTICULARLY SINCE WE ARE AHEAD OF SCHEDULE, AND BE
13  DARK TOMORROW FROM THE JURORS' PERSPECTIVE.  AND THAT WILL
14  GIVE COUNSEL AND I THE DAY TO PERFECT THE INSTRUCTIONS AND
15  WORK ON ALL OF THE OTHER MATTERS.

16         SO WHAT YOU COULD ANTICIPATE, THEN, IS ON WEDNESDAY
17  WE WOULD START AT 8:30.  WE WILL HAVE ABOUT ONE HOUR OF
18  TESTIMONY.  ALL OF THE EVIDENCE WILL THEN BE IN.  I WOULD THEN
19  INSTRUCT ON THE LAW, AND WE WILL HAVE CLOSING ARGUMENT.

20         THAT WILL LIKELY TAKE THE ENTIRE DAY, CLOSE TO IT.
21  IT COULD EVEN ROLL INTO THURSDAY, BUT I DON'T THINK SO.  I AM
22  ANTICIPATING YOU WILL HAVE THE CASE SUBMITTED TO YOU FOR YOUR
23  DELIBERATIONS SOMETIME LATE WEDNESDAY, AROUND THE 2:00 O'CLOCK
24  TIME FRAME.

25         SO I WILL ASK THAT YOU RETURN ON WEDNESDAY AT 8:30.

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1   AND WE WILL KEEP THE SAME SCHEDULE IN PLACE, 8:30 TO 2:00.  I

 2   WILL ASK THAT YOU USE THURSDAY FOR A DAY OF DELIBERATIONS AND

 3   FRIDAY, IF NECESSARY, AS WELL.

 4            AND ONCE AGAIN, I DO THINK WE ARE ABOUT A DAY AHEAD

 5   OF SCHEDULE, SO I THINK IT WORKS WELL, FROM YOUR STANDPOINT

 6   AND THE COURT'S, TO GO DARK TOMORROW.

 7            I WILL ASK THAT YOU LEAVE YOUR NOTEBOOKS HERE.

 8            KEEP IN MIND ALL OF THE ADMONITIONS NOT TO DISCUSS

 9   THE CASE, FORM OR EXPRESS ANY OPINIONS OR CONCLUSIONS.

10            THANK YOU AGAIN FOR YOUR TIME AND ATTENTION TODAY.

11   DON'T COME HERE TOMORROW, ENJOY THE DAY.  WORK, WHATEVER YOU

12   WOULD LIKE TO DO.  WE WILL SEE YOU ALL WEDNESDAY AT 8:30.

13            THANK YOU VERY MUCH.

14            (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

15            OPEN COURT, OUT OF THE HEARING OF THE JURY)

16            THE COURT:  OKAY.  WE ARE OUTSIDE OF THE PRESENCE OF

17   THE JURY.

18            LET'S TAKE A -- I HAVE A 2:30 MATTER THAT IS GOING

19   TO TAKE PROBABLY HALF AN HOUR OR AN HOUR.  I WILL ASK THAT

20   COUNSEL STAY CLOSE BY.  WHAT I WANT TO DO IS GIVE YOU THE

21   DRAFT SET OF INSTRUCTIONS THAT I HAVE PREPARED.  THEY ARE THE

22   INSTRUCTIONS WITHOUT THE BENEFIT OF THE DEFENSE PROPOSED

23   INSTRUCTIONS, BECAUSE I READ THE INSTRUCTIONS THAT MR. CAMDEN

24   HAS WHILE WE WERE IN SESSION TODAY BUT I DIDN'T HAVE TIME TO

25   LOOK AT THEM CAREFULLY.
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1              SO WHAT I WILL ASK IS THAT COUNSEL STAND BY.  WE
 2    WILL PROVIDE DRAFT INSTRUCTIONS TO COUNSEL.  AND THEN ASK
 3    COUNSEL TO RETURN AT 3:30, SO THAT I CAN HAVE THE BENEFIT OF
 4    ALL OF THE ARGUMENTS AND THEN I CAN MODIFY THE INSTRUCTIONS AS
 5    NECESSARY.  AND THEN WE CAN MEET AGAIN TOMORROW AND SEE HOW WE
 6    ARE DOING.
 7              HERE AGAIN, MR. GHAHREMAN NEED NOT BE PRESENT FOR
 8    THE JURY INSTRUCTION CONFERENCE.  BUT OF COURSE YOU ARE
 9    WELCOME TO BE HERE IF YOU DESIRE.
10              DEFENDANT GHAHREMAN:  THANK YOU.
11              THE COURT:  SO IF YOU WILL GIVE ME ABOUT 15 MINUTES
12    I WILL PROVIDE DRAFT INSTRUCTIONS TO YOU, AND THEN WE WILL
13    MEET UP AGAIN AT 3:30.
14              ANYTHING ELSE WE NEED TO ADDRESS --
15              MR. HARRIGAN:  NO, YOUR HONOR.
16              THE COURT:  -- AT THIS TIME?
17              MR. JOHNSTON:  NOT AT THIS TIME, YOUR HONOR.
18              THE COURT:  THANK YOU.
19              (RECESS)
20              THE COURT:  WE ARE BACK ON THE RECORD WITH COUNSEL
21    ONLY.
22              I HAVE GIVEN COUNSEL THE DRAFT OF THE COURT
23    PROPOSED.
24              WELL, LET'S START FIRST WITH THE GOVERNMENT.  THERE
25    WAS A COUPLE OF PROPOSALS I RECEIVED TODAY DEFINING THE TERM
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1   BUY, B-U-Y.  AND AN INSTRUCTION DEALING WITH AN INERT DEVICE.

