UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                )
UNITED STATES OF AMERICA,        )
            PLAINTIFF,           )   CASE NO. 13CR4228-DMS
                                )
                                )   SAN DIEGO, CALIFORNIA
                                )WEDNESDAY APRIL 22, 2015
                                )    8:30 A.M. CALENDAR
ARASH GHAHREMAN,                 )
            DEFENDANT.           )
_____)        VOLUME VIII


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL/DAY SIX




INTERPRETERS:                    BADI BADIOZAMANI
                                 ASLAN ASLANIAN


                                 LEE ANN PENCE,
REPORTED BY:                     OFFICIAL COURT REPORTER
                                 UNITED STATES COURTHOUSE
                                 333 WEST BROADWAY ROOM 1393
                                 SAN DIEGO, CALIFORNIA 92101

```
COUNSEL APPEARING:

FOR PLAINTIFF:          LAURA E. DUFFY,
                        UNITED STATES ATTORNEY
                        BY:  SHANE P. HARRIGAN
                             TIMOTHY D. COUGHLIN
                        ASSISTANT U.S. ATTORNEYS
                        880 FRONT STREET
                        SAN DIEGO, CALIFORNIA 92101

FOR DEFENDANT           FEDERAL DEFENDERS OF SAN DIEGO, INC.
GHAHREMAN:                   BY:  ELLIS M. JOHNSTON
                                  JOSEPH S. CAMDEN
                        TRIAL ATTORNEYS
                        225 BROADWAY, SUITE 900
                        SAN DIEGO, CALIFORNIA 92101
```

GHAHREMAN – CROSS-EXAMINATION

```
 1   SAN DIEGO, CALIFORNIA – WEDNESDAY, APRIL 22, 2015 – 8:30 A.M.

 2                            *   *   *

 3            THE CLERK:  NO. 1 ON CALENDAR, CASE NO. 13CR4228,

 4   UNITED STATES OF AMERICA VERSUS ARASH GHAHREMAN; ON FOR JURY

 5   TRIAL DAY SIX.

 6            THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.

 7            WE HAVE ALL JURORS PRESENT COUNSEL AND MR.

 8   GHAHREMAN.

 9            WE ARE GOING TO COMPLETE THE TESTIMONY OF MR.

10   GHAHREMAN THIS MORNING, AND THEN WE WILL INSTRUCT ON THE LAW

11   AND START WITH CLOSING ARGUMENTS LATER THIS MORNING.  SO WE

12   WILL PROCEED WITH THE CONTINUED CROSS-EXAMINATION OF MR.

13   GHAHREMAN.

14            SIR, YOU CAN HAVE A SEAT.  AND I WOULD REMIND YOU

15   THAT YOU REMAIN UNDER OATH FROM YOUR PRIOR TESTIMONY.

16            THE WITNESS:  YES.

17            THE COURT:  THANK YOU, AND GOOD MORNING.

18            MR. HARRIGAN.

19            MR. HARRIGAN:  THANK YOU.

20                   CROSS-EXAMINATION(RESUMED)

21   Q.    (MR. HARRIGAN) GOOD MORNING, MR. GHAHREMAN.

22   A.    GOOD MORNING.

23            THE WITNESS:  GOOD MORNING, ALL.

24   Q.    (MR. HARRIGAN) ON JUNE 13TH YOU MET WITH THE UNDERCOVER

25   AGENTS, THAT YOU NOW KNOW ARE AGENT COLE AND AGENT HELSING, AT
```

APRIL 22, 2015

1    THE GREEN VALLEY RANCH HOTEL SUITE, RIGHT?

2    **A.**    YES, I DID.

3    **Q.**    AND YOU WENT TO THAT MEETING WITH ERGUN YILDIZ, RIGHT?

4    **A.**    YES, SIR.

5    **Q.**    AND DURING THAT MEETING THERE WERE A LOT OF THINGS

6    DISCUSSED.  IS THAT A FAIR STATEMENT?

7    **A.**    YES, SIR.

8    **Q.**    ALL RIGHT.  AND ONE OF THE THINGS THAT WAS DISCUSSED IN

9    YOUR PRESENCE WAS A SAFE WAY TO CONDUCT BUSINESS IN THE

10   FUTURE.

11   **A.**    YES, SIR.

12   **Q.**    AND BY SAFE IT MEANT MAKING SURE THAT YOU COULD GET

13   GOODS OUT OF THE COUNTRY.

14   **A.**    FOR EXPORTATION, SIR.

15   **Q.**    FOR EXPORTATION, EXACTLY.  AND THERE WERE DISCUSSIONS

16   ABOUT IN THE FUTURE BEING ABLE TO CONDUCT DEALS WITHOUT HAVING

17   TO MENTION EXACTLY WHERE THEY ARE GOING, RIGHT?

18   **A.**    I DON'T RECALL THAT.

19   **Q.**    YOU DON'T RECALL.  DO YOU RECALL THE AGENTS TALKING TO

20   ERGUN YILDIZ AND YOU ABOUT FUTURE BUSINESS?

21   **A.**    NOT ME.

22   **Q.**    YOU WERE AT THE MEETING, SIR, CORRECT?

23   **A.**    YES, I WAS.

24   **Q.**    AND YOU WERE SEATED DIRECTLY NEXT TO ERGUN YILDIZ DURING

25   THAT MEETING, CORRECT?

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **A.**    YES, I WAS.

2   **Q.**    IT IS A FAIR STATEMENT YOU WERE LESS THAN A FOOT AWAY

3   FROM ERGUN YILDIZ?

4   **A.**    NO, I WAS -- I WAS SITTING THERE.

5   **Q.**    YOU WERE THERE AND HE WAS RIGHT NEXT TO YOU.

6   **A.**    YES.

7   **Q.**    SEATED.

8   **A.**    YES, SIR.

9   **Q.**    AND DIRECTLY ACROSS FROM YOU WERE DAVID MILLS, CORRECT?

10  **A.**    YES.

11  **Q.**    AND JOHN HELSING.

12  **A.**    YES, SIR.

13  **Q.**    WHO YOU KNEW AS JOHN ERICKSON.

14  **A.**    YES, SIR.  I DON'T REMEMBER HIS LAST TIME THAT, BUT.

15  **Q.**    AND THE DISCUSSIONS ABOUT FUTURE WAYS TO GET GOODS OUT

16  OF THE COUNTRY OCCURRED WHILE YOU WERE ALL SEATED ACROSS FROM

17  EACH OTHER, RIGHT?  YOU KNOW THAT.

18  **A.**    I KNOW THAT, THAT IS, BUT THAT TIME I DIDN'T ACT BECAUSE

19  I WAS BUSY.  I DON'T KNOW WHICH TIME YOU ARE TALKING ABOUT.

20  **Q.**    I AM TALKING ABOUT WHEN YOU ARE ALL SEATED.  YOU

21  REMEMBER THAT?

22  **A.**    YES.  THAT -- I DIDN'T -- WAS ABOUT THE SENDING -- DAVID

23  MILLS EXPRESSED HIS CONCERN ABOUT THE -- THIS BUSINESS IS

24  GOING ON.  I DIDN'T -- I DON'T THINK SO AT THAT TIME OFFERING

25  FOR THE SENDING OUT AND EXPORTATION.

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1    **Q.**    SO --

2    **A.**    HE WAS INTRODUCING THE SOUTH STAR TRADING, HOW IS SOUTH

3    STAR TRADING START TO WORK.  THEY WERE PREPARING BEFORE

4    CARRIER.  AND ERGUN YILDIZ IS TALKING ABOUT INTRODUCING HIS

5    COMPANY.

6    **Q.**    AND YOU WERE PRESENT DURING THAT CONVERSATION, RIGHT?

7    **A.**    YES, I WAS.

8    **Q.**    YOU HEARD THE CONVERSATION, RIGHT?

9    **A.**    YES.

10   **Q.**    OKAY.  AND YOU WERE LOOKING AT DAVID MILLS WHILE HE WAS

11   TALKING, RIGHT?

12   **A.**    I LOOKING AT EVERYONE, YES.  I WAS OVER THERE.  I DON'T

13   WANT TO DENY THAT, BECAUSE I DON'T CHEAT.  I DON'T REMEMBER I

14   LOOKED TO DAVID MILLS OR JOHN ERICKSON OR ERGUN.  I WAS

15   LOOKING TO ERGUN, ALSO, JOHN ERICKSON, AS YOU SAID, OR DAVID

16   MILLS.

17   **Q.**    FAIR ENOUGH.  YOU WERE ALL AROUND DIRECTLY ACROSS FROM

18   EACH OTHER.

19   **A.**    YES, SIR.  I WAS IN THE MEETING.

20   **Q.**    RIGHT.  THIS IS BEFORE YOU EVEN LOOKED AT THE GOODS,

21   RIGHT?

22   **A.**    FOUR PEOPLE, YES, WE WERE SITTING IS FOR HALF AN HOUR, I

23   THINK.

24   **Q.**    IT WAS DURING THAT TIME THAT DAVID MILLS, AGENT COLE, IN

25   YOUR WORDS, EXPRESSED CONCERN, RIGHT?

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **A.**    EXPRESSED CONCERN AND EXPRESSED THAT IS THE –– WHAT ––

2   WHO IS THAT –– WHO THEY ARE.

3   **Q.**    THE QUESTION WAS, SIR, YOU SAID THAT DAVID MILLS

4   EXPRESSED CONCERN.

5   **A.**    YES.

6   **Q.**    RIGHT?  AND HE EXPRESSED CONCERN WHILE YOU WERE ALL

7   SEATED ACROSS FROM EACH OTHER, CORRECT?

8   **A.**    YES.

9   **Q.**    AND HE JUST DIDN'T EXPRESS CONCERN, HE MADE SOME FURTHER

10   STATEMENTS, CORRECT?

11   **A.**    YES.  AS USUAL.

12   **Q.**    AS USUAL.  AS USUAL?

13   **A.**    YEAH, HE MADE –– THAT IS AFTER MAY 28, HE IS STARTING TO

14   SAY HIS BELIEFS.

15   **Q.**    AND WHAT BELIEFS WAS HE STARTING TO SAY?

16   **A.**    THAT IS THERE, THAT IS I DON'T REMEMBER WORD BY WORD.

17   **Q.**    WELL, YOU DON'T REMEMBER BY WORD THESE BELIEFS HE SAID?

18   **A.**    THAT IS HE ––

19   **Q.**    SIR, YES OR NO.  YOU DON'T REMEMBER THE BELIEFS THAT HE

20   EXPRESSED TO YOU?

21   **A.**    IS YES, I REMEMBER SOME.

22   **Q.**    YES.  OKAY.  THANK YOU.

23       PLEASE TELL ME WHAT BELIEFS HE EXPRESSED TO YOU.

24   **A.**    THAT HIS BELIEF THAT IS THAT KOORUSH IS NOT TRUTH WITH

25   HIM.

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **Q.**    KOORUSH WAS NOT TRUTH WITH HIM.

2   **A.**    YES.  KOORUSH --

3   **Q.**    HE SAID MORE THAN THAT, DIDN'T HE, SIR?

4   **A.**    YES, HE SAID MORE THAN THAT.

5   **Q.**    HE SAID HE ALWAYS KNEW THE GOODS WERE GOING TO IRAN,

6   CORRECT?

7   **A.**    I DON'T KNOW WHAT HE SAID, BUT HE SAID YES, HE KNEW THE

8   GOODS GOING TO IRAN.  HE SAID, YES.

9   **Q.**    LET ME ASK YOU AGAIN BECAUSE YOU SAID YOU DON'T KNOW

10  WHAT HE SAID, THEN YOU SAID YES.

11       DID HE TELL YOU THAT HE BELIEVED THE GOODS WERE GOING TO

12  IRAN?

13  **A.**    HE SAID.

14  **Q.**    AND YOU HEARD THAT.

15  **A.**    YES.

16  **Q.**    ALL RIGHT.  AND HE ALSO DISCUSSED WITH YOU THE FACT THAT

17  YOU NEEDED TO DO BUSINESS IN A SAFE WAY, DIDN'T HE?

18  **A.**    THAT IS THE YES.  PROPER WAY.

19  **Q.**    A PROPER WAY, THAT IS WHAT YOU SAID?

20  **A.**    YES.

21  **Q.**    BY PROPER WAY, SIR, A WAY THAT OTHER PEOPLE -- THE

22  GOVERNMENT, CUSTOMS -- WOULDN'T FIND OUT THAT THE GOODS WERE

23  GOING TO IRAN; ISN'T THAT CORRECT, SIR?

24  **A.**    CAN YOU REPEAT THIS QUESTION, PLEASE?

25  **Q.**    YOU TESTIFIED THAT HE SAID HE WANTED TO DO BUSINESS IN A

APRIL 22, 2015

GHAHREMAN − CROSS−EXAMINATION

1    PROPER WAY, RIGHT?

2    **A.**    YES.

3    **Q.**    AND HE ALSO SAID THAT BY PROPER WAY HE WANTED TO MAKE

4    SURE THAT OTHERS DID NOT FIND OUT THAT YOU WERE ALL SENDING

5    THE GOODS TO IRAN.

6    **A.**    I DON'T THINK SO HE SAID THESE WORDS YOU SAID.

7    **Q.**    SIR, YOU DON'T THINK SO?  IT IS YES OR NO.  DID HE SAY

8    THAT?

9    **A.**    NO, SIR.

10   **Q.**    HE NEVER SAID THAT?

11   **A.**    NO.

12   **Q.**    HE NEVER DISCUSSED CONCERNS ABOUT BEING DISCOVERED,

13   GETTING ARRESTED BECAUSE THOSE GOODS WERE GOING TO IRAN.

14   **A.**    THAT IS NOT THE SAME YOU SAID.

15   **Q.**    DID HE DISCUSS FEAR ABOUT BEING ARRESTED?

16   **A.**    YES —— NO, THAT IS ARRESTED, IT WAS OTHER WORDS HE SAID

17   THAN ARRESTED.  YES, HE WAS CONCERNED TO ARRESTED.

18   **Q.**    FAIR ENOUGH.  HE DISCUSSED FEAR ABOUT GOING TO JAIL,

19   RIGHT?

20   **A.**    YES HE SAID ONCE, I THINK SO.

21   **Q.**    HE SAID MORE THAN ONCE, DIDN'T HE?

22   **A.**    I DON'T THINK SO IN THE CONVERSATION MORE THAN ONCE.  I

23   CAN REMEMBER IS THE ONCE.

24   **Q.**    DURING YOUR ENTIRE CONVERSATIONS WITH HIM, FROM THE TIME

25   YOU MET IN DECEMBER TO THE TIME YOU WERE ARRESTED, HE

APRIL 22, 2015

GHAHREMAN - CROSS-EXAMINATION

1   MENTIONED HIS FEAR OF GOING TO JAIL MORE THAN ONCE TO YOU,

2   DIDN'T HE?

3   **A.**   HE FEAR -- I DON'T REMEMBER.  IF YOU REMEMBER, PLEASE

4   REPLAY THAT -- THIS OR PHONE CONVERSATION.  I REMEMBER ONCE HE

5   SAID.

6   **Q.**   SIR, THE QUESTION IS POSED TO YOU, AND IT IS A SIMPLE

7   QUESTION.

8   **A.**   UM-HUM.

9   **Q.**   ISN'T IT A FACT, SIR, THAT DURING YOUR MEETINGS AND

10  TELEPHONE CONVERSATIONS WITH AGENT MILLS, AGENT COLE, DAVID

11  MILLS, HE MENTIONED TO YOU ON MORE THAN ONE OCCASION THAT YOU

12  ALL RISKED GOING TO JAIL?

13  **A.**   ONE TIME, YES.

14  **Q.**   ONLY ONE TIME?

15  **A.**   I REMEMBER ONE TIME.

16  **Q.**   YOU ONLY REMEMBER ONE TIME, OR WAS IT ONLY ONE TIME?

17  **A.**   I REMEMBER ONE TIME.

18  **Q.**   COULD IT HAVE BEEN TWO?

19  **A.**   I DON'T THINK SO.  ONE.

20  **Q.**   JUST ONE.  LET'S TALK ABOUT ONE TIME THAT HE MENTIONED

21  THAT.  AND HE DID MENTION IT AT THE JUNE 13TH MEETING IN GREEN

22  VALLEY RANCH, SIR.  YOU REMEMBER THAT, RIGHT?

23  **A.**   GREEN VALLEY RANCH IS THE -- PLEASE, I DON'T REMEMBER

24  ALL WORDS, SIR.  THAT IS YOU ARE EXPECTING ALL WORDS I SAID?

25  **Q.**   NO, I AM NOT EXPECTING.  IF YOU CAN'T REMEMBER, TELL ME

APRIL 22, 2015

GHAHREMAN – CROSS–EXAMINATION

1   YOU CAN'T REMEMBER.  THAT'S FINE.  BUT THE QUESTION IS, FOR

2   THE MEETING AT THE JUNE 13 --

3   **A.**   I DON'T THINK SO JUNE 13TH HE MENTIONED JAIL.  IN GREEN

4   VALLEY MEETING, NO.

5   **Q.**   OKAY.  ALL RIGHT.  DO YOU REMEMBER MENTIONING JAIL AT

6   THE JUNE 13TH MEETING?

7   **A.**   JUNE 13 MEETING, YES, I MENTIONED JAIL.  I WAS JOKING.

8   **Q.**   YOU WERE JOKING.

9   **A.**   YES.  AND GIVE ULTIMATUM TO ERGUN YILDIZ.

10  **Q.**   I AM SORRY.  WOULD YOU REPEAT THAT?

11  **A.**   I GIVE ULTIMATUM TO ERGUN YILDIZ, BECAUSE WE WERE IN THE

12  RIGHT TRACK AND WE HAND OVER THE GOODS TO THE DUBAI, TO ERGUN

13  YILDIZ, TIG MARINE.  AND THIS IS THAT THAT THEY SHOULD TO BE

14  CAREFUL, THAT IS FOR THE DELIVERY WOULD BE IN CORRECT WAY AND

15  PROPER AND LEGAL THINGS, THAT IS I DON'T WANT TO SAY TO LEGAL.

16  BUT BECAUSE WHEN WE HAND OVER IT IS LIKE THAT IS WHEN I SELL A

17  CIGAR TO MAKE SURE AGE OF MORE THAN 18, I WANT TO BE SURE THIS

18  GUY KNOWS THAT SHOULD NOT SELL THIS CIGARETTE TO UNDER 18 AGE.

19  **Q.**   SO, IF I UNDERSTAND YOU, WHEN YOU SELL A CIGAR, RIGHT?

20  YOU WANT TO MAKE SURE THAT SOMEBODY IS OF LEGAL AGE TO SMOKE

21  THAT CIGAR, RIGHT?

22  **A.**   YES.

23  **Q.**   SO ONE OF THE THINGS YOU DO YOU WANT TO MAKE SURE THAT

24  THEY ARE THE PROPER AGE.

25  **A.**   PROPER AGE, YES.

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1    **Q.**    AND, YOU KNOW, ONE OF THE WAYS TO DO THAT IS ASK THEM,
2    RIGHT?
3    **A.**    YES.
4    **Q.**    RIGHT?
5    **A.**    YES, SIR.
6    **Q.**    OKAY.  AND IF SOMEBODY THAT YOU ARE SELLING THE CIGAR TO
7    TELLS YOU, I AM ONLY 15.  RIGHT?
8    **A.**    PARDON?
9    **Q.**    WHAT IF THAT PERSON YOU ARE SELLING THE CIGAR TO TELLS
10   YOU HE IS ONLY 15, WOULD YOU SELL HIM THE CIGAR?
11   **A.**    NO, SIR.
12   **Q.**    OKAY.  WHAT IF YOU -- IN FACT IF HE TOLD YOU -- WHAT IF
13   HE TOLD YOU HE WAS 18 BUT YOU SAW HIS DRIVER'S LICENSE AND
14   KNEW HE WAS UNDER AGE.  WOULD YOU SELL HIM THE CIGAR?
15   **A.**    PARDON SIR.  I SIMPLE IT FOR YOU.  IF SOMEBODY -- IF I
16   SELL CIGAR, SOMEBODY COME TO ME.  I DON'T CARE WHAT HE SAID, I
17   SAID GIVE YOUR I.D., I CHECK HIS I.D.  THAT IS RECORD I CHECK.
18   **Q.**    AND YOU ONLY CHECK HIS I.D., THAT'S IT?
19   **A.**    WHAT I SHOULD CHECK, SIR?  WHAT IS THE PROOF OF ME?  I
20   AM NOT DISCRIMINATED PEOPLE.
21   **Q.**    ALL RIGHT.  FINE.
22   **A.**    I BELIEVE THAT PEOPLE WHEN THEY COMING TO ME.  I DON'T
23   HAVE PROOF THAT PEOPLE IS THE CRIMINAL OR -- THAT IS THAT
24   PEOPLE COME TO ME, THEY ARE INNOCENCE AND NOT GUILTY.  I AM
25   NOT DISCRIMINATED, NOT PREJUDGE ABOUT THE PEOPLE.  I AM GOING

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1    WITH THE RECORD, WHATEVER IS HAPPENED.  I AM PROJECT MANAGER

2    IN MY JOB.  SUPERVISOR COMING TO ME, VENDORS COMING TO ME, IS

3    THE CUSTOMERS COMING TO ME.  THEY HAVE SO MANY CHALLENGE

4    SOMETIMES BUT --

5    **Q.**    SIR, THERE IS NO QUESTION PENDING.  ALL RIGHT.  LET'S

6    MOVE ON.

7    **A.**    OKAY.

8    **Q.**    ASK YOU ABOUT WHEN YOU MENTIONED JAIL IN THE JUNE 13TH

9    MEETING.

10   **A.**    SURE.

11   **Q.**    YOU RECALL THAT, RIGHT?

12   **A.**    YES.

13   **Q.**    AND BEFORE YOU MENTIONED THE WORD JAIL YOU WERE ASKED A

14   QUESTION -- OR DAVID MILLS WAS SPEAKING -- AGENT COLE WAS

15   SPEAKING, RIGHT?

16   **A.**    YES.

17   **Q.**    THIS IS GOVERNMENT'S EXHIBIT 317, CLIP 2.  SIR, I WANT

18   TO DIRECT YOUR ATTENTION TO THE TRANSCRIPT.  DO YOU SEE WHAT'S

19   HIGHLIGHTED THERE?

20   **A.**    YES, SIR.

21   **Q.**    OKAY.  AND ISN'T IT A FACT THAT AT THAT MEETING AT THE

22   GREEN VALLEY RANCH DAVID -- AGENT COLE -- TOLD YOU -- OR TOLD

23   ERGUN IN YOUR PRESENCE:  I TOLD ARASH LAST NIGHT WE'RE THE

24   ONES.  THE THREE OF US ARE THE ONES LIVING IN THE U.S., RIGHT?

25   BECAUSE OF THE SANCTIONS, YOU'RE IN DUBAI, IF WE SCREW UP OR

APRIL 22, 2015

GHAHREMAN - CROSS-EXAMINATION

1   YOU DO SOMETHING STUPID TO SCREW ME UP, THE ONLY ONES -- THE

2   ONLY ONES GOING TO JAIL ARE US.

3        NOW, YOU REMEMBER HEARING THAT, RIGHT?

4   **A.**   YES.

5   **Q.**   AND YOUR RESPONSE TO THAT WAS NOT THAT, I DON'T BELIEVE

6   YOU, RIGHT?  YOU DIDN'T TELL AGENT COLE, I DON'T BELIEVE YOU.

7   **A.**   NO.

8   **Q.**   IN FACT, YOU AGREED, RIGHT?

9   **A.**   THAT IS WHAT HE SAID TO ERGUN, I WAS AGREED.

10  **Q.**   YOU AGREED, SIR, RIGHT?

11  **A.**   THAT IS WHAT I AGREED OVER THERE TO SAY TO ERGUN, YES, I

12  WAS AGREED WITH HIM.

13  **Q.**   SIR, DID YOU AGREE WITH WHAT AGENT COLE SAID WHEN HE

14  SAID YOU ALL RISK GOING TO JAIL?

15  **A.**   NO, SIR.  THAT IS EXAGGERATED THAT I CONSIDER.

16  **Q.**   SIR, ISN'T IT A FACT THAT IN RESPONSE TO THAT

17  STATEMENT -- AND AGAIN SAME EXHIBIT, LOOKING AT THE TOP OF THE

18  PAGE -- YOU SAID, SAME CELL WITH THESE TWO GUYS AND THAT IS.

19  **A.**   I WAS JOKING, YES.

20  **Q.**   YOU WERE JOKING.

21  **A.**   YES.

22  **Q.**   ALL RIGHT.  YOU WERE JOKING.

23  **A.**   YES.

24  **Q.**   SO AT THAT POINT YOU HAD NO CONCERNS THAT THESE GOODS,

25  THE GYROCOMPASS AND THE Y-690, WERE GOING TO IRAN.

APRIL 22, 2015

GHAHREMAN – CROSS–EXAMINATION

1    **A.**    NO, SIR.

2    **Q.**    NOT AFTER AGENT MILLS TOLD YOU IN THAT MEETING THAT YOU

3    ALL RISKED GOING TO JAIL, INCLUDING YOU.

4    **A.**    THAT IS IN THAT MEETING, NO.

5    **Q.**    IT IS A YES OR NO ANSWER, SIR --

6    **A.**    NO.

7    **Q.**    AND I WILL ASK IT AGAIN.

8    **A.**    NO.  AS MY KNOWLEDGE NO.

9    **Q.**    NO.  ALL RIGHT.  TO YOUR KNOWLEDGE NO?

10   **A.**    AS MY KNOWLEDGE ABOUT THE DESTINATION OF THE CARGOES NO.

11   **Q.**    THE QUESTION WASN'T ABOUT YOUR KNOWLEDGE OF THE

12   DESTINATION OF THE CARGO.  THE QUESTION WAS, AFTER YOU WERE

13   TOLD BY AGENT COLE THAT YOU ALL RISKED GOING TO JAIL YOU NEVER

14   HAD ANY CONCERNS.

15   **A.**    I HAD CONCERNS AFTER MEETING.

16   **Q.**    YOU HAD CONCERNS?

17   **A.**    YES.

18   **Q.**    BUT YOU NEVER RAISED THOSE CONCERNS HERE, DID YOU?

19   **A.**    NO.

20   **Q.**    RIGHT.  BECAUSE YOU THOUGHT HE WAS JOKING.

21   **A.**    I DIDN'T SAY HE WAS JOKING, I SAID I WAS JOKING, SIR.  I

22   SAID HE IS EXAGGERATING.

23   **Q.**    HE WAS EXAGGERATING.

24   **A.**    YES.

25   **Q.**    AND YOU NEVER TOLD HIM, WAIT, YOU ARE EXAGGERATING.

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **A.**    SIR, ETHICS, THE BEST ANSWER FOR ETHICS IS NOT TO

2   RESPOND TO PEOPLE AND KEEP THE SILENCE.  ESPECIALLY IN THE

3   BUSINESS YOU KEEP SILENCE.  YOU DON'T HAVE PROOF TO BACK TO

4   PEOPLE RESPOND.  YOU HAVE NO FIGHT WITH THE PEOPLE.

5   **Q.**    SO IN A NORMAL BUSINESS DEAL, LEGITIMATE BUSINESS DEAL,

6   WHEN SOMEONE TELLS YOU YOU THINK YOU ARE ALL GOING TO JAIL,

7   THE BEST ETHICS IS -- THOSE ARE YOUR WORDS -- ETHICS IS TO

8   REMAIN SILENT.  IS THAT RIGHT?

9   **A.**    HE WAS TALKING AND I DIDN'T WANT --

10  **Q.**    SIR, AGAIN THAT IS A YES OR NO QUESTION.  IF YOU

11  DISAGREE WITH MY --

12  **A.**    NO.

13  **Q.**    I AM NOT RIGHT.

14  **A.**    NO, YOU ARE NOT RIGHT.

15  **Q.**    SO THE BEST ETHICS WOULD BE TO QUESTION, RIGHT?  TO SAY,

16  WHAT DO YOU MEAN?

17  **A.**    HE WAS TALKING, SIR.  HE DIDN'T LET ANYBODY TALK.  AND

18  THAT IS MY POINT.  THAT IS HE CAN SAY HIS BELIEFS, AND I CAN

19  KEEP LISTENING.  BUT HE WAS THE DAVID MILLS THE SUPPLIER, HE

20  WAS NOT DAVID COLE AS THE AGENT OR SOME OFFICIAL AS REFERRED.

21  DAVID MILLS WAS SUPPLIER, SELLER.  HIS --

22  **Q.**    OKAY.

23  **A.**    -- WORD WAS NOT LAST WORDS.

24  **Q.**    OKAY.  SO FORGET ABOUT DAVID MILLS.  DURING THAT MEETING

25  AFTER AGENT COLE MADE THE STATEMENT, DAVID MILLS, ERGUN YILDIZ

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1  AGREED WITH HIM AND SAID HE WOULD ALSO BE IN JAIL.  SAME FOR

2  ME.  DO YOU REMEMBER THAT?

3  **A.**    YES.

4  **Q.**    NOW, YOU DIDN'T RAISE ANY QUESTIONS TO ERGUN YILDIZ AT

5  THAT POINT IN TIME, DID YOU?

6  **A.**    NO, SIR.

7  **Q.**    YOU SAID NOTHING TO HIM.

8  **A.**    IT WAS NOT MY DUTY TO TALK.  IT WAS –– THAT IS I WAS

9  ONLY AS THE APPEARANCE OVER THERE.  THAT IS THE –– ALSO BEFORE

10  KOORUSH TOLD ME, YOU ARE ONLY VERIFY PRODUCT.  ERGUN, I

11  TRUSTED TO HIM, HE TAKE OVER THE MEETING.  AND HE KNOWS WHAT

12  HE SAID.  AND I TOLD MY CONCERN AFTER THE MEETING TO KOORUSH.

13  THAT'S ALL.

14  **Q.**    LET'S GET TO THAT.  AFTER THIS MEETING YOU WERE

15  SUSPICIOUS AND YOU CALLED KOORUSH, RIGHT?

16  **A.**    YES.

17  **Q.**    ALL RIGHT.  AND I THINK WHAT YOU SAID IS YOU

18  SPECIFICALLY ASKED HIM, IS THIS STUFF GOING TO IRAN?  TELL ME.

19  RIGHT?

20  **A.**    YES.  I SAID DO YOU HAVE BUSINESS WITH IRAN, TIG MARINE?

21  HE SAID NO.  HE SAID –– I SAID –– I SAID ––

22  **Q.**    SIR, SIR.

23  **A.**    HE SAID I HATE IRANIAN, WORKING WITH IRANIAN PEOPLE.  I

24  DIDN'T WANT TO USE THE WORD OF THE HATE, BUT THAT IS EXACTLY

25  HIS WORD.

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **Q.**    SO HE SAID, I HATE, HATE THE IRANIAN PEOPLE.
2   **A.**    NO.  HE SAID I HATE WORK WITH IRANIAN AND IRANIAN
3   PEOPLE.
4   **Q.**    EXCUSE ME.  I AM SORRY.  I HATE WORKING WITH IRANIAN
5   PEOPLE, AND DON'T LIKE WORKING WITH IRANIAN GOVERNMENT, RIGHT?
6   **A.**    YES.
7   **Q.**    THOSE WERE HIS WORDS HE TOLD YOU?
8   **A.**    YES.
9   **Q.**    AND YOU BELIEVED HIM, RIGHT?
10  **A.**    YES, SIR.
11  **Q.**    THAT ALLAYED ALL CONCERNS THAT YOU HAD, RIGHT?
12  **A.**    YES, SIR.
13  **Q.**    YOU KNEW THAT WASN'T TRUE, RIGHT, THAT HE HATED WORKING
14  WITH THE IRANIAN PEOPLE?
15  **A.**    IS HE TOLD ME THAT IS, SOMEHOW I BELIEVE HIM.
16  **Q.**    SOMEHOW YOU BELIEVED HIM.
17  **A.**    YES.
18  **Q.**    SIR, THE QUESTION WAS, YOU KNEW THAT HIS STATEMENT TO
19  YOU, OR WHAT YOU SAID HE TOLD YOU, ON MONDAY, WASN'T TRUE.
20  **A.**    NO.  AS MY UNDERSTANDING KOORUSH I COULD UNDERSTAND HIM,
21  LIKE SO MANY IRANIAN IN THIS COUNTRY, THEY DON'T WANT TO
22  HANGING WITH EACH OTHER.  THIS IS SOMETHING THAT HAPPENED
23  AFTER REVOLUTION.  IS VERY NORMAL THINGS IN IRAN.
24  **Q.**    THE QUESTION, THOUGH, WAS, SIR, YOU KNEW WHEN HE TOLD
25  YOU THAT HE HATED WORKING WITH IRANIANS, YOU KNEW FOR A FACT

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1    THAT WAS NOT TRUE.

2    **A.**    NO.

3    **Q.**    ALL RIGHT.  WELL, LET ME SHOW YOU WHAT'S MARKED AS –– OR

4    WHAT HAS BEEN INTRODUCED INTO EVIDENCE AS GOVERNMENT'S

5    EXHIBIT 224.  ALL RIGHT.  IT IS AN EMAIL CHAIN OR

6    COMMUNICATION BETWEEN YOU AND ANOTHER COMPANY IN THE

7    NETHERLANDS AND MR. TAHERKHANI.  DO YOU RECALL THAT EMAIL?

8    **A.**    I DON'T RECALL.

9    **Q.**    OKAY.  LET ME SHOW YOU GOVERNMENT'S EXHIBIT 224.  ALL

10   RIGHT.

11        DO YOU SEE THE HEADING ON THAT EMAIL FROM PIETER BORG?

12   **A.**    YES.

13   **Q.**    ALL RIGHT.  AND IT IS TO WHO?

14   **A.**    IT IS TO ME.

15   **Q.**    ALL RIGHT.  THAT IS YOUR EMAIL ACCOUNT, RIGHT, SIR?

16   **A.**    YES.

17   **Q.**    AND WHEN WAS THAT SENT TO YOU?

18   **A.**    THAT IS THE 6000M3 BARGE ––

19   **Q.**    THE DATE.  WHEN WAS IT SENT?

20   **A.**    FEBRUARY 14.

21   **Q.**    ALL RIGHT.  AND WHAT WAS THE SUBJECT OF THAT EMAIL?

22   **A.**    HUH?

23   **Q.**    WHAT WAS THE SUBJECT OF THAT EMAIL?

24   **A.**    IS THE THERMAL OIL FIRED HEATER FOR 6000M3 BARGE.

25   **Q.**    AND YOU ARE FAMILIAR WITH THE THERMAL OIL FIRED HEATER,

APRIL 22, 2015

GHAHREMAN – CROSS–EXAMINATION

1    CORRECT?

2    **A.**    THAT IS THE BOILER.

3    **Q.**    THE BOILER, RIGHT?

4    **A.**    YES.

5    **Q.**    FOR A LARGE SHIP, RIGHT?

6    **A.**    HUH?

7    **Q.**    FOR A LARGE SHIP OR VESSEL?

8    **A.**    FOR THE BARGE, 6000M3 BARGE.

9    **Q.**    AND THAT EMAIL -- IN THAT EMAIL MR. BORG TELLS YOU THAT

10   THE ATTACHED QUOTATION FOR THAT THERMAL OIL FIRED HEATER IS

11   GENERATED BY A COLLEAGUE OF HIS IN HIS COMPANY, RIGHT?

12   **A.**    YES.

13   **Q.**    AND THAT IS HIGHLIGHTED, RIGHT?

14   **A.**    YES.  ALFA LAVAL.

15   **Q.**    SO HE HAD PROVIDED YOU WITH A QUOTE FOR THE CALL HE HAD

16   FOR THIS OIL FIRED HEATER, RIGHT?

17   **A.**    YES.

18   **Q.**    YOU HAD REQUESTED THAT FROM HIM, RIGHT?

19   **A.**    YES.

20   **Q.**    AND THE REASON YOU REQUESTED THAT FROM HIM WAS BECAUSE

21   MR. TAHERKHANI ASKED YOU TO GET THAT QUOTE, CORRECT?

22   **A.**    YES, SIR.

23   **Q.**    THAT IS CORRECT, RIGHT?

24   **A.**    YES, SIR.

25   **Q.**    AND IN THIS EMAIL MR. BORG ASKED YOU, COULD YOU PLEASE

APRIL 22, 2015

1  INFORM ME ABOUT THE SHIPYARD OWNER YOU ARE WORKING FOR.

2  RIGHT?

3  **A.**    YES, SIR.

4  **Q.**    AND HE SAYS, AT THIS MOMENT WE HAVE NO INFORMATION ABOUT

5  WHERE THE PROJECT MAY TAKE PLACE.  RIGHT?

6  **A.**    YES.

7  **Q.**    THEY WANT TO KNOW WHO THIS WAS GOING TO, RIGHT?

8  **A.**    YES, SIR.

9  **Q.**    AND IN RESPONSE TO THAT EMAIL, HIS REQUEST AS TO WHERE

10  THIS HEATER WAS GOING, YOU FORWARDED THAT EMAIL TO WHO, SIR?

11  DO YOU SEE THAT HEADER INFORMATION?

12  **A.**    I FORWARD TO KOORUSH.

13  **Q.**    RIGHT.  AND WHAT DAY DID YOU FORWARD THAT TO HIM?

14  **A.**    SAME DAY, BECAUSE IS --

15  **Q.**    YES OR NO.

16  **A.**    YES.

17  **Q.**    SAME DAY, RIGHT?

18  **A.**    YES.

19  **Q.**    AND AFTER YOU FORWARDED THAT QUOTE -- AND YOU FORWARDED

20  THAT QUOTE -- YES OR NO -- BECAUSE MR. TAHERKHANI HAD

21  REQUESTED YOU TO GET THE QUOTE FOR THE THERMAL HEATER, RIGHT?

22  **A.**    YES.

23  **Q.**    ALL RIGHT.  AND MR. TAHERKHANI TOOK YOUR QUOTE, RIGHT?

24  AND YOUR INFORMATION YOU PROVIDED, RIGHT?

25  **A.**    YES.

APRIL 22, 2015

GHAHREMAN — CROSS-EXAMINATION

1   Q.   AND HE THEN SENT ANOTHER EMAIL ON THE NEXT DAY, CORRECT?

2   A.   YES.

3   Q.   TO WHO?

4   A.   TO MAE.

5   Q.   AND YOU KNOW WHO MAE IS, RIGHT?

6   A.   I THINK SHE WAS SECRETARY OF THE TIG MARINE.

7   Q.   SHE WAS THE WHAT?

8   A.   SECRETARY OF THE TIG MARINE.

9   Q.   RIGHT.  MAE DAYSO, RIGHT?

10  A.   I DON'T REMEMBER HER LAST NAME, BUT MAE I REMEMBER.

11  Q.   YES.  AND YOU HAD PERSONAL COMMUNICATIONS WITH HER ABOUT

12  DOCUMENTS AND STUFF, RIGHT?

13  A.   YES.

14  Q.   YES.

15  A.   SHE HELP ME OUT FOR MY DOCUMENT, THAT ONE, YES.

16  Q.   AND IN THAT EMAIL MR. TAHERKHANI INSTRUCTS MAE TO DO A

17  FEW THINGS, RIGHT?

18  A.   YES.

19  Q.   OKAY.  FIRST HE ASKED HER TO ADD 30 PERCENT ONTO THE

20  PRICE, RIGHT?

21  A.   YES.

22  Q.   SO TO ADD A THIRD OF THE QUOTE PRICE THAT YOU HAD GOTTEN

23  ONTO THE PRICE AND SEND IT TO A CUSTOMER, RIGHT?

24  A.   YES.

25  Q.   OKAY.  AND THAT CUSTOMER HE ALSO IDENTIFIES, RIGHT?

APRIL 22, 2015

GHAHREMAN – CROSS–EXAMINATION

1    **A.**    YES.

2    **Q.**    AND HE IDENTIFIES THAT CUSTOMER AS ISOICO, THE ISOICO

3    YARD, RIGHT?

4    **A.**    YES.

5    **Q.**    AND YOU ARE FAMILIAR WITH WHAT ISOICO IS, AREN'T YOU?

6    **A.**    NO.

7    **Q.**    YOU KNOW, SIR, THAT THE ISOICO IS THE IRAN SHIPBUILDING

8    AND OFFSHORE INDUSTRIES COMPLEX, DON'T YOU, SIR?

9    **A.**    NO.

10   **Q.**    YOU KNOW THAT IT IS LOCATED IN BANDAR ABBAS TEHRAN,

11   DON'T YOU.

12   **A.**    IN BANDAR ABBAS I KNOW SADRA AND WHERE I WAS WORKING.

13   **Q.**    SO YOUR TESTIMONY IS AT THIS POINT IN TIME YOU HAVE NO

14   IDEA WHERE ISOICO IS LOCATED?

15   **A.**    NO.  THAT MOMENT -- THIS MOMENT OR THAT MOMENT?

16   **Q.**    BOTH.  AT ANY POINT IN TIME.

17   **A.**    NO.  THAT POINT I DIDN'T KNOW ISOICO.  THAT IS AFTER

18   THIS IS WE WERE MEETING WITH MY LAWYER, THAT IS WE FIND OUT

19   THAT WHAT ISOICO.

20   **Q.**    OKAY.  YOU KNEW BEFORE THAT, DIDN'T YOU, SIR?

21   **A.**    PARDON?

22   **Q.**    YOU KNEW BEFORE YOU TALKED WITH YOUR LAWYER --

23   **A.**    NO.

24   **Q.**    -- WHERE ISOICO WAS.

25   **A.**    NO.

APRIL 22, 2015

GHAHREMAN – CROSS–EXAMINATION

1  **Q.**   FAIR ENOUGH.  LET'S LOOK AT GOVERNMENT'S EXHIBIT 225,

2  WHICH HAS BEEN ENTERED INTO EVIDENCE.

3      I AM GOING TO SHOW YOU -- IT IS AN EMAIL CHAIN, AND I AM

4  GOING TO SHOW YOU PAGE 4 OF THAT EMAIL CHAIN.  I HAVE

5  HIGHLIGHTED CERTAIN PORTIONS FOR YOU, SIR.  DO YOU SEE THAT?

6  **A.**   YES.

7  **Q.**   ALL RIGHT.  AND, SIR, IT IS CORRECT TO SAY THAT IS AN

8  EMAIL SENT FROM MR. TAHERKHANI, RIGHT?

9  **A.**   YES.

10  **Q.**   AS THE MANAGING DIRECTOR OF TIG MARINE?

11  **A.**   YES.

12  **Q.**   TO YOU, RIGHT?

13  **A.**   YES.

14  **Q.**   AT YOUR TIG MARINE EMAIL ADDRESS, RIGHT?

15  **A.**   YES.

16  **Q.**   AND THAT WAS SENT ON FEBRUARY 27TH, RIGHT?

17  **A.**   YES.

18  **Q.**   LESS THAN TWO WEEKS AFTER THAT LAST EMAIL YOU JUST

19  LOOKED AT, RIGHT?

20  **A.**   OKAY.  YES.

21  **Q.**   OKAY OR YES?

22  **A.**   YES.

23  **Q.**   OKAY.

24  **A.**   OKAY.  YOU SAID OKAY NOW, ALSO.  SORRY.

25  **Q.**   I AM SORRY.  I WAS MOVING ON.

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1          AND IN THAT EMAIL MR. TAHERKHANI TELLS YOU, SALAM.
2    GREETINGS, RIGHT?
3    **A.**    YES.
4    **Q.**    I WILL CALL ARMIN TODAY TO PAY HIM MONEY.  RIGHT?
5    **A.**    YES.
6    **Q.**    AND HE NEXT TELLS YOU, I WAS IN BANDAR ABBAS SINCE LAST
7    NIGHT.  RIGHT?
8    **A.**    YES.
9    **Q.**    YOU KNOW WHERE BANDAR ABBAS IS, DON'T YOU?
10   **A.**    YES, I WAS STUDYING BANDAR ABBAS.
11   **Q.**    YOU STARTED WORKING --
12   **A.**    STARTING -- I WAS STUDYING BANDAR ABBAS.  I WAS IN
13   BANDAR ABBAS, SO MANY LOCATION IN MY CAREER TIME.
14   **Q.**    YEAH.  IN FACT YOU WORKED IN BANDAR ABBAS, RIGHT?
15   **A.**    I WAS WORKING BANDAR ABBAS, TOO.
16   **Q.**    BUT YOU WORKED THERE FOR A PERIOD OF TIME, RIGHT?
17   **A.**    YES, I DID.
18   **Q.**    FOR OVER A YEAR, RIGHT?
19   **A.**    IS TWO YEARS.
20   **Q.**    RIGHT.  SO YOU ARE FAMILIAR WITH IT, WHERE BANDAR ABBAS
21   IS LOCATED.
22   **A.**    YES, SIR.
23   **Q.**    AND YOU ARE FAMILIAR THAT THERE ARE SHIPYARDS THERE,
24   LIKE SADRA HAS SOME BASES THERE, RIGHT?
25   **A.**    YES.

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **Q.**   AND OTHER COMPANIES YOU WORKED FOR.  IRAN O HIND, TOO.

2   **A.**   PARDON?

3   **Q.**   DID IRAN O HIND HAVE --

4   **A.**   NO.  THAT HEADQUARTER WAS TEHRAN.

5   **Q.**   THAT HEADQUARTER WAS TEHRAN.  ALL RIGHT.

6         BONYAD SHIPPING COMPANY?

7   **A.**   HEADQUARTER TEHRAN.

8   **Q.**   SO HE TELLS YOU, I WAS IN BANDAR ABBAS SINCE LAST NIGHT

9   FOR A CEREMONY OF LAUNCHING A TANKER VESSEL.  RIGHT?

10  **A.**   YES.

11  **Q.**   AND BY TANKER VESSEL HE MEANS A LARGE TANKER SHIP,

12  RIGHT?  THAT'S WHAT YOU UNDERSTOOD, RIGHT?

13  **A.**   UNDERSTOOD THE TANKER VESSEL, THAT IS THE TANKER, BIG

14  TANKER SHIP, YES.

15  **Q.**   AND HE SAYS, WHICH I WAS INVITED BY ISOICO FOR THAT.

16  **A.**   YES.

17  **Q.**   CORRECT?

18  **A.**   YES.

19  **Q.**   BECAUSE I HELPED THEM A LOT FOR THAT PROJECT.  RIGHT?

20  **A.**   YES.

21  **Q.**   SO, SIR, IT IS A CORRECT STATEMENT THAT LESS THAN TWO

22  WEEKS AFTER HE MENTIONED ISOICO IN THAT ONE EMAIL TO YOU --

23  **A.**   YES.

24  **Q.**   -- HE SENT ANOTHER EMAIL ABOUT ISOICO, RIGHT?

25  **A.**   YES.

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **Q.**    SPECIFICALLY TELLING YOU THAT HE WAS IN BANDAR ABBAS FOR

2   A CEREMONY THAT ISOICO WAS HOLDING, RIGHT?

3   **A.**    YES.

4   **Q.**    WHERE THEY LAUNCHED A TANKER VESSEL, RIGHT?

5   **A.**    YES.

6   **Q.**    AND HE TOLD YOU THAT HE WAS THERE AND THEY INVITED HIM

7   BECAUSE HE HAD HELPED OUT A LOT ON THAT PROJECT, RIGHT?

8   **A.**    YES, HE SAID.

9   **Q.**    OKAY.  NOW, SIR --

10  **A.**    YES.

11  **Q.**    -- YOU ARE FAMILIAR, AREN'T YOU, WITH THE USE OF A

12  COMPANY TO ACQUIRE GOODS, FROM THE U.S. OR ELSEWHERE, THAT

13  WOULD HIDE FROM AUTHORITIES WHERE THOSE GOODS WERE GOING.  A

14  FRONT COMPANY, SIR.  HAVE YOU HEARD THAT TERM BEFORE?

15  **A.**    FRONT COMPANY IS -- I LEARN IN LAST TWO YEARS HERE, THAT

16  FRONT COMPANY.

17  **Q.**    AND CAN YOU EXPLAIN TO ME WHAT YOUR KNOWLEDGE IS OF A

18  FRONT COMPANY?

19  **A.**    MY KNOWLEDGE IS THAT -- I DON'T HAVE KNOWLEDGE.  THAT IS

20  WHAT I UNDERSTAND THEY CALL TIG MARINE FRONT COMPANY IN THE

21  LAST TWO YEARS.

22  **Q.**    OKAY.  AND WHAT IS YOUR UNDERSTANDING OF WHAT IS MEANT

23  BY THE TERM FRONT COMPANY?

24  **A.**    IT MEANS THE COMPANY PROVIDES THE PRODUCT FOR THIRD

25  COUNTRY.

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1    **Q.**    RIGHT.  IT IS A COMPANY THAT'S USED TO DISGUISE WHO THE

2    ACTUAL PURCHASER OF THE GOODS ARE, RIGHT?

3    **A.**    IS YES, YOU CAN SAY THIS ONE.

4    **Q.**    I REALLY -- I DON'T WANT TO PUT WORDS IN YOUR MOUTH.

5    WOULD YOU AGREE WITH THAT STATEMENT?  IS THAT A FAIR

6    STATEMENT?

7    **A.**    NO, THAT IS A FAIR STATEMENT I DON'T KNOW.  THAT IT

8    MEANS THE COMPANY HAS OTHER CUSTOMERS, THAT IS THE -- IS NOT

9    END USER.

10   **Q.**    DOES IT MEAN THAT THE FRONT COMPANY IS A COMPANY THAT

11   ACTUALLY DOES BUSINESS, OR IS SET UP TO MAKE SURE THAT ANOTHER

12   COMPANY CAN GET THE GOODS?

13   **A.**    IS THE I THINK IS WHAT I LEARNED THAT IS THE FRONT

14   COMPANY MEANS THAT IS WHAT YOU SAID, THE COMPANY THAT SOMEBODY

15   IS THAT SET UP OR THE TRUE PURCHASER GOING TO PUT INVESTMENT

16   AND INVEST TO MAKE THE COMPANY, THAT IS IT.

17   **Q.**    SO I GET IT RIGHT, YOU WOULD HAVE YOUR TRUE PURCHASER,

18   RIGHT?

19   **A.**    PARDON?

20   **Q.**    YOU HAVE YOUR PURCHASER OF THE GOODS, RIGHT?  AND YOU

21   HAVE A SELLER OF GOODS, RIGHT?

22   **A.**    YES.

23   **Q.**    AND THE FRONT COMPANY IS SOMEONE WHO THE PURCHASER

24   REPRESENTS AS THE ACTUAL BUYER, WHEN IN FACT IT IS NOT THE

25   ACTUAL BUYER, RIGHT?

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1   **A.**    I CANNOT TELL YOU THAT IS THAT I UNDERSTAND.  AS MY

2   UNDERSTANDING, FRONT COMPANY IS THE COMPANY IS INVESTED BY THE

3   TRUE PURCHASERS TO HIDE SOMETHING.

4   **Q.**    OKAY.  THAT IS EXACTLY IT.  TO HIDE SOMETHING, RIGHT?

5   **A.**    THAT'S --

6   **Q.**    IT IS A FAKE, FACTITIOUS COMPANY, RIGHT?

7   **A.**    THAT IS THE TRUE PURCHASER TO IT, YES.

8   **Q.**    THE FRONT COMPANY WOULD BE THE FAKE, FACTITIOUS SET UP

9   TO HIDE THE TRUE PURCHASER.

10  **A.**    THAT IS THE TRUE PURCHASER DOING THIS, YES.

11  **Q.**    OKAY.  AND YOU KNEW AT THE TIME YOU WERE DEALING WITH

12  TIG MARINE, RIGHT, THAT FRONT COMPANIES WERE OFTEN USED TO

13  ACQUIRE GOODS AND GET THEM TO IRAN ILLEGALLY, RIGHT?

14  **A.**    IS THE I KNEW SOME COMPANY TRYING TO SEND GOODS OR SOME

15  PEOPLE THEY WANT TO SEND GOODS TO IRAN.

16  **Q.**    YOU KNEW THAT AT THE TIME YOU WERE ACQUIRING GOODS FOR

17  TIG MARINE THAT FRONT COMPANIES WERE USED BY OTHER PEOPLE TO

18  ACQUIRE GOODS ILLEGALLY FOR IRAN, TO HIDE THE TRUE PURCHASER.

19  YOU WERE AWARE OF THAT FACT, RIGHT?

20  **A.**    IF I SAID YES, IT IS NOT FAIR MY ANSWER.  I KNEW THAT

21  PEOPLE WANT TO TAKE THE GOODS TO IRAN.  THAT IS THE COMPANY,

22  INDIVIDUAL, I DIDN'T KNOW EXACTLY.

23  **Q.**    FAIR ENOUGH.  IN FACT, SIR, YOU RECALL A TIME WHEN YOU

24  HAD DISCUSSIONS WITH ANOTHER INDIVIDUAL ABOUT THE USE OF FRONT

25  COMPANIES, RIGHT?

APRIL 22, 2015

GHAHREMAN − CROSS−EXAMINATION

```
 1   A.    IS ABOUT THE FRONT COMPANY, THIS IS --
 2   Q.    YES OR NO.  DID YOU HAVE A DISCUSSION WITH ANOTHER
 3   INDIVIDUAL?
 4   A.    YES.
 5   Q.    OKAY.  AND THAT INDIVIDUAL'S NAME WAS SAEED SHAMI,
 6   RIGHT?
 7   A.    YES.
 8   Q.    AND THAT SURROUNDED THE PURCHASE OF SOME OIL RIGS THAT
 9   YOU WANTED TO ACQUIRE, RIGHT?  OR THAT HE WANTED TO ACQUIRE,
10   RIGHT?
11   A.    YES.
12   Q.    AND HE ASKED YOU TO ACQUIRE THOSE OIL RIGS, CORRECT?
13   A.    YES.
14   Q.    AND IN RESPONSE TO THAT YOU REACHED OUT TO A COMPANY IN
15   NORWAY, RIGHT?
16   A.    YES.
17   Q.    AND YOU DEALT WITH AN INDIVIDUAL BY THE NAME OF MIKAEL
18   RONES, RIGHT?
19   A.    YES, THE COMPANY.  HE HAD THE COMPANY, YES.
20   Q.    AND THAT WAS IN ABOUT AUGUST OF 2011, RIGHT?
21   A.    YES, I THINK.
22   Q.    OKAY.  AND YOU COMMUNICATED WITH MIKAEL RONES AND TOLD
23   HIM THAT YOU HAD A CLIENT, A WEALTHY CLIENT, IN THE PERSIAN
24   GULF REGION, RIGHT?
25   A.    YES.  THAT IS THE SAEED TOLD ME THAT IN THE BEGINNING.
```

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1    **Q.**   SO THAT'S WHAT SAEED TOLD YOU IN THE BEGINNING --

2    **A.**   YES.

3    **Q.**   -- RIGHT?  OKAY.  AND HE RESPONDED TO YOUR REQUEST BY

4    TELLING YOU THAT HE WAS CONCERNED, OR THE COMPANY WAS

5    CONCERNED, RIGHT?

6    **A.**   YES.

7    **Q.**   OKAY.  IN FACT, HE TOLD YOU AT THIS POINT THE OWNERS

8    WEREN'T WILLING TO SELL INTO SANCTIONED AREAS, RIGHT?

9    **A.**   YES, HE SAID.

10   **Q.**   AND YOU KNOW WHAT HE MEANT BY SANCTION, RIGHT?

11   **A.**   YES.

12   **Q.**   THE SANCTION AGAINST IRAN, RIGHT?

13   **A.**   THE SANCTION IS THAT SO MANY COUNTRIES IN SANCTIONS.

14   THAT IS FOR ME, I KNOW IRAN ALSO IT WAS ONE OF THE COUNTRY HAD

15   SOME SANCTIONS ON IT.

16   **Q.**   OKAY.  YOU KNEW THAT IRAN WAS ONE OF THE COUNTRIES THAT

17   HAD SOME SANCTIONS ON IT?  IS THAT YOUR STATEMENT?

18   **A.**   THAT IS I AM NOT FAMILIAR WITH ALL SANCTIONS, SIR.  WHEN

19   HE SAID SANCTIONS I KNOW IT MEANS FOR WHERE THE CARGO IS

20   GOING.  I KNOW SOME SANCTIONS WAS IN IRAN, YES.

21   **Q.**   JUST SOME SANCTIONS?

22   **A.**   YES.

23   **Q.**   YOU KNEW, IN FACT, SIR, THAT THERE WERE SANCTIONS

24   AGAINST IRAN WHICH PROHIBITED GOODS FROM GOING FROM THE U.S.

25   TO IRAN, RIGHT?

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1  **A.**    I KNOW THAT SOME SANCTIONS FROM -- AGAINST IRAN.  EVEN

2  IN UNITED STATES I KNOW COMPUTER OR MEDICINES FREELY FROM

3  UNITED STATES GOING TO IRAN.  THE SANCTION IS THAT WHAT I KNEW

4  THAT IS THAT SOME PRODUCTS IS SANCTIONS.  I DON'T KNOW.  I

5  NEVER CHECKED ABOUT THE SANCTION BECAUSE I WAS NOT IN THE

6  EXPORTING TO CHECK ALL ITEMS.

7  **Q.**    FAIR ENOUGH.  BUT, SIR, AS TO THESE PRODUCTS HERE, THE

8  GYROCOMPASSES AND THE Y-690'S, YOU SAID THAT IMMEDIATELY WHEN

9  KOORUSH CONTACTED YOU, BECAUSE HE WAS FROM IRAN, YOU WERE

10  CONCERNED ABOUT THE SANCTIONS, RIGHT?

11  **A.**    YES.

12  **Q.**    AND YOU IMMEDIATELY ASKED HIM, IS THIS GOING TO IRAN?

13  RIGHT?

14  **A.**    YES.

15  **Q.**    BECAUSE YOU KNEW THAT SENDING GOODS TO IRAN WAS --

16  SENDING THOSE GOODS TO IRAN WOULD VIOLATE THE SANCTIONS,

17  RIGHT?

18  **A.**    YES.  I KNEW SOME PRODUCTS GOING TO IRAN IS -- SHOULD

19  NOT GO TO IRAN BECAUSE OF THE SANCTIONS.

20  **Q.**    AND YOU KNEW THESE GOODS SHOULDN'T GO TO IRAN BECAUSE OF

21  THE SANCTIONS.

22  **A.**    I DIDN'T KNOW.

23  **Q.**    I AM NOT SAYING WHETHER YOU KNEW THEY WERE GOING TO

24  IRAN, YOU KNEW THAT IF KOORUSH OR SOMEBODY ELSE SENT THESE

25  GOODS TO IRAN THAT WOULD VIOLATE U.S. LAWS.

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1  **A.**    I KNOW THAT KOORUSH, IF TO SEND SOMEBODY -- PRODUCT

2  OF -- U.S. PRODUCT TO IRAN IS GO -- IS MAKE THE ILLEGAL

3  THINGS, AND IS MAYBE BROKEN THE LAW.  HE WILL BE BROKEN THE

4  LAW.

5  **Q.**    YOU KNEW IT MAYBE BROKE THE LAW?

6  **A.**    YES.  BECAUSE I DON'T KNOW ABOUT ALL LAWS THAT IS HERE.

7  **Q.**    SIR, YOU TOOK CLASSES REGARDING THE EXPORT REGULATIONS,

8  RIGHT?

9  **A.**    SIR, THAT'S I -- I TOOK CLASSES IS LIKE THAT YOU SAID IS

10  SO MANY COUNTRIES GOING TO NEGOTIATE, AS WHEN THEY COMING OUT

11  THEY DON'T KNOW, ALL OF THEM SAY SOMETHING ELSE.  THEY ARE ALL

12  EDUCATION PEOPLE FROM THE GOVERNMENT, GOING TO CONFERENCE,

13  GOING TO MEETING.  WHEN THEY COME OUT, ALL OF THEM THEY SAID

14  SEPARATE THINGS.  AND YOU EXPECTING ME THAT IS THE WHAT I

15  SAID.  I DIDN'T KNOW LAW.

16  **Q.**    ALL RIGHT.  BUT EVEN THOUGH YOU DIDN'T KNOW LAW YOUR

17  FIRST CONCERN WAS, WHEN KOORUSH CONTACTED YOU, TO CONTACT HIM

18  TO MAKE SURE THAT THE GYROCOMPASSES WEREN'T GOING TO IRAN,

19  RIGHT?

20  **A.**    SURE.  I DIDN'T SAID I DIDN'T -- I KNOW WHAT IS, I

21  LEARNED.

22  **Q.**    SO LET'S TALK ABOUT THAT.  YOU WERE TOLD THAT THEY

23  WEREN'T GOING TO SELL THEM TO SANCTIONED AREAS.  AND YOU

24  RESPONDED TO THAT EMAIL, RIGHT?

25  **A.**    YES, I DID.

APRIL 22, 2015

GHAHREMAN – CROSS–EXAMINATION

1    Q.    AND THIS IS YOUR RESPONSE, SIR, RIGHT?

2    A.    YES.

3    Q.    YOU RESPONDED THAT, ON AUGUST 23RD:  DEAR MIKAEL, I KNOW

4    ABOUT THE SANCTIONS AGAINST IRAN, AND I AM INTERESTED IN A

5    LEGAL STRAIGHTFORWARD CONTRACT AND DEALS.

6          SO YOU TOLD HIM YOU KNEW ABOUT THE SANCTIONS AGAINST

7    IRAN, CORRECT?

8    A.    YES, I SAID.

9    Q.    IS THAT WHAT YOU SAID?

10   A.    YES, SIR.

11   Q.    THOSE ARE YOUR WORDS.

12   A.    YES.

13   Q.    OKAY.  AND YOU SAY:  I AM A U.S. RESIDENT AND I AM NOT

14   LOOKING FOR TROUBLE.  RIGHT?

15   A.    YES, SIR.

16   Q.    AND YOU SAY YOU WILL RELEASE THE COMPANY INFORMATION IF

17   YOUR CLIENT IS INTERESTED.  RIGHT?

18   A.    YES, SIR.

19   Q.    BUT BEFORE THAT, YOU KNOW, YOU ARE GOING TO TALK TO

20   THEM, RIGHT?

21   A.    NO, NOT NECESSARY.

22   Q.    NOT NECESSARY.  WELL, YOU DID TALK TO MR. SAEED SHAMI

23   LATER, DIDN'T YOU?

24   A.    I FORWARDED INFORMATION OF THE JACKUP RIGS.

25   Q.    AND YOU SPOKE WITH MR. SAEED SHAMI, RIGHT?

APRIL 22, 2015

1    **A.**    YES, ABOUT THIS PRODUCT, IS THE JACKUP RIGS, YES.

2    **Q.**    RIGHT.  AND IN FACT YOU AGREED TO BE AN AGENT FOR MR.

3    SHAMI, RIGHT?

4    **A.**    NOT MR. SHAMI.  PARADISE COMPANY, MARSHALL ISLAND.

5    **Q.**    OKAY.  AND THAT IS ULTIMATELY –– PARADISE COMPANY IN

6    MARSHALL ISLANDS IS ULTIMATELY THE COMPANY YOU INTRODUCED TO

7    MR. RONES, CORRECT?

8    **A.**    YES.

9    **Q.**    AND THEY WEREN'T A WEALTHY COMPANY IN THE PERSIAN GULF,

10   WERE THEY?

11   **A.**    THAT IS THE WHAT IS THE KOORUSH –– I MEAN SAEED TOLD ME

12   IS THE BEGINNING.  AND WHEN I AM GOING TO ––

13   **Q.**    JUST YES OR NO.

14   **A.**    YES.

15   **Q.**    THEY WEREN'T, RIGHT?

16   **A.**    NO.

17   **Q.**    THEY WERE NOT.

18   **A.**    NO.

19   **Q.**    THEY WERE IN FACT LOCATED IN THE MARSHALL ISLANDS,

20   RIGHT?

21   **A.**    YES.

22   **Q.**    AND AFTER YOU MADE –– YOU MADE THAT INTRODUCTION AT THE

23   REQUEST OF MR. SHAMI, RIGHT?

24   **A.**    PARDON?  YES.

25   **Q.**    RIGHT.  AND AFTER YOU MADE THAT INTRODUCTION MR. RONES

APRIL 22, 2015

GHAHREMAN – CROSS–EXAMINATION

1  WANTED MORE BACKGROUND ABOUT THE COMPANY, RIGHT?

2  **A.**    THIS IS THE PROCESS OF THE PURCHASING THE JACKUP RIGS

3  AND --

4  **Q.**    SIR, IT IS A YES OR NO QUESTION, PLEASE.

5  **A.**    YES.

6  **Q.**    AND YOU THEN TALKED TO MR. SHAMI SOME MORE, RIGHT?

7  **A.**    I SENT HIM IS THE REQUIRED.

8  **Q.**    IT IS A YES OR NO.  YOU HAD MORE COMMUNICATIONS WITH HIM

9  BY EMAIL, RIGHT?

10  **A.**    YES.

11  **Q.**    AND HE BASICALLY ASKED YOU TO INTRODUCE PARADISE

12  OFFSHORE COMPANY AS THE REP, REPRESENTATIVE, RIGHT?

13  **A.**    YES.

14  **Q.**    BY THAT YOU UNDERSTOOD TO BE THE REPRESENTATIVE OF THE

15  BUYER, RIGHT?

16  **A.**    YES.

17  **Q.**    AND YOU RESPONDED IN THE EMAIL --

18  **A.**    NO, NO, NO, NO.  REPRESENTATIVE NOT BUYER.  EXCUSE ME.

19  REPRESENTATIVE OF THE SELLER.

20  **Q.**    ALL RIGHT.  SO YOU WERE INTRODUCING HIM AS THE

21  REPRESENTATIVE OF THE SELLER, RIGHT?

22  **A.**    IS THE MEAN THAT IS THE MIKAEL RONES COMPANY, THE JACKUP

23  RIGS, THAT THEY REQUEST OF THAT IS I -- THEY REQUESTED THE

24  SELLER INTRODUCE THE PARADISE COMPANY AS THE REPRESENTATIVE.

25  **Q.**    OF THE SELLER.  SO YOU WERE REPRESENTING THE SELLER,

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1   THEN, BECAUSE YOU WERE --
2   **A.**    NO, NO, NO, NO.
3   **Q.**    -- THE AGENT FOR PARADISE OFFSHORE COMPANY?
4   **A.**    I WAS AGENT OF THE PARADISE COMPANY, YES.
5   **Q.**    RIGHT.  OKAY.
6   **A.**    AND PARADISE COMPANY TOLD ME, I AM TELLING TO THE MIKE
7   RONES, TO INTRODUCE TO THEM THE COMPANY PARADISE AS THEIR
8   REPRESENTATIVE.
9   **Q.**    AND YOU WERE CONCERNED ABOUT THAT, RIGHT?
10  **A.**    YES.  I NEVER SAW IN MY LIFE SOMETHING LIKE THAT.
11  **Q.**    PLUS IT DIDN'T MAKE SENSE THAT YOU WERE GOING TO
12  REPRESENT THE SELLER, RIGHT?
13  **A.**    THAT IS THEIR REQUEST, IT WAS NOT -- I WASN'T FAMILIAR,
14  IT WAS NOT IN MY KNOWLEDGE.  AND I NEVER FACED WITH THE SAME
15  SITUATION.
16  **Q.**    OKAY.  IN FACT, YOUR RESPONSE WAS -- AND YOU CAN SEE
17  YOUR EMAIL, RIGHT?  FROM YOU TO MR. SHAMI, AFTER YOU REQUESTED
18  THAT, WAS TO INTRODUCE PARADISE COMPANY AS THEIR REP, ARE YOU
19  INSANE OR AM I SO STUPID.  THAT IS YOUR RESPONSE, RIGHT?
20  **A.**    YES.
21  **Q.**    AND MR. SHAMI RESPONDED TO THAT, RIGHT?
22  **A.**    YES.
23  **Q.**    AND LET'S LOOK AT THAT RESPONSE, SHALL WE?
24  **A.**    YES.
25  **Q.**    HE RESPONDED ON THE SAME DAY TO YOU, RIGHT?

APRIL 22, 2015

GHAHREMAN — CROSS-EXAMINATION

1   **A.**    YES.

2   **Q.**    IN FARSI, RIGHT?

3   **A.**    YES.  SOME FARSI, SOME ENGLISH.

4   **Q.**    AND THE TRANSLATION THERE IS BELOW, RIGHT?  AND YOU SEE

5   THAT.  HE TOLD YOU, DEAR ARASH, THEY FUNCTION LIKE THAT IN

6   IRAN.  RIGHT?

7   **A.**    YES.

8   **Q.**    SO THE CUSTOMER FOR THIS PARADISE OFFSHORE WAS IRANIAN,

9   RIGHT?

10  **A.**    PARADISE OFFSHORE, NO.  IT WAS FRIEND OF THE SAEED, AS

11  HE SAID.  HE WAS AMERICAN.  IS THE NATIONALITY, DUAL

12  NATIONALITY, IRANIAN/AMERICAN.

13  **Q.**    HE IS TELLING YOU NOT THAT THE COMPANY IS AMERICAN, HE

14  TELLS YOU ABOUT HIS REQUEST THAT THEY FUNCTION LIKE THIS IN

15  IRAN.  THOSE WERE HIS WORDS HE TOLD YOU, RIGHT, SIR?

16  **A.**    THAT IS HE SAID.

17  **Q.**    YES OR NO, SIR?

18  **A.**    YES.  THAT SAID THE FUNCTION, BUT IS THE PARADISE

19  COMPANY --

20  **Q.**    SIR --

21  **A.**    -- BUT NOT FRONT COMPANY.

22  **Q.**    SIR --

23  **A.**    YES.

24  **Q.**    YOU WILL HAVE AN OPPORTUNITY TO ANSWER MORE QUESTIONS,

25  BUT IF YOU CAN PLEASE -- IF IT CALLS FOR A YES OR NO, PLEASE

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

1    RESPOND.  I DON'T MEAN TO INTERRUPT YOU.

2    **A.**    SORRY.  SORRY.

3    **Q.**    I DON'T WANT TO BE RUDE.

4    **A.**    THANK YOU.  SORRY.

5    **Q.**    THEY FUNCTION LIKE THAT IN IRAN IS WHAT HE TOLD YOU,

6    RIGHT?

7    **A.**    YES, SIR.

8    **Q.**    AND HE ALSO SAID, DUE TO THE SANCTIONS, NOBODY KNOWS

9    WHAT IS GOING ON.  RIGHT?

10   **A.**    YES.

11   **Q.**    AND HE TELLS YOU THEY FORM FAKE, FACTITIOUS COMPANIES,

12   RIGHT?

13   **A.**    YES.  YES, SIR.

14   **Q.**    MONEY IS PAID AND THIS IS NOT SOMETHING STRANGE.  RIGHT?

15   **A.**    AS HE SAID, YES.

16   **Q.**    AND BY FAKE, FACTITIOUS COMPANY HE WAS REFERRING TO

17   PARADISE OFFSHORE COMPANY, WASN'T HE?

18   **A.**    IS THE MY UNDER --

19   **Q.**    YES OR NO, SIR.  HE WAS REFERRING TO PARADISE OFFSHORE

20   COMPANY, WASN'T HE, SIR?

21   **A.**    YES.  I WOULD DOUBT ABOUT THAT, SIR.  REALLY I AM

22   DOUBTFUL ABOUT THAT.  HE MENTIONED ABOUT THE PARADISE COMPANY

23   OR NOT.

24   **Q.**    SIR --

25   **A.**    FAIR ANSWER IS YES, BECAUSE WE WERE TRYING, FAIR ANSWER.

APRIL 22, 2015

GHAHREMAN - CROSS-EXAMINATION

1    **Q.**    OKAY.

2    **A.**    IS TRUE, TO ME, I STILL DOUBT ABOUT THAT, WHAT HE SAID.

3    **Q.**    OKAY.  SO IN FACT YOU ENTERED INTO A CONTRACT WITH

4    PARADISE OFFSHORE COMPANY, DIDN'T YOU?

5    **A.**    YES, I WAS.

6    **Q.**    AND THAT WAS CALLED AN INTERNATIONAL OCCASIONAL

7    INTERMEDIARY CONTRACT?

8    **A.**    YES, SIR, IT WAS.

9    **Q.**    WHICH HAD -- MEANT YOU HAD AN AGENCY RELATIONSHIP NOT

10   WITH THE SELLER BUT WITH THE PURCHASER, RIGHT?  PARADISE

11   OFFSHORE COMPANY, RIGHT?

12   **A.**    YES.

13   **Q.**    WHO WAS THE PURCHASER, RIGHT?

14   **A.**    YES.

15   **Q.**    WHO MR. SHAMI DESCRIBED TO YOU AS A FAKE, FACTITIOUS

16   COMPANY, YES?

17   **A.**    HE EXPLAINED THAT THE WAY IS THE FUNCTION IN IRAN.

18   **Q.**    THAT IS THE WAY THEY FUNCTION IN IRAN, RIGHT?

19   **A.**    YES.

20   **Q.**    THEY USE FAKE, FACTITIOUS COMPANIES, RIGHT?

21   **A.**    YEAH, HE SAID.

22   **Q.**    HE SAID THAT, RIGHT?

23   **A.**    YES.

24   **Q.**    AND IN SAYING THAT HE WAS REFERRING TO PARADISE OFFSHORE

25   COMPANY, WASN'T HE, SIR?

APRIL 22, 2015

GHAHREMAN – CROSS-EXAMINATION

```
 1   A.    THAT IS THE FAIR, YES.
 2         MR. HARRIGAN:  THANK YOU, SIR.
 3         THE COURT:  REDIRECT.
 4                    REDIRECT EXAMINATION
 5   Q.    (MR. JOHNSTON) GOOD MORNING, MR. GHAHREMAN.
 6   A.    GOOD MORNING.
 7   Q.    THE GOVERNMENT BEGAN THIS MORNING TALKING ABOUT YOUR
 8   MEETING AT THE GREEN VALLEY RANCH.
 9   A.    YES, HE DID.
10   Q.    OKAY.  AND A MENTION BY DAVID MILLS ABOUT GOING TO JAIL.
11   A.    YES, SIR.
12   Q.    OKAY.  AND YOU TOLD THE PROSECUTOR THAT YOU RESPONDED TO
13   THAT COMMENT WITH HUMOR.
14   A.    YES.
15         MR. JOHNSTON:  IF WE COULD PLAY CLIP 317 2.
16   Q.    (MR. JOHNSTON) I AM GOING TO PLAY FOR YOU EXHIBIT 317,
17   CLIP 2, THAT WAS PREVIOUSLY INTRODUCED INTO EVIDENCE, I
18   BELIEVE.
19         MR. JOHNSTON:  IF WE COULD PUBLISH?
20         THE COURT:  YES.
21         (VIDEOTAPED PLAYED)
22   Q.    (MR. JOHNSTON) WE HEARD A LENGTHY CLIP WITH DAVID MILLS
23   SPEAKING TO YOU AND ERGUN YILDIZ.
24   A.    UM-HUM.
25   Q.    WAS THAT THE FIRST TIME YOU HAD HEARD HIM SAY THAT HE
```

APRIL 22, 2015

GHAHREMAN – REDIRECT EXAMINATION

1    BELIEVED THESE ITEMS WERE GOING TO IRAN?

2    **A.**    NO.

3    **Q.**    HE HAD SAID THAT MANY TIMES BEFORE?

4    **A.**    YES.

5    **Q.**    AND YOU TESTIFIED ON CROSS-EXAMINATION THAT SOMETIMES IT

6    IS JUST BEST TO BE SILENT, RIGHT?

7    **A.**    YES.

8    **Q.**    PARTICULARLY IF YOU DON'T KNOW WHAT THE SELLER IS SAYING

9    IS TRUE.

10   **A.**    YES.

11   **Q.**    OKAY.  DID YOU BELIEVE WHEN HE SAID THAT, WE ARE THE

12   ONES GOING TO JAIL, THAT YOU WOULD REALLY BE GOING TO JAIL?

13   **A.**    NO, SIR.

14   **Q.**    DID YOU KNOW THE CONTEXT -- LET ME STRIKE THAT.

15        BUT YOU SAID AFTER THIS MEETING YOU DID HAVE CONCERNS,

16   RIGHT?

17   **A.**    YES.

18   **Q.**    AND YOU TOLD THE GOVERNMENT THAT YOU ACTUALLY SPOKE WITH

19   KOORUSH TAHERKHANI AFTER THIS MEETING.

20   **A.**    YES, SIR.

21   **Q.**    AND YOU SAID THAT HE HATED DEALING WITH IRANIANS,

22   IRANIAN BUSINESS.

23   **A.**    IRANIAN BUSINESSES, YES, SIR.

24   **Q.**    DID YOU MEAN TO SAY THAT IN YOUR EXPERIENCE YOU NEVER

25   KNEW KOORUSH TO HAVE DEALT WITH IRANIAN BUSINESS?

APRIL 22, 2015

GHAHREMAN – REDIRECT EXAMINATION

1  **A.**    I KNOW THAT HE WORKING WITH IRANIAN.  HE EXPLAINED FOR
2  ME HE WORKING WITH IRANIAN.  AND IS THAT IS HIS -- SPEAK FROM
3  HIS EXPERIENCE, HE HATE WORKING WITH THE IRANIAN BUSINESS AND
4  IRANIAN COMPANY.
5  **Q.**    WHEN YOU SAY, JUST TO BE CLEAR, WHEN YOU SAID HE WAS
6  WORKING WITH IRANIAN, DO YOU MEAN IN THE PAST BEFORE --
7  **A.**    THE PAST, SIR.
8  **Q.**    YOU KNEW THAT HE HAD WORKED FOR VARIOUS COMPANIES IN
9  IRAN BEFORE TIG MARINE.
10  **A.**    YES, SIR.
11  **Q.**    ALL RIGHT.  BUT IN YOUR FIRST PHONE CALL WITH HIM ABOUT
12  THE GYROS, DID HE EXPLAIN WHAT HE HAD BEEN DOING LATELY?
13  **A.**    YES.  HE WAS WORKING FOR TIG MARINE.  HE EXPLAINED HIS
14  COMPANY, AND WORKING IN DUBAI.  THEY ARE SUCCESSFUL.  THEY ARE
15  COMING REPAIR THE SHIPS, INSTALL EQUIPMENT FOR THE PARTS FOR
16  THE SHIPS IN DUBAI.  AND THEY HAVE GOOD CONNECTIONS IN DUBAI.
17  **Q.**    LET ME ASK YOU THIS.  ON FEBRUARY 15TH, 2013 YOU WERE
18  CC'D ON AN EMAIL FROM KOORUSH TO MAE DAYSO, RIGHT?  THE
19  GOVERNMENT JUST SHOWED YOU THAT EARLIER.
20  **A.**    YES.
21  **Q.**    AND AT THAT TIME, ON FEBRUARY 15TH, 2013, DID YOU KNOW
22  WHO ISOICO WAS?
23  **A.**    NO, REALLY, SIR, I DIDN'T KNOW.
24  **Q.**    DID ISOICO EXIST WHEN YOU WERE IN BANDAR ABBAS?
25  **A.**    I NEVER HEARD THAT, ISOICO.

APRIL 22, 2015

GHAHREMAN – REDIRECT EXAMINATION

1  **Q.**    DID YOU EVER LATER LEARN WHEN ISOICO CAME INTO

2  EXISTENCE?

3          **MR. HARRIGAN:**  OBJECTION.  NO FOUNDATION.

4          **THE WITNESS:**  NO.

5          **THE COURT:**  SUSTAINED.

6  **Q.**    **(MR. JOHNSTON)** WELL, LET ME ASK YOU THIS.  ON

7  FEBRUARY 27TH, 2013 HE TOLD YOU THAT HE HAD BEEN AT ISOICO

8  SHIPYARDS IN BANDAR ABBAS.  YOU SAW THAT EMAIL THE GOVERNMENT

9  SHOWED YOU.

10  **A.**    SENT TO ISOICO.  THAT IS THE EVEN I DIDN'T REMEMBER

11  BECAUSE MAYBE SOMETIME I FAST READING.  I DIDN'T REMEMBER

12  SHIPYARD IN BANDAR ABBAS IN THE EMAIL.

13  **Q.**    RIGHT.  BUT THE GOVERNMENT SHOWED YOU ANOTHER EMAIL A

14  LITTLE LESS THAN TWO WEEKS LATER WHERE KOORUSH TOLD YOU THAT

15  HE HAD BEEN IN BANDAR ABBAS THE NIGHT BEFORE.  REMEMBER THAT?

16  **A.**    I PASSED EMAIL TO FORWARD INFORMATION.  ANY SHIP IS THE,

17  YOU KNOW, WHEN I FAST READING, WHAT ANY SHIP IS COMING FROM

18  CHINA, GERMANY, SOUTH KOREA, IN THE IRANIAN THEY ARE

19  CELEBRATING IN BANDAR ABBAS.  IS ANY NEW SHIP.  THAT IS THE,

20  YOU KNOW, I WAS VERY FAST, BUT IT WAS ALWAYS HAPPENED.  ALL

21  THE SHIP COMING FROM THE SHIPYARDS AROUND THE WORLD FOR

22  IRANIAN COMPANIES IS CELEBRATING IN BANDAR ABBAS.  IS VERY

23  NORMAL, ROUTINE.

24  **Q.**    IS IT FAIR TO SAY IN THE HUNDREDS OR THOUSANDS OF EMAILS

25  YOU HAD OVER THE SIX-MONTH PERIOD THAT YOU DIDN'T PAY --

APRIL 22, 2015

GHAHREMAN – REDIRECT EXAMINATION

1          **MR. HARRIGAN:**  OBJECTION.  LEADING.

2          **THE COURT:**  SUSTAINED.

3   **Q.     (MR. JOHNSTON)** WERE YOU PAYING A LOT OF ATTENTION TO

4   THAT PARTICULAR FEBRUARY 25TH EMAIL?

5   **A.**    NO, I DIDN'T PARTICULAR ATTENTION.  BUT I SAW THE EMAIL,

6   THAT IS IT.

7   **Q.**    YOU DID SEE IT.  FAIR ENOUGH.

8          NOW LET'S TALK ABOUT, NEXT, THE OIL JACKUP RIGS --

9   **A.**    UM-HUM.

10  **Q.**    -- THAT INVOLVED MIKAEL RONES AND SAEED SHAMI.

11  **A.**    YES, SIR.

12  **Q.**    YOU TOLD THE GOVERNMENT ON CROSS-EXAMINATION THAT THE

13  WAY THAT SAEED WANTED TO STRUCTURE THIS DEAL SEEMED UNUSUAL TO

14  YOU, RIGHT?

15  **A.**    YES, SIR.

16  **Q.**    AND YOU RESPONDED TO HIS EMAIL WITH SOME CONCERN?

17  **A.**    YES, SIR.

18  **Q.**    AND THEN HE TOLD YOU ABOUT SANCTIONS IN IRAN?

19  **A.**    HE TOLD ME THAT IS ABOUT THE WAY THEY ARE PURCHASING IN

20  IRAN BECAUSE OF THE SANCTION.

21  **Q.**    OKAY.  AND LET ME ASK YOU THIS.  DID YOU GO FORWARD WITH

22  THAT DEAL?

23  **A.**    NO.

24  **Q.**    DID THAT DEAL EVER GET COMPLETED?

25  **A.**    NO.

APRIL 22, 2015

GHAHREMAN – REDIRECT EXAMINATION

1   Q.    NOW I WANT TO RETURN TO A SUBJECT THAT WAS BROUGHT UP
2   THE DAY BEFORE YESTERDAY.
3         THE GOVERNMENT ASKED YOU SOME QUESTIONS ABOUT STATEMENTS
4   YOU MADE AFTER YOU WERE ARRESTED IN THIS CASE.
5   A.    YES.
6   Q.    HAD YOU EVER BEEN ARRESTED BEFORE JUNE 17TH, 2013?
7   A.    NEVER IN MY LIFE.
8   Q.    DID ANYONE POINT A GUN AT YOU WHEN THEY ARRESTED YOU ON
9   JUNE 17TH?
10  A.    I NEVER IN MY LIFE, AND I WISH NOW NOT HAPPEN FOR ANYONE
11  TOO.
12  Q.    I AM ASKING YOU, ON JUNE 17TH DID ANYONE HAVE A WEAPON
13  DRAWN WHEN THEY ARRESTED YOU?
14  A.    YES.
15  Q.    HOW DID THAT MAKE YOU FEEL?
16  A.    I WISH NOBODY HAPPEN, FOR NOBODY HAPPEN.  THAT ALL I CAN
17  TELL YOU.
18  Q.    THEN WERE YOU TAKEN TO A PLACE WHERE YOU WERE
19  QUESTIONED?
20  A.    YES, WITH THE BLINDFOLD, BLINDFOLD ME.  THAT IS CLOSED
21  MY EYES AND THEY TOOK ME TO A PLACE.
22  Q.    NOW, WHEN YOU GOT TO THIS PLACE, YOU WERE INTERVIEWED BY
23  AGENTS, RIGHT?
24  A.    YES, SIR.
25  Q.    AGENT KEVIN HAMAKO WHO IS SEATED HERE.

APRIL 22, 2015

1  **A.**    YES, SIR.

2  **Q.**    AND ANOTHER AGENT, RIGHT?

3  **A.**    YES, SIR.

4  **Q.**    AND DID YOU WANT TO TALK TO THESE AGENTS?

5  **A.**    YES, I WANTED.

6  **Q.**    DID THEY TELL YOU IT WAS IMPORTANT TO TALK TO THEM?

7  **A.**    YES.  THEY MENTIONED TO ME THAT IT IS SHORT OF THE TIME

8  AND THEY -- THAT YOU SHOULD HELP US, AND DON'T WASTE OUR TIME.

9  **Q.**    OKAY.  THEY TOLD YOU THAT THE TIME WAS SHORT?

10  **A.**    YES.

11  **Q.**    THAT THEY WANTED YOU TO HELP THEM?

12  **A.**    YES, SIR.

13  **Q.**    DID THEY TELL YOU THAT THAT COULD HAVE ANY BENEFIT TO

14  YOU?

15  **A.**    IS THE YES, SIR.  WHAT IS REALLY I DIDN'T UNDERSTAND IS

16  ABOUT THE BENEFIT.

17  **Q.**    OKAY.  NOW, LET ME ASK YOU THIS.  DID YOU EVER TELL THEM

18  THAT YOU DIDN'T WANT TO TALK TO THEM?

19  **A.**    I TOLD THEM I AM NOT -- I DIDN'T TELL THEM I DIDN'T WANT

20  TO TALK TO THEM.

21  **Q.**    DID YOU WANT TO TALK TO THEM?

22  **A.**    YES, I WANTED TO TALK TO THEM.

23  **Q.**    BUT HAD YOU EVER BEEN IN AN EXPERIENCE LIKE THIS BEFORE?

24  **A.**    NO, I NEVER HAD EXPERIENCE LIKE THIS BEFORE.

25  **Q.**    DID YOU ASK FOR THE ASSISTANCE OF AN ATTORNEY WHILE THEY

GHAHREMAN – REDIRECT EXAMINATION

1   WERE ASKING YOU QUESTIONS?

2   **A.**    SEVERAL TIMES, SIR.

3   **Q.**    OKAY.  DID THEY TELL YOU THAT YOU COULD HAVE AN ATTORNEY

4   DURING THIS INTERROGATION?

5   **A.**    THEY TOLD ME NO, YOU CANNOT.  THE ATTORNEY IS NOT

6   ALLOWED COME TO THE BUILDING.

7   **Q.**    OKAY.  DID YOU DECIDE TO SPEAK WITH THEM ANYWAY?

8   **A.**    YES, SIR.

9   **Q.**    WAS IT A REAL DECISION ON YOUR PART?  DID YOU FEEL LIKE

10  YOU HAD A CHOICE?

11  **A.**    I FEEL I DON'T HAVE ANOTHER CHOICE.

12  **Q.**    SO YOU CONTINUED TO TALK TO THEM.

13  **A.**    YES.

14  **Q.**    AFTER THEY TOLD YOU THAT YOU COULDN'T HAVE AN ATTORNEY

15  PRESENT IN THE ROOM.

16  **A.**    YES, SIR.

17  **Q.**    ALL RIGHT.  NOW, THE GOVERNMENT PICKED OUT A FEW

18  STATEMENTS THAT YOU MADE DURING THAT INTERROGATION.  DO YOU

19  KNOW HOW LONG IT LASTED, APPROXIMATELY?

20  **A.**    IS THE INTERVIEW?

21  **Q.**    YES.

22  **A.**    ABOUT ONE HOUR.

23  **Q.**    OKAY.

24  **A.**    I DON'T REMEMBER.  ONE HOUR MORE, OR ONE HOUR.

25  **Q.**    AND YESTERDAY THE GOVERNMENT READ TO YOU FROM PAGE 2

APRIL 22, 2015

GHAHREMAN - REDIRECT EXAMINATION

1    LINE 18.  WHO EXACTLY -- THIS IS AGENT HAMAKO ASKED YOU, WHO

2    EXACTLY DID KOORUSH TELL YOU THEY WERE GOING TO, THE

3    NAVIGAT-2100'S?

4         DO YOU REMEMBER HIM ASKING YOU THAT QUESTION?

5    A.    YES, SIR.

6    Q.    OKAY.  AND THEN THE GOVERNMENT READ YOUR ANSWER, QUOTE,

7    THE NAVIGAT-2100, THAT IS THE I CAN'T TELL YOU THAT IS THAT HE

8    SAID IT GO TO IRAN OR SOMETHING.

9    A.    YES, I SAID I CAN'T TELL YOU.  THAT IS ALWAYS I

10   REMEMBER.  I SAID I CAN'T TELL YOU THAT IS GOING TO IRAN OR

11   SOMEPLACE ELSE.

12   Q.    THAT YOU CANNOT.

13   A.    I CAN'T.  YEAH.

14   Q.    OKAY.

15   A.    IT MEANS THAT IS I DON'T KNOW.  THAT IS SOMETIMES IN

16   ENGLISH I CAN'T, IT MEANS MAYBE I HAVE A LIMITATION.  I DIDN'T

17   HAVE LIMITATION, I DIDN'T KNOW.

18   Q.    BUT THE GOVERNMENT ALSO INTRODUCED IN YOUR

19   CROSS-EXAMINATION THE FACT THAT YOU TOLD THEM ABOUT A COMPANY

20   CALLED VALFAJR.

21   A.    YES.

22   Q.    AND AGENT HAMAKO ASKED YOU, BUT YOU KNEW THAT VALFAJR

23   WORKS WITH IRISL AND IS PART OF IRISL, ISLAMIC REPUBLIC OF

24   IRAN SHIPPING LINES, YES?

25   A.    YES, THAT IS.

APRIL 22, 2015

GHAHREMAN - REDIRECT EXAMINATION

1   **Q.**    DO YOU REMEMBER YOUR ANSWER TO THAT?

2   **A.**    I REMEMBER I TOLD HIM I KNOW THAT IS SUBSIDIARY.  I

3   DON'T KNOW ABOUT THE OWNERSHIP OF THAT VALFAJR 8 OR VALFAJR

4   HASHT, THAT IS IT.  BECAUSE IS MY KNOWLEDGE THAT IS THE -- AS

5   MY KNOWLEDGE IS THE VALFAJR 8 IT WAS THE MOST ACTIVE FERRY

6   SHIPPING IN THE PERSIAN GULF.

7   **Q.**    LET ME STOP YOU THERE.  THE GOVERNMENT READ TO THE JURY

8   YOUR ANSWER, THAT IS YES, THAT I KNOW.  RIGHT?

9   **A.**    YES.

10  **Q.**    BUT YOU CONTINUED TO TRY TO EXPLAIN YOUR UNDERSTANDING

11  OF VALFAJR --

12  **A.**    YES.

13  **Q.**    -- TO AGENT HAMAKO.

14         BUT THE GOVERNMENT READ ANOTHER QUESTION FROM AGENT

15  HAMAKO WHEN HE SAID, AND YOU KNEW THAT VALFAJR IS AN IRANIAN

16  SHIPPING COMPANY, YES?

17         DO YOU REMEMBER THAT?

18  **A.**    I REMEMBER I SAID YES, BUT IT IS THAT WORDS I DON'T

19  REMEMBER.  I EXPLAIN FOR HIM THAT IS THE I DON'T KNOW ABOUT

20  THE OWNERSHIP OF THE VALFAJR.  I DON'T RECALL ALL.

21  **Q.**    RIGHT.  AND ULTIMATELY AGENT HAMAKO SAID TO YOU, MAYBE

22  THEY ARE NOT A DIRECT SUBSIDIARY OF IRISL, BUT THEY WORK WITH

23  IRISL A LOT, YES?

24  **A.**    IS I DON'T RECALL ALL HIS WORDS WHAT HE SAID, SIR,

25  REALLY.  BUT HE WAS -- THAT IS GOING FORWARD AND BACK, I DON'T

APRIL 22, 2015

GHAHREMAN - REDIRECT EXAMINATION

1  REMEMBER.  IF YOU PLAY I ANSWER.

2      **MR. JOHNSTON:**  YOUR HONOR, IF I COULD JUST REFRESH

3  HIS RECOLLECTION.

4      **THE COURT:**  YES.

5      **MR. JOHNSTON:**  IF I COULD HAVE THE ELMO JUST FOR THE

6  WITNESS, PLEASE.  COULD WE CLEAR THAT RED LINE?

7  **Q.**    **(MR. JOHNSTON)** IF YOU CAN LOOK AT THE PART I

8  HIGHLIGHTED.

9  **A.**    YES, I REMEMBER, SIR.

10  **Q.**    AND WERE YOU EVEN SURE VALFAJR WAS A SUBSIDIARY OF

11  IRISL?

12  **A.**    I SURE THAT IS SOME -- IT WAS SUBSIDIARY PARTIAL OF THE

13  IRISL.

14  **Q.**    OKAY.

15  **A.**    I DON'T WANT TO USE SUBSIDIARIES BECAUSE REALLY I

16  DON'T -- IN THE OWNERSHIP I DON'T KNOW WHAT IS THE

17  SUBSIDIARIES.  WHAT IS THE -- YOU KNOW, I DON'T KNOW LEGALLY

18  WHAT IS -- IN THE LAW WHAT IS SUBSIDIARIES.

19  **Q.**    WAS YOUR ANSWER TO AGENT HAMAKO, I AM NOT SURE?

20  **A.**    YES.

21      **MR. HARRIGAN:**  OBJECTION.  LEADING.

22  **Q.**    **(MR. JOHNSTON)** BUT I THINK YES.

23      **MR. JOHNSTON:**  SORRY.

24      **THE COURT:**  SUSTAINED.

25  **Q.**    **(MR. JOHNSTON)** DO YOU REMEMBER WHAT YOUR ANSWER WAS,

APRIL 22, 2015

GHAHREMAN – REDIRECT EXAMINATION

1   AND IF IT HELPS REFRESH YOUR RECOLLECTION?

2   **A.**    THAT IS WHAT I TOLD BEFORE YOU, I SAID I AM NOT SURE

3   ABOUT THE OWNERSHIP HOW IT IS GOING ON WITH THIS IRISL AND THE

4   VALFAJR HASHT.

5   **Q.**    OKAY.

6   **A.**    WHO IS THE INVESTOR AND WHO.

7         **MR. JOHNSTON:**   IF WE CAN CLEAR THE SCREEN, BUT I

8   WILL LEAVE IT UP FOR A MOMENT.

9   **Q.**    **(MR. JOHNSTON)** NOW, THE GOVERNMENT SELECTED ANOTHER

10  ANSWER YOU MADE FROM AGENT HAMAKO ABOUT THE Y-690'S.  AND IN

11  CROSS-EXAMINATION THEY READ TO YOU THAT AGENT HAMAKO SAID TO

12  YOU, BUT YOU KNEW IT WAS AN AIRPORT IN IRAN.

13  **A.**    I REMEMBER SOMETHING.

14  **Q.**    AND THE ANSWER THAT THE GOVERNMENT READ BACK TO YOU WAS,

15  THAT IS WHAT I HEARD.

16  **A.**    THAT IS WHAT I HEARD, THAT IS THAT WHAT I HEARD IS IN

17  PERSIAN, BUT I THINK I HEARD IT –– IT WAS CONTINUED, MY WORDS,

18  AFTER THAT.

19  **Q.**    AND YESTERDAY YOU TRIED TO EXPLAIN WHAT ELSE YOU SAID TO

20  THE PROSECUTOR, RIGHT?

21  **A.**    YES, I TRIED.

22  **Q.**    BUT YOU HAVE AN OPPORTUNITY HERE, RIGHT?

23  **A.**    NO, BECAUSE THEY TOOK PICTURE, IS THE ONE WORD, THAT

24  SHOW ME.

25  **Q.**    LET ME JUST ASK YOU.  WHAT DID YOU CONTINUE TO EXPLAIN

APRIL 22, 2015

GHAHREMAN – REDIRECT EXAMINATION

1  AFTER YOU SAID THAT YOU HEARD THAT?

2  **A.**    WHAT I WANTED TO SAY TO THEM, WHAT I HEARD IT IS

3  AIRPORT.  WHAT I HEARD IS AIRPORT.  NOT IRAN OR ANYBODY ELSE.

4  **Q.**    DID YOU TELL AGENT HAMAKO --

5  **A.**    YES.

6  **Q.**    -- WHETHER -- DID YOU TELL AGENT HAMAKO WHETHER KOORUSH

7  HAD EVER TOLD YOU AIRPORTS IN IRAN?

8  **A.**    NO, KOORUSH NEVER TOLD ME, KOORUSH AIRPORTS.  I TOLD TO

9  -- I HEARD AND KOORUSH TOLD ME AIRPORTS.  AND IT WAS THE

10  FUNCTION OF THE -- FUNCTION OF THE Y-690.  IT WAS NOT THE

11  LOCATION, THAT IS MOST THE AIRPORTS, JUST THE FUNCTION OF THE

12  APPLICATION OF THE Y-690.  NEVER IT WAS THE PLACE.

13  **Q.**    RIGHT.  AND DID YOU -- BUT DID YOU TELL AGENT HAMAKO

14  THAT DAVID MILLS HAD REPEATEDLY SAID THAT IT WAS FOR IRAN?

15  **A.**    DAVID MILLS ALWAYS SAID, YOU KNOW, IS THAT SOMETHING

16  ALSO, IN THE VERY FAST CONVERSATION THAT USE --

17          **MR. HARRIGAN:**  OBJECTION.  NONRESPONSIVE.

18          **THE COURT:**  SUSTAINED.

19          **THE WITNESS:**  I CANNOT EXPLAIN?

20          **THE COURT:**  MR. JOHNSTON WILL POSE ANOTHER QUESTION.

21          **MR. JOHNSTON:**  YES.  THANK YOU.  SORRY, YOUR HONOR.

22  **Q.**    **(MR. JOHNSTON)** LET ME JUST MAKE SURE OF ONE THING.

23          SO, MR. GHAHREMAN, THE GOVERNMENT SELECTED ANOTHER

24  STATEMENT THAT YOU MADE DURING THIS HOUR OR SO LONG

25  INTERROGATION ABOUT THE Y-690'S WHEN AGENT HAMAKO ASKED YOU,

APRIL 22, 2015

GHAHREMAN – REDIRECT EXAMINATION

1   BUT AN AIRPORT WHERE, ARASH?

2        DO YOU REMEMBER THAT?

3   **A.**   YES, HE ASKED IT.

4   **Q.**   AND THE GOVERNMENT READ YOUR ANSWER TO YOU, WHICH IS

5   THAT, QUOTE, IT IS REALLY I, THAT IS MY UNDERSTANDING, LIKE

6   YOUR UNDERSTANDING WHEN SAID AIRPORT I SUSPECTED TO IRANIAN

7   AIRPORT.

8   **A.**   IS THAT I REMEMBER.

9   **Q.**   DID YOU GO ON TO EXPLAIN WHY YOU SUSPECTED THAT MAYBE IT

10  WAS FOR AN IRANIAN AIRPORT?

11  **A.**   YES, I DID.

12  **Q.**   WHY DID YOU SUSPECT THAT IT COULD BE FOR AN IRANIAN

13  AIRPORT AT THAT POINT, AFTER YOU HAD BEEN ARRESTED IN THIS

14  CASE?

15  **A.**   I TOLD HIM, IT IS LIKE ME, I AM HERE AS IRANIAN

16  NATIONALITY, IS SOMETIMES WHEN IT IS NATIONALITY COMING IS

17  THAT YOU ARE SUDDENLY GOING TO MAYBE IS IRANIAN AIRPORTS.

18  **Q.**   DID YOU KNOW AT THE TIME THAT THEY WERE GOING TO IRANIAN

19  AIRPORTS?

20  **A.**   NO.

21  **Q.**   OKAY.  AND ON ONE MORE OCCASION AGENT HAMAKO LATER ON

22  SAID TO YOU -- IT LOOKS LIKE HE WAS TALKING ABOUT THE GYROS

23  AND HE SAID, JUST LIKE THE Y-690'S WERE GOING TO IRAN.

24        DO YOU REMEMBER HIM BRINGING THAT UP AGAIN?

25  **A.**   AS I REPEAT, I DON'T REMEMBER.  AS I REPEAT IS THAT --

APRIL 22, 2015

GHAHREMAN - REDIRECT EXAMINATION

 1    THAT IS THAT -- THIS IS WHAT --
 2             **MR. HARRIGAN:**  OBJECTION.  NONRESPONSIVE.
 3             **THE COURT:**  SUSTAINED.
 4    **Q.**    **(MR. JOHNSTON)** WOULD IT REFRESH YOUR RECOLLECTION TO
 5    LOOK AT THE TRANSCRIPT?
 6    **A.**    YES.  THANK YOU.
 7    **Q.**    YOU CAN JUST LOOK AT THE HIGHLIGHTED PORTIONS AND LOOK
 8    UP WHEN YOU ARE DONE.
 9    **A.**    THANK YOU.  THAT IS EXACTLY I WANTED TO SAY.
10    **Q.**    DO YOU RECALL NOW WHAT YOU SAID WHEN HE TOLD YOU THAT
11    THE 690'S WERE GOING TO IRAN?
12    **A.**    YES.
13    **Q.**    LET ME REMOVE THIS.
14    **A.**    YES.
15    **Q.**    AND WHAT DID YOU TELL HIM?
16    **A.**    THAT I TOLD HIM I DON'T KNOW, DON'T -- PLEASE DON'T PLAY
17    WITH ME, BECAUSE ALWAYS THAT IS LIKE THE DAVID MILLS.  IRAN,
18    IRAN.  THAT MR. HAMAKO ALSO REPEAT AND SAID IRAN.  IT IS, FOR
19    MY EAR, IS NOT FAMILIAR.  WE SAID, ALL MY LIFE ERAN [PH.], NOT
20    IRAN, WITH THAT VERY FAST.  AND THEY WERE -- I ADMIT TO THEM,
21    PLEASE DON'T PLAY WITH ME.  BECAUSE WHATEVER THEY FINISH THEY
22    SAID IRAN, AND I DIDN'T KNOW HOW TO ANSWER.  THEY PUT SO MANY
23    QUESTION TO ONE SENTENCE AND PLAYING WITH ME.  AND I SAID,
24    DON'T PLAY WITH ME.
25    **Q.**    DID YOU DO THE BEST YOU COULD UNDER THE CIRCUMSTANCES?

APRIL 22, 2015

GHAHREMAN – REDIRECT EXAMINATION

1    **A.**    I DID MY BEST, SIR.

2              **MR. JOHNSTON:**  THANK YOU, NOTHING FURTHER.

3              **THE WITNESS:**  I WANTED TO HELP.

4              **THE COURT:**  ANY MORE?

5              **MR. HARRIGAN:**  JUST ONE MORE QUESTION, YOUR HONOR.

6                        RECROSS-EXAMINATION

7    **Q.**    **(MR. HARRIGAN)** SIR, IT IS YOUR TESTIMONY THAT AFTER YOU

8    WERE ARRESTED YOU WERE BLINDFOLDED?

9    **A.**    YES, THEY DID.

10   **Q.**    AND WAS THAT WITH A BAG, WAS IT WITH A BLINDFOLD?

11   **A.**    WHEN THEY TRANSFERRED ME FROM THE PLACE TO THE BUILDING

12   THEY BLINDFOLDED ME.

13   **Q.**    WHAT DID THEY USE TO BLINDFOLD YOU WITH?

14   **A.**    SIR, IS I WISH I REMEMBER WHAT THEY USE.  JUST THEY PUT

15   SOMETHING THAT IN MY EYES.  I DON'T KNOW.

16   **Q.**    HAD YOU EVER BEEN BLINDFOLD BEFORE?

17   **A.**    NO.

18   **Q.**    BY LAW ENFORCEMENT?

19   **A.**    NO.

20   **Q.**    AND AS YOU SIT HERE TODAY, YOU CAN'T REMEMBER WHAT THEY

21   USED TO BLINDFOLD YOU WITH?

22   **A.**    THEY PUT SOME -- THEY HAVE EQUIPMENT OR SOMETHING FOR

23   BLINDFOLD.

24   **Q.**    AND YOU HAVE NO IDEA WHAT EQUIPMENT THEY USED; IS THAT

25   RIGHT?

APRIL 22, 2015

GHAHREMAN – RECROSS–EXAMINATION

1  **A.**    NO.

2  **Q.**    THERE WERE TWO AGENTS IN THE CAR, RIGHT?  THAT

3  TRANSPORTED YOU, RIGHT?

4  **A.**    IS I DON'T RECALL THAT IS THE TWO AGENTS IS THERE.  IT

5  LOOKED -- I HEARD TWO VOICES.

6  **Q.**    YOU HEARD TWO VOICES, BUT YOU DIDN'T SEE ANYTHING.

7  **A.**    NO.

8  **Q.**    AND ONE OF THOSE VOICES YOU HEARD WAS AGENT HAMAKO,

9  RIGHT.  SEATED OVER HERE?

10  **A.**    YES.

11  **Q.**    AND IT IS YOUR TESTIMONY THAT AGENT HAMAKO BLINDFOLDED

12  YOU.  IS THAT YOUR TESTIMONY HERE TODAY?

13  **A.**    IS THE WHAT I REMEMBER, YES.  THEY MADE ME --

14  **Q.**    DO YOU REMEMBER?

15  **A.**    YES.

16  **Q.**    OKAY.  AND IT WAS AGENT HAMAKO, SEATED HERE, WHO

17  BLINDFOLDED YOU.

18  **A.**    I DON'T REMEMBER THAT IS WHO BLINDFOLD ME.

19  **Q.**    WELL, WAS THERE ANOTHER AGENT THERE?

20  **A.**    IT IS I HEARD THAT TWO VOICES.

21  **Q.**    WELL, SO YOU DIDN'T SEE WHO BLINDFOLDED YOU.

22  **A.**    NO.

23  **Q.**    OKAY.  AND YOU HEARD TWO VOICES IN THE CAR.

24  **A.**    YES.  THAT IS THE ONE IS MR. HAMAKO VOICE, IS AFTER THAT

25  I KNOW.

APRIL 22, 2015

GHAHREMAN – RECROSS–EXAMINATION

1   Q.   SIR, YOU WEREN'T BLINDFOLDED WHEN YOU WERE RESPONDING TO

2   QUESTIONS FROM AGENT HAMAKO, WERE YOU?

3   A.   NO.  THAT IS THAT THEY REMOVE MY BLIND I THINK IN THE

4   PARKING OF THE BUILDING.  I DIDN'T SAY ALL THE TIME, SIR.

5   Q.   IN FACT YOU WOULD AGREE THAT WHEN YOU HAD -- DURING THAT

6   INTERVIEW WHEN YOU WANTED WATER, AGENT HAMAKO WOULD GET THAT

7   FOR YOU; IS THAT RIGHT?

8   A.   YES.

9   Q.   IN FACT AT ONE POINT YOU NEEDED YOUR GLASSES BECAUSE YOU

10  WANTED TO READ SOMETHING.  DO YOU REMEMBER THAT?

11  A.   YES.

12  Q.   YOU HAVE LISTENED TO THE TRANSCRIPTS, RIGHT?

13  A.   YES.

14  Q.   IN FACT THEY STOPPED THE INTERVIEW SO THEY COULD GO GET

15  YOUR GLASSES.  ONE OF THE AGENTS WENT AND DID THAT FOR YOU,

16  RIGHT?

17  A.   YES, SIR.

18  Q.   BECAUSE YOU WANTED TO TAKE NOTES, RIGHT?  WHILE THEY

19  WERE ASKING YOU QUESTIONS, RIGHT?

20  A.   YES, SIR.  I TRIED TO CONCENTRATE.

21  Q.   RIGHT.  AND, GENERALLY, OTHER THAN IT BEING

22  UNCOMFORTABLE FOR YOU, THIS IS THE FIRST TIME YOU HAD BEEN

23  ARRESTED, AGENT HAMAKO WAS A COURTEOUS MAN TO YOU, WASN'T HE?

24  A.   PARDON?

25  Q.   HE WAS COURTEOUS, RIGHT?

APRIL 22, 2015

GHAHREMAN – RECROSS–EXAMINATION

1   **A.**    WHAT MEANS THAT WORD?

2   **Q.**    WHEN YOU NEEDED SOMETHING HE TRIED TO GET THAT FOR YOU,

3   FOR EXAMPLE YOUR GLASSES, RIGHT?

4   **A.**    YES, SIR.

5   **Q.**    HE NEVER DENIED YOU WATER, RIGHT?

6   **A.**    YES, SIR.

7   **Q.**    HE NEVER DENIED YOU WATER, RIGHT?

8   **A.**    PARDON?

9   **Q.**    YOU WANTED SOME WATER, HE ASKED IF YOU WANTED WATER AT

10  ONE POINT, RIGHT?

11  **A.**    YES.  THEY GAVE ME WATER, YES.

12  **Q.**    THEY GAVE YOU WATER.

13  **A.**    YES.

14  **Q.**    ALL RIGHT.  AND HE RESPONDED TO THE QUESTIONS YOU ASKED

15  ABOUT WHAT WAS HAPPENING, RIGHT?

16  **A.**    IS YES, I ASKED WHAT'S HAPPENING.

17  **Q.**    RIGHT.  AND YOU IN FACT TOLD HIM IN THAT INTERVIEW THAT

18  YOU UNDERSTOOD HE WAS DOING HIS JOB, RIGHT?

19  **A.**    YES, SIR.  TODAY ALSO I BELIEVE HE IS DOING HIS JOB.

20  **Q.**    RIGHT.  AND THERE WAS ANOTHER AGENT THERE, RYAN

21  PRECIADO, RIGHT?

22  **A.**    I DON'T REMEMBER HIS NAME, BUT IS ANOTHER AGENT WAS

23  THERE.

24  **Q.**    AND DURING THAT INTERVIEW AGENT HAMAKO DIDN'T HAVE A GUN

25  DRAWN, RIGHT?

APRIL 22, 2015

GHAHREMAN – RECROSS–EXAMINATION

1    **A.**    NO, SIR.

2    **Q.**    IN FACT ––

3    **A.**    I DON'T REMEMBER.

4    **Q.**    YOU DON'T REMEMBER WHETHER HE HAD A GUN DRAWN?

5    **A.**    NO, THEY DIDN'T HAVE GUNS.  THAT IS I HAVEN'T SEEN GUN

6    WITH THEM.

7    **Q.**    YOU DIDN'T SEE A WEAPON VISIBLE DURING THAT INTERVIEW,

8    RIGHT?

9    **A.**    NO.

10   **Q.**    SO YOU DIDN'T FEEL THAT AGENT HAMAKO WAS GOING TO USE A

11   GUN ON YOU DURING THAT INTERVIEW, DID YOU?

12   **A.**    NO, SIR.

13   **Q.**    ALL RIGHT.

14   **A.**    THAT IF YOU ARE TALKING ABOUT ETHICS, I FACE WITH THAT

15   NON ETHICS THINGS DURING IN THE LAST TWO AND A HALF YEARS WITH

16   ME.  BUT I DIDN'T SAY THAT IS THAT THEY PUSH ME WITH THE GUNS

17   OR TORTURE ME.  I NEVER SAID AND I NEVER TOLD THESE THINGS.

18   **Q.**    THEY DIDN'T PUSH YOU, THEY DIDN'T TORTURE YOU IN THAT

19   INTERVIEW, RIGHT?

20   **A.**    NO.  THAT'S IT WAS NOT –– IT WAS ––

21   **Q.**    YOU WEREN'T BLINDFOLDED, RIGHT?

22   **A.**    NO.  DURING THE CONVERSATION, NO.

23   **Q.**    YOUR EYES WERE WIDE OPEN, WEREN'T THEY, SIR?

24   **A.**    I DON'T UNDERSTAND EYES WIDE OPEN, WHAT YOU MEAN WIDE

25   OPEN.

APRIL 22, 2015

1358

GHAHREMAN – RECROSS–EXAMINATION

1   **Q.**    YOU DIDN'T HAVE YOUR EYES CLOSED DURING THE INTERVIEW,

2   YOU COULD SEE.

3   **A.**    YES, THAT WAS MY -- I DIDN'T WAS BLINDFOLDED DURING

4   CONVERSATION.

5          **MR. HARRIGAN:**  ALL RIGHT.  THANK YOU, SIR.

6          **THE WITNESS:**  YOUR ARE WELCOME, SIR.

7          **MR. JOHNSTON:**  JUST REAL BRIEF, YOUR HONOR.

8                 REDIRECT EXAMINATION

9   **Q.**    **(MR. JOHNSTON)** THE PROSECUTOR SAID THAT AGENT HAMAKO

10   PROVIDED YOU EVERYTHING YOU NEEDED?

11   **A.**    WITH NOT LAWYER.

12   **Q.**    YOU FELT YOU NEEDED A LAWYER UNDER THESE CIRCUMSTANCES

13   TO ASSIST.

14   **A.**    YES, SIR.

15   **Q.**    DID HE PROVIDE YOU THAT?

16   **A.**    NO, SIR.

17   **Q.**    AND UNDER THESE CIRCUMSTANCES DID HE TELL YOU, TIME IS

18   OF THE ESSENCE NOW?

19   **A.**    YES, SIR.  HE SAID.

20   **Q.**    THIS IS THE ONLY OPPORTUNITY YOU HAVE TO HELP YOURSELF?

21   **A.**    YES, SIR.

22          **MR. JOHNSTON:**  NOTHING FURTHER.

23          **THE WITNESS:**  AND HE MENTIONED HE IS FROM HOMELAND

24   SECURITY.

25          **MR. JOHNSTON:**  THANK YOU.

APRIL 22, 2015

GHAHREMAN – REDIRECT EXAMINATION

```
 1              THE COURT:  MR. HARRIGAN, ANY MORE?
 2              MR. HARRIGAN:  NO FURTHER QUESTIONS, YOUR HONOR.
 3              THE COURT:  THANK YOU.  YOU MAY STEP DOWN.
 4              THE WITNESS:  THANK YOU.
 5              THE COURT:  DEFENSE RESTS?
 6              MR. JOHNSTON:  YES, YOUR HONOR.  THE DEFENSE RESTS
 7   AND RENEWS ITS MOTION.
 8              THE COURT:  I WILL RESERVE ON THAT.
 9              LET'S GO AHEAD AND PASS OUT THE JURY INSTRUCTIONS.
10              MR. JOHNSTON:  YOUR HONOR, COULD WE BE HEARD BRIEFLY
11   AT SIDEBAR?
12              THE COURT:  YES.
13              MR. JOHNSTON:  THERE WAS AN ISSUE ABOUT ONE
14   INSTRUCTION.
15              THE COURT:  I AM GOING TO READ THAT INSTRUCTION.
16              MR. JOHNSTON:  GOOD.  THANK YOU.  I WANTED TO MAKE
17   SURE.
18              THE COURT:  OKAY.  SO WE ARE GOING TO GO AHEAD AND
19   PASS OUT THE JURY INSTRUCTIONS.
20              THE EVIDENCE IS IN, BOTH SIDES HAVE RESTED.  YOU ARE
21   WELCOME TO READ ALONG WITH ME ON THESE INSTRUCTIONS.  THEY
22   WILL BE YOURS TO USE IN YOUR DELIBERATIONS, SO YOU CAN TAKE
23   NOTES ON THEM.  USE THEM HOW YOU DESIRE.  YOU WILL HAVE THESE
24   INSTRUCTIONS AT ALL TIMES WITH YOU THROUGH YOUR DELIBERATIONS.
25              I DON'T THINK WE ARE GOING TO FINISH READING
```

APRIL 22, 2015

```
 1   THESE -- IN FACT I KNOW WE WON'T -- BY 10:15.  BUT WE WILL GET
 2   STARTED, TAKE A BREAK, AND FINISH READING THE INSTRUCTIONS
 3   AFTER THE BREAK AND MOVE IMMEDIATELY INTO CLOSING ARGUMENT.
 4          WE ARE GOING TO READ, TOGETHER, INSTRUCTIONS 1
 5   THROUGH 35.  THEY ARE ALL ENUMERATED ON THE TOP LEFT.
 6   INSTRUCTIONS 16 THROUGH 28 ARE THE INSTRUCTIONS THAT RELATE TO
 7   THE CHARGES IN QUESTION, AND WE WILL GET TO THOSE IN A MOMENT.
 8          I AM GOING TO START WITH INSTRUCTION NO. 1.
 9          (WHEREUPON THE INSTRUCTIONS WERE READ TO THE JURY BY
10          THE COURT; NOT REPORTED PURSUANT TO STIPULATION)
11   THE COURT:  LET'S TAKE OUR BREAK HERE.  IT IS 10:15.
12   WE WILL TAKE 15 MINUTES.  I THINK THE BALANCE OF THE
13   INSTRUCTIONS WILL TAKE ABOUT 10 MINUTES, THEN WE WILL MOVE
14   INTO CLOSING ARGUMENT.  THANK YOU.
15          (RECESS)
16   THE COURT:  WELCOME BACK, LADIES AND GENTLEMEN.  WE
17   ARE ALL PRESENT AND WILL RESUME WITH THE JURY INSTRUCTIONS.
18          (WHEREUPON THE INSTRUCTIONS WERE READ TO THE JURY BY
19          THE COURT; NOT REPORTED PURSUANT TO STIPULATION)
20   THE COURT:  I HAVE ONE MORE.  IT IS NOT AN
21   INSTRUCTION, IT IS AN ADMONITION.  I HAD GIVEN IT TO YOU
22   DURING THE TESTIMONY, AND I AM GOING TO REPEAT IT FOR YOU AT
23   THIS TIME.
24          YOU HAVE HEARD THAT STATEMENTS WERE MADE TO THE
25   DEFENDANT, ARASH GHAHREMAN, ASSERTING THAT THE Y-690 TRIODES
```

1361

1   ARE CLASSIFIED AS MUNITIONS BY THE UNITED STATES GOVERNMENT.

2   YOU HAVE ALSO HEARD THAT UNDERCOVER AGENT DAVID COLE TOLD THE

3   DEFENDANT THAT BECAUSE THE Y-690 TRIODE TUBES WERE CLASSIFIED

4   AS MUNITIONS THEY REQUIRE AN EXPORT LICENSE NO MATTER WHERE

5   THEY ARE TO BE SENT.  THE Y-690 TRIODE TUBES IN FACT ARE NOT

6   CLASSIFIED AS MUNITIONS BY THE UNITED STATES GOVERNMENT, AND

7   DO NOT REQUIRE AN EXPORT LICENSE TO BE SENT TO A THIRD COUNTRY

8   SUCH AS PANAMA OR THE CZECH REPUBLIC.

9        MR. GHAHREMAN IS NOT CHARGED WITH ANY VIOLATIONS OR

10  ATTEMPTS OR CONSPIRACY TO VIOLATE THE LAW SPECIFIC TO

11  EXPORTATION OF MUNITIONS.  HOWEVER, AS YOU HAVE JUST BEEN

12  INSTRUCTED, IT IS ILLEGAL TO WILLFULLY EXPORT ANY GOODS,

13  INCLUDING Y-690'S, DIRECTLY OR INDIRECTLY, TO THE COUNTRY OF

14  IRAN OR THE GOVERNMENT OF IRAN WITHOUT A LICENSE.

15       EVEN IF YOU CONCLUDE THAT MR. GHAHREMAN ERRONEOUSLY

16  BELIEVED THAT THE Y-690'S REQUIRED A LICENSE FOR EXPORT TO ANY

17  COUNTRY, YOU MAY NOT PRESUME FROM THAT EVIDENCE ALONE THAT HE

18  INTENDED THAT THEY BE EXPORTED TO IRAN SPECIFICALLY.

19       WITH THAT, WE ARE GOING TO MOVE TO CLOSING ARGUMENT.

20  CLOSING ARGUMENT IS THE OPPORTUNITY FOR COUNSEL TO ARGUE THE

21  CASE, AND THEY ARE GOING TO DO EXACTLY THAT.  THEY ARE GOING

22  TO ARGUE ALL OF EVIDENCE YOU HAVE JUST HEARD AND THEY ARE

23  GOING TO ARGUE IT FROM THEIR VANTAGE POINT.  THEY WILL SUGGEST

24  TO YOU WHAT EVIDENCE HAS SHOWN, WHAT INFERENCES YOU MIGHT DRAW

25  FROM THAT EVIDENCE, AND THEN THEY WILL ARGUE THOSE FACTS AS IT

APRIL 22, 2015

1   RELATES TO THE LAW IN THIS CASE.

2            TO THE EXTENT THAT THE ATTORNEYS ARGUE THE EVIDENCE,

3   DO KEEP IN MIND THAT WHAT THEY SAY IS NOT EVIDENCE.

4   ULTIMATELY EACH OF YOU IS THE JUDGES OF THE FACTS.

5            AND, IN ADDITION, TO THE EXTENT THEY COMMENT ON THE

6   LAW, HERE AGAIN WHAT THEY SAY IS NOT CONTROLLING, RATHER THE

7   INSTRUCTIONS THAT YOU HAVE ARE THE GUIDING PRINCIPLES IN THIS

8   CASE.

9            BECAUSE THE GOVERNMENT CARRIES THE BURDEN OF PROOF

10  AT ALL TIMES, THE ORDER OF PROCEEDINGS IS AS FOLLOWS:  MR.

11  HARRIGAN, FOR THE GOVERNMENT, WILL CONDUCT AN INITIAL CLOSING

12  ARGUMENT.  MR. JOHNSTON, ON BEHALF OF MR. GHAHREMAN, WILL HAVE

13  AN OPPORTUNITY TO PRESENT HIS CLOSING ARGUMENT.  AND THEN THE

14  GOVERNMENT WILL HAVE A FINAL OR REBUTTAL CLOSING ARGUMENT.

15           I ANTICIPATE OUR BREAKS WILL BE A LITTLE DIFFERENT

16  NOW.  WE WILL PLAY IT BY EAR.  PROBABLY WHEN MR. HARRIGAN IS

17  THROUGH WE MIGHT TAKE A BRIEF RECESS BEFORE MOVING INTO MR.

18  GHAHREMAN'S CLOSING.  WE WILL PLAY THAT BY EAR.

19           MR. HARRIGAN.

20           **MR. HARRIGAN:**  THANK YOU, YOUR HONOR.

21           THIS WAS NOT A NORMAL BUSINESS DEAL.  YOU HEARD THE

22  EVIDENCE, YOU HAVE SEEN THE EVIDENCE, AND YOU KNOW THAT.  THIS

23  WAS ABOUT AN ILLEGAL SCHEME TO SEND TECHNOLOGY, THE

24  GYROCOMPASSES, THE Y-690'S --

25           **THE COURT:**  MR. HARRIGAN, CAN WE GIVE YOU THE

APRIL 22, 2015

1363

1    MICROPHONE?  I AM SORRY.

2           **MR. HARRIGAN:**  I THINK MY VOICE WAS LOUD ENOUGH, BUT

3    I WILL SPEAK LOUDER.

4           THIS WAS NOT A NORMAL BUSINESS DEAL.  YOU KNOW THAT.

5    IT WAS ABOUT A SCHEME TO ACQUIRE U.S. TECHNOLOGY AND ILLEGALLY

6    EXPORT IT OUT OF THE COUNTRY TO IRAN.  AN ILLEGAL SCHEME THAT

7    INVOLVED A CRIMINAL NETWORK.  A CRIMINAL NETWORK THAT -- AND

8    YOU NOW KNOW -- REACHED FROM IRAN TO DUBAI ALL THE WAY TO THE

9    UNITED STATES.  AND DEFENDANT ARASH GHAHREMAN WAS A KNOWING

10   AND CRITICAL MEMBER OF THAT CRIMINAL NETWORK.  YOU KNOW THAT.

11   MAKE NO MISTAKE ABOUT IT.

12          HE WASN'T A MAN CAUGHT IN THE MIDDLE JUST TRYING TO

13   MAKE A DEAL WORK, JUST TRYING TO GET GOODS TO DUBAI; HE WAS A

14   KNOWING AND CRITICAL MEMBER OF THAT NETWORK.  YOU KNOW THAT

15   FROM THE EVIDENCE, WHAT YOU HAVE SEEN, AND WHAT YOU HAVE

16   HEARD.  HIS COMMUNICATIONS IN THE EMAILS.  THE RECORDINGS OF

17   HIS PHONE CALLS.  WHAT HE SAID, HIS WORDS.  WHAT HE DIDN'T

18   SAY.  THE FACE-TO-FACE MEETINGS IN VEGAS WITH THE UNDERCOVER

19   AGENTS AND ERGUN YILDIZ.  WHAT HE SAID.  HIS WORDS.  HIS WORDS

20   OVERWHELMINGLY ESTABLISH TO YOU THAT HE WAS A KNOWING MEMBER

21   OF THIS CRIMINAL NETWORK.

22          AND HE JOINED THAT CRIMINAL NETWORK KNOWING OF THE

23   RISK.  KNOWING WHAT HE WAS DOING -- GETTING THOSE GOODS TO

24   IRAN -- WAS AGAINST THE LAW.  WE KNOW THAT, FROM HIS WORDS.

25          HE JOINED THAT KNOWING THE RISK.  AND HE JOINED THE

APRIL 22, 2015

1    CRIMINAL NETWORK FOR ONE SIMPLE REASON:  THERE IS GOOD MONEY

2    TO BE MADE.  WE ALL KNOW THAT.  AND WHEN HE JOINED IT HE HAD A

3    CHOICE.  IF I JOIN I RISK GETTING CAUGHT AND GOING TO JAIL.

4    BUT I CAN MAKE GOOD MONEY.  WHAT DO I DO?

5            YOU KNOW WHAT HE DID.  HE CHOSE MONEY.  AND THAT IS

6    WHY HE SITS HERE BEFORE YOU TODAY.  AND IF THERE IS ANY DOUBT,

7    ANY QUESTION ABOUT WHETHER HE WAS A KNOWING MEMBER OF THIS

8    CRIMINAL CONSPIRACY, LISTEN TO HIS WORDS.

9            LISTEN TO HIS WORDS ON JUNE 13TH IN THE UNDERCOVER

10   MEETING IN HENDERSON AT THE GREEN VALLEY RANCH WHERE HE MET

11   WITH ERGUN YILDIZ AND THE UNDERCOVER AGENTS.  AND LISTEN TO

12   HIS WORDS AT THE MEETING THE NIGHT BEFORE WITH AGENT HELSING

13   AND AGENT COLE.

14           (AUDIO PLAYED)

15           THE SAME CELL WITH YOU TWO GUYS.

16           THE SAME JAIL CELL WITH THE UNDERCOVER AGENTS.  HIS

17   WORDS.  NOT THE WORDS OF AGENT COLE, NOT THE WORDS OF AGENT

18   HELSING.  NO ONE WAS NOT GIVING HIM THE OPPORTUNITY TO SPEAK.

19   HE VOLUNTEERED THAT.  YOU HEARD THAT.  THE SAME CELL.  AND HE

20   KNEW WHAT HE WAS TALKING ABOUT.  HE WASN'T CONFUSED, HE WASN'T

21   JUST GOING ALONG WITH THE GAME ACCEPTING WHATEVER THE AGENTS

22   SAID.  HE WAS TOLD, AND AGENT COLE TOLD HIM, WE ALL FACE THE

23   SAME RISK BECAUSE OF THE SANCTIONS.  BECAUSE WHAT THEY WERE

24   DOING WAS ILLEGAL.  BECAUSE THESE GOODS WERE GOING TO IRAN, WE

25   RISK GOING TO JAIL.

```
 1          AND WHAT WAS THE RESPONSE?  I WILL BE IN THE SAME
 2   CELL WITH YOU TWO.
 3          AND HE IS ENGAGED IN THAT CONVERSATION.  IN FACT, HE
 4   GESTICULATES WITH HIS HAND LIKE, IF I AM THERE HE WILL BE
 5   BLAMING ME.
 6          BUT THAT IS NOT THE ONLY TIME THAT HE ACKNOWLEDGED
 7   THE RISK.  REMEMBER WHAT HE SAID THE NIGHT BEFORE WHEN HE MET
 8   WITH AGENT HELSING AND AGENT COLE.  LET'S LISTEN TO HIS WORDS.
 9   BECAUSE, LADIES AND GENTLEMEN OF THE JURY, HIS WORDS SPEAK
10   VOLUMES.  THEY SCREAM TO YOU.  HE KNEW WHAT WAS GOING ON, HE
11   KNEW THIS WAS ILLEGAL.  HE WASN'T SOME MAN CAUGHT IN THE
12   MIDDLE JUST TRYING TO GET GOODS TO DUBAI.  THIS WAS NO
13   LEGITIMATE BUSINESS DEAL.  THIS WAS A CRIMINAL NETWORK, A
14   SCHEME.
15          (AUDIO PLAYED)
16          HIS WORDS -- WE WILL BE IN THE SAME CELL -- WHEN
17   RESPONDING TO AGENT HELSING'S COMMENTS.
18          I AM LIKE YOU, I AM A U.S. CITIZEN.  I FACE THE SAME
19   RISK AS YOU.  IF WE ARE NOT CAREFUL AND WE DO SOMETHING STUPID
20   AND GET CAUGHT BY LAW ENFORCEMENT, I WILL BE IN THE SAME CELL.
21          HE IS NOT TALKING ABOUT DOING THINGS RIGHT, HE IS
22   TALKING ABOUT DOING THINGS CAREFULLY SO THEY WON'T GET CAUGHT.
23   AND HE SAYS TWO IMPORTANT THINGS THAT ARE VERY TELLING, YOU
24   KNOW.  WHAT IS IMPORTANT TO KOORUSH, HIS PARTNER IN CRIME, MR.
25   TAHERKHANI, REALLY ONLY TWO THINGS:  DELIVERY, GOT TO GET THE
```

1    GOODS TO IRAN, THAT IS IMPORTANT; AND MONEY.

2          BUT WHAT DOES HE SAY?  HE SAYS FOR KOORUSH MONEY

3    COMES FIRST.

4          AND THAT SPEAKS VOLUMES ABOUT WHAT HE KNEW AND WHAT

5    WAS GOING ON HERE.  AS WE KNOW NOW, THAT IS WHY THIS WASN'T A

6    NORMAL BUSINESS DEAL.  WHAT THEY WERE DOING WAS ILLEGAL.

7    THERE WERE TORTUROUS PROTRACTED NEGOTIATIONS TO GET THESE

8    GOODS.  WHY?  BECAUSE THEY ARE ILLEGAL.

9          TAHERKHANI KNEW AND DEFENDANT KNEW THAT IF THEY GOT

10   RIPPED OFF, IF THEIR GOODS DIDN'T MAKE IT, THEY COULDN'T

11   RECOVER THEIR MONEY BECAUSE THEY WERE IN AN ILLEGAL BUSINESS,

12   THEY ARE A CRIMINAL NETWORK.  THEY CAN'T GO TO LAW ENFORCEMENT

13   AND SAY, HEY, CAN YOU HELP US OUT?  THEY CAN'T SUE IN COURTS.

14   THOSE WORDS SPEAK VOLUMES ABOUT WHAT HE KNEW AND WHAT WAS

15   GOING ON.

16         NOW, BEFORE I TALK WITH YOU ABOUT WHAT ALL OF THE

17   EVIDENCE HAS SHOWN, I WANT TO BRIEFLY COVER WITH YOU THE

18   COUNTS.

19         NOW, THE JUDGE HAS EXPLAINED THE COUNTS TO YOU.  YOU

20   HAVE THE JURY INSTRUCTIONS IN FRONT OF YOU.  IT IS NINE

21   COUNTS.  SEEMS LIKE A LOT OF COUNTS.  THERE ARE ELEMENTS THAT

22   WERE READ TO YOU, BUT LET ME JUST EXPLAIN.  ALL OF THESE NINE

23   COUNTS ARISE OUT OF THE SAME ILLEGAL SCHEME THAT I DESCRIBED

24   TO YOU; THAT IS TO GET THESE GOODS OUT OF THE U.S., ILLEGALLY,

25   EXPORT THEM ILLEGALLY IN VIOLATION OF U.S. LAW AND GET THEM TO

APRIL 22, 2015

1    IRAN.  TO KNOWINGLY AND INTENTIONALLY VIOLATE U.S. LAW AND GET

2    THESE TO IRAN.

3             AND THE CONSPIRACY COUNTS, THERE ARE THREE OF THEM.

4    IT IS COUNTS, 7, 2 AND 1.  THOSE CONSPIRACIES ARE ALL JUST

5    PART AND PARCEL OF THAT SAME SCHEME.  AND IT MAKES SENSE IF

6    YOU LOOK AT IT.  BECAUSE STARTING WITH COUNT 7 -- I AM GOING

7    TO START BACKWARDS, BUT IF YOU ARE INVOLVED IN AN ILLEGAL

8    SCHEME TO GET GOODS TO IRAN YOU HAVE GOT TO HAVE MONEY TO PAY

9    FOR THOSE GOODS.  AND THAT IS WHAT COUNT 7 COVERS.  THOSE ARE

10   THE MONEY LAUNDERING COUNTS.  THAT REALLY JUST MEANS THEY

11   AGREED TO SEND MONEY FROM DUBAI TO THE UNITED STATES TO

12   FURTHER THEIR SCHEME, TO GET THOSE GOODS ILLEGALLY OUT OF THE

13   UNITED STATES TO IRAN.

14             AND AFTER THEY GET THE MONEY THERE, THEY GOT TO BUY

15   IT AND RECEIVE THE GOODS IN THE UNITED STATES.  AND THAT IS

16   SIMPLY WHAT COUNT 2 IS, IT IS AN AGREEMENT TO GET AND BUY

17   THOSE GOODS BEFORE THEY ARE EXPORTED, KNOWING THEY ARE GOING

18   TO BE SENT OUT OF THE UNITED STATES ILLEGALLY.  AGAIN TO IRAN.

19   INDIRECTLY OR DIRECTLY.

20             AND FINALLY THE CONSPIRACY ON COUNT 1 IS SIMPLY THE

21   ACTUAL AGREEMENT TO EXPORT OR SUPPLY THOSE GOODS FROM THE

22   UNITED STATES TO IRAN IN VIOLATION OF U.S. LAW.

23             THREE CONSPIRACIES, REALLY ALL ARISE OUT OF THE SAME

24   FACTS.  AND THE OTHER COUNTS ARE JUST WHAT WE CALL SUBSTANTIVE

25   COUNTS OR CRIMES THAT ARE DONE IN FURTHERANCE OF EACH OF THOSE

APRIL 22, 2015

1    CONSPIRACIES.  AND THAT IS ALL THOSE COUNTS DEAL WITH, THEY

2    DEAL WITH TWO TIMES IN WHICH MONEY WAS TRANSMITTED, THEY DEAL

3    WITH THE ATTEMPTS TO EXPORT BOTH THE GYROCOMPASSES AND THE

4    Y-690'S, AND THEY DEAL WITH THE PURCHASE OR RECEIPT OF BOTH OF

5    THOSE GOODS.  AGAIN, ALL IN KNOWING VIOLATION OF LAW, WITH THE

6    INTENT TO GET THOSE GOODS TO THE UNITED STATES [VERBATIM].

7            SO WHEN I TALK ABOUT THE ELEMENTS OF THOSE COUNTS I

8    WANT TO TRY TO SIMPLIFY THINGS FOR YOU, BECAUSE A LOT OF THE

9    ELEMENTS FOR THE COUNTS, THEY OVERLAP.  RIGHT.  AND A LOT OF

10   THEM, AS I THINK YOU WILL FIND OUT, REALLY AREN'T IN DISPUTE

11   IN THIS CASE.  AND REALLY WHAT IT COMES DOWN TO, NOT TO HAVE A

12   SPOILER HERE, BUT IT COMES DOWN TO:  DID DEFENDANT KNOWINGLY

13   JOIN THAT CONSPIRACY, THOSE CONSPIRACIES.  IN OTHER WORDS, DID

14   HE KNOW AND INTEND THAT THE OBJECT OF THE CONSPIRACIES WERE TO

15   GET THOSE GOODS TO IRAN -- NOT TO DUBAI, BUT GET THEM TO IRAN,

16   DIRECTLY OR INDIRECTLY.  ALL RIGHT.  DID HE HAVE THE

17   KNOWLEDGE, THE KNOWLEDGE AND THE INTENT.

18           SO I WANT TO TALK WITH YOU WHAT IS NOT AT ISSUE AND

19   TALK A LITTLE BIT ABOUT THE COUNTS.  THERE IS NO QUESTION THAT

20   A CONSPIRACY EXISTED HERE, LADIES AND GENTLEMEN.  YOU HEARD

21   FROM ERGUN YILDIZ WHY TIG MARINE WAS SET UP.  HE SET IT UP OR

22   JOINED IT WITH KOORUSH.  IT WAS A FRONT COMPANY.  WE KNOW

23   THAT, AND THE EVIDENCE TELLS US IT WAS.

24           KOORUSH TAHERKHANI'S CUSTOMER BASE WAS IN IRAN.  YOU

25   HEARD ERGUN YILDIZ TELL YOU ON THE STAND HE WAS JUST THE FACE

APRIL 22, 2015

```
 1    MAN OF THE COMPANY, THE FACE OF THE COMPANY.  HE WAS GETTING

 2    PAID, OR PROMISED TO BE PAID, 80 GRAND A YEAR TO DO THAT.  TO

 3    HELP TAHERKHANI CREATE A FACE THAT THIS WAS NOT GOING BACK TO

 4    IRAN, BECAUSE OF HIS NATIONALITY.

 5            NO QUESTION THERE WAS AN AGREEMENT.  THE QUESTION

 6    IS, DID THE DEFENDANT JOIN THAT CONSPIRACY.  BY DOING THE ACTS

 7    HE DID WAS HE KNOWING THAT HE WAS ASSISTING THEM.  DID HE KNOW

 8    OF THE GOAL OF THE CONSPIRACY, DID HE HELP TO ACCOMPLISH IT.

 9    AND THAT IS SIMPLY KNOWING THAT IT WAS GOING TO IRAN.

10            DID THE DEFENDANT ACT WILLFULLY.  WELL, YOU HEARD

11    THE DEFENDANT'S TESTIMONY ON THE STAND.  ASKED BY HIS OWN

12    COUNSEL, I KNOW ABOUT THE SANCTIONS.

13            AND THAT IS REALLY ALL WE HAVE TO PROVE IN TERMS OF

14    WILLFULNESS.  IT IS JUST KNOWING THAT AN ACT --

15            MR. JOHNSTON:  OBJECTION.  MISSTATES THE LAW.

16            THE COURT:  I WOULD OVERRULE THE OBJECTION WITH THE

17    ADMONITION THAT THE INSTRUCTION WITH RESPECT TO WILLFULNESS

18    AND KNOWLEDGE ARE SET OUT SPECIFICALLY IN YOUR INSTRUCTIONS,

19    AND I WOULD ASK THE MEMBERS OF THE JURY TO BE GUIDED BY THOSE

20    PRINCIPLES.

21            MR. HARRIGAN.

22            MR. HARRIGAN:  THANK YOU, YOUR HONOR.

23            YOU WILL HAVE THE INSTRUCTIONS WITH YOU, AND THE

24    INSTRUCTION ON WILLFULNESS, IT IS NOT A COMPLICATED

25    INSTRUCTION.  IT IS KNOWING THAT YOUR ACTIONS VIOLATE THE LAW.
```

APRIL 22, 2015

1338

```
 1   AND IN THIS CASE WE HAVE TO PROVE, AND THE EVIDENCE SHOWS,
 2   THAT HE ACTED KNOWING THAT WHAT HE WAS DOING -- IF WE CAN SHOW
 3   THAT HE KNEW IT WAS GOING TO IRAN, WHICH, I TELL YOU, THE
 4   EVIDENCE OVERWHELMINGLY SHOWS THAT, THAT THOSE ACTIONS VIOLATE
 5   U.S. LAW.  THEY VIOLATE U.S. EXPORT LAWS.  TO SUGGEST
 6   OTHERWISE WOULD BE TO IGNORE ALL THE FACTS THAT YOU HAVE
 7   HEARD.  ALL OF HIS STATEMENTS, ALL OF THE TALKS ABOUT
 8   SANCTIONS.  HIS OWN STATEMENT ON THE EMAIL, YOU KNOW, I KNOW
 9   ABOUT THE SANCTIONS.
10        WE JUST HEARD ABOUT THAT ON CROSS-EXAMINATION.  TO
11   SUGGEST OTHERWISE, I SUBMIT TO YOU, IS A DISTORTION OF THE
12   EVIDENCE.  NOT AN ISSUE THERE, I REALLY DON'T BELIEVE IT IS AN
13   ISSUE.  BUT I WILL HAVE A CHANCE TO RESPOND IF MY LEARNED
14   COUNSEL AND COLLEAGUE HERE DISAGREES.
15        NO LICENSE TO SEND TO IRAN.  THAT IS REALLY NOT A
16   QUESTION.  YOU HEARD FROM MOLLY MILLER FROM OFAC, THERE WAS NO
17   LICENSE ISSUED FOR THESE PRODUCTS FOR DEFENDANT OR ANY OF HIS
18   ACCOMPLICES OR ANYBODY THAT WAS INVOLVED IN THIS ASSOCIATED
19   WITH TIG MARINE.  DON'T REALLY BELIEVE IT IS A QUESTION.  ALL
20   RIGHT.
21        AND THEN LOOKING AT THE ATTEMPT COUNTS, SO THOSE ARE
22   THE ATTEMPT TO EXPORT.  AND ONE OF THE THINGS YOU WILL HEAR,
23   OR YOU HAVE HEARD, IN ORDER TO PROVE AN ATTEMPT -- AN ATTEMPT
24   IS WHAT IS CALLED AN INCOMPLETE CRIME, OR INCHOATE CRIME.  IT
25   DOESN'T HAVE TO BE COMPLETED.  AND WHAT IS NECESSARY IS TO
```

APRIL 22, 2015

```
 1   SHOW THAT A PERSON HAS THE INTENT TO COMMIT THAT CRIME, FOR
 2   EXAMPLE THE ATTEMPT TO EITHER SHIP OR SUPPLY THE ITEMS IN THIS
 3   CASE.  ALL RIGHT.
 4          BUT IT IS NOT ENOUGH JUST TO HAVE MERE PREPARATION,
 5   YOU HAVE TO TAKE SUBSTANTIAL STEPS.  SO THERE IS NO QUESTION
 6   HERE, BASED ON THE TESTIMONY OF AGENT HELSING, THAT DEFENDANT
 7   DID EVERYTHING YOU COULD DO TO MAKE SURE THOSE GOODS WOULD GET
 8   OUT OF THE UNITED STATES.
 9          NOW, MIND YOU, THE ISSUE MAY BE DID HE KNOW THEY
10   WERE GOING TO IRAN?  BUT THE EXTENT OF WHAT HE DID, HE WENT
11   WITH AGENT HELSING TO THE UPS STORE IN KEARNEY MESA.  HE
12   HELPED UNLOAD THE BOXES, BROUGHT THEM INTO THE STORE.  IN FACT
13   THEY USED HIS KNIFE TO LOOK AND MAKE SURE THE CONTENTS WERE
14   STILL THERE.  YOU KNOW WHY THEY DID THAT?  SO THEY WOULD MAKE
15   SURE THEY WEREN'T GETTING RIPPED OFF.  THEN HE HELPED FILL OUT
16   PAPERWORK, AND IT WAS HANDED OVER.  THERE WAS NOTHING LEFT TO
17   BE DONE.  THAT IS A SUBSTANTIAL STEP, AND THAT IS WHY THERE IS
18   NO ISSUE AS TO ATTEMPT TO EXPORT OR SUPPLY.
19          DID THEY BUY THE GYROS?  BECAUSE THAT IS PART OF THE
20   COUNT OF 5 AND 6, DID THEY BUY OR RECEIVE THE GYROCOMPASSES
21   AND THE Y-690'S PRIOR TO THEIR EXPORTATION KNOWING THEY WERE
22   INTENDED FOR ILLEGAL EXPORT TO IRAN.  NO QUESTION THEY BOUGHT
23   THE GYROS.  YOU SAW THE CONTRACTS.  AND BY BUYING IT SIMPLY
24   MEANS A PAYMENT OF MONEY FOR THE RECEIPT OR POSSESSION OF A
25   GOOD.
```

APRIL 22, 2015

1    THERE WAS A CONTRACT HERE.  THEY PAID MONEY.  IN

2  FACT, YOU HEARD THE PLAN.  THE PLAN WAS WHEN AGENT HELSING

3  WENT TO THE UPS STORE, THE PLAN WAS TO ASK THEM HOW DID THEY

4  WANT TO HANDLE IT.  THEY WERE ESSENTIALLY IN CONTROL OF THOSE

5  GOODS.  AGENT HELSING MAY HAVE SIGNED AS THE SHIPPER, AS THE

6  EXPORTER, BUT IT WAS THEIR DETERMINATION WHERE IT WAS GOING TO

7  GO.  THEY FILLED OUT THE DESTINATION OF WHERE IT WAS GOING.

8  THEY BOUGHT, THEY RECEIVED THOSE GOODS.  NO QUESTION ABOUT

9  THAT.  NOT AN ISSUE.

10    AND THE FINAL TWO ISSUES HERE THAT ARE TWO FACTORS

11  THAT ARE NOT AT ISSUE WERE, WAS THE Y-690'S GOING TO IRAN?

12  YOU HEARD CONCLUSIVE EVIDENCE THAT THE CUSTOMERS FOR THOSE

13  Y-690'S WERE GOING TO IRAN.

14    I DIRECT YOU TO LOOK AT, OR IF YOU REMEMBER,

15  EXHIBITS 211 THROUGH 217.  AND THAT WAS A SERIES OF EMAILS

16  THAT DEALT WITH THE DEFENDANT GETTING THE DATA SHEET FOR THE

17  Y-690'S.  TELLING AGENT COLE, IT IS NEEDED FOR THE CUSTOMER TO

18  MAKE THE DEAL.

19    WHERE DID DEFENDANT SEND THAT TO?  HIS PARTNER,

20  KOORUSH TAHERKHANI.  RIGHT?

21    WHAT DID KOORUSH TAHERKHANI DO WITH THAT?  WE KNOW

22  WHAT HE DID WITH IT, HE SENT IT TO AN INDIVIDUAL BY THE NAME

23  OF MEHDI SARKHOSH.  AND WHO IS MEHDI SARKHOSH?  YOU KNOW MEHDI

24  SARKHOSH SAID, THANKS FOR THE DATA SHEET.  I WANT TO ORDER

25  100.

APRIL 22, 2015

```
1              HE SENT BACK AN EMAIL WITH A REQUEST, ON LETTERHEAD
2    FOR A COMPANY THAT WAS BASED WHERE?  TEHRAN, IRAN,
3    KOHANDIAREMAD IN TEHRAN, IRAN.  NO QUESTION THEY WERE GOING TO
4    IRAN.  AGAIN THE QUESTION IS, DID HE KNOW?
5              AND FINALLY AS TO THE GYROS.  THERE IS NO QUESTION,
6    THE EVIDENCE IS OVERWHELMING.  THOSE GYROCOMPASSES WEREN'T
7    GOING TO WESAL SHIPPING.  THERE IS NO EVIDENCE THAT THEY WERE
8    GOING TO WESAL SHIPPING.  WE KNOW THERE WAS AN EQUIPMENT
9    MISMATCH.  WHEN THEY PUT THAT IN THE FALSE END USER STATEMENT
10   NORTHROP GRUMMAN CAME BACK AND SAID, YOU KNOW WHAT?  THIS IS
11   LIKE PUTTING A MERCEDES ENGINE IN A TRICYCLE.  PREPOSTEROUS.
12   YOU WOULDN'T DO IT.
13             AND AS YOU HEARD, THE THOUSANDS OF EMAILS THAT AGENT
14   HAMAKO LOOKED THROUGH TO FIND OUT WAS THERE ANY COMMUNICATION
15   WITH WESAL SHIPPING ABOUT ANY GOODS, ANYTHING, ANYTHING TO DO
16   WITH GYROCOMPASSES.  AND WHAT DID HE FIND?  ONE EMAIL, FROM
17   2011, IN WHICH KOORUSH TAHERKHANI WAS TALKING TO WESAL
18   SHIPPING ABOUT ACQUIRING A BOAT.  USING THEM TO ACQUIRE A BOAT
19   FOR ONE OF HIS CUSTOMERS.  NOTHING ABOUT GYROS.  COMMON SENSE
20   TELLS YOU THIS WAS GOING TO IRAN.
21             AGAIN, IT COMES BACK TO THE QUESTION, I THINK WHAT
22   IS AT ISSUE IS, DID HE KNOW THAT?  WAS HE A KNOWING
23   PARTICIPANT?  AND THE ANSWER IS AN OVERWHELMING YES.  THERE IS
24   OVERWHELMING EVIDENCE OF HIS KNOWLEDGE.
25             HOW DO WE KNOW THAT?  WELL, WHEN I GO THROUGH THE
```

1    EVIDENCE WITH YOU I WANT TO DIVIDE IT UP INTO THREE AREAS,

2    KIND OF CHRONOLOGICALLY, IN WHAT I CALL PRE DAVID MILLS,

3    BEFORE THIS DEFENDANT EVER CONTACTED HIM.  AND THEN TALK TO

4    YOU A LITTLE BIT ABOUT THE COMMUNICATIONS ON THE TELEPHONE AND

5    EMAIL FROM DECEMBER 21ST THROUGH MAY 30TH, WHEN THEY TALKED,

6    DEFENDANT AND DAVID MILLS, OR AGENT COLE, ON THE PHONE AND IN

7    EMAIL.  AND THEN FINALLY TALK TO YOU ABOUT THE EVIDENCE FROM

8    THE FACE-TO-FACE MEETINGS.  BECAUSE YOU SEE AN EVOLUTION, AND

9    WE WILL TALK ABOUT THAT, FROM DEFENDANT BEING MORE CAUTIOUS

10   ABOUT TALKING ABOUT HIS ILLEGAL ACTIVITIES ON THE PHONE OR

11   EMAIL, TO THOSE FACE-TO-FACE MEETINGS WHERE HE ADMITS -- AND

12   YOU HEARD IT -- I FACE THE SAME RISK AS YOU.  I AM GOING TO

13   END UP IN A JAIL CELL IF WE GET CAUGHT.

14        SO LET'S TALK ABOUT THE PRE DECEMBER 21, 2012 TIME

15   PERIOD, A TIME PERIOD WHEN, MIND YOU, IF HE WAS A MAN IN THE

16   MIDDLE, HE COULDN'T BE, IT IS IMPOSSIBLE, BECAUSE THERE WAS NO

17   DAVID MILLS.  AND YOU KNOW WHAT THIS SHOWS WHEN YOU LOOK AT

18   THE EVIDENCE?  IT SHOWS THAT THE CRIMINAL SCHEME, AND HIS

19   PARTICIPATION IN IT, WAS ALREADY AFOOT.  HE WAS ALREADY

20   INVOLVED IN IT.

21        HOW DO WE KNOW THAT?  WE KNOW THAT FROM THE

22   CIRCUMSTANCES.  WE KNOW THAT FROM THE CIRCUMSTANCES OF THE

23   RELATIONSHIP WITH TAHERKHANI, HIS OWN BACKGROUND AND

24   EXPERIENCE.  AND WE ALSO KNOW IT FROM THOSE EARLY

25   COMMUNICATIONS AND EMAILS.  IF YOU LOOK AT THAT, WE KNOW

APRIL 22, 2015

1   WHAT'S GOING ON.  COMMON SENSE TELLS US WHAT IS GOING ON.

2   BECAUSE, LADIES AND GENTLEMEN OF THE JURY, THAT IS WHAT YOU

3   BRING TO OUR SYSTEM OF JUSTICE, YOUR COMMON SENSE.

4        WHEN YOU GO BACK IN THE JURY ROOM AND DELIBERATE YOU

5   DON'T CHECK YOUR COMMON SENSE AT THE DOOR.  YOU LOOK AT THE

6   EVIDENCE, ALL OF THE EVIDENCE, AND ASK YOURSELF, DOES WHAT

7   DEFENDANT IS TELLING ME COMPORT WITH WHAT I KNOW HOW THINGS

8   WORK IN THE REAL WORLD?  DOES THIS MAKE SENSE?  USE YOUR

9   COMMON SENSE.  AND LET'S TAKE A LOOK AT THAT EVIDENCE.

10        I THINK IT IS IMPORTANT WE TALK ABOUT THIS ILLEGAL

11   SCHEME THAT WE KIND OF STEP BACK FIRST AND TAKE A LOOK WHAT

12   WAS GOING ON IN THE BROADER PICTURE, AND HOW DOES THAT SHOW US

13   THAT DEFENDANT WAS A KNOWINGLY PARTICIPANT.  WE KNOW THIS.

14        AND WE HEARD FROM GREG TOPCZEWSKI.  REMEMBER?  HE

15   WAS A SECURITY OFFICER FROM NORTHROP GRUMMAN.  HIS BASIC JOB

16   WAS NOT A CRIMINAL INVESTIGATOR, NOT AT ALL, BUT TO PROTECT

17   THE CORPORATION.  RIGHT?  HE WAS MAKING DETERMINATIONS WHEN

18   PEOPLE MADE INQUIRES, BECAUSE THAT IS IMPORTANT TO

19   CORPORATIONS, THAT THEY COMPLY WITH U.S. LAW.  TO MAKE SURE

20   THAT A GOOD IS BEING SOUGHT FROM THEM, WHEN THEY HAVE

21   SENSITIVE EQUIPMENT LIKE THE GYROCOMPASS, THAT IT DOESN'T GET

22   INTO THE WRONG HANDS.  AND THEY DON'T KNOWINGLY ASSIST THAT.

23   AND HE HAD A LOT OF EXPERIENCE IN THAT, AND HE HAD A LOT OF

24   EXPERIENCE IN GYROCOMPASSES.

25        YOU MAY RECALL, OF ALL OF THE SUSPICIOUS CONTACT

APRIL 22, 2015

1   REPORTS HE TOOK, I THINK HE SAID ABOUT OVER 80, 90 PERCENT

2   JUST DEALT WITH THE GYROCOMPASS.  AND THEY DEALT WITH

3   COMPANIES SUSPICIOUSLY IN THIRD COUNTRIES REQUESTING IT, YOU

4   KNOW, PLACES LIKE DUBAI.

5          AND KOORUSH TAHERKHANI WAS IN IRAN, WE KNOW HAD A

6   HUGE CUSTOMER BASE IN IRAN, KNEW THIS.  SO WHAT DID HE DO?  HE

7   WANTED TO MAKE SOME MONEY.  HE KNEW THERE WAS MONEY TO BE MADE

8   BECAUSE THERE IS A HUGE DEMAND FOR U.S. GOODS.  BUT THE

9   PROBLEM IS IT IS ILLEGAL.  IT IS ILLEGAL.  SO HE DID WHAT MR.

10  TOPCZEWSKI TOLD YOU INDIVIDUALS DO WHO ARE INVOLVED IN THE

11  CRIMINAL NETWORKS, THEY SET UP FRONT COMPANIES.  HE SET UP A

12  COMPANY CALLED TIG MARINE IN DUBAI.

13         BUT THE PROBLEM WITH THAT IS SETTING IT UP UNDER HIS

14  NAME DIDN'T NECESSARILY -- JUST BECAUSE IT WAS IN DUBAI IT

15  DIDN'T TAKE AWAY SUSPICION.  AS GREG TOPCZEWSKI TOLD YOU,

16  COMPANIES IN THE U.S. ALSO LOOK TO SEE, HEY, WHO IS ASSOCIATED

17  WITH THAT?  AND BEING THE DIRECTOR AND MANAGER WASN'T GOING TO

18  BE GOOD, WASN'T GOING TO HELP HIM OUT.  SO WHAT DID HE DO?  HE

19  PUT ERGUN YILDIZ AS A FACE OF THAT COMPANY.  YOU HEARD FROM

20  ERGUN YILDIZ ON THE STAND.  HE WAS GETTING PAID 80 GRAND JUST

21  TO BE THE FACE OF THE COMPANY.

22         AND THEY SET UP IN DUBAI BECAUSE, AS YOU CAN SEE ON

23  THE SCREEN THERE, IT IS JUST 92 MILES FROM DUBAI ACROSS THE

24  STRAITS OF HORMUZ TO BANDAR ABBAS IN IRAN.  AND THAT IS A SPIT

25  COMPARED TO THE DISTANCE BETWEEN DUBAI AND THE UNITED STATES.

APRIL 22, 2015

```
1          SO THIS CRIMINAL NETWORK NEEDED, AND TAHERKHANI
2   KNEW, SOMEBODY IN THE UNITED STATES TO ASSIST THEM.  AND THEY
3   HAD THAT PERSON:  DEFENDANT ARASH GHAHREMAN.
4          AND WHY DO WE KNOW FROM THE CIRCUMSTANCE THAT HE WAS
5   A KNOWING MEMBER OF THAT CONSPIRACY?  WE KNOW BECAUSE OF HIS
6   BACKGROUND AND EXPERIENCE.  WE ARE NOT TALKING ABOUT ANYONE --
7   THIS IS NOT TAMMY FROM TIMCO, RIGHT?  WHO IS IN INDIANA, THE
8   SUPPLIER THAT DEFENDANT TALKED ABOUT.  THIS IS SOMEBODY WHO
9   LIVED IN IRAN FOR 37 YEARS.  WHO WAS EDUCATED IN IRAN.  HAD A
10  BACHELOR OF SCIENCE IN MARINE ENGINEERING, EMPHASIS IN
11  SHIPBUILDING.  HE HAD SPENT 10 YEARS AFTER HE GRADUATED IN THE
12  IRANIAN SHIPPING INDUSTRY AS A MARINE ENGINEER, AND HE
13  RECEIVED TRAINING FROM IRISL, THE ISLAMIC REPUBLIC OF IRAN
14  SHIPPING LINES.  AND AT THE TIME HE WAS CONTACTED WHERE WAS HE
15  WORKING?  HE WAS A U.S. CITIZEN WORKING IN A SHIPYARD IN THE
16  U.S., AND HAD EXPERIENCE AND CONTACTS.  REMEMBER WHAT HE SAID?
17  I WORK AS A VENDOR, THAT WAS PART OF MY JOB, CONTACTING TO GET
18  PARTS FOR GMD SHIPYARDS.
19          PERFECT FOR TAHERKHANI, AND MORE PERFECT AND MOST
20  IMPORTANT BECAUSE OF THE RELATIONSHIP THAT HE HAD WITH THE
21  DEFENDANT.  WHAT WAS THAT RELATIONSHIP?  HE MAY WANT TO
22  DISTANCE HIMSELF AND CLAIM, WE HADN'T TALKED TO EACH OTHER FOR
23  YEARS.  BUT LOOK AT THE FACTS.  THEY WENT TO SCHOOL TOGETHER.
24  THEY WERE DORM MATES.  THEY WENT TO THE SAME COLLEGE, THEY HAD
25  THE SAME MAJOR.  AND AFTER THEY BOTH GRADUATED THEY WERE BOTH
```

APRIL 22, 2015

1   IN THE SHIPPING INDUSTRY.  HE WASN'T A STRANGER TO HIM.  THEY

2   KNEW EACH OTHER, THEY KNEW THEIR CHARACTERS.

3           AND WHEN HE REACHED OUT TO HIM HE KNEW THIS:  HE IS

4   IN THE U.S., HE KNOWS HOW TO ACQUIRE GOODS BECAUSE OF HIS --

5   WHERE HE IS SITUATED.  HE KNOWS WHAT GOODS WE WILL NEED.  HE

6   HAS BEEN IN IRAN.  HE IS NOW IN THE U.S., AND HE IS A U.S.

7   CITIZEN.  SO IF HE CONTACTS THE VENDORS THERE IS NOT GOING TO

8   BE IMMEDIATE SUSPICION.  I HAVE GOT EVEN MORE COVER.

9           AND HOW DO WE KNOW THAT HE IS A KNOWING MEMBER FROM

10  THAT?  WE KNOW BECAUSE WE KNOW WHAT DEFENDANT SAID AND WHAT

11  THE EVIDENCE TELLS YOU.  HE NEEDED SOMEBODY WHO WAS TRUSTED.

12  REMEMBER, THEY WERE INVOLVED IN AN ILLEGAL SCHEME.  IT IS A

13  CRIMINAL NETWORK.  THEY CAN'T RELY ON LAW ENFORCEMENT TO

14  PROTECT THEIR MONEY OR MAKE SURE GOODS GET THERE.  YOU HAVE

15  GOT TO HAVE SOMEBODY IN THE UNITED STATES WHO CAN ASSURE YOU

16  DO THAT.  DEFENDANT WAS THAT PERSON.  THAT IS WHAT THE

17  EVIDENCE TELLS YOU.  THAT IS WHAT SHOWS KNOWLEDGE, JUST

18  LOOKING AT HOW THIS IS SET UP.

19          BUT THERE IS MORE, BECAUSE WE LOOK AT THOSE INITIAL

20  COMMUNICATIONS -- LET'S GO THROUGH THOSE.

21          REMEMBER THE FIRST CONTACT.  THIS IS THE EMAIL,

22  GOVERNMENT'S EXHIBIT 201, THAT WAS SENT TO THE DEFENDANT BY

23  TAHERKHANI ASKING HIM TO GET A QUOTE FOR FOUR TO SIX GYROS.

24          REMEMBER WHAT HE SAID?  HUGE MONEY.

25          WELL, WE KNOW THERE WAS HUGE MONEY, RIGHT?  REMEMBER

```
 1    WHAT DEFENDANT TOLD YOU HE WOULD GET FOR 100 -- OR WHAT IT
 2    WOULD COST FOR 100 GYROS?  OVER 6 MILLION.  HIS TAKE WAS GOING
 3    TO BE $120,000.  THAT IS A NICE CHUNK OF CHANGE FOR JUST
 4    PUTTING TWO PEOPLE TOGETHER, RIGHT?
 5           AND ALSO HE SAYS JUST EXACTLY WHAT YOU WOULD THINK.
 6    YOU ARE IN AN AREA WHERE YOU CAN REALLY HELP US OUT.  THAT
 7    WOULD BE GREAT.  YOU ARE WORKING IN THE SHIPYARD, THAT WOULD
 8    BE GREAT.
 9           AND MOST TELLING ABOUT THIS -- AND MAKE NO
10    MISTAKE -- IS THIS LAST COMMENT, I HAVE TO TALK TO YOU ON
11    SKYPE.
12           WHY DOES HE SAY THAT?  HE SAYS THAT BECAUSE, AS WE
13    KNOW, AS AGENT COLE TOLD YOU, PEOPLE INVOLVED IN CRIMINAL
14    NETWORKS DON'T WANT TO RECORD THINGS IN EMAILS.  THAT IS WHAT
15    THIS IS ABOUT.  THEY TALKED ON SKYPE.  AND THE EVIDENCE SHOWS
16    YOU THAT THE FURTHER COMMUNICATIONS, HE KNEW WHAT WAS GOING
17    ON.
18           NOW, DEFENDANT TOLD YOU WHEN HE WAS FIRST CONTACTED
19    HE CALLED TAHERKHANI, BECAUSE HE KNEW HE WAS IRANIAN, AND
20    ASKED, ARE THESE GOING TO IRAN?  AND WAS TOLD NO.
21           WELL, I AGREE THAT THE EVIDENCE SHOWS THEY SPOKE,
22    AND I AGREE THAT QUESTION WAS ASKED; BUT THE EVIDENCE TELLS
23    YOU THE ANSWER WAS A LOT DIFFERENT THAN WHAT DEFENDANT SAID.
24    BECAUSE THE EVIDENCE SHOWS THAT ALL OF THEIR ACTIONS FROM THAT
25    POINT FORWARD ARE TO PROTECT THEMSELVES, TO MAKE SURE THAT
```

APRIL 22, 2015

```
 1   THEY AREN'T CAUGHT, THAT THEY DON'T GO TO JAIL.  THAT THEY CAN
 2   GET THE GOODS, AND THAT MR. TAHERKHANI'S MONEY IS PROTECTED.
 3            IF YOU LOOK AT THE NEXT EMAIL -- AND THIS OCCURS IN
 4   GOVERNMENT'S EXHIBIT 202.  THIS IS AFTER THE DEFENDANT HAS
 5   CONTACTED TAMMY AT TIMCO TO TRY TO GET THE GYROCOMPASS.  AND
 6   HE COMES BACK TO MR. TAHERKHANI.  WHAT DOES HE SAY?  THIS IS A
 7   SENSITIVE SALE.  HOMELAND SECURITY MIGHT HAVE TO BE NOTIFIED.
 8            WHY IS HE SAYING THAT?  WE KNOW WHY HE SAYS THAT,
 9   BECAUSE HE KNOWS WHAT THEY ARE DOING IS ILLEGAL.  AND WHAT HE
10   IS TELLING MR. TAHERKHANI IS:  U.S. LAW ENFORCEMENT MAY BE
11   WATCHING, WE HAVE GOT TO BE CAREFUL ABOUT WHAT WE DO.  BE
12   CAREFUL.  THEY WANT END USER INFORMATION, BUT BE CAREFUL.
13            SO THEY SUBMIT THAT END USER INFORMATION.
14            BACK UP A LITTLE BIT.
15            ANOTHER FACTOR IS THAT DEFENDANT, IN GETTING THIS
16   FOR MR. TAHERKHANI, HE DIDN'T GO TO NORTHROP GRUMMAN, HE WENT
17   TO AN OBSCURE THIRD PARTY SUPPLIER WHICH, DESPITE WHAT
18   DEFENDANT MAY SAY ON THE STAND, THAT IT IS COMMON PLACE, WITH
19   SUPPLIERS, IT IS CHEAPER.  REMEMBER WHEN I ASKED HIM AND I HAD
20   TO ASK THE QUESTION OVER AND OVER AGAIN JUST TO GET THE COMMON
21   RESPONSE THAT GENERALLY IF YOU GO TO THE MANUFACTURER THE
22   GOODS ARE GOING TO BE CHEAPER.  ALL RIGHT.  HE WOULDN'T ADMIT
23   TO THAT.  AND WHY WOULDN'T HE ADMIT TO THAT READILY?  BECAUSE
24   HE KNOWS IT DIDN'T MAKE SENSE, TO GET THIS GOOD HE WAS GOING
25   TO A SUPPLIER, PARTICULARLY IN INDIANA, RATHER THAN NORTHROP
```

APRIL 22, 2015

```
1    GRUMMAN.
2              WHY DID HE DO THAT?  WE KNOW WHY HE DID THAT.  THERE
3    IS LESS QUESTIONS ASKED.  HE DIDN'T WANT TO GO TO THE
4    MANUFACTURER.  IN FACT, AS WE KNOW FROM HIS CONVERSATION WITH
5    AGENT COLE LATER ON IN GOVERNMENT EXHIBIT 301, HE EXPLAINED, I
6    TOLD HIM WE DON'T WANT TO GO TO THE MANUFACTURER.
7              WHEN TAMMY DIDN'T LISTEN TO HIM AND WENT TO THE
8    MANUFACTURER HE SAID, I HAD TO KEEP GOING BECAUSE -- HIS
9    WORDS -- THERE WOULD BE A PROBLEM.
10             AND WHAT WAS THAT PROBLEM?  SUSPICIONS WOULD BE
11   RAISED.  PEOPLE WOULD ASK QUESTIONS.  THAT SHOWS HE KNEW.
12             NOW, THIS PLAN WENT AWRY, AND HE GETS -- BECAUSE THE
13   SALE WAS DENIED.  AND HE GETS THE EMAIL BACK FROM TAMMY OR
14   GETS THE INFORMATION BACK FROM TAMMY AND TELLS TAHERKHANI,
15   THEY DENIED IT.
16             AND WHY DID THEY DENY IT?  BECAUSE OF COMPANY
17   ASSOCIATIONS AND THE EQUIPMENT MISMATCH.  AGAIN, THIS IS WHERE
18   HE IS TOLD IT MAKES NO SENSE, THE STATED USE THAT YOU SAID
19   THAT IT IS GOING TO GO ON THIS VESSEL MAKES ABSOLUTELY NO
20   SENSE.
21             AND WHAT IS HIS RESPONSE TO THAT, TO MR. TAHERKHANI.
22   IF HE IS SO CONCERNED AND HE WAS SUSPICIOUS THAT MR.
23   TAHERKHANI WAS FROM IRAN, IS THERE ANYTHING IN THE EMAIL, ASK
24   YOURSELF, THAT HE FORWARDED TO MR. TAHERKHANI ASKING THAT
25   QUESTION?  IS THERE ANY INDICATION HE WENT BACK TO TAMMY AT
```

1    TIMCO AND SAID, WAIT A SECOND, THIS REALLY WORKS.  THIS WORKS.

2    THEY ARE WRONG.  THIS IS A REGULAR, LEGITIMATE BUSINESS DEAL.

3            THAT IS WHAT YOU WOULD EXPECT.  THAT IS HOW YOU

4    WOULD EXPECT PEOPLE WOULD ACT IN THE REAL WORLD.  USE YOUR

5    COMMON SENSE.

6            WHAT IS HIS RESPONSE TO THAT?  HE SIMPLY FORWARDS IT

7    ON TO MR. TAHERKHANI.  AND MR. TAHERKHANI RESPONDS BACK IN

8    KIND.  DOESN'T ASK A QUESTION, WHAT DO YOU MEAN?  THIS IS

9    SUPPOSED TO GO ON THE WESAL-V.  WE CAN EXPLAIN TO THEM IT IS.

10           HE SAYS, THIS IS A REASON THAT I ASKED YOU TO GO TO

11   THE DISTRIBUTORS.

12           THEY DON'T DISPUTE THAT IT WAS A MISMATCH.  THEY

13   DON'T DISPUTE IT, BECAUSE YOU KNOW WHY?  WE KNOW WHY, YOU KNOW

14   WHY:  DEFENDANT KNEW THOSE GYROCOMPASSES WERE NEVER GOING TO

15   DUBAI, THEY WERE NEVER GOING ON A BOAT IN DUBAI, BUT THEY WERE

16   DESTINED FOR IRAN.

17           AND ALL THE TIME THIS COMMUNICATION WAS HAPPENING,

18   BEFORE AGENT COLE WAS EVER INVOLVED, WAS EVER CONTACTED, WHAT

19   ELSE DO WE KNOW?  WHERE WAS MR. TAHERKHANI?  WE KNOW FROM THE

20   EMAIL ORIGINATION, THE IP ADDRESSES, HE WAS IN TEHRAN RUNNING

21   THIS FRONT COMPANY.

22           THIS TELLS YOU, BEFORE EVEN AGENT COLE WAS INVOLVED,

23   THE EVIDENCE TELLS YOU THIS DEFENDANT WAS INVOLVED IN A

24   KNOWING SCHEME TO GET THOSE GOODS ILLEGALLY OUT OF THE UNITED

25   STATES TO IRAN.

APRIL 22, 2015

1382

```
 1              AND LET'S LOOK AT THE NEXT TIME PERIOD, THROUGH --
 2   DECEMBER 21 THROUGH MAY 2013.  IF YOU LOOK AT THOSE, AGAIN,
 3   DEFENDANT'S WORDS AND ACTIONS SHOW KNOWLEDGE.
 4              AND BEFORE I TALK ABOUT ALL OF THE EVIDENCE I THINK
 5   IT IS IMPORTANT THAT YOU VIEW THAT EVIDENCE WITH ONE THING IN
 6   MIND, AND I THINK IT IS SHOWN BY A TELEPHONE CONVERSATION THAT
 7   DEFENDANT HAD WITH AGENT COLE.  IT WAS A CONFERENCE CALL, AND
 8   MR. TAHERKHANI WAS ON THE LINE.  AND YOU REMEMBER THAT
 9   OCCURRED ON MAY 30TH.  IT WAS GOVERNMENT'S EXHIBIT 315.  WE
10   PLAYED YOU A CLIP FROM THAT TELEPHONE CALL.
11              AND YOU MAY RECALL IT OCCURRED AT A TIME WHEN AGENT
12   COLE, PLAYING THE ROLE OF DAVID MILLS, WAS UPSET THERE HAD
13   BEEN NO PAYMENTS.  AND FINALLY, A COUPLE DAYS BEFORE TOLD THE
14   DEFENDANT, YOU KNOW, I AM TIRED OF PLAYING THIS GAME.  YOU
15   KNOW, WE ALWAYS KNEW -- SOUTH STAR TRADING ALWAYS KNEW THIS
16   WAS GOING TO IRAN.  AND IT IS DISRESPECTFUL THAT MR.
17   TAHERKHANI DOESN'T JUST TELL US THAT.  THAT WAY WE CAN DO
18   BUSINESS SAFER.  YOU KNOW, HE WON'T BE CHANGING THE TERMS OF
19   WHAT BANKS WE ARE USING, WE CAN ALL BE ON THE SAME PAGE.
20              AND HE ASKS, CAN I TALK TO MR. TAHERKHANI?
21              AND HE SETS UP THAT CONFERENCE CALL.
22              IF YOU LISTEN, AT THE BEGINNING OF THAT CONFERENCE
23   CALL HE STARTS OUT TELLING MR. TAHERKHANI THE SAME THINGS HE
24   TOLD DEFENDANT IN THE PREVIOUS TELEPHONE CALLS, THAT YOU GOT
25   TO DO THIS RIGHT.
```

APRIL 22, 2015

```
 1              AND RIGHT WHEN HE IS ABOUT TO TELL HIM, YOU KNOW, I

 2   KNOW THIS IS GOING TO IRAN, WE KNOW WHAT IS GOING ON, YOU JUST

 3   HAVE TO BE HONEST, WHAT DOES DEFENDANT SAY?  LET'S LISTEN TO

 4   WHAT DEFENDANT SAYS.

 5              (AUDIO PLAYED)

 6              I DON'T WANT TO TALK ABOUT THAT OVER THE PHONE, THAT

 7   ISSUE.  I AM CUTTING YOU OFF.

 8              WHY DOES HE SAY THAT?  HE THINKS THIS IS A

 9   LEGITIMATE BUSINESS DEAL?  THIS IS NO NORMAL BUSINESS DEAL.

10   HE SAYS THAT BECAUSE THEY ARE INVOLVED IN A CRIMINAL

11   CONSPIRACY.  THAT IS WHY HE SAYS THAT, WE CAN'T TALK ABOUT

12   THIS ON THE PHONE.

13              SO WHEN YOU LOOK AT ALL OF THE EVIDENCE OR YOU HEAR

14   DEFENSE COUNSEL SAY, WELL, THAT WASN'T SAID HERE, THIS WASN'T

15   SAID THERE; IT EXPLAINS HIS RESPONSES ALL THROUGHOUT THAT TIME

16   PERIOD WHERE HE NEVER ISSUES A DENIAL.  I AM NOT GOING TO SAY

17   IF YOU ARE RIGHT OR YOU ARE WRONG.  THAT TELLS YOU VOLUMES.

18              AND LET'S LOOK AT THE EVIDENCE.  LET'S LOOK AT HIS

19   RESPONSES IN MAY WHEN AGENT COLE FINALLY TOLD HIM, LOOK, WE

20   KNEW ALL ALONG THIS WAS GOING TO IRAN.  THESE GYROS AND THE

21   Y-690'S BOTH.  MAKE NO MISTAKE ABOUT IT, IT WASN'T JUST THE

22   Y-690'S OR JUST THE GYROS.

23              THE FIRST TIME THAT OCCURRED WAS ON MY 28TH, AND

24   THERE IS NO QUESTION DEFENDANT WAS GIVEN AN OPPORTUNITY TO

25   RESPOND.  AFTER AGENT COLE WENT THROUGH A LONG EXPLANATION AT
```

APRIL 22, 2015

1    312-1, THAT EXHIBIT, AND ASKED HIM WHAT DO YOU THINK ABOUT

2    THAT?  WHAT DID DEFENDANT SAY?  I AM NOT GOING TO SAY IF YOU

3    ARE RIGHT OR NOT.

4             YOU KNOW, IF YOU ARE INVOLVED IN A LEGITIMATE

5    BUSINESS DEAL YOU WOULD SAY, WHAT?  IT IS GOING TO IRAN?  I

6    THOUGHT THIS WAS GOING TO DUBAI.  I ALWAYS KNEW IT WAS GOING

7    TO DUBAI.

8             WHERE IS THAT?  NOWHERE.

9             DEFENDANT ON THE STAND SAID, I TOLD HIM IT WAS GOING

10   TO DUBAI.

11            YOU WILL NOT FIND IN THE RECORD ANYWHERE THAT HE

12   SAYS IT IS GOING TO DUBAI.  ONLY SAYS IT IS GOING TO DUBAI TO

13   GET TO IRAN.

14            WHAT DEFENDANT DOES IS POINT TO THE CONTRACT, AND

15   THINK THAT'S HIS COVER.  THE CONTRACT SAYS DUBAI, I AM OKAY.

16            AGENT COLE PUSHES HIM, AND WHAT DOES DEFENDANT SAY?

17   WELL, HE SAYS A LITTLE MORE.  NO NEED TO DISCLOSE EVEN OUR

18   FOREIGN WHEN WE KNOW WHAT IS GOING ON.

19            WE KNOW WHAT IS GOING ON.  HE KNEW WHAT WAS GOING

20   ON.  WE DON'T HAVE TO TALK ABOUT THIS OVER THE PHONE, THAT IS

21   WHAT HE IS TELLING HIM.  THERE IS NO NEED TO DISCLOSE IT.

22            AND, MORE IMPORTANTLY -- AND THIS IS HIS LAST

23   STATEMENT IN THAT LONG CONVERSATION WAS, IF TAHERKHANI DOESN'T

24   TELL YOU, AGENT COLE, WHERE THE GYROS ARE GOING, TO IRAN, YOU

25   HAVE PLAUSIBLE DENIABILITY.

APRIL 22, 2015

```
 1              THAT IS ESSENTIALLY WHAT HE SAYS.  AND LET'S LOOK AT
 2   THE TRANSCRIPT OF WHAT HE SAID.  DAVID, THERE IS SOMETHING
 3   THAT YOU ARE NOT GOING WRONG.  I'M NOT GOING WRONG.  YOU KNOW,
 4   IF YOU SELL SOMETHING IN THIS COUNTRY TO ME TODAY AND SIX
 5   MONTHS LATER IS THIS GOING TO AFRICA, SUDAN OR SOME CIVIL WAR
 6   COUNTRY OR SOMETHING OVER THERE --
 7              WE KNOW WHAT OVER THERE IS, IRAN.
 8              -- THIS IS NOT YOUR FAULT.  KOORUSH --
 9              MR. TAHERKHANI.
10              -- PROVIDE THE END USER FOR THIS.  IF HE KNOWS THAT
11   IT IS GOING TO HIS OWN COUNTRY --
12              WHERE IS HIS OWN COUNTRY?  IRAN.
13              -- OR SOMETHING, HIS PROBLEM THAT HE SHOULD ANSWER,
14   NOT HERE, AND HE IS GOING TO JAIL OVER THERE, NOT HERE.
15              PLAUSIBLE DENIABILITY.  SOUNDS SIMILAR.  VERY, VERY
16   EERILY SIMILAR TO WHAT DEFENDANT TOLD YOU ON THE STAND.  THE
17   CONTRACT SAID DUBAI, ALL I AM DOING IS THE CONTRACT.
18   PLAUSIBLE DENIABILITY.  BUT YOU KNOW WHAT?  YOU HAVE HEARD ALL
19   OF THE EVIDENCE.  DEFENDANT ARASH GHAHREMAN'S EXPLANATION, IT
20   DOESN'T HOLD WATER BECAUSE WE KNOW WHAT HE SAID, WE KNOW WHAT
21   HIS ACTIONS TELL US.  HE KNEW WHAT WAS GOING ON.
22              LET'S LOOK ABOUT HIS RESPONSES TO, AGAIN, THE
23   UNDERCOVER AGENT DISCUSSING WITH HIM AND CONFIRMING, LOOK, WE
24   ARE GOING TO GO TO JAIL.
25              ALL RIGHT.  AND THAT WAS DONE NOT ONCE, NOT TWICE,
```

APRIL 22, 2015

1    BUT THREE TIMES.  ONCE HE TELLS HIM, LOOK, YOU KNOW, OUR

2    ACTIONS VIOLATE THE U.S. EXPORT LAWS, WE ARE TAKING ALL THE

3    RISK.

4            ANOTHER TIME:  LOOK, MR. TAHERKHANI DOESN'T

5    APPRECIATE THE FACT WE ARE TAKING ALL OF THE RISK AND GOING TO

6    JAIL.

7            AND FINALLY, IN A CONVERSATION OF MAY 29TH, HE SAYS,

8    LOOK, I MODIFIED THE PROPOSAL TO REDUCE OUR RISK OF GOING TO

9    JAIL.

10           DEFENDANT DOESN'T OBJECT TO THESE.  DEFENDANT EITHER

11   SAYS, I UNDERSTAND OR YES, YOU KNOW.  AND HE IS NOT BEING

12   BOUND, GAGGED OR BLINDFOLDED.  HE CAN TALK.  YOU HEARD THOSE

13   CONVERSATIONS.  AND IF YOU ARE IN A NORMAL LEGAL BUSINESS

14   DEAL, LIKE HE WANTS YOU TO BELIEVE, YOU ARE GOING TO SAY

15   SOMETHING ABOUT THAT.  YOU ARE GOING TO SAY, JAIL?  I THOUGHT

16   THIS WAS GOING TO DUBAI.  JAIL?  WE ARE GOING TO JAIL?

17           BUT THE DEFENDANT'S RESPONSE IS SAYING, WELL, I

18   THOUGHT HE WAS JOKING, WE JOKE ALL THE TIME.

19           APPARENTLY ABOUT GOING TO JAIL IN LEGITIMATE

20   BUSINESS DEALS.

21           AND THEN YOU GET TO HIS REQUEST FOR 100 GYROS, AND

22   THIS IS VERY EARLY IN THE DEAL, YOU MAY RECALL.  WITHIN DAYS

23   AFTER FIRST CONTACTING AGENT COLE THE REQUEST GOES FROM FOUR

24   TO SIX GYROS TO 100 GYROS.  100 GYROS.  YOU TOLD -- YOU HEARD

25   WHAT THAT MEANT FOR HIM.  100 GYROS, THAT WAS OVER A

APRIL 22, 2015

```
 1    $6 MILLION DEAL.
 2            YOU KNOW, NOW, HE MAY HAVE HAD A LOT OF PROBLEMS
 3    RECALLING OTHER THINGS ON THE STAND WHEN I ASKED A QUESTION,
 4    BUT HE KNEW WHAT COMMISSION HE WAS GOING TO GET.  REMEMBER?  I
 5    SAID THAT IS A 2 PERCENT COMMISSION FOR YOU UNDER YOUR
 6    CONTRACT.
 7            YUP, 120 GRAND.
 8            AND HE WANTS YOU TO BELIEVE THAT THE REASON THAT HE
 9    DIDN'T GO THROUGH WITH THIS WAS NOT BECAUSE OF THE FOREIGN
10    GOVERNMENT BUT HE DIDN'T REALLY THINK KOORUSH TAHERKHANI HAD
11    THE ABILITY TO GET THE MONEY FOR THE 100 GYROS.
12            BUT CLEARLY, WHAT DID DAVID COLE TELL HIM WHEN HE
13    ASKED FOR 100 GYROS?  THIS IS A QUOTE:  LOOK, IF I GO TO
14    NORTHROP GRUMMAN THEY WILL NOT BELIEVE THAT ANY CUSTOMER OTHER
15    THAN A FOREIGN GOVERNMENT WANTS TO BUY 100.
16            WHAT DOES THE DEFENDANT SAY?  YES, EXACTLY.  I
17    WASN'T HAPPY ABOUT THAT EITHER.  WE WILL GET FOUR, MAYBE SIX.
18            NOW, DOES IT MAKE SENSE TO YOU THAT SOMEBODY WHO WAS
19    GOING TO GET 120 GRAND IF THEY HAVE 100 GYROS AND THIS IS A
20    LEGITIMATE DEAL THEY ARE GOING TO RESPOND THAT WAY?  NO.  YOU
21    WANT TO MAKE MONEY.  IT ONLY MAKES SENSE IF YOU ARE INVOLVED
22    IN AN ILLEGAL CRIMINAL NETWORK, AND YOU ARE AGREEING WITH THEM
23    IT WOULD BE A FOREIGN GOVERNMENT.
24            AND AGENT COLE DIDN'T HAVE TO TELL HIM WHAT THE
25    FOREIGN GOVERNMENT WAS.  HE KNOWS.  HE ALREADY KNEW.  HE KNEW
```

APRIL 22, 2015

1  BASED ON RESPONSES OF TAMMY AT TIMCO THAT CAME FROM NORTHROP

2  GRUMMAN.  AND HE DOESN'T, AT ANY POINT, SAY, FOREIGN

3  GOVERNMENT?  FOREIGN GOVERNMENT?  THIS IS GOING TO WESAL

4  SHIPPING, THIS IS GOING TO DUBAI, IT IS A LEGITIMATE DEAL.

5          WHY DOESN'T HE SAY THAT?  BECAUSE HE KNOWS.

6          AND THEN WE HAVE HIM PROVIDING FALSE END USER

7  INFORMATION TO NORTHROP GRUMMAN AND CPI FOR THE GOODS.  AND

8  AGAIN, IN EXHIBIT 303 WHEN AGENT COLE TELLS HIM, LOOK, I KNOW

9  THAT YOUR PRIOR END USER GOT DENIED SO YOU KNOW WHAT I AM

10 GOING TO DO?  I AM NOT GOING TO MENTION YOU, I AM NOT GOING TO

11 MENTION WESAL SHIPPING WITH THE PRIOR END USER.  I AM NOT

12 GOING TO PUT ANYTHING DOWN.

13         DID THE DEFENDANT BAT AN EYE?  YOU KNOW, IF IT WAS A

14 NORMAL BUSINESS DEAL WOULDN'T YOU THINK HE WOULD SAY, WAIT, WE

15 HAD A GOOD CUSTOMER, YOU DON'T HAVE TO TAKE THOSE STEPS.  LET

16 ME EXPLAIN IT TO YOU.

17         NO, HE DIDN'T, BECAUSE HE KNEW THIS WAS AN ILLEGAL

18 BUSINESS, HE KNEW THIS WAS GOING TO IRAN.

19         AND THEN WHEN WE GET TO THE Y-690'S, WHICH OCCURRED

20 IN FEBRUARY, THAT EXHIBIT 304, AND HE ASKS FOR THOSE.  AND

21 THERE WAS A CONVERSATION OR TESTIMONY YOU HEARD ABOUT THE

22 Y-690'S NOT BEING MUNITIONS OR MILITARY.

23         AND LET ME SAY AT THE OUTSET, DEFENDANT IS NOT

24 CHARGED WITH VIOLATING THE EXPORT LAWS REGARDING MUNITIONS,

25 BUT THIS EVIDENCE IS STILL RELEVANT.  AND WHY IS IT?  REMEMBER

APRIL 22, 2015

```
 1   WHAT AGENT COLE TOLD HIM WHEN HE SAID THESE ARE MUNITIONS.

 2          AND AGENT COLE WAS RELYING ON WHAT CPI TOLD HIM THAT

 3   THESE WERE DESIGNED FOR MILITARY AIRBORNE RADAR.  WE LATER

 4   FOUND OUT THE STATE DEPARTMENT, WHO INITIALLY AGREED, SAID NO.

 5   THAT WAS IT.

 6          HE IS NOT CHARGED WITH THAT, BUT HIS RESPONSES TO

 7   AGENT COLE'S STATEMENTS ARE IMPORTANT.  BECAUSE AGENT COLE

 8   TELLS HIM, LOOK, THIS THING, THIS Y-690, IT IS IN A MORE

 9   RESTRICTIVE CATEGORY.  IT NOT ONLY REQUIRES A LICENSE TO GET

10   OUT OF THE UNITED STATES, IT REQUIRES A LICENSE TO GET

11   ANYWHERE OUT OF THE UNITED STATES.  CANADA.  AND WHAT THAT

12   MEANS IS, DEFENDANT, NOT ONLY IS THE MANUFACTURER GOING TO

13   LOOK AT IT, BUT A GOVERNMENT AGENCY IS GOING TO LOOK AT IT

14   TOO.

15          AND SO WHAT DEFENDANT KNOWS NOW IS, WELL, HECK, IF

16   THE FALSE END USER STATEMENT DIDN'T WORK WITH NORTHROP GRUMMAN

17   WHEN IT JUST WENT TO THE MANUFACTURER, WE ARE NOT GOING TO BE

18   ABLE TO PROVIDE THE INFORMATION THAT IS GOING TO GET THROUGH

19   TWO LEVELS OF SCRUTINY.

20          AND AGENT COLE GIVES HIM THE OPPORTUNITY TO --

21   LISTEN -- IF YOU HAVE ANY QUESTION YOU CAN LISTEN TO THAT

22   CLIP.

23          HE SAYS, LOOK, IF YOU --

24          DEFENDANT.

25          -- AND MR. TAHERKHANI HAVE AN END USER THAT IS
```

APRIL 22, 2015

1  VERIFIABLE AND CAN BE CHECKED OUT, GIVE IT TO US.  BUT IF YOU

2  DON'T FEEL COMFORTABLE TELL ME, SOONER OR LATER ON.

3          ON TWO CLICKS, SOONER, HE SAID NO.  RIGHT?  HE SAID,

4  I AM SURE WE DON'T WANT TO RELEASE THE END USER INFORMATION.

5          THIS WASN'T ABOUT SOME CONTRACTUAL OBLIGATION LIKE

6  HE TOLD YOU ON THE STAND.  HE FREELY GAVE THE END USER TO

7  TAMMY AT TIMCO.  HE WAS TELLING HIM NO BECAUSE HE KNEW, HE

8  KNEW IT WOULDN'T PASS MUSTER.  AND HE DIDN'T CARE WHETHER IT

9  VIOLATED THE EXPORT LAW, WHAT EXPORT LAW IT VIOLATED.  DIDN'T

10  MATTER.  HIS END GOAL WAS TO ACQUIRE THOSE GOODS TO GET THEM

11  TO IRAN.

12          THAT IS WHY IT IS RELEVANT.  DIDN'T HAVE TO DO WITH

13  THE MILITARY, THE FACT IS HE JUST DIDN'T CARE WHAT

14  REQUIREMENTS.  HE WAS WILLING TO DO WHATEVER HE COULD TO GET

15  THOSE GOODS TO IRAN.  WHATEVER WAS NECESSARY.

16          AND THEN WE HAVE THE FACT THAT MR. TAHERKHANI WAS

17  GOING TO COME TO THE UNITED STATES.  YOU MAY RECALL THAT AND

18  DEFENDANT'S CONVERSATIONS WITH THE AGENT ABOUT THAT, WITH

19  AGENT COLE.  AND THERE WERE DISCUSSIONS ABOUT THAT, BUT THESE

20  ARE DEFENDANT'S WORDS.  HE EXPLAINED HE DIDN'T WANT TO COME TO

21  THE UNITED STATES, AND IT MAY BE, WELL, IT IS BECAUSE HE IS

22  IRANIAN.

23          THERE IS NO EVIDENCE THAT PEOPLE WHO ARE IRANIAN

24  JUST GET ARRESTED WHEN THEY COME TO THE UNITED STATES.  TO

25  SUGGEST THAT IS NOT IN BASE WITH REALITY.  BUT WHAT HE DID SAY

APRIL 22, 2015

```
1    IS SOMEBODY WANT TO PURCHASE -- YOU HEARD THIS.  SOMEBODY WANT
2    TO PURCHASE SOMETHING FROM THE UNITED STATES, GO TO JAIL OR
3    SOMETHING.
4            WHY IS HE SAYING THAT IF THIS IS A LEGITIMATE
5    BUSINESS DEAL?  BECAUSE HE KNOWS THAT HE AND TAHERKHANI ARE
6    INVOLVED IN AN ILLEGAL BUSINESS DEAL.  THAT IS WHY HE SAYS IT.
7    THAT IS THE EXPLANATION.
8            WHAT DOES THAT TELL YOU?  DEFENDANT KNEW.
9            AND FINALLY THERE ARE TORTUROUS, PROTRACTED
10   NEGOTIATIONS THAT WENT ON.  AND, AS I SAID BEFORE, WHY DID
11   THAT HAPPEN?  BECAUSE WHAT THEY WERE DOING WAS ILLEGAL.  THEY
12   HAD NO RECOURSE IF THEY WERE RIPPED OFF.  ALL OF THIS
13   SURROUNDED MR. TAHERKHANI'S DESIRE TO GET MORE SECURITY FOR
14   PAYMENTS THAT WERE MADE.  HE DIDN'T WANT TO PUT MONEY ON THE
15   BARREL UNTIL HE GOT THE GOODS.  PARTICULARLY BECAUSE HE KNEW
16   THERE WAS NO RECOURSE.  DEFENDANT KNEW THIS.  THIS WASN'T A
17   NORMAL BUSINESS DEAL.
18           THEN WE GET TO THE FACE-TO-FACE MEETINGS WHERE
19   THINGS CHANGE A LITTLE BIT, BECAUSE DEFENDANT IS NOT QUITE AS
20   CAUTIOUS, IS HE?  BECAUSE IN CRIMINAL CONSPIRACIES YOU WANT TO
21   MEET IN PERSON.  THERE YOU CAN TALK MORE OPENLY.  AND YOU HAD
22   A CHANCE TO HEAR WHAT HE SAID, AND NOT ONLY HEAR WHAT HE SAID
23   BUT SAW WHAT HE DID IN THOSE VIDEOS OF THE UNDERCOVER MEETING.
24           AND YOU MAY RECALL THOSE INITIAL MEETINGS COVERED
25   GENERALLY A FEW TOPICS, AND A LOT OF IT WAS -- FIRST TALKED
```

APRIL 22, 2015

```
 1   ABOUT DISCUSSION AND METHODS OF SHIPMENT TO AVOID GETTING
 2   CAUGHT.  AND THERE WERE NUMEROUS DISCUSSIONS, WITH DEFENDANT,
 3   IN DEFENDANT'S PRESENCE.  AND IT WASN'T ABOUT DOING A
 4   LEGITIMATE BUSINESS DEAL, LADIES AND GENTLEMEN OF THE JURY, IT
 5   WAS ABOUT HOW DO WE SHIP THESE GOODS OUT OF THE UNITED STATES
 6   WITHOUT GETTING CAUGHT, WITHOUT CUSTOMS SEIZING OUR GOODS OR
 7   GETTING INTO TROUBLE.
 8          AND FROM THE VERY FIRST MEETING ON JUNE 12TH AT THE
 9   RESTAURANT FROM AGENT COLE, ONE OF THE FIRST THINGS THEY
10   TALKED ABOUT IN 316-1 WAS, WANT TO SHIP IT BY UPS.
11          AND GUESS WHAT -- AGENT COLE TELLS THEM -- YOU CAN
12   PUT ANY NAME ON THE SHIPPING DOCUMENT.  DOESN'T MATTER.
13          THAT IS A NORMAL BUSINESS DEAL?  WHY WOULD THEY HAVE
14   TO DO THAT IF THIS WAS LEGAL?
15          AND WE ARE GOING TO GO TO A PLACE WHERE A YOUNG GIRL
16   IS THERE WHO WORKS, SHE IS NOT GOING TO ASK A LOT OF QUESTIONS
17   ABOUT WHAT YOU ARE DOING.
18          I MEAN, HIS MAIN CONCERN WAS THE MONEY.  CAN WE
19   CLAIM THE PROPER VALUE FOR THE INSURANCE.  AND WHY ASK THAT?
20   YOU ONLY ASK THAT IF YOU ARE TALKING ABOUT LYING ABOUT WHAT
21   THE GOODS ARE.  AND THEY HAD A DISCUSSION ABOUT THAT, TOO.
22          AND IF THIS IS A LEGITIMATE BUSINESS DEAL WHY AT
23   THAT MEETING, WHY IN 316-1, IS HE TALKING ABOUT LET'S -- CAN
24   WE PUT THE Y-690'S, TAKE THEM OUT OF THEIR PACKAGE AND SHIP
25   THEM WITH THE GYROCOMPASSES.
```

APRIL 22, 2015

```
 1              WHY DOES HE SAY THAT?  BECAUSE HE KNOWS THIS ISN'T A
 2     LEGITIMATE BUSINESS DEAL.  HE KNOWS WHERE IT IS GOING.
 3              AND THEN WHEN YOU GET TO THE MEETING, THE VIDEOTAPED
 4     MEETING YOU SAW, YOU KNOW, HE IS THE GUY LOOKING AT THE
 5     Y-690'S.  YOU SEE THAT IN THE VIDEO.  BECAUSE HE IS THE
 6     EXPERT, REMEMBER?  THAT IS WHAT ERGUN YILDIZ SAID HE ADMITTED,
 7     I WAS THERE TO MAKE SURE THE GOODS WERE THERE, THAT THEY WERE
 8     THE GOODS WE WERE PURCHASING.
 9              HIS SUGGESTION IS, LET'S REMOVE THE BOXES.
10              WHY ARE YOU REMOVING THE BOXES WHEN YOU SHIP IT,
11     OTHER THAN YOU ARE TRYING TO CONCEAL WHAT YOU ARE SHIPPING?
12              THERE ARE DISCUSSIONS IN HIS PRESENCE WHERE AGENT
13     COLE SAYS, YOU KNOW, MAYBE WE SHOULD COVER UP THE NORTHROP
14     GRUMMAN LOGO ON THE GYROCOMPASSES BECAUSE EVERYBODY KNOWS WHAT
15     NORTHROP GRUMMAN IS AND THEY WILL THINK THIS IS MILITARY.
16              AND IN FACT, AS YOU SAW, WHEN IT WAS SHIPPED THE
17     BOXES WERE EGG CARTONED TO HIDE THAT FACT.  THERE WAS NO NEED
18     TO PUT EXTRA BOXES ON THERE.  THEY HAD DISCUSSED THAT FACT.
19     DEFENDANT KNEW WHAT WAS GOING ON.
20              AND THERE WAS DISCUSSION ABOUT KEEPING THE MANUALS
21     SEPARATE.  AND WHETHER DEFENDANT WANTED TO KEEP THEM TOGETHER
22     OR HE WANTED THEM SEPARATE, WHEN THEY WERE DISCUSSING THE
23     WHOLE THING ABOUT THE MANUALS IT WAS ALL IN AN EFFORT TO
24     DISGUISE WHAT WAS BEING SENT.  AND IT IS CLEAR WHAT DEFENDANT
25     SAID:  IF SOMEBODY SEES THIS --
```

APRIL 22, 2015

1           AND THEY ARE TALKING ABOUT CUSTOMS.

2           -- THEY WILL SAY THIS IS VERY NAUGHTY.

3           THAT IS WHAT THEY WERE CONCERNED ABOUT.  AND MOST

4    IMPORTANTLY, IF YOU EVER NEED QUESTION THAT HE WAS A KNOWING

5    PARTICIPANT IN TRYING TO GET THESE OUT OF THE COUNTRY AND

6    AVOID SCRUTINY BY LAW ENFORCEMENT, LISTEN TO WHAT HE SAID AT

7    GOVERNMENT'S EXHIBIT 317-3.

8           (VIDEOTAPED PLAYED)

9           EVERY SERIAL NUMBER, EVERYTHING WILL BE REMOVED,

10   DESTROYED.

11          THESE ARE HIS WORDS.  AND YOU REMEMBER HIS

12   EXPLANATION ON THE STAND BY DEFENSE COUNSEL?  YOU KNOW, HE HAD

13   NO EXPLANATION FOR WHY HE SAID IT.  HIS RESPONSE WAS, WELL,

14   THAT CAN'T BE DONE, YOU KNOW, BECAUSE THERE ARE APPARENTLY

15   SERIAL NUMBERS INSIDE THAT SOMEONE COULD FIND OUT, YOU KNOW.

16          WHICH IS INTERESTING BECAUSE WHEN FIRST QUESTIONED

17   HE REALLY DIDN'T KNOW MUCH ABOUT MARINE NAVIGATION EQUIPMENT;

18   BUT WHEN IT FITS HIS NEED NOW HE KNOWS ABOUT MARINE NAVIGATION

19   EQUIPMENT.  BUT THE BOTTOM LINE IS, HIS RESPONSE DIDN'T MAKE

20   SENSE.  HE NEVER EXPLAINED BECAUSE HE CAN'T EXPLAIN.  BECAUSE

21   THE ONLY REASON YOU MAKE THAT STATEMENT IS IF YOU ARE INVOLVED

22   IN A CRIMINAL NETWORK THAT IS TRYING TO GET GOODS ILLEGALLY

23   OUT OF THE UNITED STATES TO IRAN.  COMMON SENSE TELLS YOU

24   THAT.

25          AND WE HAVE HIS ADMISSIONS.  AND THERE WAS A LOT OF

APRIL 22, 2015

1386

1   BACK AND FORTH, WELL, HE NEVER SAID IRAN, HE DIDN'T SAY IRAN,

2   WHAT DOES OVER THERE MEAN.

3            BUT THERE IS NO QUESTION.  YOU CAN LISTEN TO

4   GOVERNMENT EXHIBIT 316-4, GOVERNMENT EXHIBIT 317-8.  YOU KNOW,

5   WHEN ASKED WHERE THEY ARE GOING OVER THERE -- AND AGENT COLE

6   WASN'T TALKING ABOUT DUBAI BECAUSE THE WHOLE CONVERSATION WAS

7   HIS BELIEF THAT THESE WERE GOING TO IRAN, HIS KNOWLEDGE THAT

8   THESE WERE GOING TO IRAN.  WHAT DOES HE SAY?  THEY ARE GOING

9   FOR NOT MILITARY BUT COMMERCIAL.  I THINK MAYBE GOVERNMENT, I

10  DON'T KNOW.  MAYBE AIR TRAFFIC CONTROL.

11           AND HE REPEATS THAT THE NEXT DAY WHEN HE IS ASKED,

12  WHERE ARE THESE GOING?  AND THEY ASK HIM WHERE IS IT GOING.

13  AIRPORTS.

14           HE GOES, IN IRAN.

15           AIRPORTS.

16           NOW, IF THIS IS A LEGITIMATE BUSINESS DEAL AND

17  SOMEBODY IS ASKING YOU, IS IT GOING TO IRAN?  SOMEBODY WHO

18  CLAIMS THAT AFTER THAT MEETING, YOU KNOW, AND BEFORE HE WAS

19  ALWAYS CONCERNED ABOUT WHERE THIS WAS GOING, AREN'T YOU GOING

20  TO SAY SOMETHING AT THAT POINT IN THE DEAL?  BECAUSE IT

21  DOESN'T MAKE SENSE.  WOULDN'T YOU SAY SOMETHING IF THIS IS A

22  LEGITIMATE BUSINESS DEAL?

23           WHAT DOES THE DEFENDANT DO?  HE EITHER DOESN'T

24  BELIEVE WHAT THE AGENTS SAY, OR HE SAYS, I WASN'T GIVEN THE

25  OPPORTUNITY TO RESPOND TO IT.  OR I JUST LET HIM SAY IT, HE

APRIL 22, 2015

```
 1    SAID A LOT OF THINGS.
 2              YOU KNOW, WE KNOW THIS DEFENDANT WAS ENGAGED IN
 3    CONVERSATIONS.  YOU SAW THE CLIP BEFORE WHERE HE TALKS AND
 4    VOLUNTEERS THAT, WE WILL DESTROY THE SERIAL NUMBERS.  TO
 5    SUGGEST THAT SOMEHOW HE JUST WAS GOING ALONG TO GET ALONG, I
 6    WAS JUST GOING TO GET THE GOODS TO DUBAI, IS JUST A COMPLETE
 7    DISTORTION OF THE EVIDENCE AS YOU KNOW IT.
 8              AND THIS IS VERY TELLING, BECAUSE HE DID LET HIS
 9    GUARD DOWN.  AT THE JUNE 12TH MEETING HE ADMITTED, KOORUSH HAS
10    A HUGE CUSTOMER BASE IN IRAN.
11              WHAT DOES HE SAY?  HE SAYS, KOORUSH HAS 2 TO
12    $3 MILLION BEHIND US, WHEN THEY WERE TALKING ABOUT WHAT END
13    USERS DO YOU HAVE.  AND HE ASKED HIM, IS IT FOR ONE END USER,
14    DIFFERENT USER?  HE SAID SAYS DIFFERENT USER.
15              AND THIS IS HIS QUOTE:  KOORUSH WORKS FOR A COMPANY
16    IN IRAN, ALMOST ALL SHIPPING COMPANY, OIL COMPANY, AND MINE
17    COMPANIES.
18              HE KNOWS ABOUT THE HUGE CUSTOMER BASE.  HECK, HE
19    KNEW ABOUT IT WHEN HE FIRST WAS CONTACTED BY DEFENDANT
20    TAHERKHANI.  THEY TALKED ABOUT THE HUGE BUSINESS.  WE KNOW THE
21    HUGE BUSINESS.
22              WHAT HE SAW WAS DOLLAR SIGNS.  HE DIDN'T CARE HOW IT
23    GOT THERE, HE DIDN'T CARE IF IT VIOLATED THE LAW.  HE KNEW
24    ABOUT THE LAW.  HIS GOAL WAS TO MAKE MONEY.  THAT IS WHAT THIS
25    IS ABOUT.  IT IS NOT ABOUT A NORMAL BUSINESS DEAL, IT IS ABOUT
```

APRIL 22, 2015

1    DEFENDANT WAS ENGAGED IN ILLEGAL CONDUCT KNOWINGLY AND WANTED

2    TO MAKE A BUCK.

3          AND THEN THERE IS A CONVERSATION ABOUT, YOU KNOW,

4    WHERE IS IT GOING?  SOME MORE.  AND NOW DEFENDANT IS A LITTLE

5    MORE OPEN BECAUSE THEY ARE MEETING IN PERSON.  AND REMEMBER

6    THOSE CONVERSATIONS.  BOTH OCCURRED AT THE DINNER MEETING.

7          DEFENDANT TELLS THE AGENT, WHEN THE AGENT ASKS HIM,

8    DO YOU KNOW IT IS GOING TO IRAN?  HE SAYS, NORMALLY I DON'T

9    HAVE TO ASK TAHERKHANI WHERE THE GOODS ARE GOING IN MY HOME

10   COUNTRY BECAUSE I KNOW FROM MY OTHER CONNECTIONS IN MY HOME

11   COUNTRY.

12          AND HE ADDS THAT, EVEN I DON'T ASK KOORUSH WHO THE

13   END USER IS, BECAUSE I KNOW, BECAUSE I HAVE SO MANY

14   CONNECTIONS.

15          HE KNEW THESE GOODS WERE GOING TO IRAN.  THEN AGAIN,

16   HE EXPLAINS, THOUGH, TO AGENT COLE, IN THAT SAME MEETING, IF

17   YOU KNOW NOTHING ABOUT THAT IS SOMETHING.  IT'S BETTER FOR

18   YOU, YOU ARE PROTECTED.  YOU CAN JUST CLAIM LACK OF

19   INFORMATION.  LACK OF INFORMATION.

20          WHAT YOU HEARD FROM THE WITNESS STAND, LACK OF

21   INFORMATION.  PLAUSIBLE DENIABILITY.  BUT IT IS NOT PLAUSIBLE,

22   WE KNOW THAT.  WE KNOW THAT FROM ALL OF THIS EVIDENCE.  WE

23   KNOW THAT FROM HIS ADMISSIONS THAT HE WOULD BE IN THE JAIL

24   CELL.

25          AND WE KNOW THIS WAS NOT A MISTAKE.  DEFENDANT WAS

APRIL 22, 2015

1   NOT CAUGHT UP IN SOME HORRIBLE SCHEME THAT HE DIDN'T KNOW

2   ABOUT, WE KNOW THAT BECAUSE THERE IS OTHER EVIDENCE THAT SHOWS

3   HE KNOWS.  THAT HE KNEW ABOUT THE USE OF FRONT COMPANIES TO

4   DIVERT GOODS TO IRAN.

5           AND THE JUDGE INSTRUCTED YOU ABOUT THAT EVIDENCE,

6   AND THAT EVIDENCE WAS PUT BEFORE YOU TO PROVE ONE THING:  THAT

7   THIS DEFENDANT HAD KNOWLEDGE OF FRONT COMPANIES.  HE WASN'T A

8   STRANGER TO HOW THINGS WORK.  YOU HEARD HIM.  HE ACTUALLY AT

9   SOME POINT WAS ABLE TO DESCRIBE A FRONT COMPANY BETTER THAN I

10  COULD.  YOU KNOW, IT IS TO HIDE WHO THE PURCHASER IS.

11          AND HE HAD EXPERIENCE WITH THAT, AS WE KNOW FROM THE

12  E-MAILS.  HE HAD EXPERIENCE.  BECAUSE, AS WE KNOW, THE

13  PARADISE OFFSHORE COMPANY -- REMEMBER WHEN HE WAS TRYING TO

14  BUY THE OIL RIGS?  REMEMBER WHEN HE INITIALLY WENT TO THE

15  NORWEGIAN COMPANY AND SAID, I GOT A COMPANY, A WEALTHY CLIENT

16  IN THE PERSIAN GULF WHO WANTS TO ACQUIRE OIL RIGS, AND WAS

17  TOLD, WELL, WE DON'T SELL TO SANCTIONED AREAS.

18          AND HE SAYS, NO, WAIT, I KNOW ABOUT THE SANCTIONS,

19  YOU KNOW, AND I WANT A LEGAL DEAL, YOU KNOW.  I WILL -- I AM

20  NOT GOING TO GIVE YOU MY INFORMATION ABOUT MY COMPANY NOW, BUT

21  I WILL GIVE IT LATER.

22          HE DOES GIVE IT LATER, AND WHO DOES HE GIVE?  IT IS

23  NOT A COMPANY IN THE PERSIAN GULF, IT IS AN OFFSHORE COMPANY

24  IN THE MARSHALL ISLANDS, IN THE PACIFIC, YOU KNOW, FAR AWAY

25  FROM IRAN.  AND WE FOUND OUT WHO THE CUSTOMER BEHIND THAT WAS,

APRIL 22, 2015

1    OR WHO THE REPRESENTATIVE OF THE CUSTOMER WAS, IT WAS SAEED

2    SHAMI.  AND THEY HAD A DISCUSSION ABOUT THE USE OF THAT

3    OFFSHORE COMPANY, PARADISE OFFSHORE COMPANY.  AND SHAMI ASKED

4    HIM, INTRODUCE THEM AS THE BUYER'S REP.

5            AND DEFENDANT SAYS, ARE YOU CRAZY?  WE INTRODUCE

6    THEM AS BUYER'S REP?  THEY WANT TO KNOW INFORMATION ABOUT THE

7    ACTUAL BUYER.

8            AND THIS IS THE RESPONSE HE GOT, THEY FUNCTION LIKE

9    THAT IN IRAN.  DUE TO THE SANCTIONS NOBODY KNOWS WHAT IS GOING

10   ON.  THEY FORM FAKE, FACTITIOUS COMPANIES.

11           WHY IS THAT IMPORTANT?  BECAUSE YOU KNOW THAT IN

12   THIS CASE TIG MARINE WAS A FAKE, FACTITIOUS COMPANY.  ALL

13   RIGHT?  AND IT SHOWS THE DEFENDANT -- THIS WAS NO MISTAKE.  HE

14   KNOWS HOW THINGS WORK.  HE IS AWARE OF THE USE OF FRONT

15   COMPANIES TO HIDE THE TRUE PURCHASER, TO HIDE THE TRUE

16   CUSTOMERS IN IRAN.  THAT IS WHY THAT IS IMPORTANT, AND THAT IS

17   WHY YOU SHOULD CONSIDER THAT EVIDENCE.

18           THE EMAILS ARE ALSO VERY TELLING.  THEY SHOW THAT HE

19   KNEW TAHERKHANI WAS SEEKING PRODUCTS FOR CUSTOMERS IN IRAN.

20   REMEMBER THE EMAIL 224?  HE WAS JUST ASKED ABOUT IT ON THE

21   STAND.  ALL RIGHT?  THIS INVOLVED AN EMAIL CHAIN WHERE HE HAD

22   GOTTEN A REQUEST FROM TAHERKHANI TO GET QUOTES FOR OIL BARGES,

23   PARTS FOR THEM.  HE DOES THAT.

24           THE COMPANY SAYS, WELL, WHERE IS THIS GOING TO?

25           WHAT DOES HE DO?  HE JUST FORWARDS IT TO TAHERKHANI.

APRIL 22, 2015

1          AND WHAT DOES TAHERKHANI DO?  HE SENDS IT TO A

2     COMPANY EMPLOYEE AND SAYS, JACK UP THE PRICE, ADD 30 PERCENT

3     ON IT AND SEND IT TO BANDAR ABBAS.  YOU KNOW, SEND IT ON

4     ISOICO.

5          BECAUSE THAT IS WHAT THIS BUSINESS IS ABOUT.  YOU

6     GET A PRODUCT SOMEWHERE ELSE, YOU CAN GET IT OUT OF THE

7     COUNTRY, YOU CAN JACK UP THE PRICE, YOU CAN MAKE A LOT OF

8     MONEY.

9          AND HE CC'D DEFENDANT WITH THAT EMAIL.  AND

10    DEFENDANT CAN SIT HERE TODAY AND SAY, I DON'T KNOW WHAT ISOICO

11    IS.

12         WELL, WE KNOW HE KNOWS WHAT ISOICO IS, BECAUSE --

13    AND MIND YOU, THIS ALL OCCURRED RIGHT DURING THE TIME PERIOD

14    THAT HE IS NEGOTIATING FOR THE NAVIGAT-2100'S AND FOR THE

15    Y-690'S, DOING THE SAME THING.  HE KNOWS THAT TAHERKHANI IS

16    ASKING HIM TO GET QUOTES FOR CUSTOMERS IN IRAN.  THAT

17    CONCLUSIVELY PROVES THAT TO YOU.  BECAUSE WE KNOW JUST LESS

18    THAN TWO WEEKS LATER HE TELLS THE DEFENDANT EXACTLY WHERE

19    ISOICO IS.  IN THAT EMAIL HE APOLOGIZES FOR NOT GETTING BACK

20    TO HIM BUT HE SAYS, I WAS IN BANDAR ABBAS SINCE LATE LAST

21    NIGHT FOR THE LAUNCHING OF A TANKER VESSEL WHICH I WAS INVITED

22    TO BY ISOICO.  I HELPED THEM A LOT FOR THAT PROJECT.

23         SO TO SUGGEST THAT HE DIDN'T KNOW HE HAD ANY

24    CUSTOMERS IN IRAN, TO SUGGEST THAT TAHERKHANI TOLD HIM, I HATE

25    DEALING WITH IRANIAN CUSTOMERS, I HATE DEALING WITH THE

APRIL 22, 2015

1   IRANIAN GOVERNMENT AS A CUSTOMER, IS A COMPLETE FABRICATION.

2           LADIES AND GENTLEMEN, THIS SHOWS THAT HE WAS WELL

3   AWARE THAT TAHERKHANI'S CUSTOMER BASE WAS IN IRAN.  THAT HE

4   KNEW THESE GYROCOMPASSES, THESE Y-690'S WERE GOING TO IRAN.

5   HE KNEW THIS ALL ALONG, FROM THE VERY GET-GO TO THE VERY END.

6   THE EVIDENCE SCREAMS TO YOU, TELLS YOU THAT.  HE KNEW VERY

7   EARLY ON THAT WHAT HE WAS DOING WAS VIOLATING U.S. EXPORT

8   LAWS.  HE KNEW THE RISK OF DOING THIS CONDUCT.  HE MADE A

9   CONSCIOUS DECISION, SHOULD I DO THINGS THE RIGHT WAY, OR THE

10  WRONG WAY AND MAKE MONEY.  HE CHOSE -- HE CHOSE TO MAKE MONEY.

11          I ASK YOU THAT, AFTER LOOKING AT ALL OF THE

12  EVIDENCE, CONSIDERING ALL OF THE EVIDENCE, DO WHAT THE

13  EVIDENCE TELLS YOU.  HOLD HIM ACCOUNTABLE FOR THE CHOICE HE

14  MADE.  FIND HIM GUILTY OF ALL COUNTS.

15          THANK YOU.

16

17

18

19

20

21

22

23

24

25

APRIL 22, 2015

```
 1          THE COURT:  THANK YOU.

 2          WHY DON'T WE -- WE WILL TAKE 15 MINUTES HERE, AND

 3   THEN I ANTICIPATE WE WILL FOLLOW UP WITH MR. GHAHREMAN'S

 4   CLOSING ARGUMENT THROUGH MR. JOHNSTON, AND THE GOVERNMENT'S

 5   REBUTTAL IN THE LAST SESSION, AND THEN THE CASE WILL BE YOURS

 6   FOR YOUR DELIBERATION.

 7          WE WILL PICK UP IN 15 MINUTES.  THANK YOU.

 8          (RECESS)

 9          (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

10          OPEN COURT, OUT OF THE HEARING OF THE JURY)

11          THE COURT:  WE ARE ON THE RECORD WITH COUNSEL AND

12   MR. GHAHREMAN, OUTSIDE THE PRESENCE OF THE JURY.

13          MR. JOHNSTON.

14          MR. JOHNSTON:  YOUR HONOR, I WASN'T SURE HOW TO

15   ADDRESS THIS DURING THE GOVERNMENT'S CLOSING ARGUMENT, BUT MR.

16   HARRIGAN MADE THE STATEMENT TO THE EFFECT THAT NOWHERE IN THE

17   RECORD DID MR. GHAHREMAN SAY THAT THESE GOODS WERE FOR

18   DELIVERY TO DUBAI.

19          MY CONCERN IS THIS, IS THAT WE DO HAVE EVIDENCE,

20   PROVIDED BY THE GOVERNMENT, THAT THEY ARE WELL AWARE OF, THAT

21   MR. GHAHREMAN DID IN FACT SAY THAT TO DAVID MILLS.  IT WAS NOT

22   INTRODUCED INTO EVIDENCE, IT WOULD BE A HEARSAY STATEMENT BY

23   MR. GHAHREMAN.  BUT IT IS AN ARGUMENT TO THE JURY THAT HE

24   NEVER SAID THAT THESE WERE INTENDED FOR SHIPMENT TO DUBAI.

25          IT IS AN IMPROPER ARGUMENT.  I DON'T KNOW HOW TO
```

APRIL 22, 2015

1    CURE IT.  I MEAN, I CERTAINLY WOULD LIKE TO PLAY ONE CLIP

2    WHERE HE DOES SAY, I SHIP TO DUBAI.  BUT THE GOVERNMENT HAS

3    NOW LEFT THE JURY WITH THE MISIMPRESSION WHEN IT KNOWS FULL

4    WELL THESE STATEMENTS DO EXIST.

5         **THE COURT:**  DIDN'T MR. HARRIGAN QUALIFY THAT LATER?

6    HE CORRECTED HIMSELF AND SAID HE DIDN'T EVER SAY IT WAS GOING

7    TO DUBAI AND NOT ON TO IRAN, ESSENTIALLY.

8              SO THE WAY I UNDERSTOOD THE ARGUMENT IS HE MAY HAVE

9    SAID THE GOODS WERE GOING TO DUBAI, KNOWING THAT THEY WOULD

10   THEN GO TO IRAN.

11        **MR. JOHNSTON:**  THERE MAY HAVE BEEN LANGUAGE AFTER

12   THAT, BUT I THINK THE IMPORT OF THE STATEMENT WAS HE NEVER

13   SAID, THESE ARE GOING TO DUBAI.  I HAVE A CLEAR STATEMENT BY

14   MR. GHAHREMAN WHERE HE SAYS, I SHIP TO DUBAI.

15        **THE COURT:**  DO YOU, MR. HARRIGAN, OBJECT TO HAVING

16   THAT PLAYED OR MR. JOHNSTON MAKING THAT ARGUMENT?

17        **MR. HARRIGAN:**  YOUR HONOR, I NEVER SAID THAT.  I

18   THINK THAT WAS IN RESPONSE TO WHAT DEFENDANT'S RESPONSES WERE

19   WHEN HE WAS SAYING IT WAS GOING TO IRAN, ALL RIGHT, WHEN THE

20   UNDERCOVER AGENT SAID IT IS GOING TO IRAN.  HE NEVER SAID, YOU

21   ARE WRONG, HE NEVER SAID IT IS GOING TO DUBAI.

22             THEN I QUALIFIED THAT TO SAY, NEVER SAID YOU ARE

23   WRONG IT IS GOING TO DUBAI AND INTO IRAN.  I DIDN'T MEAN TO

24   SUGGEST THAT HE NEVER SAID IT WAS GOING TO DUBAI.  IN FACT I

25   THINK MY ARGUMENT INCLUDED THAT HE SAID IN THE CONTRACT IT IS

APRIL 22, 2015

```
 1   GOING TO DUBAI.
 2              THE COURT:  THAT'S THE WAY I UNDERSTOOD IT.
 3              MR. HARRIGAN:  TO THE EXTENT -- I DIDN'T WANT TO
 4   SUGGEST IT.  I WILL -- YOU KNOW, I DON'T KNOW --
 5              WHAT ARE YOU REFERRING TO, MR. JOHNSTON?  WHAT TIME
 6   PERIOD AND WHAT --
 7              THE COURT:  DO YOU HAVE A PROPOSAL AS TO SOMETHING
 8   YOU WOULD LIKE TO READ?
 9              MR. JOHNSTON:  I DON'T KNOW HOW TO ADDRESS IT, YOUR
10   HONOR.  I MEAN, WE KNOW THAT THERE IS EVIDENCE, WE DELIVER TO
11   DUBAI.
12              MR. HARRIGAN:  WHAT ARE YOU TALKING ABOUT?  WHAT
13   TRANSCRIPT IS THIS?
14              MR. JOHNSTON:  THIS WOULD BE FROM THE 5/28 PHONE
15   CALL.
16              MR. HARRIGAN:  I DON'T EVEN KNOW WHAT THE WHOLE
17   TRANSCRIPT IS, LOOKING AT THE CONTEXT.
18              THE COURT:  DO YOU OBJECT TO MR. JOHNSTON READING
19   THAT PORTION?
20              MR. HARRIGAN:  YES, I DO, WITHOUT LOOKING AT THE
21   TRANSCRIPT.  HE IS SHOWING ONE PORTION OF IT.
22              AND MY ARGUMENT ISN'T EVIDENCE.  IT IS NOT EVIDENCE.
23   AND I THINK THE COURT AGREES I DIDN'T MISSTATE THAT.
24              MR. JOHNSTON:  JUST FOR THE RECORD, WHAT WE WOULD --
25   WHAT WE KNOW TO BE IN THE RECORD, NOT IN THE COURT'S RECORD
```

APRIL 22, 2015

1   BUT PROVIDED IN DISCOVERY, IS THE STATEMENT -- A RECORDED

2   STATEMENT BY MR. GHAHREMAN ON 5/28/2013.

3          **THE COURT:**  OKAY.  THERE BEING AN OBJECTION, THEN I

4   WOULD DECLINE THE INVITATION TO HAVE SOMETHING THAT IS NOT IN

5   EVIDENCE READ TO THE JURY.

6          AND THEN I WOULD INVITE YOU SIMPLY TO MAKE THE

7   ARGUMENT THAT MR. GHAHREMAN DID SAY THE ITEMS WERE GOING TO

8   DUBAI.  AT LEAST THAT IS HOW I RECALL THE EVIDENCE.  AND THEN

9   I WOULD INVITE MR. HARRIGAN TO -- IN REBUTTAL HE CAN CLARIFY

10  THAT POINT TO THE EXTENT THERE IS ANY MISUNDERSTANDING.

11         **MR. CAMDEN:**  PAGE 90.

12         **MR. HARRIGAN:**  OF WHAT TRANSCRIPT?

13         **MR. CAMDEN:**  5/28/2013.

14         **MR. HARRIGAN:**  SO IT IS PAGE WHAT?

15         **MR. CAMDEN:**  PAGE 90.

16         FOR THE RECORD, ALSO, THE TIME STAMPS FOR THAT ARE,

17  ONE HOUR 14 MINUTES 25 SECONDS TO ONE HOUR 14 MINUTES 53

18  SECONDS.

19         **MR. HARRIGAN:**  PAGE 90, 5/28, AT 1753 21.

20         **MR. CAMDEN:**  YES.

21         **MR. HARRIGAN:**  I AM LOOKING AT PAGE 90, I DON'T SEE

22  DUBAI ANYWHERE MENTIONED.

23         WELL, HERE IS MY POINT, YOUR HONOR.  THAT WHOLE 5/28

24  CONVERSATION WAS A CONFRONTATION ABOUT THE GOODS GOING TO

25  IRAN, AND I PLAYED TRANSCRIPTS.

APRIL 22, 2015

1        **THE COURT:**  SO I THINK THE RECORD HAS BEEN

2 PERFECTED, AND YOU CAN MAKE YOUR ARGUMENT.  AND THEN I WILL

3 INVITE MR. HARRIGAN TO CLARIFY THAT POINT IN REBUTTAL.

4        ALL RIGHT.  LET'S GO AHEAD AND BRING THE JURY IN.

5        **THE CLERK:**  MR. CAMDEN, DO YOU WANT THE JURY

6 MONITORS MUTED OR DISPLAYED?

7        **MR. CAMDEN:**  CAN I JUST KEEP IT ON, WHEN I PLUG IT

8 IN IT WILL COME ON.

9        **THE COURT:**  LET'S ALSO GIVE THE MEMBERS OF THE JURY

10 THE VERDICT FORM, SO THEY CAN HAVE THAT AS WELL.

11        **THE CLERK:**  OKAY.

12        (DISCUSSION OFF THE RECORD BETWEEN COUNSEL)

13        **THE COURT:**  WE ARE GOING TO BRING THE JURY IN, MR.

14 HARRIGAN.

15        **MR. HARRIGAN:**  OKAY.

16        (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

17        OPEN COURT, IN THE HEARING OF THE JURY)

18        **THE COURT:**  WE HAVE ALL MEMBERS OF THE JURY PRESENT.

19        AT THIS TIME WE WILL PROCEED WITH MR. GHAHREMAN'S

20 CLOSING ARGUMENT THROUGH MR. JOHNSTON.

21        **MR. JOHNSTON:**  THANK YOU, YOUR HONOR.

22        ARASH GHAHREMAN REALLY DIDN'T KNOW WHETHER THESE

23 ITEMS WERE GOING TO IRAN.  AND HE CERTAINLY DIDN'T HAVE THE

24 INTENT THAT THEY END UP IN IRAN, OR WITH THE GOVERNMENT OF

25 IRAN.  AND AS FAR AS THE MONEY THAT HE WAS GOING TO MAKE, HE

1    WAS GOING TO BE PAID FOR DELIVERY TO DUBAI.  WHAT HE AGREED

2    TO, AND WHAT HE TIRELESSLY WORKED ON FOR NEARLY SIX MONTHS,

3    WAS GETTING A DEAL THROUGH FOR DELIVERY OF THESE GOODS TO

4    DUBAI.

5         NOW, THIS IS A DIFFICULT CASE, AND IT IS DIFFICULT

6    BECAUSE YOU, LIKE ME, HAVE COME TO IT AT THE VERY END.  WE

7    KNOW EVERYTHING THAT HAS HAPPENED.  IT IS LIKE SITTING DOWN TO

8    WATCH YOUR FAVORITE TV SERIES, A NEW SEASON —— MAYBE NOT YOUR

9    FAVORITE SERIES, BUT A TV SERIES, A NEW SEASON, AND STARTING

10   WITH THE FINAL EPISODE.

11        YOU KNOW EVERYTHING ALREADY.  YOU KNOW, THROUGH A

12   VERY INTENSE INVESTIGATION, THAT YOU CAN LOOK BEHIND THE

13   CURTAIN OF TIG MARINE.  YOU CAN SEE WHAT KOORUSH TAHERKHANI

14   WAS DOING WITH SOME OF HIS IRANIAN CLIENTS.  YOU CAN LOOK

15   BEHIND THE CURTAIN, THANKS TO ERGUN YILDIZ WHO TESTIFIED,

16   BASED ON HIS PERSONAL KNOWLEDGE, IN DUBAI, ABOUT KOORUSH

17   TAHERKHANI'S INTERACTION WITH IRANIAN CUSTOMERS.

18        YOU HAVE ALSO BENEFITED FROM THE UNDERCOVER

19   INVESTIGATION, NOT ONLY BY DAVID MILLS BUT BY A HOST OF OTHER

20   AGENTS WHO PROVIDED YOU WITH THEIR BELIEFS AS THEY PURSUED

21   PEOPLE LIKE KOORUSH TAHERKHANI.  PEOPLE WHO, EVEN BEFORE MR.

22   GHAHREMAN IN DECEMBER OF 2012 TOOK A BREAK FROM HIS STUDIES TO

23   HELP OUT KOORUSH TAHERKHANI, WHO LONG BEFORE THAT WERE LOOKING

24   FOR PEOPLE, WERE LOOKING FOR PROSECUTIONS, WERE LOOKING FOR

25   CONVICTIONS FOR PEOPLE WHO MIGHT, LIKE KOORUSH TAHERKHANI, BE

APRIL 22, 2015

1    TRYING TO EVADE THE IRANIAN EXPORT LAW.

2              BUT THE DIFFICULTY HERE, AND WHAT WE HAVE TO DO IN

3    THIS CASE, OR YOU AS THE JURORS HAVE TO DO, IS TO DISCERN

4    THROUGH ALL OF THIS, KNOWING EVERYTHING AT THE VERY END, WHAT

5    DID MR. GHAHREMAN KNOW AT THE TIME THAT HE ENGAGED IN THIS

6    CONDUCT?  WHAT WERE MR. GHAHREMAN'S INTENTIONS AT THE TIME

7    THAT HE ENGAGED IN THIS CONDUCT?

8              AND AT THE CONCLUSION, HAVING CAREFULLY REVIEWED THE

9    EVIDENCE, THE STATEMENTS, AND MOST IMPORTANTLY THE CONTEXT OF

10   THE STATEMENTS THAT HE MADE, YOU WILL SEE THAT THE GOVERNMENT

11   HAS NOT PROVEN THAT HE KNEW THESE ITEMS WERE GOING TO IRAN

12   BEYOND A REASONABLE DOUBT, AND CERTAINLY THAT HE DIDN'T HAVE

13   THE INTENTION, THE DESIRE FOR THEM TO GO THERE.

14             SO LET'S START WITH WHAT I WILL CALL THE FIRST

15   BOULDER THAT THE GOVERNMENT HAS TO PUSH UP THE HILL OR THE

16   MOUNTAIN OF REASONABLE DOUBT.

17             MR. HARRIGAN, THE PROSECUTOR, MIGHT MAKE YOU THINK

18   THAT WE JUST NEED TO THROW A FEW PEBBLES TO CONCLUDE THAT THE

19   EVIDENCE WAS OVERWHELMING THAT THE NAVIGATS WERE ACTUALLY

20   GOING TO IRAN.

21             WERE THE NAVIGATS GOING TO IRAN?  WELL, WE KNOW A

22   FEW THINGS.  WE KNOW ABOUT WESAL VESSELS.  WE KNOW THAT ARASH

23   GHAHREMAN WAS TOLD THAT THEY WERE FOR FERRIES.  AND WE KNOW

24   THAT END USER INFORMATION WAS PROVIDED BY KOORUSH TAHERKHANI

25   FOR A WESAL VESSEL CALLED THE WESAL-V.

APRIL 22, 2015

```
 1         WHAT DO WE KNOW ABOUT WESAL OR ITS SHIPS?  THE
 2   GOVERNMENT, WHO HAS THE BURDEN IN THIS CASE, HAS PROVIDED VERY
 3   LITTLE, OTHER THAN WHAT WE HEARD FROM GREG TOPCZEWSKI, WHO
 4   SAID THAT A BOAT THIS SIZE DIDN'T SEEM TO BE A GOOD MATCH.
 5         WHAT I AM GOING TO ASK YOU TO LOOK AT WHEN YOU GO
 6   BACK AND GO THROUGH THE EVIDENCE IS A BIT OF EVIDENCE, AND
 7   THINK ABOUT A FEW THINGS.
 8         FIRST, YOU NEED TO REMEMBER THAT THERE WAS A LITTLE
 9   BIT OF UNCERTAINTY ON BEHALF OF GREG TOPCZEWSKI, ON THE BEHALF
10   OF TAMMY FARNSLEY AND OTHERS ABOUT WHETHER THIS REQUEST WAS
11   FOR A 2100 NAVIGAT OR A 3000 NAVIGAT.
12         AND YOU WILL SEE WHEN YOU LOOK AT DEFENSE EXHIBIT
13   D -- WHICH I WILL PULL UP IN A MINUTE -- THAT WHILE TOPCZEWSKI
14   DETERMINED THAT IT WASN'T THE NORMAL USE OF A 2100 FOR THAT
15   TYPE OF VESSEL, THE WESAL-V, IT WAS THE 3000 FOR WHICH IT
16   WOULD BE, IN HIS WORDS, OVERKILL.
17         AND SO DO WE KNOW, DO WE KNOW BASED ON THAT, ON THE
18   DENIAL OF WESAL VESSEL, WHEN WE KNOW THAT THERE WAS CONFUSION
19   ABOUT WHETHER THE REQUEST WAS FOR THE NEW, FANCY, UPDATED
20   VERSION OF THE NAVIGAT AS OPPOSED TO THE OLD 20-YEAR-OLD, I
21   THINK TOPCZEWSKI CALLED IT ANTIQUATED VERSION; DO WE KNOW THAT
22   THAT WAS NOT THE ULTIMATE END USER?
23         WE KNOW THAT ERGUN YILDIZ, IN THE PRESENCE OF MR.
24   GHAHREMAN AT THE GREEN VALLEY RANCH, TOLD DAVID MILLS THAT THE
25   NAVIGATS IN THIS CASE WERE FOR USE ON A VESSEL IN AJMAN, UAE.
```

APRIL 22, 2015

1   FOR A COMPANY OWNED BY AN IRANIAN NATIONAL, BUT FOR USE IN

2   AJMAN, UAE.

3            DOES THAT PROVE, OVERWHELMINGLY, THAT THESE ITEMS

4   WERE GOING TO IRAN?  NO.

5            WE DO HAVE THE MENTION OF VALFAJR FROM MR. GHAHREMAN

6   IN HIS POST-ARREST STATEMENT.  HE HAD SAID THAT THESE

7   FERRIES -- THAT KOORUSH HAD TOLD HIM THAT THERE WERE TWO

8   ORDERS.  MAYBE YOU RECALL THE DIFFERENCE BETWEEN THE FOUR AND

9   THE SIX NAVIGAT ORDERS.  AND YOU MAY RECALL MR. GHAHREMAN

10  SAYING, WHEN HE INQUIRED ABOUT WHAT IS GOING ON WITH THE TWO

11  ORDERS, THAT KOORUSH TAHERKHANI SAID THAT THEY ARE FOR

12  FERRIES, FOR IRANIAN FERRIES.

13           NOW, DID KOORUSH MEAN THE AJMAN FERRIES THAT ERGUN

14  YILDIZ WAS TALKING ABOUT?  DID HE MEAN IRANIAN FERRIES THAT

15  WERE GOING TO THE TERRITORY AND BELONGED TO THE TERRITORY OF

16  IRAN OR THE GOVERNMENT OF IRAN?  WE DON'T KNOW, BECAUSE HE

17  ENDED UP DROPPING THAT ORDER.  THAT ORDER WENT OUT.

18           BUT DO THINK ABOUT VALFAJR.  EVEN IF THAT WAS WHERE

19  THESE ARE GOING -- AND ALSO STEP BACK AND REALIZE THE

20  CIRCUMSTANCES MR. GHAHREMAN WAS IN WHEN HE TALKED ABOUT

21  VALFAJR.  BEING TOLD, THIS IS YOUR ONLY OPPORTUNITY TO HELP

22  YOURSELF.  SORRY, YOU CAN'T HAVE AN ATTORNEY ASSIST YOU AT

23  THIS CRITICAL MOMENT, BUT WHAT CAN YOU TELL US?

24           IF HE IS HEARING VALFAJR -- IF HE IS HEARING IRANIAN

25  FERRIES FROM KOORUSH MAYBE HE WANTS TO THINK THAT MAYBE HE IS

APRIL 22, 2015

```
 1   TALKING ABOUT VALFAJR.
 2            BUT EVEN IF IT IS VALFAJR, WHEN WE START WITH THE
 3   FIRST BUILDING BLOCK THAT THE GOVERNMENT HAS TO DO TO BUILD A
 4   CONVICTION, WHEN THEY HAVE TO PROVE THAT THESE ITEMS WERE
 5   GOING TO IRAN, WHO IS VALFAJR?  MR. GHAHREMAN DOESN'T HAVE A
 6   GREAT IDEA.  HE KNOWS THAT IT MAY BE A SUBSIDIARY OF IRISL.
 7   WE DON'T KNOW ANYTHING ABOUT WHO OWNS IRISL, OR WHAT THE
 8   OWNERSHIP STRUCTURE IS, OR THE SHAREHOLDER STAKES.
 9            WE KNOW THAT IT IS AN IRANIAN COMPANY, YES.  BUT
10   DOES THAT MEAN IT IS A COMPANY OWNED BY AN IRANIAN, MAYBE IN
11   AJMAN, MAYBE IN DUBAI; OR DOES IT MEAN A COMPANY BASED SOLELY
12   IN THE TERRITORY OF IRAN OR OWNED BY THE GOVERNMENT OF IRAN,
13   WHICH IS WHAT THE GOVERNMENT HAS TO PROVE IN THIS CASE.  WE
14   DON'T HAVE THAT.
15            THE GOVERNMENT HOLDS THE BURDEN OF PROVING ANY
16   QUESTION THAT HASN'T BEEN ANSWERED.  THE GOVERNMENT HAS
17   IMMENSE RESOURCES TO CALL ANY WEALTH OF EXPERTS TO EXPLAIN TO
18   YOU WHO THESE ENTITIES ARE; BUT THEY DIDN'T.
19            SO WHAT WE HAVE IS UNCERTAINTY ABOUT THE NAVIGATS
20   AND EVEN WHETHER THEY WERE GOING -- EVEN BEFORE WE TALK ABOUT
21   KNOWLEDGE OR INTENT -- TO IRAN.
22            AND MAYBE JUST A QUICK ANALOGY BEFORE WE MOVE ON TO
23   THE Y-690'S.
24            WE LIVE IN AN AGE OF GLOBALIZATION.  WE HAVE
25   COMPANIES THAT ARE INTERNATIONAL IN NATURE.  FOR EXAMPLE, WE
```

APRIL 22, 2015

1    HAVE MCDONALD'S.  MCDONALD'S IS A U.S. BASED COMPANY, BUT

2    MCDONALD'S HAS MCDONALD'S ALL OVER THE WORLD.  AND IF

3    MCDONALD'S IN, SAY, TIJUANA, MEXICO ORDERED A NEW FRYER AND

4    GRILL FOR THAT STORE THERE, WE WOULDN'T SAY THAT THOSE ITEMS

5    WENT TO THE TERRITORY OF THE UNITED STATES OR THE UNITED

6    STATES GOVERNMENT.

7            WE LIVE IN AN AGE OF GLOBALIZATION WHERE COMPANIES

8    HAVE DIFFERENT LOCATIONS.  THEY MAY HAVE HEADQUARTERS IN ONE

9    PLACE, BUT THEY MAY HAVE ESTABLISHMENTS IN OTHERS.  WE KNOW

10   THAT.  THAT IS WHAT ERGUN YILDIZ TOLD US.  THERE ARE NUMEROUS

11   IRANIANS WHO HAVE LEGITIMATE BUSINESS IN DUBAI.

12           SO A FURTHER LEVEL OF DIFFICULTY IS WE ARE NOT EVEN

13   TALKING ABOUT STABLE ENTITIES, WE ARE TALKING ABOUT SHIPS FOR

14   THE NAVIGATS.  SHIPS THAT COME TO AND FROM PORTS THAT MIGHT BE

15   BASED IN ONE PORT OR ANOTHER.

16           SO THINK ABOUT THIS WHEN THE GOVERNMENT TELLS YOU

17   THERE IS OVERWHELMING EVIDENCE THAT THE NAVIGATS WERE EVEN

18   INTENDED FOR IRAN, DID THEY PROVE THAT TO YOU?  DID THEY PROVE

19   THAT TO YOU BEYOND A REASONABLE DOUBT?

20           WHAT ABOUT THE Y-690'S?  I THINK THE CHOICE OF WORDS

21   FROM THE GOVERNMENT FOR THAT WAS, IT WAS CONCLUSIVELY PROVED

22   THAT THE Y-690'S WERE GOING TO IRAN.

23           AND THE EVIDENCE THAT THEY POINTED TO BEGINS WITH

24   EXHIBIT 217.  AND I BELIEVE THEY SAID EMAILS 211 THROUGH 217,

25   SO PLEASE LOOK AT ALL OF THEM.

APRIL 22, 2015

          1              BUT IT IS IN EXHIBIT 217, ON THE SECOND PAGE, THAT

          2     WE HAVE THIS INDICATION OF AN IRANIAN ENTITY THAT IS

          3     INTERESTED IN THE Y-690'S.

          4              AND THE GOVERNMENT DID A GOOD JOB OF SHOWING HOW THE

          5     INFORMATION ON THIS LETTER -- WHICH INTERESTINGLY IS WRITTEN

          6     IN ENGLISH, A REQUEST FOR Y-690'S WRITTEN IN ENGLISH, NOT

          7     FARSI, NOT TRYING TO HIDE FROM ANY PRYING EYES, WRITTEN IN

          8     ENGLISH -- WAS TRANSPOSED INTO AN EMAIL TO MR. GHAHREMAN.

          9     CERTAINLY NOT WITH THE HEADER, KOHANDIAREMAD INTERNATIONAL

         10     TRADING COMPANY, JUST THE BODY, WHAT WAS ON IT.

         11              BUT LOOK AT THIS.  WHAT DOES THIS TELL US?  WELL, IF

         12     YOU LOOK AT THE BOTTOM -- AND I DON'T HAVE IT BLOWN UP -- BUT

         13     IT SAYS TEHRAN.  IT SAYS THIS COMPANY IS LOCATED IN TEHRAN,

         14     IRAN.

         15              OKAY.  THAT IS FINE.  BUT WHAT IS THIS COMPANY?  AN

         16     INTERNATIONAL TRADING COMPANY.  ANOTHER COMPANY THAT IS

         17     INVOLVED IN INTERNATIONAL TRADE.

         18              DOES ANYTHING THAT THE GOVERNMENT HAS PROVIDED US

         19     SHOW WHAT KOHANDIAREMAD INTENDED TO DO WITH THESE ITEMS?  WHO

         20     THEIR ULTIMATE PURCHASER WAS?  NO.

         21              WE DON'T KNOW IF THEY WERE INTENDING FOR THOSE TO BE

         22     SHIPPED TO THEIR FACILITY IN DUBAI OR THEIR FACILITY IN CHINA

         23     OR THEIR FACILITY ANYWHERE.  WE DON'T KNOW THAT.

         24              AND AGAIN, THIS IS THE GOVERNMENT'S BURDEN TO ANSWER

         25     ALL OF THESE QUESTIONS IN A CASE BEFORE THEY CAN BUILD THE

                                    APRIL 22, 2015

1    MOUNTAIN REQUIRED TO ASK YOU TO CONVICT.

2         NOW, WE DO KNOW THAT ARASH GHAHREMAN BELIEVED THAT

3    THESE Y-690'S WERE INTENDED FOR AIRPORTS, FOR COMMERCIAL

4    AIRPORTS.  DID HE KNOW THAT THEY WERE AIRPORTS IN IRAN?  WELL,

5    WE HEARD HOW HE TRIED TO EXPLAIN IT TO AGENT HAMAKO AFTER HIS

6    ARREST.  HE DID SAY I HEARD.  I HEARD.  BUT WE KNOW WHO HE

7    HEARD IT FROM, HE HEARD IT FROM DAVID MILLS, WHO REPEATEDLY

8    WAS TRYING TO GET HIM TO SAY THAT THESE ITEMS WERE FOR IRAN.

9         BUT WHAT HE TELLS AGENT HAMAKO WHEN HE IS GIVEN A

10   CHANCE TO FURTHER EXPLAIN IS, HONESTLY, I DON'T KNOW.  I

11   SUSPECTED IRANIAN AIRPORTS.

12        AGAIN, YOU HAVE TO TAKE THAT STATEMENT IN THE

13   CONTEXT OF A MAN WHO HAS NOW BEEN HANDCUFFED, THE BLINDFOLD,

14   LITERALLY AND FIGURATIVELY, REMOVED.  ALL OF THE INFORMATION

15   THAT AGENT HAMAKO HAD GATHERED OVER A SIX-MONTH LONG

16   INVESTIGATION HAS BEEN PRESENTED TO HIM.  HE IS TRYING TO

17   HELP.  BUT THE MOST HE CAN SAY -- THE MOST HE CAN SAY IS, I

18   SUSPECTED IRANIAN AIRPORTS.  KOORUSH DIDN'T TELL ME THAT.

19        IF WE CAN GO TO INSTRUCTION 29.

20        THIS IS ONE OF THE INSTRUCTIONS THAT THE COURT READ

21   TO YOU, AND IT IS A VERY IMPORTANT INSTRUCTION IN THIS CASE.

22        AND THE INSTRUCTION SAYS:  IF YOU FIND ONLY THAT THE

23   DEFENDANT WAS SUSPICIOUS, CARELESS, OR EVEN INDIFFERENT --

24   EVEN INDIFFERENT ABOUT THE DESTINATION OF THE GOODS, OR MERELY

25   KNEW -- KNEW, WHICH WE WILL GET TO IN A MINUTE -- MERELY KNEW

APRIL 22, 2015

1  THE GOODS WERE GOING TO IRAN, WITHOUT THE INTENT THAT THE

2  GOODS BE EXPORTED OR SUPPLIED TO IRAN, YOU MUST VOTE NOT

3  GUILTY.  SUSPICION ALONE IS NOT SUFFICIENT.

4         NOW, WE DO ALL KNOW THAT DAVID MILLS WANTED THESE

5  ITEMS TO BE FOR IRANIAN AIRPORTS.  WE KNOW THAT DAVID COLE,

6  SPECIAL AGENT FOR HOMELAND SECURITY, WANTED THESE ITEMS TO BE

7  FOR IRANIAN AIRPORTS TO FURTHER HIS INVESTIGATION, TO SECURE A

8  CONVICTION.  WE KNOW THAT.

9         BUT THE GOVERNMENT SAYS, LISTEN TO THE CLIPS, IT IS

10 CLEAR.  ARASH GHAHREMAN WAS BASICALLY CONCEDING IT WAS IRAN.

11        I AM JUST GOING TO PLAY CLIP 317 -- SORRY --

12 EXHIBIT 317, CLIP 8, JUST ONCE.

13        (VIDEOTAPE PLAYED)

14        NOW, I ASK YOU TO LISTEN TO IT AS MANY TIMES AS YOU

15 NEED, OR NOT, TO DETERMINE WHETHER THAT WAS A CONCESSION THAT

16 THESE ITEMS ARE INTENDED FOR IRAN.  IT IS SIMPLY ARASH

17 GHAHREMAN TELLING HIM, THESE ARE FOR AIRPORTS.

18        HE TOLD YOU ON THE STAND -- HE TOOK THE STAND,

19 ALTHOUGH HE HAS A CONSTITUTIONAL RIGHT TO SIT THERE AND REMAIN

20 SILENT -- TO EXPLAIN, I UNDERSTOOD WHAT THE USE WAS FOR THESE

21 ITEMS, I UNDERSTOOD IT WAS USED FOR AIRPORTS.

22        BUT AGAIN, WHERE IS THE PROOF THAT THEY WERE

23 INTENDED FOR IRAN?  WE KNOW DAVID MILLS WANTS TO SAY IRAN A

24 LOT OF TIMES, BUT THE QUESTION IS:  WERE THEY TRULY GOING TO

25 IRAN?

1          AND THIS IS WHERE ERGUN YILDIZ COMES INTO PLAY AS

2    WELL.  WHAT DID ERGUN YILDIZ TELL US ABOUT THE Y-690'S?  HE

3    SAID EVEN HE, A TRUSTED COMPATRIOT, THE PRESIDENT OF TIG

4    MARINE WHO HAS BEEN TRUSTED BY KOORUSH TAHERKHANI TO KNOW

5    QUITE A BIT, DIDN'T LEARN ABOUT THEM UNTIL TWO DAYS BEFORE HE

6    LEFT.  AND HE SAID, QUOTE, KOORUSH TOLD ME IT IS FOR HIS

7    CUSTOMERS, DON'T WORRY, END QUOTE.

8          HE DIDN'T SAY -- AND HE HAD A LOT OF GOOD REASONS TO

9    SAY AS MUCH AS HE KNEW ABOUT WHAT WAS GOING ON.  HE DIDN'T

10   SAY, THEY TOLD ME THEY WERE FOR HIS IRANIAN CUSTOMERS; HE

11   SAID, THEY WERE FOR HIS CUSTOMERS.  AND HE ALSO, WHEN ASKED IF

12   IT WAS COMMERCIAL USE, SAID, THAT IS WHAT HE TOLD ME.

13         BUT THIS IS IMPORTANT BECAUSE HE DID SAY THAT HE

14   UNDERSTOOD THESE ITEMS WERE FOR IRAN.  OKAY.  HE DID SAY THAT.

15   BUT HE DIDN'T SAY THAT, KOORUSH TOLD ME THEY WERE FOR THE

16   IRANIAN GOVERNMENT, THE IRANIAN AIRPORT, IRANIAN WHO KNOWS

17   WHAT.

18         HE SAID, BASED ON HIS UNDERSTANDING OF HAVING BEEN

19   BEHIND THE CURTAIN, OF HAVING BEEN THERE IN DUBAI, OF HAVING

20   WORKED WITH THIS COMPANY FOR A NUMBER OF YEARS WITH KOORUSH

21   TAHERKHANI, THAT HE MERELY UNDERSTOOD THAT THEY WERE FOR IRAN.

22         AND AGAIN, THAT SIMPLY ISN'T ENOUGH TO BUILD THIS

23   FIRST BLOCK OF THE PUZZLE, OR THE MOUNTAIN, THAT THE

24   GOVERNMENT MUST BUILD TO SEEK A CONVICTION.

25         NOW, WHAT WE ARE LEFT WITH IS CIRCUMSTANTIAL

APRIL 22, 2015

```
 1   EVIDENCE THAT THESE ITEMS WERE GOING TO IRAN.  AND IF THERE IS
 2   A REASONABLE CONCLUSION, IF YOU CAN SIT THERE AND SAY IT IS
 3   REASONABLE TO CONCLUDE THAT THEY WERE GOING TO IRAN, THAT IS
 4   OKAY.  BUT WHEN YOU ARE FACED WITH ONLY CIRCUMSTANTIAL
 5   EVIDENCE, NO DIRECT EVIDENCE, NO ERGUN YILDIZ SAYING, THESE
 6   WERE INTENDED FOR IRAN, KOHANDIAREMAD WAS GOING TO SELL THEM
 7   TO THE IRANIAN GOVERNMENT OR TO AN AIRPORT IN IRAN, WITHOUT
 8   DIRECT EVIDENCE YOU ARE LEFT WITH CIRCUMSTANTIAL EVIDENCE.
 9           AND EVEN IF IT IS REASONABLE, EVEN IF, AS THE
10   GOVERNMENT HAS ASKED US, EVEN IF YOU USE YOUR COMMON SENSE AND
11   SAY, YEAH, THESE THINGS HAVE TO HAVE BEEN GOING TO IRAN, IF
12   THERE IS ANY OTHER REASONABLE EXPLANATION, IF THERE IS ANY
13   OTHER QUESTION LEFT UNANSWERED ABOUT WHERE THESE WERE REALLY
14   GOING OR WHO THESE COMPANIES MIGHT BE, THAT IS A REASONABLE
15   INFERENCE THAT POINTS AWAY FROM GUILT.
16           AND WHEN YOU WEIGH CIRCUMSTANTIAL EVIDENCE, IF THERE
17   ARE TWO REASONABLE CONCLUSIONS -- AND THIS IS THE HEART OF THE
18   REASONABLE DOUBT INSTRUCTION -- YOU MUST ACCEPT THE ONE THAT
19   POINTS TO INNOCENCE.
20           BUT EVEN IF WE ASSUMED THAT THE GOVERNMENT HAS
21   PROVED OR BUILT THIS FIRST BLOCK, HAS PROVED BEYOND A
22   REASONABLE DOUBT THAT THE Y-690'S AND THE GYROS WERE GOING TO
23   IRAN, THAT IS ONLY THE FIRST BRICK IN THE WALL, THE FIRST
24   BOULDER UP THE MOUNTAIN.
25           AGAIN, AS THE GOVERNMENT HAS ACCEPTED, THEY HAVE THE
```

```
 1   BURDEN OF PROVING KNOWLEDGE.  THEY HAVE THE BURDEN OF PROVING
 2   NOT THAT MR. GHAHREMAN WAS MERELY SUSPICIOUS THAT THESE ITEMS
 3   WERE GOING TO IRAN, OR EVEN INDIFFERENT, THAT HE JUST DIDN'T
 4   CARE THAT THEY WERE GOING TO IRAN; THEY HAVE TO PROVE THAT HE
 5   KNEW THEY WERE GOING TO IRAN.
 6            AND THIS IS A QUESTION THAT I TOLD YOU IN OPENING
 7   WOULD REQUIRE YOUR CAREFUL CONSIDERATION, TO TRY TO UNDERSTAND
 8   THE STATEMENTS THAT MR. GHAHREMAN MAKES IN THE CONTEXT OF THE
 9   POSITION THAT HE IS IN.
10            IT IS HIS CLEAR -- IT IS CLEAR THAT DAVID COLE
11   BELIEVED THESE ITEMS WERE GOING TO IRAN.  IF WE WANT TO TALK
12   ABOUT WORDS SPEAKING VOLUMES, THEN I THINK WE HAVE TO AGREE
13   THAT DAVID COLE HAS SPOKEN ENOUGH TO FILL ANY NUMBER OF
14   LIBRARIES THROUGHOUT THIS COUNTRY AND PROBABLY THE STATE.
15            HE WANTS THESE ITEMS TO BE FOR IRAN.  IT IS THE
16   STARTING POINT OF EVERY CONVERSATION HE HAS WITH ARASH
17   GHAHREMAN, AND IT IS THE STARTING POINT OF EVERY STATEMENT
18   THAT HE COMMUNICATES TO MR. GHAHREMAN.
19            KNOWLEDGE REALLY HAS BEEN THE FOCUS AND THE MEAT OF
20   THE GOVERNMENT'S CASE.  THEY FOCUSED ALMOST EXCLUSIVELY ON IT.
21   AND WHEN I GET TO INTENT I WILL EXPLAIN THE IMPORTANCE OF
22   THAT.  BUT LET'S GET DOWN TO THE TWO ITEMS THEY HAVE CHARGED,
23   THE NAVIGATS AND THE Y-690'S.
24            WHAT HAS THE GOVERNMENT PRESENTED TO SHOW THAT MR.
25   GHAHREMAN KNEW THAT THE NAVIGAT-2100'S WERE GOING TO THE
```

APRIL 22, 2015

1    TERRITORY OF IRAN OR TO THE GOVERNMENT OF IRAN.

2         WELL, WHAT DO WE KNOW?  WE KNOW THAT KOORUSH

3    TAHERKHANI, AN OLD FRIEND WHO HE HADN'T SEEN IN APPROXIMATELY

4    NINE YEARS, GETS IN TOUCH WITH HIM.  WE KNOW THAT KOORUSH

5    TAHERKHANI WAS NOT ASKING FOR THE NAVIGAT 3000.  WHEN YOU

6    REVIEW THESE EMAILS AND CORRESPONDENCE YOU WILL SEE IT WAS

7    CLEAR HE WAS CONSISTENTLY ASKING FOR THE OLDER VERSION, THE

8    NAVIGAT-2100.

9         WE KNOW FROM MR. GHAHREMAN'S TESTIMONY THAT WHEN MR.

10   GHAHREMAN SAID, WHY DON'T YOU GO TO SPERRY IN DUBAI?  THEY

11   HAVE PLACES EVERYWHERE.

12        HE SAID, I DID GO TO SPERRY IN DUBAI, AND ALL THEY

13   HAD WAS THE 3000.  THEY DON'T CARRY THE 2100 ANYMORE.  THEY

14   ARE DISCONTINUING IT.

15        AND THAT STATEMENT, WHILE IT COMES FROM MR.

16   GHAHREMAN AND YOU CAN QUESTION IT, CORROBORATES THINGS THAT WE

17   HAVE HEARD FROM PEOPLE THAT THE GOVERNMENT HAS PUT ON.  THE

18   3000 WAS THE PRODUCT THAT SPERRY WAS TRYING TO SELL.  THE 2100

19   WAS BEING DISCONTINUED.  DAVID MILLS TOLD MR. GHAHREMAN THAT

20   HE HAD TO BASICALLY GET A FAVOR FROM A FRIEND AT SPERRY TO

21   PLACE A FINAL ORDER FOR THE NAVIGAT-2100'S.

22        SO IT MAKES SENSE THAT THE 2100'S MIGHT NOT BE IN

23   STOCK IN DUBAI.  AND SO WHEN THE GOVERNMENT TRIES TO PUT A

24   WHOLE LOT OF WEIGHT ON THE FACT THAT KOORUSH TAHERKHANI IS

25   ASKING FOR HIM TO GO TO STOCKERS OR DISTRIBUTORS, IT DOESN'T

APRIL 22, 2015

```
 1    CARRY THAT WEIGHT WHEN YOU CAN UNDERSTAND HE HAS ALREADY GONE
 2    TO THE MANUFACTURER.  THEY SAY, WE ARE DOING 3000'S, WE ARE
 3    NOT DOING 2100'S.  HE NEEDS TO FIND SOMEBODY WHO HAS IT IN
 4    STOCK.
 5              AND DAVID MILLS' OWN EMAILS SUPPORT THIS.  DAVID
 6    MILLS TELLS MR. GHAHREMAN, YEAH, YOU KNOW, THEY ARE
 7    DISCONTINUING IT.  I HAVE A CUSTOMER IN MEXICO, HE ORDERED
 8    FIVE AND HE KEPT ONE ON HIS SHELF.  MAYBE I CAN GET THAT FROM
 9    HIM.
10              NOW, WHEN KOORUSH TAHERKHANI FIRST APPROACHED
11    MR. GHAHREMAN OR CONTACTED HIM ABOUT THE 2100, HE ASKED HIM TO
12    CHECK OUT THIS COMPANY IN NEW YORK THAT HE HAD LOOKED UP.
13              AND MR. GHAHREMAN LOOKED INTO THE COMPANY, HE WASN'T
14    GETTING A RESPONSE.  AND WHAT DID HE TELL KOORUSH TAHERKHANI
15    WHEN WE ARE WONDERING WHETHER HE KNEW THIS WAS FOR IRAN OR HE
16    KNEW THAT THIS WAS TO BE EXPORTED IN VIOLATION OF THE EMBARGO?
17              WELL, WHAT HE TOLD HIM IS, I WOULD LIKE TO TRY TO
18    USE A TRUSTED APPROVED SUPPLIER.  HE SAID, FORGET ABOUT THIS
19    GTF, I WANT TO GO TO A TRUSTED APPROVED SUPPLIER.
20              THOSE ARE NOT THE WORDS OF A PERSON WHO IS KNOWINGLY
21    ENGAGING IN CONDUCT THAT HE BELIEVES IS VIOLATING THE LAW.
22              AND THE GOVERNMENT CAN DISPARAGE TAMMY FARNSLEY OR
23    TIMCO AS BEING SOME SMALL SECOND-HAND, SECOND STORE
24    DISTRIBUTOR OUT IN INDIANA, BUT THAT IS NOT REALLY A FAIR
25    ASSESSMENT.
```

APRIL 22, 2015

1          MR. GHAHREMAN TOLD YOU THAT HE HAD A PRIOR BUSINESS

2   RELATIONSHIP WITH TIMCO MARINE, WITH TAMMY FARNSLEY.  THAT

3   THESE ARE PEOPLE THAT HE HAD WORKED WITH BEFORE.  SO WHEN HIS

4   FRIEND IS ASKING HIM TO HELP LOOK FOR A NEW PRODUCT, HE GOES

5   TO A PERSON HE HAS WORKED WITH BEFORE.  TIMCO IS A TRUSTED

6   SUPPLIER.  TIMCO IS SOMEONE WHO MIGHT BE ABLE TO HAVE THESE IN

7   STOCK.  TIMCO TELLS MR. GHAHREMAN YES, WE DO INTERNATIONAL

8   BUSINESS, YES WE CAN EXPORT TO OTHER COUNTRIES.

9          AND THE GOVERNMENT MAKES A BIG DEAL OF THE FACT

10  THAT -- LET ME BACK UP.

11         TAMMY FARNSLEY DOES HER WORK.  COMES BACK TO MR.

12  GHAHREMAN, SAYS THIS IS A HIGH TECH ITEM, HOMELAND SECURITY

13  MIGHT NEED TO BE INVOLVED SO WE ARE GOING TO NEED SOME MORE

14  INFORMATION.

15         IT DOESN'T SURPRISE MR. GHAHREMAN.  HE DOESN'T WRITE

16  BACK, LIKE, NO, I DON'T WANT TO BE INVOLVED IN THIS.  HE

17  FORWARDS THIS INFORMATION TO KOORUSH TAHERKHANI.

18         KOORUSH DOESN'T SAY WHOA, PULL THE PLUG, I DON'T

19  WANT HOMELAND SECURITY INVOLVED.

20         WHAT WE HAVE, THE EVIDENCE THAT YOU HAVE REGARDING

21  ANY KNOWLEDGE OF ILLEGAL ACTIVITY IS KOORUSH TAHERKHANI SIMPLY

22  SENDING BACK END USER INFORMATION.  END USER ON THE FORM

23  PROVIDED BY SPERRY MARINE THAT MR. GHAHREMAN THEN SENDS BACK

24  TO SPERRY VIA TAMMY FARNSLEY.  IT DOESN'T SEEM TO BE THE SORT

25  OF ACTIVITY THAT SOMEONE ENGAGED IN CRIMINAL CONDUCT WOULD DO.

APRIL 22, 2015

```
 1            WAS KOORUSH TAHERKHANI UPSET THAT MR. GHAHREMAN HAD
 2  ENDED UP GOING TO THE MANUFACTURER WHEN THEY REJECT IT?  HE
 3  WAS UPSET BECAUSE HE KNEW THE MANUFACTURER WASN'T INTERESTED
 4  IN DEALING WITH THE 2100 ANYWAY.
 5            WE KNOW FROM DAVID MILLS, IF HE IS TO BE BELIEVED,
 6  HE HAD TO ACTUALLY GET A SPECIAL FAVOR FROM SPERRY MARINE TO
 7  GET A 2100.
 8            BUT WE ALSO KNOW, WHEN WE ARE TALKING ABOUT THE
 9  RESPONSE FROM NORTHROP GRUMMAN, THERE IS THE MERCEDES ENGINE
10  ON A TRICYCLE.
11            AS THE GOVERNMENT SAID, YOU CAN HAVE NO OTHER
12  CONCLUSION THAN TO KNOW THAT WESAL NEVER COULD BE THE END USER
13  FOR THIS ITEM.
14            AGAIN, I AM GOING TO ASK YOU TO LOOK CAREFULLY --
15  AND MAYBE WE CAN -- I MIGHT BE A LITTLE AHEAD OF MYSELF, BUT
16  MAYBE IF WE CAN PULL EXHIBIT D.
17            LET'S TALK ABOUT A FEW THINGS FROM -- THIS IS A
18  CHAIN OF EMAILS YOU WILL HAVE BACK IN THE JURY ROOM THAT YOU
19  CAN LOOK THROUGH.
20            ONE OF THE MOST INTERESTING THINGS IS WE HAVE GREG
21  TOPCZEWSKI FROM SPERRY MARINE, THE HEAD OF SECURITY, THE
22  PERSON WHO HAS BEEN DOING THIS, I THINK, FOR SOME 30 YEARS,
23  SAYING, I DON'T SEE ANYTHING ABOUT TIMCO MARINE KNOWING THAT
24  THIS IS SUSPICIOUS.
25            TIMCO MARINE, WHO TOOK THE SAME PIECE OF INFORMATION
```

APRIL 22, 2015

1     THAT MR. GHAHREMAN HAD, AND GAVE IT TO NORTHROP GRUMMAN, TIMCO

2     MARINE, WHO GAVE THE SAME COMMENT TO MR. GHAHREMAN ABOUT

3     HOMELAND SECURITY NEEDING TO BE INVOLVED, PASSED THIS

4     INFORMATION ON.  AND THE GOVERNMENT IS TRYING TO MAKE SOME

5     SORT OF DISTINCTION BETWEEN MR. GHAHREMAN AND TIMCO MARINE

6     WHEN HERE WE HAVE THE HEAD OF SECURITY AT NORTHROP GRUMMAN

7     SAYING, I DON'T THINK -- I THINK TIMCO MARINE IS UNAWARE OF

8     THE IMPLICATIONS OF THIS TRANSACTION.

9           NOW, ONE OF THE PROBLEMS THAT YOU CAN SEE IN THIS

10    EMAIL, THAT I HAVEN'T BLOWN OUT, IS WHAT WERE THEY REALLY

11    SAYING WHEN THEY SAID IT IS LIKE PUTTING A MERCEDES ENGINE ON

12    A TRICYCLE.

13          I THINK I MENTIONED A LITTLE BIT EARLIER, AND YOU

14    WILL HAVE THIS BACK THERE, BUT TOPCZEWSKI SAYS, A 95-FOOT

15    CRUISE SHIP IS NOT THE NORMAL USE FOR A 2100, AND DEFINITELY

16    OVERKILL FOR A 3000.

17          IS IT POSSIBLE THAT WHEN THEY RESPONDED ABOUT

18    MERCEDES ENGINES ON A TRICYCLE THAT THEY REALLY WERE THINKING

19    ABOUT PUTTING A MUCH MORE UPDATED VERSION OF THE 20-YEAR-OLD

20    ANTIQUATED -- TO USE TOPCZEWSKI'S WORDS -- DEVICE, IS THAT

21    WHAT THEY WERE TALKING ABOUT?

22          WELL, I THINK IT IS FAIR TO INFER THAT THAT IS WHAT

23    MR. GHAHREMAN AND KOORUSH TAHERKHANI BELIEVED.

24          IF YOU WILL LOOK AT THESE OTHER EMAILS I THINK --

25    HERE, FROM TAMMY FARNSLEY, I KNOW FOR SURE THIS GUY WAS

APRIL 22, 2015

1    SUPPOSED TO HAVE AT LEAST ONE OF THE 3000'S, BUT I NEVER ASKED

2    ABOUT THE 2000.

3              TAMMY FARNSLEY IS CONFUSED ABOUT THE 2100 AND THE

4    3000, AS WELL.

5              THE END USER INFORMATION PROVIDED BY TIG MARINE

6    SAID, WE WANT A 2100.  AND SHE PASSED THAT ON TO THEM.  BUT IF

7    YOU GO LOOK THROUGH ALL OF THOSE EMAIL EXCHANGES YOU WILL SEE

8    THAT THEY WEREN'T SURE, THEY THOUGHT MAYBE THAT WAS A MISTAKE.

9    THEY THOUGHT IT WAS SUSPICIOUS BECAUSE THEY WANTED A 3000.

10             AND KOORUSH SAYS NO, I TALKED TO SUPERINTENDENT OF

11   THE BOAT.  HE FINDS THE OLDER ONE, IT MIGHT BE ANTIQUATED BUT

12   IT IS RELIABLE, IT IS WHAT HE WANTS ON THAT BOAT.

13             SO I JUST DON'T THINK THAT THAT RESPONSE CARRIES THE

14   WEIGHT TO SHOW BEYOND A REASONABLE DOUBT THAT MR. GHAHREMAN

15   KNEW THAT THAT ITEM WAS GOING TO IRAN.

16             BUT WE KNOW A FEW OTHER THINGS THAT MIGHT HELP

17   EXPLAIN THE CONTEXT.  AGAIN, I ASKED YOU TO APPRECIATE THE

18   CONTEXT.  AND THIS COMES FROM DAVID MILLS HIMSELF, THE PERSON

19   WHO APPEARS TO BE THE MOST WELL-CONNECTED PERSON TO THE

20   INDUSTRY WHO ENDS UP COMMUNICATING WITH MR. GHAHREMAN.

21             THE GOVERNMENT DISPARAGES THE COMMENT ABOUT THE MAN

22   THE MIDDLE.  BUT WHEN I TALK ABOUT THE MAN IN THE MIDDLE I AM

23   EXPLAINING A PERSON WHO IS LIMITED IN THE INFORMATION HE HAS

24   TO WHAT IS PROVIDED TO HIM BY ONE SIDE OR PROVIDED TO HIM BY

25   THE OTHER.

APRIL 22, 2015

```
1              AND WHAT HE'S PROVIDED BY DAVID MILLS IS AN
2   EXPLANATION FOR WHY THIS WAS REJECTED, AN INNOCENT EXPLANATION
3   FOR WHY NORTHROP GRUMMAN MIGHT NOT BE INTERESTED IN PROVIDING
4   NAVIGATS TO A COMPANY FROM DUBAI WITH AN OWNER WITH A FOREIGN
5   NAME, A MIDDLE EASTERN NAME.
6              IF WE CAN PLAY EXHIBIT FF I WOULD APPRECIATE THAT.
7              (AUDIO PLAYED)
8              FORGOTTEN ABOUT.  A NICER WAY OF SAYING
9   DISCRIMINATED AGAINST.
10             ANOTHER WAY OF SAYING:  THIS IS A LARGE COMPANY.
11  THEY GOT LARGE CUSTOMERS.  THEY HAVE THE U.S. GOVERNMENT.
12  THEY HAVE OTHER LARGE COMPANIES.  THEY DON'T NEED TO WASTE
13  THEIR TIME WITH A SMALL COMPANY FROM THE MIDDLE EAST.
14             THIS IS SOMETHING THAT ERGUN YILDIZ TOLD YOU THAT
15  DAVID MILLS REPEATED TO THEM AT THE GREEN VALLEY RANCH.  THIS
16  ISN'T JUST THE BEGINNING, HE TELLS IT TO THEM AGAIN JUNE 13TH
17  OF 2013.
18             HE IS TELLING THEM, THESE ARE LARGE COMPANIES.  THEY
19  GET HUNDREDS OF THESE ORDERS, ALL THE TIME.  THEY DON'T SPEND
20  FIVE MINUTES ON IT.  IF THEY DON'T LIKE IT THEY THROW IT AWAY.
21  THEY DON'T CHECK IT OUT, THEY DON'T MAKE SURE YOU ARE ASKING
22  FOR THE 2100 INSTEAD OF THE 3000 BEFORE THEY SAY NO.  THESE
23  COMPANIES DON'T HAVE THE TIME FOR PEOPLE WITH FUNNY LAST NAMES
24  FROM THE MIDDLE EAST.
25             THESE ARE INNOCENT EXPLANATIONS FOR WHY MR.
```

APRIL 22, 2015

1    GHAHREMAN WOULD UNDERSTAND THAT HE MIGHT HAVE TO GO ABOUT THIS

2    BUSINESS IN A DIFFERENT WAY.  HE HAS GONE DIRECTLY TO THE

3    MANUFACTURER.  HE IS TRYING TO TELL THEM HE WANTS ONE ITEM.

4    HE IS BEING TOLD, YOU CAN'T HAVE THE OTHER ITEM AND IT DOESN'T

5    FIT.

6            HE IS ALSO BEING EXPLAINED BY DAVID MILLS -- AND I

7    THINK IT IS CONSISTENT WITH HIS EXPERIENCE AND MAYBE MR.

8    TAHERKHANI'S EXPERIENCE -- THAT IT IS VERY HARD TO EVEN DO

9    LEGITIMATE BUSINESS WITH LARGE UNITED STATES MANUFACTURERS

10   WHEN YOU ARE A SMALL COMPANY IN THE MIDDLE EAST.

11           SO WHAT ARE WE TO MAKE OF THE GOVERNMENT'S ARGUMENT

12   THAT MR. GHAHREMAN NEVER OBJECTED TO DAVID MILLS' USE OF A

13   DIFFERENT END USER FOR GYROS?  THAT IS ONE OF THE ARGUMENTS

14   THEY MAKE.  THEY SAY LOOK, DAVID MILLS SAID, I AM GOING TO PUT

15   DOWN A DIFFERENT END USER.  THEY REJECTED YOU.

16           AND MR. GHAHREMAN DIDN'T OBJECT TO IT.

17           WELL, I GUESS THE QUESTION IS ONE THAT NEEDS TO GO

18   BACK TO THE GOVERNMENT:  WHAT ELSE ARE THEY TO DO?

19           IF THESE COMPANIES ARE GOING TO REJECT END USERS

20   LIKE TIG MARINE, EVEN ASSUMING THEY ARE A LEGITIMATE BUSINESS,

21   WHAT ARE THEY TO DO?

22           DAVID MILLS TOLD THEM THAT ON TOP OF THIS THERE IS

23   NOT ONLY THIS PROBLEM BUT THEY ARE DISCONTINUING THE 2100.  WE

24   NEED TO GET OUR ORDER IN QUICK.  I HAD TO GET A FAVOR TO GET

25   THEM TO DO IT, SO I CAN'T JUST GO BACK WITH YOUR END USER,

APRIL 22, 2015

THEY WILL SEE THAT THEY JUST REJECTED THE WESAL AND YOU WON'T

GET YOUR PRODUCT.  AND, BY THE WAY, IF WE DO IT THAT WAY

AGAIN, YOU KNOW, THEY ARE NOT EVEN MAKING THE 2100'S ANYMORE.

DAVID MILLS SAYS, I WILL USE MY OWN END USER, OR, I

WILL USE A DIFFERENT END USER.

AND THAT DOESN'T MAKE MR. GHAHREMAN'S COMPLICITY OR

HIS SILENCE CRIMINAL.  IT HAS AN INNOCENT EXPLANATION.  THIS

IS THE WAY TO GET THESE PARTS.

AND LET'S JUST PLAY EXHIBIT GG JUST TO BE CLEAR

ABOUT HOW DAVID MILLS IS EXPLAINING HOW THESE COMPANIES

OPERATE.

(AUDIO PLAYED)

THESE COMPANIES ARE WEIRD.  THEY HAVE ALL SORTS OF

REQUIREMENTS THAT GO BEYOND ANY LAWFUL OR UNLAWFUL CONDUCT.

AND ARASH GHAHREMAN, AS THE OCCASIONAL INTERMEDIARY FOR TIG

MARINE, IS TRYING TO NAVIGATE THIS WORLD TO MAKE A DEAL COME

TOGETHER, A DEAL FOR DELIVERY OF ITEMS TO DUBAI.

AND I MAY HAVE ONE MORE EXHIBIT I WOULD LIKE TO

PLAY, GOVERNMENT'S EXHIBIT 301.

(AUDIO PLAYED)

THOSE QUESTIONS THEY HAD ABOUT YOU, THE WORRIES THEY

HAD ABOUT YOU, CONVERSATIONS ABOUT THE COMPANIES BEING WEIRD,

NOT WANTING TO DEAL WITH SMALL BUSINESSES WITH PEOPLE WHO HAVE

FOREIGN NAMES.

WE CAN CERTAINLY LOOK AT DAVID MILLS, WHO WE KNOW

APRIL 22, 2015

1   TODAY TO BE DAVID COLE, AND UNDERSTAND THAT HE COULD BE

2   MEANING THAT A DIFFERENT WAY.  BUT LISTENING TO THAT, IN THE

3   CONTEXT OF THOSE OTHER CALLS, YOU CAN SEE THAT ARASH

4   GHAHREMAN, HEARING THAT, UNDERSTANDS THAT DAVID MILLS IS

5   PROVIDING HIM A WAY TO DO WHAT HE BELIEVES TO BE HIS

6   LEGITIMATE BUSINESS.  AND CERTAINLY NOTHING IN THAT IS PROVING

7   THAT ARASH GHAHREMAN KNEW THAT THESE ITEMS WERE GOING TO IRAN.

8           NOW, WE DO NEED TO TURN TO THE Y-690'S.  AND I THINK

9   THE FIRST PLACE THAT WE HAVE TO START IS TO UNDERSTAND THE

10  ROLES OF THE PARTIES IN THIS CASE.

11          AND WE DO HAVE TO UNDERSTAND THAT ARASH PLAYED A

12  SPECIFIC ROLE FOR THE BUYER IN THIS VENTURE.  HE WAS THE

13  OCCASIONAL NONEXCLUSIVE INTERMEDIARY FOR THE BUYER OF THESE

14  GOODS.  AND THE BUYER OF THESE GOODS MEANING THE IMPORTER.

15  OKAY.

16          DAVID MILLS HAS MADE CLEAR TO YOU IN HIS TESTIMONY,

17  AS WELL AS HIS STATEMENTS TO MR. GHAHREMAN, THAT HE PLAYED THE

18  ROLE OF THE SELLER, THE EXPORTER, THE PERSON RESPONSIBLE FOR

19  ANY LICENSING REQUIREMENTS THAT THERE MIGHT BE.

20          AND YOU CAN LISTEN TO EXHIBIT 307 WHERE HE MAKES IT

21  ABSOLUTELY EXPLICIT TO MR. GHAHREMAN, I AM THE EXPORTER.  I

22  WILL EXPORT EVERYTHING THAT YOU NEED.

23          AND YOU MAY RECALL THE WITNESS MOLLY MILLER.  SHE

24  STARTED OUT, I THINK, ON DAY ONE, CAME BACK ON DAY TWO.  SHE

25  EXPLAINED TO YOU THAT EXPORT LICENSES ARE REQUIRED FOR THOSE

1    WHO EXPORT ITEMS OUT OF THE UNITED STATES.

2         SO AGAIN, DAVID MILLS IS THE EXPORTER.  HE IS

3    RESPONSIBLE FOR ANY LICENSING REQUIREMENTS THAT THERE MAY BE.

4    MR. GHAHREMAN IS THE OCCASIONAL NONEXCLUSIVE INTERMEDIARY FOR

5    THE IMPORTER, FOR THE BUYER.  AND THE GOVERNMENT'S EXPERT

6    WITNESS HAS TOLD YOU THAT IT IS THE EXPORTER RESPONSIBLE FOR

7    THESE LICENSES.

8         NOW, YOU HAVE HEARD THAT DAVID MILLS HAS

9    ERRONEOUSLY, AND WHETHER IT IS IN GOOD FAITH OR NOT, HAS

10   ERRONEOUSLY TOLD MR. GHAHREMAN THAT THE Y-690'S WERE MUNITIONS

11   THAT REQUIRED A SPECIAL LICENSE FOR EXPORT OUT OF THE COUNTRY.

12        WE HAVE HEARD THE INSTRUCTION FROM THE JUDGE, AND WE

13   WILL TALK ABOUT THAT IN A MOMENT.  BUT WHAT DID HE SAY TO MR.

14   GHAHREMAN WHEN IT CAME TIME -- WHEN HE TELLS HIM AT THE SAME

15   TIME HE IS SAYING THESE REQUIRE SPECIAL EXPORT LICENSE TO ANY

16   COUNTRY, EVEN DUBAI.  AND THE GOVERNMENT SAYS HE GAVE MR.

17   GHAHREMAN A CHOICE, AND MR. GHAHREMAN, WITHOUT SKIPPING A

18   BEAT, SAID, WE PREFER NOT TO USE OUR END USERS.

19        WHAT WAS THE CONTEXT OF THAT CONVERSATION?  THIS IS

20   EXHIBIT 304.  AND I AM NOT GOING TO PLAY ALL OF THESE EXHIBITS

21   FOR YOU TODAY, BUT YOU ARE GOING TO HAVE THE EQUIPMENT BACK IN

22   THE JURY ROOM TO LISTEN TO ALL OF THE EVIDENCE.

23        BUT IN EXHIBIT 304, THIS IS THE ONE WHERE DAVID

24   MILLS SAYS, LOOK, THESE THINGS REQUIRE LICENSES, AND YOU NEED

25   TO EITHER PROVIDE ME WITH YOUR END USER AND THERE WILL BE

```
 1    ADDITIONAL REVIEW, OR I HAVE ONE, I HAVE A TRUSTED, VERIFIABLE
 2    END USER THAT I CAN USE TO GET THE EXPORT LICENSE THAT I,
 3    DAVID MILLS, NOT YOU ARASH GHAHREMAN OR TIG MARINE, IS
 4    REQUIRED TO GET TO EXPORT THESE ITEMS FROM THE UNITED STATES.
 5              AND WHAT THE GOVERNMENT OMITTED IS THAT MR.
 6    GHAHREMAN HAD ALREADY TOLD DAVID MILLS THAT THE END USER FOR
 7    THE Y-690'S, THE END USER THAT HE SHOULD USE, WAS TIG MARINE.
 8    THAT TIG MARINE HAD SOME -- TO HIS UNDERSTANDING -- USE FOR
 9    SOME OF THEM IN THE SHOP, AND THAT OTHERS MIGHT BE FOR
10    AIRPORTS, BUT THAT HE DIDN'T HAVE ANY ADDITIONAL INFORMATION.
11              AND DAVID MILLS HAD ALREADY TOLD HIM, THAT WON'T
12    WORK.  THEY WON'T APPROVE THAT.
13              AND WE KNOW THEY WON'T APPROVE THAT BECAUSE DAVID
14    COLE, THE AGENT WHO TESTIFIED, TOLD YOU, THESE LICENSES ARE
15    FOR MUNITIONS.  YOU HAVE TO HAVE MILITARY -- APPROVED MILITARY
16    USE BEFORE YOU CAN GET ONE OF THESE LICENSES.
17              AND WITH THE INFORMATION THAT MR. GHAHREMAN HAS THAT
18    THEY ARE FOR USE IN COMMERCIAL AIRPORTS AND A SHOP IN DUBAI
19    MARITIME CITY, THAT IS NOT AN OPTION.  IT IS NOT AN OPTION.
20    IT IS NOT GOING TO GET THOSE PRODUCTS TO HIM.
21              EVEN THOUGH WE KNOW TODAY THAT THESE AREN'T
22    MUNITIONS, THAT THEY DON'T REQUIRE ANY LICENSE, THAT THEY HAVE
23    COMMERCIAL USE.  THAT THEY ARE NOT MUNITIONS OR THE THINGS
24    THAT DAVID MILLS REPRESENTED.
25              AND SO THE GOVERNMENT SAYS HE MADE A CHOICE.  HE
```

APRIL 22, 2015

```
 1   SAID, WE ARE NOT COMFORTABLE RELEASING OUR END USER
 2   INFORMATION.
 3           BUT DAVID MILLS TOLD HIM SOMETHING ELSE IN THIS
 4   CONVERSATION, AS WELL.  HE SAID, WE ONLY HAVE ONE SHOT AT
 5   THIS.  I CAN'T GO TO THEM TODAY WITH TIG MARINE, SEE IF THEY
 6   ACCEPT THAT -- EVEN THOUGH DAVID MILLS KNOWS THEY WON'T
 7   BECAUSE HE IS NOT ASKING FOR MILITARY USE -- AND THEN GO BACK
 8   TO YOU AGAIN WITH MY VERIFIABLE TRUSTED END USER.
 9           SO DOES MR. GHAHREMAN ACQUIESCE AND AGREE TO LET
10   DAVID MILLS USE HIS TRUSTED, VERIFIABLE END USER?  YES.  YES,
11   HE DOES.  BUT TO UNDERSTAND WHETHER THAT MEANS MR. GHAHREMAN
12   KNEW THESE ARE GOING TO IRAN OR NOT, IT DOESN'T EVEN COME
13   HALFWAY TO ANSWERING THE QUESTION.
14           THE COURT HAS GIVEN YOU AN ADMONITION.  IT WASN'T AN
15   INSTRUCTION BUT IT WAS AN ADMONITION THAT WAS GIVEN TO YOU AT
16   THE CONCLUSION OF THE EVIDENCE, AND I BELIEVE I HAVE -- DO I
17   HAVE IT ON HERE?
18           I JUST WANT TO TAKE A MOMENT, BECAUSE THIS IS
19   IMPORTANT.
20           THE Y-690'S -- THIS IS THE SECOND PARAGRAPH -- ARE
21   NOT CLASSIFIED AS MUNITIONS BY THE UNITED STATES GOVERNMENT,
22   REGARDLESS OF WHATEVER WAS SAID.  SO THEY DO NOT REQUIRE AN
23   EXPORT LICENSE TO BE SENT TO A THIRD COUNTRY SUCH AS PANAMA,
24   OR IN THIS CASE THE CZECH REPUBLIC.  AND MR. GHAHREMAN ISN'T
25   CHARGED WITH ANY VIOLATIONS OF THE SPECIAL LICENSING
```

1  REQUIREMENT.  I THINK YOU MAY HAVE HEARD IT REFERRED TO AS

2  ITAR.

3           BUT WHAT THE JUDGE SAID TO YOU -- AND I THINK THIS

4  IS AS CLOSE TO WORD FOR WORD AS IT IS, BUT I AM SURE THE

5  GOVERNMENT CAN CORRECT ME.  EVEN IF YOU CONCLUDE THAT MR.

6  GHAHREMAN ERRONEOUSLY BELIEVED THAT THE Y-690'S REQUIRED A

7  LICENSE FOR EXPORT TO ANY COUNTRY, MEANING, YOU KNOW, IT WAS

8  SPECIALLY CONTROLLED -- YOU MAY NOT PRESUME FROM THAT EVIDENCE

9  ALONE THAT HE INTENDED THAT THEY BE EXPORTED TO IRAN

10 SPECIFICALLY.

11          NOW, THIS MAKES A LITTLE BIT OF COMMON SENSE, RIGHT?

12 IF HE THINKS THAT IT NEEDS A LICENSE TO GO TO ANY COUNTRY,

13 THAT DOESN'T MEAN IT IS MORE LIKELY THAN NOT THAT HE KNEW THAT

14 IT WAS GOING TO A SPECIFIC COUNTRY, TO IRAN.

15          BUT THERE IS A CONCERN, BECAUSE DAVID MILLS -- AND

16 THIS IS GOING TO EXPLAIN A LOT OF THE STATEMENTS THAT ARE MADE

17 THROUGHOUT THE COURSE OF THIS INVESTIGATION.

18          DAVID MILLS IS SAYING THAT HE IS GOING TO HAVE TO

19 POTENTIALLY VIOLATE THE LAW BY PROVIDING FALSE END USER

20 INFORMATION OR A DIFFERENT END USER.

21          AND WE ARE TALKING ABOUT KNOWLEDGE OF WHETHER THESE

22 Y-690'S WERE GOING TO IRAN.  AND I ASK YOU, THE JURORS, NOT TO

23 CONFUSE THE ISSUES, NOT TO LOOK AT WHETHER MR. GHAHREMAN WAS

24 COMPLICIT OR NOT IN DAVID MILLS' DECISION, EXCLUSIVELY AS THE

25 EXPORTER.  THIS WOULD BE HIS RESPONSIBILITY, NOT MR.

APRIL 22, 2015

1   GHAHREMAN'S, TO GET A LICENSE IN WHATEVER WAY HE FELT WOULD

2   HELP THEM GET THE DEAL DONE.  DON'T CONFUSE THAT WITH THE

3   GOVERNMENT'S BURDEN OF NEEDING TO PROVE THAT MR. GHAHREMAN

4   KNEW THESE ITEMS WERE SPECIFICALLY INTENDED FOR USE BY THE

5   GOVERNMENT OF IRAN OR IN THE TERRITORY OF IRAN.

6            BUT IT REALLY IS THIS MISSTATEMENT THAT LEADS TO

7   WHAT THE GOVERNMENT SPENT SOME TIME ON, A NUMBER OF INSTANCES

8   WHERE THE TALK ABOUT GOING TO JAIL COMES UP.

9            AND DAVID MILLS TALKS ABOUT, IF WE DON'T DO THINGS

10  RIGHT WE ARE GOING TO BOTH GO TO JAIL.

11           DAVID MILLS ALSO TALKS ABOUT WHY THE LARGE BANKS

12  THAT TIG MARINE HAS SAID THEY WANT TO SECURE THE STANDBY

13  LETTER OF CREDIT -- REMEMBER THERE WAS AN ISSUE ABOUT WE GOT

14  TWO NEW PARTIES WORKING TOGETHER SENDING LOTS OF MONEY BACK

15  AND FORTH, WE NEED SOME INSURANCE.  WE CAN'T DO THIS LIKE

16  CRAIGSLIST AND JUST WIRE A BUNCH OF MONEY TO SOMEONE WE DON'T

17  KNOW, WE NEED BANKS.

18           DAVID MILLS MAKES A BIG DEAL ABOUT, WE CAN'T HAVE

19  THE BIG BANKS LOOKING AT THIS BECAUSE THEY MIGHT SEE SOME

20  PROBLEMS.

21           WHAT IS MR. GHAHREMAN TO DO?  AND WHAT ARE YOU, THE

22  JURY, TO INFER FROM THESE STATEMENTS ABOUT JAIL AND THESE

23  STATEMENTS ABOUT, I NEED TO USE BANK OF THE WEST?

24           WELL, MR. GHAHREMAN DOESN'T TELL DAVID MILLS THAT HE

25  FEARS GOING TO JAIL WHEN DAVID MILLS FIRST TELLS HIM THESE

APRIL 22, 2015

1435

1   THINGS.  I THINK THE GOVERNMENT HAS PLAYED THOSE CLIPS FOR YOU

2   WHERE HE BASICALLY ACQUIESCES OR DOESN'T SAY ANYTHING.

3           THE ONE TIME THAT HE RESPONDS, THAT THE GOVERNMENT

4   DIDN'T PLAY BUT I PLAYED, THAT CLIP WHERE HE STARTS LAUGHING

5   AT THE END WHEN I THINK DAVID MILLS IS, LIKE, LOOK, IF WE

6   DON'T DO THIS RIGHT ALL THREE OF US WILL BE IN JAIL TOGETHER,

7   HE IS LAUGHING.  HE IS JOKING.  HE DOESN'T APPRECIATE THAT HE

8   COULD GO TO JAIL FOR THIS, BECAUSE HE DOESN'T BELIEVE THAT

9   DAVID MILLS' DECISION TO VIOLATE THESE EXPORT RESTRICTIONS OR

10  TO FIND A DIFFERENT END USER IS HIS RESPONSIBILITY.

11          DAVID MILLS SAYS, I HANDLE THAT.  DAVID MILLS SAYS,

12  I UNDERSTAND THESE COMPANIES ARE WEIRD, I KNOW YOU ARE TRYING

13  TO DO THIS BUSINESS.

14          SO I DON'T THINK THAT IT CARRIES THE WEIGHT, THESE

15  STATEMENTS OF JAIL.  AND I GUESS I SHOULD TALK ABOUT THAT --

16  WELL, LET ME JUST FINISH THAT POINT ON THIS.

17          MR. GHAHREMAN IS NOT THE EXPORTER.  HE IS NOT THE

18  PERSON WHO SEEKS THE LICENSE.  HE IS THE PERSON WHO IS NOT IN

19  A POSITION TO SEEK THE LICENSE.  SO WHEN DAVID MILLS TALKS

20  ABOUT CONCERNS THAT HE MIGHT HAVE, MR. GHAHREMAN TOLD YOU, YOU

21  DON'T DISRESPECT THEM, YOU DON'T TELL THEM, OH, YOU ARE GOING

22  TO JAIL NOT ME.  YOU HAVE TO MAINTAIN A BUSINESS RELATIONSHIP

23  WITH THIS PERSON.

24          AND IF DAVID MILLS WANTS TO THINK THAT THEY ARE IN

25  THE SAME BOAT TOGETHER, ARASH GHAHREMAN IS NOT GOING TO

APRIL 22, 2015

1   DISRESPECT HIM OR TELL HIM DIFFERENTLY IF HE DOESN'T HAVE TO.

2          AND, LOOK, IN THE END WE KNOW THAT DAVID MILLS, AND

3   CERTAINLY DAVID MILLS THE BUSINESSMAN WHO WANTS TO GET THE

4   DEAL DONE, AND DAVID COLE, THE PROSECUTOR WHO IS EAGER --

5   SORRY -- NOT THE PROSECUTOR, THE SECRET AGENT WHO IS EAGER TO

6   PURSUE PROSECUTION IN THIS CASE, WAS PUSHING MR. GHAHREMAN TO

7   GO FORWARD IN THIS DEAL.

8          HE IS A MAN WHO CAN -- I THINK THE GOVERNMENT

9   DESCRIBED IT AS A SOLILOQUY, THE 11-MINUTE LONG SPEECH.  I AM

10  NOT SURE WE COULD SAY IT IS A TIRADE, BUT IT IS PROBABLY

11  FAIRLY SOMETHING IN BETWEEN.

12         WHEN HE TALKS TO MR. GHAHREMAN IN THIS LONG MAY 28

13  PHONE CALL, WHERE HE TALKS ON AND ON, WHERE HE IS UNLOADING ON

14  HIM ALL OF THESE IDEAS THAT MR. MILLS HAS ABOUT THESE ITEMS

15  GOING TO IRAN -- AND IT IS VERY DIFFICULT FOR MR. GHAHREMAN TO

16  GET A WORD IN EDGEWISE.  DAVID MILLS HAS PLAYED THIS

17  CONVINCING ROLE OF THE SALESMAN.

18         IN THE END, I JUST DON'T THINK THAT THESE

19  STATEMENTS, THAT ARE PRIMARILY TIED AROUND THE Y-690, AROUND

20  THIS LICENSING REQUIREMENT, GO TO PROVE THIS NEXT BRICK WE

21  HAVE BEEN TALKING ABOUT, KNOWLEDGE, KNOWLEDGE ON MR.

22  GHAHREMAN'S BEHALF THAT THESE ITEMS WERE DESTINED FOR IRAN.

23         NOW, WHAT ABOUT IN GENERAL.  WHAT ABOUT IN GENERAL

24  DAVID MILLS' INSISTENCE, I KNOW THESE THINGS ARE GOING TO

25  IRAN.

APRIL 22, 2015

```
 1          WHAT IS MR. GHAHREMAN TO DO?  DAVID MILLS HAS TOLD
 2   HIM, I DON'T LIKE BEING LIED TO WHEN IT IS OBVIOUS TO ME THESE
 3   ARE GOING TO IRAN.  DON'T BE DISRESPECTFUL BY TELLING ME THAT
 4   THEY ARE GOING ANYWHERE OTHER THAN IRAN.
 5          WHAT IS MR. GHAHREMAN TO DO?  THE GOVERNMENT HAS
 6   PICKED OUT EACH OF HIS STATEMENTS AND CRITICIZED THE WAY THAT
 7   HE RESPONDED TO THIS.  CRITICIZED HIS DECISION NOT TO SAY, NO,
 8   NO, NO, NO, THESE THINGS AREN'T GOING TO IRAN.
 9          WELL, I THINK WE HAVE TO PAUSE AND THINK ABOUT THE
10   SIGNIFICANCE OF THE STATEMENTS HE SAID AND WHY HE MIGHT SAY
11   THOSE THINGS.
12          AT THIS POINT IN THE DEAL, IF MR. GHAHREMAN REALLY
13   BELIEVED THAT THESE ITEMS WERE GOING TO IRAN -- AND WE ARE AT
14   MAY 28.  WE ARE ALMOST AT THE VERY END OF A SIX-MONTH LONG
15   INVESTIGATION.
16          IF HE REALLY HAD REASON TO BELIEVE THAT THE ITEMS
17   WERE GOING TO IRAN AND HE WAS BEING PUSHED BY DAVID MILLS, WHO
18   CAN TALK 11 MINUTES AT A TIME WITHOUT BEING INTERRUPTED,
19   PUSHED AND PUSHED ABOUT WHETHER THESE ITEMS ARE GOING TO IRAN,
20   DON'T LIE TO ME ABOUT THESE ITEMS GOING TO IRAN, WOULDN'T IT
21   HAVE BEEN EASIER FOR HIM TO JUST SAY YES, THEY ARE.
22          REALLY?  WOULDN'T IT BE EASIER TO JUST BE, LIKE, YOU
23   ARE YOU RIGHT.
24          BUT HE DOESN'T SAY THAT.  AND WHY DOESN'T HE SAY
25   THAT?  HE SAYS, I CAN'T TELL YOU IF YOU ARE RIGHT OR WRONG.
```

APRIL 22, 2015

```
 1              I CAN'T TELL YOU IF YOU ARE RIGHT OR NOT, I THINK
 2    THAT IS WHAT HE SAID.  THAT IS THE HONEST ANSWER FROM MR.
 3    GHAHREMAN.  HE CAN'T TELL HIM THAT HE IS RIGHT OR NOT.
 4              IT WOULD HAVE BEEN EASIER TO SAY YES, OF COURSE THEY
 5    ARE GOING TO IRAN, BUT LET'S NOT TALK ABOUT IT ANYMORE, OR,
 6    LET'S ONLY DO IT FACE-TO-FACE.  HE DIDN'T DO THAT.  THAT WOULD
 7    HAVE BEEN THE EASIEST THING TO DO.
 8              SO WHAT DO YOU DO WHEN YOU DON'T KNOW THAT IT IS
 9    GOING TO IRAN?  WHAT DO YOU DO WHEN YOU HAVE GOT A GUY WHO IS
10    PUSHING YOU, WHO IS TELLING YOU, YOU REALLY CAN'T TELL ME
11    ANYTHING OTHER THAN THESE THINGS ARE GOING TO IRAN?  YOU
12    PROBABLY SAY WHAT MR. GHAHREMAN SAID, I CAN'T TELL YOU IF YOU
13    ARE RIGHT OR NOT.  YOU KNOW, OTHERWISE HE WOULD SAY, YEAH,
14    THEY ARE GOING TO IRAN.
15              HE CAN'T TELL HIM WHETHER HE IS RIGHT OR NOT BECAUSE
16    MR. GHAHREMAN DOESN'T KNOW THAT THEY ARE GOING TO IRAN.
17              BUT THAT DOESN'T WORK.  DAVID MILLS KEEPS PRESSING
18    HIM, KEEPS PRESSING HIM, KEEPS PRESSING HIM.  AND THAT IS
19    WHERE YOU GET THE SUCCESSIONS OF STATEMENTS:  I DON'T ASK, IT
20    IS BETTER NOT TO KNOW.
21              I MEAN, AT THIS POINT HE IS NOT EVEN BEING LET OFF
22    THE HOOK WITH I CAN'T TELL YOU IF YOU ARE RIGHT OR NOT.  SO
23    NOW HE HAS TO SAY, I DON'T ASK KOORUSH TAHERKHANI, SO YOU
24    CAN'T ASK ME ANYMORE BECAUSE I DON'T KNOW.
25              WE KNOW THAT MR. GHAHREMAN DID INDEED SPEAK WITH MR.
```

APRIL 22, 2015

```
1   TAHERKHANI.  THE GOVERNMENT AGREES THAT THEY HAD THESE

2   CONVERSATIONS.  WE MIGHT DISAGREE ABOUT WHAT WAS SAID, BUT

3   THAT IS WHY MR. GHAHREMAN TOOK THE STAND.  THAT IS WHY YOU,

4   THE JURY, ARE IN A POSITION TO JUDGE HIS CREDIBILITY.

5          IT IS CREDIBILITY THAT NEEDS TO BE CONSIDERED IN

6   CONJUNCTION WITH WITNESSES LIKE EBRAHIM SHAYEI, WHO CAME HERE

7   FROM VANCOUVER.  THAT IS NOT TESTIMONY THAT YOU JUST GET FROM

8   ANYBODY.  HE DIDN'T JUST COME IN FROM DOWN THE STREET HERE IN

9   SAN DIEGO.  THIS IS THE KIND OF TESTIMONY THAT IS EARNED FOR

10  HAVING THE CHARACTER THAT SOMEBODY LIKE MR. SHAYEI TALKED

11  ABOUT.

12         AGAIN, IT IS FOR YOU TO JUDGE HIS CREDIBILITY.  BUT

13  MR. GHAHREMAN DID TELL YOU THAT HE SPOKE WITH KOORUSH

14  TAHERKHANI ON SEVERAL OCCASIONS ABOUT, WHAT IS GOING ON HERE?

15  IN THE VERY BEGINNING, JUST A GENERAL, I HAVEN'T SEEN YOU IN

16  NINE YEARS.  LAST TIME I TALKED TO YOU YOU WERE WORKING IN

17  IRAN.  IS THAT WHAT YOU ARE DOING NOW?  I AM NOT INTERESTED.

18         TO BE MORE SPECIFIC, LIKE AFTER GREEN VALLEY RANCH

19  WHEN HE IS, LIKE, HEY, I HAVE HEARD A LOT OF THINGS HERE TODAY

20  AND I DON'T FEEL COMFORTABLE.

21         SO WHEN HE TELLS DAVID MILLS, I DON'T ASK, IT IS

22  BETTER NOT TO KNOW, YOU ARE PROTECTED THAT WAY, AND THINGS

23  LIKE THAT, THAT'S NOT WHAT HE DID.  IT IS WHAT HE FELT WAS THE

24  ONLY THING HE COULD SAY THAT WOULD PLACATE DAVID MILLS.  THE

25  ONLY THING HE COULD SAY THAT WOULD HAVE THIS GUY, WHO THEY ARE
```

APRIL 22, 2015

1    ALREADY CONTRACTUALLY BOUND TO, TO GET A DEAL TOGETHER.  THE

2    ONLY THING THAT HE COULD SAY TO HIM TO MOVE FORWARD.  TO MOVE

3    ON.

4           AND YOU HAVE TO UNDERSTAND MR. GHAHREMAN'S COMMENTS

5    AS ATTEMPTS TO MOVE FORWARD AND TO MOVE ON WHEN MR. GHAHREMAN

6    MAYBE DOESN'T HAVE PERFECT INFORMATION, YET IT IS BEING

7    DEMANDED.  CONSTANTLY, INTENSELY, REPEATEDLY BY DAVID MILLS.

8           NOW, THE GOVERNMENT DID PROMISE YOU A FEW THINGS IN

9    THIS CASE.  YOU MAY RECALL IN OPENING STATEMENTS THAT THE

10   GOVERNMENT PROMISED YOU THAT YOU WOULD HEAR EVIDENCE THAT MR.

11   GHAHREMAN SAID, THESE ITEMS WERE GOING TO IRAN, AT THE GREEN

12   VALLEY RANCH.

13          I ASK YOU TO PLAY ALL OF THE CLIPS THAT HAVE BEEN

14   OFFERED FROM THE GREEN VALLEY RANCH.  I THINK IT IS

15   EXHIBIT 317, MAYBE 318.  I AM SORRY.  LISTEN TO THESE CLIPS.

16          MR. GHAHREMAN NEVER SAID THESE ITEMS WERE GOING TO

17   IRAN, AT THE GREEN VALLEY RANCH.  I THINK MR. HARRIGAN

18   BASICALLY CONCEDED THAT WHEN HE SHOWED YOU A COUPLE OF CLIPS

19   HERE TODAY IN HIS FIRST CLOSING.  YEAH, IT IS OVER THERE.  IT

20   IS DAVID MILLS SAYING IRAN AND ARASH SAYING AIRPORTS.

21          BUT THAT'S QUITE A BIT DIFFERENT THAN THE PROMISE

22   YOU WOULD HEAR MR. GHAHREMAN SAY, YEAH, THE THINGS WERE GOING

23   TO IRAN, YEAH, THESE THINGS WERE GOING TO AN IRANIAN AIRPORT,

24   THESE THINGS WERE GOING TO A SHIP OWNED BY THE GOVERNMENT OF

25   IRAN OR IN THE TERRITORY OF IRAN.  THEY SIMPLY DIDN'T LIVE UP

APRIL 22, 2015

1    TO THAT PROMISE.

2            THEY PROMISED YOU THAT YOU WOULD HEAR MR. GHAHREMAN

3    SAYING THAT THE GYROS WERE BEING SHIPPED TO IRAN.  LET'S

4    LISTEN CAREFULLY TO WHAT WAS SAID AT THE GREEN VALLEY RANCH IN

5    EXHIBIT DD.

6            OH, WE DON'T HAVE THAT?

7            THEN LET'S RECALL, UNTIL WE GET IT BACK IN THE JURY

8    ROOM, WHAT WAS SAID AT THE GREEN VALLEY RANCH ON EXHIBIT DD.

9            AND I THINK THIS IS THE EXHIBIT THAT YOU MAY RECALL

10   DAVID MILLS SAYING, SO HOW ARE YOU GOING TO GET THESE -- THE

11   GYROS, FOR EXAMPLE -- HOW ARE YOU GOING TO GET THESE TO IRAN?

12           AND I THINK ERGUN YILDIZ SAID SOMETHING LIKE, OH, BY

13   SHIP, BY SHIP.

14           MAYBE YOU RECALL THIS CONVERSATION.

15           WE SHIP THINGS FROM DUBAI TO IRAN BY SHIP.

16           AND ARASH GHAHREMAN IS EVEN ENGAGED IN THE

17   CONVERSATION FOR A MOMENT.

18           BUT WHAT YOU HEAR IS NOT THAT THESE GYROS ARE GOING

19   TO IRAN BECAUSE YOU HEAR ERGUN YILDIZ SAY, BUT NO, NO, THESE

20   GYROS, THEY ARE NOT FOR IRAN.  THESE GYROS ARE FOR A CUSTOMER

21   IN AJMAN, UAE.  THESE ITEMS ARE FOR A CUSTOMER IN AJMAN, UAE

22   WHO IS AN IRANIAN.

23           OH, IRAN, IRAN.

24           WE GOT THE DAVID MILLS.

25           OH, IRAN, YOU SAID IRAN?

APRIL 22, 2015

```
 1              NO, NO.  AN IRANIAN.  AN IRANIAN WHO OWNS A COMPANY

 2   IN THE UAE, BUT THESE ARE NOT FOR IRAN.

 3              I GUESS WE CAN PLAY IT.

 4              (VIDEOTAPED PLAYED)

 5         DAVID MILLS TRYING TO THROW IN SANCTIONS, WHATEVER

 6   HE CAN GET, TO MAKE THIS SOUND BETTER.  BUT HE IS, LIKE, NO,

 7   HE IS JUST AN IRANIAN NATIONAL.  THIS BUSINESS IS LOCATED IN

 8   UAE.  THE END USE IS IN UAE.

 9              AND WHEN WE ARE ASKING WHAT MR. GHAHREMAN KNEW, WHAT

10   HIS KNOWLEDGE WAS ABOUT WHERE THESE ITEMS WERE GOING, THIS IS

11   PROBABLY THE MOST SIGNIFICANT DETAIL HE HAS HEARD FROM THE

12   PRESIDENT OF THE COMPANY, THAT THESE ARE GOING TO UAE.

13              NOW, THE GOVERNMENT ALSO PROMISED YOU IN ITS

14   OPENING -- OR AT LEAST THIS IS WHAT MY NOTES SHOWED, AND I

15   THINK IT KEPT ARGUING THIS.  IN FACT THEY ARGUED IT TODAY.

16   THAT YOU WOULD HEAR EVIDENCE THAT MR. GHAHREMAN WAS COMPLICIT

17   IN THIS CONCEPT, THIS IDEA THAT THEY WOULD TAKE THE MANUALS

18   OUT OF THE BOXES WHEN THEY SHIP THE ITEMS.  THAT IF YOU SHIP

19   THESE ITEMS WITHOUT THE MANUALS THAT THAT WOULD BE A BETTER

20   WAY OF NOT RAISING ANY SUSPICIONS.

21              AND IT IS VERY TROUBLING TO ME THAT WE CAN HAVE SUCH

22   A FUNDAMENTAL DISAGREEMENT ON WHAT WAS SAID.  AND IN THE END

23   IT IS NOT WHAT MR. HARRIGAN THINKS, IT IS NOT WHAT I THINK; IT

24   IS WHAT YOU THE JURY, WHEN YOU HAVE THIS EVIDENCE BACK WITH

25   YOU, THINK.
```

APRIL 22, 2015

1     I WANT TO PLAY THIS CLIP.  CLIP 317 -- SORRY.

2  EXHIBIT 317, CLIP 7.

3         (VIDEOTAPED PLAYED)

4     WHEN YOU SEND THIS WITH THE DISK -- REMEMBER ONE OF

5  THE MANUALS ON THE DISK, THE MANUAL -- THEY KNOW WHAT THAT IS.

6  WHEN YOU SEND IT ALONE THEY DON'T.  WHEN YOU SEND IT WITH THE

7  DISK IT IS NOTHING.

8     THE GOVERNMENT IS STILL MAINTAINING NAUGHTY.  YOU

9  HAVE HEARD MR. GHAHREMAN NOW FOR TWO DAYS OF TESTIMONY.

10  NAUGHTY DOESN'T REALLY SEEM LIKE A WORD IN HIS VOCABULARY, BUT

11  YOU HEARD HIM SAY NOTHING QUITE A FEW TIMES.

12     AND DON'T TAKE MY WORD FOR IT, JUST FIGURE OUT THE

13  LOGIC OF IT.  WHY WOULD HE SAY WHAT HE SAID, THAT IF YOU PUT

14  THE DISK IN IT THEY KNOW WHAT IT IS.  IF YOU PUT THE MANUAL IN

15  IT THEN THEY KNOW WHAT IT IS.  AND IT IS NOT ALONE.

16     WHAT MR. GHAHREMAN IS SAYING, AS OPPOSED TO WHAT

17  ANYONE ELSE WAS SAYING IN THAT ROOM, IS, NO, THESE THINGS NEED

18  TO BE TOGETHER, THEY NEED TO KNOW WHAT IT IS.  YOU WON'T HAVE

19  PROBLEMS WITH SHIPPING IF THEY ARE TOGETHER AND THEY KNOW WHAT

20  IT IS.

21     THE REASON WHY THAT IS IMPORTANT IS BECAUSE MR.

22  GHAHREMAN'S ONLY INTEREST IS THAT THESE DON'T GET HELD UP BY

23  CUSTOMS.  IF CUSTOMS INSPECTORS OPEN A BOX AND SEE A Y-690 OR

24  NAVIGAT AND DON'T SEE ANY MANUALS, IT IS GOING TO GET HELD UP.

25  EVEN IF IT IS LEGITIMATELY BEING SHIPPED TO A LEGITIMATE THIRD

1    COUNTRY, IT IS GOING TO GET HELD UP BECAUSE THEY ARE GOING TO

2    BE, LIKE, WE GOT TO FIGURE OUT WHAT THIS IS.  INSTEAD HE IS

3    THE ONE SAYING, PUT THE MANUAL IN THE BOX.

4         AND HE IS NOT SAYING IT IS NAUGHTY.  HE IS SAYING IF

5    THE MANUAL IS IN THE BOX AND THEY SEE IT, THEY WILL SAY IT IS

6    NOTHING.  NOTHING TO HIDE.

7         NOW, THERE IS THE VERY NONSENSICAL STATEMENT THAT

8    MR. GHAHREMAN MADE, THE GOVERNMENT POINTED IT OUT TODAY, ABOUT

9    THE SERIAL NUMBERS.  REMEMBER HIM SAYING, YES, YES, WE WILL

10   HAVE ALL OF THE SERIAL NUMBERS REMOVED.

11        AND THEN THE PROSECUTOR SAID, BUT HE GAVE A CRAZY

12   ANSWER ON THE STAND WHEN HE TRIED TO EXPLAIN THAT.  HE SAID

13   YOU COULD REMOVE THE SERIAL NUMBER FROM THE OUTSIDE BUT YOU

14   COULDN'T REMOVE ALL OF THE IDENTIFYING NUMBERS ON THE INSIDE.

15   HE SEEMS TO HAVE A LOT OF KNOWLEDGE ABOUT THE NAVIGAT WHEN IT

16   SUITS HIS NEEDS.

17        MR. GHAHREMAN WAS TALKING FROM GENERAL EXPERIENCE TO

18   SAY ANY PIECE OF MARINE EQUIPMENT, ANY PIECE OF ELECTRONICAL

19   EQUIPMENT -- AS PROBABLY MANY OF YOU KNOW IF YOU HAVE EVEN

20   OPENED UP ANY DEVICE AT HOME -- HAS NUMBERS ALL OVER.  EVERY

21   PART IS NUMBERED.  MANUFACTURERS CAN FIGURE OUT EXACTLY WHAT

22   BATCH THOSE PARTS CAME FROM, EVEN IF YOU DON'T HAVE THE MAIN

23   SERIAL NUMBER ON IT.

24        BUT I THINK THE GOVERNMENT MISSES THE FOREST FOR THE

25   TREES BECAUSE THAT WASN'T REALLY THE MAIN EXPLANATION THAT MR.

APRIL 22, 2015

1    GHAHREMAN WAS GIVING.  HE SAID IT MADE NO SENSE TO SAY THAT IN

2    THE FIRST PLACE BECAUSE I KNOW, WITH MY EXPERIENCE, THAT YOU

3    CAN'T SEND BACK A NAVIGAT-2100 WITH AN OBLITERATED SERIAL

4    NUMBER TO SPERRY MARINE AND EXPECT THEM TO WORK ON IT.  THEY

5    ARE NOT GOING TO WORK ON SOMETHING WHERE YOU ERASED THE

6    IDENTIFYING INFORMATION.

7           THEY MISS THE FOREST FOR THE TREES, WHEN MR.

8    GHAHREMAN IS, LIKE, AND IF THESE REALLY WERE GOING TO IRAN DO

9    YOU THINK YOU ARE GOING TO SEE A BOX SHIPPED FROM TEHRAN, IRAN

10   OR BANDAR ABBAS, IRAN TO NORTHROP GRUMMAN SPERRY MARINE IN

11   CHARLOTTESVILLE, VIRGINIA?  NO.  NO.

12          IN THE END IT REALLY WAS A NONSENSICAL ANSWER.  BUT

13   THE QUESTION WAS AS NONSENSICAL WHEN JOHN HELSING, I GUESS

14   PLAYING THE ROLE OF JOHN ERICKSON, SAYS, WELL, I MEAN, YOU

15   KNOW, WE GOT TO WORRY ABOUT THESE THINGS BEING SENT BACK FROM

16   IRAN.

17          AGAIN THIS IS MR. GHAHREMAN TRYING TO ALLAY THE

18   CONCERNS OF THE SELLERS.  IT MAKES NO SENSE WHAT HE SAID, BUT

19   HE KNOWS THAT IT WOULDN'T WORK ANYWAY.  I THINK YOU HAVE TO

20   DISCOUNT THAT STATEMENT WHEN YOU CONSIDER ALL OF THE

21   CIRCUMSTANCES.

22          NOW, I DO WANT TO TALK ABOUT ALL OF THE

23   DISCUSSION -- THE GOVERNMENT PLAYED A BUNCH OF CLIPS DURING

24   THE TRIAL OF HOW ALL OF THESE PACKAGES WERE BOXED UP, AND ALL

25   OF THE DISCUSSION THAT HAPPENED AT GREEN VALLEY RANCH.  DO WE

1    REMOVE THE BOXES?

2          HEY, ERGUN -- REMEMBER DAVID IS, LIKE, HEY, ERGUN

3    YOU CAN JUST TAKE IT WITH YOU ON THE PLANE.

4          AND ARASH IS, LIKE, NO, YOU DON'T TAKE THIS KIND OF

5    EQUIPMENT ON THE PLANE, YOU SHIP IT.  THAT IS WHAT WE DO.

6    THIS IS NORMAL BUSINESS, NORMAL BUSINESS WE SHIP THINGS.

7          AND THERE WAS SOME DISAGREEMENTS.  MR. GHAHREMAN

8    SAYS, HEY, YOU PUT THE MANUALS IN THE BOX.  THAT IS WHAT WE

9    DO.  NORMAL BUSINESS.  MANUALS IN THE BOX.

10         YOU KNOW, MAYBE ERGUN AND THE OTHERS HAVE DIFFERENT

11   IDEAS.  BUT IN THE END YOU HAVE GOT THESE BOXES OVER HERE, YOU

12   CAN LOOK AT THESE BOXES.  YOU CAN SEE WHAT WAS IN HERE.

13         THE AGENTS NESTED THESE BOXED -- I THINK THAT WAS

14   THEIR WORD -- NESTED THESE BOXES TOGETHER.  BUT ON THE INSIDE

15   YOU REMEMBER SEEING NORTHROP GRUMMAN SPERRY MARINE.  ANY

16   CUSTOMS OFFICER IS GOING TO OPEN THESE ITEMS, HAS TO UNNEST

17   THE BOXES, THEY ARE GOING TO SEE WHAT IT IS.  THE MANUALS ARE

18   WITH THE ITEMS.  THE Y-690'S ARE IN HERE, PERFECTLY

19   IDENTIFIED.  THE MANUALS ARE INSIDE THE BOX.

20         IN THE END THIS WAS DONE THE WAY THAT YOU DO NORMAL

21   BUSINESS.  WHATEVER IDEAS DAVID MILLS TRIED TO SPIN AS HE

22   TRIED TO IMPROVE THE CHANCES OF CONVICTION OR PROSECUTION,

23   TRYING TO GET ERGUN TO AGREE TO DIFFERENT WAYS OF SHIPPING, IN

24   THE END YOU CAN SEE HOW THEY WERE SHIPPED.

25         AND AS FOR THE BOXES ON THE OUTSIDE, JUST TAKE A

APRIL 22, 2015

1    PERSONAL EXAMPLE.  WOULD YOU SEND TO SOMEONE YOU KNOW A
2    GIFT -- LET'S SAY YOU ARE SENDING YOUR LOVED ONE A PIECE OF
3    JEWELRY, YOU WOULDN'T SEND IT IN THE ICONIC TIFFANY'S BOX WITH
4    A POSTAGE STAMP ON THE TOP.  THAT IS PASSING THROUGH LOTS OF
5    HANDS, NOT JUST CUSTOMS.  I MEAN, WHEN YOU HAVE EXPENSIVE
6    EQUIPMENT YOU DON'T ADVERTISE IT ON THE OUTSIDE OF THE BOX.
7    THIS WAS DONE IN STANDARD PRACTICE.
8          AND THE SHIPPING LABELS?  FOR THE MOST PART THEY
9    IDENTIFY WHAT THESE ITEMS WERE.  THEY TELL YOU, Y-690'S.  WE
10   HAVE GOT THE 2100 DESCRIBED AND ALL OF ITS PARTS.
11         THE GOVERNMENT MIGHT WANT TO POINT OUT THAT THE 2100
12   WAS ONLY VALUED FOR INSURANCE PURPOSES AT $25,000 INSTEAD OF
13   71, OR WHATEVER THE PRICE WAS?  BUT DO YOU REALLY THINK
14   $25,000 IS GOING TO BE THE DIFFERENCE FOR A CUSTOMS AGENT, OR
15   WHATEVER THE CONCERN WAS.  THEY ARE, LIKE, WHOA, I AM GOING TO
16   LET THIS ONE GO, IT IS ONLY 25, I NEED TO SEE SOMETHING THAT
17   SAYS 71.
18         NO.  NO.  THERE HAD TO BE ANOTHER REASON.
19         AND REMEMBER THAT JOHN HELSING SAID IT WAS ERGUN
20   YILDIZ WHO PUT $25,000 DOWN.
21         OTHERWISE, ESSENTIALLY INNOCUOUS, WHAT WE HAVE HERE.
22   THE ITEMS WITH THE MANUALS IN THEIR OWN BOX.  AND THE REASON
23   WHY, AS FAR AS MR. GHAHREMAN CAN TELL, IS BECAUSE THE MOST
24   IMPORTANT THING WAS FOR THESE ITEMS TO BE DELIVERED, NOT TO BE
25   HELD UP.  TO PRESENT THEM AS WHAT THEY ARE.

APRIL 22, 2015

1          THERE IS NO TV MANUALS IN THERE, THERE IS NO NOTHING

2     TO THROW PEOPLE OFF; THEY WERE PRESENTED TO BE WHAT THEY ARE.

3     THIS ISN'T NAUGHTY, THIS IS NOTHING.  NOTHING TO HIDE.

4          SO WHAT ABOUT ERGUN YILDIZ?  HE HAD SOME TESTIMONY,

5     AND TOLD YOU QUITE A BIT ABOUT HIS SITUATION.  BUT SPECIFIC TO

6     MR. GHAHREMAN HE TOLD YOU TWO THINGS.  MAYBE THEY WEREN'T EVEN

7     PLAUSIBLE ENOUGH FOR THE GOVERNMENT TO BRING UP IN THEIR FIRST

8     OPENING.

9          BUT HE TOLD YOU THAT ARASH TOLD ME TWO THINGS.

10    FIRST, HE TOLD ME THAT HE ASKED THE AGENTS TWICE IF THEY WERE

11    AGENTS.

12         I THINK DAVID MILLS WOULD HAVE BEEN THE FIRST PERSON

13    TO TELL YOU, OR JOHN ERICKSON WOULD HAVE BEEN THE FIRST PERSON

14    TO TELL YOU THAT MR. GHAHREMAN SAID, HEY, ARE YOU AGENTS?

15    THAT DIDN'T HAPPEN.  AND FOR HIM TO TELL MR. ERGUN THAT THAT

16    HAPPENED -- MR. YILDIZ THAT THAT HAPPENED IS JUST SIMPLY

17    IMPLAUSIBLE.

18         BUT ERGUN, IN A TOUGH SITUATION, A NEWLYWED WHO SAT

19    HERE BEFORE YOU IN PRISON CLOTHES AND LEG SHACKLES, HE THOUGHT

20    MAYBE HE JUST NEEDED TO ADD ONE MORE IN THERE:  WELL, HE TOLD

21    ME THAT HE CONSULTED WITH AN ATTORNEY IN NEW YORK ABOUT WHEN

22    AGENTS HAVE TO REVEAL THEIR TRUE IDENTITY TO YOU.

23         AGAIN, THIS IS JUST -- THIS IS IMPLAUSIBLE.

24         BUT HERE IS WHAT I CAN TELL YOU.

25         IF WE CAN DISPLAY THE DEMONSTRATIVE THAT WE WENT

APRIL 22, 2015

1    OVER WITH MR. YILDIZ.

2            HE REALLY IS IN A DIFFICULT SITUATION.  MR. YILDIZ

3    WAS FACING UP TO 20 YEARS IN PRISON, WITH A GUIDELINE RANGE

4    THAT STARTED AT A LEVEL 26 -- NOT 20 YEARS, BUT 63 TO 78.  HE

5    TOLD YOU HE AGREED IF HE WAS CONVICTED OF ALL COUNTS THAT HE

6    COULD BE LOOKING AT 78 TO 97 MONTHS.  HE WASN'T SO SURE ABOUT

7    IF HE GOT A MANAGEMENT OR LEADERSHIP ROLE WHETHER HE WOULD GO

8    UP TO LEVEL 30, 97 TO 121.

9            BUT HE TOLD YOU SOMETHING.  HE TOLD YOU -- HE DIDN'T

10   SAY, I PLED GUILTY BECAUSE THE FACT WAS IT WAS TRUE; HE TOLD

11   YOU, I PLED GUILTY TO TAKE A DEAL.  I TOOK THE DEAL.

12           AND THE DEAL HE TOOK STARTED WITH THE GOVERNMENT

13   RECOMMENDATION OF HALF OF WHAT HE WAS ORIGINALLY LOOKING AT, A

14   GOVERNMENT RECOMMENDATION OF 46 MONTHS.  HALF OF WHAT HE WAS

15   LOOKING AT.

16           AND THAT IS JUST THE BEGINNING FOR ERGUN YILDIZ.

17   THAT IS JUST THE BEGINNING OF HIS DEAL WITH THE GOVERNMENT.

18           IF WE CAN GO TO THE NEXT EXHIBIT.

19           MR. YILDIZ TOLD YOU, SAID, YEAH, I ENTERED INTO AN

20   ADDITIONAL AGREEMENT WITH THE GOVERNMENT, SIGNED BY ME, BY MY

21   ATTORNEY, BY THE PROSECUTOR.  AND THAT WAS THE COOPERATION

22   AGREEMENT.

23           AND HE ACKNOWLEDGED THIS LINE FROM THIS PROFFER

24   AGREEMENT WHERE HE SAID, I UNDERSTAND THE DECISION WHERE I --

25   WHETHER -- WHETHER I AM PERMITTED TO COOPERATE AND WHETHER --

APRIL 22, 2015

1    WHETHER -- I MAY LATER RECEIVE ANY BENEFIT FOR COOPERATION

2    RESTS SOLELY WITH THE PROSECUTOR.  RESTS SOLELY WITH THE

3    PROSECUTOR.

4            YES, IT IS TRUE THAT THE JUDGE WILL HAVE THE FINAL

5    SAY IN MR. YILDIZ' SENTENCE.  BUT FOR HIM TO GET AN ADDITIONAL

6    BENEFIT FROM THE GOVERNMENT HE HAD TO TAKE THE STAND AND

7    PLEASE THEM IN THEIR PROSECUTION OF MR. GHAHREMAN.

8            IT IS THE TRUTH THAT MATTERS IS THE TRUTH THAT THESE

9    GENTLEMEN HERE BELIEVE HE TELLS.  WE KNOW HE TOLD A DIFFERENT

10   STORY AT HIS FIRST PROFFER SESSION, EVEN THOUGH HE WAS TOLD HE

11   COULD BE PROSECUTED FOR ADDITIONAL CRIMES, LIKE FALSE

12   STATEMENT TO FEDERAL OFFICERS.  THEY DIDN'T CHOOSE TO ACCEPT

13   THAT ONE, THEY CHOSE TO ACCEPT THE STATEMENTS THAT HE FINALLY

14   GAVE UP HERE ON THE STAND.

15           SO DON'T TAKE MY WORD FOR IT, ACTUALLY TAKE MR.

16   YILDIZ' WORD FOR IT:  YOU ALWAYS LOOK OUT FOR YOURSELF FIRST.

17           THIS IS A MAN WHO IS LOOKING OUT FOR HIMSELF.  WHY

18   DOES HE MAKE THESE IMPLAUSIBLE STATEMENTS?  HE IS IN A REALLY

19   BAD SITUATION.  HE IS IN A REALLY BAD SITUATION AND HE KNOWS

20   HE HAS TO LOOK OUT FOR HIMSELF FIRST.

21           BUT FINALLY, DON'T TAKE MY WORD FOR IT, DON'T TAKE

22   MR. YILDIZ' WORD FOR IT; TAKE THE COURT'S WORD FOR IT.

23           YOU HAVE HEARD IN INSTRUCTION NO. 14, THE COURT

24   INSTRUCTED YOU THAT THIS IS A SPECIAL KIND OF WITNESS.  HE

25   NAMED MR. YILDIZ BY NAME IN THE INSTRUCTIONS AND REMINDED YOU

APRIL 22, 2015

1    THAT HE WAS TESTIFYING AND SEEKING BENEFITS FROM THE

2    GOVERNMENT FOR HIS TESTIMONY, A SPECIAL KIND OF WITNESS.  SO

3    IT IS NOT JUST ME, IT IS NOT JUST MR. YILDIZ WHO WAS VERY

4    CANDID WITH YOU, I AM LOOKING OUT FOR MYSELF FIRST, IT IS THE

5    COURT WHO SAYS YOU SHOULD EXAMINE THIS WITNESS'S TESTIMONY

6    WITH GREATER CAUTION THAN THAT OF ANY OTHER WITNESSES.

7              AND IT MAKES SENSE, DOESN'T IT?

8              SO THESE STATEMENTS THEMSELVES ARE A BIT

9    IMPLAUSIBLE, A LITTLE KOOKY.  BUT ON TOP OF THAT THE INCENTIVE

10   MR. YILDIZ HAD TO MAKE THEM WAS OVERWHELMING.  HE WANTED TO

11   PLEASE THE PROSECUTION.  WHEN I TALK ABOUT THE PROSECUTION, I

12   TALK ABOUT THE MEN WHO ARE SEEKING A CONVICTION AGAINST MR.

13   GHAHREMAN.

14             HIS TESTIMONY CARRIES LITTLE WEIGHT, AND I THINK THE

15   FACT THAT THE GOVERNMENT DIDN'T HIGHLIGHT IT IN THEIR CLOSING

16   SIMPLY UNDERSCORES THAT, AND I THINK YOU SHOULD DISCOUNT IT

17   TOO.

18             SO WE HAVE TALKED ABOUT THE TWO BOULDERS, THE TWO

19   BRICKS IN THE BUILDING THAT THE GOVERNMENT HAS TO BUILD OR

20   ROLL UP THE HILL OF REASONABLE DOUBT BEFORE THEY CAN GET TO A

21   CONVICTION.

22             THE GOVERNMENT MADE CONSIDERABLE EFFORT TO FOCUS ON

23   KNOWLEDGE IN THIS CASE.  BUT THERE IS A THIRD -- THERE IS A

24   THIRD FUNDAMENTAL ISSUE, BEFORE WE EVEN GET INTO ALL OF THE

25   COUNTS AND ALL OF THEIR DETAILS, A THIRD FUNDAMENTAL THING

APRIL 22, 2015

1     THAT THEY HAVE TO PROVE TO YOU BEYOND A REASONABLE DOUBT.  AND

2     THAT IS THAT MR. GHAHREMAN INTENDED, INTENDED FOR THESE ITEMS

3     TO GO TO IRAN.

4          YOU REMEMBER INSTRUCTION NO. 29, MERE SUSPICION IS

5     NOT ENOUGH.  CARELESSNESS IS NOT ENOUGH.  INDIFFERENCE ––

6     INDIFFERENCE IS NOT ENOUGH.  IF HE JUST DIDN'T CARE.  I THINK

7     YOU BASICALLY HEARD THE GOVERNMENT SAY HE DIDN'T REALLY CARE,

8     IT IS ALL ABOUT THE MONEY.  HE DIDN'T REALLY CARE WHERE THEY

9     WERE GOING.

10         THE COURT HAS INSTRUCTED YOU IF THAT IS ALL THERE IS

11    YOU MUST VOTE NOT GUILTY.

12         BUT IT GOES FURTHER.  IF HE MERELY KNEW THAT THESE

13    GOODS WERE GOING TO IRAN –– AND I AM NOT SAYING THAT HE DID,

14    BUT IF YOU, THE JURY, CONCLUDE THAT EVEN IF HE KNEW THESE

15    ITEMS WERE GOING TO IRAN, THE GOVERNMENT HAS A FURTHER BURDEN

16    OF PROVING INTENT.

17         AND YOU HEARD ME –– BEFORE I GET INTO THIS –– OBJECT

18    DURING THE PROSECUTOR'S CLOSING STATEMENT –– CLOSING ARGUMENT

19    WHEN HE SAID THAT WILLFULNESS IS AN ACT THAT IS COMMITTED WITH

20    THE KNOWLEDGE THAT IT WAS PROHIBITED BY LAW.  YOU HEARD HIM

21    SAY THAT, THAT AN ACT IS DONE WILLFULLY IF IT IS COMMITTED

22    WITH THE KNOWLEDGE THAT IT WAS UNLAWFUL.

23         WELL, I ASK YOU TO LOOK AT INSTRUCTION NO. 26.  I

24    WANT TO MAKE THIS ABUNDANTLY CLEAR.  IT IS CRITICAL TO THE

25    CASE.  THE INSTRUCTION GIVEN TO YOU BY THE COURT IS:  AN ACT

APRIL 22, 2015

1   IS DONE WILLFULLY IF IT IS VOLUNTARILY COMMITTED WITH THE

2   KNOWLEDGE THAT IT WAS PROHIBITED BY LAWS OF THE UNITED STATES.

3           SO FAR SO GOOD.  WE ARE ON THE SAME PAGE.

4           BUT IT IS AND -- AND WITH THE PURPOSE -- THE PURPOSE

5   OF DISOBEYING THE LAW.

6           THERE IS MORE TO WILLFULNESS, THERE IS MORE TO

7   INTENT THAN MERE KNOWLEDGE THAT THESE ITEMS WERE GOING TO

8   IRAN.  SO YOU CAN READ INSTRUCTION NO. 26 IN CONJUNCTION WITH

9   INSTRUCTION NO. 29.

10          AND THIS ISN'T MY ARGUMENT, THESE ARE THE WORDS OF

11  THE COURT, THE WORDS THAT MATTER, ABOUT HOW YOU NEED TO

12  ANALYZE THIS CASE.

13          AND WHEN IT COMES TO INTENT, THE GOVERNMENT'S CASE

14  IS LACKING.  WE START WITH WHAT WE HAVE IN WRITING.  WE START

15  WITH THE CONTRACTS.  I THINK THE GOVERNMENT SAID SOMETHING

16  LIKE, OH, HE IS GOING TO HIDE BEHIND THE CONTRACTS.

17          WELL, LOOK, THE CONTRACTS ARE WRITTEN DOCUMENTS THAT

18  MEMORIALIZE MR. GHAHREMAN'S INTENT IN THIS CASE.

19          WE HAVE HIS INTERNATIONAL OCCASIONAL INTERMEDIARY

20  CONTRACT.  SO WHAT DID MR. GHAHREMAN AGREE TO DO?  WELL, WE

21  LOOK AT THESE THINGS.

22          AND I DON'T KNOW IF I HAVE EXHIBIT 207 PRIMED UP OR

23  NOT.  EXHIBIT 207, OCCASIONAL INTERMEDIARY CONTRACT, YOU CAN

24  REVIEW THAT BACK IN THE JURY ROOM.

25          ONE OF THE THINGS IN THAT CONTRACT HE HAS -- AND

APRIL 22, 2015

1454

1    REMEMBER, THIS IS HIS DEAL WITH TIG MARINE.  ONE OF THE THINGS

2    THAT HE HAS IS THIS WRITTEN CONTRACTUAL AGREEMENT TO REPRESENT

3    THEM AS THEIR INTERMEDIARY.  AND IT HAS VERY CLEAR

4    INSTRUCTIONS, EVERYTHING MUST BE IN WRITING TO HAVE ANY

5    AFFECT, EVERYTHING MUST BE IN WRITING.

6            SO IF WE WANT TO KNOW WHAT HIS ROLE WAS WE DO NEED

7    TO LOOK TO THE WRITINGS FIRST.

8            AND WHAT WAS IN WRITING?  THERE WERE TWO CONTRACTS.

9    EXHIBIT 706.  BOTH OF THEM ARE THERE TOGETHER, YOU DON'T EVEN

10   HAVE TO FLIP THROUGH THE BINDER.

11           WHAT DO WE HAVE FOR THE NAVIGATS?  WE HAVE AN

12   ACCURATE DESCRIPTION.  THIS DOESN'T SAY IPODS OR WHATEVER,

13   WHATEVER.  IT IS AN ACCURATE DESCRIPTION OF WHAT IT IS THAT

14   WAS BEING AGREED TO.

15           AND WE HAVE A DESTINATION, A PLACE OF DELIVERY,

16   DUBAI, UAE.

17           THE GOVERNMENT SAYS, HE NEVER SAID THAT THESE THINGS

18   WERE JUST GOING TO DUBAI.  HE NEVER SAID THEY WERE GOING TO

19   DUBAI.  THEN THEY SAY BECAUSE HE NEVER SAID THAT THEY WEREN'T

20   GOING TO IRAN.  HE IS CONSISTENTLY SAYING THAT THEY ARE GOING

21   TO DUBAI.  THIS IS THE CONTRACT THAT HE IS BOUND BY.  THIS IS

22   WHAT HE HAS ENTERED INTO.

23           WHAT ABOUT THE Y-690'S?  SAME THING.  ACCURATE

24   DESCRIPTION OF THE PRODUCT.  IT DOESN'T SAY IPODS, MARINE

25   EQUIPMENT, WHATEVER, WHAT IS GOING ON BETWEEN DAVID MILLS AND

APRIL 22, 2015

1    KOORUSH.  PLACE OF DELIVERY, DUBAI, UAE.

2          THESE DO HAVE MEANING BECAUSE THIS IS A

3    MEMORIALIZATION OF THE INTENT THAT MR. GHAHREMAN HAD WHEN HE

4    ENTERED INTO THIS DIFFICULT POSITION AS A MAN IN THE MIDDLE

5    BETWEEN TWO PARTIES.  HE HAD THE WRITTEN ASSURANCES OF WHAT

6    WAS BEING DONE.

7          NOW, WHAT ABOUT ALL THE OTHER WRITINGS?  LET'S NOT

8    LIMIT IT TO THE CONTRACTS.  WE HAVE OVER 14,000 PAGES OF

9    EMAILS, BOTH PERSONAL AND PROFESSIONAL, AND NOTHING IN THEM

10   THE GOVERNMENT HAS SHOWN CONTRADICT THE TERMS OF MR.

11   GHAHREMAN'S CONTRACT.  NOTHING IN THERE SAYS, SHIP THESE

12   THINGS TO IRAN.  NONE OF THOSE THINGS IN THERE SAY THAT.

13         BUT THE GOVERNMENT TELLS YOU, IT IS ALL ABOUT THE

14   MONEY.  I THINK HIS QUOTE WAS, IT IS GOOD MONEY TO BE MADE.

15         WHAT IS MR. GHAHREMAN'S STAKE?  THE GOVERNMENT

16   SUGGESTS THAT HE HAS SOME GREAT STAKE HERE.  THEY TALK ABOUT,

17   YOU KNOW, HUNDREDS OF THOUSANDS OF DOLLARS THAT HE HAS TO MAKE

18   HERE.  BUT LET'S FOCUS ON THE CONTRACT HE DID ENTER INTO, OR

19   THAT HE DID HELP COME TOGETHER BETWEEN PARTIES.

20         WE ARE TALKING ABOUT FOUR NAVIGATS AND 50 Y-690'S.

21   AND, YOU KNOW, THE GOVERNMENT HASN'T SUGGESTED -- AND I DON'T

22   THINK THEY WILL -- THAT MR. GHAHREMAN IS SOME IDEALOGUE OR

23   THAT HE HAS SOME EVIL INTENT; THEY SAY THIS IS JUST ABOUT THE

24   MONEY.

25         WELL, THEN, LET'S TALK ABOUT GETTING PAID.  HOW DOES

APRIL 22, 2015

1456

```
 1    MR. GHAHREMAN GET PAID?  HOW DOES IT TIE TO IRAN?  IT IS NOT
 2    TIED TO IRAN.  HE GETS PAID ONCE THESE CONTRACTS ARE
 3    FULFILLED.  HE GETS PAID ONCE THEY ARRIVE IN DUBAI.  THERE IS
 4    NO ADDITIONAL CONTRACT OUT OF THOUSANDS OF PAGES OF
 5    DOCUMENTARY EVIDENCE AND, YOU KNOW, HUNDREDS OF HOURS OF
 6    INTERMINABLE PHONE CALLS.  THERE IS NOTHING ABOUT ADDITIONAL
 7    PAYMENT.  HE GETS PAID WHEN THESE ITEMS GO TO DUBAI.
 8            SO IF IT IS REALLY ALL ABOUT THE MONEY, THE MONEY
 9    COMES TO HIM WITH NOTHING ELSE HAVING TO HAPPEN OTHER THAN
10    THESE ITEMS GETTING TO DUBAI.
11            AND, LIKE I SAID, THERE IS NO OTHER REAL PLAUSIBLE
12    EXPLANATION FOR INTENT, NO REASON TO SHOW WHY HE INTENDED OR
13    WANTED THESE THINGS TO GO TO DUBAI -- I MEAN, SORRY -- TO
14    IRAN.
15            HE TOLD YOU ABOUT HIS BACKGROUND.  HE HAS NO
16    PERSONAL INTEREST IN THE GOVERNMENT OF IRAN.  HE HAS BEEN
17    REJECTED FOR NOT BEING IRANIAN ENOUGH.  HE HAS BEEN DENIED
18    SCHOLARSHIPS DESPITE BEING TECHNICALLY QUALIFIED BECAUSE HE
19    COULDN'T PASS THE ISLAMIC SECURITY TESTS.  HE HAS BEEN PASSED
20    UP ON PROMOTIONS IN HIS JOBS BECAUSE HE COULDN'T PASS ISLAMIC
21    SECURITY TESTS.  HE HAS NO ALLEGIANCE TO IRAN.
22            WHAT IS HIS MOTIVE OR INTENT?  WHAT IS IT THAT THE
23    GOVERNMENT HAS TO PROVE, THAT THEY HAVE GIVEN YOU EVIDENCE OF,
24    TO SHOW THAT NOT ONLY DID HE MERELY KNOW THESE WERE GOING TO
25    IRAN BUT THAT HE INTENDED FOR THEM TO GO THERE?
```

APRIL 22, 2015

1457

```
 1              I WANT YOU TO -- I AM NOT GOING TO PLAY THIS HERE
 2    BECAUSE I KNOW THAT IT IS TOUGH QUALITY TO LISTEN TO.  BUT YOU
 3    WILL RECALL THE CONVERSATION THAT DAVID MILLS HAD WITH ARASH
 4    GHAHREMAN IN THE VEGAS DINNER, WHAT EVERYBODY HAS CALLED THE
 5    VEGAS DINNER.
 6              AND YOU WILL RECALL THE GOVERNMENT PLAYING THAT
 7    CLIP, I THINK IT WAS -- I DON'T HAVE IT WRITTEN DOWN.  BUT
 8    THEY PLAYED A CLIP WHERE BASICALLY DAVID MILLS SAID, SO YOU
 9    DON'T HAVE TO ASK WHERE IT IS GOING BECAUSE YOU ALREADY KNOW
10    BECAUSE OF ALL OF YOUR CONNECTIONS.
11              AND ARASH IS, LIKE, NO, I WILL KNOW IN, LIKE, IN SIX
12    MONTHS OR TWO MONTHS, OR WHATEVER IT WAS, YOU KNOW, I WILL
13    FIND OUT IF IT GOT THERE.
14              BASICALLY HE IS TELLING HIM, IF DAVID MILLS LIED --
15    IF KOORUSH TAHERKHANI LIED TO ME, I WILL FIND OUT.  I WILL
16    FIND OUT.
17              HE DIDN'T SAY HE KNEW.
18              BUT IT IS WHAT COMES AFTER.  AND THIS IS DEFENSE
19    EXHIBIT T.  AND I REALLY WANT YOU ALL TO LISTEN TO THIS, AND
20    HOPEFULLY THE SPEAKER IS GOOD ENOUGH.  BECAUSE IF YOU EVER
21    WANTED TO KNOW WHAT ARASH GHAHREMAN'S INTENTIONS WERE THROUGH
22    ALL THIS, IF IT REALLY WAS AS THE GOVERNMENT SAID ALL ABOUT
23    THE MONEY, THEN YOU WILL HEAR -- YOU WOULD HEAR A DIFFERENT
24    CONVERSATION THAN WHAT YOU WILL HEAR IN EXHIBIT T.
25              BECAUSE THIS IS THE MOMENT WHERE DAVID MILLS SAYS,
```

APRIL 22, 2015

1   HEY, SO YOU GOT THESE CONNECTIONS, YEAH, YOU GOT THESE

2   CONNECTIONS IN IRAN.  YOU HAVE TO HAVE SOME MARITIME

3   CONNECTIONS THERE.  YOU KNOW, DO THEY NEED PARTS?  DO THEY

4   NEED BUSINESS?  DO THEY NEED MY BUSINESS?  CAN YOU HOOK ME UP

5   WITH THEM?

6           DAVID MILLS IS OFFERING HIM NEW BUSINESS

7   OPPORTUNITIES WITH CONNECTIONS IN IRAN.  AND WHAT DOES ARASH

8   GHAHREMAN SAY?  YOU WILL BE ABLE TO HEAR IT.  IT IS CLEAR WHAT

9   HE SAYS.  HE SAYS, THERE IS NO AMERICAN MARKET THERE.  MAYBE

10  THERE SHOULD BE SOME DAY, BUT THERE IS NO MARKET THERE NOW.

11  THERE ARE SANCTIONS.

12          HE IS TELLING DAVID MILLS THAT HE CAN'T DO BUSINESS

13  IN IRAN BECAUSE OF SANCTIONS.  THINK ABOUT THAT.  HE IS BEING

14  OFFERED THIS OPPORTUNITY.  IF HE HAD THE INTENT HE WOULD JUMP

15  ON THIS.  BUT HE TELLS HIM THERE ARE SANCTIONS.

16          MR. GHAHREMAN WAS INTERESTED IN MONEY.  HE IS A --

17  YOU KNOW, HE IS A BUSINESSMAN.  HE GOT HIS MASTER'S IN

18  INTERNATIONAL MARITIME BUSINESS.  BUT HE IS INTERESTED IN

19  MONEY FOR, AS HE TOLD MIKAEL RONES, LEGAL STRAIGHTFORWARD

20  DEALS.

21          THE GOVERNMENT MADE A BIG DEAL ABOUT THAT JACKUP RIG

22  INCIDENT.  WHAT HAPPENED?  NOTHING.  THE DEAL DIDN'T GO

23  THROUGH.  SAEED SHAMI WAS TALKING ABOUT CRAZY STUFF.

24  MR. GHAHREMAN TOOK HIS HANDS OFF OF THAT AND MOVED ON BECAUSE

25  HE IS INTERESTED IN LEGAL STRAIGHTFORWARD DEALS.

APRIL 22, 2015

1          SAEED SHAMI GAVE HIM THE KIND OF PROOF THAT THIS HAD

2    SOMETHING TO DO WITH IRAN THAT KOORUSH TAHERKHANI NEVER GAVE

3    HIM.  KOORUSH TAHERKHANI, WHO NEVER TRUSTED MR. GHAHREMAN

4    ENOUGH TO EVEN LET HIM GO TO VEGAS ALONE.  REMEMBER ERGUN

5    YILDIZ SAID, YEAH, I HAD TO GO TO VEGAS CAUSE THIS GUY HAS

6    BEEN IN THE U.S. FOR A LONG TIME, WE DON'T REALLY TRUST HIM.

7    MAYBE HE IS GOING TO CHEAT US.

8          THEY DIDN'T TRUST HIM.  ERGUN YILDIZ IS OUT TO SEE

9    IF MR. GHAHREMAN BE TRUSTED.  AND KOORUSH TAHERKHANI, HE IS

10   OUT OUT.  KOORUSH TAHERKHANI IS PROTECTING HIMSELF IN EVERY

11   WAY HE CAN.

12         AND THE GOVERNMENT CANNOT GIVE YOU ONE VALID

13   EXPLANATION WHY KOORUSH TAHERKHANI WOULD FEEL IT NECESSARY TO

14   TELL MR. GHAHREMAN THAT THESE ITEMS WERE GOING TO IRAN.  HE

15   HAS EVERY INCENTIVE NOT TO.  HE IS THE ONE PERSON WHO YOU

16   HAVEN'T SEEN IN THIS COURTROOM IN THIS ENTIRE CASE.  THE

17   PERSON WHO PROBABLY IS CLOSEST TO ACTUALLY BEING GUILTY OF THE

18   CRIME OF TRYING TO EXPORT GOODS FROM THE UNITED STATES OR

19   TRYING TO GET THEM OUT IN VIOLATION OF THE SANCTIONS, HE IS

20   NOT HERE BECAUSE HE IS GOOD AT WHAT HE DOES.

21         AND IF HE IS GOOD AT WHAT HE DOES IT IS BECAUSE HE

22   PROTECTS HIMSELF AND HE DOESN'T PROVIDE INFORMATION TO PEOPLE

23   LIKE MR. GHAHREMAN, WHO, YEAH, MAY HAVE BEEN A COLLEGE BUDDY,

24   BUT WE HAD A LOT OF COLLEGE BUDDIES WAY BACK WHEN THAT WE

25   MIGHT NOT TRUST WITH OUR MOST PERSONAL AND PRIVATE, OR IN MR.

APRIL 22, 2015

1   TAHERKHANI'S CASE, CRIMINAL INTENTIONS OR IDEAS.

2           THESE COUNTS ARE COMPLEX.  ALL PARTIES AND THE JUDGE

3   WORKED HARD ON TRYING TO PRESENT THEM TO YOU IN A WAY THAT

4   HOPEFULLY WILL BE HELPFUL.  WE ANTICIPATE THAT YOU WILL GO

5   THROUGH THEM CAREFULLY, THAT YOU WILL READ THESE INSTRUCTIONS.

6           BUT I DO WANT TO EMPHASIZE.  THE JUDGE TOLD YOU, WE

7   ARE HERE TO HELP.  IF YOU HAVE A QUESTION, WRITE A NOTE.  ASK

8   US.

9           AND THE INSTRUCTIONS ARE HELPFUL IN A NUMBER OF

10  WAYS.  YOU KNOW, THEY DESCRIBE WHAT AN EXPORT IS, INSTRUCTION

11  28.  THAT MEANS SENDING OR TAKING A GOOD OR MERCHANDISE OUT OF

12  THE UNITED STATES.  YOU CAN LOOK AND SEE THAT MR. GHAHREMAN

13  DIDN'T TAKE IT OUT OF THE UNITED STATES.  HE DIDN'T SEND IT

14  OUT OF THE UNITED STATES.  LOOK AT THE SHIPPING LABEL, THAT

15  WAS JOHN ERICKSON.

16          THEN YOU WILL SEE SOME INSTRUCTIONS LIKE AIDING AND

17  ABETTING.  AND FURTHER INSTRUCTIONS THAT SAY HE MAY HAVE

18  HELPED JOHN ERICKSON TRY TO SEND THESE BOXES OUT OF THE UNITED

19  STATES, BUT YOU CAN'T HELP, YOU CAN'T AID AND ABET AN

20  UNDERCOVER AGENT.  THAT IS NOT A LAWFUL THEORY OF PROSECUTION.

21  SO THESE INSTRUCTIONS ARE HELPFUL.

22          AND, YOU KNOW, I DON'T WANT TO BE TOO FLIP, BUT

23  THERE IS AN EXPRESSION AMONG ATTORNEYS.  YOU KNOW, THERE IS

24  THE CLOSING ARGUMENT THAT YOU PREPARE.  THERE IS THE CLOSING

25  ARGUMENT YOU GAVE.  AND THEN THE MINUTE THAT I SIT DOWN IN

APRIL 22, 2015

1  THAT CHAIR, THERE IS THE CLOSING ARGUMENT THAT I WISH I HAD

2  GIVEN.  THERE IS THE CLOSING ARGUMENT WHERE I DIDN'T MISS THE

3  POINTS THAT I WANTED TO MAKE.

4          BUT I AM GOING TO MISS POINTS.  AND BECAUSE THE

5  GOVERNMENT HAS THE BURDEN, THEY ARE GOING TO GET THE LAST SAY.

6  THEY ARE GOING TO GET TO COME UP HERE WHEN I SIT DOWN.  BUT

7  YOU, THE JURY, ARE STILL IN THE POSITION TO ASK THE QUESTIONS

8  THAT I WOULD ASK OF THE GOVERNMENT WHEN THEY COME UP IN THEIR

9  REBUTTAL.

10          MR. GHAHREMAN REMAINS CLOAKED IN THE PRESUMPTION OF

11  INNOCENCE, THE PRESUMPTION OF INNOCENCE THAT WE AGREED REMAINS

12  WITH AN INDIVIDUAL UNLESS AND UNTIL THEY ARE FOUND GUILTY.

13          YOU WILL NEED TO ASK THE GOVERNMENT THOSE QUESTIONS.

14  AND IF THE GOVERNMENT DOESN'T ANSWER THEM, WHEN YOU GO BACK TO

15  DELIBERATE, THAT, IN AND OF ITSELF, IS REASONABLE DOUBT.

16  REASONABLE QUESTIONS THAT HAVE NOT BEEN ANSWERED, REASONABLE

17  DOUBT.  REASONABLE DOUBT IS A FIRM CONVICTION.

18          IF AT THE CONCLUSION OF THIS CASE YOU SAY, YOU KNOW,

19  HE PROBABLY KNEW THESE ITEMS WERE GOING TO IRAN, HE PROBABLY

20  WANTED THEM TO GO THERE; THAT IS NOT PROOF BEYOND A REASONABLE

21  DOUBT.

22          SOME OF YOU HAVE BEEN ON CIVIL TRIALS BEFORE.  IF

23  YOU SAY, WHEN I WEIGH ALL OF THIS EVIDENCE IT IS MORE LIKELY

24  THAN NOT THAT HE KNEW THESE ITEMS WERE GOING TO IRAN AND HE

25  INTENDED FOR THEM TO GO THERE; THAT IS STILL NOT PROOF BEYOND

APRIL 22, 2015

1    A REASONABLE DOUBT.

2           THERE IS A HIGHER CIVIL STANDARD OF CLEAR AND

3    CONVINCING.  IF YOU ARE CLEARLY CONVINCED THAT MR. GHAHREMAN

4    KNEW THESE ITEMS WERE GOING TO IRAN AND HAD THE INTENT TO DO

5    SO; THAT IS STILL NOT PROOF BEYOND A REASONABLE DOUBT.

6           PROOF BEYOND A REASONABLE DOUBT, WHEN IT ASKS YOU TO

7    USE YOUR REASON AND COMMON SENSE, IT SAYS USE YOUR REASON AND

8    COMMON SENSE -- AND LET ME READ IT.

9           A REASONABLE DOUBT IS A DOUBT BASED UPON REASON AND

10   COMMON SENSE, AND IS NOT BASED PURELY ON SPECULATION.  IT MAY

11   ARISE FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF THE

12   EVIDENCE OR -- OR -- FROM THE LACK OF EVIDENCE.

13          HOLD THE GOVERNMENT TO THEIR BURDEN IN THIS CASE.

14   HOLD THEM TO THEIR BURDEN WHEN QUESTIONS HAVE BEEN LEFT

15   UNANSWERED.

16          AND IN THE END I WILL SAY, THIS IS A CASE ABOUT A

17   MAN IN THE MIDDLE, A MAN STUCK BETWEEN TWO PARTIES WHO DIDN'T

18   SUFFICIENTLY TRUST HIM.  KOORUSH TAHERKHANI AND TIG MARINE,

19   WHO DIDN'T TRUST HIM ENOUGH TO TELL HIM WHAT WAS GOING ON; AND

20   BETWEEN A GOVERNMENT UNDERCOVER OPERATION THAT WAS BENT ON

21   SECURING A PROSECUTION.

22          BUT IN THE END HE WAS A MAN IN THE MIDDLE.  AND I

23   ASK YOU TO REVIEW THIS EVIDENCE CAREFULLY, WEIGH IT, RESPECT

24   WHAT THE LAW REQUIRES, AND FIND MR. GHAHREMAN NOT GUILTY OF

25   ALL COUNTS.

APRIL 22, 2015

1          THANK YOU.

2          **THE COURT:**  THANK YOU.

3          I WOULD LIKE TO TAKE JUST A FIVE-MINUTE BREAK SO WE

4     CAN STAND AND STRETCH.  WE WILL RESUME IN FIVE MINUTES, AND

5     THEN WE WILL HAVE THE GOVERNMENT'S FINAL, OR REBUTTAL, CLOSING

6     ARGUMENT.  THANK YOU.

7          (RECESS)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APRIL 22, 2015

1          **THE COURT:**  WE ARE BACK ON THE RECORD WITH ALL

2     PRESENT.

3          MR. HARRIGAN, GOVERNMENT'S REBUTTAL.

4          **MR. HARRIGAN:**  THANK YOU, YOUR HONOR.

5          NOW, MY FRIEND MR. JOHNSTON AND I MAY DISAGREE ABOUT

6     A LOT OF THINGS, BUT ONE THING WE AGREE ABOUT IS THAT YOU

7     SHOULD LOOK AT THE CIRCUMSTANCES OF THIS CASE, ALL OF THE

8     CIRCUMSTANCES.

9          ONE OF THOSE DAYS.  LET ME START AGAIN.

10         YOU NEED TO LOOK AT ALL OF THE CIRCUMSTANCES AND NOT

11    SELECTIVELY PICK OUT ANY PIECE OF ITEM, AS MR. JOHNSTON SAID.

12    AND HE USED THE WORD "I" A LOT OF TIMES, YOU MAY HAVE NOTICED:

13    I THINK THERE COULD BE A REASONABLE EXPLANATION.

14         WHAT I SAY, WHAT MR. JOHNSTON SAYS, THAT IS NOT

15    EVIDENCE.  IT IS UP TO YOU TO DECIDE THAT, AND THAT IS WHAT

16    OUR SYSTEM OF JUSTICE DOES.  AND I THINK THE GREATEST THING

17    ABOUT OUR SYSTEM OF JUSTICE, IT IS YOU, IT IS YOUR COMMON

18    SENSE.  AND THAT IS REALLY WHAT THE GOVERNMENT IS ASKING YOU

19    TO DO, BECAUSE IF YOU LOOK AT THE ENTIRE EVIDENCE, YOUR COMMON

20    SENSE AND REASON LEAD TO ONE INESCAPABLE CONCLUSION:

21    DEFENDANT KNEW.

22         AND I USE THE TERM THAT HE KNEW, HE INTENDED FOR

23    THESE ITEMS TO GO TO IRAN.  MAKE NO MISTAKE ABOUT IT.

24         AND LET ME GIVE YOU AN EXAMPLE HOW MR.

25    JOHNSTON POINTS TO ONE THING AND SAYS, WELL, THAT SHOWS

APRIL 22, 2015

1465

1    INNOCENCE.

2            HE POINTED TO YOU, TOOK YOU OVER TO THE Y-690 BOX

3    AND SAID, WELL, LOOK, THEY DIDN'T DO THIS, THEY DIDN'T DO

4    THAT.

5            OF COURSE THEY DIDN'T, BECAUSE THEY DECIDED TO SHIP

6    IT TO THE CZECH REPUBLIC.  THEN IT WAS GOING TO BE SMUGGLED TO

7    DUBAI, AND THEN IT WAS GOING TO GO TO IRAN.  BUT THE KEY THING

8    IS, AND WHAT HE IGNORES AND DIDN'T EXPLAIN, IS THE DISCUSSIONS

9    THEY HAD WHEN THEY MET ON JUNE 13TH.

10           AND DEFENDANT'S STATEMENT THAT HE WAS GOING TO

11   DESTROY THE SERIAL NUMBERS, THAT WASN'T NONSENSICAL IN THE

12   CONTEXT OF WHAT THEY WERE DOING.  IT MADE COMPLETE SENSE.  IT

13   MADE COMPLETE SENSE BECAUSE IT WOULDN'T COME BACK TO DAVID

14   COLE.  THAT WAS THEIR CONCERN.  OR THE AGENTS, THAT IT NOT

15   COME BACK.  AND THAT WAS VOLUNTEERED BY HIM.  THAT MADE

16   COMPLETE SENSE.  WHAT WAS NONSENSICAL WAS HIS EXPLANATION FROM

17   THE STAND WHICH WAS, WELL, IT COULDN'T HAVE BEEN DONE ANYWAY.

18           HE NEVER STATED WHY DID HE MAKE THAT RECOMMENDATION

19   IN THE FIRST PLACE?  HERE IS A GUY WHO WANTS YOU TO BELIEVE

20   THAT, I JUST WENT ALONG FOR THE RIDE.  WHATEVER HE SAID, I AM

21   NOT GOING TO SAY ANYTHING.

22           WHY IS HE SAYING -- WHY IS DEFENDANT ARASH GHAHREMAN

23   SAYING, DESTROY ALL OF THE SERIAL NUMBERS, REMOVE THEM.

24           WE KNOW WHY.  WE KNOW WHY.  BECAUSE HE IS INVOLVED

25   IN A CRIMINAL CONSPIRACY.  HE KNEW, HE INTENDED THAT THESE

1466

```
 1   GOODS GO TO IRAN.
 2           AND WHEN WE TALK ABOUT WITNESSES -- AND I DIDN'T
 3   TOUCH ON THIS IN MY OPENING CLOSING.  LET'S TALK ABOUT THE
 4   DEFENDANT'S STATEMENTS TO YOU.
 5           NOW, THERE IS A REASON WHY THE WITNESS STAND IS
 6   PROBABLY, BUT FOR THE JUDGE, IS CLOSER TO YOU THAN ANYBODY
 7   ELSE IN THE COURTROOM, BECAUSE, LADIES AND GENTLEMEN OF THE
 8   JURY, IT IS NOT SO MUCH WHAT IS SAID, BUT HOW IT IS SAID.  AND
 9   WHAT IS SAID.
10           AND REMEMBER DEFENDANT'S TESTIMONY DURING DIRECT,
11   HOW HE WAS VOLUNTEERING INFORMATION, HOW HE DIDN'T HAVE A
12   PROBLEM SAYING THINGS; AND REMEMBER HOW HE RESPONDED TO
13   QUESTIONS ON CROSS-EXAMINATION.  REMEMBER HOW HE ACTED.
14   REMEMBER WHAT HE DID, REMEMBER WHAT HE SAID.  AND REMEMBER
15   WHEN I WAS ASKING HIM YES OR NO QUESTIONS, WHAT WAS HIS
16   RESPONSE?  HE COULD HAVE SAID, I DON'T RECALL.  LACK OF
17   INFORMATION.  LACK OF INFORMATION.
18           THAT IS HIS DEFENSE, LACK OF INFORMATION.
19   EVERYTHING IS IN THE CONTRACT.  EVERYTHING IS IN THE CONTRACT.
20           THAT'S ANOTHER CIRCUMSTANCE THAT MR. JOHNSTON
21   POINTED TO.  HE SAID, LOOK, THE OBLIGATION OF THE CONTRACT, HE
22   WAS JUST FOLLOWING THE CONTRACT.
23           WELL, LET'S LOOK AT THE CONTRACT FOR THE Y-690.
24           CAN WE CONNECT IT?
25           IF ALL HE WAS DOING WAS GETTING THOSE GOODS PURSUANT
```

1    TO THE CONTRACT, LET'S LOOK AT WHAT THE DESTINATION WAS FOR

2    THE Y-690'S.  JUST FOCUS IN ON THAT.

3            IT WAS DUBAI, UAE.  THERE WAS TO BE NO MODIFICATIONS

4    TO THE CONTRACT, RIGHT?  TAKE A LOOK AT THE ADDRESS ON THE

5    Y-690 PACKAGE.  WHERE WAS THAT?  CZECHOSLOVAKIA, PRAGUE,

6    CZECHOSLOVAKIA.  HE WASN'T FOLLOWING THE CONTRACT THERE, BUT

7    HE WAS FOLLOWING THE PLAN BECAUSE THE PLAN WAS, LOOK, WE GOT A

8    LICENSE.  EVEN THOUGH IT IS GOING TO -- GET IT TO THE CZECH

9    REPUBLIC, THEN WE CAN GET IT TO DUBAI, THEN IT CAN GO TO IRAN.

10           SO THAT CIRCUMSTANCE POINTS TO ONE THING:  HE WAS

11   INVOLVED IN A CRIMINAL CONSPIRACY.

12           AND TO SUGGEST SOMEHOW THAT HE ACTED PURSUANT TO THE

13   CONTRACT, THAT IS JUST POPPYCOCK.  BECAUSE IF HE WAS INVOLVED

14   IN JUST THE CONTRACT AND ALL HIS OBLIGATIONS WAS THE CONTRACT,

15   WHY WAS HE INVOLVED IN THE MODIFICATION OF THE TERMS?

16           AND YOU ARE RIGHT, HE WAS -- HE IS BRIGHT.  PAYMENT

17   WAS UPON DELIVERY, BUT THE DELIVERY WAS IN DUBAI.  AND THE

18   MONEY WASN'T GOING TO BE MADE BY GETTING IT TO DUBAI.  WE KNOW

19   WHERE THE MONEY WAS GOING TO BE MADE, IT IS BECAUSE THERE IS A

20   HUGE ILLEGAL MARKET, A HUGE MARKET FOR GOODS IN IRAN.  AND

21   THAT IS WHERE THE MONEY WAS GOING TO BE MADE, AND THAT IS WHAT

22   KOORUSH TAHERKHANI MEANT WHEN HE TOLD HIM, WE GOT HUGE

23   BUSINESS.  AND THAT IS WHAT DEFENDANT KNEW.

24           THEY WANT TO SUGGEST -- I THINK MR. JOHNSTON WANTS

25   TO SUGGEST ANOTHER REASONABLE EXPLANATION FOR HIM NOT SAYING

APRIL 22, 2015

1   ANYTHING ABOUT JAIL.  AND MIND YOU, THIS WAS NEVER SAID BY
2   DEFENDANT ON THE STAND, THIS COMES FROM MR. JOHNSTON.  I GUESS
3   WHAT HE HOPED HIS CLIENT WOULD HAVE SAID ON THE STAND, BUT IT
4   STILL DOESN'T MAKE SENSE, IS THAT THE TALK ABOUT JAIL WAS,
5   WELL, HE WAS JUST TALKING THAT AGENT COLE WAS THE INDIVIDUAL
6   THAT WAS CONCERNED ABOUT GOING TO JAIL BECAUSE HE WAS
7   RESPONSIBLE FOR THE EXPORT LICENSE.
8              DEFENDANT IS NOT CHARGED WITH FAILING TO GET AN
9   EXPORT LICENSE.  HE IS FAILING -- HE IS CHARGED WITH
10  ATTEMPTING TO GET GOODS FROM THE UNITED STATES ILLEGALLY.
11  OKAY?  WHETHER IT WAS HIS OBLIGATION TO GET THE LICENSE OR
12  SOMEBODY'S OBLIGATION TO GET THE LICENSE, THE FACT IS THOSE
13  GOODS COULDN'T GO TO IRAN.  HE KNEW THAT.  THAT EXPLAINS HIS
14  ACTIONS.
15             IT WASN'T LIMITED TO THE Y-690'S, BECAUSE IF YOU
16  LOOK AT THOSE COMMENTS ABOUT GOING TO JAIL, ON AT LEAST ONE
17  OCCASION, IF NOT MORE, THEY ARE TALKING ABOUT BOTH.  AND ONE
18  OF HIS RESPONSES, IT IS ACTUALLY IN RESPONSE TO THE AGENT'S
19  CONCERN THAT, I WAS CONCERNED IF THIS WENT OVER TO DUBAI, I AM
20  GLAD WE ARE TALKING ABOUT THIS THAT IT WOULD END UP -- AND HE
21  IS TALKING ABOUT THE GYROS NOT THE Y-690'S -- THAT IT WOULD
22  END UP IN IRAN.
23             THAT'S WHERE THEY TALKED ABOUT THE RISK OF GOING TO
24  JAIL.  SO HIS EXPLANATION THAT SOMEHOW THIS WAS JUST LIMITED
25  TO THE Y-690'S WAS NOT TESTIFIED BY DEFENDANT AND IS PURE

APRIL 22, 2015

1   SPECULATION.

2          AND, LADIES AND GENTLEMEN, THAT IS NOT A REASONABLE

3   DOUBT.  YOU ARE NOT TO SPECULATE WHAT MIGHT HAPPEN, WHAT MR.

4   JOHNSTON THINKS, WHAT I THINK; IT IS SUPPOSED TO BE BASED ON

5   REASON AND COMMON SENSE.  AND IF YOU LOOK AT THE TOTALITY OF

6   CIRCUMSTANCES THERE IS ONLY ONE INESCAPABLE CONCLUSION:  THIS

7   DEFENDANT KNEW.

8          MR. JOHNSTON DESCRIBED AGENT COLE AS WANTING TO GET

9   AN ANSWER.  HE HAD TO GET AN ANSWER THAT THIS WAS GOING TO

10  IRAN, THAT IT WAS GOING TO IRAN.

11         YOU KNOW THAT IS NOT THE TESTIMONY OF AGENT COLE.

12  HE GOT INTO THIS TO FIGURE OUT WHAT WAS GOING ON.  AND TO

13  SUGGEST THAT SOMEHOW HE DIDN'T GIVE DEFENDANT THE OPPORTUNITY

14  TO EXPLAIN, DURING THOSE CONVERSATIONS, JUST DOES NOT COMPORT

15  WITH THE FACTS AS WE KNOW THEM.

16         HE WAS ASKED -- IF YOU TAKE, FOR EXAMPLE, WHAT

17  HAPPENED WITH THE Y-690'S, GO BACK AND LOOK AT THE TRANSCRIPT

18  IF YOU HAVE ANY QUESTIONS, OR LISTEN TO THE TAPE.  HE TELLS

19  HIM, THIS IS A MORE RESTRICTIVE CATEGORY.  AND HE GIVES

20  DEFENDANT AND KOORUSH TAHERKHANI THE OPTION OF WHAT TO DO.

21         HE MADE THAT CHOICE, NOT AGENT COLE.  THAT WAS HIS

22  CHOICE.  AND HE MADE THE CHOICE TO PROVIDE FALSE INFORMATION

23  BECAUSE HE KNEW THESE WERE GOING TO IRAN.  IT WAS ANOTHER

24  HURDLE IF THEY HAD TO GO THROUGH FINDING AN END USER STATEMENT

25  THAT DIDN'T WORK, THAT IS NOW GOING TO GO TO A GOVERNMENT

APRIL 22, 2015

1   AGENT.  AND HIS ULTIMATE GOAL WAS TO GET THAT TO IRAN.

2         NOW, I DIDN'T MENTION ERGUN YILDIZ EXCEPT FOR THE

3   CONSPIRACY IN MY OPENING FOR A VERY GOOD REASON.  YOU DON'T

4   NEED ERGUN YILDIZ' TESTIMONY TO FIND THE DEFENDANT WAS A

5   KNOWING AND -- KNOWING PARTICIPANT IN THIS SCHEME.  YOU DON'T

6   NEED IT, YOU KNOW.

7         AND WE TOLD YOU AT THE VERY BEGINNING, LOOK, ERGUN

8   YILDIZ COMES INTO THIS COURT WITH BAGGAGE.  HE DOES.  HE IS

9   HOPING TO GET A BENEFIT.  THAT BENEFIT IS BASED ON HIS

10  SUBSTANTIAL ASSISTANCE.  AS HE TOLD YOU, PROVIDING TRUTHFUL

11  TESTIMONY, THAT IS PART OF THE PLEA AGREEMENT TOO.

12        SO IT IS JUST NOT TO SAY WHAT THE GOVERNMENT WANTS

13  TO HEAR OR WHAT ANYONE WANTS TO HEAR.  AND, TRUST ME, YOU

14  THINK THE GOVERNMENT WOULD WANT TO HEAR HIM SAY A LOT MORE,

15  BUT HE TOLD YOU WHAT HE HEARD AND WHAT HE SAID.  HE CAME AND

16  SAID, I HAD LIMITED CONTACT WITH THE DEFENDANT, BUT THIS IS

17  WHAT THE DEFENDANT TOLD ME.

18        AND IT IS NOT IMPORTANT WHETHER THEY EVER WENT TO A

19  GOVERNMENT AGENT WHEN MR. GHAHREMAN MADE THAT STATEMENT --

20  WHEN DEFENDANT MADE THAT STATEMENT.  THE FACT IS, WHY IS HE

21  SAYING THAT?  WHY IS HE SAYING, OH, THEY ARE OKAY, DON'T WORRY

22  THEY ARE GOVERNMENT AGENTS.

23        BECAUSE HE KNEW, AND HE WAS CONCERNED, THAT THERE

24  WAS A POSSIBILITY WHAT THEY WERE DOING WAS ILLEGAL AND THEY

25  WOULD GET CAUGHT.  HE WAS ALLAYING MR. YILDIZ' CONCERNS.

APRIL 22, 2015

1        AND MR. YILDIZ IS NOT NECESSARY -- WHILE HE IS NOT
2   NECESSARY FOR YOU TO REACH A DETERMINATION OF GUILT IN THIS
3   CASE, WHAT HE DOES FOR YOU IS HE PROVIDES A UNIQUE INSIGHT
4   INTO WHAT WAS GOING ON.  AND WHILE YOU SHOULD VIEW HIS
5   TESTIMONY WITH CAUTION YOU SHOULD ALSO VIEW, DOES IT MAKE
6   SENSE WITH THE OTHER EVIDENCE THAT I HAVE HEARD IN THIS CASE?
7   IT ABSOLUTELY DOES.
8        HE CAME IN AND TOLD YOU, LOOK, I WAS JUST THE FACE
9   OF THE COMPANY.  THIS WAS A FRONT COMPANY.  HE TOLD YOU,
10  KOORUSH TAHERKHANI, ALL HIS BUSINESS WAS IN IRAN.
11       THIS IS THE SAME THING THAT THE DEFENDANT SAID AT
12  THE JUNE 12TH MEETING WITH THE AGENT, THAT HE HAS 2,
13  $3 MILLION BEHIND HIM.  THAT HE WORKS FOR AN IRANIAN COMPANY.
14  THAT HE HAS SHIPPING, WORKS FOR SHIPPING COMPANIES, OIL
15  COMPANIES, MINING COMPANIES.
16       SOMETHING MR. JOHNSTON -- A CIRCUMSTANCE THAT MR.
17  JOHNSTON NEVER MENTIONED, BECAUSE THERE IS NO OTHER REASONABLE
18  EXPLANATION FOR THAT.  THE EXPLANATION IS, HE KNEW WHERE THOSE
19  GOODS WERE GOING.  HE KNEW THEY WERE GOING TO IRAN.
20       AND MY POINT BEING IS YOU NEED TO LOOK AT THE ENTIRE
21  EVIDENCE.  WHEN YOU LOOK AT THE ENTIRE EVIDENCE IT GIVES YOU
22  ONE PICTURE, AND THE PICTURE IS THAT DEFENDANT WAS NOT A MAN
23  CAUGHT IN THE MIDDLE.  ALL RIGHT.  HE WAS NOT A MAN JUST
24  TRYING TO GET GOODS TO DUBAI.  DEFENDANT ARASH GHAHREMAN WAS
25  PART OF A CRIMINAL NETWORK.  AND MAKE NO MISTAKE ABOUT IT, HE

APRIL 22, 2015

1    DID IT FOR MONEY.

2            AND YOU ARE RIGHT, MR. JOHNSTON, I AGREE, IT IS UPON

3    DELIVERY.  BUT DELIVERY WASN'T JUST TO DUBAI.  THAT IS NOT THE

4    TERMS OF THE CONTRACT.  IF IT WAS THE TERMS OF THE CONTRACT

5    WHERE ARE THE CHANGES ON OTHER THINGS THEY DID?  THE TERMS OF

6    THE CONTRACT DIDN'T MATTER.  WHAT MATTERED WAS MONEY.  AND

7    THEY WEREN'T GOING TO MAKE MONEY UNLESS THIS GOT TO IRAN.

8    THAT'S THE POINT.

9            NOW, MR. JOHNSTON DESCRIBED REASONABLE DOUBT AS TWO

10   BOULDERS.  THERE ARE NO INSTRUCTIONS IN -- THAT WILL BE READ

11   TO YOU OR YOU WILL READ THAT DESCRIBES REASONABLE DOUBT LIKE

12   PUSHING BOULDERS UP A HILL, YOU KNOW.  THE BURDEN OF

13   REASONABLE DOUBT REQUIRES THAT YOU FIND THAT A DOUBT BASED ON

14   REASON AND COMMON SENSE.  NOT ON SPECULATION, NOT ON

15   CONJECTURE, BUT YOUR COMMON SENSE.

16           AND, LADIES AND GENTLEMEN, IT IS THE SAME BURDEN

17   THAT THE UNITED STATES FACES IN EVERY COURTROOM IN EVERY

18   CRIMINAL CASE IN THIS COUNTRY.  IT IS A BEDROCK OF OUR SYSTEM

19   OF JUSTICE.  AND IT IS A BURDEN THAT THE GOVERNMENT WELCOMES.

20   AND IT IS A BURDEN THAT THE GOVERNMENT HAS MET IN THIS CASE.

21   YOUR COMMON SENSE, YOUR REASON, TELLS YOU THAT.

22           AS I TOLD YOU AT THE BEGINNING OF MY OPENING --

23   OPENING ARGUMENT, BACK IN DECEMBER DEFENDANT MADE A CHOICE.

24   HE MADE A CHOICE WHETHER TO LIVE A LAW ABIDING LIFE AND NOT

25   GET INVOLVED IN THIS CRIMINAL NETWORK; OR WHETHER TO VIOLATE

APRIL 22, 2015

1    THE LAW AND RISK GETTING CAUGHT AND MAKE SOME MONEY.  HE CHOSE

2    MONEY.

3            LADIES AND GENTLEMEN, YOU HAVE HEARD ALL THE

4    EVIDENCE.  YOU KNOW WHAT DEFENDANT SAID.  YOU HAVE HEARD HIS

5    WORDS.  YOU KNOW THAT ALL THAT EVIDENCE LEADS TO ONE

6    INESCAPABLE CONCLUSION:  DEFENDANT WAS A KNOWING PARTICIPANT

7    IN A CRIMINAL SCHEME TO GET THOSE GOODS FROM THE UNITED STATES

8    TO IRAN.  THAT HE INTENDED THAT THOSE GOODS GO TO IRAN.

9            HOLD HIM ACCOUNTABLE FOR HIS CHOICE.  FIND HIM

10   GUILTY OF ALL THE COUNTS IN THE INDICTMENT.

11           THANK YOU.

12           **THE COURT:**  THANK YOU.

13           I HAVE JUST A FEW CONCLUDING INSTRUCTIONS, AND THEN

14   WE WILL RECESS FOR THE DAY, AND ASK THAT YOU RETURN TOMORROW

15   AT 8:30.

16           FIRST, WITH RESPECT TO OUR ALTERNATE JUROR, I AM

17   GOING TO ASK THAT YOU LEAVE YOUR NOTES, JURY INSTRUCTIONS,

18   EVERYTHING HERE.  AND, HERE AGAIN, YOU CAN ASSUME ABSOLUTE

19   CONFIDENTIALITY.  NO ONE WILL HAVE ACCESS TO THEM, EXCEPT FOR

20   THE COURT.  AND THEN ULTIMATELY ALL OF THAT INFORMATION WILL

21   BE SHREDDED, SO YOU MAY ASSUME ABSOLUTE CONFIDENTIALITY.

22           I WOULD ASK THAT YOU KEEP IN MIND THE ADMONITION NOT

23   TO DISCUSS THE CASE, FORM OR EXPRESS ANY OPINIONS OR

24   CONCLUSIONS, WHICH IN YOUR CASE MEANS UNTIL WE HEAR FROM THE

25   12 DELIBERATING JURORS.

APRIL 22, 2015

```
1          IF YOU ARE NOT SUBSTITUTED IN AS ONE OF THE 12

2    JURORS, THAT ADMONITION WILL REMAIN IN PLACE UNTIL THE COURT

3    CONTACTS YOU AND LETS YOU KNOW OF ANY OUTCOME IN THIS CASE,

4    AND THEN THE ADMONITION WOULD BE LIFTED.

5          YOU DON'T HAVE TO RETURN TOMORROW, BUT WE DO ASK

6    THAT YOU BE IMMEDIATELY AVAILABLE, SO THAT IF WE LOSE ONE OF

7    OUR 12 JURORS WE WILL CONTACT YOU.  I AM GOING TO ASK THAT YOU

8    LEAVE YOUR BEST NUMBER, CELL NUMBER, PERHAPS, WITH MS.

9    KLOSTERMAN SO THAT IN THE EVENT WE NEED YOU WE CAN CONTACT YOU

10   AND YOU CAN REPORT IMMEDIATELY TO COURT.  BUT YOU DON'T HAVE

11   TO COME TOMORROW, WE JUST ASK THAT YOU BE IMMEDIATELY

12   AVAILABLE.

13         FOR OUR 12 DELIBERATING JURORS, WE WILL BEGIN THE

14   DELIBERATIONS TOMORROW MORNING AT 8:30.

15         I WILL PROVIDE A LUNCH MENU FOR YOU, AND SO WHEN YOU

16   COME IN FIRST THING YOU CAN FILL OUT A LUNCH MENU.  AND WE

17   WILL TRY TO HAVE THAT LUNCH HERE BY 11:00 OR 11:30, AND YOU

18   CAN CONSUME THAT WHILE YOU DELIBERATE OR YOU CAN TAKE A BREAK,

19   WHATEVER YOU WANT.

20         FOR TOMORROW THE SCHEDULE WOULD BE 8:30 TO 2:00.

21   YOU ARE FREE TO TAKE BREAKS WHENEVER YOU WANT AND FOR HOWEVER

22   LONG YOU WANT.  THAT'S THE MAJOR DIFFERENCE.  YOU WILL BE IN

23   THE JURY ROOM, AS YOU ARE ACCUSTOMED TO.  THERE IS A BUTTON,

24   BACK THERE, I THINK IT IS IN THE JURY ROOM.  AND IF YOU PRESS

25   IT MY LAW CLERK, MOANA MCMULLAN AND MARJETA SIX, WILL REPORT
```

APRIL 22, 2015

1475

1    AND LET YOU OUT OF THE JURY ROOM AND THEN YOU CAN TAKE A

2    BREAK.  YOU CAN GO OUT INTO THE HALLWAY, GO OUT WHEREVER YOU

3    WANT.

4            WHILE ON RECESS PLEASE KEEP IN MIND THE ADMONITION

5    NOT TO DISCUSS THE CASE, FORM OR EXPRESS ANY OPINIONS OR

6    CONCLUSIONS.  AND OF COURSE THAT ADMONITION HOLDS IN THE EVENT

7    YOU ARE UNABLE TO ARRIVE AT A VERDICT TOMORROW AND YOU RETURN

8    ANOTHER DAY.

9            IF YOU FEEL THAT YOU ARE CLOSE TO RESOLVING THE CASE

10   AND YOU NEED MORE TIME, SO SAY IT IS CLOSE TO 2:00 AND YOU

11   WANT TO STAY LONGER, YOU ARE WELCOME TO DO THAT.  YOU CAN STAY

12   UNTIL AS LATE AS 4:30 OR 5:00.  I KNOW THAT WOULD BE A VERY

13   LONG DAY, BUT YOU ARE WELCOME TO DO THAT IF YOU WANT.

14           WE WILL HAVE FOR YOU TOMORROW ALL OF THE EXHIBITS IN

15   THE JURY LOUNGE.  TONIGHT OR THIS AFTERNOON WHEN YOU LEAVE WE

16   WILL HAVE YOU GO OUT THROUGH THE JURY LOUNGE SO YOU CAN BRING

17   WITH YOU YOUR JURY INSTRUCTIONS, THE VERDICT FORM, YOUR NOTES

18   ANY OTHER PERSONAL EFFECTS.  AND YOU CAN LEAVE THOSE ITEMS IN

19   THE JURY ROOM SO THAT THEY WILL BE AVAILABLE FOR YOU TOMORROW

20   MORNING WHEN YOU BEGIN YOUR DELIBERATIONS.

21           WITH REGARD TO (NAME REDACTED), JUROR NO. 1, YOU

22   INDICATED THAT YOU WILL NOT BE AVAILABLE FRIDAY, THE DAY AFTER

23   TOMORROW.  AND THAT STILL REMAINS THE CASE?

24           **JUROR:**  YES.

25           **THE COURT:**  WILL YOU BE AVAILABLE MONDAY?

APRIL 22, 2015

1              **JUROR:**  THAT IS A POSSIBILITY.  IT IS A POSSIBILITY.

2              **THE COURT:**  IF, FOR EXAMPLE, THE JURY DOES NOT

3    ARRIVE AT A VERDICT THURSDAY, THEN ORDINARILY WHAT WOULD

4    HAPPEN IS YOU WOULD COME BACK –– BECAUSE YOU WON'T BE HERE

5    FRIDAY, THE JURY WOULD COME BACK ON MONDAY.  SO WILL YOU BE

6    ABLE TO RETURN TO MONDAY?

7              **JUROR:**  YES, UNTIL ABOUT 1:00.  WOULD THAT BE OKAY?

8              **THE COURT:**  I AM SORRY?

9              **JUROR:**  UNTIL ABOUT 1:00 O'CLOCK.

10             **THE COURT:**  OKAY.  SO ON MONDAY YOU COULD BE HERE

11   FROM 8:30 TO 1:00?

12             **JUROR:**  YES.

13             **THE COURT:**  THEN ON TUESDAY, IF NECESSARY?

14             **JUROR:**  YES.

15             **THE COURT:**  I AM GIVING A PARADE OF HORRIBLES HERE

16   THAT DELIBERATIONS GO ON AND ON AND ON.  BUT WHAT IS REQUIRED

17   IS THAT THE MEMBERS OF THE JURY CONTINUE THEIR DELIBERATIONS

18   FROM ONE DAY TO THE NEXT, SO IN THE EVENT YOU ARE UNABLE TO

19   ARRIVE AT A VERDICT TOMORROW, THURSDAY, AND YOU ELECT TO CALL

20   IT A DAY, THEN YOU WILL HAVE TO RETURN, NOT FRIDAY BUT MONDAY,

21   AND RESUME YOUR DELIBERATIONS, BECAUSE (NAME REDACTED; JUROR

22   NO. 1) WILL BE AVAILABLE.

23             HERE AGAIN, WE ASK THAT YOU TAKE GOOD CARE OF

24   YOURSELVES.  WE NEED ALL OF YOU TO RETURN AND TO CONTINUE WITH

25   YOUR DELIBERATIONS.

                          APRIL 22, 2015

```
1           IF FOR SOME REASON ONE OF YOU IS UNABLE TO RESUME
2    THEN WE WILL HAVE OUR ALTERNATE JUROR, (NAME REDACTED), STAND
3    IN.  BUT WE ASK THAT ALL 12 OF YOU TAKE GOOD CARE OF
4    YOURSELVES AND CONTINUE WITH THE DELIBERATIONS TO THE BEST OF
5    YOUR ABILITY.
6           AT THIS TIME, MADAM CLERK, WILL YOU SWEAR THE LAW
7    CLERKS, PLEASE.
8           THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
9           DO YOU, AND EACH OF YOU, SOLEMNLY SWEAR OR AFFIRM
10   THAT YOU WILL KEEP THIS JURY IN SOME PRIVATE AND CONVENIENT
11   PLACE, YOU WILL NOT PERMIT ANY PERSON TO SPEAK TO OR
12   COMMUNICATE WITH THEM, NOR DO SO YOURSELF, EXCEPT BY ORDER OF
13   THE COURT OR TO ASK THEM IS THEY HAVE AGREED UPON A VERDICT.
14   AND THAT YOU WILL RETURN THEM INTO COURT WHEN THEY HAVE SO
15   AGREED, OR WHEN ORDERED BY THE COURT.
16           MS. MCMULLAN:  I DO.
17           MS. SIX:  I DO.
18           THE COURT:  SO AT THIS TIME I WILL ASK THE 12
19   DELIBERATING JURORS TO FOLLOW MS. MCMULLAN AND MS. MARJETA SIX
20   BACK INTO THE JURY ROOM.  TAKE ALL OF YOUR THINGS WITH YOU.
21   THEN YOU CAN SIMPLY LEAVE THEM ON THE JURY TABLE, AND THEN YOU
22   WOULD BE DONE FOR THE DAY, AND RETURN TOMORROW AT 8:30.
23           (NAME REDACTED; ALTERNATE JUROR), IF YOU WILL LEAVE
24   YOUR ITEMS ON YOUR CHAIR AND THEN -- OR GIVE THEM TO MS.
25   KLOSTERMAN, THAT WOULD BE BEST.  THEN IF YOU COULD GIVE US A
```

APRIL 22, 2015

```
 1    CELL NUMBER OR A NUMBER WHERE WE CAN REACH YOU.
 2              THE CLERK:  I WILL WALK OUT WITH YOU.
 3              THE COURT:  THANK YOU.
 4              (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN
 5              OPEN COURT, OUT OF THE HEARING OF THE JURY)
 6              THE COURT:  WE ARE OUTSIDE OF THE PRESENCE OF THE
 7    JURY.
 8              SO I WILL ASK COUNSEL TO COLLECT THE EXHIBITS TO
 9    ENSURE THAT ONLY THOSE EXHIBITS THAT HAVE BEEN RECEIVED INTO
10    EVIDENCE ARE COLLECTED AND THEN DELIVERED INTO THE JURY ROOM.
11              MR. COUGHLIN:  YOUR HONOR, WE DID COME UP WITH A
12    COMPUTER, STAND-ALONE COMPUTER.  COUNSEL ALSO REPRESENTED THAT
13    POSSIBILITY.
14              MR. CAMDEN:  WE HAVE GOT ONE TOO.
15              THE COURT:  SO IF THE JURY INDICATES THAT THEY WANT
16    TO LISTEN TO ANY OF THE AUDIO OR VIDEO WE WILL --
17              MR. CAMDEN:  I WOULD PROPOSE, YOUR HONOR, WE CAN GO
18    BACK AND SET IT UP TONIGHT AND LEAVE IT, SO THEY CAN JUST GO
19    BACK, AND IF THEY WANT TO WATCH SOMETHING THEY CAN.
20              THE COURT:  THAT IS EVEN BETTER.
21              DO YOU AGREE?
22              MR. HARRIGAN:  THAT IS FINE.
23              MR. JOHNSTON:  SAVE US A NOTE.
24              THE COURT:  THE JURORS WENT OUT THE BACK DOOR?
25              MS. SIX:  YES.
```

APRIL 22, 2015

1          **THE COURT:**  THEY ARE GONE.

2          THERE IS A RULE 29 MOTION THAT WE HAVE BEEN

3    RESERVING AND WE --

4          **MR. JOHNSTON:**  YOUR HONOR, IT IS STILL FOR ALL

5    ELEMENTS, ALL COUNTS.  I DON'T KNOW IF THE OPPORTUNITY FOR

6    BRIEFING ON ANY PARTICULAR ISSUE, NOT WAIVING THE OTHERS,

7    COULD BE HELPFUL.  SO MAYBE WE COULD CONSIDER DOING THAT.  BUT

8    THE MOTION IS FOR ALL ELEMENTS, ALL COUNTS.

9          **THE COURT:**  ALL RIGHT.

10         **MR. JOHNSTON:**  ALL COUNTS, ALL ELEMENTS.

11         **THE COURT:**  AT THIS POINT IT IS SIMPLY AN ORAL

12   MOTION.  AM I CORRECT?

13         **MR. JOHNSTON:**  AT THIS POINT, YOUR HONOR, YES.

14         **THE COURT:**  ON THAT MOTION I WOULD DENY WITHOUT

15   PREJUDICE, FINDING THAT THERE IS SUFFICIENT EVIDENCE TO GO TO

16   THE JURY, AND TO BE UPHELD SHOULD THERE BE AN ADVERSE VERDICT.

17         IF THERE IS AN ADVERSE VERDICT, THEN OF COURSE THERE

18   WOULD BE AN OPPORTUNITY FOR ADDITIONAL POST-TRIAL MOTIONS

19   PRIOR TO SENTENCING.

20         ARE THERE ANY OTHER HOUSEKEEPING MATTERS WE NEED TO

21   ADDRESS?

22         **MR. COUGHLIN:**  YOUR HONOR, WE HAVE ONE EXHIBIT, 306,

23   WHICH INITIALLY WHEN WE PUT IT UP THERE CONTAINED TWO

24   EXCERPTS.  WE CHOSE ONLY TO PUT ONE IN SO THAT ONLY ONE GOES

25   BACK.  WE HAVE CREATED A NEW DISK THAT HAS JUST THE ONE

1480

1    EXCERPT ON IT.  WE WOULD LIKE TO SUBSTITUTE THAT IN.  306, I

2    MENTIONED IT TO COUNSEL ALREADY.  THEY JUST WANT TO VERIFY

3    THAT.  OTHER THAN THAT, I THINK THAT IS GOING TO BE THE ONLY

4    CHANGE, FROM OUR PERSPECTIVE, ON THE EXHIBITS.

5              **THE COURT:**  OKAY.

6              **MR. JOHNSTON:**  YOUR HONOR, I HAVE NO PROBLEM WITH

7    THAT.

8              I WAS JUST SPEAKING WITH MR. CAMDEN.  DURING MY

9    CLOSING ARGUMENT I REFERENCED A DEFENSE EXHIBIT D.  WHAT I WAS

10   ACTUALLY PUTTING UP, I BELIEVE, WAS DEFENSE EXHIBIT E, WHICH

11   WAS NOT ENTERED INTO EVIDENCE.

12             **MR. CAMDEN:**  E WAS.

13             **MR. JOHNSTON:**  E WAS TOO?  THEN IT IS JUST MY BAD.

14             I WAS GOING TO SAY IF I WAS REFERENCING ONE THAT WAS

15   ENTERED THINKING IT WAS THE OTHER, I WOULD ASK TO JUST CHANGE

16   THE LETTER, BUT WE WILL LEAVE IT AS IT IS.  THEY CAN FIGURE

17   THAT OUT.

18             THE ONLY OTHER ISSUE I JUST WANTED TO NOTE ON THE

19   RECORD IS I DO HAVE A LITTLE BIT OF A CONCERN ABOUT (NAME

20   REDACTED; JUROR NO. 1) SITUATION.  I DON'T KNOW HOW LONG

21   DELIBERATIONS WILL TAKE IN THIS CASE, BUT HE DEFINITELY HAD A

22   CONSIDERABLE AMOUNT OF HESITATION ABOUT MONDAY, BEING ABLE TO

23   BE HERE, AND OFFERED TO BE HERE UNTIL 1:00.  WE ARE ALSO

24   ACCOMMODATING HIM WHERE THE JURORS WOULD DELIBERATE TOMORROW

25   AND THEN NOT DELIBERATE FOR AT LEAST THREE DAYS.

APRIL 22, 2015

```
 1          I THINK MY PREFERENCE WOULD BE THAT THE JURORS
 2   DELIBERATE CONSECUTIVE DAYS, EVEN IF THAT MEANS HAVING AN
 3   ALTERNATE.
 4          MY CONCERN IS IF YOU GET TOWARDS THE END OF
 5   THURSDAY, PEOPLE KNOW THAT (NAME REDACTED; JUROR NO. 1) NEEDS
 6   TO GO TO HIS OBLIGATION ON FRIDAY.  I JUST DON'T WANT THE
 7   JURORS TO FEEL PRESSURED, COME TO VERDICT, IF THEY ARE STILL
 8   TRYING TO DEAL WITH, YOU KNOW, SOME SIX DAYS OF TRIAL
 9   TESTIMONY IN DELIBERATIONS.  AND I DON'T WANT THEM TO FEEL
10   LIKE THEY NEED TO ACCOMMODATE HIM OR ANYONE ELSE'S SCHEDULE TO
11   REACH A VERDICT.
12          IT WAS HIS HESITATION AND PAUSE IN COMING BACK
13   MONDAY.  AND THEN MY ADDITIONAL CONCERN THAT WE ARE DARK ON
14   FRIDAY, THEY ARE GOING TO HAVE ONE DAY OF DELIBERATIONS AND
15   THEN THREE DAYS AWAY FROM THE CASE.
16          THE COURT:  TRIALS ALWAYS HAVE ISSUES, AND CERTAINLY
17   THIS IS AN ISSUE.  BUT I AM COMFORTABLE WITH THE WAY IT IS
18   WORKING OUT IN THAT THE JURY ROOM IS VERY COMFORTABLE.  WE ARE
19   GOING TO FEED THEM.  THEY HAVE ACCESS TO EVERYTHING THEY NEED
20   IN THERE, INCLUDING A MICROWAVE, COFFEE, RESTROOMS,
21   EVERYTHING.  IT IS REALLY AN IDEAL JURY ROOM.  AND THEY CAN
22   STAY HERE UNTIL 5:00 IF THEY WANT.
23          IT IS ALSO SEEMS TO BE A VERY GOOD GROUP OF JURORS.
24   THEY ARE VERY RESPONSIVE AND ATTENTIVE, AND THEY HAVE BEEN
25   THROUGHOUT.  WE DON'T HAVE ANYONE NODDING OFF.  THEY ARE
```

APRIL 22, 2015

1    REALLY -- THEY HAVE BEEN GOOD.

2         SO I AM CONFIDENT THAT IF (NAME REDACTED; JUROR NO.

3    1) -- WELL, IF THE JURY DOESN'T ARRIVE AT A VERDICT THURSDAY

4    THAT THEY WILL BE ABLE, AND ABLY SO, TO ABIDE BY THE

5    ADMONITIONS, RETURN ON MONDAY AND RENEW THEIR DELIBERATIONS.

6    I JUST DON'T SEE ANYTHING THAT WOULD INDICATE TO THE CONTRARY.

7         AND OF COURSE WE HAVE (NAME REDACTED; ALTERNATE

8    JUROR) WHO HAS BEEN EXCELLENT, AND IF NECESSARY WE CAN ADDRESS

9    THAT ISSUE AND HAVE HER STAND IN PLACE OF ANY ONE OF THE 12

10   JURORS.

11        **MR. JOHNSTON:**  AND RESTART THE DELIBERATIONS.

12        **THE COURT:**  AND RESTART.  I WOULD, OF COURSE, GIVE

13   THE STANDARD RESTART JURY INSTRUCTION, IF THAT WERE TO HAPPEN.

14        ARE THERE ANY OTHER MATTERS?  ALL RIGHT.

15        **MR. HARRIGAN:**  THANK YOU, YOUR HONOR.

16        **THE COURT:**  AND COUNSEL, OF COURSE, WILL BE HERE AND

17   AVAILABLE.  IF THERE IS ANY QUESTION, COUNSEL WILL BE READILY

18   AVAILABLE?

19        **MR. HARRIGAN:**  YES, YOUR HONOR.  I WILL GIVE MS.

20   KLOSTERMAN MY CELL PHONE.

21        **MR. JOHNSTON:**  LIKEWISE, YES, YOUR HONOR.

22        **THE COURT:**  MR. GHAHREMAN, WOULD YOU WAIVE HIS

23   PRESENCE, OR WILL HE BE HERE IMMEDIATELY IF THERE IS ANY

24   QUESTION FROM THE JURY?

25        **MR. JOHNSTON:**  I CAN WAIVE HIS PRESENCE FOR ANY

APRIL 22, 2015

1    QUESTION, BUT I CERTAINLY -- HE WILL BE AVAILABLE ANY TIME THE

2    COURT WANTS HIM TO COME.

3         **THE COURT:**  SO IF THERE IS A QUESTION FROM THE JURY

4    THEN WHAT THE RULES PROVIDE IS THE COURT NEEDS TO MEET WITH

5    COUNSEL TO RESPOND TO THE JURY.

6         YOU HAVE A RIGHT TO BE HERE.  YOU ALSO CAN WAIVE

7    YOUR PRESENCE.  JUST SO THE RECORD IS CLEAR, DO YOU UNDERSTAND

8    THAT YOU HAVE A RIGHT TO BE HERE?

9         **DEFENDANT GHAHREMAN:**  YES, I DO.

10        **THE COURT:**  AND YOU ARE WAIVING YOUR RIGHT TO BE

11   PRESENT.

12        **DEFENDANT GHAHREMAN:**  YES, I DO.

13        **THE COURT:**  IF THE JURY ARRIVES AT A VERDICT, YOU

14   WILL NEED TO BE PRESENT.  DO YOU UNDERSTAND?

15        **DEFENDANT GHAHREMAN:**  YES.

16        **THE COURT:**  SO THAT WILL NOT BE AN OPTION.  SO IF WE

17   HEAR THAT THE JURY HAS A VERDICT, THEN WE WILL, OF COURSE,

18   CONTACT COUNSEL AND YOU WILL NEED TO BE PRESENT AT THAT TIME.

19        DO YOU UNDERSTAND?

20        **DEFENDANT GHAHREMAN:**  YES, SIR.

21        **THE COURT:**  ON THE BOXES, I AM CONTENT TO HAVE THOSE

22   GO IN TO THE JURY.  ANY OBJECTION?

23        **MR. HARRIGAN:**  NOT BY THE GOVERNMENT.

24        **MR. JOHNSTON:**  I HAVE NO PROBLEM, YOUR HONOR.  THE

25   OTHER OPTION WOULD BE TO HAVE THEM COME AND VIEW THEM IF THEY

APRIL 22, 2015

1484

1    WANT.  I AM PRETTY INDIFFERENT.

2          **THE COURT:**  I THINK WE WILL JUST PUT THEM INTO THE

3    JURY ROOM AS WELL.  OKAY.

4          THANK YOU VERY MUCH.

5          **MR. HARRIGAN:**  THANK YOU, YOUR HONOR.

6          **MR. JOHNSTON:**  THANK YOU, YOUR HONOR.

7

8                   *   *   *

9          I CERTIFY THAT THE FOREGOING IS A CORRECT
TRANSCRIPT FROM THE RECORD OF PROCEEDINGS

10          IN THE ABOVE-ENTITLED MATTER.

11          S/LEEANN PENCE                 6/16/2015

12          LEEANN PENCE, OFFICIAL COURT REPORTER    DATE

APRIL 22, 2015

1485

INDEX OF WITNESSES

GHAHREMAN, ARASH

  BY MR. JOHNSTON                 1228, 1358

  BY MR. HARRIGAN       1300             1353

APRIL 22, 2015