UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____

UNITED STATES OF AMERICA,       )
            PLAINTIFF,           )   CASE NO. 13CR4228-DMS
                                 )
                                 )  SAN DIEGO, CALIFORNIA
                                 ) FRIDAY, MARCH 20, 2015
                                 )   1:30 P.M. CALENDAR
ARASH GHAHREMAN,                 )
            DEFENDANT.           )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION IN LIMINE HEARING

REPORTED BY:                    LEE ANN PENCE,
                                OFFICIAL COURT REPORTER
                                UNITED STATES COURTHOUSE
                                333 WEST BROADWAY ROOM 1393
                                SAN DIEGO, CALIFORNIA 92101

```
COUNSEL APPEARING:

FOR PLAINTIFF:          LAURA E. DUFFY,
                        UNITED STATES ATTORNEY
                        BY:  SHANE P. HARRIGAN
                             TIMOTHY D. COUGHLIN
                        ASSISTANT U.S. ATTORNEYS
                        880 FRONT STREET
                        SAN DIEGO, CALIFORNIA 92101

FOR DEFENDANT           FEDERAL DEFENDERS OF SAN DIEGO, INC.
GHAHREMAN:                   BY:  ELLIS M. JOHNSTON
                                  JOSEPH S. CAMDEN
                        TRIAL ATTORNEYS
                        225 BROADWAY, SUITE 900
                        SAN DIEGO, CALIFORNIA 92101
```

```
 1      SAN DIEGO, CALIFORNIA – FRIDAY, MARCH 20, 2015 – 12:20 P.M.

 2                              *   *   *

 3           THE CLERK:  19 ON CALENDAR, CASE NO. 13CR4228,

 4    UNITED STATES OF AMERICA VERSUS ARASH GHAHREMAN; ON FOR

 5    MOTIONS IN LIMINE.

 6           MR. HARRIGAN:  GOOD AFTERNOON, YOUR HONOR.  SHANE

 7    HARRIGAN AND TIMOTHY COUGHLIN APPEARING ON BEHALF OF THE

 8    UNITED STATES.

 9           THE COURT:  GOOD AFTERNOON.

10           MR. JOHNSTON:  GOOD AFTERNOON, YOUR HONOR.  TRIP

11    JOHNSTON, OF FEDERAL DEFENDERS, ALONG WITH JOE CAMDEN, ON

12    BEHALF OF MR. GHAHREMAN, WHOSE PRESENCE HAS BEEN WAIVED FOR

13    THIS HEARING.

14           THE COURT:  THANK YOU.  GOOD AFTERNOON.

15           THERE ARE MANY MOTIONS ON.  I HAVE READ ALL OF THEM,

16    AND I APPRECIATE ALL OF THE BRIEFING.

17           I THINK WHAT I WOULD LIKE TO DO, MIGHT BE THE MOST

18    EFFICIENT WAY TO PROCEED, IS TO GIVE AS MANY TENTATIVES AS

19    POSSIBLE, AND THEN INVITE DISCUSSION.

20           AND THERE ARE SOME AREAS WHERE I JUST DON'T HAVE

21    ENOUGH INFORMATION, AND I WILL LET YOU KNOW WHEN WE GET THERE.

22           THE FIRST MATTER, IT IS MY RECOLLECTION THAT THERE

23    WAS A MOTION TO DISMISS COUNT 7, 8 AND 9 THAT WAS FILED, I

24    THINK, IN JUNE OF 2014.  I THINK THE MATTER WAS CONTINUED AND

25    A RECORD WAS NOT MADE.  I SIMPLY INDICATED THAT THAT MOTION
```

1    WAS GOING TO BE DENIED SO THAT DEFENSE COUNSEL COULD PROCEED

2    ACCORDINGLY.

3             THE BASIS FOR THAT DENIAL IS THE FOLLOWING.  AND

4    HERE I AM GOING TO START WITH ALL OF MY VARIOUS TENTATIVES.

5             UNDER SECTION 1956(A)(2)(A) THE DEFENDANT MUST HAVE,

6    NUMBER ONE, TRANSMITTED OR TRANSFERRED MONEY TO THE UNITED

7    STATES FROM A PLACE OUTSIDE THE UNITED STATES; AND, TWO, HAVE

8    DONE SO WITH THE INTENT TO PROMOTE THE CARRYING ON OF

9    SPECIFIED UNLAWFUL ACTIVITY.

10             THAT STATUTE IS DISTINGUISHED FROM 1956(A)(1) WHICH

11   PENALIZES FINANCIAL TRANSACTIONS THAT INVOLVE THE PROCEEDS OF

12   SPECIFIED UNLAWFUL ACTIVITY.  SO AS THAT STATUTE HAS BEEN

13   INTERPRETED, THAT IS 1956(A)(1), MONEY TRANSFERS, SEPARATE AND

14   APART FROM THE SPECIFIED UNLAWFUL ACTIVITY, ARE REQUIRED.

15             HERE, I WAS PERSUADED BY THE LANGUAGE OF THE STATUTE

16   ITSELF, 1956(A)(2)(A), AND THE CASES CITED BY THE GOVERNMENT.

17   ONE IS JUDGE A LORENZ CASE, NAZEMZADEH, AT 2014 WESTLAW,

18   310460, AND KAZIN -- I DON'T THINK IT IS KAZINSKY, BUT IT IS

19   KRASINSKI AT 545 FED.3RD 546, A SEVENTH CIRCUIT CASE, AND

20   PIERVINANZI AT 23 FED.3RD 670, A SECOND CIRCUIT CASE.

21             AND, AS DEFENSE COUNSEL ARE AWARE, THOSE CASES

22   ESSENTIALLY STAND FOR THE PROPOSITION THAT MONEY TRANSACTIONS

23   RELATED TO EXISTING DEALS NEED NOT BE DISTINCT FROM UNLAWFUL

24   ACTIVITY BECAUSE THE TRANSMISSION ADVANCES THE GOALS OF THE

25   UNLAWFUL ACTIVITY.  NO REQUIREMENT THAT THE PROCEEDS FIRST BE

MARCH 20, 2015

1    GENERATED BY SPECIFIED UNLAWFUL ACTIVITY.

2              I FOUND THOSE TO BE PERSUASIVE, AND THAT WOULD BE

3    THE BASIS OF THE TENTATIVE.

4              THEN, MOVING ON TO THE VARIOUS MOTIONS.  THE

5    GOVERNMENT HAS A NUMBER OF MOTIONS IN LIMINE.

6              THE FIRST IS TO ADMIT CERTIFIED RECORDS OF REGULARLY

7    CONDUCTED ACTIVITY THAT QUALIFY AS BUSINESS RECORDS.  SO THIS

8    REQUIREMENT, IF SATISFIED, MAKES CERTIFICATION OF RECORDS SELF

9    AUTHENTICATING, SO LONG AS THE UNDERLYING RECORDS QUALIFY AS

10   BUSINESS RECORDS UNDER 803(6), AND THE SELF-AUTHENTICATING

11   PROVISION IS 902(11).

12             HERE THE TENTATIVE IS THAT I THINK THE DEFENDANT IS

13   CORRECT IN THAT THE RECORDS THAT ARE REFERENCED WOULD NOT

14   QUALIFY AS BUSINESS RECORDS.  I AM NOT SURE HOW THE CUSTODIAN

15   OF THESE VARIOUS INTERNET SERVICE PROVIDERS WOULD BE ABLE TO

16   VERIFY OR STATE THAT THE EMAILS OR OTHER DOCUMENTS AT ISSUE

17   WERE MADE AT OR NEAR THE TIME OF THE MATTER DESCRIBED, OR THAT

18   THEY WERE PREPARED IN THE REGULAR COURSE OF BUSINESS.

19             **MR. JOHNSTON:**  YOUR HONOR, COULD I INTERRUPT JUST

20   BRIEFLY, PERHAPS SPEED THINGS ALONG.

21             I APPRECIATE THAT TENTATIVE RULING, BUT I WOULD LIKE

22   THE COURT TO KNOW WE WOULD BE WILLING TO STIPULATE TO THE

23   AUTHENTICITY OF THESE EMAILS, AND NOT REQUIRE THE GOVERNMENT

24   TO BRING IN AN UNNECESSARY WITNESS IN THIS CASE, THE

25   CUSTODIAN.  I THINK WE ARE CORRECT AS A MATTER OF LAW THAT

```
1   THEY WOULD NEED TO BRING THE CUSTODIAN IN, BUT THAT IS NOT A
2   FIGHT WE NEED TO FIGHT IN THIS CASE.
3           THE COURT:  OKAY.  THAT WAS GOING TO BE -- THANK
4   YOU.
5           MR. JOHNSTON:  BUT, JUST TO BE CLEAR, WE ARE NOT
6   STIPULATING THAT THESE ARE THEREFORE ADMISSIBLE UNDER ALL
7   RULES OF EVIDENCE.
8           THE COURT:  YES.
9           MR. JOHNSTON:  RELEVANCE OR OTHER HEARSAY EXCEPTIONS
10  THEY MUST MEET BEFORE THEY CAN BRING IN OTHER INDIVIDUAL
11  STATEMENTS WITHIN THOSE EMAILS.
12          THE COURT:  THAT WAS GOING TO BE THE FURTHER COMMENT
13  OF MY TENTATIVE, IS THAT IT SEEMED TO ME MANY OF THESE
14  DOCUMENTS, THEY COULD BE AUTHENTICATED ANYWAY THROUGH THE
15  AGENTS OR THROUGH COOPERATING WITNESSES OR THROUGH SOME OTHER
16  PERSON.  IT SEEMED THAT MANY OF THESE DOCUMENTS COULD BE
17  AUTHENTICATED, AND THAT WE WOULD BE WASTING TIME AT TRIAL.
18          SO THAT BEING SAID, THEN, WE DON'T HAVE AN
19  AUTHENTICATION ISSUE, AND I WOULD SIMPLY RESERVE AS TO ANY
20  UNDERLYING OBJECTION.  MANY OF THESE DOCUMENTS MAY COME IN AS
21  ADMISSIONS OR 801(D)(2)(E), CO-CONSPIRATOR STATEMENTS OR
22  OTHER -- MAYBE OTHER BASIS.
23          MR. HARRIGAN:  JUST TO BE CLEAR, YOUR HONOR, WE WERE
24  NOT SEEKING -- WE WERE NOT SAYING THROUGH THE DECLARATIONS
25  THAT THE CUSTODIAN OF RECORDS OF THESE ISP'S COULD SAY ARASH
```

1   GHAHREMAN DRAFTED THIS EMAIL ON THIS DATE, OR SENT IT ON THIS

2   OCCASION.

3           WHAT THE DECLARATIONS SAY IS THAT THESE EMAIL

4   SERVICE PROVIDERS FOR THAT ACCOUNT HAVE TO MAINTAIN THOSE

5   RECORDS, AND ANY DATA TRANSMITTED THROUGH IT IS STORED ON A

6   SERVER WHICH RECORDS THE CONTENT THAT IS SENT, AS WELL AS THE

7   TIME AND DATE RECEIVED.  THAT IS ALL WE ARE SEEKING, SO WE

8   DON'T HAVE TO BRING IN GOOGLE AND YAHOO.

9           TO THE EXTENT THERE IS OBJECTIONS AS TO HEARSAY, FOR

10  EACH OF THE EMAILS THEY ARE EITHER ADMISSIONS OR

11  CO-CONSPIRATOR STATEMENTS.

12          **THE COURT:**  THAT GOES TO A DIFFERENT MOTION AS WELL,

13  TOO, DOESN'T IT?

14          **MR. HARRIGAN:**  IT MAY, YOUR HONOR.  IT MAY.

15          **THE COURT:**  YES.  THAT ISSUE WAS -- WE WILL COME TO

16  IT.

17          **MR. HARRIGAN:**  SO THE GOVERNMENT'S INTENTION IS

18  TO -- SINCE WE HAVE TO SHOW WHERE THE SEARCH WARRANT EMAILS

19  COME IN, IS TO AT LEAST PRESENT THESE WITH THE RECORDS THAT

20  THEY ARE -- NOT INTRODUCE THOSE, BUT TAKE SELECTED EMAILS FROM

21  THOSE SEARCH WARRANTS.

22          **THE COURT:**  YES.

23          **MR. HARRIGAN:**  OKAY.

24          **THE COURT:**  THE NEXT GOVERNMENT MOTION IN LIMINE IS

25  UNDER 404(B), 803(17), AND EVIDENCE SEIZED FROM

1    MR. GHAHREMAN'S APARTMENT.

2           ON THE 404(B), THE TENTATIVE IS TO GRANT THAT MOTION

3    AND TO ALLOW THE GOVERNMENT TO INTRODUCE THAT EVIDENCE.

4           THERE ARE INCIDENTS REFERENCED FROM AUGUST 2011 TO

5    JANUARY 2012, MR. GHAHREMAN'S ATTEMPTS, FROM THE GOVERNMENT'S

6    POINT OF VIEW, TO BROKER THE PURCHASE OF OIL RIGS FOR SAEED

7    SHAMI, AN IRANIAN INDIVIDUAL, FROM A NORWEGIAN COMPANY THROUGH

8    USE OF MARSHALL ISLANDS, A FRONT COMPANY.  AND A FEBRUARY 2013

9    INCIDENT INVOLVING A COOPERATING WITNESS, TAHERKHANI AND

10   MR. GHAHREMAN OBTAINING MARINE EQUIPMENT FOR DELIVERY TO AN

11   IRANIAN SHIPPING COMPANY.  ISOICO IS THE ACRONYM.

12          IT SEEMS TO ME, GIVEN THE PROFFER, THAT THAT

13   INFORMATION WOULD BE RELEVANT TO SHOW THAT MR. GHAHREMAN WAS

14   AWARE OF IRANIAN TRADE SANCTIONS, AWARE OF THE USE OF FRONT

15   COMPANIES TO EVADE TRADE SANCTIONS, AND AWARE THAT THAT

16   EQUIPMENT WAS BEING DELIVERED FOR EXPORT TO IRAN.  AND THAT,

17   OF COURSE, IF ESTABLISHED, WOULD BE RELEVANT TO LEGITIMATE

18   MATTERS SUCH AS KNOWLEDGE, MOTIVE, MODUS OPERANDI, INTENT.

19   AND IT SEEMED TO ME THAT THOSE PRIOR INCIDENTS WERE SIMILAR

20   ENOUGH TO BE ARGUED WITH RESPECT TO INTENT.  THEY ARE NOT TOO

21   REMOTE IN TIME.  IT APPEARS THERE WOULD BE SUFFICIENT EVIDENCE

22   TO ESTABLISH THOSE FACTS BY A PREPONDERANCE.  AND BY WAY OF

23   TENTATIVE WOULD PASS A 403 BALANCE IN THAT IT SEEMS TO ME TO

24   BE RELEVANT, GOING TO ELEMENTS AT ISSUE, SO HIGHLY MATERIAL

25   AND NOT OUTWEIGHED BY UNDUE OR UNFAIR PREJUDICE.

MARCH 20, 2015

```
 1              THE NEXT TENTATIVE IS UNDER 803(17,) MARKET REPORTS
 2   AND SIMILAR PUBLICATIONS.  THIS WOULD BE EVIDENCE FROM
 3   MAXMIND -- M-A-X-M-I-N-D .COM REGARDING INTERNET ADDRESSES
 4   USED BY MR. GHAHREMAN'S CO-CONSPIRATORS AND ASSOCIATES TO
 5   PROVE THAT THE END USERS OF PRODUCTS SOUGHT BY MR. GHAHREMAN
 6   WERE IN IRAN.
 7              THIS GOES TO THAT ISSUE THAT MR. HARRIGAN JUST
 8   MENTIONED, I THINK.
 9              HERE, I WOULD LIKE A FURTHER PROFFER, SO WE CAN COME
10   BACK TO THIS.  THE DEFENDANTS STATE THAT IT HAS NOT BEEN SHOWN
11   THAT MAXMIND.COM SEARCH WAS A WHOIS --
12              AND THAT, FOR MS. PENCE, IS CAPITAL WHO, LOWER CASE
13   I, CAPITAL S.
14              -- DATABASE QUERY OF THE RELEVANT IRR.  AND THAT
15   MAXMIND.COM MAINTAINS ITS OWN PROPRIETARY DATABASES IN
16   ADDITION TO WHOIS.  SO THERE WAS A GAP IN THE BRIEFING FROM
17   THE GOVERNMENT THAT, BY WAY OF A TENTATIVE, WAS POINTED OUT BY
18   THE DEFENSE.  I WOULD LIKE TO HEAR FURTHER ARGUMENT ON THAT.
19              THE NEXT MATTER RELATED TO DOCUMENTS FROM
20   MR. GHAHREMAN'S APARTMENT AND COMPUTER.  LATER IN THE MOTION
21   TO SUPPRESS THE SEARCH WARRANT THE GOVERNMENT SEEMED TO BE
22   SAYING THAT IT WASN'T SEEKING THE ADMISSION OF ANY DOCUMENTS
23   FROM THE COMPUTER, SO THIS WOULD BE LIMITED TO THE APARTMENT?
24              **MR. HARRIGAN:**  YES, IT WOULD BE LIMITED TO JUST THE
25   APARTMENT.
```

1           **THE COURT:**  AND HERE THE OPPOSITION -- THERE WAS NO

2    SPECIFIC OPPOSITION EXCEPT IT IS ADDRESSED, OF COURSE, THROUGH

3    THE MOTION TO SUPPRESS THE SEARCH WARRANT.  SO I WILL COME TO

4    THAT LATER.

5           THAT TAKES US TO MR. GHAHREMAN'S MOTIONS IN LIMINE.

6           THE FIRST IS TO ALLOW THE USE OF THE AUGUST 2005

7    INCIDENT FOR CROSS-EXAMINATION OF AGENT DAVID COLE.  THE

8    TENTATIVE HERE IS TO DENY THAT REQUEST.  THERE IS A STATEMENT

9    IN THAT RECORD THAT PROVIDES AS FOLLOWS, AND THE QUOTATION IS

10   THAT AGENT COLE, QUOTE, ALLEGEDLY MAY HAVE FAILED TO REPORT

11   ALL THE PERTINENT INFORMATION, SLASH, FACTS WHEN REPORTING THE

12   INCIDENT, END QUOTE.

13          AND THAT IS A STAND-ALONE STATEMENT.  THERE IS NO

14   EVIDENCE TO SUBSTANTIATE THAT.  IT APPEARS TO HAVE BEEN AN

15   ALLEGATION BY SOMEONE WITHIN BORDER PATROL THAT THERE MAY NOT

16   HAVE BEEN ALL OF THE FACTS REPORTED.

17          THERE IS NO EVIDENCE SUBSTANTIATING THAT.  AND THE

18   CUSTOMS AND BORDER PROTECTION DISCIPLINE REVIEW BOARD MADE NO

19   ADVERSE FINDING.  SO ALL WE HAVE IS A STAND-ALONE ALLEGATION.

20   AND UNDER THE CASE CITED BY THE GOVERNMENT, UNITED STATES

21   VERSUS WILSON, 605 FED.3RD 985, STANDS FOR THE PROPOSITION

22   THAT BALD ASSERTIONS WITHOUT EVIDENCE ARE NOT PROBATIVE OF

23   TRUTHFULNESS OR UNTRUTHFULNESS.  IT SEEMS TO ME THAT GIVEN THE

24   PRESENT STATE OF THE RECORD THAT IS WHERE WE ARE.

25          THERE WAS ALSO A REQUEST FOR MORE DISCOVERY.  I

MARCH 20, 2015

1    UNDERSTAND THE GOVERNMENT'S PROFFER HERE IS THAT THERE IS NO

2    MORE INFORMATION, THAT THIS IS EVERYTHING THAT IT HAS.

3            IS THAT CORRECT?

4            **MR. HARRIGAN:**  THAT IS CORRECT, YOUR HONOR.

5            **THE COURT:**  AND IN READING THE RECORD IT DOES

6    SEEM -- THAT SEEMS CONSISTENT.  THERE WAS A STATEMENT BY

7    SOMEONE THAT THERE MAY HAVE BEEN A FAILURE TO REPORT ALL OF

8    THE PERTINENT INFORMATION.  THEY WENT ON WITH THEIR HEARING.

9    THE CBP REVIEW BOARD MADE ITS FINDINGS, AND THAT APPEARS TO BE

10   THE END OF IT.

11           SO I WOULD, BY WAY OF TENTATIVE, DENY THE REQUEST

12   THAT THE GOVERNMENT FURTHER THE SEARCH OUT.  IT SEEMS TO ME

13   THAT THAT WOULD BE ESSENTIALLY A FISHING EXPEDITION THAT WOULD

14   NOT BE WARRANTED.

15           THE NEXT DEFENDANT'S MOTION -- THERE ARE A SERIES OF

16   THEM IN ONE BRIEF.  THERE ARE SEVEN IN LIMINE REQUESTS.

17           THE FIRST IS TO PRECLUDE TESTIMONY REGARDING THE

18   PURPORTED PURPOSE OF GOODS AT ISSUE, THAT IS THE NAVIGAT-2100

19   GYROCOMPASS AND THE Y-690 TRIODES.

20           THE TENTATIVE HERE IS TO DENY THAT REQUEST.  IT

21   SEEMS, GIVEN THE PROFFER, THAT THE PURPOSE OF THE EQUIPMENT

22   AND ALL OF THE EVIDENCE RELATING TO THAT EQUIPMENT IS

23   INEXTRICABLY INTERTWINED WITH ALL OF THE EVIDENCE, THE EMAILS,

24   THE VARIOUS MATTERS.  AND THERE IS NO PRACTICAL WAY TO

25   SEPARATE IT ALL, NOR IS THERE ANY GOOD REASON TO DO SO.  IT

1   SEEMS TO ME THAT THESE ARE PART AND PARCEL OF THE CASE, THE

2   REALITIES OF THE CASE, AND THEY ARE ALL FAIRLY PRESENTED TO

3   THE JURY.

4          THE PURPOSE OF THIS EQUIPMENT ALSO IS RELEVANT TO

5   MATTERS OF KNOWLEDGE IN THIS CASE.  AND THERE IS ALSO

6   INFORMATION THAT ONE OF THE PROSPECTIVE SELLERS BECAME

7   SUSPICIOUS WHEN LEARNING OF THE ATTEMPT TO PURCHASE THIS TYPE

8   OF EQUIPMENT FOR THE VESSEL THAT MR. GHAHREMAN OR SOME OTHER

9   INDIVIDUAL REPRESENTED WAS THE VESSEL THAT THE EQUIPMENT WOULD

10  BE USED FOR, THE MERCEDES FOR A TRICYCLE WAS THE ANALOGY.

11         IT SEEMS TO ME THIS WOULD ALL BE RELEVANT, WOULD

12  PASS A 403 BALANCING THAT IT IS RELEVANT AND MATERIAL, NOT

13  SUBSTANTIALLY OUTWEIGHED BY UNDUE OR UNFAIR PREJUDICE.

14         THE NEXT REQUEST IS TO NOT READ THE INDICTMENT.  THE

15  TENTATIVE IS TO GRANT THAT REQUEST.  I WOULD SUMMARIZE IT.  IT

16  WILL END UP BEING A LONG SUMMARY THAT I WILL READ TO THE JURY,

17  BUT I HAVE DONE THIS IN OTHER CASES, AND I WILL PREPARE

18  SOMETHING.  AND WE WILL MEET AGAIN WITH COUNSEL AND I WILL LET

19  YOU KNOW WHAT IT IS I WOULD PROPOSE TO READ.  AND IT WILL BE A

20  PRETTY DETAILED RENDITION OF WHAT'S ALLEGED IN THE INDICTMENT.

21         3 IS TO PRECLUDE TESTIMONY REGARDING OTHER ITEMS

22  SOLICITED FOR PURCHASE.  THIS IS A 404(B), 403 ISSUE.  HERE

23  AGAIN THE TENTATIVE IS TO DENY.  THAT IT SEEMS TO ME IT IS

24  INEXTRICABLY INTERTWINED.  THE OTHER ITEMS SOLICITED, I THINK,

25  ARE PART AND PARCEL OF ALL OF THE EVIDENCE, AND MAY WELL NOT

MARCH 20, 2015

```
 1    BE 404(B) EVIDENCE TO THE EXTENT IT IS INEXTRICABLY

 2    INTERTWINED.  AND TO THE EXTENT IT MAY QUALIFY AS 404(B), I

 3    THINK THAT HAS BEEN ADDRESSED IN THE OTHER MOTIONS FOR WHICH

 4    THE COURT HAS PROVIDED TENTATIVES.

 5         THE FOURTH IS TO PRECLUDE REFERENCE TO DEFENDANT'S

 6    PRIOR MILITARY SERVICE.  THE TENTATIVE IS TO GRANT THAT.  IT

 7    SEEMS TO ME THAT HAS MINIMAL PROBATIVE VALUE, AND IS

 8    POTENTIALLY HIGHLY PREJUDICE.

 9         THE FIFTH IS TO PRECLUDE EXPERTS.  IT WAS BASED ON

10    NO NOTICE.  SINCE THEN, SINCE SEPTEMBER OF 2014, NOTICE HAS

11    BEEN GIVEN.  I THINK THE PROFFER WAS THAT C.V.'S AND RULE 16

12    HAVE BEEN COMPLIED WITH WITH RESPECT TO THE THREE INDIVIDUALS

13    IDENTIFIED ON IT, OLDEKOP, COX AND HINTON.  THE TENTATIVE

14    WOULD BE TO DENY.

15         THE SIXTH IS TO EXCLUDE STATEMENTS BY CO-DEFENDANTS.

16    HERE, GIVEN ALL OF THE INFORMATION I HAVE AND THE PROFFERS,

17    WOULD BE TO DENY.  IT SEEMS TO ME THAT THERE IS NO NEED FOR A

18    PRETRIAL HEARING.  THE EVIDENCE WOULD BE ADMITTED SUBJECT TO A

19    MOTION TO STRIKE.  THE TESTIMONY -- OR THE EVIDENCE THUS FAR I

20    THINK IS SUFFICIENT TO PROCEED IN THAT MANNER.  IT SEEMS TO ME

21    THAT THERE IS SUFFICIENT EVIDENCE AT THIS JUNCTURE TO PROCEED

22    TO -- FOR THE GOVERNMENT TO SHOW, IN GOOD FAITH, THAT THERE IS

23    AN EXISTENCE OF A CONSPIRACY, THAT MR. GHAHREMAN WAS CONNECTED

24    WITH THE CONSPIRACY, AND THAT THE STATEMENTS WERE IN

25    FURTHERANCE OF IT.
```

