UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____

UNITED STATES OF AMERICA,              )
            PLAINTIFF,                 )   CASE NO. 13CR4228-DMS
                                       )
                                       )   SAN DIEGO, CALIFORNIA
                                       )FRIDAY, APRIL 10, 2015
                                       )   1:30 P.M. CALENDAR
ARASH GHAHREMAN,                       )
            DEFENDANT.                 )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS HEARING


INTERPRETER:                    ASLAN ASLANIAN


REPORTED BY:                    LEE ANN PENCE,
                                OFFICIAL COURT REPORTER
                                UNITED STATES COURTHOUSE
                                333 WEST BROADWAY ROOM 1393
                                SAN DIEGO, CALIFORNIA 92101

```
COUNSEL APPEARING:

FOR PLAINTIFF:           LAURA E. DUFFY,
                         UNITED STATES ATTORNEY
                         BY:   SHANE P. HARRIGAN
                               TIMOTHY D. COUGHLIN
                         ASSISTANT U.S. ATTORNEYS
                         880 FRONT STREET
                         SAN DIEGO, CALIFORNIA 92101

FOR DEFENDANT            FEDERAL DEFENDERS OF SAN DIEGO, INC.
GHAHREMAN:                     BY:   ELLIS M. JOHNSTON
                                     JOSEPH S. CAMDEN
                         TRIAL ATTORNEYS
                         225 BROADWAY, SUITE 900
                         SAN DIEGO, CALIFORNIA 92101
```

```
 1      SAN DIEGO, CALIFORNIA - FRIDAY, APRIL 10, 2015 - 1:30 P.M.
 2                              *   *   *
 3            THE CLERK:  NO. 10 ON CALENDAR, 13CR4228, UNITED
 4      STATES OF AMERICA VERSUS ARASH GHAHREMAN; ON FOR STATUS
 5      HEARING.
 6            MR. HARRIGAN:  GOOD AFTERNOON, YOUR HONOR.  SHANE
 7      HARRIGAN AND TIMOTHY COUGHLIN ON BEHALF OF THE UNITED STATES.
 8            THE COURT:  GOOD AFTERNOON.
 9            MR. JOHNSTON:  GOOD AFTERNOON, YOUR HONOR.  TRIP
10      JOHNSTON OF FEDERAL DEFENDERS, WITH JOE CAMDEN, ALONG WITH
11      MR. GHAHREMAN.  HE IS PRESENT ON BOND.
12            THE COURT:  GOOD AFTERNOON.
13            MR. JOHNSTON:  MR. GHAHREMAN IS BEING ASSISTED BY A
14      FARSI LANGUAGE INTERPRETER OVER THE PHONE, IF YOU ARE
15      WONDERING WHY HE IS HOLDING THAT.
16            THE COURT:  YES.  ALL RIGHT.  THANK YOU.
17            WE ARE HAVING A STATUS CONFERENCE.  THERE AREN'T
18      MANY REMAINING ISSUES.  THERE IS A RENEWED MOTION IN LIMINE TO
19      EXCLUDE THE FINDINGS FROM THE SEARCH WARRANT WITH RESPECT TO
20      THE TEXTBOOK THAT WAS FOUND IN MR. GHAHREMAN'S RESIDENCE.
21            HERE, UNLESS COUNSEL WISH TO ARGUE, THE RULING WOULD
22      BE TO DENY THE REQUEST TO EXCLUDE THE EVIDENCE.
23            FIRST, IT SEEMS TO ME THE CASE CITED BY
24      MR. GHAHREMAN, THE POY CASE, I BELIEVE, IS DISTINGUISHABLE.
25      AND THE GOVERNMENT'S BRIEFING, I THINK, IS PERSUASIVE IN THAT
```

APRIL 10, 2015

1    THE TEXTBOOK WAS FOUND IN MR. GHAHREMAN'S HOME WHERE HE HAS

2    DOMINION AND CONTROL OVER IT.   HIS CV INDICATES A CLASS HE WAS

3    TAKING.   THAT CLASS, AND THE MATERIALS PROVIDED PURSUANT TO

4    THAT CLASS, PROVIDE THAT THE TEXTBOOK IN QUESTION IS REQUIRED

5    READING.   AND SO CERTAINLY THERE IS A FAIR INFERENCE TO BE

6    MADE THAT MR. GHAHREMAN NOT ONLY HAD DOMINION AND CONTROL OVER

7    THE TEXTBOOK, BUT GIVEN THAT IT WAS REQUIRED READING FOR A

8    COURSE HE WAS TAKING IT CAN BE FAIRLY ARGUED, AND

9    CIRCUMSTANTIALLY SO, THAT HE READ RELEVANT PORTIONS OF THE

10   BOOK THAT ARE RELEVANT TO THE CHARGES HERE.

11          IS IT SUBMITTED ON THAT, OR DO YOU WISH TO ARGUE

12   THAT MOTION?

13          **MR. CAMDEN:**  I WILL SUBMIT ON THE BRIEFING, YOUR

14   HONOR.

15          **THE COURT:**  ALL RIGHT.

16          ON THE READING OF THE INDICTMENT, A SUPERSEDING

17   INDICTMENT.   THE INDICTMENT IS LENGTHY, AND THERE ARE MANY

18   FACTUAL ALLEGATIONS THAT ARE SET OUT IN THE OVERT ACTS.   I

19   REALLY TRIED TO PARE THEM DOWN.   I THINK EVEN AS PARED DOWN IT

20   IS GOING TO BE A LONG READING.   BUT I ATTEMPTED TO CUT OUT

21   ALLEGATIONS THAT WERE INFLAMMATORY, AND STREAMLINE WHAT WOULD

22   BE RELEVANT OVERT ACTS, BUT THE JURY IS -- OR THE PROSPECTIVE

23   VENIRE IS GOING TO BE GETTING PLENTY OF INFORMATION TO GET

24   INSIGHT INTO THE CASE, GIVEN WHAT I AM PROPOSING TO READ.

25          IS THERE ANY OBJECTION?

APRIL 10, 2015

1          **MR. HARRIGAN:**  NOT ON BEHALF OF THE UNITED STATES,

2     YOUR HONOR.

3          **MR. JOHNSTON:**  WELL, YOUR HONOR, I JUST STARTED

4     LOOKING THROUGH IT.  I APPRECIATE THE COURT'S EFFORTS, BUT

5     HONESTLY HAVEN'T -- I HAVE GOTTEN THROUGH PAGE 5.  I GUESS ALL

6     I CAN SAY IS I WOULD BE HAPPY TO REVIEW IT OVER THE WEEKEND,

7     IF THERE IS ANYTHING THAT I NOTICE MAYBE I CAN BRING THAT UP

8     BEFORE WE CALL IN THE JURY.

9          **THE COURT:**  YES.

10         **MR. HARRIGAN:**  AND MAYBE COUNSEL CAN WORK OUT

11    CONCERNS FOR HIM.

12         **THE COURT:**  VERY GOOD.  WE CAN MEET, PERHAPS, AT

13    8:45 TOMORROW -- I MEAN -- I AM SORRY MONDAY.

14         **MR. JOHNSTON:**  YOU JUST GAVE YOUR CLERK A HEART

15    ATTACK.

16         **THE COURT:**  WE HAVE A PRESCREENED JURY, DON'T WE?

17         **THE CLERK:**  NO.  I TOLD THEM IT WOULD BE TWO WEEKS,

18    BUT THEY DIDN'T DO A SCREENING ON THEM.  BUT WE HAVE EXTRA

19    JURORS.

20         **THE COURT:**  HOW MANY JURORS?

21         **THE CLERK:**  I ORDERED 50.

22         **THE COURT:**  50.  OKAY.  THAT SHOULD BE PLENTY.

23         WE WILL USE THE TRADITIONAL METHOD WHERE WE SEAT 32

24    PROSPECTIVE JURORS, QUESTION ALL OF THEM.  EXERCISE PEREMPTORY

25    CHALLENGES IN THE ABSENCE OF THE JURY.  SO WE WILL RECESS THEM

```
 1    INTO THE HALLWAY AND THEN COUNSEL CAN EXERCISE PEREMPTORIES.
 2           AND WE WILL GO IN, LET'S SEE, FIVE ROUNDS WHERE THE
 3    GOVERNMENT WILL EXERCISE -- OR SIX ROUNDS.  THE GOVERNMENT
 4    WILL EXERCISE ONE PEREMPTORY EACH.  MR. GHAHREMAN WILL
 5    EXERCISE TWO PEREMPTORIES EACH ROUND.  GO BACK AND FORTH UNTIL
 6    ALL PEREMPTORIES ARE EXHAUSTED, IF NECESSARY, SIX AND 10,
 7    RESPECTIVELY.
 8           WE WILL SEAT TWO ALTERNATES, AND SO THEY WILL BE
 9    SEATED AS JURORS 29, 30, 31 AND 32.  AND EACH SIDE WILL HAVE
10    ONE PEREMPTORY AS TO THOSE ALTERNATES, WHICH WILL LEAVE US
11    WITH TWO.
12           MR. JOHNSTON:  THE ALTERNATES WILL BE PICKED FROM
13    THE JURORS AFTER?
14           THE COURT:  YES.
15           MR. JOHNSTON:  AFTER THE PEREMPTORIES HAVE BEEN
16    EXERCISED, THOSE WILL BE EXERCISED, YOU ALLOW AN ADDITIONAL
17    STRIKE.
18           THE COURT:  RIGHT.  SO THE PEREMPTORIES AS TO THE 12
19    DELIBERATING JURORS, THE FOCUS WILL BE ON JURORS 1 THROUGH 28.
20    THE ALTERNATES WILL BE 29 THROUGH 32, AND EACH SIDE WILL HAVE
21    ONE PEREMPTORY.
22           VOIR DIRE, I THINK WE COVERED THAT, 15 MINUTES EACH.
23           MR. JOHNSTON:  I THINK WE SAID 20, YOUR HONOR.
24           THE COURT:  DID I SAY 20?
25           MR. HARRIGAN:  15 MINUTES IS FINE FOR THE
```

APRIL 10, 2015

1    GOVERNMENT.  I LIKE TO TALK, YOUR HONOR.

2              **THE COURT:**  IF I SAID 20 I WILL STAND BY THAT.

3              **MR. JOHNSTON:**  JUST TO BE CLEAR, YOUR HONOR.  FOR

4    VOIR DIRE, I MEAN, THERE HAVE BEEN RECENT EVENTS IN THE NEWS

5    CONCERNING IRAN, THE VERY SANCTIONS THAT ARE IN QUESTION IN

6    THIS CASE.  ALL I AM ASKING FOR IS AN ADEQUATE OPPORTUNITY TO

7    ASSESS WHETHER ANY JURORS HAVE STRONG OPINIONS, ONE WAY OR THE

8    OTHER.

9              I HAVE SPOKEN WITH MR. HARRIGAN ABOUT CONCERNS THE

10   GOVERNMENT MAY HAVE, WHICH ARE SLIGHTLY DIFFERENT THAN MINE.

11   BUT IT HAS BEEN IN THE NEWS.  I THINK IT IS AN ISSUE THAT

12   NEEDS TO BE EXPLORED.  AND I JUST WANT AN ADEQUATE OPPORTUNITY

13   TO DO THAT, SEEING AS THIS CASE IS COMING RIGHT IN THE MIDDLE

14   OF THESE EVENTS.

15             **THE COURT:** YES.  THAT IS FINE.

16             **MR. HARRIGAN:**  YOUR HONOR, MAY I INQUIRE.  DEFENSE

17   COUNSEL FIRST ON VOIR DIRE AND GOVERNMENT SECOND?

18             **THE COURT:** YES.

19             ON JURY VOIR DIRE QUESTIONS, THE GOVERNMENT HAS

20   PROPOSED SOME IN ITS TRIAL MEMORANDUM.  DO YOU HAVE ANY

21   QUESTIONS YOU WANT THE COURT TO ASK, OR ARE YOU CONTENT TO

22   ADDRESS ANY CONCERNS YOU HAVE ON YOUR OWN VOIR DIRE?

23             **MR. JOHNSTON:**  I AM HAPPY TO ADDRESS THOSE SORT OF

24   CONCERNS ABOUT IRAN IN THE NEWS EVENTS ON MY OWN.  BEYOND THE

25   COURT'S GENERAL QUESTIONS, I DON'T KNOW OF ANY I WANT

APRIL 10, 2015

1  NECESSARILY THE COURT TO ASK.  BUT GIVEN SUFFICIENT TIME, I

2  THINK I CAN COVER ALL OF THE BASES.

3          **THE COURT:**  ALL RIGHT.