 2           IS THERE ANY OBJECTION TO THOSE?

 3           MR. CAMDEN:  WELL, FOR THE INSTRUCTION ON BUY, THAT

 4   IS -- THAT ACCURATELY STATES THE HOLDING IN KUOK.  WE ARE

 5   STILL GOING TO OBJECT BECAUSE WE WANT TO PRESERVE THAT ISSUE

 6   FOR FURTHER REVIEW, BUT I UNDERSTAND THE COURT IS BOUND BY

 7   KUOK.

 8           THE COURT:  DOES IT NEED TO BE GIVEN?

 9           MR. CAMDEN:  ALSO I DON'T THINK THAT IT -- I AM NOT

10   SURE THAT IT IS NEEDED AS AN INSTRUCTION.  I THINK BUY IS A

11   PRETTY COMMON SENSE TERM.

12           THE COURT:  ISN'T BUY AND EXPORT, AREN'T THOSE --

13   CAN'T WE PROCEED WITHOUT INSTRUCTING ON THOSE?

14           MR. HARRIGAN:  YOUR HONOR, I THINK SO.  I NOTICE

15   THAT YOUR HONOR DID NOT GIVE -- EXCUSE ME -- DID NOT GIVE THE

16   GOVERNMENT'S REQUESTED EXPORT INSTRUCTION.  AND WE ARE OKAY

17   WITH THAT.

18           MY ONLY CONCERN ABOUT BUY IS, AS HAPPENED -- THERE

19   WAS A LOT OF ARGUMENT IN KUOK OVER WHETHER THIS WAS BOUGHT.  I

20   THINK IF IT IS NOT AN ISSUE -- IF THEY ARE GOING TO ARGUE

21   THERE IS SOME OTHER DEFINITION OF BUY THEN I WOULD AT LEAST

22   LIKE THIS, WHICH JUST SAYS IT INCLUDES, DOESN'T GIVE THE

23   DEFINITION.  BECAUSE OBVIOUSLY -- I THINK IN KUOK WHAT THE

24   ARGUMENT IS YOU HAVE TO PUT ALL OF THE MONEY DOWN FOR THE

25   THING, RIGHT?  AND HE REALLY DIDN'T BUY IT.  KUOK SAYS NO, YOU
```

APRIL 20, 2015

1  CAN USE THE DICTIONARY DEFINITION WHERE YOU GIVE MONEY AND YOU

2  RECEIVE --

3          **THE COURT:**  SO YOU WOULDN'T BE MAKING A CONTRARY

4  ARGUMENT.

5          **MR. CAMDEN:**  WELL, YOUR HONOR, I DO NEED TO PRESERVE

6  THIS.  SO I DO THINK KUOK WAS WRONGLY DECIDED.  IT DID INCLUDE

7  IN THE DEFINITION OF BUY IF SOMETHING IS BOUGHT IF JUST MONEY

8  IS PROMISED IN EXCHANGE FOR IT.

9          OUR DEFINITION OF BUY THAT WE PROPOSE WOULD BE WHEN

10  TITLE PASSES, ESSENTIALLY, UNDER THE PARTIES' UNDERSTANDING.

11  SO IN THIS CASE IT IS TRUE, I THINK WE WOULD HAVE AN ARGUMENT,

12  IF WE WERE ALLOWED TO MAKE IT, WHICH WOULD BE CONTRARY TO

13  KUOK.  BUT THE ARGUMENT WE WOULD HAVE MADE IS THAT THEY

14  WEREN'T BOUGHT UNTIL TITLE HAD PASSED, AND UNDER THE CONTRACT

15  TITLE DIDN'T PASS UNTIL IT WAS RECEIVED.

16          **THE COURT:**  THAT ARGUMENT, THOUGH, WOULD BE

17  FORECLOSED.

18          **MR. CAMDEN:**  SO AS LONG AS WE GET A RULING FROM THE

19  COURT WE WON'T BE MAKING THAT ARGUMENT, BUT JUST ON THE

20  UNDERSTANDING THAT THAT IS THE COURT'S POSITION.

21          **THE COURT:**  I WOULD MAKE THAT CLEAR, THEN, THAT I

22  WOULD FIND THAT KUOK CONTROLS, AND THAT ARGUMENT WOULD THEN BE

23  FORECLOSED.

24          SO, IN LIGHT OF THAT, WE DON'T NEED TO INSTRUCT ON

25  THE TERM BUY.  I DON'T THINK WE NEED TO INSTRUCT ON THE TERM

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

 1    EXPORT.

 2              WHAT ABOUT INERT DEVICE?  DO YOU -- WE COULD EITHER

 3    INSTRUCT ON IT OR COUNSEL --

 4              **MR. HARRIGAN:**  I ONLY ADDED THAT BECAUSE I DIDN'T

 5    KNOW WHAT ARGUMENTS THEY WERE GOING TO MAKE.  SOMETIMES THAT

 6    BECOMES AN ISSUE.

 7              **THE COURT:**  YOU COULD SIMPLY ARGUE THAT AN INERT

 8    DEVICE, IT IS STILL --

 9              **MR. HARRIGAN:**  DID THEY HAVE THE INTENT, THAT IS THE

10    ISSUE.  THERE IS NO ARGUMENT THEY DIDN'T BELIEVE IT WASN'T

11    REAL, SO THE QUESTION IS DID THEY TAKE SUBSTANTIAL STEPS IN

12    THE EXPORT.

13              **THE COURT:**  YES.  DO YOU OBJECT, MR. CAMDEN, TO MR.

14    HARRIGAN SIMPLY MAKING THAT ARGUMENT AND THEN YOU NOT

15    CONTROVERTING IT?

16              **MR. CAMDEN:**  I THINK IT IS PROBABLY BETTER FOR MR.

17    JOHNSTON TO ADDRESS THAT.

18              **THE COURT:**  MR. JOHNSTON.

19              **MR. JOHNSTON:**  I AM SORRY.  GIVE ME ONE MOMENT, YOUR

20    HONOR.

21              **THE COURT:**  YES.

22              **MR. JOHNSTON:**  YOUR HONOR, TO THE EXTENT THE

23    GOVERNMENT IS ARGUING THAT THE DEFENDANTS WERE ATTEMPTING TO

24    EXPORT THE GOODS, NO, I DIDN'T INTEND TO MAKE THE ARGUMENT

25    THEY COULD NOT HAVE EXPORTED IT.  TO THE EXTENT THE AGENTS ARE

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1    THE EXPORTERS AND THEY ARE ALLEGEDLY EXPORTING IT, I WOULD

2    MAKE CLEAR THAT THEY NEVER INTENDED TO EXPORT ANYTHING BECAUSE

3    THESE ARE INERT OBJECTS.  BUT I DON'T THINK THAT IS GOING TO

4    UNDERCUT MR. HARRIGAN'S ARGUMENT, IF HE WANTS TO ARGUE THAT

5    MR. GHAHREMAN WAS CRIMINALLY RESPONSIBLE FOR EXPORTING.

6         I AM NOT GOING TO SAY MR. GHAHREMAN IS NOT GUILTY OF

7    EXPORTING BECAUSE THEY WEREN'T, YOU KNOW -- BUT I CERTAINLY

8    WILL MAKE THE ARGUMENT THAT THE AGENTS NEVER INTENDED TO

9    EXPORT ANYTHING, AND THAT IS EVIDENCED, IN PART, BY THE FACT

10   THAT THESE OBJECTS WERE INERT.

11        **MR. HARRIGAN:**  THEN MAYBE WE NEED TO -- BECAUSE IT

12   WAS PLACED IN THE STREAM OF COMMERCE, AT LEAST, AND THE

13   DEFENDANTS WERE PRESENT, MAYBE WE NEED TO GIVE AN EXPORT

14   INSTRUCTION.  I UNDERSTAND THAT AGENTS CAN'T EXPORT IT, AND

15   THEY CAN'T AID AND ABET THE AGENT.

16        BUT WHAT WE HAVE HERE IS KIND OF A JOINT OPERATION

17   WHERE THEY ARE ALL IN TOGETHER FILLING IT OUT, AND ACTUALLY

18   WITNESSED AND WERE OKAY WITH IT BEING PLACED IN THE STREAM OF

19   COMMERCE.  THEIR DEFINITION IS IT HAS TO BE RECEIVED, AND NOT

20   ONLY DOES IT HAVE TO BE SENT BUT IT HAS GOT TO BE SENT TO THE

21   TERRITORY OF IRAN.

22        **THE COURT:**  SO YOU ARE REQUESTING BOTH AN EXPORT

23   INSTRUCTION AND THE INERT DEVICE INSTRUCTION.

24        **MR. HARRIGAN:**  BASED ON WHAT THEY JUST SAID.  I

25   DON'T KNOW SO MUCH THE INERT, BUT NOW IT BRINGS INTO PLAY THE

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1    EXPORT.  I AM CERTAINLY NOT GOING TO ARGUE THAT THE DEFENDANT
 2    CAN AID AND ABET, YOU KNOW, THE AGENT, AND EXPORT.  THERE IS
 3    EVIDENCE HE WAS -- HE SIGNED THE SHIPPER THING, AND THEY ARE
 4    GOING TO ARGUE HE WAS THE EXPORTER.  BUT MERE PREPARATION,
 5    ATTEMPT CAN STILL BE ACCOMPLISHED, EVEN THOUGH SOMEBODY ELSE
 6    IS EXPORTING.  IF HE IS AIDING AND ABETTING THAT EFFORT TO
 7    GET -- THEY HAVE -- IF THERE IS A JOINT AGREEMENT TO GET IT
 8    THERE, TAKING SUBSTANTIAL STEPS.  THERE IS NOTHING MORE THEY
 9    COULD HAVE DONE, AT THAT POINT.  THE MERE FACT HE IS CALLED
10    THE SHIPPER DOESN'T MEAN THAT THEY WEREN'T -- YOU KNOW, DIDN'T
11    HAVE THE INTENT TO EXPORT IT.
12              THE COURT:  I WILL RESERVE ON THE EXPORT INSTRUCTION
13    AND THE INERT DEVICE.
14              MR. CAMDEN:  THIS MAY BE -- SORRY.  I DIDN'T MEAN TO
15    INTERRUPT.
16              THE COURT:  YES.
17              MR. CAMDEN:  JUST TO BRING -- OUR COUNTERPOINT
18    INSTRUCTION IN THE BRIEFING, THE JUSTIFICATION ON THAT WAS
19    DEFENDANT'S PROPOSED INSTRUCTION 17.
20              THE COURT:  YES.
21              MR. CAMDEN:  AS LONG AS THE COURT RECEIVED THAT, I
22    DON'T THINK I HAVE ANYTHING TO ADD.  I DID CITE CASES.
23              THE COURT:  OKAY.  WHAT ABOUT -- DOES THE GOVERNMENT
24    HAVE ANY OBJECTIONS TO ANY OF THE PROPOSED INSTRUCTIONS THAT
25    WERE GIVEN BY THE COURT IN THE PACKAGE THIS AFTERNOON?
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1            MR. HARRIGAN:  THE ONLY ONE IS JURY INSTRUCTION 16,
 2   YOUR HONOR.  I THINK THAT WAS PROPOSED BY DEFENDANT, AND THAT
 3   DEALS WITH KIND OF DEFINING INTERNATIONAL ECONOMIC POWERS ACT
 4   AND SETTING OUT WHAT THE ITSR IS.
 5            THE PROBLEM IS WE ARE STATING THE ITSR'S TWICE, AND
 6   IF WE DO THAT THEN MAYBE WE SHOULD BE DEFINING WHAT, YOU KNOW,
 7   TITLE 18 554 IS.  IT JUST MAKES IT MORE CONFUSING.
 8            I THINK THE WAY IT SHOULD BE SET OUT, THERE IS A
 9   CONSPIRACY, AS THE GOVERNMENT PROPOSED AND AS THE COURT HAS
10   FOLLOWED, AND THAT CERTAINLY WE HAVE -- THERE IS AN OBJECT OF
11   THE CONSPIRACY AND HERE ARE THE ELEMENTS.  AND WE AGREE THEY
12   HAVE TO BE INSTRUCTED ON THE ELEMENTS.  AND I THINK THE COURT
13   DOES THAT, YOU KNOW, IN COURT'S INSTRUCTION 18, WHICH FOLLOWS
14   THE 17, WHICH IS THE CONSPIRACY INSTRUCTION.
15            OTHERWISE IT IS JUST CONFUSING.  THERE IS NO REASON
16   TO DEFINE ITSR.  THEY DON'T EVEN HAVE TO KNOW THAT IT IS, THE
17   ITSR, THEY JUST HAVE TO KNOW THE LAW.
18            THE COURT:  WHAT IF --
19            MR. HARRIGAN:  JUST INCORPORATE THE INSTRUCTION.  WE
20   ARE JUST RESTATING IT TWICE, AND IT MAKES IT SEEM LIKE, OH, DO
21   WE HAVE TO FIND ANOTHER ELEMENT?  I MEAN, AS IT IS, WITH 17
22   AND 18 TOGETHER, IT IS PRETTY CLEAR WHAT THEY HAVE TO DO, YOU
23   KNOW.
24            MR. JOHNSTON:  COULD I INTERJECT FOR ONE MOMENT?
25            THE COURT:  YES.
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1     **MR. JOHNSTON:**  ARE YOU REFERRING TO THE NUMBERS JUST

2  BASED ON -- THE COPY WE GOT DOESN'T HAVE THAT.

3          **THE COURT:**  I DON'T HAVE NUMBERS ON MINE, EITHER.

4          **MR. HARRIGAN:**  I JUST NUMBERED THEM CONSECUTIVELY.

5          **THE COURT:**  OKAY.

6          **MR. HARRIGAN:**  BECAUSE THEY WEREN'T NUMBERED.  AND

7  THE ONLY ONE -- IT IS ONE THAT STARTS, THE INTERNATIONAL

8  EMERGENCY ECONOMIC POWERS ACT -- AND CITES THE STATUTE --

9  MAKES IT A CRIME FOR ANYONE TO WILLFULLY VIOLATE OR ATTEMPT TO

10  VIOLATE THE ITSR.

11          **THE COURT:**  THAT WOULD BE NO. 16 --

12          **MR. HARRIGAN:**  YES.

13          **THE COURT:**  -- ON THE COURT'S CURRENT PROPOSAL?

14          **MR. HARRIGAN:**  YES, THAT WOULD BE NO. 16.  AND THAT

15  IS THE ONLY ONE THAT WE HAVE AN OBJECTION TO.  INCLUDED IN

16  THAT IS THE -- I THINK THAT CAME FROM -- THE ONE OF THE TWO

17  THAT DEFENDANT PROPOSED.

18          **THE COURT:**  YES.

19          **MR. HARRIGAN:**  AND THE OTHER OBJECTION, IF THE COURT

20  IS CONSIDERING, IS THAT I UNDERSTAND THAT IRAN IS DEFINED AS

21  THE TERRITORY OF IRAN OR THE GOVERNMENT OF IRAN.  I THINK

22  TERRITORY IS A LITTLE CONFUSING.  I DON'T THINK THERE IS ANY

23  CONFUSION.  WE ARE NOT SAYING IT IS NOT GOING TO IRAN IT IS --

24  I DON'T KNOW WHY WE NEED TO INCLUDE TERRITORY OF IRAN.  THAT

25  TERM HAS NEVER BEEN USED BEFORE.

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1    **THE COURT:**  ALL RIGHT.  SO YOU WOULD PREFER IRAN OR

2    THE GOVERNMENT OF IRAN.

3    **MR. HARRIGAN:**  YEAH.  AGAIN, I JUST THINK FOR THIS

4    WE ARE JUST STATING WHAT IS ALREADY STATED IN THE ELEMENTS OF

5    18.  WE ARE GOING TO STATE ITSR TWICE.

6    **THE COURT:**  WHAT IS --

7    **MR. HARRIGAN:**  IT IS CONFUSING.

8    **THE COURT:**  IEEPA ONLY PLAYS INTO THIS CASE IN THAT

9    IEEPA MAKES IT A CRIME TO VIOLATE OR ATTEMPT TO VIOLATE THE

10   ITSR.

11   **MR. HARRIGAN:**  RIGHT.

12   **THE COURT:**  THEN THE ITSR IS REALLY WHAT IS BEING

13   LITIGATED.

14   **MR. HARRIGAN:**  I DON'T WANT TO MISLEAD THE COURT.

15   IEEPA IN ITSELF CAN BE A CRIME, BUT THAT IS NOT WHAT WE ARE

16   CHARGING HERE, WE ARE CHARGING JUST ITSR, WHICH IS A CRIME.

17   **THE COURT:**  YES.

18   **MR. HARRIGAN:**  I THINK IT IS REALLY NOT NECESSARY,

19   AND MORE CONFUSING.

20   **THE COURT:**  YOUR ARGUMENT IS THAT THE ITSR IS

21   ALREADY DEFINED IN THE FOLLOWING INSTRUCTION.

22   **MR. HARRIGAN:**  THOSE ACTIONS OF THE ITSR.  WE ARE

23   NOT TALKING ABOUT THE ENTIRE ITSR, IN FACT IT JUST -- WE ARE

24   JUST TALKING ABOUT 560.203 AND 560.204, WHICH ARE ALREADY

25   DEFINED IN WHAT THE SUBSTANTIVE IS.

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1              THE COURT:  OKAY.  I HAVE GOT THAT ARGUMENT IN MIND.
 2         AS TO THE DEFENSE --
 3              MR. CAMDEN:  IF I COULD RESPOND TO A COUPLE OF
 4    THINGS THAT THE GOVERNMENT SAID.
 5              THE COURT:  YES.
 6              MR. CAMDEN:  SO THE WAY I PUT IT, I PREFER, YOUR
 7    HONOR, IF THERE IS THE INITIAL INSTRUCTION UP FRONT THAT SAYS,
 8    HERE IS WHAT THE ITSR AND IEEPA ARE, JUST TO KEEP IN MIND AS
 9    THE INSTRUCTIONS FOLLOW.
10              BECAUSE ITSR ISN'T JUST IN COUNTS 1, 3 AND 4, WHICH
11    ARE THE IEEPA VIOLATIONS, IT IS ALSO FOR THE SMUGGLING GOODS,
12    IT IS KNOWING OR INTENDING THAT THEY BE EXPORTED IN VIOLATION
13    OF THOSE PARTICULAR VIOLATIONS.  THEN FOR THE PROMOTION COUNT
14    IT IS TRANSMITTING FUNDS WITH THE INTENT TO PROMOTE THE
15    CARRYING ON OF VIOLATIONS OF ITSR OR CONSPIRACY TO WILLFULLY
16    VIOLATE ITSR.
17              I HAVE DONE IT IN OUTLINE FORMAT, AND INCLUDED ALL
18    OF THOSE ELEMENTS OF ITSR WITHIN THE CONSPIRACY OR THE INTENT
19    INSTRUCTIONS JUST BECAUSE THE WAY I SEE THE JURY, WHEN THEY
20    GET THESE INSTRUCTIONS GOING BACK THERE, IS THEY ARE GOING TO
21    SIT DOWN AND SEE THE OVERVIEW.  THEN THEY ARE GOING TO SIT
22    DOWN WITH COUNT 1, WHAT IS COUNT 1.  THEY ARE GOING TO BE ABLE
23    TO -- IT HELPS THEM FACILITATE THEIR DISCUSSION ON EACH CRIME
24    INDIVIDUALLY AS OPPOSED TO JUST GOING BACK AND SAYING, HEY, WE
25    FOUND A VIOLATION OF ITSR WE CAN FIND GUILTY ON ALL OF THE
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1    COUNTS.

2           SO THEY CAN GO THROUGH FOR -- HERE IS COUNT 1, HERE

3    IS ALL OF THE ELEMENTS JUST ON ONE PAGE, SO WE CAN GO THROUGH

4    LINE-BY-LINE.  IF ANYBODY HAS ANY PROBLEMS OR DISCUSSIONS IT

5    CAN TAKE PLACE THEN.  THEN THEY CAN VOTE.

6           SO I THINK LISTING OUT THE ELEMENTS OF ITSR

7    INDIVIDUALLY WITHIN EACH COUNT IN WHICH IT IS A PREDICATE IS

8    GOING TO BE HELPFUL TO THE JURY TO ISOLATE EACH COUNT AND

9    CONSIDER THE EVIDENCE ON EACH ELEMENT OF EACH COUNT

10   INDIVIDUALLY.

11          THERE WERE A COUPLE -- THE GOVERNMENT SAID A LOT, SO

12   I DON'T WANT TO RESPOND OUT OF TURN OR CONFUSE THE ISSUES.  SO

13   THAT IS JUST MY GENERAL -- THAT WAS MY APPROACH IN DRAFTING

14   OUR INSTRUCTIONS.

15          **THE COURT:**  YES.

16          **MR. CAMDEN:**  AND THE ORDER WAS, FIRST DESCRIBE ITSR,

17   THEN SAY HERE IS IEEPA.  THAT IS WHAT MAKES IT A CRIME TO

18   VIOLATE THE REGULATIONS.

19          THEN SAY, YOU KNOW, COUNT 1 -- REALLY WHAT IT COMES

20   DOWN TO, YOUR HONOR, IS THE CHARGE IN THE INDICTMENT IS

21   ACTUALLY CONSPIRACY TO VIOLATE A CRIMINAL STATUTE THAT

22   PUNISHES WILLFUL VIOLATION OF A REGULATION THAT PROHIBITS

23   TRANSACTIONS THAT HAVE THE INTENT OF EVADING OR AVOIDING

24   ANOTHER REGULATION.  SO WE ARE FOUR LEVELS DEEP HERE.

25          WE DIDN'T RAISE A DUE PROCESS CHALLENGE TO HOW MANY

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1    NESTED LEVELS THE GOVERNMENT CAN ALLEGE IN AN INDICTMENT, BUT

2    THAT IS WHAT IT IS.  THAT IS WHAT THE ACTUAL CHARGE IS.  SO I

3    THINK THE JURY INSTRUCTIONS -- I EVEN DID AN OUTLINE FOR, YOU

4    KNOW 1A, B, C, AND THEN EVEN DOWN TO ROMAN NUMERALS, JUST SO

5    THE JURY CAN SEE THAT, WHEN THEY GO THROUGH THE LIST, THESE

6    ARE ALL OF THE ELEMENTS WITHIN THAT COUNT.

7          REGARDING IN THE COURT'S, JUST GOING BY ORDER, THE

8    DEFINITION OF TERRITORY OF IRAN OR GOVERNMENT OF IRAN.  THE

9    GOVERNMENT SAYS THAT IS NOT GOING TO BE AN ISSUE; I REALLY

10   THINK IT MIGHT BE.  WHETHER THEY ARGUE IT OR NOT, THERE HAS

11   ALREADY BEEN EVIDENCE THAT THESE THINGS WERE GOING TO -- HE

12   MAY HAVE KNOWN THAT THEY WERE GOING TO AN IRANIAN COMPANY.

13   AND I JUST WANT TO MAKE SURE THAT THE JURY DOESN'T THINK THAT,

14   OH, AN IRANIAN COMPANY, THAT IS ENOUGH TO FIND A VIOLATION OF

15   THE REGULATIONS OR INTENDED VIOLATION OF THE REGULATIONS.

16          **MR. HARRIGAN:**  WE ARE NOT ARGUING THAT, YOUR HONOR.

17          **MR. CAMDEN:**  RIGHT.  IT DOESN'T MATTER WHETHER THEY

18   ARE ARGUING IT OR NOT, THE JURY HEARD IT, SO I DON'T WANT THAT

19   TO BE A BASIS.

20          AND THE COURT IS GOING TO TELL THEM THAT, YOU KNOW,

21   THE ARGUMENTS ARE NOT EVIDENCE, THEY HAVE TO CONSIDER THE

22   EVIDENCE.  I THINK THE COURT DESCRIBED THE ANALYSIS THEY ARE

23   CONDUCTING IS A CLINICAL ANALYSIS.  SO WE HAVE TO ASSUME THEY

24   ARE GOING TO BE CONSIDERING EVERYTHING THEY HEARD IN COURT,

25   AND THEY HAVE TO HAVE THE RIGHT STANDARD.  I DON'T THINK

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1    TERRITORY IS AMBIGUOUS.  NOBODY SAID, YOU KNOW, WHERE THE --

2    YOU KNOW, DISPUTING WHERE THE ACTUAL BORDER IS.

3             **THE COURT:**  A COMPANY OF IRAN IS NOT IRAN.

4        **MR. JOHNSTON:**  RIGHT.  SO PRIVATELY OWNED COMPANY.

5    I THINK IN THE CROSS OF MS. MILLER WE GOT OUT THE EXPLANATION

6    THAT THE GOVERNMENT OF IRAN INCLUDES A COMPANY WHERE THE

7    GOVERNMENT OF IRAN OWNS LARGER THAN A 50 PERCENT SHARE.  AND

8    THAT IT DOESN'T INCLUDE PRIVATE COMPANIES THAT ARE BASED IN

9    IRAN.  THE PROHIBITION ON THE REGULATION IS ONLY FOR GOODS

10   GOING TO THE ACTUAL COUNTRY, MEANING THE TERRITORY, OR TO THE

11   ACTUAL GOVERNMENT OF IRAN, WHEREVER THEY ARE LOCATED.

12            SO I JUST WANT TO MAKE SURE, WHETHER OR NOT THE

13   GOVERNMENT ARGUES IT OR NOT, THAT THEY ARE NOT GOING TO BE

14   USING, YOU KNOW, OH, HE SAID, YOU KNOW, A PRIVATE COMPANY OR

15   AN IRANIAN COMPANY, AND THINK THAT THAT IS ENOUGH, IN AND OF

16   ITSELF IT VIOLATES.

17            IT MAY BE CIRCUMSTANTIAL, AND THEY CAN ARGUE THAT IT

18   IS CIRCUMSTANTIAL EVIDENCE THAT IT IS GOING TO THE TERRITORY

19   OR GOVERNMENT, BUT THAT IS THE ACTUAL STANDARD.  SO I THINK IT

20   IS IMPORTANT THAT THE JURY HEARS THAT DEFINITION.

21            **THE COURT:**  OKAY.

22        **MR. CAMDEN:**  I CAN SIT DOWN UNTIL WE GET ON TO OTHER

23   ISSUES.

24            **THE COURT:**  I AM READY, I THINK -- LET'S JUST GO TO,

25   FROM THE DEFENSE PERSPECTIVE, THE OBJECTIONS TO WHAT'S IN THE

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1   COURT'S PROPOSED PACKAGE, STARTING WITH -- I THINK WE ARE
 2   MOVING ON TO COUNT 1 WHICH, IF WE GO IN ORDER, THAT WOULD
 3   BE -- NUMERICALLY THAT WOULD BE NO. 17, COUNT 1?
 4          MR. HARRIGAN:  CORRECT, YOUR HONOR.
 5          MR. CAMDEN:  YEAH.  THAT WOULD CORRESPOND TO OUR
 6   PROPOSED INSTRUCTION NO. 5.
 7          THE COURT:  YES.
 8          MR. CAMDEN:  YES, YOUR HONOR.
 9          SO THE FIRST IS ORGANIZATION.  I THINK, BY WAY OF
10   BACKGROUND, WE OFTEN -- WHEN WE ARE IN MAGISTRATE COURT, FOR
11   EXAMPLE, AND THERE IS A PLEA TO A 1544, AND THE GOVERNMENT
12   SAYS THERE IS ONE ELEMENT TO THIS CRIME, THE COURT SAYS THERE
13   IS ONE ELEMENT, THAT THE PERSON WILLFULLY AND KNOWINGLY USED A
14   U.S. PASSPORT DESIGNED OR ISSUED FOR ANOTHER PERSON.  I MEAN,
15   THERE IS A LIMIT TO HOW MANY DISCRETE FACTS YOU CAN CRAM INTO
16   ONE ELEMENT.
17          SO THIS -- OUR PROPOSED INSTRUCTION NO. 5 LISTS OUT,
18   IT SAYS THERE WAS AN AGREEMENT TO DO THESE THINGS -- AND THAT
19   IS TAKEN DIRECTLY FROM THE IEEPA -- OR THE ITSR INSTRUCTION --
20   OR TO DO THE SECOND THING, WHICH IS ENGAGE IN THE TRANSACTIONS
21   WHICH AVOID THE FIRST REGULATION.
22          I DID ADD THE REQUIREMENT THAT THERE BE UNANIMITY AS
23   TO THE OBJECT OF THE CONSPIRACY, AND THAT IS DEFINITELY THE
24   LAW.  CASTRO WAS THE CASE I CITED IN THE FOOTNOTE.
25          THE COURT:  DO YOU DISAGREE, MR. HARRIGAN, THAT
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

 1    UNANIMITY IS REQUIRED?

 2          **MR. HARRIGAN:**  I HAVE NO OBJECTION THAT THEY HAVE TO

 3    AGREE ON THE OBJECT.

 4          **THE COURT:**  OKAY.  THERE IS ALSO -- THE DEFENSE

 5    ADDED PRONG THREE, WHICH DOES NOT SEEM TO BE REQUIRED FOR

 6    COUNT 1 BUT DOES SEEM TO BE REQUIRED FOR THE OTHER CONSPIRACY

 7    THAT IS ALLEGED, THE OVERT ACT.

 8          **MR. HARRIGAN:**  I AGREE THAT SHOULDN'T BE INCLUDED IN

 9    COUNT 1.  AND I DON'T THINK WE INCLUDED IT, AND THE COURT

10    INCLUDED IT, IN COUNT 1, JUST COUNT 2.

11          **THE COURT:**  SO DO YOU AGREE IT SHOULD BE PART OF

12    COUNT 1 OR NOT?

13          **MR. HARRIGAN:**  IT SHOULD NOT BE PART OF COUNT 1.

14          **THE COURT:**  ONLY PART OF COUNT 2.

15          **MR. HARRIGAN:**  YES, BECAUSE IT IS NOT A 371,

16    ACTUALLY IEEPA HAS ITS OWN CONSPIRACY STATUTE.

17          **THE COURT:**  THAT SEEMS CONSISTENT WITH THE LAW.

18          **MR. CAMDEN:**  IF I FIND ANYTHING TO THE CONTRARY I

19    WILL BRING IT TO THE COURT'S ATTENTION, BUT FOR NOW, WITHOUT

20    DOING FURTHER RESEARCH, I WOULD SUBMIT.

21          **THE COURT:**  ALL RIGHT.

22          **MR. HARRIGAN:**  YOUR HONOR, I THINK THAT THERE IS NOT

23    A LOT OF THE DISAGREEMENT ON THE BASIC ELEMENTS, IT IS THE

24    FORM.

25          **THE COURT:**  THE FORMAT.

APRIL 20, 2015