MARCH 20, 2015

```
 1          THE SEVENTH MOTION IS TO RECONSIDER THE
 2   ADMISSIBILITY OF MR. GHAHREMAN'S POST-ARREST STATEMENTS.  I
 3   HAVE LOOKED AT EVERYTHING AGAIN, AND I REREAD THE TRANSCRIPT.
 4   I WOULD STAND ON THE EARLIER DENIAL.
 5          HERE COUNSEL STATED IN THE BRIEFING THAT I HAD
 6   CONCLUDED THAT THERE WAS AN UNEQUIVOCAL INVOCATION.  I DON'T
 7   THINK I SAID THAT.  I HAD -- I REREAD THE TRANSCRIPT FROM THE
 8   HEARING, AND I DIDN'T FIND THOSE WORDS.
 9          WHAT I THOUGHT I SAID, AND WHAT IS REFLECTED IN THE
10   TRANSCRIPT, IS THAT IN EVERY INSTANCE THERE WAS AN EQUIVOCAL
11   STATEMENT REGARDING COUNSEL, AND THEN A LOT OF BACK AND FORTH.
12   MR. GHAHREMAN, AS YOU ARE WELL AWARE, IS VERY VERBAL.  A LOT
13   OF BACK AND FORTH.  AND SO I DID NOT FIND AN UNEQUIVOCAL
14   INVOCATION.
15          ALSO, THE MIRANDA ISSUE, I WOULD STAND ON THAT.  IT
16   APPEARS THAT THE MIRANDA ADVISAL IS SUFFICIENT ON THE ONE
17   ISSUE WITH RESPECT TO HAVING COUNSEL PRESENT BEFORE MAKING ANY
18   STATEMENT, THAT WAS SAID TO MR. GHAHREMAN.  AND HE INITIALED
19   INDICATING HE UNDERSTOOD.
20          LATER IN THE INTERVIEW THERE IS DISCUSSION ABOUT
21   WHETHER MR. GHAHREMAN WANTS AN ATTORNEY OR NOT.  AND WHAT IS
22   CLEAR TO ME, IN READING THE TRANSCRIPT AND WATCHING THE VIDEO,
23   IS HE WAS DISCUSSING WHETHER OR NOT HE WANTED AN ATTORNEY
24   WITHOUT UNEQUIVOCALLY INVOKING.  AND THE AGENTS MADE CLEAR
25   THAT THAT WAS HIS RIGHT, AND HE COULD HAVE AN ATTORNEY.  THEY
```

```
 1    ALSO MADE CLEAR THAT -- WHICH IS JUST THE PRACTICAL REALITY,
 2    THAT IF HE WANTED AN ATTORNEY THEY COULDN'T JUST OPEN THE
 3    INTERVIEW DOOR AND HAVE AN ATTORNEY COME IN AND SIT IN.  THAT
 4    IS NOT THE WAY IT HAPPENS IN THE REAL WORLD.  IT TAKES TIME.
 5              SO WHAT THEY WERE SAYING IS, IF YOU WANT AN ATTORNEY
 6    THEN WE HAVE TO STOP THE QUESTIONING, AND ONE WILL BE
 7    APPOINTED TO YOU.  YOU WILL HAVE YOUR ARRAIGNMENT.  AND THEY
 8    WENT DOWN THAT ROAD IN THAT DISCUSSION.
 9              THEY ALSO SAID, IN WORDS AND IN EFFECT, THAT IF HE
10    WANTED AN ATTORNEY THEN THE QUESTIONING WOULD STOP.  AND
11    THAT'S -- THAT IS THE PRACTICAL REALITY.
12              THERE IS, IN THE BRIEFING, DISCUSSION ABOUT WHETHER
13    THEY IMPROPERLY ADVISED MR. GHAHREMAN, BUT I DON'T FIND THAT
14    TO BE THE CASE.  RATHER, THE CONCEPT WAS IF YOU WANT AN
15    ATTORNEY YOU CAN HAVE ONE, WE HAVE TO THEN STOP QUESTIONING.
16              I THINK MR. GHAHREMAN WAS INQUIRING WHETHER HE COULD
17    HAVE AN ATTORNEY RIGHT THEN SO THAT HE COULD CONTINUE WITH THE
18    INTERVIEW WITH AN ATTORNEY.  AND THE AGENTS WERE SIMPLY
19    TELLING HIM THAT THAT COULDN'T HAPPEN, PRACTICALLY SPEAKING.
20    AND EVEN IF IT COULD, AS I UNDERSTAND THE AGENTS' COMMENTARY,
21    THEY WOULD ELECT NOT TO GO FORWARD WITH THE INTERVIEW, WHICH
22    WOULD BE THEIR -- WITHIN THEIR PREROGATIVE.  IF ONE WANTS TO
23    HAVE AN ATTORNEY AND THE ATTORNEY HAPPENS TO BE AVAILABLE
24    RIGHT THEN, THE AGENTS WOULD NOT BE OBLIGATED TO GO FORWARD
25    WITH THE INTERVIEW UNDER THOSE CIRCUMSTANCES.
```

MARCH 20, 2015

```
1          SO I THINK THAT WAS KIND OF THE GIST OF THE BACK AND
2    FORTH, ALL OF IT NOT RESULTING IN ANY MIRANDA VIOLATION.
3          AND THEN, FINALLY, ON THE VOLUNTARINESS.  I DID
4    CONSIDER THE TOTALITY OF THE CIRCUMSTANCES, NOT ONLY THE
5    AGENTS' CONDUCT AND THE CONCLUSION THAT IT WAS NOT COERCIVE,
6    BUT ALSO THE ATTRIBUTES ATTRIBUTED TO MR. GHAHREMAN AND HIS
7    CAPABILITIES, WHICH ARE SIGNIFICANT.  HE IS COLLEGE EDUCATED,
8    HE IS ARTICULATE, HE IS INDUSTRIOUS; AND ALL OF THOSE FACTORS
9    WENT INTO THE DETERMINATION THAT THE STATEMENTS ATTRIBUTED TO
10   HIM ARE VOLUNTARY.
11         AND WHILE THE GOVERNMENT WON'T BE USING THEM IN
12   THEIR CASE IN CHIEF, THEY WOULD BE AVAILABLE, IN THE EVENT
13   MR. GHAHREMAN TESTIFIES, FOR PURPOSES OF IMPEACHMENT.
14         THE NEXT MOTION -- THE BRIEF HAS FOUR REQUESTS.  ONE
15   IS UNDER THE VALLEJO, RELEVANCE TO PRECLUDE STRUCTURE
16   TESTIMONY REGARDING IRANIAN PROCUREMENT NETWORKS.
17         THE TENTATIVE HERE IS TO DENY THAT.  THE GOVERNMENT
18   HAS REPRESENTED THAT IT IS NOT OFFERING STRUCTURE EXPERT
19   TESTIMONY.  IT IS NOT ARGUING, AND WILL NOT ARGUE, THAT
20   IRANIAN PROCUREMENT NETWORKS DON'T USE UNKNOWING MIDDLEMEN;
21   RATHER, IT IS ARGUING THAT UNDER THESE FACTS, FOCUSING ON THIS
22   GROUP OF DEFENDANTS AND TIG MARINE, THAT IT, IN FACT, ACTED AS
23   AN IRANIAN PROCUREMENT NETWORK, AND THAT MR. GHAHREMAN, IN
24   FACT, WAS A KNOWING MIDDLEMAN.
25         SO THAT IS VERY DISTINCT FROM VALLEJO.  AND THERE IS
```

MARCH 20, 2015

1    ALSO, OF COURSE, A CONSPIRACY CHARGE HERE.  AND IT SEEMS TO ME

2    THAT ALL OF THE EVIDENCE TO ATTEMPT TO PROVE UP THAT

3    MR. GHAHREMAN AND THE OTHERS, INCLUDING TIG MARINE, DID

4    CONSTITUTE AN IRANIAN PROCUREMENT NETWORK IS FAIR, GIVEN THE

5    ALLEGATIONS, AND NOT OUTWEIGHED BY UNDUE OR UNFAIR PREJUDICE.

6              THE NEXT IS TO SUPPRESS EVIDENCE FROM ILLEGAL

7    CUSTOMS SUBPOENAS, CITING 15, CFR, SECTION 762.7.

8              THE TENTATIVE HERE IS TWO-PRONG.

9              ONE WOULD BE TO DENY IN THAT THERE WOULD NOT BE A

10   PRIVACY INTEREST IN IP ADDRESSES AND SUBSCRIBER INFORMATION.

11   THE CASE CITED BY THE GOVERNMENT APPEARS TO BE ON ALL FOURS ON

12   THAT ISSUE, THE FORRESTER CASE, AT 512 FED.3RD 500, NINTH

13   CIRCUIT, 2008.

14             AND SECOND, TO DENY BASED ON THE STATUTORY

15   PROVISIONS CITED BY THE GOVERNMENT, UNDER THE EAA 50 USC

16   SECTION 2401 ET SEQ. AND ITS REGULATIONS UNDER THE EAR AT 15

17   CFR 730 ET SEQ.  AND THERE ARE OTHER STATUTORY PROVISIONS AND

18   REGULATIONS, INCLUDING UNDER ITAR, THAT SEEM TO PROVIDE,

19   EXPLICITLY, IN THE LANGUAGE IT USES, THE AUTHORITY TO SUBPOENA

20   AND TO TARGET THE INFORMATION RECEIVED HERE.

21             THE NEXT MOTION IS TO SEVER COUNTS 3, 5 AND 8.  THE

22   TENTATIVE IS TO DENY.  IT SEEMS TO ME THAT THE EVIDENCE

23   RELATING TO THE NAVIGAT GYROCOMPASSES IS PART AND PARCEL OF

24   THE EVIDENCE RELATING TO THE Y-690 TRIODE TUBES.  IT IS AN

25   OVERARCHING CONSPIRACY ALLEGATION; COMMON PLAN, COMMON

MARCH 20, 2015

1    PARTIES, COMMON TIMEFRAME.  THE EVIDENCE IS ALL INEXTRICABLY

2    INTERTWINED, AND IT IS FAIRLY PRESENTED, BY WAY OF TENTATIVE,

3    IN ONE SETTING.

4            THERE ALSO WAS NOT A SUFFICIENT PROFFER FROM

5    MR. GHAHREMAN THAT HE WOULD BE WILLING TO TESTIFY ON SOME

6    COUNTS BUT WOULD HAVE A STRONG NEED NOT TO TESTIFY ON OTHER

7    COUNTS, JUSTIFYING A SEVERANCE.  I WOULD NEED TO HEAR MORE IN

8    THAT REGARD.

9            THE LAST MOTION IN LIMINE IS TO DISCLOSE EVIDENCE OF

10   BLIND FRONTS FOR PROCUREMENT NETWORKS.  THIS IS SIMILAR TO THE

11   BLIND MULE ISSUE IN BORDER BUST CASES.  AND HERE, AS I

12   MENTIONED EARLIER, THE GOVERNMENT IS NOT MAKING THAT ARGUMENT.

13   THEY ARE NOT SAYING THAT THESE TYPE OF PROCUREMENT NETWORKS

14   NEVER USE BLIND MIDDLEMEN, THEY ARE FOCUSING SOLELY ON THIS

15   GROUP AND ARGUING THAT IT IS AN IRANIAN PROCUREMENT NETWORK

16   AND MR. GHAHREMAN IS A KNOWING PARTICIPANT.

17           SO TO CHARGE THE GOVERNMENT WITH THE OBLIGATION OF

18   TRYING TO FIND ANY OTHER IRANIAN PROCUREMENT NETWORK WHERE

19   THERE IS A BLIND MIDDLEMAN I THINK WOULD BE UNWARRANTED AND

20   ULTIMATELY A FISHING EXPEDITION.  AND THAT AVENUE IS NOT ONE

21   THAT THE GOVERNMENT WILL BE PURSUING.

22           PART OF THE TENTATIVE IS BASED ON THE FACT THAT

23   TAMMY FARNSLEY APPEARS NOT TO BE ASSOCIATED --

24           IS IT TEEG OR TIG MARINE?

25           **MR. HARRIGAN:**  TIG.

MARCH 20, 2015

1      **THE COURT:**  WITH TIG MARINE.  AND SO THE TENTATIVE

2  WOULD BE TO DENY.

3      THAT TAKES US TO THE LAST AREA, THE MOTION TO

4  SUPPRESS THE SEARCH WARRANTS.  AND THE GOVERNMENT, IN ITS

5  BRIEFING, GIVEN THE EVIDENCE IT WOULD LIKE TO INTRODUCE, HAS

6  NARROWED THE SEARCH WARRANTS TO EIGHT.  AND SO HERE THE

7  TENTATIVE IS TO DENY THE MOTION TO SUPPRESS.

8      I READ THE AFFIDAVITS, THE SEARCH WARRANTS, ALL OF

9  THOSE MATTERS.  AND WHILE THE SEARCH WARRANT DOES FOCUS ON

10  THESE ISP PROVIDERS OR OTHER DOCUMENTS AND RECORDS, AND SEEKS

11  WHOLESALE PRODUCTION OF, FOR EXAMPLE, EMAIL ATTRIBUTED TO, FOR

12  EXAMPLE, MR. GHAHREMAN, WITHOUT TIME FRAMES, IT SEEMED TO ME

13  THAT IT WAS SUFFICIENTLY PARTICULAR, THAT IS THE SEARCH

14  WARRANTS WERE, BECAUSE THEY SET OUT IN GREAT DETAIL THE

15  PROBABLE CAUSE.  THEY THEN IDENTIFIED THE SIX CATEGORIES THAT

16  THEY WANTED TO SEARCH.  SO FOR EXAMPLE, WITH AN ISP PROVIDER

17  THEY WOULD ASK THAT PROVIDER TO RETRIEVE THE EMAIL FOR

18  MR. GHAHREMAN AT, FOR EXAMPLE, GOOGLE OR NUTECH OR MSN, AND

19  THEN THEY WOULD GET THAT COLLECTIVE DATA.

20      THEY WOULD THEN, IN A SEPARATE LOCATION, SET INTO

21  PLACE A PROTOCOL, AT LEAST ON THE FIRST SEARCH WARRANT,

22  13MJ0111, THE NUTECH SEARCH WARRANT FOR WHICH THE GOVERNMENT

23  WOULD LIKE TO INTRODUCE EIGHT EMAILS, A PROTOCOL WHERE THEY

24  WOULD USE SEARCH TERMS, THEY WOULD USE INDIVIDUAL EXAMINERS TO

25  REVIEW, AND OTHER RANGES OF DATA ANALYSIS TECHNIQUES, IS THE

MARCH 20, 2015

```
 1   PHRASE USED, AND BE PROVIDED THE PERIOD OF UP TO 90 DAYS TO
 2   CULL THROUGH THE EMAILS AND TO RETRIEVE THE TARGETED
 3   INFORMATION WHICH FOCUSED ON THESE SIX AREAS, AND THAT WOULD
 4   BE:  COMMUNICATIONS REGARDING PURCHASES OR SALES OF GOODS FROM
 5   THE UNITED STATES TO IRAN; COMMUNICATIONS REGARDING PURCHASES
 6   OR SALE OF U.S. EXPORT OF CONTROLLED ITEMS; GOODS AND
 7   TECHNOLOGIES INVOLVING MARINE NAVIGATION APPLICATIONS,
 8   INCLUDING GYROCOMPASSES, ELECTRON TUBES AND OTHERS;
 9   INFORMATION TENDING TO IDENTIFY CO-CONSPIRATORS; INFORMATION
10   RELATING TO U.S. EXPORT LAWS, REGULATIONS AND CONTROLS; AND
11   INFORMATION THAT PROVIDES CONTEXT TO ANY EMAIL REGARDING
12   CRIMINAL ACTIVITY DESCRIBED IN THOSE FIVE CATEGORIES, ABOVE
13   CATEGORIES.
14          AND LOOKING AT THE CASES CITED BY THE GOVERNMENT,
15   ADJANI AND GIBERSON AMONG OTHERS, IT SEEMED TO ME THAT THE
16   WARRANTS WERE SUFFICIENTLY PARTICULAR, THAT THEY WERE -- THE
17   CATEGORIES WERE SUPPORTED BY PROBABLE CAUSE.  THAT A PROTOCOL
18   WAS SET IN PLACE INITIALLY.  AND THEN THERE IS A DECLARATION
19   BY THE AGENT THAT THAT PROTOCOL REMAINED IN PLACE AS TO ALL
20   SEARCH WARRANT EXECUTION, BUT INADVERTENTLY WAS NOT INCLUDED
21   IN THE SUBSEQUENT SEARCH WARRANT AFFIDAVITS.
22          BUT IMPORTANTLY ON THAT INITIAL SEARCH WARRANT, IT
23   WAS INCLUDED AND IT WAS APPROVED BY THE COURT.  AND IN IT THE
24   AGENTS SET OUT NOT ONLY THE PROTOCOL BUT THE REASONS FOR
25   REQUESTING A WHOLESALE PRODUCTION OF EMAIL WITHOUT TIME FRAME,
```

MARCH 20, 2015

```
1    ALL OF WHICH APPEARED TO BE SUPPORTED BY PROBABLE CAUSE.
2              SO THE TENTATIVE WOULD BE TO DENY THE SEARCH WARRANT
3    AS TO THE SEARCH WARRANTS IDENTIFIED BY THE GOVERNMENT, AND
4    FOR THE RECORD I WILL LIST THEM.  THAT WOULD BE 13M511,
5    13MJ0111, 13MJ0728, 13MJ0730, 13MJ1657, 13MJ1656, 13MJ2829 AND
6    13MJ2827.  AND THE GOVERNMENT HAS SET OUT WHO THE ISP
7    PROVIDERS WERE AND WHAT DOCUMENTS THEY WANT TO INTRODUCE BASED
8    ON THOSE SEARCH WARRANTS.
9              ALSO THERE WAS A STANDING OBJECTION, AND BY WAY OF
10   TENTATIVE THAT SEEMED MERITORIOUS TO ME.  AND THAT WOULD
11   RELATE TO 13MJ0728, THE SECOND NUTECH SUBPOENA.  THREE EMAILS
12   FROM TAHERKHANI AND TIG MARINE, AS WELL AS 13MJ1656, THE
13   GOOGLE SEARCH WARRANT INVOLVING SARKHOSH, S-A-R-K-H-O-S-H.
14   AND THEN THE 13MJ2827 WARRANT INVOLVING THE MSN HOTMAIL, ONE
15   EMAIL INVOLVING MR. YILDIZ.
16             THAT TENTATIVE ALSO ADDRESSES THE DEFENDANT'S
17   MOTION -- OR THE GOVERNMENT'S MOTION TO ALLOW IT TO INTRODUCE
18   EVIDENCE SEIZED FROM MR. GHAHREMAN'S APARTMENT.
19             HOW WOULD YOU LIKE TO START, MR. CAMDEN?
20        MR. CAMDEN:  WE COULD GO WITH THE MOST RECENT BACK.
21        THE COURT:  YES.  ANY WAY YOU LIKE.
22        MR. CAMDEN:  LET'S START, THEN, WITH THE SEARCH
23   WARRANT ISSUES.
24             I UNDERSTAND WHAT THE GOVERNMENT DID IN APPROACHING
25   THIS CASE WAS JUST TO SEIZE ALL OF THE EMAILS FROM THE
```

MARCH 20, 2015

```
 1    ACCOUNT, AND ASK FOR PERMISSION AHEAD OF TIME TO DO THAT, AND
 2    THEN SEARCH IT FOR THE FIVE CATEGORIES.
 3           THE PROBLEM IS THE FOURTH AMENDMENT APPLIES TO
 4    SEIZURES AS WELL AS SEARCHES.  SO TAMURA IS WHERE THE NINTH
 5    CIRCUIT SET OUT THIS PROCEDURE AND THEY SAID, LOOK, IF THE
 6    AGENTS KNOW AHEAD OF TIME THAT THEY ARE NOT GOING TO BE ABLE
 7    TO SIT THERE AND SORT OUT THROUGH THE WHOLE THING THEY CAN
 8    APPLY AHEAD OF TIME TO SEIZE THE WHOLE THING AND SEARCH IT
 9    LATER.  BUT THERE HAS TO BE -- THEY HAVE TO, WHEN THEY DO
10    THAT, PROVIDE A PROTOCOL FOR SORTING OUT RELEVANT FROM NON
11    RELEVANT DATA THAT IS GOING TO BE HANDLED BY A PERSON WHO IS
12    NOT INVOLVED IN THE INVESTIGATION.  AND IN COMPREHENSIVE DRUG
13    TESTING, OF COURSE, WE NOW KNOW, WITH EVERYBODY'S EMAILS BEING
14    SORTED AUTOMATICALLY AND STORED EN MASSE, THIS IS GOING TO
15    HAPPEN ALL THE TIME.  SO IN COMPREHENSIVE DRUG TESTING WAS THE
16    CASE WHERE THEY SAID, LOOK, HERE IS WHAT YOU HAVE TO DO WHEN
17    YOU ARE GOING TO BE SEIZING LARGE AMOUNTS OF NONRESPONSIVE
18    DATA.
19           THE COURT:  BUT THAT IS NOT A REQUIREMENT, THOUGH,
20    IS IT?
21           MR. CAMDEN:  WELL, NO, IT IS NOT A STRICT
22    REQUIREMENT, IT IS A INTERPRETATION OF HOW TO APPLY TAMURA.
23    TAMURA SAYS YOU CAN -- BECAUSE ESSENTIALLY WHAT THIS WARRANT
24    DID, YOUR HONOR, BY SAYING THAT THEY CAN SEIZE ALL EMAILS AND
25    ANY OTHER FILES, ALLOWED SEIZURE OF DOCUMENTS FOR WHICH THERE
```