4          **MR. HARRIGAN:**  YOUR HONOR, I MIGHT SUGGEST THE COURT

5  AT LEAST FASHION ONE QUESTION AS TO -- I DIDN'T INCLUDE

6  THAT -- AS TO THE ISSUE OF IRAN THAT HAS BEEN IN THE NEWS.

7  THAT MAY ALLOW -- MAKE IT QUICKER FOR US TO ADDRESS THAT

8  ISSUE.  BECAUSE, REALLY, MY QUESTIONS WOULD BE LIMITED TO,

9  DESPITE WHATEVER VIEWS YOU HAVE DO YOU UNDERSTAND -- ARE YOU

10  ABLE TO SET THOSE ASIDE, FOLLOW THE LAW AS THE JUDGE INSTRUCTS

11  YOU, THOSE TYPE OF QUESTIONS.

12          **THE COURT:**  YES.

13          **MR. HARRIGAN:**  I HAVE THE SAME CONCERNS -- DIFFERENT

14  CONCERNS BUT WE HAVE THE SAME CONCERNS GETTING AN IMPARTIAL

15  JURY.  AND THAT MAY HELP MR. JOHNSTON, TOO, IN TERMS OF IF THE

16  COURT RAISES IT FIRST.

17          **THE COURT:**  YES.

18          ARE WE HEARING TESTIMONY FROM ONE OF THE DEFENDANTS

19  IN THIS CASE?

20          **MR. HARRIGAN:**  YES, WE ARE, YOUR HONOR, FROM ERGUN

21  YILDIZ.

22          **THE COURT:**  ALL RIGHT.

23          **MR. HARRIGAN:**  AND, YOUR HONOR, MR. COUGHLIN

24  ACTUALLY PREPARED JURY INSTRUCTIONS I NEEDED -- AND I BROUGHT

25  HIM LATE IN THE CASE.  I WAS HOPING TO GET THEM FILED THIS

APRIL 10, 2015

```
 1    MORNING, I JUST HAVEN'T HAD THE OPPORTUNITY.  I STILL HOPE TO
 2    GET THOSE FILED THIS AFTERNOON.
 3              THE COURT:  THAT WOULD BE TERRIFIC.
 4              MR. HARRIGAN:  I AM GOING TO DO MY BEST TO GET THAT
 5    DONE.
 6              THE COURT:  THEN IF THERE ARE ANY DEFENSE
 7    INSTRUCTIONS YOU ARE FREE TO FILE THOSE EX PARTE TO THE EXTENT
 8    ANY REVEAL YOUR DEFENSE.
 9              ON THE TIME ESTIMATE, THE GOVERNMENT IS PROJECTING
10    FOUR DAYS?
11              MR. HARRIGAN:  YES, YOUR HONOR.
12              THE COURT:  THAT WOULD INCLUDE JURY SELECTION AND
13    THEN OPENING AND THE GOVERNMENT'S CASE IN CHIEF?
14              MR. HARRIGAN:  YES, YOUR HONOR.
15              IT IS ALL DEPENDENT UPON CROSS-EXAMINATION.  THE
16    MOST LENGTHY WITNESSES -- I THINK WE HAVE NINE WITNESSES.  I
17    TOLD MR. JOHNSTON PROBABLY THE TWO MOST LENGTHY ARE AGENT
18    HAMAKO, THE CASE AGENT, AND REALLY AGENT COLE.  AND WITH HIM I
19    EXPECT THERE IS GOING TO BE PROBABLY OVER TWO DOZEN EMAILS AND
20    PROBABLY ABOUT 16 EXCERPTS OF -- 16 OR 17 EXCERPTS FROM
21    MEETINGS, WHICH MAY BE MORE THAN ONE EXCERPT FROM TELEPHONE
22    CONVERSATIONS.  SO IT DOES TAKE SOME TIME TO GO THROUGH THAT.
23    BUT THOSE ARE THE TWO LONGEST WITNESSES.  THEN WE HAVE THE
24    COOPERATOR.  DEPENDING ON -- I DON'T THINK OUR DIRECT WILL BE
25    TOO LONG, BUT THERE MAY BE LONGER CROSS-EXAMINATION.  TWO
```

APRIL 10, 2015

```
 1   HOURS ON DIRECT FOR HIM.

 2              THE COURT:  OKAY.

 3              MR. HARRIGAN:  AND AT LEAST -- PROBABLY LONGER FOR

 4   BOTH AGENT HAMAKO AND AGENT COLE, I THINK, WILL TAKE LONGER

 5   THAN TWO HOURS, BASED ON MY PRETRIAL MEETINGS WITH THEM.  BUT

 6   I AM TRYING TO SHORTEN IT DOWN.

 7              THE COURT:  YES.

 8              IF A DEFENSE IS PRESENTED, DO YOU HAVE ANY TIME

 9   ESTIMATE?

10              MR. JOHNSTON:  YOUR HONOR, I WOULD SAY LESS THAN TWO

11   DAYS.

12              THE COURT:  OKAY.

13              MR. JOHNSTON:  IS THE COURT GOING TO BE DARK ON

14   FRIDAY?

15              THE COURT:  YES.

16              MR. JOHNSTON:  SO IF WE STICK TO OUR ESTIMATES THE

17   GOVERNMENT WOULD BE THROUGH THURSDAY, THEN THE DEFENSE CASE

18   WOULD BEGIN MONDAY?

19              THE COURT:  YES.  SO WE SHOULD BE ABLE TO INSTRUCT

20   AND ARGUE BY TUESDAY OR WEDNESDAY, AT THE LATEST, IF THERE IS

21   A DEFENSE.

22              MR. JOHNSTON:  AGAIN, IT WOULD DEPEND ON

23   CROSS-EXAMINATION, BUT PROBABLY WEDNESDAY AT THE LATEST.  THE

24   CASE SHOULD BE SUBMITTED BY THE END OF THAT WEEK, NO PROBLEM.

25              THE COURT:  ALL RIGHT.  I WILL TELL THE JURY THAT WE
```

APRIL 10, 2015

1  WILL ASK THEM TO BE AVAILABLE FOR TWO WEEKS, SO THROUGH A WEEK

2  FROM FRIDAY.  AND THAT WE ARE PROJECTING TO INSTRUCT AND ARGUE

3  PERHAPS BY WEDNESDAY OF NEXT WEEK, BUT THAT THAT IS A SOFT

4  TIME ESTIMATE.  AND, OF COURSE, I WILL KEEP THEM POSTED AS WE

5  GO.

6          I WOULD ALSO LIKE TO USE THE 8:30 TO 2:00 SCHEDULE.

7  SO FOR MONDAY WE WOULD HAVE A TRADITIONAL DAY OF 9:00 TO 4:30

8  WITH THE JURY, WITH LUNCH FROM 12:30 TO 2:00.  THEN WE WILL

9  START AN 8:30 TO 2:00 SCHEDULE, WITH TWO 15-MINUTE BREAKS.

10          **MR. HARRIGAN:**  AND SNACKS FOR THE ATTORNEYS?

11          **THE COURT:**  YES.  I TELL THE JURORS THAT THEY ARE

12  WELCOME TO BRING SOMETHING, CONSUME THAT ON THE RECESS.  AND

13  THEY SEEM TO ENJOY THAT SCHEDULE VERY MUCH.  WE HAVE FIVE

14  HOURS OF TRIAL TIME AND THEN THEY ARE ON THEIR WAY AT 2:00,

15  AHEAD OF THE TRAFFIC.

16          WITH RESPECT TO EXHIBITS, ARE THERE A LOT OF

17  EXHIBITS?

18          **MR. HARRIGAN:**  YES, YOUR HONOR, THERE ARE.  WE PLAN

19  TO PREPARE A BINDER FOR DEFENSE COUNSEL AND FOR THE COURT, AND

20  ALSO AT LEAST SOME -- WE WILL HAVE SEPARATE BINDERS IN TERMS

21  OF SOME OF THE WITNESSES IN TERMS OF THE EMAILS.

22          OUR PRESENTATIONS TO THE EMAILS AND ANY PHONE

23  CONVERSATIONS ARE GOING TO BE THROUGH SANCTION.  ANY HARD

24  EXHIBITS WE HAVE WE ARE ALSO GOING TO -- WE WILL HAVE THE HARD

25  EXHIBITS FOR THE JURY, BUT WE WILL HAVE THAT ON SANCTION.  SO

APRIL 10, 2015

```
 1    THE ANSWER IS, WE ARE PUTTING TOGETHER BINDERS THAT WE WILL

 2    HAVE FOR THE COURT ON MONDAY MORNING.

 3              THE COURT:  ALL RIGHT.  BUT THE EXHIBITS WILL COME

 4    RIGHT UP, AND THE JURORS WILL BE ABLE TO SEE THEM ON THE

 5    MONITORS?

 6              MR. HARRIGAN:  YES, YES.

 7              THE COURT:  OKAY.

 8              MR. HARRIGAN:  WE ONLY HAVE, IN TERMS OF STUFF WE

 9    CAN'T SHOW THROUGH SANCTION, IS THE ACTUAL GYROCOMPASS BOXES

10    THEMSELVES.

11              THE COURT:  ALL RIGHT.

12              MR. HARRIGAN:  WE WILL HAVE A LIST OF THE EXHIBITS.

13    WE HAVE TALKED TO DEFENSE COUNSEL TODAY.

14              THE COURT:  IS THERE A WITNESS LIST?

15              MR. HARRIGAN:  YES, IT IS INCLUDED IN OUR TRIAL

16    MEMO.  THE COOPERATING WITNESS IS ERGUN YILDIZ.  WE JUST

17    DIDN'T PUT HIS NAME IN THERE.

18              THE COURT:  I DON'T REMEMBER SEEING THE WITNESS

19    LIST.

20              THE CLERK:  PAGE 37 OF THE GOVERNMENT'S TRIAL BRIEF.

21              THE COURT:  OKAY.  I GOT IT.  PAGE 37.

22              ON THE JURY SELECTION, I WILL DO THE STANDARD VOIR

23    DIRE.  I WILL COVER THE AREAS, GENERALLY, WITH RESPECT TO IRAN

24    AND ANY ISSUES THERE THAT WOULD BE PROBLEMATIC FOR ANY JUROR.

25              WE WILL HAVE A JURY QUESTIONNAIRE, THE STANDARD ONE
```