```
 1          MR. HARRIGAN:  AND IF YOU WANT TO PARSE OUT AND
 2   BREAK DOWN ELEMENTS, THEY HAVE DONE THAT HERE.  IT JUST -- ALL
 3   OF THEIR INSTRUCTIONS, MY MAIN OBJECTION IS IT DOESN'T
 4   SIMPLIFY THINGS, IT MAKES IT VERY COMPLICATED FOR A JURY TO
 5   READ.  PARTICULARLY WHEN THERE IS NOT A LOT OF -- I DON'T
 6   BELIEVE THERE IS GOING TO BE A LOT OF ISSUES NECESSARILY IN
 7   DISPUTE IN THIS CASE.  AGAIN, I DON'T KNOW THE THEORY OF
 8   DEFENSE.  BUT IF YOU LOOK AT BY COUNT --
 9          THE COURT:  THE WHOLE CASE SEEMS TO BE CENTERING ON
10   KNOWLEDGE AND WILLFULNESS.
11          MR. HARRIGAN:  I AGREE.  SO IF THAT IS THE CASE, I
12   THINK WE JUST MAY BE CONFUSING THE JURY.  IT WILL BE MORE
13   TIME-CONSUMING TO READ.  THEY CAN PUT UP THERE ARE ACTUALLY
14   SIX ELEMENTS IF THEY WANT.  I AM NOT GOING PUT UP SIX
15   ELEMENTS.  I HAVE TO GO OVER THE JURY INSTRUCTIONS WITH THEM,
16   WE BOTH DO.  I WOULD LIKE TO DO IT FAIRLY -- I MEAN, THE
17   ELEMENTS IN FAIRLY CONCISE MANNER.  AND, AGAIN, I THINK THIS
18   WAY IT MAKES IT SEEM LIKE IT IS A LITTLE COMPLICATED WHEN IT
19   REALLY ISN'T COMPLICATED IN TERMS OF THE INSTRUCTIONS.
20          THE COURT:  OKAY.  WHAT'S NEXT?  SHOULD WE MOVE TO
21   COUNT 2?  IS THERE ANYTHING IN PARTICULAR HERE?
22          MR. CAMDEN:  I ACTUALLY GROUPED THEM COUNTS 1
23   THROUGH 4 AND THEN COUNT 2.  IT MAY BE -- I DON'T KNOW HOW THE
24   COURT IS GOING TO ORDER THE INSTRUCTIONS.  JUST BECAUSE 1, 3
25   AND 4 ARE THE 1705 CONSPIRACY AND ATTEMPTS, AND THEN 2, 5 AND
```

```
 1   6 ARE THE SMUGGLING GOODS FROM THE UNITED STATES.