MARCH 20, 2015

1   WAS NO PROBABLE CAUSE.

2          WE HAVE GONE THROUGH THE DISCOVERY.  THERE ARE

3   EMAILS RELATING TO HAPPY BIRTHDAY FOR SOMEBODY OR HOW IS YOUR

4   FAMILY DOING, PICTURES OF FUNNY CATS, AND IT IS ALL JUST

5   LUMPED IN TOGETHER, YOUR HONOR.

6          **THE COURT:**  WHAT ABOUT THE PROTOCOL THAT AT LEAST

7   INITIALLY WAS SET IN PLACE, AND THEN THE GOVERNMENT AGENT

8   SAYS, UNDER OATH BY WAY OF DECLARATION, THAT PROTOCOL WAS

9   FOLLOWED THROUGHOUT, WHICH WOULD SEGREGATE THAT TYPE OF

10  INFORMATION.

11         **MR. CAMDEN:**  AS TO 13MJ0111, THAT IS THE FIRST

12  NUTECH, I BELIEVE, THE SEARCH WARRANT THAT DOES INCLUDE A

13  PROTOCOL.  THAT PROTOCOL JUST DOESN'T COMPLY WITH TAMURA,

14  TAMURA AND CDT, CONTEMPLATING SOMEBODY THAT IS GOING TO BE

15  ABLE TO SEARCH THROUGH THE DATA AND SORT OUT RESPONSIVE FROM

16  NONRESPONSIVE THINGS, THAT IS NOT PART OF THE INVESTIGATIVE

17  ARM OF THE GOVERNMENT.  THE WHOLE IDEA IS TO PROTECT THE

18  PRIVACY INTEREST FOR THINGS FOR WHICH NO PROBABLE CAUSE

19  EXISTS.  SO THERE IS THE ALI'S GUIDELINES IS WHAT TAMURA

20  CITES.

21         **THE COURT:**  WHAT ABOUT IN ADJANI AND GIBERSON,

22  THOUGH, AND THE REALITY THAT THIS PROTOCOL IS NOT A

23  REQUIREMENT BUT AT LEAST AT THIS POINT IN TIME A SUGGESTION.

24         **MR. CAMDEN:**  ADJANI, I BELIEVE -- YEAH.  ADJANI WAS

25  DECIDED IN 2006, BEFORE -- BEFORE CDT, WHICH WAS AN EN BANC

1    CASE, WAS DECIDED AT ALL.

2            I AM SORRY, IT SEEMED TO ME THAT THE ISSUE IN ADJANI

3    WAS HOW THEY CONDUCTED THE SEARCH.  THE DEFENDANT IN THAT CASE

4    WAS ARGUING THAT THEY SHOULD HAVE USED SOME SORT OF KEY WORD

5    SEARCH.  AND, OBVIOUSLY, ANYBODY WHO HAS DONE A GOOGLE SEARCH

6    AND TYPED IN THE WRONG THING OR MAYBE YOU DON'T GET THE

7    RESULTS YOU ARE LOOKING FOR, IT IS OBVIOUS THAT WE CAN'T

8    DICTATE TO THE GOVERNMENT THE PROTOCOL THAT THEY ARE GOING TO

9    USE IN ORDER TO SORT OUT THE -- WHAT CRITERIA THEY ARE GOING

10   TO USE TO SORT OUT THE RELEVANT FROM THE NONRELEVANT STUFF.

11           CDT AND TAMURA, THOUGH, REQUIRE TO ASK REALLY WHO IS

12   GOING TO BE DOING THAT.  IN THIS CASE IT WAS AGENT HAMAKO, WHO

13   IS THE CASE AGENT, WHOSE JOB IS COLLECTING INVESTIGATIVE

14   MATERIAL -- OR EVIDENCE FOR PROSECUTION TO INTRODUCE AT TRIAL.

15   IT IS NOT COMPUTER PERSONNEL, AS THE NINTH CIRCUIT APPROVED IN

16   CDT AND TAMURA.  IT IS NOT A TAG TEAM, AS I UNDERSTAND, THAT

17   IS IN PRETTY MUCH EVERY OTHER DISTRICT IN THE COUNTRY THAT GO

18   IN.

19           AND THE WHOLE POINT OF REQUIRING PARTICULARITY IN

20   THE SEARCH WARRANT AHEAD OF TIME IS SO THAT THE OFFICER

21   EXECUTING IT KNOWS EXACTLY, OKAY, THIS EMAIL, JUDGED AGAINST

22   THE CRITERIA THAT HAVE TO BE LISTED IN THE SEARCH WARRANT,

23   YES, THIS IS RESPONSIVE; NO, THIS IS NOT RESPONSIVE, WE ARE

24   GOING TO DESTROY OR RETURN IT.  AND THEN TAKE ALL OF THE

25   RESPONSIVE MATERIALS AND TURN IT OVER TO THE INVESTIGATIVE

MARCH 20, 2015

```
 1    CASE AGENT.  SO WHAT HE ENDED UP WITH IS EXACTLY NO MORE THAN
 2    WHAT THE WARRANT DESCRIBED.
 3            IN THIS CASE, AGENT HAMAKO ENDED UP WITH EVERY BIT
 4    OF DETAIL FROM MR. GHAHREMAN'S PRIVATE LIFE THAT IS PROTECTED
 5    INFORMATION, NO PROBABLE CAUSE EXISTED.  AND THE SEARCH
 6    WARRANT ALLOWED HIM TO DO THAT BY HAVING A SEARCH WARRANT
 7    PROTOCOL IN THE FIRST ONE THAT WAS -- SIMPLY DIDN'T ALLOW FOR
 8    THIS SORT OF SEGREGATION, AND BY OMITTING THE SEARCH
 9    WARRANT -- THAT PROTOCOL ENTIRELY FROM THE OTHER EMAIL
10    WARRANTS.
11            THE OTHER THING IS, WHEN WE GET BEYOND THE 0111, THE
12    REST OF THEM WHERE THEY APPARENTLY COPIED AND PASTED THE WRONG
13    PROVISION, THE NINTH CIRCUIT HAS SAID THAT WHEN WE ARE TALKING
14    ABOUT THE PARTICULARITY REQUIREMENT, THE OVERBREADTH, IT IS TO
15    BE JUDGED ON THE FACE OF THE WARRANT, AND HOW THE OFFICERS
16    ACTUALLY EXECUTED IS NOT SOMETHING WE GET INTO.  IF IT IS
17    INVALID ON ITS FACE IT IS INVALID ON ITS FACE.
18            NOW, IT CAN INCORPORATE THE PROBABLE CAUSE STATEMENT
19    WHERE IT IS SPECIFICALLY REFERENCED IN THE WARRANT ITSELF.  IN
20    THIS CASE THEY DID TRY TO REFER IT TO A SECTION OF THE WARRANT
21    THAT JUST DIDN'T EXIST.
22            MUCH MORE DISTURBING TO US, YOUR HONOR, IS THE FACT
23    THAT MAGISTRATE JUDGES ARE SIGNING OFF ON WARRANTS THAT
24    REFERENCE PROVISIONS OF AN AFFIDAVIT THAT JUST DON'T EXIST.
25    THE NINTH CIRCUIT SAID THAT TAMURA AND CDT ARE KEY TO MAKING
```

26

```
1    SURE THESE SEARCHES DON'T TURN INTO GENERAL RUMMAGING, WHICH
2    IS EXACTLY WHAT HAPPENED IN THIS CASE.
3             THERE IS NO REASON, THERE IS NO PROBABLE CAUSE TO
4    GET PICTURES MR. GHAHREMAN MAY OR MAY NOT HAVE FORWARDED OF
5    FUNNY KITTENS, OR TO SEE WHO HE IS WISHING A HAPPY BIRTHDAY OR
6    WHOSE CHILDREN HE IS INTERESTED IN CONGRATULATING.
7             THE COURT:  YOU CONCEDE, THOUGH, DON'T YOU, THAT
8    THERE IS NO CASE THAT SAYS THAT SPECIFIC PROTOCOL WHICH YOU
9    HAVE IDENTIFIED THAT WAS SUGGESTED IN TAMURA IS REQUIRED.
10            MR. CAMDEN:  NO.  CDT SAYS THE GOVERNMENT CAN AVOID
11   THESE PROBLEMS BY FOLLOWING THIS, BUT IT DOESN'T SET IT OUT AS
12   LEGAL REQUIREMENT, THEY PROMISE THEY ARE GOING TO INVALIDATE
13   ANY WARRANTS THAT DON'T COMPLY WITH IT.  IT IS JUST SORT OF A
14   SAFE HARBOR FOR THEM, ESSENTIALLY.  I WILL AGREE TO THAT.
15            BUT THE FACT IS, THERE IS NO CASE APPROVING WHAT THE
16   GOVERNMENT DID IN THIS CASE, WHICH IS HAVE THE INVESTIGATORY
17   CASE AGENT BOTH SEIZE AND THEN GO THROUGH ANY AND ALL OF THE
18   EMAILS, WHEN THESE OPTIONS ARE AVAILABLE FOR THEM TO HAVE
19   SOMEBODY AVAILABLE WHO CAN SORT OUT THE RESPONSIVE FROM THE
20   NONRESPONSIVE MATERIALS.
21            THE COURT:  WHAT ABOUT GIBERSON?  THAT WAS A
22   COMPUTER SEARCH, IT WAS --
23            MR. CAMDEN:  I MEAN, GIBERSON ALSO WAS A CASE
24   DECIDED BEFORE COMPREHENSIVE DRUG TESTING.  AND IN THE
25   MAJORITY OPINION IN THAT CASE DOES CRITICIZE THE GOVERNMENT
```

MARCH 20, 2015

1    VERY STRONGLY FOR FAILING TO HAVE SOMEBODY WHO COULD SORT THIS

2    MATERIAL OUT WHO WAS COMPUTER PERSONNEL.

3            IN CDT, EVEN THE MAJORITY OPINION DISCUSSES THE

4    GOVERNMENT, IN THE SEARCH WARRANT, SAID, WE ARE GOING TO HAVE

5    SOMEBODY -- WE ARE GOING TO HAVE THIS TAMURA PROCEDURE IN

6    PLACE WHERE COMPUTER PERSONNEL ARE GOING TO SORT IT OUT.

7            THAT IS NOT WHAT HAPPENED.  THE INVESTIGATIVE

8    AGENT -- THEY JUST DISREGARDED THAT.  THE INVESTIGATIVE AGENT

9    WENT THROUGH THE DIRECTORY, FOUND STEROID USE RECORDS FOR

10   HUNDREDS OF OTHER BASEBALL PLAYERS AND THEN DECIDED TO USE IT

11   IN THE INVESTIGATION AND THE PROSECUTION IN ASKING FOR MORE

12   SUBPOENAS AND GRAND JURY TESTIMONY.

13           SO TO THE EXTENT THAT GIBERSON SAYS THAT IS OKAY FOR

14   THE INVESTIGATIVE AGENT -- WHICH I DON'T BELIEVE IT DOES --

15   BUT OKAY FOR THE INVESTIGATIVE AGENT, THEN I THINK THAT HAS TO

16   BE REEXAMINED IN LIGHT OF COMPREHENSIVE DRUG TESTING.  THE

17   MAJORITY OPINION WAS STRONGLY CRITICAL OF THE GOVERNMENT FOR

18   HAVING THE INVESTIGATIVE AGENT JUST REVIEW THE FILES EN MASSE.

19           NOBODY -- I MEAN, I AM NOT TRYING TO SAY THAT THE

20   GOVERNMENT CAN'T SEIZE, I MEAN, WHEN THEY HAVE PROBABLE CAUSE

21   TO BELIEVE THAT CERTAIN EMAILS EXIST THAT ARE GOING TO BE

22   ADMISSIBLE EVIDENCE OR ARE GOING TO RELATE FOR, LIKE, PROBABLE

23   CAUSE TO COMMIT -- IN THE COMMISSION OF A CRIME.  WE ARE NOT

24   SAYING THEY CAN'T SEIZE THE EMAILS AND SEARCH THEM ACCORDING

25   TO SOME KIND OF PROTOCOL.  WE ARE NOT SAYING THAT THE

MARCH 20, 2015

1    GOVERNMENT'S APPLICATION UP FRONT TO SEIZE ALL OF THE EMAILS

2    IS WRONG, IT IS THE APPLICATION COMBINED WITH A LACK OF A

3    SEGREGATING -- PROCEDURE FOR SEGREGATING NONRESPONSIVE FROM

4    RESPONSIVE DATA.

5           THE WARRANT EITHER SHOULD SAY YOU CAN SEIZE THOSE

6    FIVE CATEGORIES AND NO MORE, AND THEN THE OFFICERS CAN GO IN

7    AND SEIZE MORE IF THEY HAVE TO, AND GO TO THE JUDGE AND SAY IT

8    IS ALL INTERMINGLED AND HERE IS HOW WE ARE GOING TO SORT IT

9    OUT.  OR THEY CAN DO -- APPLY UPFRONT AND SAY, WE ARE GOING TO

10   SEIZE EVERYTHING BECAUSE WE KNOW AHEAD OF TIME WE ARE NOT GONG

11   TO BE ABLE TO SORT IT OUT ON SITE.  THEN THEY CAN PROVIDE, UP

12   FRONT, THE PROTOCOL.  SO FOR MOST OF THESE SEARCH WARRANTS

13   THERE IS JUST NO PROTOCOL ON ITS FACE.

14          AND THE NINTH CIRCUIT IN, I BELIEVE -- I APOLOGIZE.

15   BUT THE CASES ARE VERY CLEAR THAT WHAT REALLY MATTERS IS WHAT

16   IS WITHIN THE FOUR CORNERS OF THE WARRANT OR ADOPTED BY

17   REFERENCE INTO THE FOUR CORNERS OF THE WARRANT.  SO THE FACT

18   THAT OFFICER HAMAKO STILL FOLLOWED THE SAME PROCEDURE THAT HE

19   LAID OUT IN THE FIRST WARRANT IN EXECUTING LATER WARRANTS

20   DOESN'T CURE THE PROBLEM THAT THE WARRANT ON ITS FACE IS

21   OVERBROAD.

22          IT IS NOT ENTIRELY CLEAR THAT HE DID FOLLOW THE

23   PROCEDURES.  WE HAVE GOT NEW DISCOVERY WE RECEIVED, YOU KNOW,

24   YOUR HONOR, TONS OF PICTURES OF EMAILS REGARDING FAMILY THAT

25   DON'T RELATE, EVEN ARGUABLY, WHATSOEVER IN THE FIVE CATEGORIES

```
 1   OF DOCUMENTS THAT WERE LISTED IN THE SEARCH WARRANT.

 2             THE COURT:  RIGHT.  OKAY.

 3             MR. HARRIGAN:  FIRST, I TAKE ISSUE WITH THAT WE

 4   RECEIVED IN DISCOVERY TONS OF EMAILS THAT SHOW NONPERTINENT

 5   STUFF.  DEFENSE COUNSEL HAD THIS FOR OVER 15 MONTHS.  THEY

 6   CHOSE, ON THE EVE OF TRIAL, POSSESSING THE EVIDENCE THEY

 7   POSSESSED 15 MONTHS AGO, NOW TO FILE THIS MOTION TO SUGGEST

 8   SOMEHOW THERE WASN'T SEGREGATION OR THERE WAS AN OVERBROAD

 9   SEARCH.  TO MAKE THAT BROAD CLAIM WITHOUT ACTUAL SUPPORTS ON

10   EXHIBITS I THINK SHOULD BE DISREGARDED BY THIS COURT.

11             I JUST WANT TO ADDRESS THE ONE ARGUMENT ABOUT THE

12   FACE OF THE WARRANT.  THAT BECAUSE, IN THE SUBSEQUENT WARRANTS

13   THERE WAS NO PROTOCOL -- AND BY NO PROTOCOL THERE WAS A

14   PROTOCOL STILL WITHIN THE WARRANT.  THERE STILL WAS THE

15   LIMITATION THAT THE SEARCH, EVEN THOUGH WE ARE TAKING THE

16   WHOLE EMAIL ACCOUNT, IS GOING TO BE LIMITED TO THESE

17   CATEGORIES.

18             SO LET'S BE CLEAR WHAT WAS NOT IN THOSE SUBSEQUENT

19   SEARCH WARRANTS, IT WAS SIMPLY JUSTIFICATION FOR TAKING THE

20   WHOLE EMAILS ACCOUNTS.  WHICH, AS YOUR HONOR KNOWS, AND

21   EVERYONE KNOWS, NEITHER GOOGLE NOR YAHOO NOR HOTMAIL DO IT IN

22   ANY DIFFERENT WAY.  THEY INVITE THE AGENTS TO TAKE ALL OF THE

23   CONTENT FOR THAT EMAIL ACCOUNT BECAUSE IT IS SIMPLY

24   IMPRACTICAL TO DO IT ANY OTHER WAY.  THEY ARE NOT EXPERIENCED,

25   THEY DON'T KNOW WHAT THEY ARE LOOKING FOR.  SO THERE IS STILL
```

MARCH 20, 2015

```
 1   A PROTOCOL IN THE SEARCH WARRANT HOW TO LOOK AT AND SEARCH FOR
 2   MATERIAL THAT IS RELEVANT.
 3            AND I JUST POINT OUT THAT IN TERMS OF BEING FATAL,
 4   BEING FATAL AS AN INVALID SEARCH WARRANT, I THINK THE HILL
 5   CASE CITED IN OUR PAPERS IS VERY, VERY IMPORTANT.  IT REALLY
 6   FOLLOWS THE LINE OF DALIA WHICH SAYS THAT, YOU KNOW, THERE IS
 7   NO REQUIREMENT THAT AN OFFICER HAS TO JUSTIFY THE LACK OF A
 8   PROTOCOL, OR THE MANNER IN WHICH THEY EXECUTE A WARRANT, IN
 9   OBTAINING A SEARCH WARRANT.  AND IN FACT THE SUPREME COURT IN
10   DALIA, REALLY IS STILL THE STANDARD HERE.  THERE ARE REALLY
11   THREE THINGS THAT NEED TO BE SHOWN, AND ONE OF THEM IS NOT THE
12   MANNER IN WHICH THE WARRANT IS EXECUTED.  THAT IS REALLY WHAT
13   THEY ARE COMPLAINING ABOUT, IS THE MANNER THE WARRANT IS
14   EXECUTED.  ALL DALIA SAYS AND ALL HILL SAYS IS THAT THE
15   GOVERNMENT HAS TO DO THAT REASONABLY.  AND WE KNOW THAT
16   OCCURRED HERE.  WE KNOW THAT OCCURRED HERE BECAUSE AGENT
17   HAMAKO USED THE SAME REASONABLE PROCEDURE IN THE FIRST WARRANT
18   THAT HE USED IN EACH SUBSEQUENT SEARCH WARRANT.  AND UNDER
19   THAT STANDARD OF REASONABLENESS, IT PASSES FOURTH AMENDMENT
20   MUSTER.  YOU WOULD AGREE THAT THE PROTOCOL THAT WAS ACTUALLY
21   USED IS SHORT OF WHAT IS SUGGESTED IN TAMURA.
22            I THINK IT COMPLIES WITH TAMURA, WITH THE IDEA OF
23   TAMURA.  IT DOESN'T FOLLOW EXACTLY THE SAME AS TAMURA, BUT
24   TAMURA DOESN'T REQUIRE A SPECIFIC PROTOCOL, AND THE NINTH
25   CIRCUIT NEVER HAS.
```

MARCH 20, 2015

1              BUT IT DOES FOLLOW TAMURA, THE DICTATES OF TAMURA,

2     THAT THERE HAS TO BE SOME PROCEDURE IN WHICH YOU SEGREGATE

3     THOSE ITEMS THAT ARE RESPONSIVE TO THE WARRANT TO THOSE ITEMS

4     THAT ARE NOT SO YOU DON'T KEEP ON GOING BACK INTO THE WARRANT

5     AND YOU DON'T VIOLATE OTHER CONCERNS.  AND TO THAT EXTENT I

6     WOULD ARGUE THAT THE FIRST SEARCH WARRANT IS FAITHFUL TO THE

7     HOLDING OF TAMURA.

8              **THE COURT:**  EVEN THOUGH THERE WASN'T A NONINVOLVED

9     AGENT --

10             **MR. HARRIGAN:**  EXACTLY.

11             **THE COURT:**  -- OR REVIEWER.

12             **MR. HARRIGAN:**  YES.

13             **THE COURT:**  ALL RIGHT.  OKAY.

14             MR. CAMDEN, LET'S MOVE ON TO OTHER MOTIONS.

15             **MR. CAMDEN:**  COULD WE TALK ABOUT TWO RELATED ISSUES.

16    SO ONE IS THE -- WELL, THEY ARE BOTH DISCOVERY REQUESTS,

17    ESSENTIALLY.  ONE IS IN RELATION TO THE RECORDS REGARDING

18    AGENT COLE.  WE WOULD ASK FOR -- THAT THE GOVERNMENT WOULD BE

19    ABLE TO INVESTIGATE WHAT THE INITIAL ALLEGATION WAS THAT HE

20    FAILED TO INCLUDE PERTINENT INFORMATION IN THE REPORT.

21             THEN THE OTHER IS THE REQUEST TO PRODUCE DISCOVERY

22    REGARDING POSSIBLE BLIND FRONT MEN FOR PROCUREMENT EFFORTS.

23             THEY BOTH REALLY IMPLICATE THE GOVERNMENT'S

24    OBLIGATION TO PRODUCE BRADY MATERIAL.  SO THE GOVERNMENT

25    OBVIOUSLY DOESN'T HAVE TO TURN OVER ANYTHING THAT IT DOESN'T

```
1    ACTUALLY HAVE IN ITS POSSESSION.  WE CAN'T FORCE THEM TO TURN
2    OVER STUFF THEY DIDN'T ACTUALLY KNOW ABOUT.  BUT, AT THE SAME
3    TIME, BRADY INVOLVES NOT JUST THE OBLIGATION TO DISCLOSE BUT
4    THE OBLIGATION TO INVESTIGATE BEFORE THEY DETERMINE WHETHER
5    THEY HAVE THAT INFORMATION OR NOT.
6              SO IN THE GOVERNMENT'S RESPONSE TO MOTIONS REGARDING
7    AGENT COLE, FOR EXAMPLE, THEY PUT FORWARD AGENT COLE'S VERSION
8    OF WHAT HAPPENED AND SEEM TO GIVE IT FULL CREDENCE; BUT THEY
9    DON'T, AT ALL, EXPRESS ANY CURIOSITY OR ANY INTEREST IN
10   FINDING OUT WHAT LED TO THE INITIAL COMPLAINT.
11             NOW WHAT HAPPENED, OBVIOUSLY, IS THAT HE GOT A
12   15-DAY SUSPENSION ON NEGOTIATED TERMS JUST FOR THE VIOLATION
13   OF THE --
14             THE COURT:  PURSUIT.
15             MR. CAMDEN:  PURSUIT PROTOCOL.
16             THE COURT:  ISN'T THAT WHAT CAUSED THE -- YOU ARE
17   TALKING ABOUT THE ANONYMOUS CALL OR THE TIP?
18             MR. CAMDEN:  I AM ASSUMING IT WAS ANONYMOUS.  I
19   DON'T BELIEVE IT SAYS WHAT THE SOURCE WAS, YOUR HONOR.
20             THE COURT:  DOESN'T THAT RELATE TO THE PURSUIT?
21   SOMEBODY CALLED ABOUT THE PURSUIT AND SHOTS FIRED, AND THAT IS
22   WHAT TRIGGERED THE INVESTIGATION?  THAT IS THE WAY I
23   UNDERSTOOD IT.
24             MR. CAMDEN:  IT IS GOING TO TAKE ME ONE SECOND TO
25   FIND THIS, YOUR HONOR.
```

MARCH 20, 2015

1    **MR. HARRIGAN:**  YOUR HONOR, I THINK IT IS LAID OUT IN

2    THE REPORT THAT A CBP SUPERVISOR CALLED THE HOTLINE AND

3    PROVIDED INFORMATION.  THAT IS WHAT IT SAYS.

4          I THINK THAT IS SET FORTH IN THE DEFENDANT'S PAPERS.

5    BUT IT DOES SAY, WITH THE LIMITED INFORMATION WE HAVE -- AND

6    AGAIN OUR INFORMATION IS LIMITED TO WHAT WAS IN THE OPR FILE

7    AND WHAT WE GOT FROM AGENT COLE, WHAT AGENT COLE TOLD US.

8          **THE COURT:**  AND THAT CALL WAS ABOUT THE PURSUIT.