APRIL 10, 2015

1  WITH THE 10 QUESTIONS THAT THE 32 PROSPECTIVE JURORS WILL RUN

2  THROUGH, AND THEN I WILL OPEN IT UP FOR ATTORNEY VOIR DIRE.

3        DURING TRIAL I WOULD ASK THAT COUNSEL STAY OUT OF

4  THE WELL EXCEPT FOR VOIR DIRE, OPENING AND CLOSING.  I ASK

5  THAT COUNSEL QUESTION FROM THE PODIUM, AND NOT APPROACH THE

6  WITNESS ON THE STAND UNLESS NECESSARY TO ORIENT HIM OR HER TO

7  AN EXHIBIT AND THEN RETURN TO THE PODIUM.

8        ON OBJECTIONS, I DO REQUEST THAT COUNSEL SIMPLY GIVE

9  ME THE WORD "OBJECTION" AND THE LEGAL GROUND, AND THEN I WILL

10  RULE ON IT, IF NECESSARY.  I LIKE TO AVOID SIDEBAR, BUT IF

11  NECESSARY WE CAN ADDRESS MATTERS AT SIDEBAR.

12        ARE THERE ANY OTHER HOUSEKEEPING MATTERS, OR ANY

13  OTHER ISSUES WE NEED TO ADDRESS AT THIS TIME?

14        **MR. JOHNSTON:**  YOUR HONOR, THE DEFENSE HAS BEEN

15  TRYING TO WORK WITH THE GOVERNMENT ON SOME STIPULATIONS THAT

16  MIGHT MAKE THE TRIAL GO FASTER, AND I THINK WE ARE GOING TO BE

17  IN AGREEMENT ON THOSE.  I DON'T KNOW IF THE GOVERNMENT WANTED

18  TO DISCUSS IN PARTICULAR IN COURT BUT IT SOUNDS LIKE WE ARE

19  GETTING AGREEMENT.

20        **MR. HARRIGAN:**  AND I DON'T KNOW IF THE COURT WANTS A

21  WRITTEN STIPULATION OR WE JUST STIPULATE.  THERE ARE AREAS

22  THAT I COVERED WITH —— THAT I THINK WE HAVE RESOLVED, TO LET

23  THE COURT KNOW, IS ON THE WHATISMYIP OR THE MAXMIND SEARCH.

24  WE ENDED UP USING THE WHATISMYIP.

25        AND I WILL TALK WITH DEFENSE COUNSEL SOME MORE

APRIL 10, 2015

1    BECAUSE I ACTUALLY HAVE BEHIND THE EXHIBITS THAT ACTUAL

2    SEARCH, WHETHER HE WANTS ME TO SHOW THAT OR NOT.  ALL I TEND

3    TO ASK IS, DID YOU DETERMINE THE ORIGINATING IP.  WE HAVE THE

4    EMAIL IN ITS NATIVE FORMAT, BEHIND THAT CONTAINS SOME METADATA

5    WHICH JUST CONTAINS THE EXACT SAME EMAIL WITH THE IP.  AND

6    BEHIND THAT WOULD BE A SCREEN SHOT OF THE SEARCH.

7            WE DO IT FOR, I THINK, ABOUT 15 EMAILS.  THEY ARE

8    GENERALLY EMAILS FROM KOORUSH TO ANOTHER PERSON OR -- SO IT IS

9    NOT FOR EVERY EMAIL.  SO I WILL TALK WITH DEFENSE COUNSEL.  WE

10   REACHED A STIPULATION THE WHATISMYIP IS OKAY.  AND I AM OKAY

11   IF HE DOESN'T WANT ME TO SHOW THE ACTUAL SEARCH, BUT I WILL

12   TALK WITH DEFENSE COUNSEL.

13           THE OTHER ISSUE WAS -- WHICH BECAME MOOT, THEY

14   AGREED TO STIPULATE, WAS ON THE CUSTODIAN OF RECORDS FOR THE

15   EMAIL SEARCH WARRANT CONTENT SEARCH WARRANTS.  OUR INTENT IS

16   TO SIMPLY USE THE ATTACHMENT B, NOT THE ORIGINAL DISK, AND

17   SHOW THOSE TO THE AGENT.  WE ARE NOT GOING TO PUT THOSE INTO

18   EVIDENCE UNTIL JUST BEFORE THE IDENTIFICATION, AND THEN WE

19   PLAN TO USE APPROXIMATELY, LIKE I SAID, 20 EMAILS FROM THOSE.

20           AND TO THE EXTENT THAT DEFENSE COUNSEL WANTS TO USE

21   EMAILS FROM THOSE, OR ANY OTHER, THEY CAN IDENTIFY -- WE

22   AGREED TO THE FOUNDATION WITHOUT ANY FURTHER NECESSITY OF ANY

23   TESTIMONY FROM ANY OF THE INTERNET SERVICE PROVIDERS OR

24   ANYONE.  EXCEPT, YOU KNOW, THERE HAS TO BE SOME RELEVANCE TO

25   THAT, SO THE FOUNDATIONAL AUTHENTICITY.

APRIL 10, 2015

1        I THINK THE ONLY OTHER THING THAT WE HAD TALKED

2    ABOUT IS A COUPLE OF THE EMAILS HAVE A FARSI TRANSLATION.  I

3    PROVIDED THOSE TRANSLATIONS TO DEFENSE COUNSEL.  IT IS

4    LIMITED, BUT THEY HAVE AGREED TO STIPULATE TO THE FARSI

5    TRANSLATIONS.

6        MY INTENT IS TO SHOW THE AGENT THAT EMAIL WITH THE

7    ANNOTATIONS WHICH CONTAIN BOTH THE FARSI AND ENGLISH

8    TRANSLATION BELOW THAT.  AND THAT'S THE THIRD STIPULATION WE

9    REACHED, I BELIEVE.

10        **THE COURT:**  ON ANY VIDEO WHERE THERE IS

11    COMMUNICATION BACK AND FORTH, THERE ARE TRANSCRIPTS THAT ARE

12    PREPARED WE WILL GIVE TO THE JURY TO ASSIST THEM?

13        **MR. HARRIGAN:**  YEAH.  WHAT WILL HAPPEN -- IT IS

14    ACTUALLY LOADED IN SANCTION.  WHAT WE HAVE DONE IS WE HAVE

15    CREATED SEPARATE CD'S FOR EACH OF THE CONVERSATIONS THAT WE

16    PLAN TO USE, AND THEY ARE JUST EXCERPTS.

17        I THINK WITH MOST OF THIS THEY HAVE THE ENTIRE

18    TRANSCRIPTS FOR THOSE, ALTHOUGH WE ARE NOT PLAYING THE ENTIRE.

19    THERE MAY BE A COUPLE WHERE WE DIDN'T PREPARE ENTIRE

20    TRANSCRIPTS.

21        BUT THOSE TRANSCRIPTS WE DO HAVE, IT WILL BE FOR THE

22    UNDERCOVER AGENT.  HE WILL TESTIFY HE HAS REVIEWED THE

23    TRANSCRIPTS WITH THE EXCERPTS AND THEY ACCURATELY PORTRAY.  I

24    WILL MOVE -- GENERALLY, I DON'T KNOW WHAT THE COURT'S PRACTICE

25    IS.  MY INTENT WAS NOT TO HAVE THEM GO BACK TO THE JURY.  IF

APRIL 10, 2015

16

```
 1   THEY NEED TO HEAR THEM THEY WILL OBVIOUSLY SEE IT AGAIN ON
 2   SANCTIONS WITH -- BUT THERE WILL BE A RECORD SO THE COURT
 3   REPORTER DOES NOT HAVE TO TRANSCRIBE THE TRANSCRIPTIONS, SO WE
 4   HAVE THOSE.
 5        YOU HAVE THE TRANSCRIPTS NOW.  I DIDN'T ASK FOR A
 6   STIPULATION OF THOSE.  MY AGENT WILL TESTIFY HE REVIEWED THEM,
 7   SO I DON'T KNOW IF THAT IS NECESSARY.
 8        MR. JOHNSTON:  YOUR HONOR, THERE ARE A COUPLE OF
 9   THINGS.  I WILL START WITH THE LAST THING FIRST, THE
10   TRANSCRIPTS.
11        WE DON'T AGREE TO THE ACCURACY OF THE TRANSCRIPTS IN
12   THEIR ENTIRETY.  I THINK THERE ARE A FEW TRANSCRIPT ENTRIES
13   THAT I THINK DO NOT ACCURATELY REFLECT THE WORDS THAT WERE
14   SAID FOR A NUMBER OF REASONS, FROM ACCENTS TO WORDING TO
15   BACKGROUND NOISE.
16        I DON'T HAVE A PROBLEM WITH THE GOVERNMENT PLAYING
17   THE TRANSCRIPT WITH ANY AUDIO OR VIDEO RECORDING, BUT WE
18   CERTAINLY DON'T AGREE THEY ARE ENTIRELY ACCURATE.  I MEAN, FOR
19   THE MOST PART THEY ARE.  I THINK THERE ARE SEVERAL INSTANCES
20   WHERE, HAVING REVIEWED IT MYSELF, I DON'T THINK IT SAYS WHAT
21   THE TRANSCRIBER SAID.
22        THE COURT:  SO THE TRANSCRIPT WE ARE REFERRING TO
23   ACTUALLY APPEARS ON THE SCREEN.
24        MR. HARRIGAN:  IT IS LOADED IN SANCTIONS, YES.  BUT
25   WE HAVE A HARD COPY, TOO.
```

APRIL 10, 2015

17

```
 1              THE COURT:  THERE IS A HARD COPY?
 2              MR. HARRIGAN:  THERE IS A HARD COPY FOR THE RECORD
 3    FOR ON APPEAL.
 4              THE COURT:  WHAT I USUALLY DO, WHEN WE HAND THE HARD
 5    COPY TO THE JURORS I TELL THEM THAT THAT IS NOT EVIDENCE, IT
 6    IS SIMPLY AN AID TO ASSIST THEM IN LISTENING TO THE VIDEO OR
 7    WHAT IS PROJECTED ON THE SCREEN.  AND THAT THE VIDEO ITSELF
 8    WOULD BE ADMITTED INTO EVIDENCE, BUT THE JURY WOULDN'T BE
 9    GETTING THE HARD COPY OF THE TRANSCRIPT.
10              SO THEY WOULD BE ADMONISHED THAT IT IS NOT EVIDENCE,
11    IT IS SIMPLY AN AID TO ASSIST THEM AS THEY LISTEN.
12              I GUESS THE ONE POTENTIAL ISSUE IS IF AT THE TIME OF
13    DELIBERATIONS THEY WANT TO PLAY THE VIDEO THEN THE
14    TRANSCRIPTION WOULD APPEAR AGAIN, BUT THEY WOULD HAVE THAT
15    ADMONITION IN MIND.
16              MR. JOHNSTON:  NO, I UNDERSTAND THAT.  I MEAN,
17    HOPEFULLY, AT THE END OF THE TRIAL ANY IMPORTANT DISCREPANCIES
18    HAVE BEEN IDENTIFIED AND THEY WILL HAVE TO RELY ON THEIR OWN
19    EYES AND EARS TO DETERMINE IN FACT WHAT WAS SAID OR DONE.  SO
20    I WOULD HAVE A CONCERN WITH THEM TAKING ANY FORM OF TRANSCRIPT
21    BACK TO DELIBERATIONS.
22              I DON'T NECESSARILY HAVE AN OBJECTION TO THEM USING
23    THE TRANSCRIPT AS PART OF THE SANCTION PROGRAM THAT THE
24    GOVERNMENT HAS, BUT JUST WITH THE FULL KNOWLEDGE THAT THE
25    DEFENSE HAS NOT NECESSARILY AGREED THAT IS AN ACCURATE -- AN
```

APRIL 10, 2015

1    ENTIRELY ACCURATE TRANSCRIPTION OF THE WORDS THAT WERE SAID.

2         **MR. HARRIGAN:**  AND I WOULD LET THE COURT KNOW THAT

3    THE AGENTS SAY IT IS REASONABLY ACCURATE.  THERE MAY BE -- I

4    CAN TALK TO MR. JOHNSTON, TOO.  MAYBE THERE ARE CERTAIN AREAS

5    HE HAS CONCERNS HE CAN POINT OUT TO ME, AND I CAN SEE WHAT WE

6    CAN DO ABOUT THOSE.  BUT WHEN PEOPLE TALK OVER EACH OTHER --

7    AND THAT HAPPENS ON SOME OCCASIONS -- YOU KNOW, THERE IS

8    PROBLEMS.  AND MR. GHAHREMAN DOES HAVE A HEAVY ACCENT.  SO

9    THERE IS A POSSIBILITY THERE ARE SOME TRANSCRIPTIONS THAT

10   AREN'T ENTIRELY ACCURATE, SOME PORTIONS.

11        **THE COURT:**  ALL RIGHT.  OKAY.

12        **MR. JOHNSTON:**  DAVID MILLS IS A PRETTY FAST TALKER

13   HIMSELF.

14        BUT, YOUR HONOR, GOING BACK TO THE ORIGINAL POINT

15   MR. HARRIGAN BROUGHT UP, EMAILS.  WE ARE NOT GOING TO OBJECT

16   AND WE ARE GOING TO STIPULATE TO THE FOUNDATION FOR THOSE

17   EMAILS.  HOWEVER, WE CERTAINLY RESERVE THE RIGHT TO OBJECT ON

18   OTHER GROUNDS, 403, WHATEVER, HEARSAY GROUNDS MAY EXIST.  BUT

19   WE ARE NOT GOING TO BOTHER THEM TO PUT ON SOMEBODY TO

20   AUTHENTICATE THE EMAILS COME FROM, SAY, YAHOO OR HOTMAIL.

21        **THE COURT:**  ALL RIGHT.