 2           SO I WOULD ASK -- I THINK IT WOULD BE HELPFUL FOR

 3   THE JURY TO HEAR THOSE GROUPED BY SUBSTANTIVE COUNT INSTEAD OF

 4   GROUPED IN ORDER OF THE INDICTMENT.

 5           BUT REGARDING THE SUBSTANCE OF COUNT 2, IT IS THE

 6   SAME IDEA, YOUR HONOR, BY LISTING OUT THE FACTS.  OBVIOUSLY BY

 7   THE TIME THE JURY GETS TO COUNT 8 OR 9 THEY ARE GOING TO

 8   RECOGNIZE THE ELEMENTS OF THE VIOLATION.  BUT BY INCLUDING --

 9   LIKE IF THERE IS A DISPUTE, OBVIOUSLY, AS TO WHETHER THE

10   DEFENDANT KNEW THAT THE GOODS WERE GOING TO IRAN, IT IS GOING

11   TO BE IN THE TEXT OF THE COUNT, INSTEAD OF JUST SAYING A

12   VIOLATION OF THE ITSR AND HAVING TO REFER TO SOME OTHER

13   INSTRUCTION TO SEE WHAT THE ELEMENTS OF THE OBJECTS OF THE

14   CONSPIRACY WERE.  OR -- YEAH, IT IS THE SAME IN THIS CASE,

15   WHICH IS ALSO CONSPIRACY.

16           SO I LIKE THE ORGANIZATION BY GOING 1A, B, C, D, E

17   F.  THEY CAN CHECK THOSE OFF AS THEY GO THROUGH.  THEY CAN

18   SAY, IS THERE ANY DISAGREEMENT ABOUT THIS ONE?  NO, CHECK.  IS

19   THERE ANY DISAGREEMENT ABOUT THIS ONE?  NO, CHECK.  IS THERE A

20   DISAGREEMENT ABOUT THIS ONE?  AND SOMEBODY CAN RAISE AN ISSUE

21   AS TO A DISCRETE -- LEGAL STANDARD OR DISCRETE ELEMENT.

22           I THINK IT WOULD FACILITATE THE INSTRUCTION.

23   ACTUALLY I THINK EVEN IF IT RESULTS IN A LONGER INSTRUCTION

24   AND MORE PAPER BEING WASTED I THINK IT WILL BE SHORTER

25   DELIBERATIONS BECAUSE THEY WILL BE ABLE TO HOME IN ON THE
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1    ISSUES THAT ARE REALLY AT ISSUE QUICKER IF THEY HAVE THE

2    ACTUAL -- THE FULL ELEMENTS LISTED IN THE COUNT.

3              **MR. HARRIGAN:**  YOUR HONOR, WHEN I LOOK AT IT, I AM

4    CONFUSED, JUST FROM ALL OF THE NUMBERS.  IT DOESN'T FLOW.

5    THEY CAN BREAK IT DOWN IN ELEMENTS IF THEY WANT.  I DON'T HAVE

6    A PROBLEM WITH THAT.  BUT I STRONGLY BELIEVE THAT IT MAKES

7    SENSE WITH THE COURT'S PROPOSED INSTRUCTIONS.

8              **THE COURT:**  OKAY.  WHAT'S NEXT, MR. CAMDEN?

9              **MR. CAMDEN:**  I DO NOTE, JUST IF THE COURT IS

10   INCLINED TO GIVE THE INSTRUCTION THAT THE GOVERNMENT SUBMITTED

11   AND THE COURT ADOPTED IN THE 19TH ONE, I THINK THERE DOES HAVE

12   TO BE A CROSS-REFERENCE THEN TO THE -- IT JUST SAYS IN

13   VIOLATION OF 18 USC 371 AND 554.  AND THEN THERE WAS AN

14   AGREEMENT BETWEEN TWO OR MORE PEOPLE TO COMMIT THE CRIME

15   CHARGED ABOVE.  AND IT DOESN'T REFER TO ANY OTHER INSTRUCTIONS

16   OR THE ELEMENTS OF 554 OR 371.

17             SO I THINK THERE AT LEAST, AT THE VERY MINIMUM, HAVE

18   TO BE A CROSS-REFERENCE TO, I GUESS, THE CHARGES EITHER IN

19   COUNT 5 OR 6 WHICH WOULD LIST OUT THE FULL ELEMENTS OF THE

20   554.  SO THEY ARE GOING TO BE GOING BACK AND FORTH BETWEEN THE

21   INSTRUCTIONS.

22             **MR. HARRIGAN:**  IT CAN INCLUDE:  THE ELEMENTS OF 554

23   ARE IN COURT'S INSTRUCTION.  I THOUGHT I INCLUDED THAT, YOUR

24   HONOR.  I APOLOGIZE.

25             **THE COURT:**  AT THE BOTTOM.  IT WOULD BE DEFINED IN

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1    COURT'S INSTRUCTION, AND THEN THAT WOULD GO TO --

2              **MR. HARRIGAN:**  YEAH.  I DID INCLUDE IT, YEAH.

3              **THE COURT:**  I GUESS COUNTS 5 AND 6.

4              **MR. HARRIGAN:**  RIGHT.  SO IT WOULD BE IN COURT'S

5    INSTRUCTION, WHATEVER THAT IS.

6              **MR. JOHNSTON:**  THEN THAT IS 22 IN THE COURT'S

7    INSTRUCTION.  BUT THEN THAT INSTRUCTION, AT THE END, FURTHER

8    GOES BACK AND REFERS TO INTENDED TO EXPORT CONTRARY TO THE

9    LAWS OF THE UNITED STATES AS DEFINED IN JURY INSTRUCTION

10   BLANK.

11             SO THEY ARE GOING TO BE GOING THROUGH THREE

12   CROSS-REFERENCES OF JURY INSTRUCTIONS JUST TO GET THROUGH THE

13   ELEMENTS OF ONE COUNT.  THAT IS A PROBLEM I FORESEE WHEN THEY

14   ARE DELIBERATING.

15             I GUESS MOVING ON TO COURT'S PROPOSED INSTRUCTION --

16   OR THE COURT'S INSTRUCTION 20.  I THINK THAT IS PRETTY MUCH

17   THE EXACT SAME AS WE INCLUDED AS THE OVERVIEW OF CONSPIRACY.

18             **THE COURT:**  YES.  I DID ADD THE LAST PARAGRAPH WHICH

19   INCORPORATES THE DEFENSE PROPOSAL, THAT AN INDIVIDUAL MUST

20   CONSPIRE WITH AT LEAST ONE CO-CONSPIRATOR, CANNOT BE A

21   CONSPIRACY WHEN THE ONLY PERSON WITH WHOM THE DEFENDANT

22   ALLEGEDLY CONSPIRED WAS A GOVERNMENT AGENT.

23             **MR. CAMDEN:**  I WOULD STAND ON OUR REQUEST FOR THE

24   INSTRUCTION, YOUR HONOR.  THE INVOLVEMENT OF JOHN HELSING AND

25   DAVID COLE IN THE NEGOTIATIONS AND IN THE TRANSPORTATION AND

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1    TRIP TO UPS WAS INVOLVED AND INTERMINGLED.  SO THERE IS -- I
 2    MEAN, ESSENTIALLY THERE IS FIVE PEOPLE HERE, RIGHT?  THERE IS
 3    DAVID COLE AND JOHN HELSING WITH SOUTH STAR TRADING ON ONE
 4    SIDE, THERE IS, AS THE GOVERNMENT ALLEGES, OUR CLIENT AND
 5    KOORUSH TAHERKHANI AND ERGUN YILDIZ.  AND THEY HAVE GOT TO
 6    FIND A CONSPIRACY BETWEEN TWO OR MORE OF THAT GROUP OF FIVE
 7    PEOPLE.
 8              I JUST WANT TO MAKE SURE THAT WHEN THEY ARE FINDING
 9    THAT CONSPIRACY THEY CAN'T INCLUDE A CONSPIRACY WITH OR
10    BETWEEN HELSING AND COLE, SO IT HAS GOT TO BE BETWEEN THE
11    THREE REMAINING CO-DEFENDANTS OR OTHER PEOPLE, NAMED OR
12    UNNAMED.  BUT JUST ANY CONSPIRACY THEY FIND CAN'T BE BASED ON
13    AN AGREEMENT WITH DAVID COLE OR JOHN HELSING.
14              I AM NOT SURE THE COURT'S INSTRUCTION COMPLETELY
15    COVERS THAT.  IT SAYS THERE CAN BE NO CONSPIRACY WHEN THE ONLY
16    PERSON -- WHEN THE ONLY PERSON WITH WHOM THE DEFENDANT
17    CONSPIRED WAS A GOVERNMENT AGENT.
18              I DON'T THINK THAT -- ANYWAY, I THINK IT IS STILL
19    KIND OF UP IN THE AIR.  AND OUR INSTRUCTION, I THINK, WAS A
20    LITTLE MORE EXPLICIT ABOUT YOU CAN FIND A CONSPIRACY AS LONG
21    AS IT IS NOT BASED ON AN AGREEMENT WITH EITHER OF THESE TWO
22    PEOPLE.  JUST TO MAKE SURE THEY ARE EXCLUDED COMPLETELY FROM
23    THE ANALYSIS.
24              **THE COURT:**  I WILL MAKE A NOTE OF THAT.
25              WHAT'S NEXT?  WE ARE ON TO COUNTS 3 AND 4?
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1          MR. CAMDEN:  I WON'T REITERATE OUR ARGUMENTS.  I
 2   MEAN, OBVIOUSLY, FOR ALL OF THESE COUNTS WE ARE GOING TO BE
 3   ARGUING THAT THE FULL DEFINITION AND CROSS-REFERENCE --
 4          THE COURT:  RIGHT.
 5          MR. CAMDEN:  GIVEN THAT, YOUR HONOR, OUR
 6   INSTRUCTIONS, ESSENTIALLY, I THINK, ARE THE SAME AS THE
 7   COURT'S IN SUBSTANCE, IF NOT IN FORM.  IT IS THE SAME ELEMENTS
 8   THAT -- AN INTENT TO COMMIT THE CHARGED CRIME OR THE
 9   UNDERLYING CRIME AND A SUBSTANTIAL STEP.  WE DON'T HAVE A
10   QUIBBLE WITH THE DEFINITION OF SUBSTANTIAL STEP AT THE END.
11          MEAN, IT IS JUST THE OBJECTION -- THE ISSUE AS TO
12   FORM.
13          THE COURT:  HOW ABOUT THE NEXT INSTRUCTION, COUNTS 5
14   AND 6?
15          MR. CAMDEN:  SO THIS WOULD BE OUR PROPOSED
16   INSTRUCTIONS 9 AND 10.  THERE IS AN ISSUE ON 5, 6, I THINK 2
17   AS WELL.  SO THE STATUTE, 554, PUNISHES RECEIVING, BUYING OR
18   FACILITATING THE TRANSPORTATION OR SALE OF.
19          AND THERE IS NO CASE LAW ON THIS, YOUR HONOR, BUT
20   WHETHER THAT IS DIVISIBLE.  SO IF YOU ANALOGIZE TO THE DRUG
21   STATUTES, FOR EXAMPLE, ONES THAT PUNISH DISTRIBUTION --
22   MANUFACTURE, DISTRIBUTION OR POSSESSION WITH INTENT TO
23   MANUFACTURE OR DISTRIBUTE, THOSE ARE SEPARATE ALTERNATIVE
24   ELEMENTS, THEY EITHER CHARGE DISTRIBUTION OR THEY CHARGE
25   MANUFACTURING OR THEY CHARGE POSSESSION WITH INTENT TO
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1   DISTRIBUTE.

 2            I THINK NOW, AT LEAST, IS THE TIME WHERE THE

 3   GOVERNMENT SHOULD ELECT -- THE STATUTE IN THIS CASE IS PHRASED

 4   THE SAME WAY, IT IS EITHER RECEIVED OR BOUGHT OR FACILITATED

 5   THE TRANSPORTATION OR SALE OF.

 6            I THINK THAT NOW IS THE POINT I THINK WHERE THE

 7   GOVERNMENT WOULD HAVE TO ELECT WHICH OF THOSE ACTS IT IS GOING

 8   TO ARGUE AND IT IS GOING TO BASE ITS REQUEST OF THE JURY TO

 9   FIND -- TO MAKE A FINDING OF GUILT ON.  SO THAT IS WHY I PUT

10   THOSE IN BRACKETS, THE ALTERNATIVE ACTIONS.

11            MR. HARRIGAN:  WELL, YOUR HONOR, NOT ONLY DID I GET

12   THIS LATE, BUT THERE IS NO CASE LAW IN SUPPORT OF HIS

13   ARGUMENT.

14            WHAT I WOULD BE WILLING TO DO, THOUGH, HERE, IS I

15   THINK OUR THEORY IS EITHER BASED ON ONE OF TWO THINGS, HE

16   EITHER RECEIVED OR BOUGHT OR BOTH.  AND SO I DON'T THINK WE

17   NEED TO DO THE FACILITATED, TRANSPORTATION OR SALE OF.

18            THE COURT:  SO HE RECEIVE OR BUY?

19            MR. HARRIGAN:  YEAH, BOUGHT.  SO TO THE EXTENT THAT

20   WE KEEP THE GOVERNMENT INSTRUCTION, THAT IS WHAT WE WOULD BE

21   RELYING ON.

22            I ASSUME THEY ARE GOING TO REQUEST A UNANIMITY

23   INSTRUCTION ON THAT.  I WOULD LIKE TO TAKE A LOOK AT THAT.

24   THEY MAY BE CORRECT, I JUST HAVEN'T HAD THE CHANCE TO LOOK AT

25   IT, SO I APOLOGIZE, TO DETERMINE IF THAT WERE -- IF IT IS
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1    DIVISIBLE.  I ASSUME IT WOULD REQUIRE UNANIMITY.