9          **MR. HARRIGAN:**  IT WAS ABOUT THE PURSUIT, YES.

10         **THE COURT:**  THERE IS NOT ANOTHER INCIDENT?

11         **MR. HARRIGAN:**  NO.

12         **MR. CAMDEN:**  SO THERE ARE TWO REFERENCE NUMBERS.  IN

13   THE EXHIBITS THAT -- I SUBMITTED THE FULL DOCUMENTATION TO

14   YOUR HONOR.

15         **THE COURT:**  YES.

16         **MR. CAMDEN:**  SO IN THE PAGES MARKED APPENDIX 1 IT

17   SAYS -- THERE IS A TABLE, APPARENTLY A DATABASE ENTRY OF SOME

18   KIND.  AND IT SAYS REFERENCE FOR, AND THEN A REFERENCE NUMBER.

19   AND THEN AN ALL CAP SUMMARY, ALLEGEDLY FAILED TO REPORT ALL OF

20   THE PERTINENT INFORMATION, SLASH, FACTS WHEN REPORTING.

21         AND THE SIMPLE FACT THAT THE GOVERNMENT, BY -- OR

22   THE CBP BY AGREEING TO A 15-DAY SUSPENSION WHERE HE DIDN'T

23   HAVE TO ADMIT ANY KIND OF LIABILITY RESOLVED THE DISPUTE AND

24   TOOK NO FURTHER INVESTIGATION DOESN'T MEAN THE GOVERNMENT CAN

25   JUST DROP IT RIGHT NOW AND PRESUME THAT IS EXACTLY WHAT

MARCH 20, 2015

```
 1   HAPPENED.
 2               THE COURT:  BUT DOESN'T THIS MEAN THAT --
 3               MR. CAMDEN:  SOMEBODY PUT THAT IN THERE, YOUR HONOR.
 4               THE COURT:  ALLEGEDLY FAILED --
 5               MR. CAMDEN:  SOMEBODY FROM THE GOVERNMENT.
 6               THE COURT:  FAILED TO REPORT ALL OF THE PERTINENT
 7   INFORMATION AND FACTS ABOUT THE PURSUIT.
 8               MR. CAMDEN:  RIGHT.  WELL, EXACTLY.  IF HE IS
 9   VIOLATING THE PURSUIT PROTOCOL PERHAPS THAT IS NOT REALLY
10   RELEVANT TO HIS CREDIBILITY, YOUR HONOR.  BUT IF HE IS FAILING
11   TO REPORT PERTINENT FACTS THAT HE IS REQUIRED TO REPORT, THAT
12   BECOMES IMPEACHMENT, AND THEN IT BECOMES RELEVANT TO HIS
13   CREDIBILITY IN FRONT OF THE JURY.
14               THE COURT:  I AGREE, IF THERE IS EVIDENCE OF THAT.
15               MR. CAMDEN:  SO TO THE EXTENT THAT THERE IS EVIDENCE
16   OUT THERE THAT HE ALLEGEDLY FAILED TO REPORT ALL THE PERTINENT
17   INFORMATION, WHERE DID THIS INFORMATION -- SOMEBODY IN THE
18   GOVERNMENT PUT THIS INFORMATION IN THE DATABASE IN A REPORT.
19   THERE IS A BASIS FOR IT SOMEWHERE.  AND THE GOVERNMENT, I
20   THINK, CAN'T JUST GO TO AGENT COLE AND SAY, WHAT REALLY
21   HAPPENED?  AND USE THAT AS THEIR STORY TO DROP ANY FURTHER
22   INQUIRY.
23               I THINK THEY HAVE TO FIND OUT WHO, IF THEY CAN, WHO
24   GENERATED THIS REPORT AND WHAT THE SOURCE OF THAT INFORMATION
25   WAS.  BECAUSE IF IT TURNS OUT SOMEBODY ACCUSED HIM OF THIS,
```

MARCH 20, 2015

1    AND THEY HAD A GOOD FAITH BASIS FOR IT, AND IT WAS NEVER

2    BROUGHT UP BECAUSE THEY JUST RESOLVED IT WITH A 15-DAY

3    SUSPENSION FOR ANOTHER REASON --

4            THE COURT:  WHAT ABOUT THE FINDING, WHICH WE DO

5    HAVE, WHICH FOCUSES ENTIRELY ON VIOLATION OF PURSUIT POLICY,

6    AND THERE IS NO REFERENCE TO ANY OTHER WRONGDOING.

7            MR. CAMDEN:  THE GOVERNMENT GIVES CHARGE BARGAINS

8    ALL THE TIME, YOUR HONOR, TO MY CLIENTS -- AND I AM HAPPY TO

9    GET THEM -- WHERE PERHAPS THE EVIDENCE THEY HAVE JUSTIFIES ONE

10   CHARGE, BUT THEY ARE ALLOWED TO PLEAD GUILTY TO A DIFFERENT OR

11   A LOWER OR LESSER OR A SORT OF SEMI RELATED CHARGE WITHOUT

12   ADMITTING GUILT ON THE LARGER ISSUES.  NOW, THAT IS FINE WHEN

13   IT COMES TO RESOLVING AGENT COLE'S LIABILITY FOR FAILING TO

14   FOLLOW ORDERS OR A CRIMINAL DEFENDANT'S' LIABILITY FOR A

15   CRIMINAL VIOLATION.

16           THE COURT:  BUT THE SETTLEMENT OCCURRED AFTER THE

17   CBP MADE ITS FINDING.  SO, IN OTHER WORDS, THE CBP DID ITS

18   REVIEW, MAKES ITS ADVERSE FINDING, WHICH APPEARS EXPRESSLY TO

19   BE LIMITED TO VIOLATION OF THE PURSUIT POLICY.  MAKES NO OTHER

20   ADVERSE FINDINGS.  THEY DON'T SAY, YOU WITHHELD INFORMATION,

21   YOU DIDN'T GIVE US A FULL REPORT OR, YOU GAVE US MISLEADING

22   INFORMATION; THERE IS NO COMMENT OF ANY KIND.  IT IS SOLELY

23   LIMITED TO VIOLATION OF A PURSUIT POLICY.  AND THEN THEY

24   CHASTISE HIM FOR THAT.  AND THEN THE AGENT WANTS TO CONTEST IT

25   FROM THE GOVERNMENT'S POINT OF VIEW, BUT THEN ULTIMATELY

```
1    AGREES TO SETTLE FOR A VARIETY OF REASONS.

2          MR. CAMDEN:  BUT THAT DOESN'T CHANGE, YOUR HONOR,

3    THE FACT THAT SOMEBODY IN THE GOVERNMENT PUT IN, ALLEGEDLY,

4    FAILED TO REPORT ALL OF THE PERTINENT INFORMATION.  THAT

5    ALLEGATION WAS NEVER RESOLVED.  IT WASN'T ADDRESSED IN THE

6    FINAL DETERMINATION.  IT WASN'T RAISED.

7          SO TO THE EXTENT THAT ALLEGATION WAS JUST LEFT OUT

8    THERE HANGING, WE HAVE TO RESOLVE IT NOW BECAUSE IT PUTS US

9    ALL ON NOTICE THAT THERE WAS AT LEAST AN ALLEGATION AND THERE

10   MAY BE MORE IN THE GOVERNMENT'S POSSESSION, CBP'S POSSESSION,

11   REALLY, THAT AFFECTS THE CREDIBILITY OF AGENT COLE.

12          THE COURT:  MR. HARRIGAN.

13          MR. HARRIGAN:  YOUR HONOR --

14          THE COURT:  WHAT ABOUT THE CONTENTION THAT BECAUSE

15   THIS ALLEGATION IS MADE, I MEAN, SOMEBODY WROTE THAT AGENT

16   COLE ALLEGEDLY FAILED TO PROVIDE ALL RELEVANT INFORMATION,

17   SOMETHING ALONG THOSE LINES, THAT THE GOVERNMENT HAS TO FIND

18   OUT WHO THAT WAS AND WHY THAT WAS SAID.

19          MR. HARRIGAN:  THE NAME IS IN THE REPORT.  IT IS TIM

20   YORK, IT SAYS, CBP, MADE IT.  BUT THERE STILL WAS NO FINDING.

21          LET'S ASSUME THAT HE IS PERMITTED TO ASK THAT

22   QUESTION.  IT IS RELEVANT BECAUSE THE AGENT MADE THAT CLAIM,

23   REGARDLESS OF THE FACT THAT IT IS UNSUBSTANTIATED.  WHAT THAT

24   WOULD DO, I WOULD SUGGEST, WOULD OPEN UP AGENT COLE, AND THE

25   GOVERNMENT WOULD BE ALLOWED TO PUT IN ALL OF THE REASONS WHY
```

MARCH 20, 2015

1    THAT WAS NOT TRUE, WHICH WOULD INVOLVE THE FACT, AS AGENT COLE

2    POINTS OUT --

3              **THE COURT:**  WHAT ABOUT JUST THE DISCOVERY INTO IT,

4    NOT --

5              **MR. HARRIGAN:**  THIS IS ALL THE DISCOVERY.  I DON'T

6    THINK DISCOVERY REQUIRES US TO GENERATE REPORTS ON BEHALF -- I

7    HAVE NO OTHER DISCOVERY.  THIS IS THE DISCOVERY THAT I HAVE.

8    IF THEY CARE TO GO TRY TO LOCATE AND INTERVIEW AGENT YORK, IF

9    HE IS STILL WITH THE BORDER PATROL, FINE.  THEY ARE FREE TO DO

10   THAT.  BUT WE ARE NOT HIDING INFORMATION FROM THEM.

11             WHAT THEY ARE REQUESTING IS THAT WE CONDUCT MORE

12   DISCOVERY OF THIS INCIDENT TO PROVIDE TO THEM, AND I DON'T

13   THINK THAT IS REQUIRED ON THE FACTS SET FORTH HERE.  AGAIN, WE

14   AGREE WITH YOUR HONOR'S TENTATIVE RULING THAT THIS IS AN

15   UNSUBSTANTIATED ALLEGATION.  ALL RIGHT.  AND TO USE AN ANALOGY

16   OF PLEA BARGAIN IS INAPPROPRIATE.

17             IF THAT PLEA BARGAIN, AS YOUR HONOR POINTED OUT,

18   INVOLVED ADMISSION OF CERTAIN FACTS, YES, THAT WOULD COME IN.

19   ALL RIGHT.  BUT HERE WE DON'T HAVE ANY INFORMATION THAT

20   SUBSTANTIATES THAT HE MADE ANY FALSE STATEMENTS OR FAILED TO

21   ALLEGE REPORTS.

22             IN FACT, WE INTERVIEWED AGENT COLE, WHICH IS MORE

23   THAN WE HAD TO DO IN THIS CASE, AND SET FORTH HIS VERSION OF

24   THE EVENTS, WHICH IS THAT HIS SUPERVISOR TOLD HIM NOT TO WRITE

25   A REPORT SINCE THEY DIDN'T FIRE ANY SHOTS AND THEY WERE

```
 1    FOLLOWING FROM A DISTANCE AND REALLY WEREN'T INVOLVED IN AN
 2    ACTIVE PURSUIT.
 3         SO THE VERSION OF EVENTS THAT AGENT COLE GIVES, AT
 4    LEAST, ARE CONSISTENT WITH HIM NOT OMITTING ANY REPORTS BUT IN
 5    FACT HIS SUPERVISOR TELLING HIM NOT TO FILE A REPORT.  AND IF
 6    THAT, AS INDICATED, APPEARS THIS ALL CAME TO LIGHT AFTER IT
 7    BECAME A POLITICAL ISSUE WHEN THE VAN -- THE SHOTS WERE FIRED
 8    BY THE LOCALS, THEN WENT DOWN TO MEXICO AND SOMEBODY CALLED
 9    BORDER PATROL ABOUT IT.  THAT WOULD BE AGENT COLE'S
10    INDICATION.  AND WHAT HE WAS DISCIPLINED FOR INVOLVED SAFETY,
11    WHICH IS -- BUT NOT ANYTHING TO DO WITH HONESTY.
12              THE COURT:  ALL RIGHT.
13              MR. CAMDEN, ANYTHING IN ADDITION ON THAT ISSUE?
14              MR. CAMDEN:  I AM GOING BACK THROUGH THE REPORTS
15    RIGHT NOW.  IT IS NOT ENTIRELY CLEAR WHETHER AGENT YORK IS THE
16    SOURCE OF THE, QUOTE, ALLEGED FAILURE TO PROPERLY REPORT ALL
17    INFORMATION OR FACTS IN THE PURSUIT INCIDENT, GENERATED
18    REPORTS.
19              BUT TO THE EXTENT THAT THERE WAS AN ALLEGATION OF --
20    THAT GOES TO CREDIBILITY THAT WAS NOT RESOLVED IN THAT PRIOR
21    PROCEEDING, THE GOVERNMENT, THE PROSECUTOR, COULD AT LEAST
22    ASK -- THEY CAN CALL THEM UP AND SAY, DO YOU HAVE ANY RECORDS
23    OF NOTES FROM THIS PHONE CALL THAT AGENT YORK MADE OR WHO
24    ENTERED THIS DATABASE ENTRY.  WE HAVE A REFERRAL OR A
25    REFERENCE NUMBER, WHO MADE THAT ENTRY?
```

MARCH 20, 2015

```
 1              THAT'S ALL WE ARE ASKING AT THIS POINT.  ONCE WE GET
 2   THAT DISCOVERY WE CAN DECIDE WHETHER IT IS GOING TO BE USEFUL
 3   IMPEACHMENT OR WHETHER WE WANT TO -- PERHAPS, YOU KNOW,
 4   OFFICER COLE IS GOING TO DENY IT, THEN WE DON'T REALLY GET
 5   INTO THAT.  BUT WE HAVE TO BE ABLE TO MAKE THAT EVALUATION,
 6   THAT DECISION ABOUT WHETHER TO USE IT AS IMPEACHMENT OR NOT,
 7   OR ARE ARGUING FOR IT, BASED ON THE FULL RECORD THAT WE JUST
 8   DON'T HAVE AT THIS POINT.
 9              THE COURT:  HOW ABOUT THE NEXT ISSUE WITH RESPECT
10   TO -- I THINK THAT WAS THE MIDDLEMAN ISSUE.
11              MR. CAMDEN:  IT IS A SIMILAR OBLIGATION THAT I
12   BELIEVE THE GOVERNMENT HAS, YOUR HONOR.  WHEN THEY -- WHEN
13   THEY ARE ON NOTICE OF A CERTAIN TYPE OF ACTIVITY OR CERTAIN
14   EVIDENCE MAY EXIST, THEY CAN'T JUST SIMPLY TURN A BLIND EYE TO
15   IT AND REFUSE TO INVESTIGATE.  SO THEY HAVE GOT THE
16   DECLARATIONS FROM, FOR EXAMPLE, AGENT HAMAKO WHO SAYS HE HAS
17   BEEN INVOLVED IN MANY OF THESE TYPES OF INVESTIGATIONS.
18              I AM NOT SAYING IT DOES DEFINITELY EXIST BUT YOUR
19   HONOR IS FAMILIAR WITH WHAT HAPPENED IN ALL OF THE BORDER BUST
20   CASES.  WE HAD THE GOVERNMENT EXPERTS IN HERE SAYING THAT
21   BLIND MULES JUST DON'T EXIST, THEY NEVER DO THAT, IT IS TOO
22   MUCH OF A RISK OF LOSING THE DRUGS.  AND THEN, LO AND BEHOLD,
23   STARTING AROUND 2011 WE UNCOVERED THREE OR FOUR SCHEMES WHERE
24   ADS WERE BEING PLACED WHERE --
25              THE COURT:  BUT IF THE GOVERNMENT IS NOT TAKING THAT
```

MARCH 20, 2015

```
 1    POSITION, IN OTHER WORDS THEY ARE NOT SAYING BLIND MIDDLEMEN
 2    DON'T EXIST IN THESE PROCUREMENT NETWORKS, WHAT WOULD BE
 3    THEIR --
 4              MR. CAMDEN:  THAT IS ALL --
 5              THE COURT:  -- OBLIGATION TO GO FIND OUT IF THAT
 6    ACTUALLY HAPPENS.
 7              MR. CAMDEN:  IF THAT IS HOW THE COURT READS THEIR
 8    MOTIONS THEN I WOULD AGREE TO THAT.  IF THE GOVERNMENT DOESN'T
 9    OPEN THE DOOR BY SAYING THAT, WELL, GENERALLY IF THEY -- THE
10    PROBLEM IS, YOUR HONOR, THAT THEY HAVE SAID THAT THEY ARE
11    GOING TO INTRODUCE EXPERT TESTIMONY ABOUT PROCUREMENT NETWORKS
12    AND HOW THEY WORK AS APPLIED IN THE CONTEXT OF THIS CASE.  BUT
13    IT IS STILL GOING TO BE GENERAL PROCUREMENT NETWORKS SAYING,
14    FOR EXAMPLE, WHY THE INITIAL CONTACT AT SPERRY MARINE WHEN
15    THEY MADE THE REQUEST LISTING WESAL SHIPPING AND CERTAIN
16    VESSELS WE ARE USING THIS GYROCOMPASS, WHY THAT RAISED THEIR
17    SUSPICIONS.  AND THAT IS NECESSARILY, IF THEY ARE ALLOWED TO
18    PRESENT THAT TESTIMONY, GOING TO INVOLVE IT RAISED THEIR
19    SUSPICIONS BECAUSE IT TRACKS WITH HOW IRANIAN PROCUREMENT
20    NETWORKS WORK.
21              THE COURT:  BUT WHAT THEY ARE NOT GOING TO BE
22    SAYING, EXPRESSLY OR IMPLICITLY, IS THESE IRANIAN PROCUREMENT
23    NETWORKS EXIST AND THESE NETWORKS NEVER USE A BLIND MIDDLEMAN.
24              MR. CAMDEN:  I DON'T THINK THAT IT HAS TO BE THAT
25    SPECIFIC TO INVOKE THE GOVERNMENT'S BRADY OBLIGATIONS.
```

MARCH 20, 2015

1        **THE COURT:**  THAT IS WHAT HAPPENED IN THE BORDER BUST

2    ARENA.  THE DEFENSE MIGHT HAVE BEEN LACK OF KNOWLEDGE, AND

3    THEN THE GOVERNMENT IN REBUTTAL WOULD ARGUE, THROUGH AN EXPERT

4    OR OTHERWISE, THAT THESE DTO'S DON'T USE UNKNOWING COURIERS.

5    SO THE ISSUE WAS FRONT AND CENTER.

6        HERE, IT IS A VERY DIFFERENT APPROACH.  IT IS THE

7    OPPOSITE.  THEY ARE NOT MAKING THAT ARGUMENT AT ALL.  THEY

8    ARE -- I THINK YOU ARE SAYING CORRECTLY THAT THEY WANT TO

9    PROVE UP THAT THIS ORGANIZATION AT ISSUE HERE IS A PROCUREMENT

10   NETWORK, AND THAT MR. GHAHREMAN WAS A KNOWING MIDDLEMAN, BUT

11   THAT WOULD BE THE EXTENT OF THE EVIDENCE AND THE ARGUMENT.  SO

12   I DON'T SEE HOW IT OPENS UP THE DOOR IN ANY WAY TO THE

13   GOVERNMENT'S OBLIGATION TO INVESTIGATE WHETHER BLIND MIDDLEMEN

14   EXIST IN THESE NETWORKS.

15       **MR. CAMDEN:**  IT IS A LITTLE INCONSISTENT WITH THE

16   404(B) ARGUMENT THEY ARE MAKING.  THEY WANT TO INTRODUCE THE

17   EVIDENCE ABOUT THE OIL JACKUP RIG CONTEMPLATED TRANSACTION --

18   IT NEVER EVEN WENT THROUGH -- TO SAY THAT IT PUT -- YOU KNOW,

19   IT INVOLVED TOTALLY SEPARATE PEOPLE, IT WASN'T UNDER --

20   ILLEGAL, AT LEAST NOT UNDER THE IRAN SANCTIONS ACT.  BUT THE

21   GOVERNMENT WANTS TO USE IT TO PROVE THAT MR. GHAHREMAN WAS

22   ALLEGEDLY AWARE OF THE USE BY IRANIAN PROCUREMENT NETWORKS OF

23   FRONT COMPANIES.

24       SO THIS EVIDENCE, LIKE, IF IT COMES IN -- IF THAT

25   EVIDENCE COMES IN IT IS COMING IN FRONT OF THE JURY, WHETHER

MARCH 20, 2015

1  THE GOVERNMENT EXPLICITLY SAYS, WE KNOW HOW EXACTLY THAT – HOW

2  IRANIAN PROCUREMENT NETWORKS ALL WORK, AND THEY NEVER USE

3  BLIND FRONT MEN, AND THEREFORE MR. GHAHREMAN IS NOT A BLIND

4  FRONT MAN; IT IS STILL GOING TO BE PRESENTED TO THE JURY.  IT

5  IS STILL GOING TO BE SOMETHING FROM WHICH THE GOVERNMENT IS

6  GOING TO BE ASKING THEM TO DRAW THE INFERENCE HE KNEW, THERE

7  IS EVIDENCE OF OTHER SIMILAR TRANSACTIONS WITH TOTALLY

8  UNRELATED PEOPLE FOR UNRELATED GOODS.

9         SO THERE IS A BIT OF INCONSISTENCY THERE.  AND THE

10  GOVERNMENT PUTS A LINE IN ITS BRIEFING SAYING, WE DON'T INTEND

11  TO ARGUE THERE ARE NO BLIND FRONT MEN EVER EXIST, BUT TO THE

12  EXTENT THEY DO EXIST, AND TO THE EXTENT THAT THE GOVERNMENT

13  KNOWS -- THIS IS STILL, AGAIN, JUST AT THE DISCOVERY STAGE,

14  YOUR HONOR, A DISCOVERY REQUEST.  TO THE EXTENT THE GOVERNMENT

15  IS AWARE THAT IRANIAN NETWORKS HAVE USED MIDDLEMEN AND

16  CONCEALED FROM THOSE MIDDLEMEN THE END USE DESTINATION TO IRAN

17  FOR THE GOODS, I THINK IT IS RELEVANT FOR US TO BE ABLE TO

18  BALANCE OUT WHAT THE GOVERNMENT IS GOING TO PRESENT,

19  ESPECIALLY IN THE 404(B) CONTEXT.

20         **THE COURT:**  NOW HERE, AS I UNDERSTAND THE GOVERNMENT

21  PROFFER, THERE IS NO EVIDENCE THAT YOU ARE AWARE OF AN

22  INCIDENT INVOLVING A BLIND FRONT MAN IN THIS TYPE OF NETWORK.

23         **MR. COUGHLIN:**  NOT AS IT RELATES TO THIS PARTICULAR

24  CASE, YOUR HONOR, ESPECIALLY IN LIGHT OF MR. GHAHREMAN'S

25  INVOLVEMENT WITH THE PROCUREMENT NETWORK, AND THAT IS WHY WE

MARCH 20, 2015

1  LISTED IT IN THERE.

2          I THOUGHT THE STEVER CASE WAS PARTICULARLY RELEVANT

3  IN TERMS OF THE FACTORS THAT THE COURT -- THE NINTH CIRCUIT

4  LOOKED AT AND SAID THE COURT SEEMED TO NOT TAKE THESE INTO

5  ACCOUNT.  AND IN THIS CASE WE LOOKED TO THE PROFFER THAT THE

6  DEFENSE MADE, AND THE PROFFER THAT THEY MADE WAS TAMMY

7  FARNSLEY.  AND WE EXPLAINED THAT THAT IS EXACTLY -- THAT IS

8  EXACTLY A GOOD EXAMPLE THAT THERE MIGHT BE SOMEBODY WHO IS

9  INVOLVED IN THE PROCUREMENT WHO DOESN'T KNOW WHAT THE END USE

10  IS GOING TO BE.  AND WE ARE TAKING THAT SAME POSITION.

11          I THINK IF AN AGENT IS ASKED, DOES EVERYONE ALONG

12  THE WAY IN A PROCUREMENT OF A PARTICULAR ITEM WHOSE END USE

13  MIGHT BE IRAN, DO THEY KNOW THAT THAT IS THE END USE?  AND THE

14  ANSWER IS GOING TO BE NO, THEY DON'T KNOW.

15          BUT FROM TIME TO TIME, IN THIS PARTICULAR CASE, THE

16  GOVERNMENT IS GOING TO PRESENT EVIDENCE THAT MR. GHAHREMAN

17  ABSOLUTELY KNEW.  AND WE TICKED OFF THE REASONS WHY WE BELIEVE

18  THAT WILL BE PROVED AT TRIAL IN OUR MOTION RESPONSE.

19          **THE COURT:**  ARE YOU AWARE OF ANY CASE IN WHICH AN

20  IRANIAN PROCUREMENT NETWORK USED SOMEONE, SO THAT PERSON

21  SERVED AS A FRONT MAN UNWITTINGLY?

22          **MR. COUGHLIN:**  YOUR HONOR, IN THIS PARTICULAR CASE I

23  THINK WE ANSWERED THAT QUESTION BY STICKING VERY CLOSELY TO

24  THE FACTS OF THIS CASE.  IN OTHER WORDS, SOMEBODY THAT WAS

25  INVOLVED THAT HAD THESE TIES TO IRAN, THAT DID ACT AS THE

MARCH 20, 2015

AGENT OF THE COMPANY, WE ARE NOT AWARE OF ANYTHING LIKE THAT

THAT WE CAN PROVIDE TO THE DEFENSE.