22        **MR. JOHNSTON:**  THE ONLY OTHER ISSUE I WOULD LIKE TO

23   ADDRESS -- I THINK IT IS A POINT THAT I DISCUSSED WITH MR.

24   HARRIGAN BUT WE DON'T NECESSARILY AGREE ON THE RESULT.

25        THE GOVERNMENT HAS INDICATED THAT MR. YILDIZ WILL

APRIL 10, 2015

1  TESTIFY AGAINST MR. GHAHREMAN, AND TO DATE WHAT I HAVE

2  RECEIVED IN THIS CASE IS A LITTLE UNUSUAL, IN MY EXPERIENCE,

3  FOR A COOPERATING WITNESS.

4          I RECEIVED A LETTER ON MARCH 19TH FROM MR. COUGHLIN

5  SUMMARIZING FOUR MEETINGS THAT MR. YILDIZ HAD WITH THE

6  GOVERNMENT, I KNOW AT LEAST TWO OF WHICH MR. COUGHLIN WASN'T

7  PRESENT AT.

8          AND ORDINARILY WHAT I WOULD GET WOULD BE A REPORT OF

9  INVESTIGATION FROM AN AGENT WHO ATTENDED THESE MEETINGS THAT

10  WOULD REFLECT WHAT THE STATEMENTS WERE; AND HERE I HAVE A

11  BASIC SUMMARY OF WHAT TRANSPIRED.  AND I HAVE ASKED MR.

12  HARRIGAN, HE HAS INDICATED THAT NO REPORTS WERE PREPARED FROM

13  THESE MEETINGS, BUT SOMEHOW THESE MEETINGS WERE DOCUMENTED TO

14  ALLOW MR. COUGHLIN, WHO WASN'T EVEN PRESENT IN AT LEAST TWO OF

15  THEM, TO MEMORIALIZE IT.

16          MY CONCERN IS, IF THERE ARE NOTES OF WHAT WAS SAID

17  AT EACH MEETING, THIS IS IMPORTANT, NOT JUST FOR BRADY BUT FOR

18  GIGLIO.  MR. HARRIGAN SAID, LOOK, HE WASN'T HONEST WITH US AT

19  THE FIRST MEETING, WE WROTE THAT IN THERE.  HE WAS HONEST WITH

20  US IN THE NEXT MEETING, AND THEN HE PROVIDED SOME OTHER

21  INFORMATION IN ANOTHER MEETING.

22          MY CONCERN IS, I NEED TO KNOW WHAT THAT INFORMATION

23  IS.  WHAT IS IT THAT HE SAYS IN ONE MEETING VERSUS WHAT HE

24  SAYS IN ANOTHER.  AND LET'S SAY HE SAYS SIX FACTS THAT WOULD

25  BE DAMAGING TO MR. GHAHREMAN IN THE FIRST MEETING, AND IN THE

APRIL 10, 2015

```
 1   NEXT ONE THERE IS AN ADDITIONAL SIX FACTS, AND IN THE NEXT ONE
 2   THERE IS AN ADDITIONAL 12 FACTS.
 3          IT IS IMPORTANT FOR ME TO KNOW WHAT IT IS HE HAS
 4   SAID, WHETHER IT CAN BE CHARACTERIZED AS INCULPATORY OR
 5   EXCULPATORY, BECAUSE ADDITIONAL FACTS AT ADDITIONAL MEETINGS
 6   CAN GO TO GIGLIO, CAN UNDERCUT HIS CREDIBILITY WHEN HE IS
 7   PROVIDING MORE INFORMATION.
 8          SO I HAVE ASKED MR. HARRIGAN TO SHARE ANY NOTES THAT
 9   HE OR HIS AGENTS TOOK FROM THOSE MEETINGS, AND I DON'T THINK
10   HE HAS AGREED TO RELEASE THOSE TO ME.
11          AND EVEN IF THERE WEREN'T NOTES I THINK I AM
12   ENTITLED TO SOME DISTILLATION OF WHAT IT WAS THAT WAS SAID IN
13   MORE DETAIL THAN THIS LETTER.  AND I AM ASKING THE COURT FOR
14   THAT, AS A MATTER OF DISCOVERY, UNDER GIGLIO OR BRADY.
15          THE COURT:  ARE THERE ANY NOTES?
16          MR. HARRIGAN:  THERE ARE NO AGENT NOTES, YOUR HONOR,
17   FROM THOSE.  I TALKED TO MR. JOHNSTON AT LENGTH ABOUT THIS, AD
18   NAUSEAM YESTERDAY ABOUT WHAT OCCURRED.
19          THE INITIAL MEETINGS WITH MR. YILDIZ, AS I EXPLAINED
20   WHAT WAS CONTAINED IN THE LETTER IS, HE READILY ADMITTED THAT
21   ONCE HE GOT TO THE UNITED STATES AND TALKED WITH MR. GHAHREMAN
22   AND THEN WAS AT THAT MEETING WHERE THEY TALK ABOUT
23   REPACKAGING, REMOVING SERIAL NUMBERS FROM THAT, HE KNEW THIS
24   WAS GOING TO IRAN.  HOWEVER, HE TOLD US THAT WHILE -- BEFORE
25   HE CAME OUT HE HAD NO -- HE DID NOT KNOW THAT THIS STUFF WAS
```

APRIL 10, 2015

1    DESTINED FOR IRAN.

2            AND WE SPENT A LOT OF TIME CONFRONTING HIM WITH IT.

3    THERE WASN'T A LOT OF DISCUSSION, OTHER THAN HIS CONSULTATION

4    WITH HIS ATTORNEY, BECAUSE WE DIDN'T BELIEVE HIM AT THE TIME.

5    WE SAID UNLESS HE IS COMPLETELY TRUTHFUL THAT WE WEREN'T GOING

6    TO -- HE WAS GOING TO GET NO CREDIT FOR COOPERATION, HE COULD

7    PLEAD GUILTY.  THAT IS WHAT -- THE SUM AND SUBSTANCE OF WHAT

8    HAPPENED THROUGH THAT.

9            WE THEN MET AGAIN WHERE, AFTER TALKING TO HIS

10   ATTORNEY, SAID, LOOK, HE IS WILLING TO SAY THE FOLLOWING

11   THINGS.  AND WE PREPARED A PLEA AGREEMENT, WHICH WE PREPARED A

12   FACTUAL BASIS, WHICH IS VERY DETAILED.

13           SO HE HAS INFORMATION THAT HE LIED TO US AT

14   POST-ARREST, HE LIED TO US AT THE INITIAL MEETING.  I DON'T

15   KNOW WHAT MORE DETAIL HE WANTS FROM THAT.  HE CAN QUESTION

16   MR. GHAHREMAN -- I MEAN MR. YILDIZ ABOUT HIS STATEMENTS.  I

17   JUST DON'T HAVE ANY OTHER INFORMATION.

18           HE WANTS REPORTS, BUT I DON'T HAVE REPORTS.  HE

19   EXPLAINED WHY DIDN'T WE HAVE REPORTS DONE AT THE TIME BECAUSE

20   THOSE INITIAL MEETINGS WHERE HE WAS LYING TO US WE REALLY

21   WEREN'T GOING TO WASTE OUR TIME WITH HIM.  IT WAS MORE JUST

22   CONVINCING HIM, IF YOU WANT TO COOPERATE YOU HAVE TO BE

23   TRUTHFUL.

24           **THE COURT:**  YOUR REPRESENTATION IS THAT NOTES WERE

25   NOT PREPARED AT ANY OF THE DEBRIEFS?

APRIL 10, 2015

```
 1              MR. HARRIGAN:  NO.  I DOUBLE CHECKED WITH THE AGENTS
 2   TODAY.
 3              THE COURT:  WHEN YOU SAY NO, THAT MEANS THERE WERE
 4   NO NOTES.
 5              MR. HARRIGAN:  I AM GOING TO DOUBLE CHECK BECAUSE HE
 6   WAS TALKING ABOUT THE INITIAL.
 7              ON THE FUTURE MEETINGS THAT MR. COUGHLIN HAD --
 8   BECAUSE I WAS IN AND OUT OF THOSE MEETINGS -- WE HAD AGENTS
 9   PRESENT.  BUT I DON'T BELIEVE THEY TOOK NOTES DURING THOSE
10   MEETINGS.
11              MR. COUGHLIN:  THAT IS CORRECT.
12              MY SITUATION WAS, I WAS COMING INTO THE CASE NEW.  I
13   SIMPLY HAD AREAS THAT I JUST WANTED HIM TO TALK ABOUT.  AND I
14   JUST HAD A LIST OF THE AREAS I WAS GOING TO COVER, HIS
15   BACKGROUND, HIS EMPLOYMENT, THINGS LIKE THAT.
16              IT WAS ALL TRIAL PREP FOR ME.  I WAS DEALING WITH A
17   WITNESS WHO HAD ENTERED A PLEA, AND I WAS GETTING READY FOR
18   TRIAL.  I SIMPLY WAS INTERVIEWING HIM, IF YOU WILL, SO THAT I
19   HAD SOME UNDERSTANDING OF WHAT HE WAS TALKING ABOUT.
20              AGAIN, I HAD AN OUTLINE OF THE AREAS THAT I WAS
21   GOING TO COVER WITH HIM, SO I AM HAPPY TO PROVIDE COUNSEL WITH
22   THE OUTLINE.  BUT I NEVER SHOWED IT TO THE DEFENDANT HIMSELF.
23              AND AGAIN -- ON TUESDAY OF THIS WEEK WE MET AGAIN
24   FOR THE FINAL TIME IN TERMS OF HIS PREPARATION.  A GOOD DEAL
25   OF THE TIME SPENT WITH THE WITNESS WAS GOING OVER THE
```

1   VIDEOTAPED MEETING THAT COUNSEL ALREADY HAS.  JUST, YOU KNOW,

2   DO YOU RECALL THAT THIS WAS TALKED ABOUT?  DO YOU RECALL THAT

3   THAT WAS TALKED ABOUT?

4          AGAIN, THOSE ARE THE KINDS OF THINGS THAT WAS SIMPLY

5   TRIAL PREP.  AND IN CONNECTION WITH THAT I HAVE TWO OUTLINES

6   THAT I USED THAT I AM HAPPY TO TURN OVER TO COUNSEL.  BUT,

7   AGAIN, THEY ARE NOT NOTES BY THE AGENTS.  IN FACT I THINK THE

8   AGENTS THAT ACTUALLY BROUGHT OVER THE DEFENDANT, MR. YILDIZ,

9   ON TWO OF THE OCCASIONS ARE NOT INVOLVED IN THE CASE AT ALL,

10  THEY SIMPLY WERE TRANSPORTING SO THAT HE WOULD BE THERE.  HIS

11  ATTORNEY WAS PRESENT AT ALL MEETINGS.  AND THAT IS HOW IT WAS

12  CONDUCTED.

13         **THE COURT:**  MR. JOHNSTON HAS MENTIONED THAT YOU

14  PREPARED A SUMMARY OF INTERVIEWS WHERE YOU WEREN'T PRESENT?

15         **MR. COUGHLIN:**  I DID.  I TALKED WITH MR. HARRIGAN

16  AND WITH THE AGENT, AND PREPARED, BASICALLY, A GENERAL SUMMARY

17  BASED ON HIS COMMENTS IN CONNECTION WITH WHAT HAD OCCURRED AT

18  THOSE MEETINGS.  AGAIN, THE MAIN THING IS EXACTLY WHAT

19  MR. HARRIGAN HAS INDICATED.

20         I THINK THE BIG -- OUR PERSPECTIVE ON THIS IS THAT

21  HE HARDLY KNOWS MR. GHAHREMAN AT ALL, HE MET HIM FOR THE FIRST

22  TIME WHEN HE WAS HERE.  SO HE WASN'T DEALING WITH HIM AS A

23  REGULAR BASIS.  HIS DEALINGS, IF ANYTHING, WERE WITH

24  MR. TAHERKHANI IN CONNECTION WITH THEM BEING IN DUBAI.

25         SO THE ONE MEETING THEY HAD WITH THE AGENT, IT IS A

```
 1    TWO-HOUR VIDEOTAPED MEETING.  SO ALL OF THE AREAS THAT I WAS
 2    TALKING TO HIM ABOUT, FOR THE MOST PART, TOOK PLACE DURING
 3    THAT.  EVERYTHING ELSE WAS JUST BACKGROUND ON HIM.  SO THAT IS
 4    THE KIND OF INFORMATION.
 5            AGAIN, I USED THE PLEA AGREEMENT JUST TO GO BACK
 6    OVER THOSE.  AND THAT IS VERY DETAILED, AS MR. HARRIGAN SAID,
 7    SO I CAN UNDERSTAND HOW HE COULD SAY IN HIS OWN WORDS EACH OF
 8    THE POINTS THAT IS MADE IN THE PLEA AGREEMENT.  SO A GOOD DEAL
 9    OF THE INFORMATION WAS JUST REPETITIOUS.
10            I WENT OVER THE INITIAL R.O.I. THAT WAS DONE WHEN HE
11    WAS INTERVIEWED AND BASICALLY FOUND OUT, JUST AS MR. HARRIGAN
12    HAS INDICATED, THAT WHAT HE SAID WERE ALL PARTIAL TRUTHS, NOT
13    COMPLETE TRUTHS.  AND NOW HE IS INDICATING THAT THAT WAS A
14    PARTIAL TRUTH, HERE IS THE WHOLE TRUTH.  THAT IS HOW HE
15    CHARACTERIZED IT.
16            **THE COURT:**  WILL YOU INQUIRE SPECIFICALLY OF THE
17    AGENTS AND VERIFY WHETHER OR NOT THEY HAVE NOTES SO THAT THERE
18    CAN BE A REPRESENTATION ON THE RECORD THAT IF IN FACT THEY
19    STATE THEY HAVE NO NOTES THAT --
20            **MR. COUGHLIN:**  I WILL DO SO, YOUR HONOR.
21            **THE COURT:**  ALL RIGHT.
22            IF THERE ARE NOTES, THEN IT SEEMS TO ME THEY WOULD
23    NEED TO BE PRODUCED FORTHWITH.  SO I WOULD ASK COUNSEL TO
24    INQUIRE OF THE AGENTS THIS AFTERNOON, AND IF THEY EXIST TO GET
25    THEM OVER TO MR. JOHNSTON IMMEDIATELY.
```