 2         THE COURT:  IF IT IS RECEIVE OR BUY IT WOULD MAKE

 3    SENSE THAT THEY HAVE TO AGREE ON WHICH ONE.

 4         MR. HARRIGAN:  RIGHT.  I THINK THAT IS PROBABLY

 5    GOING TO BE THE CASE.  I DON'T THINK WE HAVE TO ELECT JUST

 6    ONE.

 7         THE COURT:  RIGHT.

 8         MR. HARRIGAN:  I DON'T SEE ARGUING FACILITATED,

 9    TRANSPORTATION OR THE SALE OF.

10         THE COURT:  THE JURY INSTRUCTIONS YOU REFER TO AS

11    DEFINED IN, THAT WOULD RELATE TO COUNTS 9 AND 10?  SO AS TO

12    COUNTS 5 AND 6 YOU HAVE A REFERENCE TO THE JURY TO GO SEE

13    CERTAIN JURY INSTRUCTIONS.  WHICH ONES ARE YOU REFERRING TO?

14         MR. HARRIGAN:  OH, YES.  IT WOULD BE -- IT WOULD BE

15    THE IEEPA COUNTS INSTRUCTIONS.

16         MR. CAMDEN:  THOSE ARE JUST FOR ATTEMPT, IS THE

17    PROBLEM, YOU KNOW.  THERE IS NO INSTRUCTION THAT JUST GIVES

18    THE BARE ELEMENTS OF THE IEEPA.

19         THE COURT:  SO WHAT WOULD THE JURY GO SEE?

20         MR. HARRIGAN:  I THINK YOU WOULD SAY CONTRARY TO THE

21    LAWS AS CHARGED IN COUNT 17 AND 18.  IT DOESN'T MATTER THAT IT

22    IS -- IT DOESN'T HAVE TO BE -- IT IS NOT COUNTS, OR WE DON'T

23    SAY COUNTS WE JUST SAY CONTRARY TO LAW AS DEFINED IN JURY'S 17

24    AND 18.  RIGHT?  IT IS THE CONSPIRACY AND THE SUBSTANTIVE

25    DEFINED.  THAT WOULD BE IT, RIGHT?
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1              THE COURT:  SO 17 AND 18 ON THE PRESENT DRAFT.

 2              MR. HARRIGAN:  RIGHT.

 3              THE COURT:  GO BACK TO WHAT'S ALLEGED IN COUNT 1.

 4              MR. HARRIGAN:  AND THE SUBSTANTIVE OBJECT OF OR

 5    OBJECTS OF COUNT 1, WHICH IS ALLEGED IN INSTRUCTION 18.

 6              THE COURT:  OKAY.  OKAY.  WE ARE ON TO -- ON THE

 7    COURT'S PROPOSED WE ARE ON TO COUNT 7.

 8              ANY OBJECTION THERE, OTHER THAN THAT THE COURT

 9    SHOULD PUT IN THE STATUTORY ELEMENTS?

10              MR. CAMDEN:  THIS ONE WOULD ALSO, YOUR HONOR, SINCE

11    I THINK THE OBJECT OF THE CONSPIRACY IS TWO SEPARATE OBJECTS

12    IN THE INDICTMENT, IT IS -- WELL, IT IS TO TRANSFER OR

13    TRANSMIT MONETARY INSTRUMENT TO PROMOTE UNLAWFUL ACTIVITY.

14    AND THE UNLAWFUL ACTIVITY THAT IS BEING PROMOTED IS THE

15    VIOLATION OF 1705(C), WHICH ALSO REFERS TO 560.203 AND

16    560.204, I THINK.

17              SO THERE IS STILL -- IN THE END OF THAT FORK THERE

18    IS TWO OBJECTS OF THE CONSPIRACY.  SO I THINK THERE WOULD

19    STILL HAVE TO BE A UNANIMITY INSTRUCTION ON THE OBJECT OF THE

20    CONSPIRACY.  AND THAT IS IN OUR PROPOSED INSTRUCTION NO. 11.

21              THE COURT:  AND THEN, AS TO THIS INSTRUCTION, COUNT

22    7 --

23              MR. CAMDEN:  I APOLOGIZE.  I AM GOING TO HAVE TO

24    RESEARCH THE OVERT ACT.  I REALIZE THE COURT HASN'T INCLUDED

25    THAT, AND THERE MAY BE CASE LAW, BUT I HAVEN'T BEEN AWARE OF
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1   IT.  I DO NEED TO DOUBLE CHECK THAT.

2           **MR. HARRIGAN:**  I THINK IT IS IN THE NINTH CIRCUIT

3   INSTRUCTIONS THAT IF IT HAS CONSPIRACY IN THE INSTRUCTION

4   ITSELF AN OVERT ACT IS NOT REQUIRED.

5           **THE COURT:**  HERE AGAIN THE COUNT 7 INSTRUCTION IS

6   REFERRING TO COURT'S INSTRUCTION THAT GOES BACK TO --

7           **MR. HARRIGAN:**  24.

8           **THE COURT:**  24?

9           **MR. HARRIGAN:**  YES.

10          **MR. CAMDEN:**  THE CONSPIRACY.

11          **THE COURT:**  OR IT GOES BACK --

12          **MR. HARRIGAN:**  I AM SORRY.  I WAS LOOKING -- THAT IS

13  20.  I WAS LOOKING AT THE NEXT ONE.  SORRY, YOUR HONOR.

14          **THE COURT:**  GOES TO 17 AND 18?

15          **MR. HARRIGAN:**  I APOLOGIZE.  IT GOES BACK TO THE

16  GENERAL LAW ON CONSPIRACY, WHICH WAS 20.  CONSPIRACY IS A KIND

17  OF CRIMINAL PARTNERSHIP.  COURT'S INSTRUCTION 20.

18          **THE COURT:**  OKAY.  AND THEN THE ELEMENTS OF

19  TRANSMITTING AND TRANSFERRING.  THAT'S NO. 24 AS PRESENTLY

20  ENUMERATED?

21          **MR. HARRIGAN:**  YES, YOUR HONOR.

22          AND, IF I MAY, AS TO TRANSFERRING OR TRANSMITTING

23  YOU MAY RECALL THE COURT DEALT WITH THE ISSUE THAT SOMEHOW

24  THIS IS DUPLICITOUS.

25          **THE COURT:**  YES.

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1            MR. HARRIGAN:  AND THE COURT AGREES THAT IT WASN'T.

 2            I AM NOT -- I MEAN, I DIDN'T GO BACK TO LOOK TO SEE

 3    IF WE NEEDED A UNANIMITY INSTRUCTION.  CLEARLY RECEIVED AND,

 4    YOU KNOW, SALE ARE TWO DIFFERENT TERMS.  I THINK TRANSFER OR

 5    TRANSMIT, YOU COULD USE EITHER TERM FOR A WIRE TRANSFER, SO I

 6    DON'T KNOW WE HAVE TO HAVE UNANIMITY.  I DON'T KNOW HOW

 7    TRANSMIT DIFFERS FROM TRANSFER, IF THE COURT FOLLOWS WHAT I AM

 8    SAYING.  I UNDERSTAND UNANIMITY, I THINK, IS JUST, YOU KNOW, A

 9    DIFFERENT WAY OF DESCRIBING THE SAME ACT.

10            NOW, IF DEFENSE COUNSEL WANTS TO ELUCIDATE WHY THOSE

11    SHOULD BE TREATED DIFFERENTLY, YOU KNOW, MAYBE IT REQUIRES --

12    I JUST DON'T SEE IT.  IT WOULD JUST BE CONFUSING.

13            THE COURT:  WHAT INSTRUCTION ARE YOU ON?  WHICH ONE

14    ARE YOU ARGUING?

15            MR. HARRIGAN:  I WAS TALKING ABOUT THE MONEY

16    LAUNDERING.  THEY SAID THAT BECAUSE IT INCLUDES TRANSMIT OR

17    TRANSFER MONETARY INSTRUMENTS THAT SOMEHOW THAT WAS DIVISIBLE,

18    AND THAT WOULD REQUIRE ALSO A UNANIMITY INSTRUCTION.  I DON'T

19    SEE THE SAME ISSUE WITH TRANSFER OR TRANSMIT AS I DO WITH THE

20    ISSUE THEY RAISED WITH RECEIVE, BUY, BUYER.

21            THE COURT:  THAT IS COUNTS 8 AND 9 YOU ARE REFERRING

22    TO?

23            MR. HARRIGAN:  YES, AND ON 7, TOO.  8 OR 9, RIGHT.

24            THE COURT:  YES.  OKAY.  I HAVE THAT IN MIND.

25            MR. HARRIGAN:  ALSO THE CODE SHOULD BE 56(H) AS TO
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1    CONSPIRACY, NOT 57, ON 23.
 2              THE COURT:  OKAY.
 3              MR. CAMDEN, WHAT'S NEXT?
 4              MR. CAMDEN:  SO THAT'S 7, 8, 9.  I THINK MR.
 5    HARRIGAN REPRESENTED OUR ARGUMENTS.
 6              THE COURT:  ON COUNTS 8 AND 9?
 7              MR. CAMDEN:  YES, YOUR HONOR.
 8              THE COURT:  OKAY.
 9              MR. CAMDEN:  I GUESS NEXT WE GET TO THE COURT'S
10    AIDING AND ABETTING INSTRUCTION.
11              THE COURT:  YES.  THAT WOULD BE NO. 25 ON THIS
12    PRESENT DRAFT.
13              ANY OBJECTION TO THAT?
14              MR. CAMDEN:  SO THIS IS WHERE I INCLUDED IN OUR
15    INSTRUCTION NO. 16 THE NOTE THAT A PERSON CANNOT AID AND ABET
16    AN UNDERCOVER OFFICER.  THE UNDERCOVER OFFICERS AREN'T
17    COMMITTING CRIMES, AND THE FIRST ELEMENT OF AIDING AND
18    ABETTING IS THAT THE CRIME WAS COMMITTED BY SOMEBODY ELSE.
19              SO I DO THINK THAT INSTRUCTION SOMEWHERE IS GOING TO
20    BE NECESSARY, JUST TO MAKE SURE THE JURY DOESN'T THINK THAT A
21    PERSON CAN BE CONVICTED OF AIDING AND ABETTING AN UNDERCOVER
22    OFFICER, THAT THE UNDERCOVER OFFICERS ARE COMMITTING CRIMES IN
23    THIS CASE.
24              ESSENTIALLY, ASIDE FROM THAT, OUR ARGUMENTS ARE -- I
25    ADOPTED, PRETTY MUCH, THE MODEL INSTRUCTION EXCEPT FOR THAT.
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

 1  AND ALSO AT THE VERY END OF THE MODEL AIDING AND ABETTING

 2  INSTRUCTION IT SAYS A DEFENDANT ACTS WITH THE INTENT TO

 3  FACILITATE THE CRIME WHEN THE DEFENDANT ACTIVELY PARTICIPATES

 4  IN A CRIMINAL VENTURE WITH ADVANCE KNOWLEDGE OF THE CRIME AND

 5  HAVING ACQUIRED THAT KNOWLEDGE WHEN THE DEFENDANT STILL HAD A

 6  REALISTIC OPPORTUNITY TO WITHDRAW FROM THE CRIME.

 7           SO I ADDED THE BOLD LANGUAGE STARTING AT HOWEVER IN

 8  DEFENDANT'S PROPOSED INSTRUCTION 16.

 9           THE ONLY REASON FOR THIS, YOUR HONOR, IS BECAUSE

10  THERE HAS TO BE -- THE ACT AND THE INTENT HAVE TO BE

11  CONTEMPORANEOUS.  I THINK HE DID SOMETHING IN THIS CASE AND

12  THEN ONLY LATER ACQUIRED THE KNOWLEDGE THAT IT WAS GOING TO

13  IRAN, THEY SHOULDN'T STILL BE ABLE TO VOTE GUILTY.  THE ACT,

14  OR WHATEVER IT IS, HAS TO COME AFTER THE KNOWLEDGE IS

15  ACQUIRED.  SO JUST MAKE SURE THEY UNDERSTAND THE TIMING, THAT

16  THE ACTION HAS TO BE DONE WITH THE GUILTY KNOWLEDGE.

17           THAT DIDN'T APPEAR TO BE IN THE NINTH CIRCUIT MODEL

18  INSTRUCTIONS, IT MAY NOT COME UP IN ANY CASES, BUT I THINK IT

19  IS IMPORTANT GIVEN THE FACTS OF OUR PARTICULAR CASE.

20           **THE COURT:**  OKAY.  ANYTHING ELSE ON THAT?

21           **MR. CAMDEN:**  NO, THOSE ARE THE ONLY TWO CHANGES I

22  PROPOSED TO THE MODEL INSTRUCTION.

23           **THE COURT:**  ALL RIGHT.

24           WHAT ABOUT WILLFULLY, NO. 26 ON THIS DRAFT?

25           **MR. CAMDEN:**  THE GOVERNMENT -- THIS REALLY MAY BE

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1    THE HEART OF THE CASE, YOUR HONOR.  SO THIS -- OUR

2    DISAGREEMENT, I THINK, IS ON BOTH OF US QUOTING DIFFERENT

3    PARTS OF MOUSAVI, WHICH IS THE CASE.

4          SO IN THE END, THE HOLDING, THE NINTH CIRCUIT DOES

5    SAY IN MOUSAVI THAT THE PERSON JUST MUST HAVE KNOWN THAT WHAT

6    THEY WERE DOING WAS -- I THINK WAS -- I THINK UNLAWFUL WAS THE

7    WORD, WORD USED.

8          BUT PREVIOUSLY IN THE DISCUSSION, THE SAME

9    DISCUSSION, THEY JUST SAY DEFENDANTS CHARGED WITH A VIOLATION

10   OF IEEPA AND THE ITAR ARE ADEQUATELY PROTECTED BY REQUIRING

11   THE GOVERNMENT TO PROVE THAT THE DEFENDANTS KNEW THEIR ACTIONS

12   VIOLATED THE UNITED STATES EMBARGO ON TRANSACTIONS WITH IRAN.

13         I WANT TO MAKE SURE THE JURY DOESN'T THINK THAT, WE

14   CAN CONVICT HIM IF HE THINKS HE IS VIOLATING ANY EXPORT LAW OR

15   ANY OTHER LAW.

16         **THE COURT:**  DO YOU OBJECT TO THE EMBARGO LANGUAGE?