**THE COURT:**  WHAT ABOUT MORE GENERALLY, ARE YOU AWARE

OF ANY IRANIAN PROCUREMENT NETWORK WHERE SOMEONE GOT USED?

**MR. COUGHLIN:**  YOUR HONOR, I WOULD HAVE TO DEFER TO

MR. HARRIGAN ON THAT.

**MR. HARRIGAN:**  YOUR HONOR, I HAD DISCUSSIONS WITH

THE AGENTS, WE WANT TO FULFILL ALL OF OUR DISCOVERY

OBLIGATIONS.  AND I POSED THE QUESTION TO AGENT HAMAKO AND HE

SAID, I WOULDN'T KNOW WHERE TO BEGIN TO LOOK BECAUSE THERE ARE

SO MANY IRANIAN PROCUREMENT NETWORKS OUT THERE.

BUT WHAT HE DID SAY, HE SAID IN HIS EXPERIENCE --

AND HE HAS BEEN WORKING AS A COUNTER-PROLIFERATION AGENT WITH

HSI SINCE 2010, DONE MANY CASES, DONE OVER 45 SEARCH WARRANTS.

HE SAID, IN A CIRCUMSTANCE LIKE THIS, WHERE AN INDIVIDUAL IS

DIRECTLY TIED TO A FRONT COMPANY, WENT TO COLLEGE WITH THE

OWNER OF THAT FRONT COMPANY, WHO SPENT TIME IN IRAN, AND NOT

ONLY SPENT TIME IN IRAN BUT WORKED FOR SHIPBUILDING COMPANIES

AND WOULD KNOW MARINE NAVIGATION EQUIPMENT AND WOULD KNOW THE

INDIVIDUAL WHO IS REQUESTING THAT EQUIPMENT, IN THAT

CIRCUMSTANCE I HAVE NEVER COME ACROSS, WHERE TIES ARE THAT

CLOSE, THAT A PERSON LIKE -- IN THAT SITUATION WOULD BE USED

BY A FRONT COMPANY.

IS IT POSSIBLE THAT SOMEONE CAN BE USED?  HE SAYS,

YEAH, ANYTHING IS POSSIBLE.  BUT HE DOESN'T HAVE INFORMATION.

MARCH 20, 2015

```
1              AND WE TALKED ABOUT TAMMY FARNSLEY, AND WE POINT
2    THAT OUT AGAIN, THAT IS AN EXAMPLE OF HOW SOMETIMES COMPANIES
3    DON'T ALWAYS KNOW WHO THE END USER IS.  BUT WE DON'T CONSIDER
4    THEM PART OF THE IRANIAN PROCUREMENT NETWORK, THEY ARE PART OF
5    THE PROCESS IN GETTING THE GOODS.  BUT AS WE POINT OUT, THE
6    MEDIA REPORTS ARE FULL OF IRANIAN PROCUREMENT NETWORKS,
7    REPORTS OF THEM.  AND IT IS KNOWN THAT THEY SOMETIMES USE MANY
8    LAYERS OF BUYERS AND SELLERS TO OBFUSCATE WHO THE TRUE END
9    USER IS IN THAT CASE.
10             SO, YES, IT COULD HAPPEN.  I CAN TELL THE COURT THAT
11   THE EVIDENCE WILL SHOW IN THIS CASE, AS TO THE Y-690'S, THE
12   SEPARATION BETWEEN TIG MARINE AND AN IRANIAN COMPANY WAS JUST
13   ONE DEGREE, YOU KNOW.  TIG MARINE CONTACTS ARASH GHAHREMAN TO
14   GET THAT STUFF.  THAT IS THE REQUEST OF A COMPANY DIRECTLY IN
15   TEHRAN, IRAN, KOHANDIAREMAD.  SO IT IS NOT THIS MANY LAYERS
16   THAT I THINK THE AGENT WOULD SAY IT WOULD BE POSSIBLE.  BUT,
17   AGAIN, WHERE DO YOU BEGIN LOOKING?
18             THE COURT:  ON THE BROADER QUESTION, NOT SO CLOSELY
19   TIED TO THE FACTS OF THIS CASE, WAS THE AGENT AWARE OF ANY
20   CASE WHERE SOMEBODY WAS USED AND ENDED UP UNWITTINGLY SERVING
21   AS A FRONT PERSON?
22             MR. HARRIGAN:  I HAVEN'T ASKED THE AGENT WHETHER
23   SOMEONE HAS USED THAT AS A DEFENSE, BUT WHERE IT IS ACTUALLY
24   TRUE, HE WAS UNAWARE OF A CASE THAT THAT ACTUALLY TURNED OUT
25   THAT SOMEBODY WAS USED, IN HIS EXPERIENCE.
```

MARCH 20, 2015

1       BUT HE HASN'T TALKED TO, YOU KNOW, EVERY LAW

2  ENFORCEMENT OFFICER IN THE UNITED STATES.  AND I DON'T KNOW

3  THAT STEVER REQUIRES THAT.

4       THIS IS -- WE ARE NOT JUST SAYING IT IS A FISHING

5  EXPEDITION, WE ARE SAYING THAT -- I READ THE STEVER CASE WHERE

6  IT MADE SENSE BECAUSE THE GOVERNMENT ACTUALLY HAD INFORMATION

7  IN THEIR POSSESSION THAT WAS RELEVANT TO THAT SPECIFIC

8  DEFENDANT.  THEY HAD THE INFORMATION THAT THE GOVERNMENT HAD

9  NATIONAL DRUG INTELLIGENCE REPORTS ABOUT CARTELS MOVING INTO

10 THE OREGON AREA.  YOU KNOW, THEY HAD COMMUNICATION FROM OTHER

11 CASES ABOUT THE SAME THING, AND THERE WERE MEDIA REPORTS.  SO

12 THAT IS ON A DIFFERENT LEVEL.

13      WHAT DEFENSE IS ESSENTIALLY ASKING US IS IT IS THE

14 GOVERNMENT'S DUTY TO GO OUT AND QUESTION EVERYBODY ABOUT ANY

15 POSSIBLE DEFENSE WE HAVE.

16      AND AS THE COURT POINTS OUT, WE ARE NOT ARGUING THAT

17 THERE IS NOT SUCH A THING AS A BLIND PERSON.  THERE MAY BE.

18 BUT WHAT WE ARE GOING TO PROVE IS, AS TO THE FACTS OF THIS

19 CASE, THIS DEFENDANT KNEW VERY WELL.  HE WOULD HAVE HAD TO

20 HAVE BEEN DEAF, DUMB AND BLIND NOT TO KNOW THESE GOODS WERE

21 GOING TO IRAN.

22           **THE COURT:**  MR. CAMDEN, ANYTHING ELSE?

23           **MR. CAMDEN:**  THIS IS THE SAME THING WE RUN INTO IN

24 PRETTY MUCH EVERY DISCOVERY DISPUTE.  THE GOVERNMENT, I MEAN,

25 HAS TROUBLE PUTTING ITSELF INTO THE SHOES OF THE DEFENSE

MARCH 20, 2015

```
 1    COUNSEL.  WE ARE SITTING HERE THINKING ABOUT WHAT THE EVIDENCE
 2    IS GOING TO BE AND WHAT A POSSIBLE DEFENSE IS.  AND THE
 3    GOVERNMENT JUST HAS REAL TROUBLE TRYING TO IMAGINE WHAT IT IS
 4    LIKE TRYING TO THINK OF A DEFENSE OR TO COLLECT EVIDENCE
 5    AROUND A STRUCTURE OF A DEFENSE IN A CRIMINAL TRIAL.
 6              SO THEY SEEM TO -- I MEAN, HE WENT AND TALKED TO
 7    AGENT HAMAKO.  AND HAMAKO SAYS, OH, NOT WHERE HE HAS BEEN
 8    ROOMMATES WITH THE PERSON WHO WE KNOW IS IN IRAN TRYING TO GET
 9    THE GOODS.  NO, THAT CIRCUMSTANCE, IT IS NOT RELEVANT.
10              WELL, YOU CAN'T TRY THE CASE IN YOUR OWN HEAD AND
11    THINK THE PERSON IS GUILTY, THEREFORE EVERY BIT OF EVIDENCE
12    THAT MIGHT BE USED TO TEND TO SHOW HE MIGHT NOT HAVE KNOWN
13    ISN'T RELEVANT.
14              IT IS OUR DETERMINATION ON WHETHER THE MATERIAL
15    IS -- OR THE REQUESTED MATERIAL IS GOING TO BE MATERIAL TO
16    PREPARING THE DEFENSE.  IT IS THE COURT'S DETERMINATION ABOUT
17    WHETHER IT IS GOING TO BE ADMISSIBLE OR NOT.  WE JUST OUGHT TO
18    HAVE THE INFORMATION TO BE ABLE TO SEE.
19              I WOULD FEEL MUCH BETTER IF THE GOVERNMENT COULD
20    PRODUCE ANY SORT OF INFORMATION FROM AGENT HAMAKO SAYING, YES
21    OR NO, THIS HAPPENS, IT DOESN'T HAPPEN, OR I DON'T KNOW AND I
22    AM UNABLE TO FIND OUT FOR WHATEVER REASON.
23              BUT TO THE EXTENT THE EVIDENCE MAY EXIST AND IS OUT
24    THERE, WE STAND ON OUR DISCOVERY REQUEST.
25              **THE COURT:**  MR. COUGHLIN.
```

MARCH 20, 2015

1      **MR. COUGHLIN:**  I WOULD JUST FINISH, YOUR HONOR, BY

2   INDICATING I DON'T THINK WE CAN SAY IT ANY CLEARER.  IF YOU

3   ASK THE QUESTION OF MR. HAMAKO ON THE STAND, ARE THERE

4   GOVERNMENT -- ARE THERE PROCUREMENT NETWORKS THAT USE

5   UNWITTINGS?  THE ANSWER IS GOING TO BE, CERTAINLY COULD BE,

6   CERTAINLY COULD HAPPEN.

7      WHICH IS EXACTLY THE OPPOSITE OF WHAT THE GOVERNMENT

8   WAS SAYING AS TO UNKNOWN COURIERS OR BLIND MULES, IF YOU WILL.

9      AND WE ARE NOT TAKING THAT POSITION HERE, NOR HAS

10  COUNSEL MADE A PROFFER, AS WAS DONE IN THE STEVER CASE, THAT

11  GIVES US SOME PARAMETERS ON WHICH TO TRY TO DETERMINE WHAT

12  EXACTLY THEY ARE LOOKING FOR.

13      THE EXAMPLE THEY GAVE, THE FARNSLEY CASE, JUST

14  DOESN'T CUT IT IN TERMS OF HELPING US UNDERSTAND.  WHAT WE ARE

15  SAYING IS THAT IF AGENT HAMAKO WAS ASKED ON CROSS-EXAMINATION,

16  IS IT POSSIBLE FOR PROCUREMENT NETWORKS TO USE UNWITTINGS?

17  THE ANSWER IS GOING TO BE, YES, IT IS POSSIBLE.  WHICH IS ALL

18  THEY ARE LOOKING FOR IN TERMS OF THE POSSIBILITY THAT THERE IS

19  AN UNKNOWING PERSON INVOLVED IN THE PROCUREMENT OF GOODS THAT

20  ARE EVENTUALLY GOING TO IRAN.

21      **THE COURT:**  IT IS ALSO YOUR REPRESENTATION THAT IF

22  ASKED IF AGENT HAMAKO IS AWARE OF ANY USE BY A PROCUREMENT

23  NETWORK OF AN UNKNOWING FRONT PERSON, HIS ANSWER IS GOING TO

24  BE NO.

25      **MR. COUGHLIN:**  I WOULD HAVE TO ASK HIM EXACTLY THAT,

MARCH 20, 2015

```
 1    YOU KNOW, HOW FAR OUT, HOW MANY DEGREES AWAY FROM THE INITIAL
 2    GROUP OF INDIVIDUALS THAT HAVE BEEN IDENTIFIED AS PART OF THE
 3    NETWORK, BUT CERTAINLY WE CAN DO THAT AND MAKE THAT
 4    REPRESENTATION.
 5              THE COURT:  BECAUSE IF HE IS AWARE OF AN --
 6              MR. COUGHLIN:  RIGHT.  CERTAINLY.  CERTAINLY.
 7              THE COURT:  -- UNKNOWN PERSON, THEN THAT MIGHT
 8    TRIGGER DISCOVERY OBLIGATION.
 9              MR. HARRIGAN:  PART OF THE PROBLEM IS THAT I
10    ACTUALLY HAD THE CONVERSATION WITH AGENT HAMAKO.  HE WAS
11    UNAWARE.  AND THEN I ASKED HIM THE QUESTION, IS IT POSSIBLE?
12    THEN HE SAID, YEAH, I GUESS ANYTHING IS POSSIBLE, BUT IN THIS
13    CIRCUMSTANCE WITH THESE FACTS, IS WHAT -- HE SAID, IN MY
14    OPINION, BASED ON WHAT'S HERE AND THE EVIDENCE HERE, THIS
15    SHOWS KNOWLEDGE, BUT I GUESS IT IS POSSIBLE.
16              THE COURT:  BUT ON THE BROADER QUESTION, IF ASKED ON
17    CROSS, ARE YOU AWARE OF ANY PROCUREMENT NETWORK USING A BLIND
18    FRONT MAN --
19              MR. HARRIGAN:  YEAH, HE WOULD SAY HE DOES NOT HAVE
20    PERSONAL KNOWLEDGE OF THAT, I THINK.
21              THE COURT:  OKAY.
22              MR. HARRIGAN:  BUT I WILL ASK IN THE BROADER SENSE,
23    IF THERE IS ANOTHER CASE, OTHER THAN THE CIRCUMSTANCE WE HAVE
24    HERE.
25              THE COURT:  OKAY.  MR. CAMDEN, ANY OTHER ARGUMENTS?
```

1           **MR. CAMDEN:**  ON THOSE ISSUES, NO, YOUR HONOR.

2           I DID WRITE SOME OF THE OTHER IN LIMINES THAT THE

3    COURT DISCUSSED.

4           THE ONE REGARDING THE ADMINISTRATIVE SUBPOENAS.  I

5    HAVE BEEN WORKING VERY HARD ON THIS, YOUR HONOR, AND I

6    APOLOGIZE.  THERE IS A CASE THAT I WOULD LIKE TO BRING TO THE

7    COURT'S ATTENTION.

8           I HAVEN'T HAD A CHANCE TO THOROUGHLY ANALYZE HOW IT

9    MIGHT AFFECT THIS CASE.  IT IS PRETTY MUCH THE ONLY NINTH

10   CIRCUIT CASE DISCUSSING THE EXPORT SUBPOENA POWER THAT THE

11   GOVERNMENT HAS NOW INVOKED IN THEIR RESPONSE.

12          THE CASE IS UNITED STATES WHITING, W-H-I-T-I-N-G,

13   AND IT IS 781 F.2D 692.  IT IS A NINTH CIRCUIT CASE, 1986.

14          I WOULD ASK -- I THINK I NEED TO DO MORE RESEARCH

15   BEFORE I AM PROPERLY ABLE TO DISCUSS THE ARGUMENTS THE

16   GOVERNMENT MADE.  WHEN I INITIALLY WENT THROUGH THEY DIDN'T

17   PROVIDE US COPIES OF THE ACTUAL SUBPOENAS THAT WERE SENT, SO

18   IT WAS HARD TO DETERMINE UNDER WHICH REGULATIONS THE SUBPOENAS

19   WERE ACTUALLY ISSUED.

20          I FOUND THE CFR SECTION AND CITED IT, BUT THE

21   GOVERNMENT SAYS IN ITS REPLY THAT THAT IS NOT WHAT THEY WERE

22   INVOKING, IT WAS ACTUALLY THE 50 U.S. CODE APPENDIX

23   SECTION 2411, I THINK (A)(1).

24          SO I DO NEED TO DO MORE RESEARCH ON THAT, AND I

25   DON'T THINK I CAN RESPOND PROPERLY ON THAT AT THIS POINT.

MARCH 20, 2015

1          **THE COURT:**  OKAY.

2          **MR. HARRIGAN:**  YOUR HONOR, WHAT I WOULD JUST ADD ON

3    THAT IS THAT UNLESS DEFENDANT HAS OTHER ARGUMENTS IT IS NOT

4    OUR INTENTION, IN OUR CASE IN CHIEF, TO PUT IN EVIDENCE OF

5    THE -- WHAT WE OBTAINED FROM THOSE SUBPOENAS IN OUR CASE IN

6    CHIEF.  THAT MAY MAKE IT MOOT.

7          **THE COURT:**  IT MAY BE MOOT.

8          **MR. CAMDEN:**  IT WILL STILL REQUIRE, I THINK, SORTING

9    OUT WHETHER THAT INFORMATION WENT INTO THE SEARCH WARRANT

10   APPLICATION.

11         **MR. HARRIGAN:**  AGAIN, THAT IS NOT A MOTION THEY

12   MADE, YOUR HONOR.  THEY HAVE HAD 15 MONTHS.  AND TO, ON THE

13   EVE OF TRIAL, TO KEEP ON THROWING THINGS UP TO THE COURT AND

14   SAYING, LOOK, I NEED MORE TIME TO LOOK INTO THAT.

15         THIS WILL BE UP TO THE POINT OF TRIAL.  THEY HAVEN'T

16   MADE THAT MOTION.  IT SHOULD BE DENIED ON THAT FACT.  AND

17   STILL NO MATTER -- I DON'T KNOW WHAT WHITING -- WHAT PURPOSE

18   THEY ARE CITING WHITING FOR, BUT THEY DON'T REALLY HAVE A

19   REASONABLE EXPECTATION OF PRIVACY IN ANY OF THAT, FORGETTING

20   ABOUT IT BEING A VALID SUBPOENA OR NOT.  THAT THROWS IT OUT TO

21   BEGIN WITH.

22         BUT TO, AGAIN, PIECEMEAL, TO LITIGATE ISSUES WHICH

23   THEY COULD HAVE LITIGATED MONTHS AGO, AND SHOULD HAVE MADE

24   MONTHS AGO, IS REALLY NOT APPROPRIATE.

25         **MR. CAMDEN:**  I WILL TAKE IT UP AT THIS POINT TO

MARCH 20, 2015

1   APOLOGIZE, YOUR HONOR, FOR THE LATE FILED MOTIONS.  THEY WERE

2   FILED LATE.  I WAS BROUGHT INTO THIS, AND I HAVE BEEN

3   SEARCHING -- WE HAVE THOUSANDS AND THOUSANDS AND THOUSANDS OF

4   PAGES OF DISCOVERY, AND SOMETIMES I DON'T SPOT AN ISSUE UNTIL

5   I HAVE READ SOMETHING FIVE OR SIX TIMES, OR THE SEARCH WARRANT

6   ISSUES CAME UP AND I AM INVESTIGATING A TOTALLY DIFFERENT --

7   YOU KNOW I RUN ACROSS A CASE THAT I HADN'T RUN ACROSS BEFORE

8   THAT AFFECTS THE ANALYSIS.

9           SO I DO APOLOGIZE BOTH TO OPPOSING COUNSEL AND TO

10  THE COURT FOR THE LATE FILED MOTIONS, BUT ONCE I SPOT THE

11  ISSUE I JUST CAN'T SIT ON IT.  I THINK I HAVE TO PRESENT IT

12  FOR MR. GHAHREMAN.

13          **THE COURT:**  OKAY.