APRIL 10, 2015

1        ARE THERE ANY OTHER AREAS?

2        **MR. JOHNSTON:**  JUST TO FOLLOW UP ON THAT.  AND I

3    APPRECIATE THE COURT'S RULING ON THAT.

4        BUT TO THE EXTENT THAT NOTES WEREN'T TAKEN, I JUST

5    WANT A MEMORIALIZATION, NOT OF WHAT THE GOVERNMENT'S OUTLINE

6    IS OR THEIR WORK PRODUCT OF HOW THEY INTEND TO GO FORWARD WITH

7    THE PRESENTATION OF THIS WITNESS, I WANT TO KNOW WHAT

8    MR. YILDIZ HAS SAID ON EACH AND EVERY OCCASION.

9        AN EXAMPLE HERE IS THAT IT IS ALLEGED IN THE LETTER

10   ON THE NIGHT OF JUNE 12 MR. YILDIZ AND MR. GHAHREMAN MET.

11   MR. GHAHREMAN, QUOTE, ASSURED YILDIZ THAT EVERYTHING WAS OKAY.

12   THEY -- MEANING DAVID MILLS -- WERE NOT LAW ENFORCEMENT.  AND

13   THEN EXPLAINED HOW HE KNEW THIS.

14       THERE IS NOTHING THERE TO TELL ME WHAT THE DETAILS

15   ARE OR WHAT MR. YILDIZ WILL SAY MR. GHAHREMAN SAID HOW HE KNEW

16   THESE PEOPLE WEREN'T AGENTS.  I DON'T KNOW IF HE SAID

17   SOMETHING DIFFERENT IN THE NEXT MEETING ABOUT WHAT

18   MR. GHAHREMAN SAID, BUT IT WOULD BE THOSE DIFFERENCES I CAN

19   ONLY KNOW BY KNOWING EXACTLY WHAT HE SAID IN EACH MEETING THAT

20   WOULD MAKE A DIFFERENCE AND RISE TO THE LEVEL OF IMPEACHMENT

21   MATERIAL UNDER GIGLIO.  AND I JUST SIMPLY DON'T HAVE THAT.

22       I APPRECIATE THAT MR. HARRIGAN SAYS, HE WAS LYING TO

23   US IN THE BEGINNING AND NOW HE IS TELLING THE TRUTH, AND THAT

24   MR. JOHNSTON CAN ASK MR. YILDIZ ON THE STAND ABOUT WHAT

25   HAPPENED, BUT THAT IS THE PROBLEM.  I AM ASKING SOMEONE WHO

APRIL 10, 2015

1    HAS ADMITTEDLY LIED BEFORE ON THE STAND WHAT HAPPENED.  I WANT

2    TO KNOW WHAT THE GOVERNMENT HAS GLEANED FROM HIM TO THE EXTENT

3    THAT IS ADDITIONAL, DIFFERENT OR OTHERWISE IMPEACHMENT.

4            **MR. HARRIGAN:**  WELL, TO RESPOND TO THE ONE QUESTION

5    THAT HE HAD ABOUT WHAT DID HE SAY, HE SAID, I ASKED THE AGENTS

6    AND IN THIS COUNTRY, WHEN YOU ARE A U.S. CITIZEN, THEY HAVE TO

7    TELL YOU IF YOU ARE WORKING FOR THE GOVERNMENT.

8            AND I THINK HE LATER ADDED THAT IN FACT HE TOLD

9    MR. YILDIZ, I ACTUALLY TALKED TO AN ATTORNEY ABOUT THAT.

10           SO THAT IS THE REASON.

11           NOW, THAT IS INCULPATORY, YOUR HONOR.  THE BASIC

12   SUBSTANCE PROVIDED TO THEM, I THINK WE HAVE GONE BEYOND -- AS

13   WE HAVE WELL IN THIS CASE -- BEYOND WHAT IS REQUIRED UNDER

14   RULE 16, GIGLIO, JENCKS AND EVERYTHING ELSE.

15           AND I UNDERSTAND HIS NEED TO WANT TO KNOW

16   EVERYTHING, BUT THERE HAS TO BE A BASIS IN LAW.  WE WANT TO

17   HELP HIM OUT AND MAKE SURE HE HAS EVERYTHING HE NEEDS, BUT, TO

18   ME, I UNDERSTAND SPECIFIC DETAILS -- MORE SPECIFIC DETAILS

19   THAT COVER THE SAME AREA AND THAT AREN'T CONTRADICTORY ARE NOT

20   IMPEACHMENT MATERIAL.  OKAY.

21           HE MAY ARGUE THAT IT IS.  AND HE WILL HAVE THE

22   OPPORTUNITY TO ASK HIM ON THE STAND, WELL, WAIT, THAT IS NOT

23   IN THERE.  DID YOU TELL THAT TO THEM AT THE TIME?

24           HE CAN SAY, YES OR NO.  IF HE SAYS NO, I DIDN'T,

25   THEN HE CAN IMPEACH HIM, MAKE THAT SAME ARGUMENT.

APRIL 10, 2015

```
1              BUT I DON'T AGREE WITH HIM, HIS ANALYSIS, THAT
2    BECAUSE EACH TIME HE PROVIDES MORE DETAILS THAT IT NECESSARILY
3    IS IMPEACHMENT MATERIAL.
4              THE COURT:  WHAT WOULD BE THE AUTHORITY FOR THE
5    REQUEST THAT YOU MADE?  WOULDN'T IT ESSENTIALLY BE ASKING THE
6    COURT TO ORDER MR. HARRIGAN TO MAKE NOTES AND TO RECALL WHAT
7    IT IS THAT MR. YILDIZ SAID ON EACH OF THE FOUR DEBRIEFS?
8              MR. JOHNSTON:  WELL, IT WOULD BE, BECAUSE AGAIN THIS
9    IS AN UNUSUAL CASE.  TYPICALLY THESE STATEMENTS, THESE
10   PROFFERS ARE RECORDED, ORDINARILY BY AN AGENT.  THERE IS NO --
11   I DON'T KNOW IF THAT IS WRITTEN DOWN SOMEWHERE, BUT TYPICALLY
12   STATEMENTS MADE AT PROFFERS, WHICH ARE IMPORTANT TIMES,
13   WHETHER THEY ARE LIES OR TRUTHS, ARE IMPORTANT TO THE
14   GOVERNMENT IF THEY INTEND TO INTRODUCE THE WITNESS.  AND THE
15   REPRESENTATION IS THAT NO AGENTS TOOK NOTES.
16             I THINK WHAT MR. HARRIGAN IS SAYING -- AND PLEASE
17   CORRECT ME IF I AM WRONG -- IS THAT HE MAY HAVE BEEN TAKING
18   NOTES DURING THIS.  BUT HE CAN MAKE HIS ARGUMENT IF HE SAYS
19   THAT IS WORK PRODUCT OR NOT.  I DON'T WANT ALL OF HIS NOTES, I
20   JUST WANT A MEMORIALIZATION OF EXACTLY WHAT IT IS HE SAID ON
21   EACH OCCASION SO TO THE EXTENT THERE ARE DISCREPANCIES OR NEW
22   ADDITIONS OR CHANGES THAT I CAN ADEQUATELY CROSS-EXAMINE A
23   COOPERATING WITNESS AGAINST MY CLIENT.
24             THE COURT:  DID YOU TAKE NOTES?
25             MR. HARRIGAN:  I HAVE VERY SKETCHY NOTES THAT I CAN
```

APRIL 10, 2015

1    BARELY READ THE HANDWRITING.

2           WHAT I RELAYED TO MR. COUGHLIN AT THE TIME IS WHAT I

3    GARNERED FROM THAT MEETING, WHICH WAS ESSENTIALLY, WHEN I GOT

4    HERE I KNEW.

5           AND IT IS FOR SOME OF THE SAME REASONS THAT

6    MR. COUGHLIN PUT IN, ULTIMATELY, LATER ON, HE TOLD ME ABOUT

7    THE LAW ENFORCEMENT, OR, I ASKED THEM IF THEY WERE LAW

8    ENFORCEMENT.  THEN WHEN I WAS AT THE MEETING, YOU KNOW, WE

9    WERE TALKING ABOUT IT.  AND IN FACT I THOUGHT THEY STILL WERE

10   GOVERNMENT AGENTS BECAUSE THEY KEPT ON MENTIONING IRAN, IRAN,

11   IRAN, BUT WAS ASSURED BY MR. GHAHREMAN THAT THEY WERE NOT

12   UNDERCOVER AGENTS BECAUSE HE HAD ASKED THEM.

13          WHERE IT -- WE DID NOT BELIEVE HIM WAS HIS STATEMENT

14   TO US THAT UNTIL HE GOT HERE HE DID NOT KNOW THAT THE GOODS

15   WERE GOING TO IRAN.  AND WE SPENT TIME -- I SPENT TIME

16   CONFRONTING HIM WITH EMAILS, 404(B), STUFF THAT I PROVIDED TO

17   DEFENSE COUNSEL LAST AUGUST, WHICH SHOWS COMMUNICATIONS WHICH

18   SUGGEST HE WOULD HAVE KNOWN WHAT WAS GOING ON HERE.

19          HE SPENT A LOT OF TIME TALKING WITH HIS COUNSEL.

20   HIS COUNSEL APPARENTLY DIDN'T BELIEVE HE WAS TELLING THE WHOLE

21   TRUTH.  AND THAT WAS THE MAJORITY OF THE TIME THAT WAS SPENT.

22   THAT IS WHY THERE IS VERY LITTLE NOTES ABOUT IT.

23          I WOULD ADD THAT IT IS NOT TYPICAL IN PROFFERS THAT

24   WE TAKE NOTES.  IT IS TRUE THAT SOMETIMES WE WRITE REPORTS,

25   BUT DURING THE COURSE OF THIS INVESTIGATION IN AT LEAST THREE

APRIL 10, 2015

```
 1   OF THE MEETINGS WE HAD WITH MR. GHAHREMAN [VERBATIM] AGENT
 2   HAMAKO, OUR CASE AGENT, WAS NOT PRESENT BECAUSE HE WAS
 3   TRAVELING ON BUSINESS OR WAS OUT, SO WE HAD TO USE OTHER
 4   WITNESSES JUST TO BE THERE TO ESCORT HIM OVER SO MR. -- AGENT
 5   HAMAKO, BECAUSE OF THE PRESSING OF TIME, WE DIDN'T HAVE THE
 6   ABILITY TO HAVE HIM THERE.  AND HE'S THE ONE WITH KNOWLEDGE OF
 7   THE CASE.
 8          SO WE MIGHT HAVE HAD NOTES THERE, BUT WE DIDN'T.  HE
 9   WAS THERE AT ONE TIME, BUT AT THE TIME HE DOESN'T HAVE NOTES.
10   I TALKED TO HIM DIRECTLY ABOUT THAT, WHETHER HE HAD NOTES.
11          **THE COURT:**  DO YOU ARGUE THAT YOUR NOTES ARE WORK
12   PRODUCT?
13          **MR. HARRIGAN:**  I DO BELIEVE THEY ARE WORK PRODUCT.
14   I WILL GO BACK THROUGH THEM AND LOOK AT THEM.  TO THE EXTENT I
15   SEE STUFF THAT ISN'T WORK PRODUCT I WILL TURN IT OVER TO
16   MR. JOHNSTON.  AND I AM WILLING TO PROVIDE THEM IN CAMERA TO
17   THE COURT.  BUT THEY REALLY ARE SCRIBBLES, YOU KNOW.  AND I
18   LOOK AT THEM TO SAY, OKAY, THIS IS THE AREA WE ARE TALKING
19   ABOUT.
20          REALLY, THAT WAS PREPARATORY.  THAT WAS A PROFFER
21   SESSION.  THE MORE DETAILED STUFF COMES LATER.  WE COULDN'T
22   EVEN CROSS THE RUBICON OF HIM SAYING, LOOK, I KNEW THIS WAS IN
23   IRAN.
24          AND THE WAY IT HAPPENED IS FINALLY WHEN HE CROSSED
25   THAT RUBICON, AND WE STILL DIDN'T GO INTO GREAT DETAIL, I
```