17         **MR. HARRIGAN:**  YES, I DO, YOUR HONOR, BECAUSE WE

18   NEVER DEFINED EMBARGO.  AND.

19         HE IS ACTUALLY CITING THE LANGUAGE, BUT IT SAYS SEE

20   ID. IS CITING THE BRYAN CASE, WHICH I THINK JUST KIND OF TALKS

21   ABOUT THE SAME THING, THAT IT HAS TO BE -- THE CONDUCT HAS TO

22   BE UNLAWFUL.

23         BY REFERRING TO THE IRAN EMBARGO, IT IS A TERM OF

24   ART.  ALL RIGHT?  SO HE HAS TO KNOW ABOUT THE ACTUAL IRAN --

25   HE JUST HAS TO KNOW HIS CONDUCT IS UNLAWFUL.  AND HIS CONDUCT

APRIL 20, 2015

1    WE HAVE TO PROVE IS THAT HE KNOWINGLY INTENDED TO SEND IT

2    DIRECTLY OR INDIRECTLY, OR IN THIS CASE, AS A SUBSTANTIVE

3    COUNT, INDIRECTLY TO IRAN VIA A THIRD COUNTRY.

4          SO WE HAVE TO PROVE THAT IT IS GOING TO IRAN, AND HE

5    HAS TO KNOW THAT THAT CONDUCT WAS UNLAWFUL.  THAT'S IT.  HE

6    NEVER EVEN HAS TO HAVE HEARD ABOUT THE IRAN TRADE EMBARGO, YOU

7    KNOW.  SOMEONE COULD HAVE TOLD HIM, YOU KNOW, HEY, GOING TO

8    THAT COUNTRY IS -- AND IF WE HAD EVIDENCE OF IT, THAT WOULD BE

9    FINE.  THERE IS ABSOLUTELY NO TERM -- WE ARE NOT TRYING TO

10   ARGUE THAT SOME OTHER CONDUCT THAT HE THOUGHT WAS UNLAWFUL IS

11   EVIDENCE OF, YOU KNOW, HIS WILLFULNESS.

12         AND AFTER HEARING HIM TESTIFY TODAY WHERE HE SAID HE

13   KNEW ABOUT IRAN TRADE SANCTIONS, KNEW THAT GOODS WERE

14   PROHIBITED, I DIDN'T REALLY THINK THIS WAS GOING TO BE AN

15   ISSUE HERE BECAUSE IT APPEARS FROM HIS OWN TESTIMONY -- UNLESS

16   I MISHEARD IT -- THAT HE WAS WELL AWARE OF THE TRADE

17   SANCTIONS.

18         **THE COURT:**  AS 26 IS PRESENTLY WRITTEN, IT IS

19   TETHERED TO THAT HE ACKNOWLEDGED THAT IT WAS PROHIBITED BY THE

20   EXPORT LAWS OF THE UNITED STATES.  DO YOU THINK THAT IS

21   SUFFICIENT, OR DOES IT NEED TO BE MODIFIED?

22         **MR. HARRIGAN:**  THE COURT'S INSTRUCTION?

23         **THE COURT:**  YES.

24         **MR. HARRIGAN:**  YEAH, I AM SORRY.  I SAID YES HERE,

25   AND IT REALLY SHOULD BE THE GOVERNMENT'S INSTRUCTION

JURY INSTRUCTION DISCUSSION

```
 1    ORIGINALLY.  I THOUGHT THE COURT -- WE WENT THROUGH THESE
 2    QUICKLY BEFORE WE CAME DOWN.  I APOLOGIZE, I MISSED THAT.  I
 3    THINK THE GOVERNMENT'S INSTRUCTION IS PROPER.  THAT MISSTATES
 4    THE LAW UNDER BRYAN AND MOUSAVI.
 5          HERE WE HAVE TO JUMP THROUGH ANOTHER HURDLE BECAUSE
 6    WHAT EXPORT LAWS, YOU KNOW.  JUST THAT IT VIOLATES -- HIS
 7    CONDUCT VIOLATES U.S. LAWS, AND WE HAVE TO PROVE THAT HE
 8    COMMITTED THAT CONDUCT.  AND HERE WE HAVE TO PROVE THAT IT WAS
 9    GOING TO IRAN.
10          SO, YOU KNOW, WE CAN'T -- WE ARE NOT GOING TO BE
11    ABLE TO SAY IT WAS WILLFUL IF HE THOUGHT IT WAS GOING TO
12    DUBAI, RIGHT?
13              THE COURT:  YOUR INSTRUCTION --
14              MR. HARRIGAN:  OURS WAS 18.
15              THE COURT:  YES.
16              MR. HARRIGAN:  AND TO DO OTHERWISE WOULD BE TO DO
17    EXACTLY WHAT BRYAN AND MOUSAVI SAY WE DON'T HAVE TO DO IN ANY
18    CASE WHEN IT IS WILLFUL.
19              THE COURT:  SO THE WAY YOU LEFT IT IS THAT HE
20    ACKNOWLEDGED THAT IT WAS PROHIBITED BY LAW.
21              MR. HARRIGAN:  RIGHT.
22              THE COURT:  AND WITH THE PURPOSE OF DISOBEYING THE
23    LAW.
24              MR. HARRIGAN:  RIGHT.
25              THE COURT:  WHAT ABOUT BY ANALOGY TO, FOR EXAMPLE,
```

APRIL 20, 2015

 1    1324 CASES THE ELEMENT IS THAT THE DEFENDANT ACTED WITH THE

 2    KNOWLEDGE THAT HE WAS VIOLATING IMMIGRATION LAW.

 3         **MR. HARRIGAN:**  WELL, THAT IS DIFFERENT BECAUSE IT

 4    SPECIFICALLY INCLUDES THAT, I THINK, IN THE ELEMENT ITSELF.

 5    THIS IS THE -- THIS IS THE -- OTHER THAN CITING MOUSAVI, YOUR

 6    HONOR, THEY EVEN ADMIT MOUSAVI, THAT IS THE HOLDING IS THAT WE

 7    JUST HAVE TO PROVE THAT HIS CONDUCT WAS UNLAWFUL.  THAT IS

 8    WHAT IT SHOWS HERE.  TO SUGGEST SOMEHOW TO MENTION EXPORT

 9    LAWS, TO MENTION OTHER THINGS, YOU KNOW -- I DON'T EVEN KNOW

10    IF THEY WANT THE EXPORT LAWS BECAUSE, YOU KNOW, THAT GOES TO

11    THEIR ARGUMENT, WELL, THAT COULD INCLUDE VIOLATING ITAR.

12         **MR. CAMDEN:**  THAT IS TRUE, YOUR HONOR.  THE

13    ARGUMENT.

14         **MR. HARRIGAN:**  I THINK OURS IS, YOU KNOW, A SAFER --

15    AND REALLY I DON'T KNOW WHY THIS IS AN ARGUMENT HERE.  MAYBE I

16    AM HALLUCINATING, BECAUSE I HEARD HIS CLIENT SAY HE WAS AWARE

17    OF THE SANCTIONS, AND THE ISSUE HERE IS KNOWLEDGE.  IF HE IS

18    AWARE OF THE SANCTIONS AND HE KNEW THEY WERE GOING TO IRAN,

19    THEN THAT'S --

20         **MR. CAMDEN:**  THE PROBLEM IS THE COUNTS OF THE

21    INDICTMENT, 1, 3 AND 4, YOUR HONOR, THEY DON'T ALLEGE WILLFUL

22    VIOLATIONS OF ITAR OR ANY OF THE OTHER EXPORT LAWS.  THEY

23    ALLEGE A WILLFUL VIOLATION OF THE ITSR AND IEEPA.

24         SO, NUMBER ONE, THERE IS REALLY NO NOTICE IF THE

25    GOVERNMENT ALLEGES THIS IN THE INDICTMENT AND THEN THEY COME

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

 1 | IN AND PROVE, OR THE JURY -- EVEN IF THEY DON'T ARGUE IT THE

 2 | JURY THINKS THEY HAVE PROVEN AN INTENT TO VIOLATE ITAR, THE

 3 | JURY CAN'T THEN SUBSTITUTE THAT INTENT TO VIOLATE ITAR.

 4 |     THE PROBLEM IS, WHAT IF THE JURY CONCLUDES THAT HE

 5 | DIDN'T KNOW THIS STUFF WAS GOING TO IRAN BUT HE KNEW IT

 6 | VIOLATED ITAR OR HE THOUGHT IT VIOLATED ITAR TO EXPORT THE

 7 | Y-690'S ANYWHERE, THE GOVERNMENT'S INSTRUCTION LEAVES IT OPEN

 8 | TO THEM TO VOTE GUILTY BASED ON THAT THEORY, AND THAT IS NOT A

 9 | THEORY THAT IS SUPPORTED BY THE INDICTMENT AND THE SPECIFIC

10 | CHARGE IN THE INDICTMENT.  AND HE IS GOING TO SAY HE IS NOT

11 | GOING TO ARGUE IT, HE IS GOING TO ARGUE THAT HE HAS TO

12 | PROVE EXPORT TO IRAN BUT --

13 |     **MR. HARRIGAN:**  NO, THAT IS NOT WHAT THE INDICTMENT

14 | READS, JOE.  IT IS NOT.  I MEAN, IT IS A DISTORTION OF -- YOU

15 | KNOW, HONESTLY, I JUST DON'T SEE WHERE YOU ARE GETTING THAT.

16 | NOWHERE IS HE CHARGED WITH -- HE IS CHARGED WITH SENDING IT TO

17 | IRAN.  AND IT IS -- AN ELEMENT OF THAT IS IT HAS TO BE

18 | WILLFUL.  ALL RIGHT.  SO THE QUESTION IS, WHAT IS THE BURDEN

19 | OF PROOF?  MOUSAVI DEALT WITH THE EXACT SAME COUNT OF IEEPA,

20 | THEY FOUND THIS WAS THE LAW.  I THINK WHAT THEY ARE TRYING TO

21 | DO IS CREATE A HURDLE.