14          **MR. CAMDEN:**  THE GOVERNMENT DOES CITE FORRESTER,

15  WHICH HELD THAT IP ADDRESSES -- THAT WAS REGARDING EMAILS AND

16  THAT WAS THE TWO FROM THE IP ADDRESS INFORMATION OF AN EMAIL,

17  WHICH IS PRETTY MUCH JUST THE SENDING INFORMATION.  IT IS LIKE

18  ON A ENVELOPE, THE STAMP AND THEN THE ADDRESS LINE AND THE

19  RETURN ADDRESS ON THE OUTSIDE OF THE ENVELOPE, FOR WHICH A

20  PERSON DOESN'T, OBVIOUSLY, HAVE AN EXPECTATION OF PRIVACY

21  BECAUSE THE MAILMAN SEES IT AND EVERYONE SEES IT.  THEY DON'T

22  SEE THE CONTENTS.

23          BUT I THINK THE INFORMATION THEY GOT BY SUBPOENA IN

24  THIS CASE IS A LITTLE BIT DIFFERENT AND A LITTLE BIT MORE

25  PRIVATE.  SO WHAT THEY DID IS THEY WENT TO THE SERVICE

1    PROVIDERS, YAHOO OR NUTECH OR GOOGLE, AND THEY ASKED FOR NOT

2    TO-FROM INFORMATION FOR A PARTICULAR EMAIL BUT THEY ASKED FOR

3    DATES AND TIMES AT WHICH A PERSON HAD LOGGED INTO A SPECIFIC

4    PERSONAL ACCOUNT.

5         SO, FOR EXAMPLE, ANY EMAIL ADDRESS WILL HAVE THE

6    EMAIL USER NAME AND IT WILL ALSO HAVE A PASSWORD.  SO THIS

7    ISN'T SOMEBODY THAT JUST ACCESSED A PUBLICALLY AVAILABLE WEB

8    PAGE AT A CERTAIN TIME AND A CERTAIN DATE, THIS IS SOMEBODY,

9    WITH THE INFORMATION THEY GOT, IS THE LOG IN, THE INSTANCES OF

10   ALL OF THOSE PEOPLE WHO HIT ON THE PAGE OF PEOPLE WHO ACTUALLY

11   ENTERED THIS PARTICULAR EMAIL ADDRESS AND THIS PARTICULAR

12   PASSWORD AND WERE ABLE TO GET INTO THE ACCOUNT.

13        SO THAT EXPOSES, I THINK, OR THAT INVOLVES A LITTLE

14   BIT MORE PERSONAL AND PRIVATE AND PROTECTED INFORMATION THAN

15   SIMPLY THE PUBLICALLY AVAILABLE FROM, TO OR IP HEADERS.

16        NOTE 7 IN -- I AM SORRY -- FOOTNOTE 6 ON PAGE 14 IN

17   FORRESTER DISCUSSES THIS.  THEY SAY, WELL, EVEN IF THE HEADER

18   INFORMATION IN AN EMAIL IS PUBLIC, WHEN A PERSON, FOR EXAMPLE,

19   SEARCHES OR GOES TO A SPECIFIC URL WITHIN A WEB PAGE, THE IP

20   ADDRESS -- JUST TO BACK UP A LITTLE BIT.

21        GOOGLE WILL HAVE ONE IP ADDRESS.  AND THE FORRESTER

22   COURT WAS VERY CLEAR THAT SHOWING THAT SOMEBODY WENT TO AN IP

23   ADDRESS, WEBSITE IN GENERAL, DOESN'T SHOW THE GOVERNMENT WHICH

24   PARTICULAR WEBSITE WITHIN THAT -- OR WHICH PARTICULAR PAGE

25   WITHIN THAT WEBSITE THEY WENT TO.

MARCH 20, 2015

```
 1              HOWEVER, THEY DISTINGUISH IN NOTE 6 URL'S, WHICH ARE
 2    UNIFORM RESOURCE LOCATORS, THOSE WILL TELL THE GOVERNMENT OR
 3    TELL WHOEVER LOOKS AT IT EXACTLY WHAT PAGE THAT PERSON LOOKED
 4    AT.
 5              SO THE INFORMATION THE GOVERNMENT GOT IN THIS CASE
 6    SHOWS NOT JUST PEOPLE WHO ARE HITTING A PUBLICALLY AVAILABLE
 7    SITE, OR PINGING IT, IT SHOWS PEOPLE THAT ACTUALLY ACCESSED,
 8    WENT IN AND ENTERED THE CORRECT PASSWORD AND ENTERED THE
 9    CORRECT EMAIL FOR THIS PARTICULAR PERSONAL ACCOUNT AND GOT
10    INTO IT.  SO THAT IS THE LOG IN INFORMATION THE GOVERNMENT
11    HAS.
12              THE COURT:  IT IS LOG IN TO A WEBSITE, THOUGH,
13    RIGHT?
14              MR. CAMDEN:  NO, IT IS NOT LOG IN TO A SITE IN
15    GENERAL, IT IS NOT EVERYBODY WHO HIT YAHOO.COM, OR EVEN WHO
16    HIT YAHOO MAIL.  WHAT THE GOVERNMENT GOT WAS JUST THE TIMES
17    AND DATES AND IP ADDRESSES FROM WHICH THE PERSONAL ACCOUNT WAS
18    ACCESSED, MEANING SOMEBODY HAD GONE TO A CERTAIN PART OF THE
19    WEBSITE AND PUT IN A CERTAIN PASSWORD ASSOCIATED WITH THAT
20    ACCOUNT TO BE ABLE TO LOG IN TO IT.
21              THE COURT:  AND THE ACCOUNT CAN EITHER BE A WEBSITE
22    OR --
23              MR. CAMDEN:  I AM PRETTY SURE IN ALL OF THESE CASES,
24    YOUR HONOR, IT WAS EMAIL ADDRESSES.  SO, FOR EXAMPLE, IF YOU
25    HAVE A YAHOO ACCOUNT, YOU GO TO MAIL.YAHOO.COM, IT SAYS WHAT
```

MARCH 20, 2015

```
 1   IS YOUR USER NAME AND PASSWORD.  YOU PUT IT IN.  AND THEN ONCE
 2   YOU HIT SEND -- SO IT IS NOT ALL OF THE PEOPLE THAT GO TO THAT
 3   SITE INITIALLY THAT THE GOVERNMENT GETS, IT IS THE PEOPLE THAT
 4   GO ENTER THIS PARTICULAR USER NAME AND PASSWORD AND HIT
 5   SUBMIT.  THOSE ARE THE IP ADDRESSES THAT THE GOVERNMENT GOT,
 6   ALONG WITH DATES AND TIMES THAT THAT INFORMATION WAS ENTERED.
 7            THE COURT:  THIS IS OFF TOPIC, BUT WHAT IF YOU --
 8   OFTEN NOW YOU JUST SAVE YOUR EMAIL ADDRESS AND YOUR PASSWORD
 9   SO YOU JUST CLICK ON GMAIL, FOR EXAMPLE, AND IT COMES UP.  SO
10   ARE YOU PERPETUALLY LOGGED IN, OR DO YOU LOG IN -- DOES IT
11   SHOW YOU LOGGING IN AS SOON AS YOU CLICK ON GMAIL NO MATTER
12   WHAT TIME IT IS?
13            MR. CAMDEN:  I THINK THE WAY A LOT OF THE WEBSITES
14   WORK, THERE IS SOME SORT COOKIE WITH YOUR LOG IN INFORMATION
15   SO THAT YOU DON'T HAVE TO KEEP LOGGING IN AND OUT.  A LOT OF
16   THEM HAVE A TIMER SO, YOU KNOW, AFTER A HALF AN HOUR OR A DAY
17   OR WHATEVER IT WILL AUTOMATICALLY LOG YOU OUT AND THEN YOU
18   HAVE TO LOG BACK IN.  I THINK OUR LOCAL ECF SYSTEM DOES THAT.
19            THE COURT:  OKAY.
20            MR. CAMDEN:  OTHER TIMES -- THEN THERE IS -- THAT IS
21   ON THE SERVER SIDE.  ON THE LOCAL SIDE YOU HAVE THE BROWSER
22   SET UP TO SAVE THE PASSWORD.  IT LOOKS LIKE THE PERSON IS
23   ENTERING THAT INFORMATION ON THE COMPUTER.
24            THE COURT:  WHAT'S NEXT?
25            MR. CAMDEN:  I THINK I CAN HOLD OFF ON THE
```

MARCH 20, 2015

```
 1    MAXMIND.COM --
 2              THE COURT:  YES.
 3              MR. CAMDEN:  -- UNTIL -- THE COURT HAD REQUESTED A
 4    FURTHER PROFFER.
 5              THE COURT:  YES.  MAXMIND.COM.
 6              MR. HARRIGAN:  IF IT WILL SHORTEN THINGS, WE ARE
 7    WILLING TO USE THE WHOIS SERVER FOR -- THERE IS A -- OR ONE
 8    THAT CLEARLY USES A WHOIS SERVER.  I STILL BELIEVE THAT THE
 9    EVIDENCE HAS SHOWN THAT MAXMIND DOES NOT USE THE WHOIS SERVER.
10    THE REASON WE USE THAT IS THAT IS WHAT LAW ENFORCEMENT THAT I
11    WORK WITH USE, AND THEIR EXPERT SAID THEY ACCESS THAT, WHETHER
12    THEY ACCESS THEIR OWN INFORMATION.
13              ALL WE WANT TO PUT IN IS THAT THE IP ORIGINATION
14    ADDRESS FOR EMAILS SENT BY KOORUSH OR OTHER CO-CONSPIRATORS
15    WAS IN IRAN.  AND SO TO THE EXTENT THAT THEY ARE NOT
16    CHALLENGING THE NECESSITY, WHICH THEY ARE NOT, OR THE
17    RELIABILITY OF THE WHOIS DATA, WE WILL USE THE WHOIS.
18              AND ALL WE INTEND TO PUT IN, YOUR HONOR, IS THAT THE
19    IP WAS -- WHERE THIS EMAIL CAME FROM WAS LOCATED IN IRAN.  IF
20    THAT IS AGREEABLE TO DEFENSE COUNSEL AND IF THEY WANT TO PICK
21    A WHOIS SERVER, THAT IS OKAY, WE WILL USE THAT, BECAUSE ALL WE
22    WANT TO SHOW IS THE COUNTRY THAT THAT IP ADDRESS ORIGINATED
23    IN.
24              THE COURT:  MR. CAMDEN.
25              MR. CAMDEN:  IF WE COULD HOLD OFF ON THIS UNTIL WE
```

MARCH 20, 2015

SEE WHAT THEY ARE GOING TO PRODUCE.  IF THEY DO A WHOIS WE CAN

EVALUATE IT ON ITS TERMS.

       **MR. HARRIGAN:**  HERE IS THE ISSUE.  I WANT TO MOVE

THINGS ALONG, AND I AM NOT PRESSING DEFENSE COUNSEL.  BUT IF

THEY ARE NOT DISAGREEING WITH OUR ANALYSIS THAT THE WHOIS

SERVER AND THOSE THAT ACCESS THE WHOIS SERVER -- AND I ASSUME

WHOIS LOOKUP IS ONE OF THEM.  I ASKED THE AGENT TO RUN THEM

ALL AGAIN WITH WHAT IS WHATSMYIP LOOKUP WHICH I THINK IS A

WHOIS, THEY ALL CAME BACK TO THE SAME INFORMATION WE GOT FROM

MAXMIND.

       **THE COURT:**  IF YOU COULD QUICKLY DO THE WHOIS SEARCH

AND THEN THE DOCUMENTS WOULD BE THE SAME, AND THEN I AM

ASSUMING YOU WOULD AGREE --

       **MR. HARRIGAN:**  WHAT WE WANT TO USE WOULD BE THE

SAME.  WE NEVER PLANNED TO USE GEO LOCATION.  AND ALL GEO

LOCATION WOULD GIVE US IS THE GEO LOCATION OF THE ISP

PROVIDER.  WOULDN'T TELL US WHERE HE ACTUALLY SENT IT FROM

BECAUSE AN ISP PROVIDER CAN HAVE A WIDE RANGE.  IT WOULD TELL

US THAT IT WOULD BE IN IRAN BECAUSE, AS I POINT OUT IN THE

PAPERS, THEY ARE ALLOCATED THOSE SPECIFIC IP ADDRESSES, AND

THEN THEY ALLOCATE THEM, THE REGIONAL IRI'S ALLOCATE THEM TO

ISP'S OR DOMAINS.

       **THE COURT:**  OKAY.

       **MR. CAMDEN:**  I THINK HE SHOULD HOLD OFF.  I WILL

TALK TO MR. HARRIGAN, WE MAY BE ABLE TO REACH AN AGREEMENT.

MARCH 20, 2015

**THE COURT:**  OKAY.  I WILL RESERVE.

**MR. CAMDEN:**  WE WEREN'T ABLE TO RESPOND IN WRITING, AS THE COURT NOTED, TO THE GOVERNMENT'S MOTION TO ADMIT THE DOCUMENTS FROM THE APARTMENT AND HOTEL SEARCH.  I GUESS ONE OF THOSE IS MR. GHAHREMAN'S CV, HIS CURRICULUM VITAE.  TO THE EXTENT THAT THE COURT HAS ALREADY RULED THAT MR. GHAHREMAN'S MILITARY SERVICE WAS COMPULSORY AND SHOULD NOT BE -- UNDER 403 WOULD NOT BE ADMISSIBLE, WE ASK THAT THAT BE REDACTED AHEAD OF TIME.

REGARDING -- THERE WAS ALSO A TEXTBOOK ON, I BELIEVE, MARITIME REGULATIONS THAT THE GOVERNMENT SAYS INCLUDES A SECTION THAT DISCUSSES THE IRAN TRADE SANCTIONS.

I HAVE GOT ABOUT 8 OR 9,000 PAGES OF TEXTBOOKS THAT I HAVE ACCUMULATED FROM COLLEGE AND LAW SCHOOL, AND I WOULD BE REALLY HESITANT FOR ANYONE TO THINK I COULD BE IMPUTED TO HAVE KNOWLEDGE OF SOME PAGE OR TWO OF ANY OF THOSE DOCUMENTS.

SO THE REAL PROBLEM FOR THE TEXTBOOK IS THE LINK. THE GOVERNMENT, I DON'T THINK, HAS PRODUCED ANYTHING TO SHOW THAT MR. GHAHREMAN ACTUALLY READ THAT PAGE OR READ THAT MATERIAL.  MAYBE IF HE HAD -- IF THEY HAD SOME SORT OF ADMISSION OR SOMETHING LINKING HIM TO THAT, MAYBE IT WOULD BE RELEVANT.  BUT AT THIS POINT I THINK IT DOESN'T EVEN MEET THE THRESHOLD CONDITIONAL RELEVANCY TEST OF REQUIRING -- A BASIS FOR WHICH THE JURY COULD CONCLUDE THAT HE ACTUALLY SAW OR READ THAT PAGE, OR THAT SECTION IN THE TEXTBOOK.

MARCH 20, 2015

1          **THE COURT:**  IT WAS IN HIS HOUSE, THOUGH, RIGHT?

2          **MR. HARRIGAN:**  YES, YOUR HONOR.  IT WAS FOUND IN HIS

3   APARTMENT DURING THE SEARCH AT THE STATEN ISLAND APARTMENT.

4          **MR. JOHNSTON:**  YOUR HONOR, I WOULD BE HAPPY TO

5   SUPPLEMENT AT SOME POINT, BUT I DO HAVE RECOLLECTION OF A

6   CASE -- I DON'T RECALL THE NAME -- REGARDING ADOPTIVE

7   ADMISSIONS, A CASE FROM THE NINTH CIRCUIT.  IT IS RATHER OLD,

8   BUT I BELIEVE IN THAT CASE THERE WAS A LETTER THAT WAS FOUND

9   ON THE PERSON OF AN INDIVIDUAL THAT THE NINTH CIRCUIT HELD

10  WASN'T SUFFICIENTLY CONNECTED TO THAT INDIVIDUAL TO SHOW

11  EVIDENCE THAT THAT PERSON HAD READ IT OR NECESSARILY ADOPTED

12  WHAT WAS WRITTEN ON THAT DOCUMENT.  SO MAYBE WE COULD PROVIDE

13  THAT BEFORE TRIAL TIME.

14          BUT THERE IS AN ISSUE OF WHETHER HE HAS ADOPTED THE

15  ADMISSIONS THAT ARE IN THAT TEXTBOOK, WHICH ARE OTHERWISE

16  HEARSAY THAT HAVE NO OBJECTION TO HIM, EVEN IF IT WAS FOUND IN

17  HIS APARTMENT.  I THINK THE CASE THAT I AM REMEMBERING

18  INVOLVED A DOCUMENT THAT WAS ACTUALLY ON THE PERSON OF AN

19  INDIVIDUAL, AND THAT WASN'T SUFFICIENT TO ESTABLISH THE

20  ADOPTIVE ADMISSION.

21          **THE COURT:**  THE PURPOSE FOR INTRODUCING THE BUSINESS

22  LAW TEXTBOOK IS TO SHOW THAT MR. GHAHREMAN HAD IT IN HIS

23  POSSESSION, HIS APARTMENT, AND INFERENTIALLY THE JURY COULD

24  CONCLUDE THAT HE WAS AWARE OF THESE CERTAIN EXPORT LAWS AND

25  REGULATIONS?

MARCH 20, 2015

```
 1            MR. HARRIGAN:  YES, YOUR HONOR.  AT THE TIME HE WAS
 2   ACTUALLY GOING TO SCHOOL, GRADUATE SCHOOL, AT SUNY MARITIME
 3   COLLEGE, WHICH IS IN HIS RESUME.  SO THERE IS MORE THAN JUST A
 4   BOOK BEING FOUND THAT SOMEONE LEFT THERE, IT IS APPARENT IT IS
 5   A TEXTBOOK.
 6            AND WE PRODUCED TO -- I THINK WE ARE GOING TO
 7   PRODUCE LIMITED PAGES FROM THAT.  THEY CAN PRODUCE THE WHOLE
 8   BOOK IF THEY WANT.  WE ARE GOING TO SHOW THEM THE PAGES WHICH
 9   ACTUALLY TALK ABOUT RED FLAGS TO LOOK FOR IN U.S. EXPORT, TALK
10   ABOUT IEEPA, AND TALK IRAN TRADE SANCTIONS.
11            SO TO THE EXTENT THAT IT IS RELEVANT, IT IS
12   CERTAINLY RELEVANT FOR THAT.  AND IT IS NOT -- ITS PROBATIVE
13   VALUE, IT IS VERY PROBATIVE GIVEN THE FACT THAT WHAT WE HAVE
14   TO PROVE IN THIS CASE IS WILLINGNESS, HIS KNOWLEDGE, OF THE
15   IRAN TRADE SANCTIONS.  IT CERTAINLY ISN'T UNFAIRLY PREJUDICIAL
16   BECAUSE WE HAVE EVIDENCE THAT TIES HIM TO THAT BOOK, NOT ONLY
17   BEING FOUND -- IT IS ESSENTIALLY A ONE-BEDROOM APARTMENT WHERE
18   HE LIVED WITH HIS GIRLFRIEND, BUT THAT HE WAS GOING TO SCHOOL
19   AT SUNY MARITIME COLLEGE.
20            THE COURT:  MR. CAMDEN, ANY OTHER ARGUMENT?
21            MR. CAMDEN:  ON THAT ISSUE, NOT AT THIS POINT.
22            IF I COULD HAVE ONE SECOND, YOUR HONOR.
23            THE COURT:  YES.
24            MR. CAMDEN:  THE NEXT I GUESS WOULD BE THE
25   GOVERNMENT'S PROFFERED 404(B) EVIDENCE, RELATING TO THE
```

```
 1    SALE -- THE SALE OF THE OIL JACKUP RIGS THROUGH THE NORWEGIAN

 2    COMPANY.

 3              THE CASES THE GOVERNMENT CITES ON THE ONE HAND THERE

 4    IS THE WASTEWATER CASE -- I APOLOGIZE, I CAN GIVE THE NAMES OF

 5    THE CASES.

 6              THERE WERE TWO CASES ON WHICH THE GOVERNMENT RELIED.

 7    ONE INVOLVED A MAN WHO WAS A LICENSED DEALER IN CALIFORNIA BUT

 8    HE WENT TO AN ARIZONA GUN SHOW AND SOLD GUNS TO PEOPLE AT THE

 9    ARIZONA GUN SHOW IN ARIZONA, AND ALLOWED THEM TO WALK OFF WITH

10    THE GUNS; AFTER HE HAD BEEN TOLD BY THE SHOW'S ORGANIZERS AT

11    THE BEGINNING OF THE SHOW THAT SINCE HE WAS A CALIFORNIA

12    DEALER HE CAN'T ACTUALLY ALLOW PEOPLE -- HE CAN NEGOTIATE BUT

13    HE CAN'T ALLOW THEM TO WALK AWAY FROM THE TABLE WITH A GUN.

14    SO HE WAS CHARGED WITH SALE BY AN UNLICENSED DEALER TO A

15    PERSON WITH A LICENSE IN ONE STATE TO A RESIDENT IN ANOTHER

16    STATE, WHICH IS ILLEGAL.  AND THE GOVERNMENT INTRODUCED

17    EVIDENCE OF THE TWO PRIOR TRANSACTIONS THAT SAME DAY WHERE THE

18    SAME EXACT THING HAPPENED.

19              SO IN THAT CASE THERE IS A COMMONALITY BETWEEN THE

20    ONE FOR WHICH -- THE CHARGE FOR WHICH HE WAS FACING AND THE

21    TWO PRIOR INCIDENTS.  THEY BOTH CAME AFTER A WARNING WHAT HE

22    WAS DOING WAS ILLEGAL -- OR WHAT HE WAS CONTEMPLATING WAS

23    ILLEGAL.  AND THEY BOTH INVOLVED VIOLATIONS OF THE SAME EXACT

24    STATUTE, SO THEY WERE ACTS THAT VIOLATED THE SAME STATUTE.  SO

25    THAT WAS THE COMMONALITY, COMMON ILLEGALITY IN THAT CASE.
```

MARCH 20, 2015

```
 1              THEN THERE WAS THE WASTEWATER CASE THAT THE
 2    GOVERNMENT CITED WHERE A MAN WAS CHARGED WITH DISCHARGING
 3    WASTEWATER IN VIOLATION OF CERTAIN REGULATIONS.  IT WAS FROM A
 4    DRUM CLEANING OPERATION, SO THEY WOULD GET DRUMS BACK FROM
 5    CUSTOMERS -- THEY SOLD CLEANING CHEMICALS, I THINK.  THEY
 6    WOULD GET THE DRUMS BACK FROM THE CUSTOMERS.  THE GUY THAT
 7    STARTED THE BUSINESS HAD THEM IN A CERTAIN PLACE AT FIRST, AND
 8    THEY WOULD WASH OUT THE DRUMS THERE AND THEN JUST DUMP THEM IN
 9    THE SEWERS, EVEN THOUGH THEY HAD BEEN DENIED PERMISSION TO DO
10    IT.  BUT IT WASN'T ILLEGAL.
11              WHAT WAS ILLEGAL WAS AFTER HE MOVED INTO A DIFFERENT
12    LOCATION, AND THEN HE BEGAN DUMPING IN SEWERS IN THAT
13    LOCATION.  THAT WAS IN VIOLATION OF THE LAW.
14              SO THEY WERE ABLE TO USE -- THE GOVERNMENT WAS
15    ALLOWED TO USE THE FACT THAT HE WAS INVOLVED IN THE SETTING UP
16    AND GENERATING THE WASTEWATER AT THIS EARLIER LOCATION, EVEN
17    THOUGH IT WASN'T ILLEGAL, BECAUSE THE SAME COMPANY, THE SAME
18    PROCESS HE SET UP HIMSELF, IT IS THE SAME TYPE OF WASTE, IT IS
19    THE SAME EXACT ONGOING ENTERPRISE, YOUR HONOR, JUST FROM AN
20    EARLIER TIME.
21              SO IN THAT CASE THERE WASN'T COMMON ILLEGALITY, ONE
22    TIME IT WAS ILLEGAL, ONE TIME IT WASN'T, BUT THERE WAS
23    COMMONALITY OF ALL OF THE OTHER FACTUAL ELEMENTS THAT THE
24    DEFENDANT WAS AWARE OF.
25              IN THIS CASE THE PROBLEM IS THAT THERE IS NO
```

MARCH 20, 2015

```
 1   COMMONALITY OF ILLEGALITY.  THIS IS A NORWEGIAN COMPANY
 2   SELLING AN OIL JACKUP RIG TO PARADISE OFFSHORE WHICH
 3   APPARENTLY -- THE EMAILS FROM SAEED SHAMI SAY IT WAS A FRONT
 4   COMPANY FOR AN IRANIAN BUYER.  BUT THAT DOESN'T VIOLATE ANY OF
 5   THE UNITED STATES SANCTIONS, THE UNITED STATES SANCTIONS ARE
 6   FOR EXPORTING FROM THE UNITED STATES TO IRAN.  THE NORWEGIAN
 7   COMPANIES CAN DO WHATEVER THEY LIKE.  THEY CAN VOLUNTARY
 8   COMPLY WITH SANCTIONS OR REFUSE TO SELL THEM TO AREAS THAT ARE
 9   SANCTIONED, BUT THAT DOESN'T MAKE IT ILLEGAL TO COMPLETE THAT
10   TRANSACTION.
11           SECONDLY, IT INVOLVES COMPLETELY DIFFERENT GOODS.
12   IT IS WAS OIL JACKUP RIGS, WHICH ARE WORTH A LOT MORE MONEY,
13   BUT THEY AREN'T RELATED TO ANYTHING LIKE GYROCOMPASSES OR
14   TRIODE TUBES FOR USE IN AIRPORTS THAT ARE IN ISSUE HERE.
15           THEY ARE JUST TOTALLY DIFFERENT PARTIES.  IT IS A
16   COMPLETELY DIFFERENT PERSON THAT IS THE ONE WHO IS SETTING
17   THIS UP.  SO WE DON'T REALLY HAVE COMMONALITY OF PARTICIPANTS
18   OR CIRCUMSTANCES.  WE DON'T HAVE COMMON ILLEGALITY THE WAY THE
19   OTHER TWO CASES DO.  THAT MAKES -- I MADE THE ARGUMENT THAT
20   THAT IS NOT RELEVANT, YOUR HONOR.
21           IF THE COURT DISAGREES WITH ME THAT MAY BE WHAT IT
22   IS, BUT THE FACT IS IF IT IS RELEVANT IT IS EXTREMELY
23   MARGINALLY RELEVANT, WHEREAS THE PREJUDICIAL VALUE IN THIS
24   CASE -- THE POSSIBILITY OF UNFAIR PREJUDICE IS PRETTY HIGH.
25   THE JURY, NUMBER ONE, BASED ON CONFUSION OF THE ISSUES -- SO
```

1    THE JURY -- THE CHARGES HERE INVOLVE ONLY GYROSCOPES, THE

2    NAVIGAT-2100'S AND THE TRIODE TUBES, THE Y-690'S.  AND IF THE

3    JURY IS TOLD THAT MR. GHAHREMAN IS INVOLVED IN A DEAL, A

4    PREVIOUS DEAL, FOR AN IRANIAN -- OIL JACKUP RIGS FROM A

5    NORWEGIAN COMPANY, AND DURING THE COURSE OF THAT DEAL HE WAS

6    TOLD THE END USER WAS IN IRAN, IT WAS A SHELL COMPANY USING

7    PARADISE, THE RISK IS THAT THEY WILL SAY, WELL, IF HE HAD THE

8    INTENT BACK THEN, WHEN IT WAS LEGAL, WHEN IT WASN'T -- HE

9    DIDN'T HAVE ANY OBLIGATION TO STOP GOING THROUGH WITH THAT

10   DEAL, THEN THEY MIGHT JUST TRANSFER THAT INTENT AND SAY, OH,

11   WELL, IF HE KNEW IT WAS ILLEGAL OR HE KNEW THE END USERS WERE

12   IN IRAN THERE OF COURSE HE KNOWS THE END USERS ARE IN IRAN.

13           AND THE PROBLEM IS, YOUR HONOR, THAT WOULDN'T BE

14   BASED ON THE EVIDENCE RELATING TO THE GYROSCOPES AND THE

15   TRIODE TUBES WHICH ARE REALLY AT ISSUE.  SO THERE IS A

16   SUBSTANTIAL DANGER, I THINK, OF THE JURY CONFUSING THE

17   TRANSACTIONS WITH THE TRANSACTIONS FOR WHICH HE IS CHARGED.

18   THE TRANSACTIONS WITH WHICH HE IS CHARGED ARE ILLEGAL, IF THE

19   GOVERNMENT PROVES THEM; THIS TRANSACTION JUST WASN'T.  IT

20   INVOLVED DIFFERENT PEOPLE, DIFFERENT GOODS.

21           **THE COURT:**  MR. HARRIGAN.