APRIL 10, 2015

```
 1    PREPARED THE PLEA AGREEMENT.

 2              AS THE COURT MAY RECALL, THIS WAS ALL PRETTY RUSHED

 3    BECAUSE IT WAS RIGHT NEXT TO TRIAL, AND WE WERE POSSIBLY GOING

 4    TO USE THE WITNESS.  SO AT THE TIME I WAS PREPARING OTHER

 5    THINGS, I DIDN'T HAVE THE TIME TO SIT DOWN WITH HIM.

 6              SO THAT EXPLAINS A LOT OF THE MYSTERIES I THINK THAT

 7    MR. JOHNSTON HAS, BUT I WOULD CERTAINLY SAY IT IS NOT THE CASE

 8    THAT WE ALWAYS RECORD, YOU KNOW.  IN FACT, IT IS NOT THE CASE

 9    THAT EVERYBODY IN OUR OFFICE EVEN HAS ATTORNEY NOTES.  SOME

10    DON'T TAKE ATTORNEY NOTES DURING THESE MEETINGS.

11              TO MAKE THAT STATEMENT, THAT IS -- IN MY EXPERIENCE,

12    THAT IS NOT NECESSARILY THE CASE.

13              THE COURT:  ALL RIGHT.

14              THERE MAY WELL BE A WORK PRODUCT PRIVILEGE AS TO

15    COUNSEL'S NOTES, BUT GIVEN THAT MR. HARRIGAN HAS INDICATED HE

16    TOOK SOME NOTES AND IS WILLING TO REVIEW THEM AND SHARE NON

17    WORK PRODUCT MATTERS WITH DEFENSE COUNSEL, I WOULD LIKE TO

18    LEAVE IT AT THAT AND ASK THAT COUNSEL MEET AND CONFER.  AND IT

19    MAY BE THAT YOU CAN SCAN AND EMAIL OR DO SOMETHING WHERE YOU

20    --

21              MR. JOHNSTON:  I PREFER NOT TO HAVE HIS SCRIBBLES,

22    HONESTLY.  I JUST PREFER MR. HARRIGAN TO EITHER -- EVEN ORALLY

23    CONVEY TO ME --

24              MR. HARRIGAN:  THE PROBLEM IS, I DON'T KNOW THEY ARE

25    GOING TO BE MUCH HELP TO HIM.  WHEN I TAKE NOTES IT JOGS MY
```

APRIL 10, 2015

 1    MEMORY, EVEN WHEN I DO WITNESS INTERVIEWS.

 2            **THE COURT:**  ALL RIGHT.  I WILL SIMPLY ASK THAT

 3    COUNSEL MEET AND CONFER AT THE EARLIEST OPPORTUNITY, AND IF

 4    NECESSARY WE CAN ADDRESS THE ISSUE SOMETIME MONDAY.

 5            WITH RESPECT TO EXHIBITS AND OBJECTIONS, IF THERE

 6    ARE EXHIBITS THAT YOU KNOW YOU ARE GOING TO OBJECT TO, I WOULD

 7    PREFER TO HANDLE THOSE OUTSIDE THE PRESENCE OF THE JURY,

 8    PERHAPS FIRST THING MONDAY MORNING OR IN THE AFTERNOON AFTER

 9    WE RECESS THE JURY.  OR WE CAN ADDRESS OBJECTIONS LIVE IN THE

10    PRESENCE OF THE JURY, I AM OKAY WITH THAT.  BUT TO THE EXTENT

11    THERE ARE SOME MORE SIGNIFICANT ISSUES INVOLVED AND TIME IN

12    SESSION OUTSIDE THE PRESENCE OF THE JURY WOULD BE HELPFUL, I

13    WOULD INVITE THAT.

14            **MR. JOHNSTON:**  I APPRECIATE THAT.  I THINK WHEN THE

15    GOVERNMENT GIVES US THEIR EXHIBIT LIST WE CAN MAYBE ZERO IN ON

16    SOME EXHIBITS AND BE READY TO DO THOSE.  I DON'T KNOW FIRST

17    THING MONDAY MORNING, BUT AT SOME POINT BEFORE THEY COME IN.

18            I KNOW THAT MR. CAMDEN WANTED TO RAISE ONE

19    ADDITIONAL ISSUE CONCERNING -- THE PROBLEM WE HAVE, THE

20    GOVERNMENT'S PRESENTATION OF THE CASE WILL INVOLVE A

21    SUBSTANTIAL AMOUNT OF EVIDENCE ABOUT THE Y-690 TRIODE TUBE,

22    WHICH WAS REPRESENTED BY DAVID MILLS, WHICH IS THE UNDERCOVER

23    NAME FOR AGENT DAVID COLE, REPRESENTED TO MR. GHAHREMAN

24    THROUGHOUT THE SIX-MONTH INVESTIGATION THAT THESE WERE ITAR

25    CONTROLLED ITEMS -- OR HE DIDN'T SAY ITAR CONTROLLED, HE SAID

                         APRIL 10, 2015

1   THEY WERE MUNITIONS THAT REQUIRED AN EXPORT LICENSE TO ANY

2   COUNTRY IN THE WORLD.

3            IT TURNS OUT THAT THAT IS NOT TRUE.  THE DEPARTMENT

4   OF STATE ULTIMATELY DID A SECOND-LEVEL REVIEW AND SAID THAT

5   THAT IS NOT THE CASE.  BUT I WILL LET MR. CAMDEN SPEAK ON

6   THIS.

7            WE HAVE A GRAVE CONCERN THAT A MOUNTAIN OF EVIDENCE

8   CONCERNING AN ALLEGED ILLEGAL VIOLATION IS GOING TO COME IN.

9   THE GOVERNMENT IS GOING TO TRY TO USE THE CIRCUMSTANTIAL

10  EVIDENCE TO PROVE THAT MR. GHAHREMAN WAS WILLFULLY VIOLATING

11  DIFFERENT AND DISTINCT LAWS.  BUT WE FEEL LIKE SOME SORT OF

12  LIMITING INSTRUCTION IS GOING TO NEED TO BE GIVEN BY THE

13  COURT, AND PREFERABLY BEFORE THESE WITNESSES TESTIFY, NOT AT

14  THE END OF A TWO-WEEK TRIAL.  WE HAVE A PROPOSED INSTRUCTION.

15           **MR. COUGHLIN:**  WE WOULD BE HAPPY TO LOOK AT THAT,

16  YOUR HONOR.  AND AS TO WHAT COUNSEL IS INDICATING, WE

17  CERTAINLY UNDERSTAND THAT HALFWAY THROUGH OUR DEALING WITH THE

18  COMPANY THAT WAS DEALING WITH THE Y-690, THEY WERE UNDER THE

19  IMPRESSION THAT IT WAS SOMEHOW CONTROLLED.

20           BUT I WOULD INDICATE TO YOU THAT THE GOVERNMENT IS

21  NOT GOING TO TRY TO LEAN HEAVILY ON THAT AT ALL IN CONNECTION

22  WITH WHAT THE REALITY WAS.  IF ANYTHING, THE GOVERNMENT'S

23  POSITION WOULD SIMPLY BE THAT, DESPITE THIS ADDITIONAL KIND OF

24  HURDLE THAT WAS PUT OUT IN FRONT OF MR. GHAHREMAN ABOUT THAT

25  MAYBE THERE WAS AN EXPORT LICENSE REQUIRED IN ADDITION TO END

APRIL 10, 2015

```
 1   USER INFORMATION, THAT DIDN'T SEEM TO FAZE HIM IN ANY WAY,

 2   SHAPE OR FORM.

 3           SO IN THAT SENSE, THAT WOULD BE THE INFERENCE WE

 4   WOULD BE DRAWING FROM ANY KIND OF ADDITIONAL INFORMATION.  IT

 5   IS NOT THAT THIS WAS A SPECIALLY CONTROLLED ITEM, DEFENSE

 6   ITEM.  SO I THINK THERE IS A LITTLE BIT OF A DISCONNECT IN

 7   TERMS OF HOW WE PLAN TO MAKE USE OF THAT, BECAUSE THE

 8   GOVERNMENT WOULD READILY ADMIT THAT THE INITIAL CONTACT WITH

 9   THE MANUFACTURER GAVE US THE WRONG IMPRESSION, AND EVEN OUR

10   INITIAL CONTACT WITH THE DEPARTMENT ABOUT WHETHER OR NOT IT IS

11   CONTROLLED IS A LITTLE BIT DIFFERENT.

12           IN OTHER WORDS, IT IS THERE, BUT WE ARE NOT GOING

13   TO -- THAT IS NOT A HEAVY HIT OF WHAT WE ARE TRYING TO PRESENT

14   IN CONNECTION WITH THIS CASE.

15           THE COURT:  DO YOU OBJECT TO THIS PROPOSED LIMITING

16   INSTRUCTION, OR DO YOU NEED ADDITIONAL TIME TO CONSIDER IT?

17           MR. HARRIGAN:  AT MY FIRST GLANCE, I WILL TAKE MORE

18   TIME READING IT, YOUR HONOR, BUT I OBJECT.

19           I MEAN, IT STARTS OUT BY TALKING ABOUT A WITNESS WHO

20   GAVE STATEMENTS THAT WERE FACTUALLY -- THE STATEMENTS --

21   NEITHER OF THE STATEMENTS IS FACTUALLY CORRECT.  IT PAINTS THE

22   WITNESS AS HAVING TOLD HIM SOMETHING -- AND GRANTED UNDERCOVER

23   AGENTS CAN LIE, BUT THEY WERE FACTUALLY CORRECT AT THE TIME

24   THE AGENT MADE THE STATEMENT.

25           THEY MAY WANT TO DIVORCE THE MILITARY ASPECT, BUT IT
```

APRIL 10, 2015

1  IS MR. GHAHREMAN WHO BROUGHT THAT INTO THE CASE.  HE COULD

2  HAVE VERY WELL SAID, MILITARY?  ELECTRONICS?  NEED SPECIAL

3  LICENSE?  I DON'T WANT ANYTHING TO DO WITH IT.

4          IN FACT HE SAID, THAT'S OKAY.  I AM SURE WE DON'T

5  WANT TO USE OUR END USER, YOU USE YOURS.

6          NOW, IT IS A DIFFERENT THING -- I DON'T KNOW WHAT

7  THEY WERE USING IT FOR.  I KNOW IT WAS GOING TO IRAN, IT COULD

8  HAVE BEEN MILITARY, IT COULD HAVE BEEN CIVIL.  HE CLAIMS

9  CIVIL.

10          BUT THE FACT IS -- I UNDERSTAND THEIR CONCERN WITH

11  THE PREJUDICE.  THE INSTRUCTION TO ME WOULD BE -- THIS

12  INSTRUCTION DOESN'T SEEM TO COVER THEIR CONCERNS.  IN FACT, IT

13  SEEMS TO SUGGEST SOMEHOW THAT THE GOVERNMENT WAS PRESENTING

14  FALSE INFORMATION TO THE AGENT, WHICH AN UNDERCOVER AGENT CAN

15  DO.  BUT THE EVIDENCE AT TRIAL WILL SHOW THAT WHEN THEY

16  REQUESTED IT, DEFENDANT REQUESTED IT, WE DIDN'T PUT THIS IN

17  THEIR MIND, WE LOOKED AT IT, WE CONTACTED THE MANUFACTURER,

18  CPI, THEY SAID THIS WAS MADE FOR MILITARY AIRBORNE RADAR.

19          WE HAD CONVERSATIONS, THE UNDERCOVER AGENT DID, WITH

20  DEFENDANT, SAID, THIS IS ELECTRONIC WARFARE.

21          THOSE ARE THE WORDS HE USED.

22          IT IS DIFFERENT.  YOU UNDERSTAND THAT.  WE HAVE

23  RISKS WE ARE TAKING.  THIS IS DIFFERENT EVEN THAN A

24  NAVIGAT-2100.  IT NOT ONLY CAN'T GO TO IRAN, ESSENTIALLY, IT

25  CAN'T GO ANYWHERE OUT OF THE UNITED STATES WITHOUT A LICENSE.

APRIL 10, 2015

1      NOW, WE LATER FOUND, AS I SAID, THIS WAS NOT CORRECT

2   BY SECOND-LEVEL INFORMATION, BUT WHY THIS IS RELEVANT, WHY IT

3   IS IMPORTANT IS NOT BECAUSE IT IS MILITARY, NECESSARILY, BUT

4   IT IS BECAUSE HE DIDN'T CARE.  HE WAS WILLING TO VIOLATE THE

5   LAW NO MATTER HOW SENSITIVE IT WAS.

6      I THINK THE GOVERNMENT SHOULD BE ABLE TO ARGUE THAT.

7   HE DIDN'T CARE, NO MATTER HOW SENSITIVE IT WAS.  WE ARE NOT

8   SAYING HE IS GETTING ON A SHIP OR GETTING ANYWHERE AND RIDING

9   A PLANE.  WE ARE NOT CLAIMING HE IS AN IDEOLOGUE FOR IRAN.

10  THE FACT IS, HE DID THIS FOR MONEY.  AND HE WAS WILLING TO

11  VIOLATE ANY LAW OF THE UNITED STATES TO GET THAT FOR CASH.

12  AND WE SHOULD BE ABLE TO ARGUE THAT.

13      I THINK THIS INSTRUCTION HERE SUGGESTS SOMEHOW -- IT

14  TEMPERS WHAT REASONABLE INFERENCES THE JURY CAN DRAW AND WE

15  CAN DRAW FROM THE EVIDENCE.

16          **THE COURT:**  I WILL --

17          **MR. CAMDEN:**  IF I COULD JUST SAY A COUPLE OF WORDS.