22 |     **THE COURT:**  FOR EXAMPLE, BY ANALOGY, THE PATTERN

23 | INSTRUCTION 9.1, BRINGING TO THE UNITED STATES AN UNDOCUMENTED

24 | INDIVIDUAL, THE FOURTH -- OR THE THIRD ELEMENT IS THAT THE

25 | DEFENDANT ACTED WITH THE INTENT TO VIOLATE THE UNITED STATES

APRIL 20, 2015

1    IMMIGRATION LAWS BY ASSISTING THAT PERSON TO ENTER THE UNITED

2    STATES AT A TIME AND PLACE OTHER THAN AS DESIGNATED BY U.S.

3    IMMIGRATION OFFICIALS.  SO THERE HAS TO BE THE INTENT TO

4    VIOLATE THE IMMIGRATION LAWS.

5            HERE, MR. GHAHREMAN HAS TO HAVE THE INTENT OR THE

6    KNOWLEDGE, THE WILLFULNESS TO VIOLATE THE EXPORT LAWS.  THERE

7    IS SOME --

8            **MR. HARRIGAN:**  NO, HE DOESN'T.  HE HAS TO ACT IN --

9    THIS IS QUOTING FROM MOUSAVI DIRECTLY.  ACCORDINGLY WE

10   CONCLUDE THAT WILLFULNESS UNDER THE IEEPA REQUIRES THE

11   GOVERNMENT TO PROVE BEYOND A REASONABLE DOUBT THAT DEFENDANT

12   ACTED WITH KNOWLEDGE THAT HIS CONDUCT WAS UNLAWFUL, BUT NOT

13   THAT HE WAS AWARE OF A SPECIFIC LICENSING REQUIREMENT.

14           SO ANY TIME YOU TALK ABOUT EXPORT LAWS YOU ARE

15   CREATING A HIGHER BURDEN FOR THE GOVERNMENT.  WHAT WE HAVE TO

16   PROVE THAT HIS CONDUCT -- AND THE CONDUCT IN THIS CASE WE HAVE

17   TO PROVE THAT HE KNOWINGLY ENGAGED IN -- FORGET ABOUT THE

18   WILLFULNESS, HE KNOWINGLY ENGAGED IN CONDUCT THAT INVOLVED

19   EITHER CONSPIRACY TO EXPORT, DIRECTLY OR INDIRECTLY, TO IRAN

20   OR THE ATTEMPTED EXPORT OF GOODS INDIRECTLY TO IRAN VIA A

21   THIRD COUNTRY.

22           THAT IS THE CONDUCT IT IS TALKING ABOUT.  HE DOES

23   THAT, HE SAYS I KNOW I DID THAT.  ALL RIGHT.  IT IS NOT ENOUGH

24   THAT WE PROVE THAT, WE HAVE TO PROVE THAT WHAT HE KNEW WHEN HE

25   DID THAT, HE KNEW IT VIOLATED A LAW.  WE DON'T HAVE TO SHOW

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1    WHICH LAW, JUST THAT IT WAS UNLAWFUL.  THEN TO DEFINE WHAT

2    LAW, EITHER EXPORT OR WITH ITSR, IT CUTS AGAINST EXACTLY WHAT

3    MOUSAVI SAYS.

4         THEIR RECOMMENDED INSTRUCTION SAYS, SAY ITSR.  WELL,

5    THAT REALLY CUTS OFF THE HEAD OF WHAT MOUSAVI SAID BECAUSE

6    THEN THEY INCLUDE A DEFINITION OF WHAT THE ITSR IS.  AND THEY

7    HAVE TO GO BACK, WELL, HE HAS GOT TO KNOW THIS?  HE HAS GOT TO

8    KNOW THIS?

9         THAT IS NOT THE REQUIREMENT.

10        WE HAVE A BURDEN, AND THE BURDEN IS TO SHOW HE KNEW

11   HIS ACTS WERE UNLAWFUL.  THEY WANT TO SUGGEST THAT HE IS

12   CHARGED WITH OTHER CONDUCT THAT IS NOT COVERED BY THE ITSR.

13   HIS CONDUCT IS COVERED BY THE ITSR.  WE ARE NOT CHARGING HIM

14   WITH IT GOING TO DUBAI.  HIS CONDUCT, AS CHARGED, IS EITHER

15   SENDING IT, DIRECTLY OR INDIRECTLY, TO IRAN KNOWINGLY.  AND

16   THE QUESTION IS, AT THE TIME HE COMMITTED THAT, WHAT WAS HIS

17   SCIENTER?  ALL WE NEED TO SHOW IS THAT HE KNEW IT VIOLATED THE

18   LAW, PLAIN AND SIMPLE.

19        I KNOW THE COURT HAS RAISED THE ILLEGAL ENTRY, AND I

20   REMEMBER THAT ELEMENT WAS ADDED.  I APOLOGIZE TO THE COURT,

21   I -- WITHOUT THAT IN FRONT OF ME AND TO DISTINGUISH THAT --

22   AND I KNOW WHERE THE COURT IS COMING FROM.  BUT I DON'T THINK

23   IT APPLIES IN THE LONG LINE OF CASES THAT DEAL WITH -- BRYAN

24   AND OTHER CASES THAT DEAL WITH WILLFULNESS IN THE CONTEXT OF

25   IMPORT/EXPORT LAW.  THIS IS IT.  IT IS THE SAME FOR THE 554

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1   AND THE 545.
 2          THE COURT:  OKAY.  I HAVE GOT THE ARGUMENT IN MIND,
 3   AS WELL AS THE DEFENSE ARGUMENT WHICH IS PROPOSED IN THE
 4   DEFENDANT'S INSTRUCTION NO. 18.  I WILL LOOK AT THAT.  ALL
 5   RIGHT.
 6          IS THERE ANYTHING ELSE?  WHAT I AM --
 7          MR. CAMDEN:  ONE LAST THING, YOUR HONOR.
 8          THE COURT:  YES.
 9          MR. CAMDEN:  MR. HARRIGAN DID SAY THAT WE ARE
10   MISREPRESENTING THE INDICTMENT.  COUNT 2 I AM READING DIRECTLY
11   FROM HERE.  TO WIT, TITLE 50, UNITED STATES CODE 1702 AND
12   1705, AND TITLE 31, CODE OF FEDERAL REGULATIONS, PART 560, ALL
13   IN FACT OF THE COUNTS ALLEGE THOSE AND ONLY THOSE EXPORT LAWS
14   OR REGULATIONS.
15          SO I THINK TO THE EXTENT THE GOVERNMENT IS GOING TO
16   RELY ON A BELIEF THAT HE WAS VIOLATING ITAR TO EITHER BUTTRESS
17   OR SUPPLEMENT OR EVEN AS CIRCUMSTANTIAL EVIDENCE OR IN ANY WAY
18   SUBSTITUTE FOR THE VIOLATION, THE INTENT TO VIOLATE THE
19   PROHIBITION AGAINST EXPORTING GOODS TO IRAN, IS REALLY A
20   VARIANCE IN THE INDICTMENT AT THIS POINT.
21          THE GOVERNMENT IS SAYING RIGHT NOW THAT, YOU KNOW,
22   THEY UNDERSTAND THEY HAVE GOT TO PROVE THAT THESE THINGS WERE
23   GOING TO IRAN.  BUT THE EVIDENCE THEY HAVE HEARD INCLUDED
24   POSSIBLE VIOLATIONS OF OTHER EXPORT LAWS, SO IT IS STILL
25   WITHIN THAT CLASS OF EXPORT LAWS.
```

APRIL 20, 2015

```
 1              SO THE JURY DOESN'T HAVE TO JUST RELY ON WHAT

 2    ARGUMENTS ARE MADE IN ORDER TO FIND THE FACTS.  AND I REALLY

 3    AM CONCERNED IN THIS CASE THAT THEY MIGHT FIND THAT, MAYBE WE

 4    ARE NOT SURE HE KNEW FOR CERTAIN THIS STUFF WAS GOING TO IRAN,

 5    BUT HE DEFINITELY KNEW THIS STUFF, EXPORTING IT ANYWHERE

 6    VIOLATED ITAR SO THEREFORE HE HAS ACTED WILLFULLY.

 7              I REALLY DON'T THINK THAT IS -- MOUSAVI DID SAY

 8    THAT.  IT SAID, WE CONCLUDE WILLFULNESS UNDER IEEPA REQUIRES

 9    THE GOVERNMENT TO PROVE BEYOND A REASONABLE DOUBT THE

10    DEFENDANT ACTED --

11              SORRY, I WILL SLOW DOWN.

12              -- WITH KNOWLEDGE THAT HIS CONDUCT WAS UNLAWFUL.

13              AND THAT HIS CONDUCT WAS UNLAWFUL IS A DIRECT QUOTE

14    FROM BRYAN.  BRYAN IS CITED IN LINE WITH THAT SENTENCE.

15              BUT NOT THAT THE DEFENDANT WAS AWARE OF A SPECIFIC

16    LICENSING REQUIREMENT.

17              AND THE ISSUE IN BRYAN WAS -- IN MOUSAVI WAS DID THE

18    GOVERNMENT HAVE TO PROVE THAT HE HAD READ IEEPA AND THAT HE

19    KNEW ABOUT THE LICENSING REQUIREMENTS.  THE LICENSING

20    REQUIREMENTS WERE THE ISSUE THERE.

21              WE ARE NOT GOING TO BE ARGUING, WE ARE NOT ASKING

22    FOR AN INSTRUCTION SAYING THAT HE HAD TO HAVE READ AND BEEN

23    AWARE OF ALL OF THE CONTOURS OF THIS LAW, IT IS MORE GENERAL

24    KNOWLEDGE.  BUT IT IS STILL KNOWLEDGE ABOUT THAT SPECIFIC AREA

25    OF LAW THAT THIS -- THESE PARTICULAR STATUTES VIOLATE.
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1          WE COULD EVEN HAVE AN INSTRUCTION THAT INSTEAD OF

 2   REFERENCING -- IN MY NO. 18 I WROTE THE IRAN TRANSACTIONS AND

 3   SANCTIONS REGULATION, INCLUDE A REFERENCE.  BUT IN 18A, ON THE

 4   NEXT ONE, I INCLUDED AN ALTERNATE, IF THE COURT IS NOT WILLING

 5   TO DO THAT, JUST DIRECTLY QUOTING FROM MOUSAVI.  IT SAYS THAT

 6   THE DEFENDANT INTENDED TO VIOLATE THE UNITED STATES EMBARGO ON

 7   TRANSACTIONS WITH IRAN.

 8          AND THAT IS EXACTLY WHAT MOUSAVI SAID THE GOVERNMENT

 9   HAS TO PROVE BEYOND A REASONABLE DOUBT, AND IN FACT IS THE

10   ONLY PROTECTION A DEFENDANT CHARGED WITH A VIOLATION OF IEEPA

11   AND ITSR HAS IS TO THE INTENT ELEMENT.  THAT IS ENOUGH, THEY

12   DON'T HAVE TO PROVE KNOWLEDGE OF THE LICENSING REQUIREMENTS.

13          SO 18A IS JUST A DIRECT QUOTE STRAIGHT FROM MOUSAVI

14   INTO THE JURY INSTRUCTIONS.  IT IS ALSO -- I MEAN, IT SAYS

15   EMBARGO ON TRANSACTIONS WITH IRAN.  I THINK THAT IS ENOUGH TO

16   HAVE THE JURY KEEP IN MIND THAT WE ARE TALKING ABOUT THE

17   PROHIBITION AGAINST SENDING TO IRAN AND NOT THE PROHIBITION ON

18   EXPORTING MUNITIONS, BUT IT IS ALSO GENERAL ENOUGH NOT TO

19   FORCE THEM TO THINK THAT HE KNOWS ALL OF THE LICENSING

20   REQUIREMENTS.

21          **THE COURT:**  WHAT ABOUT THE ARGUMENT THAT EMBARGO ON

22   TRANSACTIONS WITH IRAN IS REALLY A TERM OF ART?  WE HAVEN'T

23   DEFINED WHAT EMBARGO IS.

24          **MR. CAMDEN:**  WELL, I MEAN, IF IT IS A TERM OF ART

25   THEN THAT IS WHAT THE NINTH CIRCUIT IS SAYING THE GOVERNMENT
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1    STILL HAS TO PROVE.  IT SAYS BY REQUIRING THE GOVERNMENT TO

2    PROVE -- DEFENDANTS ARE ADEQUATELY PROTECTED BY REQUIRING THE

3    GOVERNMENT TO PROVE THAT THE DEFENDANTS KNEW THEIR ACTIONS

4    VIOLATED THE UNITED STATES EMBARGO ON TRANSACTIONS WITH IRAN.

5              SO THE INTENT AND THE KNOWLEDGE OF THE LAW IS THE

6    LAW REGARDING THE -- WE COULD EVEN, INSTEAD OF PUTTING

7    EMBARGO, WE COULD SAY THE PROHIBITION AGAINST EXPORTING,

8    SELLING OR SUPPLYING GOODS, DIRECTLY OR INDIRECTLY, TO IRAN,

9    WITHOUT REFERENCE TO THE LICENSING REQUIREMENTS.

10             **THE COURT:**  WOULD YOU OBJECT TO THAT?