22           **MR. HARRIGAN:**  I THINK HE IS TRYING TO RESTRICT THE

23   HOLDING OF IVERSON.  ESSENTIALLY THE NINTH CIRCUIT FOUND THAT

24   THE PRIOR ACTS WERE RELEVANT TO SHOW THE DEFENDANT'S

25   FAMILIARITY WITH THE COMPANY'S INDUSTRIAL WASTE, AND THAT THEY

MARCH 20, 2015

1   WERE INVOLVED IN THE SAME TYPE OF OPERATION PREVIOUSLY IN

2   DUMPING WASTE.  WHETHER IT WAS ILLEGAL THEN DIDN'T MATTER.

3           THAT IS THE SAME THING IT GOES TO HERE.  IT SHOWS

4   MR. GHAHREMAN'S FAMILIARITY WITH THE USE OF FAKE OR FACTITIOUS

5   BUSINESSES.  AND THESE ARE THE WORDS THAT MR. SHAMI USED IN

6   THE EMAIL TO HIM TO AVOID THE SANCTIONS, TO DISGUISE THE TRUE

7   OWNER OF -- OR THE TRUE PURCHASER OF THE GOODS.  EXACTLY WHAT

8   HAS OCCURRED HERE.  AND EXACTLY WHAT IS GOING TO BE, I ASSUME,

9   THE HEART OF THE DEFENSE'S DEFENSE, THAT HE DIDN'T KNOW IT WAS

10  A FRONT COMPANY.

11          SO IT IS NOT TO SHOW THAT BECAUSE HE DID IT THEN,

12  WITH A DIFFERENT COMPANY, HE DID IT HERE; IT IS TO SHOW HE IS

13  FAMILIAR WITH HOW THEY DO IT IN IRAN, BECAUSE HE WAS TOLD BY

14  MR. SHAMI, THIS IS HOW THEY DO IT IN IRAN, THEY USE FAKE OR

15  FACTITIOUS COMPANIES TO GET THESE ITEMS.  IT COULDN'T BE MORE

16  PROBATIVE AND DIRECTLY ON POINT TO WHAT THE GOVERNMENT NEEDS

17  TO PROVE IN THIS CASE.

18          **THE COURT:**  ALL RIGHT.

19          MR. CAMDEN, ANY OTHER TOPICS?

20          **MR. CAMDEN:**  I AM GETTING A LITTLE HOARSE.

21          **MR. JOHNSTON:**  YOUR HONOR, I WILL GIVE MR. CAMDEN A

22  BREAK HERE.

23          I DO WANT TO ADDRESS THE STATEMENTS ISSUE, AND MAKE

24  CLEAR THAT IT APPEARS THE GOVERNMENT DOES INTEND TO USE

25  MR. GHAHREMAN'S POST-ARREST STATEMENTS IN ITS CASE IN CHIEF.

MARCH 20, 2015

```
 1    THEY SAID THAT IN THEIR INITIAL MOTIONS AND REITERATED THAT IN

 2    OUR MOST RECENT ROUND OF BRIEFING.  IF THAT IS THE CASE THEN I

 3    DON'T WANT TO SPEND ANY TIME ON THE MIRANDA ISSUE EXCEPT FOR

 4    HOW THOSE RIGHTS REFLECTED IN THE VOLUNTARINESS.

 5             BUT I WOULD LIKE TO DO ONE THING, IS TO MAKE CLEAR

 6    THAT WHEN I WROTE IN MY MOTIONS THAT THE COURT AGREED THAT

 7    MR. GHAHREMAN MADE UNEQUIVOCAL REQUESTS FOR COUNSEL, WHAT I

 8    WAS CITING WAS THE TRANSCRIPT, PAGE 26, IN WHICH THE COURT DID

 9    ACKNOWLEDGE THAT, QUOTE, MR. GHAHREMAN, QUOTE, DID USE THE

10    WORDS, FOR THIS REASON I NEED A LAWYER, AS HAS BEEN CITED IN

11    THE TRANSCRIPT.

12             THAT IS -- THE COPY I HAVE DOESN'T HAVE PAGE NUMBERS

13    AT THE BOTTOM, BUT IT IS PAGE 26 OF 78, AND THE MIDDLE OF THE

14    PAGE.

15             AND THEN THE COURT CONTINUES.  BUT THEN

16    MR. GHAHREMAN CONTINUES WITH A LONG ANSWER AND HE ENDS AGAIN

17    SAYING, BUT I HAVE TO BRING A LAWYER HERE.

18             SO WHEN I SAY THE COURT AGREED THAT HE MADE

19    UNEQUIVOCAL REQUESTS FOR COUNSEL, I CAN'T IMAGINE ANYTHING

20    MORE UNEQUIVOCAL THAN, I NEED A LAWYER HERE, I NEED TO BRING A

21    LAWYER.

22             SO AS A MATTER OF LAW, MY POSITION IS THAT THAT IS

23    AN UNEQUIVOCAL REQUEST FOR COUNSEL.  AND THAT THE AGENTS HAD

24    NO RIGHT, ONCE HE MADE THAT UNEQUIVOCAL REQUEST, TO INQUIRE

25    FURTHER OR INTEND TO, QUOTE, UNQUOTE, CLARIFY THAT REQUEST.
```

```
1           BUT AGAIN, THE GOVERNMENT SAYS THEY ARE NOT

2   INTRODUCING HIS STATEMENTS IN THEIR CASE IN CHIEF.  I WILL

3   TAKE THEM AT THEIR WORD.  BUT THAT IS WHAT I MEANT.  I JUST

4   DIDN'T WANT THE COURT TO THINK I WAS PUTTING WORDS IN THE

5   COURT'S MOUTH.

6           MY UNDERSTANDING OF THE LAW IS THAT IS ABOUT AS

7   CLEAR AS YOU CAN GET.  JUST LIKE THE NINTH CIRCUIT SAID IN

8   ANDERSON VERSUS TERHUNE, AN EN BANC DECISION.  WHEN SOMEONE

9   SAYS, I PLED THE FIFTH, IT REALLY COULDN'T BE MORE CLEAR THAT

10  THEY ARE SAYING, I INVOKE MY RIGHT TO SILENCE.

11          I THINK HERE WHEN MR. GHAHREMAN SAYS, I NEED A

12  LAWYER HERE, IT JUST CAN'T BE ANY MORE CLEAR.  AND THE AGENTS

13  DIDN'T HAVE A RIGHT TO INQUIRE FURTHER.

14          BUT THEY DID GO ON FURTHER.  AND MY ARGUMENT TODAY

15  IS THAT WHAT THE AGENTS DID, WHETHER IT WAS INTENTIONALLY

16  COERCIVE OR IMPLICITLY COERCIVE OR NEITHER, OR THE INTENT WAS

17  NOT EVEN THERE ON THE PART OF THE AGENTS, THEY DID ULTIMATELY

18  COERCE MR. GHAHREMAN INTO FEELING LIKE HE HAD TO GIVE A

19  STATEMENT.

20          THERE ARE ESSENTIALLY THREE FACTS AT PLAY HERE.  THE

21  FIRST IS -- LET ME BACK UP.

22          MR. GHAHREMAN UNDENIABLY HAD TWO RIGHTS BY THE TIME

23  HE WAS ARRESTED AND TAKEN INTO THE ROOM FOR INTERROGATION BY

24  AGENT HAMAKO AND AGENT PRECIADO.  HE HAD THE FIFTH AMENDMENT

25  RIGHT AGAINST SELF INCRIMINATION AND HE HAD THE SIXTH
```

1    AMENDMENT RIGHT TO THE ASSISTANCE OF COUNSEL.

2            AND THE SUPREME COURT EXPLAINED HOW THOSE RIGHTS ARE

3    AT PLAY IN AN INTERROGATION.  THE RIGHT AGAINST SELF

4    INCRIMINATION IS THE RIGHT TO REMAIN SILENT.  AND IF YOU

5    INVOKE THAT RIGHT TO REMAIN SILENT THE AGENTS CAN'T DO

6    ANYTHING TO BREAK THAT, UNLESS AND UNTIL YOU HAVE SPOKEN WITH

7    A LAWYER, AT WHICH POINT YOU CAN REINITIATE THE CONVERSATION.

8            THE RIGHT TO THE ASSISTANCE OF COUNSEL -- AND THIS

9    IS WHAT I THINK IS IMPORTANT IN THIS CASE -- HAS BEEN

10   INTERPRETED BY THE SUPREME COURT AS NOT JUST THE RIGHT TO

11   ASSISTANCE OF COUNSEL ONCE AND UNTIL THEY ARE APPOINTED TO YOU

12   IF YOU CAN'T AFFORD A COUNSEL, THEY HAVE INTERPRETED IT IN THE

13   CONTEXT OF INTERROGATION AS THE RIGHT TO THE PRESENCE OF

14   COUNSEL DURING QUESTIONING.

15           AND I AM GOING TO GET TO IN A MOMENT WHAT THE COURT

16   AND WHAT MR. HARRIGAN HAS ARGUED WHICH IS, WELL, HE MIGHT HAVE

17   A RIGHT TO A PRESENCE OF COUNSEL IN A HEARING BUT HE DOESN'T

18   HAVE A RIGHT TO DEMAND IN AN INTERROGATION OR AN INTERVIEW AT

19   ANY GIVEN POINT IN TIME.

20           I WANT TO GET TO THAT IN A MOMENT, BUT I WANT TO

21   BACK UP AND UNDERSTAND WHAT MR. GHAHREMAN'S CIRCUMSTANCES WERE

22   AT THE MOMENT HE WAS TOLD, YOU CANNOT HAVE A LAWYER IN HERE

23   NOW.

24           HE WAS FIRST TOLD, THIS IS YOUR OPPORTUNITY.  THIS

25   IS YOUR ONLY OPPORTUNITY, AND THIS IS YOUR BEST OPPORTUNITY TO

MARCH 20, 2015

```
 1    MAKE A BAD SITUATION BETTER FOR YOURSELF.
 2              PARAPHRASING WHAT AGENT HAMAKO SAID.
 3              THE COURT REFERRED TO, AND THE GOVERNMENT HAS
 4    REFERRED MR. TO GHAHREMAN'S BACKGROUND AND CIRCUMSTANCES THAT,
 5    YOU KNOW, HE IS AN EDUCATED MAN, HE APPEARS TO UNDERSTAND WHAT
 6    IS GOING ON.  AND, YES, HE WAS INTELLIGENT ENOUGH TO
 7    APPRECIATE THAT THE AGENTS WERE TELLING HIM THIS WAS HIS ONLY
 8    OPPORTUNITY TO HELP HIMSELF AND TO HELP THE AGENTS FURTHER
 9    THEIR INVESTIGATION.
10              BUT WE ALSO KNOW THAT -- SO I THINK MR. GHAHREMAN
11    NEVER INTENDED TO INVOKE HIS RIGHT TO SILENCE.  HE NEVER
12    INTENDED TO NOT WANT TO TALK TO THOSE AGENTS.  HE WANTED TO
13    TALK TO THEM.  HE UNDERSTOOD, BASED ON WHAT AGENT HAMAKO TOLD
14    HIM, THAT THIS WAS HIS BEST AND ONLY OPPORTUNITY TO HELP
15    HIMSELF TO GET THE BEST DEAL, WHATEVER WORDS AGENT HAMAKO
16    USED.  HE NEVER WANTED TO INVOKE HIS RIGHT TO SILENCE.
17              BUT WHAT HE ALSO APPEARS INTELLIGENT ENOUGH TO
18    UNDERSTAND IS THAT WHEN HE WAS TOLD, YOU HAVE A RIGHT TO
19    COUNSEL, WHICH I THINK THE COURT SAID IN ITS TENTATIVE, THAT
20    THAT WAS AN OPPORTUNITY FOR HIM TO BRING SOMEONE ON HIS SIDE
21    WHO UNDERSTOOD THE LAW.
22              HE TOLD THE AGENTS, LOOK, THE PROSECUTOR, HE KNOWS
23    THE LAW, YOU THE AGENTS, YOU KNOW THE LAW.  I DON'T KNOW THE
24    LAW, I NEED THE HELP OF AN ATTORNEY.
25              AND THEN WE GET INTO A DIALOGUE BACK AND FORTH WHERE
```

```
1    I BELIEVE, AT LEAST ON THOSE TWO OCCASIONS, HE UNEQUIVOCALLY

2    ASKED FOR AN ATTORNEY.  THE AGENTS ARE SAYING, DO YOU REALLY

3    WANT THAT?

4              WHAT HE WAS INVOKING WAS THE RIGHT TO THE PRESENCE

5    OF COUNSEL.

6              IN THE COURSE OF THAT -- AND THIS IS THE SECOND

7    FACTOR THAT I THINK LEADS TO INVOLUNTARY OR COERCED

8    STATEMENTS, WAS HE WAS TOLD, AS SOON AS WE ARE DONE HERE IN

9    THIS ROOM YOU ARE GOING TO JAIL.

10             MR. GHAHREMAN MAY HAVE BEEN INTELLIGENT ENOUGH TO

11   KNOW THE VALUE OF TALKING THEN AT HIS ONLY OPPORTUNITY; HE WAS

12   HUMAN ENOUGH TO AUDIBLY RESPOND IN A VERY PAINED WAY ABOUT

13   LEARNING THAT HE WAS GOING TO JAIL WHEN THIS INTERVIEW WAS

14   DONE.

15             IT CLEARLY AFFECTED HIM.  HE KNOWS HE HAS AN

16   OPPORTUNITY, THAT OPPORTUNITY IS ONLY GOING TO BE NOW.  AND HE

17   KNOWS THAT AS SOON AS THEY ARE DONE HE IS GOING TO JAIL, AND

18   THAT AUDIBLY UPSETS HIM ON THE TAPE THAT YOUR HONOR LISTENED

19   TO.

20             WHERE I THINK IT CROSSES THE LINE AND WHERE I FEEL

21   LIKE HIS STATEMENTS, SUBSEQUENT STATEMENTS, WERE INVOLUNTARY,

22   IS WHEN HE AGAIN ASKED FOR AN ATTORNEY, AND THE AGENTS SAY,

23   LOOK, YOU ARE NOT GOING TO GET APPOINTED AN ATTORNEY UNTIL

24   TOMORROW OR WEDNESDAY.

25             THIS INTERROGATION TOOK PLACE, I BELIEVE, ON A
```

MARCH 20, 2015

1    MONDAY.

2              AND HE SAYS, OKAY.  BUT WHY CAN'T I CALL MY

3    GIRLFRIEND TO GET HER TO HAVE AN ATTORNEY HERE NOW?

4              WHAT AGENT PRECIADO SAID TO HIM WAS BASICALLY TO

5    SAY, YOU DO NOT HAVE THE RIGHT TO HAVE THE PRESENCE OF

6    COUNSEL, BECAUSE WHAT HE TOLD HIM IS, WE WILL NOT LET THE

7    ATTORNEY COME IN HERE NOW.

8              AND MAYBE I SHOULD GET THE EXACT QUOTE.

9              QUOTE, WE ARE NOT GOING TO LET HIM COME IN HERE

10   RIGHT NOW.

11             SPECIAL AGENT HAMAKO:  YES.

12             THEN PRECIADO AGAIN:  NOT ALLOWED TO COME IN HERE.

13             SO EVEN HAD MR. GHAHREMAN BEEN ABLE TO HAVE AN

14   ATTORNEY PRESENT, THEY ARE TELLING HIM -- THEY ARE NOT SAYING

15   THE CONSTITUTION GIVES YOU THE RIGHT TO THE PRESENCE OF

16   COUNSEL, THEY ARE JUST SAYING YOU DON'T HAVE THAT RIGHT, YOU

17   DON'T HAVE THAT OPPORTUNITY.

18             MR. HARRIGAN WOULD HAVE THE COURT ACCEPT WHAT AGENT

19   PRECIADO IS TELLING HIM IS A PRACTICAL REALITY.  WE DON'T KNOW

20   WHAT THE PRACTICAL REALITY IS, BECAUSE HE SAID, IF I CALL MY

21   GIRLFRIEND I MIGHT BE ABLE TO HAVE AN ATTORNEY TO HELP ME HERE

22   NOW.

23             WE DON'T KNOW WHETHER THAT ATTORNEY COULD HAVE BEEN

24   THERE OR NOT; BUT WHAT WE DO KNOW IS AGENT PRECIADO DIDN'T

25   WANT IT TO HAPPEN.  AND HE TOLD HIM, NO, IT WILL NOT HAPPEN,

MARCH 20, 2015

1    YOU CANNOT HAVE AN ATTORNEY HERE.

2            SO HE HAS BASICALLY TOLD HIM, YOU DO NOT HAVE ONE OF

3    THE CONSTITUTIONAL PROTECTIONS THAT YOU ARE ENTITLED TO.  HE

4    IS BEING TOLD THIS IS HIS ONLY OPPORTUNITY TO SPEAK.  AND HE

5    IS BEING TOLD THIS WHEN HE IS FEARING WHAT WILL HAPPEN AT THE

6    END OF THE INTERVIEW IS THAT HE GOES TO JAIL.

7            I DON'T FEEL THAT HE HAD ANY OTHER OPTION AT THAT

8    POINT, NOT WANTING TO INVOKE HIS RIGHT TO SILENCE, NOT WANTING

9    TO LOSE HIS OPPORTUNITY, OTHER THAN TO TALK TO THOSE AGENTS.

10           IT COULD BE -- THE AGENTS COULD SAY IT IS NOT

11   PRACTICAL TO CALL AN ATTORNEY.  LOOK, WE HAVE FIVE MINUTES TO

12   CALL KOORUSH TAHERKHANI AND GET HIM ON THE PHONE AND KEEP THIS

13   THING GOING SO YOU CAN HELP US, AND THEREFORE HELP YOURSELF.

14           I CAN IMAGINE THAT THE AGENTS COULD SAY ANY NUMBER

15   OF THINGS; IT IS NOT OUR POLICY TO PERMIT ATTORNEYS TO COME IN

16   HERE BECAUSE OF THE SENSITIVE NATURE OF THIS INFORMATION WE

17   WOULDN'T WANT AN ATTORNEY TO COME IN HERE WITHOUT -- I DON'T

18   KNOW -- THE NAME OF A NATIONAL SECURITY POLICY.  NONE OF THOSE

19   THINGS WERE SAID.

20           SO WHAT WE ARE LOOKING AT HERE IS WHAT THE AFFECT

21   WAS ON MR. GHAHREMAN.  ALL HE KNEW, THE ONLY REASON THAT THE

22   AGENTS GAVE, THE ONLY THING THAT THE RECORD WOULD SUPPORT IS

23   THAT IF WE HAVE TO WAIT UNTIL WEDNESDAY OR THE NEXT DAY TO GET

24   YOU AN ATTORNEY, THAT WILL BE TOO LATE.

25           THEY DIDN'T SAY ANYTHING TO EXPLAIN WHY HE COULDN'T

MARCH 20, 2015

1    HAVE AN ATTORNEY RIGHT THEN AND THERE.  AND I THINK THAT THAT

2    HAD A DRAMATIC AFFECT ON MR. GHAHREMAN.

3            THAT IS WHEN HE SAID, AFTER INVOKING COUNSEL, THE

4    RIGHT TO COUNSEL, TWICE -- IN MY OPINION UNEQUIVOCABLY -- HE

5    SAID, NO, I WILL TALK, I WANT TO TALK.

6            BECAUSE HE DIDN'T WANT TO GIVE UP THE RIGHT -- HE

7    DIDN'T WANT TO INVOKE THE RIGHT OF SILENCE, HE WANTED TO TALK

8    TO THESE PEOPLE, HE WANTED TO HELP THEM.  HE WANTED TO SEE IF

9    HE COULD HELP HIMSELF.  BUT HE WASN'T GIVEN THE OTHER

10   CONSTITUTIONAL OPTION HE HAD, WHICH IS TO HAVE COUNSEL

11   PRESENT.

12           I CAN IMAGINE A SET OF FACTS WHERE THE AGENT COULD

13   SAY SOMETHING THAT WOULD MAKE SENSE WITH MR. HARRIGAN'S

14   ARGUMENT WHICH IS, YOU KNOW, YOUR CLIENT DOESN'T HAVE A RIGHT

15   TO HAVE AN INTERVIEW AT ANY TIME AT ANY PLACE WITH THESE

16   AGENTS WITH COUNSEL; BUT THAT WASN'T WHAT MR. GHAHREMAN WAS

17   TOLD.  AND IN THE END IT IS WHAT IS THE AFFECT ON HIM.

18           AND THIS IS WHY WE RAISED THIS IN A MOTION TO

19   RECONSIDER BECAUSE PRESTON, THE EN BANC CASE THAT CAME OUT

20   AFTER YOUR HONOR'S DECISION INITIALLY ON THE STATEMENTS, SAYS,

21   WE DON'T NEED TO LOOK AT FIRST WHETHER THE AGENTS IMPLICITLY

22   OR EXPLICITLY ATTEMPTED TO COERCE THE CLIENT, WHAT WE HAVE TO

23   LOOK AT IS THE TOTALITY OF FACTS THAT WERE HERE AT THE TIME

24   AND HOW THEY MAY HAVE AFFECTED HIM OR OVERCOME HIS WILL.

25           HIS WILL WAS TO HAVE AN ATTORNEY PRESENT THERE TO

MARCH 20, 2015

1   SPEAK, AND HE WASN'T GIVEN THAT OPPORTUNITY.  HE WASN'T GIVEN

2   ANY EXPLANATION WHY HE COULDN'T HAVE AN ATTORNEY PRESENT.  SO

3   WHAT HE WAS FACED WITH WAS THE POSSIBILITY TO TAKE ADVANTAGE

4   OF THE OPPORTUNITY, AGENT HAMAKO EMPHASIZED, TRIPLE

5   EXCLAMATION POINTED FOR HIM, HE WAS HAVING TO MAKE THIS

6   DECISION UNDER THE FEAR OF THE MINUTE THEY ENDED THE INTERVIEW

7   HE WOULD GO TO JAIL.  AND HE HAD TO MAKE THIS DECISION WHEN HE

8   WAS TOLD, YOU DO NOT HAVE THE RIGHT TO THE PRESENCE OF

9   COUNSEL, WHICH IS IN DIRECT CONTRADICTION OF OUR CONSTITUTION.

10          IT WAS COERCIVE.  IT WAS INVOLUNTARY.  HE MADE THOSE

11   STATEMENTS BECAUSE HE FELT HE HAD NO OTHER CHOICE.  THAT IS

12   WHY I ASKED THIS COURT TO RECONSIDER.  I DON'T THINK THESE

13   STATEMENTS CAN BE CONSIDERED VOLUNTARY BASED ON WHAT WAS

14   HAPPENING, AND ESPECIALLY WHAT AGENT PRECIADO SAID, WE ARE NOT

15   GOING TO LET YOUR ATTORNEY IN HERE.

16          **THE COURT:**  OKAY.