18          **THE COURT:**  YES.

19          **MR. CAMDEN:**  SO THERE ARE TWO CONCERNS WITH THE

20  Y-690 EVIDENCE.  THEY ARE GOING TO HEAR THAT STATEMENTS WERE

21  MADE TO MR. GHAHREMAN THAT THIS IS A MUNITION, A CONTROLLED

22  MUNITION.  AND I UNDERSTAND THAT THEY DIDN'T GET THE FINAL

23  DETERMINATION FROM THE STATE DEPARTMENT UNTIL AFTER -- I

24  BELIEVE AFTER THE ARREST HAD HAPPENED, PROBABLY AFTER THE

25  INDICTMENT WAS ISSUED IN JULY OF 2013 WAS THE FIRST THEY HEARD

APRIL 10, 2015

1    FROM THE STATE DEPARTMENT THAT THIS IS ACTUALLY NOT A

2    MUNITION.  SO IT IS NOT NECESSARILY BAD FAITH ON THE PART OF

3    THE UNDERCOVER OR ANYTHING LIKE THAT.

4         THERE ARE TWO 403 PROBLEMS WITH THE JURY HEARING

5    THAT, THOUGH, YOUR HONOR.  THE FIRST IS CONFUSION OF THE

6    ISSUES.  I THINK WE GOT A GOOD PREVIEW OF THAT RIGHT NOW.

7         IEEPA AND ITAR -- AND BY IEEPA I AM REFERRING TO THE

8    IRAN EXPORT SANCTIONS WHICH ONLY COVER ANY GOODS, REGARDLESS

9    OF THEIR PURPOSE, THAT GO TO THE TERRITORY OF IRAN OR THE

10   GOVERNMENT OF IRAN.  THEN YOU HAVE GOT ITAR, WHICH IS NOT

11   BASED ON THE DESTINATION BUT IS BASED ON TYPE OF GOODS AND

12   REQUIRES A SPECIAL EXPORT LICENSE ONLY FOR MUNITIONS.  AND THE

13   VIOLATION OF THE STATUTE UNDER 50 USC 1705, HOW MR. GHAHREMAN

14   IS CHARGED, HAS TO BE WILLFUL.

15        WE ARE PROBABLY GOING TO HAVE A DEBATE IN THE JURY

16   INSTRUCTIONS ABOUT HOW EXACTLY WILLFUL, BUT WILLFUL, AT LEAST

17   IN THE NINTH CIRCUIT, IS DEFINED AS THE VIOLATION OF A KNOWN

18   LEGAL DUTY.

19        SO ESSENTIALLY WHAT THEY ARE DOING IS THEY ARE

20   HAVING THE UNDERCOVER OFFICER, WHETHER IN GOOD FAITH -- EVEN

21   IF IT IS IN GOOD FAITH, TELL MR. GHAHREMAN THAT THIS VIOLATES

22   A CERTAIN -- ONE REGULATION.  AND THEN THEY ARE GOING TO USE

23   THE EVIDENCE THAT HE DOESN'T CONTEST OR DOESN'T DISPUTE THAT

24   OR DOESN'T ARGUE WITH THE UNDERCOVER ABOUT IT AS EVIDENCE OF A

25   WILLFUL VIOLATION OF A COMPLETELY DIFFERENT STATUTE.

APRIL 10, 2015

1    SO THE INSTRUCTION IS INTENDED TO LIMIT THE JURY TO

2  SAY, LIKE, THE INTENT HE IS CHARGED WITH IS THE INTENT TO

3  VIOLATE IEEPA, NOT THE INTENT TO VIOLATE ITAR.  AND TO MAKE

4  SURE THAT THEY CAN MAKE THAT DISTINCTION AS THEY ARE LISTENING

5  TO THE EVIDENCE.

6    WHAT THEY ARE GOING TO HEAR AND WHAT THE GOVERNMENT

7  IS, I AM AFRAID, WAS GOING TO ARGUE WAS EXACTLY WHAT WE HEARD

8  MR. HARRIGAN SAY NOW IS, HE JUST INTENDED TO VIOLATE THE LAW

9  AND THAT IS ENOUGH.

10    AND IT IS NOT.  A VIOLATION OF THE STATUTE HAS TO BE

11  A WILLFUL VIOLATION OF THE IRAN EXPORT SANCTIONS.

12    SO THAT IS THE FIRST 403, IS CONFUSION OF THE

13  ISSUES.

14    THE SECOND 403 PROBLEM, YOUR HONOR, IS JUST THE

15  INHERENT EMOTIONAL REACTION THE JURY IS GOING TO HAVE WHEN

16  THEY HEAR THAT, OH, MY GOD, THESE ARE NOT JUST IPHONES, IPADS

17  OR COMPUTERS, THESE ARE MILITARY APPLICATIONS OR MILITARY

18  ITEMS THAT ARE BEING EXPORTED.

19    I HAVE GOT SOME OTHER ISSUES WITH THAT.

20    THE GOVERNMENT SENT A LETTER ON MARCH 10TH SAYING

21  THAT MR. COX FROM CPI, WHO MANUFACTURES THE Y-690'S, IS GOING

22  TO TESTIFY.  THE LETTER PROVIDED A SUMMARY AND SAID THE

23  GOVERNMENT WASN'T SAYING WHETHER IT WAS GOING TO BE AN EXPERT

24  OR NOT, BUT JUST OUT OF AN ABUNDANCE OF CAUTION A SUMMARY OF

25  HIS TESTIMONY.  AND ONE OF THE THINGS HE WAS GOING TO TESTIFY

APRIL 10, 2015

28

1   TO WAS THAT THE Y-690 HAS BOTH CIVILIAN AND MILITARY

2   APPLICATIONS.  IT WAS DESIGNED, I BELIEVE, AS A TRANSPONDER

3   FOR -- IT SAYS MILITARY AND AIRBORNE RADAR APPLICATIONS.

4         SO WHAT WE KNOW, THOUGH, FROM THE FACT THAT THE

5   STATE DEPARTMENT EVENTUALLY CLASSIFIED THIS AS NOT A

6   MUNITION -- IF YOU LOOK AT THE DEFINITION OF MUNITION, IT IS

7   EVEN SOMETHING THAT WAS DESIGNED AS A -- FOR MILITARY USE IS

8   NOT CLASSIFIED AS A MUNITION IF IT NOW, AT THE TIME OF THE

9   CERTIFICATION, HAS A PREDOMINANTLY CIVILIAN APPLICATION.

10        SO I GOT THE LETTER THAT MR. COX IS GOING TO

11  TESTIFY, YES, IT HAS MILITARY AND CIVILIAN USES.  I FIGURED WE

12  WOULD BE ABLE TO, ON CROSS-EXAMINATION, ELICIT SOME THE

13  CIVILIAN USES, BECAUSE HIS TESTIMONY ON DIRECT IS GOING TO BE

14  VERY SPECIFIC ABOUT THE SPECIFIC MILITARY USE.  I THINK OUR

15  CROSS HAS TO BE EQUALLY SPECIFIC ABOUT THE OTHER SPECIFIC

16  CIVILIAN USES.

17        I CALLED HIM UP THE OTHER DAY, MR. COX, AND HE

18  ACTUALLY SPOKE WITH ME.  I HAD AN INVESTIGATOR PRESENT FOR A

19  LITTLE BIT.  HE SAID HE DOESN'T KNOW WHAT CIVILIAN USES THERE

20  ARE, AT ALL.

21        SO THERE IS A LITTLE BIT OF DISCONNECT BETWEEN CPI,

22  THE REPRESENTATIVE, THE MANUFACTURER THAT IS GOING TO APPEAR

23  IN COURT AND THE STATE DEPARTMENT'S DETERMINATION.

24        I CONTACTED MR. HARRIGAN, AND I BELIEVE MR. COUGHLIN

25  ALSO SPOKE WITH MR. COX.  WE DON'T BELIEVE HE HAS BEEN ABLE TO

APRIL 10, 2015

1    GET ANY INFORMATION.  SO WE FILED A MOTION IN LIMINE ASKING TO

2    PRECLUDE TESTIMONY ABOUT THE USE OF THE PRODUCT.  AND THE

3    COURT DENIED THAT, AND I UNDERSTAND IT.  BUT WE HAVE STILL GOT

4    TO LIMIT THE POTENTIAL FOR THE JURY TO DECIDE THIS ON AN

5    EMOTIONAL BASIS IF THEY HEAR MUNITIONS OR MILITARY.

6          SO THE WAY I WAS GOING TO DO THAT WAS THROUGH

7    CROSS-EXAMINATION OF MR. COX, WHICH I WAS PREPARING BASED ON

8    THE LETTER WE GOT SAYING THERE WERE CIVILIAN USES.  BUT IT

9    APPEARS NOW THAT IS NOT GOING TO BE SPECIFIC ENOUGH.

10          THERE IS A COUPLE OPTIONS.  I KNOW THAT THE

11   DEPARTMENT OF STATE HAD TO DETERMINE THAT THIS WAS A

12   PREDOMINANTLY CIVILIAN USE ITEM IN ORDER TO MAKE THE

13   DETERMINATION THEY DID ON JULY 3RD, 2013.  PRESUMABLY THE

14   DEPARTMENT OF STATE HAS -- I AM SURE THE PROSECUTORS IN THIS

15   PARTICULAR CASE DON'T HAVE THOSE DOCUMENTS.  I SPOKE TO MR.

16   HARRIGAN, HE SAYS HE DOESN'T, AND I BELIEVE HIM.  BUT I STILL

17   THINK WE NEED THOSE DOCUMENTS.

18          I KNOW THAT DHS WAS THE ONE THAT MADE THE REQUEST TO

19   THE DEPARTMENT OF STATE FOR THESE, SO I KNOW THAT -- THE

20   DEPARTMENT OF STATE CERTIFICATION.  THEY ALSO GOT A PRETRIAL

21   CERTIFICATION.  SO THIS IS, I THINK, THE DEPARTMENT OF STATE

22   IS INVOLVED IN THE CERTIFICATION PROCESS IN THE INVESTIGATION

23   AND PROSECUTION OF THIS OFFENSE.

24          SO I THINK -- MY FIRST ARGUMENT I THINK IS THAT THAT

25   INFORMATION ON THE CIVILIAN USES IS GOING TO BE BRADY.  IT IS

APRIL 10, 2015

1  SOMETHING I CAN USE TO CROSS-EXAMINE ONE OF THE GOVERNMENT

2  WITNESSES TO TRY TO MITIGATE THE POSSIBILITY OF UNFAIR

3  PREJUDICE AND MAKE SURE THE JURY IS NOT OVERWHELMED BY THE

4  FACT THAT THIS IS A WILLINGNESS TO EXPORT A MILITARY ITEM.

5          IF NOT, YOUR HONOR, I HAVE PREPARED A REQUEST FOR --

6  IF THE COURT DETERMINES IT IS NOT BRADY OR NOT WITHIN THE

7  CONSTRUCTIVE, EVEN, POSSESSION OF THE GOVERNMENT, I HAVE

8  PREPARED A REQUEST FOR A SUBPOENA TO THE DEPARTMENT OF STATE,

9  WHICH COULD EITHER BE THE RECORDS THEY RELIED ON -- MR. COX

10 DIDN'T EVEN KNOW WHAT THE DEPARTMENT OF STATE HAD RELIED ON TO

11 MAKE THIS DETERMINATION -- OR JUST A LETTER FROM WHOEVER --

12 WHATEVER PERSON DETERMINED THAT THIS IS NOT A MUNITION SAYING

13 THESE ARE THE CIVILIAN APPLICATIONS OF Y-690.  IF WE COULD GET

14 EVEN JUST A LETTER LIKE THAT.  I HAVE A SUBPOENA THAT WOULD

15 COVER THAT, AND I WOULD ASK FOR THE COURT TO BE ABLE TO

16 PROVIDE US -- OR TO ORDER THAT INFORMATION PROVIDED IN ONE WAY

17 OR THE OTHER.

18          **THE COURT:**  DO YOU HAVE THE SUBPOENA NOW?

19          **MR. CAMDEN:**  I HAVE COPIES NOW.

20          **THE COURT:**  I THINK THAT WOULD BE -- I AM PREPARED

21 TO SIGN THAT SUBPOENA.  I AM NOT SURE IT IS BRADY IN THAT I

22 DON'T KNOW IF THERE IS ANYTHING IMPEACHING, RATHER IT APPEARS

23 TO BE MORE OF KIND OF A GENERAL DISCOVERY INFORMATIONAL SEARCH

24 THAT WOULD BE MORE APPROPRIATE FOR A SUBPOENA.

25          **MR. CAMDEN:**  YOUR HONOR, I HAVE ATTACHED TO THE

APRIL 10, 2015

1   APPLICATION COPIES OF THE LETTER FROM THE DEPARTMENT OF STATE,

2   I BELIEVE, AND THE SUMMARY LETTER THE GOVERNMENT PROVIDED

3   ABOUT MR. COX'S TESTIMONY.

4           **THE COURT:**  MR. HARRIGAN, ANYTHING ON THIS?