11             **MR. HARRIGAN:**  YEAH, I WOULD, YOUR HONOR.  AND I

12   WILL BRIEF THIS FURTHER IF THE COURT WANTS.

13             IF YOU TAKE A LOOK AT BRYAN, THE ISSUE IS THE

14   CONDUCT.  THE ISSUE IS THEIR CONDUCT, DID THEY KNOW THEIR

15   CONDUCT WAS --IT COULD BE LIKE THEY NEVER READ A BOOK, THEY

16   COULD NEVER HAVE HAD ANYTHING, IF THEY HAVE KNOWLEDGE THAT IT

17   IS UNLAWFUL.  ALL RIGHT.

18             AND IT IS NOT ANY LAW, IT IS A LAW THAT DEALS WITH

19   THEIR CONDUCT.  MUCH LIKE SELLING A GUN WITHOUT A LICENSE.

20   AND BRYAN HELD YOU DON'T HAVE TO KNOW THAT YOU HAVE TO HAVE A

21   LICENSE FOR THAT, OR ANY SPECIFIC REGULATION, JUST THAT IT IS

22   AGAINST THE LAW.  THEY WOULD ARGUE, WELL --

23             **THE COURT:**  WHAT ABOUT MR. CAMDEN'S ARGUMENT THAT

24   THERE IS EVIDENCE THAT IT WAS UNLAWFUL BECAUSE IT INVOLVED A

25   MUNITION OR THOSE TYPES OF THINGS.

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

1        **MR. HARRIGAN:**  I GUESS THE WAY I WOULD ADDRESS THAT,

2   YOUR HONOR, IS THE FACT IS IT VIOLATED -- GOING TO IRAN

3   VIOLATED BOTH ITAR AND OFAC.  ALL RIGHT.  IT VIOLATED BOTH.

4   WE STILL HAVE TO PROVE IT WENT TO IRAN.  HE CAN'T GET A FREE

5   PASS JUST BECAUSE HE IS WILLING TO VIOLATE, WELL, IT WAS A

6   DIFFERENT LAW.

7        YOU KNOW, BUT I AM NOT USING THAT TO ARGUE HIS

8   SCIENTER AND KNOWING IT IS UNLAWFUL.  I AM STAYING AWAY FROM

9   THAT.  THE ONLY REASON I THINK IT IS RELEVANT IS, AS I BROUGHT

10  OUT ON HIS CROSS TODAY, IS THAT WHEN HE FIRST GOT DENIED WHAT

11  DID THEY TELL HIM?  IT WAS JUST A COMPANY.  AND NOW HE IS TOLD

12  IT IS A GOVERNMENT REGULATOR THAT IS GOING TO LOOK EVEN MORE

13  STRICTLY AT THAT.  SO HIS RESPONSE WAS, OH, I AM SURE WE DON'T

14  WANT TO GIVE IT TO THEM NOW, BECAUSE IF THE LAST ONE DIDN'T

15  PASS, THIS ONE AIN'T GOING TO PASS.  THE FACT OF THE MATTER,

16  HE DIDN'T CARE, AND HE DIDN'T CARE BECAUSE HE KNEW IT WAS

17  GOING TO IRAN.

18        THAT IS NOT TO SHOW WILLFULNESS.  I DON'T THINK --

19  BASED ON HIS OWN STATEMENT, TRUST ME, I THINK HE ADMITTED.

20  BUT I STILL THINK THEY WANT TO PUT THAT TO SAY, WELL, LOOK AT

21  THIS.  HE STILL HAS TO KNOW ABOUT THE ITSR.  ANY TIME YOU

22  MENTION LAW -- AND I THINK THAT IS WHAT THEY WANT TO ARGUE,

23  AND THAT IS NOT THE LAW.

24        **THE COURT:**  I DO AGREE WITH THAT, HE DOESN'T HAVE TO

25  KNOW ABOUT THE ITSR SPECIFICALLY.  BUT WHAT ABOUT THEIR

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1    FALL-BACK POSITION THAT HE NEEDS TO KNOW IT WOULD VIOLATE THE
 2    PROHIBITION AGAINST EXPORTING, DIRECTLY OR INDIRECTLY, TO
 3    IRAN?
 4              MR. HARRIGAN:  HE JUST NEEDS TO KNOW THAT IT
 5    VIOLATES LAW.  IT SEEMS TO CREATE -- LET ME THINK ABOUT THAT.
 6              WHEN YOU TALK ABOUT PROHIBITION, THOUGH, WHAT DOES
 7    THAT REFER TO, BACK TO THE LAW.  AGAIN, IT USES A LEGALESE
 8    TERM, I GUESS, IS THE PROBLEM I HAVE WITH THAT, THE TERM
 9    PROHIBITION.  BECAUSE IT ALMOST SEEMS TO REFER BACK TO THE
10    ITSR.  SO WE GOT TO LOOK AT THIS TO FIGURE OUT WHAT DID HE
11    HAVE TO KNOW.
12              THE COURT:  BUT THE INSTRUCTION GOES ON TO SAY THAT
13    THE GOVERNMENT DOESN'T HAVE TO PROVE THAT THE DEFENDANT WAS
14    AWARE OF SPECIFIC EXECUTIVE ORDERS PURSUANT TO IEEPA OR
15    LICENSING OR AUTHORIZATION REQUIREMENTS.
16              MR. HARRIGAN:  I THINK THAT IS SUFFICIENT, YOUR
17    HONOR.  I THINK THAT IS GOOD.  WE WILL AGREE.
18              THE COURT:  SO IT WOULD READ, THEN, THAT:  AN ACT IS
19    DONE WILLFULLY IF IT IS VOLUNTARILY COMMITTED WITH THE
20    KNOWLEDGE THAT IT WAS PROHIBITED.
21              MR. CAMDEN:  I PUT IN MY PROPOSED INSTRUCTION A LAW
22    INSTEAD OF LAW.  MAYBE RIGHT IN BETWEEN WOULD BE, KNOWING IT
23    WAS PROHIBITED BY SOME LAW, AND WITH THE PURPOSE OF DISOBEYING
24    THAT LAW.
25              IS THE COURT GOING OFF MODIFYING COURT'S 26?
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
1          THE COURT:  YES.  WHAT WOULD YOU PROPOSE?

2          MR. JOHNSTON:  CAN I JUST FLY IN FROM 30,000 FEET

3     HERE AND SEE IF THIS HELPS?

4          WE ARE TRYING TO JUST MAKE SURE IT IS ANCHORED IN

5     THE VIOLATION OF LAWS CONCERNING EXPORTATION TO IRAN.  SO I

6     THINK IT WOULD ACTUALLY BE IN THE COURT'S SECOND SENTENCE:

7     WHILE THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT THAT

8     DEFENDANT INTENDED TO VIOLATE THE UNITED STATES EXPORT LAWS

9     REGARDING IRAN.

10         I MEAN, ALL WE ARE TRYING TO DO IS MAKE SURE IT IS

11    ANCHORED IN IRAN AND NOT THESE OTHER LAWS THAT MAY OR MAY NOT

12    HAVE BEEN AT ISSUE HERE, AND CERTAINLY WEREN'T CHARGED.

13         MR. HARRIGAN:  I THINK THAT IS FINE, YOUR HONOR.

14         MR. JOHNSTON:  IT WOULD BE TWO WORDS AFTER THE

15    UNITED STATES EXPORT LAWS.

16         THE COURT:  RIGHT.

17         MR. JOHNSTON:  REGARDING IRAN.

18         THE COURT:  WHAT ABOUT THE SECOND LINE, LEAVE IT --

19    RIGHT NOW IT REFERENCES PROHIBITED BY EXPORT LAWS REGARDING

20    IRAN?

21         MR. HARRIGAN:  NO, THAT JUST NEEDS TO SAY -- THE

22    FIRST LINE SHOULD SAY THAT AN ACT IS DONE WILLFULLY IF

23    VOLUNTARILY COMMITTED WITH KNOWLEDGE THAT IT IS PROHIBITED BY

24    THE LAWS OF THE UNITED STATES WITH THE PURPOSE OF DISOBEYING

25    THE LAW.
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
1              THIS ALL GOES BACK TO THIS, JUDGE.

2          MR. JOHNSTON:  I DON'T DISAGREE WITH THAT.  THE

3   FIRST SENTENCE CAN BE -- I AM SORRY.  GO AHEAD.

4          MR. HARRIGAN:  THIS IS THE FRUSTRATION I HAVE.  I AM

5   TRYING TO FIGURE OUT HOW I AM GOING TO ARGUE THIS TO THE JURY

6   BECAUSE ALL I HAVE TO SHOW IS THE ACT THEY DID THAT THEY ARE

7   CHARGED WITH, YOUR HONOR, WHICH IS SENDING GOODS TO IRAN --

8   NOTHING ELSE -- THEY KNEW WAS UNLAWFUL.

9              AND NOW THEY WANT TO ADD ON TOP OF THAT THEY KNEW

10  WAS UNLAWFUL AS SPECIFIED IN SOME LAW OR SOME GENERAL EXPORT

11  LAWS.  WE JUST HAVE TO KNOW THAT THE CONDUCT THAT HE DID WAS

12  UNLAWFUL.

13             I AM NOT ARGUING, NOR DOES THE INSTRUCTION PERMIT ME

14  TO ARGUE THAT, YOU KNOW, THE ACT OF SENDING IT -- THE ACT OF

15  JUST SENDING IT TO DUBAI, RIGHT, IN VIOLATION OF ITAR, ALL

16  RIGHT, IS KNOWLEDGE OF WILLFULNESS.  HOWEVER, THE ACT OF

17  SENDING IT TO DUBAI AND ALSO ON TO IRAN, KNOWING IT IS GOING

18  TO IRAN, KNOWING THAT IT IS IN VIOLATION OF ITAR LAWS, WHICH

19  IT ALSO IS, ALL RIGHT, POSSIBLY, YOU KNOW, BECAUSE THAT IS

20  WHAT HE IS THINKING.  THAT IS WHAT HE IS THINKING, RIGHT?

21  THAT IS EVIDENCE OF WILLFULNESS.

22             SO, YOU KNOW, IT REALLY IS THE ACT ITSELF.  WHAT

23  THEY ARE SAYING -- WHAT THEY WANT TO ARGUE, SHOULD BE ABLE TO

24  ARGUE, LOOK, IF YOU THINK IT WAS JUST GOING TO DUBAI, IT

25  WASN'T WILLFUL, AND IT ALSO WAS NOT A CRIME.  THAT IS THE
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1    ISSUE.

 2              THE COURT:  SO HOW ABOUT, I THINK AS MR. JOHNSTON

 3    PROPOSED, IT WOULD READ THIS WAY -- AND I THINK THE GOVERNMENT

 4    WAS NOT OBJECTING.

 5              AN ACT IS DONE WILLFULLY IF IT IS VOLUNTARILY

 6    COMMITTED WITH THE KNOWLEDGE THAT IT WAS PROHIBITED BY THE

 7    LAWS OF THE UNITED STATES AND WITH THE PURPOSE OF DISOBEYING

 8    THE LAW.  WHILE THE GOVERNMENT MUST PROVE BEYOND A REASONABLE

 9    DOUBT THAT THE DEFENDANT INTENDED TO VIOLATE THE UNITED STATES

10    EXPORT LAWS REGARDING IRAN, IT IS NOT NECESSARY.

11              THEN IT GOES ON.

12         MR. HARRIGAN:  ALL RIGHT, YOUR HONOR.  ALL RIGHT.

13         THE COURT:  DO YOU AGREE?

14         MR. HARRIGAN:  I AM JUST TOO TIRED.  I DON'T AGREE

15    THAT IT IS NECESSARY BUT, YOU KNOW, FOR THE SAKE OF MOVING ON,

16    BECAUSE I DON'T REALLY THINK IT IS AN ISSUE IN THIS CASE, WE

17    WILL MOVE ON.

18              THE COURT:  LET ME THINK ABOUT THAT.  ALL RIGHT.

19              WHAT I WOULD LIKE TO DO, I AM GOING TO WORK WITH THE

20    INSTRUCTIONS, GIVEN THE ARGUMENTS HERE TODAY, AND GIVE ANOTHER

21    PROPOSED SET TOMORROW MORNING.

22              THEN LET'S MEET AT 1:30 AND WE WILL PERFECT THE

23    INSTRUCTIONS.

24         MR. HARRIGAN:  THANK YOU, YOUR HONOR.

25         MR. CAMDEN:  ONE LAST THING.  I FORGOT TO SUBMIT THE
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1   INSTRUCTION THE COURT GAVE REGARDING -- IT WAS DURING DAVID

 2   COLE'S TESTIMONY.  I WAS GOING TO RESUBMIT IT AS AN

 3   INSTRUCTION AT THE END OF THE CASE.  I FORGOT TO SUBMIT THAT

 4   IN THE PACKAGE.  SO AS SOON AS I GET BACK IN THE OFFICE I WILL

 5   SEND A POST INSTRUCTION VERSION OF THAT TO OPPOSING COUNSEL.

 6           THE COURT:  OKAY.

 7           MR. HARRIGAN:  YOUR HONOR, I UNDERSTAND THERE IS

 8   GOING TO BE A JURY INSTRUCTION THEORY OF DEFENSE, AND MAYBE WE

 9   COULD HAVE THAT BEFORE WE MEET TOMORROW.

10           THE COURT:  DO WE HAVE THAT?

11           MR. JOHNSTON:  WE ARE WORKING ON IT, YOUR HONOR.  I

12   MEAN, HE HASN'T FINISHED TESTIFYING, TECHNICALLY.

13           MR. HARRIGAN:  I UNDERSTAND.

14           THE COURT:  BUT WE ALL KNOW WHAT IT IS GOING TO BE.

15   SO IF YOU WILL GO AHEAD AND IF YOU WILL SUBMIT IT TONIGHT WE

16   CAN HAVE A PROPOSAL BY TOMORROW IN THE COURT'S PROPOSED

17   INSTRUCTIONS.

18           WHAT I WOULD LIKE TO DO IS GET YOU ANOTHER DRAFT BY

19   NO LATER THAN NOON TOMORROW, AND THEN MEET AT 1:30 AND PERFECT

20   ALL OF THE INSTRUCTIONS.

21           MR. JOHNSTON:  THAT WOULD BE GREAT.

22           THE COURT:  SO IF YOU COULD SUBMIT YOUR DEFENSE

23   THEORY BY TOMORROW, 9:00 A.M., NO LATER THAN 9:00?

24           MR. JOHNSTON:  WE CAN DO THAT, YOUR HONOR.

25           THE COURT:  AS WELL AS THE DAVID COLE ADMONITION
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

```
 1   INSTRUCTION.
 2              MR. JOHNSTON:  YES, YOUR HONOR.
 3              THE COURT:  AND THEN DO WE HAVE THE VERDICT FORM?
 4              THE CLERK:  UM-HUM.
 5              THE COURT:  WHICH WILL BE THE STANDARD FORM.  WE
 6   WILL GO AHEAD AND PROVIDE THAT TO COUNSEL.  WE CAN ADDRESS
 7   THAT AT 1:30 TOMORROW TOO?
 8              ANYTHING ELSE?
 9              MR. HARRIGAN:  NO, THAT'S IT.
10              THE COURT:  THANK YOU.
11              MR. HARRIGAN:  APPRECIATE IT.
12              MR. CAMDEN:  THANK YOU.
13
14                          *   *   *
15              I CERTIFY THAT THE FOREGOING IS A CORRECT
                TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
16              IN THE ABOVE-ENTITLED MATTER.
17              S/LEEANN PENCE                    6/14/2015
18              LEEANN PENCE, OFFICIAL COURT REPORTER   DATE
19
20
21
22
23
24
25
```

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

INDEX OF WITNESSES

HELSING, JOHN

  BY MR. COUGHLIN    981

  BY MR. CAMDEN                1005


GHAHREMAN, ARASH

  BY MR. JOHNSTON   1021

  BY MR. HARRIGAN             1108


SHAYEI, EBRAHIM

  BY MR. JOHNSTON   1176

  BY MR. COUGHLIN             1182

APRIL 20, 2015

JURY INSTRUCTION DISCUSSION

INDEX OF EXHIBITS

| EXHIBIT | IDENTIFIED | RECEIVED |
|---------|-----------|----------|
| 752 | 998 | 999 |
| 753 | 1001 | 1001 |
| 754 | 1002 | 1003 |
| 755 | 1003 | 1004 |
| ZZ-1 | 1009 | |
| AAA | 1011 | 1012 |
| BBB | 1047 | 1048 |
| 901 | 1121 | |
| 902 | 1136 | |

APRIL 20, 2015