17          MR. HARRIGAN, ANYTHING?

18          **MR. HARRIGAN:**  YOUR HONOR, UNLESS YOU HAVE

19   QUESTIONS, I THINK YOU HAVE ALREADY RULED ON THIS.  AND THE

20   ARGUMENTS MR. JOHNSTON JUST MADE HE MADE PREVIOUSLY.

21          SO UNLESS THE COURT HAS QUESTIONS, WANTS ME TO

22   DISTINGUISH PRESTON -- WHICH I HAVE ALREADY DONE IN MY

23   PAPERS -- I SUBMIT.

24          **THE COURT:**  ARE THERE ANY OTHER MOTIONS THAT COUNSEL

25   WANT TO ARGUE?

```
 1          MR. HARRIGAN:  YOUR HONOR, ARE YOU REFERRING TO THE
 2   GOVERNMENT?
 3          THE COURT:  ALL COUNSEL, YES.
 4          MR. HARRIGAN:  AS TO YOUR RULING ON THE MILITARY
 5   SERVICE, ALL WE WOULD ASK IS THAT IF THE DEFENDANT DOES TAKE
 6   THE STAND THAT THE COURT WOULD RECONSIDER THAT.  WE AGREE THAT
 7   MAYBE BEING IN THE MILITARY SERVICE ITSELF IS NOT -- COULD BE
 8   PREJUDICIAL AND NOT NECESSARILY THAT PROBATIVE, BUT HE DID
 9   SERVE AS A TECHNICAL DESIGN OFFICER IN THE BANDAR ABBAS
10   SHIPYARD WHICH IS, I THINK, THE RELEVANT PART OF THAT.
11          WE STILL INTEND TO PUT IN EVIDENCE OF HIS EXPERIENCE
12   IN -- WITH SHIPPING COMPANIES, BUT PARTICULARLY BANDAR ABBAS,
13   WHICH IS WHERE, IN FACT, MR. TAHERKHANI WAS AT ONE POINT
14   HELPING OUT WITH THE SHIP, SO I JUST POINT THAT OUT.  I THINK
15   WE HAVE OTHER EVIDENCE, BUT JUST IF HE DOES TAKE THE STAND WE
16   RESERVE TO MAYBE HAVE YOU RECONSIDER THAT RULING.
17          THE COURT:  OKAY.  I WILL RESERVE ON THAT PENDING
18   MR. GHAHREMAN'S DECISION WHETHER OR NOT HE TAKES THE STAND,
19   AND THEN IF THAT DOOR IS OPENED.  IF IT IS NOT, WHETHER A
20   TARGETED INQUIRY COULD BE MADE WITHOUT PERHAPS REVEALING
21   MILITARY SERVICE, BUT JUST THE FACTUAL PARTICULARS OF THAT
22   SERVICE AT THAT TIME, I WILL RESERVE ON THAT.
23          ANY OTHER MATTERS?
24          MR. JOHNSTON:  YOUR HONOR, I JUST ASK THAT YOU
25   RESERVE ON THE ADMISSION OF THE TEXTBOOK.
```

MARCH 20, 2015

1    **THE COURT:**  PENDING REVIEW OF THAT ONE CASE?

2    **MR. JOHNSTON:**  YES, YOUR HONOR.  AND CERTAINLY IF

3    THE GOVERNMENT PRESENTS A FOUNDATION TO SHOW HE DID INDEED

4    READ THAT PART OF THE TEXTBOOK, SO BE IT.  BUT ABSENT SOME

5    ADDITIONAL FOUNDATION, YES, I WOULD LIKE THE OPPORTUNITY TO

6    PRESENT THAT CASE TO YOUR HONOR.

7    **THE COURT:**  OKAY.  ALL RIGHT.  SO LET ME WRAP UP THE

8    HEARING, THEN.

9    AS TO THE 902(11) ISSUE, THAT IS MOOT GIVEN OUR

10   EARLIER DISCUSSION.

11   AS TO THE 803(17), WHOIS ISSUE, I WILL RESERVE.  IT

12   APPEARS THAT IS GOING TO WORK OUT.  THE GOVERNMENT IS GOING TO

13   REDO THE INQUIRY UNDER WHOIS, SHARE THE DOCUMENTS WITH

14   COUNSEL.  I ANTICIPATE THAT WILL WORK OUT, SO I WILL SIMPLY

15   RESERVE ON THAT.

16   ON THE SEARCH WARRANT ISSUE, I WILL SIMPLY STAND ON

17   THE TENTATIVE, AND DENY THE MOTION TO SUPPRESS FOR THE REASONS

18   INDICATED, AS WELL AS THOSE ADVANCED IN THE GOVERNMENT'S

19   BRIEFING AND ORAL ARGUMENT HERE TODAY.

20   ON THE 608 ISSUE INVOLVING AGENT COLE, I AM GOING TO

21   STAND ON THE TENTATIVE HERE, TOO, IN THAT ALL WE HAVE IS A

22   STATEMENT, IT IS A SINGULAR STATEMENT THAT APPEARS.  FOLLOWING

23   THAT STATEMENT WHAT WE KNOW FROM THE EVIDENCE IS THAT CBP

24   CONDUCTED ITS INTERNAL REVIEW, IT APPEARS TO BE A PANEL

25   ANALOGOUS TO INTERNAL AFFAIRS IN A POLICE DEPARTMENT, AND THEY

MARCH 20, 2015

77

1   MADE AN ADVERSE FINDING, AND IT WAS LIMITED TO THE PURSUANT

2   ISSUE.  THERE IS NO FURTHER EVIDENCE OR FINDINGS AS TO FAILING

3   TO PROVIDE INFORMATION OR WITHHOLDING INFORMATION.

4          AND I WOULD FIND THAT UNDER RULE 16 AND BRADY THE

5   GOVERNMENT HAS FULFILLED ITS OBLIGATIONS AND HAS NO FURTHER

6   OBLIGATIONS.  AND IT IS IMPORTANT TO RECOGNIZE THAT IT IS THE

7   GOVERNMENT WHO, AFTER FINDING OUT THIS INFORMATION, REVEALED

8   IT EX PARTE, AND THEN THE COURT PRODUCED IT.  IN LIGHT OF THAT

9   ONE STATEMENT THAT I READ I WANTED TO MAKE SURE WE HAD THE

10  BENEFIT OF A FULL HEARING, AND I AM NOW SATISFIED THAT THE

11  GOVERNMENT HAS FULFILLED ITS OBLIGATIONS, AND THAT IT IS NOT

12  SUBSTANTIATED SUFFICIENT TO ALLOW CROSS-EXAMINATION UNDER 608

13  ON THE ISSUE OF TRUTHFULNESS OR UNTRUTHFULNESS.

14          WITH RESPECT TO THE REQUESTED DISCOVERY FOR BLIND

15  FRONT MAN, I WOULD DENY THE REQUEST, STAND ON THE TENTATIVE.

16          THIS CASE IS VERY DIFFERENT FROM THE BLIND MULE

17  BORDER BUST CASE WHERE THE GOVERNMENT BECOMES AWARE THAT IN

18  FACT THE DRUG TRAFFICKING ORGANIZATIONS DO USE BLIND MULES AND

19  IN FACT THE GOVERNMENT WAS TAKING POSITIONS AT TRIAL THAT

20  THERE ARE NO BLIND MULES.  WE ARE SIMPLY FACTUALLY 180 DEGREES

21  FROM THAT.

22          THIS CASE IS ALSO DIFFERENT FROM THE MARIJUANA CASE,

23  THE STEVENS OR STEVER CASE THAT THE GOVERNMENT CITED WHERE THE

24  GOVERNMENT HAD INFORMATION THAT CARTELS WERE IN FACT IN THAT

25  OREGON AREA WITH MARIJUANA GROVES.  THAT WAS INFORMATION THEY

MARCH 20, 2015

```
 1   HAD, AND IT CERTAINLY COULD HAVE BEEN EXCULPATORY TO THE
 2   DEFENSE.
 3           HERE THERE IS NO SUCH INFORMATION.  AND COUNSEL WILL
 4   BE FREE TO CROSS-EXAMINE THE AGENT, BUT GIVEN THE PROFFER HE
 5   IS GOING TO TESTIFY THAT BLIND FRONT MEN MAY EXIST, BUT HE IS
 6   NOT SPECIFICALLY AWARE OF ANY.
 7           SO FOR THOSE REASONS I WOULD FIND THAT THE
 8   GOVERNMENT HAS MET ITS DISCOVERY OBLIGATIONS, AND WOULD NOT
 9   CHARGE IT WITH THE RESPONSIBILITY OF AFFIRMATIVELY FINDING A
10   SITUATION WHERE THERE IS A BLIND FRONT MAN.  THAT CERTAINLY
11   COULD EXIST BUT THE GOVERNMENT DOESN'T HAVE ANY BRADY OR RULE
12   16 OBLIGATIONS TO DO THAT UNDER THESE CIRCUMSTANCES.
13           ON THE EXPORT SUBPOENAS, I WILL RESERVE ON THAT.  IT
14   APPEARS THIS ISSUE IS GOING TO BE MOOT.  BUT TO THE EXTENT THE
15   DISCOVERED DOCUMENTS WERE USED FOR PROBABLE CAUSE FOR THE
16   SEARCH WARRANTS, I WILL RESERVE ON THAT PENDING FURTHER
17   DISCUSSION, IF ANY, ON THE WHITING CASE THAT MR. CAMDEN CITED.
18   BUT IT APPEARS TO ME AT THIS JUNCTURE THAT THE ISSUE IS MOOT,
19   SO I WOULD DENY IT AS MOOT.  BUT THAT WOULD BE WITHOUT
20   PREJUDICE TO THE DEFENSE REOPENING THE ISSUE.
21           BY WAY OF TENTATIVE, TOO, ON THE PRIVACY ISSUE, IT
22   DOES SEEM TO ME THERE IS NOT A REASONABLE EXPECTATION OF
23   PRIVACY.  I THINK EVERYONE IS AWARE THAT WHAT HAPPENS ON THE
24   INTERNET IS NOT PRIVATE.  THERE IS ALL OF THE COOKIES AND THE
25   SHARING OF INFORMATION FOR ADVERTISING, AND EVERYONE IS AWARE
```

MARCH 20, 2015

1    THAT THESE PRIVATE VENDORS, ISP'S, EVERYONE USES INFORMATION

2    FOR MARKETING AND OTHER BUSINESS PURPOSES, AND THERE IS

3    NOTHING PRIVATE.

4            BY WAY OF TENTATIVE, I WOULD NOT FIND THAT WHEN ONE

5    ACCESSES A WEBSITE OR AN EMAIL, MSN OR GOOGLE OR WHATEVER,

6    THAT I WOULD NOT FIND THAT ONE HAS A REASONABLE EXPECTATION

7    THAT THAT WOULD BE PRIVATE.  FOR EXAMPLE, THAT I COULD

8    REASONABLY EXPECT THAT GOOGLE EMAIL, FOR EXAMPLE, IS NOT --

9    DOESN'T HAVE THE CAPABILITY OF LEARNING WHEN I LOG ON TO

10   GMAIL.

11           ON THE 803(17) ISSUE -- THAT'S THE -- YES, WE

12   ADDRESSED THAT.

13           ON THE TEXTBOOK ISSUE, I WILL RESERVE ON THAT.  THE

14   TENTATIVE, THOUGH, SEEMS TO ME TO MAKE IMMINENT SENSE IN THAT

15   THIS IS IN GHAHREMAN'S APARTMENT.  HE WAS GOING TO SCHOOL, IT

16   IS A BOOK THAT WOULD BE RELATED TO THOSE TOPICS.  THE DOMINION

17   AND CONTROL ISSUE.  I THINK A FAIR INFERENCE CAN BE DRAWN THAT

18   GIVEN HE POSSESSES THE BOOK THAT HE CAN BE -- THE JURY COULD

19   CONCLUDE THAT HE HAD ACCESS TO THAT INFORMATION AND WAS AWARE

20   OF IT.  BUT I WILL RESERVE ON IT.  I WOULD LIKE TO SEE THAT

21   CASE WITH RESPECT TO THE PURSE AND THE LETTER TO SEE IF I AM

22   MISSING SOMETHING.  SO ON THAT PARTICULAR ISSUE I WILL RESERVE

23   AND ASK THAT THE GOVERNMENT NOT REFERENCE IT UNTIL WE HAVE

24   CONCLUDED THAT ISSUE.

25           THE 404(B) ISSUE, I WILL SIMPLY STAND ON THE

MARCH 20, 2015

1    TENTATIVE.  I THINK THE GOVERNMENT HAS ESTABLISHED THAT THAT

2    INCIDENT MEETS THE CRITERIA SET OUT IN THE CASE LAW IN THAT IT

3    IS MATERIAL AND NOT OUTWEIGHED BY UNDUE OR UNFAIR PREJUDICE.

4            ON THE STATEMENTS ISSUE, HERE AGAIN I WILL STAND ON

5    THE TENTATIVE.  WE HAVE DISCUSSED THIS A LOT, AND THE RECORD,

6    I THINK, IS COMPLETE.  I WOULD SIMPLY REITERATE THAT I DO NOT

7    FIND THAT MR. GHAHREMAN MADE AN UNEQUIVOCAL INVOCATION OF HIS

8    RIGHT TO COUNSEL, AND THAT DURING THE BACK AND FORTH THE

9    AGENTS WEREN'T THREATENING AND SAYING, WELL, IF YOU INVOKE

10   THEN WE ARE DONE, AND YOU ARE GOING TO JAIL.

11           THERE IS A LOT OF BACK AND FORTH ABOUT, YOU DO HAVE

12   A RIGHT TO HAVE COUNSEL.  IF THAT IS WHAT YOU WANT TO DO THEN

13   WE ARE REQUIRED NOT TO ASK ANY MORE QUESTIONS.

14           THAT'S THE ESSENCE, AS I AM LOOKING AT PAGE 11 OF

15   THE TRANSCRIPT.  THERE IS A LOT OF THIS DISCUSSION GOING ON.

16   AND THEN IT BECOMES CLEAR THAT WHAT THE AGENTS ARE SAYING IS,

17   IF YOU WANT AN ATTORNEY, EVEN IF HIS GIRLFRIEND CALLS AN

18   ATTORNEY, THAT WILL TAKE TIME.  THE REALITY, AS WE KNOW, IS NO

19   ATTORNEY IS GOING TO SHOW UP AND SAY OKAY, LET'S CONTINUE THE

20   INTERVIEW, GO AHEAD AND TALK.

21           THAT WOULD NEVER HAPPEN.  EVEN IF AN ATTORNEY WAS

22   CONTACTED AND THERE IN 20 MINUTES, HE OR SHE WOULD HAVE TO

23   SAY, I DON'T HAVE ANY IDEA WHAT THIS CASE IS ABOUT.  I NEED TO

24   SIT DOWN WITH MR. GHAHREMAN, I NEED TO FIND OUT.

25           IN THE VERY FEW CASES WHERE COUNSEL AGREE TO ALLOW

MARCH 20, 2015

1    THEIR CLIENTS TO TALK TO LAW ENFORCEMENT, IT IS VERY CAREFULLY

2    ORCHESTRATED AND IT IS VERY TACTICAL.  SO WHAT THE AGENTS, IN

3    LIGHT OF THAT, WHAT IS JUST THE REALITY, IS SAYING, IS IF YOU

4    INVOKE THEN WE HAVE AN OBLIGATION NOT TO ASK ANY MORE

5    QUESTIONS.  AND THE PRACTICAL REALITY IS YOU CAN'T HAVE AN

6    ATTORNEY HERE IMMEDIATELY AND WE CAN CONTINUE THIS DISCUSSION.

7          IT JUST, NUMBER ONE, IT WILL TAKE TOO MUCH TIME TO

8    GET AN ATTORNEY THERE.  NUMBER TWO, THE AGENTS AREN'T TELLING

9    THIS TO MR. GHAHREMAN, BUT THEY KNOW THAT IF AN ATTORNEY IS

10   GOING TO ALLOW MR. GHAHREMAN TO TALK IT IS CERTAINLY NOT GOING

11   TO BE RIGHT THEN, IT IS GOING TO BE SOMETIME MUCH, MUCH LATER.

12         AND IT SEEMS TO ME, LOOKING AT THE BACK AND FORTH

13   HERE OF THE DISCUSSION, THAT IS THE GIST OF THE CONVERSATION.

14   AND MR. GHAHREMAN IS UNDERSTANDING THAT HE DOES HAVE A RIGHT

15   TO COUNSEL.  IF HE INVOKES THEN THAT WILL BE HIS CHOICE, BUT

16   IT WILL BE AN END TO THE INTERVIEW, FOR PRACTICAL REASONS AS

17   WELL AS THE LEGAL REASON THAT THE AGENTS WOULD BE OBLIGATED

18   NOT TO INQUIRE FURTHER.

19         WITH THAT, I WILL STAND ON THE TENTATIVE ON ALL OF

20   THE OTHER MOTIONS THAT WERE NOT EXPRESSLY ARGUED.

21         I THINK WE HAVE ADDRESSED ALL OF THE ISSUES.

22         I WOULD LIKE TO MEET AGAIN BECAUSE I WANT TO GO

23   THROUGH THE INDICTMENT AND PREPARE SOMETHING THAT I WILL READ

24   TO THE JURY.  I WOULD NOT BE GIVING THE INDICTMENT TO THE

25   JURY, SO IT WOULD BE A ONE-TIME READING OR OVERVIEW OF THE

MARCH 20, 2015

1  INDICTMENT. AND WE CAN, DURING THE NEXT MEETING, DISCUSS ANY

2  OTHER ISSUES THAT MIGHT REMAIN.

3          THE TRIAL IS COMING UP QUICKLY, APRIL 13. SO I

4  WOULD PROPOSE THAT WE MEET AGAIN, PERHAPS ON APRIL 10. IS

5  THAT A GOOD DAY? THE FRIDAY BEFORE. WE CAN MEET AT 1:30.

6  PROBABLY BE A BRIEF MEETING, BUT IF THERE ARE ANY ISSUES WE

7  CAN ADDRESS THEM THEN.

8          **MR. HARRIGAN:** THAT IS FINE WITH THE GOVERNMENT,

9  YOUR HONOR. THAT WOULD WORK.

10         I THINK MR. JOHNSTON WANTED TO RAISE AN ISSUE ABOUT

11 JURY SELECTION, THOUGH. HE APPROACHED ME, AND WANTS TO RAISE

12 THAT WITH THE COURT, WHICH HE MAY WANT TO TRY TO RAISE

13 BEFOREHAND.

14         **MR. JOHNSTON:** WE KEPT EVERYBODY WELL OVER THE LUNCH

15 HOUR. THE 10TH WOULD BE A FINE TIME. IT MIGHT GIVE ME A

16 CHANCE TO TALK WITH MR. HARRIGAN.

17         I DO HAVE SOME CONCERNS ABOUT RECENT NEWS, RECENT

18 EVENTS BETWEEN THE UNITED STATES AND IRAN THAT VERY WELL MAY

19 COME TO A HEAD JUST BEFORE THIS TRIAL BEGINS. WHILE WE DON'T

20 HAVE TIME TO DO A FORMAL QUESTIONNAIRE TO BE SENT OUT TO

21 HUNDREDS OF PROSPECTIVE JURORS NOW, I AM CONSIDERING A

22 PROPOSAL WHERE WE MIGHT HAVE SOMETHING AS SIMPLE AS A ONE-PAGE

23 QUESTIONNAIRE THAT COULD BE PROVIDED TO THE JURORS WHO ARE

24 GOING TO BE SELECTED TO COME TO YOUR COURTROOM ON THE

25 13TH JUST AS A MATTER OF SCREENING FOR PEOPLE WHO MAY HAVE

MARCH 20, 2015

1   VERY STRONG THOUGHTS ABOUT IRAN, THESE ISSUES.  THEY ARE

2   COMING UP NOW, THEY ARE IN THE MEDIA.

3           MAYBE WE CAN DISCUSS HOW MANY JURORS WE NEED TO COME

4   UP SO WE GET OUR 12, PLUS OUR ALTERNATES.

5           AND I CERTAINLY WOULD REQUEST -- I DIDN'T DO THIS

6   FORMALLY IN MY MOTIONS BUT I THINK THIS IS CERTAINLY A CASE

7   WHERE VOIR DIRE BY THE ATTORNEYS IS APPROPRIATE, AND PROBABLY

8   MORE THAN THE USUAL 10 MINUTES THAT YOU MIGHT HAVE IN A BORDER

9   BUST OR ANOTHER CASE.  I AM NOT ASKING FOR A DAY OR SOMETHING

10  LONG, BUT I AM ASKING FOR AN ADEQUATE OPPORTUNITY TO EXPLORE A

11  LOT OF ISSUES THAT I THINK WILL BE SIGNIFICANT WITH THE JUROR

12  POOL.

13          **THE COURT:**  I AM NOT OPPOSED TO A ONE-PAGE

14  QUESTIONNAIRE.  I THINK, THOUGH, THAT WE CAN HANDLE IT THE

15  OLD-FASHIONED WAY BY SIMPLY QUESTIONING THE JURY.  WE CAN SEAT

16  32.

17          AND I THINK, BY WAY OF TENTATIVE, I WOULD PROVIDE

18  FOR 20 MINUTES EACH TO VOIR DIRE.  AND IF WE NEED MORE TIME,

19  THEN I CAN MAKE ADJUSTMENTS.  BUT IT MAY VERY WELL BE THAT --

20  I MEAN, IT COULD BE A LONG SESSION TRYING TO PICK A JURY WHERE

21  WE HAVE A LOT OF OPINIONATED JURORS; BUT IT COULD VERY WELL BE

22  THAT JURORS WILL COME IN AND RECOGNIZE WHAT'S GOING ON BETWEEN

23  OUR COUNTRIES IS A TOTALLY SEPARATE ISSUE, AND THEY CAN

24  COMPARTMENTALIZE IT AND VIEW THIS CASE ON ITS MERITS.

25          SO WE WON'T KNOW UNTIL WE GET OUR GROUP HERE, BUT I

MARCH 20, 2015

```
 1   THINK 20 MINUTES, AT LEAST INITIALLY, TO INQUIRE AND FERRET

 2   OUT THOSE POTENTIAL HOT BUTTON ISSUES WOULD BE FAIR.

 3           ANY OTHER MATTERS AT THIS TIME?

 4           MR. HARRIGAN:  NO, YOUR HONOR.

 5           THE COURT:  OKAY.  WE WILL MEET AGAIN FRIDAY, THE

 6   10TH, AT 1:30.  THANK YOU.

 7           MR. JOHNSTON:  THANK YOU, YOUR HONOR.

 8

 9                          *   *   *

10           I CERTIFY THAT THE FOREGOING IS A CORRECT
             TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
11           IN THE ABOVE-ENTITLED MATTER.

12           S/LEEANN PENCE                    6/17/2015

13           LEEANN PENCE, OFFICIAL COURT REPORTER   DATE

14

15

16

17

18

19

20

21

22

23

24

25
```

MARCH 20, 2015