5           **MR. HARRIGAN:**  I AGREE WITH YOUR HONOR.  I DON'T SEE

6   HOW IT IS BRADY AT ALL.

7           I WOULD SUGGEST -- AND I UNDERSTAND DEFENSE

8   COUNSEL'S CONCERNS.  I THINK WE ARE ALL IN AGREEMENT HE IS NOT

9   CHARGED WITH ITAR, ALL RIGHT.  AND EVIDENCE OF THAT BEING A

10  MUNITION IS ONLY COMING IN FOR THE LIMITED PURPOSES OF SHOWING

11  HIS WILLFUL VIOLATION OF THE LAW.

12          I WOULD DISAGREE, THOUGH, WITH THIS CHARACTERIZATION

13  OF THIS CONFUSION ABOUT WHAT THE GOVERNMENT HAS TO PROVE.

14  UNDER THE MOUSAVI CASE WE DON'T HAVE TO PROVE THAT HE KNEW IT

15  WAS A VIOLATION OF A SPECIFIC REGULATION, WE JUST HAVE TO

16  PROVE HIS ACTS WERE IN VIOLATION OF LAW.

17          THE FACT THAT HE WAS WILLING TO VIOLATE THE ITAR,

18  ALL RIGHT, OR THE ARMS EXPORT CONTROL ACT IS RELEVANT AND

19  CIRCUMSTANTIAL EVIDENCE OF HIS WILLINGNESS TO VIOLATE THE LAW.

20  PLUS OUR ARGUMENT IS WE STILL HAVE TO SHOW THAT BASICALLY THIS

21  WAS GOING -- HE INTENDED -- OR, NUMBER ONE, AGREED WITH OTHERS

22  THAT THIS WAS GOING TO GO, THE Y-690, TO IRAN.  OKAY.

23          AND THAT IS REALLY OUR ARGUMENT, BECAUSE WHETHER IT

24  WAS ITAR OR NOT, I MEAN, A MUNITION OR NOT, IT COULDN'T GO TO

25  IRAN, EITHER WAY, WITHOUT A LICENSE.  SO THE FACT -- THIS IS

1    WHAT WE ARGUED BEFORE.  THE RELEVANCE OF THE MILITARY

2    APPLICATION REALLY IS TO HIS STATE OF MIND AND WILLINGNESS.

3    AND I THINK THE MOST WE WOULD ARGUE IS WHAT I JUST ARGUED

4    THERE IS, HE DIDN'T CARE WHEN TOLD IT WAS.

5           **THE COURT:**  ON THIS ISSUE I WILL REVIEW THE PROPOSED

6    LIMITING INSTRUCTION AND WORK WITH IT.  IT MAY BE WARRANTED.

7    AND, IF SO, THEN THE QUESTION IS IN WHAT TERMINOLOGY.  AND I

8    CAN WORK WITH THAT.

9           THIS ALSO MAY BE AN AREA WHERE THE PARTIES CAN

10   STIPULATE, AND SO I WILL ENCOURAGE COUNSEL TO MEET AND CONFER.

11   IT MAY BE THE SUBJECT OF A STIPULATION THAT CAN BE READ.

12          **MR. CAMDEN:**  I AM NOT SURE IF WE KNOW THE FACTS THAT

13   WE COULD STIPULATE TO.  I THINK IF THE GOVERNMENT WERE TO FIND

14   OUT EITHER FROM MR. COX OR THE DEPARTMENT OF STATE WHAT THE

15   CIVILIAN USES ARE, WE WOULD HAVE NO PROBLEM WITH JUST A

16   STIPULATION.  WE DON'T NEED TO HAVE IT ACTUALLY LIVE TESTIMONY

17   OR DOCUMENTS, JUST THE INFORMATION AS SPECIFIC ON THE CIVILIAN

18   USES AS ON THE MILITARY USES THAT THE GOVERNMENT IS GOING TO

19   ELICIT.

20          **MR. HARRIGAN:**  I WILL DO THAT.  I WILL BE IN TOUCH

21   WITH MR. COX THIS AFTERNOON, AND LET HIM KNOW THAT COUNSEL IS

22   VERY ADAMANT ABOUT UNDERSTANDING WHAT ARE SOME OF THE CIVILIAN

23   USES OF THE Y-690, AND WE WILL GET THAT TO HIM WITHOUT DELAY.

24          **THE COURT:**  VERY GOOD.

25          **MR. CAMDEN:**  JUST EVEN CALL SOMEBODY BACK AT CPI AND

APRIL 10, 2015

```
 1   GET SOME INFORMATION.  WE WOULD BE WILLING TO ACCEPT THOSE
 2   REPRESENTATIONS.
 3          MR. COUGHLIN:  THE OTHER ISSUE THAT WE WERE SPEAKING
 4   ABOUT HAD TO DO WITH EXHIBITS, AND IF COUNSEL HAS FINISHED I
 5   HAVE ONE REQUEST.
 6          THE COURT:  YES.
 7          MR. CAMDEN:  I HAVE GOT ONE MORE ISSUE, NOT RELATED
 8   TO THIS.
 9          THE COURT:  OKAY.
10          MR. CAMDEN:  I CAN FINISH.
11          I HAD FILED A MOTION TO SUPPRESS THE RESULTS OF THE
12   SEARCH WARRANTS.  AND THE GOVERNMENT -- I SPOKE AT THE HEARING
13   ABOUT EMAILS WE HAD RECEIVED IN DISCOVERY THAT WERE PART OF
14   ATTACHMENT B THAT DID NOT SEEM TO BE RESPONSIVE.  I MENTIONED
15   CAT PICTURES AND I MENTIONED LOVE LETTERS.
16          BUT I REALIZE NOW THAT I DIDN'T PUT ANY OF THOSE IN
17   THE RECORD, AND I AM AFRAID WHEN WE GET UP ON APPEAL THEY ARE
18   GOING TO SAY, WELL, YOU TALKED ABOUT THEM BUT YOU NEVER
19   SUBMITTED ANYTHING.  I AM NOT ASKING THE COURT TO REVISIT THE
20   RULING ON THE SEARCH WARRANTS, I JUST WANT TO MAKE SURE THE
21   RECORD IS COMPLETE.
22          THE COURT:  OKAY.
23          MR. CAMDEN:  I HAVE GOT A PACKET OF THOSE EMAILS.  I
24   AM ASKING TO FILE THEM UNDER SEAL JUST BECAUSE, ONE, IT
25   CONTAINS THE INFORMATION WE RECEIVED UNDER THE PROTECTIVE
```

APRIL 10, 2015

1    ORDER, BUT, TWO, OUR ARGUMENT IS THAT THIS STUFF WAS PRIVATE

2    AND NEVER SHOULD HAVE BEEN DISCLOSED IN THE FIRST PLACE, SO TO

3    FORCE US TO FILE IT IN A PUBLIC RECORD THAT COULD BE ACCESSED

4    BY ANYBODY WOULD SEEM TO BE -- NOT JUST IRONIC.

5              **THE COURT:**  ANY OBJECTION?

6              **MR. HARRIGAN:**  I HAVE NO OBJECTION TO FILING UNDER

7    SEAL, YOUR HONOR.  I DO OBJECT TO IT BEING PART OF THE RECORD

8    JUST -- I KNOW THE COURT IS GOING TO ACCEPT IT, AND WOULD JUST

9    MAKE THE FOLLOWING OFFER OF PROOF.

10             IT IS APPROXIMATELY FIVE EMAILS, AND I WOULD POINT

11   OUT THERE WERE HUNDREDS, IF NOT THOUSANDS, OF EMAILS IN THE 11

12   SEARCH WARRANTS WE DID.  AND THAT IT ISN'T A REPRESENTATIVE

13   SAMPLE OF WHAT WAS ACTUALLY SEIZED IN THE CASE, AND COUNSEL

14   HAS NOT PROVIDED THE COURT WITH A RECORD OF, IN THE GENERAL

15   PERCENTAGE OF THINGS.

16             AS YOUR HONOR KNOWS, THINGS MAY HAPPEN WHERE SOME

17   EMAILS GET SEIZED.  YOU ARE GOING THROUGH A LOT, LIKE SPAM,

18   YOU TRY TO CUT THAT OUT.  BUT JUST BECAUSE THAT HAPPENS THAT

19   DOESN'T MEAN THAT THE ENTIRE WARRANT IS BAD.  AND TO SUGGEST

20   THAT THESE FIVE EMAILS REPRESENT, YOU KNOW, WHAT THE AGENT DID

21   IN THE SEARCHES OF ALL THOSE EMAIL ACCOUNTS I DON'T THINK IS

22   ACCURATE.

23             **THE COURT:**  ALL RIGHT.  I HAVE SIGNED THE ORDER.

24             **MR. CAMDEN:**  THANK YOU, YOUR HONOR.  THOSE ARE NOT

25   ALL OF THE NONRESPONSIVE EMAILS, THOSE ARE JUST A FEW

APRIL 10, 2015

45

1    REPRESENTATIVE SAMPLE.

2              **THE COURT:**  MR. COUGHLIN, YOU HAD AN ISSUE?

3              **MR. COUGHLIN:**  YOUR HONOR, I SENT COUNSEL A COPY OF

4    FIVE PHOTOGRAPHS THAT I WOULD LIKE TO USE IN MY OPENING.  I

5    THINK IT WAS A PHOTOGRAPH OF MR. TAHERKHANI, A PHOTOGRAPH OF

6    MR. YILDIZ, A TIG MARINE WEBSITE, AND THEN A PHOTOGRAPH OF THE

7    NAVIGAT-2100 AND THE Y-690.  I JUST WANT TO USE IN MY OPENING,

8    THOSE.  I DON'T THINK THERE WILL BE AN OBJECTION TO THOSE WHEN

9    THEY COME IN DURING OUR CASE IN CHIEF.

10             **MR. JOHNSTON:**  THERE IS NOT.  I MEANT TO TELL

11   MR. COUGHLIN THAT BEFORE THE HEARING.  BUT I DON'T OBJECT TO

12   THE SLIDES.

13             **THE COURT:**  ALL RIGHT.

14             **MR. COUGHLIN:**  THANK YOU.

15             **THE COURT:**  ARE THERE ANY OTHER MATTERS?

16             **MR. JOHNSTON:**  YOUR HONOR, I HAVE ONE EX PARTE AT

17   THE END.

18             **THE COURT:**  ALL RIGHT.

19             **MR. JOHNSTON:**  NOTHING ELSE.

20             **MR. COUGHLIN:**  NO, YOUR HONOR.  NOT FROM THE

21   GOVERNMENT.

22             **THE COURT:**  ALL RIGHT.  LET'S RECESS AT THIS TIME,

23   RECONVENE AT 8:45 ON MONDAY.

24             MR. JOHNSTON WOULD YOU LIKE TO MEET SIDEBAR ON THE

25   RECORD EX PARTE?

APRIL 10, 2015

```
 1            MR. JOHNSTON:  THAT IS FINE, YOUR HONOR.  HOWEVER
 2    YOU WANT TO DO IT.
 3            THE COURT:  THAT WOULD BE FINE.
 4            MR. JOHNSTON:  IT IS A MINOR MATTER.
 5            THE COURT:  YES.
 6            (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD AT
 7            THE BENCH, OUT OF THE HEARING OF THE JURY)
 8            MR. JOHNSTON:  I WANT TO CHECK ON THE STATUS OF THE
 9    17(B) SUBPOENA AND MOTION THAT I SUBMITTED TO THE COURT.
10            THE COURT:  I SIGNED IT.
11            MR. JOHNSTON:  YOU DID.  OKAY.
12            THE COURT:  I THINK YESTERDAY.
13            MR. JOHNSTON:  OKAY.  I WILL CHECK AT THE OFFICE,
14    MAKE SURE TO GET IN TOUCH WITH THE MARSHALS AS SOON AS
15    POSSIBLE.
16            THE COURT:  AS SOON AS I GOT IT, I SIGNED OFF.
17            MR. JOHNSTON:  I WILL CONTACT THE MARSHAL KNOWING
18    THAT.
19            THE COURT:  VERY GOOD.
20
21                      *   *   *
22            I CERTIFY THAT THE FOREGOING IS A CORRECT
              TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
23            IN THE ABOVE-ENTITLED MATTER.
24            S/LEEANN PENCE                   6/17/2015
25            LEEANN PENCE, OFFICIAL COURT REPORTER   DATE
```

APRIL 10, 2015